**IN THE UNITED STATES DISTRICT COURT FOR**

**THE EASTERN DISTRICT OF WASHINGTON**

FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAY 0 6 2024

SEAN F. McAVOY, CLERK
SPOKANE, WASHINGTON

DENNIS SHELDON BREWER, Individually,
1210 City Pl, Edgewater, NJ 07020,

and on Behalf of All Others Similarly Situated,

Plaintiffs,

Civil Action No.: 2:24-cv-00149-MKD

v.

**Known Federal Defendants, Official
Capacity:**

William Burns
Director
Central Intelligence Agency (CIA)
Washington, DC 20505
(505) 855-6744,

Christopher Wray
Director, Federal Bureau of Investigation (FBI)
935 Pennsylvania Avenue, NW
Washington, District of Columbia 20535-0001
202-324-3000,

Merrick Garland
Attorney General of the United States (DOJ)
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC, 20530-0001
202-514-2000,

Ronald Davis
Director
United States Marshals Service (USMS)
1215 S. Clark St.
Arlington, VA 22202,

Avril Haines
Director of National Intelligence (DNI)

**COMPLAINT FOR INJUNCTIVE
RELIEF AND CIVIL DAMAGES**

**DEMAND FOR JURY TRIAL**

Office of the Director of National Intelligence
1201 New York Avenue NW. Suite 500
Washington, DC 20005,

Lloyd Austin
Secretary of Defense (DOD)
1000 Defense Pentagon
Washington, DC 20301-1000
703-571-3343,

Christine Wormuth
Secretary of the Army (ARMY)
101 Army Pentagon
Washington, DC 20310,

Dr. Stefanie Tompkins
Director, Defense Advanced Research Projects
Agency (DARPA)
675 North Randolph Street
Arlington, VA 22203-2114
(703) 526-6630,

Alejandro Mayorkas
Secretary
Department of Homeland Security (DHS)
245 Murray Lane, SW
Washington, DC 20528-0075
202-282-800,

Kimberly Cheatle
Director
United States Secret Service (USSS)
245 Murray Ln SW - BLDG T-5
Washington, DC 20223
202-406-5708,

Xavier Becerra
Secretary
Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201,

Jeanne Marrazzo, M.D., M.P.H.

Director
National Institute of Allergy and Infectious
Diseases (NIAID)
5601 Fishers Lane
North Bethesda, Maryland 20852,

Colleen Shogan
Archivist of the United States
The National Archives and Records
Administration (NARA)
8601 Adelphi Road
College Park, MD 20740-6001,

**Known State and Local Defendants, Official
Capacity:**

Eric Adams
Mayor
City of New York (NYC)
New York City Law Department
100 Church Street
New York, NY 10007
212-356-1000,

Edward A. Caban
Commissioner
City of New York Police Department (NYPD)
Attention: PALS Unit
One Police Plaza
New York, New York 10038,

Patrick J. Callahan
Colonel, State Police (NJSP)
State of New Jersey
P.O. Box 7068
West Trenton, NJ 08628,

John Bilich
Chief of Security
Port Authority of New York and New Jersey
Police Department (PAPD)
Four World Trade Center
150 Greenwich St

New York, NY 10006,

Christopher Trucillo
Chief Of Police
New Jersey Transit Police Department
One Penn Plaza East
Newark, New Jersey 07105,

Anthony Cureton
Sheriff
County of Bergen Sheriff's Department
2 Bergen County Plaza
Hackensack, NJ 07601,

James Todesco
County Executive
County of Bergen, New Jersey
One Bergen County Plaza
5th Floor, Rm 580
Hackensack, NJ 07601-7076,

Jennifer Pokorski
County Manager
County of Maricopa County, Arizona
c/o Maricopa County Attorney
225 West Madison Street
Phoenix, AZ 85003,

Paul Penzone
Sheriff, Maricopa County Sheriff's Department
550 West Jackson Street
Phoenix, AZ 85003
602-876-1000,

King County Sheriff's Department
516 Third Avenue, Room W-116
Seattle, WA 98104-2312,

Washington State University
Attn: Asst. Attorney General, WSU
332 French Administration Building
Pullman, WA 99163,

Federal Way School District
33330 Eighth Ave S.
Federal Way, WA 98003,

Government Police Powers Departments And
Agencies, While Operating As, And/Or Within,
Apparently Private Entities,

**Known Entity Defendants:**

ESTABLISH Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

ACME MARKETS Inc.
c/o: The Corporation Trust Company
830 Bear Tavern Road
West Trenton NJ 08628,

Daniel WEINER
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004,

WALMART Inc.
702 SW 8th Street
Bentonville, AR 72716,

WALMART (CHINA) Investment Co., Ltd.
702 SW 8th Street
Bentonville, AR 72716,

COSTCO Wholesale Corporation
999 Lake Drive
Issaquah, WA 98027,

The KROGER Co.
1014 Vine Street
Cincinnati, OH 45202,

PPG Industries Inc.
One PPG Place
Pittsburgh, Pennsylvania 15272,

INSIGHT NETWORK Spain
c/o: Don KEISER
Calle Antina 22 Primera Planta, 03130,
St. Pola, Comunidad Valenciana, España.
Teléfono: +34 96 541 17 58,

TECHNOLOGY SALES LEADS, Inc. (TSL)
c/o National Registered Agents, Inc
155 Federal Street, Suite 700 2nd Floor
Boston MA 02110,

LOEB & LOEB, LLP
c/o Mitchell NUSSBAUM
Vice Chairman
345 Park Avenue
New York, NY 10154,

Raymond F. SULLIVAN, LLC
c/o: Raymond SULLIVAN
Attorney
10440 Little Patuxent Parkway, Suite 900
Columbia, MD 21044,

TRADEKEY.COM, doing business in the
United States through:
ORBIT TECHNOLOGIES LLC
264 Hemlock Terrace
Teaneck, NJ 07666,

WEBLINK.IN Pvt. Ltd.
33 and 33A Rama Road
Industrial Area, Shivaji Marg
New Delhi, India,

Vishal PATEL, MD
One Hudson Medical Associates, LLC
235 Old River Road
Edgewater, NJ 07020,

Michael SCIARRA, DO
Riverview Gastroenterology Limited Liability
Company
300 Midtown Drive
Beaufort, South Carolina 29906,

Luis M. ASTUDILLO, MD
Northern New Jersey Cardiology Associates,
P.A.
7650 River Rd Ste 300
North Bergen, NJ 07047,

MATCH GROUP, Inc.
Jared Sine
Chief Business Affairs & Legal Officer
8750 N. Central Expressway, Suite 1400
Dallas, TX 75231,

BUMBLE Inc.
1105 W 41st Street
Austin, TX 78756,

**Known Individual Defendants, Generally
Known to USMS institutionally:**

William BURNS, individually
fka Dr. Patrick Heffron
c/o: Central Intelligence Agency
1000 Colonial Farm Road
Langley Virginia 22101,

Stephen BREYER, individually,
fka Jack Sackville-West
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138,

Andrew WEISSMANN, individually
fka Lyle Whiteman
New York University School of Law
40 Washington Sq. South
New York, NY 10012,

Charles ROSENBERG, individually
fka Chuck LeFevre (as CEO, NutraSource),
fka William Drumm (as General Manager,
ESTABLISH)
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004,

Robert MUELLER

Address Known to USMS and FBI,

Leslie CALDWELL
fka name unknown while fraudulently
misrepresenting self as Seed & Berry
intellectual property attorney
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111,

Anthony FAUCI
fka Larry R. Cook
Address Known to USMS

**Known Individual Defendants:**

Roger STONE
fka David P. Moller while at CIA
Address Known to FBI
Fort Lauderdale, FL

Lisa RUBIN
fka Michelle Yarbrough while at FBI
MSNBC
30 Rockefeller Plaza
New York, NY 10112,

Alexander VINDMAN
fka Paul Yarbrough while at ARMY
8309-8409 SW 26th Street
Davie, FL 33324,

Ari MELBER
fka Wes Lewis while at FBI
MSNBC
30 Rockefeller Plaza
New York, NY 10112,

Joseph ARPAIO
fka Greg Crossgrove while Sheriff, Maricopa
County, AZ
12808 Vía Del Sol
Fountain Hills, AZ 85268,

David Reichert
fka Sheriff, KCSD

Address Known to USMS, DHS, KCSD,

Neal KATYAL
fka Shawn Morrissey while student Decatur
High School, Federal Way, WA
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004,

Thomas KEENE
fka Michael Callahan while Dominick &
Dickerman Managing Director
Bloomberg Media
731 Lexington Ave
New York, NY 10022,

Stephanie Clifford (MODDERMAN)
Address Known to USMS,

Norelle Dean (GIA)
Address Known to USMS,

Marc CHALOM
Address Known to USMS,

Other Unknown Government Officers, Agents,
and Employees,

John Does (unknown number),

        Defendants.

**A. Procedural Notes to District Court:** While this pro se attorney understands that

complaints are not typically preceded by "ex parte" notations to the Court, this Complaint

requires such a communication. *Class action request for counsel:* Since a pro se attorney cannot

represent a class of plaintiffs, a request for the appointment of counsel for the class is made in

the last paragraph of the Complaint. *Request for electronic filing made:* A request for electronic

filing of the evidence in this case is made due to the costs to this pro se plaintiff and its necessary

initial length for compliance with F. R. Civ. P. Rule 9(b), as explained at A3 below. *Active*

*obstructions of justice continue:* This document has been actively electronically hacked during

preparation by defendant UNITED STATES. Note that certain references, spellings, grammatical

errors, awkward phrasing, and legal citations are the direct result of illegal electronical

modification by defendant UNITED STATES personnel (typically defendant CIA which is

known for such conduct) for the purposes of confusing the reader, delaying preparation, and

creating the conditions for non-responsive answers, and to continue defendant UNITED

STATES' pattern of defamation through public narrative, and discrediting of the Lead Plaintiff

while acting as pro se attorney. Evidence was electronically deleted by defendant use of illegal

remote electronic access to an old cell phone no longer in use by Lead Plaintiff on February 4,

2024, during its overnight recharging for the purpose of recovering the names of 15-20

witnesses, which corroborating evidence of direct contacts with those witnesses had also

previously been deleted, together with other events and meeting attended, by defendant UNITED

STATES' remote electronic hack from Lead Plaintiff's electronic calendar on his Outlook email

application in September 2023, all to cover up defendants' human trafficking both to and within

the states of New York, California, Washington, and Arizona; and to conceal financial frauds; all

as undertaken by defendants including, without limitation, FBI, MARICOPA SHERIFF,

ARPAIO, NYPD and unknown others, during 2018-2024. These hacks, frauds, and obstructions

are consistent with prior patterns of obstructions of justice documented by (i) the Lead Plaintiff

in this complaint, by (ii) the Senate Intelligence Committee in 1975 and 2014, by (iii) internal

inquiries at defendant CIA, and (iv) as documented in other federal police powers agencies,

which have and do obstruct justice and destroy evidence, and by their practices including,

without limitation, in defendants DOJ, FBI, CIA, USMS, USSS, CPB, as documented in public

reports and Congressional investigations and reports. These obstructions, hacks, retaliations, and tampering are extensively documented in this complaint. The government will almost certainly use *ex parte* communications to attempt to dissuade the court from allowing threshold entry of the complaint, see appendix 1, in spite of all existing case law to the contrary as cited herein. Further, defendant UNITED STATES agencies have redeployed certain intelligence assets and provided deliberate visibility to the Lead Plaintiff of those intelligence assets in its desperate attempt to make a specious national security argument to the court or at least to attempt to induce an apparent technical violation of law and rationalize its own further hyper-extended inquiries. This pattern of practice is completely consistent with defendant UNITED STATES' durable history of concealing associated-in-fact enterprise patterns of racketeering acts for, quite literally, generations, as the court will note in reviewing this complaint. See the complaint Synopsis at paragraphs 1-37 and the national security facts subcategory of the Facts section at paragraphs 600-603. This is a transparent, bad faith pattern of color of law abuse of 5 U.S.C. § 301, among other statutes, see paragraphs 250-346.

**A1**. **Unique Nature Of Principal Defendants:** The primary defendants are government departments and agencies with police powers, and certain members of the press, media, and entertainment industry including, without limitation, employees of Bloomberg News, MSNBC, and PBS, (media corporate entity culpability is not yet established and depends upon discovery yet to be undertaken among already named defendants), who have been granted privileged access to the otherwise illegally constrained Lead Plaintiff. These press and media persons include some who are also former employees of defendant DOJ and its agencies. Both named and many unknown defendant personnel have and/or do operate under deep cover, some of whom were improperly and illegally embedded in private sector roles under assumed names, some with their

own children in tow during operations for many years before they vanished, then reappeared elsewhere with different names and ages and their own children still of course in tow. These children, many now adults, had previously known the Lead Plaintiff as an uncle, or otherwise related, through defendant UNITED STATES, BURNS, WATERS, ROSENBERG, and other defendants' action to orchestrate a sham marriage to Jeanette, Lead Plaintiff's second spouse (paragraph 610 HEXP-7). These police powers individual defendants, including those subsequently identified as members of the press, did not identify their actual affiliations and operated undercover at all times into 2024 in the presence of the Lead Plaintiff, and therefore must self-identify their roles and/or lack of specific direct role in each act, violation, and injury cited herein, as these plaintiffs cannot reasonably be expected to know their actual identities when these defendants operated undercover.

**A2. Constitutional And Congressional Intent Are Clear. Defendant Fraudulent Concealment, Willful Blindness, And Self-Interest Are Also Clear:** Proceedings for violations of constitutional rights by these individual and institutional defendants are explicitly provided for in Congressional intent expressed at (i) 28 U.S.C. § 2679(b)(2) (paragraph 250-266) with regard to individual police powers and governmental employee defendants acting outside of scope and/or in bad faith, at (ii) PL 91-452 (RICO) October 1970 (paragraph 334-336) with regard to all defendants, and (iii) in Congressional intent in its legislative records of findings (paragraph 337-340) as to these specific defendant UNITED STATES departments, agencies, and officials, as to their official capacity and as to those named as individual defendants. This entire associated-in-fact enterprise pattern of racketeering acts including, without limitation, frauds, violent acts, and constitutional rights violations, has been built upon and fraudulently concealed by, without limitation, defendant DOJ and other governmental defendants, and by

members of the press, media, and entertainment industry, and by certain moneyed interests with special access to the otherwise illegally constrained Lead Plaintiff, who have and do act and operate within, and/or as integral conspirators in, defendants' pattern of unconstitutional color of law abuse of the state secrets privilege. The state secrets privilege is a privilege, it is not an inherent right of any government when it lacks a legally compelling governmental interest (paragraph 259). The state secret privilege is constitutionally conditioned upon legal compliance with (a) our Constitution and (b) clear Congressional intent to protect unalienable rights including, without limitation, (i) establishing justice (Constitution, preamble), (ii) religious expression (42 U.S.C. § 2000bb-1), and (iii) administrative procedures which comply with law (5 U.S.C. § 301), which are (iv) intended to be actively enforced by and within each department, see paragraphs 250-346. These laws and regulations are not enforced as to these defendants who exist in a bubble of unindicted privilege above the law, and who have and do systematically disregard laws and regulations to conspire against rights - 57 years of evidence herein clearly demonstrate this as the functional reality which faces these gravely imperiled plaintiffs, whose very lives have been threatened and, in some cases, taken from them. Defendant UNITED STATES has and does fail to meet these constitutional, legal, and administrative tests, and government defendants at all levels have and do fail to comply with Constitutional and Congressional intent, with law, and with administrative procedures, as presented in the well-documented patterns of practice and documentary evidence presented in the entirety of this complaint.

**A3. Judicial Efficiency In Complex Litigation:** To (i) establish justice (Constitution, preamble) when defendant DOJ willfully refuses to do so and places in its own administrative interests and the personal interests of its executives (some of whom are specifically identified

and their acts described in this complaint) over those of the People, (ii) to facilitate efficient

defendant answers for their abusive color of law governmental and other defendants' illegal and

undercover operations fraudulently concealed in civilian dress (both governmental defendants

and civil defendants so concealed in their patterns of enterprise-in-fact racketeering acts,

violations, and injuries) and (iii) to provide for an efficient judicial process based upon directly

responsive answers under penalties of perjury from defendants who are (a) not readily

distinguishable from each other to these plaintiffs, and who are also (b) actively and directly

interfering with legal preparation of this complaint, requires this Complaint be built as a layer

cake, to wit:



Governmental, media, institutional, and individual identities have almost entirely been and are

deliberately obscured as official acts and acts of privileged access perpetrated in fraudulent

concealment, and in color of law abuse of national security, while these defendants have and do

act in bad faith in their extensive and systematic color of law violations of constitutional rights.

Extensive direct evidence of predicate acts is necessarily initially filed to comply with F. R. Civ.

P. Rule 9(b) regarding particularity, and to provide efficient disclosure of acts, violations, and

injuries, particularly given the novel nature of the technical and biomedical claims well established herein, related to development and operation of the illegal BRMT bioweapon and bioweapon delivery system (18 U.S.C. § 175). Defendant UNITED STATES has and does illegally use this treaty prohibited BRMT bioweapon and bioweapon delivery system in illegal involuntary human medical experiments without consent on Lead Plaintiff and on other plaintiffs. This layer cake construction allows claims for specific relevant predicate acts, violations, and injuries, perpetrated by these mostly undercover defendants, to be pled without excessive redundancy in each of the relevant counts, and to be directly answered by each institutional and individual defendant in a timely fashion, even though the identities of the specific defendants who perpetrated and conspired in those specific acts, violations, and injuries are not readily discernible to these plaintiffs.

**A4**. **Explicit Defendant Unmasking Herein Contrasts With Prior Judicial Refusals Which Contravened SCOTUS Mandates:** This complaint has been comprehensively drafted based upon substantial progress made in forensic analysis and individual identifications in this complex matter which has occurred since October 2023. Appendix 1 documents a brief history of previous partial filings in other federal districts in and before October 2023, which filings lacked almost all of the specific individual identifications of individuals named herein, who had operated undercover and under various assumed names at different times and places of their contact with these plaintiffs. Unmasking these individuals, mostly identified since September 2023, has and does also permit the definitive unmasking of various institutional defendants. Those institutional identities could only be guessed at previously due to color of law abuses of police powers disclosure exemptions which have extended to refusals to even merely acknowledge, as required by law, much less disclose, information requests in response to public

information requests as required by law. The profound transformation of this case through forensic analysis incorporated in the facts narrative since Fall 2023, has resulted in a far clearer presentation of the facts and evidence of defendants' decades-long pervasive pattern of fraudulent concealment of illegal acts, violations, and injuries behind color of law abuse of the state secrets privilege. Prior judicial process abuses of mandatory summons service notice in the District of New Jersey, of *sua sponte* dismissals in the District of Columbia federal court, and an arbitrary 20 page complaint length limit imposed in the Southern District of New York federal court, were judicial violations of *Neitzke* and *Denton* mandates at paragraphs 250 through 345, are described in Appendix 1 which are documented on the relevant dockets at Pacer.gov.

**A5. Note Regarding Service On Individual Defendants:** The Court will need to assure itself of the diligence of locating individual defendants and of legal process service as DOJ and USMS are among the named defendants with long histories of statutory violations herein, and therefore have institutional interests at stake in this matter, which conflicts of interest have and do directly conflict with the interests of justice. Additionally, Spokeo.com, the primary website used to develop process service addresses for individual defendants in this Complaint, has likely been hacked and/or spoofed by USMS, FBI, and/or CIA to obscure service addresses for certain current and/or former undercover individual defendants named herein. Additional research with relevant police powers agencies, including as to federal protectees named herein, will be required to locate and properly serve certain individual defendants. USMS institutionally knows the whereabouts of certain of these individual defendants as part of its on-going mission and routine protectee operations. Other defendants requiring service and appearance are known to other police powers defendants named herein and have been deliberately concealed, relocated, and/or

reassigned since their interactions with these plaintiffs to deliberately hide both defendants and witnesses from these plaintiffs for the specific purpose of evading justice.

## B. Note On Conventions Used Throughout This Complaint

**B1. Naming Of Defendants Sued In Official Capacity:** This pro se attorney's naming of defendants may not necessarily meet the standard expected of licensed attorneys, hence the need for this explanation of naming conventions used herein. For ease of understanding, the term "defendant UNITED STATES" is used herein to refer to the specific federal officials sued in their official capacity as the current incumbent officers of the relevant federal departments and agencies of the United States organized in the Article II executive branch of government, and thereby subject to the direct and/or indirect authority of the President of the United States. Similar defendant naming characterizations, including, without limitation, ARMY, CIA, DOJ, USMS, FBI, NIAID, DHHS, DHS DOD, DARPA refer to those federal departments and agencies and to the senior official, such as the Cabinet Secretary and/or Agency Director, who is formally being named as the defendant sued in their official capacity. For ease of reference, State and local government officials sued herein are similarly referenced by their entity name, such as NYPD, rather than their personal name where sovereign immunity requires such identifications of defendants. Where that specific individual official is known to be directly and personally involved, and that person is being sued both in their official capacity and as an individual defendant, for actions which have and/or do exceed their scope of legal authority in constitutional and/or tortious acts, violations, and injuries to these plaintiffs, they are named in both their official capacity and their individual capacity as clearly identified in the caption, which individual capacity naming is subject to revision and to addition upon discovery.

**B2. Exhibits:** Evidence filed herewith, including predicate act evidence in accordance with F. R. Civ. P. Rule 9(b), referenced in the 54 claims for relief herein can be located by using the RED page number at the bottom of each page of the Lead Plaintiff Evidentiary Exhibits ("LPEE" herein), except for cited emails and for evidence added at LPEEV65 beginning in February 2024 due to a defendant UNITED STATES technical hack explained at paragraph 230. The emails are also filed within LPEE (Lead Plaintiff Evidentiary Exhibits) and can be located by the date of the email in YYMMDD format as they are primarily filed in date sequence, with some added in later volumes as additional evidence has been uncovered. The short title of each email relates to the Lead Plaintiff's principal contact name and the subject matter of the email, not necessarily to the topic as indicated in the subject line of that specific email. Certain emails with various defendant and related parties are referenced by alternate abbreviations in the email reference which abbreviations are located at paragraph 228.

**B3. Compendium:** A compendium which includes the names and brief descriptions of selected key entities and individuals, listings of selected key emails, documents, disbursements in both date and alphabetic orders is filed at LPEE ("LPEE") pages 934-1075. It is helpful in locating relevant documents in the various volumes of LPEE evidence submitted with this filing.

**B4. Voluminous Initial Filing:** Since nearly all the injurious conduct has been undertaken in secrecy by undercover officers, it is virtually impossible for these plaintiffs to directly establish which defendant police powers operation is responsible for each specific act, violation, or injury, hence the need to provide the volume of evidence initially filed to secure accurate answers from these defendants, while meeting the specific requirements of F. R. Civ. P. Rule 9(b) which requires pleading of frauds with particularity. The Complaint Table of Contents

beginning at page 19 below lists paragraph numbers and uses the RED color page number at the BOTTOM of each page for ease of reference.

**B5.** Page total number in footer varies from page to page as the document was printed in increments not in a single print session, for the explicit purpose of minimizing the known pattern of document hacking after proofing and before printing, which has occurred in previous printed documents. See also the description of defendant CIA's malign long-term patterns of practice in evidence and document tampering at paragraph 17. The final document contains 1324 printed pages.

## COMPLAINT TABLE OF CONTENTS

| PARA | ITEM (Use RED numbers at the bottom of each page for all Lead Plaintiff Evidentiary Exhibits "LPEE" page references) | PAGE |
|---|---|---|
| | **COMPLAINT** | |
| | **SYNOPSIS** | 37 |
| 1 | Defendants UNITED STATES, ARMY, CIA, DOJ, FBI, Other Government Co-Conspirators Violate First Amendment Establishment Clause Which Guarantees Freedom Of Religion | |
| 2 | Inhumane Medical Experiments Secretly Abuse Unwitting US Persons For Decades To Develop And Test Illegal Bioweapon Violating 18 U.S.C. § 175 | 40 |
| 3 | *Illustration 1:* Basic Brain Structures Hijacked During Illegal Medical Experiments Used For Illegal BRMT Bioweapon Development, Testing, And Operation 18 U.S.C. § 175 | 42 |
| | *Illustration 2:* Hypothalmus, Pituitary, And Pineal Glands Secrete Brain Hormones (Brain Biochemical Neurotransmitters) Hijacked By Illegal BRMT Bioweapon For Toxin Effect 18 U.S.C. § 178(2) | 43 |
| | *Illustration 3:* Basic Brain Hormones Hijacked By Illegal BRMT Bioweapon Using Bioweapon Delivery System | 44 |
| 4 | Development, Test, And Deployment Progression Of Illegal BRMT Bioweapon And Bioweapon Delivery System 18 U.S.C. § 175 | 44 |
| 6 | FDA Approvals For Antilog Medical Device Tests Prove Scientific Feasibility of Secret Illegal BRMT Bioweapon | 47 |
| | *Illustration 4*: Synchron Brain-Computer Interface Implanted In First Six US Patients | 48 |

| 8 | Title 18 Racketeering Acts And Title 42 Civil Rights Violations Sustain Government Cover-Up | 49 |
| 9 | Defendant CIA Murder of ARMY Contract Biomedical Researcher Frank Olson | 49 |
| 10 | Homicidal Conduct Against Lead Plaintiff's Extended Family Matches Other BRMT Indirect Perpetrator Pattern Evidence | 51 |
| | *Interline Exhibit 1:* Probable September 2011 Illegal BRMT Bioweapon Brain Hijacking Homicide | 52 |
| 16 | Individual Defendant Identifications In 2023-24 Confirm Government Defendants Are Key Perpetrators | 56 |
| 18 | Defendants ARMY, CIA, DOJ Fraudulently Conceal Criminal Conduct Behind Illegal Abuse Of State Secrets Privilege 5 U.S.C. § 301 | 57 |
| 19 | Sustained Pattern of Third Amendment and Posse Comitatus Law Violations By Defendants ARMY And DOD 18 U.S.C. § 1385 | 57 |
| 20 | Defendant CIA's Illegal BRMT Bioweapons Program Executives Identified In 2023-24 – Breyer, Hopper, Burns, Fauci | 59 |
| 22 | Defendants DOJ. FBI, USMS, And Other Illegal BRMT Bioweapons Program, Rights, And Racketeering Acts Defendants Identified In 2023-24 | 62 |
| 25 | Fraudulent Concealment, Willful Blindness, And Official Silence From Defendants DOJ, CIA, ARMY, National Archives | 64 |
| 30 | *Table:* Constitutional Rights and Racketeering Violations Timeline | 71 |
| 31 | Absence Of Valid Defenses - Constitutional Rights Are Protected As State Secret Privilege Is An Invalid Defense 5 U.S.C. § 301 For An Illegal Bioweapon 18 U.S.C. § 175 | 77 |
| 34 | Illegal Cover-Up Benefits Defendants' Corrupt Intent - Plaintiffs' Rights, Religion, Property, Family Are Profoundly Damaged | 80 |
| 36 | *Table:* Directly Inculpated Senior Government Officials | 84 |
| | **JURISDICTION AND VENUE** | 89 |
| 38 | Subject Matter Jurisdiction | 89 |
| 39 | Personal Jurisdiction | 90 |
| 40 | Venue | 91 |
| 41 | Known Government Conflicts of Interest Requiring Threshold Consideration | 94 |
| | **PARTIES** | |
| | **Plaintiffs** | 99 |
| 50 | Lead Plaintiff | 99 |

| 51 | Extreme Difficulty Of Detection - Lead Plaintiff's Injuries Are Representative Of Injuries To The Class Of Plaintiffs | 100 |
| 55 | Other Plaintiffs | 103 |
| 58 | A. Mere Recognition Of BRMT Is Immensely Difficult For Victims | 104 |
| 59 | B. Myriad Challenges To Identify Members Of The Class Of Injured Plaintiffs | 108 |
| 64 | C. Scale Of Research, Development, And Deployment Expenditure Is Vital Clue To Likely Number Of BRMT Victims | 110 |
| 66 | D. Estimated Size Of Plaintiff Class | 110 |
| 90 | **Defendants** | 115 |
| 93 | A. Specific Technical And Tradecraft Challenges To Undercover Operational Identifications - Police Powers, Intelligence, And Media | 116 |
| 102 | A1. Government Defendants Generally | 123 |
| 105 | *Table:* Named Defendants Associations And Relationships | 127 |
| 110 | A2. Individual Defendants Generally | 133 |
| 113 | A3. Additional Unknown Defendants Generally | 135 |
| 114 | A4. Police Powers Undercover Defendants' Culpability Must Be Established Through Answers And Discovery | 137 |
| 120 | B. Known Federal Defendants, In Their Official Capacity | 137 |
| 140 | C. Known State and Local Defendants, In Their Official Capacity | 149 |
| 149 | *Table:* Apparent Cover Entities - Police Powers, Press, Private | 156 |
| 160 | D. Known Entity Defendants, Including Police Powers Cover Operations | 159 |
| 211 | E. Individual Defendants, Including John Does Acting Outside Their Official Capacity In Bad Faith Acts Performed Under Fraudulent Concealment, And John Does | 168 |
| 226 | *Table:* Unknown Government Agents; Press, Media, Entertainment, And Other Persons Granted Access By Police Powers | 183 |
| 228 | Alternate Search Terms – Named Defendants | 185 |
| | **NOTICE TO COURT AND DEFENDANTS – CONTINUING OBSTRUCTIONS OF JUSTICE BY DEFENDANT UNITED STATES** | 186 |
| 229 | Technically Suppressed Evidence, Hacking, Harassing, And Tampering Which Do Obstruct Complete Complaint Presentation | 186 |
| 230 | Evidence Labeling Practices - Change Forced By Defendant UNITED STATES Technical Hack | 187 |
| | *Table:* LPEEV65 Documents Index - Beginning February 2024, LPEEV65 page references are substituted for Bates numbering of specific evidence. This evidence labeling change | 188 |

|     | was forced by a still continuing technical hack of the Adobe Acrobat Pro application by defendant UNITED STATES. |     |
| --- | --- | --- |
| 250 | **VIOLATIONS OF LAW AND CONFLICTS OF LAW** | 189 |
| 251 | Summary of Laws and Treaties Violated by United States and Co-Conspirators | 189 |
| 254 | Points of Law, Case Law Precedents, And Conflicts of Law Favor Plaintiffs | 192 |
| 255 | A. Limits On Sovereign Immunity Imposed By Congress | 193 |
| 259 | B. Limits On Religious Discrimination Imposed By Congress And Case Law Precedents | 195 |
| 260 | C. Limits On State Secrets Privilege Imposed By Congress And Case Law Precedents | 197 |
|     | *Interline Exhibit 2:* Administrative Procedures Act Limitations – State Secrets | 199 |
| 267 | D. Limits On Absolute And Qualified Individual State Secrets Immunity Imposed By Congress And Case Law Precedents | 203 |
| 272 | E. Absolute And Qualified Immunity Precedents In Case Law Answered By Congressional Intent In November 1988 At 28 U.S.C. § 2679(b)(2) | 207 |
| 277 | F. Bivens Special Factors and Alternative Remedy Immunity Claims Are Defeated By Facts And By Defendant UNITED STATES Failures To Act | 215 |
| 307 | G. Application Of Equitable Tolling In Fraudulent Concealment – Unequal Administration Of Justice | 232 |
| 314 | H. Equitable Tolling - Civil RICO Time Bars Are Equitably Tolled By Defendants' Systematic Fraudulent Concealments | 235 |
| 317 | H1. Diligent Pursuit of Claims by Lead Plaintiff In The Face Of Long-Running Fraudulent Concealment by Defendants | 237 |
| 322 | I. Constitutional Issues - Ratified International Treaties Supersede Existing US Law And Supersede Defendant UNITED STATES' Neglect To Prevent | 250 |
| 322 | I1. Defendant UNITED STATES' Noncompliance With Law - *Bioweapons Treaty* Prohibits ALL Bioweapons And Bioweapon Development From March 1975 | 250 |
| 328 | I2. Conflict Of Law - Senate Ratification Determined Treaty Is NOT Self-Executing, *Torture Treaty* Requires Civil Right Of Action | 254 |
| 331 | J. *Denton* and *Nietzke* Mandate Factual Development Of Novel Claims, For In Forma Pauperis Pro Se Litigation, Even If Imperfectly Pled | 255 |
| 334 | K. Congressional Intent - Title 18 RICO Statutes, Title 28 Judicial Proceedings | 257 |
|     | K1. Defendant Agencies, Individuals, and *Mens Rea* – Select Congressional Findings Contemporaneous With Events In This | 258 |

| | | |
|---|---|---|
| | Litigation | |
| 342 | L. RICO Associated-In-Fact Enterprise | 260 |

## CASE LAW CITATIONS KEY

| | Paragraph |
|---|---|
| *Marbury v. Madison*, 1 Cranch 137, 163, 2 L. Ed. 60 (1803) | 277 |
| *Bradley v. Fisher*, 13 Wall. 335, 80 U. S. 351 (1871) | 272 |
| *United States v. Lee,* 106 U. S. 220 (1882) | 283 |
| *The Western Maid,* 257 U.S. 419 (1922) | 277 |
| *Bemis Bros. Bag Co. v. United States,* 289 U.S. 28 (1933) | 277 |
| *Jacobs v. United States,* 290 U. S. 13, 290 U. S. 16 (1933) | 279 |
| *Bell v. Hood,* 327 U.S. 678 (1946) | 277, 282 |
| *United States v. Standard Oil Co.,* 332 U. S. 301, 332 U. S. 311 (1947) | 279 |
| *US v. Karl Brant* et al, Nuremberg trail record, November 21, 1946 and August 20, 1947 | 358 |
| *United States v. Reynolds,* 345 U. S. 1 (1953) | 24, 26a, 32, 66, 260, 262, 270, 271, 284, 315, 319, 351D, 396, 599B(v), 914 |
| *United States v. Gilman,* 347 U. S. 507 (1954) | 279 |
| *Wheeldin v. Wheeler,* 373 U. S. 647 (1963) | 279 |
| *J. I. Case Co. v. Borak,* 377 U. S. 426, 377 U. S. 433 (1964) | 279 |
| *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971) | 91, 260, 277-285, 288-296 |
| *Gravel v. United States,* 408 U. S. 606, 408 U. S. 615 (1972) | 283 |
| *Doe v. McMillan,* 412 U. S. 306, 412 U. S. 320 (1973) | 267A, 272B, 283 |
| *Scheuer v. Rhodes,* 416 U. S. 232 (1974) | 272C |
| *Wood v. Strickland,* 420 U. S. 308, 420 U. S. 322 (1975) | 273 |
| *Imbler v. Pachtman,* 424 U.S. 409 (1976) | 36, 276, 276B |
| *Hampton v. Mow Sun Wong,* 426 U. S. 88 (1976) | 283 |
| *Stump v. Sparkman*, 435 U.S. 349 (1978) | 272 |
| *Butz v. Economou,* 438 U. S. 478 (1978) | 272C, 274, 278, 283 |
| *Davis v. Passman*, 442 U. S. 228, 442 U. S. 245 (1979) | 278, 282, 283 |
| *United States v. Kubrick*, 444 U.S. 111, 100 S. Ct. 352, 62 L.Ed.2d 259 (1979) | 316 |
| *Carlson v. Green,* 446 U. S. 14 (1980) | 278, 291 |
| *Gomez v. Toledo,* 446 U. S. 635 (1980) | 273 |
| *Boag v. MacDougall*, 454 U. S. 364 (1982) | 331 |
| *Nixon v. Fitzgerald,* 457 U. S. 731 (1982) | 260, 272C |

| | |
|---|---|
| *Harlow v. Fitzgerald,* 457 U.S. 800 (1982) | 91, 272C, 273, 320, 352, 914 |
| *Chappell v. Wallace,* 462 U.S. 296 (1983) | 290, 291 |
| *Bush v. Lucas,* 462 U.S. 367 (1983) | 290, 291 |
| *United States v. Stanley,* 483 U.S. 669 (1987) | 290, 291 |
| *Erwin v. United States* 484 US 292 (1988) | 267A, 272B |
| *Schweiker v. Chilicky,* 487 U.S. 412 (1988) | 290, 291 |
| *United States v. Kozminski,* 487 U.S. 931 (1988) | 809, 820 |
| *Neitzke v. Williams,* 490 U.S. 319 (1989) | 327, 331, 599H |
| *Denton v. Hernandez,* 504 U.S. 25 (1992) | 327, 331 |
| *FDIC v. Meyer,* 510 U.S. 471 (1994) | 290, 291 |
| *Klehr v. A. O. Smith Corp.,* 521 U.S. 179 (1997) | 316d |
| *Rotella v. Wood,* 528 U.S. 549 (2000) | 236, 315-317, 583 |
| *Correctional Services Corp. v. Malesko,* 534 U.S. 61 (2001) | 290, 291 |
| *Wilkie v. Robbins,* 551 U.S. 537 (2007) | 290, 291 |
| *Hui v. Castaneda,* 559 U.S. 799 (2010) | 284, 289, 290, 291, 293 |
| *Minneci v. Pollard,* 565 U.S. 118 (2012) | 290, 291 |
| *Lozano* v. *Montoya Alvarez,* 572 U.S. 1 (2014). | 316f |
| *Ziglar v. Abbasi,* 582 U. S. ___ (2017) | 290, 291 |
| *Hernández v. Mesa,* 589 U. S. ___ (2020) | 290, 291 |
| *Egbert v. Boule,* 596 U.S. 482 (2022) | 290, 297 |
| *Boechler* v. *Commissioner,* 596 U. S. ___, ___ (2022) | 316 |
| *Arellano v. McDonough,* 598 U.S. ___ (2023) | 316f |

## COMPLAINT TABLE OF CONTENTS (continues)

| PARA | FACTS | PAGE |
|---|---|---|
| | **FACTS – GENERAL ALLEGATIONS** | 265 |
| 350 | **Five Basic Illegal Patterns of Practice** – Illegal Bioweapon Development, Racketeering Conspiracy, Direct Threats to Life, Involuntary Servitude, Fraudulent Concealment And Willful Blindness | 265 |
| 357 | **1.  First, Illegal BRMT Bioweapon Development and Deployment** | 270 |
| | *Interline Exhibit 3:* Defendant CIA's Failed MKUltra Mind Control Program, Later Replaced By Illegal BRMT Bioweapon And Bioweapon Delivery System | 272 |
| 359 | Precursor Events: Illegal CIA and ARMY Experiments Use Nazi Dachau Concentration Camp Doctors and Illegal Drugs on US Persons | 273 |
| 364 | CIA And ARMY Conduct Illegal Medical Experiments, Develop Prohibited Bioweapon By Medically Abusing American Civilians As Human Subjects | 275 |

| 369 | | Basic Human Brain Functions Are Commanded by Illegal BRMT External Hijacking | 277 |
|---|---|---|---|
| 380 | | Illegal BRMT Bioweapon Operates Like Other Remote Offensive Weapon Systems | 283 |
| 400 | 2. | **Second, Racketeering Associated-In-Fact Enterprise Crimes Cover Illegal BRMT Development, Illegal Domestic Spying, And International Commercial Cover Espionage** | 293 |
| 403 | | Historical Federal Police Powers Patterns Of Institutional Criminal Conduct | 293 |
| 409 | | Lead Plaintiff's Family Quaker Religious Origins And This Class Of Plaintiffs | 293 |
| 410 | | Religion Based Targeted Federal Government Abuse Of American Families Across Generations | 296 |
| 414 | | Lead Plaintiff First Human Trafficked As Collateral To Parental Employment Human Trafficking | 298 |
| 417 | | CIA And Army Human Traffick Lead Plaintiff For Illegal Human Medical Experimentation As A Minor Child Beginning At Age 12 | 300 |
| 419 | | Lead Plaintiff Extensively And Repeatedly Human Trafficked As An Adult | 303 |
| 425 | | Illegal Human Trafficking In Involuntary Servitude: Lead Plaintiff's Professional Life – Programmed Employment, Unemployment, Enterprise Wrecking 1979-2002 | 307 |
| 462 | | Illegal Human Trafficking In Involuntary Servitude: Lead Plaintiff's Professional Life– Programmed Employment, Unemployment, Enterprise Wrecking, Homelessness 2002-2008 | 329 |
| 465 | | *Excerpt:* ROSENBERG (FBI, as William Drumm) Signed ESTABLISH Offer Letter - LPEE pages 797-798 | 332 |
| 471 | | Illegal Human Trafficking In Involuntary Servitude: Lead Plaintiff's Professional Life– Since ESTABLISH (FBI, ROSENBERG) Termination 2008-2024 | 335 |
| | | *Interline Exhibit 4:* Winnett – FBI, Other Defendant Interferences In Interstate Commerce | 340 |
| | | *Interline Exhibit 5:* Winnett Interstate Commerce Interferences - "Produce Consultant Crossgrove" Defendant MARICOPA SHERIFF ARPAIO, officially and individually | 343 |
| | | *Interline Exhibit 6:* $100,000 From Fraudulent Investor "DEAN T. SMITH" (FBI) | 344 |
| | | *Interline Exhibit 7:* Fraudulent Financings: ADAMSON Brothers (FBI) Fraudulent Private Placement Memorandum and SEC S-1 Consume $40,000, Raise $0 | 345 |
| | | *Interline Exhibit 8:* KROGER, DOMINICK Corporate Email Accounts Hide True Identities of Defendant Personnel And Entities | 346 |
| | | *Interline Exhibit 9:* WALMART Winnett Produce Supply Contract Meeting at Bentonville, AR Home Office With McCormick (FBI) | 347 |

|  |  | ***Interline Exhibit 10***: Winnett Cattle Company Sales Contract Signed With WALMART (China) Investment Co., Ltd. – Later Cancelled | 348 |
|  |  | ***Interline Exhibit 11:*** Lead Plaintiff Sued Individually in Federal Court For Alleged Misuse of Funds Provided By Fraudulent Investor "Dean T. Smith" (FBI) | 350 |
|  |  | ***Interline Exhibit 12:*** Lead Plaintiff Starts New Enterprise In 2020 - Sheldon Beef | 351 |
| 490 |  | Illegal Human Trafficking In Involuntary Servitude: Lead Plaintiff's Personal Life – Continuous Manipulations, Episodic Destruction, Fraudulent Relationships, Sex Sting Entrapment Attempts | 356 |
| 510 |  | Illegal Human Trafficking In Involuntary Servitude: Lead Plaintiff's Personal Finances and Assets Repeatedly Subjected to Forced Liquidation By Defendant UNITED STATES, Using Relationship, Employment, And Private Enterprises Sabotage | 365 |
|  |  | ***Interline Exhibit 13:*** Redmond Residence – Added Rear Landscaping 14,000 Square Feet, Added In-ground Sprinklers Front and Rear Covering 28,000 Square Feet, Renovated Front Planting Beds | 366 |
|  |  | ***Interline Exhibit 14:*** Kirkland Residence - Rebuilt and Added 60% Square Footage Enlargement | 367 |
| 516 |  | "National Security" Pretexting of Lead Plaintiff by Defendant UNITED STATES Accelerated After 9/11 Attack | 370 |
| 517 |  | Defendants Malicious Acts Against Lead Plaintiff Extend to Torturous Acts | 371 |
| 521 |  | Defendants Malicious Acts Against Lead Plaintiff AGAIN Extend to Torturous Acts | 374 |
| 526 |  | Lead Plaintiff's Personal Volunteer Work Sabotaged By UNITED STATES | 377 |
| 535 | 3. | **Third, Indirect Threats, Lethality Attempts, And Human Trafficking Are Used To Coerce And Indirectly Destroy Evidence Of Past Crimes** | 379 |
|  |  | ***Interline Exhibit 15:*** Indirect Verbal Threat and Subsequent Lethality Events | 384 |
|  |  | IE 15A. First, An Indirect Verbal Threat | 384 |
|  |  | IE 15B. Second, A Mass Casualty Attempt On A MTA Hudson Line Express Train | 385 |
|  |  | IE 15C: Third, A BRMT Assault in Morningside Park, NYC follows | 386 |
|  |  | IE 15D. Fourth, A Vehicle Rundown Sequence In New York City and North Bergen, NJ | 388 |
|  |  | IE 15E. Fifth, A Report Is Made, Met As Always With No Response, Only Official Silence | 390 |
| 540 | 4. | **Fourth, Defendant UNITED STATES Sustains Involuntary Servitude** | 391 |

| 541 | *Table:* Key Contacts- Involuntary Servitude Of Lead Plaintiff | 392 |
|---|---|---|
| | **5.  Fifth, Fraudulent Concealment And Willful Blindness Sustain Obstruction Of Justice** | 393 |
| 550 | **Fraudulent Concealment** | 393 |
| | *Interline Exhibit 16:* August 2021 58th Anniversary MLK "I Have A Dream" Speech Lincoln Memorial Permit Allegedly Cancelled by Organizer – FALSE FOIA Response to Cover First Amendment Violation | 398 |
| 555 | Fraudulent Concealment - NYPD and FBI Coordinate Cover-Up of Human Trafficking, Pre-Texted Investigations | 399 |
| | *Interline Exhibit 17:* Defendants NYPD and FBI Coordinate September 2021 Fraudulent Concealment | 409 |
| | *Interline Exhibit 18:* Defendant FBI Sends Official Liar Letter in September 2021 Coordinated Fraudulent Concealment | 411 |
| | *Interline Exhibit 19*: Defendant Department of Justice Assistant Inspector General Investigations Division Declines Investigation of Defendant FBI, Then Ignores Lead Plaintiff's Follow-Up Letter | 413 |
| 580 | **Willful Blindness - Forty Complaint Letters To US Attorney Ignored** | 420 |
| 593 | **FACTS – 110 ILLEGAL PATTERN ACTS, VIOLATIONS, AND INJURIES** | 422 |
| | **NATIONAL SECURITY PRETEXTING, FRAUDS, AND ENTANGLEMENTS (NSEC series offenses)** | |
| 600 | *NSEC-1 National Security Frauds:* Government Orchestrated Family Assignment and Deliberate Entanglements in National Security Matters, 1961 to Present | 447 |
| 601 | *NSEC-2 National Security Frauds:* Human Trafficking, Forced Labor, Peonage, Inculpating Allied Intelligence Services - CSIS, RCMP, MI-6, MI-5, London Metropolitan Police, UK 1990-1994 | 456 |
| 602 | *NSEC-3 National Security Frauds:* Involuntary Servitude, Forced Labor, Deliberate Entanglements To Violate Rights - Nuclear and Space Deliberate Entanglements, 9/11 Attack, Domestic Sabotage Campaign 1996-2009 | 460 |
| 603 | *NSEC-4 National Security Frauds:* Human Trafficking, Forced Labor, Violations of Rights – Mossad, MI-6, MI-5, London Metropolitan Police, UK 2007 | 485 |
| | **ILLEGAL HUMAN EXPERIMENTATION - BRMT BRAIN HIJACKING ABUSES (HEXP SUBCOUNT OFFENSES)** | |
| | *Biological and Medical Invasions - Torture* | |
| 604 | *HEXP-1 Illegal Human Experimentation:* Biological and Medical Invasions - BRMT Induced Torture, Washington State 2003 | 489 |
| 605 | *HEXP-2 Illegal Human Experimentation:* BRMT Induced Torture And Psychological Operations, Massachusetts 2006-2007 | 495 |
| 606 | *HEXP-3 Illegal Human Experimentation:* Torture And Psychological Operations, New Jersey 2008-2011 | 499 |

| 607 | *HEXP-4 Illegal Human Experimentation:* BRMT Induced Emotional Swings And Short Cycle Torture Sequences Through 2023 | 509 |
|---|---|---|
| **Orchestrated Personal and Intimate Relationships** | | |
| 608 | *HEXP-5 Illegal Human Experimentation:* Personal and Intimate Relationships - Orchestrated Romantic Interests Using BRMT Oxytocin Hormone Brain Hijacking, Generally | 515 |
| 609 | *HEXP-6 Illegal Human Experimentation:* Personal and Intimate Relationships - Orchestrated BRMT and Other Interference in Marital Community With First Spouse, Lynne 1980-1988 | 521 |
| 610 | *HEXP-7 Illegal Human Experimentation:* Personal and Intimate Relationships - Orchestrated BRMT and Other Interference in Fraudulent Marital Community With Second Spouse, Jeanette 1988-2005 | 525 |
| 611 | *HEXP-8 Illegal Human Experimentation:* Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fraudulent Relationship, Marinka 2008 | 531 |
| 612 | *HEXP-9 Illegal Human Experimentation:* Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fraudulent Relationship, Laura 2014-2018 | 539 |
| 613 | *HEXP-10 Illegal Human Experimentation:* Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fraudulent Relationship, Gia 2019-2021 | 544 |
| **Biological and Medical Invasions – Personal Humiliation, Endangerment, Illness** | | |
| 614 | *HEXP-11 Illegal Human Experimentation:* Biological and Medical Invasions - Orchestrated Romantic Interests, BRMT Induced Erectile Dysfunction 2005, 2008, 2020-2021 | 547 |
| 615 | *HEXP-12 Illegal Human Experimentation:* Biological and Medical Invasions - BRMT Orchestrated Personal Movements and Activities | 549 |
| 616 | *HEXP-13 Illegal Human Experimentation:* Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation | 553 |
| 617 | *HEXP-14 Illegal Human Experimentation:* Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses | 557 |
| 618 | *HEXP-15 Illegal Human Experimentation:* Biological and Medical Invasions - BRMT Forced Public Urination Sequence, 2022 | 561 |
| 619 | *HEXP-16 Illegal Human Experimentation:* Biological and Medical Invasions - BRMT Public Flash Temper Hijacking, 2023 | 563 |
| 620 | *HEXP-17 Illegal Human Experimentation:* Biological and Medical Invasions – Food Borne Illnesses 2008-2010, 2018-2023 | 566 |
| **INDIVIDUAL RIGHTS VIOLATIONS AND CONSPIRACIES (RGTS SUBCOUNT OFFENSES)** | | |
| **Entrapments, Illegal Searches and Willful Blindness** | | |
| 621 | *RGTS-1 Rights Violations:* Entrapment and Incrimination Attempts, Stevens Pass 1980s | 569 |

| 622 | *RGTS-2 Rights Violations:* Entrapment and Incrimination Attempts, Money Laundering - Alliance Nominee Cash Bank Deposit 1990, Akoto Structured Payments 2016-2017 | 573 |
|---|---|---|
| 623 | *RGTS-3 Rights Violations:* Entrapment and Incrimination Attempts – FBI/RCMP VSE Pink Sheet Probe 1992-1993 | 578 |
| 624 | *RGTS-4 Rights Violations:* Entrapment and Incrimination Attempts – FBI Sole Source, CFO Search, Tax Filings, Ironwood 2018-2023 | 583 |
| 625 | *RGTS-5 Rights Violations:* Bad Faith Acts – Illegal Searches, Hacking, and Harassing, Oregon Interstate Commerce Trip 2021 | 588 |
| 626 | *RGTS-6 Rights Violations:* Bad Faith Acts – Federal Police Powers Abuses of Legal Processes 1990 to present | 592 |
| 627 | *RGTS-7 Rights Violations:* Bad Faith Acts – Federal Police Powers Abuses of Legal Processes Forced Personal Bankruptcy 1993 | 605 |
| 628 | *RGTS-8 Rights Violations:* Bad Faith Acts – Willful Blindness - US Attorney Offices, DOJ Headquarters 2005, 2021-2023 | 608 |
| 629 | *RGTS-9 Rights Violations:* Bad Faith Acts – Illegal General Searches, Continual Monitoring 1968 to present | 611 |
| 630 | *RGTS-10 Rights Violations:* Bad Faith Acts – Privacy and Quiet Enjoyment | 614 |
| 631 | *RGTS-11 Rights Violations:* Bad Faith Acts – Biological and Medical Invasions, Access to Ethical Basic Health Care | 617 |
| **Direct Interferences in Personal and Intimate Relationships** | | |
| 632 | *RGTS-12 Rights Violations:* Personal and Intimate Relationships - Orchestrated Romantic Interests, Arranged In-person Contacts | 619 |
| 633 | *RGTS-13 Rights Violations:* Personal and Intimate Relationships – Blocked and Spoofed Access to Dating Sites 2004-2005, 2007-2008, 2011-2014, 2018 to present | 622 |
| 634 | *RGTS-14 Rights Violations:* Personal and Intimate Relationships – Orchestrated Romantic Interests, Fraudulent Dates 2004-2005, 2008, 2019-2020 | 624 |
| **Hacking, Harassment, Disinformation, Abuse of Official Records** | | |
| 635 | *RGTS-15 Rights Violations:* Illegal Searches, Hacking, and Harassing, Computer Technology | 628 |
| 636 | *RGTS-16 Rights Violations:* Blocking Information Access and Supplying Deliberate Disinformation | 630 |
| 637 | *RGTS-17 Rights Violations:* Misuse of Official Records and Mispersonation, Dubai 2015 | 632 |
| **RACKETEERING – (RICO SUBCOUNT OFFENSES)** | | |
| **Racketeering - Thefts and Takings Targeted at Personal Assets** | | |
| 638 | RICO Statute: Congressional Intent PL 91-452 (RICO) October 1970 "shall be liberally construed to effectuate its remedial purposes." | 635 |
| 639 | *RICO-1 Racketeering Violations:* Involuntary Servitude, Forced Labor, Human Trafficking, Entrapment Attempts and Entanglements – | 636 |

| | Obstructing Market Rate Private Employment and Interstate Commerce From Deloitte (1979) through Establish (2008) | |
|---|---|---|
| 640 | *RICO-2 Racketeering Violations:* Theft and Takings - Financial Resources, Obstructing Market Rate Private Employment 1986 to present | 645 |
| 641 | *RICO-3 Racketeering Violations:* Theft and Takings - Financial Resources, Thefts of Compensation PAN 1993-1994, CNA 2002, Establish 2008 | 647 |
| 642 | *RICO-4 Racketeering Violations:* Theft and Takings - Financial Resources, Thefts of Labor And Materials, Cliffside Park Apartment Renovations 2008 | 651 |
| 643 | *RICO-5 Racketeering Violations:* Theft and Takings - Financial Resources, Deprivation of Benefits, Kidnapping, and Involuntary Commitment 2008-2011 | 654 |
| 644 | *RICO-6 Racketeering Violations:* Theft and Takings - Financial Resources, Forced Labor Imposed Litigation Expenses 1993-2022 | 661 |
| 645 | *RICO-7 Racketeering Violations:* Theft and Takings - Financial Resources, Shadow Banking System Thefts And Manipulations | 667 |
| ***Racketeering – Personal Color of Law Entrapment Attempts*** | | |
| 646 | *RICO-8 Racketeering Violations:* Theft and Takings - Credit and Credit Access Hacks | 669 |
| 647 | *RICO-9 Racketeering Violations:* Illegal Searches, Hacking, and Harassing– Tax Software Hack EITC Entrapment Attempt 2021, 2022 | 672 |
| 648 | *RICO-10 Racketeering Violations:* SOLE SOURCE Fraudulent Financing with Ironwood Tax Loss Self-Exculpatory Offset Attempt 2018-2023 | 674 |
| **Racketeering – Targeting Small Business and Enterprise** | | |
| ***Racketeering - Thefts and Takings*** | | |
| 649 | *RICO-11 Racketeering Violations:* Deprivation Of SBA Government Bonding Benefits, UT Bonding Fraud 1990-1993 | 680 |
| 650 | *RICO-12 Racketeering Violations:* Theft Of Receivables, Check Frauds 1990 To Present | 684 |
| ***Racketeering - Fraudulent Financings*** | | |
| 651 | *RICO-13 Racketeering Violations:* Money Laundering - Alliance Nominee Cash Bank Deposit 1990 | 688 |
| 652 | *RICO-14 Racketeering Violations:* Factoring Frauds –Pacific Financial Services 1992-1993, PAN Environmental Services 1993-1994 | 691 |
| 653 | *RICO-15 Racketeering Violations:* Fraudulent Financial Services – Ex-CIA Northern Africa Case Officer 1992-1995 Alliance | 695 |
| 654 | *RICO-16 Racketeering Violations:* Fraudulent Financial Services – Ex-CIA Latin America Case Officer 2013-2015 | 700 |
| 655 | *RICO-17 Racketeering Violations:* Fraudulent Financings and Loans - NYC Broker/Investor 2011-2017 | 703 |
| 656 | *RICO-18 Racketeering Violations:* BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution 2014-2015 | 707 |

| 657 | *RICO-19 Racketeering Violations:* False Personation – NYC Forbes 200 Captive Corporate Investment Firm 2013-2017 | 712 |
| 658 | *RICO-20 Racketeering Violations:* Fraudulent Investor Personation - Investments and Loans 2015-2019 | 714 |
| 659 | *RICO-21 Racketeering Violations:* Fraudulent Investor Personation and Investments 2015-2020 | 719 |
| 660 | *RICO-22 Racketeering Violations:* Fraudulent Financings – Private Placement and Public IPO 2015-2017 | 722 |
| 661 | *RICO-23 Racketeering Violations:* Fraudulent Financings, International CFIUS Pretexting 2015 | 725 |
| 662 | *RICO-24 Racketeering Violations:* Fraudulent Financing Fees Supporting Fraudulent Sales Opportunities 2018 | 729 |
| 663 | *RICO-25 Racketeering Violations:* Fraudulent Financing Fees 2018 | 731 |
| 664 | *RICO-26 Racketeering Violations:* Fraudulent Financial Services – Domestic Debt Broker 2018 | 732 |
| 665 | *RICO-27 Racketeering Violations:* Fraudulent Financial Services - International Debt Broker 2015-2016 | 734 |
| 666 | *RICO-28 Racketeering Violations:* Fraudulent Financial Services – Mid-Market Investment Bank 2016-2017 | 736 |
| 667 | *RICO-29 Racketeering Violations:* Fraudulent Financial Services - International Financial Services Institution 2016-2017 | 738 |
| 668 | *RICO-30 Racketeering Violations:* Fraudulent Financial Services – Wall Street and Los Angeles Investment Banks 2015-2021 | 740 |
| 669 | *RICO-31 Racketeering Violations:* Fraudulent Financings and Representation, Online Referral Services 2015-2018 | 750 |
| 670 | *RICO-32 Racketeering Violations:* Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses 1986 to 2022 | 753 |
| 671 | *RICO-33 Racketeering Violations:* Commercial Frauds: Fraudulent Financings and Litigation - *AUCTUS v. CORNHUSKER* 2019 | 774 |
| 672 | *RICO-34 Racketeering Violations:* Fraudulent Financings, Online Platform 2021 | 778 |
| *Racketeering – Fraudulent Sales Leads* | | |
| 673 | *RICO-35 Racketeering Violations:* Fraudulent Sales Leads 2002-2004 | 779 |
| 674 | *RICO-36 Racketeering Violations:* Fraudulent Sales Lead Solicitation Services 2021 | 781 |
| 675 | *RICO-37 Racketeering Violations:* Fraudulent Sales Lead Solicitation Services 2021 | 783 |
| 676 | *RICO-38 Racketeering Violations:* Fraudulent Sales Lead Development Services 2017 | 784 |
| 677 | *RICO-39 Racketeering Violations:* Fraudulent Sales Lead Development Services 2017 | 786 |

| 678 | *RICO-40 Racketeering Violations:* Fraudulent Sales Opportunities, International 2020-2021 | 787 |
| 679 | *RICO-41 Racketeering Violations:* Fraudulent Sales Opportunities, Domestic 1983-2022 | 791 |
| 680 | *RICO-42 Racketeering Violations:* Fraudulent Sales And Marketing Representation 2019-2021 | 799 |
| **Racketeering – Dishonest Professional Services** | | |
| 681 | *RICO-43 Dishonest professional services –* Accounting Compilation And Review 1993, 2021 | 803 |
| 682 | *RICO-44 Racketeering Violations:* Dishonest Professional Services, Web 2021-2022 | 806 |
| 683 | *RICO-45 Racketeering Violations:* Dishonest Professional Services, Legal 1986-2005 | 808 |
| 684 | *RICO-46 42 Racketeering Violations:* Dishonest Professional Services, Legal 2014-2021 | 813 |
| 685 | *RICO-47 Racketeering Violations:* Dishonest Professional Services, MARICOPA SHERIFF, ARPAIO as Consultant 2014-2017 | 816 |
| 686 | *RICO-48 Racketeering Violations:* Dishonest Professional Services, Employees, Recruiters, Various Positions 1986-2022 | 826 |
| 687 | *RICO-49 Racketeering Violations:* Dishonest Professional Services, Employees, Recruiters, Logistics 2015-2021 | 831 |
| 688 | *RICO-50 Racketeering Violations:* Dishonest Professional Services, Employees, Sales | 834 |
| 689 | *RICO-51 Racketeering Violations:* Dishonest Professional Services, Employees, CFO and Controller | 836 |
| 690 | *RICO-52 Racketeering Violations:* Dishonest Professional Services, Employees, Controller 2018 | 840 |
| **Racketeering – Fraudulent Production Asset Sales** | | |
| 691 | *RICO-53 Racketeering Violations:* Fraudulent Production Asset Purchase Options, Professional Services 2015-2021 | 841 |
| 692 | *RICO-54 Racketeering Violations:* Fraudulent Production Asset Purchase Options, AZ 2015-2017 | 850 |
| 693 | *RICO-55 Racketeering Violations:* Fraudulent Production Asset Purchase Options, OR, ID, TX 2015-2021 | 854 |
| **LETHALITY ATTEMPTS (LETHL SUBCOUNT OFFENSES)** | | |
| 694 | *LETHL-1 Lethality Attempts*: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – mid 1980s | 859 |
| 695 | *LETHL-2 Lethality Attempts*: Washington State BRMT Induced Falls, 1990-2005 | 863 |
| 696 | *LETHL-3 Lethality Attempts*: Washington State BRMT Induced Suicide Ideation 2003-2005 | 864 |
| 697 | *LETHL-4 Lethality Attempts:* Inciting Public Vigilantism, 2004-2023 | 866 |

| | | |
|---|---|---|
| 698 | *LETHL-5 Lethality Attempts:* New Jersey BRMT Induced Suicide Ideation 2008-2010 | 870 |
| 699 | *LETHL-6 Lethality Attempts*: New Jersey Cliffside Park BRMT Falls 2008-2010 | 871 |
| 700 | *LETHL-7 Lethality Attempts*: BRMT Staircase Falls and Attempts in New Jersey and New York 2008-2022 | 873 |
| 701 | *LETHL-8 Lethality Attempts*: New Jersey, Hackensack, BRMT Fall, 2017 | 875 |
| 702 | *LETHL-9 Lethality Attempts*: California, BRMT Induced Extreme Eye Watering, 2017 | 876 |
| 703 | *LETHL-10 Lethality Attempts*: New Jersey, Edgewater Bedroom BRMT Falls, 2019 | 879 |
| 704 | *LETHL-11 Lethality Attempts*: Website Hacks to Eliminate or Delay Covid Vaccination, 2020 | 880 |
| 705 | *LETHL-12 Lethality Attempts*: New Jersey Edgewater BRMT Falls, 2021-2022 | 882 |
| 706 | *LETHL-13 Lethality Attempts*: New Jersey North Bergen Hospital Fall, 2021 | 884 |
| 707 | *LETHL-14 Lethality Attempts*: New York Metro North Mass Casualty Attempt, 2022 | 886 |
| 708 | *LETHL-15 Lethality Attempts:* New York Morningside Park BRMT Fall, 2022 | 888 |
| 709 | *LETHL-16 Lethality Attempts*: New York New Jersey North Bergen Vehicle Rundown Sequence, 2022 | 890 |
| 710 | *LETHL-17 Lethality Attempts*: Programmed Health Collapse, 2023 | 892 |
| 712 | **Key Illegal BRMT Program State And Local Government Co-Conspirators' Relationships To Federal Defendants** | |
| 716 | A. Defendant FWSD - Federal Way School District | 898 |
| 718 | B. Defendant WSU – Washington State University | 900 |
| 728 | C. Defendant WASH - State of Washington | 905 |
| 740 | D. Defendant KCSD – King County Sheriff's Department | 909 |
| 760 | E. Summary – Lead Plaintiff's Relationships With Federal, State And Local Governmental Defendants | 916 |
| 762 | Summary Table | 917 |
| 766 | State and Local Government Co-Conspirator Employee Crossover Employment - Adverse Impacts On Lead Plaintiff and Other Class Members | 925 |
| 767 | Entities With Known Embedded Agent Which Employed Class Members | 927 |
| 771 | Other Lead Plaintiff Related Class Members' Involuntary Servitude - Employment Patterns | 929 |
| 771 | A. First Spouse Lynne's Employment Pattern | 929 |
| 772 | B. Second Spouse Jeanette's Employment Pattern | 930 |
| 774 | C. Father Don's Employment Pattern | 931 |
| 777 | D. Uncle Bruce's Employment Pattern | 933 |

| 779 | E. Maternal Grandparents' Employment Pattern | 934 |
|---|---|---|
| 781 | F. Other Class Member Employment Patterns Subject to Discovery | 935 |
| 785 | **FIFTY-FOUR CLAIMS FOR RELIEF** | 936 |
| 798 | *Table:* Constitutional Rights Violations By Claim For Relief | 944 |
| 799 | *Table:* Named Defendants By Claim For Relief | 947 |
| 800 | Legally Responsive Answers Requirements | 967 |
| 801 | Bioweapons and Bioweapons Delivery Systems Prohibited | 968 |
| 802 | Terrorism - Violent Crimes in Aid of Racketeering Enterprises | 979 |
| 803 | Murder | 982 |
| 804 | Attempted Murder | 991 |
| 805 | Conspiracy To Murder | 994 |
| 806 | Manslaughter | 1032 |
| 807 | Attempted Manslaughter | 1034 |
| 808 | Kidnapping | 1037 |
| 809 | Human Trafficking | 1044 |
| 810 | Torture – Mental and Physical Abuse | 1054 |
| 811 | Conspiracy to Torture | 1060 |
| 812 | Assault | 1063 |
| 813 | Aggravated Battery | 1064 |
| 814 | Soliciting Crime Of Violence | 1066 |
| 815 | Interference With Interstate Commerce By Threats Or Violence | 1069 |
| 816 | Tampering With Witness | 1071 |
| 817 | Tampering With Witness - Evidence | 1074 |
| 818 | Retaliating Against Witness | 1077 |
| 819 | Tampering With Consumer Products | 1079 |
| 820 | Involuntary Servitude | 1081 |
| 821 | Peonage | 1100 |
| 822 | Forced Labor | 1106 |
| 823 | Sexual Abuse | 1109 |
| 824 | Frauds - Mail | 1111 |
| 825 | Frauds – Wire | 1123 |
| 826 | Frauds – Computer Access Devices | 1126 |
| 827 | Fraud And Related Activity – Computers | 1130 |
| 828 | Attempts and Conspiracy - Frauds By Mail, Wire, Computer | 1134 |
| 829 | Scheme To Defraud Of Honest Services - Mail, Wire, Computer | 1139 |
| 830 | Property Rights Of Citizens - Illegal Takings | 1143 |
| 831 | Racketeering - Monetary Benefit From Unlawful Activity | 1152 |
| 832 | Interstate And Foreign Travel Or Transportation For Racketeering Purposes | 1164 |

| 833 | Free Exercise Of Religion | 1168 |
|-----|---------------------------|------|
| 834 | Posse Comitatus - Use Of Military To Violate Constitutional Rights | 1176 |
| 835 | Involuntary Servitude | 1180 |
| 836 | Intentional Discrimination in Employment | 1184 |
| 837 | Peonage Abolished | 1189 |
| 838 | Conspiracy Against Rights | 1195 |
| 839 | Deprivation of Rights– Equal Protection | 1198 |
| 840 | Deprivation of Rights Under Color of Law | 1204 |
| 841 | Deprivation of Rights Under Color of Law - Anti-Terrorist Forfeiture Protection | 1207 |
| 842 | Deprivation of Rights Under Color of Law - Searches and Warrants | 1224 |
| 843 | Deprivation of Rights Under Color of Law - Searches Without Warrant | 1225 |
| 844 | False Information and Hoaxes | 1228 |
| 845 | Neglect To Protect - Failure To Protect | 1233 |
| 846 | Neglect To Protect - Failure To Supervise | 1242 |
| 847 | Neglect To Protect - Failure To Train | 1246 |
| 848 | Neglect To Protect - Misprison of Felony | 1250 |
| 849 | Neglect To Protect - Acting as Accomplice | 1256 |
| 850 | Neglect To Protect - Acting as Accessory | 1260 |
| 851 | Neglect To Protect - Aiding and Abetting | 1264 |
| 852 | Prohibited Activities - Pattern Of Racketeering Acts | 1268 |
| 853 | Defamation | 1276 |
| 854 | Freedom Of Information | 1293 |
| 893 | **CONSTITUTIONAL AND STATUTORY REMEDIES FOR CLAIMS** | 1295 |
| 899 | *Table 899A*: Scope Of Remedies Available Under Constitution, Federal Statutes, Common Law | 1297 |
|     | *Table 899B*: Scope of Remedies By Claim | 1302 |
| 901 | *Table:* Remedies Available By Defendant For Each Claim For Relief | 1303 |
| 902 | Order Reversing Conflict Of Law 18 U.S.C. § 2340B | 1303 |
| 903 | Emergency Order Providing Immediate Injunctive Relief | 1304 |
| 905 | Permanent Injunctive Order | 1305 |
| 907 | Order Of Forfeiture | 1308 |
| 908 | Monetary Damages Award | 1308 |
| 909 | Compensatory Damages For Defendants' Individual Injuries To Plaintiffs | 1310 |
| 910 | Compensatory Damages For Defendants' Injuries To Business, Commercial, And Entrepreneurial Property And Rights | 1320 |
| 911 | Compensatory Damages For Defendants' Business, Commercial, And Entrepreneurial Civic Participation Rights And Benefits Injuries | 1322 |
| 912 | Additional Statutory Damages And Remedies - Treble And Other Damages | 1322 |

| | | 1323 |
|---|---|---|
| 3 | Costs And Damages | 1323 |
| 4 | Punitive Damages | 1323 |
| 915 | Reasonable Costs, Expenses, And Fees | 1324 |
| 916 | Other Relief | 1324 |
| 917 | **JURY DEMAND** | 1324 |
| 918 | **REQUEST FOR APPOINTMENT OF COUNSEL** | 1324 |
| | **SIGNATURE** | 1324 |

Page total number in footer varies from page to page as the document was printed in increments, not in a single print session. Actual final page total is 1324 pages.

**Filed herewith:**

Appendix 1: Prior Filings In The District of Columbia, Southern District Of New York

Appendix 2: Abbreviated Timeline: Botched Cover-Up, Threats, and Lethality Attempts

[Intentionally left blank.]

# COMPLAINT

**SYNOPSIS**

## Defendants UNITED STATES, ARMY, CIA, DOJ, FBI, Other Government Co-Conspirators Violate First Amendment Establishment Clause Which Guarantees Freedom Of Religion

1. This Complaint arises out of a fraudulently concealed pattern of religion-based cross-generational discrimination and purposeful, knowing, and willful acts, violations, and injuries against constitutional rights, perpetrated by defendant UNITED STATES and its co-conspirators, against a Quaker-based order of conscientious objectors while in military service, and in patterns of continued injuries and racketeering crimes against them and their children after their military service ended, for the illegal purpose of using these US citizens as unwitting human subjects of illegal field medical experiments without consent to develop and test an illegal weapon system, the BRMT brain hijacking bioweapon and bioweapon delivery system, which is prohibited under US law 18 U.S.C. § 178 and under the ratified 1972 Bioweapon Treaty. These acts, violations, and injuries have and do violate the Constitution's First Amendment establishment clause regarding religious freedom, violate prevailing case law regarding the balancing of religious freedom and compelling governmental interest as affirmed in *Sherbert v. Verner,* 374 U.S. 398 (1963). This religious freedom mandate was affirmed five years before Lead Plaintiff's own initial human trafficking by defendant UNITED STATES as a minor child at age 12. Congress acted again to affirm this unalienable right in the 1993 *Religious Freedom Restoration Act* 42 U.S.C. § 2000bb–1 (paragraph 259), wherein Congress restored prior prevailing case law regarding religious practices and civil rights of action to defend these sacred constitutional rights against government intrusion in the absence of a compelling governmental interest. Despite this constitutional prohibition and Congressional intent repeatedly expressed in law, defendant

UNITED STATES has and does perpetuate its discriminatory patterns of conduct, to and including systematic rights violations, and manage and operate in a sustained associated-in-fact enterprise pattern of racketeering acts against these plaintiffs by defendants DOD, CIA, and DOJ, and their respective departments and agencies, under the knowing and watchful eye of Executive Office of the President including, without limitation, the National Security Council and the Office of the Director of National Intelligence (DNI), in conspiracy with other defendants named herein, in sustained violations of, without limitation, 5 U.S.C. § 301 *Administrative Procedures,* 18 U.S.C. §§ 1961-1968 *RICO,* and 42 U.S.C. §§ 1981-1994 *Civil Rights,* 42 U.S.C. §§ 2000bb-2000bb-4, *Religious Freedom*, and our Constitution.

2. Defendant UNITED STATES has and does act through its departments and agencies including, without limitation, defendants ARMY, CIA, FBI, and USMS, together with co-conspirators including domestic and foreign governmental police and intelligence powers, certain moneyed interests, and the press, in knowing and willful sweeping violations of the *First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth*, and *Fourteenth* Amendments, and other constitutional and statutory rights of this class of US persons. Religious discrimination violating the *First* Amendment, a functional cross-generational *bill of attainder* constructed by administrative fiat violating the Constitution's Section 9 prohibition, and systematic violations of *constitutional rights,* all for the corrupt purposes of developing a banned weapon system on human beings who are US citizens used as involuntary subjects and human lab rats, and of fraudulently concealing the entire corrupt associated-in-fact enterprise, are the root causes of these criminal acts. This action is brought by these plaintiffs as a civil action because:

(i) defendant DOJ has and does refuse to act in the interests of justice despite these issues
being raised repeatedly before it across decades of fraudulent concealment, willful
blindness, and official silence, while it has and does

(ii) act and fail to act, in its own continuing self-interest, rather than in the public interest it is
constitutionally charged to protect, which failures to act have and do

(iii) directly contradict the constitutional interests of all US persons, as defendant DOJ

(iv) continues to fraudulently conceal and sustain its willful blindness to the associated-in-
fact enterprise pattern of racketeering and other illegal acts, which defendant DOJ has
and does both

(v) directly operate through its police powers agencies, and against which defendant DOJ has
and does

(vi) continually fail to act, for the specific purpose of sustaining its own operations and the
operations of its co-conspirators against US persons in this specific plaintiff class.

This pattern of fraudulently concealed illegal practices by defendant UNITED STATES and its

governmental, private sector, and individual defendant co-conspirators has persisted for at least

seventy years across four generations of American religious families of this order of Quakers,

and now endangers the fifth generation of these same families, whether or not those succeeding

generations continue to practice this specific religion in the same fashion as their forebears, as

well as others who subjected to the same discriminatory treatment arbitrarily imposed by

defendant UNITED STATES, which has and does ferociously resist the repeated efforts of

Congressional through reforms of law, to root out these continuing illegal practices in defendant

UNITED STATES' willful, knowing, and continuing scofflaw conduct, and that of its co-

coconspirators.

**Criminal Law 18 U.S.C. § 175 Violated By Inhumane Medical Experiments Secretly Abusing Unwitting US Persons For Decades To Develop And Test Illegal BRMT Bioweapon And Bioweapon Delivery System**

2. The original purpose of this specific conspiracy among defendant UNITED STATES' federal department and agency defendants has been and is to perpetuate the illegal development of an ultra-secret and illegal bioweapon and bioweapon delivery system (known herein as BRMT) which produces biochemicals in the brain and body which are legally defined as toxins (paragraph 253) as deployed against individual human beings, in criminal violation of 18 U.S.C. § 175, wherein Congress provided for penalties ranging to life in prison. This illegal BRMT bioweapon and bioweapon delivery system is the successor in fact to the fatally flawed and failed illegal defendant CIA MKUltra LSD secret drugging program run by Dr. Sidney Gottleib in which defendant ARMY also closely collaborated (Interline Exhibit 3). That ultrasecret government "mind control" program ran from 1953 until its public disclosure in 1973, when it was disclosed as the American people were still reeling from the 1971 disclosure of another out of control illegal federal government program, defendant FBI's Cointelpro, wherein defendant FBI engaged in felony violations of constitutional and civil rights and in patterns of racketeering acts to and including violence against US persons. Defendant FBI also funded a White Supremacist militia against civil rights groups and other rights activists as part of its illegal Cointelpro program, described at paragraphs 332, 403-408. Lead Plaintiff's own family of origin was itself swept up in defendant FBI's Cointelpro evidence obstruction and destruction operations while his unwitting father was employed by a secret FBI cover company, Pacific Paper Products, which operated in plain sight while illegally undercutting prices offered by private US businesses in interstate commerce, so defendant FBI could use the Lead Plaintiff's unwitting father to purchase medical x-rays from specified doctors' offices and medical clinics

for recycling, thus destroying vital medical evidence of defendant FBI and co-conspirators' illegal Cointelpro violence in northern and southern California, described at paragraphs 403-418.

3. As with CIA's illegal MKUltra LSD drugging program, the illegal BRMT bioweapon development began with a few experiments which started as medical science was unlocking the biological "secrets" of human minds and bodies, primarily hormones, including, without limitation, adrenaline (energy), melatonin (sleep), and oxytocin (love). According to Harvard Health, oxytocin is a hormone that is produced in the hypothalamus and released into the bloodstream by the pituitary gland. Oxytocin is commonly known as the "love" hormone. Beginning in the 1960s, defendants CIA and ARMY abused soldiers and citizens in illegal human subject medical experiments on their hormones without their consent. As an early subject of this illegal medical experimentation, Lead Plaintiff has been its unwitting victim since about 1968. With the benefit of careful forensic analysis since 2021, it has become clear that crude initial experiments on the unwitting Lead Plaintiff were run in the tent camping area of a California State Park near Redwoods National Park by defendant ARMY and CIA personnel one evening in 1968 when Lead Plaintiff was age 12. Two white males in an adjacent tent camping spot used a secretly developed focused brain hormone hijacking (hijacking is defined as an involuntary forced takeover as used herein throughout the complaint) device from about 20 feet away, which was concealed by the hedge between the two camping spots, to drive an extreme oxytocin biochemical release from the pituitary gland in the Lead Plaintiff's brain (see Illustrations 1-3 below). At the time, Lead Plaintiff was on a camping trip in the sole custody of his unwitting father's former ARMY buddy, Gary Jack, (paragraph 417, 492), likely a continuing member of, or contractor to, defendant ARMY. Gary Jack had either been duped into this defendant ARMY and CIA operation or had infiltrated the Quaker-based religious group of Lead

Plaintiff's unwitting father. This infiltration for predatory religious discriminatory and illegal

purposes has been defendant UNITED STATES' common practice against this religious group

across multiple generations since at least the 1950s as further described herein.

***Illustration 1:*** **Basic Brain Structures Hijacked During Illegal Medical Experiments Used For Illegal BRMT Bioweapon Development, Testing, And Operation 18 U.S.C. § 175**



*Source:* Dana Foundation https://dana.org/resources/neuroanatomy-the-basics/

[Intentionally left blank.]

*Illustration 2:* **Hypothalmus, Pituitary And Pineal Glands Secrete Brain Hormones (Brain Biochemical Neurotransmitters) Hijacked By Illegal BRMT Bioweapon For Toxin Effect 18 U.S.C. § 178(2)**



The Hypothalamus, Pituitary and Pineal Glands

Three glands of critical importance to the body, the hypothalamus, pituitary and pineal glands, are all located in the brain.

These glands work synergistically to control many functions in the body.

[Intentionally left blank.]

*Illustration 3:* **Basic Brain Hormones Hijacked By Illegal BRMT Bioweapon Using Bioweapon Delivery System**



*Source:* https://alaughingsoul.wordpress.com/2016/01/06/the-neurotransmitters-that-rule-our-life/

**Development, Test, And Deployment Progression Of Illegal BRMT Bioweapon And Bioweapon Delivery System 18 U.S.C. § 175**

4. From these crude illegal experiments on the 12 year old Lead Plaintiff and other human subjects in the 1960s, the idea for a new secret weapon gradually evolved, through medical research and technological progress, into defendant UNITED STATES' illegal and internationally prohibited BRMT bioweapon and bioweapon delivery system. Since the early 1970s, this illegal BRMT bioweapon has evolved with time, massive expenditures, medical research on the brain and body, illegal experimentation on human subjects without their knowledge and consent, and technological progress in computing, communications, and

precision location systems. Lead Plaintiff is among those directly violated and injured by defendant UNITED STATES in its long-running illegal medical experiments on human subjects without consent, which illegal biomedical abuse continues at the present time. These illegal acts, violations, and injuries by defendant UNITED STATES against these plaintiffs has progressed in ever more intrusive, sophisticated, and depraved forms over more than 57 years of continuous illegal operation:

(i) Fired as a locally used device around Summer 1968 – in the forensically reverse engineered first known 1968 abuse against Lead Plaintiff, BRMT was fired under the supervision of BREYER, formerly ARMY Intelligence, in the California State Park at paragraph 3, then

(ii) Fired as a locally used device around Spring 1975 - the technological equivalent of a musket, BRMT was fired under the supervision of BREYER, formerly ARMY Intelligence, at Dworshak Reservoir on a tent camping and canoe trip near Orofino, ID from Washington State University, Pullman, WA, when Lead Plaintiff was age 19, and in the company of his girlfriend Susan B. Irish (paragraph 492). then

(iii) Fired as a remotely triggered local device around 1983-85 - the technological equivalent of remotely controlled machine gun, BRMT was suitable for use in assassinations, as was attempted at Porteau Cove, British Columbia, likely under the supervision of BURNS (CIA) when Lead Plaintiff was approximately age 30 in the company of his wife Lynne (LETHL-1, paragraph 694), then evolved further to be

(iv) Fired as a fully remote operator controlled bioweapon and bioweapon delivery system around 2004 – the technological equivalent of remotely triggered drone weapon used for torture and to provoke self-murder (suicide ideation from extreme doses to

induce biochemically driven depression) when Lead Plaintiff was age 48, while alone at home across the street from the former BURNS residence, while Phillips lived there (likely USMS), then evolved still further since 2004 to be

(v)        Fired absent direct operator intervention in the moment – by adding daemons, speech and thought synthesis, and, more recently, likely around 2020, artificial intelligence, in a fully remote mode by unknown CIA and ARMY management who can locally through handheld or fully remote through video monitoring (paragraphs 380-394) using remotely pulsed energy to drive brain biochemical toxin effects.

5. The illegal BRMT bioweapon and bioweapon delivery system is now a highly sophisticated illegal secret offensive bioweapon and bioweapon delivery system, used against these plaintiffs without their consent in direct and continuing violations of their constitutional rights. This conduct, originating in defendants ARMY and CIA selection of unwitting victims through defendant ARMY religious discrimination against this Quaker-based group, who serve as conscientious objectors in the ARMY medical corps, was and is a constitutionally prohibited intrusion into "unalienable rights" from its first use, and was and is explicitly internationally prohibited for use against any and all persons by the ratified 1972 Bioweapons Treaty. Its offensive use as a bioweapon against an unwitting US person is also a criminal offense under 18 U.S.C. § 175 and, by making these plaintiffs involuntary servants of the United States government over decades of this abuse, also criminally violates 18 U.S.C. §§ 241, 242, 1961-1968, among other federal statutes. Defendant DOJ has been and is silent, willfully so, including the current Attorney General GARLAND, who may have been Stuart Bettesworth, a student at Lead Plaintiff's Decatur High School in 1971-1972, and has been forensically identified by Lead Plaintiff in late 2023 as the person known to him as Robert Mandich while GARLAND operated

undercover at Washington State University (WSU), Pullman, WA in 1974-1976. GARLAND

posed as a student co-resident on the same residential floor of the WSU Perham Hall student

dormitory in 1974-75 and as a student neighbor in WSU Nez Perce Village student apartment

housing in 1975-76, while driving a well-used green Mercury Capri, in support of this illegal

program under the supervision of BREYER, its apparent field executive then posing first as a

fraudulent church elder in Kent, WA in 1970-1972, then as father of an embedded agent posing

as a student alongside GARLAND, and supposedly residing in Spokane, WA (paragraphs 99d,

111, 211, 417-419) from 1974 into 1980, all as can be attested by DOLAN, who later served as

Chief of Staff to Washington Governor Gregoire (paragraph 111).

### FDA Approvals For Antilog Medical Device Tests Prove Scientific Feasibility of Secret Illegal BRMT Bioweapon

6. Beneficial medical devices, using the same medical and scientific principles which

undergird the illegal BRMT bioweapon and bioweapon delivery system, are only now coming to

the commercial medical market. These are beneficial medical devices directly controlled by the

user's brain, not by a government employee or an automated government-controlled system, and

have been approved by FDA for human trials to assist disabled people who have progressive

brain disabilities such as ALS. Synchron, a US company formed in 2012, spent less than $70

million to take its device from concept to first implant in Australia in 2019 and to complete the

first six US patient implants by September 2022. The Synchron system is being successfully

used in human trials today as can be seen on video available at Synchron.com. NeuraLink, an

Elon Musk company, was FDA approved for human trials in May 2023 and completed its first

human implantation in early 2024. See paragraphs 320g, 374-375, and Lead Plaintiff Evidentiary

Exhibits "LPEE" pages 1-55.

undercover at Washington State University (WSU), Pullman, WA in 1974-1976. GARLAND posed as a student co-resident on the same residential floor of the WSU Perham Hall student dormitory in 1974-75 and as a student neighbor in WSU Nez Perce Village student apartment housing in 1975-76, while driving a well-used green Mercury Capri, in support of this illegal program under the supervision of BREYER, its apparent field executive then posing first as a fraudulent church elder in Kent, WA in 1970-1972, then as father of an embeeded agent posing as a student alongside GARLAND, and supposedly residing in Spokane, WA (paragraphs 99d, 111, 211, 417-419) from 1974 into 1980, all as can be attested by DOLAN, who later served as Chief of Staff to Washington Governor Gregoire (paragraph 111).

### FDA Approvals For Antilog Medical Device Tests Prove Scientific Feasibility of Secret Illegal BRMT Bioweapon

6. Beneficial medical devices, using the same medical and scientific principles which undergird the illegal BRMT bioweapon and bioweapon delivery system, are only now coming to the commercial medical market. These are beneficial medical devices directly controlled by the user's brain, not by a government employee or an automated government-controlled system, and have been approved by FDA for human trials to assist disabled people who have progressive brain disabilities such as ALS. Synchron, a US company formed in 2012, spent less than $70 million to take its device from concept to first implant in Australia in 2019 and to complete the first six US patient implants by September 2022. The Synchron system is being successfully used in human trials today as can be seen on video available at Synchron.com. NeuraLink, an Elon Musk company, was FDA approved for human trials in May 2023 and completed its first human implantation in early 2024. See paragraphs 320g, 374-375, and Lead Plaintiff Evidentiary Exhibits "LPEE" pages 1-55.

***Illustration 4*: Synchron Brain-Computer Interface Implanted In First Six US Patients**

MEDTECH**DIVE**       Deep Dive   Library   Events   Press Releases   Topics ⌄

DIVE BRIEF

# Synchron brain-computer interface implanted in first 6 US patients

The device is intended to give people with severe paralysis the ability to use their thoughts to perform everyday functions, such as online communications, hands-free.

Published Sept. 8, 2023

Source: MedTechDive.com.  See also Synchron.com.

7. The legal, scientific, and technological basis for these devices to be tested on willing humans is clear. The complete absence of any legal basis for illegal human experiments on US persons to develop a weapon – the BRMT bioweapon and bioweapon delivery system - and for defendant UNITED STATES' continuing governmental criminal abuse of US persons is also clear. There is no legal basis for illegal biomedical experiments on human subjects without informed consent. These same types of acts were criminally prosecuted against Nazi doctors, some of whom received death sentences. A life sentence is available to the courts for this criminal conduct at 18 U.S.C. § 175, demonstrating clear Congressional intent regarding the severity of these criminal acts which also violate 5 U.S.C. § 301, due to their illegal use against US persons as an offensive weapon of war. During its continued illegal development and abuse of US persons, defendant UNITED STATES has and does also violate the First Amendment, as it has suppressed access to brain-to-computer interface information from web access during research by Lead Plaintiff from 2012 to 2021, by using technical hacks to fraudulently conceal this vital evidence from discovery by Lead Plaintiff while he was actively searching for answers to explain his prior experiences with suicide ideations which occurred despite his extreme

emotional stability (320e and LPEE pages 190-236), and to explain a series of lethality attempts

(paragraphs 604, 606 HEXP-1, 3; 694-710 LETHL-1-17) by defendant UNITED STATES then

believed to be and made to look as if they were accidents.

### Title 18 Racketeering Acts And Title 42 Civil Rights Violations Sustain Government Cover-Up

8. The illegal BRMT bioweapon and bioweapon delivery system used against Lead

Plaintiff and other members of this plaintiff class of US persons violates:

(i)     the "unalienable" rights of US persons under our Constitution and its *First, Third,*

*Fourth, Fifth, Eighth, Ninth, Thirteenth,* and *Fourteenth* Amendments,

(ii)    the ratified 1972 *Bioweapons Treaty* internationally effective in force March

1975,

(iii) 18 U.S.C. § 175, Prohibitions with respect to biological weapons,

    a.      "175(c) Definition.— For purposes of this section, the term "for use as
    a weapon" includes the development, production, transfer, acquisition,
    retention, or possession of any biological agent, toxin, or delivery system for
    other than prophylactic, protective, bona fide research, or other peaceful
    purposes."

(iii)    numerous other federal and state statutes (paragraph 251), and,

(iv)    as used in known abuses of plaintiffs, other ratified international treaties having

force of law (paragraph 251).

9. Defendant UNITED STATES has and does employ extreme methods to cover up and

sustain its illegal operations. In 1953, as defendant CIA's illegal LSD drug dealing program

MKUltra was being kicked off, Frank Olsen, a contract researcher, raised legal and ethical

objections to the program plan. He was secretly dosed with LSD later in that same November 19,

1953 meeting, and died five days later on a New York City sidewalk, after his semi-conscious

body came through an upper floor hotel room window around 100 feet above the sidewalk,

which he had been sharing with the MKUltra program assistant director, at around 2AM on November 28, 1953. There was no criminal prosecution. In 1975. President Ford and CIA Director Colby apologized to the Olsen family for his death.



*Source:* Wikipedia https://en.wikipedia.org/wiki/Frank_Olson

To sustain illegal BRMT bioweapon and bioweapon delivery system program secrecy, maintain involuntary servitude, and perpetuate the fraudulent concealment and cover up of defendants CIA and ARMY's illegal human subject medical abuse of the Lead Plaintiff and other members of the class, defendant DOJ (including its various police powers agencies) has and does also directly manage these unwitting human subjects as its involuntary servants in its own illegal programs of domestic spying and surveillance on US persons, foreign nations, and foreign nationals. As it did in defendant FBI's violent Cointelpro program from the 1950s into the 1970s for which there were no criminal prosecutions, defendant DOJ has and does use defendant FBI, USMS, and other federal police powers agencies to conduct durable patterns of rights violations and associated-in-fact enterprise patterns of racketeering acts in conspiracy with other defendants, against these plaintiffs. Over time, an increasing number of domestic police powers departments and agencies have been entangled in these illegal operations against rights and in

associated-in-fact enterprise patterns of racketeering acts, as have foreign intelligence services and police powers in allied countries, along with members of the press, media, and entertainment industry, and certain members of the public. This overall program of illegal BRMT, rights, and racketeering conspiracy violates Title 5 administrative procedures, Title 18 criminal statutes, and Title 42 civil rights statutes of the United States Code and common law. The myriad federal constitutional, ratified treaty and statutory violations are summarized at paragraph 251 and, together with state law violations, are specifically enumerated at each relevant claim in Claims for Relief paragraphs 801 through 854.

### Homicidal Conduct Against Lead Plaintiff's Extended Family Matches Other BRMT Indirect Perpetrator Pattern Evidence

10. The illegal BRMT bioweapon and bioweapon delivery system quite probably played the critical role in the homicidal death of at least one member of Lead Plaintiff's extended family, Audrey Brewer, 18, on September 6, 2011 (Interline Exhibit 1 below) around 1:15AM (4:15AM Eastern time), as described in great detail at paragraphs 803 and 805.

[Intentionally left blank.]

*Interline Exhibit 1:* **Probable September 2011 Illegal BRMT Bioweapon Brain Hijacking Homicide**

## Union Bulletin

WALLA WALLA - Angela Effinger was sentenced this morning to 10 years and three months in prison for murdering a woman during a fight in September in the vicinity of the former Blue Mountain Mall. Effinger, 30, looked straight ahead and nodded in understanding when the sentence was imposed by Superior Court Judge John Lohrmann following a half-hour hearing. She was led from the courtroom at the County Courthouse a short time later.

Effinger pleaded guilty April 12 to second-degree murder in the stabbing death of 18-year-old Audrey Brewer, who had started a relationship with Effinger's former boyfriend, Andrae Jackson.

..........

Before the sentence was imposed, Effinger tearfully said, "I didn't mean to hurt (Brewer)." Effinger's attorney, Jim Barrett, read a statement she prepared in which she acknowledged taking Brewer's life, expressed remorse for choosing to drink heavily and then fight with Brewer, and prayed for forgiveness.

Effinger's statement also included claims that her years with Jackson were filled with physical and emotional abuse. Barrett said Jackson - who attended the fight between Effinger and Brewer - had instigated it, therefore Barrett asked for an exceptionally low prison term of five or six years for his client.

Lohrmann declined to depart from the standard range of 10 years and three months to 18 years and four months. But he said there is a strong indication Effinger was acting unlike herself when she killed Brewer.

While calling the crime horrendous, Lohrmann pointed out that Effinger has no criminal history whatsoever, was in a difficult mental state as the result of an abusive relationship with Jackson and "something snapped."

"She certainly was greatly manipulated," Lohrmann said.    ..............

Source: Partial excerpt of news article from Walla Walla Union Bulletin, July 2, 2012. Full text of news article at LPEE65-1 (emphasis added, see note at paragraph 230 to locate original document in evidence).

On this specific September 6, 2011 date, Acting CIA Director Morrell was replaced by the incoming Senate confirmed CIA Director Petraeus, creating a moment of organizational ambiguity which could be exploited by the agency and/or program managers to conceal this criminal act from internal notice and accountability. Petraeus would later resign on November 9, 2012 after disclosure of his sharing of classified information during an adulterous relationship. This biographical similarity of conflicted romance and classified program information in

common between these two separate sets of events comprises an intelligence community

tradecraft rhyme for a criminal psychopath, used to act out (see discussion of criminal

psychopathy at paragraph 820O-Q) in a criminal field test of the illegal BRMT bioweapon and

bioweapon delivery system tools of violence on Angela and Audrey over the months leading to

the murder and through the murder itself. These common story lines would have been known to

the agency perpetrators at the time this assassination field test crime was conceived in the

intervening months between the April 28, 2011 nomination, the June 30 confirmation, and the

September 6, 2011 assumption of duties. See the knife as a weapon illegal BRMT mental

manipulations hijacking of Lead Plaintiff at paragraph 805BH, beginning in April 2011, five

months before Audrey's murder in September 2011. Without making an accusation, it is also

notable that acting director Morrell, from July 1, 2011 to September 6, 2011, bears a strong facial

resemblance, according to his Wikipedia biography picture, to Lead Plaintiff's uncle Bruce in

Walla Walla, WA. Recall that similar violent acts have occurred without any criminal

investigation or other action being taken by defendant DOJ including, without limitation, in (i)

the 1953 murder of Frank Olson as the illegal defendant CIA MKUltra program got underway

(paragraphs 359-363), itself the predecessor program to this illegal BRMT bioweapon and

bioweapon delivery system program, (ii) in the overall illegal MKUltra LSD drugging program

from 1953 to 1973, and (iii) for the obstruction of justice MKUltra program evidence destruction

ordered by CIA Director Helms, all of which resulted in zero criminal prosecutions against any

defendant CIA personnel ever (paragraphs 9, 61, 308, 332, 801F, 805T). Both the victim's estate

and the supposed perpetrator, if acted upon remotely and/or locally using the illegal BRMT

bioweapon and bioweapon delivery system, are plausible members of this class of injured

plaintiffs, as more fully explained through the technical analysis of the illegal BRMT bioweapon and bioweapon delivery system at paragraphs 359-399.

11. While the Lead Plaintiff is not a forensic psychiatrist, he notes the strong symbolism across this murder and other multiple events perpetrated by defendants over time, including:

(i) the above mentioned September 6, 2011 murder date which incorporated illegal BRMT bioweapon and bioweapon delivery system brain hijacking tools of violence (paragraphs 803, 805),

(ii) the September 2007 attempted inculpation of Lead Plaintiff into a totally specious terror investigation, which included his repeat human trafficking to London (paragraph 465, 519, 599D(i)(e), 601C-F, 603C) which was related to pattern 2007-2008 fraudulent employment at defendant ESTABLISH by defendant ROSENBERG (FBI) in northern New Jersey (paragraphs 99e, 165, 166, 213, 320c, 320f(v), 416, 425-436, 462-471(i), 471(v), 472, 474, 482, 503, 518-519, 521, 536, 557, 599D(i)(e), 603, 611, 634A, C, 641, 650D, 656D),

(iii) September 11, 2022 lethality attempt on Lead Plaintiff and others in a mass casualty event documented at Interline Exhibit 15B,

(iv) September 11, 2001 attack in reprisal for prior invasion of sovereignty operations in the Middle East by defendant UNITED STATES as related at paragraph 610 HEXP-7.

12. This particular forensic observation, inculpating the illegal BRMT bioweapon and bioweapon delivery system in this specific murder, was made in January 2024. It is strongly circumstantial, based upon specific understandings of (i) comparable patterns of typical US intelligence tradecraft, (ii) forensic analysis of comparable patterns documented in publicly available sources including Congressional reports and press reports, and (iii) known aspects of

the life experiences of close family members and extended family members and friends. These patterns of comparable life circumstances and adverse experiences have repeatedly occurred across many decades to Lead Plaintiff and across extended family members own life experiences.

13. The Lead Plaintiff notes his attention has repeatedly been drawn by illegal BRMT bioweapon and bioweapon delivery system brain hijacking to the time 9:11 over many years, even in the midst of other critical tasks when there would be no reason to want to know the time in that moment. An obsessed remote operator or computer daemon (an automated scheduler of an event in computer software) can orchestrate this specific pattern of notice by an illegal BRMT command delivered to the brain in that moment.

14. This pattern of conduct is worthy of close examination at trial by a criminal forensic psychiatrist or psychologist expert witness. The conduct echoes known conduct, as investigated by defendant FBI of predatory OB/GYN criminal conduct against trusting and vulnerable victims in the Dr. Larry Nassar case at Michigan State University, in its badly flawed and negligent investigative conduct, which resulted in additional crimes by the perpetrator for several years after initial reports. Comparable assaults on other trusting and vulnerable victims by Dr. Robert Hadden at Columbia University went uninvestigated for many years until reported by the wife of a US presidential candidate. Defendant BURNS, cited herein both in official capacity and individually, ostensibly practiced as an OB/GYN in Kirkland, WA into the 1990s when he lived across the street from Lead Plaintiff's second spouse Jeanette, which BURNS orchestrated into Lead Plaintiff's life for that fraudulent coerced relationship and marital community. as described in paragraphs 609-610 HEXP-6, 7.

15. The Quaker spin-off religious community which Lead Plaintiff grew up in and which many members of his extended family and thousands of others still practice today, is a very tight knit high trust community, so it is particularly vulnerable to these forms of surreptitious neurotic, predatory, and psychopathic conduct, as these types of events are extremely uncommon among the members of this community. When combined with a novel bioweapon which can hijack brain functions and which is outside of all known human experience, this high trust religious community provides a perfect target group of vulnerable people for these types of criminal exploitations.

### Individual Defendant Identifications In 2023-24 Confirm Government Defendants Are Key Perpetrators

16. These patterns have emerged gradually but persistently to Lead Plaintiff, as they were observed in fact and in their extremely adverse effects over the course of decades, but the root causes and the identities of the surreptitious perpetrators were elusive and not understood. These defendants' fraudulent concealment of their malign purpose by their abuse of state secret privilege, and fraudulent concealment of the specific actual identities of the corrupt defendants operating under multiple names and covers at various times and places as identified to date, has emerged only very gradually since mid-2021 through (i) diligent forensic analysis of known events and fact patterns, (ii) research into the progress of science, medicine, and technology across recent decades, specific identification first known to Lead Plaintiff in mid-2022 (ARPAIO) and others from September 2023.

17. Specific defendant culpability has become extremely clear and convincing in the past few months with the specific individual identifications between September 2023 and April 2024 which provide explicit definitive links to the particular institutional defendants named herein (paragraph 99, LPEE pages 12251-12261). These identifications have crystalized the elements of

this complaint. These patterns of malign and illegal conduct echo nearly identical patterns of practice which the Senate Intelligence Committee (1975 – FBI and CIA, 2014 CIA) and Rockefeller Commission (1977 CIA) have directly connected to illegal institutional conduct of federal police powers and intelligence agencies, including defendants FBI, CIA, and ARMY. Comparable patterns experienced by Lead Plaintiff are directly compared to those documented patterns at LPEE pages 237-311. The original 1975 Senate Intelligence Committee and 1977 Rockefeller Commission reports are at LPEE pages 6885-7466. The 2014 Senate Intelligence Committee findings are at paragraph 340.

### Defendants ARMY, CIA, DOJ Fraudulently Conceal Criminal Conduct Behind Illegal Abuse Of State Secrets Privilege 5 U.S.C. § 301

18. This pattern of illegal BRMT bioweapon and bioweapon delivery system, constitutional rights, and associated-in-fact enterprise pattern racketeering conspiracy, including acts, violations, and injuries, were originated against this specific plaintiff bgroup of Quaker spin-off religious plaintiffs in the 1950s by defendant ARMY (initially through the ARMY Bioweapons Lab and Medical Corps) religious discrimination against conscientious objectors in military service. The state secret privilege is a privilege – it cannot legally be used in color of law abuse and systematic failure to comply and enforce law by defendant UNITED STATES and its co-conspirators to subsume individual rights under our Constitution. It is subject to constraints under law and case law as described at paragraphs 254-266.

### Sustained Pattern of Third Amendment and Posse Comitatus Law Violations By Defendants ARMY And DOD 18 U.S.C. § 1385

19. The following Third Amendment rights violations and posse comitatus violations have been perpetrated by defendants DOD, ARMY, DARPA, and other unknown military departments and agencies directly against the Lead Plaintiff over many decades, and most probably against other members of this class of plaintiffs:

(i) Gary Jack – who human trafficked Lead Plaintiff in 1968 as a 12 year old child, while posing as father's buddy, from defendant ARMY

(ii) Stephen BREYER – former defendant ARMY Intelligence, who posed as Quaker religion spin-off sect home church elder Snow in 1970-1972, then as Jack Sackville-West from 1974 into the 1980s, during these continuing violations against Lead Plaintiff and other members of this class.

(iii) Warren Wilkins – Lt. Colonel, then Colonel, Washington Army National Guard, while at LazerSoft which employed Lead Plaintiff in 1986-1989.

(iv) Jeanette (Yarbrough/Hansen/Smith/Brewer/Austin) – fraudulently orchestrated to become Lead Plaintiff's second spouse, while a national security deliberately compromised bisexual enlisted military soldier, who was conditioned into a Mideast intelligence assignment (defendant ARMY) which is indicated by her belly dancing skill and costumes, and by tradecraft comments in her presence by HADJINIAN (paragraphs 457, 460, 499). Jeanette was threatened with criminal prosecution at some point to coerce her into matching with Lead Plaintiff as arranged by defendants BURNS and WATERS, then followed orders to pair up and then separate on multiple occasions over the 17 year fraudulently coerced relationship with Lead Plaintiff from 1988 to 2005 (paragraph 610 HEXP-7) orchestrated primarily by defendants BURNS and WATERS.

(v) Lloyd AUSTIN – while at defendant ARMY, assigned as a project manager at CNA Industrial Engineering for approximately six months during the HomeGrocer distribution warehouse project series, as defendant ARMY active duty officers Alexander and Yvgeney VINDMAN were continuing their pose as extended family members of Lead

Plaintiff's fraudulently placed spouse Jeanette who occupied the same residence as Lead Plaintiff in civilian dress only, with no representation of any military service at any time.

(vi) Alexander and Yvgeney VINDMAN – defendant ARMY, who posed as extended family members of Lead Plaintiff's fraudulently placed spouse Jeanette from the early 1990s into 2004.

### Defendant CIA's Illegal BRMT Bioweapons Program Executives Identified In 2023-24 – Stephen Breyer, William Burns, Anthony Fauci

20. A series of program executives have perpetrated the illegal BRMT bioweapon and bioweapon delivery system program as it has evolved from (i) the 1960s crude brain hormone hijackings used in assassination attempts and local manipulations of behavior and free will through (ii) remotely triggered brain hormone hijackings used to evoke love affairs (extreme oxytocin - love) to homicides (extreme melatonin – sleep or adrenaline – fight or flight) using locally embedded devices in the 1980s (such as cell phone equipment boxes in vehicles) which evolved toward (iii) a more rigorously science-based device using neuroscience, computer, low latency communications technology in the 1990s, which (iv) technological progression accelerated dramatically after the 9/11 attack using the massive increase in national security funding to vastly expand the scope and pace of illegal BRMT bioweapon and bioweapon delivery system funding and research to facilitate (v) highly sophisticated, neurologically tunable (ranging from subtle to extreme) thoughts and feelings free will hijackings (brain hormone external stimulations) using a fully remote hyper-precision location pulsed nanometer bioweapon deployed on its space-based constellation of geosynchronous satellite platforms for use anywhere on earth in the present era.

21. These known and identified illegal BRMT program executives, as forensically identified by Lead Plaintiff during September 2023 through February 2024, and who can be cross-identified by known high-veracity witnesses at trail are:

(i) Stephen BREYER (through his initial ARMY intelligence role and subsequent government employment), as a religious intruder interposed in the family religion for the purpose of managing the 1970-1972 trauma period inflicted upon the Lead Plaintiff's family of origin in the 1970 birth/homicide/death traumas sequence, posing as home-based church elder Snow when Lead Plaintiff's family was surreptitiously trafficked from their long familiar Maple Valley, WA area home church congregation to the fraudulent Kent, WA area Snow home church congregation for close observation, brain hormone hijackings, and coercive psychological manipulations before being moved again around 1972 to another Midway, WA home congregation, then disbanding the fraudulent home church he ran in Kent, WA to facilitate BREYER's relocation. BREYER then reappeared as Jack Sackville-West in 1974, presiding patriarch of that Spokane faked family who had befriended Lead Plaintiff at Washington State University, Pullman, WA, while also most probably overseeing on-going illegal BRMT brain hijacking experiments on Lead Plaintiff's uncle and family in Walla Walla, WA then in the Tri-Cities area of Washington state (site of the national security Hanford Nuclear Reservation) in the 1970s into the 1980s.

(ii) Harold Hopper, as Lead Plaintiff's employer at Deloitte Seattle from 1980-1986 as he worked in involuntary servitude on illegal investigations, was trafficked to work with embedded defendants CIA BANNON, STONE, BLAIR, THORPE, and defendant FBI's WEISSMAN and ROSENBERG, survived a double homicide attempt (paragraph 694

LETHL-1) and various entrapment attempts, worked unwittingly in defendant UNITED

STATES' illegal surveillance and spying operations, and met and married his first

spouse, Lynne, whose marriage to Lead Plaintiff was destroyed using oxytocin by the

next program manager, BURNS, below.

(iii) Williams BURNS (CIA) known as Dr J. Patrick Heffron OB/.GYN. practicing in

Kirkland, WA, where Lead Plaintiff lived with and then married first spouse Lynne in

the 1980s, and who was BRMT hijacked to a wrecked marriage and loss of property in

1987-1988 (paragraph 609 HEXP-6), then BRMT hijacked into a fraudulent 1990

marriage to Jeanette (paragraph 610 HEXP-7) who lived across the street from the

apparent BURNS residence, while BURNS presided over this illegal BRMT sequence in

the latter 1980s into the 1990s.

(iv) Anthony FAUCI (Director of NIAID) known as Larry R Cook, operated in a program

executive role from the mid-1990s into the 2000s (paragraph 602 NSEC-3) which used

illegal BRMT brain hijackings to and including extreme mental biochemical torture and

coercive psychological operations, which led to suicide ideations by the early 2000s in

the aftermath of the 9/11/2001, during a period when documented torture was being

practiced in defendant CIA operations and surreptitiously used by FAUCI against Lead

Plaintiff.

(v) Subsequent program executives directing the illegal BRMT bioweapon and bioweapon

delivery system are unknown as there is no longer a need for program personnel to

appear locally in field operations. Illegal BRMT bioweapon and bioweapon delivery

system operations are fully remote using (a) remote video feeds for completely remote

operations and/or (b) using encrypted cell phone style devices and applications to

support field operations in proximity to the victim being hijacked. Defendants DOJ, FBI, USMS have and continue to conduct illegal associated-in-fact enterprise patterns of racketeering acts to sustain involuntary servitude using, among other illegal acts, financial frauds against Lead Plaintiff individually and against his businesses, and by using surreptitious employment/unemployment control and other illegal acts. Defendant FBI human trafficker defendant ROSENBERG coordinated and directly participated in the 2005-2010 human trafficking sequence, which then added physical torture in Boston, MA and still more forms of physical torture in Cliffside Park, NJ, to the previously conducted mental torture and coercive psychological operations (2002-2005), which led to the 2010-2011 forced dismissal under duress of Lead Plaintiff's federal civil rights litigation while kidnapped into and confined by defendants as a psychiatric patient at a Bergen County, NJ hospital (a scenario which is identical in form to those used in the former Soviet Union against targeted persons). Since that time, and into the present, defendants have and do continue illegal acts including, without limitation, violations of rights, law, and regulations, human trafficking, patterns of racketeering acts, entrapment attempts, lethality attempts, and programmed medical maladies, as related in this complaint.

**Defendants DOJ, FBI, USMS, And Other Illegal BRMT Bioweapons Program, Rights, And Racketeering Acts Defendants Identified In 2023-24**

22. These malign patterns of the illegal BRMT, rights, and racketeering conspiracy, including acts, violations, and injuries, have been repeatedly experienced by Lead Plaintiff, have occurred in Lead Plaintiff's uncle's family (below), have been experienced by other members of his family of origin, extended family, by marital community members, by other members of this Quaker spin-off religious order, as well as by close friends and relations of Lead Plaintiff. These

acts have been perpetrated by various defendant police powers departments and agencies at all levels of government, by certain members of the press, media, and entertainment who operated without properly identifying themselves and who participated directly in specific acts, violations, and injuries, and are therefore defendants, and by other entity and individual defendants in their associated-in-fact enterprise patterns of rights and racketeering acts, violations, and injuries.

23. This discriminatory pattern has and does also target other groups based upon their gender, sexual orientation, race, and/or political viewpoint, and now extends well beyond this specific Quaker spin-off religious group. These plaintiff victims are also included by joinder in the class of plaintiffs herein, all in defendants' systematic violations of Constitution, rights, and law, as described in the specific claims in this complaint.

24. This entire class of plaintiffs have been purposefully and systematically pretexted and entangled by defendant UNITED STATES, specifically including defendants ARMY, CIA, FBI and USMS, in national security matters to fraudulently conceal the illegal BRMT bioweapon and bioweapon delivery system program's existence, and to evade legal consequences by fraudulently claiming "state secrets" privilege which is invalid under federal law 5 U.S.C. § 301 Administrative Procedures (paragraphs 260-262, Interline Exhibit 2) and *United States v. Reynolds,* 345 U.S. 1 (1953), as discussed below at paragraphs 255-266. The primary purpose of these deliberate pretexting and entanglements in national security matters of these innocent unwitting US persons has been and is to disguise continuing illegal operations by defendant UNITED STATES, specifically including, without limitation:

(i)    to conceive, conduct initial experiments, and then perpetuate illegal development of the successive generations of the internationally prohibited bioweapon and bioweapon delivery system, known herein as BRMT, through defendant UNITED STATES' illegal

pattern of direct human medical experimentation on unwitting human subjects, and coercion through psychological manipulations and racketeering crimes in field operations against those plaintiffs,

(ii)    to conceal defendants' sustained illegal abridgements of constitutional, civil, and human rights of US persons by police powers, intelligence, and by military personnel and operations while they have been concealed in civilian dress, and

(iii)    to conceal and perpetuate defendants' obstruction of justice operations including, without limitation, those conducted for the purposes of (a) discrediting and tampering with witnesses, and (b) destroying evidence of criminal conduct against rights and property interests by defendants FBI, USMS, CIA, and ARMY, and by other federal departments and agencies' police powers, intelligence, and military operations illegally conducted by their officers, agents, employees, informants, and other co-conspirators.

### Fraudulent Concealment, Willful Blindness, And Official Silence From Defendants DOJ, CIA, ARMY, National Archives

25. To fraudulently conceal this illegal bioweapon and bioweapon delivery system from public and legal scrutiny, defendant UNITED STATES has and does extend these same patterns of illegal BRMT, rights, and racketeering conspiracy, including acts, violations, and injuries which were already in well-practiced use by defendant UNITED STATES' CIA, ARMY in MKUltra, by FBI in Cointelpro, by USMS (assigned the role of principal day to day handler of these plaintiffs' living environments and cover operations employment), and by their co-conspirators including, without limitation police powers operations in WA, MA, NJ, NY, all while these unwitting and unknowing involuntary servitude plaintiff victims have been and are illegally used in human medical experiments conducted in field conditions without consent by defendant UNITED STATES and its co-conspirator defendants. Government defendants'

continued conduct speaks loudly of their intent to fraudulently conceal these facts from these plaintiffs and from the general public:

(i) Defendant DOJ has turned a blind eye and will not even acknowledge and does not respond to complaints and inquiries in any way. Despite literally dozens of repeated pleas, defendant DOJ has and does refuse to address these criminal violations (paragraph 550-583, Interline exhibits 15E, 18, 19, and LPEE pages 368-793, LPEEV65-11 through 16, Appendix 2 paragraphs 1-040 through 1-042, 1-046 through 1-055, 1-057, 1-059, 1-063, 1-067), and is inextricably inculpated through its own acts and failures to act as described herein.

(ii) Defendant DOJ's agency FBI engaged with defendant NYPD in a flawed and clearly coordinated cover-up in September 2021 (Interline Exhibits 17-19).

(iii) National Park Service letterhead was used to lie in reply to a FOIA request (thereby violating 5 U.S.C. § 552) about the August 2021 ML King DC voting rights rally location, after the Lead Plaintiff was deliberately misdirected at considerable taxpayer expense with a crowd of police powers volunteers, from this rally in August 2021, and defendant UNITED STATES also technically hacked the New York Times website feed the following day to suppress all delivery of news reports and photographs of that and other voting rights rallies nationwide to Lead Plaintiff,

(iv) Defendants ARMY, CIA, and NARA have and do refuse to even acknowledge FOIA and Privacy Act requests, which have and do continue to go completely unacknowledged by all other departments and agencies of defendant UNITED STATES since 2021 for more than two years by these defendants, and to go unanswered by other federal departments and agencies, all of whom have and do violate 5 U.S.C. § 552 (LPEE pages 508-541). US

Mail has been and is suppressed and not delivered to GARLAND, Jack Smith, and Robert Hur, all with official positions at defendant DOJ. Jack Smith is plausibly inculpated in the illegal BRMT operations under BREYER in the 1970s, while known as James ("Jim" and "Jimbo") Sackville-West, the youngest member of the Sackville-West family in Spokane, WA, then headed by BREYER (paragraphs 21(i), 111, 211).

(v) Illegal abuse of the "state secrets" privilege has been and is used to fraudulently conceal and cover up the entire matter for all these decades of criminal abuse of these plaintiffs by defendant UNITED STATES (paragraphs 32, 255-271, 314-321, 550-583).

26. There are no less than three fundamental legal reasons the claims of this class of plaintiffs are continuously valid from the inception of the BRMT, rights, and racketeering conspiracy of acts, violations, and injuries to the present:

a)      This illegal BRMT and racketeering program has continuously operated in secret while it has violated rights and law, so it is not eligible for the safe harbor of "state secrets" privilege under the Supreme Court mandate *United States v. Reynolds* 345 U. S. 1 (1953) (paragraph 260), which requires all such programs to be "not inconsistent with law," at Footnote 4, citing per 5 U.S.C. § 22, and which was subsequently replaced by 5 U.S.C. § 301 when the U.S. Code was reorganized (see the inline exhibit in paragraph 260).

b)      This illegal BRMT, rights, and racketeering conspiracy has been fraudulently concealed from inception, and was not uncovered until September 2023 to sufficient extent to definitively identify the original perpetrator defendant UNITED STATES federal departments and agencies identified herein. This discovery has been made by the diligent efforts of a victim, Lead Plaintiff, not by defendants' voluntary disclosure ever,

as these defendants have remained utterly silent except to tell official lies (Interline

Exhibits 16-18, LPEE pages 508-541). Fraudulent concealment invokes equitable tolling

under hundreds of years of common law and under the mandate of *Rotella v. Wood*, 528

U.S. 549 (2000) (paragraphs 315-317), so the entire sequence of illegal BRMT, rights,

and racketeering conspiracy, including acts, violations, and injuries which have been

continuous from program inception and from first injury to these plaintiffs, is subject to

this Court's scrutiny and jurisdiction under law.

c)      This illegal conspiracy of BRMT, rights, and racketeering conspiracy including

acts, violations, and injuries has continuously violated the RICO statute of 1970, as 18

U.S.C. §§ 1961-1698 requires only two acts and that the most recent such racketeering

act be no more than ten years from a prior offense (18 U.S.C. § 1961(5)) to establish a

pattern of racketeering acts – there are thousands of such racketeering acts, as defined in

section 1961(1), described herein as to Lead Plaintiff alone. The illegal BRMT, rights,

and racketeering conspiracy has involved continuous criminal violations of at least two

specific pattern of racketeering acts, (i) 18 U.S.C. 1584 Involuntary Servitude from its

inception, and (ii) 18 U.S.C. § 175 Bioweapons, which was adopted into law in 1990.

The illegal BRMT bioweapon and bioweapon delivery system was already prohibited

from use by defendant UNITED STATES effective March 26, 1975 under the ratified

1972 *Bioweapons Treaty* (paragraphs 322-324), both of which violations always were

prohibited from use on a US person by our Constitution from the moment of illegal first

use on any human subject without consent.

27. Under US law and the common law principle of equitable tolling invoked by

fraudulent concealment, which lies beneath the thoroughly discredited and illegal application of

the "state secrets" privilege to conceal this illegal program which acts directly against the "unalienable" rights of US persons, the claims herein extend continuously from at least the forensically established 1968 first known use against the Lead Plaintiff of the bioweapon to the present time. Certain other plaintiffs may be entitled to relief extending to as early as the 1950s, as the date on which the first secret local illegal BRMT bioweapon styled device was used in illegal brain hormone hijacking experiments against them without consent, is currently unknown to these plaintiffs.

28. The illegal BRMT bioweapon and bioweapon delivery system is still in use to this day against these plaintiffs. Associated-in-fact enterprise pattern of racketeering acts and constitutional rights violations also continue into the present time, as evidenced by the 2010 kidnapping, the 2018 human trafficking, and the entrapment attempts against the Lead Plaintiff related in paragraphs 606, 607 HEXP-3,4; 643, 648, RICO-5, 10; 808-811. The Constitution does not functionally exist for these plaintiffs. These plaintiffs have no "unalienable" rights, and their selection for victimization resulted from religious discrimination, not from any legally permitted or constitutional process whatsoever. Defendants' pretexting and follow-on acts, violations, and injuries against them are the direct, foreseeable, willful, knowing, and repeated results of defendant UNITED STATES executive branch caprice and unlawful religious and other discrimination disguised in the fraudulent dress of "state secrets," and in the acts and neglect to prevent of these defendants in systematic violations of the Constitution and laws summarized at paragraph 251.

29. Defendant DOJ continues to sustain its fraudulent concealment, willful blindness, and official silence despite numerous entreaties and petitions in accordance with the First Amendment right. This directly benefits three currently serving presidential cabinet secretaries

(BURNS, GARLAND, AUSTIN) and the numerous federal, state local governmental and individual defendants named herein. These plaintiffs have no other recourse than to bring to this Court this litigation as a civil matter for remedies against unconstitutional and criminal conduct by these defendants. Plaintiffs have constitutional rights and legal rights, under law and ratified treaty, of due process and redress for grievous injustices, acts, violations, and injuries imposed by these governments, each and all of whom were allegedly formed "to secure these rights" of the People, to be secure from the tyranny and oppressions of an imperious and arbitrary king, as stated in our Declaration of Independence,

30. Either "state secret" privilege cannot fraudulently conceal a criminal racket to constitutionally triumph over unalienable rights – or else we have no rights but the "right of government" to its own arbitrary determination for its own corrupt purposes to subjugate and sustain involuntary servitude for its own convenience whomever it chooses. Under our Constitution and under law 5 U.S.C. § 301, government can neither pursue and nor perpetuate these illegal purposes. Despite these constitutional and legal structures, under the durably and willfully blind eye of defendant DOJ since at least the 1950s, defendant UNITED STATES and its institutional and individual co-conspirators have and do continue to engage in illegal conduct in pursuit of lethal outcomes, paragraphs 694-710 LETHL-1 through 17, and through torture which has and does invoke suicide ideations at paragraphs 604-607 HEXP-1-4. The forms of torture imposed by defendant UNITED STATES (defendant CIA, as corroborated by the Senate Intelligence Committee at paragraph 340, and conducted without consent under defendant NIAID management by defendant FAUCI) have and do include coercive psychological, brain biochemical, and remotely imposed physical torture and combinations thereof, each imposed in field conditions on the Lead Plaintiff (paragraphs 604-607 HEXP-1-4), and most probably on

other unwitting human subjects, all of which torturous practices have extremely detrimental

effects:

> **Conclusions:** Ill treatment during captivity, such as psy-chological manipulations, humiliating treatment, and forced stress positions, does not seem to be substan-tially different from physical torture in terms of the se-verity of mental suffering they cause, the underlying mechanism of traumatic stress, and their long-term psy-chological outcome. Thus, these procedures do amount to torture, thereby lending support to their prohibition by international law.
>
> *Arch Gen Psychiatry. 2007;64:277-285*

(REPRINTED) ARCH GEN PSYCHIATRY/VOL 64, MAR 2007          WWW.ARCHGENPSYCHIATRY.COM
277

©2007 American Medical Association. All rights reserved.

See the full text of the American Medical Association scholarly analysis above at LPEEV65-17.

The timeline below summarizes the scope and duration of these acts, violations, and injuries -

against the Lead Plaintiff only, as representative of the class of plaintiffs.



**ILLEGAL CONSTITUTIONAL RIGHTS AND RACKETEERING PATTERN ACTS, VIOLATIONS, AND INJURIES (Timeframes Are Approximate)**

| | 1960 1969 | 1970 1974 | 1975 1979 | 1980 1984 | 1985 1989 | 1990 1994 | 1995 1999 | 2000 2004 | 2005 2009 | 2010 2014 | 2015 2019 | 2020 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Illegal BRMT Bioweapon And Bioweapon Delivery System | Breyer to 1980 | | | Hopper 80-86 | Burns 1986-94/96 | | Fauci 1994/96-06 | | | | | To Be Identified |
| Program Management - CIA, Army | | | | | | | | | | | | |
| Management - Racketeering And Rights Violations - DOJ and | | Weisman 1960s to 1980s | | | | Rosenberg 1980s to 2010s | | | | | | To Be Identified |
| Other Domestic Federal Departments | | | | | | | | | | | | |
| BRMT Approximate Stage of Development | | Crude Local Hormone Device | | | Remote Triggered Local Hormone Device | | Transition to Remote Device | | | | Advanced Remote Device | |
| **Key Events** | | FWSD, KCSD, WASH, WSU | | | | | | | | | MA (06-07), NJ, NY state and local government and police powers from 2007 | |
| | | FROM MARCH 1975 - ALL BIOWEAPONS BANNED BY RATIFIED TREATY | | | | | | | | | | |
| Key Government Co-Conspirators - United States departments and agencies including DOJ, FBI, USMS, DHS, USSS, CPB, CIA, DOD, Army, Navy, Air Force, DHHS, NIAID | | | | | | | | | | | | |

Illegal Government Biomedical Experiments On US Persons, Which Perpetuated Nazi-style Dachau Concentration Camp Experiments, Began in 1950s With Secret LSD Drugging and Brain Biochemical Hormone Hijacking

**NATIONAL SECURITY PRETEXTING, FRAUDS, AND ENTANGLEMENTS (NSEC series offenses)**

600 *NSEC-1 National Security Frauds*: Government Orchestrated Family Assignment and Deliberate Entanglements in National Security Matters, 1961 to Present

*NSEC-2 National Security Frauds*: Human Trafficking, Forced Labor, Peonage,
601 Inculpating Allied Intelligence Services - CSIS, RCMP, MI-6, MI-5, London Metropolitan Police, UK 1990-1994

*NSEC-3 National Security Frauds*: Involuntary Servitude, Forced Labor, Deliberate
602 Entanglements To Violate Rights - Nuclear and Space Deliberate Entanglements, 9/11 Attack, Domestic Sabotage Campaign 1996-2009

*NSEC-4 National Security Frauds*: Human Trafficking, Forced Labor, Violations of
603 Rights – Mossad, MI-6, MI-5, London Metropolitan Police, UK 2007

**ILLEGAL HUMAN EXPERIMENTATION - BRMT BRAIN HIJACKING ABUSES (HEXP SUBCOUNT OFFENSES)**

*Biological and Medical Invasions - Torture*

HEXP-1 *Illegal Human Experimentation*: Biological and Medical Invasions - BRMT
604 Induced Torture, Washington State 2003

HEXP-2 *Illegal Human Experimentation*: BRMT Induced Torture And
605 Psychological Operations, Massachusetts 2006-2007

HEXP-3 *Illegal Human Experimentation*: Torture And Psychological Operations,
606 New Jersey 2008-2011

607 HEXP-4 *Illegal Human Experimentation*: BRMT Induced Emotional Swings And Short Cycle Torture Sequences Through 2023

*Orchestrated Personal and Intimate Relationships*

HEXP-5 *Illegal Human Experimentation*: Personal and Intimate Relationships -
608 Orchestrated Romantic Interests Using BRMT Oxytocin Hormone Brain Hijacking, Generally

HEXP-6 *Illegal Human Experimentation*: Personal and Intimate Relationships -
609 Orchestrated BRMT and Other Interference in Marital Community With First Spouse, Lynne 1980-1988

HEXP-7 *Illegal Human Experimentation*: Personal and Intimate Relationships -
610 Orchestrated BRMT and Other Interference in Fraudulent Marital Community With Second Spouse, Jeanette 1988-2005



**ILLEGAL CONSTITUTIONAL RIGHTS AND RACKETEERING PATTERN ACTS, VIOLATIONS, AND INJURIES (Timeframes Are Approximate)**

Years (columns): 1960/1969, 1970/1974, 1975/1979, 1980/1984, 1985/1989, 1990/1994, 1995/1999, 2000/2004, 2005/2009, 2010/2014, 2015/2019, 2020/2024

611 *HEXP-8 Illegal Human Experimentation*: Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fraudulent Relationship, Marinka 2008

612 *HEXP-9 Illegal Human Experimentation*: Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fraudulent Relationship, Laura 2014-2018

613 *HEXP-10 Illegal Human Experimentation*: Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fraudulent Relationship, Gia 2019-2021

*Biological and Medical Invasions – Personal Humiliation, Endangerment, Illness*

614 *HEXP-11 Illegal Human Experimentation*: Biological and Medical Invasions - Orchestrated Romantic Interests, BRMT Induced Erectile Dysfunction 2005, 2008, 2020-2021

615 *HEXP-12 Illegal Human Experimentation*: Biological and Medical Invasions - BRMT Orchestrated Personal Movements and Activities

616 *HEXP-13 Illegal Human Experimentation*: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation

617 *HEXP-14 Illegal Human Experimentation*: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses

618 *HEXP-15 Illegal Human Experimentation*: Biological and Medical Invasions - BRMT Forced Public Urination Sequence, 2022

619 *HEXP-16 Illegal Human Experimentation*: Biological and Medical Invasions - BRMT Public Flash Temper Hijacking 2023

620 *HEXP-17 Illegal Human Experimentation*: Biological and Medical Invasions – Food Borne Illnesses 2008-2010, 2018-2023

**INDIVIDUAL RIGHTS VIOLATIONS AND CONSPIRACIES (RGTS SUBCOUNT OFFENSES)**

*Entrapments, Illegal Searches and Willful Blindness*

621 *RGTS-1 Rights Violations*: Entrapment and Incrimination Attempts, Stevens Pass 1980s

622 *RGTS-2 Rights Violations*: Entrapment and Incrimination Attempts, Money Laundering - Alliance Nominee Cash Bank Deposit 1990, Alioto Structured Payments 2016-2017

623 *RGTS-3 Rights Violations*: Entrapment and Incrimination Attempts – FBI/RCMP VSE Pink Sheet Probe 1992-1993

624 *RGTS-4 Rights Violations*: Entrapment and Incrimination Attempts – FBI Sole Source, CFO Search, Tax Filings, Ironwood 2018-2023

625 *RGTS-5 Rights Violations*: Bad Faith Acts — Illegal Searches, Hacking, and Harassing, Oregon Interstate Commerce Trip 2021

626 *RGTS-6 Rights Violations*: Bad Faith Acts – Federal Police Powers Abuses of Legal Processes 1990 to present

627 *RGTS-7 Rights Violations*: Bad Faith Acts – Federal Police Powers Abuses of Legal Processes Forced Personal Bankruptcy 1993

628 *RGTS-8 Rights Violations*: Bad Faith Acts – Willful Blindness - US Attorney Offices, DOJ Headquarters 2005, 2021-2023

629 *RGTS-9 Rights Violations*: Bad Faith Acts – Illegal General Searches, Continual Monitoring 1968 to present

630 *RGTS-10 Rights Violations*: Bad Faith Acts – Privacy and Quiet Enjoyment



ILLEGAL CONSTITUTIONAL RIGHTS AND RACKETEERING PATTERN ACTS, VIOLATIONS, AND INJURIES (Timeframes Are Approximate)

631  *RGTS-11 Rights Violations*: Bad Faith Acts – Biological and Medical Invasions, Access to Ethical Basic Health Care

**Direct Interferences in Personal and Intimate Relationships**

632  *RGTS-12 Rights Violations*: Personal and Intimate Relationships - Orchestrated Romantic Interests, Arranged In-person Contacts

633  *RGTS-13 Rights Violations*: Personal and Intimate Relationships – Blocked and Spoofed Access to Dating Sites 2004-2005, 2007-2008, 2011-2014, 2018 to present

634  *RGTS-14 Rights Violations*: Personal and Intimate Relationships – Orchestrated Romantic Interests, Fraudulent Dates 2004-2005, 2008, 2019-2020

**Hacking, Harassment, Disinformation, Abuse of Official Records**

635  *RGTS-15 Rights Violations*: Illegal Searches, Hacking, and Harassing, Computer Technology

636  *RGTS-16 Rights Violations*: Blocking Information Access and Supplying Deliberate Disinformation

637  *RGTS-17 Rights Violations*: Misuse of Official Records and Mispersonation, Dubai 2015

**RACKETEERING – (RICO SUBCOUNT OFFENSES)**

**Racketeering - Thefts and Takings Targeted at Personal Assets**

638  RICO Statute: Congressional Intent PL 91-452 (RICO) October 1970 "shall be liberally construed to effectuate its remedial purposes."

639  *RICO-1 Racketeering Violations*: Involuntary Servitude, Forced Labor, Human Trafficking, Entrapment Attempts and Entanglements – Obstructing Market Rate Private Employment and Interstate Commerce From Deloitte (1979) through Establish (2008)

640  *RICO-2 Racketeering Violations*: Theft and Takings - Financial Resources, Obstructing Market Rate Private Employment 1986 to present

641  *RICO-3 Racketeering Violations*: Theft and Takings - Financial Resources, Thefts of Compensation CNA 2002 Establish 2008

642  *RICO-4 Racketeering Violations*: Theft and Takings - Financial Resources, Thefts of Labor And Materials, Cliffside Park Apartment Renovations 2008

643  *RICO-5 Racketeering Violations*: Theft and Takings - Financial Resources, Deprivation of Benefits, Kidnapping, and Involuntary Commitment 2008-2011

644  *RICO-6 Racketeering Violations*: Theft and Takings - Financial Resources, Forced Labor Imposed Litigation Expenses 1993-2022

645  *RICO-7 Racketeering Violations*: Theft and Takings - Financial Resources, Shadow Banking System Thefts And Manipulations

**Racketeering – Personal Color of Law Entrapment Attempts**

646  *RICO-8 Racketeering Violations*: Theft and Takings - Credit and Credit Access Hacks

647  *RICO-9 Racketeering Violations*: Illegal Searches, Hacking, and Harassing– Tax Software Hack EITC Entrapment Attempt 2021, 2022

648  *RICO-10 Racketeering Violations*: SOLE SOURCE Fraudulent Financing with Ironwood Tax Loss Self-Exculpatory Offset Attempt 2018-2023



ILLEGAL CONSTITUTIONAL RIGHTS AND RACKETEERING PATTERN ACTS, VIOLATIONS, AND INJURIES (Timeframes Are Approximate)

1960 1969 | 1970 1974 | 1975 1979 | 1980 1984 | 1985 1989 | 1990 1994 | 1995 1999 | 2000 2004 | 2005 2009 | 2010 2014 | 2015 2019 | 2020 2024

**Racketeering – Targeting Small Business and Enterprise**

*Racketeering – Thefts and Takings*

649 RICO-11 *Racketeering Violations*: Deprivation Of SBA Government Bonding Benefits, UT Bonding Fraud 1990-1993

650 RICO-12 *Racketeering Violations*: Theft Of Receivables, Check Frauds 1990 To

*Racketeering – Fraudulent Financings*

651 RICO-13 *Racketeering Violations*: Money Laundering - Alliance Nominee Cash Bank Deposit 1990

652 RICO-14 *Racketeering Violations*: Factoring Frauds –Pacific Financial Services 1992-1993, PAN Environmental Services 1993-1994

653 RICO-15 *Racketeering Violations*: Fraudulent Financial Services – Ex-CIA Northern Africa Case Officer 1992-1995 Alliance

654 RICO-16 *Racketeering Violations*: Fraudulent Financial Services – Ex-CIA Latin America Case Officer 2013-2015

655 RICO-17 *Racketeering Violations*: Fraudulent Financings and Loans - NYC Broker/Investor 2011-2017

656 RICO-18 *Racketeering Violations*: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution 2014-2015

657 RICO-19 *Racketeering Violations*: False Personation – NYC Forbes 200 Captive Corporate Investment Firm 2013-2017

658 RICO-20 *Racketeering Violations*: Fraudulent Investor Personation – Investments and Loans 2015-2019

659 RICO-21 *Racketeering Violations*: Fraudulent Investor Personation and Investments 2015-2020

660 RICO-22 *Racketeering Violations*: Fraudulent Financings – Private Placement and Public IPO 2015-2017

661 RICO-23 *Racketeering Violations*: Fraudulent Financings, International CFIUS Pretexting 2015

662 RICO-24 *Racketeering Violations*: Fraudulent Financing Fees Supporting Fraudulent Sales Opportunities 2018

663 RICO-25 *Racketeering Violations*: Fraudulent Financing Fees 2018

664 RICO-26 *Racketeering Violations*: Fraudulent Financial Services – Domestic Debt Broker 2018

665 RICO-27 *Racketeering Violations*: Fraudulent Financial Services –International Debt Broker 2015-2016

666 RICO-28 *Racketeering Violations*: Fraudulent Financial Services – Mid-Market Investment Bank 2016-2017

667 RICO-29 *Racketeering Violations*: Fraudulent Financial Services – International Financial Services Institution 2016-2017

668 RICO-30 *Racketeering Violations*: Fraudulent Financial Services – Wall Street and Los Angeles Investment Banks 2015-2021

669 RICO-31 *Racketeering Violations*: Fraudulent Financings and Representation, Online Referral Services 2015-2018



ILLEGAL CONSTITUTIONAL RIGHTS AND RACKETEERING PATTERN ACTS, VIOLATIONS, AND INJURIES (Timeframes Are Approximate)

| | 1960 1969 | 1970 1974 | 1975 1979 | 1980 1984 | 1985 1989 | 1990 1994 | 1995 1999 | 2000 2004 | 2005 2009 | 2010 2014 | 2015 2019 | 2020 2024 |

670 RICO-32 Racketeering Violations: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses 1986 to 2022

671 RICO-33 Racketeering Violations: Commercial Frauds: Fraudulent Financings and Litigation - AUCTUS v. CORNHUSKER 2019

672 RICO-34 Racketeering Violations: Fraudulent Financings, Online Platform 2021

Racketeering – Fraudulent Sales Leads

673 RICO-35 Racketeering Violations: Fraudulent Sales Leads 2002-2004

674 RICO-36 Racketeering Violations: Fraudulent Sales Lead Solicitation Services 2021

675 RICO-37 Racketeering Violations: Fraudulent Sales Lead Solicitation Services 2021

676 RICO-38 Racketeering Violations: Fraudulent Sales Lead Development Services 2017

677 RICO-39 Racketeering Violations: Fraudulent Sales Lead Development Services 2017

678 RICO-40 Racketeering Violations: Fraudulent Sales Opportunities, International 2020 2021

679 RICO-41 Racketeering Violations: Fraudulent Sales Opportunities, Domestic 1983- 2022

680 RICO-42 Racketeering Violations: Fraudulent Sales And Marketing Representation 2019-2021

Racketeering – Dishonest Professional Services

681 RICO-43 Dishonest professional services – Accounting Compilation And Review 1993, 2021

682 RICO-44 Racketeering Violations: Dishonest Professional Services, Web 2021-2022

683 RICO-45 Racketeering Violations: Dishonest Professional Services, Legal 1986- 2005

684 RICO-46 42 Racketeering Violations: Dishonest Professional Services, Legal 2014- 2021

685 RICO-47 Racketeering Violations: Dishonest Professional Services, MARICOPA SHERIFF, ARPAIO as Consultant 2014-2017

686 RICO-48 Racketeering Violations: Dishonest Professional Services, Employees, Recruiters, Various Positions 1986-2022

687 RICO-49 Racketeering Violations: Dishonest Professional Services, Employees, Recruiters, Logistics 2015-2021

688 RICO-50 Racketeering Violations: Dishonest Professional Services, Employees, Sales

689 RICO-51 Racketeering Violations: Dishonest Professional Services, Employees, CFO and Controller

690 RICO-52 Racketeering Violations: Dishonest Professional Services, Employees, Controller 2018

Racketeering – Fraudulent Production Asset Sales

691 RICO-53 Racketeering Violations: Fraudulent Production Asset Purchase Options, Professional Services 2015-2021

692 RICO-54 Racketeering Violations: Fraudulent Production Asset Purchase Options, AZ 2015-2017



ILLEGAL CONSTITUTIONAL RIGHTS AND RACKETEERING PATTERN ACTS, VIOLATIONS, AND INJURIES (Timeframes Are Approximate)

1960 1969 | 1970 1974 | 1975 1979 | 1980 1984 | 1985 1989 | 1990 1994 | 1995 1999 | 2000 2004 | 2005 2009 | 2010 2014 | 2015 2019 | 2020 2024

693 *RICO-55 Racketeering Violations*: Fraudulent Production Asset Purchase Options, OR, ID, TX 2015-2021

**LETHALITY ATTEMPTS (LETHL SUBCOUNT OFFENSES)**

694 *LETHL-1 Lethality Attempts*: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – mid 1980s

695 *LETHL-2 Lethality Attempts*: Washington State BRMT Induced Falls, 1990-2005

*LETHL-3 Lethality Attempts*: Washington State BRMT Induced Suicide Ideation 2003-2005

697 *LETHL-4 Lethality Attempts*: Inciting Public Vigilantism, 2004-2023

698 *LETHL-5 Lethality Attempts*: New Jersey BRMT Induced Suicide Ideation 2008-2010

699 *LETHL-6 Lethality Attempts*: New Jersey Cliffside Park BRMT Falls 2008-2010

700 *LETHL-7 Lethality Attempts*: BRMT Staircase Falls and Attempts in New Jersey and New York 2008-2022

701 *LETHL-8 Lethality Attempts*: New Jersey, Hackensack, BRMT Fall, 2017

702 *LETHL-9 Lethality Attempts*: California, BRMT Induced Extreme Eye Watering, 2017

703 *LETHL-10 Lethality Attempts*: New Jersey, Edgewater Bedroom BRMT Falls, 2019

704 *LETHL-11 Lethality Attempts*: Website Hacks to Eliminate or Delay Covid Vaccination, 2020

705 *LETHL-12 Lethality Attempts*: New Jersey Edgewater BRMT Falls, 2021-2022

706 *LETHL-13 Lethality Attempts*: New Jersey North Bergen Hospital Fall, 2021

*LETHL-14 Lethality Attempts*: New York Metro North Mass Casualty Attempt, 2022

708 *LETHL-15 Lethality Attempts*: New York Morningside Park BRMT Fall, 2022

709 *LETHL-16 Lethality Attempts*: New York New Jersey North Bergen Vehicle Rundown Sequence, 2022

710 *LETHL-17 Lethality Attempts*: Programmed Health Collapse, 2023

**Absence Of Valid Defenses - Constitutional Rights Are Protected As State Secret
Privilege Is An Invalid Defense 5 U.S.C. § 301 For An Illegal Bioweapon 18 U.S.C. §
175**

31. The individual defendants identified between September 2023 and March 2024 and
thereby now known to have directly interacted with the formerly unwitting Lead Plaintiff while
in those fraudulently concealed roles are named individual defendants herein and, by their recent
identifications in those roles, do definitively attach these acts to both themselves, and to the
related institutional defendants in which they have and/or do operate. These defendants have and
do fraudulently conceal their illegal acts against constitutional rights and their violations of
federal law behind the state secret privilege. The state secret privilege is a privilege conditionally
granted to government under law, it is not an unalienable constitutionally identified right of
government, and their illegal acts are therefor subject to our Constitution, to law under *United
States v. Reynolds,* 345 U.S. 1 (1953), and to proper administrative procedures and regulations
under 5 U.S.C. § 301. Through their knowing, willful, and sustained acts and patterns of acts in
their associated-in-fact enterprise, both directly and through others, these and other defendants
have and do destroy the unalienable constitutional rights of US persons, including Lead Plaintiff
and others. The individual defendants who are current or former government officials are
personally directly liable to these plaintiffs for these systematic violations of constitutional rights
under 28 U.S.C. § 2679(b)(2), as are all other defendants.

32. To successfully defend this decades long fraudulently concealed pattern of illegal
acts, violations, and injuries and the conspiracies related thereto, defendant UNITED STATES
and its co-conspirators must show:

[Intentionally left blank.]

| Defendant UNITED STATES And Co-Conspirators Must Assert As Their Defense: | Such Requisite Asserted Defenses Are Defeated By Constitutional Prohibition And By Congressional Intent: |
|---|---|
| Defendant UNITED STATES, and it co-conspirators must demonstrate (i) a compelling state interest which permits the government to | 42 U.S.C. § 2000bb–1 - Free exercise of religion protected –(a)(5) compelling interest test as set forth in prior Federal court rulings is a workable test. The purposes of this chapter are—(1) to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and |
| (ii) engage in religious discrimination for the specific purposes of | (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government. <br><br> Constitution - First Amendment establishment clause prohibits all religious discrimination absent a compelling governmental interest. |
| (iii) researching, developing and deploying an internationally prohibited bioweapon and bioweapon system which violates federal law and ratified international treaty, using | Title 18 Criminal Law: 18 U.S.C. § 175, (a) Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States. <br><br> 18 U.S.C. § 1961, definitions of racketeering offenses include prohibitions against bioweapons and bioweapon delivery systems. <br><br> 1972 *Bioweapons Treaty,* ratified international treaty prohibits development and deployment of bioweapons and bioweapons delivery systems since March 1975. |
| illegal medical experiments on human subjects who are US persons, and | 18 USC 2340A, prohibits torture including biomedical experiments without consent. <br><br> *Torture Treaty*, Article 14, requires a civil right of action and remedies for torture. |

| (iv) to engage in explicit patterns of constitutional rights violations, and | *First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth* Amendment violations are subject to myriad criminal and civil sanctions 42 U.S.C. § 1986 provides a civil right of action for neglect to prevent constitutional and civil rights violations, which patterns of rights violations have been conducted together with state and local officials. |
|---|---|
| (v) establish and sustain a decades long systematic associated-in-fact enterprise pattern of racketeering acts, and permit others to both conspire and act, which | Congressional Intent PL 91-452 (RICO) October 1970 "(a) The provisions of this title [enacting this chapter and amending sections 1505, 2516, and 2517 of this title] shall be liberally construed to effectuate its remedial purposes." 18 USC 1961-1968, prohibits racketeering acts, conspiracies, and establishment and sustainment of associated-in-fact enterprises. |
| (vi) has and does constitutionally permit the government and its co-conspirators to abuse the states secrets privilege under color of law to sustain fraudulent concealment of the illegal bioweapon and bioweapon delivery system, | 5 USC 301, prohibits regulations which violate federal law. *United States v. Reynolds,* 345 U. S. 1 (1953) prohibits color of law abuse of state secrets privilege. |
| which illegal bioweapon program it cannot legally conduct except in explicit violation of law. | |

33. Defendants cannot make any such showing to this court absent perjury. There are no plausible defenses under our Constitution, our laws, and as clearly expressed in Congressional intent. Neither defendant UNITED STATES nor any co-conspirator defendant can plausibly sustain any defense against these acts undertaken for these illegal purposes; nor for the sustained associated-in-fact enterprise organized, managed, and operated for racketeering acts and these other illegal purposes; nor for their own knowing and willful participation; nor for their knowing and willful fraudulent concealment; nor of any compelling governmental interest to willfully and knowingly violate federal law and treaty prohibiting bioweapons in any form or manner; nor for their willful blindness to the acts of others who are party to this conspiracy. Neither sovereign immunity, nor absolute immunity, nor qualified immunity, all as constrained by Congress,

absolutely protects any person from liability for their own knowing and willful violations of our Constitution and laws.

### Illegal Cover-Up Benefits Defendants' Corrupt Intent - Plaintiffs' Rights, Religion, Property, Family Are Profoundly Damaged

34. Defendant UNITED STATES has and does continue to (i) conduct illegal human subject medical experiments on these plaintiffs without the consent of any of these plaintiffs, and without the direct knowledge of most plaintiffs, which illegal biomedical experiments on human subjects for illegal bioweapons development, testing, and deployment are comparable in scope to the criminal offenses tried by US prosecutors in the 1946-1947 Nuremberg Doctors Trial, and are decades longer in duration than the three years of illegal experiments by those Nazi doctors, some of whom received the death penalty for those illegal medical experiments. Despite the 1972 *Bioweapon Treaty* and 18 U.S.C. § 175, defendant UNITED STATES has and does continue to (ii) conduct a pattern of racketeering acts incorporating all forms of frauds for the purpose of sustaining involuntary servitude to both perpetuate its control of these plaintiffs and their life circumstances, through its own direct acts and those of its co-conspirators including its own personnel embedded in other police powers operations at various levels of government and through cooperating defendants and other persons to perpetuate (ii-a) its illegal biomedical experiments, and (ii-b) its involuntary servitude over these plaintiff in its direct control and manipulations of life circumstances including, without limitation, health and wellness circumstances, relationships and their progression and destruction, employment and its availability and income level, enterprises and their success or failure, the public reputations of its victims, and its fraudulent concealment of the entire associated-in-fact enterprise through the abuse of police powers exemptions and state secrets privilege, all under color of law.

34A. These continuing coercive illegal BRMT bioweapon and bioweapon delivery system operations by defendant UNITED STATES (iii) operate as a terroristic threat toward populations and toward other governments, as defined at 18 USC § 2331(1)(B)(i) and 25 CFR § 11.402 - Terroristic threats. By conducting coercive, injurious, and illegal BRMT bioweapon and bioweapon delivery system operations against the Lead Plaintiff in full public view, with intrusive illegal video surveillance and during field operations in public places, defendant UNITED STATES has and does (iv) use these demonstrations of dominance over these individual citizens and their "unalienable rights" and its illegal direct, targeted interferences in the free will of US persons as it perpetuates its involuntary servitude of these plaintiffs to (a) blatantly and illegally advance development of the illegal BRMT bioweapon and bioweapon system, while it (b) makes views of these coercive and injurious operations publicly accessible and (c) has and does provide specific opportunities for the press, media, and the leadership of other nations to view and review these illegal operations, for the implicit coercive purpose of exercising influence and interference in the sovereignty of other nations.

35. These are the core purposes of this entire associated-in-fact enterprise used against these plaintiffs by defendant UNITED STATES, whomsoever the self-entitled members of the executive branch of the government formed "to secure these rights" shall elect to abuse in any given time period – whether for a few minutes, for a lifetime from age 12 (Lead Plaintiff, for example), or for a premature death (Audrey, age 18, paragraphs 10, 801J-l, 803I-K, 805 BD-BK, BS, BV) in a secret field demonstration of total dominance by the illegal BRMT bioweapon and bioweapon delivery system – as defendant UNITED STATES' continues its blatant and willful violations of our Constitution, the ratified 1972 Bioweapons Treaty, 18 U.S.C. § 175, 5 U.S.C. § 301, and other federal and state statutes cited herein, together with its co-conspirators. These are

the corrupt benefits to, and the *mens rea* of, defendant UNITED STATES and its co-

conspirators, through their domination of life circumstances in systematic abridgments of

unalienable rights and the involuntary servitude of US persons. The damage to these plaintiffs is

pervasive, not merely to property and money, but to life, to peace of mind, and to their free will

as human beings, and to all that it is supposed to mean to be a free citizen. Defendant UNITED

STATES has and does destroy, before the eyes of the world, the very principles our founders

fought and died to implement on behalf of themselves and their posterity in their fight for liberty

and in adopting our Constitution. These corrupt illegal purposes and the damages to these

plaintiffs extends through each and every act recounted herein, and to those yet to be discovered

through this legal process.

36. There is no reason to believe this damage is isolated to some few individual US

citizens. The predecessor defendant CIA illegal program MKUltra continued for 20 years as it

illegally and secretly distributed 100 million doses of LSD, mostly to unwitting citizens and

soldiers in a US population averaging 170 million during that time. The predecessor defendant

FBI illegal program Cointelpro consumed approximately 30% of that agency's resources, over

7,000 of its more than 21,000 employee authorized strength, for more than 15 years, doing

enormous damage to rights, to organizations formed to secure those rights, to and including

violence and murder against US persons. None of these criminal violations was ever prosecuted

against either agency which perpetrated this violence against US persons. This damage to US

persons presented in this complaint is not isolated, it is most probably pervasive, as it (i) easier to

virtually distribute these brain hijacking caused harms than it was to physically distribute the

physical drugging harms of MKUltra, (ii) these same government departments and agencies have

more resources than before, and (iii) these illegal operations have continued more than three time

longer than either MKUltra or Cointelpro, while (iv) combining the patterns of malign acts, violations, and injuries of both those illegal programs. But even if this damage were not pervasive, these plaintiffs are constitutionally and legally entitled to each and every remedy available under our Constitution including, without limitation, the 1970 Racketeering Influenced and Corrupt Organization Act 18 U.S.C. §§ 1961-1968, as amended, 28 U.S.C. § 2679(b)(2), other federal and state statutes herein presented at each claim, and *Bivens*. Color of law abuse of the state secret privilege cannot sustain an associated-in-fact criminal enterprise pattern of racketeering acts and trump the unalienable rights of U.S. persons under 5 U.S.C. § 301 and *United States v. Reynolds,* 345 U. S. 1 (1953). Actions outside any conceivable scope of authority do not qualify for the privilege of absolute or qualified immunity under our Constitution when the administration of justice is itself profoundly corrupted, self-interested, and completely silent for generations. To qualify for the privilege of immunity, acts must be within the outer perimeter of the constitutionally and legally defined scope of discretionary authority, *Imbler v. Pachtman,* 424 U.S. 409 (1976), and *Harlow v. Fitzgerald* 457 U.S. 800 (1982), and of non-discretionary authority. The simple self-interest of individuals who engaged in non-discretionary functions as they performed specific roles at specific points early in their careers is legally insufficient to sustain abuse of privilege of power or position for the purpose of covering for themselves and for their prior superiors in their later discretionary roles. Nor can it legally suffice as the method of fraudulently concealing their current subordinates who now occupy their former positions, while they engage in supposedly discretionary acts which are nothing more than protecting their indefensible policies and practices from accountability under law. That is mere public corruption and color of law abuse of authority – the very spark which created our republic in its first moments – a rebellion against the capricious tyranny of the powerful. As

forensically developed between September 2023 and April 2024, the then unwitting Lead

Plaintiff had the following specific known direct interactions and periods of direct interaction

with later high ranking of senior government officials over decades of defendants' corrupt

patterns of practice and cover-ups:

| Individual | Last Known Senior Government Role | Direct Interactions with Lead Plaintiff |
|---|---|---|
| Stephen BREYER | Associate Justice, Supreme Court | 1970-72, extensive direct interactions, as fraudulent church elder Snow immediately after Sandra's murder, and 1974 into 1980s as Jack Sackville-West while at WSU, paragraphs 19(i), 21(i), 99d, 211, 417-418 |
| Janet Reno | Attorney General, Clinton cabinet officer | 1966-67 as Martha at Lakeland Elementary School during 6th grade, paragraph 717, then November 2014 backcheck in Phoenix (paragraph 654A) posing as Gail Jackson with her brother and John Tyler, Cherry Creek Partners. Charles was fka Bruce Zuelsdorf at Lakeland or Lakota around the same time as Martha at Lakeland |
| Merrick GARLAND | Attorney General, Biden cabinet officer | 1974-76 at WSU, plausibly 1971-72 at Decatur High School, paragraphs 5, 99m, 419 |
| Lloyd AUSTIN | Secretary of Defense, Biden cabinet officer, previously Army General Officer | 1999, HomeGrocer, Renton, WA distribution center project manager at CNA, paragraphs 19(v), 105 table, 762 table, while ARMY violated the Third Amendment with fraudulently orchestrated spouse Jeanette, and fraudulent brothers-in-law Alexander Vindman, Yvgeney Vindman, who both later served as ARMY personnel on National Security Council |
| Stansfield Turner | CIA Director under Carter | 1979 in NGA cameo, 1990s Spokane memorial service burying Jack Sackville-West legend prior to Breyer promotion to SCOTUS, paragraph 424, 725, 805AS |
| William BURNS | CIA Director, Biden cabinet officer | 1986 to around 1992, extensive direct interactions as LazerSoft Board member and cross-street neighbor during Lead Plaintiff's marriage to orchestrated Jeanette, paragraph 48, 120, 214, 320f, 440, 443-445, 497-499, 557, 600K, 609C, 610, 617C, 627D, 627E, 644D, 652G, 695, 820N, 834, 844, 845, 853 |
| Robert Mueller | FBI Director under Bush 43, Obama | 2017 Pittsburgh backcheck with Rosenberg, possible interactions in 1974 and other dates, paragraphs 467-470. FBI Director during FBI racketeering and trafficking |
| Anthony FAUCI | Director, NIAID | 1996-2002 extensive direct interactions at CNA, paragraphs 21(iii), 30, 58B, 107, 225, 427, 599D(i)d, 600N, 602C, Q-W, AA9a), 604B, 606N, 608A, E, |

| | | 617G, 626D, J, K, 735, 746, 748, 750, 751, 754, 762 table, 768, 769, 778, 805AD, BA, BB, 810B, c, 841J, AA, 845/e, 853E |

The above named individuals' direct interactions with Lead Plaintiff, and the direct interactions of their then current and future subordinates with Lead Plaintiff, including, without limitation, defendants:

(a) WEISSMAN (who, without limitation, conspired with BREYER and was later general Counsel to FBI Director MUELLER who oversaw defendant FBI throughout the 2001-2013 period of trafficking, torture to suicide ideation, and fraudulent employment of Lead Plaintiff by ROSENBERG),

(b) ROSENBERG (who, without limitation, supervised the human trafficking and fraudulent employment of Lead Plaintiff during the destruction and orchestration of marital communities by BURNS, was maneuvered into two US Attorney roles by Attorney General GONZALES, while ROSENBERG was directly participating in this wrecking process between 2005 and 2008, and who later served as defendant FBI's Chief of Staff to Director COMEY who had himself worked directly for GONZALES at defendant DOJ), are, with

(c) defendant CALDWELL (embedded at defendant WSU for periods between 1974-1977 with GARLAND, and managed by BREYER, paragraphs 99e, 219, 626 later presenting as a private attorney at Seed & Berry in 2004 to protect an illegal FBI racketeering acts operation, paragraphs 275, 276, 462, 830D, 841L, 845E, 853S, and still later Assistant Attorney General Criminal Division in 2014-2017 under Attorney General HOLDER,),

(d) with defendant PRAY, who worked for ROSENBERG,

(e) plausibly with MUELLER, later U.S. Attorney and FBI Director, then backchecked by and with ROSENBERG (paragraphs 467-470, and

(f) myriad other defendants herein,

who are all hopelessly entangled and intertwined with each other - and with the Lead Plaintiff and other members of this class - over more than fifty years of public corruption in these associated-in-fact enterprise patterns of acts, violations, and injuries.

36A. By their willful and knowing consent to this illegal pattern of practice, and by their sustained silence in direct contravention of their oath and duty, three of these perpetrators have progressed to be Cabinet secretaries of the executive branch, and one has now served and retired from the Supreme Court. Still others have served in other senior governmental roles with grave responsibilities while their own lawlessness has never been held to account. These facts are well established in this complaint and through their various positions identified in public biographies. These profound and transparently obvious conflicts of interest between:

(a) these defendants imperative to cover their institutional and specific individual historical patterns of associated-in-fact enterprise racketeering acts, the perpetual intent to cover up the illegal BRMT bioweapon and bioweapon delivery system and the directly related rights and racketeering acts, violation, and injuries used to support and sustain this illegal and internationally prohibited program, and

(b) the interests of justice which these institutions and these individuals are sworn to protect could not be more profound. These conflicts of interest, and the interactions and intertwined patterns of interactions are representative of, and proximate in time to, direct interactions of these same government officials with other members of this class of plaintiffs, some of which were witnessed and/or directly experienced by the Lead

Plaintiff, and all of which are subject to further discovery as to these and to other members of this class of plaintiffs.

37. Continuing coercive and adverse contacts of these institutional and individual governmental defendants with the Lead Plaintiff and with other members of the class have been and are, without limitation, for the corrupt purposes of (i) fraudulent concealment and for (ii) the pervasive, perpetual, and on-going attempts by these defendants both to (a) entrap plaintiffs and to (b) self-exculpate for their corrupt specific self-interested purposes of evading constitutional accountability under law for their durable and systematic violations of law and rights, which violations are summarized at paragraph 251 and in the 54 claims herein at paragraphs 801-854. Establishing justice was laid as one of the five foundational purposes of our Constitution by the framers in its Preamble and was reinforced in the Bill of Rights drafted by James Madison, the principal drafter of the Constitution itself, to achieve the framer's purpose that the federal Constitution would be ratified as the supreme law of the land by the state legislatures. Those legislative ratifiers, profoundly skeptical of supreme authority vested in any one national government, insisted on these protections as an explicit condition for their ratification, so as to protect the People from offenses against their unalienable rights, including from acts by an overreaching federal government. The ratifiers sought above all to preserve individual liberty and the "unalienable rights" which the People had fought and died for in the Revolution and would again in the Civil War. Defendant DOJ willfully refuses to discharge its constitutional responsibility, and sustains official silence, (paragraphs 550-584), for the profoundly corrupt and illegal purposes of, without limitation, fraudulently concealing and continuing (i) the illegal BRMT bioweapon and bioweapon delivery system (18 U.S.C. § 175) and (ii) the associated-in-fact pattern of racketeering acts (18 U.S.C. §§ 1961-1968) which have been and are used,

but limitation, to (a) conceal that illegal weapon (paragraphs 2-5, 322, 357-402) prohibited

per ratified international treaty, to (b) conceal biomedical experiments on human subjects

without consent performed on US persons (paragraphs 2, 3), to (c) systematically viol.

constitutional rights to and including torture and forced suicide ideations (paragraphs 604-607

HEXP-1-4), to (d) engage in indefinite detention without charge or trial (paragraphs 600 NSEC-

1, 808, 809, 820-822, 839-844), to (e) coerce forfeiture of actions which are protected rights

(First and Fifth Amendment, paragraphs 626, 627 RGTS-6-7, 808), and to (f) sustain involuntary

servitude in systematic violations of the Thirteenth Amendment (paragraphs 820-822). These

systematic violations of constitutional rights and law are in no conceivable way within the scope

of the discretionary or non-discretionary authority of any federal department or agency under any

plausible interpretation of our Constitution, nor any plausible interpretation of the doctrine of

immunity which governs valid exercise of discretionary authority. They are simply corrupt acts

undertaken willfully by these defendants. These plaintiffs must therefore pursue this cause of

action themselves, even as they have been and are specifically impoverished, enslaved as

involuntary servants, and deprived of their liberty and rights by these defendants acting in their

own corrupt self-interest while lacking the discretionary constitutional authority to so act.

Impunity cannot prevail under our constitutional system, else we have no Constitutional system

at all, we have the very autocracy the founders fought to overcome. There is no other choice left

to these plaintiffs but this one.

[Intentionally left blank.]

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

38. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1333, and 18 U.S.C. §§ 1961-1968 over Plaintiffs' claims described herein, including, without limitation:

(i) Constitutional rights claims against deprivations of, and conspiracies to, violate rights; and racketeering acts, violations, and injuries; by defendant UNITED STATES and its domestic co-conspirators described herein,

(ii) Claims which arise under the ratified 1972 *Bioweapons Treaty* (effective in force March 1975), the *Torture Treaty* (1984, ratified 1992) which incorporates a right of action directly and specifically contradicting the existing unconstitutional federal law 18 U.S.C. § 2340A argued at paragraphs 328-329, and the Constitution of the United States,

(iii) State statutory and common law claims because they are so closely intertwined with and related to the federal statutory and international treaty acts, violations, and injuries, conducted by, or in pursuit of, an associated-in-fact enterprise of all defendants which arose and arises out of the collective and individual acts of defendant UNITED STATES, CIA, FBI, WASH, WSU, and their co-conspirator defendants in their acts, violations, injuries, and unconstitutional conduct against Lead Plaintiff and others of the class,

(iv) Claims arising from other violations of state statutes because those offenses are directly intertwined with and arise from the original violations by defendant UNITED STATES and it co-conspirators, and thereby comprise (a) elements of and within the pattern of conspiracy to commit, and (b) elements within the pattern of rights violations and racketeering activity conducted through an associated-in-fact enterprise in conspiracy with other defendants,

(v) Claims arising from the extra-territorial actions of departments, agencies, officers, and
agents of defendant UNITED STATES, and including, without limitation, CORNWELL
CIA, ROSENBERG, FBI,

(vi) Constitutional rights claims against deprivations of and conspiracies to violate rights;
and racketeering acts, violations, and injuries; all by defendant UNITED STATES, its
departments and agencies, against these plaintiffs, accomplished through defendant
UNITED STATES' purposeful pretexting of these plaintiffs with foreign intelligence and
police powers departments and agencies who act in violation of US law within and
without the territorial boundaries of the US for the purpose of supporting otherwise
illegal police powers operations of defendant UNITED STATES in their own and others'
territories, which illegal acts specifically include, without limitation, acts undertaken by
and/or with the knowledge of ROSENBERG (FBI) in 1995-1996 by the police powers
and intelligence services of Canada and the United Kingdom, and again in 2007 by the
police powers and intelligence services of the United Kingdom, which operations were
conducted for the purpose of benefitting the corrupt intent of defendant UNITED
STATES, ROSENBERG (FBI), CIA, ARMY, and others, against the Lead Plaintiffs'
constitutional and legal rights and interests.

**Personal Jurisdiction**

39. This Court has personal jurisdiction over all defendants under 18 U.S.C. § 1965(a)
through § 1965(d) inclusive, 28 U.S.C. § 2679(b)(2), and pursuant to Fed. R. Civ. P. 4(k)(1)(C)
and Fed. R. Civ. P. 4(k)(2)(B), because these defendants and their agents caused injuries to
plaintiffs through their acts and conspiracy in their acts and omissions originating in, or having
an effect in, the Eastern District of Washington which acts and purposeful omissions have been

perpetrated by defendant UNITED STATES, its co-conspirators, and individually liable

defendant officers and agents acting in bad faith, and in their joint and several fraudulent

concealment of illegal acts against the Lead Plaintiff and other plaintiffs between 1968 to 2024.

**Venue**

40. Venue is proper in this District Court pursuant to the above described statutes

because certain executive decisions, management, and operation, of the associated-in-fact

enterprise and other substantial conduct giving rise to plaintiffs' claims have occurred in the

Eastern District of Washington under fraudulent concealment, since at least September 1974

against Lead Plaintiff, likely earlier against other members of this class, at the executive

direction of defendant UNITED STATES through its myriad intelligence and police powers

operations, including, without limitation, defendants ARMY, CIA, DOJ, FBI, and USMS, among

others. Specific acts and injuries under executive authorities were directed, managed, and/or

conducted by and under the authority of executives and managers with offices in this District by

agents and/or officers of defendant UNITED STATES throughout the United States and in

foreign countries, specifically including offenses over which this court has been granted extra-

territorial jurisdiction. To wit, four categories of specific acts, violations, and injuries against the

Lead Plaintiff and other plaintiffs conducted by defendant UNITED STATES, its departments

and agencies, in conspiracy with other defendants and their employees domiciled and/or

operating in this District, including, without limitation, FBI, CIA, ARMY, USMS, WSU,

WASH, BREYER, BURNS, GARLAND, ZOULAS, THORPE, EPSKAMP, DOLAN and other

pseudonymed government employees posing as the Sackville-West family in Spokane, WA,

through their executives, managers, personnel, and operations in this district including, without

limitation:

(i)  Constitutional rights violations including, without limitation, illegal biomedical and psychological experiments on Lead Plaintiff and other plaintiffs without consent and under fraudulent concealment, to continue illegal BRMT bioweapon and bioweapon delivery system development and deployment, which acts and conspiracy inculpate, without limitation, defendants CIA, ARMY, FBI, USMS, BREYER, WASH, WSU, BURNS,

(ii) the murder of one of Lead Plaintiff's extended family members, Audrey Brewer, age 18, by direct psychological biohijacking of hormones and through the direct manipulation of the hand of a third party using the illegal BRMT bioweapon and bioweapon delivery system program, orchestrated and conducted as a field test of tools of violence by defendant CIA and unknown individual officials and employees of defendant CIA, in a moment of organizational transition and institutional blindness on September 6, 2011 in Walla Walla, WA, under cover of official darkness and of fraudulent concealment, matching an established prior pattern of conduct by defendant CIA,

(iii) Racketeering acts affecting interstate commerce, violating 18 U.S.C. §§ 1961-1968, within and through the management and operations of federally funded financial and higher education institutions, and in ordinary commerce across state lines in Washington and Idaho including, without limitation, acts which perpetuated involuntary servitude, forced labor, peonage, and other racketeering acts, and which acts inculpate, without limitation, FBI, USMS, CIA, ARMY, Deloitte Seattle, BURNS, WEISSMAN, ROSENBERG, while the unwitting Lead Plaintiff attended WSU in Pullman, WA, and later worked in illegal intelligence probes presenting as consulting projects at the three federally funded and insured Farm Credit Banks and their common enterprise shared

expense administrative department, in Spokane, WA, and while he visited former college classmates and extended family members in this District,

(iv) Constitutional rights violations including, without limitation, religious discrimination by defendants UNITED STATES, ARMY, CIA, and FBI in human trafficking, illegal human subject medical experiments, and racketeering acts in this District against Lead Plaintiff and other members of this class including, without limitation, directed assignments of classes and professors, interposition of assigned romantic interests and interferences in other personal interests and conduct, and the complete surrounding of Lead Plaintiff and other members of this class by embedded officers and employees of UNITED STATES, FBI, CIA, ARMY, WASH, WSU, the individual defendants named herein and others as yet unknown, who directed, managed, operated, and participated in sustained constitutional rights violations including, without limitation, involuntary servitude, forced labor, and peonage, in support of the illegal BRMT bioweapon and bioweapon delivery system and its continuation of illegal human subject medical experiments on the unwitting Lead Plaintiff and other members of this class while the program was supervised by BREYER posing as Jack Sackville-West in Spokane, WA, and included BRMT team member GARLAND as Robert Mandich at WSU,

all while defendants fraudulently concealed this conspiracy against rights and law behind color of law abuse of state secret privilege. This fraudulent concealment was not unmasked until forensic analysis revealed the accurate and correct identification of the principal individual perpetrators of this illegal program beginning in September 2023. This program was undertaken for the explicit purposes of researching, developing, and deploying the illegal BRMT bioweapon and bioweapon delivery system on and against US persons in systematic violations of their

constitutional rights, and to sustain the fraudulent concealment and continuation of this illegal program by, without limitation, defendants CIA, ARMY, and FBI, as original perpetrators from at least 1968, through defendants' associated-in-fact enterprise pattern of racketeering crimes, acts, violations, injuries to Lead Plaintiff and to other members of this class.

### Known Government Conflicts Of Interest Requiring Threshold Consideration

41. This cause of action arises from a very long-running fraudulently concealed illegal program which systematically violates constitutional rights under the *First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth* and *Fourteenth* Amendments, the RICO Act 18 U.S.C. §§ 1961-1968, and myriad other federal and state statutes summarized at paragraph 251. Defendant DOJ and its agencies have been actively involved in the conduct of this illegal program across multiple federal regions for approximately six decades. The vast majority of federal judges have been drawn from defendant DOJ officials and employees during the pendency of this illegal program, so there are potential conflicts of interest in the federal judiciary. Due care must be exercised to avoid these potential conflicts of interest and ethics to sustain a fair process of equal justice in fact and in appearance, and in accordance with Congressional intent expressed at 28 U.S.C. § 1915, and the Supreme Court mandates expressed in *Neitzke* and *Denton*.

42. Critical key identifications of individual defendants began in September 2023 and continued through April 2024, as described below at paragraph 99. It is this series of identifications of individuals, particularly those of inculpated federal officials, which have finally provided the plain and straightforward connections which tie them to, and which directly inculpate, the particular departments and agencies of defendant UNITED STATES, and serve to directly illuminate the underlying reasons for the depth and breadth of the cover-up undertaken by defendant UNITED STATES and its co-conspirators (paragraphs 550-584).

43. These individual identifications include a former illegal BRMT program executive, now retired former Supreme Court Justice BREYER, whose presence and conduct in this District can be independently confirmed by, among others, DOLAN, the former Chief of Staff to former Washington Governor Gregoire. Three presently sitting Cabinet members were also involved in illegal acts undertaken in this District, BURNS, GARLAND, and AUSTIN, as were other current and former officials in the executive branch at very senior levels, as identified herein.

44. These clear personal conflicts of these specific current and former government executives motivates strong personal self-interest, and that of their subordinates and perhaps some colleagues, to employ all feasible means and resources of these vastly resourced and empowered departments, agencies, and institutions to attempt to perpetuate and conceal the individual direct participation and culpability of these empowered individuals, and to deploy vast resources from the billions of dollars, tens of thousands of employees, and vast executive powers, to perpetuate these acts and to conceal the acts, violations, and injuries which are the object of this litigation. Any *ex parte* communications and claims made by defendant UNITED STATES through defendant DOJ ought to be considered by this court with this factual reality and these direct internal conflicts of interests of these defendants in mind.

45. Other key factors worthy of this court's consideration include, without limitation:

(i)    approximately 13,000 pages of carefully curated predicate act, documentary, analytical, and pattern of practice evidence from independent sources, and specifically relevant independent research and findings, all of which is intended to be presented for the record with the initial filing in a form and manner which this court directs, considering the impoverished status of the Lead Plaintiff and his ability to transmit and file this evidence in a financially feasible manner which

also assures the integrity of this evidence from electronic hacking, modification, and/or deletion, by potential malign and conflicted actors who can access the vast technical resources of defendant UNITED STATES, which resources have already been used to delete and to attempt to modify certain evidence,

(ii)     evidence from a crucial recent period in 2018-2020, related to continued illegal human trafficking and to racketeering in interstate commerce, has been deleted from Lead Plaintiff's own electronic records, and other evidence has been and is still actively blocked from access during the preparation of this complaint, all by the actions of defendant UNITED STATES, which has and does continue to control the circumstances of the Lead Plaintiff's continued involuntary servitude,

(iii)    certain key evidence had been strategically destroyed, deleted, concealed, or suppressed by defendant UNITED STATES as described at paragraphs 555-562, 635, 636, 637, Interline Exhibits 17-19,

(iv)    the current circumstances of the Lead Plaintiff's continued *in forma pauperis* status and continued involuntary servitude directly and proximately inculpate current defendant DOJ's Attorney General GARLAND, and current CIA Director BURNS, as operation of the illegal BRMT bioweapon and bioweapon delivery system continues unabated.

46. This district court's threshold test for admissibility requires the balancing of complex constitutional issues – constitutional rights violations, statutory and ratified treaty violations, color of law abuse of state secret privilege and police powers exemptions, abuse of absolute and qualified immunity, direct constitutional conflicts of law identified herein, and conflicts in rules which govern civil pleadings under existing mandates – all as pled by an *in forma pauperis pro*

*se* plaintiff, in accordance with the existing Supreme Court mandates of *Nietzke v. Williams*, 490 U.S. 319 (1989), which states that failure to state a claim is not fatal to an *in forma pauperis pro se* complaint, and *Denton v. Hernandez,* 504 U.S. 25 (1992), which mandates that novel claims made by an *in forma pauperis pro se* litigant must be allowed to proceed to discovery and cannot be dismissed as a threshold matter.

47. This court is required to balance these Supreme Court mandates, which sustain *in forma pauperis pro se* litigants' rights to access federal courts extended by Congress in 28 U.S.C. § 1915, with the rights of these extremely well informed, self-interested, and well-resourced defendants. These defendants have concealed themselves behind color of law abuse of the state secret privilege, which abuse violates 5 U.S.C. § 301, as their cloak of fraudulent concealment for approximately six decades of unconstitutional conduct against US persons, to avoid litigation, which exposes durable patterns of bad faith, corrupt, and illegal acts against rights and law by governments, brought by Lead Plaintiff whom they have directly and deliberately impoverished, and who has zealously pursued these rights since initial discovery despite the enormous mountain of prejudicial, discriminatory, coercive, and potentially lethal obstacles presented by the overwhelming power, illegal interventions, and fraudulent concealment of these defendants.

48. The *in forma pauperis* economic status of the *pro se* Lead Plaintiff has been and is directly caused, created, and sustained by defendant UNITED STATES and by these co-conspirator defendants, whether acting directly for their own benefit under color of law, or in conspiracy with other self-interested defendants. Defendant UNITED STATES has and does use wire fraud and other illegal means to perpetuate employment discrimination, racketeering crimes against enterprises of plaintiffs, and deliberate harms to public reputation, as well as its

envelopment and control of the surrounding environment, including, without limitation, for the specific continued purpose of illegal human subject biomedical experimentation, which it has and does use to develop, test, and deploy the illegal BRMT bioweapon and bioweapon delivery system, which is prohibited under the ratified 1972 *Bioweapon Treaty* and 18 U.S.C. § 175, which itself is an integral element of racketeering law as set forth at 18 U.S.C. § 1961(1)(B).

49. In balancing the pleading standards of the Federal Rules of Civil Procedure Rule 8 and Rule 9(b) for both "short and plain" statements and for "particularity in special matters" with (a) the massive and complex fraudulently concealed pattern of facts, with (b) the clear intent of these sophisticated and extremely well-resourced defendants to hide behind claimed police powers exemptions and state secret privilege which are invalidly applied in their color of law abuses, and with (c) the complexities of sustained violations of constitutional rights, of law, and the inherent conflicts of law presented in this litigation, this court must consider that (i) the threshold test required for admissibility dictates that any plausible claim be admitted under *Nietzke* even if not well stated, and (ii) that any plausible facts and pattern of facts are sufficient for pursuit of discovery under *Denton*, even when presented with fatal flaws by an inexpert *pro se* attorney to a district court, as it reaches any threshold decision under the aforementioned Supreme Court mandates of *Nietzke* and *Denton* involving necessarily complex neuroscience and technologies in which it has neither education nor experience. Lead Plaintiff notes that any matters insufficiently pled by this *in forma pauperis pro se* attorney can be immediately repled upon appointment of counsel, so those claims specifically can be remedied in an amended complaint to comply with other prevailing case law, as in *Bell Atlantic v. Twombly,* 556 U.S. 662 (2009) and *Ashcroft v. Iqbal*, 596 US ____ (2009).

## PARTIES

### I.    Plaintiffs

50. Dennis Sheldon Brewer, Lead Plaintiff, is an involuntary servant of defendant

UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system program, who was

involuntarily enrolled in the illegal BRMT development and deployment without consent while a

minor child at approximately age 12 in 1968. He was selected by defendants ARMY and CIA,

with the covert support of defendants DOJ, FBI, and USMS, because he was child in an illegally

targeted Quaker offshoot religious group whose father had served as a conscientious objector in

defendant ARMY's Medical Corps. The illegal BRMT bioweapon and bioweapon delivery

system program, an unimaginably intrusive program which biochemically hijacks the human

brain, directly contravenes the very purpose for which the United States government was created,

to secure "unalienable Rights." The illegal weapon program has and does use him as a human

guinea pig, all fraudulently concealed from him from age 12, one of defendant UNITED

STATES' direct human medical experiment abuse victims through brain biochemical torture to

the point of suicide ideation on multiple occasions. Defendant UNITED STATES has developed

BRMT's capabilities by hijacking the unwitting Lead Plaintiff's brain, and those of others in his

family and beyond, for its illegal human experiments and sustained his on-going involuntarily

servitude to defendant UNITED STATES, to and including numerous injuries and attempts on

health and life by defendant UNITED STATES, as well as through a pattern of racketeering acts

which it and other defendants have secretly repeatedly perpetrated over his entire adult life,

destroying and orchestrating relationships to and including marriage, controlling the entirety of

his career and employment, destroying multiple businesses and engaging in forced labor in still

others, and created and sustained humiliating false public narratives while it engaged in acts of

domestic sabotage through its own acts and violence of others, as it did in MKUltra and

Cointelpro between the 1950s and the 1970s. A personal statement and comprehensive profile of

the Lead Plaintiff is provided at LPEE pages 140-236. Lead Plaintiff Dennis Brewer is a resident

of Edgewater, New Jersey.

### Extreme Difficulty Of Detection - Lead Plaintiff's Injuries Are Representative Of Injuries To The Class Of Plaintiffs

51. Defendant CIA's MKUltra, with active collaboration of defendant ARMY

(Bioweapons Lab), illegally abused unwitting US persons with 100 million doses of LSD in a

population of about 170 million, while it operated in secret for two decades. It was not well

known even to members of defendant CIA outside the program itself during that entire period.

Defendant FBI's illegal Cointelpro program similarly operated in secret for decades, and was

only uncovered because of a citizen activist group burglary of files in a tiny FBI satellite field

office in Media, PA. Both programs engaged in systematic patterns of criminal acts against US

persons for which there were no legal consequences ever. Defendant CIA's MKUltra secretly ran

over 140 illegal field operations, some lasting decades, and secretly illegally drugged US persons

with 100 million doses of LSD into a US population of roughly 170 million people, spreading

drug-related mayhem, injuries, and violence in particular targeted communities as well as in

prisons, hospitals, and universities, and in brothels it owned and operated. During the same era,

Cointelpro consumed about 30% of FBI field operations resources (defendant FBI had an

approved internal headcount of approximately 20,000 people in 1975, plus an unknown number

of paid informant infiltrators) for its surreptitious infiltrations, using interpersonal and

organizational sabotage and manipulations, and violent acts which physically injured people, and

which stole citizens' rights to peaceably assemble for lawful purposes. FBI infiltrated faith-based

organizations like the Lead Plaintiff family's Quaker church which was infiltrated by BREYER

and a phony home-based congregation established, as well as community-based organizations

which ran feeding, community empowerment, and community health programs, and supported

other civil rights such as voting registration, as well as community-governance organizations

such as farmer, wholesale, and consumer cooperatives later infiltrated by defendant WEISSMAN

(Puget Consumers Cooperative) and ROSEBERG (NutraSource) with no legal basis for their

infiltration. CIA's MKUltra was finally ended in 1973 and its injuries of US persons were

illegally covered up with obstruction of justice by the federal government. FBI's Cointelpro

ended in 1971, but comparable scofflaw violations continue today, such as (i) the above

referenced illegal infiltrations lacking any legal foundation by BREYER, WEISSMAN, and

ROSENBERG in the 1970s into the 1990s, (ii) 45 years of continuing violations of FISA

warrants, and (iii) fifteen years of Section 702 violations by FBI, which rights violations

continue at the present time according to Congressional investigations and the FISA Court.

Defendants CIA and ARMY's illegal BRMT bioweapon and bioweapon delivery system and the

accompanying defendant DOJ program of racketeering crimes against these plaintiffs have

likewise been fraudulently concealed by obstructions of justice and color of law abuses of the

"state secrets" privilege from the 1960s to the present time by defendant DOJ and other

defendants through their corrupt obstructions of justice, including systematic destruction of

evidence.

52. Illegal BRMT bioweapon and bioweapon delivery system neuroscientific and

technological progress has continued in great secrecy since the 1960s, as scientific, medical, and

technological research and development has progressed, eventually completely supplanting CIA

and ARMY's failed MKUltra experiments to secure mind control in humans. The illegal BRMT

bioweapon was first used against the unwitting human trafficked Lead Plaintiff by defendant

UNITED STATES in 1968 when he was age 12, by the following illegal artificial hijacking of his

brain's biochemistry:

> "The posterior pituitary gland secretes ADH and oxytocin hormones synthesized in
> the hypothalamus and are released into the neurohypophyseal capillaries that
> surround the gland. Antidiuretic hormone (ADH) is synthesized in the supraoptic
> nuclei of the hypothalamus, while oxytocin is synthesized in the paraventricular
> nuclei of the hypothalamus."
> Source: National Institutes of Health

The illegal BRMT bioweapon has progressed from (i) a crude locally operated device used to

hijack the free will of the Lead Plaintiff by overstimulating his brain's oxytocin hormone level to

an extreme level in 1968 (paragraph 417), to (ii) a remotely triggered device in the 1980s

(paragraph 694 LETHL-1), and to (iii) completely remote operational capabilities in the present

time.

53. Advances in computing, communications, and precision location technologies,

together with the evolving understanding of neuroscience, have been used to increase the

operational capabilities of the illegal BRMT system over the past decades. Developments in this

broad category of brain/computer interface devices, including relatively crude antilog devices,

such as the medically beneficial Synchron device at paragraph 6 and LPEE pages 11-25, were

deliberately and fraudulently concealed from Lead Plaintiff's active searches for knowledge by

defendant UNITED STATES technology hacking of Lead Plaintiff's internet access from at least

2012 until 2021.

54. Since illegal BRMT brain hijacking technology is an unprecedented development in

human history, and has operated in great secrecy since the 1960s, the illegal BRMT bioweapon

and program caused injuries and patterns of injuries from both BRMT and the pattern of

racketeering acts, violations, and injuries used in its development and deployment, which have

injured other US persons in this class who would have no awareness of their injuries, nor any

reason to be even aware that the elaborately contrived naturally appearing events and consequences were in fact deliberate injuries perpetrated by defendant UNITED STATES and its co-conspirators. As described herein at paragraphs 359-399, and LPEE beginning at page 1, it is virtually impossible to detect the modern version of BRMT used in brain hijacking, since it uses very discretely addressed pulses of directed energy targeted to hijack and trigger completely normal natural brain functions remotely. Since the sensation of the moment seems completely normal, it is extremely improbable that injured members of this class would even be aware they were actively being hijacked.

### Other Plaintiffs

55. As with its direct lineal predecessor program, MKUltra, there is an extremely high probability the illegal BRMT bioweapon and bioweapon delivery system has been used to abuse many innocent US persons and others around the world over the past fifty-six or more years. The Lead Plaintiff's direct knowledge of likely BRMT brain hijacking victims includes only a very small number of the class of plaintiffs likely injured as a result of the actions of the defendants and their co-conspirators. The class of plaintiffs includes members of the Lead Plaintiffs extended family of origin and his two destroyed marital communities. Plaintiff class members very likely include members of the Lead Plaintiff's own family of origin, his two former spouses and their minor children (his former stepchildren), members of his extended family, as well as friends, former girlfriends, and others not identifiable at this time.

56. Other injured persons also likely include members of a broader class of the general public who have been and/or are presently directly injured US persons and/or have indirectly injured acts against relatives and others by these defendants. Plaintiffs and their rights have been injured in a wide variety of ways, or even incarcerated or killed, as a result of the actions of the

defendants and their co-conspirators. Since BRMT leaves no direct evidentiary traces for its victims or nearby witnesses, other forensic means will be required, including production of defendant UNITED STATES' computer and operator log records.

57. The identities and specific extent of injuries of virtually all members of the class of injured Plaintiffs is currently only known to those defendants directly responsible for the management and operation of the illegal BRMT bioweapon and bioweapon delivery system over the past five decades. Key reasons for this reality are (i) the extreme difficulty to detect the modern version of BRMT, (ii) a lack of public awareness due to the unique nature of the system, and (iii) the lack of transparency afforded by "state secrets" to defendant UNITED STATES. This lack of transparency is affirmed by acts as simple as CIA and ARMY refusals to comply with the legal requirements of the Freedom of Information Act and Privacy Act, which require them to acknowledge, and to act upon, information requests. Neither CIA nor ARMY has met even this minimal legal obligation to acknowledge Lead Plaintiff's requests (LPEE pages 387-412, 508-541). FBI coordinated a cover-up of events in the ROSENBERG human trafficking sequence with NYPD in September 2021 (Interline Exhibits 17 and 18), but NYPD had already let slip a key investigative detail in a September 3, 2021 email reply to Lead Plaintiff acknowledging the matter (Interline Exhibit 17).

## A. Mere Recognition Of BRMT Is Immensely Difficult For Victims

58. The primary reasons the Lead Plaintiff was eventually able to unravel the illegal BRMT bioweapon and bioweapon delivery system and forensically reverse engineer the entire development sequence using his specialized knowledge and experience (see LPEE pages 140-236 for Lead Plaintiff's education and professional experience) is because of:

A. Defendant UNITED STATES' repeated brain hijackings, some of which are literally impossible for the human mind to produce on its own, such as the multiple guillotine-like nerve activation sensations across the neck as a knife blade in August 2022 in the early stages of an accelerated frequency of physical lethality events between a July 2022 verbal threat and incidents of indirect physical violence from then until November 2022, described at paragraph 537(e), and other physical and verbal manipulations which were founded in brain hijackings of Lead Plaintiff using the illegal BRMT bioweapon and bioweapon delivery system described herein.

B. Eventual recognition of the long cycle sequences of programmed adverse outcomes to Lead Plaintiff provided the insights needed to forensically reverse engineer the stages of BRMT's development, its increasing sophistication over the decades, and the associated-in-fact enterprise pattern of racketeering acts used to perpetuate his involuntary servitude to the illegal human biomedical experiments and extreme psychological coercion used in BRMT development, particularly in the destruction and orchestration of marital relationships by BURNS and after the 9/11/2001 terror attack while FAUCI ran the BRMT program, described herein.

C. Defendant UNITED STATES field operations personnel in defendants CIA, FBI, USMS, ARMY and other agencies, functionally trained the Lead Plaintiff in common U.S. intelligence tradecraft methods without intending to do so. Field personnel also left tradecraft clues which led like breadcrumbs from the time he was in high school, such as his first 1972 glimpse of a satellite/cell phone in a brief case near Greenwater, WA; in 1979 at graduate school, "Keep in touch, I like to know famous people" a completely mystifying statement at the time by one of his college professors, Dr. Paul SHAFFER;

and as a 1980s consultant, "A physician invented a cure for which there was no disease, his assistant caught the cure and died," by John Hagopian, National Community Banking Senior Manager at Deloitte Seattle, on the Federal Deposit Insurance Corporation project and Lead Plaintiff's co-instructor for Bank Administration Institute strategic planning seminars.

D. Key recollections as at C above, forensic recognition of then mysterious but distinctive pattern operational security backchecks run routinely to assess operational security across decades, and tradecraft "rhymes and riddles" such as FBI's trademark "coincidences" with the Senator Menendez investigation (related at paragraph 301, 514, 524-525, 564, 599D(i)(h)) are now familiar to Lead Plaintiff. Combined with Lead Plaintiff's unique range of experiences in (a) many kinds of government (legislative, executive, department, agency, bureau, office) and private sector operations (startups to global leaders), (b) his systems development and integration project experience, and (c) his relatively unusual combination of systems design, technology literacy, and science background, this unique experience and his "natural, unteachable ability to see around corners" (LPEE pages 191-192), were critical to his eventual insight that the illegal BRMT bioweapon was even scientifically possible as defendant UNITED STATES continued to carefully conceal all web-based knowledge of brain-computer interfaces in development (Synchron device now being tested under FDA approval, at paragraph 6 and LPEE pages 11-25) from his view until 2021. This analytical conclusion led in turn to his mind experiments, to an understanding of the methods used to fraudulently conceal BRMT, and to his further understanding of operant conditioning used in mental magnification of BRMT's effects during extended coercive psychological field operations, and to a clear recognition of the

specific psychological triggers used both to make these associations and to conceal the true biochemical source - common brain hormones manipulated to evoke heightened feelings and emotions - which are actually being synthetically created in that moment by the illegal BRMT bioweapon's remote hijacking of brain biochemistry using precisely aimed pulsed energy sequences which target those glands and other addresses in various brain regions, from primitive (such as the fight or flight adrenaline hormone) to advanced (such as executive reasoning and speech center functions).

E. Lead Plaintiff used a methodical process of hypothesis development, research, and experimental tests, widely known as the scientific method, to eventually understand BRMT. During Lead Plaintiff's own field experiments to firmly establish a direct correlation between his verbalizations and defendant UNITED STATES' actions, defendant UNITED STATES BRMT operators provided repeated direct responses in a predictable manner when it used the illegal BRMT system to specifically contradict a series of verbal and non-verbal thought experiments being run by the Lead Plaintiff. Lead Plaintiff's intent was to test repeatability to specific stimuli and to firmly establish the mechanism of activation to that these biochemical sensations were non-randomized artificially driven unnatural occurrences. Defendant UNITED STATES' own very sloppy tradecraft provided this repeatability and thus established the extremely strong correlation, a highly effective confirmation to the Lead Plaintiff which could only have been provided directly by the defendant UNITED STATES' BRMT operators. This set of thought experiments revealed the extent and scope of their illegal artificial dominance of free will through these brain biochemical hijackings.

F. This methodical approach, and the forensic reverse engineering which followed, is how the Lead Plaintiff came, with great difficulty, to understand and integrate his long chain of experiences and its wide ranging adverse impacts. Reverse forensic engineering of the technologies required to operate this illegal bioweapon system remotely directly led to understanding of the evolutions in neuroscience and technological systems exploited through research, development, test, and deployment of the illegal BRMT bioweapon and bioweapon delivery system since the 1960s. Then Lead Plaintiff researched the neuroscience basics of brain function to reverse engineer the series of system components required to implement the BRMT system for remote operation on a global scale. The illegal BRMT bioweapon and bioweapon delivery system is explained in summary beginning at LPEE page 1.

## B. Myriad Challenges To Identify Members Of The Class Of Injured Plaintiffs

59. Most other plaintiffs in this class who are similarly situated would find it virtually impossible to detect BRMT hijacking intrusions. BRMT pulsed energy signals penetrate the skull in carefully dosed, timed, and aimed sequences to hijack the natural biochemistry of the brain at a specific address, so the specific nerve sensation, thought, word, or action feels completely normal to the BRMT victim. Since there is no need for the BRMT operator to be anywhere near the victim, the visual clues normally present with any normal police powers operation are simply not there. Neither the victim nor any bystander would be able to visually detect the illegal BRMT operation when it happens nor after a BRMT sequence is complete. There are simply no visual clues, only tiny undetected momentary energy pulses which disappear just as any radio signal does when it passes a location.

60. The BRMT signal sequence can be transmitted virtually anywhere in the world, originating from a remote supercomputing center, transiting a global constellation of satellites owned and managed by defendant UNITED STATES, and reaching the BRMT victim in about 0.3 seconds, the blink of an eye. No local trace of the BRMT hijacking remains since the tiny, directed energy pulses used as BRMT hijacking instructions are received and absorbed by the victim's brain, which uses the energy in the biochemical reaction which creates the thought, act, verbalization, etc.,.

61. It is also very difficult for US persons, educated from childhood to believe in the concepts of free will and liberty as guaranteed by our Constitution, to even conceive of such a monstrous program being conducted by defendant UNITED STATES against its own people - children, adults, families, anyone. But defendant UNITED STATES has done this to US persons before. As mentioned, ARMY and CIA pursued MKUltra, FBI pursued Cointelpro, which ran from the 1950s into the 1970s entirely in secret until discovered by a citizen activist burglary, press reports, Congressional hearings, and a Presidential Commission in the 1970s. Further, while laws were passed to reform these practices (and ignored by defendant DOJ and its police powers agencies), there were no criminal consequences to any of the executive branch participants in these illegal acts of violence and rights abuses against citizens. So, the practice has simply continued, and the laws written to reform these practices at the time continue to be ignored. BRMT and the accompanying racketeering program are the result of that continuing willful disregard of the rule of law by defendant UNITED STATES, primarily DOJ, FBI, USMS, CIA, ARMY and other military services.

62. Even if an unidentified member of the class of BRMT hijacked plaintiffs were able to understand it is possible for defendant UNITED STATES to conduct this kind of depraved abuse

against a US persons, they would still need many repetitions of BRMT induced behaviors which are well outside their normal range of behaviors to catch even a glimmer of this biological and behavioral hijacking by Defendant UNITED STATES. And their typical first instinct would naturally be to blame themselves, rather than any malicious intimate intervention.

63. This type of violence, the biochemical hijacking of the human brain, has never been experienced in the two million year history of human beings, much less at the hands of a supposedly democratic government, proclaiming itself to be the shining light of democracy to the world. It was simply impossible. So, why would a reasonable person even suspect it?

## C. Scale of Research, Development, and Deployment Expenditure Required Is Vital Clue to Likely Number Of BRMT Victims

64. Accomplishing the current highly sophisticated stage of prohibited BRMT bioweapon development has been extremely expensive and daunting, probably requiring secret expenditures on a scale similar to developing the first nuclear weapons, or to engineering the first orbits of the earth by U.S. astronauts. It certainly took vastly more effort to develop BRMT in secret than it did to drug victims with 100 million purchased doses of LSD during MKUltra using a drug which had already been developed by a Swiss pharmaceutical company.

65. Both the federal government's malign history of abuses using MKUltra and Cointelpro on US persons, and the fifty-five year experience of the Lead Plaintiff which initially overlapped with both those programs into the 1970s, make it very highly probable that many other innocent people have been victimized and violated by Defendant UNITED STATES. This reality and the evidence presented here provide strong circumstantial evidence that these defendants' violations of human, civil, and Constitutional rights have been and likely continue to be on a large scale.

## D. Estimated Size of Plaintiff Class

66. BRMT's total class of Plaintiff victims is currently known only to the federal government executives, managers, and operators hiding behind color of law abuse of the "state secret" privilege which cannot prevail under independent legal scrutiny of a prohibited program such as the illegal BRMT bioweapon and bioweapon delivery system. BRMT is a *prima facie* violation of 5 U.S.C. § 301 and *United States v. Reynolds,* 345 U. S. 1, 12 (1953) (paragraph 260) which requires all such programs, regulations, and acts comply with law (and with the Constitution's reservation of "unalienable" rights to US persons). To provide some context for the Lead Plaintiff's estimated range of Plaintiffs, we below consider defendant CIA's MKUltra and defendant FBI's Cointelpro programs, then attempt to estimate the likely range of potential plaintiffs in the class.

67. CIA's MKUltra directly impacted millions of people over twenty years (1953-1973). Though most records were destroyed by defendant CIA to obstruct justice and hide the program's injuries from the American people and Congress, the ten year CIA brothel drugging project alone likely involved well over 650,000 contacts. There were more than 140 other projects conducted under the MKUltra program umbrella while the 100 million LSD doses were administered by what was then likely the world's largest drug dealer, Defendant CIA's MKUltra, operated against US and Canadian citizens and soldiers as the total US population in that era grew from 155 million in 1953 to over 205 million in 1973.

68. Cointelpro was another program of comparable scale of defendant UNITED STATES. Defendant FBI, which is defendant DOJ's largest police powers agency, operated as a White Supremacist police powers organization against civil rights, and as a co-conspirator with and funder of violent far right radical extremists over 15 years (1956-1971) across the entire United States. It also funded and directed a violent far-right White Supremacist militia group.

While FBI's activities were focused most intensely on people like Dr. Martin Luther King, Junior, SNCC leader John Lewis, Malcolm X, and other prominent leaders and activists, its impacts were felt broadly in the Black community and among anti-war activists of the time.

69. The confidential files detailing Cointelpro's prime targets and measures to be taken were burgled by activists from a tiny two-person FBI office in Media, PA in March 1971, so the program was obviously very wide-spread across the United States. The Black population alone grew from about 16.5 million in 1956 to 23.6 million in 1972, though the impact was more widespread as Cointelpro's FBI agent and paid informant infiltrations, operations, and sabotage included acts against people of color, anti-war activists, alternative lifestyle advocates, and other "fringe" persons and groups who promoted ideas, notably including many now mainstream and well accepted concepts and rights. These "fringe" groups included many majority Whites such as non-mainstream Christian evangelicals, including Lead Plaintiff's grandparents who were openly surveilled by Defendant FBI (paragraph 404, 410-411), and other ethnicities.

70. To calculate the potential number of BRMT victims, we must consider (1) BRMT's more than fifty years of direct and indirect malign impacts ranging from lethal events to perversion of justice to systematic hijacking of free will for the benefit of another; (2) the extreme difficulty any US person or other innocent would have in detecting and confirming that their own brain is being biochemically hijacked by the BRMT bioweapon and bioweapon delivery system; (3) the incredible 3 quadrillion operations per second computing power of a single supercomputer installation – defendant UNITED STATES has dozens of supercomputer centers; and (4) the ability of defendant UNITED STATES communication, satellite, and precision location technologies to reach sub-pinpoint locations (likely ranging to as small as 5,000 nanometers or so in the brain, around the size of a single cell, in a human body which

typically has about 37 trillion cells), and to accomplish this task virtually anywhere on the globe, using a stream of BRMT biochemical hijacking instructions can which typically reach the intended victim within 0.3 seconds after transmission (about one short eyeblink).

71. Over the program's fifty-five plus years to date, it would have been possible to impact every single citizen of the United States for literally hours of BRMT hijacking over the course of each year, though the Lead Plaintiff is confident these acts and the related pattern of racketeering acts of Defendants were restricted to a select minority of the total population. Assuming the development cycle proceeded very slowly in the early stages (1970s and 1980s) and each new generation of the technology took two to three years to troubleshoot and to correct flaws in the BRMT bioweapon itself before field deployment using the BRMT bioweapon delivery system, it is likely the number of US persons who are injured direct Plaintiff victims is quite large.

72. This estimate relies on currently unverifiable assumptions due to the "state secrets" privilege and the complete blackout of communications of executive branch perpetrator departments and agencies with the Lead Plaintiff. The Court will need to compel defendant UNITED STATES to produce this information to determine the actual identities of the plaintiffs and the precise scope, duration, and extent of injuries to plaintiffs.

73. In the absence of such a remedy, the Constitution is itself, for all practical intents and purposes a moot document of no particular significance, as it is only a matter of funding and time, to deliver this illegal BRMT bioweapon by, for, and on behalf of defendant UNITED STATES to any and all US persons at any future point for any reason or no reason whatsoever based upon a presidential order or, simply, on any arbitrary bureaucratic whim, with no regard for due process. Our country's history informs this view - Cointelpro and MKUltra which

demonstrated the power of "state secrets" combined with functionally unimpeded bureaucratic or Presidential whim, in light of defendant DOJ's willful blindness (paragraphs 550-583) and its long-standing unwillingness to criminally prosecute such violations.

74. Paragraphs 74 through 89 are reserved.

[Intentionally left blank.]

## II.    Defendants

90.  This action is brought primarily against government officials as named herein, and

their successors and assigns, all in their official capacities. The primary institutional perpetrators

of the illegal BRMT biomedical and psychological operations experiments and deployment;

rights violations; and racketeering acts, injuries, and violations, are the government departments

and agencies which they supervise. Federal defendants named below, which may include as yet

unidentified departments and agencies, are known collectively as defendant UNITED STATES

in this Complaint, since they operate in secret, never identifying themselves. Due to this

uncertainty, defendant UNITED STATES may appear in this Complaint identified as one of its

departments or agencies even when actually operating in another department of agency as these

roles are confused and overlapping, as well as conducted in secrecy. Plaintiffs identifications are

made in good faith based upon patterns of practice but cannot be made absolutely due to this

pattern of secrecy, so the burden of proof to the culpable party must be laid upon these

defendants to assure equity in these proceedings. The misidentification of one agency or

department for another by these plaintiffs as to any specific act nonetheless must resolve to

plaintiffs' benefit to sustain equity and justice in these circumstances, as these acts, violations,

and injuries have been and are perpetrated by these defendants' joint and several acts, violations,

and injuries in their associated-in-fact enterprise and conspiracies to act, and in their neglect to

prevent.

91. Most other police powers defendants in this litigation also operate undercover nearly

all the time as well. Some non-governmental defendants are known and specifically identified.

Several current and/or former federal officials are also named in their personal capacity as

individual defendants, in accordance with personal liability for bad faith acts provided, without

limitation, by *Harlow v. Fitzgerald,* 457 U.S. 800 (1982) (paragraphs 272-273), by *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971) (paragraphs 277-299), and by the statutory provisions which expose them to direct individual liability for violations of constitutional rights, as provided at 28 U.S.C. § 2679(b)(2) (paragraph 267).

92. Defendants are clearly identified in the page caption to the extent possible in accordance with F. R. Civ. P. Rule 17, when identifications have not been defeated by defendant UNITED STATES' in-line hacking of addresses of certain individual defendants during complaint preparation as described above at paragraph A. Each specifically identifiable defendant participated in the overall conspiracy, their role is summarized herein, and their role, where they are readily identifiable, is also described in the Facts section narrative and 102 examples of acts, violations, and injuries cited therein. All defendants also have vicarious liability as co-conspirators for the acts and failures to act of other co-conspirators under federal and state laws related to rights, to racketeering, and to conspiracies, including under U.S.C. Title 18; and violations of constitutional and civil rights and conspiracies, including under U.S.C. Title 42, Chapter 21.

## A. Specific Technical And Tradecraft Challenges To Undercover Operational Identifications - Police Powers, Intelligence, and Media

93. Defendant FBI, DOJ, and military services government officials who work in deep cover assignments have and do at times permanently disappear from view, even though the specific individual continues to live on after their undercover role is completed. Staged "deaths" are one common exit method used to extract personnel from deep cover roles and sustain operational secrecy and security for on-going espionage operations which can span decades.

94. New identities list "official" biographical ages, typically a decade or so younger, which will not correspond to the ages they would have been during their undercover roles,

thereby helping to obscure their true age and the former undercover identity. These biographical lies and, at times, medical plastic surgery, are elements of their "resurrections" from deep cover assignments to new identities and roles, both within and outside their respective departments and agencies.

95. These birthdate changes are tradecraft elements of background legends which have subsequently been built to minimize the possibility of an identity match (for example, by being too young based upon the "resurrected" birthdate to be an adult while you were an adult figure in a prior undercover life, the odds of an identity match across these two "lives" is reduced). This is a common technique for manufacturing new identities for deep cover operatives - but these defendants' physical appearances are completely consistent with positive identifications and near normal aging, with the occasional bit of face tightening or other normal medical procedures used to modify appearance.

96. Some personnel have had their children directly involved in these roles as family members to sustain credible covers. This is a sure throughline which definitively identifies their past roles in this program, as those children were also directly involved in these operations as Lead Plaintiff's young nieces and nephews from as young as 12 hours old to adult ages.

97. Both intelligence operations (police powers and intelligence agencies and departments at all levels of government), and media who have been directly involved in acts, violations, and injuries to members of this class through their patterns of racketeering acts, make common use of body doubles as well to mislead targets by conflating identities across these roles and by trading personnel.

98. While not generally publicly known, these tradecraft practices have been and are routinely used by various intelligence operations around the world, including by domestic police

powers and by international intelligence agencies and departments, to exit personnel from deep cover assignments related to various secret operations, including the ultra-secret and completely illegal BRMT bioweapon and bioweapon delivery system across the past six decades (Constitution, 18 USC § 175, and 1972 *Bioweapons Treaty*, among others), and to the pattern of rights violations and racketeering acts perpetrated to cover the illegal BRMT program and other illegal general search operations inside and outside the territory of the United States.

99. Rotations out of deep cover assignments to "normal" life from the illegal BRMT program among institutional defendants and named individual defendants in this action (LPEE pages 12251-12261) have included, without limitation:

   a. Joseph ARPAIO – MARICOPA SHERIFF, known as Greg Crossgrove. Identified June 2022.

   b. George BIVENS – known as John Steele at Alliance on Port of Seattle BCD Concourse project in the early 1990s, Lt. Col. George Bivens, Pennsylvania State Police, identified September 2023.

   c. Lloyd AUSTIN – ARMY, former name not recollected, during rotations through Boeing defense operations; then at CNA as an indirect report while ARMY in civilian dress; then as general officer; now SEC DEF. Identified September/October 2023.

   d. Stephen BREYER – formerly known as Jack Sackville-West, Spokane architect who "died" out of program executive role in Spokane; and went to SCOTUS; now retired. BREYER also posed as the presiding elder in the "Snow" home-based church in Kent, WA which was attended by Lead Plaintiff's family of origin having been transferred away from its home congregation from 1963 forward to

1970 by that religious group's "preachers" (who were actually government infiltrators of the religious group if this pattern and the deliberate are established by corroboration) within a few weeks after the death of Lead Plaintiff's eleven year old sister, Sandra, in April 1970 from Reye Syndrome induced by a fatal overdose of aspirin blended with pain-killing codeine to give maximum lethality effect prescribed telephonically by family physician Dr. KOHLER, Federal Way, WA, (paragraphs 99d, 417, 418, 714, 740, 803C-D, 805B(i), H, S, BS, 806B, 814B). Identified September/October 2023.

e. Leslie CALDWELL – Assistant US Attorney, fraudulently misrepresenting herself as a Seed & Berry intellectual property attorney in Seattle, WA in Spring 2004, who represented Allegent, LLC dba Performa in intellectual property claims in a direct ethical conflict of interest to fraudulently conceal FBI undercover operations against Allegent, LLC, using FBI's ShipNow cover company in the financial wrecking of Lead Plaintiff; later Assistant Attorney General - Criminal Division; later private practice; now retired. Identified September/October 2023.

f. Ari MELBER - FBI, formerly known as Wes Lewis, who became the husband of Theresa Yarbrough half-sister to Jeanette (fraudulently orchestrated second wife of Lead Plaintiff), as an extended family member by marriage; later SDNY prosecutor; now network television media anchor. Identified September/October 2023.

g. Charles ROSENBERG – FBI, formerly known as Chuck LeFevre, NutraSource CEO, as a CEO reporting to Lead plaintiff and to other FBI embed Board

members; then William Drumm ESTABLISH General Manager, as an employer, while actually a US Attorney; then FBI Chief of Staff, then Acting DEA Administrator, now law school professor, private practice, and network television media analyst. Identified September/October 2023.

h. Lisa RUBIN - FBI, formerly known as Michelle Yarbrough, an extended family member by marriage with children in tow during operations; then Assistant US Attorney; now network television media analyst. Identified September/October 2023.

i. Alexander and Yvgeney VINDMAN - ARMY, formerly known as Paul and Greg Yarbrough, extended family members by marriage in the fraudulently orchestrated marriage of Lead Plaintiff to Jeanette who was secretly an active duty soldier threatened with military prosecution to coerce the fraudulent marriage, both with children in tow during operations; now a book author and consultant, and a federal electoral office candidate, respectively. Identified September/October 2023.

j. Andrew WEISSMAN – FBI, known as Lyle Whiteman, first at West Coast Grocers, then at Puget Consumers Cooperative where Lead Plaintiff was on the Board of Trustees for three years in the early 1980s; then US Attorney; later FBI General Counsel; now law school professor and network television media analyst. WEISSMAN was identified September/October 2023.

k. Michael WORTHY – FBI, who has distinctive red hair and mustache, who appeared as Brad last name not recollected, a grocery checker and stocking clerk at Larry's Market where Lead Plaintiff worked in 1972-74, co-owned by Larry

Brewer (an extended family member) and by FBI through its illegal investment using an agent who posed as a store partner (and worked as produce manager for a time, name not recollected); then reappeared as Mike WORTHY (paragraphs 99k, 418, 422, 493, 726, 762 table, 770, 805AG, AK) at WSU during Lead Plaintiff's WSU MBA program, then in a background photo on MSNBC's MELBER (former FBI as undercover Wes Lewis in the 1990s and early 2000s) behind WEISSMAN (FBI) in 2023 (paragraph 422), believed to be a photo taken of a group of co-workers in the Eastern District of New York where WEISSMAN worked for a time and later presided as U.S. Attorney. Identified September/October 2023.

l.  Neal KATYAL – formerly known as Shawn Morrissey while posing as a student at the small carve-out high school attended by Lead Plaintiff,; later DOJ Acting Solicitor General; now law school professor and network television media analyst. Identified September/October 2023.

m.  Merrick GARLAND – while posing as student Robert Mandich in Perham Hall and the Nez Perce student apartments at Washington State University, Pullman, WA where he drove an older model green Mercury Capri with extensive door dings, while residing near the Lead Plaintiff during the 1974-1976 school years. Identified January 2024. GARLAND was plausibly also Stuart Bettesworth, a student at Lead Plaintiff's Decatur High School in 1971-1972, as identified in that role in March 2024.

Network media personalities have also played deep cover roles during the illegal BRMT, rights, and racketeering acts, violations, and injuries to Lead Plaintiff and other members of this class of plaintiffs including, without limitation:

> n. Bianna GOLODRYGA- unknown agency or other relationship, now press appearing on the CNN and PBS Amanpour Report television interview program, formerly known as Ruthanne Meyers, an accounting staff member who reported to STONE at LazerSoft, when Lead Plaintiff became employed there as CFO in 1986. GOLODRYGA left LazerSoft in late 1986 or early 1987.

> o. Thomas KEENE – while Bloomberg Media, formerly known as Michael Callahan, while posing as an investment banker at DOMINICK during a financing effort by Lead Plaintiff for his Winnett Perico, Inc. (Winnett) startup; network television anchor. Identified January 2024.

100. All these personnel underwent similar tradecraft transformations to rotate into and out of these assignments while sustaining a consistent operational appearance. Specific individuals have been and are rotated in or out of specific events or event sequences to sustain operational secrecy and obscure certain details, at times even from a highly visible public profile person who believes they are directly involved in each and every phase, and in each and every action, but are not always directly involved in or knowledgeable about certain events which transpire under their identity, but are conducted by a deep cover body double or by a deep cover person in their "sphere" or "entourage."

101. Some of these operations are legally permissible. The operations described herein are a subset of the entire scope of both operations conducted and of Lead Plaintiff's now much clearer knowledge of such operations and operational details. This litigation is focused

exclusively on unconstitutional and extra-legal conduct of these institutional and individual

defendants against US persons who are entitled to the full protection of the Constitution and laws

of the United States of America, regardless of any invalid claim of state secrets privilege to

exculpate illegal and criminal acts (paragraph 260) and regardless of tacit institutional willful

blindness to these defendants' illegal and criminal acts (paragraph 550-583).

### A1. Government Defendants Generally

102. Generally speaking, and without limitation as to specific defendants, the overall

illegal pattern of practice by these defendants incorporates the following acts, violations, and

injuries, as federal statutory violations (state statutory violations are co-identified with each

federal statutory violation where the relevant state domicile can be firmly established absent

discovery):

(i) Without limitation as to the identities of defendants within the federal executive branch,

defendants CIA, ARMY, DOD, DARPA, NIAID, and DHHS have and do conduct illegal

abusive human biomedical experiments to and including torture, coordinated indirect

physical injuries, and lethality attempts, at times with co-conspirators including, without

limitation, City of New York, NYPD, and other police powers departments and agencies,

against the Lead Plaintiff using the BRMT bioweapon and bioweapon delivery system,

which is prohibited under 18 U.S.C. § 175, 18 U.S.C. § 1385, and Title 42 Chapter 21

Civil Rights,

(ii) Defendant FBI has and does pursue a pattern of racketeering offenses against the Lead

Plaintiff including, without limitation, involuntary servitude, financial entrapments,

deliberate entanglements in other investigative matters, forced labor, and human

trafficking, prohibited under 18 U.S.C. §§ 1961-1968 and Title 42 Chapter 21 Civil

Rights,

(iii) Defendant USMS has and does pursue a pattern of racketeering offenses against the

Lead Plaintiff including involuntary servitude, deliberate entanglements in other

investigative matters, also using embedded personnel to engage in negligent and

purposeful violations of (a) safe food handling practices resulting in food borne illnesses,

(b) proper medical care deprivations and distortion of lab records and results used in

proper medical care, (c) typical daily street level operational harassment – often in

collaboration with state and local police powers agencies, as well as (d) deprivation of

employment, forced labor, and human trafficking, prohibited under 18 U.S.C. §§ 1961-

1968 and Title 42 Chapter 21 Civil Rights,

(iv) Without limitation as to any unidentified and/or unknown identities of certain defendants

organized under color of law as state secret entities, within the federal executive,

defendants DOJ, DHHS, DHS, USSS, and other federal police powers agencies, and

other federal executive departments and agencies have and do pursue an associated-in-

fact enterprise pattern of rights and racketeering acts, violations, and injuries against

these plaintiffs; and have and do, from time to time, conspire with and sustain support for

the above named primary federal police powers operations; as well as conspire, sustain,

support, and stand aside from the sovereign operations of other police powers and

intelligence departments and agencies, both foreign and domestic, all in their acts and in

their failures to act,

(v) other state and local police powers defendants have and do pursue direct pretexting and

entrapment acts including, without limitation, through unfounded accusations related to

personal conduct and through direct field harassment of civil rights, prohibited under 18 U.S.C. §§ 1961-1968 and Title 42 Chapter 21 Civil Rights.

State law violations are in addition to the above mentioned general pattern of practice. This division of malign labors and bad faith acts which have and do injure these plaintiffs is generally consistent with the patterns noted over the past years by Lead Plaintiff, but discovery is needed to establish the next level of specificity for proper attribution of particular acts to provide proof of culpability and extent of liability at trial.

103. Lead Plaintiff and certain other injured members of the class, including without limitation both his former spouses, had direct professional and/or personal direct contact relationships with the institutional defendants, and with each and every one of the named individual defendants at various times while those individual defendants acted and operated in knowing bad faith under assumed names before disappearing to other identities and locations through their staged imaginary deaths, routine transfers, job changes, and other apparently natural but actually orchestrated actions. Those relationships and bad faith interactions, undertaken in secret against these plaintiffs, ranged from momentary contact to years and decades, and from tens of hours to thousands of hours of direct interpersonal contact.

104. Lead Plaintiff also had personal relationships with other known and identified police powers personnel including, without limitation, Gregory R. Boyle (King County, Washington Sheriff's Department) whose ex-wife Lynne shared a co-habitation and then marital community, and whose two daughters shared a roof and life experiences as teenage minor children with their stepfather Lead Plaintiff for about 7 years from 1980 to 1987. FBI agent Bruce Ciosacchi (intelligence operations, whose spouse Margaret was a co-worker of both Lead Plaintiff and first wife Lynne at Safeco, the 1980 financial audit professional assignment where they met), and FBI

agent Kerry Vanderberry (bank robbery squad, whose wife Laurie was a co-worker of second wife Jeanette) at various times between 1980 and 2004. As with many of the named individual defendants herein, those relationships included, for example, holiday parties, restaurant meals and drinks, baby-sitting of infants, and zoo visits with minor children, and a myriad of other normal family and friends activities over many decades of fraudulent concealment. These individuals are not named as defendants in this Complaint as they played no known direct role in the acts, violations, and injuries described in the Complaint, though they were undoubtedly aware of the circumstances, corrupt acts, violations, and injuries to the Lead Plaintiff and to other plaintiffs of this class and could be accountable for failures to act in their neglect to prevent. Only the most serious and egregious acts, violations, and injuries to these plaintiffs are described in this complaint.

105. The identities of the individual defendants who are named are not in doubt, their relationships to the Lead Plaintiff are well established, and those identities and relationships can be corroborated by witnesses not named herein. These specific multi-point identifications connect them individually, and definitively connect the departments and agencies in which they worked, to bad faith acts against Lead Plaintiff and other members of this class, including both of Lead Plaintiff's former spouses. These now identified individual defendants were finally able to be unmasked through the rigorous and systematic forensic review which began in June 2021 with a very basic analysis of the constitutional rights violations and the pattern of racketeering acts by the associated-in-fact enterprise. This analysis of acts, violations, and injuries, led in turn to unmasking the true original purpose behind those fraudulently concealed acts, the concealment of the illegal BRMT bioweapon and bioweapon delivery system and its development through illegal medical experiments on adults and their children in American families, who faithfully

served their nation and were originally discriminated against by defendants ARMY and CIA,

then by the myriad other defendants, in their criminal violations, without limitation, of 18 U.S.C.

§§ 175, 1961-1968, 5 USC 301, and 42 USC Chapters 21, 21A, and 21B. This entire pattern of

criminal conduct has been hidden by color of law abuse of state secret privilege and police

powers exemptions, and by patterns of defamation initiated by named individual defendants

among the federal executive defendants for slanderous incriminations of these plaintiffs and for

their own self-exculpatory purposes. Beginning in mid-2022, when ARPAIO only was initially

identified as an individual defendant, then continuing in September 2023 through March 2024,

when more than a dozen individual defendants were finally able to be identified. The actual

identities of these previously falsely named undercover persons were not known to Lead Plaintiff

as they had disappeared with (i) the passage of time, with (ii) promotions, reassignments,

changes in location, and changes in career, and (iii) through fraudulent faked deaths out of their

undercover roles and identities. These individual defendants were subsequently "reborn" into

identities not known to the Lead Plaintiff during those prior periods of direct contact.

**Table: Named Defendants Associations And Relationships**

| Named Defendant | Cover Employer When Known | Actual Employer When Known, Forensic Unmasking Dates | Undercover Role When Known |
|---|---|---|---|
| AUSTIN, LLOYD, fka name not recollected | CNA Industrial Engineering, reporting to Arthur Thompson, indirectly to Lead Plaintiff | ARMY, Fall 2023 | Project Manager, HomeGrocer – Renton, WA distribution center renovation and automation project |
| BANNON, STEVE, fka Timothy C. Easton | Deloitte Seattle, 1980s | CIA, Summer 2023 | Manager, Micronesia (Palau for Interior Department) and Latin America projects |
| THORPE, Gerald L. | Deloitte Seattle, 1980s | | Manager, Consulting |

| | | | |
|---|---|---|---|
| BREYER, STEPHEN, fka Jack Sackville, West | Self as Architect | Likely ARMY or CIA, formerly with ARMY Intelligence, Summer 2023 | Self as Architect, primarily for public school districts in and around Spokane, WA |
| BURNS, WILLIAM | Self as OB/GYN practicing in Kirkland, WA | CIA, Summer 2023 | Board member and investor in LazerSoft employing STONE, then Lead Plaintiff |
| GARLAND, MERRICK fka Robert Mandich, possibly Stuart Bettesworth | WSU Perham Hall and Nez Perce Village student apartments, possibly Decatur High School | DOJ, likely FBI | WSU undergraduate student, possibly Decatur High School student |
| HICKMAN, John Reed | Deloitte Seattle | FBI commercial cover embed | Manager, Consulting |
| BLAIR, John R. | Deloitte Seattle | CIA commercial cover embed | Director, Consulting |
| SEPPI, Arnold E. | Deloitte Seattle | FBI commercial cover embed | Manager, Consulting |
| BREHM, Karlton | Deloitte Seattle | FBI commercial cover embed | Manager, Consulting |
| SPERBER William | Deloitte Seattle | FBI commercial cover embed | Director, National Banking Group |
| CAREY, David J. | Deloitte Seattle | | Investor, Alliance |
| SPADONI, Mark | Westin Hotels | | Project Manager |
| ZOULAS, John | Westin Hotels | CIA commercial cover embed | Manager, Corporate |
| ASTENGO, Martin | Westin Hotels | MI-6 commercial cover embed | Resident Manager, Seattle |
| TREADWAY, James | Westin Hotels | USMS, FBI, CIA commercial cover | General Manager, Seattle Various domestic and international commercial cover intelligence, spying, and espionage assignments |
| STONE, ROGER, fka David P Moller | Deloitte Seattle, 1980s | CIA, Summer 2023 | Manager, South Africa ATM project |
| VINDMAN, ALEXANDER, fka Paul Yarbrough | USAF Officer and Engineering Manager, Boeing AWACS | ARMY, Fall 2023 | Brother-in-law through Lead Plaintiff's marriage to Jeanette |
| VINDMAN, Yvegeney, fka Greg Yarbrough | CSC employee, Birmingham, AL | ARMY, Fall 2023 | Brother-in-law through Lead Plaintiff's marriage to Jeanette |

| **Named Defendant** | **Cover Employer When Known** | **Actual Employer When Known, Forensic Unmasking Timeframe** | **Undercover Role When Known** |
|---|---|---|---|
| WILKINS, Warren | LazerSoft hired by STONE, worked for Lead Plainitff after STONE's orchestrated departure | ARMY, originally also known to be Lt. Colonel, then Colonel, WA ARMY National Guard | Sales Representative, LazerSoft hired by STONE, |
| WSU WOMAN ON STAIRS, unknown but regularly seen as described at LPEE page 12251 | Unknown, later associated with STONE through documentary film footage, late 1970s | Unknown, probably CIA, Summer 2023 | WSU Student |
| MELBER, ARI fka Wes Lewis | Regional Sales Manager, Negro Modelo (Corona Beer) | FBI, Summer 2023 | Romantic interest, later husband to Theresa, half-sister of Jeanette, brother-in-law through Lead Plaintiff's second wife Jeanette, as orchestrated to Lead Plaintiff by WATERS |
| RUBIN, LISA, fka Michelle Yarbrough | | FBI, Summer 2023 | Sister-in-law through Lead Plaintiff's marriage to Jeanette |
| WEISSMAN, ANDREW, fka Lyle Whiteman | Puget Consumers Cooperative, reporting to Lead Plaintiff and Board; later organized NutraSource using PCC funds | FBI, Summer 2023 | General Manager, PCC; NutraSource Board member with Lead Plaintiff |
| ROSENBERG, CHARLES, fka Chuck LeFevre, then William Drumm | NutraSource, Establish | FBI, Summer 2023 | CEO, NutraSource; General Manager, Establish |
| CALDWELL, LESLIE fka name not recollected | Seed & Berry, law firm | DOJ, Fall 2023 | Attorney representing Allegent, LLC co-owned by Lead Plaintiff |

| Named Defendant | Cover Employer When Known | Actual Employer When Known, Forensic Unmasking Timeframe | Undercover Role When Known |
|---|---|---|---|
| SULLIVAN, RAY | Self as Outside Attorney | DHS Customs and Border Protection, Fall 2023 | Outside Attorney Winnett, introduced by JACKSON, CIA |
| BIVENS, GEORGE fka John Steele | Direct report at Alliance, co-owned and run by Lead Plaintiff as CEO | Unknown, currently Lt. Colonel, Pennsylvania State Police, September 2023 | Superintendent – Sea-Tac Airport B, C, D Concourse expansion asbestos abatement subcontract to M.A. Mortenson |
| ARPAIO, JOE, fka Greg Crossgrove | Self as Independent Produce Consultant, Arizona to Winnett, Lead Plaintiff's organic foods startup | Maricopa County Sheriff, Arizona, first unmasked in SDNY letter 220622 | Independent Produce Consultant, Arizona |

Those individuals' now obvious relationships with the named defendant police powers

institutions clinched the identities of those institutional police powers defendants. Those

identities had been previously presumed but were not dispositively confirmable due to (i) the

defendant entities' fraudulent concealment, (ii) the defendant entities' flawed cover-up of

information as at Interline Exhibits 16-19, (iii) the defendant entities' systematic and still

continuing refusals to produce information in response to Lead Plaintiff's lawful requests under

FOIA, Privacy Act, (violating 5 U.S.C. § 52) and other public information laws (New York

State's Freedom Of Information Law "FOIL" Pub Off L. §§ 84-90 violated by defendant NYPD)

during early forensic analysis in 2021, documented at LPEE pages 508-541. See also the table at

paragraph 228 for abbreviations commonly used for indexing emails from these and other

defendants.

106. It is nearly impossible for the Lead Plaintiff to establish even now, through careful

forensic analysis, which specific institutional and individual defendants were directly involved at

specific times and locations in which particular acts, violations, and injuries and which coordinated patterns of acts, violations, and injuries were performed by which specific defendant. Such is the nature of malign undercover operations and their officers, agents, and informants acting in bad faith. Discovery is required to establish which specific defendant(s) engaged in which element of which set of acts which comprise the entire pattern across decades, while those defendants claimed good faith police powers exemptions and privileges to engage in bad faith acts under fraudulent concealment. The specific culpability of institutional and individual defendants for specific injuries and patterns of injuries will result from specific answers to this Complaint, and from admissions during discovery and will be proven at trial.

107. Discovery will most probably operate to collapse the number of actual defendants from the myriad cover entities and cover individual identities to their actual institutional and individual identities, simplifying the litigation and substantially reducing the overall number of parties. In many cases, the predicate act frauds are most probably the product of a few prolific and profligate police powers agencies and commercial collaborators which were actually run as undercover operations on private premises, rather than by the commercial entities themselves, or using by use of numerous cover entities to conceal one or a few actual defendant identities. For example, as the amended Complaint recounts in specific detail operations undertaken by, without limitation, defendants FBI, USMS, NYPD, ARPAIO (including with ARPAIO both defendant MARICOPA COUNTY and defendant Maricopa County Sheriff's Department (MARICOPA SHERIFF) are difficult to discern as to the specific institutional defendant whose personnel undertook specific acts, as they are closely intertwined and lack obvious distinction one from the other, in their long-running pattern(s) of interfering with interstate commerce, and with civil and constitutional rights, and their use of the premises, personnel, and/or co-opted email addresses of

major American companies, including, without limitation, WALMART (Interline Exhibits 9-10), KROGER, COSTCO, Willmeng Construction, JLL Commercial Realty, Bio-Lab, Clipper Windpower, PPG Industries, and dozens of others, as well as those defendants own independent commercial covers including, without limitation, CNA Industrial Engineering, and ESTABLISH, where Lead Plaintiff was fraudulently employed, apparently by FAUCI, ROSENBERG and ROSS on fraudulent projects, both of which entities also included human trafficking operations by defendants FAUCI, ROSENBERG, and others of defendant UNITED STATES.

108. What can be definitively established now is that no actual interstate commerce was ever permitted by these defendants, that these locations were devoid of other actors than these police powers defendants and their co-conspirators acting in concert so independent witnesses were deliberately disallowed, and in their individual and conspiratorial actions, they intended and did isolate the Lead Plaintiff from ordinary and authentic interactions in life and commerce, and intended to and did systematically abridge constitutionally guaranteed rights to conduct personal and commercial endeavors without undue and perpetual interferences of government. This also operates as a clear demonstration of the long-perpetuated pattern of malign and illegal practices described above which these police powers defendants have carried forward and perpetuated from 1950s-1970s defendant FBI Cointelpro origins, from 1950s-1970s defendant CIA MKUltra origins, and from other systematically abusive and predatory police powers practices in violations of 18 U.S.C. §§ 241, 242, such as the documented sustained patterns of FISA Act violations for 45 years and Patriot Act Section 702 violations for 15 years, into the present time, which while not the specific subject of this litigation, have and do persist over decades among these police powers defendants, and demonstrate their long-running discriminatory scofflaw

approach and methods in their administration of unequal "justice," through their acts, violations, and injuries, which ARE the subject of this litigation by these plaintiffs

109. Defendants UNITED STATES, NYPD, PAPD, and NJTPD, as well as other police powers agencies with operations in various districts of New York and New Jersey, directed and/or perpetrated much of the illegal activity from 2007 to present, together with collaborative and independent actions which occurred in (i) Washington, California, and Arizona, among other states, and in (ii) Canada and the United Kingdom where the Lead Plaintiff was physically present, and in (iii) numerous other countries where he attempted to transact commercial operations but which have been and are orchestrated and/or disrupted primarily by defendant UNITED STATES departments and agencies, in their active interferences with rights and with interstate commerce. Some of those activities, including lethality attempts and other physical injuries, almost certainly were and are directly coordinated with defendants CIA and ARMY operations personnel, who have and do deploy and use the illegal BRMT bioweapon and bioweapon delivery system against the Lead Plaintiff. This illegal pattern of racketeering acts by this associated-in-fact enterprise has been and is true for virtually every activity attempted to be undertaken in interstate commerce.

## A2. Individual Defendants Generally

110. The principal individual defendants are identified by the Lead Plaintiff in a manner which is as specific as possible where such identities were finally able to be discerned through careful forensic analysis and independent biographical sources backchecking. Other police powers individual defendant identifications in the instant complaint comply with the standard established for *Bivens* type identifications of unknown individual police powers defendants who

have and do act in individually and in concert, concealing their identities, in bad faith acts, and in the same manner as they would in lawful undercover police powers operations.

111. The veracity of the Lead Plaintiff's identifications of key individual defendants acting in bad faith in federal capacities can be readily ascertained with the cooperation of key witnesses to their roles and acts in the relevant time periods. For example, the identification of Stephen BREYER, a former member of the Supreme Court, as a defendant can be attested to by Laurie DOLAN, a former Chief of Staff to former Governor of Washington Christine Gregoire. Laurie DOLAN was known to Lead Plaintiff as Laurie Sackville-West, a daughter-in-law of Jack Sackville-West (BREYER) married to his son David, with infant child Anne, while BREYER managed implementation of the illegal BRMT bioweapon and related illegal human medical experiments in Spokane, Washington. DOLAN can attest to Lead Plaintiff's acquaintance and friendship with the "Sackville-West family" in Spokane, Washington at 1424 South Maple Street and other locations. Lead Plaintiff met both DOLAN and BREYER after being befriended by a person he knew as William (Bill) Sackville-West. Bill presented as the college student son of Jack while in Perham Hall, a student dormitory at Washington State University, Pullman Washington, when Lead Plaintiff was 19 years old in the Fall of 1974. Lead Plaintiff was a frequent visitor to Spokane and the home he knew as the Sackville-West residence on Spokane's South Hill. He also visited David and Laurie Sackville-West (DOLAN) at their home in the Spokane area, before and after Anne Sackville-West was born. This can be easily verified.

112. Similar veracity attaches to identifications of other individual defendants including, without limitation, WEISSMAN (FBI) and ROSENBERG (FBI and DEA), STONE, BANNON, THORPE, and ZOULAS, (all CIA) among others. Both WEISSMAN (FBI) and ROSENBERG (FBI and DEA) reported to corporate governing Boards which Lead Plaintiff served on while

they were illegally embedded executives at Puget Consumers Cooperative (PCC) and

NutraSource, both in Seattle, Washington, which FBI illegally co-opted and illegally managed

beginning in the 1980s. Others who knew them, including, without limitation, Randy Lee, the

now retired long-time CFO of PCC, will be able to verify their roles and conduct in those

organizations, and their contacts with Lead Plaintiff. The same fact patterns are true for Roger

STONE (CIA) and BURNS (CIA), as well as for Steve BANNON (CIA), the widely known

former aide to President Trump, and Gerald Lee THORPE (as known to Lead Plaintiff from

WSU graduate school as well) who were co-workers at Deloitte Seattle, and witnesses to

STONE's (CIA) presence at Deloitte Seattle, and to certain acts described in the instant

complaint. STONE will establish BURNS presence and participation in LazerSoft funding and

governance, where Lead Plainitff worked and later led the small team, including Colonel Warren

WILKINS (Washington ARMY National Guard), R. Kent TARPLEY, and Stephen WATERS,

whose specific federal employment is not well established, plausibly USMS.

## A3. Additional Unknown Defendants Generally

113. Additional defendants known only through email contacts and other means are

identified as unknown police powers defendants simply because their identities are not currently

discernible to the Lead Plaintiff. These defendants' actions, both those of entities and of

individuals, violated various federal and state statutes as specifically described in the related

evidence including, without limitation, through emails, contracts, bank statements, and wire

transfer receipts, which comprise evidence of frauds and other injuries, to rights and in interstate

commerce. Several thousand of these specific acts, violations, and injuries are pled with

particularity in accordance with F. R. Civ. P. Rule 9(b). The intent of this litigation is to establish

the pattern of racketeering acts, not to specifically assign each and every single act to a specific

individual defendant, though this is done wherever it is reasonably possible to do so within the pattern as currently known and understood. The actual defendants' behind each of these names and email addresses is currently unknowable, as is the actual entity and/or individual identity of each of these defendants, who most probably posed in multiple roles in undercover operations, which will quite probably be able to be collapsed into a much smaller universe of defendants who actually perpetrated the rights violations and particular racketeering acts through defendants' answers and through discovery. For example, Lead Plaintiff sent email solicitations related to interstate commerce financings to several hundred people on multiple occasions, as did an undercover FBI agent who posed as Andrew ALTAHAWI, the principal of various ADAMSON Brothers entities. Typically, such solicitations will secure some level of interest, anywhere from 1% to 10%. None of these mass email solicitation campaigns ever received any significant level of interest, none ever resulted in even $1 of investment, and most of these solicitations secured no interest of any kind. This is strongly indicative of fraudulent use of bogus email addresses and/or of active suppression of those email solicitations, each of which cost thousands of dollars to undertake by paying for dishonest services, by using rented lists and by other means. This same pattern of fraudulent conduct has been true of the deliberate interferences with and as the Lead Plaintiff's own contacts over time by these illegal police powers racketeering act interferences in interstate commerce including, without limitation, for the corrupt purposes of violating constitutional rights, sustaining their illegal cover-up of involuntary servitude and the continued development, testing, and deployment in (i) the illegal BRMT bioweapon and bioweapon delivery system against these plaintiffs, 18 U.S.C. § 175, in (ii) continued violation of the ratified 1972 Bioweapons Treaty, in (iii) making terroristic threats toward populations and toward other nations through the publicity and operation of the illegal

BRMT bioweapon and bioweapon delivery system against the Lead Plaintiff in full public view of the world, 18 USC § 2331(1)(B)(i) and 25 CFR § 11.402, and (iv) most probably in acts of war against other nations by the federal executive in targeting specific persons in those nations' governmental leadership ranks without the constitutionally required consent of Congress, Constitution Article I, Section 8, clause 11.

### A4. Police Powers Undercover Defendants' Culpability Must Be Established Through Answers And Discovery

114. It is necessary that each and every participating police power defendant (both institutional and individual) review each and every set of facts presented, and answer, admitting or denying their own degree of culpability (whether through their own direct act or vicariously through conspiracy) in that specific act or set of acts. It is impossible for the Lead Plaintiff, or for this Court, to deduce specific defendants' identities without this essential step in the legal process to facilitate proper assignment of defendants' scope, extent, and degree of culpability. There is no other feasible means known to plaintiffs to accomplish this result. This pattern of pleading is entirely consistent with normal practices, as in *Bivens* styled claims.

115. Paragraphs 115 through 118 are reserved.

### B. Known Federal Defendants, In Their Official Capacity

119. Defendant UNITED STATES is a collective pseudonym for the unidentified and unknown departments and agencies of the federal executive branch who are represented by the officials sued in their official capacity, as identified at paragraphs 120 through 133 herein. It is not necessarily possible to determine which department or agency is specifically responsible for each particular element of a specific claim for relief/cause of action, as these operations have been and are at times conducted in varying combinations with multiple departments and agencies of the federal government, and have been and are at times, conducted in cooperation and in co-

conspiracy with state, local, and foreign governments, who themselves also have certain
sovereign rights and abilities to conduct operations regardless of direct involvement, consent, or
concurrence by federal executive departments and agencies. Plaintiffs have made positive
identifications and good faith presumptions of identities of defendants wherever possible and to
the degree feasible without the technical and legal means to determine with precision which
defendant(s) perpetrated which specific acts and elements of acts. The general lines of presumed
and typical responsibility are based upon the identifications of certain individual defendants, the
acts in which those individual defendants are directly inculpated, and the known institutional
defendant associations to define these patterns, which patterns are identified at paragraph 102.
The final disposition of responsibility and liability for each specific act, violation, and injury
requires discovery for definitive determination, given the color of law abuses of state secrets
privilege and police powers exemptions and the entangled conspiratorial pattern of racketeering
acts and rights violations conducted by these defendants. Defendants used undercover and other
agents, officers, confidential informants, and contractors, wrongful investigations lacking cause
under color of law, assets and myriad frauds and violations of civil rights in acting against,
threatening, retaliating against, and in failing to protect Lead Plaintiff, both separately and
jointly. Defendants engaged with Lead Plaintiff in their fraudulent roles as part of defendant
UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations,
and associated-in-fact pattern of racketeering acts and conspiracy. Defendants knowingly
perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendants, as
bad faith actors and under fraudulent concealment, acted jointly with other defendants and
severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

120. William BURNS is Director, Central Intelligence Agency headquartered in Vienna, VA, CIA herein, with field offices in the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff. BURNS was formerly known as Patrick Heffron (BURNS), an OB/GYN physician who practiced in Kirkland, Washington, an investor in and Board member of LazerSoft, Seattle, WA where Lead Plaintiff was human trafficked for employment reporting initially to STONE, and while in that identity BURNS was directly and personally involved in illegal BRMT medical experimentation on humans and in the cover-up of related injuries committed in interstate commerce and against civil rights against Lead Plaintiff from at least 1986 to 1992. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

121. Christopher WRAY is Director, Federal Bureau of Investigation, FBI herein, an agency of the Department of Justice, headquartered in Washington, DC with field offices throughout the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and

myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy acting through, among myriad others, WEISSMAN, ROSENBERG, MELBER, RUBIN, TURNER, MAGGARD. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

122. Merrick GARLAND is Attorney General of the United States, manages the U.S. Department of Justice, DOJ herein, headquartered in Washington, DC, with agencies, operations, and personnel throughout the United States and the world, a nexus for substantial acts against Lead Plaintiff. Defendants used, without limitation, Department of Justice, Federal Bureau of Investigation, United States Marshals Service, Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms and Explosives, malignly exploited national security laws and regulations through its National Security Division and other operations of the Department, and used other departmental and subordinate agency personnel, facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights both jointly and severally in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy acting through, including acts

and failures to act by FBI, USMS, and CALDWELL, and among myriad others, WEISSMAN, ROSENBERG, MELBER, RUBIN, TURNER, MAGGARD. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

123. Ronald DAVIS is Director, United States Marshals Service, USMS herein, an agency of the Department of Justice, headquartered in Arlington, Virginia, with field offices throughout the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

124. Ms. Avril HAINES is Director, Office of the Director of National Intelligence, DNI herein, with agencies, operations, and personnel throughout the United States and the world, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening,

and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act including, through negligent supervision of defendant UNITED STATES intelligence agencies. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

125. Lloyd AUSTIN is Secretary, Department of Defense, DOD herein, headquartered in Arlington, VA, with departments, agencies, operations, and personnel throughout the United States and the world, a nexus for substantial acts against Lead Plaintiff through its military departments, joint operations, and the Office of the Secretary, including, without limitation, ARMY, USAF, NAVY, MARINES, DARPA. Defendants used uniformed and out of uniform military officers and personnel, facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant

knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. AUSTIN himself and Alexander and Yvgeney VINDMAN, while ARMY officers, appeared in civilian dress only and undercover, in violation of posse comitatus law protecting civilians from military force against them which was being perpetrated and perpetuated by DOD department ARMY, as well as Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs. Alexander VINDMAN appeared in false USAF dress during this same time period while serving as an ARMY intelligence officer. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

126. Ms. Christine WORMUTH is Secretary, United States Army, ARMY herein, headquartered in Arlington, VA, with agencies, operations, and personnel throughout the United States and the world, a nexus for substantial acts against Lead Plaintiff. Defendants used uniformed military officers and personnel, facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy.

Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

127.  Dr. Stefanie TOMPKINS is Director, Defense Advanced Research Projects Agency, DARPA herein, headquartered in Arlington, VA with field offices and personnel throughout the United States, a nexus for substantial acts against Lead Plaintiff. Defendants used personnel and contractors, private personal medical and other information illegally acquired without consent, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

128.  Alejandro MAYORKAS is Secretary, Department of Homeland Security, DHS herein, headquartered in Washington, DC with numerous agencies and field offices throughout the United States and personnel within and without the United States, including, without

limitation, CPB, USSS, and was and is a nexus for substantial acts against Lead Plaintiff. Defendants used facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

129. Kimberly CHEATLE is Director, United States Secret Service, USSS herein, an agency of the Department of Homeland Security, headquartered in Washington, DC with field offices throughout the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other agents, officers, confidential informants and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly. Defendants used the Presidential detail, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations

of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

130. Xavier Becerra is Secretary, Department of Health and Human Services, DHHS herein, headquartered in Washington, DC with field offices and personnel throughout the United States, including the National Institute of Allergy and Infectious Diseases where defendant FAUCI worked, and was and is a nexus for substantial acts against Lead Plaintiff. Defendants used personnel and contractors, private personal medical and other information illegally acquired without consent, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and

bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

131. Jeanne Marrazzo, M.D., M.P.H. is Director, National Institute of Allergy and Infectious Diseases, NIAID herein, headquartered in Bethesda, MD with field offices and personnel throughout the United States, where defendant FAUCI worked, and was and is a nexus for substantial acts against Lead Plaintiff. Defendants used personnel and contractors, private personal medical and other information illegally acquired without consent, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

132. Colleen Shogan is Archivist of the United States, The National Archives and Records Administration (NARA herein), headquartered in College Park, MD. NARA was and is

a nexus for substantial acts in withholding information from the Lead Plaintiff. Defendants used personnel and contractors, private personal medical and other information illegally acquired without consent, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

133. John Doe institutional department, agency, and office defendants include federal intelligence and police powers operations, public and private entities, groups, associations, as well as unknown individual persons. Unknown public entities include a variety of governments, their departments, agencies, and special purpose entities in various states and in other nations. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery

system, rights violations, and associated-in-fact pattern of racketeering acts and conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

134. Paragraphs 134 through 135 are reserved.

## C. Known State and Local Defendants, In Their Official Capacity

136. Federal Way School District, Federal Way, WA, a public school district in King County, Washington, FWSD herein, an independent governmental unit, was the nexus for operations conducted by defendant UNITED STATES in the systematic violations of constitutional rights of minor children and their parents while Lead Plaintiff attended school between the third grade and completion of high school. FWSD conspired with federal, state, and local governmental units, including police powers departments and agencies to conduct illegal human subject experiments on minor children, including by accommodating the embedding of federal intelligence and police powers personnel in classes posing as students, and as faculty and school administrators, arranged and funded the premature organization of Decatur High School three years before the school's campus was constructed, among other acts. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's human trafficking and involuntary servitude by actions and failures to act. Defendant as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs of this class.

137. King County Sheriff's Department, Seattle, WA, a police powers agency of King County, Washington, KCSD herein, conspired with federal police powers and state police powers agencies to support and sustain violations of constitutional rights in the illegal BRMT bioweapon program as defendant UNITED STATES conducted illegal and unconstitutional human subject medical experiments on Lead Plaintiff and other family members and engaged in associated-in-fact enterprise patterns of racketeering acts against minor children, adults, and private enterprises from 1963. As Sheriff David Reichert was moving from his first KCSD employment in 1972 to the US House of Representatives in 2005, KCSD conspired with defendant UNITED STATES, ROSENBERG, FAUCI, FBI, CIA, and other co-conspirator defendants herein to orchestrate a variety of acts, violations, and injuries during that time period. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's human trafficking and involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs of this class.

138. State of Washington, Olympia, WA, WASH herein, acting through its governmental departments and agencies, conspired with federal police powers and state police powers agencies to support and sustain violations of constitutional rights in the illegal BRMT bioweapon program as defendant UNITED STATES conducted illegal and unconstitutional human subject medical experiments on Lead Plaintiff and other family members and engaged in associated-in-fact enterprise patterns of racketeering acts against minor children, adults, and private enterprises from 1963. WASH detailed state employees to pose as members of the team which surrounded the Lead Plaintiff in cover operations who then returned to state employment, including from the

Governor's office at various times and places between 1963 and 2005. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's human trafficking and involuntary servitude by actions and failures to act. Defendant as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs of this class.

139. Washington State University, Pullman, WA, an independent agency of the State of Washington, WSU herein, was the nexus for operations conducted by defendant UNITED STATES in the systematic violations of constitutional rights of Lead Plaintiff while he attended the university at various times between 1974 and 1979. WSU conspired with federal, state, and local governmental units, including police powers departments and agencies to conduct illegal human subject experiments on US persons including, without limitation, Lead Plaintiff, by accommodating the embedding of federal intelligence and police powers personnel in classes posing as students, and as faculty and school administrators, among other acts. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's human trafficking and involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs of this class.

140. Eric ADAMS, Mayor, City of New York, Attention: Georgia Pestana, New York City Law Department. City of New York, NYC herein, a political subdivision of the State of New York, was and is a nexus for substantial acts against Lead Plaintiff. Defendants have and do use municipal assets and property, undercover and other officers, wrongful investigations lacking

cause under color of law, assets and myriad frauds and violations of civil rights in acting against,

threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged

with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights,

and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's human

trafficking and involuntary servitude by actions and failures to act. Defendant, as a bad faith

actor and under fraudulent concealment, acted jointly with other defendants and severally acted

to harm Lead Plaintiff and most probably other unidentified plaintiffs.

141.   Edward A. CABAN, Commissioner, City of New York Police Department, NYPD

herein, Attention: Ernest F. Hart, Deputy Commissioner for Legal Matters, PALS Unit, One

Police Plaza, New York, New York, a Department of the City of New York, a nexus for

substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful

investigations lacking cause under color of law, assets and myriad frauds and violations of civil

rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and

jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant

UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly

perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a

bad faith actor and under fraudulent concealment, acted jointly with other defendants and

severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

142.   Colonel Patrick J. CALLAHAN, State Police, State of New Jersey, NJSP herein,

West Trenton, NJ, a department of the State of New Jersey, a nexus for substantial acts against

Lead Plaintiff. Defendants used officers, wrongful investigations lacking cause under color of

law, assets and myriad frauds in acting against, threatening, and retaliating against Lead Plaintiff

both separately and jointly. Defendants used undercover and other officers, wrongful

investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

143. John BILICH, Chief of Security, Port Authority of New York and New Jersey Police Department, PAPD herein, New York, NY, an agency of the Port Authority of New York and New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

144. Christopher Trucillo - Chief Of Police, New Jersey Transit Police Department, NJTPD herein, Newark, New Jersey, a department of New Jersey Transit, itself an agency of the State of New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating

against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

145. Anthony CURETON is Sheriff, BERGEN SHERIFF herein, Bergen County Sheriff's Department, Hackensack, NJ, an agency of the County of Bergen, a political subdivision of the State of New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

146. James TODESCO is County Executive, County of Bergen, BERGEN COUNTY herein, Hackensack, New Jersey, a political subdivision of the State of New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant

UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

147. Jennifer POKORSKI, County Manager, County of Maricopa County, Arizona, MARICOPA COUNTY herein, Attention: Maricopa County Attorney, a political subdivision of the State of Arizona, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant, through ARPAIO as County Sheriff and others in that Department, engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

148. Maricopa County Sheriff's Department, MARICOPA SHERIFF herein, Attention: Sheriff Paul PENZONE, Phoenix, AZ, a department of the County of Maricopa, a political subdivision of the State of Arizona, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant, through ARPAIO as County Sheriff and others in that Department, engaged with Lead Plaintiff in their fraudulent

role as part of defendant UNITED STATES' illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

149. Apparently private entities, incorporating (i) government police powers departments and agencies as institutional bad faith actors and (ii) as individual bad faith actors, (iii) members of the press, and (iv) other persons with special access granted by police powers, while acting in an associated-in-fact enterprise and conspiracy to engage and to violate, without limitation, (a) constitutional, (b) statutory and (c) common law rights, and (d) in patterns of racketeering acts in interstate commerce against plaintiffs:

**Table: Apparent Cover Entities - Police Powers, Press, Private**

| Police Powers Departments and Agencies Operating As And/Or Within Private Entities: | The SHEFFORD Group, Inc. c/o The Corporation Trust Company Corporation Trust Center 1209 Orange St Wilmington, DE 19801, | BIBBY Financial Services, Inc. c/o C T Corporation System 289 S Culver St. Lawrenceville, GA, 30046-4805, |
|---|---|---|
| PREFERRED TRUST Company, LLC 2471 W. Horizon Ridge Parkway, Ste. 100 Henderson, NV 89052, on behalf of Dean T. Smith, a presumed FBI cover company and agent | SHEFFORD & Associates, LLC c/o Jonathan CROSS 3980 Premier Drive Suite 110 High Point, NC 27265, | AXIAL Networks, Inc. c/o Peter Lehrman 902 Broadway, 19TH Floor New York, NY 10010, |
| SASHA'S FARM FRESH, legal from not known, on behalf of Dean T. Smith, a presumed FBI cover company and agent | SHEFFORD Capital Partners, LLC c/o: Jonathan CROSS 2255 Glades Rd 324A Boca Raton, FL 33431, | TECHNOLOGY SALES LEADS, Inc. (TSL) c/o National Registered Agents, Inc 155 Federal Street, Suite 700 2nd Floor Boston MA 02110, |
| CFO SEARCH, Inc. c/o: Michael MAGGARD | FRACTAL Advisors LLC c/o Michael ROZNOWSKI 9308 Lee Court | ENGLEMAN Associates, Inc. |

9602 Kewanee
Lubbock, TX 79424,

BA BESTWICK CARDONE
GROUP
Bank of America, N.A.
One Bryant Park
New York, NY 10036

DOMINICK &
DICKERMAN LLC
c/o Corporation Service
Company
251 Little Falls Drive
Wilmington, DE 19808,

WEFUNDER Admin, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WEFUNDER Advisors, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WEFUNDER BD, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WEFUNDER, Inc.
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WEFUNDER Portal LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

Leawood, KS 66206,

CORNHUSKER Capital
c/o Reginald MCGAUGH
1545 North 18th ST
Omaha, NE 68110,

BANCO Advisors, LLC
c/o GREG SMITH
16100 N 71st St Ste 140,
Scottsdale, AZ, 85254,

INSIGHT NETWORK Spain
c/o: Don KEISER
Calle Antina 22 Primera
Planta, 03130,
St. Pola, Comunidad
Valenciana, España.
Teléfono: +34 96 541 17 58,

MADISON STREET Capital
Advisors, LLC
c/o: Charles Botchway
105 W MADISON STREET,
12th Floor
Chicago, IL 60602,

NEW AMERICA LENDING,
LLC
c/o: David Choate HUGHES
2812 Pat Tillman Drive
Springfield, Illinois 62711,

RICHARD A. MILLER
Consulting, LLC
c/o RICHARD A. MILLER
15 Avery Street
Tunkhannock, PA 18657,

MULTIFUNDING, LLC
921-A Bethlehem Pike, Suite 206
Ambler, PA 19002,

SALLYPORT Commercial
Finance, LLC

aka SOFTSELECT Systems
c/o: Mark ENGLEMAN
607 East Reserve Street
Vancouver, Washington
98661
360-699-6150,

ASSURE GROUP
International, LLC
c/o Alexander Gibbs
Ste 2000
1401 Mercantile Ln
Largo MD 20774,

ABT Trading Inc.
c/o Registered Agents Inc.
7901 4TH Street North
Ste 300
St. Petersburg, FL 33702,

DC INTERNATIONAL LLC
c/o Phillip G. DALEUSKI
1471 Dewar Dr Ste 147
Rock Springs, WY 82901,

CONSUMERBASE LLC dba
EXACT DATA
c/o CT Corporation System
208 S. LaSalle ST, Ste 814
Chicago, IL 60604,

TRADEKEY.COM, doing
business in the United States
through:
ORBIT TECHNOLOGIES
LLC
264 Hemlock Terrace
Teaneck, NJ 07666,

WEBLINK.IN Pvt. Ltd.
33 and 33A Rama Road
Industrial Area, Shivaji Marg
New Delhi, India,

FOSHAN SHUNDE
XinJianHan Trading Co, Ltd

WEFUNDER Portfolio, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WEFUNDER SPV, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

BLACKPOOL Group, Inc.
c/o Jonathan CROSS
401 E Las Olas Blvd.
Ste. 1400
Fort Lauderdale, FL 33301,

ENVOTEC, a Pakistani web development company paid through Freelancer.com,

VENDORCO, whose legal entity name and service address are currently blocked by defendant computer hack from access by defendants UNITED STATES

EGM, whose legal entity name and service address are currently blocked by defendant UNITED STATES computer hack from plaintiff access, likely FBI

MATCH GROUP, Inc.
Jared Sine
Chief Business Affairs & Legal Officer
8750 N. Central Expressway, Suite 1400
Dallas, TX 75231,

BUMBLE Inc.
1105 W 41st Street

c/o Steven N Kurtz, Esq.
15303 Ventura Blvd, Ste 1650
Sherman Oaks, CA 91403,

SOLE SOURCE Capital LLC
c/o: The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington DE 19801,

ADAMSON Brothers LLC
c/o: Legaline Corporate Services Inc.
651 N Broad St Ste 201
Middletown DE 19709,

ADAMSON Brothers, LLC
c/o Andy ALTAHAWI
205D Chubb Ave Ste 240
Lyndhurst, NJ 07071,

ADAMSON Brothers Corp
c/o Andy ALTAHAWI
116 Scarlet Oak Lane
Paramus, NJ 07652,

ADAMSON Brothers Inc
c/o Andy ALTAHAWI
2423 SW 147th Ave #706
Miami, FL 33185,

ADAMSON Brothers Inc
c/o Andy ALTAHAWI
12 N State Rt 17
Paramus, NJ 07652-2644,

ADAMSON Brothers, Inc.
c/o Delaware Corporations LLC
1000 N. West St., Ste 1501
Wilmington, DE 19801,

ADAMSON Brothers
Financial Corp
c/o Harvard Business Services, Inc.

Room 201, Building G,
Shunde Creative Industrial Park, No#41 Dailiang Feng Xiang Road, Shunde District FoShan City, GuangDong, PRC 528300,

EGM, whose legal entity name and service address are currently blocked by defendant UNITED STATES computer hack from access by Defendants,

Vishal PATEL, MD
One Hudson Medical Associates, LLC
235 Old River Road
Edgewater, NJ 07020

Michael SCIARRA, DO
Riverview Gastroenterology Limited Liability Company
300 Midtown Drive
Beaufort, South Carolina 29906

Luis M. ASTUDILLO, MD
Northern New Jersey Cardiology Associates, P.A.
7650 River Rd Ste 300
North Bergen, NJ 07047,

RANCH CREEK
PARTNERS, LLC
c/o JD Kritser
19020 N.E. 84th St.
Redmond, WA 98053,

CROSSROADS
FINANCIAL LLC
c/o Lee Haskin, CEO
6001 Broken Sound Pkwy
Suite 620
Boca Raton FL 33487,

| Austin, TX 78756, | 16192 Coastal Highway Lewes, DE 19958, | |

See also LPEEV65-8 (see note at paragraph 230 to locate document in filed evidence.) The specific roles played by certain of these entities used by unknown police powers departments, agencies, agents, and officers to conceal and spoof their actual entity and personal identities is described in specific context therein. The roles and relationships of other unknown and concealed entities, acting jointly and/or severally, will be specifically identified through the discovery process. See also the table at paragraph 228 for abbreviations commonly used for indexing emails from these and other defendants.

150. John Doe defendants include state and local police powers agencies and departments, public and private entities, groups, associations, and individual persons. Unknown public entities include a variety of governments, their departments, agencies, and special purpose entities in various states and in other nations.

151. Paragraphs 151 through 158 are reserved.

## D. Known Entity Defendants, Including Police Powers Cover Operations

159. Many of the entities identified at the subcounts listed at the end of this paragraph were most probably created by and related to named and unnamed defendants. They are most probably cover entities which have been and are illegally used in bad faith by police powers and intelligence agencies and departments for (i) broad-based illegal general searches, (ii) to disrupt the personal and business affairs of illegally targeted persons and groups including private enterprise, including in interstate commerce, and (iii) to sustain the associated-in-fact enterprise against this class of plaintiffs including, without limitation, the pattern of human trafficking and involuntary servitude acts, violations, and injuries to this class of plaintiffs, including to the Lead Plaintiff. For this reason, these entities are not individually identified as named defendants upon

filing, and instead are subject to discovery for the purpose of determining liability for injuries as they were most probably used by various defendants, FBI, CIA, USMS, and NYPD, to cause and create acts, violations, and injuries to this class of plaintiffs. These entities are named, without limitation, in the following paragraphs in this Complaint:

      i.    NSEC-1 through NSEC-4, paragraphs 601-603

      ii.    HEXP-5 trough HEXP-10, paragraphs 608-613

      iii.    RGTS-2 through RGTS-7, RGTS-11 through RGTS-17 paragraphs 622-627, 631-637

      iv.    RICO-1 through RICO-55, paragraphs 639-693

160. Albertsons Companies, Inc. through its wholly owned subsidiary(ies) ACME MARKETS, Inc. 1013755 and/or ACME MARKETS, Inc. 2112922, (ACME MARKETS herein) is a corporation with a retail location at 481 River Road, Edgewater, NJ. Its retail location was used to supply spoiled refrigerated foods to Lead Plaintiff in various states, including spoiled milk, spoiled produce, and spoiled prepared meat products. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

161. WALMART (China) Investment Co., Ltd., Bentonville, AR headquarters, personnel, and email were used by defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy.

Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

162. WALMART Inc., Bentonville, AR headquarters, personnel, and email were used by defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

163. COSTCO Wholesale Corporation headquarters, personnel, and email were used by defendants, including HUSKEY and WALKER, as part of a series of interstate sales and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

164. The KROGER Company, Blue Vine, OH offices, personnel, and email were used by defendants, including KREMPEL, MERCED, (organic produce procurement for Arizona stores) and Will Zimmerman (organic beef procurement), as part of a series of interstate sales and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their

fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

165. PPG Industries Inc. headquarters, personnel, and email were used by defendants as part of a series of interstate sales and contract frauds (perpetrated during Lead Plaintiff's fraudulent employment and human trafficking by ESTABLISH and ROSENBERG by FBI) against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

166. ESTABLISH Inc. human trafficked and employed Lead Plaintiff in New Jersey, and on false projects at defendant PPG Industries Inc., Pittsburgh, PA, and at Clipper Windpower in Carpinteria, CA and Cedar Rapids, IA. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy, specifically involving, without limitation, ROSENBERG (FBI), ROSS, MCDONALD, KOVONUK, PANKOWSKI. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

167. INSIGHT NETWORK Spain is a corporation with offices in Spain. Its officers, including Don KEISER, personnel, and email addresses were used to present and conduct financing and contract frauds and other acts, including in-person meetings, wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

168. Technology Sales Leads, Inc., (TSL) Boston, MA headquarters, personnel, and email were used by defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

169. LOEB & LOEB, LLP headquarters, personnel, and email were used by defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under

fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead
Plaintiff and most probably other unidentified plaintiffs.

170. Daniel WEINER, an attorney licensed in New York, knowingly engaged in
mispersonation by misrepresenting himself as an employee of ARLON GROUP LLC. ARLON
GROUP was supposedly a subsidiary which was formed to invest the proceeds of the sale of
Continental Grain Company headquartered in New York, New York. ARLON GROUP email
accounts were used by this Defendant as part of a series of interstate financing and contract
frauds against Lead Plaintiff. On knowledge and belief, WEINER was actually the Chairman of
the Litigation Department at HUGHES HUBBARD and REED, New York, NY misrepresenting
himself as an ARLON GROUP employee. Defendant engaged with Lead Plaintiff in their
fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering
conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions
and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted
jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other
unidentified plaintiffs.

171. Raymond F. SULLIVAN, LLC, Attorney, was introduced by Charles JACKSON,
allegedly a now deceased alumni of defendant CIA and the brother of Attorney General Janet
Reno. As allegedly a former investigator for defendant DEPARTMENT OF HOMELAND
SECURITY (DHS) Customs and Border Protection, SULLIVAN used email, phone, and in-
person meetings to functionally provided intelligence to defendant UNITED STATES on
interstate commercial activities and on personal information provided by Lead Plaintiff as an
involuntary subject of the BRMT program operated by this Defendant at all times throughout.
Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED

STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

172. TRADEKEY.COM is an entity allegedly based in Pakistan doing business in the United States through ORBIT TECHNOLOGIES LLC, 264 Hemlock Terrace, Teaneck, NJ 07666. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

173. WEBLINK.IN Pvt. Ltd. Is a limited company in New Delhi, India with offices at 33 and 33A Rama Road, Industrial Area, Shivaji Marg, New Delhi, India. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

174. Vishal PATEL, a physician in Edgewater, NJ, and most likely an employee of defendant UNITED STATES, identified here in his personal and professional capacities practicing in One Hudson Medical Associates, LLC, acted against the best medical interests of the Lead Plaintiff during 2019 through 2023. PATEL participated in a pattern intended as a programmed medical collapse of the Lead Plaintiff in 2022-2023. In doing so, PATEL acted well outside the ethical and legal role of a medical doctor. PATEL knowingly perpetuated Lead Plaintiff's involuntary servitude and adverse medical outcomes by his actions. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted well outside the scope of authority and best practices of a medical doctor, and acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

175. Michael SCIARRA, a gastroenterologist and physician in Edgewater, NJ, and most likely an employee of defendant UNITED STATES, identified here in his personal and professional capacity practicing in Riverview Gastroenterology Limited Liability Company, acted together with other medical professionals in his medical practice against the best medical interests of the Lead Plaintiff during 2019 through 2021. SCIARRA participated in a scheme to create the circumstances for a lethality attempt in April 2021 at Palisades Medical Center in North Bergen, NJ, likely specifically executed by CIA using the illegal BRMT device remotely. In doing so, SCIARRA acted well outside the ethical and legal role of a medical doctor. SCIARRA knowingly perpetuated Lead Plaintiff's involuntary servitude and adverse medical outcomes by his actions. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted well outside the scope of authority and best practices of a medical doctor, and acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

176. Luis ASTUDILLO, a cardiologist and physician in North Bergen, NJ, and most likely an employee of defendant UNITED STATES, identified here in his personal and professional capacities while in Northern New Jersey Cardiology Associates, P.A., acted against the best medical interests of the Lead Plaintiff during 2021 through 2023. ASTUDILLO participated in a pattern intended as a programmed medical collapse of the Lead Plaintiff between April 2021 through October 2023. In doing so, ASTUDILLO acted well outside the ethical and legal role of a medical doctor. ASTUDILLO knowingly perpetuated Lead Plaintiff's involuntary servitude and adverse medical outcomes by his actions. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted well outside the scope of authority and best practices of a medical doctor, and acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

177. MATCH GROUP, Inc. is a corporation operating dating sites used by Lead Plaintiff, including Match.com, Tinder, BlackPeopleMeet, Plenty Of Fish, and Hinge. Its website, personnel, and email addresses have been and are used to present and conduct sales and marketing frauds and other acts, including online communications, arranged meetings, actions, and email correspondence, to interfere in interstate commerce, and to defraud the Lead Plaintiff with fraudulent police powers dates intended to isolate, restrain and entrap the Lead Plaintiff and deprive him of the valid exercise of his constitutional rights including, without limitation of privacy, of free speech and free association with other members of the general public. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under

fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

178. BUMBLE Inc. operates bumble.com, a dating site used by Lead Plaintiff. Its website, personnel, and email addresses have been and are used to present and conduct sales and marketing frauds and other acts, including online communications, arranged meetings, actions, and email correspondence, to interfere in interstate commerce, and to defraud the Lead Plaintiff with fraudulent police powers dates intended to isolate, restrain and entrap the Lead Plaintiff and deprive him of the valid exercise of his constitutional rights including, without limitation of privacy, of free speech and free association with other members of the general public. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

179. John Doe defendants include public and private entities, groups, associations, and individual persons. Unknown public entities include a variety of governments, their departments, agencies, and special purpose entities in various states and in other nations.

180. Paragraphs 180 through 210 are reserved.

## E. Individual Defendants, Including John Does, and John Does Acting Outside Official Capacity, In Bad Faith Acts Performed Under Fraudulent Concealment

211. Stephen BREYER, a former Supreme Court Associate Justice, identified here in his personal capacity, acted in his roles as fraudulent elder Snow, and as Jack Sackville-West. While employed by the UNITED STATES, most probably ARMY or CIA, he directed the illegal BRMT program focused on Lead Plaintiff from age 12 and on his family of origin, and most

probably against other extended family members then residing in the region, from Kent, WA while posing as an elder in Lead Plaintiff's family's Quaker based church group by hosting fraudulent Sunday home religious services beginning around June 1970, a few weeks after the mid-April death of Lead Plaintiff's sister Sandra from an aspirin-induced fatal Reye Syndrome at age 11; then from Spokane, WA beginning in Fall 1974 while Lead Plaintiff attended Washington State University, Pullman, WA, about 80 miles south of Spokane, WA, with Bill Sackville-West, GARLAND (Robert Mandich), and others identified at paragraph 419.

BREYER engaged in bad faith acts and harmed Lead Plaintiff through his participation in defendant UNITED STATES' illegal BRMT and racketeering program. Defendant hosted Lead Plaintiff and family members at his apparent Kent, WA farm in 1970-1973, then hosted Lead Plaintiff at 1424 South Maple Street, Spokane, Washington residence from at least 1974-1980 as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. BREYER would later go on to write and publish Active Liberty in 2005. Lead Plaintiff and THORPE had developed a software scheduling system (ActivLabor, 1983-84) as a result of a consulting project which occurred in conjunction with Queen Elizabeth II's 1983 visit to the Westin Hotel in Seattle, WA, a national security event into which ZOULAS inculpated Lead Plaintiff. Others from Deloitte Seattle joined the project including, without limitation, THORPE, HEATHCOTE, and LEMMON, who worked with Westin client personnel SPADONI, TREADWAY, ASTENGO. Lead Plaintiff had named the software scheduling system ActivLabor, for the primary function it served as intended to be used in hotel operations. BREYER's wife was reportedly a British national from a leading family in Great Britain. While not dispositive, these types of naming rhymes (ActivLabor, Active Liberty) and cultural tie-ins (Breyer family as US and UK husband and wife; UK's Queen Elzabeth II visited the Seattle Westin where Lead

Plaintiff had previously worked on the prototype for the similarly software project) are consistent with now familiar tradecraft rhymes which federal undercover and intelligence operations often echo as this complaint demonstrates. BREYER was specifically joined in this conspiracy by unknown persons posing as his wife, and Laura Lynn SNOW (daughter) in 1970-1973; then by Dorothy SACKVILLE-WEST, "Skip" legal name unknown SACKVILLE-WEST, Richard SACKVILLE-WEST, David SACKVILLE-WEST, Laurie Sackville-West, fka wife of David Sackville-West (DOLAN herein), Robert SACKVILLE-WEST, Karen SACKVILLE-WEST (other plausible identities at paragraph 717),  William SACKVILLE-WEST, and James SACKVILLE-WEST, all while posing as related by marriage and/or blood to Jack Sackville-West (BREYER) beginning in Fall 1974. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

212. Andrew WEISSMANN, (WEISSMAN herein) a former FBI and DOJ official, is identified here in his personal capacity. While employed by the FBI engaged in bad faith acts, WEISSMAN harmed Lead Plaintiff through his participation in defendant UNITED STATES' illegal BRMT and racketeering program. Defendant engaged with Lead Plaintiff in his roles as PCC General Manager and Board member of NutraSource from approximately 1983-1986 as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead

Plaintiff's involuntary servitude by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

213. Charles "Chuck" ROSENBERG (FBI) identified here in his personal capacity while employed by FBI, engaged in bad faith acts, acted in his undercover role Chuck LeFevre (ROSENBERG), CEO of NutraSource, Seattle, Washington which illegally spied in Pacific Northwest food cooperatives while he resided in Washington state in the 1980s, and as William Drumm, supposedly a resident of NJ and General Manager of ESTABLISH, Fort Lee, NJ, but actually a US Attorney acting outside the scope of his employment, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as authentic officers, employers, and fellow employees of Lead Plaintiff at ESTABLISH, Inc and fraudulently presented project sales, project consulting services, and corporate offices, plants and other facilities, in the illegal human trafficking, fraudulent employment, forced labor, illegal termination, and thefts of commissions and compensation against Lead Plaintiff together with ROSS, and used wire and email fraud, interstate and international travel in the furtherance of their pattern of human trafficking, forced labor, and other myriad frauds in interstate commerce, including inculpation of foreign police powers and intelligence services as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant in his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

213A. David Reichert, whose address is known to USMS, identified here in his personal capacity while employed by defendant KCSD, engaged in bad faith acts as an officer and as Sheriff of defendant KCSD. Reichert directed and conspired with co-defendants including, without limitation, with subordinate Gregroy R. Boyle, the first and second former husband of Lynne, who was Lead Plaintiff's romantic partner and spouse from 1979-1988, to fraudulently conceal systematic patterns of violations of constitutional rights, programmed destruction of families and private enterprises in systematic associated-in-fact enterprise patterns of racketeering acts, and to conceal the wrongful roles of police powers and governmental employees acting outside their scope of authority in bad faith acts against Lead Plaintiff and other plaintiffs of this class. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

214. William BURNS, identified here in his personal capacity while employed by the United States, engaged in bad faith acts. BURNS is Director, Central Intelligence Agency headquartered in Vienna, VA. BURNS was formerly known as Patrick Heffron (BURNS), an OB/GYN physician who practiced in Kirkland, Washington, and while in that identity was directly and personally involved in defendant UNITED STATES' illegal BRMT medical experimentation on humans and in the cover-up related injuries committed in interstate commerce against Lead Plaintiff from at least 1986 to 1992. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights,

and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary
servitude by actions and failures to act. Defendant, in his personal capacity as a bad faith actor
and under fraudulent concealment, acted jointly with other defendants and severally acted to
harm Lead Plaintiff and other unidentified plaintiffs.

215. Roger STONE, identified here in his personal capacity while employed by the
United States, engaged in bad faith acts, while employed directly or under contract by defendant
Central Intelligence Agency headquartered in Vienna, VA. STONE was formerly known as
David P. Moller, was a consulting Manager at Deloitte Seattle during the pendency of the South
Africa Banking System ATM design and implementation project with Boeing for defendant CIA,
then became CEO of LazerSoft where he employed Lead Plaintiff as CFO in 1986 in Seattle and
Bothell, WA. While in those identities, STONE was directly and personally involved in human
trafficking, as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy
including, without limitation, illegal BRMT medical experimentation on humans and in the
cover-up related to acts, violations, and injuries committed by defendants, including in interstate
commerce, against Lead Plaintiff during 1983 to 1989. Defendant engaged with Lead Plaintiff in
their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and
racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude
by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under
fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead
Plaintiff and other unidentified plaintiffs.

216. Lisa RUBIN (FBI), identified here in her personal capacity, fka Michelle Yarbrough
while posing as a stepbrother of Jeanette, acted in conspiracy with defendant UNITED STATES,
including ARMY, CIA, BURNS, and others, to sustain a systematically compromised romantic

interest and marriage of Lead Plaintiff to Jeanette, his second wife. RUBIN, while an FBI agent, and her family members including minor children, were directly involved in sustaining the myth of a Yarbrough extended family relationship with Lead Plaintiff throughout the coerced and contrived relationship used by CIA and ARMY to conduct human experiments on Lead Plaintiff, second wife Jeanette, and stepson Bryce. RUBIN knowingly perpetuated Lead Plaintiff's involuntary servitude by her actions. Defendant, in her personal capacity as a bad faith actor and under fraudulent concealment, acted well outside the scope of authority of an FBI agent, as defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

217. Alexander VINDMAN, identified here in his personal capacity, fka Paul Yarbrough while posing as a stepbrother of Jeanette. VINDMAN, posing as an Air Force officer and engineering manager on the Boeing AWACS procurement program while an ARMY officer, and his family members including two minor children, were directly involved in sustaining the myth of a family relationship with Lead Plaintiff throughout the coerced and contrived relationship used by CIA and ARMY to conduct human experiments on Lead Plaintiff, second wife Jeanette, and stepson Bryce. VINDMAN knowingly perpetuated Lead Plaintiff's involuntary servitude by his actions as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted well outside the scope of authority of a member of the US military in violation of, among other things, posse comitatus law, and acted jointly with other defendants and acted severally to harm

Lead Plaintiff and other unidentified plaintiffs as defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

218. Ari MELBER, identified here in his personal capacity, fka Wes Lewis while posing as related by marriage to Theresa, a half-sister of Jeanette, while an FBI agent, and his family members by marriage including two minor children, were directly involved in sustaining the myth of a family relationship with Lead Plaintiff throughout the coerced and contrived relationship used by CIA and ARMY to conduct human experiments on Lead Plaintiff, second wife Jeanette, and stepson Bryce. MELBER knowingly perpetuated Lead Plaintiff's involuntary servitude by his actions as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted well outside the scope of authority of an FBI agent, as defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

218A. Robert MUELLER, whose address is known to USMS and FBI, identified here in his personal capacity while employed by the United States, engaged in bad faith acts as a US Attorney, and as Director of defendant FBI from 2001-2013. MUELLER directed and conspired

with co-defendants to fraudulently conceal systematic patterns of violations of constitutional

rights, programmed destruction of families and private enterprises in systematic associated-in-

fact enterprise patterns of racketeering acts, and to conceal the wrongful roles of federal

prosecutors acting out of scope of authority against Lead Plaintiff and other plaintiffs of this

class. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant

UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly

perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, in

his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with

other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified

plaintiffs.

219. Leslie CALDWELL, while assigned to Seattle, Washington by DOJ, identified here

in her personal capacity, is a former DOJ prosecutor in the US Attorney's Office for Northern

California, while reporting there to Robert MUELLER, who was later FBI Director.

CALDWELL, who was later Assistant Attorney General for the Criminal Division of DOJ,

pretended to be an intellectual property attorney at the law firm Seed and Berry (now Seed IP),

Seattle, Washington, representing the Lead Plaintiff's business, Allegent, LLC in 2004, in co-

ownership with PRAY (actually FBI or USMS agency funds funneled indirectly through PRAY

to sustain secret co-ownership). While in this role, CALDWELL participated directly in a

complex illegal FBI business wrecking and financial entrapment scheme against the Lead

Plaintiff which was intended, among other things, to avoid exposing the federal agent co-owner

PRAY of Lead Plaintiff's private enterprise as its field operative. CALDWELL knowingly

perpetuated Lead Plaintiff's involuntary servitude by her actions as part of defendant UNITED

STATES illegal BRMT, rights, and racketeering conspiracy as defendant, in her personal

capacity as a bad faith actor and under fraudulent concealment, acted well outside the scope of authority of a federal prosecutor, Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

220. Joseph ARPAIO, both as MARICOPA SHERIFF and as an individual in his personal capacity, acted severally and in conspiracy with others, falsely personated a fresh produce industry consultant, Greg CROSSGROVE, and used email, phone and in-person meetings, and organized a team of false employees for Lead Plaintiff's companies engaged in interstate commercialization of organic produce, organic beef, and other products to major retailers, including defendants COSTCO Wholesale Corporation, WALMART, Inc and subsidiaries, and The KROGER Company and subsidiaries, among others. Defendant engaged with Lead Plaintiff in his fraudulent role as a consultant to Winnett Perico, Inc., (Winnett) as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

221. Neal KATYAL, employed by DOJ or ARMY, identified here in his personal capacity, formerly known as Shawn Morrissey while posing as a high school student, engaged in

bad faith acts at the small and specifically carved-out Decatur High School, Federal Way, WA

attended by Lead Plaintiff. While in his undercover role, KATYAL acted individually and in

conspiracy with others in fraudulently misrepresenting himself and others as authentic fellow

students of Lead Plaintiff at Decatur High School, Federal Way, WA, befriended Lead Plaintiff

and engaged in coercive acts and civil rights violations, fraudulently participating in the illegal

human trafficking, biomedical abuse of human subjects, and other illegal acts against Lead

Plaintiff together with an unknown agent fka Thomas Grady and other defendant FBI, ARMY,

and CIA student posers of defendant UNITED STATES, and used wire and email fraud, and

interstate travel in the furtherance of their pattern of human trafficking, forced labor, and other

myriad frauds in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent

role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy.

Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures

to act. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment,

acted jointly with other defendants and severally acted to harm Lead Plaintiff and other

unidentified plaintiffs.

222. Thomas KEENE, while a Bloomberg Media network television anchor, identified

here in his personal capacity, fka Michael Callahan, while posing as an investment banker at

DOMINICK & DICKERMAN LLC (DOMINICK, DD) during an interstate commerce financing

effort by Lead Plaintiff for his Winnett startup, engaged in civil rights and racketeering

violations, fraudulently participating in the illegal human trafficking, biomedical abuse of

human subjects, and other illegal acts against Lead Plaintiff, together with GROSS, CARDONE,

and other FBI, ARMY, and CIA personnel of defendant UNITED STATES and its co-

conspirator defendants, and used wire and email fraud, and interstate travel in the furtherance of

their pattern of human trafficking, forced labor, and other myriad frauds in interstate commerce, all as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. KEENE knowingly perpetuated Lead Plaintiff's involuntary servitude by his actions as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted well outside the scope of authority of a professional media employee and/or private citizen in racketeering acts as defendant engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

223. Stephanie Clifford (MODDERMAN), believed to be a resident of New York and Florida, whose address is known to the District Attorney for Manhattan, New York City, NY. MODDERMAN is an adult film actor who posed in 2008 as Marinka MODDERMAN, from a MATCH GROUP website, match.com, which website, or the spoofing of same as corruptly obstructed and administered for the benefit of defendants FBI (ROSENBERG) and CIA (BURNS) during the 2007-2008 human trafficking from Boston, MA to Fort Lee, NJ and fraudulent employment at ESTABLISH, and the defamation and reputational smear campaign against Lead Plaintiff. MODDERMAN was presented as the doting mother of three children for the purpose of orchestrating a publicly available video sex scene smear performed without knowledge or consent in the Cliffside Park, NJ apartment rented by Lead Plaintiff from CHALOM (USMS) for the conduct of this illegal and publicly corrupt operation by defendants DOJ, FBI, USMS, and CIA in 2007-2008. MODDERMAN knowingly perpetuated Lead

Plaintiff's involuntary servitude and damaged his public reputation by her actions as part of

defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant, in her

personal capacity as a bad faith actor and under fraudulent concealment acted to defame, jointly

and severally to harm Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent

role as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy.

Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures

to act. Defendant, in her personal capacity as a bad faith actor and under fraudulent concealment,

acted jointly with other defendants and severally acted to harm Lead Plaintiff.

224. Norelle Dean (GIA), a resident of New York posed in 2019-2021 as Gia

Shakur and alternatively as Tina Rinehart, from a MATCH GROUP website, which website, or

the spoofing of same as corruptly obstructed and administered for the benefit of defendants

including, without limitation, FBI and CIA during the 2019-2021 series of dates and a fraudulent

relationship with Lead Plaintiff. GIA was presented as a college student engaged in literary and

artistic pursuits and poetry for the purpose of orchestrating a fraudulent relationship and

videographed sex scenes smear performed without Lead Plaintiff's knowledge or consent in the

Edgewater, NJ apartment rented by Lead Plaintiff from a USMS cutout entity for the conduct of

this illegal and publicly corrupt operation including, without limitation, by defendants DOJ, FBI,

USMS, and CIA as they have and do continue from 2018 when Lead Plaintiff was trafficked by

defendants DOJ, FBI, USMS into the midst of the Senator Menedez public corruption

investigation (paragraphs 624 RGTS-4, 648 RICO-10). GIA knowingly perpetuated Lead

Plaintiff's involuntary servitude and damaged his public reputation by her actions as part of

defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendant, in her

personal capacity as a bad faith actor and under fraudulent concealment, acted against the

interests and reputation, and engaged with Lead Plaintiff in their fraudulent role as part of

defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendant

knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act.

Defendant, in his personal capacity as a bad faith actor and under fraudulent concealment, acted

jointly with other defendants and severally acted to harm Lead Plaintiff and other unidentified

plaintiffs.

225. Anthony FAUCI, a resident of Maryland, whose address is known to USMS, while

known to Lead Plaintiff as Larry R Cook, was an illegal BRMT bioweapon and bioweapon

delivery system program executive identified here in his personal capacity who, while employed

by the United States, engaged in bad faith acts. FAUCI operated as Lead Plaintiff's employer at

CNA Industrial Engineering, Bellevue, WA from November 1996 to September 2006. FAUCI is

known to have operated in this role from approximately the mid-1990s into the 2000s, which

illegal operations incorporated racketeering acts, and illegal BRMT brain hijackings to and

including extreme mental biochemical torture and coercive psychological operations, which led

to suicide ideations by the early 2000s, in the aftermath of 9/11/2001 retaliatory attack during a

period when torture was a documented practice in defendant CIA operations (paragraphs 336-

340). While in that Larry R. Cook identity, FAUCI was directly and personally involved in

defendant UNITED STATES' illegal BRMT medical experimentation on humans and in the

cover-up of related injuries committed in interstate commerce against Lead Plaintiff. Defendant

engaged with Lead Plaintiff in their fraudulent role as part of defendant UNITED STATES

illegal BRMT, rights, and racketeering conspiracy. Defendant knowingly perpetuated Lead

Plaintiff's involuntary servitude by actions and failures to act. Defendant, in his personal

capacity as a bad faith actor and under fraudulent concealment, acted jointly with other

defendants and severally acted to harm Lead Plaintiff and other unidentified plaintiffs.

225A. Marc CHALOM, a resident of New Jersey, acted and/or posed as the landlord of

the 282 Palisade Avenue, Cliffside Park, NJ, apartment building where Lead Plaintiff was human

trafficked and lived from August 2007 to October 1, 2010, while he was fraudulently employed

at Establish in Fort Lee, NJ by defendants ROSENBERG and ROSS until June 2008. Lead

Plaintiff was tortured and subjected to public humiliation and sexual abuse at this Cliffside Park,

NJ location before being forced by CHALOM to leave in October 2010 to be kidnapped without

due process into Bergen Regional Medical Center locked behavioral health wards in Paramus,

NJ, after Lead Plaintiff filed federal civil rights litigation in the federal District of New Jersey in

June 2010. CHALOM also closely resembled, and may have been directly involved in prior

human trafficking, in a fraudulent employment opportunity presented in on San Juan Island at a

prismatic lens development startup in 1989 as unwitting Lead Plaintiff was reviewing

employment options in the greater Western Washington area as an element of defendant FBI,

CIA, USMS, DOJ, UNITED STATES involuntary servitude in their associated-in-fact enterprise

pattern of racketeering acts with other governmental defendants in Washington state including,

without limitation, defendants KCSD and WASH. Defendant engaged with Lead Plaintiff in

their fraudulent role as part of defendant UNITED STATES illegal BRMT, rights, and

racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude

by actions and failures to act. Defendant, in his personal capacity as a bad faith actor and under

fraudulent concealment, acted jointly with other defendants and severally acted to harm Lead

Plaintiff and other unidentified plaintiffs.

226. Unknown government agents, officers, and employees, currently or formerly employed by governmental defendants in police powers and other government operations, identified here in their personal capacities, some of whom are identified by their known cover and current public names in the caption, and others as John Doe Police Powers defendants of unknown number. These unidentified defendants include, without limitation, police powers officers, agents, employees, and officials of named and not yet identified defendant agencies and departments, including of general government, as well as of police unions, and related private entities, groups, associations, and individual persons, including, without limitation, unknown officers, agents, contractors, successors and assigns of governmental entities who are also currently unknown to be identified during discovery. Defendants knowingly perpetuated violations of constitutional rights of these plaintiffs, including, without limitation, Lead Plaintiff, including their rights under the *First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, and Fourteenth* Amendments by their actions and failures to act as part of defendant UNITED STATES BRMT, rights, and racketeering conspiracy. Defendants, in their personal capacity as bad faith actors and under fraudulent concealment, exceeded their legal authority under law, acted jointly with other defendants and acted severally to harm Lead Plaintiff and most probably other unidentified plaintiffs under color of law. These defendants include, without limitation, persons using the following identities at the time of their contact with Lead Plaintiff:

**Table: Unknown Persons - Government Agents, Press, Media, Entertainment, And Other Persons Who Have Been Granted Access To The Otherwise Inaccessible Lead Plaintiff By Defendant UNITED STATES and Other Police Powers**

| Other Unknown Government Officers, Agents, and Employees, while known as: Dorothy SACKVILLE-WEST, and | David KELLER, David WYLY, DEAN T. SMITH (Auburn, CA), Dewey TURNER, Don KEISER, | Michael STRASSER, Michael BABCOCK, Michael LARSON, Orland HOWARD, Dr. Paul SHAFFER, PAUL SMITH, |
|---|---|---|

"Skip" legal name unknown SACKVILLE-WEST, and Richard SACKVILLE-WEST, and David SACKVILLE-WEST, and Robert SACKVILLE-WEST, and Karen SACKVILLE-WEST, and William SACKVILLE-WEST, and James SACKVILLE-WEST, all while posing as related by marriage and/or blood to Jack Sackville-West (defendant BREYER),

Akshay SETH,
AL THANI, Sheikh Jassim Bin Hamad Bin Jabor,
Alice CHENG,
Andrew ALTAHAWI,
Andrew CARDONE,
Andrew KUNSAK,
Arthur THOMPSON,
Bob HUSKEY,
Brad KUMIN,
Bradford ROSSI,
Brandon HUTCHISON,
Bruce BLITCH,
Charles JACKSON,
Chris CANCHOLA,
Conrad ROSS,
Dana SMITH,
Daniel KREWSON,
Daniel LONERGAN,
Daniel WEINER,
Darrell C. PRAY,
David Choate HUGHES,

Dorothy FULLER,
Doug PETERSEN,
Eric GALKIN,
Frank MAUGHAN,
Gary JACK,
Gerald CORNWELL,
Gerald NEWMAN,
Glen GARRISON,
Greg LINS,
GREG SMITH,
Gwen HEATHCOTE,
H. Paul LOWBER,
Ibrahim ABDELSAYED,
Jacob KREMPEL,
James CHRISTENSEN
Jason PANKOWSKI,
Jason WASEMAN,
Jasper VAN BRAKEL,
Jay CARTER,
Jim RHODES,
Joanne LABELLE,
Joel GOTTESMAN,
John ARTUSO,
John GOODMAN,
John VANGCHHIA,
Jon NICKLESS,
Jonathan CROSS,
Jose MERCED,
Kim EPSKAMP,
Kristine J. VOLK,
Larry R. COOK,
Laura AKOTO,
Laura Lynn SNOW,
Lee ZUKER,
Lino BELLI,
Lori ALVAREZ,
Marc CHALOM,
Mark GROSS,
Michael CASTRO,
Michael HENDERSON,
Michael KURGAN,
Michael MAGGARD
Michael ROZNOWSKI,

Peter GRUBSTEIN,
Peter LEBLOND,
Phil DALEUSKI,
Phil LALJI,
Piotr PREGNER,
R. Kent TARPLEY,
Raoul WHEELER,
Ray KOVONUK,
Raymond POON,
Reginald MCGAUGH,
Richard A. MILLER,
Robert BESTWICK,
Robert FINKELSTEIN,
Robert HIBBS,
Robert MANDICH,
Robert MILLER,
Robert POON,
Robert SAUL,
Robert SWAIN,
Robert WHARTON,
Robert ZOOK, Amfac CIO and later unknown name while CEO, Zetec, a CNA client,
Rod PROCTOR,
Ron MCCORMICK,
Ron WILLIAMS,
Sam SANDERS,
Selwyn GORDON,
Stephen WATERS,
Steve MCDONALD,
Steve POINDEXTER,
Susan WALKER,
Tesina PAINTER,
Vito PERILLO,
Walter HABERER, aka Walter SIMON,
Warren WILKINS,
William REED,
William TARAZEWICH,
Yoshiyuki HIGAKI,
Zach SEASE,
Zoe SCHUMAKER.

See also LPEEV65-8 (see note at paragraph 230 to locate that document in filed evidence.) The specific roles played by certain of these entities used by unknown police powers departments, agencies, agents, and officers to conceal and spoof their actual entity and personal identities is described in specific context therein. The roles and relationships of other unknown and concealed entities, acting jointly and/or severally, will be specifically identified through the discovery process. See also the table at paragraph 228 for abbreviations commonly used for indexing emails from these and other defendants.

227. John Doe defendants of unknown number include other unidentified private entities, groups, associations, and individual persons, including, without limitation, unknown officers, agents, contractors, successors and assigns of governmental entities who are also currently unknown to be identified during discovery. Defendants knowingly perpetuated Lead Plaintiff's involuntary servitude by their actions as part of defendant UNITED STATES illegal BRMT, rights, and racketeering conspiracy. Defendants, in their entity and/or personal capacity as bad faith actors, exceeded their legal authority under law, acted jointly with other defendants, and acted severally to harm Lead Plaintiff and most probably other unidentified plaintiffs under color of law and fraudulent concealment.

228. All defendants are responsible for careful review and answers to all paragraphs. Alternate search terms include, without limitation, the following email abbreviations used interchangeably with the defendant name for the following person and entity defendants:

| DEFENDANT | ALTERNATE SEARCH TERM |
|---|---|
| All Winnett Fraudulent Employees | WO TEAM |
| ALTAHAWI | ADAMSON |
| ARPAIO | OLIVER |
| BESTWICK | BA BESTWICK CARDONE |
| CARDONE | BA BESTWICK CARDONE |
| CARTER | LIBERTY |

| DC INTERNATIONAL | DC INTL |
|---|---|
| DOMINICK | DD |
| EARLY BIRD | EB |
| FOSHAN SHUNDE | RMC |
| GROSS | DD |
| INSIGHT NETWORKS | INSIGHT |
| KEENE (CALLAHAN) | DD |
| KELLER | LIBERTY |
| LIBERTY WEST | LIBERTY |
| MADISON STREET | MADISON ST |
| MARICOPA SHERIFF | OLIVER |
| RAM CONSULTING | RAM |
| WALMART | WMT |
| WALMART CHINA | WMT CHINA |
| WILLIAM REED | BREED |
| WILLIAM REED | REED |

Note that these abbreviations may be misspelled in email topic lines contained in the evidence tables at paragraphs 600-710. See also the compendium and glossary at LPEE pages 934-1075.

## NOTICE TO COURT AND DEFENDANTS CONCERNING CONTINUING OBSTRUCTIONS OF JUSTICE BY DEFENDANT UNITED STATES

229. Defendant UNITED STATES has and does use a continuing technical hack to suppress evidence of its human trafficking, interferences in interstate commerce, in constitutional rights, and other acts, violations, and injuries to Lead Plaintiff (generally related at paragraph 648 RICO-10) in certain email accounts from March 4, 2018 through July 9, 2020. This pattern of suppression of evidence, the September 2023 erasure of his electronic MS-Outlook calendar, and the February 2024 overnight erasure of female dating contact records from his old cell phone, are further to the continuing pattern of racketeering acts of evidence and witness tampering obstructions of justice (18 U.S.C. §§ 1512, 1513) by defendant UNITED STATES as it continues its broad pattern of obstruction, destruction, and tampering documented herein, which accelerated from June 2022 to the present (Interline Exhibit 15, LPEE pages 11645-11672, 11708-11925, 11931-11936, 12146-12244, LPEEV65 documents 2-5, 9, 11-16).

Defendant UNITED STATES also has and does hack spelling of names, verb tenses, and punctuation marks in this complaint during preparation and has been known to change paragraph references and legal references to statutes to render them meaningless. Lead Plaintiff has and does exercise due care in preparation but cannot be assured of the integrity of each and every element of the text despite due care as a result of this technical hacking. This hacking is consistent with defendant CIA's pattern of practice related to the 2104 Senate Intelligence Committee staff work and its report on torture (paragraphs 336-340), which together with other forms of biomedical and other indirect physical assaults, and with intentional and malicious narrative shaping public humiliations, against these plaintiffs comprise a significant portion of that specific defendant's primary role in this complaint.

230. LPEEV65 document references were forced by defendant UNITED STATES to be substituted for the Bates numbering of evidence beginning in February 2024. This change in the method of identifying evidence was required due to a technical hack of Adobe Acrobat Pro by defendant UNITED STATES from that date which is still continuing. The short description of these documents is in the table below.

[Intentionally left blank.]

Table: LPEEV65 Documents Index

- LPEE V65-1 Audrey Brewer Homicide - Effinger sentenced WW Union-Bulletin 120702
- LPEEV65-2 Colon Health Diary Addendum 231106 to 240127_20240127_0001
- LPEEV65-3 BRMT Contrived Conduct - Select Examples 2023 240203
- LPEEV65-4 Dating Apps Obstruction Oct 23 - Jan 24 240202
- LPEEV65-5 Fake Contrived Blown Events Club Free Time EventBrite 2021-2023 240202
- LPEEV65-6 BA 5058 D BREWER DDA SELECTED ENTRIES 2007-2015 240202
- LPEEV65-7 BA 5058 Notice of Duty to Preserve Evidence 220120
- LPEEv65-8 Police Powers Select Cover And Unknown Individual Roles 230102
- LPEEv65-9 FBI Ironwood All 230205 230530
- LPEEV65-10 DC Civil Email Redacted 211012
- LPEEV65-11 Ltr 221109 SDNY Threats and Assaults Ltr Encl 221109_Redacted
- LPEEV65-12 Ltr 230228 SDNY Wire Fraud Intuit Website 230228_Redacted
- LPEEV65-13 Ltr 230711 AG SDNY Health Ltr Encl 230711_Redacted
- LPEEV65-14 Ltr 230814 SDNY Ltr Encl 230814_Redacted
- LPEEV65-15 Ltr 230901 SDNY Ltr Encl 230901_Redacted
- LPEEV65-16 Ltr 231004 SDNY Ltr Encl Colon 231004_Redacted
- LPEEV65-17 Torture - Compare Psych Physical 240227
- LPEEV65-18 Fatal Pinter Hack Third Printer 13 months 240308

Paragraphs 231 through 249 are reserved.


[Intentionally left blank.]

## VIOLATIONS OF LAW AND CONFLICTS OF LAW

250. The illegal BRMT biomedical abuse of US persons and the perpetuated cross-generation involuntary servitude through racketeering crimes are associated-in-fact enterprise patterns which have persisted against this class of plaintiffs for more than fifty-five years, are fraudulently concealed behind illegal abuse of the state secrets privilege, and functionally defeat Constitutional rights, including guarantees of religious freedom.

251. Defendant UNITED STATES continues today to illegally develop and operate succeeding generations of the illegal BRMT bioweapon and bioweapon delivery system in violation of US law and in defiance of the international treaties it has sponsored, negotiated, and ratified. Defendant UNITED STATES fiercely defends its on-going cover-up as, together with its co-conspirators, it continues to violate:

(i)      the *Constitution of the United States of America* and its *First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, and Fourteenth* (section 1) amendments,

(ii)     18 U.S.C. § 175 prohibiting bioweapons and bioweapons delivery system development and use, and 18 U.S.C. §178(2) development and delivery of toxin prohibited, which imposes up to the death penalty against offenders,

(iii)    18 U.S.C. § 1385 posse comitatus violations by elements of defendant DOD and the named military services defendants herein through their use of active duty military personnel against civilian US persons in civilian dress secret operations including, without limitation, Lead Plaintiff's fraudulently orchestrated marriage to active duty deferred prosecution coerced Jeanette, and by technical operations of the National Reconnaissance Office, US Space Force, and its predecessor US Air Force, through their

technical support and provisioning of classified supercomputer systems, satellite communications systems, and enhanced precision location systems,

(iv)     18 U.S.C. §§ 1581, 1584, 1589, prohibiting involuntary servitude, forced, peonage, and human trafficking,

(v)     18 U.S.C. §§ 1961-1968 patterns of racketeering acts, in violation of the Racketeering Influenced and Corrupt Organizations Act, which defendant DOJ has itself used to criminally prosecute various government and private associated-in-fact enterprises, conspiracies to and patterns of racketeering acts since 1970,

(vi)     18 U.S.C. § 2331 prohibiting terrorism, which imposes up to the death penalty,

(vii)     18 U.S.C. § 2340A prohibiting torture, which imposes up to the death penalty,

(viii)     18 U.S.C. §§ 241, 242, and 42 U.S.C. § 1981 prohibiting conspiracies and deprivations of civil rights,

(ix)     together with other co-conspirator defendants, literally three and one-half dozen sections of Title 18, Civil Rights chapter 21 of Title 42, and myriad state statutes across numerous states, as specifically cited at each of the 54 Claims for Relief in paragraphs 801-854, which are comprised of thousands of explicit violations of the relevant statutes cited therein, all these offenses being perpetrated against the Lead Plaintiff alone.

(x)     the *United Nations Charter* and *Universal Declaration of Human Rights*, (effective in force - EIF 1948),

(xi)     *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction,* (*Bioweapons Treaty*, EIF 1975),

(xii)     *International Covenant on Civil and Political Rights* (EIF 1976),

(xiii)    *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (*Torture Treaty,* EIF as ratified in 1992), and

252.  The BRMT bioweapon and bioweapon delivery system which is at the root of this entire pattern of conduct is prohibited by law 18 U.S.C. § 175 and the ratified 1972 Bioweapon Treaty. These sophisticated individual defendants, and defendant UNITED STATES, could reasonably be expected to know, and did know, that this illegal BRMT bioweapon and bioweapon delivery system explicitly violates the human, civil, and Constitutional rights of this entire class of plaintiffs as to all elements of law at paragraph 251 including, without limitation, explicit provisions of 18 U.S.C. § 175(a):

"Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

253. As defined at 18 U.S.C. § 178(2):

"toxin means the toxic material or product of .... animals....a recombinant or synthesized molecule, whatever their origin and method of production, and includes – any....biological product that may be engineered as a result of biotechnology produced by a living organism; or... any...biological product..."

The BRMT bioweapon is intended, designed, and operates to produce excessive or deficient quantities of endogenous (naturally occurring) biological chemicals in the human body, including, without limitation, dopamine (neurotransmitter), nitric oxide (circulatory effects), and glutamate (neurotransmitter). The presence or absence of these biological compounds are toxic through their out-of-natural balance effects which produce a wide variety of symptoms including, without limitation, halted breathing, disrupted consciousness, heart attack, depression, suicide ideations, involuntary body movement (such as involuntarily pulling a trigger or wielding

a knife in rage when not naturally intended by the victim), mental illnesses of varying degree, and deep sleep (while operating a vehicle or equipment), among other symptoms and illnesses. These imbalances also have long-term disabling effects when induced in persistently excessive or suppressed amounts, including, without limitation, in Alzheimer's, ALS, intellectual disabilities, and other permanent disabilities.

**Points of Law, Case Law Precedents, And Conflicts of Law Favor Plaintiffs**

254. This section includes a close discussion of points of law and case law which are particularly relevant to the unique facts and circumstances of this complaint:

A. Limits On Sovereign Immunity Imposed By Congress at paragraph 255

B. Limits On Religious Discrimination Imposed By Congress And Case Law Precedents at paragraph 259

C. Limits On State Secrets Privilege Imposed By Congress And Case Law Precedents at paragraph 260

D. Limits On Absolute And Qualified Individual State Secrets Immunity Imposed By Congress And Case Law Precedents at paragraph 267

E. Absolute And Qualified Immunity Precedents In Case Law Answered By Congressional Intent In November 1988 At 28 U.S.C. § 2679(b)(2) at paragraph 272

F. Bivens Special Factors and Alternative Remedy Immunity Claims Are Defeated By Facts And By Defendant UNITED STATES Failures To Act at paragraph 277

G. Application Of Equitable Tolling In Fraudulent Concealment – Unequal Administration Of Justice at paragraph 307

H. Equitable Tolling - Civil RICO Time Bars Are Equitably Tolled By Defendants' Systematic Fraudulent Concealments at paragraph 314

I. Constitutional Issues - Ratified International Treaties Supersede Existing US Law And Supersede Defendant UNITED STATES' Neglect To Prevent at paragraph 322

J. *Denton* and *Nietzke* Mandate Factual Development Of Novel Claims, For *In Forma Pauperis Pro Se* Litigation, Even If Imperfectly Pled at paragraph 331

K.  Congressional Intent - Title 18 RICO Statutes, Title 28 Judicial Proceedings at
     paragraph 334

L.  RICO Associated-In-Fact Enterprise at paragraph 342

Proper understanding of these finer legal points of law and case law are essential to
understanding the legal path to fair and equitable adjudication of these claims.

## A. Limits On Sovereign Immunity Imposed By the Constitution and Congress

255. In their initial set of motions to dismiss, defendant UNITED STATES and other

government defendants will undoubtedly assert sovereign immunity, as will individual

defendants who are current and former public officials. Those sovereign immunity claims might

even prevail in "other circumstances." But those "other circumstances" do not exist in this case,

given the pattern of facts which are developed herein. The pattern of bad faith acts and

conspiracies which comprise the facts of this case demonstrate *prima facie* that these defendants'

extraordinary and profound contempt for Constitutional liberties, which have been and are being

completely overthrown by sweeping invalid assertions of federal executive police powers

supremacy over ALL the "unalienable" rights of this class of plaintiffs.

256. Nor can color of law nor color of legal authority arguments prevail as to either

institutional or individual government officials or employees liability for their bad faith acts and

their conspiracy to commit such bad faith acts. The scope of color of law and color of legal

authority is constrained to reasonable interpretations of law in the context of Constitutional

rights. Our Constitution does not incorporate the legal authority to violate constitutional rights,

nor to claim any right to violate rights which are "unalienable." Imposition of reasonable

constraints on rights for the public safety, and for national security in times of invasion or

rebellion which must be explicitly authorized by Congress, does not extend federal executive

authority to willful, knowing, and perpetuated color of law abuse of constitutional rights, much

less to decades long patterns of associated-in-fact enterprise patterns of racketeering acts and

rights violations which defendant DOJ has and does willfully refuse to criminally prosecute,

which offenses by government officials and employees committed within a tacit permission

structure which directly inculpates defendant DOJ, is employees, and it police powers agencies,

among others. This persistent historical defendant DOJ pattern of "neglect to prevent" is itself a

violation of 42 U.S.C. § 1986 which further compounds the violations of constitutional rights of

these plaintiffs, and piles those additional defendant pattern of "neglect to prevent" failures to act

onto an already overwhelming *prima facie* pattern of facts and failures of justice documented

herein. This is simple public corruption and criminal lawlessness conducted institutionally under

fraudulent concealment. Congress could not constitutionally assent to such an invasion of

individual rights and liberties if it chose to do, which it clearly did not. Nor could the Courts,

which clearly do not.

258. The Constitution itself precludes all functional withdrawals or suspensions of rights

by any branch or level of government in the United States of America, whether by assertion of

state secrets privilege or for any other reason, save one. The only individual right which can be

withdrawn or suspended, and this only by an act of Congress, is found at Article 1 Section 9 of

the Constitution, wherein the right of the writ of habeas corpus can be suspended in times of

"Rebellion or Invasion." No other right can be withdrawn by any act of government.

258. The facts and circumstances under which this complaint arises are the result of acts,

violations, and injuries which originate in illegal federal executive actions, including illegal

BRMT bioweapon and bioweapon delivery system human subject biomedical experiments

extending to torture, and associated-in-fact enterprise patterns of racketeering acts, which have

and do extend across decades and generations against these plaintiffs, all originating in

discrimination against them by their choice and practice of religion, and/or their parents' choice and practice of religion while the plaintiffs themselves were minor children – all perpetrated in great secrecy at vast taxpayer expense by these defendants against at least four generations of plaintiff victims in the case of the Lead Plaintiff's own extended family. This is the exact fact pattern of illegal practice by defendant UNITED STATES and its co-conspirators against the **68 year old Lead Plaintiff from age 12,** and against his extended family of origin and family by marriage, from his grandparents time in the 1950s across at least four generations of these families, with a fifth generation now nearing the age of 12, and doubtless other plaintiffs' families across generations as well.

258A. Further, this pattern has been perpetuated across more than five decades of fraudulent concealment by the knowing, willful, and continuing blindness of defendant DOJ to those acts, violations, and injuries by defendant UNITED STATES and it co-conspirators, including directly by DOJ's own Attorney General, officers, agents, and prosecutors with direct conflicts of personal interest against the greater interests of justice. All these allegations are proven *prima facie* in the Facts section.

## B. Limits On Religious Discrimination Imposed By Congress And Case Law Precedents

259. As required by our Constitution and reenacted by Congress in the 1993 Religious Freedom Restoration Act, defendant UNITED STATES and its governmental co-conspirators must show a compelling governmental interest to balance its impositions on these plaintiffs which legally justifies its persistent and continuing prejudicial and discriminatory acts, violations, and injuries to their religious freedom, to their other unalienable rights, and in the associated-in-fact enterprise pattern of racketeering acts which it and co-conspirators conduct against them. It can make no such showing (emphasis added):

### 42 U.S. Code § 2000bb - Congressional findings and declaration of purposes

(a) Findings

The Congress finds that—

(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution; (2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

(3) governments should not substantially burden religious exercise without compelling justification;

(4) in *Employment Division v. Smith*, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

(b) Purposes

The purposes of this chapter are—

(1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

### 42 U.S. Code § 2000bb–1 - Free exercise of religion protected

(b) Exception - Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

259A. In *Sherbert v. Verner*, 374 U.S. 398 (1963) cited above at 42 U.S.C. §

2000bb(b)(1), the Supreme Court found no compelling state interest in denying eligibility for

unemployment compensation after the appellant was terminated for refusal to work as required

by the employer on her sabbath and with no alternative work schedule available from any

employer in the area which accommodated this religious practice.

259B. In *Wisconsin v. Yoder*, 406 U.S. 205 (1972) cited above at 42 U.S.C. §

2000bb(b)(1), the Supreme Court found no compelling state interest that children attend public

school beyond the eighth grade which attendance is in direct opposition to religious beliefs

regarding public education and the proper preparation of children for adulthood within the Old Order Amish religion and the Conservative Amish Mennonite Church religious communities.

### No Compelling Governmental Interest In Criminal And Civil Violations Of Rights And Law By Defendant UNITED STATES Nor Its Governmental Co-Conspirators

259C. In the matter at hand in this litigation, which arises out of religious discrimination against the Lead Plaintiff as a minor child and members of his extended family in a Quaker-based religious group, there is no legally sustainable compelling governmental interest nor any least restrictive means by which the violation of unalienable rights (*First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth)* nor the violation of any federal statute established by Congress at 42 USC Chapter 21, 21A, 21B, 18 U.S.C. §§ 175, 1961-1968, among other federal statutes and ratified treaties which are cited at paragraph 251, nor of the myriad state statutes cited at paragraphs 801-854 which can be constitutionally authorized under 5 U.S.C. § 301 Administrative Procedure (paragraph 260 immediately below). These defendants, in particular defendants UNITED STATES and its departments and agencies, can offer no plausible defense for their color of law abuse of the state secrets privilege and police powers exemptions to fraudulently conceal under color of law their decades long pattern of associated-in-fact enterprise pattern of racketeering acts and persistent pattern of civil rights acts, violations, and injuries. Plaintiffs are compelled to bring to this court as a civil matter as a result of defendant UNITED STATES' own willful blindness to its own pattern of practices and those of its co-conspirators in their associated-in-fact enterprise of racketeering acts and violations of unalienable rights, as at paragraph 550-584.

### C. Limits On State Secrets Privilege Imposed By Congress And Case Law Precedents

260. Defendant UNITED STATES is not entitled, nor are other defendants entitled to, any valid assertion of "state secrets" privilege, nor to "absolute" or "qualified" immunity for bad faith acts which violate federal laws. Defendants' sophisticated legal institutional knowledge precludes any assertion that these tacitly permitted institutional patterns of practice, (which have never been prosecuted by defendant DOJ for the criminal deprivations and conspiracies against rights they actually are under 18 U.S.C. §§ 241, 242) are legitimate defenses within their constitutionally limited legal scopes of authority. The utter invalidity of any assertion of "Government privilege against court-ordered disclosure of state and military secrets," against unalienable constitutional rights is clear and transparent in *United States v. Reynolds*, 345 U.S. 1, 12 (1953), at (emphasis added):

> "[Footnote 4] 5 U.S.C. 22: "The head of each department is authorized to prescribe regulations, **not inconsistent with law,** for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it."

Footnote 4 above in *Reynolds* cites 5 U.S.C. § 22, has been superseded by 5 U.S.C. § 301, deleting the phrase "not inconsistent with law." The stipulated reason for this change to Administrative Procedure, as shown in the last two lines of Interline Exhibit 2 below, is: "The words "not inconsistent with law" are omitted as surplusage as a regulation which is inconsistent with law is invalid."

[Intentionally left blank.]

*Interline Exhibit 2*: **Administrative Procedures Act Limitations – State Secrets**

5 U.S.C.
United States Code, 2020 Edition
Title 5 - GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I - THE AGENCIES GENERALLY
From the U.S. Government Publishing Office, www.gpo.gov

# PART I—THE AGENCIES GENERALLY

| Chap. | | Sec. |
|---|---|---|
| 1. | Organization | 101 |
| 3. | Powers | 301 |
| 5. | Administrative Procedure | ¹ 501 |
| 6.² | The Analysis of Regulatory Functions | 601 |
| 7. | Judicial Review | 701 |
| 8. | Congressional Review of Agency Rulemaking | 801 |
| 9. | Executive Reorganization | 901 |

## SUBCHAPTER I—GENERAL PROVISIONS

EDITORIAL NOTES

AMENDMENTS

2019—Pub. L. 115–435, title I, §101(a)(1), Jan. 14, 2019, 132 Stat. 5529, inserted subchapter heading.

### §301. Departmental regulations

The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 379.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| | 5 U.S.C. 22. | R.S. §161. Aug. 12, 1958, Pub. L. 85–619, 72 Stat. 547. |

The words "Executive department" are substituted for "department" as the definition of "department" applicable to this section is coextensive with the definition of "Executive department" in section 101. The words "not inconsistent with law" are omitted as surplusage as a regulation which is inconsistent with law is invalid.

Source: https://www.govinfo.gov/content/pkg/USCODE-2020-title5/html/USCODE-2020-title5-partI.htm

Neither the Constitution, nor the laws, nor regulations made in conformance with "may prescribe regulations," provides any authority to act outside clear legal authority and/or outside

constitutional constraints. It is an absurd and incoherent legal argument to claim color of law or

color of legal authority as valid constitutional authority while defendants have and do act in bad

faith and persistently act outside legal authority, whether or not these bad faith acts have been or

are concealed behind any claim of state secrets privilege, when clearly acting against valid

assertions of constitutional rights. 5 U.S.C. § 301 is clear. The perpetual failure of defendant DOJ

in its persistent historical pattern of violations of rights, its violations of statute, and its

simultaneous "neglect to prevent" these violations and those of other executive departments by

failing in its duty to pursue and prosecute executive branch violations of law when they fall

within its self-decreed historical tacit permission structure of persistent and well-documented

violations of constitutional rights, and when it has proposed no solution, only official silence as

its administrative remedy to repeated complaints, is an aggravating injury under 42 U.S.C. §§

1983, 1986, which clearly redounds to the benefit of these plaintiffs. Defendant DOJ's persistent

and durable failure to carry out its constitutional duty to investigate and prosecute specific

persistent patterns of constitutional rights violations perpetrated by several executive branch

departments and agencies, including its own, is not a valid form of consent to that criminal

conduct, which it cannot give, nor to bad faith acts and patterns of bad faith acts by government

officials or employees, which it cannot provide, when it persistently and particularly fails in its

constitutional duty to "establish justice," the paramount constitutional objective of the

department under Article II. There can be no such refuge or safe harbor for federal executive

branch violations of our Constitution and federal law, nor for conspiracy or complicity with state

or local governments who act in conspiracy with those federal executive branch departments and

agencies, else we have no Constitution at all. As repeatedly cited in *Nixon v. Fitzgerald,* 457 U.S.

731 (1982), which holds for Presidential absolute immunity for official acts, Congress provides

explicit rights of civil action for specific injuries (*id.* at 747, and at Footnote 27). For persistent

patterns of injuries wherein no alternative remedy exists or is administratively proposed, and no

special relationship exists, *Bivens* provides for civil relief, paragraphs 277-297.

261.  The BRMT bioweapon and bioweapon delivery system has and does violate (i) 18

U.S.C. § 175 (prohibiting bioweapons and bioweapon delivery system), (ii) 18 U.S.C. § 178(2)

(creating a toxin in humans), (iii) 18 U.S.C. § 1385 (posse comitatus, as orchestrated events

resulted in the lodging of Jeanette (a soldier) under fraudulent concealment in both personal

residence and in family life). The illegal BRMT bioweapon and bioweapon delivery system is an

offensive weapon system deployed directly against US persons using military assets and

personnel to conduct illegal human biomedical experiments. The operation of military-controlled

technology components of the illegal BRMT bioweapon delivery system, (iv) is a *prima facie*

violation of the *Convention on the Prohibition of the Development, Production and Stockpiling*

*of Bacteriological (Biological) and Toxin Weapons and on Their Destruction,* and (v) violates

the *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or*

*Punishment,* as it has been and is used in violation of 18 U.S.C. § 2340 (torture).

262.  The profound hypocrisy and unquestionable legal invalidity of any assertion of

"state secrets" privilege under *United States v. Reynolds*, 345 U.S. 1 (1953), is transparently

obvious based upon defendant UNITED STATES' comprehensive and systematic associated-in-

fact enterprise of racketeering acts, violations, and injuries over more than fifty-six years in

conspiracy with state, local and foreign governments and other actors.

263. Defendant UNITED STATES promulgated, negotiated, and proclaimed to all the

nations and peoples of the earth in a three capitals (Washington, DC, London, Moscow) global

signing ceremony in 1972, then duly ratified and signed into law on January 22, 1975, the

*Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*, making this treaty "the supreme law of the land" (Constitution, Article VI, clause 2) as the federal executive simultaneously has and does engaged in a secret duplicitous campaign to develop, deploy, and operate the very form of illegal bioweapon and bioweapon delivery system which it and other nations explicitly agreed to prohibit by this treaty.

264. The versions of the technologies used in the prohibited BRMT bioweapon delivery system are themselves undoubtedly classified as Top Secret. But these same technologies are also commonly used in military, intelligence, and ordinary commercial operations for other purposes. There is no need for this Court to command disclosure of detailed technical specifications, nor for any alternative and legally permissible operational purposes or uses to be disclosed, if there are such for an internationally prohibited weapon and weapon delivery system.

265. Slightly less sophisticated versions of each and every technological element of the illegal BRMT bioweapon and bioweapon delivery system – including its supercomputers, software, artificial intelligence, precision location, predictive analytics, satellite communication, and operationalization technologies - are found in various commercial applications of these same technologies, and in other unclassified uses by governments around the world. Commercial FDA approved medical systems which are analogous to BRMT's individually addressable pulsed energy bioweapon system operate in beneficial medical applications. The principles of applied neuroscience, biology, and medicine used in the illegal BRMT bioweapon and bioweapon delivery system are used daily in common, peaceful commercial operations from shipping to farming to medical devices, and for entertainment and information access purposes by people around the world.

266. Analogous lethal weapons systems which use these same technologies are also currently in use in offensive operations by defendants CIA and military services - to operate drones, fire missiles, and effect other lethal consequences against targets under the world-wide authority of the 2001 authorization for the use of military force Pub. L. 107-40 adopted September 18, 2001. So, actual technical details and specifications of all these elements of the illegal bioweapon and bioweapon delivery system, which would or might compromise other valid national security operations and systems, need not be disclosed. Such an assertion of state secret privilege over Constitutional rights in light of defendant DOJ's profound and persistent failure to enforce 18 U.S.C. § 175 since treaty adoption in 1975, would be specious, outrageous, and for the sole purpose of evasion of accountability for more than five decades executive branch scofflaw conduct by defendant UNITED STATES in violations of 18 U.S.C. § 1961-1968, among the myriad other constitutional rights, treaty, and federal statutory violations cited at paragraph 251, and the myriad state law violations cited at paragraphs 801-854.

## D. Limits On Absolute And Qualified Individual State Secrets Immunity Imposed By Congress And Case Law Precedents

267. These individual defendants are not entitled to any valid assertion of "state secrets" privilege protection, nor to valid assertion of "qualified immunity," as defenses, as all these bad faith acts, violations, and injuries were undertaken under color of law by these defendants in their ordinary, daily, and self-proclaimed scope of agency, despite their sophisticated legal institutional knowledge that these institutionally tacitly permitted patterns of practice have been and are well outside their Constitutional and legal scopes of authority, as discussed at paragraph 260.

267A. On January 13, 1988, the Supreme Court held in *Erwin v. United States* 484 US 292 (1988):

"Conduct by federal officials must be discretionary in nature, as well as being within the scope of their employment, before the conduct is absolutely immune from state law tort liability. *See Doe v. McMillan,* 412 U. S. 306. Granting absolute immunity for nondiscretionary functions would not further the official immunity doctrine's central purpose of promoting effective government by insulating the decision making process from the harassment of prospective litigation which could make federal officials unduly timid in carrying out their duties. The threat of tort liability cannot detrimentally inhibit conduct that is not the product of independent judgment, and it is only when officials exercise decision making discretion that potential liability may shackle the fearless, vigorous, and effective administration of governmental policies. Petitioners' alternative argument that the discretionary function requirement is satisfied if the precise conduct of the federal official is not prescribed by law and the official exercises "minimal discretion" is rejected......"

267B. Congress then again modified civil litigation immunity, with the November 18,

1988 signing of PL 100-694, the Westfall Act, which explicitly mandates at 28 U.S.C. §

2679(b)(2) that there is no statutory authority for individual absolute or qualified immunity

against constitutional and statutory civil claims, as follows

" (2) Paragraph (1) does not extend or apply to a civil action against an employee of the Government—(A) which is brought for a violation of the Constitution of the United States, or (B) which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized."

267C. From November 18, 1988, the conduct of, among others, judicial officials, is

subject to 28 U.S.C. § 2679(b)(2), as these officials are among the individual defendants who

meet the statutory definition of "employee of the Government" defined at 28 U.S.C. § 2671,

(emphasis added):

"As used in this chapter and sections 1346(b) and 2401(b) of this title, the term "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

"Employee of the government" includes (1) officers or employees of any federal
agency, members of the military or naval forces of the United States, members of
the National Guard while engaged in training or duty under section 115, 316, 502,
503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an
official capacity, temporarily or permanently in the service of the United States,
whether with or without compensation, and (2) any officer or employee of a Federal
public defender organization, except when such officer or employee performs
professional services in the course of providing representation under section 3006A
of title 18."

268. Congress further explicitly provided for individual liability of government officials

and employees at 28 U.S.C. § 2680 Exemptions (emphasis added):

"The provisions of this chapter and section 1346(b) of this title shall not apply to (the
following tort claims) —

(h) Any claim arising out of assault, battery, false imprisonment, false arrest,
malicious prosecution, abuse of process, *libel, slander, misrepresentation, deceit, or
interference with contract rights*:

Provided, That, with regard to acts or omissions of investigative or law enforcement
officers of the United States Government, the provisions of this chapter and section
1346(b) of this title shall apply to any claim arising, on or after the date of the
enactment of this proviso, out of assault, battery, false imprisonment, false arrest,
abuse of process, or malicious prosecution. For the purpose of this subsection,
"investigative or law enforcement officer" means any officer of the United States
who is empowered by law to execute searches, to seize evidence, or to make arrests
for violations of Federal law."

Claims and actions against governmental officials as individual defendants for *libel, slander,*

*misrepresentation, deceit, or interference with contract rights* are thus also explicitly permitted

to proceed under other federal and state statutes cited herein for each such claim in paragraphs

801-854, as such claims are at 28 U.S.C. §2679(b)(2) above, for *constitutional rights acts,*

*violations, and injuries.*

269. These individual defendants, some of whom have and do hold police powers roles as

officers, agents, and/or prosecutors, have relied instead on the tacit permission structure which

has arisen due to defendant DOJ's purposeful and negligent willful blindness and persistent

failures to criminally prosecute broad patterns of violations of 18 U.S.C. §§ 241, 242, and other applicable criminal laws, in these same institutional patterns of practice, which are also well documented by Congressional investigations and the Courts (paragraph 308-309, LPEE pages 6885-7466).

269A. These individual defendants and other defendants appeared to Lead Plaintiff and to other plaintiffs, in well disguised roles while engaging in joint and several bad faith acts well beyond their legal scope of authority, some with legal educations as well as direct knowledge of the laws and ratified treaties they were acting to violate. The individual defendants in this case posed, without limitation, as these plaintiffs' friends, neighbors, employers, prospective employers, employees, investors, legal counsel, co-owners, family members, medical providers, and in a wide variety of other roles, while pursuing their associated-in-fact enterprise patterns of racketeering acts, rights violations, and other bad faith acts, violations, and injuries, and have and do perpetuate subjugation in involuntary servitude and forced labor of the entire class while acting illegally against law fraudulently concealed by illegal use of the "state secret" privilege.

270. The Constitution, law, and case law all require that government regulations, individual acts, and long running patterns of acts, of individual officers, agents, employees, contractors, and other co-conspirators, be performed in a good faith manner which is "not inconsistent with law" *United States v. Reynolds* (1953), at Footnote 4 citing 5 U.S.C. § 22, as discussed in paragraph 260. These mandatory obligations under law pertain directly to defendants' individual liability for color of law abuses within the "state secrets" sphere and trump any claims of absolute or qualified immunity they may assert. The Attorney General or another government may defend such a suit only when an individual defendant officer or employee is acting within the scope of his office or employment and the suit is brought under 28

U.S.C. §§ 2671-2680. This litigation is brought under other federal and state statutes including, without limitation 42 U.S.C. Chapter 21 Civil Rights, and 18 U.S.C. §§ 1961-1968 Racketeering, as described herein, so these individual defendants are not entitled to be defended by defendant UNITED STATES nor by any other governmental defendant hereto and must therefore defend themselves by their own means.

271. There is no other authority in the Constitution for Congress to act to abridge rights, so Congress could not act to offer any government official or employee any such authority to abridge rights so as to surreptitiously detain, enroll as an involuntary servant, and/or injure any US person or any of their rights, absent due process of law. Congress has not offered any federal officer any exemption from individual liability for these joint and several abridgments nor for any institutional pattern of abridgements of Constitutional rights and law. Rather, Congress has done quite the opposite as at, without limitation, 28 U.S.C. § 2679(b)(2) which clearly establishes Individual Liability For Constitutional and Statutory Violations, at 42 U.S.C. Chapter 21 Civil Rights including permitting actions for neglect to prevent, and at 18 U.S.C. §§ 1961-1968 Racketeering, where direct and specific statutory liability is found for any "person," as that word is broadly defined therein. The Supreme Court has repeatedly affirmed rights under law in *Bivens, Harlow, Butz, Carlson, Hui, Rotella, Arellano*, and *Reynolds*, as discussed herein. Other federal court decisions apply these same principles equally and equitably to all including, without limitation, state and local police powers offenders and all others who act against rights, in accordance with 28 U.S.C. § 1652 and other statutes.

### E. Absolute And Qualified Immunity Precedents In Case Law Answered By Congressional Intent In November 1988 At 28 U.S.C. § 2679(b)(2)

272. Absolute immunity from civil lawsuits for the President, judges, and prosecutors,

and for administrative judges and prosecutors, was defined in *Stump v. Sparkman*, 435 U.S. 349

(1978), provided such acts are within the outer boundary of their discretionary authority:

> "(a) A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority, but, rather, he will be subject to liability only when he has acted in the "clear absence of all jurisdiction," *Bradley v. Fisher*, 13 Wall. 335, 80 U. S. 351. Pp. 435 U. S. 355-357."
>
> .................
>
> (d) The factors determining whether an act by a judge is "judicial" relate to the nature of the act itself (whether it is a function normally performed by a judge) and the expectation of the parties (whether they dealt with the judge in his judicial capacity), and here, both of these elements indicate that the Circuit Judge's approval of the sterilization petition was a judicial act, even though he may have proceeded with informality. Pp. 435 U. S. 360-363."

272A. Discretionary immunity doctrine applied this immunity to the policy making role.

Even then, it did not include persistent broad gauge durable non-discretionary acts, such as these

defendants' institutional failures to implement their own policy promulgated under 5 U.S.C. §

301 Administrative Procedures and under other statutes prescribed by Congress, as cited in this

complaint. Neither the Constitution, nor the framers themselves, intended that discretionary

immunity be used as the sword and shield for persistent decades long failures to implement

statutes and/or consistently and equitably apply departmental policy, in service of the self-

interest of individual government officials nor any agency or department. Defendant DOJ's

generations-long willful refusals to prosecute, and to continuously permit, violations of

constitutional and statutory rights are not a discretionary function, nor a constitutional or lawful

application of immunity doctrine, they are self-interested public corruption.

272B. On January 13, 1988, the Supreme Court held in *Erwin v. United States* 482 US

292 (1988) (emphasis added):

"Conduct by federal officials must be discretionary in nature, as well as being within
the scope of their employment, before the conduct is absolutely immune from state
law tort liability. *See Doe v. McMillan,* 412 U. S. 306. Granting absolute immunity for
nondiscretionary functions would not further the official immunity doctrine's central
purpose of promoting effective government by insulating the decision making
process from the harassment of prospective litigation which could make federal
officials unduly timid in carrying out their duties. The threat of tort liability cannot
detrimentally inhibit conduct that is not the product of independent judgment, and
it is only when officials exercise decision making discretion that potential liability
may shackle the fearless, vigorous, and effective administration of governmental
policies. Petitioners' alternative argument that the discretionary function
requirement is satisfied if the precise conduct of the federal official is not prescribed
by law and the official exercises "minimal discretion" is rejected......"

272C. The Supreme Court also dealt with this set of personal immunity and liability

issues for bad faith acts under color of law while in an official role in *Harlow v. Fitzgerald*, 457

U.S. 800 (1982). "Absolute immunity" pertains to official acts broadly defined within the

Constitutional scope of duties of certain specific federal officers, the President, judges,

prosecutors, and administrative adjudicators with comparable roles to judges and prosecutors.

But the Supreme Court has not mandated "absolute immunity" for either out of scope or bad

faith acts. Neither a President nor a FBI agent can escape legal consequences for consenting to a

murder or robbing a bank, for example, as discussed at paragraph 260. A judge cannot escape

legal consequences for accepting a bribe, and so forth. These acts must be within the outer

bounds of constitutional and statutory authority. *Harlow* speaks on "absolute immunity" as

follows:

"Government officials whose special functions or constitutional status requires
complete protection from suits for damages – including certain officials of the
Executive Branch, such as prosecutors and similar officials, see *Butz v. Economou*,
438 U. S. 478, and the President, *Nixon v. Fitzgerald*, ante p. 457 U. S. 731 – are
entitled to the defense of absolute immunity. However, executive officials in general
are usually entitled to only qualified or good faith immunity. The recognition of a
qualified immunity defense for high executives reflects an attempt to balance
competing values: not only the importance of a damages remedy to protect the

rights of citizens, but also the need to protect officials who are required to exercise
discretion and the related public interest in encouraging the vigorous exercise of
official authority. *Scheuer v. Rhodes*, 416 U. S. 232. **Federal officials seeking
absolute immunity from personal liability for unconstitutional conduct must
bear the burden of showing that public policy requires an exemption of that
scope.** Pp. 457 U. S. 806-808."

Congress made its intent clear in November 1988 at 28 U.S.C. §2679(b)(2), paragraphs 267-269,

explicitly permitting individual defendant liability for constitutional and statutory violations,

even as to "absolute immunity."

273. "Qualified immunity" is a valid affirmative defense only if articulated by

government officials and employees, including officers, agents, and other employees, in good

faith acts. In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court clearly articulated

the standard which defendants must meet to validly claim "qualified immunity" *id.* at 815, IV B:

"Qualified or "good faith" immunity is an affirmative defense that must be pleaded
by a defendant official. Gomez v. Toledo, 446 U. S. 635 (1980). [Footnote 24]
Decisions of this Court have established that the "good faith" defense has both an
"objective" and a "subjective" aspect. The objective element involves a presumptive
knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v.
Strickland,* 420 U. S. 308, 420 U. S. 322 (1975). The subjective component refers to
"permissible intentions." Ibid. Characteristically, the Court has defined these
elements by identifying the circumstances in which qualified immunity would not be
available. Referring both to the objective and subjective elements, we have held that
**qualified immunity would be defeated if an official "knew or reasonably
should have known that the action he took within his sphere of official
responsibility would violate the constitutional rights of the [plaintiff], or if he
took the action with the malicious intention to cause a deprivation of
constitutional rights or other injury. . . ."**

**Butz v. Economou, 438 U. S. 478 (1978)**

274. In *Butz v. Economou*, 438 U. S. 478 (1978) the Supreme Court again held that

absolute immunity requires acting within scope of duties:

"Federal officials should enjoy no greater zone of protection when they violate
federal constitutional rules than do state officers."

275. The fact pattern herein is of various defendants who have and do act well outside any conceivable good faith interpretation of their roles in police powers or other valid governmental operations. As but one example of defendants' bad faith personal conduct, among the myriad such examples in the Facts section herein, over the course of more than fifty-six years of surreptitious acts and injuries directed at one single plaintiff, the Lead Plaintiff:

(i) Defendant CALDWELL (who later became Assistant Attorney General for the Criminal Division of defendant DOJ) while a defendant DOJ prosecutor, participated directly in a complex illegal FBI business wrecking and financial entrapment scheme against the Lead Plaintiff which was intended, among other things, to avoid exposing both the federal agent posing as supposed co-owner PRAY, in Lead Plaintiff's private enterprise, Allegent, LLC, and to fraudulently conceal the nature and federal institutional identity of the perpetrator of the associated-in-fact enterprise racketeering acts in the $82,000 bad check fraud against Lead Plaintiff's company Allegent, LLC (KURGAN, FBI, acting through ShipNow, a corporation chartered in the British Virgin Islands). CALDWELL pretended to be an intellectual property attorney at the law firm Seed & Berry, Seattle, Washington, representing the Lead Plaintiff's business Allegent, LLC in 2004. While in this role, defendant CALDWELL actively worked to dissuade the Lead Plaintiff from pursuing this $82,000 intellectual property theft of services claim against that bogus defendant FBI entity, ShipNow. Further details of these interferences with legal rights and in interstate commerce are at paragraphs 639, 644, 649, 670, 679 RICO – 1, 6, 11, 32, and 41.

276. Congress made its intent clear in November 1988 at 28 U.S.C. §2679(b)(2),
paragraphs 267-269, explicitly permitting individual defendant liability for constitutional and
statutory violations, even as to "absolute immunity." To claim to represent the business and
property interests of Lead Plaintiff's company (Allegent, LLC) as it was unwittingly co-owned
by Lead Plaintiff with an unknown federal agent, defendant Darrell PRAY, while preying upon
the Lead Plaintiff, defendant CALDWELL, while an Assistant U.S. Attorney from Northern
California in 2004 (who also worked with defendant WEISSMAN at various times in other
places), as a knowing and willing participant in a federal scheme and conspiracy to deprive rights
and property, acted well outside any reasonable interpretation of the scope of any defendant DOJ
prosecutor's duties. To claim such acts are within the scope of absolute immunity for a
prosecutor is equivalent to designating a federal police powers agent or officer as acting within
their scope of duties when that agent or officer commits a bank robbery, by arguing that the
agency which employs them has primary jurisdiction over banks and banking related crimes.
CALDWELL explicitly contravened her duty of fidelity to the Constitution and law in depriving
the Lead Plaintiff of rights as part of this conspiracy. These acts and conspiracies, defrauding US
persons and their private businesses, are nowhere to be found within the extreme outer perimeter
of the scope of duties of a U.S. Attorney as defined at 28 U.S.C. § 547 and *Imbler v. Pachtman,*
424 U.S. 409 (1976). Such individual defendants are subject to civil liability under 28 U.S.C. §
2679(b)(2).

276A. Attorney General Alberto Gonzales conducted a similar evasion on behalf of
defendant ROSENBERG, formerly assigned to defendant FBI's Seattle field office as the
illegally embedded NutraSource CEO, by naming him acting U.S. Attorney for the Southern
District of Texas in June 2005-March 2006. This temporary appointment was effective

immediately after the forced sale of Lead Plaintiff's residence on May 26, 2005, which forced

sale had assured Lead Plaintiff's subsequent human trafficking orchestrated by defendant

ROSENBERG would occur. Lead Plaintiff was then being human trafficked by defndants FBI

and ROSENBERG from the torture and racketeering acts sequence in Kirkland, WA, between

2002 and 2005 to Boston, MA, paragraphs 490-520, 809. Attorney General Gonzales used this

maneuver again with defendant ROSENBERG's Senate confirmation as the U.S. Attorney for

the Eastern District of Virginia from June 2006 to October 2008, as Lead Plaintiff was being

human trafficked yet again from Boston, MA in August 2007 for fraudulent employment by

defendant ROSENBERG at defendant ESTABLISH in Fort Lee, NJ until June 2008. The

simultaneous Cliffside Park, NJ captive apartment residency was orchestrated by defendants

UNITED STATES, FBI, ROSENBERG, and CHALOM, removing him from the Pine Street Inn,

Dorchester Heights, Boston, MA homeless shelter. Defendant CHALOM, acting as the Cliffside

Park, NJ apartment landlord, represented himself as previously a television producer of "3-2-1

Contact" biographical interviews of famous people, and together with defendants ROSENBERG,

FBI, USMS, and CIA, orchestrated the trafficking to the Cliffside Park, NJ apartment where the

defendant UNITED STATES specially modified cable television set up with embedded fiber

optic camera were placed in defendants' conspiracy to record the surreptitious salacious

defamatory 2008 video of Lead Plaintiff with defendant MODDERMAN at that residence. This

sequence transpired shortly before the false June 2008 Pankowski wedding where defendant

ROSENBERG appeared with other defendant UNITED STATES (DOJ, FBI, USMS, CIA)

undercover personnel from defendant ESTABLISH, paragraphs 603 NSEC-4, 611 HEXP-8. A

comparable pattern was repeated against the still unwitting Lead Plaintiff in 2020 with GIA,

paragraph 613 HEXP-10, after Lead Plaintiff was trafficked into the midst of the early stages of

the Senator Menendez investigation by defendant UNITED STATES, FBI in November 2018 (paragraph 301).

276B. These acts and conspiracies including, without limitation, organizing and videoing salacious sex scenes for distribution without consent, are nowhere to be found within the extreme outer perimeter of the constitutionally and legally defined scope of duties of an Attorney General as defined at 28 U.S.C. § 509, nor of a U.S. Attorney as defined at 28 U.S.C. § 547, nor under *Imbler v. Pachtman,* 424 U.S. 409 (1976), which provides absolute immunity for actions "within the scope of his duties," *id.* at 420, 423. These three examples here at paragraphs 276A and 276B are representative of acts, violations, and injuries to this class of plaintiffs, and of other such claims described herein, through both the bad faith acts of defendant DOJ and these individual defendants, who have and do conspire to participate in these acts, violations, and injuries, which are representative of color of law abuses of federal law 28 U.S.C. § 547 and 5 U.S.C. § 301. Defendant DOJ has and does engage in these corrupt durable pattern of acts, violations, and injuries to US persons for the purpose of fraudulently conceal its own role in endemic conspiracies and corruption which are formed, managed, and operated in an associated-in-fact enterprise pattern of racketeering acts which violate 18 USC 1961-1968, and are fraudulently concealed with color of law abuse of the state secret privilege. Defendant DOJ has and does perpetrate such acts, violations, and injuries, together with other federal department and agency defendants including, without limitation, defendants CIA, ARMY, DOD, ROSEBERG, and WEISSMAN throughout this conspiracy to fraudulently conceal violations of 18 U.S.C. § 175 which is the principal originating offense against these plaintiffs since at least the 1960s. Congressional intent that there be individual liability for such out of scope acts from November 1988 is clear at 28 U.S.C. § 2679(b)(2) which delineates that systematic patterns of constitutional

rights violations and accompanying associated-in-fact patterns of racketeering acts which transpire in color of law abuses of our constitution and laws across decades, are not within any conceivable scope of duties of any government official, even one who enjoys, and systematically abuses, the discretionary privilege of absolute immunity.

### F. Bivens Special Factors and Alternative Remedy Immunity Claims Are Defeated By Facts And By Defendant UNITED STATES Failures To Act

277. There is yet another clear path provided by Congress, by the Supreme Court, and by state statutes, to finding individual liability for each and all the individual defendants in this case. Together with 28 U.S.C. § 2679(b)(2), *Bivens* guides this particular path, as these are not good faith acts, whether they are (i) illegal BRMT bioweapon and bioweapon delivery system offenses, (ii) racketeering offenses, or (iii) other injuries and offenses, while acting under color of law. Under *Bivens* each of these individual defendants is individually and personally liable, as identified herein and through the discovery process, for their actions, jointly and severally, which have injured these plaintiffs. The Supreme Court has made this principle plain and obvious. Justice Brennan wrote for the Court on the seizing of a person absent the basic principles of due process under the Fourth Amendment in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 392, 397 (1971):

> ......at 392
> "Accordingly, as our cases make clear, the Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen. It guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority. And 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.' *Bell v. Hood*, 327 U.S., at 684, 66 S.Ct., at 777 (footnote omitted); see *Bemis Bros. Bag Co. v. United States*, 289 U.S. 28, 36, 53 S.Ct. 454, 457, 77 L.Ed. 1011 (1933) (Cardozo, J.); *The Western Maid*, 257 U.S. 419, 433, 42 S.Ct. 159, 161, 66 L.Ed. 299 (1922) (Holmes, J.).

......at 397

"'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.' *Marbury v. Madison*, 1 Cranch 137, 163, 2 L.Ed. 60 (1803). Having concluded that petitioner's complaint states a cause of action under the Fourth Amendment, supra, at 390— 395, we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment."

### Carlson v. Green, 446 U. S. 14, 18-20 (1980)

278. *Carlson v. Green*, 446 U. S. 14, 18-20 (1980) establishes the validity of the claims

herein against these individual defendants:

"*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right. Such a cause of action may be defeated in a particular case, however, in two situations. The first is when defendants demonstrate "special factors counseling hesitation in the absence of affirmative action by Congress." 403 U.S. at 403 U. S. 396; *Davis v. Passman*, 442 U. S. 228, 442 U. S. 245 (1979). The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective. *Bivens*, supra at 403 U. S. 397; *Davis v. Passman*, supra at 442 U. S. 245-247.

"Neither situation obtains in this case. First, the case involves no special factors counseling hesitation in the absence of affirmative action by Congress. Petitioners do not enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against them might be inappropriate. *Davis v. Passman*, supra at 442 U. S. 246. Moreover, even if requiring them to defend respondent's suit might inhibit their efforts to perform their official duties, the qualified immunity accorded them under *Butz v. Economou*, 438 U. S. 478 (1978), provides adequate protection. See *Davis v. Passman*, supra at 442 U. S. 246.

"Second, we have here no explicit congressional declaration that persons injured by federal officers' violations of the Eighth Amendment may not recover money damages from the agents, but must be remitted to another remedy, equally effective in the view of Congress. Petitioners point to nothing in the Federal Tort Claims Act (FTCA) or its legislative history to show that Congress meant to preempt a *Bivens* remedy or to create an equally effective remedy for constitutional violations. [Footnote 5] FTCA was enacted long before *Bivens* was decided, but when Congress amended FTCA in 1974 to create a cause of action against the United States for intentional torts committed by federal law enforcement officers, 28 U.S.C. § 2680(h), the congressional comments accompanying that amendment made it crystal clear that Congress views FTCA and Bivens as parallel, complementary causes of action:

"[A]fter the date of enactment of this measure, innocent individuals who are subjected to raids [like that in *Bivens*] will have a cause of action against the individual Federal agents and the Federal Government. Furthermore, this provision should be viewed as a counterpart to the Bivens case and its progenty [sic], in that it waives the defense of sovereign immunity so as to make the Government independently liable in damages for the same type of conduct that is alleged to have occurred in *Bivens* (and for which that case imposes liability upon the individual Government officials involved)."

279. So, here is *Bivens* at 396-397 on the above mentioned "special factors counseling

hesitation in the absence of affirmative action by Congress:"

"The present case involves no special factors counseling hesitation in the absence of affirmative action by Congress. We are not dealing with a question of "federal fiscal policy," as in *United States v. Standard Oil Co.*, 332 U. S. 301, 332 U. S. 311 (1947). In that case, we refused to infer from the Government-soldier relationship that the United States could recover damages from one who negligently injured a soldier, and thereby caused the Government to pay his medical expenses and lose his services during the course of his hospitalization. Noting that Congress was normally quite solicitous where the federal purse was involved, we pointed out that "the United States [was] the party plaintiff to the suit. And the United States has power at any time to create the liability." Id. At 332 U. S. 316; see *United States v. Gilman*, 347 U. S. 507 (1954). Nor are we asked in this case to impose liability upon a congressional employee for actions contrary to no constitutional prohibition, but merely said to be in excess of the authority delegated to him by the Congress. *Wheeldin v. Wheeler*, 373 U. S. 647 (1963). Finally, we cannot accept respondents' formulation of the question as whether the availability of money damages is necessary to enforce the Fourth Amendment. For we have here no explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress. The question is merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts. *Cf. J. I. Case Co. v. Borak*, 377 U. S. 426, 377 U. S. 433 (1964); *Jacobs v. United States*, 290 U. S. 13, 290 U. S. 16 (1933).
""The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.""

280. There is no "special relationship" of these ordinary civilian citizen plaintiffs pursing

their normal activities of life to any federal official individually named in this action (see

paragraph 290). There is no military enlistment, no federal employment, nor any reasonable expectation of any such relationship during the periods of these acts, violations, and injuries. None of these conditions of "special relationship" can be reasonably inferred by the existence of a conspiracy against and subjugation of these plaintiffs within a set of malign governmentally planned and funded harms and injuries – to and including involuntary servitude and lethality attempts against them – under any conceivably constitutional government program(s) conducted and supervised by these federal officials and/or their co-conspirator defendants. Individual defendants' willful and perpetuated patterns of acts, violations, and injuries against these plaintiffs preclude any interpretation of any good faith voluntary relationship involving special factors or "special relationships." The bad faith and unconstitutional acts of these defendants stray wildly from any conceivable interpretation of constitutional authority delegated to the federal executive. Defendants have violated the *First, Fourth, Fifth, Eighth, Ninth, Thirteenth,* and *Fourteenth* Amendment rights of the entire class.

281. So, no such "special factors counseling hesitation in the absence of affirmative action by Congress" exist. No "special relationship" prevails. *Bivens* prevails, personal liability attaches to these defendants.

282. *Carlson* at 18 then continues with the second factor which can invalidate a *Bivens* claim of defendants' individual liability:

> "....The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective. *Bivens*, supra at 403 U. S. 397; *Davis v. Passman*, supra at 442 U. S. 245-247.

283. Turning now to the above referenced *Davis v. Passman*, at 442 U. S. 245-247

> "We approach this inquiry on the basis of established law.

"[I]t is . . . well settled that, where legal rights have been invaded and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."

"*Bell v. Hood,* 327 U.S. at 327 U. S. 684. *Bivens,* 403 U.S. at 403 U. S. 396, holds that, in appropriate circumstances, a federal district court may provide relief in damages for the violation of constitutional rights if there are "no special factors counseling hesitation in the absence of affirmative action by Congress." See *Butz v. Economou*, 438 U.S. at 438 U. S. 504.

"First, a damages remedy is surely appropriate in this case. "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens,* supra at 403 U. S. 395. Relief in damages would be judicially manageable, for the case presents a focused remedial issue without difficult questions of valuation or causation. See 403 U.S. at 403 U. S. 409 (Harlan, J., concurring in judgment). Litigation under Title VII of the Civil Rights Act of 1964 has given federal courts great experience evaluating claims for backpay due to illegal sex discrimination. See 42 U.S.C. 2000e-5(g). Moreover, since respondent is no longer a Congressman, see n 1, supra, equitable relief in the form of reinstatement would be unavailing. And there are available no other alternative forms of judicial relief. For *Davis,* as for *Bivens*, "it is damages or nothing." [Footnote 23] *Bivens*, supra at 403 U. S. 410 (Harlan, J., concurring in judgment).

"Second, although a suit against a Congressman for putatively unconstitutional actions taken in the course of his official conduct does raise special concerns counseling hesitation, we hold that these concerns are coextensive with the protections afforded by the Speech or Debate Clause. [Footnote 24] See n 11, supra. If respondent's actions are not shielded by the Clause, we apply the principle that "legislators ought . . . generally to be bound by [the law] as are ordinary persons." *Gravel v. United States*, 408 U. S. 606, 408 U. S. 615 (1972). *Cf. Doe v. McMillan*, 412 U. S. 306, 412 U. S. 320 (1973). As *Butz v. Economou* stated only last Term:

"Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law:"

""No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.' *United States v. Lee*, 106 U.S. [196,] 106 U. S. 220 [(1882)]."

"Third, there is in this case "no explicit congressional declaration that persons" in petitioner's position injured by unconstitutional federal employment discrimination "may not recover money damages from" those responsible for the injury. Bivens, supra at 403 U. S. 397. (Emphasis supplied.) The Court of Appeals apparently interpreted § 717 of Title VII of the Civil Rights Act of 1964, 86 Stat. 111, 42 U.S.C. § 2000e-16, as an explicit congressional prohibition against judicial remedies for those in petitioner's position. When § 717 was added to Title VII to

protect federal employees from discrimination, it failed to extend this protection to congressional employees such as petitioner who are not in the competitive service. [Footnote 26] See 42 U.S.C. § 2000e-16(a). There is no evidence, however, that Congress meant § 717 to foreclose alternative remedies available to those not covered by the statute. Such silence is far from "the clearly discernible will of Congress" perceived by the Court of Appeals. 571 F.2d at 800. Indeed, the Court of Appeals' conclusion that § 717 permits judicial relief to be made available only to those who are protected by the statute is patently inconsistent with *Hampton v. Mow Sun Wong*, 426 U. S. 88 (1976), which held that equitable relief was available in a challenge to the constitutionality of Civil Service Commission regulations excluding aliens from federal employment. That § 717 does not prohibit discrimination on the basis of alienage [Footnote 27] did not prevent Hampton from authorizing relief. In a similar manner, we do not now interpret § 717 to foreclose the judicial remedies of those expressly unprotected by the statute. On the contrary, § 717 leaves undisturbed whatever remedies petitioner might otherwise possess."

284. There is no explicit Congressionally mandated statutory scheme for civil remedy of these individual defendants' knowing, willful, and perpetuated participation in conspiracy in a decades long pattern of violations under color of law of defendants' comprehensive violations of the *First, Fourth, Fifth, Eighth, Ninth, Thirteenth,* and *Fourteenth* Amendment rights of the entire class in deprivation of rights and conspiracy against rights (42 U.S.C. Chapter 21) fraudulently concealed by abuse of the state secrets privilege which these defendants have abused contrary to the "not inconsistent with law" mandate of *United States v. Reynolds* 345 U.S. 1 (1953) [Footnote 4]. There is in fact sustained official silence (paragraphs 298-299) and perpetuated fraudulent concealment (paragraphs 307-313). Congress in enacting the Federal Tort Claims (Westfall) Act "provided an explicit exception for constitutional violations, §2679(b)(2)." *Hui v. Castaneda*, 559 U.S. 799 (2010). This SCOTUS mandate in *Hui* exempts these plaintiffs' constitutional rights violations from the FTCA (Westfall Act) limitations on defendants' individual liability for bad faith acts. This in turn clearly directs these plaintiffs towards the *Bivens* path as a means of resolution of their claims.

285. As with the first factor exempting liability at paragraphs 278-284 above, a "special relationship," which does not exist in the Facts of this case, there is clearly no second factor, any alternative remedy, per *Carlson, id.* at 18:

"an alternative remedy which it explicitly declared to be a substitute for recovery ",

provided by Congress, which would limit individual liability. Rather, as before, personal liability attaches to these defendants, and *Bivens* claims will prevail under 28 U.S.C. § 2679(b)(2).

286. The conduct of these individual defendants has continued against at least four generations of these injured plaintiffs. These plaintiffs were selected by defendants Army, CIA, FBI, DOJ, and others in the federal government for egregious injuries due to the individual plaintiffs' religious beliefs, personal behaviors, sexual orientation, race, ethnicity, and/or personal views. These plaintiffs have been and are coerced, co-opted, defrauded, and/or duped jointly and severally by these individual defendants, acting egregiously and in bad faith outside the scope of their constitutional authority. These individual defendants made conscious decisions to subject these plaintiffs to, without limitation:

      (i) Nazi-style biomedical abuses and human experimentation by BRMT,

      (ii) Lethality attempts ranging from programmed medical collapses to programmed falls down stairs, vehicle rundowns, and international double murder attempts,

      (iii) Psychological abuses in field operations,

      (iv) Repeated entrapment attempts lacking any legal foundation for their initiation or pursuit,

      (v) Financial depredations,

      (vi) Racketeering offenses ranging from frauds to involuntary servitude and human trafficking in interstate commerce,

(vii)        Systematic violations of all forms of human, civil, and Constitutional

rights.

287. Excusing and subsuming the joint and several extra-constitutional conduct of these

individual defendants acting under color of law, and well outside any reasonably contemplated

scope of legal authority which Congress has delegated, much less even plausibly could delegate,

to the executive or to any individual in any capacity, against members of this class of plaintiffs,

vastly exceeds the legal authority of any government department, agency, office, official, or

employee. An institutionally endorsed long-running riot against rights, family life, careers, and

businesses by federal departments, agencies, by state and local governments, by their personnel,

as well as by other bad faith actors, against the "certain unalienable rights" of individuals or

groups of US persons based upon parentage, religious choices, implicit bills of attainder, or any

other unconstitutional means, does not present any pattern of facts other than as what it actually

is – an unconstitutional color of law institutional riot against American citizens. Nor does the

persistent institutional failure of defendant DOJ to criminally prosecute such conduct constitute

any extra-legal privilege to evade civil liability for such acts, violations, and injuries. The

Attorney General or another government may defend such civil litigation against an individual

current or former official only when an individual defendant officer or employee has and does

act within the scope of his office or employment and when the suit is brought under 28 U.S.C. §§

2671-2680. This litigation is against violations of constitutional rights and is brought under other

statutes including, without limitation 42 U.S.C. Chapter 21 Civil Rights, and 18 U.S.C. §§ 1961-

1968 Racketeering. These individual defendants are not entitled to be defended by defendant

DOJ nor by any other governmental defendant hereto and must therefore defend themselves by

their own means.

288. In *Wilkie v. Robbins*, 551 U.S. 537 (2007), the Supreme Court held that *Bivens*

claims are valid for mere employment discrimination in violation of the Due Process Clause.

Defendants have most certainly violated employment rights. But that is but one element of a vast

pattern of rights abuses in their decades long program of involuntary servitude, forced labor, and

forced unemployment in involuntary servitude, facilitated by an enterprise pattern of

racketeering acts and rights violations against Lead Plaintiff, and likely against other members of

the class, as will be demonstrated through the discovery process. Surely, no Court could hold that

a scheme as egregious and depraved as that which has been perpetrated under color of law by

these individual defendants against these plaintiffs could be exempt from individual liability

when mere employment discrimination is subject to a *Bivens* remedy, when no alternative

remedy had been offered by Congress, and when Congress has explicitly permitted such claims

to proceed under 28 U.S.C. 2679(b)(2).

289. In *Hui v. Castaneda*, 559 U.S. 799 (2010) the Supreme Court noted that Congress

has explicitly held this class of individual liability claims against these individual defendants

open for their willful constitutional rights violations, writing (emphasis added):

" (a) The Court's inquiry begins and ends with §233(a)'s text, which plainly
precludes a *Bivens* action against petitioners by limiting recovery for harms arising
from the conduct at issue to an FTCA action against the United States. The breadth
of §233(a)'s words "exclusive" and "any" supports this reading, as does the
provision's inclusive reference to all civil proceedings arising out of "the same
subject-matter." Because the phrase "exclusive of any other civil action" is easily
broad enough to accommodate both known and unknown causes of action, the
Court's reading is not undermined by the fact that §233(a) preceded *Bivens*. The later
enacted Westfall Act further supports this understanding of §233(a). In amending
the FTCA to make its remedy against the United States exclusive for most claims
against Government employees for their official conduct, the Westfall Act essentially
duplicated §233(a)'s exclusivity language, 28 U. S. C. § 2679(b)(1), **but provided an
explicit exception for constitutional violations, §2679(b)(2).** This shows that
Congress did not understand the exclusivity provided by §2679(b)(1)—or the
substantially similar §233(a)—to imply such an exception. Pp. 5–7"

290. Writing in *Egbert v. Boule,* 596 U.S. ___ (2022), Justice Thomas cites eleven cases

which limit *Bivens* claims:

> "In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), this
> Court authorized a damages action against federal officials for alleged violations of
> the Fourth Amendment. Over the past 42 years, however, we have declined 11 times
> to imply a similar cause of action for other alleged constitutional violations. See
> Chappell v. Wallace, 462 U.S. 296 (1983); Bush v. Lucas, 462 U.S. 367 (1983); United
> States v. Stanley, 483 U.S. 669 (1987); Schweiker v. Chilicky, 487 U.S. 412 (1988); FDIC
> v. Meyer, 510 U.S. 471 (1994); Correctional Services Corp. v. Malesko, 534 U.S. 61
> (2001); Wilkie v. Robbins, 551 U.S. 537 (2007); Hui v. Castaneda, 559 U.S. 799 (2010);
> Minneci v. Pollard, 565 U.S. 118 (2012); Ziglar v. Abbasi, 582 U. S. ___ (2017);
> Hernández v. Mesa, 589 U. S. ___ (2020)."

291. Taking the relationship of those plaintiffs to those defendants each in turn exposes

the "special factors" and Congressional specification of "alternative remedy" (which are the two

specific tests required to claim exemption from *Bivens* claims for individual liability of

government officers and employees in *Carlson v. Green,* 446 U. S. 14, 18-20 (1980) discussed at

paragraph 278, 282). All these eleven cases involve one or both the aforementioned special

factors which permit exemption from personal liability:

1. *Chappell v. Wallace*, 462 U.S. 296 (1983) – Navy enlisted man against superior officers

2. *Bush v. Lucas*, 462 U.S. 367 (1983) – NASA employee against NASA supervisor

3. *United States v. Stanley*, 483 U.S. 669 (1987) – Army enlisted man against Army
   superior officers

4. *Schweiker v. Chilicky*, 487 U.S. 412 (1988) – US person improperly denied government
   benefits against state and federal policymakers

5. *FDIC v. Meyer*, 510 U.S. 471 (1994) – Bank officer terminated in FSLIC/FDIC takeover
   of failing savings and loan against government agency

6. *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) – Prisoner in federally contracted private prison contesting medical treatment

7. *Wilkie v. Robbins*, 551 U.S. 537 (2007) – US person, private property, and an openly contested factual dispute over an easement grant with BLM

8. *Hui v. Castaneda*, 559 U.S. 799 (2010) – Illegal alien in government detention facility over medical treatment denied by USPHS employees

9. *Minneci v. Pollard*, 565 U.S. 118 (2012) – Prisoner in federally contracted private prison on deprivation of medical care and where alternative remedies available under state law

10. *Ziglar v. Abbasi*, 582 U. S. ___ (2017) – Illegal alien in government detention facility against detention conditions

11. *Hernández v. Mesa*, 589 U. S. ___ (2020) – Cross border shooting of Mexican national by US Border Patrol agent

292. The circumstances of the relationships of these injured plaintiffs in this case to these individual defendants is profoundly dissimilar to ALL the relationships cited above for rejecting *Bivens* individual liability claims:

*First,* there was no reasonably knowable governmental relationship between these plaintiffs and these defendants who acted undercover under color of law to fraudulently conceal their true relationship to these injured plaintiffs throughout and after each and all the defendants' malign conduct, and no alternative remedy has been imposed by Congress.

*Second,* these individual defendants and other defendants appeared to Lead Plaintiff, and likely to other plaintiffs, in disguised roles described at paragraph 269 above, while

pursuing their bad faith acts and malign patterns of injuries, victimizations, and

subjugation of the entire class.

*Finally,* the eleven cases cited above in *Egbert* offer no refuge in any of those cases to

any of the individual defendants in this case. The relationships are profoundly dissimilar

and no alternative remedy scheme which mandates exemption from individual liability

exists as to these federal officers, agents, and employees, and their co-conspirators.

*Bivens* prevails, and personal liability attaches to these defendants.

293. *Hui v. Castaneda*, 559 U.S. 799 (2010) further reinforces this precedent and

Congressional intent:

> "In amending the FTCA to make its remedy against the United States
> exclusive for most claims against Government employees for their official conduct,
> the Westfall Act essentially duplicated §233(a)'s exclusivity language, 28 U. S. C. §
> 2679(b)(1), **but provided an explicit exception for constitutional violations,
> §2679(b)(2)."**

294. *Bivens* again at 397:

> "The very essence of civil liberty certainly consists in the right of every
> individual to claim the protection of the laws, whenever he receives an injury."

295. Congress clearly intended there be a clear path to reach these individual defendants

for this patten of fraudulently concealed knowing, willful, and perpetuated pattern of malign acts

and injuries while those officials have and do act under color of law and hide behind their abuse

of the state secrets privilege. As to other officials and their individual liability, this clear path is

further affirmed by *Harlow* at paragraph 272-273 and by *Butz* at paragraph 274.

296. Congress did not provide nor intend to provide such relief from individual liability

to federal officers and employees for such violations of constitutional rights. *Bivens, Harlow,*

*Butz, Carlson,* and *Hui* all affirm the clear Constitutional and Congressional intent that

individual liability obtains for these federal officers, agents, employees, and co-conspirator defendants as individual defendants in this matter as to these injured US persons in this matter. Further, without limitation, 42 U.S.C. §§ 1983, 1986, 2000bb-1(c) explicitly empower US persons in such actions for deprivations and conspiracies against rights and for neglect to prevent against federal officials, as against state and local officials, when those federal officials act in conspiracy with state and local officials.

### *Absence Of An Alternative Remedy Is Further Established By Defendants' Actions And Failures To Act*

297.  In *Egbert v. Boule*, 596 U.S. 482 (2022), the Supreme Court also cited *Carlson* at 18 (discussed above at paragraph 282 above) that an alternative statutory remedy scheme is sufficient to foreclose such claims against individual immunity of these individual defendants. However, there is no statutory alternative form of remedy provided nor has one ever been proposed by defendant UNITED STATES whatsoever for any of these plaintiffs. Defendant agents and officers have and do act knowingly and have and do explicitly chose to directly entangle these plaintiffs in national security matters, while directly violating, without limitation, the *Thirteenth Amendment* rights of each and every plaintiff in the entire class. This pattern of practice is clearly demonstrated by the facts herein, including, without limitation:

(i)  repeated entanglements in national security, to wit, paragraphs 601-603 NSEC-1-4,

(ii)  through a series of non-verbal visual leaks subsequent to those specific subcounts at paragraphs 600-710, as if national security is intended to be used by the clever and nefarious to abuse constitutional rights, and the state secrets privilege acts for public officials as a personal immunity sword and shield privilege and as their personal get-out-of-individual-liability-free card, all while they knowingly violate the unalienable rights of US persons, and

(iii) by their extraordinarily pervasive invasions into the Lead Plaintiff's life and rights in all

respects, to and including, for example, their depraved, perverted, and direct in the

moment intrusion into sexual function during intimate relations, by using the illegal

BRMT bioweapon and bioweapon delivery system (paragraph 614 HEXP-11) as they

please.

298. Rather than propose any form of statutory remedy scheme, defendant UNITED

STATES has persistently declined to make any answer of any kind at any time. Lead Plaintiff

has communicated these injuries and the extent of this secret program directly by mail and by

personal hand delivery to the Executive Office of the President, to other federal defendant

departments and agencies, most particularly to the Department of Justice in New York City, in

Washington, D.C., and Washington state in writing, on over forty occasions, with no reply on

any occasion. When pressed with a FOIL request under New York state freedom of information

laws, defendant NYPD first answered accurately if not fully on September 3, 2021 (Interline

Exhibit 17). Twelve days later, it officially lied in coordination with defendant FBI, which then

issued fifteen days later, its own official lie on September 30, 2021 (Interline Exhibit 18), a

violation of 5 U.S.C. § 552. This initial defendant NYPD admission, and the nearly immediate

federal and local police powers information cover-up which transpired in close coordination over

27 days, operated at remarkable speed for any response to a public information request

coordinated across local and federal governments, particularly given over two years and nine

months of complete bureaucratic silence on dozens of other FOIA and Privacy Act information

requests (LPEE pages 508-541). Courtesy service of complaint DC:21-cv-2424 on the US

Attorney for the District of Columbia was effected by hand on September 11, 2021, and an email

reply was received on October 12, 2021 (LPEEV65-10) stating that the complaint was not

officially received and would not be acted upon. The DOJ Assistant Inspector General for

Investigations was contacted by letter on November 9, 2021, and declined any interest in the

matter (Interline Exhibit 19) on January 28 and March 22, 2022. All outstanding 2021 FOIA

request responses have been systematically evaded except for two responses, both of which are

outright lies (NPS at Interline Exhibit 16 and CPB at LPEE pages 507, 537-541). A letter to the

US Attorney for SDNY, CIA IG, and DOJ IG on July 15, 2022 which documented this FOIA

and Privacy Act pattern of fact suppression is at LPEE pages 508-541, among the more than 40

such communications to the US Attorney for SDNY, and others to DOJ headquarters, all met by

complete and utter official silence.

299. That is the sum total of the remedy proposed by defendant UNITED STATES.

Nothing. It is completely silent. Its co-conspirator defendants are silent, conspiring, and

complicit. Congress answered with 28 U.S.C. § 2679(b)(2) authorizing civil litigation against

current and former government officials for their individual liability in acts against constitutional

rights.

300. However, defendant UNITED STATES, in particular defendants DOJ and FBI,

behavior speaks quite loudly on another point. Defendant UNITED STATES recently indirectly

revealed its continuing efforts to act against the Lead Plaintiff in yet another of its human

trafficking sequences of Lead Plaintiff from 2018 which continues.

301. NJ Senator Robert Menendez was indicted on September 22, 2023 in the Southern

District of New York. Lead Plaintiff was human trafficked from Ramsey, NJ to Edgewater, NJ in

November 2018 using a federal HUD Section 8 Housing Choice Voucher ("Section 8 voucher")

which was originally issued around August-September 2018, a few months after the Menendez

investigation was reportedly opened in early 2018. The Menendez investigation also resulted in

indictments of Daibes, a real estate developer, and Hana, an Egyptian national authorized to certify halal beef exports to Egypt, both of whom have offices 550 feet from Lead Plaintiff's personal residence (which residence is likely actually owned by defendant USMS through a cutout entity and was rented at a rate intended to attract Lead Plaintiff as had been done in Cliffside Park, NJ by defendant CHALOM). The Menendez et al indictment incorporated allegations of bribery and of undue influence of the Egyptian government on the Senator which relate to national security, a familiar form of national security entanglement repeatedly abused by defendant UNITED STATES against these plaintiffs, paragraphs 600-603 NSEC-1-4.

302. This specific fact set, and the other tradecraft "rhymes," (as in "history does not repeat but it does rhyme"), which comprise tacit admissions of human trafficking and forced labor by defendant FBI and USMS of the Lead Plaintiff, are at paragraph 648 RICO-10. Relevant details of this tacit indirect defendant admission also include an Egyptian national proposed to Lead Plaintiff as CFO of his international trading startup company Sheldon Beef (Interline Exhibit 12) who was recommended by MAGGARD (FBI Amarillo, TX field office) through his CFO SEARCH (FBI, Lubbock, TX) cover company, and a clumsy subsequent coverup attempt by defendants of a surreptitious $6,000 agency loan to GPR, Inc. and $6,000 agency loan personally to Lead Plaintiff characterized as coming personally from MAGGARD (FBI), then further clumsily covered by the sudden reappearance of an eighteen year old long released property interest from the divorce from fraudulently orchestrated second wife Jeanette, of just over $6,000 (Ironwood at RICO-10 paragraph 648, LPEEV65-9). An extended series of other acts and injuries, to and including lethality attempts at paragraphs 703-710 LETHL-10-17, have also been repeated during Lead Plaintiff's residency in Edgewater, NJ, from 2018 to present, and are described in many of the 110 example subcounts at paragraphs 600-710.

303. Individual federal defendants are sophisticated persons particularly educated in the laws of the United States, including defendant WEISSMAN, the former General Counsel of FBI, as well as defendants CALDWELL, RUBIN, MELBER, and others with law degrees and licenses who knew, should have known, and could reasonably be expected to know, that they and other defendant co-conspirators, including police powers agents and officers, were injuring, abusing, and violating the rights of these plaintiffs under color of law, and/or with malicious intent, yet they entered, agreed, participated in, and continued to participate, together with other defendants, in one or more 18 U.S.C. §§ 1961-1968 associated-in-fact enterprises, and engaged in conspiracy or conspiracies under 18 U.S.C. § 1962(d) in, with, and among one or more associated-in-fact enterprises, participated in those enterprises' broad patterns of racketeering acts and civil rights violations, as documented in the thousands of specific violations incorporated herein and, subject to discovery, likely engaged in numerous additional acts, violations, and injuries through their active participation and/or their explicit and knowledgeable failures to protect, all under color of law while acting in bad faith.

304. These acts were knowingly planned, conspired, and conducted by these persons and entities using knowledge developed through their color of law abuses of their official positions, and/or their access to confidential information, and/or their willful failure to reasonably consider the actual good faith patterns of conduct of the plaintiffs, and/or in willful disregard of rights and of the law in which they are particularly trained and experienced, and under which any reasonable person would expect these defendants to recognize and comprehend their purposeful and wrongful acts, Their conduct, actions, and failures to act thereby void any claim to be acting in accordance with the standards of conduct and/or state of mind required to make good faith assertions of qualified immunity.

305. These defendant persons and entities acted as if they were exempt from and above the law in their executive management, direct management, supervision, and/or operational participation in and/or support of defendants' long-running associated-in-fact enterprise and in the repetitive patterns of long-cycle and short-cycle racketeering acts, injuries, and destruction against these plaintiffs including, without limitation, all qualifying racketeering acts, injuries, and violations cited under 18 U.S.C. § 1961 herein.

306. These same defendants further engaged in and/or engaged other participants in their conspiracies, acts, violations, and injuries of rights in violation of 42 U.S.C. §§ 1981 equal rights, and/or § 1981(a) intentional discrimination in employment, and § 1982 property rights, and § 1985 conspiracy, and § 1986 failure to prevent, and § 1994 peonage, and in their pattern(s) of fraudulent concealment at paragraphs 550-583 below, as or together with state and local co-conspirator defendants. All these acts were and are willful and knowing acts, violations, and injuries, undertaken in bad faith and with malicious intent to deliberately violate, harm, injure, and exploit these plaintiffs, to benefit their associated-in-fact enterprise, and to personally benefit themselves and their close associates, relatives, and friends from these injuries. The acts, violations, and injuries by these defendant are not entitled to the protections of qualified immunity, as they were and are untaken as willful violations of rights and law and were and are undertaken with malicious intent to injure these plaintiffs.

## G. Application Of Equitable Tolling In Fraudulent Concealment – Unequal Administration Of Justice

307. A key fundamental issue requiring this Court to urgently address the claims herein is an unyielding truth about the historical pattern of unequal administration of justice in these United States:

> Lead Plaintiff finds no record that defendant UNITED STATES, specifically
> DOJ, has ever in the entire history of the United States of America, acted
> criminally against collective and wide-spread institutional abuse of police powers
> by its own federal departments and agencies.

308. For example, no criminal indictments were ever brought for recurring patterns of criminal conduct under the MKUltra or Cointelpro felony violations by defendants CIA, ARMY, and FBI from the 1950s into the 1970s for original crimes or for institutional obstructions of justice, including, without limitation, destruction of evidence. Forty-five years of FISA warrant violations since 1978, fifteen years of Section 702 violations since its original adoption in 2008 to cure prior violations of law, and the widespread January 6, 2021 executive branch cell phone text wipes also have a similar record. These are ignored and disregarded as routine bureaucratic administrative errors of no particular consequence despite their profound implications for individual rights and for the rule of law, and no criminal prosecutions attach for these widely tolerated executive branch criminal violations of law, including, without limitation, these repeated institutional violations of rights under 18 US §§ 241 and 242.

309. As a result, defendant UNITED STATES has developed a tacit permission structure in its intelligence and police powers operations for the systematic abuse of the principles of "state secrets" and "national security" to engage in a long series of programmatic abuses and coverups of its violations of the Constitution, of ratified international treaties, and of the laws of the United States of America, against a wide variety of individuals, groups, and sovereign bodies, both within and outside the United States of America, by executive branch departments and agencies. Congress can prescribe and proscribe, the Courts can remedy and sanction, but the executive branch has and does simply ignore and evade enforcement. By these failures to act,

individual rights and liberty have been destroyed for this class of plaintiffs, and executive
impunity reigns supreme over plaintiffs' constitutional rights.

310. The prohibited BRMT bioweapon and bioweapon delivery system has been used by
defendant UNITED STATES against these plaintiffs through its evolution from crude to extreme
sophistication for over five decades. That timespan is more than three times longer than
defendant FBI's infamous Cointelpro (15 years) organized nationwide program of felonies
against Constitutional and civil rights; and more than two times longer than defendant CIA's
MKUltra (20 years) criminal LSD distribution and surreptitious dosing program while defendant
CIA was likely America's largest single illegal drug dealer. Both those illegal programs required
physical interactions with the victims. Both illegal programs are known to have injured tens of
thousands to hundreds of thousands of US persons through specific felony violations of U.S.C.
Title 18.

311. In contrast, the modern versions of illegal BRMT bioweapon and bioweapon
delivery system do not require any direct proximate interaction with any victim. This has been
true since at least the early 1980s double murder attempt by melatonin overdose on Lead
Plaintiff and his first wife Lynne at Porteau Cove, British Columbia, Canada, related in
paragraph 694 LETHL-1. BRMT deployment, its use in acts of abuse and violations of rights and
law, are vastly simpler than they were during MKUltra. The supercomputer systems used today
in illegal BRMT bioweapon operations perform three quadrillion operations per second
(3,000,000,000,000) and can deliver literally billions of micro-pulsed illegal BRMT biochemical
brain hijacking instruction sequences each second. The scope of illegal BRMT bioweapon and
bioweapon delivery system violations against these plaintiffs vastly exceeds, likely by hundreds
of thousands to billions of felony events, the combined violations of Cointelpro and MKUltra.

312. Lead Plaintiff's historical and current experience and the sampling of evidence herein document defendants' continuing pattern of criminal and civil violations of rights which involve illegal biomedical hijacking (BRMT), various financial and other frauds, asset stripping, destruction of relationships and inducement of fraudulent relationships, deprivation of benefits, and other abuses intended by defendant UNITED STATES and its co-conspirators to sustain victims' penury, mental instability, and to fraudulently conceal and cover up and perpetuate the "state secret" illegal BRMT program against US persons, which defendants with military, intelligence, and police powers are sworn to protect.

313. These offenses and violations as elements of the "state secret" pattern of operation of the prohibited BRMT bioweapon program commenced in the 1960s, have been fraudulently concealed throughout this time from these plaintiffs, and continue as this complaint is written.

## H. Equitable Tolling - Civil RICO Time Bars are Equitably Tolled by Defendants Systematic Fraudulent Concealments

314. Lead Plaintiff began a forensic analysis to develop the pattern of facts presented herein in mid-2021. With the exception of defendant ARPAIO in mid-2022, it was not until the September 2023 that he was finally able to begin to establish a definitive link between individual defendants, their concealed undercover identities under which he knew them, and their actual current identities, thereby explicitly connecting those to the underlying institutional defendant entities. Establishing this chain of identifications is crucial to factually and dispositively unmasking these defendants who have and do operate using continuous concealment of their identities and defendant institutional affiliations.

315. A four year statute of limitations drawn from the Clayton Act was established for most civil RICO claims. *Rotella v. Wood*, 528 U.S. 549 (2000) incorporates a critically important equitable tolling exception. Defendant UNITED STATES including, without limitation, CIA,

FBI, DOJ, and various DOD departments and agencies, have and do engage in a systematized program of illegal acts which has and does violate the conditions for the lawful use of state secret privilege established in *United States v. Reynolds* 345 U.S. 1, 12 (1953), and have used it as their sword and shield for fraudulent concealment of their illegal acts, thereby broadly invoking equitable tolling.

316. The specific circumstances of each element of equitable tolling by fraudulent concealment are described in this section. Quoting from *Rotella* and then from other guiding case law on equitable tolling of civil RICO and rights claims impacts on the statute of limitations:

*a. Rotella* at 555, 556:

> "**We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain.** The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask." Quoted from United States v. Kubrick, 444 U.S. 111, 122, 100 S. Ct. 352, 62 L.Ed.2d 259 (1979)"

*b. Rotella* at 560, 561:

> "It is not that we mean to reject Rotella's concern about allowing "blameless ignorance" to defeat a claim, Urie v. Thompson, 337 U.S. 163, 170, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949); we simply do not think such a concern should control the decision about the basic limitations rule. In rejecting pattern discovery as a basic rule, **we do not unsettle the understanding that federal statutes of limitations are generally subject to equitable principles of tolling,** see Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946), and **where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to the plaintiff's difficulty, complementing Federal Rule of Civil Procedure 11(b)(3).** See ibid.; see generally Klehr, 521 U.S., at 192–193, 117 S. Ct. 1984 (noting distinctions between different equitable devices). **The virtue of relying on equitable tolling lies in the very nature of such tolling as the exception, not the rule.**"

### c. Federal Rules of Civil Procedure Rule 11(b)(3)

"the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery;"

### d. Klehr v. A. O. Smith Corp., 521 U.S. 179 (1997) at 183, 194, 195:

"We limit our consideration of the question to the context of civil RICO. In that context, we conclude that "reasonable diligence" does matter, and a plaintiff who is not reasonably diligent may not assert "fraudulent concealment.""

### e. RICO - Congressional Intent PL 91-452 (RICO) October 1970

"(a) The provisions of this title [enacting this chapter and amending sections 1505, 2516, and 2517 of this title] shall be liberally construed to effectuate its remedial purposes."

### f. SCOTUS Speaks on Equitable Tolling Again in 2023

*Arellano v. McDonough*, 598 U.S. ___ (2023)

**"Equitable tolling "effectively extends an otherwise discrete limitations period set by Congress."** Lozano v. Montoya Alvarez, 572 U.S. 1, 10 (2014). In practice, it "pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." Ibid. **The doctrine "is a traditional feature of American jurisprudence and a background principle against which Congress drafts limitations periods."** Boechler v. Commissioner, 596 U. S. ___, ___ (2022) (slip op., at 8). **Consistent with this jurisprudential backdrop, we presume that federal statutes of limitations are subject to equitable tolling.** Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95–96 (1990). The Irwin presumption, however, is just that—a presumption. It can be rebutted, and if equitable tolling is inconsistent with the statutory scheme, courts cannot stop the clock for even the most deserving plaintiff. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 137–138 (2008); United States v. Beggerly, 524 U.S. 38, 48–49 (1998)."

### G1. Diligent Pursuit of Claims by Lead Plaintiff In The Face Of Long-Running Fraudulent Concealment by Defendants

317. Defendants' comprehensive pattern of actions to fraudulently conceal and cover up

the entirety of the BRMT brain hijacking and racketeering crimes has been and is fraudulent

concealment, and thereby gives rise to equitable tolling in accordance with *Rotella* at paragraph

316a and 316b above. This critical exception to the four year statute of limitations for civil

racketeering and rights violations. Direct and liberal application of *Rotella* described at

paragraph 316a above is consistent with the statutory scheme described by Congress and with the

liberal construction Congress intended in enacting RICO, as shown at paragraph 316e above.

318. Since these acts, injuries, and violations were not fully discovered and definitively

linked to the specific institutional defendants until Summer and Fall 2023 (paragraph 99, LPEE

pages 12251-12261), while Lead Plaintiff has continuously been diligent in pursuing this

information from mid-2021, including through continual defendant stone-walling of FOIA,

Privacy Act, and other legal requests for information (LPEE pages 508-541, Interline Exhibits

17-19), the four year statute of limitations is clearly tolled. As affirmed in *Arellano* at paragraph

316f above, this assertion cannot be rebutted by these defendants. The final linkages of this

conspiracy and of these acts, violations, and injuries to these institutional and individual

defendants' undercover chain of acts, violations, and injuries, and to their joint and several

liability, will be made in answers and discovery under F. R. Civ. P. Rule 11(b)(3), paragraph 316c

above.

319. Lead Plaintiff has been diligent in pursuing his claims as required under *Klehr* at

paragraph 316d above. Defendant UNITED STATES has abused the "state secrets" privilege

under color of law to engage in a persistent pattern of fraudulent concealment since the inception

of the BRMT brain hijacking program. *United States v. Reynolds* 345 U.S. 1, 12 (1953) clearly

states that all activities which operate under this privilege must comply with federal law,

"Footnote 4: 5 U.S.C. § 22: ... not inconsistent with law..." Defendants forfeited this state

secrets privilege from the first day of their violations of plaintiffs' "unalienable" rights and are

directly responsible for all injuries due to their criminal and civil violations of the US Constitution, existing US law, and ratified international treaties. The BRMT program and related pattern of rights violations and racketeering acts used to fraudulently conceal and cover up its existence violate 18 U.S.C. §§ 175, 1961-1968, and a sweeping array of other federal laws, ratified treaties, and the Constitution, as described throughout this Complaint.

320. This diligent pursuit by Lead Plaintiff to defeat these defendants' fraudulent concealments has encountered defendants' fierce, ferocious, even torturous repeated resistance, intimidations, and retaliation, as well as technical hacking in obstructions of rights, to and including tampering with evidence and obstructing access to evidence, which efforts and obstructions have and do continue. Principal methods of fraudulent concealments by defendants are discussed at a. through f. below, note the vital issue of who perpetrated these rights and RICO injuries. Other fraudulent concealment by defendants at g. through k. below precluded access to vital information and have and do obstruct evidence required to properly prepare this litigation. The eleven principal methods used by defendants to accomplish their past and on-going obstructions are as follows:

a. ***Fraudulent Concealment: Human Trafficking and Homeless Duress*** - Being completely unaware of both the illegal BRMT brain hijacking system and the already long-running but slowly evolving rights and racketeering injuries pattern which began about 1968, Lead Plaintiff filed a Federal Tort Claims Act (FTCA) claim with the United States in September 2005 regarding only the extremely financially damaging and psychologically coercive police powers field operations he was experiencing in 2002-2005. He was completely unaware of the illegal BRMT bioweapon and bioweapon delivery system in any form, and related his experiences only to the

preceding three years as of September 2005. Lead Plaintiff hand delivered the FTCA claim in Washington, D.C. due to the repeated failures of mail and express services to complete deliveries to defendant DOJ, EOP, and others at that time. No reply was ever received. Within 120 days of those hand deliveries in DC, he was rendered homeless by the pattern of defendants' actions from 2002-2005 after he left CNA and the direct employ of defendant FAUCI. This fraudulent concealment, and the period of confinement in the form of enforced homelessness and complete instability of shelter by defendants' acts of duress, tolled the statute of limitations.

b. *Fraudulent Concealment: Human Trafficking and Homeless Duress* - Lead Plaintiff was then human trafficked by defendants' actions, to and including through December 2005, to Boston, Massachusetts, to four months in a hotel room until funds were exhausted, then to 17 months of homelessness. This fraudulent concealment, and the period of confinement in the form of enforced homelessness and complete instability of shelter by defendants' actions, tolled the statute of limitations.

c. *Fraudulent Concealment: Human Trafficking and Duress* - In August 2007, Lead Plaintiff was again human trafficked unbeknownst to him, to false employment in defendant ESTABLISH by defendant ROSENBERG in a defendant FBI/USMS cover operation. He was then prejudicially terminated by ROSS in June 2008, soon after a knowingly impossible to meet demand was made that he invest $25,000 in his failing fraudulent employer ESTABLISH by his boss (ROSS). It was impossible for the Lead Plaintiff to establish these conditions of his false and fraudulent employment and involuntary servitude at that time. This fraudulent concealment and the involuntary servitude, incorporating human trafficking, fraudulent employment, and housing in a

defendant USMS by defendant CHALOM "safe" house apartment, were concealed and were not visible to Lead Plaintiff, continuing this tolling of the statute of limitations.

d. ***Fraudulent Concealment: Human Trafficking and Involuntary Confinement*** - Lead Plaintiff continued his diligent pursuit of his broadened claims by incorporating an incorrect allegation of a stomach implant thought to be used in the illegal BRMT brain hijacking program in the injuries listed in his federal district court filing in the District of New Jersey in 2010, Civil No. 10-3204 (SDW). Within 100 days of that filing, defendants' actions again rendered Lead Plaintiff homeless, where he was kidnapped into civil confinement in a hospital ward for six months (paragraph 808), as he was again penniless due to not being allowed any employment and NJ state law does not permit a hospital to release any patient into homelessness. Lead Plaintiff received indirect pressure while confined from physical violence acted out in his presence, threats of violence witnessed on his ward, and indications he would not be released while this litigation was pending. After about three months of confinement, he "voluntarily" dismissed the case in January 2011 due to the impossibility of pursuing the matter while in the civil confinement conditions created and perpetuated by these defendants. Defendants coordinated throughout this period to act functionally as his kidnappers, using civil law to retain Lead Plaintiff in a locked hospital facility under threat of indefinite detention. Further, Lead Plaintiff was denied even the right to move to a homeless shelter during this period. Release to alternate housing was only permitted after the January 7, 2011 dismissal (excerpt below). The rehousing process started in late January or early February 2011 (only after the dismissal order was

entered to the docket by the court) and was completed by March 30, 2011. In actual

fact, the Ramsey, NJ housing location where he was ultimately placed had already

been available the entire time he had been confined (per Advance Housing as

confirmed by his Ramsey co-resident Schmiedhauser) and could have been made

available much earlier to the Lead Plaintiff. This fraudulent concealment, and the

period of confinement in the form of enforced civil confinement by color of law

abuses of New Jersey law, again tolled the statute of limitations.

## Federal District of NJ District Court - Order Excerpt:

DENNIS SHELDON BREWER

Civil No. 10-3204 (SDW)

v.

UNITED STATES SECRET
SERVICE, et al

O R D E R OF VOLUNTARY DISMISSAL

It appearing that Plaintiff having filed a letter dated December  15, 2010

[doc. # 2] stating that they will withdraw this matter;

It is on this 7 th day of January, 2011

O R D E R E D that the complaint in this action be and is hereby dismissed

without prejudice.

e. *Fraudulent Concealment: Extreme Mental Abuse and Torture* - Defendants engaged

in three distinct periods of extreme mental torture and other mental cruelty which

disabled the Lead Plaintiff to the point of suicide ideation in 2003-2004, 2006-2007,

and in 2008-2010. These periods of extraordinary duress imposed by defendant

UNITED STATES in Kirkland, Washington, Boston, Massachusetts, and Fort Lee,

New Jersey, described at paragraphs 641-643 RICO-3-5 herein, further tolled the

statute of limitations as they caused extreme duress, severely limited the mental

reasoning of the Lead Plaintiff, and restricted his ability to pursue due diligence and forensic analysis throughout these periods of extreme and torturous duress. Lead Plaintiff is found to be among the 10% most emotionally stable persons in independent psychological tests shown below and described at LPEE pages 190-236, so this is not a specious allegation based upon mere mental or physical discomfort.

Conscientiousness



Level of Neuroticism



f. ***Fraudulent Concealment: False Personation*** - The critical facts which established

the identities of the plaintiffs in this matter were not known to Lead Plaintiff until

September 2023, when Lead Plaintiff was able to identify several prior false identities

of eight current and former CIA, FBI, DOJ, and military officials, among others at

LPEE pages 12251-12261.

(i) Stephen BREYER (fka Jack Sackville-West (BREYER), Spokane, WA), a former

Supreme Court Associate Justice;

(ii)     Andrew WEISSMAN (fka Lyle Whiteman, PCC General Manager), actually a

former FBI agent, then FBI General Counsel;

(iii)    William BURNS (fka Pat Heffron, posing as OB/GYN physician) a former CIA

BRMT project manager or executive, now CIA Director;

(iv)    Roger STONE (fka David Moller (STONE), Deloitte manager), a former CIA

commercial cover officer for a South Africa banking system espionage project,

(v)     Charles ROSENBERG, a former affiliate CEO from approximately 1983 to 1996

(fka Chuck LeFevre (ROSENBERG), CEO NutraSource), then as hiring manager in

2007-2008 (fka William Drumm, GM ESTABLISH) actually former FBI/DOJ/DEA

official Chuck ROSENBERG, who now appears as legal analyst on MSNBC,

(vi)    Leslie CALDWELL (fka as a Seed and Berry, Seattle, Washington intellectual

property attorney during fraudulent defendant FBI ShipNow operation and litigation

at RICO-1, 6, 12, 35, 45 and RGTS-8), acted unethically and outside her legal scope

of authorized duties as a federal prosecutor, represented herself in 2004-2005 as an

attorney acting in the interests of Allegent, LLC, a company unwittingly co-owned by

Lead Plaintiff with an undercover federal agent known as Darrell PRAY, to pursue an

intellectual property claim against ShipNow, Inc, a false intelligence cover company used by FBI (KURGAN) to spy on domestic software, retail, and other private enterprises. CALDWELL was instrumental in acting to dissuade the Lead Plaintiff from pursuit of a valid legal claim by Allegent, LLC during a 2002-2005 human trafficking sequence in which Lead plaintiff lost his home and business in 2005, as related at paragraph 462-470, 610 HEXP-7. CALDWELL practiced law at Latham & Watkins in San Francisco, California and was formerly Assistant Attorney General heading DOJ Criminal Division from 2014-2017.

(vii)   Ari MELBER (fka Wes Lewis) and Lisa RUBIN (fka Michelle Yarbrough), two former fraudulent family members from approximately 1990 through 2005, past FBI/DOJ agents and/or officials who also appear on MSNBC,

(viii)  Alexander VINDMAN (fka Paul Yarbrough), a former ARMY officer who posed as a brother-in-law in the U.S. Air Force from approximately 1990 through 2005. His twin brother Yvgeney (fka Greg Yarbrough), another ARMY officer, also appeared from time to time.

(ix)   Other ARMY officers also appeared in civilian dress during these events, including WILKINS (known at the time to also be an officer in Washington ARMY National Guard), and AUSTIN (ARMY, now named as defendant Secretary of Defense, in his official capacity only), and unknown to the Lead Plaintiff at the time (CNA Industrial Engineering, see paragraph 602 NSEC-3).

(x)    All these persons used false identities at the time of their fraudulently concealed interactions with the Lead Plaintiff.

These bad faith actors directly injured the Lead Plaintiff with their actions and failures to act while actually employed by CIA, FBI, DOJ, and the United States armed forces at those times. These bad faith acts, as defined in *Harlow v. Fitzgerald, 457 U.S. 800* (1982) at paragraphs 272-273, and the actual identities of these perpetrators were fraudulently concealed from the beginning and continuing into September 2023, except that ARPAIO as MARICOPA SHERIFF and not attached to any federal department or agency, was unmasked by Lead Plaintiff in mid-2022. Fraudulent concealment tolls the statute of limitations on all these defendants' bad faith acts.

g. ***Fraudulent Concealment: Blocking and Concealment of Critical Information Sources*** - Defendants definitively blocked the awareness of the Lead Plaintiff to all internet-based information about brain-to-computer interfaces in web searches at all times until 2021. These beneficial commercial medical devices are based upon the same medical, neuroscience, and scientific principles as the illegal BRMT bioweapon and bioweapon delivery system, which is a computer controlled manipulation of the brain and is an offensive weapon. Given the novel nature of this illegal bioweapon system, this lack of knowledge of such beneficial devices using these same principles functionally kept the Lead Plaintiff in purposeful ignorance from at least 2012 when Synchron was first formed (paragraph 6 and LPEE pages 11-25) to commercially exploit this science and technology. Since no such system has ever before been known to the general public, it would be nearly impossible for the Lead Plaintiff to have been able to establish the veracity of the existence of this illegal BRMT bioweapon and bioweapon delivery system. This fraudulent concealment by defendants tolls the

statute from the time of the original federal court complaint in the District of New

Jersey. These specific web search interferences were fraudulent concealment which

again tolled the statute of limitations.

h. ***Fraudulent Concealment: Blocking and Concealment of Critical Experts*** -

Defendants definitively precluded the Lead Plaintiff from due inquiries to experts with

knowledge of neuroscience. Defendants blocked all email communications with

neuroscience experts in university and other institutional settings in 2021. See LPEE

pages 803-817. These email interferences were fraudulent concealment which again

tolled the statute of limitations.

i. ***Fraudulent Concealment: Systematic Blocking of All Federal FOIA and Privacy Act***

***Responses Limited Preliminary Discovery*** - Defendants have and do engage in a

comprehensive FOIA and Privacy Act blockade of all information from federal

departments and agencies from 2021 forward, except for two completely inaccurate

responses, all in violation of 5 U.S.C. § 552. This has been coordinated with a FOIL

blockade by defendant NYPD which began in September 2021. See these coordinated

information blocking examples at Interline Exhibits 17-19 and at LPEE pages 508-

541. This has severely impacted Lead Plaintiff's forensic analysis of the total fact

pattern since that time. These coordinated FOIA and FOIL violations of law are

fraudulent concealment which again tolls the statute of limitations for all prior actions

of relevant agencies and departments.

j. ***Fraudulent Concealment: Systematic Blocking on Lead Plaintiff's Computer*** -

Defendants continue to block access to critical information on the Lead Plaintiff's

computer to this day, including all interstate commerce business-related emails from

March 4, 2018 through July 9, 2020. This prevents the entire series of predicate acts by these defendants during that period from being included in the racketeering injuries to Lead Plaintiff, including, without limitation, human trafficking and interferences in interstate commerce. These coordinated violations of law, which block key case evidence, are fraudulent concealment which again tolls the statute of limitations for all prior actions of relevant agencies and departments.

k.    ***Fraudulent Concealment: Systematic Blocking and Technology Hacking -***
Defendants have and do engage in various forms of continuing harassment, including deliberate hacking of documents during and after preparation, concealment and falsifications of statutes and of case law information sourced online, the hacking and disabling of computer printers, and other technical blocking and interferences noted in LPEE pages 11727-11907. Evidence in email accounts related to food borne illness correspondence with the corporate headquarters of defendant ACME has been deleted from history, the electronic calendar in Outlook has been deleted through September 1, 2023, deleting evidence of illegal interferences with personal life, and other evidence has been tampered with and distorted, This has continued throughout the process of preparing this litigation. These coordinated violations of law are fraudulent concealment which again toll the statute of limitations and obstructs justice perpetrated by defendant UNITED STATES in its systematic efforts to defeat this litigation and to fraudulently conceal its conduct. This pattern of systematic obstructions and fraudulent concealment during preparation of litigation is at LPEE page 11645-12261. This pattern of fraudulent concealment including, without limitation, obstructions of evidence, combined with hyper-intrusive "glass house" international visibility

constructed by defendant UNITED STATES for Lead Plaintiff throughout it human

trafficking process (principally by defendants DOJ, CIA, ARMY, BREYER,

GARLAND, WEISSMAN, ROSENBERG, BURNS) has continued through the series

of "safe" houses where Lead Plaintiff has been functionally confined by defendant

UNITED STATES in its on-going efforts to escape accountability for its corrupt and

continuing acts against Lead Plaintiff and others in this class of plaintiffs. This pattern

of acts, violations, and injuries of constitutional rights and statutory rights has been

and is a systematic and sustained effort to (i) make an internationally visible public

example to the world of defendant UNITED STATES' intolerance for those who

would dare to expose federal executive branch police powers corruption, and to (ii)

intimidate other members of this class which defendant UNITED STATES has and

does elect to entangle into its decades long and ongoing color of law systematic

violations of constitutional rights (*First, Third, Fourth, Fifth, Eighth, Ninth,*

*Thirteenth, Fourteenth* Amendments), domestically and internationally illegal BRMT

program (18 U.S.C. § 175, 1972 *Bioweapons Treaty*), and other patterns of

racketeering acts (18 U.S.C. §§ 1961-1968), as it continues its scofflaw approach to

equal justice and the rule of law in other defendant DOJ comparable patterns of

practice including, without limitation, 45 consecutive years of FISA violations of

rights documented by the FISA Court, and 15 years of Section 702 violations of rights

documented by Congress, with no prosecutions for these systematic violations of

rights and law. Congress intended that constitutional rights crimes (18 U.S.C. § 241)

carry the same criminal penalty as non-violent bank robbery (18 USC § 2113(b)),

providing criminal penalties of maximum 10 years imprisonment and an unspecified

fine for each violation. Meeting this clear standard of Congressional intent with regard

to 18 U.S.C. § 241 within executive branch departments and agencies own patterns of

practice is not defendant DOJ's pattern of practice at any time in the past 56 years in

Lead Plaintiff's direct personal experience, which experience is representative of the

experiences of this class. Fraudulent concealment and tacit permission for obstruction

of justice prevails at all levels inside defendant DOJ for conduct by its own and other

federal police powers agencies and for intelligence (CIA) and military (ARMY)

intrusions (18 USC § 1385) into the daily lives of any US person they choose to

pretext without cause or process, all sustained by fraudulent concealment, as described

by the entire fact set laid out in this Complaint (paragraphs 350-710).

321. This entire set of patterns of fraudulent concealment is consistent with the pattern of

practice found by the Senate Intelligence Committee in 1975 related to activities of FBI and CIA

(LPEE pages 6885-7466). Further, it is consistent with the pattern of practice of the intelligence

community (CIA) against the Senate Intelligence Committee during 2014 as the Senate was

conducting its inquiry into illegal torture practices of CIA (paragraphs 332, 340). This further

substantiates these agencies practices against the Lead Plaintiff as consistent with their other

contemptuous patterns of practice including hacking, intimidation, and retaliation against both

U.S. persons and against a separate branch of government (Congress) which is constitutionally

mandated to conduct oversight and set policy for the federal executive.

**I.  Constitutional Issues - Ratified International Treaties Supersede Existing US
    Law And Supersede Defendant UNITED STATES' Neglect To Prevent**

**I1. Defendant UNITED STATES' Noncompliance With Law - *Bioweapons Treaty*
    Prohibits ALL Bioweapons And Bioweapon Development From March 1975**

322. Defendant UNITED STATES' development and operation of the prohibited BRMT

bioweapon and bioweapon delivery system is a prima facie violation of the *Convention on the*

*Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and*

*Toxin Weapons and on Their Destruction*, which prohibits (italics added):

"Article I
Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:
(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes;
(2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict.
Article II
Each State Party to this Convention undertakes to destroy, or to divert to peaceful purposes, as soon as possible but not later than nine months after the entry into force of the Convention, all agents, toxins, weapons, equipment and means of delivery specified in article I of the Convention, which are in its possession or under its jurisdiction or control. In implementing the provisions of this article all necessary safety precautions shall be observed to protect populations and the environment.
Article III
Each State Party to this Convention undertakes not to transfer to any recipient whatsoever, directly or indirectly, and not in any way to assist, encourage, or induce any State, group of States or international organizations to manufacture or otherwise acquire any of the agents, toxins, weapons, equipment or means of delivery specified in article I of the Convention.
Article IV
Each State Party to this Convention shall, in accordance with its constitutional processes, take any necessary measures to prohibit and prevent the development, production, stockpiling, acquisition, or retention of the agents, toxins, weapons, equipment and means of delivery specified in article I of the Convention, within the territory of such State, under its jurisdiction or under its control anywhere."

See the full text of this ratified international treaty at LPEE pages 10776-10779.

323. BRMT also violates 18 U.S.C. § 175(b) (italics added):

"Whoever knowingly possesses any biological agent, toxin, or delivery system of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose, shall be

fined under this title, imprisoned not more than 10 years, or both. In this subsection, the terms "biological agent" and "toxin" do not encompass any biological agent or toxin that is in its naturally occurring environment, if the biological agent or toxin has not been cultivated, collected, or otherwise extracted from its natural source."

324. Toxin is defined at 18 U.S.C. § 178(2) (italics added):

*"toxin means the toxic material or product of .... animals....a recombinant or synthesized molecule, whatever their origin and method of production, and includes – any....biological product that may be engineered as a result of biotechnology produced by a living organism; or... any...biological product..."*

325. Defendant UNITED STATES violates both the 1972 *Bioweapons Treaty* AND 18

U.S.C. § 175. The illegal BRMT bioweapon and bioweapon delivery system is intended,

designed, and operates to produce unnatural manipulated ("*cultivated, collected, or otherwise*

*extracted")* quantities of endogenous (naturally occurring) biological brain chemicals in the

brain and central nervous system of its unwitting involuntary human victims and other animal

subjects, including, without limitation, dopamine (neurotransmitter), nitric oxide (circulatory

effects), and glutamate (neurotransmitter), whether that quantity exceeds or is suppressed from

the otherwise naturally occurring quantities produced by the human victim or animal subject and

then either forcibly withholds or forcibly secretes these brain biochemicals through the illegal

hijacking of normal brain function (which normal brain function is free will in humans and other

animals).

326. The presence or absence of these specific biological compounds are toxic as they

create and sustain unnatural effects on the unwitting human victims through their out-of-natural

balance effects. These biochemical hijackings are forced takeovers of free will and/or of

normally regulated body functions which produce a wide variety of symptoms including, without

limitation, halted breathing, disrupted consciousness, heart attack, depression, suicide ideations,

involuntary body movements (such as pulling a trigger when not naturally intended by the

victim), mental illnesses of varying degree, and deep sleep (such as unnatural inducement while

operating a vehicle or equipment, paragraph 694, LETHL-1), among other symptoms and

illnesses. These unnatural biochemical imbalances have direct real world consequences on

individual liberty, rights, morbidity, and mortality which are arbitrarily imposed by defendant

UNITED STATES outside the due process of law. They unnatural biochemical imbalances also

have long-term disabling effects when induced in persistently excessive or suppressed amounts,

such as in clinical depression, Alzheimer's, ALS, intellectual disabilities, and other permanent

disabilities, potentially including chronic traumatic encephalopathy (CTE), and other effects as

described at LPEE beginning page 1 and LPEE beginning page 140. These episodic and chronic

effects are arbitrarily imposed by defendant UNITED STATES outside the due process of law, in

its knowing and willful violations of unalienable constitution rights and federal law, through its

knowing abuse of the state secret privilege (which is not a right of the executive branch, it is a

privilege regulated by Congress under law) and its knowing, willful refusal to criminally

prosecute these violations of law.

326A. NOTE: Both references at paragraph 326 above are to the full text of those two

specific statements, related to BRMT at LPEE page 1 et al and in the Personal Statement at

LPEE page 140 et al. These statements were modified after LPEE page numbers were initially

assigned. Defendant UNITED STATES elected to undertake a computer hack in February 2023

which prevents the use of Bates numbering of these documents and other documents entered to

the evidentiary record since that specific hack against Lead Plaintiff's online subscription version

of Adobe Acrobat Pro. This software application which has been used to assign Bates number

was electronically hacked by defendant UNITED STATES, so these specific statements of

evidence are referred to herein as page 1 et al (actually 15 pages beginning at LPEE page 1) and

140 et al (actually 63 pages beginning LPEE page 140). Other references to LPEE evidence paginated after this hack are noted as LPEEV65 to reference a document number so those documents can be located by the Court and by defendants, such as the document LPEEV65-1 which references the three page document regarding the Audrey Brewer murder in September 2011, located at that document number.

327. These defendant UNITED STATES illegal BRMT brain hijackings of unwitting human victims' free will have and do create toxic effects in the unwitting human victims as defined at 18 U.S.C. § 178(2) and are criminal offenses under 18 U.S.C. § 175, which are compensable by civil remedy, including through injunctive relief and damages. This court is constitutionally obligated to hear this non-compliance with law claim and to order full and fair enforcement of the 1972 *Bioweapons Treaty* by defendant UNITED STATES on behalf of these plaintiffs and all other persons over whom this Court exercises jurisdiction. Federal courts in two other federal districts have not permitted entry of predicate act and other documentary evidence to their official records, disallowing even the initial pleadings from being fully and accurately entered to those courts' official dockets in the District of Columbia and the Southern District of New York (Appendix 1 hereto) in their violations of the Supreme Court mandates of *Nietzke* and *Denton* (paragraphs 331-333).

### I2. Conflict Of Law - Senate Ratification Determined Treaty Is NOT Self-Executing, *Torture Treaty* Requires Civil Right Of Action

328. Defendant UNITED STATES has failed to comply its own ratification and with the specific provisions of the *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (1992 *Torture Treaty*). A current conflict of law at 18 U.S.C. § 2340B prohibiting civil remedies for torture violates the Senate determination in its October 27, 1990 ratification that the treaty is not self-executing:

"III. The Senate's advice and consent is subject to the following declarations:

(1) That the United States declares that the provisions of Articles 1 through 16 of the Convention are not self-executing."

329. 18 U.S.C. § 2340B, adopted April 30, 1994, which denies a right of civil remedy

directly contradicts, and is superseded by, Article 14 of the *Convention Against Torture and*

*Other Cruel, Inhuman or Degrading Treatment or Punishment,* as follows:

"Article 14

1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependents shall be entitled to compensation.

2. Nothing in this article shall affect any right of the victim or other persons to compensation which may exist under national law."

See the full text of this ratified international treaty at LPEE pages 921-933.

330. This court is constitutionally obligated to hear this conflict of law claim and to order

full and fair enforcement each of these treaties by defendant UNITED STATES on behalf of

these plaintiffs and all other persons over which this Court exercises jurisdiction.

## J. *Denton* and *Nietzke* Mandate Factual Development Of Novel Claims, For *In Forma Pauperis Pro Se* Litigation, Even If Imperfectly Pled

331. The *Denton* mandate commands factual development of novel claims, even if

imperfectly claimed *(Nietzke),* in ALL *in forma pauperis* pro se litigation. *Denton v. Hernandez,*

504 U.S. 25, 27, 32-34 (1992), at 27:

"In *Neitzke* v. *Williams,* 490 U. S. 319 (1989), we considered the standard to be applied when determining whether the legal basis of an *in forma pauperis* complaint is frivolous under § 1915(d). The issues in this case are the appropriate inquiry for determining when an *in forma pauperis* litigant's factual allegations justify a § 1915(d) dismissal for frivolousness, and the proper standard of appellate review of such a dismissal. "

…… at 32-34 (emphasis added):

"As we stated in *Neitzke*, a court may dismiss a claim as factually frivolous only if the facts alleged are "clearly baseless," 490 U. S., at 327, a category encompassing allegations that are "fanciful," id., at 325, "fantastic," id., at 328, and "delusional," ibid. As those words suggest, a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them. **An in forma pauperis complaint may not be dismissed, however, simply because the court finds the plaintiff's allegations unlikely. Some improbable allegations might properly be disposed of on summary judgment, but to dismiss them as frivolous without any factual development is to disregard the age-old insight that many allegations might be "strange, but true; for truth is always strange, Stranger than fiction."** Lord Byron, Don Juan, canto XIV, stanza 101 (T. Steffan, E. Steffan, & w. Pratt eds. 1977)

............

In reviewing a § 1915(d) dismissal for abuse of discretion, it would be appropriate for the Court of Appeals to consider, among other things, **whether the plaintiff was proceeding pro se,** see *Haines v. Kerner*, 404 U. S. 519, 520-521 (1972); **whether the court inappropriately resolved genuine issues of disputed fact,** see supra, at 32-33; **whether the court applied erroneous legal conclusions,** see Boag, 454 U. S., at 365, n.; **whether the court has provided a statement explaining the dismissal that facilitates "intelligent appellate review,"** ibid.; **and whether the dismissal was with or without prejudice."**

332. Defendants CIA and FBI have engaged in well-documented patterns of novel illegal practices (illegal drugging and illegal civil rights violence to name but two) outside law over many decades. These defendant institutions have fiercely resisted Congressional reforms and repeatedly engaged in widely known scofflaw behaviors. The US military sprayed US cities with chemicals they claimed to be non-toxic at the time but perhaps not so considered in later times. CIA did so as the world's largest drug dealer to US persons in the 1950s to 1970s in its MKUltra illegal LSD public drugging campaign. CIA violated the Constitutional separation of powers and federal law in 2014 spying on the Senate Intelligence Committee oversight investigation of CIA torture practices. FBI did so with Cointelpro, a violent federal police powers campaign it ran across the entire United States against the rights and lives of individual citizens, political groups,

and religious denominations from 1956 until it was discovered by a citizen burglary in 1971. As of 2023, fifteen years of continuing Section 702 violations and 45 years of continuing FISA violations are but two of many well-known current public examples of FBI misconduct. No criminal charges have ever been brought by defendant DOJ for tacitly permitted institutional criminal conduct.

333. Novel claims against defendant UNITED STATES must be considered objectively for the fact patterns they present, whether or not the underlying technology is known and understood to the general public at the time of the novel claim, and whether the rationale comports with any known moral, ethical, or legal standard of conduct - or does not comport with any such standard. Past experience and known fact patterns about these specific formally code-named, funded, and long-running patterns of prior illegal conduct by defendant UNITED STATES, discovered by individual citizens, by the media, and by Congress, demonstrate the imperative that novel claims must be examined clearly and impartially under due process.

## K. Congressional Intent - Title 18 RICO Statutes, Title 28 Judicial Proceedings

334. Congressional Intent - PL 91-452 (RICO) October 1970:

"(a) The provisions of this title [enacting this chapter and amending sections 1505, 2516, and 2517 of this title] shall be liberally construed to effectuate its remedial purposes."

Enforcing the "unalienable" constitutional, civil, and human rights of these plaintiffs and other US persons is the remedial purpose of this litigation, particularly in light of defendant DOJ's negligence practiced across decades of fraudulent concealment and knowing willful blindness (paragraphs 550-584), and absolutely no history of broad-based criminal prosecutions for broad-based institutionally tolerated misconduct in police powers and intelligence operations (paragraphs 307-313).

335. Speaking further to Congressional intent, 28 U.S.C. 2679(b)(2) (emphasis added):

"(b)(1) The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.
**(2) Paragraph (1) does not extend or apply to a civil action against an employee of the Government—**
**(A) which is brought for a violation of the Constitution of the United States, or**
**(B) which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized."**

**K1. Defendant Agencies, Individuals, and *Mens Rea* – Select Congressional Findings Contemporaneous With Events In This Litigation**

336. The Black's Law Dictionary definition of *mens rea*:

"/menz riya/ As an element of criminal responsibility: a guilty mind; a guilty or wrongful purpose; a criminal intent. Guilty knowledge and willfulness"

337. "United States Senate: Intelligence Activities And The Rights Of Americans Book II

Final Report Of The Select Committee To Study Governmental Operations With Respect To

Intelligence Activities" (commonly, the 1975 Church Committee) (emphasis added):

"(a) Covert Action - Apart from uncovering excesses in the collection of intelligence, our investigation has **disclosed covert actions directed against Americans**, and the **use of illegal and improper surveillance techniques** to gather information." (LPEE page 237)

"(b) Illegal or Improper Means-The surveillance which we investigated was **not only vastly excessive in breadth and a basis for degrading counterintelligence actions but was also often conducted by illegal or improper means**." (LPEE page 240)

338. See Lead Plaintiff's direct experiences with comparable activities at paragraphs 600

through 710.

339. "Project MKUltra: The CIA's Program Of Research In Behavioral Modification"

(commonly, the 1977 Rockefeller Commission): "Joint Hearing Before The Select Committee

On Intelligence And The Subcommittee On Health And Scientific Research Of The Committee

On Human Resources, United States Senate: August 3, 1977" (emphasis added):

> "The Commission investigated a number of projects of the Science and Technology
> Directorate which have affected persons living within the United States. **Most such
> activities** were lawful and proper." (LPEE page 262)

> **"It was clearly illegal to test potentially dangerous drugs on unsuspecting
> United States citizens.** The testing of equipment for monitoring conversations
> should not be directed against unsuspecting persons in the United States. Most of
> the testing undertaken by the agency could easily have been performed using only
> Agency personnel and with their full knowledge." (LPEE page 264)

340. Senate Select Committee on Intelligence: "Committee Study of the Central

Intelligence Agency 's Detention and Interrogation Program," declassified release December

2014:

> 1. The CIA's use of its enhanced interrogation techniques was not an effective
> means of acquiring intelligence or gaining cooperation from detainees.
> 2. The CIA's justification for the use of its enhanced interrogation techniques rested
> on inaccurate claims of their effectiveness.
> 3. The interrogations of CIA detainees were brutal and far worse than the CIA
> represented to policymakers and others.
> 4. The conditions of confinement for CIA detainees were harsher than the CIA had
> represented to policymakers and others.
> 5. The CIA repeatedly provided inaccurate information to the Department of Justice,
> impeding a proper legal analysis of the CIA's Detention and Interrogation Program.
> 6. The CIA has actively avoided or impeded congressional oversight of the program.
> 7. The CIA impeded effective White House oversight and decision-making.
> 8. The CIA's operation and management of the program complicated, and in some
> cases impeded, the national security missions of other Executive Branch agencies.
> 9. The CIA impeded oversight by the CIA's Office of Inspector General.

10. The CIA coordinated the release of classified information to the media, including inaccurate information concerning the effectiveness of the CIA's enhanced interrogation techniques.

11. The CIA was unprepared as it began operating its Detention and Interrogation Program more than six months after being granted detention authorities.

12. The CIA's management and operation of its Detention and Interrogation Program was deeply flawed throughout the program's duration, particularly so in 2002 and early 2003.

13. Two contract psychologists devised the CIA's enhanced interrogation techniques and played a central role in the operation, assessments, and management of the CIA's Detention and Interrogation Program. By 2005, the CIA had overwhelmingly outsourced operations related to the program.

14. CIA detainees were subjected to coercive interrogation techniques that had not been approved by the Department of Justice or had not been authorized by CIA Headquarters.

15. The CIA did not conduct a comprehensive or accurate accounting of the number of individuals it detained, and held individuals who did not meet the legal standard for detention. The CIA's claims about the number of detainees held and subjected to its enhanced Interrogation techniques were inaccurate.

16. The CIA failed to adequately evaluate the effectiveness of its enhanced interrogation techniques.

17. The CIA rarely reprimanded or held personnel accountable for serious and significant violations, inappropriate activities, and systemic and individual management failures.

18. The CIA marginalized and ignored numerous internal critiques, criticisms, and objections concerning the operation and management of the CIA's Detention and Interrogation Program.

19. The CIA's Detention and Interrogation Program was inherently unsustainable and had effectively ended by 2006 due to unauthorized press disclosures, reduced cooperation from other nations, and legal and oversight concerns.

20. The CIA's Detention and Interrogation Program damaged the United States' standing in the world, and resulted in other significant monetary and non-monetary costs.

341. See Lead Plaintiff's direct experiences with comparable activities by defendant

UNITED STATES, in conspiracy with other defendants, at paragraphs 600-619, 632-636, and

694-710.

## L. RICO Associated-In-Fact Enterprise

342. As alleged in 110 examples and 54 claims against these defendants, they have engaged in an associated-in-fact enterprise to financially, emotionally, and physically harm Lead Plaintiff in interstate commerce since at least 1968 by engaging in actions to perpetuate involuntary servitude in the service of the illegal development of BRMT and to sustain financial control of Lead Plaintiff and others of this class. These acts have and do include, without limitation, assaults and attempts on life, thefts of compensation and of all forms of property, and illegal imposed limits on income and employment opportunities. The pattern of racketeering acts clearly demonstrates this is an associated-in-fact enterprise, as in *Boyle v. United States*, 556 U.S. 938 (2009):

"From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. As we succinctly put it in *Turkette*, an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U. S., at 583.

343. This associated-in-fact enterprise has and does have:

(i) *purpose* – the perpetuation of the development of the illegal BRMT bioweapon and

bioweapon delivery system (18 U.S.C. § 175) over the past fifty-six years, the

perpetuation of involuntary servitude (18 U.S.C. § 1584) to illegally benefit defendant

UNITED STATES domestic and international spying operations, to benefit other

police powers illegal operations (42 U.S.C. §§ 1981-1986, 1994) against the Lead

Plaintiff and others, and to sustain a long-running cover-up (18 U.S.C. §§ 1512, 1513)

and evade financial and other consequences from its exposure related to any financial

damages and/or budget cuts which would result from its full and complete public

disclosure,

(ii) *relationships among those associated with the enterprise* – formal and informal

relationships and roles exist among the police powers, government departments and

agencies, press, unions and trade associations, various private entities, both actual and

cover operations, and individual defendants,

(iii) *longevity sufficient to permit these associates to pursue the enterprise's purpose* –

this enterprise has persisted each and every day since the BRMT program was first

initiated, against the Lead Plaintiff alone it has persisted throughout his life journey

from age 5 as collaterally human trafficked and from age 12 as directly human

trafficked, through compromised educational institutions, employers, business

enterprises, employment, unemployment, marriages, divorces, homelessness, periods

of torture, and a wide variety of other injuries which have persisted for at least fifty-

six years, all fraudulently concealed by systematic abuse of the state secrets privilege

and by a vast pattern of lies, large and small.

344. RICO (18 U.S.C. §§ 1961-1968) provides for its use against any form of associated-

in-fact enterprise pattern of racketeering acts including, without limitation, acts which do or may

result in physical injury 18 U.S.C. 1961(1)(A), and/or various financial injuries, obstructions,

and frauds 18 U.S.C. 1961(1)(B), which arise in any interference in any form of interstate

commerce, be that as simple as crossing a state line on a transit bus, or as sophisticated as to

extend to organized international thefts using oxytocin to biochemically hijack a victim into

surrendering money and property to an unknown third party (paragraph 612 HEXP-6, 639 RICO-

1). There are no exemptions for any formal or informally organized associated-in-fact enterprise

including, without limitation, police powers departments and agencies, intelligence agencies,

other government departments and agencies, unions, trade associations, political organizations,

various forms of private entities, or individual defendants. 18 U.S. Code § 1964 - Civil remedies:

(a) The district courts of the United States shall have jurisdiction to prevent and
restrain violations of section 1962 of this chapter by issuing appropriate orders,
including, but not limited to: ordering any person to divest himself of any interest,
direct or indirect, in any enterprise; imposing reasonable restrictions on the future
activities or investments of any person, including, but not limited to, prohibiting any
person from engaging in the same type of endeavor as the enterprise engaged in,
the activities of which affect interstate or foreign commerce; or ordering dissolution
or reorganization of any enterprise, making due provision for the rights of innocent
persons.

As Congress wrote in adopting PL 91-452 (RICO), October 1970 :

"(a) The provisions of this title [enacting this chapter and amending sections 1505,
2516, and 2517 of this title] shall be liberally construed to effectuate its remedial
purposes."

345. These defendants have engaged in a pattern of racketeering acts which has and does

injure this class of plaintiffs since at least 1968, when the Lead Plaintiff was human trafficked to

Oregon and California at age 12 using funds provided by his parents to camp for approximately

ten days during which defendant UNITED STATES violated rights through its illegal BRMT

oxytocin hormone brain hijacking of Lead Plaintiff (paragraph 417). This specific act, and more

than twenty thousand days of subsequent racketeering acts of defendant UNITED STATES and

its co-conspirators, have resulted in vast and persistent financial, property, and other injuries to

Lead Plaintiff in interstate commerce, as it has to others of this class (paragraph 639 RICO-1).

346. These defendants have engaged in a pattern of racketeering acts which has and does

injure this class of plaintiffs since at least 1968, all of which has been fraudulently concealed so

the relevant statutes of limitation are tolled. It is not possible for these plaintiffs to identify each

and every statutory jurisdiction in which these acts, violations, and injuries have occurred, since

they can be and have been perpetrated in at least 44 domestic state law jurisdictions as to Lead

...tiff alone, whose injuries stand in for those of all other plaintiffs as this complaint is filed.

...er federal law, this Court nonetheless has subject matter and legal jurisdiction over all such claims regardless of the plaintiffs' ability to specifically identify the relevant jurisdiction as a specific act, violation, or injury. All such acts, violations, and injuries inextricably intertwined among defendant UNITED STATES' and all known and unknown co-conspirator defendants' durable pattern of misconduct in the acts, violations, and injuries herein. Subject matter and personal jurisdiction are granted to this Court by Congress, pursuant to 28 U.S.C. §§ 1331, 1333, 2679(b)(2), 18 U.S.C. §§ 1961-1968, Fed. R. Civ. P. 4(k)(1)(C) and 4(k)(2)(B), over Plaintiffs' claims described herein, including without limitation, constitutional and statutory rights for both territorial and extra-territorial actions, including claims arising from violations of state statutes because those offenses are directly intertwined with and arise from the original acts, violations, and injuries by defendant UNITED STATES and it co-conspirators, and thereby comprise (a) elements of and within the pattern of conspiracy to commit, and (b) elements within the pattern of rights violations and racketeering activity conducted through an associated-in-fact enterprise in conspiracy with other defendants in their acts, violations, injuries, and unconstitutional conduct against Lead Plaintiff and others of the class.

Paragraphs 347 through 349 are reserved.

[Intentionally left blank.]

## FACTS – GENERAL ALLEGATIONS

**INTRODUCTION**

**Five Basic Illegal Patterns of Practice – Illegal Bioweapon Development, Racketeering Conspiracy, Direct Threats to Life, Involuntary Servitude, Fraudulent Concealment And Willful Blindness**

350. Five basic illegal patterns of practice, justiciable by this class of plaintiffs against defendant UNITED STATES and its co-conspirator defendants, demand the attention of and action by this Court –

1) First, an internationally prohibited illegal bioweapon and bioweapon delivery system which has been and is being developed by defendants CIA and ARMY abusing unwitting US persons as human subjects of illegal biomedical experiments, psychological coercion, and involuntary servitude,

2) Second, a racketeering associated-in-fact enterprise of defendant DOJ, its police powers agencies, and others, initially perpetrated primarily by defendants FBI and USMS, which has and does add other police powers co-conspirators over time, and which has and does (i) abuse civil rights through deprivations and conspiracies to deprive rights; (ii) engage in associated-in-fact enterprise patterns of racketeering acts including, without limitation, involuntary servitude, forced labor, various frauds and thefts; all to support illegal domestic spying operations and to sustain illegal BRMT program development and deployment on and against US persons,

3) Third, direct visual threats and indirect verbal threats have been and are followed by specific lethality attempts intended to intimidate, silence, and/or remove the victims as witnesses, together with human trafficking intended, without limitation, to

indirectly destroy evidence of defendants' past crimes by the passage of time to
secure routine records destruction, and

4) Fourth, defendant UNITED STATES has and does sustain involuntary servitude of
the Lead Plaintiff since he was an elementary school student, clearly demonstrating
its intent to sustain its influence and control over his life, professional career, personal
life and relationships, acting to disrupt at will any and all aspects of life, health, and
fate to the point of multiple attempts on life at various points during his adult lifetime,

5) Fifth, continuing fraudulent concealment and willful blindness of police powers,
military services, intelligence agencies, and DOJ, FBI, USMS, and Inspectors
General to criminal wrongdoing in their own operations and to co-conspirators' acts,
violations, and injuries, against these unwitting plaintiffs.

351. *First, an Illegal Bioweapon*, defendant UNITED STATES has and does illegally
deploy and operate Brain Remote Management Technology ("BRMT" herein), a neuroscience-
based brain hijacking system (paragraphs 359-399, LPEE pages 1-10A) against US persons. This
type of neuroscience based bioweapon technology has not previously been used in personalized
warfare against people, so it is completely unfamiliar to nearly everyone. A relatively
unsophisticated beneficial medical device based upon the same neuroscience principles emerged
publicly for the first time in human history in July 2022 when FDA approved human trials of this
beneficial medical device, a computer to brain interface, described at paragraphs 374-375, LPEE
pages 11-25.

A. BRMT is not beneficial to the bioweapon's target, it is not controlled by the user, and
it functionally partially controls its victim by hijacking and abusing that person
without their knowledge or consent. BRMT is malign, illegal, and internationally

prohibited; a bioweapon and bioweapon delivery system developed in secret at massive expense over decades by defendant UNITED STATES abuse of its own citizens in illegal field medical experiments on those unwitting human subjects without their consent, who were chosen based upon their religion, loyal service to the United States, or on their parentage by one of those who were religiously discriminated against by defendant ARMY.

B. BRMT is an offensive weapon of war. Offensive weapons of war can only be deployed against US persons by the federal government in certain very limited circumstances consistent with our Constitution and laws. No such circumstances of rebellion or invasion arise here.

C. BRMT is a monstrous intrusion by our federal government on liberty, human autonomy, and free will. This offensive biological weapon violates (i) the Constitutional rights of its involuntary victims, (ii) 18 U.S.C. § 175, (iii) the 1972 *Bioweapons Treaty* and four other international treaties, and (iv) Title 42 Chapter 21 Civil Rights, among others. The massive scope of defendant UNITED STATES and its mostly unwitting co-conspirators' Constitutional and statutory violations are summarized in paragraph 251.

D. BRMT violates (v) the "state secret" privilege mandate that any assertion of "state secret" privilege be "**not inconsistent with law**," *United States v. Reynolds,* 345 U. S. 1, 12 (1953), discussed at paragraph 260.

Simply put, BRMT is illegal in the United States because hijacking a human brain with a bioweapon is illegal everywhere under both U.S. law and international treaties ratified by the United States.

352. ***Second, a Racketeering Conspiracy***, defendant UNITED STATES and its co-conspirator defendants, named and as yet unidentified, have and do engage in (vi) an associated-in-fact enterprise pattern of racketeering acts against these plaintiffs including, without limitation, involuntary servitude, forced labor, human trafficking, and other prohibited acts under 18 U.S.C. §§ 1961-1968 and in (vii) an expansive pattern of violations of human, Constitutional, and civil rights under 18 U.S.C. §§ 241, 242, and 42 U.S.C. §§ 1981-1986; all against Lead Plaintiff and this class of Plaintiffs, which conspiracy perpetuates the illegal human subject biomedical experimentation, and causes direct, immediate, and continuing harm to these Plaintiffs. These illegal acts (viii) violate the "good faith" standard mandated for asserting both absolute and qualified individual immunity in *Harlow v. Fitzgerald, 457 U.S. 800* (1982), discussed at paragraph 272-273, causing each individual defendant, whether named or yet-to-be named herein, to be directly, personally, and individually liable for their joint and several conspiracy and knowing bad faith acts, violations, and injuries against these plaintiffs.

353. ***Third, Direct Threats to Life,*** these acts of (i) illegal human experimentation and BRMT brain hijacking without consent by an illegal bioweapon and (ii) creation and perpetuation of an associated-in-fact racketeering enterprise, by these defendants has been, is, and will be (ix) threats to life, liberty, rights, and the rule of law, against the Lead Plaintiff, against this entire class of Plaintiffs, and prospectively against the legal and constitutional rights of all US persons so long as this Court allows these acts to continue. Absent direct and explicit prohibition by this Court, this long-running pattern of abuses and injuries will continue and may lead to additional deaths.

354. ***Fourth, Defendant UNITED STATES Sustains Involuntary Servitude*** of Lead Plaintiff from elementary school age to the present using defendant USMS, FBI, CIA, and

ARMY personnel in civilian dress, and other co-conspirators, limiting access of other persons

except those specifically permitted to make and sustain contact including, without limitation,

determining which persons are introduced to Lead Plaintiff as prospective friends, intimate

partners and spouses, employers, business partners, bankers, investors, and customers.

355. *Fifth, Fraudulent Concealment and Willful Blindness* of these defendants extends

from the simplest and most basic violations of law to the most profound violations of rights and

law. These acts, violations, and injuries include, with limitation, range from:

- such very basic acts as refusals and stonewalling of public information requests by

police powers, military, and intelligence defendants, particularly including defendants ARMY,

CIA, and NARA, who refuse to even acknowledge these requests to correspond and reply to

FOIA and Privacy Act requests as legally required under law (LPEE pages 508-541), to

- highly sophisticated mass casualty events targeting Lead Plaintiff and orchestrated to

appear as accidents on an express train traveling toward New York City at about 60 mph at

sundown on Sunday evening September 11, 2022 (paragraph 707, LETHL-14).

355. Regardless of any obfuscation by defendants' claims of "state secret" privilege,

classification status, or other alleged privilege, these acts against US persons and others directly

and immediately imperil each and every plaintiff victim's life and liberty. The carefully

researched facts and fact patterns herein make this five decade long pattern of defendants'

misconduct plain and obvious to all, despite the strenuous attempts of these defendants to

fraudulently conceal their unprincipled abuse of the state secret privilege and continue their

illegal abuses of this class of plaintiffs.

356. A detailed description of each of these five intertwined elements of this conspiracy

is presented in the narrative below. These five elements are illustrated with examples from the

Lead Plaintiff's own experiences, which are representative of the range of acts, violations, and injuries most probably experienced by many other plaintiffs of this class. While the events themselves are closely intertwined and co-mingled as life events across more than five decades, they are divided here in the same way as they were briefly described above, into five specific domains for ease of understanding:

1. Illegal BRMT Bioweapon Development and Deployment

2. Racketeering Associated-In-Fact Enterprise Crimes Cover Illegal BRMT Development, Illegal Domestic Spying, And International Commercial Cover Espionage

3. Threats, Lethality Attempts, And Human Trafficking Used To Indirectly Destroy Evidence Of Past Crimes

4. Defendant UNITED STATES Sustains Involuntary Servitude

5. Defendants' Fraudulently Conceal Illegal Operations And Remain Willfully Blind To Violations Of Rights And Law

This fact narrative is followed by 110 specific examples of acts, violations, and injuries to Lead Plaintiff. The chart at paragraph 30 and the timeline in Appendix 2 can be used to relate these acts, violations, and injuries to each other across time. A further expanded timeline, LPEE Table 2, is included at LPEE pages 12023-12120.

## 1. FIRST, Illegal BRMT Bioweapon Development and Deployment

357. Defendants CIA and ARMY (Bioweapons Laboratory and Medical Corps) illegal human subject biomedical experimentation and deployment began in the 1950s with a series of illegal experiments which then led to over 140 failed illegal CIA MKUltra LSD drug dosing experiments across the United States from 1953 to 1973. MKUltra was itself the straight line continuation of years of depraved drugging and other human subject biomedical experiments on prisoners in the Nazi's Dachau Concentration Camps. Set up a few weeks after Hitler's rise to

Chancellor in 1933, the Dachau Concentration Camps housed political, ethnic, and religious prisoners through the May 1945 end of World War II in Europe.

358. At the first of twelve Nuremberg Trials, seven of these Nazi Concentration Camp doctors were sentenced to death, nine to long prison sentences, and seven were acquitted, see *US v. Karl Brant* et al, in the Nuremberg trail record from November 21, 1946 and August 20, 1947. Nonetheless, Nazi Dachau Concentration Camp "medical doctors and researchers" were secretly brought to the United States by defendants CIA, ARMY, and the State Department as part of Operation Paperclip between 1945 to 1959. Defendant UNITED STATES then employed these Nazis in secret labs to pursue intentional illegal drugging and other internationally prohibited "medical research" on Americans and Canadians.

[Intentionally left blank.]

**_Interline Exhibit 3:_ Defendant CIA's Failed MKUltra Mind Control Program, Later Replaced By Illegal BRMT Bioweapon And Bioweapon Delivery System**

 AUTHOR INTERVIEWS

# The CIA's Secret Quest For Mind Control: Torture, LSD And A 'Poisoner In Chief'

September 9, 2019 · 2:50 PM ET
Heard on Fresh Air

 TERRY GROSS

 FRESH

▶ **37-Minute Listen**       

During the early period of the Cold War, the CIA became convinced that communists had discovered a drug or technique that would allow them to control human minds. In response, the CIA began its own secret program, called MK-ULTRA, to search for a mind control drug that could be weaponized against enemies.

MK-ULTRA, which operated from the 1950s until the early '60s, was created and run by a chemist named Sidney Gottlieb. Journalist Stephen Kinzer, who spent several years investigating the program, calls the operation the "most sustained search in history for techniques of mind control."



CIA chemist Sidney Gottlieb headed up the agency's secret MKULTRA program, which was charged with developing a mind control drug that could be weaponized against enemies.
Courtesy of the CIA

Some of Gottlieb's experiments were covertly funded at universities and research centers, Kinzer says, while others were conducted in American prisons and in detention centers in Japan, Germany and the Philippines. Many of his unwitting subjects endured psychological torture ranging from electroshock to high doses of LSD, according to Kinzer's research.

"Gottlieb wanted to create a way to seize control of people's minds, and he realized it was a two-part process," Kinzer says. "First, you had to blast away the existing mind. Second, you had to find a way to insert a new mind into that resulting void. We didn't get too far on number two, but he did a lot of work on number one."

## CIA has never renounced its mind control goal

(Source: https://www.npr.org/2019/09/09/758989641/the-cias-secret-quest-for-mind-control-torture-lsd-and-a-poisoner-in-chief. See full text at LPEE pages 9679 - 9685.)

### Precursor Events: Illegal CIA and ARMY Experiments Use Nazi Dachau
### Concentration Camp Doctors and Illegal Drugs on US Persons

359. Defendant CIA used the Dachau Concentration Camp human subject medical
experiments "expertise" of these Nazi doctors as the springboard for its mind control research.
Defendant CIA purchased and illegally distributed 100 million LSD doses, mostly in secret
against US and Canadian citizens and soldiers, through more than 140 projects. Its collaboration
with defendant ARMY's Bioweapons Lab made CIA the world's largest drug dealer through
much of the 1950s and 1960s, mostly targeted against American citizens. Even as the American
Mafia were refusing to peddle heroin in the United States, CIA's MKUltra projects were secretly
and illegally drug dosing unwitting civilians and soldiers with LSD, then permitting those
unwitting drug-impaired hallucinating victims to return immediately and unsupervised to normal
activities. These negligent practices endangered, injured, and killed both hallucinating program
victims and other innocent people. Police reports show that LSD drug-impaired people are at
least as dangerous as any other impaired person. Lacking normal social inhibitions, hallucinating
people act as perpetrators and/or victims of assaults, murders, rapes, motor vehicle accidents, and
all other forms of public mayhem and disruption. Defendant CIA delivered LSD secretly and
without consent to unwitting victims, without prior medical screening for fatal conditions, then
turned them loose and watched the resulting mayhem, never interfering or telling others, all
while hiding the MKUltra program behind "state secret" privilege as a "national security"
program.

360. As defendant CIA ramped up the MKUltra program in 1953, Frank Olson, a contract
researcher formerly with defendant ARMY's Bioweapons Lab raised legal and ethical concerns.
Late in that meeting with program director Dr. Sidney Gottlieb and others, he was secretly
drugged with LSD, hallucinated, and then was isolated from his family for "safety" reasons.

Nine days later, likely semiconscious due to blows to his head and body, he plunged ten stories to the sidewalk from the New York City hotel room he shared with MKUltra Program Director Gottleib's personal assistant. The CIA Assassination Manual of the day stated that a fall needed to be more than 75 feet to assure it was fatal. He died on the sidewalk across from Penn Station in New York City around 2AM on November 28, 1953 (Appendix 2 paragraphs 1-002, 1-003).

361. President Ford and CIA Director Colby formally apologized to Olson's family in 1975 for that 1953 death under CIA Director Dulles. A 1994 exhumation and forensic autopsy led nine of ten members of the autopsy team to conclude Frank Olson's death resulted from blunt-force trauma to the head and injury to the chest, which occurred before Olson dropped ten stories to the sidewalk at 2AM.

362. The Lead Plaintiff's efforts to expose the illegal BRMT bioweapon and bioweapon delivery program have been met with similar hostility and threats in and around New York City, accelerating since 2021, including from defendant FBI and CIA, among others. See Interline Exhibit 15 for several recent visual and verbal threats and indirect physical violence attempts in 2022 designed to appear as naturally occurring events or even as mass casualty events. Other attempts across time are documented, without limitation, at paragraphs 618-620 and 694-710. Defendants FBI, DOJ, and NYPD coverup efforts are documented in Interline Exhibits 17-19.

363. CIA's MKUltra was an epic failure, never coming close to achieving mind control. It was finally shut down in 1973 (Appendix 2 paragraphs 1-005, 1-006). The evidence which identified both the victims it impaired or destroyed and its failure to achieve its malignant objective were destroyed in a never prosecuted government coverup. The CIA Director was sent out of the country two months later, having resigned and been swiftly confirmed Ambassador to Iran, out of sight and out of mind. But the mind control objective remained an active program at

defendants CIA, ARMY, and other DOD military services defendants named herein (see LPEE

pages 11937-12022 for a very few examples of their directly relevant weapons research

programs). Notably, there was never even one federal felony indictment of any person for the

crimes against US persons committed under MKUltra by government employees, agents, and

contractors.

### CIA And ARMY Conduct Illegal Medical Experiments, Develop Prohibited Bioweapon By Medically Abusing American Civilians As Human Subjects

364. Defendants CIA and ARMY's MKUltra LSD drugs program replacement is the

illegal BRMT bioweapon and bioweapon delivery system program. BRMT is a neuroscience and

technology platform based mind control (brain hijacking) illegal bioweapon and bioweapons

delivery system which violates 18 U.S.C. § 175. This type of bioweapon platform was

internationally banned in April 1972 in the *Convention on the Prohibition of the Development,*

*Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their*

*Destruction*, just as the illegal BRMT program was being initiated. By 1968, BRMT had already

been used as a crude locally deployed bioweapon which directly hijacked brain hormones by

using a frequency tuned device operated locally at a distance from the victim, such as the one

used on the Lead Plaintiff on a camping trip vacation at age 12 while being accompanied by

Gary JACK, an ARMY or CIA contractor described at paragraph 417 (Appendix 2 paragraph 1-

007), who plausibly acted on behalf of defendant BREYER, the program manager of that era.

365. These crude early devices of the 1960s and 1970s could stimulate hormones

including, without limitation, melatonin for sleep, adrenaline for alertness and hyper-vigilance,

and oxytocin for love. See lethality subcount paragraph 694 LETHL-1 herein for the first known

near-lethal application of BRMT to Lead Plaintiff and his first wife, Lynne,  in the 1980s. It has

been and is illegally developed and deployed by defendant UNITED STATES (ARMY and CIA)

through secret abusive medical experiments and coercive psychological operations on human beings (the fellow citizens these defendants are sworn to protect), as the plaintiff's brains are abused through hijacking in field experiments, without their consent, just as the human subject medical experiments were conducted at Dachau Concentration Camps at Dachau, Auschwitz, and Bergen-Belsen, among others. The illegal BRMT bioweapon and bioweapon delivery system has been developed through these long-running direct experiments on and direct abuses of unwitting US persons including the Lead Plaintiff, who have effectively been the live free-roaming laboratory rats of defendants UNITED STATES, CIA, ARMY, DOJ, FBI, and other defendants, as abused in involuntary servitude. See LPEE pages 6645-6699 explaining basics of the brain and neuroscience, then LPEE beginning at page 1 explaining the illegal BRMT bioweapon.

366. Development of this BRMT illegal biological offensive weapons system continues today at the cost of billions for neuroscience research and for remote technology platform development. Neuroscience has progressed much more rapidly in recent years due to the advances in medical technology tools including, without limitation, functional MRIs used to further the understanding of biochemical brain functions. Other technology platform advances provide similar benefits. Supercomputers are still uncommon, but are used daily in stock trading and other common commercial pursuits. Some of the same types of space-based remote technology platforms which support the illegal BRMT bioweapon and bioweapon delivery system in ordinary commercial applications such as planting 15,000 to 20,000 corn seeds per minute within one-third of an inch across millions of acres every spring for over a decade. Still others applications using this space-based technology reside on your cell phone for high accuracy location services.

367. The same neuroscience principles used illegally in the prohibited BRMT bioweapon are applied to beneficial medical uses against progressive brain diseases like ALS and to relieve spinal cord disabilities. But these commercial developments did not begin in the 1960s, they began around 2012, with much smaller investments to date, so they are much less advanced. An early stage antilog to BRMT (opposite in effect) beneficial medical device, a much less advanced system used to treat, has been approved for FDA human trials after only $70 million of commercial investment (see Synchron at paragraphs 374-375, see also LPEE pages 1-55). This developing fact pattern was very carefully and fraudulently concealed by technology hacks by defendants from the Lead Plaintiff until 2021, to limit his possible discovery while illegal BRMT development and abuses continued without consent in the meantime, as they still do.

368. Here are a few historical paradigms for skeptics who need further convincing of the possibility of this sort of bioweapon's mere existence– northwest Wyoming's thermal geysers, mud pots, and boiling springs were dismissed as the fantasies of a drunken and delusional man and of those who followed him, from around 1807 until the 1850s. After the invention of photography in 1839, an official expedition was sent to northwest Wyoming in 1871, including a photographer and landscape artist Thomas Moran. In 1872, this nearly sixty-four year long fantasy spun by someone who was considered a clearly drunken and delusional man by most, John Colter, became Yellowstone, the world's first national park. It's now visited by about 3.5 million other "delusional" people each year.

## Basic Human Brain Functions Are Commanded by Illegal BRMT External Hijacking

369. The illegal BRMT bioweapon and bioweapon delivery system is intended, designed, and acts to excite or suppress production of common human brain chemistry (biological compounds such as hormones) which are extraordinarily important to the proper

functioning of the human mind and body, including to human health and to exercise of free will in decision-making. See a summary description of BRMT beginning at LPEE page 1 and brief examples of the extraordinarily broad array of adverse effects of BRMT bioweapon operations directly experienced by the Lead Plaintiff from the 1980s to the present at LPEE pages 181 – 181C.

370.  Grossly oversimplified, the adult human brain is a six to eight pound biochemical manufacturing and processing plant filled with neurons and glial cells. Neurons are the "thinking and acting" cells which interact biochemically to regulate bodily functions, form thoughts, and send messages to other neurons to complete thoughts and/or command specific actions. Neurons communicate across synapses, which are the cell membrane gaps across which neurons send biochemical messages to communicate through the adjacent neuron cell's membrane into the adjacent neuron cell itself for a further biochemical reaction, such as commanding your right index finger to strike a key on your cell phone keypad. Glial cells are the neurons' servants and guardian cells which regulate the local environment, keeping it sanitary, supplying needed chemicals (oxygen, trace compounds, and so forth), and guarding against biological viruses and other intruders to support this network of billions of neurons. Neuronal networks (simplified here as nerves) carry messages across the brain for further processing, and to other parts of the body, such as muscles and organs to coordinate walking, breathing, swallowing, talking, operating a car, and so forth.

371.  The brain operates consciously (experienced for example, as thought and speech) and unconsciously (experienced without thought in regulated and monitored functions like breathing, adjusting eye focus, moving the head, and so forth). Boundaries between conscious and unconscious actions are not clear cut, of course, as we know from observing ourselves and

each other in various situations, such as observing voluntary and involuntary changes in expression and body language, and sudden awareness of normally ignored body system through nervous system signals such as pain or shortness of breath. See LPEE pages 6645-6685 for a basic explanation of neuroscience – the science of the brain and nervous system.

372. The prohibited BRMT bioweapon and bioweapon delivery system is internationally prohibited by the ratified 1972 *Bioweapons Treaty* and illegal offensive military and intelligence weapon born in the 1960s, which operates since the 1972 Bioweapon Treaty outside international law as an offensive weapon, a computer-to-brain weapon used to partially hijack human brains. As a weapon, it can be used for lethal purposes as it is a weapon controlled by a government official, not by the human target. It is not a legal beneficial medical device (a brain-to-computer interface) which is controlled by the user's brain. First, we consider the beneficial medical uses of brain-to-computer interfaces which use the same neuroscience principles as the illegal bioweapon. Then, we consider other important and directly relevant commercial beneficial medical technology which remotely modifies the brain. After those explanations, we pick up the illegal brain hijacking BRMT bioweapon again at paragraph 377.

373. Over the past decade private companies have invested a few hundred million dollars to develop medical devices, relatively crude commercial brain-to-computer interfaces. These early stage commercial prototype beneficial medical devices began being tested in humans after initial FDA approval for human trials in 2021, in pioneering medical treatments of brain injuries, diseases, and other biological and biochemical disorders, including, without limitation, ALS and Parkinson's disease.

374. Synchron, a pioneering New York City-based medical device company received FDA permission for the first ever implant of a brain-computer interface device in July 2022 for a

patient suffering from ALS, after investing $70 million to that point. An Elon Musk company, Neuralink, is investing $100 million of Musk's money to develop this type of technology into commercial medical products and has recently received FDA approval for human testing. Other companies are developing brain-computer interfaces to control artificial limbs, among other medical uses.





Source: Synchron.com

375. In another beneficial medical application, hospitals employ tiny pulses of focused
ultrasound energy. The device is used through the skull to non-invasively impact malign brain
structures such as amyloid plaques in very specifically targeted parts of the brain at specific
depths by varying the ultrasound intensity to match the location and depth of the plaque in the
brain structure. This focused ultrasound is delivered by a locally operated medical device, some
commercial versions look like a dentist's x-ray machine, other like MRI devices, still others like
general imaging devices. So, the patient benefits from symptom relief in the brain by a device
which operates and uses focused energy pulses from outside the skull.

376. These "miraculous" commercial medical breakthroughs benefit from several
hundred million dollars of applied medical research, mostly over the past decade. See LPEE
pages 11-139 filed herewith. So, as a practical matter it is currently technologically feasible to
impact thought, speech, and action by (a) biochemically "reading" the mind (nerve impulses
trapped by the Synchron device to move computer cursors and accomplish other tasks by
thinking about them and to (b) act remotely from outside the skull using tiny pulses of energy
(focused ultrasound) to alter brain structures and the brain chemistry which comprises our
thoughts. This combination of neuroscience principle and technologies is similar to the methods
used by the illegal BRMT bioweapon and bioweapon delivery system to hijack the unwitting
victim's brain without their knowledge or consent.

377. By comparison with these relatively recent beneficial medical applications, the
illegal BRMT bioweapon and bioweapon delivery system has benefitted from tens of billions of
dollars of secret research over more than six decades. It has evolved from a crude locally
operated device outside the brain which impacts hormones (in 1968, age 12, paragraph 417), to a
remotely triggered local device using cell phone triggering of a local device (in the mid-1980s,

around age 28-30, used in double homicide attempt, paragraph 694 LETHL-1) to a fully remote device which has and does employ daemons and highly sophisticated precision location technologies (early 2000s, around age 45-48), and the recent addition of predictive analytics and artificial intelligence in 4-5 years ago (probably 2015-2018, around age 60-63), now age 68 as illegal BRMT operations, rights violations, and racketeering acts by the associated-in-fact enterprise of these defendants continues to operate.

378. This sequence of breakthroughs has leveraged various science and technological research and development progress and defendant DOD infrastructure deployments, particularly of remotely deployed technologies, ultraprecision location systems, and space-based systems which can deploy pulsed energy. The illegal BRMT bioweapon delivery system leverages system integration with other hundreds of billions of dollars of stealthy military technologies which have been developed in parallel with BRMT, including, without limitation, supercomputing software, extreme low latency encrypted communications systems, extreme precision location systems, and precision focused pulsed energy systems. As a result, BRMT is vastly more capable and vastly exceeds the capabilities of the relatively primitive "miraculous" early stage private sector medical devices now in their first two years of FDA approved human trials. But BRMT remains an illegal bioweapon and bioweapon delivery system prohibited under US law (18 USC § 175) and ratified international treaty (1972 *Bioweapons Treaty*).

379. By using:

(i) Defendant DARPA, In-Q-Tel (CIA venture capital company), and various surreptitious institutions which have been and are used as funding conduits by defendant UNITED STATES and its co-conspirators, as cutouts for medical research in coercive psychology,

neuroscience, computing, and other technological research and development by

recognized medical research organizations,

(ii) together with defendant DOD facilities (ARMY, USAF, US NAVY) and military

personnel at times in civilian dress and roles, as well as defendant CIA assets and

platforms (which include co-location with commercial cover spies in USMS, FBI, and

other cover companies and clients of those commercial cover companies) in the United

States,

(iii) defendant UNITED STATES' has and does sustain deliberate pretexting and national

security entanglements of these plaintiffs in involuntary servitude. This pattern of

involuntary servitude incorporates acts, violations, and injuries including, without

limitation, BRMT bioweapon and bioweapon delivery system abusive human subject

medical experiments, coercive psychological operations, other rights violations,

racketeering acts, and patterns of racketeering acts which are perpetrated by the

associated-in-fact enterprise which includes, without limitation, all these defendants.

**Illegal BRMT Bioweapon Operates Like Other Remote Offensive Weapon Systems**

380. BRMT, the computer to brain bioweapon, operates in precisely the opposite manner

from the beneficial medical devices described above. Rather than assisting the person to perform

some operation or create more favorable brain or body function (such as by reducing ALS

tremors and other symptom suppression), moving a computer mouse or a biomechanically

assisted arm using thought (brain waves) alone, the illegal BRMT bioweapon and bioweapon

delivery system hijacks the victim's brain function, so the BRMT operator can then remotely

command and control specific brain and bodily function and sets of functions, such as breathing,

thought, and/or action.

381. The modern version of the illegal BRMT bioweapon uses its prohibited remote bioweapon delivery system to focus precisely addressed energy pulses from vast distances to precise locations in the brain. This precision focused energy is similar to x-rays and radio waves, which are also forms of energy but with different wavelengths than are used in BRMT. Simply put, x-ray waves and radio waves operate at different frequencies and amplitudes (different places on the energy spectrum and at different energy levels) from BRMT. Radio and other communications waves are broadcast widely. BRMT energy pulses are aimed very narrowly with extreme precision at a particular location in the brain to directly hijack the brain remotely.

382. Ground based location accuracy enhancement of the illegal BRMT bioweapon and bioweapon delivery system is provided by the precisely located nearest cell phone tower. Predictive analytics software adds the extreme precision needed to adjust to head movements and position changes in normal human activities like walking and driving. The speed of light (186,000 miles per second) takes care of the rest - the signal pulse and aim point can be adjusted as needed within the short blink of an eye.

383. This BRMT bioweapon delivery system uses an ultra-narrowcast pulsed nanometer scale energy pulses to force precise involuntary biochemical reactions at specific locations or sequence of locations in the brain. These energy pulses stimulate particular brain locations, addressing a specific carefully identified brain address or set of brain addresses in a very specific and carefully timed sequence to generate a particular thought, or a particular action or set of actions, such as thought, speech, or movement. The brain of the victim becomes the involuntary servant of the BRMT operator for that particular set of function or actions during the commanded sequence, while other brain activity continues as normal. The BRMT operator thus overrides and hijacks the victim's free will and normal function as they wish. This unnatural

hijacking cannot be detected by the victim. The entire illegal BRMT brain hijacking sequence
seems entirely natural to the victim, just as an airplane hijacking would to an airplane passenger
when a hijacker took the controls away from the assigned pilot if no one mentioned to the
passengers that the cockpit had been secretly hijacked behind the closed cockpit door.

384.  The prohibited BRMT bioweapon and bioweapon delivery system has benefited
from decades of research and tens of billions of " state secret" government funding, just like
other weapons systems. By using other available technologies which adapted for its use
(including, without limitation, space-based digital signaling platforms used for other military
purposes such as encrypted communications, precision location, and routine navigation), the
prohibited BRMT bioweapon can be operated remotely from a secured location just like any
armed drone aircraft and many other modern weapons systems and surveillance systems operate
daily. Precision location technology and speed of light transmission rates are used, so no direct
contact between the supercomputer-based BRMT weapon, the BRMT bioweapon delivery
system (using a space-based platform and locally corrected signal), and the impacted victim is
required. For local operation, the operator can work from an encrypted hand-held device, which
can be disguised as a cell phone. No implant is needed in the victim as the precision focused
energy commands a specific sequence of biochemical actions in the brain using remote precise
location technologies.

385. No notice or consent are given to the victim as this illegal invasion of rights is
performed from behind the "state secret" privilege curtain under the same illegal tacit permission
structure used for all other forms of illegal acts against victims in federal police powers
operations (45 consecutive years of unprosecuted defendant FBI FISA violations of rights waved
off by defendant DOJ come to mind). The victim is completely unaware of prohibited BRMT

commands as they enter invisibly through the skull totally unnoticed into the brain. Just like Covid sneaks through your airways to infect your lungs, BRMT wreaks its form of havoc and mayhem on the unsuspecting victim by direct penetration of the skull to reach very precise locations. Since human brains are all built using similar architecture, a little fine-tuning to the individual will get readily repeatable results rather quickly. In summary, the prohibited BRMT weapon's computer generated signals (which are focused energy like an x-ray, ultrasound, or radio wave) penetrate the skull, hijack the brain's natural biochemistry at very specific locations in very precisely timed sequences, and directly energize neurons (brain and nerve) cells to orchestrate hijacked conscious or unconscious human actions, such as moving limbs, altering body rhythms, changing mood, thought, speech, or action (such as falling asleep or becoming hypervigilant), inducing mental illness by longer-term over-stimulations of certain brain chemicals, and producing all manner of other havoc through hijacking the brain and central nervous system.

386. Since a single supercomputer installation can easily manage three quadrillion (3 million billion) calculations per second, a single instance of the prohibited BRMT bioweapon can send literally billions of digital commands per second, carefully timing these sequences of hijacking commands with extraordinary precision, and potentially commanding multiple victims simultaneously just like an old-fashioned marionette show (or a bunch of malign Muppets). This careful timing and sequencing activate various brain addresses as necessary to achieve the desired hijacked result. The hijacked BRMT victim is completely unaware of these external signals which command the thought or action. This hijacking is experienced by the victim as the completely normal brain function it appears to be. Simply put, everything about these thoughts,

actions, and body functions seems quite normal - except that they did not originate inside the
brain of the victim, they were commanded from the outside by a remote operator.

387. Once a brain or central nervous system pattern is identified, and the command
sequence to command that pattern is tested to confirm repeatability and reliability to generate a
particular precise result in the hijacked victim, BRMT system artificial intelligence can take over
and perform further prohibited medical experiments on the victim – testing, mapping and
refining myriad tiny variations of that original command sequence to gradually learn to
orchestrate other targeted acts. Over time, the command signal sequences needed to hijack and
command nearly any thought and/or action desired by the BRMT operator can be accumulated
by the supercomputer's memory into a catalog of commands. The operator then simply has to
organize these commands to achieve the desired results – be they benign or deadly. This process
works just like the high-level commands you use to manage the apps, functions, and steaming
media on your smartphone.

388. The BRMT bioweapon operator (i) uses a computer control device to issue human
understandable command sequences to the supercomputer, which (ii) translates them to machine
understandable language, for (iii) transmission through the BRMT bioweapon delivery system,
using common remote communications capabilities to (iv) communicate with a remote device,
which then (v) aims and physically delivers a precise pulsed energy command sequence to a
precise location, to (vi) cause and create particular biochemical reactions which comprise
thought, movement, etc., in the victim's brain. Location accuracy is typically enhanced by a
location error correction device near the BRMT victim – for example, a cell phone tower works
for this ground-based enhancement as its location is very precisely known.

389. Throughout this entire process, the BRMT operator can interact with the prohibited BRMT bioweapon and delivery system just like an Air Force or CIA drone operator sitting at a computer console in the United States, or use an encrypted handheld device in the field, essentially an encrypted cell phone. The operator uses live imaging, digital mapping resources, and/or field derived intelligence to seek out and identify the desired target then, just like firing a Hellfire missile into the rear window of the target's SUV through the billowing cloud of dust on a dirt road in Afghanistan, the operator chooses when to run a specific command sequence and the illegal BRMT bioweapon and bioweapon delivery system technology delivers the weapon's tiny pulsed energy "bullets" precisely on target, on time, and in the proper sequence to force the thought or act desired by the operator.

390. Since BRMT is a globally prohibited bioweapon operated in secret and against US persons, among others, the prohibited BRMT bioweapon and bioweapon delivery system has long been and is today an obviously illegal clear and present danger to its unwitting victims. BRMT operators can freely act on the victim's brain to directly:

(i) alter human breathing patterns, heart rate, and other basic bodily functions – accelerating them or halting them entirely. BRMT operators can

(ii) alter a person's state of consciousness directly and switch it off or on at any time for any length of time, inducing sleep, a lethal fall, or a motor vehicle crash. BRMT operators can

(iii) alter moods and thought patterns. For good or ill effect, and the victim is none the wiser for being hijacked.

The BRMT operator only needs to impact the victim's brain and central nervous system in the particular ways they desire to perform a specific act. The victim's brain, central nervous system,

and normal body functions already take care of everything else naturally. The BRMT victim is not a total robot, "only a hijacked person under the command and control of another." The victim is kidnapped for all intents and purposes, for the use of another person, without even knowing that this is happening. Entirely illegal, entirely unconstitutional, and entirely possible. As a perpetrator, you would only need to be or know the right government official to get the job done. And we know how accountable the US government bureaucracy is for malign acts. No prosecutions ever, so long as the illegal acts are tacitly tolerated. That's modern American liberty under the existential and very personal threat of the existing illegal BRMT bioweapon and bioweapon delivery system program.

391. Unlike defendant CIA's MKUltra, which used 100 million doses of LSD against a US population of about 170 million people, we do not even know the number of times these BRMT bioweapon and bioweapon delivery system brain hijacking weapons have been fired at unwitting victims over the past fifty-six plus years. Given the accelerating pace of technological change and the speed of today's computer and communications technologies, we can be confident it has been far greater than the 100 million times MKUltra would have illegally provided the LSD doses it purchased from a Swiss pharmaceutical company. A single supercomputer installation of today can process three quadrillion instructions (3,000,000,000,000) per second. Defendant UNITED STATES owns dozens of these supercomputer installations throughout its military, intelligence, police powers, and civilian agencies. The true scope of abridgments of rights by the illegal BRMT bioweapon and bioweapon delivery system is unknown, but it is plain and clear these human biomedical experiments victim plaintiffs have been injured by the illegal BRMT bioweapon and bioweapon delivery system.

392. As with all weapons systems, BRMT has advanced across six decades from a crude local device (**used on Lead Plaintiff in a California State Park campground at age 12 in 1968** as related at paragraph 22) to a sophisticated remote system pulsed energy system driven remotely by a remote video monitoring operator or a field deployed operator (**as used today on Lead Plaintiff at age 68** during complaint preparation to hijack micro (such as typing acuity) and macro conduct (such as involuntary body movements). US Army Air Force pilots first threw hand grenades and crude explosive charges from the cockpits of their biplanes and triplanes in World War I, then fired synchronized machine guns through their propellers at airborne enemies soon thereafter. Today, their successors fly defendant CIA and USAF drones over Afghanistan and Somalia from bases in the US and Djibouti, and pilot space planes from Edwards AFB and other places.

393. The illegal BRMT bioweapon and bioweapon delivery system is no different in its evolution from crude local device in the 1960s to sophisticated remote device in the 2020s across decades of research and development and billions of dollars of illegal secret expenditures. Bioweapons are prohibited under ratified international treaty and under law, so developing them is illegal conduct no matter who makes the excuse, engages in the conduct, or fails to prosecute criminal violations of law. These illegal bioweapon attacks by defendant UNITED STATES have been and are made on the hijacked brains, health, well-being, and free will of unwitting US persons to illegally abuse this class of plaintiffs in Nazi style illegal field biomedical experiments.

394. BRMT is an illegal weapons system under US law and internationally banned under the ratified 1972 *Bioweapons Treaty*. Its development and use on US persons without their knowing consent systematically violates the constitutional rights of these plaintiffs and is a clear

and present danger to all US persons. Active defendant ARMY participation documented herein,
including WILKINS, AUSTIN, VINDMAN, all in civilian dress, is *prima facie* evidence of
violations of posse comitatus law, 18 U.S.C. § 1385, as they complied with their illegal orders.

395. Specific examples of illegal BRMT acts, violations, and injuries against Lead
Plaintiff and a few other members of the class over nearly six decades are included in the 110
subcounts in paragraphs 600-710 below. These direct acts, violations, and injuries, which have
been and are the primarily direct focus of defendants CIA and ARMY culpability are described
in the Illegal Human Experimentation subcounts (paragraphs 604-620 HEXP-1 through 16,) and
the Lethality Attempt subcounts (paragraphs 694-710 LETHL-1 through 17). The successful
known terminations of lives - Sandra, age 11, and Audrey age 18, are described at paragraphs
803 and 805. Other defendants are entangled in these and all other elements of the overall
conspiracy, with greater or lesser degrees of culpability to be determined through discovery and
proven at trial.

396. The National Security state secret deliberate entanglement subcounts (paragraphs
600-604 NSEC-1 through 4) have been and are leveraged by all culpable federal defendants,
primarily defendants ARMY, CIA, DOJ, FBI, and USMS, but also inculpate, without limitation,
USSS and CPB, both elements of DHS. These deliberate state secret privilege entanglements
have been and are intended to act as the sword and shield against public exposure and to evade
both culpability and liability. This fraudulent concealment behind invalidly asserted state secrets
privilege is inconsistent with our Constitution and with law (5 USC 301, paragraph 260, and
violate the basic premise of *Reynolds.* This conspiracy against rights has been and is sustained by
the continuous willful blindness and official silence of defendant DOJ, which has persisted at
least throughout the Lead Plaintiff's entire life since Martha (later Attorney General Janet Reno)

was embedded alongside the Lead Plaintiff in 1966-1967 in Mr. Simpson's sixth grade
elementary school classroom at Lakeland Elementary School in Federal Way, WA.

397. This overarching conspiracy against rights, incorporating deliberate fraudulent
national security entanglements and defendant DOJ willful blindness, shields and enables the
effective defeat of the constitutional rights guaranteed to every US person for this class of
plaintiffs and for any other US person who becomes the target of defendant UNITED STATES, a
known scofflaw, paragraph 332.

398. The BRMT development cycle also has and does leverage acts caused and created
by defendants FBI, USMS, and other police powers in their associated-in-fact enterprise pattern
of racketeering acts (the RICO subcounts series at paragraphs 638-693) and constitutional rights
(the RGTS subcounts series at paragraphs 621-637) acts, violations, and injuries. These act,
violations, and injuries have and do create psychological stresses and life circumstances which
are used to further the illegal BRMT bioweapon and bioweapon delivery system development
cycle, and perpetuate the involuntary servitude of these plaintiffs.

399. Defendants, primarily by and through defendant UNITED STATES, can arbitrarily,
without benefit of reasonable suspicion, much less any other valid or due process, target any
person which defendant chooses using this illegal associated-in-fact enterprise (18 U.S.C. § 175
prohibiting bioweapons is an element of RICO under 18 U.S.C. § 1961).

400. Defendant DOJ willful blindness (paragraphs 550-583) shields defendant unlawful
conduct from criminal liability. National security entanglement fraudulently conceals and
fraudulently shields defendant unlawful criminal conduct from public exposure and has been
fraudulently asserted to shield defendants' criminal conduct from civil remedies, including from
findings of liability, from protection and restoration of rights through injunctive relief, and from

money damages. Perfect crimes shielded by willful blindness and official silence are not the "unalienable" rights our Founders desired for themselves and their posterity. Nonetheless, it is where we find ourselves, and these plaintiffs, today.

401. All institutional and individual defendants are hopelessly entangled in this overall conspiracy against rights and pattern of racketeering acts, and bear joint and several liability for all acts, violations, and injuries. Discovery will assist in disentangling degrees of culpability for specific acts and patterns of acts for presentation at trial and for proper assignment of the varying degrees of liability for the 54 claims for relief herein.

402. This illegal BRMT bioweapon and bioweapon delivery system of defendant UNITED STATES developed using illegal human experimentation on US persons as unwitting human subject is the **first** of defendants' five basic illegal patterns of practice.

## 2. SECOND, Racketeering Associated-In-Fact Enterprise Crimes Cover Illegal BRMT Development, Illegal Domestic Spying, And International Commercial Cover Espionage

### Historical Federal Police Powers Patterns Of Institutional Criminal Conduct

403. FBI's Cointelpro program, a formally named and sometimes violent war on civil rights ran from 1956 to 1971, targeting Blacks and non-Establishment groups and diverse viewpoints in religion, civil society, and all different kinds of activism ranging from pacificism and free expression to opposition to industrial food production. It was directed and supervised by an Assistant Director in FBI's DC headquarters who reported (from across the hall) to Director Hoover. The program was widespread across the United States, and involved burglaries, break-ins, wiretapping without court orders, frauds, character assassinations, sowing of discord in activist groups, and all manner of other criminal acts by FBI field agents. Under Cointelpro, FBI funded far right White Supremacist militia and other right wing extremists, and directly and indirectly spied for fifteen years on American citizens trying to exercise their civil and

Constitutional rights, engage in free speech and assembly, and protest malicious and indifferent
police powers and White Supremacist misconduct and crimes against them.

404. Cointelpro began during the Red Scare, around the same time period FBI agents
were surveilling the Lead Plaintiff's grandfather's dairy farm in the early 1950, where he led a
small evangelical Christian church spin-off of a Quaker sect as an elder in this church, whose
traveling preachers were and are known internally as "workers." This term was also used in the
socialist and Communist literature of the day, though these uses could not be farther from each
other in their practical effect. More on that family history at the hands of defendants FBI,
ARMY, and CIA begins at paragraph 406.

405. But such bias existed at the time against non-mainstream religions, just as it had
against third generation Japanese-Americans on the West Coast who were sent to internment
camps during World War II without cause or reasonable suspicion even as this same ethnic
group continued to work at the Pearl Harbor Navy base in Hawaii in the active war zone
throughout the war, and as it has against Chinese surnamed sixth generation Americans targeted
without cause even today by defendant FBI for "intelligence" operations in our geostrategic
competition with China.

406. Defendant FBI's Cointelpro was exposed by the "Citizens' Commission to
Investigate the FBI" activist group burglary of files in the FBI's Media, Pennsylvania Field
Office. The activists passed the burgled information to the press after the March 8, 1971
burglary. After defendant FBI's illegal Cointelpro program was exposed, notably not by either
defendants DOJ or FBI, FBI Director Hoover died in office in May 1972, not under criminal
RICO indictment for Cointelpro, but with honors and great acclaim for public service, including
the naming of the FBI's DC headquarters building in his name in 1973, and a memorial book

published in 1974 by Congress in his honor. No indictment ever issued for any of the thousands of felony crimes committed by defendant FBI and its network of agents and informants during Cointelpro.

407. Congress enacted legal reforms as a result of these public exposures of CIA and FBI criminal conduct in the mid-1970s. But what federal police powers field conduct has actually changed in the meantime? None, the scofflaw conduct has continued, though without benefit of a formal program title like Cointelpro.

408. In addition to the pattern of evidence presented herein, the FISA Court continues to affirm this perpetual scofflaw conduct, noting the 45th anniversary year of FISA warrant violations by these federal defendant police powers agencies in a 2023 report from that Court. Congress affirmed the 15th consecutive year of Section 702 scofflaw violations of that amendment to the Patriot Act, adopted in 2008 to legalize other prior criminal violations of the Fourth Amendment by these same agencies. Nothing has changed. Scofflaw conduct continues.

**Lead Plaintiff's Family Quaker Religious Origins And This Class Of Plaintiffs**

409. Lead Plaintiff's great-great grandfather was a Quaker conscientious objector who served in the Second New York Cavalry, Company C, riding unarmed for four years on horseback while bugling his Company on his Army commander's orders in the fight to preserve the Union and free slaves. He won the Medal of Honor at Appomattox Courthouse in April 1865, and lies today in a Quaker Meeting House cemetery in Cornwall-on-the-Hudson, New York, about five miles north of ARMY's West Point Military Academy, 40 miles north of New York City.

[Intentionally left blank.]






**Religion Based Targeted Federal Government Abuse Of American Families Across Generations**

410. Federal police powers (which here includes defendant ARMY, other military services, CIA, FBI, USMS, and other federal police powers) systematic pattern of abuses of a religious order of Quakers has continued now across four generations of the Lead Plaintiff's own extended family. This pattern of surreptitious illegal acts by federal police powers has been forensically dated to the early 1950s, when the Lead Plaintiff's mother's family was surveilled on the family dairy farm during religious services by the FBI.

411. Lead Plaintiff's dairy farmer grandfather was most probably human trafficked by FBI into employment at Farmer's Union Central Exchange (now Cenex), an agricultural

cooperative in Auburn, Washington, when the family dairy farm provided insufficient income to

support the family. He was later human trafficked to another Cenex farmer cooperative in

Montana (a national security entanglement related to intercontinental ballistic missile facilities in

the region), and still later in life, human trafficked for employment at an interstate hazardous

materials trucking company likely also used in defendant FBI spying. This directed employment

pattern correlates to other family members, and to defendant FBI co-opting of cooperatives,

which co-opting was also directly experienced and forensically discovered by Lead Plaintiff,

who in Summer 2023 connected this conduct to defendant WEISSMAN embedded as Lyle

Whiteman, General Manager, at Puget Consumers Cooperative in the 1980s, later as defendant

FBI's General Counsel under Director Mueller, and connected to defendant CALDWELL

through shared projects at the Enron Task Force and at US Attorney for the Eastern District of

New York.

412. After defendant ARMY service, Lead Plaintiff's father and uncle were also human

trafficked together with their families by defendant FBI as it controlled job choices, income

levels, geographic and housing locations, and pretexted them and other extended family

members in various national security entanglements. Lead Plaintiff, other extended family

members, and their spouses and children, have been subjected to the same kinds of treatment and

deliberate national security entanglements. These deliberate surreptitious national security

entanglements have been and are systematically used to evade accountability for federal police

powers criminal acts against these families.

413. Lead Plaintiff's father was targeted for biomedical experimentation by the ARMY

and CIA while serving during the Korean War era. His much younger brother, Lead Plaintiff's

uncle Bruce, was targeted while being the first family member to ever attend college, at

Whitman College in Walla Walla, Washington, then while serving in defendant ARMY during

the Vietnam era, and for many years thereafter while entangled in the national security space

which surrounded the Hanford Nuclear Reservation in Washington state as it produced bomb-

grade plutonium. Succeeding generations, including the Lead Plaintiff, have been targeted and

pretexted basically from birth (Constitutional protections of unalienable rights and prohibitions

of bills of attainder notwithstanding) by their parentage and religion.

### Lead Plaintiff First Human Trafficked As Collateral To Parental Employment Human trafficking

414. A few years after leaving the ARMY, Lead Plaintiff's unwitting father, Don, was

employed and surreptitiously human trafficked in 1961 by an FBI cover company, Pacific Paper

Products, Tacoma, Washington. Ostensibly employed as a medical products sales representative

to medical offices and clinics, he sold examination room table disposable paper covers and

surgical paper drapes for operating tables. By using federal funds to subsidize the medical paper

products company operations, this FBI cover company undercut private competitors' prices to

gain market access. Lead Plaintiff's father was given a sales lead list of medical facilities to sell

these paper products to and offered a bonus for recycling x-ray films from these same health care

practices and facilities. With a young family of five living in California, he pursued this added

income from those commissions for medical x-ray films recycling.

415. FBI's true intent in secretly employing Lead Plaintiff's father, Don, at the FBI cover

company, Pacific Paper Products, was to collect and destroy the medical x-ray evidence of

Cointelpro physical violence to victims of FBI's war on civil rights in the United States.

Cointelpro operations included violent acts by FBI agents, other police powers, informants, and

by violent criminal militias funded by FBI between 1956 and 1971. Don worked for a year in

Northern California, then a second year in Southern California. Don was offered a third year of

employment in Texas, declined to move his family again year after year, and returned to Washington state in 1963. He was then surveilled and manipulated by an FBI undercover embedded agent, Earl Keller, posing as a home fuel oil salesman, at Smith Brothers Dairy, Kent, WA, where he worked as a route delivery driver from 1963 into the 1970s. During this same period, Lead Plaintiff's father was subjected to illegal BRMT bioweapon oxytocin hormone hijacking. A local BRMT bioweapon device was installed in his route delivery truck, concealed inside the ice cream freezer unit installed after King County, WA health regulations were changed to require mechanical cooling of dairy products, replacing ice cooling. The illegal BRMT bioweapon unit hidden in this forward mounted ice cream freezer unit was activated by an operator stationed in proximity of the delivery truck using a radio frequency remote control. Defendant UNITED STATES (CIA) housed a single divorced female at the end of his delivery route and activated the illegal BRMT oxytocin boost using a radio frequency remote control to develop and sustain this specific event-driven oxytocin boost for an uncertain time period of at least four to six months in 1974. Defendant CIA used domestic U.S. brothels elsewhere during this same time period so this type of operation was typical of certain of their operations. Lead Plaintiff has experienced these types of operations (both the hijacked excitement and suppression of oxytocin and other mood hormones) for decades, beginning in 1968 (age 12, California campground), 1970 (Lani FISH love letter), and 1974-1977 (various inaccessible female embedded agents) when he attended Washington State University, including, without limitation, in a 1980s remote cell phone triggering of the illegal BRMT bioweapon device installed in cellular telephone equipment box in the trunk of his car, which defendant CIA activated in the double homicide lethality attempt on Lead Plaintiff and spouse Lynne at Porteau Cove, British Columbia, Canada in the 1980s (paragraph 694 LETHL-1).

416. Defendant ROSENBERG (FBI) offered the same sort of sales commission bonus to Lead Plaintiff as had been offered at Pacific Paper Products to his father in the ESTABLISH fraudulent cover company employment offer letter when defendant ROSENBERG repeated his orchestration of the unwitting Lead Plaintiff's human trafficking out of forced homelessness in Boston, MA to employment at defendant ESTABLISH in Fort Lee, NJ, in 2007. Defendant MODDERMAN (actually Stephanie Clifford, adult film actor) was used as defendant CIA provided the illegal BRMT bioweapon and bioweapon delivery system oxytocin boost during this same time period. Defendants ROSENBERG, ROSS, and ESTABLISH (FBI, USMS) later reneged and failed to pay virtually all these commissions in 2008, costing the Lead Plaintiff tens of thousands of dollars of lost compensation (paragraph 641 RICO-43), exploiting their complete knowledge of Lead Plaintiff's financial situation which left Lead Plaintiff with no financial resources to pursue a legal remedy for this compensation theft under state law (paragraph 641). Defendant MODDERMAN dropped the Lead Plaintiff as a "romantic interest" about the same time these funds were being stolen by defendant FBI and/or USMS (ROSENBERG, ROSS) in Summer 2008. These repetitions of methods across the family generations is a classic defendant FBI/CIA tradecraft signature and rhyme, which demonstrate their well-practiced gratuitous cruelty across generations of field personnel and management toward their targeted victims.

### CIA And Army Human Traffick Lead Plaintiff For Illegal Human Medical Experimentation As A Minor Child Beginning At Age 12

417. Lead Plaintiff was first directly human trafficked in 1967 or 1968 around age 12 (1968 is referenced throughout this complaint for clarity and simplicity of presentation), by a former ARMY "buddy" of his father, Gary JACK, for an illegal biomedical experiment on him during a camping trip by a defendant ARMY or CIA bioweapons team which abused his oxytocin hormones by using a battery powered close proximity remote device to activate

oxytocin hormones in a California State Park tent camping site near Redwoods National Park. During 1970, Lead Plaintiff (age 14 on January 1, 1970) and his family of origin experienced a series of extreme emotional experiences as his brother was born in January (echoing the 15 year difference in ages between his father and uncle), his younger sister, Sandra, was murdered by locally embedded doctor KOHLER (paragraphs 99d, 417, 418, 714, 740, 803C-D, 805B(i), H, S, BS, 806B, 814B), with a high dose of aspirin/codeine which induced Reye Syndrome while experiencing influenza in April 1970, and both paternal great-grandparents died in Summer 1970, all within the first seven or eight months of 1970.

417A. Susan, Sandra's surviving twin sister, experienced a blow to her left or right temple on a protruding faucet in the middle of the front lawn at the family residence on South 356th Street in Federal Way, WA, in the months after Sandra's April 1970 death, while riding the family Shetland pony. This blow to the head could have caused a cerebral hemorrhage only months after Sandra's murder. The blow did result in a long-term injury which weakened a blood vessel in her brain, requiring surgery to reinforce that damaged blood vessel about five decades later. This injury event is consistent with a tradecraft rhyme by defendant CIA run against Shawn Morrissey (defendant KATYAL), then embedded and posing as a student at Lead Plaintiff's Decatur High School. During a bareback horse riding lesson given by Lead Plaintiff in 1970 or 1971, defendant KATYAL lost his balance, fell to the ground and struck a metal logging yarder boom breaking ribs. Both these injuries to sister Susan and to defendant KATYAL occurred in the months following Sandra's murder and are circumstantial evidence of equilibrium manipulations using a concealed field aimed version of the illegal BRMT bioweapon to disrupt balance and equilibrium, which symptoms and effects are consistent with the crude forms of

gross manipulations being experienced by the unwitting Lead Plaintiff in the late 1960s and early
1970s.

417B. KATYAL posed as a student in the Lead Plaintiff's Decatur High School with
defendant ARMY embed pseudonym Tom GRADY, who replaced embedded ARMY Doug
DANIELSON (paragraphs 418, 803Y), who had been assigned at Lakota Junior High School in
the late 1960s at the same time Lani FISH (paragraphs 415, 803A, AW, FBI) was also embedded
at Lakota. GARLAND plausibly posed as fellow Decatur High School student Stuart
Bettesworth in 1971-1972, and the then boyfriend of Mariam BACKMAN (paragraphs 211,
417B, 467, 717, 762 table, 805AB, AC, AK). Decatur High School was a school district spin-out
from Federal Way High School organized three years before its building was constructed to
support the illegal BRMT program by isolating its child victims for easier program management.
It graduated only around 83 seniors in 1973, its first graduating class. The other two high schools
in the district routinely graduated over 350 students per year.

418. Within weeks after Sandra's murder in April 1970, Lead Plaintiff's family was
abruptly removed from the home-based church meeting place where they had gathered from
1963-1970, to a new home-based church meeting place at the "Snow" residence in Kent, WA,
hosted by fraudulent church elder Snow (defendant BREYER, a former ARMY intelligence
enlisted member). On defendant BREYER's staff in King County, Washington were, without
limitation, (a) defendant KATYAL, (posing as Shawn Morrissey, later DOJ Acting Solicitor
General) embedded at Decatur High School at the same time as (b) defendant WEISSMAN,
embedded at Associated Grocers, Seattle, WA (his later roles included Assistant US Attorney
and FBI General Counsel to Mueller), and (c) GARLAND was also plausibly embedded at
Decatur High School (Stuart Bettesworth, later appellate judge and Attorney General). Lead

Plaintiff's first job in high school was at an independent grocery store in 1972, Larry's Market,

serviced by Associated Grocers (defendant WEISSMAN FBI was illegally embedded at this

Seattle wholesale grocery cooperative during this time, prior to his illegal embed as Puget

Consumers Cooperative General Manager, described at paragraph 425-436). Larry's Market was

co-owned by an extended family member, Larry Brewer, the store manager and key partner in

the independent supermarket, which was surreptitiously co-owned by defendant FBI which had

secretly embedded an FBI agent posing as a co-owner partner and produce manager (using FBI

funds for the investment) in the grocery store until several months after the Lead Plaintiff was

first employed there in 1972, when he left as red haired Brad remained (FBI, later known to Lead

Plaintiff in the new identity Mike WORTHY (paragraphs 99k, 418, 422, 493, 726, 762 table,

770, 805AG, AK). Other embedded defendant personnel on BREYER's field operations staff -

JACK, KOHLER, KATYAL, GRADY, DANIELSON, FISH, WEISSMAN, GARLAND,

BACKMAN, WORTHY - were present as Lead Plaintiff during various periods while Lead

Plaintiff attended junior high, high school, and his first year of college. Between 1970-72, Lead

Plaintiff and his family were also attending fraudulent cutout home religious services at

fraudulent elder Snow's (BREYER, paragraphs 19(ii), 21(i), 99d, 211, 417) residence from a few

weeks after his younger sister's Sandra's death (paragraph 803C-H), at the Kent, WA residence

used by BREYER as the front for his fraudulent home church while he ran the illegal BRMT

bioweapon program in the late 1960 and early 1970s. Defendant BREYER reappeared under a

new fraudulent cover in Spokane, WA in 1974, described below.

**Lead Plaintiff Extensively And Repeatedly Human Trafficked As An Adult**

419. Lead Plaintiff was unwittingly and unknowingly handled throughout college and

graduate school by federal agents posing as fellow students and roommates beginning at Green

River Community College, Auburn, Washington in 1973 by Dickover and Brunton, who also

accompanied Lead Plaintiff to Washington State University, Pullman, Washington in 1974,

where he met and developed friendships and/or close personal relationships with Craig PAGE,

Jay Costa, Andrew Ng, Michael CUNHA, WILLIAM SACKVILLE-WEST, Lynn Sorenson,

Karen Raines, Linda Pogreba, Vic Jones, James Carberry, Tracy Berry, Katherine "Kit"

Andrews, Susan Irish, Bob Ross, Robert Mandich, among many others, as an undergraduate.

Lead Plaintiff met Mandich (GARLAND) in WSU Perham Hall residential dormitory in Fall

1974 to Spring 1975 when they resided on the same floor, then both also resided in WSU Nez

Perce Village student apartments during the 1975-76 school year. Mandich (GARLAND) drove

an older green Mercury Capri compact sedan with extensive door dings which he jokingly

accused Lead Plaintiff of causing. Lead Plaintiff opened the door on his 1969 Ford Mustang

which door edge landed on one the few places where the green paint was still intact and laughed.

GARLAND (Mandich) was then a protégé of defendant BREYER in the BRMT program and, on

knowledge and belief, dropped from that cover identity, then was "resurrected" from that cover

identity to his actual identity, became an appellate judge, and is now the Attorney General, one

of many senior government officials with a direct conflict of interest with the impartial

administration of justice and rights as it relates to this illegal program and to this class of

plaintiffs.

420. A breakthrough in Summer and Fall 2023 led to the unmasking of numerous

individual defendants named below from their previously mysterious cover identities (see LPEE

pages 11630 through 11639) and finally definitively linked this illegal BRMT bioweapon and

bioweapon delivery system program, rights violations, and associated-in-fact enterprise pattern

of racketeering acts to defendant UNITED STATES' agencies and departments who have and do

conduct much of the long-running pattern of fraudulent concealment, at times in coordination

with state and local government departments, agencies, and officials. After decades of fraudulent

concealment Lead Plaintiff was in September 2023 finally able to begin to unmask the missing

identities he had been looking for since beginning his forensic review of the entire history of the

illegal BRMT program and racketeering offenses in Summer 2021.

421. While at WSU, the Lead Plaintiff was being handled in the field under a team

headed by a BRMT program executive BREYER, (Jack Sackville-West), acting on behalf of

defendants ARMY and CIA. Defendant BREYER's team included BREYER's undercover "wife

and seven children," who principally resided in the Spokane, WA area including at the "family

home" at 1424 South Maple Street all identified by cover name at paragraph 211. Lead Plaintiff

was a frequent weekend guest, having been befriended by William (Bill) Sackville-West who

resided in WSU student dormitory Perham Hall on the same floor as Lead Plaintiff in 1974-75.

Laurie DOLAN, who much later was Chief of Staff to Washington Governor Gregoire, posed as

BREYER daughter-in-law Laurie Sackville-West with infant Anne, paragraph 111.

422. After graduating WSU in June 1977, Lead Plaintiff briefly moved to Coeur d'Alene,

Idaho, worked for the Spokane, Washington John Hancock Life General Agent and his lead co-

agent (defendant FBI embeds) briefly, then returned to his parents' home in Federal Way, WA,

worked as a relief route delivery driver for several months, and enrolled in the MBA program at

WSU beginning in February 1978. While in the WSU MBA program, he met Michael

WORTHY (FBI, paragraphs 99k, 418, 422, 493, 726, 762 table, 770, 805AG, AK, who appeared

in a group picture with defendant WEISSMAN displayed behind WEISSMAN in 2023 during an

MSNBC television interview with defendant MELBER), as well as EPSKAMP, ZOULAS, and

THORPE,

423. As a Teaching Assistant to Assistant Professor SHAFFER in 1978-79, Lead Plaintiff shared a WSU Johnson Hall office with PhD in Economics candidate Bahari-Kashani and another PhD candidate from Malawi. Bahari-Kashani was a CIA foreign national asset, an Iranian national whose family was connected to the Shah of Iran (installed as penultimate head of state in 1953 with help from CIA) and, as a result of his CIA asset status, was able to remain in the US after the Shah abdicated in January 1979 and was replaced by Ayatollah Khomeini. As the Shah left Iran and his throne in January 1979, Lead Plaintiff was moved to the basement of Todd Hall (now Carson Hall). SHAFFER, who was Lead Plaintiff's primary graduate school contact in the WSU faculty, and had previously been associated with a petroleum company, and was likely a defendant CIA embed at WSU, where he was joined in 1979 by Don Yale, likely the defendant ARMY embed posing as a retired Navy Supply officer and Assistant Professor.

424. CIA Director Stansfield Turner walked past the completely ignorant Lead Plaintiff with an intent knowing stare in the rotunda of the East Building of the National Gallery of Art during WSU Spring Break 1979 (during his return to WSU from a job interview trip to GTE in Stamford, CT, Appendix 2 paragraph 1-008, 1-009). Turner was directly interested in Lead Plaintiff as part of his mission to transform CIA from a paramilitary organization to a technology-based organization, which transformation emphasized technologies like the illegal BRMT bioweapon and bioweapon delivery system. About five months later, Lead Plaintiff's unwitting involuntary servitude moved on to a new chapter in August 1979, his professional career in involuntary servitude and forced labor. Lead Plaintiff was referred by his WSU professor and assigned CIA handler while a graduate teaching assistant, Dr. Paul Shaffer (CIA faculty embed), to Deloitte Denver and subsequently joined Deloitte Seattle in August 1979, worked as an auditor for about six months, then as a management consultant, later as a

consulting Manager. This Deloitte Seattle operation, actually hosted by defendant USMS, provided commercial covers for deep cover CIA international espionage projects, and for FBI domestic spying and investigations (Appendix 2 paragraph 1-010 through 1-012).

### Illegal Human Trafficking In Involuntary Servitude: Lead Plaintiff's Professional Life – Programmed Employment, Unemployment, Enterprise Wrecking 1979-2002

425. Since leaving the WSU MBA program in 1979, Lead Plaintiff's employment and employment deprivations, direct interventions in his private life, including human trafficking of both the Lead Plaintiff and his two spouses, and repeated racketeering offenses against him and his families including, without limitation, compensation thefts, orchestrated forfeitures and compromises of financial, real, and intangible assets, involuntary servitude, and forced labor, ran concurrently with illegal human subject experimentation on him and other family members, lethality attempts, and other crimes, as documented in the 110 example sets of depredations by the United States and its co-conspirators over more than five decades.

426. Lead Plaintiff has spent his entire working career as an unwitting involuntary servant of federal police and intelligence powers inside their commercial cover operations. Throughout this nearly six decade long illegal program, defendant DOJ and its police powers agencies have continually collaborated with defendants CIA and ARMY, which since the beginning of these illegal human medical experiments in the 1960s, have and do hijack and partially control the minds of American citizens using the illegal BRMT bioweapon and bioweapon delivery system. These co-conspirator defendants, with other defendants, have and do engage in an associated-in-fact enterprise through a long-running pattern of racketeering acts, including through numerous cover company, trade association, and other apparently private sector operations, against this class of plaintiffs.

427. These cover companies have been and are used by defendant UNITED STATES including, without limitation, defendants FBI, USMS, CIA, and ARMY for a variety of legal and illegal purposes. Defendant cover entities and organizations have and do compete for private commercial business opportunities, depriving private businesses of legitimate business opportunities by using federal government funding as subsidies to undercut competitor prices. These cover companies have and do conduct illegal general searches and programmed domestic enterprise destruction operations run by defendant UNITED STATES, including, without limitation, by defendants FBI and/or USMS, including, without limitation, through Deloitte Seattle, LazerSoft, Steve's Maintenance (later Alliance Environmental), P.A.N. Environmental Services (PAN), Pacific Pipeline, CNA Industrial Engineering, and ESTABLISH. These illegal cover companies (including, without limitation, Deloitte Seattle, Deloitte client Westin Hotels, LazerSoft, and CNA commercial client Media Arts Group) have and do provide ostensible commercial employment cover legends for CIA commercial cover (espionage) operations throughout the world. In addition, these cover companies also have and do provide non-military covers for ARMY and other military personnel who have and do rotate through in civilian dress including, without limitation, WILKINS and AUSTIN, while engaged in contacts and relationships which violate posse comitatus law, 18 U.S.C. § 1385.

428. At Deloitte Seattle, Lead Plaintiff worked with dozens of targeted clients, many in state and local governments in Washington state, as well as financial services, distribution, and other commercial enterprises, unwittingly aiding and abetting undercover domestic investigations, legal surveillance, and illegal domestic spying operations, such as following defendant FBI into Longacres Race Track, Renton, WA, during a murder investigation; Pierce County, Washington following a public corruption investigation; Whatcom and Clallam

Counties, Washington during CETA investigations; Westin Seattle during the national security event, the visit of Queen Elizabeth II to Seattle; as well in adding credibility to commercial cover legends used by defendant CIA for its international espionage (intelligence operations which are conducted under commercial cover are legally defined as espionage under international law and domestic law) operations in South Africa, Saudi Arabia, Palau, Central America, and other locations in the 1980s. Steve Bannon (later in the White House), Gerald Lee THORPE, John Blair, and Roger STONE (later a political operative), all associated with defendant CIA, were among the people who were employed at this office during Lead Plaintiff's 1979-1986 employment there. John ZOULAS, defendant CIA from Washington State University during the BREYER oversight in Pullman, WA, and nominally employed by Westin Hotels Corporation headquartered in Seattle, was previously assigned to Caribbean nations and directly involved in the national security project at Westin Seattle during Queen Elizabeth II's visit to Seattle in 1983 in which Lead Plaintiff was deliberately entangled during his first known direct exposure to MI-5 and MI-6 personnel embedded there. Lead Plaintiff met his first wife, Lynne, while working on a Deloitte Seattle financial audit at Safeco in 1980 supervised by Margaret Dufresne, a female Deloitte Seattle Manager who was or became the spouse of FBI agent Bruce Ciosacchi, who was also member of the annual community festival group, the Seafair Pirates. Larry SUMMERS, later President of Harvard and then Treasury Secretary, was known as Roger Penner during his brief tenure at Deloitte Seattle. Lead Plaintiff made his first attempt to engage as an entrepreneur leveraging the Westin Hotels project in 1983-84 into Sheldon-Lee Associates where he and THORPE (associated with CIA) funded the development of ActivLabor scheduling software. ZOULAS (Westin human resources manager corporate cover, CIA) then arranged a meeting with the individual he represented as the Westin CFO who rejected the software after a presentation

by Lead Plaintiff despite being the primary corporate driver behind the entire series of project
improvement projects throughout the Westin Hotels chain worldwide.

429. A federal agent or other employee embedded as a Deloitte Seattle consulting
department secretary was used to bait Lead Plaintiff to join the Board of Trustees of Puget
Consumers Cooperative (PCC) in the early 1980s (Appendix 2 paragraphs 1-015, 1-016). At one
of the first Board meetings Lead Plaintiff attended, Lyle Whiteman (WEISSMAN, FBI), the
illegally embedded PCC General Manager asked Board Chair Hilde Birnbaum to show Lead
Plaintiff her arm. She did. It carried a number tattoo engraved somewhere around her eighth
birthday, soon after her family had been removed from civilian life to a Nazi death camp. All her
other family members perished in the death camp, part of the Dachau Concentration Camp chain
of death camps. She survived only because she was selected to be a child subject of human
medical experiments by Nazi doctors.

430. Lead Plaintiff did not know, as he looked at that Nazi engraved number tattoo on
Hilde's arm in the early 1980s, that he was also already secretly being used by CIA from about
1968 for this same class of medical experiments on humans, being used as a human guinea pig in
the development of the illegal bioweapon he knows as BRMT (18 U.S.C. § 175). This time it
was by CIA beginning in the 1960s, rather than Nazis from the 1930s through World War II,
when that outrage of crimes against humanity ended with justice - the Nuremberg Doctor Trials
of 1946-1947, prosecuted by the US and other allies.

431. Lead Plaintiff also did not then know the actual identity of Whiteman. In Summer
2023, as this and several other fraudulent concealments of identities were finally unmasked
through a lucky break, Lead Plaintiff finally came to understand that Whiteman is actually
Andrew WEISSMAN. WEISSMAN, posing as Lyle Whiteman. was an illegally embedded FBI

agent directly engaged in co-opting West Coast Grocers, then Puget Consumers Cooperative,

wholesale and retail food cooperatives respectively, and who later organized NutraSource, which

was headed by ROSENBERG (FBI) during Lead Plaintiff's PPC Board tenure as part of FBI

domestic spying and enterprise wrecking program which FBI continued well into this century,

more than fifty years after its long-running illegal Cointelpro program was exposed in 1971.

Congress did enact reforms in the 1970s to prevent these illegal activities. But these reforms

were functionally ignored, they simply did not work. WEISSMAN later became FBI General

Counsel under FBI Director Robert Mueller, later still a law professor at New York University

432. FBI's "Chuck LeFevre" (ROSENBERG) came to Seattle soon after Lead Plaintiff's

introduction to the Nazi tattoo on Hilde Birnbaum's arm by WEISSMAN. LeFevre

(ROSENBERG) arrived from Anchorage (likely an undercover role run from the FBI Anchorage

field office) to run NutraSource, a natural foods wholesaler funded by PCC member equity

dollars ($200,000) and a secret FBI investment ($200,000) funneled through two entities (Carrs

retail and Gottstein wholesale grocers in Anchorage, represented by Allan Gallant ($125,000)

and LeFevre, and the Oakland Food Cooperative ($75,000) which was then in the final stages of

being financially wrecked by two FBI agents embedded in that cooperative who also served on

the NutraSource Board). NutraSource was formed out of the federal bankruptcy court supervised

wreckage of three natural foods companies in the Seattle, Washington area, themselves likely

also wrecked by FBI. Through this sequence of fraudulent concealment, FBI effectively

controlled the Boards and operations of both PCC and NutraSource through ROSENBERG,

WEISSMAN, GALLANT, and the two FBI agents who co-opted and destroyed the Oakland

Food Cooperative. These five people served with the Lead Plaintiff and the Controller of

Crowley Maritime, Wendy Stiers, on NutraSource's seven member Board of Directors.

433. By forming the natural foods wholesaler NutraSource using private sector funds

contributed by PCC member equity investments in the food cooperative and their food

purchases, FBI could directly spy on all the food cooperatives and buying clubs throughout the

Pacific Northwest, not just on PCC members and staff. FBI was also able to use funds being paid

as executive compensation to FBI embedded managers by the members and use cooperative

member funds as they saw fit in their embedded management roles, including for an exclusive

golf country club membership for ROSENBERG at Sahale Golf and Country Club near

Redmond, Washington.

434. ROSENBERG was joined at NutraSource by Darrell PRAY (Chief Information

Officer, later also at Pacific Pipeline as CFO during Lead Plaintiff's tenure there on that Board

and as COO), James CHRISTENSEN (Chief Financial Officer, later also at Pacific Pipeline as

CFO during Lead Plaintiff's tenure there on that Board and as COO), DANA SMITH (VP of

Operations) and others at NutraSource. ROSENBERG, years later in 2005 through 2008, human

trafficked Lead Plaintiff through Boston and homelessness (paragraphs 462-464) to northern

New Jersey and fraudulently concealed employment at ESTABLISH (described below at

paragraphs 464-466). ROSENBERG still later left FBI and became a US Attorney, then DOJ's

DEA Acting Administrator under Obama, and still later joined a Washington, DC law firm, and is

a professor of law in Washington, DC.

435. Government defendants including, without limitation, defendant FBI routinely use

privately derived funds to pay for expenditures not permitted in government operations, which

can and do directly benefit those illegally embedded government employees and their personal

interests. As one example of this pattern of practice of direct personal benefit, NutraSource paid

fees and costs for a Sahale Golf and Country Club membership in Redmond, WA for embedded

FBI CEO "Chuck LeFevre," (ROSENBERG, FBI). This was agreed to by the three PCC Board members on the NutraSource Board, which included defendant WEISSMAN (FBI) who encouraged Lead Plaintiff to vote for this golf country club membership in spite of PCC's core values as a community-based organic and natural grocery cooperative committed to farmland preservation and quality of life and environmental goals, and sharing benefits with its members, not empowering executive management privilege. Defendant ROSENBERG routinely talked about his Walla Walla wine tours to Leonetti Cellar and to other winery locations in the Walla Walla, WA area in the 1980s and 1990s, where the Lead Plaintiff's uncle lived during most of that period, and where members of his extended family lived throughout the period. Defendant FBI also used its secret control of the NutraSource Board to steal money rightfully belonging to PCC for defendant FBI's own unappropriated use in further illegal cover operations. According to WEISSMAN, after NutraSource was sold to a private company in Auburn, CA, sale proceeds were allocated to defendant ROSENBERG, despite his having no known investment nor any known contractual rights to any of the sale proceeds. PCC made the original private sector investment in NutraSource, provided critical early cash flow ahead of payment terms to keep NutraSource in business, and was the principal customer of NutraSource throughout its entire existence. ROSENBERG invested these funds, diverted from PCC, into a golf driving range near Gig Harbor, WA which went bankrupt, and a high-end Seattle, WA wine shop. This diversion from the rightful owners violates 18 USC § 1962, which prohibits such diversions and has been cited by defendant DOJ in criminal racketeering prosecutions of labor unions and mafioso organizations.

436. Defendants FBI and CIA continued their prominent role in Lead Plaintiff's life. Defendants WEISSMAN and ROSENBERG, both then deep cover FBI agents operating as

illegally embedded executives in private companies were joined in the middle 1980s by two undercover personnel from CIA (Roger STONE, William BURNS, described later herein) in surreptitiously operating against the Lead Plaintiff, and by Warren WILKINS, a Washington ARMY National Guard Colonel who reported directly to the Adjutant General. David Moller (STONE) is Roger STONE, the political operative and consultant associated with the Republican Party opposition operations from Nixon through Trump.

437. In Summer 1986, Lead Plaintiff was being gently pushed out by then current Deloitte Seatle consulting boss Michael Henderson and pulled out by his former Deloitte Seattle consulting boss Harold Hopper to transition from Deloitte Seattle (USMS hosted) to another CIA/FBI joint technology spying project, LazerSoft.

438. Lead Plaintiff joined STONE, who had left Deloitte Seattle soon after completing the South Africa ATM project used by CIA for southern Africa financial network spying and proxy war funding, WILKINS (ARMY), TARPLEY, and others to develop laser optic archival mass data storage systems for use with IBM mainframe computers. These laser optic data storage systems could then be co-opted remotely by FBI and CIA to access corporate information systems, such as at Puget Power, a major regional utility, and Alaska Airlines, for use in illegal surveillance and search violations inside the United States. None were known to have been sold internationally during LazerSoft's existence before it was sold, renamed as LaserAccess by Wembley plc to Network Imaging Corporation, Vienna, Virginia in the early 1990s.

439. Soon after Lead Plaintiff joined LazerSoft in Summer 1986, Moller (STONE) was orchestrated from the company by other management team members interacting with the Board for Moller's (STONE) fraudulent "termination." Ruthanne Meyers, Ron Blankenship, and several others left soon thereafter. Lead Plaintiff then became CEO, a transition which would

become very typical over the next fifteen years in one unwitting cover company leadership

position after another at various defendant USMS cover operations which supported illegal

spying and other domestic and international operations run from and in the Seattle area.

WILKINS, and TARPLEY continued at LazerSoft as co-workers. WATERS joined as a software

development contractor.

440. William BURNS, the current CIA Director, was then posing as an OB/GYN doctor

known as Pat Heffron. BURNS was a key LazerSoft funder and Board member in the late 1980s

and remained in the King County, WA area through at least the early 1990s (as a neighbor of

Lead Plaintiff from March 1990, paragraph 499). Heffron (BURNS) "raised" most of the needed

funds for the company to continue its operations. Heffron (BURNS) is now known to most

probably be the CIA field executive in charge during that period of the illegal human

experiments program used against Lead Plaintiff and other members of this class of plaintiffs to

develop the secret illegal BRMT bioweapon and bioweapon delivery system. During this period,

as defendant BURNS (CIA) operated in front and behind the scenes with defendant

ROSENBERG (FBI) in similar roles, Lead Plaintiff was exposed to entrapment attempts and

lethality attempts (paragraphs 621 RGTS-1, using a local device at Stevens Pass, 694 LETHL-1,

using equipment installed by SWAIN), was divorced by his first wife Lynne in 1988 as the result

of illegal BRMT oxytocin (love hormone) hijackings orchestrated by defendant BURNS while

she was in the company of SWAIN in 1987 (paragraphs 494-498, 609 HEXP-6). Lead Plaintiff

was introduced to his fraudulent second wife Jeanette (active duty soldier in deferred prosecution

status, paragraphs 499, 610 HEXP-7) in the first half of 1988 by WATERS at the Greenwood Inn

basement lounge, Bellevue, WA, while at LazerSoft, as WATERS himself allegedly went through

a divorce during this period.

441. As the LazerSoft System 1500 beta software development and mainframe
integration project was nearing completion at Puget Sound Power and Light, a regional electric
utility company in Bellevue, WA, Lead Plaintiff sought venture capital funding to expand sales
and marketing operations beyond the small Seattle area beta site customer base. He reached an
agreement with Ted Wight, Walden Venture Capital, for a $1.2 million investment, but was later
informed by counsel, Glen Garrison, Keller Rohrback, Seattle, WA, that Walden's Managing
Partner in San Francisco declined to complete the deal. After he was unable to locate another
venture capital investor on the West Coast to work with the remaining VC, Ventures West,
Vancouver, BC, (Samuel Znaimer), who did not want to be the lead investor in LazerSoft, Lead
Plaintiff turned to another local company, Pacer Corporation, to complete the sale of LazerSoft

442. Pacer (Larry Azure, CEO) quickly agreed to purchase LazerSoft, but the deal was
delayed for about five months, while Pacer was sold to Wembley plc, the UK based
entertainment company which owns Wembley Stadium. Lead Plaintiff was terminated as CEO as
the LazerSoft deal closed in 1989 and replaced as CEO by Richard Milligan, appointed by Pacer
management. Invited to rejoin Pacer operations about 6-8 weeks later, the Lead Plaintiff
declined, briefly joined a Redmond, WA fax switch technology company, then decided to acquire
a company in the environmental services industry, Steve's Maintenance (paragraph 445), which
he completed in March 1990 with the assistance of funds from Jeanette and an investor, David J.
Carey, a former SVP of commercial lending at Rainier National Bank in Seattle, WA, just days
before his March 1990 fraudulently orchestrated marriage to Jeanette.

443. Jeanette lived directly across the street from BURNS (see paragraph 499 and
subcount NSEC-1) from at least 1988, prior to Lead Plaintiff moving in late March 1990, one
night before his marriage to Jeanette. Defendant ARMY and FBI personnel assigned as their part

of this phase of the involuntary servitude network entrapment and envelopment process

perpetuated by defendant UNITED STATES include, without limitation, defendants MELBER,

RUBIN, VINDMAN. Personal life and relationships details are described in paragraphs 490-535

below.

444. Other institutional and individual defendants also appeared during this late 1980s to

early 1990s time period while BURNS ran the illegal BRMT bioweapon development cycle.

Most of those defendant ARMY, FBI, and USMS personnel were known to the unwitting Lead

Plaintiff as his second extended family, which resulted from the WATERS orchestrated

introduction and Lead Plaintiff's subsequent fraudulent marriage to Jeanette in 1990.

445. After a diligent search in late 1989, Lead Plaintiff located Steve's Maintenance

(Appendix 2 paragraph 1-017) in Auburn, WA, raised equity financing from David J. Carey the

former SVP of commercial lending at Rainier National Bank (located through a previously made

connection with John C.T. Conte, most likely FBI Seattle) and closed the asset purchase in

March 1990, about one week before his fraudulent marriage. By forensic analysis, Steve's

Maintenance, renamed as Alliance Environmental Services, then became the next defendant

FBI/CIA/ARMY vehicle for the next phase of the financial wrecking process which was used to

impose financial and psychological stress useful in the development of the illegal BRMT

bioweapon. BURNS continued to live in the house directly across NE 149th Street from Jeanette

in Kirkland, WA into the early 1990s where Lead Plaintiff had moved to join Jeanette and

stepson Bryce upon their March 1990 marriage.

446. This 1990-1993 Alliance small business typically employed about 15-20 people,

except on the Sea-Tac BCD Concourse project described below, which required immediate hiring

of 80 people (paragraphs 449, 652). The enterprise wrecking process began even before the

Steve's Maintenance asset purchase was closed in March 1990 with (i) attorney

THORBROGGER's (while posing as commercial legal counsel at Short Cressman and Burgess

with HIBBS) attempt to exclude from the asset purchase and sales agreement paragraph 12, a

cost plus provision on existing Steve's Maintenance contracts which were assumed during the

purchase (paragraph 601 NSEC-2; 622, 626 RGTS-2, 6; 649, 651, 653, 683 RICO-11, 13, 15, 45)

and (ii) deliberate overstaffing of the company prior to deal close by the then current "owners."

From the closing date forward, defendant UNITED STATES engaged in a further series of

racketeering acts, including, without limitation, (iii) deprivation of government benefits by an

FBI agent posing as an SBA employee who denied SBA bonding which the company had always

previously used prior to the deal's close (paragraph 649 RICO-11) and is vital to bid and perform

the government environmental services contracts which comprised almost all the company's

revenue, (iv) receivables theft (about $160,000 misappropriated by former "owners" Steve and

Kerry "Brewer") and its forced compromise (to about $80,000 net, less legal fees paid to Short,

Cressman and Burgess, Seattle, WA, where Robert HIBBS and Susan THORBROGGER were

employed) on a Bates Vocational Technical College, Tacoma, WA, asbestos abatement project,

which compromise cost the company over $80,000 (one-third of its total original capital and

loans) in the first few months of ownership (paragraph 650 RICO-12). While field operations

proceeded smoothly for a time, (v) fraudulent contract performance bonds (issued fraudulently

by FBI, paragraph 649 RICO-11) on a defunct Utah insurance company, (vi) a deliberate project

delay and then a dramatic acceleration requirement forced a massive and very expensive staffing

problem (more than $100,000 of excess labor on approximately $444,000 base contract amount)

during the federally funded Sea-Tac Airport concourse expansion project which

delay/acceleration was entirely prompted by defendant FBI coordination with general contractor

Mortenson to compress the schedule and to cost the company still more money and which added still more stress (paragraph 649 RICO-11). Defendant FBI also attracted IRS attention to Alliance through a fraudulent pretexting by making an $80,000 overnight cash deposit and withdrawal in the company's bank using the Alliance name but actually controlled by Kerry Brewer (actually FBI posing as the principal "owner" of Steve's Maintenance), which triggered an IRS interview (paragraph 651 RICO-13).

447. During a fraudulent cross-border financing failure intended to capitalize Alliance in 1992, Gerald CORNWELL and/or his near identical or identical twin brother, posed as a financial broker. While presenting his credentials and experience to Lead Plaintiff, CORNWELL alleged financing connections with brokers at the Vancouver Stock Exchange, a speculative venture based small capital stock market typically used to raise money for mining exploration projects in Canada and elsewhere. He claimed to be retired from a center pivot irrigation system installation business and worked with a female FBI agent posing as his wife in Newcastle, WA, to bring RCMP, CSIS, and Ralph Shearing (who ran a geotechnical drilling company which worked in mining exploration throughout Canada) into this corrupt fraudulent financing pattern. CORNWELL was most probably actually a former CIA agent who had previously sold center pivot irrigation systems as his cover for other commercial espionage operations in Libya and north Africa from his commercial cover company in Pasco, WA, near the Hanford Nuclear Reservation during much of the same period when Lead Plaintiff's uncle Bruce and family had lived there.

448. CORNWELL (formerly NAVY, then CIA) and FBI worked, unknown to Lead Plaintiff, with RCMP, CSIS and Shearing to develop a fraudulent financing package which required a financial audit. A $20,000 factoring loan from Pacific Financial Services, Bellevue,

WA (a fraudulent factoring company run by Henry Wozow, probably FBI and possibly later known as the factor in California who allegedly stole $160,000 from PAN, then as David Brown while at CNA and still later as Ron McCormick at Walmart) was used to cover the financing fees and expenses. When this fraudulent financing eventually failed in Vancouver, BC, Canada, the $20,000 factoring loan turned in a few months into a loan default totaling $65,000, which Lead Plaintiff had personally guaranteed, and then into personal federal bankruptcy in November 1993 for Lead Plaintiff and his fraudulent second wife Jeanette.

449. While the Sea-Tac BCD concourse expansion project was underway in 1991-1992, John Steele came to work on the project in 1991 through the Laborer's Union Hall where Lead Plaintiff was forced to hire to quickly add staff to the deliberately delayed then accelerated project to meet a dramatically accelerated work schedule. Lead Plaintiff promoted Steele to Project Superintendent so Lead Plaintiff could work on securing other projects to grow company sales while Steele worked days with M.A. Mortenson personnel (Thomas Grinna, Project Superintendent, among others) and Alliance's night crew supervisor Robert Hintz to meet the accelerated schedule. Many years later in September 2023, Steele was a key early identification in the 2023-24 identifications sequence, when he popped into view during a Pennsylvania jail break press conference as Lt. Col. George Bivens, Pennsylvania State Police (LPEE page 12260). This occurred after Lead Plaintiff's first identification in June 2022, when he was able to definitively identify Greg Crossgrove, supposedly a Phoenix area produce industry consultant, was actually Joseph ARPAIO, MARICOPA SHERIFF. These vital early clues and a MSNBC interview background photo behind WEISSMAN (paragraph 422) which included Michael WORTHY (WSU MBA program, (paragraphs 99k, 418, 422, 493, 726, 762 table, 770, 805AG, AK), and a fellow employee as a cashier and stocking clerk while at Larry's Market in 1972,

Federal Way, WA, owned by extended family member Larry Brewer, a cousin of Lead Plaintiff's

father), given his distinctive red hair and mustache, were key to the 2023-24 unraveling of the

series of personal identifications herein, which led to firm identifications of the federal

government department and agency institutional perpetrator defendants.

450. Lead Plaintiff began a search for new employment in mid-1993 as Alliance

operations were terminated and the company was forced to close. During this period,

CORNWELL (a former Navy carrier pilot turned deep cover CIA agent who had worked

espionage operations in north Africa before retiring), now posed as having formed a new venture,

as CEO of an environmental services company, P.A.N. Environmental Services Corporation

(PAN), by using a publicly traded shell corporation to work toward securing a form of financing

known as a PIPE (private investment in public equity), which allowed private funds to be

invested in public stock, which in turn was to be listed on NASDAQ to provide investor liquidity

without the need to go through the SEC registration process. CORNWELL promised Lead

Plaintiff compensation as soon as a financing was completed with Credit Lyonnaise Laing

(CLL), a major French investment bank and stock broking firm with offices in London, so Lead

Plaintiff agreed. He had no knowledge that he remained the effective captive and involuntary

servant of defendant UNITED STATES (CIA, ARMY, FBI, USMS), and its continuing illegal

BRMT bioweapon and bioweapon system, constitutional rights, and associated-in-fact enterprise

racketeering conspiracy.

451. Lead Plaintiff made three trips to London to meet with Credit Lyonnaise Laing

Managing Director Michael Kurtanjek (MI-6, UK's CIA equivalent) regarding financing,

returning from London Heathrow to Seattle, WA on Feb 8, 1994, and on March 11, 1994

according to CPB port of entry encounter records at LPEE page 540. A third return to La Guardia

Airport, New York is not recorded in CPB records during that 1994 time period. The promised

CLL financing failed in Spring 1994. The entire alleged financing was simply a corrupt lie used

to extend Lead Plaintiff's involuntary servitude, forced labor, and peonage by engaging (a) MI-6

(through Kurtanjek, who used his CLL international Managing Director mining industry

commercial cover for projects in Africa and elsewhere), (b) MI-5 (UK's FBI equivalent), and (c)

the London Metropolitan Police, which exposure included a five man Counterterror squad trot-

by while Lead Plaintiff was alone in a 500 foot long construction tunnel at Heathrow Airport,

and the Serious Fraud squad as a result of a hotel bill on the Copthorne Tara, Kensington, hotel

room number which remained unpaid by CORNWELL for a time which was sufficient to attract

their attention. Lead Plaintiff could then be subjected to UK technical surveillance as before, see

the prior UK/US national security event Queen Elizabeth II's 1983 visit to Seattle at paragraphs

211, 600 NSEC-1, 623B RGTS-3, 679B RICO-41 for a prior example, and could be again due to

a pretexted defendant ESTABLISH trip to London in September 2007 paragraph 603 NSEC-4.

CORNWELL and FBI also ran a $165,000 fraudulent factoring theft on a Pacific Environmental

Services (the P. in P.A.N.) sub-soil remediation or paving project during this sequence in mid

1994, echoing the prior $20,000 factoring loan which had been used for the fraudulent Canadian

financing, the subsequent $65,000 loan default, and the forced November 1993 bankruptcy

which had been discharged by the Federal Bankruptcy Court just a few months before. Lead

Plaintiff never received any of the compensation due for his work at PAN. He did subsequently

rebuild his personal credit to a 775 FICO score (practical scale maximum score 830) despite

these defendant UNITED STATES thefts and frauds, before it would be wrecked again in late

2005.

452. In the meantime, ROSENBERG (FBI), as the NutraSource CEO in Seattle, WA, had remained in contact with, then directly reengaged the Lead Plaintiff, requesting that Lead Plaintiff conduct NutraSource strategic planning sessions with the management team, and provide other consulting services during this period.

453. Adding to the stress of the December 1993 personal bankruptcy borne out of corrupt federal police powers operations which financially wrecked Alliance (paragraph 649 RICO-11), Lead Plaintiff, his second wife Jeanette, and stepson Bryce, were deprived of Lead Plaintiff's earning power by defendant UNITED STATES' corrupt police powers operations continuously from Summer 1990 through Fall 1994.

454. During a period of forced uncompensated employment (Alliance, then PAN), paragraph 652, 653 RICO-14, 15), then unemployment with minimal consulting income from NutraSource from July/August 1990 to July/August 1995, defendant ROSENBERG human trafficked Lead Plaintiff to the Pacific Pipeline Board of Directors (Appendix 2 paragraph 1-018, 1-019) in Spring 1994, and then to employment as its COO in Summer 1995. Pacific Pipeline was a book distributor used by defendant FBI for spying on and wrecking (a) targeted book retailers by (i) deliberately misfilling and short-filling their orders, by (ii) deliberately constricting credit during critical selling periods, by (iii) directly misbilling issues and (b) self-publishers by (i) soliciting consignment of books that would fail to sell through and then (ii) returning those self-published consignment inventories while Pacific Pipeline operated, then (iii) by seizure of these consigned self-published inventories as Pacific Pipeline went into bankruptcy after a programmed ERP implementation meltdown in 1995-96 orchestrated by a former Arthur Andersen Consulting information technology embed, most probably defendant FBI. Pacific Pipeline was run by Vito PERILLO, its ostensible founder and shareholder. Lead Plaintiff joined

defendant ROSENBERG and Phil LALJI (CEO, Kit's Cameras) on the Board of Directors in 1994 and became COO succeeding Dennis last name not recollected (then the recently previous COO of Egghead Software under Alhadeff) in Summer 1995. Lead Plaintiff was later joined by CHRISTENSEN and PRAY as co-workers, who came from their prior employment at NutraSource (where they had worked with ROSENBERG). The new information technology ERP system referenced above was acquired in 1995 before Lead Plaintiff joined the management team as COO, was then supposedly customized to the operation, and went live in September 1995 over Lead Plaintiff's firmly expressed private objections (and with no access allowed by PERILLO or the VP-Information Technology to review the implementation configuration customization and testing process) just before the critical Christmas selling season for book retailers got underway in Fall 1995. The implementation was a disaster from the start, with malfunctioning software and an overheated minicomputer whose motherboards had to be partially replaced due to grossly inadequate air cooling in the closed office it was placed in. This deliberately sabotaged ERP implementation severely compromised order fulfillment to retailers throughout the critical Christmas sales period, damaging the finances of many small independent bookstores, and severely degrading company finances for those retailers and for Pacific Pipeline. This implementation disaster also forced added labor, dramatically increased shipping and invoicing errors, delayed company cash flow, and forced a company bank loan default, which brought a special credits loan officer from US Bank, Kim EPSKAMP.

455. Kim EPSKAMP was US Bank workout officer assigned to Pacific Pipeline from Portland, OR. He had attended the WSU MBA program at the same time as the Lead Plaintiff (they had gone upland bird hunting in the Palouse together while in graduate school.) As it turned out, this same "problem" had been experienced by Pacific Pipeline in previous Christmas

selling seasons. This set of tactics was an element of on-going defendant FBI illegal spying and

business wrecking operations carried on in the region, and most probably nationwide, which

targeted specific independent booksellers and self-publishers for financial damage to their

private enterprises, just as defendant FBI had done during Cointelpro from the 1950 into the

1970s. This credit workout was underway by Spring 1995.

456. During the final stages of the ERP cleanup, PERILLO suggested that the company

return to the old software system which had failed in prior Christmas and had led to the

disastrous Fall 1995 implementation. Lead Plaintiff rejected the idea, attempted to buy out

PERILLO's interest, then was terminated without cause, soon after the ERP software

implementation disaster was cleaned up and operating properly in Spring 1996. About two

months after his Spring 1996 termination from $125,000 base compensation job as COO, Lead

Plaintiff received a call from New York City. PRAY reported that he had just witnessed

PERILLO fire the company's biggest customer, Barnes and Noble, in a meeting at its

headquarters in NYC. Having lost about half its sales, Pacific Pipeline then slid into financial

distress and bankruptcy as it dissolved into a financial wreck due to lack of sales. The records of

this malign FBI spying and small business bookseller targeted wrecking operation then

disappeared with the bankruptcy so the truth of the targeted private enterprises financial

wrecking process run against the small book retailers and self-publishers would be destroyed.

Pacific Pipeline was liquidated by CHRISTENSEN working for the bankruptcy court trustee.

PERILLO reportedly then formed another book distribution company named Koen Pacific, with

a Pennsylvania book wholesaler Koen as lead investor.

457. Lead Plaintiff was then human trafficked after extended unemployment, lasting

about six months, into a CNA hourly consulting sales opportunity at Henry Schein, a medical

supplies wholesaler in Port Washington, NY, with HADJINIAN and LINS, which Schein did not

pursue. In November 1996, Lead Plaintiff was asked to join his next orchestrated employment at

CNA Industrial Engineering full time (Appendix 2 paragraphs 1-018 through 1-026) at a much

reduced salary of $88,000 (down from his prior $125,000 base salary at Pacific Pipeline) joining

FAUCI, (posing as Larry R. Cook, NIAID Director and allegedly CNA's founder and owner),

HADJINIAN, LINS, LOWBER. CNA (Appendix 2 paragraphs 1-013, 1-014) had been

previously and was used (unknown to unwitting Lead Plaintiff until forensically reverse

engineered between 2021-2023) in other DOJ spying (defendants FBI, USMS) against Japanese

entertainment games companies (Sega, Sony, Nintendo) as they entered the United States, in the

engineering design of the Oracle software distribution center (to track Oracle database software

shipments to be able to identify Oracle's customer base for future spying), on Boeing civil

aircraft and military projects, Hughes NRO and NSA satellite projects, among other legal and

illegal intelligence acquisition, domestic spying, and national security projects (paragraph 602

NSEC-3).

458. Lead Plaintiff initially worked on a series of CNA distribution automation projects

for Sony, Springfield, OR, then CUC, Torrance, CA. The CUC project featured an Accu-Sort

sorter requested by CUC SVP John GOODMAN, which was repeatedly sabotaged after

installation during implementation and acceptance testing by surreptitious defendant FBI or

USMS "telephonic support" after each system tune-up by Accu-Sort technicians, to the point

where it failed the acceptance test after extended efforts by Lead Plaintiff, keeping him away

from his Kirkland, WA family in Torrance, CA over many months. Lead Plaintiff spent most of

those months trying to troubleshoot the Accu-Sort sorter and the flawed order fulfillment

software (which cubing and fulfillment software almost worked most of the time), which

software had been developed by a team run by PRAY. The entire system was ultimately

"rejected" (by pre-design) on this fraudulent CUC project, a lawsuit was filed, and Los Angeles,

CA state court ordered arbitration of this fraudulent failed project, one in the long series of

abuses of state and federal courts by defendants FBI , DOJ, and USMS, paragraphs 626, 627

RGTS-6-7.

459. This failed CUC project and subsequent litigation was one of many such sabotage

sequences of unwitting Lead Plaintiff over his many years of his involuntary servitude before his

income was completely cut off in 2002, then after human trafficking was briefly allowed for ten

months in 2007-2008 at ESTABLISH (ROSENBERG, FBI) in another in the sequence of

programmed destructions by FBI, USMS, CIA and ARMY in northern New Jersey, with co-

conspirators including, without limitation, numerous police powers operations in the region, as

well as corporate, press, and community interests. These persistent acts, violations, and injuries

violate, without limitation, 18 USC §§ 175, 241, 242, 793, 798, 1029, 1030, 1037, 1038, 1039,

1341, 1342, 1343, 1349, 1581, 1584, 1589, 1590, 1593A, 1961-1968.

460. In 1998, Lead Plaintiff was selected to replace HADJINIAN (previously a defendant

CIA affiliated native asset during the Samoza regime in Nicaragua until that family dictatorship

ended in 1979), after (a) CNA was deliberately overstaffed and about $400,000 of bogus

receivables remained uncollected and had to be written off, and (b) a disastrous distribution

software development project at Titleist run by Tim Auld came unraveled and was cancelled after

(c) a failed software implementation rescue attempt by COOK, HADJINIAN, and PRAY. Lead

Plaintiff was forced to lay off many CNA engineering and IT team members to shrink the payroll

to match revenues. This overstaffing pattern is used to facilitate the appearance of unemployment

and job searches by those laid off but who are actually redeployments of undercover police

powers and intelligence personnel to new embedded roles in various private organizations including, without limitation, as known to Lead Plaintiff, Starbucks, Navajo Farming Industries, Titleist, real estate agent covers, headhunter covers, and other illegal cover company operations. Soon after taking over CNA, Lead Plaintiff modified customer contracting terms to regain profitability. He worked through the national security project Boeing/Air Force Delta IV rocket factory engineering design and implementation, Anchorage Airport baggage systems, Sea-Tac Airport baggage systems, Port of Seattle engineering specifications rewrite, Nikken fulfillment center design and procurement, HomeGrocer fulfillment center design and implementation, Media Arts Group production and fulfillment center, among other engineering and information technology projects (that these projects were used for illegal domestic spying was still unrecognized by the unwitting Lead Plaintiff). He was joined around 1999-2000 for about six months by AUSTIN in civilian dress at CNA Industrial Engineering during a series of distribution center automation design projects for HomeGrocer, a Bellevue, WA based internet home delivery grocery company.

461. In Summer 2001, Lead Plaintiff began work to secure an engineering subcontract to Berger Abam, Federal Way, WA, at Puget Sound Naval Shipyard (PSNS), related to a seismic retrofit of dockside industrial area shop buildings. This project was delayed until Spring 2002 by the 9/11/2001 attack. As the project was scheduled to resume, he was informed that $100,000 of working capital required to complete the PSNS project had been stripped from the company by FAUCI (Larry R. Cook, supposed CNA founder and CEO). He resigned with PRAY to form Allegent, LLC in September 2002, not realizing PRAY was and always had been an embedded agent of defendant UNITED STATES.

**Illegal Human Trafficking In Involuntary Servitude: Lead Plaintiff's Professional Life– Programmed Employment, Unemployment, Enterprise Wrecking, Homelessness 2002-2008**

462. Lead Plaintiff's 2002 private business startup, Allegent LLC dba Performa (with PRAY as fraudulent "business partner,") was wrecked by defendant FBI (ROSENBERG) using ShipNow check fraud and defendant TSL sales fraud between 2002-2004 (paragraph 516, 517, 602 NSEC-3, 610 HEXP-7, 650 RICO-12, 673 RICO-35, Appenidx 2 paragraphs 1-027 through 1-029) to coerce and traffick Lead Plaintiff out of Washington state using financial wrecking and illegal psychological coercion biochemically magnified by illegal BRMT bioweapon and bioweapon delivery system manipulated fear and suicide ideation (paragraph 604 HEXP-1). Defendant UNITED STATES accomplished obstruction of justice through this trafficking as the pattern evidence in decades of his medical records, bank records, and other vital evidence of criminal acts by and under defendant DOJ agencies FBI and USMS involuntary servitude, and by defendant CIA and ARMY bioweapon and bioweapon delivery system illegal human medical experimentation without consent evidence. These records were destroyed in the years after his trafficking by the passage of time and by terminating his on-going relationships with medical and legal professionals, financial institutions, and others. A medical records request to his long-time physician was ignored or intercepted in the US Mail. Other Electronic records from the late 1990s (personal) and from about 2002 (Allegent, LLC dba Performa) which ran through the 2005 trafficking and the early months of 2006 in Boston, MA before Spring 2006 homelessness were stored on a personal laptop as the hard drive was destroyed either by being transported in a rolling suitcase as it was being relocated in about 2006, or by a technical hack which caused that appearance, while homeless in Boston (Appendix 2 paragraph 1-029), but the hard disc drive was recovered in September 2007 and sent to a lab (likely an undercover FBI or USMS lab address).

A complete copy of the hard drive contents was handed to defendant ROSENBERG (aka William Drumm, General Manager) at defendant ESTABLISH by Lead Plaintiff in about October 2007. Production of these records by defendants FBI, ESTABLISH, or by the cover company data recovery lab itself, will yield substantial additional evidentiary matter and support these and further claims against defendants.

463. Harvard President Larry SUMMERS (fka Roger PENNER, paragraph 428) conspired with FBI (ROSENBERG) to human traffick Lead Plaintiff to Boston during 2005 using a popular physics book ostensibly written by Harvard physics professor Lisa Randall, who appeared on the front cover of Scientific American magazine while supposedly promoting her book was the female bait, as Lead Plaintiff was trying to determine where to flee after being financially wrecked out of his 149th Street Kirkland, WA residence to an apartment complex between 124th Avenue NE and Slater Road NE, north of 85th Street in Kirkland, WA. No one in the apartment complex apparently needed to work as the parking lot was almost completely filled with cars both day and night. Lead Plaintiff feared, at the time, but had no facts at the time to support, federal police powers attempts to illegally entrap family members which could enable corrupt police powers personnel to use their coercion of family members to reach him for reasons he simply did not understand at all. He left his sister's home in Edgewood, WA on December 24, 2005 to travel to Boston, after being informed he could not remain there in a basement bedroom adjacent to his Aunt Joanne's apartment (the role was played by a media cutout who appeared instead of his actual aunt) in the Sumner, WA area residence owned by his sister and her husband. Twenty-one months of homelessness in Boston, MA ensued, first at a hotel near the Wonderland MBTA station for about four months until funds ran out, then at Pine Street Inn and in a Catholic Church basement satellite shelter in Boston, MA, for seventeen

months. He diligently searched for work each week and was systematically blocked from access
to legitimate employment options by defendant USMS or FBI technical hacks at a job search
center in Boston.

464. An interview with an Israeli-owned consulting firm in a western suburb of Boston
was arranged in Spring 2007, actually most probably a Mossad counter-terror intelligence officer
interview arranged by ROSENBERG (FBI) to manufacture a false terror legend narrative which
FBI then fed to NYPD and others on the regional Joint Terrorism Task Forces in northern NJ and
NYC. Lead Plaintiff was also contacted by a Pittsburgh, PA area technology trade association
regarding a trade association executive position which did not result in an in-person interview
(likely actually a defendant FBI fraudulent telephone interview), and by a Pittsburgh, PA area
executive recruiter Joe McKeon (FBI), MRI Executive Solutions. An in-person interview with
William Drumm (defendant ROSENBERG again, this time without the Seattle, WA toupee) and
others at defendant ESTABLISH was orchestrated and Lead Plaintiff was again human
trafficked, this time to Fort Lee, New Jersey in August 2007 by defendant FBI's ROSENBERG
for further involuntary servitude and forced labor at defendant ESTABLISH (Appendix 2
paragraph 1-031).

465. Sefendant ROSENBERG (FBI), Lead Plainitff's principal human trafficker from his
roles at NutraSource as CEO in the 1980s and Pacific Pipeline as a fellow Board member in the
1990s) reappeared in person in Summer 2007 in this new role of William Drumm, the General
Manager of defendant ESTABLISH in Fort Lee, NJ. This went completely unrecognized by the
unwitting Lead Plaintiff until late 2023. Cover names MCDONALD, PREGNER, KOVONUK,
ROSS, PANKOWSKI, posing as co-workers, and Hakkan ANDERSEN (a media and
entertainment industry employee) posing as the Swedish parent company's Managing Partner for

global consulting services, joined in this fraudulent scheme, including at a week-long London,

UK, company international business conference in September 2007.



July 25, 2007

Mr. Dennis Brewer
P.O. Box 180190
Boston, MA 02118

Dear Dennis:

Thank you for making the time to meet with us at our offices. We enjoyed discussing our plans for the future of our firm, and your career. We believe that you have much to offer and will be an excellent addition to our firm. Specifically, your experience in supply chain management consulting qualifies you for this position

To confirm our employment offer, we would like you to join our professional staff full time in the position of Vice President, at an annual salary of $140,000, payable semimonthly. Your responsibilities will include marketing and sales of client projects – both independently and as a member of our team, leading projects that you sell, internal administrative tasks such as scheduling and staffing, and working on billable projects.  Acceptance of this offer indicates that you understand that you will be working for our company exclusively.

You may participate in the firm's regular major medical plan and group life insurance policy.  There is a contribution amount paid per employee depending on the coverage type, while the firm pays the majority of the cost. We also have an excellent 401(K) program administered by Paychex, an employment payroll service.

You will be eligible to earn a 4 percent commission on work that you sell. We use a team selling effort for many of our projects. This means that in addition to your individual sales activities, we will involve you in sales along with others in the firm. If you sell work totally on your own, the commission will be 4 percent of the billable work. If you sell the work in a team effort, then you will earn a percentage of the 4 percent commission based on your participation in the sale. This commission will be paid quarterly on the basis of billable work during that time on projects that you sold or participated in selling.

You will be eligible for up to a 10 percent bonus for overall performance including billings, team building, cooperation, and contribution to profit.

You will qualify for 15 days of vacation during the first 12 months of employment, and 20 days per 12 months following that.  We do not automatically earn personal or sick days.  Obviously, if you are sick, we expect you to stay home and seek medical attention; this does not come out of your vacation days.

**Excerpt: ROSENBERG (FBI, William Drumm) Signed ESTABLISH Offer Letter - LPEE pages 797-798**

466. After ten months of fraudulent employment by this defendant DOJ/USMS/FBI cover

company which operated in manner similar to prior cover companies, Lead Plaintiff was

terminated from defendant ESTABLISH in June 2008 by an associate of defendant

ROSENBERG, Conrad ROSS, about three months after the staged "termination" of Drumm

(ROSENBERG), and a few weeks after being "requested" to make an impossible $25,000

investment in defendant ESTABLISH that these DOJ and agency personnel knew he could not

possibly make (Appendix 2 paragraph 1-032). A fraudulent female relationship which was

orchestrated in 2008 with MODDERMAN (paragraph 611) was also terminated at this time to

maximize personal stress and distress on the Lead Plaintiff, a practice he now recognizes as

customary federal defendant police powers tradecraft. Defendants NYPD, PAPD, NJTPD, NJSP,

and other defendants in the northern NJ/NYC region, had joined in the conspiracy in August

2007 and in the months thereafter, conspiring in the bad faith acts which comprised the ongoing

police powers associated-in-fact racketeering enterprise and conspiracy against rights described

in the 110 specific subcounts at paragraphs 600-710 as they conducted their own prejudicial

police powers operations, which coercive operations have and do continue.

467. During his forensic review in October 2023, Lead Plaintiff noted three possible

encounters with a former FBI Director Robert Mueller morphological comparable, most recently

while at defendant ESTABLISH. This is subject to confirmation during the discovery process.

The first possible interaction noted during the forensic review was in Spokane at the Sackville-

West residence as the fiancé of Karen, one of the Sackville-West children in the 1970s while

Stephen BREYER was known to Lead Plaintiff as Jack Sackville-West (BREYER), and the

parent of Karen and Bill, who posed as Lead Plaintiff's college friend at defendant WSU. Lead

Plaintiff's limited contact with this individual in the 1970s, then known as Karen Sackville-

West's (other identities at paragraph 717) fiancé "Denny," is too vague to be determinative

regarding Mueller.

468. The second probable encounter was at Pacific Pipeline, a book wholesaler and defendant DOJ/USMS/FBI domestic spying operation in Kent, Washington used against Pacific Northwest retail bookstores in the mid-1990s while that individual appeared from time to time, probably Mueller at times but not at all times, posing as its Vice President - Sales.

469. The third (very probably Mueller) encounter occurred during Lead Plaintiff's fraudulent employment at defendant ESTABLISH, while consulting on a fraudulent software selection project which defendant FBI orchestrated in 2007-2008 at PPG Headquarters in Pittsburgh, PA, in its Paint and Coatings Division. That individual was slated to become the new senior corporate officer for global operations in the Paint and Coatings Division. That division, which is now 100% of sales since the glass business was completely sold off beginning in 2008, was supposedly being moved out of the downtown Pittsburgh PPG headquarters to a suburban location, a very unlikely sequence given the size and importance of that division to PPG and its longer-term importance. Defendant ROSENBERG accompanied Lead Plaintiff to a floor where the SVP (Mueller) ostensibly had an office on the one trip to PPG in Pittsburgh which defendant ROSENBERG made to accompany the Lead Plaintiff from the Fort Lee, NJ office they shared at defendant ESTABLISH. There were no other people on the upper PPG Headquarters office floor, now recognized as a trademark form of tradecraft experienced in other defendant FBI operations to avoid having other witnesses in the area, such as in the fraudulent 20 or so sales lead visits to various plants and offices during the sales starve-out sequence which was an element of these defendants' wrecking of Allegent, LLC dba Performa in 2003-2004 (paragraph 673 RICO-35), which was primarily undertaken by defendants DOJ, FBI, and TSL to orchestrate Lead Plaintiffs trafficking through Boston and then on to fraudulent employment by defendant ROSENBERG (FBI) at defendant ESTABLISH in Fort Lee, NJ in 2007.

470. This likely fraudulent PPG project interaction with Mueller (whose cover name at PPG is not recalled) was most probably a final defendant FBI backcheck for their internal security purposes. Thereafter, defendant UNITED STATES and its co-conspirators, having detached the Lead Plaintiff from his tell-tale medical records in Washington state (which would later be routinely destroyed with the passage of time after they were not transferred to New Jersey as requested by mail by the Lead Plaintiff in late 2007), and from his financial and other records of their associated-in-fact enterprise run with their co-conspirator defendants in Washington state and Boston, MA, could proceed with the next phase of their planned operation.

### Illegal Human Trafficking In Involuntary Servitude: Lead Plaintiff's Professional Life– Since ESTABLISH (FBI, ROSENBERG) Termination 2008-2024

471. Essentially, defendant UNITED STATES and its racketeering co-conspirators intended this human trafficking as the final trip – this time to northern New Jersey and the garbage disposal. No employment has been allowed since June 2008, while various frauds and thefts by alternate means have continued including, without limitation:

(i) compensation thefts by involuntary servitude employers, including, without limitation, CNA and ESTABLISH,

(ii) forced compromises of legally due sums to various businesses owned or managed, including, without limitation, Alliance (from the asset purchase of Steve's Maintenance, FBI) Allegent, LLC dba Performa (ShipNow, FBI), and Cliffside Park, NJ and Ramsey, NJ apartment renovations (USMS), including labor, materials, equipment, and rental equipment costs and expenses,

(iii) deprivation of benefits, including, without limitation, access to SBA performance bonding and loan guarantees at Alliance,

(iv) undue forced litigation expenses, including, without limitation, at LazerSoft, Alliance, PAN, CNA, Allegent, Winnett,

(v) orchestrated commercial loan and factor loan defaults leading to personal bankruptcy, credit destruction, and high priced credit at Alliance, PAN, CNA, Allegent, ESTABLISH, wherein each and all these frauds and thefts perpetrated and permitted by these defendants, through their acts and failures to act, have cost the Lead Plaintiff (a) literally millions of dollars in lost revenue and profit at his commercial enterprises while engaged and attempting to engage in good faith, in in-state, interstate, and international commerce, (b) in the low millions of dollars in personal income over his active twenty year career, including during multiple periods of forced unemployment, (c) further millions of dollars of compensation lost to forced unemployment and further destruction of commercial enterprises engaged in interstate commerce from 2002-2007 and again from 2008 to the present, and through, without limitation, (d) disparagement, defamation, loss of reputation, harassment, and rights violations by defendant UNITED STATES, by other police powers defendants, by individual defendants, and by various other interests to be identified through the discovery process.

472. Further, the Lead Plaintiff was first human trafficked at age 12 in 1968, then comprehensively abused in involuntary servitude by defendant UNITED STATES from at least 1979, which has, at all times, limited his income and income potential, access to capital from actual investors rather than fraudulent government "investors" for the corrupt purposes of perpetrating frauds and imposing entrapment operations on the Lead Plaintiff, caused and created repeated continuity of employment issues, eliminated access to actual authentic fair market compensation, and eliminated other career and business opportunities which are legally available to all US persons under law, while accelerating the frequency and intensity of lethality attempt

against him. No employment of any kind has been permitted to Lead Plaintiff by defendants since 2002, except for ten months of fraudulent employment at ESTABLISH in New Jersey in 2007-2008. Lead Plaintiff suffered torture and loss of benefits and income to another USMS fraud by CHALOM between 2008-2010 (paragraph 642 RICO-4), attempted to access the courts for redress and was forced from his Cliffside Park residence in October 2010, thwarting his attempt as redress through imposed duress (paragraph 512, 522, 606 HEXP-3g), then relocated through a hospital (paragraph 606 HEXP-3 subparagraphs I through L) in Paramus used to civilly confine and pressure Lead Plaintiff to drop a federal court complaint under duress to Ramsey, NJ in 2011. This 2008-2011 period is described in detail later in this Complaint at paragraph 606 HEXP-3.

473. Unable to secure any employment since June 2008, even as a ShopRite night stocking clerk in Ramsey, NJ around 2012, when interfered by police powers from employment there as a night stocking clerk, most likely by a defendant USMS undercover officer posing as a female Assistant Store Director, Lead Plaintiff attempted to start several commercial enterprises in interstate commerce. Defendants have and do employ mail fraud, wire fraud, contract fraud, material misrepresentations, and other acts, violations, and injuries to preclude all further employment and private enterprise, forcing the Lead Plaintiff to exhaust the five year limit on public assistance in 2016 and then to live on Social Security retirement benefits from late 2017.

474. Lead Plaintiff's attempts from 2011 into 2022 to start a business were continuously thwarted by police powers operations (at all levels of government), and used to destroy Bank of America DDA (checking) accounts (which are actually shadow accounts maintained by defendant UNITED STATES secretly and in parallel with the actual private sector banking system by using the names of recognized financial institutions) in Summer 2015 (paragraph 656

RICO-18, LPEEV65-6, 7), which account monthly statements held the clear evidence of prior

associated-in-fact enterprise pattern of criminal racketeering acts by police powers, including the

thefts of compensation at defendant ESTABLISH in 2008 by defendant ROSENBERG and

ROSS (paragraph 641 RICO-3), and the theft of materials, labor, improvements, tools, and

personal property by defendant CHALOM at the 282 Palisade Avenue, Cliffside Park, NJ

apartment in 2008-2010 where Lead Plaintiff improved his residence at the request of "landlord"

Marc CHALOM (USMS) and was not paid in full (642 RICO-4). FBI or USMS used this same

technique to cause the Lead Plaintiff to close long-running Wells Fargo DDA accounts in late

2022, and to force the opening of new accounts in several fraudulent banking cover company

financial institutions in 2022 and early 2023 in their attempt to repeat this pattern of eventual

evidence destruction of banking records of inactive and closed accounts, but those Wells Fargo

records and other banking records are partially preserved for use at trial.

475. Lead Plaintiff has pursued interstate and international commercial business

opportunities using startup corporations Winnett Perico, Inc. ( Winnett herein, incorporated in

CO in 2011, no longer registered), Sheldon Beef, Inc. (Interline Exhibit 12, NJ, incorporated in

2020), GPR, Inc. Gannett Peak Ranch (OR, incorporated in 2021). The intent was, and subject to

resolution of this litigation is, to raise financing and conduct commercial organic vegetable

production (2011-2018), organic beef production (2011 to present), and engage in international

trading of beef products to China, Korea, and other countries (2018-2021). This series of food

companies which Lead Plaintiff tried to open and finance beginning in 2011 and continuing

through 2021, were promised funding and/or promised sales contracts by various defendant FBI

cover companies, investment banks, venture capitalists, brokers, and/or other cooperating police

powers cover entities (paragraphs 653-672 RICO-16-34, 674-680 RICO-36-42, Interline Exhibits

. LPEEV65-8). and promised sales opportunities and contracts by use of private companies

facilities and personnel including. without limitation. ALBERT'S ORGANICS, COSTCO,

WALMART (Interline Exhibits 9-10), and KROGER (Interline Exhibit 8), as well as throug

defendant FBI and other police powers cover operations. These companies have been funded

both by personal funds and by secret police powers investments (paragraph 658 RICO-20,

Interline Exhibit 6), but to date all attempts at interstate commerce have been destroyed by these

defendants interferences in that attempted interstate commerce. This includes, without limitation,

the fraudulent FBI investments below, which are examples of (i) these repeated defendant FBI

fraudulent interferences with interstate commerce (18 U.S.C. §§ 1961-1968) and of (ii)

defendant UNITED STATES and other police powers, whose personnel are embedded at senior

levels in private organizations, including, without limitation, private companies, cooperatives,

and credit unions; as well as other commercial and private interests pursuing specific agendas; all

while engaging in racketeering acts, violations, and injuries to Lead Plaintiff and other members

of the class.

[Intentionally left blank.]

*Interline Exhibit 4:* **Winnett– FBI, Other Defendant Interferences In Interstate Commerce**

From:
Subject: Re: Offer - VP Finance and Administration
Date: Fri, 28 Aug 2015 13:08:02 -0600
To: Dennis Brewer

Hi Dennis:

I am very excited about your offer. I do have some questions which I have summarized below.

I want to clarify the estimated start date to be November 1, 2016 which is subject to completion of the private placement. Assuming it is 2016, would you need my help over the next year in securing the private placement in addition to using my resume? Also during that time, would you like my help in hiring my direct reports? Would you please specify what my involvement would be until the private placement is finalized, and would there be any compensation?

I also wonder what your timing is for my response? As we discussed, I am leaving on vacation tomorrow. And due to what appears to be a contingency situation, I would like to discuss this with my legal counsel.

Again thank you for the fantastic opportunity, and I look forward to working with you!

Best Regards,
Paul

Paul Smith
255 Barcelona Drive
Boulder, CO 80303
Mobile: (303) 601-6333
Email:

On Aug 28, 2015, at 11:44 AM, Dennis Brewer                wrote:

I am very pleased to offer you the position of Vice President of Finance and Administration.

Your key responsibilities are finance, accounting, pricing, human resources, procurement, and information technology. You will serve as a member of the Company's Executive Committee.







**From:** Michael Castro <███████@yahoo.com>
**Sent:** Friday, August 28, 2015 4:31 PM
**To:** Dennis_Brewe███████
**Subject:** Re: Offer - VP Operations

Dennis,

Thanks for your consideration. I agree that I would prefer a definite resolution as soon as possible. I will curtail any new efforts to seek employment to allow time for you to move forward with the meetings, and I look forward to hearing from you next week.

Mike

Michael L Castro Tel. 619-8███ skype ███████

### Re: Backlog



Dean T. Smith <dean@whitewolfproperties.com>
To  Dennis_Brewer@winnettorganics.com

Through our Self Directed IRA the way we will apply shall be:

Dean Smith

Funded by/through and dividend receiving will be:

Preferred Trust Company, LLC fbo Dean Smith  404000191 Traditional IRA

Diana Smith

Preferred Trust Company, LLC fbo Diana Smith 404000192 Traditional IRA

Each will be separate investments and entities.

Thank you for getting this information to me tonight, greatly appreciated!

Dean


### RE: Please Vote



Doug Petersen <DPetersen@wcu.com>
To  Dennis_Brewer@winnettorganics.com; Dean T. Smith



Yes, I think this is appropriate.
Doug

**From:** Dennis Brewer [mailto:dsbrewer923@hotmail.com]
**Sent:** Wednesday, September 16, 2015 8:39 AM
**To:** Dean T. Smith; Doug Petersen
**Subject:** Please Vote

Our investment banker has advised us to do a six for one split of the common shares and sell those shares for $5.50. This means that your cost basis in common shares , when converted, is $1.67. So, your investment has more than tripled to date.

We also need to increase the number of common shares authorized to 40 million, doubling the total number of common shares authorized. **Since your shares vote, please indicate whether you vote YES to authorize the additional common shares or NO to decline to authorize the additional common shares.**

Regards,
Dennis

Dennis Brewer

*Interline Exhibit 5:* **Winnett Interstate Commerce Interferences – "Produce Consultant Crossgrove" is Defendant MARICOPA SHERIFF ARPAIO, officially and individually**



Oliver Term Sheet 160705



Greg – In an effort to speed up the process, I have designed a Term Sheet for Barry Oliver and his company Diversified Farms to construct shadehouses, shop, and office and for Barry to guarantee certain obligations of WinnettOrganics. Please review and let me know what you think. I have not discussed any of this with Barry as yet so please keep it to yourself for now.

Regards,
Dennis

Dennis Brewer
Chief Executive Officer
WinnettOrganics, Inc

www.winnettorganics.com

*Organic Fresh Food Specialists*

476. About $200,000 of FBI agency funds were secretly invested in Winnett in their 2015-2109 entrapment attempt series against Lead Plaintiff, with defendants DOJ and FBI's CASTRO, PAUL SMITH, BLITCH, WASEMAN, and CANCHOLA, Daniel KREWSON (Daniel Goldman, SDNY, MULTIFUNDING), among others (paragraphs 658, 659, 670 RICO-20, 21, 32), and which also inculpated defendant ARPAIO (Interline Exhibit 5). These FBI funds were then effectively recycled through other undercover entities which interfered with interstate commerce, while these funds were being expended in good faith by Lead Plaintiff intending to raise additional funds and accomplish interstate commerce including, without limitation, interferences by ADAMSON BROTHERS, INSIGHT NETWORK, CORNHUSKER CAPITAL, as further described at paragraphs 644, 658, 660, 665, 668, 671, 672 RICO-6, 20, 22, 27, 30, 33, 34, all in perpetuation of the illegal BRMT bioweapon and bioweapon system development and deployment, civil and constitutional rights violations, and racketeering acts, including the cover-up of the entire associated-in-fact enterprise from inception.

*Interline Exhibit 6:* **$100,000 From Fraudulent Investor "DEAN T. SMITH" (FBI)**



Redacted Per Court Rules

FBI Agency Sourced Funds Used to Seed Finance Winnett Startup

*Interline Exhibit 7:* **Fraudulent Financings: ADAMSON Brothers (FBI) Fraudulent Private Placement Memorandum and SEC S-1 Consume $40,000, Raise $0**

Name of Offeree _____

Copy Number: _____

**WINNETT PERICO, INC.**
a Colorado Corporation

**CONFIDENTIAL PRIVATE OFFERING MEMORANDUM**

Shares of Common Stock
Price Per Share: $3.50
Maximum Offering: $22,000,000 (4,000,000 Shares)
Minimum Offering: $11,000,000 (2,000,000 Shares)
Minimum Investment: $49,500.00 (9,000 Shares)[1]

THESE ARE SPECULATIVE SECURITIES WHICH INVOLVE A HIGH DEGREE OF RISK. ONLY THOSE INVESTORS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THESE SHARES. SEE "RISK FACTORS."

THE SHARES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), IN RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION SET FORTH IN THE ACT. THE SHARES HAVE NOT BEEN REGISTERED WITH ANY STATE SECURITIES AUTHORITIES IN RELIANCE ON EXEMPTIONS FROM SUCH REGISTRATION. IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE RISKS INVOLVED. THE SHARES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF AN INVESTMENT IN THE SHARES FOR AN INDEFINITE PERIOD OF TIME.

| | Sale Price | Selling Commissions[2] | Proceeds to Company |
|---|---|---|---|
| Per Share | $3.50 | $0.55 | $4.95 |
| Minimum | $11,000,000 | $1,100,000 | $9,900,000 |
| Maximum | $22,000,000 | $2,200,000 | $19,800,000 |

Consultant Founder

**ADAMSON BROTHERS CORP**
The Date of this Memorandum is September 20th, 2015

---
[1] The Company reserves the right to waive the 2,000,000 Share minimum subscription for any Investor.
[2] Finders fees consisting of 10% of the gross proceeds from the sale of the Shares in this offering payable to Adamson Brothers Corp. (the "Consultant/Founder").

See also LPEE pages 6095-6223, 8288-9901 for further documents and pages 1076-6094 for emails, all evidence of Defendants' interferences with interstate commerce from 2008 to present. This lack of results while consuming scarce financial resources is completely consistent with other pattern evidence of fraudulent financing activities inside defendants' network control of Lead Plaintiff's personal and professional life, including in interstate commerce in each commercial endeavor, both as an employee and as an entrepreneur.

*Interline Exhibit 8*: **KROGER, DOMINICK Corporate Email Accounts Hide True Identities of Police Powers Defendants' Personnel And Cover Entities**

### Dennis Brewer

| | |
|---|---|
| From: | Krempel, Jacob A <jacob.krempel@kroger.com> |
| Sent: | Wednesday, October 5, 2016 9:12 AM |
| To: | dennis_brewer@winnettorganics.com |
| Cc: | Merced, Jose F |
| Subject: | FW: Organic Fresh Foods |

Hi Dennis-

Jose (Buyer) and myself (Category Manager) handle our Fresh Organic business, and are open the week of November 7th to meet with you. Give us a couple options on date/times that you would prefer and we will get back to you with our availability.

Thanks,

*Jake*

**Jacob Krempel | Produce Category Manager**
**Kroger Co. | 1014 Vine Street Cincinnati OH. 45202**
☎ (office): 513-562-5794 | ✉ (email): **Jacob.Krempel@Kroger.com**

From: Michael Callahan [mailto:mcallahan@dominickanddickerman.com]
Sent: Thursday, July 7, 2016 1:29 PM
To: Cardone, Andrew <andrew.cardone@ml.com>; Dennis Brewer <dennis_brewer@winnettorganics.com>
Cc: Mark Gross <mgross@dominickanddickerman.com>
Subject: RE: Introduction

Thanks Andrew.
Dennis - I am free most of the day tomorrow so let me know what works for you.

Regards,
Michael J Callahan
Managing Director
Investment Banking
Dominick and Dickerman LLC
570 Lexington Ave
Suite 4200
New York,NY 10022
Direct 646 780-8432
Cell 917 930-9490

**DOMINICK & DICKERMAN LLC | *Member FINRA, SIPC***

*Interline Exhibit 9:* **WALMART Winnett Produce Supply Contract Meeting at Bentonville, AR Home Office With McCormick (FBI)**

From: Ronald G. McCormick [mailto:Ron.Mccormick@walmart.com]
Sent: Wednesday, January 11, 2017 12:29 PM
To: Ashley Kilgore <Ashley.Kilgore@walmart.com>
Cc: Julia Moore <Julia.Moore@walmart.com>; Dennis Brewer <dennis_brewer@winnettorganics.com>; Laura Himes <Laura.Himes@walmart.com>; Dan Irwin <Daniel.Irwin@walmart.com>
Subject: PLEASE SCHEDULE RE: Winnett Organics Strategic Partnership

Ashley, please send this planner

Title: **Winnett Organics Collaboration**
Purpose: To consider ways that Walmart and Winnett could work together to increase organic acreage and availability to meet future demand.
Time: 1:00 – 2:30 February 21st
Required: Shawn Baldwin, Ron McCormick, Laura Himes, Dennis Brewer, CEO WinnettOrganics, Inc. (dennis_brewer@winnettorganics.com (623) 207-520-549-6245
Optional: Michael Cochran, Mikel Hancock, Yoshie Fuji, Jeff Thorpe, Victor Velage, and Dan Irwin.
Details:
- Dennis may want additional people from his company to join.
- Please schedule a WebEx and meeting room...I believe Dennis is coming in person, but other may wish to call in.
- We will want to show a PowerPoint so an enabled room is needed.
- Don't let the optional attendee's calendars be an issue because this Julia is holding this time on Shawn's calendar.
- Please include the agenda below without the parenthetical notes.

Agenda
- Introductions
- WinnettOrganics, Inc. Overview (Updated deck needed from Dennis)
- How Walmart sources and sells organics.
- Current and potential growing areas (Walmart GDC map with WO, Inc, growing areas added is needed)
- Crop priorities for Walmart and Winnett and where they intercept, and where greatest potential exists.
- Preferred Varieties and Resilient sourcing (need a summary slide if Victor feels we can share)
- Interest and Next Steps

**Interline Exhibit 10: Winnett Cattle Company Sales Contract Signed With WALMART (China) Investment Co., Ltd., a WALMART Inc., Subsidiary – Later Cancelled**



WALMART contract implementation was dragged out by insider defendants after extensive email discussions and vendor approval was repeatedly delayed until Trump started the China trade war in 2018 and countervailing Chinese tariffs made final point of purchase retail pricing excessive.



477. After these programmed racketeering acts affecting interstate commerce were completed, FBI Sacramento then orchestrated a civil lawsuit against the Lead Plaintiff in 2019 (ostensibly brought by individual defendant investor "DEAN T. SMITH") after Lead Plaintiff did not wrongfully use the proceeds of about $200,000 invested and loaned to Winnett during that enterprise wrecking sequence (see Eastern District of California case 2:19-cv-01918-TLN-DB) but had signed a personal guarantee and was a corporate officer.

*Interline Exhibit 11:* **Lead Plaintiff Sued Individually in Federal Court For Alleged Misuse of Funds Provided By Fraudulent Investor "Dean T. Smith" (FBI)**



*Interline Exhibit 12:* **Lead Plaintiff Starts New Enterprise In 2020- Sheldon Beef**



478. Since early 2020, when Lead Plaintiff incorporated Sheldon Beef in New Jersey, this sequence of rights violations, human trafficking, and other racketeering acts, likely led by defendant FBI, has incorporated bad faith acts by, among others, WALMART (Interline Exhibits 9-10), WALMART (China) (Interline Exhibit 10), KROGER (Interline Exhibit 8), COSTCO, including its China and Korea subsidiaries, CIA, FBI, USMS, NYPD, Dewey TURNER, ROSSI, MAGGARD, SOLE SOURCE, CFO SEARCH, then by PATEL, ASTUDILLO,

ABDELSAYED (an Egyptian national posing as a CFO candidate), a Halal beef company

seeking certified products, Raymond POON (paragraph 678 RICO-40, 680 RICO-42), Phil

DALEUSKI (paragraph 678, RICO-40), John VANGCHHIA (paragraph 678, RICO-40), Todd

CRAFT (Boston) (paragraph 678, RICO-40), and related undercover entities and individuals.

479. The true identities of these individual officers and agents acting in bad faith and

against rights are not known to Lead Plaintiff, but their direct involvement is not in doubt and

their pattern of acts is completely consistent with prior patterns of direct interactions with

individuals now known to be or have been defendant FBI, USMS, CIA, ARMY, and other police

powers and intelligence personnel including, without limitation, defendants NYPD, NJSP,

BERGEN SHERIFF, PAPD, NJTPD, and other as yet unidentified police powers departments

and agencies. This associated-in-fact enterprise pattern of racketeering acts affecting interstate

commerce includes their use of commercial facilities, offices, and email addresses willingly

furnished for their use by known private entity defendants including, without limitation,

WALMART (Interline Exhibits 9-10), KROGER, COSTCO, and various other commercial and

corporate defendants whether or not currently named herein including, without limitation, other

named defendants at paragraph 149 and LPEE page 934-1075. Defendant UNITED STATES

and other police powers departments and operations have and do use a wide variety of cover

entities including, without limitation, entities and individuals operating undercover among those

named at paragraphs 105, 120-224, 541, 651-672 RICO-13-34, LPEE pages 934-1075,

LPEEV65-8, to conduct perpetual interferences affecting interstate and international commerce

of Lead Plaintiff, and have doubtless conducted similar operations against other members of this

class of plaintiffs, which illegal color of law abuses of rights and associated-in-fact enterprise

patterns of racketeering acts have and do destroy commercial enterprises and deprive US persons

of their constitutional rights for the purposes of perpetuating, without limitation, involuntary servitude, forced labor, and human trafficking of plaintiffs of this class. (Appendix 2 paragraphs 1-033 through 1-038).

480. Throughout this period, and since 1979, commercial business connections have been repeatedly established and sustained by Lead Plaintiff with people and entities thought to be other commercial ventures in finance, international business, domestic grocery retailers, and domestic suppliers. These were most often actually cover companies operated by defendants FBI, CIA, USMS, DOJ, and other police powers and intelligence departments and agencies, all affecting interstate commerce, and cooperating private entities which allowed their premises to be used in these illegal interferences affecting interstate commerce and/or created and employed their own fraudulent cover companies without actual intent to permit the Lead Plaintiff to engage in commerce, while these police powers departments and agencies played out various undercover roles to perpetuate pretexting, national security entanglements, and entrapment operations, Section 702 violations of a US person through deliberate entanglements into current and prior international espionage and surveillance operations, and other acts, violations, and injuries to (i) sustain illegal BRMT bioweapon and bioweapon delivery system development and deployment, (ii) sustain lethality operations against Lead Plaintiff, (iii) continue racketeering acts and patterns, and (iv) perpetuate the on-going cover-up of this associated-in-fact enterprise.

481. In another in the series of bald-faced attempt by defendant FBI to cover its tracks in 2023, a British Columbia condo release of interest (which had previously been released in a 2005 divorce from fraudulent second wife Jeanette) for just over $6,000 suddenly appeared with no apparent reason eighteen years later in 2023. This $6,000 release of interest generated an imagined tax loss, but was actually simply an entrapment scheme which was contrived by

defendant FBI's Manhattan (likely TURNER, ROSSI) and Amarillo (MAGGARD) field offices

(paragraphs 300-302, 563-569, 624 RGTS-4, 670, 672, 682, 689 RICO-32, 34, 44, 51), in their

attempt to cause and create (1) an imaginary $6,000 tax loss to be claimed on a release of interest

which had previously been released or (2) create an offset in the hope of causing a default on a

defendant FBI funded fraudulent $6,000 personal loan from MAGGARD. This $6,000 personal

loan used agency funds supposedly loaned personally by MAGGARD to Lead Plaintiff in yet

another of FBI and other police powers' long series of associated-in-fact racketeering schemes.

The intent of this entrapment sequence was to interfere with interstate commerce and attempt to

create the circumstances for both a tax charge (offset a $6,000 loan default against FBI funds

with an $6,000 imaginary tax loss for an interest previously released) and loss of federal benefits

(Section 8 housing voucher which Lead Plaintiff is forced to rely on to pay having been

impoverished repeatedly). These racketeering acts furthered the associated-in-fact enterprise

pattern of entrapments and conspiracies against the interests of Lead Plaintiff in his repeated

attempts and FBI wreckings of his organic protein startups, generally known as Winnett (dba

WinnettOrganics), Winnett Cattle Company, then Sheldon Beef, and then Gannett Peak Ranch.

These racketeering acts and the associated-in-fact enterprise which has and does perpetuate these

defendants' pattern of racketeering acts became clear to Lead Plaintiff in September 2023, as the

Menendez indictment in Edgewater, Nj was disclosed to the public and certain key

identifications of individual defendants and their known institutional defendant associations

became clear and obvious through various public disclosures at LPEE pages 12251-12261,

effectively ending decades of successful federal police powers fraudulent concealment.

482. As shown in Interline Exhibits 4-19, despite their sworn Constitutional and legal
obligations, defendants have for decades engaged, without limitation, in an associated-in-fact
enterprise pattern of:

(i) deprivation of rights and conspiracy against rights,

(ii) racketeering acts, violations, frauds, and other injuries to the Lead Plaintiff and others of
    this class,

(iii) directly interfered in interstate commerce, including while these plaintiffs have engaged
    in good faith to:

    a. produce and sell corporate agricultural production to large international retail
       companies,

    b. attempt to supply foreign entities with agricultural products,

    c. seek farmland and make asset and business enterprise purchases across state lines,

    d. attempt to raise financing in-state, across state lines, and in other countries,

    e. make business and personal use of out of state websites to purchase commercial
       and personal goods and supplies and commercial and personal services.

See 55 examples directly related to interstate commerce at subcounts RICO-1 through RICO-55
paragraphs 638-693. See also LPEE pages 140 et al, 380-386, 616-765, 1076-6094, 8233-10613,
for thousands of further examples. Electronic records from this period through part of 2006 were
stored on a laptop which was destroyed in about 2006 while homeless in Boston, but the hard
disc drive was recovered in September 2007 and sent to a lab (likely an undercover FBI or
USMS lab address), with a complete copy of contents handed to ROSENBERG at ESTABLISH
in about October 2007. Production of these records by defendants FBI, ESTABLISH,
ROSENBERG or the cover company lab itself will yield substantial additional evidentiary matter

and support further claims against these defendants. Additional examples and certain electronic records from 2018 through 2020 are blocked from Lead Plaintiff's access at this time, and tampering and field destruction of evidence in email accounts and other electronic records are documented herein.

483. Paragraphs 483 through 489 are reserved.

**Illegal Human Trafficking In Involuntary Servitude: Lead Plaintiff's Personal Life– Continuous Manipulations, Episodic Destruction, Fraudulent Relationships, Sex Sting Entrapment Attempts**

490. Lead Plaintiff's personal life has also been dominated by the illegal BRMT bioweapon and bioweapon delivery system program and associated-in-fact enterprise racketeering since at least elementary school in 1967, when Martha (Janet RENO, undercover later Attorney General) was present in his sixth grade class at Lakeland Elementary School (defendant FWSD). This illegal BRMT program dominance then extends through his high school years beginning in Fall 1970 at Decatur High School, a specialized high school in the Federal Way School District, Federal Way, WA which was spun out of another high school in the district three years before the Decatur High School building was even completed and graduated only 83 students (including fraudulent military academy aspirant fellow students Thomas Grady (ARMY) and Shawn Morrissey (KATYAL, probably DOJ, while claiming an interest in NAVY) in its first graduating class in 1973. GARLAND was plausibly present as Stuart Bettesworth. Around 350-400 students were in each graduating class of the other two high schools in the Federal Way WA school district at that time.

491. From that time period through today, Lead Plaintiff has been and is still an involuntary servant of defendant UNITED STATES, its illegal BRMT bioweapon and bioweapon delivery system program, its constitutional rights abuses, and racketeering acts,

violations, and injuries have been and are ever present, as have defendants USMS, USSS, FBI, ARMY, CIA and other minders assigned by defendant UNITED STATES and co-conspirator domestic and, at times, international police powers and intelligence operations. These officers, agents, informants, and others have and do pose as roommates, friends, fellow employees, romantic interests, spouses, realtors, bankers, and in other roles intended to provide defendant UNITED STATES' illegal BRMT program management with continuous awareness and extremely powerful adverse influence over nearly all life choices. College years at defendant WSU, Washington State University, Pullman, WA, included numerous contacts with defendant USMS handlers including, without limitation, PAGE and WILLIAM SACKVILLE-WEST while an undergraduate, first in chemical engineering, and later in business administration. GARLAND was present as student Robert Mandich on the same residence hall floor in Perham Hall and then at Nez Perce Village student apartments between 1974-1976.

492. While a Washington State University, Pullman, Washington (defendant WSU) undergraduate, Lead Plaintiff had a nearly two year relationship with Susan Irish, which included an overnight canoe trip to Dworshak Reservoir east of Lewiston, Idaho accompanied by a WSU Recreation Department group which had two males camping in an adjacent tent. This event sequence bore a strong resemblance to the camping trip he had taken at the age of 12 with Gary Jack where he was oxytocin (love hormone) hijacked in a California State Park for illegal biomedical experiment without consent with no direct sexual abuse by the use of a local BRMT hormone manipulation device triggered by two males in an adjacent tent camping spot. Lead Plaintiff also noted, during forensic review in 2021, the likelihood of certain oxytocin enhancements of Katherine "Kit" Andrews and the simultaneous flattening of Lead Plaintiff oxytocin levels while an undergraduate, while both were likely being BRMT biochemically

hijacked, particularly as the potential for such a relationship was specifically verbally minimized
by a then close friend and co-resident of Perham Hall, William SACKVILLE-WEST, the
ostensible son of Jack Sackville-West (BREYER). Lead Plaintiff was called out during a
Cougars basketball game by Katherine's roommate, a WSU cheerleader, to join the skylined
Katherine in the vacant school band section diagonally across the Performing Arts Coliseum
from Section 51 where Lead Plaintiff was sitting with Bill SACKVILLE-WEST and Craig
PAGE.

493. Lead Plaintiff graduated defendant WSU in June 1977 with a BA degree in Business
Administration, worked in Coeur d'Alene, ID briefly, then Kent, WA before returning to WSU
MBA graduate school in February 1978. Defendant FBI and CIA agents also attended WSU
MBA graduate school, including EPSKAMP, WORTHY, ZOULAS, and THORPE. Senior
CIA/ARMY illegal BRMT bioweapon and bioweapon delivery system program management
personnel including, without limitation, BREYER in Spokane, WA 80 miles north of the WSU
Pullman, WA campus, and Assistant Professor SHAFFER (defendant CIA embed at WSU
during graduate school), to whom Lead Plaintiff acted as a Teaching Assistant were frequently
present in his daily life. Early national security deliberate entanglements also began in this time
period, including, without limitation, being assigned to co-office with Hamid Bahari-Kashani, an
Iranian national economics PhD candidate and supporter of the Shah of Iran, whose family
doubtless had CIA connections. The Shah abdicated and left Iran in January 1979 as described at
paragraphs 421-424 above. Lead Plaintiff was then reassigned away from his shared office with
Bahari-Kashani to a shared office with CIA and FBI personnel then attending the WSU MBA
program.

494. After leaving graduate school, Lead Plaintiff joined the Seattle, WA financial audit staff at Deloitte (Deloitte Seattle), an international public accounting firm with offices worldwide, in August 1979, on a referral by SHAFFER through Deloitte Denver to Deloitte Seattle. Lead Plaintiff and his first wife, Lynne, were placed on a financial audit of Safeco in Seattle, Washington for about four months in early 1980, spent every day in the same room with about eight other audit team members, and developed their relationship in this relatively isolated environment, while spending every working day together with this group. The audit manager, Margaret Dufresne, already had a strong relationship with and, at some point in their friendship, was married to FBI agent Bruce Ciosacchi. Lead Plaintiff and his later wife Lynne were friends with the couple for a number of years thereafter. Lynne was the ex-wife of Gregory R. Boyle, a close subordinate of defendant REICHERT at defendant KCSD for many years as defendant KCSD conspired, supported, and sustained the illegal BRMT bioweapon and bioweapon delivery system, constitutional rights violations, and associated-in-fact enterprise pattern of racketeering acts in King County, WA until defendant REICHERT was elected to the U.S. House of Representatives in 2004, whereupon Lead Plaintiff was financially wrecked, fraudulent marriage destroyed, private enterprise destroyed and human trafficked by defendants FBI, ROSENBERG, and unknown others to Boston, MA in December 2005.

495. Around 1985, Lead Plaintiff and his wife Lynne survived a BRMT program double murder attempt by defendant CIA and/or ARMY near the Porteau Cove Overlook, south of Squamish, British Columbia, which had a narrow shoulder, a 70 to 100 foot cliff drop the right, no guardrail, about a 50 mph speed limit. As the road ascends from near sea level onto a cliff face while traveling south from the Porteau Cove Provincial Park entrance to a roadside overlook above Howe Sound, Lead Plaintiff was suddenly and massively dosed with melatonin (the sleep

hormone), using a remotely triggered BRMT device hidden in the cell phone equipment box in the trunk of Lead Plaintiff's car.

496. This cell phone equipment unit was installed by Robert SWAIN's cellular phone installation shop, which was later purchased by spouse Lynne's employer, US West New Vector Group. This was an illegal BRMT bioweapon and bioweapon delivery system field test using a cellular phone network trigger rather than a manually operated trigger or a radio frequency trigger, so it represented a step in the technological progression of the illegal BRMT bioweapon and bioweapon delivery system. Within about two years of that attempt, Robert SWAIN, a serial adulterer as described by Lynne, had divorced his own fourth or fifth wife to marry Lynne, the Lead Plaintiff's oxytocin overdosed former wife (and his co-victim in the attempted Porteau Cove murder) about 90 days after the Lead Plaintiff's divorce from Lynne was finalized in 1988.

497. Sometime during this same period, but prior to the Porteau Cove double murder attempt, defendant UNITED STATES, most likely defendant CIA, had previously run a murder entrapment attempt at the Stevens Pass Ski Resort described at RGTS-1, likely with co-conspirator defendant KCSD in attendance. During this period, Deloitte Seattle's HOPPER or BURNS was directing the illegal BRMT bioweapon and bioweapon program for defendant CIA. Defendants WEISSMAN and ROSENBERG were among the most senior FBI undercover personnel co-opting private enterprises PCC and NutraSource for spying and wrecking operations during this period.

498. Soon after defendants CIA and ARMY had used the illegal BRMT biopweaon and bioweapon delivery system to destroy Lead Plaintiff's first marriage to Lynne in 1987 and early 1988, as Lead Plaintiff was being divorced by Lynne, and was relatively emotionally vulnerable, defendant UNITED STATES (CIA, BURNS) used WATERS to orchestrate the introduction of

and entanglement with his second spouse, Jeanette (paragraphs 440, 610 HEXP-7). Throughout

this period defendants BURNS, WEISSMAN, and ROSENBERG personally directed malign

operations targeting Lead Plaintiff. Defendant BURNS ostensible residence, as an OB/GYN

practicing at Evergreen Hospital, Kirkland, Washington was about two miles from that hospital,

and directly across NE 149th Street from Jeanette's residence which she shared with her son

Bryce. Defendant BURNS allegedly resided there until around 1992-93 after Jeanette and Lead

Plaintiff were married in 1990 and Alliance, his defendant cover operation was wrecked on him

by defendant FBI. Defendant BURNS then allegedly sold that 149th Street residence to a "family

relative," Kelly last name not recollected, had three daughters and a younger son, and ostensibly

owned a Vibra-Clean franchise, which was also used in both federal security operations and in

illegal residential and commercial spying, and almost certainly the next co-conspirator in the

long series of defendant UNITED STATES minders. Kelly was later succeeded by the Phillips

family, with a supposed realtor breadwinner, also likely a defendant USMS minder supporting

the illegal BRMT bioweapon and bioweapon delivery system program.

499. Lead Plaintiff's second wife, Jeanette, was introduced by WATERS, a LazerSoft

software engineering contractor originally hired by defendant STONE at LazerSoft. Defendant

BURNS was the primary LazerSoft funder (using CIA science and technology directorate funds

funneled through real and imagined bankers and medical doctors' investment accounts) as

described at paragraph 437-442. With benefit of (i) a better understanding of marital behaviors

which came with the unmasking of the illegal BRMT bioweapon and bioweapon delivery system

program, (ii) the identifications of defendant BURNS, who was the cross street neighbor to

Jeanette at 149th Street, Kirkland, WA before Lead Plaintiff ever met her, and (iii) forensic

analysis of comments about sexual orientation of a couple by HADJINIAN, it is considered

highly probable that Jeanette was actually likely an active enlisted military service lesbian or

bisexual deliberately inculpated in some national security matter, then threatened with

prosecution during a time when such service by service members with these sexual orientations

was considered a national security risk, and was then coerced into meeting the Lead Plaintiff

under a civilian cover for an orchestrated fraudulent romantic interest in1988, which was

followed by a deeply troubled 15 year marriage beginning in 1990.

500. Lead Plaintiff was introduced to supposed Jeanette's family of origin, the Yarbrough

family, beginning sometime in 1988 or 1989. Defendants Lisa RUBIN (FBI. as Michelle

Yarbrough by alleged marriage to Jess), Alexander VINDMAN (ARMY, as Paul Yarbrough as

stepbrother), and later his twin brother Yvgeney "Eugene" (ARMY, as Greg Yarbrough), and still

later Ari MELBER (FBI, as Wes Lewis, romantic interest likely as a result of multiple sequential

illegal BRMT oxytocin biochemical hijackings of Theresa, Jeanette's half-sister) posed as

Yarbrough extended family members. Alexander's twin brother Yvgeney "Eugene" (ARMY)

appeared periodically as Greg, Paul's Grateful Dead band loving brother, who ostensibly worked

at CSC in Birmingham, Alabama. Lead Plaintiff was an uncle to Shanice, Jack, and nearly a

dozen other children of several of these individual defendants from 1990 until his divorce from

his fraudulent second wife Jeanette in 2005.

501. Notably, defendants MELBER (FBI, Wes Lewis, who became the husband of

Theresa Yarbrough), VINDMAN (ARMY, Paul Yarbrough), and RUBIN (FBI, Michelle

Yarbrough) are among the now identified defendant FBI, DOJ, and military services government

officials who disappeared from view after the 2005 divorce from Jeanette. Their current listed

official biographical ages do not tie out to the ages they would have been in the 1990s. This is a

result of biographical and, at times, medical plastic surgery modifications during their

"resurrections" from deep cover assignments. This same tradecraft has been and is used by various federal police powers and intelligence agencies to exit personnel from deep cover assignments to "normal" life including, without limitation, defendant BREYER (SCOTUS, after Jack Sackville-West, Spokane "died") and Lloyd AUSTIN (rotations through Boeing defense operations, temporary duty assignment to CNA, others, actually defendant ARMY throughout, now Secretary of Defense). These birthdate changes are tradecraft elements of background legends which have subsequently been built to minimize the possibility of an identity match, by for example, being too young based upon the "resurrected" birthdate to be an adult while you were an adult figure in a prior undercover life. This reduces the odds that someone will make an identity match across these two "lives" at some future point, as in this complaint and several identifications herein. This is a common technique for manufacturing new identities for deep cover operatives - but these defendants' physical appearances are completely consistent with positive identifications and near normal aging, with the occasional bit of face tightening or other normal medical procedures used to modify appearance.

502. Lead Plaintiff's personal life has been dominated and subjugated by defendant UNITED STATES under its illegal BRMT bioweapon and bioweapon delivery system, civil rights, and racketeering conspiracy associated-in-fact enterprise pattern incorporating involuntary servitude since he was very young, probably about the time of that California State Park campground sequence at age 12, paragraph 417. Since 2004, when Lead Plaintiff began online searches of dating sites during the pendency of the 2005 divorce from Jeanette, dozens of fraudulent orchestrated police powers and media industry dates, and several bogus relationships intended to sensationalize Lead Plaintiff and to construct false narratives have been cycled through the Lead Plaintiff's life in 2005, 2008, and again in 2019-2021, paragraph 608 HEXP-5.

In late 2004 and 2005, Lead Plaintiff was subjected to a series of approximately 15 to 20 online dates in the Seattle and Portland areas with defendants' undercover police powers personnel.

503. This pattern of personal relationship interferences by defendant UNITED STATES, including online romance scams, hacking of online dating sites, and fraudulent matches with police powers personnel and police powers assignees has continued since late 2007 in the New Jersey/New York City region. A fraudulent female relationship (MODDERMAN, paragraph 611) was also terminated as Lead Plaintiff was terminated from ESTABLISH in 2007 to maximize personal stress on the Lead Plaintiff, a practice he now recognizes as customary tradecraft.

504. These co-conspirator defendants, including regional and local police powers (including, without limitation, NJTPD, PAPD, NYPD, BERGEN SHERIFF, NJSP), were also running local sex entrapment attempts online in 2011-2014. Then defendant CIA stole about $14,000 of cash welfare grant funds and Social Security retirement funds from the Lead Plaintiff using illegal BRMT bioweapon and bioweapon delivery system hijacked oxytocin to fraudulently extract funds using a lesbian online porn queen as the wholesome bait in an online dating scheme between 2014 and 2018 (paragraph 612 HEXP-9).

505. During 2019, these sex traps again returned to real life (just as they had been run in 2004-2005 at paragraphs 608, 614 HEXP-5, 11, but with the obvious tinge of overt racism in the dating prospects who were allowed through as the screened-in dates) in a series of about 15 fraudulent dates which expenses were paid for by Lead Plaintiff (paragraphs 608, 614 HEXP-5, 11). A follow-on fraudulent romance which was orchestrated in 2020 began with defendant GIA during the Covid-19 outbreak and ran into 2021 (paragraph 613 HEXP-10). While the overall New Jersey/New York City area population is about 15% Black, all of Lead Plaintiff's dates

except the first 2019-2020 series were Black females, a sure sign of police powers screening and gated access to women who were permitted this special access to respond to online matching invitations from the Lead Plaintiff, a White male. Except for MODDERMAN and GIA, these outings were very short-lived, lasting no more than one or two dates. Color of law honey trap sting operations have also been run against the Lead Plaintiff on city streets, shops, parks, performance venues, subways, buses, and all other types of public places in New York City for approximately seventeen years, with accelerated intensity from November 2018 to around late 2021 in New York City on virtually every visit there.

506. From that point forward, all online contacts with dating prospects have ended in failure and no in-personal contact through any online source has ever resulted in any face-to-face meeting. Lead Plaintiff's online attempts have otherwise been completely obstructed by defendant UNITED STATES by technology hacking documented in the RICO section of this complaint, paragraphs 639-693.

507. These civil rights violations and racketeering acts inculpate defendant UNITED STATES, all other police powers defendants, and their related individual defendants, in these bad faith acts, excluding MARICOPA SHERRIFF and defendant ARPAIO which did not participate in this type of entrapment operation.

508. Paragraphs 508 thorough 509 are reserved.

**Lead Plaintiff's Personal Finances and Assets Repeatedly Subjected to Forced Liquidation By UNITED STATES, Using Relationship, Employment, And Private Enterprises Sabotage**

510. Lead Plaintiff substantially improved five residences over the past 40 years, ranging from modest remodels and interior renovations to extensive landscaping to complete rebuilds and 60% square footage additions. Upon completion of each of these improvements, defendant

UNITED STATES contrived a life event which forced the liquidation of these assets to a third party. Both divorces and indirectly forced removal due to financial or other circumstances "occurred" soon after those renovations and rebuilds were fully completed. The properties sold or were re-rented very quickly, indicative of defendants' insider knowledge and advantage. Violations of Lead Plaintiff by defendants have over time resulted in forced liquidation of all assets on multiple occasions, including the first family home he and his wife purchased for $189,340 at age 29, as shown in Interline Exhibit 13 below.

*Interline Exhibit 13:* **Redmond Residence – Added Rear Landscaping 14,000 Square Feet, Added In-ground Sprinklers Front and Rear Covering 28,000 Square Feet, Renovated Front Planting Beds**



Listed by Karin Peterson • Windermere Real Estate Central. Bought with Windermere Real Estate/East.

● LAST SOLD ON AUG 16, 2012 FOR $675,000

**17026 NE 133rd St,** Redmond, WA 98052

| $1,688,289 | 4 | 2.5 | 2,800 |
|---|---|---|---|
| Redfin Estimate | Beds | Baths | Sq Ft |

**Thinking of selling?**
Estimated sale price
**$1.60M – $1.91M**

Source: Redfin.com photo, January 2024

511. Lead Plaintiff's second family home (Interline Exhibit 14 below) was sold quickly in May 2005 while in financial distress created by another in the sequence of racketeering acts incorporated in this overall sequence of programmed personal (paragraphs 498-502, 610 HEXP-7) and financial wreckings (paragraphs 457-463; 639, 640, 641, 673, 683 RICO-1-3, 35, 45), after about ten years of labor and investments to rebuild the residence from the back fence line to

the front sidewalk. This second family home started as the reverse floor plan of the house in the first photograph below. This house is on a lot which shares the southeast lot corner of Lead Plaintiff's second home and fronts on a neighboring street. Lead Plaintiff rebuilt the reverse floor plan twin of the top photo into the home seen in the other photos below (Redfin.com photos from 2022 and 2024.

***Interline Exhibit 14*: Kirkland Residence -Rebuilt and Added 60% Square Footage Enlargement**



Reverse floor plan of residence shown above was transformed by Lead Plaintiff as shown below:





Listed by Rick Juma • Aqua. Bought with Windermere Real Estate Co.

● LAST SOLD ON JUN 23, 2020 FOR $785,000

**11729 NE 149th St,** Kirkland, WA 98034

| $1,091,991 | 3 | 2 | 1,990 |
|---|---|---|---|
| Redfin Estimate | Beds | Baths | Sq Ft |

512. All of Lead Plaintiff's material possessions except for one rolling suitcase, and boxes left at his sister's house (nearly all of which were subsequently donated and likely collected by defendant police powers personnel posing as charity workers for yet another illegally pretexted search and subsequent distribution to favored persons) were forfeited when Lead Plaintiff left Seattle for Boston on December 24, 2005. This recurrent cycle of physical possession accumulation and residential improvements completed, then followed soon after by some form of forced forfeiture was repeated yet again when Lead Plaintiff was removed from the apartment he furnished and improved in Cliffside Park, NJ on October 1, 2010, after a one m)onth overstay, and about 110 days after filing litigation in Newark federal court (NJ 2:10-cv-

3204) and was then kidnapped with no commitment hearing as required by NJ state law

(paragraph 808) through an unknown police powers action after being transported by South

Hackensack, NJ Police and an ambulance corps ambulance into a psychiatric hospital for six

months of confinement (paragraphs 512-522, 606 HEXP-3g). Once the federal civil rights case

was indirectly coerced into "voluntarily" dismissal while confined, he left the hospital in March

2011 (less than 100 days after "voluntary" dismissal) to live in shared housing in Ramsey, NJ

(paragraph 523) which had been continuously available from before the date of his confinement.

513. Lead Plaintiff resided in Ramsey, NJ from March 31, 2011. Once he began receiving

Social Security retirement at age 62 in late 2017, he spent about $5,000 of Social Security

retirement funds in early 2018 to improve the Ramsey residence including appliances and

furnishings, presuming he would continue living there for some time to come.

514. Soon after these upgrades were complete, he abruptly received a Section 8 voucher

in Summer 2018. As a result, he contacted United Way to secure bridge loan funds for the last

month's rent and security deposit on the new apartment. This was intercepted and denied, most

probably by defendant FBI or USMS. Defendant FBI and/or USMS used this Section 8 voucher

to support Lead Plaintiff's human trafficking to a defendant USMS undercover entity owned

apartment available at a favorable lease rate at City Place in Edgewater, NJ in November 2018,

for continuing entanglements, this time into national security public corruption, soon after the

2018 opening of the Menendez corruption investigation. Edgewater, NJ is the same borough

where two of Senator Menendez's co-defendants, Daibes and Hana, have and do operate

businesses about 550 feet from the Lead Plaintiff's residence.

515. Around 2019, defendant USMS then bankrupted the entity which owned the

apartment, later placed the City Place, Edgewater apartment in a new entity, and arranged a 12

month lease which is now mis-timed with the renewal of the Section 8 voucher. This allows

defendant USMS to orchestrate termination of the lease (or raise the rent exorbitantly if desired)

while the lease renewal cycle is out of synch with the voucher renewal cycle, so their human

trafficking pattern can be more easily repeated. When the lease terminates and no other

apartment is available in the general area, the voucher recipient can be forced from the area AND

lose their voucher as this Section 8 program does not easily accommodate voucher transfers.

When used with defendant UNITED STATES technical computer hacking to constrain searches

for alternative residences, this pattern of illegal acts can be used to force relocation (and further

human trafficking) on the voucher recipient (Lead Plaintiff in this case), or the total loss of the

Section 8 voucher, completely at the illegal and discriminatory discretion of defendant USMS.

While this practice is illegal, a prior attempt by Lead Plaintiff to relocate to White Plains, NY,

has already shown this to be the practical impact of this particular approach used by defendant

USMS in this form of the Section 8 program. The email evidence supporting this allegation, and

of Lead Plaintiff's human trafficking from Ramsey to Edgewater in 2018, is among the evidence

of acts, violations, and injuries between 2018 and 2020 which is currently blocked, or has been

deleted while he lacks access, in Lead Plaintiff's email account from Lead Plaintiff by defendant

UNITED STATES .

## "National Security" Pretexting of Lead Plaintiff by Defendant UNITED STATES Accelerated After 9/11 Attack

516. After the terrorist attacks of 9/11/2001, Lead Plaintiff's life become markedly

worse (as summarized at paragraph 604 HEXP-1) as defendants CIA, FBI and other federal

agencies were rewarded with greater powers for defendant FBI's notable pre-attack interdiction

failures in the months preceding the attack, as documented by the 9/11 Commission Report. In

August 2002, Lead Plaintiff left CNA Industrial Engineering, formed a new enterprise Allegent,

LLC dba Performa, which then failed in 2005 after defendants actions under color of law

involving, as in times past, (i) defendant FBI check fraud (ShipNow paragraphs 275(i), 471(ii),

650 RICO-12), (ii) defendant USMS cover company CNA compensation fraud (CNA,

paragraphs 471(i), 644 RICO-6), and (iii) litigation expenses (ShipNow and CNA, paragraphs

471(ii), 644(v) RICO-6, CALDWELL, paragraphs 99c, 275(i), 320(f)(vi)), 683 RICO-45)

combined with other fraudulent police powers color of law actions including, without limitation,

(iv) defendants FBI and TSL commercial sales frauds (Technology Sales Leads (TSL),

paragraph 673 RICO-35) which were used to destroy this consulting LLC. The undercover

nature of the Allegent, LLC co-ownership by (v) PRAY, likely FBI, was then unknown to the

unwitting Lead Plaintiff (paragraphs 461-462, table at 541, 683 RICO-45). PRAY was

previously a known associate of ROSENBERG at NutraSource while serving as its IT Director,

reporting to CHRISTENSEN (CFO, who later joined PACIFIC PIPELINE).

### Defendants Malicious Acts Against Lead Plaintiff Extend to Torturous Acts

517. During 2004-2005, Lead Plaintiff was also systematically abused by defendant

UNITED STATES' torturous use of BRMT brain hijacking and psychological operations by

FAUCI (NIAID Director) to force him to the point of suicide ideation (paragraph 604 HEXP-1),

after which he was forced to quickly sell the 149th Street, Kirkland, WA home he had rebuilt

over about ten years, in order to avoid foreclosure (Interline Exhibit 14). More details of this

comprehensive ruinous and torturous sequence are included in LPEE Table 2 paragraphs 2-0024,

0060, 0077, 0084, 0088-0097. Through this process, defendants again stripped Lead Plaintiff's

financial assets, real property, and personal property, and tortured his brain chemistry to the

point of suicide ideation, which medical records were never transferred in a pattern of

obstruction by defendant UNITED STATES (DOJ, USMS, FBI, CIA).

518. Lead Plaintiff fled the Seattle area by defendants' design, as detailed at LPEE Table 2 paragraphs 2-0105 to 2-0115, to the next pretexted destination in the defendant FBI human trafficking sequence orchestrated by ROSENBERG, Boston, on December 24, 2005. His rationale was to avoid the possibility of adverse acts being directed at other family members in order to pressure and entrap him. When his remaining funds were exhausted in early Spring 2006, homelessness ensued at Pine Street Inn, a Boston area homeless shelter. After seventeen months of homelessness in Boston, he was next human trafficked in August 2007, to 10 months of further involuntary servitude and forced labor in fraudulent employment at ESTABLISH, Fort Lee, NJ, where he worked on two interstate consulting projects. Defendant ROSENBERG (FBI), then known as William Drumm, and working without his Seattle area worn hairpiece to avoid recognition, was the General Manager of defendant ESTABLISH. Lead Plaintiff performed a fraudulent Sales and Operations Planning software selection project, ostensibly for PPG's Paint and Coatings Division at PPG headquarters in Pittsburgh, PA. He then "developed" and performed a fraudulent project for Clipper Windpower in Carpinteria, CA and Cedar Rapids, IA. See LPEE pages 8351-8352, 10305-10310, 10311-10364. The PPG project sequence included a tangential Pittsburgh hotel evening cameo with the Pitt Football team at one of their public fundraising events (KOVONUK, FBI), which coincided with defendant FBI's investigation of the Pitt football assistant coach child sex scandal in late 2007-2008, and with a likely Mueller (former FBI Director) cameo with ROSENBERG in an upper floor office area of PPG headquarters (paragraphs 219, 411, 467-470, 536 HEXP-8).

519. During this period, he was also placed under a carefully pretexted national security color of law investigation for terrorism which ROSENBERG (FBI) pretexted to engage the Joint Terrorism Task Forces in the New York City/New Jersey area and into defendant UNITED

STATES' own much greater intelligence and police powers operations in the greater NYC

region (paragraphs 603, 604 NSEC-3, 4, Interline Exhibit 17). Defendant UNITED STATES has

a much greater concentration of intelligence and police powers personnel and other assets, and a

closely collaborating set of police powers agencies including, without limitation, defendants

BERGEN SHERIFF, Port Authority of New York and New Jersey Police PAPD, New Jersey

Transit Police Department NJTPD, New Jersey State Police NJSP, and City of New York Police

Department NYPD (paragraphs 611, 613 HEXP-8, 10; 630, 632, 634 RGTS-10, 12, 14, and

Interline Exhibit 17), some of whom have long histories of constitutional and civil rights

violations and extensive records of use of excessive deadly force. A defendant ESTABLISH

"annual business meeting" trip to London was also used to drag UK's MI-6 (CIA equivalent)

into the mix again in September 2007 (paragraph 11, 465, 599 d(i)(e), 603 NSEC-4), which

defendants FBI and CIA had done in London in 1993-1994 on a series of bogus PAN financing

trips with CORNWELL (ex-CIA, to meet with Kurtanjek (MI-6), while Lead Plaintiff had

worked on another bogus cover company, PAN in Seattle, WA (PAN, paragraph 450-451, 601F

NSEC-2).

520.  Defendant UNITED STATES was the initiator of this entire sequence from 1968,

deliberately entangled Lead Plaintiff in national security events and projects to perpetuate

involuntary servitude and forced labor, among other acts, violations, and injuries, and was fully

aware at all times that there was no basis in law for this entire pattern of pretexted suspicion nor

for the highly intrusive and perpetual "investigations" and did purposefully fail to act to quash

and in fact fully participated in spreading disinformation to others and encouraged and invited

other police powers agencies, media and the general public to participate in this pattern of abuse

and discrimination in order tot sustain the illegal BRMT bioweapon and bioweapon delivery

system program, constitutional rights violations, and associated-in-fact enterprise pattern of
racketeering acts.

**Defendants Malicious Acts Against Lead Plaintiff AGAIN Extend to Torturous Acts**

521. After Lead Plaintiff was terminated from unwitting fraudulent employment at
ESTABLISH (paragraph 320c, 466, 503) in June 2008, and through the first months of 2010,
Defendants again engaged in extreme and continuous BRMT biochemical abuse of Lead
Plaintiff's brain chemistry while Lead Plaintiff continued to reside in a secretly concealed
ownership defendant USMS controlled "safe house" apartment in Cliffside Park, NJ, ostensibly
owned by defendant CHALOM. This abuse altered the Lead Plaintiff's brain biochemistry to the
point of a second suicide ideation (paragraph 606 HEXP-3) and included extended periods of
physically torturous actions, muscle spasms, sleep deprivation, and extreme daily headaches
about the same time every day for over a year, by using the illegal BRMT bioweapon and
bioweapon delivery system very aggressively (paragraph 606 HEXP-3, 810, 811); a defendant
USSS drive-by of the "Beast" presidential limousine one afternoon on Palisade Avenue while he
was called to a kitchen window he rarely visited; the removal of a supposed terrorist from his
seven-unit apartment building by defendant FBI reported by CHALOM; and other efforts to
induce psychological and physical stress and fear.

522. Upon completing his second attempted legal complaint, this time to the Federal
District Court in Newark in June 2010 (NJDC case number 10-3204 (SDW)), his apartment was
rented out from under him by late July to a third party, and he received a knock on the door on
September 1, 2010 by defendant CHALOM, accompanied by a "new tenant," and he was forced
back into a second episode of homelessness on October 1, 2010 after a one month overstay. He
took a NJ Transit bus to the county shelter in Hackensack, NJ, was told there was no room and

was directed to another overnight shelter at a nearby address which address did not even exist,

then was redirected by the Hackensack, NJ Police Department desk sergeant on duty that day to

a local budget hotel, Airport Inn in South Hackensack, NJ, where his remaining funds were

exhausted. The following day, October 2, 2010, the combination of sustained stresses and illegal

BRMT bioweapon and bioweapon delivery system brain hijackings (forcible takeovers) landed

the Lead Plaintiff in a locked mental hospital ward for six months (Bergen Regional Medical

Center), even though the admitting process to that the facility mandated by state law was not

followed, paragraph 808. He was deemed "schizophrenic," likely by an embedded defendant

UNITED STATES medical doctor and, early in the initial two week period of the "involuntary"

stay, placed in a padded cell where unexplained medications were administered by a needle to

his buttocks while he was held without resisting by two orderlies on at least two occasions

(paragraphs 606 I, 606 J, 611H(xv) HEXP-3, 8). NJ law does not allow a hospital patient to be

released unless they have shelter. With no money, Lead Plaintiff attempted to be referred to a

homeless shelter – he was repeatedly told there was no room, so he was stuck in the ward while

he was coerced into dropping federal civil rights litigation which the federal district court had

simply refused to order be served o the defendants as required under 28 U.S.C. § 1915. See

paragraph 320e and LPEE pages 190-236 for an actual independent assessment of his high

conscientiousness and very strong emotional stability.

523. About two months into the stay, an unknown undercover agent who rotated through

the same ward indicated indirectly that he would not be leaving anytime soon. Then, within 2-3

weeks after he "voluntarily" dismissed the complaint, he was told that a rehousing process was

beginning, and three months after Lead Plaintiff "voluntarily" dismissal NJ federal District Court

case (NJ case number 10-3204 (SDW)) under this duress, he was rehoused in Ramsey, NJ by a

NJ social service agency Advance Housing on March 30, 2011, which by forensic reverse engineering has been determined to have hosted defendant USMS undercover officers and others with privileged access as his case managers. That pattern of minders continued through about $5,000 of improvements to this Ramsey apartment's furnishings and fixtures in 2018 using Social Security retirement benefits until his next human trafficking in November 2018, this time using a Section 8 housing assistance voucher, to Edgewater, NJ. A favorable rent rate allowed him to live in City Place, a mixed retail and housing complex near the Hudson River, where he continues to live today…….

524. In another tricked out defendant USMS controlled apartment. Five hundred and fifty feet from the offices of two indicted co-defendants (Daibes and Hana) in SDNY's Senator Menendez criminal corruption investigation, indictment, and trial. That investigation began in early 2018, perhaps three months before he received his notice of a federal Section 8 voucher being awarded through the NJ Department of Community Affairs. The offices of gastroenterologist SCIARRA were also in this same building, until SCIARRA abruptly left his decades old NJ medical practice and moved to Beaufort, SC, shortly after Lead Plaintiff was BRMT hijacked into a statue fall from a standing position to his right next to a wall, so he narrowly missed a potentially fatal penetration of his right temple while in a hospital recovery room after his second colonoscopy within six weeks, while under SCIARRA's care, as documented at paragraphs 524, 706 LETHL-13.

525. A more complete inventory of lethality attempts and methods, as directed at Lead Plaintiff, is at the LETHL series, paragraphs 694-710 LETHL-1-17. Decades of fraudulent concealment by police powers agencies and departments has equitably tolled this entire matter. Willful blindness by defendant DOJ to more than 40 complaint letters hand delivered to SDNY

in 2021 through early September 2023 demonstrate this willful blindness of DOJ in recent times. The Menendez indictment, made public September 22, 2023. explains the timing of the Lead Plaintiff's 2018 human trafficking by elements of defendant DOJ (FBI and USMS) – into the same geography as that investigation, to again sustain pretexting, entanglements, and entrapments in a manipulated environment controlled by defendants USMS and FBI, and to support the continued development, testing, and deployment of the illegal defendant CIA/ARMY BRMT bioweapon and bioweapon delivery system, this time under the eye of GARLAND, who has a direct personal conflict of interest as to Lead Plaintiff and this specific illegal program (paragraph 5). This specific pattern of racketeering, incorporating, without limitation, human trafficking, involuntary servitude, forced labor and unemployment, wrecking of private enterprises, and so forth, has and does recur from at least 1968 through today for Lead Plaintiff.

**Lead Plaintiff's Personal Volunteer Work Sabotaged By UNITED STATES**

526. Even Lead Plaintiff's volunteer efforts have been subverted in both Washington state and New York City. Lead Plaintiff was selected during the early 2000s as the volunteer regional Chair for the northwestern United States chapter of AeA, the technology trade association representing Microsoft, Intel, Hewlett Packard, and other multinational and smaller technology firms in Washington, DC, Washington state and many other state capitols with a significant technology industry presence. While volunteering at AeA, he worked directly with Washington Governor Locke's staff and was asked by the Governor's Chief of Staff Susan Crystal to accept a key appointed volunteer position as Chair of the state's Higher Education Coordinating Board. He also worked with key Democrat and Republican legislative leaders on higher education access and a variety of other state policy issues. See LPEE page 10780. This volunteer work through AeA and then Washington Business Alliance, ended badly in 2005 at the

hands of defendants FBI, USMS, CIA and ARMY, ROSENBERG, FAUCI, and unknown other

defendants, as they conspired to accentuate hardships and divorce into the psychological shock

of a programmed brain chemistry collapse (disguising the continued development and abuses of

the BRMT bioweapon and bioweapon delivery system) into suicide ideation followed by

homelessness as conducted by defendants (paragraph 461-463, 490-500, 511-512; 600-602

NSEC-1-3; 604, 610 HEXP-1, 7; 628-636 RGTS-8-16; 639, 641, 644-646, 673, 683, 695-697

RICO-1, 3, 6-8, 35, 45, LETHL-2-4).

    527. Subsequent community activities have been systematically disrupted to suit

defendant UNITED STATES' propagandistic narrative regarding Lead Plaintiff include, without

limitation:

    A. The September 11, 2005 Pentagon Memorial Service was moved to Arlington
National Cemetery (Saturday, September 10) while Lead Plaintiff was misled with
published information online about that event's location both before and as he visited
Washington, DC to lodge a Federal Tort Claims Act complaint letter hand delivered
to defendant UNITED STATES at DOJ, FBI, IRS, EOP, among others (never
answered).

    B. As a volunteer for New York Cares in 2008 after being terminated by ESTABLISH,
Lead Plaintiff's projects were organized, hijacked, and perverted by defendant police
powers, including folding clothes and processing hangars at a used clothing charity, a
homeless children's field trip to Long Beach, a library outing, and finally a
completely bogus address to discourage any further volunteering, as this contradicted
the fraudulent narrative these defendants have and do try to portray regarding the
Lead Plaintiff's character.

C. A liar letter was sent on National Park Service letterhead in September 2021

regarding the bogus location of the August 2021 MLK "I Have A Dream" speech

anniversary voting rights rally being cancelled at the Lincoln Memorial and moved to

a place near the National Archives (Interline Exhibit 16).

And so forth by defendant UNITED STATES' skilled propagandists working to construct and

control the public narrative about the already highly visible Lead Plaintiff.

528. This associated-in-fact racketeering (RICO) conspiracy perpetrated primarily by

defendant UNITED STATES, including, without limitation, CIA, ARMY, FBI and USMS illegal

use of embedded managers who have and do use cover companies, abuse private enterprises, and

use unappropriated private sector funds to benefit themselves personally, and to operate this

conspiracy against rights, against private enterprises, is the **second** of defendants' five basic

illegal patterns of practice.

529. Paragraphs 529 through 534 are reserved.

## 3. THIRD, Indirect Threats, Lethality Attempts, And Human Trafficking Are Used To Coerce And Indirectly Destroy Evidence Of Past Crimes

535. The first known attempt in a now long-running sequence of lethality attempts by

defendant UNITED STATES against the Lead Plaintiff's life was the extra-territorial act of

attempted double murder of Lead Plaintiff and his first spouse, Lynne, in British Columbia in the

early 1980s as described at paragraph 694 LETHL-1, Appendix 2 paragraph 1-001A, and LPEE

page 181. The lethality series ( LETHL subcounts herein at paragraphs 694-710 LETHL-1-17)

documents this and subsequent attempts to severely injure or kill the Lead Plaintiff which have

and do occur periodically from the 1980s and continued in into the current years.

536. Since the fraudulent ESTABLISH employment by ROSENBERG (FBI) in 2007-

2008 and the probable MUELLER interactions with ROSENBERG conducted at PPG

headquarters during the fraudulent PPG project in Pittsburgh while defendant FBI's Penn State

sexual abuse investigations were underway there, (individual defendant KOVONUK FBI)

arranged a sidebar with the Penn State football team at a downtown Pittsburgh hotel reception

they held during the PPG project), defendant UNITED STATES and co-conspirator intensity and

frequency of adverse acts, violations, and injuries against Lead Plaintiff have been far more

frequent than in prior periods while he resided in Washington state, particularly more intense

since 2021.

    537. As during prior decades, these acts, violations, and injuries are consistently planned

and produced at vast expense to appear as naturally occurring events, but defendant UNITED

STATES employs the illegal BRMT bioweapon and bioweapon delivery system, and an array of

its own and co-conspirator personnel, to orchestrate these events including, without limitation, to

tamper, retaliate, and intimidate. Since 2021, examples (which are more fully described at LPEE

pages 11645-11672, 12150-12261) of defendants' active threats, harms, injury, and lethality

focused acts, include, without limitation:

    (a) A colonoscopy related trapped fall toward the elevated leg of a roller stand which

        narrowly missed the Lead Plaintiff's right temple in April 2021 (Appendix 2 paragraph 1-

        039), producible medical records available from the hospital (paragraph 706 LETHL-13);

    (b) This colonscopy event was conducted by gastroenterologist SCIARRA who then

        abandoned a decades-old northern New Jersey gastroenterologist medical practice and

        relocated to Beaufort, NC, abandoning his medical practice and office which was in the

        same building as two indicted Menendez co-defendants, (Daibes and Hana, paragraphs

        514, 524), paragraph 706 LETHL-13;

(c) An August 2021 mini-torture session of outer tendon of left knee tendon during a New York Mets baseball game, and an induced sleep period during two Mets base hits in the same inning with loud crowd noise which were neither heard nor seen by Lead Plaintiff (paragraph 607 HEXP-4);

(d) Induced choking on beef steak by deliberately mistimed illegal BRMT bioweapon and bioweapon delivery system induced premature swallowing occurred in early 2022;

(e) An indirect verbal threat was made on July 16, 2022 (Interline Exhibit 15A), the first ever verbal threat in a series, these threats have continued through April 14, 2024, see (j) below;

(f) Sword slice style very precise pattern physical contraction of neck muscles across the back of the neck began, emulating the sensation of a guillotine slicing the neck in August 2022. Since this sensation is literally impossible for the brain to produce except by artificial stimulation, this nerve activation pattern was dropped by September, returning again to blunt force karate chop style sensations to the back of the neck. Shortly thereafter, defendant UNITED STATES added an involuntary rapid twist of the neck which simulates a lethal neck twist similar to that used in lethal martial arts silent killings;

(g) An MTA express train derailment attempt (terrorism, paragraph 707 LETHL-14) was executed about one to two minutes after sunset on September 11, 2022 (Interline Exhibit 15B), followed by a full somersault fall on the fifth flight of deliberately darkened granite stairs soon after sunset caused by an illegal BRMT bioweapon and bioweapon delivery system brain hack on that flight of stairs in Morningside Park, New York City on September 17, 2022 about 7:30PM (paragraph 708 LETHL-15, Interline Exhibit 15C);

(h) A speeding vehicle rundown threat sequence was run on November 18-19 after dark, first in New York City, then in Bergen County, NJ (paragraph 709 LETHL-16, Interline Exhibit 15D);

(i) During 2023, the focus shifted toward more verbal threats (always delivered from behind) to accompany those previously consistently made visually (such as baseball bats carried out of season, and Abner Louima incident recalling broom handles, a well above average frequency of lights and sirens ambulance passes in NYC, which occur most often on the streets and sidewalks of Manhattan, and other symbols of intimidation;

(j) Vehicular intimidations continue. including pop-outs, blind crosses, high speed bus and truck travel paths and narrow misses, and aggressive electric scooter passes, with the April 14, 2024 profanity above at was delivered together with a rapidly accelerating and swerving gray sedan which was idling in the left lane adjacent to a New York City cab in the right lane thus blocking the street from other traffic (undercover defendant NYPD vehicles and drivers) in New York City about 150 feet west of Broadway Avenue on West 61st Street around 2PM, with the verbal element delivered as always from behind the Lead Plaintiff as he crossed the street diagonally to the west in front of the two vehicles (this is written on April 20, 2024);

(k) Episodes of physical bumps and other contacts, often while being adrenaline (fight or flight) hijacked by the illegal BRMT bioweapon and bioweapon delivery system, typically in NYC, for example on late Saturday evening, October 8, 2023, Times Square, and eastbound on 42nd Street on January 3, 2024;

(l)  medical injury and medical collapse narrative construction attempts, including previously dismissed heart issues being resurrected by doctors which were previously identified as non-issues related to normal aging (paragraph 710, LETHL-17);

(m) colon blockages to biomedically threaten life and long term health began in late summer 2023 (paragraph 710, LETHL-17), and incorporated medical indifference sequences including a primary care physician walk-off by PATEL, LPEE pages 11656-11664;

(n) Two severe focused pain mini-torture BRMT attacks of 5 and then 15 minutes to the upper outer tendon of the right knee during a live performance at the September 23, 2023 Wynton Marsalis concert (paragraph 607 HEXP-4), and other biomedical threats and harassment, as well as technical hacks and harassment, detailed at LPEE pages 11653-11670;

(o) Numerous BRMT driven slips and trips over curbs, stairs and manhole covers which have and continue. This listing will be updated from November 1, 2023 to the present time during the initial scheduling and motions process as needed as the incidents described in this paragraph continue to occur.

[Intentionally left blank.]

***Interline Exhibit 15*: Indirect Verbal Threat and Subsequent Lethality Events**

Related to the July 16 through November 19, 2022 sequence only, prior and subsequent lethality attempts are described elsewhere in paragraphs 694-710 LETHL-1 through 17



**IE 15A. First, An Indirect Verbal Threat –**

An unknown male voice behind Lead Plaintiff delivered an indirect verbal threat, ("what are we going to do with you"), during intermission as Lead Plaintiff remained in the front row of this small theater. Since the set up on entry was quite familiar, open seating in a small rentable performance space, and a tall white female in her late 30s to early 40s sitting alone in the only two seat row which was directly ahead of the entry to the theater on the far wall (single white female empty adjacent seat is a recognized classic police powers tradecraft signature seem often in various parts of the US over many years of travel across 44 states), and there had been previous in-house productions (with police powers officers as actors) where Lead Plaintiff was likely the only invited guest with all others being police powers personnel and friends, this was a rather obvious deliberately set up scenario and sequence, with an in-house theatrical production,

arranged for the specific purpose of delivering that particular indirect verbal threat at intermission.

**IE 15B. Second, A Mass Casualty Attempt On A MTA Hudson Line Express Train –**
Approximate area of attempted express train derailment on September 11, 2022. The train engine's collision with tree was heard soon after an emergency stopping procedure began and the tree's remains banged against the car where Lead Plaintiff was seated, about 3 to 4 cars several behind the engine at approximately 7:15 pm as the train traveled south at 50 to 60 mph into the just set sun (sunset was at 7:11pm). Initial eye adjustment from light to dark requires about 5-8 minutes, so the train engineer's night vision was limited at the time of the collision and potential derailment. There was no wind, rain, or excess moisture to account for any natural tree fall at this particular time and the track is used frequently throughout the day by commuter rail trains in both directions, indicating careful planning and timing of the tree fall after other passenger trains had passed through was needed for maximum effect. Hundreds of passengers and crew were on board this prime time Sunday evening return to NYC. To reach the track being used by this southbound express train, the tree fell across at least three tracks of the four track mainline adjacent to the Hudson River in this approximate area:



A view of the typical railroad mainline running immediately adjacent to the Hudson River on its eastern bank in this area. The southbound express track is second from left, about twenty feet from the Hudson River on the far left:



**IE 15C: Third, A BRMT Assault in Morningside Park, NYC follows –** where Lead Plaintiff somersault fell on the fifth in a series of granite staircases six days later on September 17, 2022 at 7:29 pm (sunset was at 7:01pm):



The path Lead Plaintiff walked from a very brightly lit taco restaurant at 109th and Morningside Drive to the southwest corner of Morningside Park. The red facade taco restaurant on the right is where Lead Plaintiff purchased a meal. It has very bright fluorescent lighting. The distance from this restaurant to the Morningside Park entry shown below is 250 feet, about 45-50 seconds to adjust from very bright light to a very dark path which is shielded from other area antique low wattage street lighting by a heavy tree cover over the path. A typical adjustment period from bright task lighting to moonless nighttime darkness is about 5 to 8 minutes, according to most sources.



Despite this bright light abrupt transition to dark of night partial night blindness, Lead Plaintiff successfully negotiated the first four sets of darkened stairs before BRMT was used.

Then, his head was forced upright, looking ahead rather than down to see the next lead step and his walking pace was quickened just prior to the somersault fall. He struck the lead step about mid-arch rather than with his toes and somersaulted head over heels to land on his back on the set of stairs shown below:



Area street lighting here is old fashioned lantern style low intensity electric lighting with a dense canopy of leaves on the trees in mid-September. The overhead path lights were deliberately turned off and it was extremely dark at 7:29PM. Sunset had happened at 7:00 pm, and "West Side Story" was due to start at 7:30pm. The BRMT commanded somersault head over heels fall resulted in injuries (which head injury was still visible and noted by staff many months later during a head and neck visual exam during an appointment at Bergen Community College Dental Hygiene Program visit) – a head injury, potential concussion, injuries to hands and knees:



**IE 15D. Fourth, A Vehicle Rundown Sequence In New York City and North Bergen, NJ**

A vehicle rundown sequence occurred after dark on November 18 and 19, 2022: First in New York City on November 18, 2022. See the Google street views below: W 21st St from 8th Avenue, looking east at top, west at bottom, with images captured in August 2022. Note the streetlights on the right side of street (top), on left side of street (bottom). Both this street and W 22nd Street were completely dark with no streetlights operating as Lead Plaintiff walked along 8th Avenue to and from the West 23rd Street subway station to, then from, a theater production on West 20th.





The following night in North Bergen, NJ, November 19, 2022, part two of this vehicle rundown threat sequence occurred in the WALMART Parking Lot, North Bergen, NJ after dark. BRMT again freezes Lead Plaintiff's head, this time looking toward a Wendy's restaurant entry door as a distant white compact sedan, which accelerated rapidly from its slow pace when

initially checked to a panic deceleration about 15 feet away just as it entered left peripheral field of vision, then a final stop about 5 feet short of striking Lead Plaintiff.



[Intentionally left blank.]

## IE 15E. Fifth, A Report Was Made, Met As Always With No Response, Only Official Silence

An excerpt from Lead Plainitff's September 19, 2022 letter to SDNY is shown below (see the full text in the December 2021 to October 2023 series of more than 40 letters, at LPEE pages 786-793):

RE: Defendants' Continuing Lethality Threats and Attempts; Clarification on September 16, 2022 Letter from total to partial evidence destruction

Good day –

Latest physical incident in the local area involving me:

9/17/2022 7:29pm SW corner Morningside Park, NYC – tumble on staircase about midway down to ballfield level. Full somersault from top of flight of stairs, landed on backside about halfway down flight. No lighting on that southwest stairs pathway with extended landings and a sequence of steps from street level down to ballfield level, screened from all area ambient lighting by dense tree cover so it was extremely dark. All other streetlights and park lights were operating at the time. West Side Story, Spielberg movie, shown outdoors on Ballfield 1. Injuries include scrape and hematoma on left side immediately below hair line and on left cheek, left hand (outside) scrape at left side of left wrist, left hand (palm) scrape at base above wrist, sore thumb, torn pants left knee, bloody left knee scrape, moderately sore knee and hip left side, scrape on right hand at base of thumb, small scrape on right side tip of right index finger, sore lower back muscles mostly on left side. It is unclear if my attention was BRMT frozen in a head up position instead of looking down at stairs at the moment of step (a normal distance stride of the left foot on flat ground) which led to loss of balance with only back half of foot landing on top stair, though that is best recollection of that moment foot, but also possible my eyes were BRMT closed immediately prior to the tumble. Notes made at 11:35pm 9/17/2022. Accompanying photos taken at 8:40 AM 9/18/2022 and left hand 2 (thumb area on back of hand) at 10:10AM. Also, moderately sore neck noted on morning of 9/18/2022.

Page 1 of 3

[Intentionally left blank.]

538. These events are specifically described in the lethality attempts LETHL series at paragraphs 694 through 710 LETHL-1-17. These numerous direct threats to life are the **third** of these defendants' five basic illegal patterns of practice.

539. Paragraphs 539 is reserved.

## 4. FOURTH, Defendant UNITED STATES Sustains Involuntary Servitude

540. Defendant UNITED STATES has and does demonstrate, though it patterns of continuous surreptitious contacts with Lead Plaintiff and the official silence of federal police powers including all elements of defendant DOJ, its intent to continue to sustain its control and involuntary servitude of these plaintiffs. Undercover personnel and technology surveillance of Lead Plaintiff have been and are sustained without consent in continuous full public view through disguised entities and perpetual prejudicial operations. This pattern began in elementary school, at least by Lead Plaintiff's sixth grade if not sooner paragraphs 490, 717, and has and does continue into the present time for all forms of personal contact, as defendant undercover personnel are a constant and continuous presence at all times and make repeated contact attempts at both orchestrated events in public venues where they control seating and adjacent contact, stage events which are affordable to Lead Plaintiff and are not open to or listed for the public, and constrain web searches and contacts available for prospective personal relationships.

541. Defendant UNITED STATES has and does accomplish involuntary servitude through key on-going contacts which have been sustained both by personal contact by various technical means summarized at paragraphs 600 NSEC-1; 608, 614, 617 HEXP-5, 11, 14; 626-634 RGTS-6-16; 639, 640, 645 RICO-1, 2, 7; 694-710 LETHL-1-17, and by personnel assigned to continuously sustain personal and professional relationships with Lead Plaintiff including, without limitation, the following key personnel and their roles:

**Table: Key Contacts- Involuntary Servitude Of Lead Plaintiff**

| Cover Name and Actual DEFENDANT name, where known | Contact Period and Role | Probable/Known Federal Department or Agency |
|---|---|---|
| Various Embedded Student, including Shawn Morrissey (KATYAL), Thomas GRADY | Decatur High School students 1970-1973 | DOJ, likely USMS or FBI |
| Donna DICKOVER and David BRUNTON | Green River Community College 1973, Washington State University (WSU) students 1974-1977 | USMS |
| William SACKVILLE-WEST | WSU Perham Hall 1974, and continuing relationship into 2005, while apparent son of BREYER | USMS |
| Craig J. PAGE | WSU Perham Hall 1974, WSU apartment roommate 1975-1977, and continuing relationship into 2005 | USMS |
| Harold A. HOPPER | Deloitte Seattle Consulting Partner and direct supervisor from 1979-1985 | USMS |
| Gerald L. THORPE | WSU MBA program from 1978, Deloitte Seattle co-worker and personal relationship into 1989 | CIA |
| Lyle Whiteman (WEISSMAN) | Puget Consumers Cooperative General Manager during Lead Plaintiff's three year PCC Board of Trustees term from about 1981-1984 | FBI |
| Chuck LeFevre (ROSENBERG) | NutraSource CEO during Lead Plaintiff's three year NutraSource Board of Directors term from about 1983-1984. Lead Plaintiff provided NutraSource consulting services from about 1989-1995 | FBI |
| David P. Moller (STONE) | Deloitte Seattle co-worker from 1983, LazerSoft direct supervisor, and personal relationship into 1987 | CIA |
| Darrell PRAY | NutraSource CIO from about 1985-1997. Direct report at Pacific Pipeline in 1996. Direct report at CNA from about 1997-2002. Allegent LLC co-manager from 2002-2005. | FBI or USMS |
| Michelle Yarbrough (RUBIN) | Sister-in-law by marriage to Jeanette from 1990-2005. | FBI |
| Paul Yarbrough (Andrew VINDMAN) | Brother-in-law by marriage to Jeanette from about 1992-2005. | ARMY |

| Cover Name and Actual DEFENDANT name, where known | Contact Period and Role | Probable/Known Federal Department or Agency |
|---|---|---|
| Greg Yarbrough (Yvgeney VINDMAN) | Brother-in-law by marriage to Jeanette from about 1992-2005. | ARMY |
| Wes Lewis (MELBER) | Romantic interest, then husband to Theresa, Jeanette's half-sister, from about 1993-2005. | FBI |
| Linda HURD | Pine Street Inn contact, assigned to Boston, MA homeless shelter in Dorchester, MA 2006-2007 | USMS primary contact, other USMS rotating undercover personnel co-housed in shelter system |
| William Drumm (ROSENBERG) | ESTABLISH General Manager and direct supervisor 2007-2008 | FBI |
| Marc CHALOM | Cliffside Park NJ Landlord | USMS |
| Emil SCHMIEDHAUSER | Assigned roommate in Ramsey, NJ apartment from 2011-2018. | USMS |
| Raymond SULLIVAN | Corporate attorney for Winnett startup from about 2012-2021. | Former DHS CPB |
| DEAN T. SMITH | Investor in Winnett startup from 2015-2019, then litigant from 2019-2021. | FBI |
| REMOTE PERSONNEL | Continuous public surveillance and comprehensively managed surrounding environment from 2018 to present. | USMS, FBI, CIA, ARMY |

542. Defendant UNITED STATES pattern of perpetual sustained contact from

approximately high school to the present demonstrates *mens rea*. This continuous and sustained

involuntary servitude through continuous direct personal contact by assigned personnel,

sustained discriminatory and prejudicial operations, and surreptitious constraints on other

relationships including, without limitation, by direct personal means and by technical means, is

the **fourth** of these defendants' five basic illegal patterns of practice.

543. Paragraphs 543 through 549 are reserved.

5. **FIFTH, Fraudulent Concealment And Willful Blindness Sustain Obstruction Of Justice And Illegal BRMT Bioweapon Development And Use Against US Persons**

   **Fraudulent Concealment**

550. Lead Plaintiff's entire existence has been and is involuntarily committed to this

associated-in-fact criminal enterprise of defendant UNITED STATES in its racketeering acts and

conspiracy against rights including, without limitation, (a) his employment and employment

deprivations, (b) direct interventions in his private life, (c) human trafficking of both the Lead

Plaintiff and his two spouses, (d) repeated racketeering offenses, including (e) thefts and

orchestrated forfeitures and compromises of financial, real, and intangible assets, (f) involuntary

servitude, (g) forced labor, (h) peonage, which have and do run concurrently with (i) illegal

human experimentation and (j) lethality attempts, and (k) with other crimes, acts, violations, and

injuries, as documented in the 110 example sets of depredations by defendant UNITED STATES

and its co-conspirators, over nearly six decades against Lead Plaintiff alone and still longer for

some members of this class of plaintiffs.

551.Defendants FBI, USMS, USSS, DHS, CPB, DOD, DARPA, as well as other

departments and agencies of defendant UNITED STATES, have and do know of CIA and

ARMY's illegal mind control program (BRMT, the prohibited bioweapon and bioweapon

delivery system) and have and do directly conspire in illegal acts, violations, and injuries of these

plaintiffs. These defendants have acted continuously, knowingly, and willfully to initiate and

perpetuate their illegal BRMT bioweapon and bioweapon delivery system, constitutional and

civil rights, and racketeering acts, violations, and injuries against the constitutional, civil, and

human rights of these plaintiffs. Other elements (departments, agencies, task forces, offices, and

so forth) of defendant UNITED STATES have and do use these same unwitting victims of

defendants CIA and ARMY illegal BRMT and related illegal human subject medical experiments

in their own victimizations in involuntary servitude and in other depraved acts. Defendant

UNITED STATES has and does conspire with others to fraudulently conceal these illegal acts,

violations, and injuries, and to fraudulently conceal its own and co-conspirator culpability in this pattern of racketeering, lethality, and criminal entrapment attempts, effectively perpetually attempting to transfer the criminal liability of these defendants to the unwitting plaintiff victims of this calss. The continuity of this pattern from illegal BRMT program inception by defendant UNITED STATES' and its co-conspirators is documented herein at all paragraphs.

552. All these malign acts, violations, and injuries have been fraudulently concealed for more than five decades, hiding behind extra-legal color of law abuse, wherein (a) defendant UNITED STATES claims national security "state secret" privilege is the legal foundation of an illegal program and (b) of the associated-in-fact enterprise pattern of racketeering acts and of (c) violations of "unalienable" constitutional rights, which both run concurrently with the illegal program and wherein American citizens' repeated complaints are met with durable repeated official silence by the department constitutionally obligated to establish justice, defendant DOJ, by its agencies and by all other departments and agencies of the executive branch (paragraph 320, LPEE pages 508-541):

| From: | DNI-FOIA <DNI-FOIA█████████ |
| Sent: | Tuesday, November 16, 2021 1:23 PM |
| To: | 'Dennis Brewer' |
| Cc: | DNI-FOIA |
| Subject: | RE: FOIA/PA Request |
| Attachments: | RE: FOIA/PA Request; RE: FOIA Requests Involving US Federal Police and Intelligence Agencies DF-2021-00179 |

Good afternoon, Mr. Brewer,

Our 26 October response (attached) reiterated what was stated in our 9 September final response to your Privacy Act request, which was that we searched ODNI's Security, Personnel, and Human Resources files and no records on you were located. Our final response was initially emailed to you on 10 September (attached) and was also included in our 26 October response.

A search was not conducted of the ODNI elements you mentioned: the National Counterterrorism Center, the National Counterintelligence and Security Center, and National Counterproliferation Center. Investigation and collection records are protected under exemptions (b)(1) and (b)(3), and ODNI can neither confirm nor deny that such records may or may not exist.

Thank you,

DNI-FOIA

while defendant UNITED STATES has and does engage its co-conspirators in a long-running elaborate conspiracy which abuses US persons, just at it has done with MKUltra (1953-1973)

and Cointelpro (1956-1971) which malign pattern of practices has and does functionally continue, in technologically updated forms, against US persons as it perpetually delays and denies justice by:

    (i)     disposing of documentary evidence by mail fraud, acts of time destroying physical evidence including, without limitation, banking and medical records, as related, without limitation, at paragraphs 102 (iii), 308, 320, 415, 462, 474, and

    (ii)    obstructing, blocking, and hacking of email accounts and web sites as related, without limitation, at paragraph 515 and,

    (iii)   by on-going entanglements, pretexting, interferences, obstructions, and entrapments as related at paragraphs 600-603 NSEC-1-4; 621-627 RGTS-1-7; 639-693 RICO-1-55 herein,

    (iv)   fraudulent concealment and willful blindness as related in this section at paragraphs 550-583

    (v)    orchestrating and using naturally appearing "accidents," including, without limitation, the hospital fall in April 2021 (paragraph 706 LETHL-13, a mass transit express train derailment attempt on an MTA Hudson Line passenger train just as the sun was setting on September 11, 2022, (paragraph 707 LETHL-14) to destroy eyewitnesses to the godawful truth these defendants, particularly defendant UNITED STATES have created and perpetuate.

553. The institutional and individual defendants in this Complaint have been and are directly involved in a conspiracy against rights and law, have and do deliberately ignore their Constitutional and legal responsibilities to US persons under law, both by inflicting the acts, violations, and injuries herein through their direct and specific actions, and by their failures to act

against these same defendants. Defendants have and do make every effort, and use vast sums of taxpayer resources, to fraudulently conceal their identities throughout while, and by, abusing police powers and national security exemptions and privileges, they have and do act in bad faith in their imperfect conspiracy and cover-up attempts.

554. Over the life of this conspiracy, these specific bad faith actor institutional and individual defendants have elected to expand their circle of co-conspirators to other police power agencies and eventually to a public mob of participants. Defendants' malign pattern of practice has and does include placing the Lead Plaintiff unwittingly and involuntarily in full public view through, among other things, surreptitious technical hacks of computer video feeds and continued human trafficking of Lead Plaintiff. A record of certain recent official lies and coordinated cover-up attempts by police powers agencies is included herein as Interline Exhibits 16-19. Neither defendants CIA, ARMY, or NARA has ever even acknowledged receipt of written Freedom of Information Act and Privacy Act requests for information from Lead Plaintiff, as required by law (LPEE pages 387-412, 508-541). All these defendants are perpetual scofflaws who have and do routinely violate federal law without consequence for their criminal acts; operate in bad faith throughout the conduct and attempted cover-up of this entire illegal BRMT bioweapon and bioweapon delivery system program; associated-in-fact enterprise pattern of racketeering acts; constitutional and civil rights violations; and the associated illegal spying and surveillance used in violations of the Constitution against still other US persons through defendants' illegal color of law abuse of cover companies, and by co-opting private enterprises for illegal uses, and to obtain direct personal benefits; and by their abuse of relationships with foreign intelligence agencies to operate against US persons.

*Interline Exhibit 16:* **August 2021 58th Anniversary MLK "I Have A Dream" Speech
Lincoln Memorial Permit Allegedly Cancelled by Organizer – FALSE FOIA Response to
Cover First Amendment Violation**



United States Department of the Interior

NATIONAL PARK SERVICE
Interior Region 1 - National Capital Area
1100 Ohio Drive, S.W.
Washington, D.C. 20242

In Reply Refer To:

FOIA 2021-6105

September 22, 2021

Mr. Dennis Brewer
1210 City Place
Edgewater, NJ 07020
dsbrewer923@hotmail.com

Dear Mr. Brewer:

Subject: Freedom of Information Act Request Dated September 20, 2021
National Park Service (NPS) *re: National Mall and Memorial Parks*

This letter is in response to your Freedom of Information Act (FOIA) request dated September
20, 2021, in which you requested: "On August 28, 2021, I attended a voting rights related event
on the National Mall adjacent to the National Archives Building. I am making a FOIA request to
identify the sponsors of that event. This event occurred at the same time as another voting rights
event at the Lincoln Memorial. Please let me know if you require other information from me
prior to fulfilling my FOIA request. Thank you."

The following response was prepared by the National Capital Area through consultation with the
division of Permits, National Mall and Memorial Parks. The FOIA, 5 U.S.C. § 552, generally
provides that the Government shall make documents available to the public for inspection and
copying to the widest extent possible. However, certain classes of documents may be exempt.
The FOIA does not require that new records be created in response to a request and only applies
to records in existence at the time the request is received. Additionally, because the NPS creates
and maintains law enforcement records, we are required by the Department of Justice to provide
the following information, even though it may or may not apply to your specific request.
Congress excluded three discrete categories of law enforcement and national security records
from the requirements of the FOIA. See 5 U.S.C. § 552(c). This response is limited to those
records that are subject to the requirements of the FOIA. This is a standard notification that we
are required to give all our requesters and should not be taken as an indication that excluded
records do, or do not, exist.

We have enclosed 2 pages of records that are responsive to your request which are being released
to you in full.

We have classified you as "other" requester. However, we do not bill requesters for FOIA
processing fees when their fees are less than $50.00, because the cost of collection would be

INTERIOR REGION 1 • NORTH ATLANTIC-APPALACHIAN
CONNECTICUT-DELAWARE-DISTRICT OF COLUMBIA-KENTUCKY-MAINE-MARYLAND-MASSACHUSETTS-
NEW HAMPSHIRE-NEW JERSEY-NEW YORK-PENNSYLVANIA-RHODE ISLAND-VERMONT-
VIRGINIA-WEST VIRGINIA

LP Evidentiary Exhibits Page 000532                                    10/05/2022

### Fraudulent Concealment – NYPD and FBI Coordinate Cover-Up of Human Trafficking, Pre-Texted Investigations

555. Defendant NYPD confirmed the 2007 era counterterror investigation (which was fraudulently constructed by defendant FBI, specifically including FBI serial human trafficker ROSENBERG and his specifically targeted acts, violations, and injuries against Lead Plaintiff from the 1980s through the first decade of the 2000s (paragraphs 213, 320f(v), 416, 425, 432-440, 452-470, 474, 482, 497-498, 516-519, 536, 541(table)) against Lead Plaintiff on September 3, 2021 (Interline Exhibit 17) but refused to produce the information, which refusal was appealed by Lead Plaintiff. In NYPD's September 15, 2021 reply to Lead Plaintiff's appeal of the refusal to produce, Defendant NYPD then stated there was absolutely no record whatsoever of any contact with Lead Plaintiff nor any records indicating any such investigation, plainly a bald-faced lie. An FBI liar letter then followed on September 30, 2021 (Interline Exhibit 18). See also LPEE pages 354-367, 799-802, and 10302-10304, 11498-11501. This was a coordinated 27 day cover-up after the initial accurate admission.

556. Defendant FBI Headquarters issued that September 30, 2021 denial letter below (Interline Exhibit 18) on September 30, only 15 days after defendant NYPD disappeared its records from their system. These are obvious official lies by both defendants FBI and NYPD were clearly coordinated, and may constitute criminal obstruction including destruction of evidence. This sequence disavows and removes from the evidentiary record key evidence of human trafficking and involuntary servitude over time, as well as of carefully pretexted illegal national security entanglements which demonstrate *mens rea,* to wit:

557. Lead Plaintiff's direct supervisor at ESTABLISH, William Drumm, was identified in September 2023 as Charles "Chuck" ROSENBERG, now a law professor and an MSNBC legal analyst. As an FBI official during Lead Plaintiff's tenure at defendant ESTABLISH,

defendant ROSENBERG was Lead Plaintiff's human trafficker, interviewer, and hiring manager.
Defendant ROSENBERG had previous undercover history with Lead Plaintiff dating back to the
early 1980s when the first known lethality attempt against Lead Plaintiff was attempted in British
Columbia, paragraph 694 LETHL-1, while ROSENBERG (FBI illegally embedded as CEO at
NutraSource by WEISSMAN), WEISSMAN (FBI illegally embedded at Puget Consumers
Cooperative), and BURNS (CIA allegedly practicing medicine in Kirkland, WA) were in the
Seattle, Washington area.

558. FBI Headquarters would have known ROSENBERG moved from FBI Anchorage
field office cover to this Seattle, WA cover legend as Chuck LeFevre (ROSENBERG) in the
early 1980s to become CEO of the startup natural foods wholesaler and FBI spying operation at
NutraSource. ROSENBERG joined Andrew WEISSMAN, later FBI General Counsel to Robert
Mueller, who was a deep cover agent known as "Lyle Whiteman" to Lead Plaintiff while
engaged in illegal embedded spying as General Manager of Puget Consumers Coop in Seattle.

559. WEISSMAN " Lyle Whiteman" was directly responsible for the loss of hundreds of
thousands of dollars of PCC member equity in the cooperative by his planning, opening, and
operating of a failed PCC retail grocery store in South Everett, which was a continuing cash
drain for about two years on PCC's limited resources, due to the inappropriate fit of "white collar
college-educated" natural and organic foods market appeal to the "blue collar" demographic
profile of the South Everett customer base (many of whom were Boeing Everett assembly plant
workers and technicians), which "Whiteman" would have the requisite knowledge and training
to determine given his prior experience while illegally embedded in grocery wholesaling and
retailing in Seattle, WA at Associated Grocers and PCC. Lead Plaintiff served on the Boards of
PCC and NutraSource for about three years in the early 1980s.

560. NutraSource was formed from the bankruptcy court wreckage of three natural and
organic foods wholesalers in Seattle. The Board of NutraSource also included two white males
from Oakland Food Coop which was in the late stages of being financially ruined under their
supervision by internal dissension, a classic defendant FBI wrecking operation subsequently
experienced repeatedly and unwittingly by the Lead Plaintiff during his involuntary servitude,
forced labor, and peonage by defendants USMS, FBI, CIA, and by defendant ARMY using its
personnel in civilian dress. These defendant UNITED STATES departments and agencies, and
their individual officers, agents, managers, and executives are substantially responsible, and
institutionally and individually liable, for the bad faith acts, violations, and injuries of the various
personal and professional wrecking sequences in Washington state, for national security
entanglements there and elsewhere in the United States and foreign countries, for human
trafficking to Boston and homelessness, thence human trafficking to New Jersey for fraudulent
employment, involuntary servitude perpetuation, and pretexted terror color of law abuses. They
acted knowingly, willingly, and perpetually, in *prima facie* violations of the rights and property
of these unwitting plaintiffs through their acts, violations, and injuries conducted in bad faith
under color of law. abusing their positions of trust and authority.

561. Subsequent to the defendant NYPD and FBI cover-up sequence at Interline Exhibit
17 (NYPD) and Interline Exhibit 18 (FBI Headquarters), Lead Plaintiff wrote to the DOJ
Assistant Inspector General for Investigations and received a no interest reply, provided a
response to the no interest letter, and received no further acknowledgement. This DOJ IG
sequence is shown at Interline Exhibit 19. Other personal entanglements present conflicts for
current senior members of defendant DOJ. Several of these defendants have direct illegal
program concurrent involvement ties to current and/or former senior DOJ officials including

current Attorney General GARLAND, which ties include, without limitation, defendant

WEISSMAN, a former FBI General Counsel while both attended the Lead Plaintiff in roles in

the 1970s under defendant BREYER (paragraph 36). Defendant CALDWELL, recently retired

from Latham & Watkins was Assistant Attorney General for DOJ Criminal Division some years

after her false personation at Seed & Berry in Seattle, Washington to fraudulently conceal a

fraudulent business partnership between PRAY and then unwitting Lead Plaintiff, known as

Allegent, LLC (paragraphs 36, 461-462, 639, 641, 650, 673, 683 RICO-1, 3, 12, 35, 45).

562. Individual defendants, and former FBI and DOJ personnel WEISSMAN, RUBIN,

and MELBER are known current residents of the greater New York City/New Jersey area where

defendant has lived since his human trafficking to New Jersey by ROSENBERG in 2007.

ROSENBERG lives in the Washington, DC area. All these defendants also have or do work at

various times since leaving Washington state for defendants FBI and/or DOJ in northern New

Jersey or New York City.

563. Defendant FBI and/or USMS (New York or New Jersey) is the most probable

source of the continuing block of emails in accounts owned by the Lead Plaintiff's between 2018

and July 2020, which includes, without limitation, further evidence of human trafficking of Lead

Plaintiff by federal and state agencies, as well as defendant FBI racketeering acts by defendant

MAGGARD and others. Other inculpatory content remains to be discovered through the removal

of this technical block by defendant UNITED STATES. Defendant FBI in the greater NYC area

has and does run illegal interference in interstate commerce against the Lead Plaintiff and has

been joined in this operation by FBI Amarillo using the cover company CFO SEARCH operated

by MAGGARD (FBI, paragraphs 624 RGTS-4, 670, 672, 682, 689 RICO-32, 34, 44, 51). This

pattern is consistent with FBI's past pattern of practice against Lead Plaintiff in his prior

commercial endeavors from 1983 (ActivLabor scheduling software and Sheldon-Lee Associates,

formed with defendant CIA embed THORPE). This racketeering pattern sequence against the

Lead Plaintiff involved agents in the New York City Manhattan office posing as the principals of

SOLE SOURCE Capital. SOLE SOURCE principals ROSSI and TURNER verbally promised a

major investment in a meeting with the Lead Plaintiff at the St. Regis Hotel bar, New York City,

on January 9, 2018, then reneged including through a phone call on January 23, 2018. As is

defendant FBI's custom, those fraudulent investment promises were made verbally in the

presence of a team of agents (four in this meeting) and then reneged in writing (email) sometime

later. This generally occurs after weeks or months of delay, which are intended to string out and

distress the target, regardless of whether or not there is any valid basis for FBI actions (none

here, merely interfering in interstate commerce without cause), in the vain hope the target (Lead

Plaintiff here) will violate some law or regulation so they can perpetuate their malign activities.

When this fails, they terminate within 90 days to evade the inspection process and then rotate the

responsibility to another team in another location or pass it off to another department or agency

to perpetuate predatory color of law abuse of US persons.

564. In this scenario, FBI New York chose to rotate that role to FBI Amarillo. CFO

SEARCH, operated by Mike MAGGARD in Lubbock, Texas, was the vehicle of choice used by

FBI Amarillo. CFO SEARCH then recruited an Egyptian foreign national for consideration as

CFO of Winnett, which company the Lead Plaintiff was attempting to start in interstate

commerce. This particular CFO nationality "coincidence," and a series of halal beef certification

requests by international traders to Sheldon Beef during other attempts at international commerce

by Lead Plaintiff were made by FBI through other offices and correspond with the Egyptian

influence peddling allegations which relate to the alleged corrupt relationship between Hana and

Menendez in the September 2023 Menendez indictment. This is now well understood by the

Leac Plaintiff to be a classic FBI "rhyming" signature trademark, which has been noted as

occurring repeatedly in the past during forensic analysis of this long-running associated-in-fact

enterprise pattern of human trafficking and other racketeering acts which affect interstate

commerce conspiracy conducted by defendants FBI, USMS, ARMY, and CIA, together with

their co-conspirator state and local governmental and private sector defendants.

565. After months of captive fruitless financing attempts by Lead Plaintiff which

included technical electronic blocking (wire fraud) by defendants, defendant MAGGARD

provided $6,000 (FBI, using agency funds) for Lead Plaintiff's business use to develop a

website, which the developer never completed. ENVOTEC, (paragraph 682 RICO-44) allegedly

a Pakistani web development firm, performed this work; incomplete software projects are a

common experience across FBI operations against captive targets like the Lead Plaintiff as tasks

are not allowed to proceed to full completion, there is always one more thing and not quite

enough funds are ever available to complete these tasks and projects (this pattern of practice

dates back to the CUC project at CNA, paragraph 458). MAGGARD also provided $6,000 (FBI,

agency funds) to the Lead Plaintiff as a personal loan, which Lead Plaintiff used in a good faith

effort to retire credit card obligations in an attempt to improve his personal credit score, so Lead

Plaintiff could co-sign for a business related loan. MAGGARD then solicited advice about

whether to lie during a loan application process, yet another entrapment effort. Lead Plaintiff

advised against any such move by MAGGARD.

566. This captured interstate commerce business project, Gannett Peak Ranch failed, with

much manufactured defendant FBI drama throughout the process as usual during 2023, as had

the numerous personal attempts of the Lead Plaintiff since 2011 (and those before dating back to

Sheldon-Lee in 1983-84, paragraph 428) to engage in interstate commerce which preceded this

attempt. These good faith acts by the Lead Plaintiff, part of his 40 year pattern of good faith acts

and attempts in interstate commerce, left FBI Amarillo with no legal pretext to continue its

prejudicial operations, and with a problem directly traceable to defendant MAGGARD and the

CFO SEARCH cover operation - the $6,000 personal loan to the Lead Plaintiff. Interest needs to

be paid on the loan in order to avoid it becoming taxable income to the Lead Plaintiff. This

interest payment was made in good faith in early 2023 and again in 2024 when monthly

payments began in arrears. This leaves the loan outstanding and avoids the requirement to

declare the loan as personal income (required if defaulted), which would risk the Lead Plaintiff's

Section 8 voucher through a failure to properly report his income or by reporting income (a

dishonored loan) which exceeds the eligibility requirement to continue to receive the Section 8

voucher which may result from properly reporting any loan default as income. Either of these

outcomes could lead to forfeiture or a substantial reduction of the Section 8 voucher benefit

amount, which voucher is required to maintain his residence since defendant UNITED STATES

has diligently operated to sustain both involuntary and peonage of Lead Plaintiff since

elementary school (paragraphs 36 table, 717). This was most probably the real purpose behind

this particularly implausible defendant FBI scheme, as they worked to get the matter their books

and onto the victim (Lead Plaintiff). This would have forced the Lead Plaintiff from yet another

in his series of defendant UNITED STATES' secretly owned human trafficked residences and

again result in the loss of some or all of his minimal personal property (yet another defendant

DOJ pattern of racketeering acts practiced repeatedly experienced by Lead Plaintiff at the hands

of defendant FBI and USMS episodically since graduate school in 1979).

567. To cover these tracks made and sustained using SOLE SOURCE and CFO SEARCH, and the MAGGARD loans, defendant FBI adopted the next tack in their strategy to get these open matters off their books in early February 2023. A Whistler, British Columbia condominium timeshare, formerly jointly owned by Lead Plaintiff and his fraudulently orchestrated second wife Jeanette, was suddenly presented for release of interest, (i) eighteen years after the 2005 divorce which had specifically released that interest from the Lead Plaintiff to former spouse Jeanette through that divorce, (ii) despite the ownership interest in the timeshare condo reportedly never having been officially recorded in British Columbia property registry as required by law, and (iii) reportedly never even having appeared on the ownership records of the condominium association.

568. This release of the timeshare interest potentially generated a slightly more than $6,000 USD capital loss to the Lead Plaintiff in 2023, which is approximately equal to the $6,000 MAGGARD personal loan value. This incentivized a default by Lead Plaintiff on the defendant FBI Amarillo MAGGARD loan, as the capital loss on the timeshare condominium interest would offset the income effect of a default on the personal loan from defendant MAGGARD, thus taking it off defendant FBI's books so the matter could be closed, concealed from any internal inspection process, and the evidence destruction period could result in its removal from accounting records, leaving no trace of this color of law racketeering act by defendant FBI.

569. Since Lead Plaintiff has come to more clearly recognize these defendant UNITED STATES pattern offenses and evidence destruction practices (FBI and USMS in particular) through his continued forensic review in 2023, he continues to decline any opportunity to default on this MAGGARD personal loan.

570. Litigation discovery using this pattern evidence will continue to demonstrate these continued predicate acts and pattern of acts, which are completely consistent with the other racketeering patterns in this complaint from prior decades, this time by using these defendants' own still available records. Meanwhile, the blocking of Lead Plaintiff's access to owned emails accounts which inculpate defendants SOLE SOURCE, VENDORCO, WALKER, HUSKEY, FBI, USMS, CIA, ARMY, other currently known and unknown co-conspirator agencies, departments, individuals, groups, organizations, and still others not yet understood, who acted against the interests of these plaintiffs during that currently blocked from access period in 2018 through 2020 continues. Evidence preservation letters were sent to defendant FBI and dozens of co-conspirator defendants beginning in 2021.

571. Generally speaking, the northern New York and New Jersey police powers environment at various levels of government has again become notably more hostile toward the Lead Plaintiff in 2021 to the present as evidence was presented to and met with complete silence from the US Attorney SDNY. Illegal BRMT and police powers operational intensity in 2023-2024 is similar to that experienced (a) in 2007-2010 during the defendants FBI, ROSENBERG, and co-conspirator terror, trafficking, torture, homelessness, kidnapping to confinement series was underway, and (c) in the repeat of multiple lethality attempts in the cycle in 2017-2021 described at paragraphs 701-706 LETHL-8-13. The 2021-2022 sequenced cover-up across police powers defendants is evidenced in the following exhibits and narrative below. The subsequent events in the timeline which follows (2022-2024) are dispositive evidence of the purpose and intent of this 2021-2022 cover-up documented in writing by defendants own hands:

[Intentionally left blank.]

| DATE | DEFENDANT ACTIONS | DOCUMENTARY EVIDENCE |
|------|-------------------|----------------------|
| **2021** | | |
| September 3, 2021 | NYPD FOIL response affirms irregular methods | Interline Exhibit 17 |
| September 11 | DC complaint 21-cv-2424 filed on paper at Clerk's Office | Pacer.gov |
| September 11 | DC complaint 21-cv-2424 courtesy copy served before case assignment on DC US Attorney Civil Division | Paragraph 628A and LPEEV65-10 |
| September 15 | NYPD denies any knowledge of Lead Plaintiff whatsoever | Interline Exhibit 17 |
| September 30 | FBI sends DC Headquarters "liar letter" response to FOIA request | Interline Exhibit 18 |
| October 12 | DC US Attorney Civil Division email received declining courtesy service on September 11 | Paragraph 628A RGTS-8, LPEEV65-10 |
| November 9 | Lead Plaintiff letter to DOJ Assistant Inspector General – Investigations (DOJ IG) | Interline Exhibit 19 |
| **2022** | | |
| January 28, 2022 | DOJ IG replies to acknowledge receipt | Interline Exhibit 19 |
| March 22 | DOJ IG replies indicating no subject matter jurisdiction | Interline Exhibit 19 |
| July 16 through November 19 | Lethality veiled verbal threat in NYC is followed by multiple covert targeted violent lethality attempts | Interline Exhibit 15 for July 16 through November 19, 2022, also at paragraphs 707-710 LETHL-14-17, LPEEV65-11 |
| **2022- Present** | | |
| February 14, 2023 | DC complaint 23-cv-415 filed on paper in person at Clerk's office as video and electronic evidence is declined and denied from the record after defendant UNITED STATES disabling technical printer hack | Technical printer hack described at DC:21-mc-0014 docket on Pacer.gov and at Appendix 1. |
| On-going | Defendant UNITED STATES continues its pattern of evidence tampering, hacking, operational harassments, and uses BRMT programmed health attacks for an on-going escalation of surreptitious lethality attempts and coercive psychological operations | Paragraphs 801, 816-818 |

*Interline Exhibit 17:* **Defendants NYPD and FBI Coordinate September 2021 Fraudulent Concealment**



NYPD admits existence of records documenting FBI and ROSENBERG bogus pretexted alleged terror investigation on September 3, 2021 above, then denies any records on September 15, 2021, next page.

On September 11, 2021, courtesy service of complaint DC:21-cv-2424 on the US Attorney for the District of Columbia was made by hand delivery. An email reply was received from that office on October 12, 2021 (LPEEV65-10).



**POLICE DEPARTMENT**
**Office of Deputy Commissioner,**
**Legal Matters**
One Police Plaza, Room 1406A
New York, New York 10038
FOILAppeals@NYPD.org

September 15, 2021

Dennis Brewer
dsbrewer923@hotmail.com

### RE:   FREEDOM OF INFORMATION LAW
### REQUEST: FOIL-2021-056-13163

Dear Mr. Brewer:

This letter is in response to your email, dated September 3, 2021, appealing the determination issued by the Records Access Officer (RAO) on September 3, 2021 regarding records requested from the New York City Police Department. Your request, pursuant to the Freedom of Information Law, was originally received by the FOIL unit on September 1, 2021 and subsequently denied pursuant to Public Officers Law §87(2)(e)(iv).

Your appeal of that determination is denied because a diligent search has been conducted for the requested records based on the information provided; however, no records were located. The New York Court of Appeals has determined that "[w]hen an agency is unable to locate documents properly requested under FOIL, Public Officers Law § 89(3) requires the agency to certify that it does not have possession of a requested record or that such record cannot be found after diligent search . . . Neither a detailed description of the search nor a personal statement from the person who actually conducted the search is required" *Rattley v. New York City Police Dept.*, 96 NY2d 873, 875; 730 NYS2d 768 (2001).

Furthermore, in 2009, the Appellate Division held that an agency cannot produce documents it does not possess or cannot disclose and that the Court cannot require respondents to produce documents that they certify they cannot find after a diligent search because petitioner "has received all that he . . . is entitled to under the law" *Bernstein Family Ltd. P'ship v. Sovereign Partners, L.P.*, 66 AD3d 1, 8; 883 NYS2d 201, 206 (1st Dept 2009).

You may seek judicial review of this determination by commencing an Article 78 proceeding within four months of the date of this decision.

Respectfully,

Jordan S. Mazur
Sergeant

COURTESY • PROFESSIONALISM • RESPECT

## *Interline Exhibit 18:* Defendant FBI Sends Official Liar Letter in September 2021 Coordinated Fraudulent Concealment



U.S. Department of Justice

Federal Bureau of Investigation
*Washington, D.C. 20535*

September 30, 2021

MR. DENNIS SHELDON BREWER
1210 CITY PLACE
EDGEWATER NJ 07020

Request No. 1505514-000
Subject: BREWER, DENNIS SHELDON

Dear Mr. Brewer:

This is in response to your Freedom of Information/Privacy Acts (FOIPA) request. Based on the information you provided, we conducted a search of the places reasonably expected to have records. However, we were unable to identify records responsive to your request. Therefore, your request is being closed. If you have additional information pertaining to the subject of your request, please submit a new request providing the details, and we will conduct an additional search.

Please see the paragraphs below for relevant information that may be specific to your request. Only checked boxes contain corresponding paragraphs relevant to your request. If no boxes are checked, the corresponding information does not apply.

☐ Please be advised that your request was reopened based on the additional information you provided. A new search was conducted, and we were unable to identify responsive records.

☐ Records potentially responsive to your request were destroyed. Since this material could not be reviewed, it is not known if it was responsive to your request. Record retention and disposal is carried out under supervision of the National Archives and Records Administration (NARA) according to Title 44 United States Code Section 3301, Title 36 Code of Federal Regulations (CFR) Chapter 12 Sub-chapter B Part 1228, and 36 CFR 1229.10. Please be advised that the General Records Schedule (GRS) disposition authority for FOIPA records is DAA-GRS-2016-0002-0001 (GRS 4.2, Item 020).

☐ Records potentially responsive to your request were transferred to the National Archives and Records Administration (NARA). If you wish to review these records, file a FOIPA request with NARA at the following address:

> National Archives and Records Administration
> Special Access and FOIA
> 8601 Adelphi Road, Room 5500
> College Park, MD 20740-6001

☐ Potentially responsive records were identified during the search. However, we were advised that they were not in their expected locations. An additional search for the missing records also met with unsuccessful results. Since we were unable to review the records, we were unable to determine if they were responsive to your request.

☐ The portion of your request concerning an FBI identification record – commonly referred to as a criminal history record or "rap sheet" – has been forwarded to the Criminal Justice Information Services (CJIS) Division for processing. For additional information, see the enclosed FBI FOIPA Addendum General Information Section.

☐ Requests for expedited processing are not applicable when a final response is issued within ten calendar days.

LP Evidentiary Exhibits Page 000799                                    10/05/2022

☐  Police departments should be aware that the search conducted was limited to FBI records. Requests for criminal history records or rap sheets should be directed to Criminal Justice Information Services (CJIS). Information regarding CJIS is listed in the enclosed FBI FOIPA Addendum General Information Section.

☐  Records potentially responsive to your request were transferred to the National Personnel Records Center, Civilian Personnel Records (NPRC CPR). In order to obtain information on a file located at the NPRC, your request must be mailed to the following address:

> National Archives and Records Administration
> ATTN: Archival Programs
> P.O. Box 38757
> St. Louis, MO 63138

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. "Part 1" of the Addendum includes standard responses that apply to all requests. "Part 2" includes additional standard responses that apply to all requests for records about yourself or any third party individuals. "Part 3" includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request Number listed above has been assigned to your request. Please use this number in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530; or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS). The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448, or facsimile at 202-741-5769. Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov. If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Sincerely,

*Michael G. Seidel*

Michael G. Seidel
Section Chief
Record/Information
Dissemination Section
Information Management Division

Enclosures

LP Evidentiary Exhibits Page 000800                              10/05/2022

Lack of veracity of this letter response: Defendant FBI's ROSENBERG and WEISSMAN first met Lead Plaintiff in the early 1980s and knew him well from dozens of direct interactions as a Trustee and Director of the two organizations they were illegally embedded in, NutraSource and Puget Consumers Cooperative, respectively, while conducting and coordinating illegal general searches in those corporate undercover roles in Seattle, Washington.

***Interline Exhibit 19***: **Defendant Department of Justice Assistant Inspector General Investigations Division Declines Investigation of Defendant FBI, Then Ignores Lead Plaintiff's Follow-Up Letter**

November 9, 2021

U.S. Department of Justice
Office of the Inspector General
950 Pennsylvania Avenue NW
Washington, D.C. 20530-0001

Good day:

I have filed a civil Complaint against DOJ and FBI, among others, related to a long-running series of civil and constitutional rights abuses by the United States. This Complaint relates an on-going series of manipulations by the Defendants and other law enforcement agencies acting in witting or unwitting cooperation with the United States. A copy of this Complaint, filed in US District Court of the District of Columbia is included herewith. I have also attached a list of cooperating and likely cover entities used by Defendants in their pursuit and manipulation of me as Plaintiff.

I will also note that I complained about this matter to Defendants beginning in 2005 with the U.S. Attorney's Office for Western Washington, and during a personal trip (after documents to be delivered by U.S. mail, UPS and FedEx did not reach their destinations or were missing, required proofs of delivery) with a member of the legal team at FBI Headquarters, by hand delivery to DOJ Headquarters, and to the Executive Office of the President, among others. Further, immediately after filing a Complaint in U.S. District Court for New Jersey at Newark in 2010, I was removed from my residence and rendered homeless. That same six unit building had been under FBI surveillance and an alien tenant was removed and deported.

I note that the FBI OIG is conducting a review of undercover entities, some of which may be related to my Complaint and the Defendants' pattern of manipulation and harassment. I am also providing a copy of an NYPD response to my FOIA request under New York State law for your evaluation. Please feel free to share this information with FBI OIG or other OIG operations as you wish.

Kindly review the Complaint and the ongoing series of events and consider careful review of this matter as it is highly likely that similar undertakings against other persons may have resulted in incarceration, injury, destruction of families and businesses, and the death of U.S. persons and others.

Thank you,

 DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL

January 28, 2022

Dennis Brewer
1210City Place
Edgewater, NJ 07020

Dear Mr. Brewer:

This is to acknowledge receipt of your recent correspondence and to thank you for contacting the Department of Justice Office of the Inspector General with your concerns.

Sincerely,

Office of the Inspector General
Investigations Division

950 Pennsylvania Avenue, NW, Washington, DC 20530-0001 | (202) 514-3435

 **DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL**

March 22, 2022

Dennis Brewer
1210 City Place
Edgewater, NJ 07020

Dear Mr. Brewer:

Thank you for your recent correspondence. The U.S. Department of Justice (DOJ), Office of the Inspector General, investigates allegations of misconduct by employees and contractors of DOJ, as well as waste, fraud and abuse affecting DOJ programs or operations.

The matters you raised are outside our investigative jurisdiction, therefore no action can be taken by our office. You may wish to consult the following web page for information on where to submit certain complaints that do not fall within the DOJ OIG's investigative authority: https://oig.justice.gov/hotline/non_doj_complaints.

Please be advised that this is the only correspondence you will receive from our Office regarding this matter. Of course, if you obtain new information that involves other allegations or issues regarding DOJ employees, contractors, programs or operations, please feel free to submit that information to us.

Thank you for giving us the opportunity to review your concerns.

Sincerely,

Office of the Inspector General
Investigations Division

Rec'vd
3/25

950 Pennsylvania Avenue, NW, Washington, DC 20530-0001

March 25, 2022

Assistant Inspector General for Investigations
Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530

Good day –

I received your letter of March 22, 2022, indicating the subjects raised in my complaint were outside your investigative domain. On knowledge and belief, the entire sequence of events involving the financial destruction of Performa, a company I owned in partnership, between 2002 to 2005 was undertaken by FBI. The agency was further involved in improper police powers activities in Boston and New York metropolitan areas summarized below.

The conduct in question is not individual misconduct which can be handled by the agency. Rather, it is **institutional misconduct by an agency within the Department of Justice.** So, I am requesting official answers to the following three direct and specific questions for potential use in civil litigation already filed against the Department of Justice.

**1. Is your office stating officially for the record that institutional misconduct by the FBI is outside the jurisdiction of DOJ OIG?**

A copy of the revised Complaint 22-cv-00592, now pending before the DC District Court, is attached for your convenience.

For your further investigative development, I offer the following if you wish to proceed to investigate institutional misconduct by FBI. The following sales leads have a common thread beyond TSL, they occurred across state lines in the jurisdiction of numerous field offices and in plants that had no employees present (other than faux employees, all FBI field agents upon knowledge and belief).

This fact, the complete absence of hourly and other managerial employees, is unlike any other period of sales activity I had undertaken between August 1979 and September 2001. During that period, I was a consultant who conducted and managed hundreds of projects on behalf of management consulting firms and an engineering firm, in a very wide variety of enterprises, as well as an executive in startup and mid-size commercial enterprises.

In other words, I have vastly more experience and knowledge of the customs and habits of such enterprises than any government employee would reasonably be expected to have. I know and understand the territory of commercial enterprises. Kindly refer to my resume in Complaint 22-cv-00592 for more information.

Upon knowledge and belief, FBI Boston arranged the set up of a dummy company, known to me as Technology Sales Leads (TSL), which I visited in downtown Boston during the period that Performa was in business. TSL provided a series of bogus sales leads in the 2003/2004 period for the unstated purpose of conducting a financial starve-out of the company, which resulted in the loss of my personal residence in Kirkland, Washington in the fall of 2005. The residence itself may well have been subsequently

internally destroyed by FBI in a search for some non-existent phantom. Kindly see lines 224 to 248 of the Complaint originally provided to your office.

Sales leads provided by TSL are shown below. None ever closed and converted to revenue projects, unlike my prior 20 year history of 60% to 80% converting to sales revenue while selling and conducting projects and technological products in large scale, mid-size, and startup enterprises.

1. Bay State Milling, Boston, MA, software improvement
2. Briggs Stratton, Midwest location, information technology
3. Badger Meter, Milwaukee, WI
4. Raynor Garage Door, Dixon, IL
5. First Alert, Aurora, IL, plant operations improvement
6. Borg Warner transfer case plant, Muncie, IN, information technology
7. Alabama telecom, sales discussion including manufacturing cell visibility system requirement
8. Western Digital (CA), manufacturing cell visibility system demo by an alleged VP using the username "Guest"
9. Grocery wholesaler, Midwest location
10. Orange City IA beef plant, purchasing efficiency
11. BioControl, Zoe Schumaker, Lawrenceville, GA, information technology
12. Brightstar, Miami, FL, information technology
13. Rockwell Collins, Cedar Rapids, IA financial planning
14. Rocketdyne Folsom, CA, F-35 e-procurement
15. Steel and Pipe Supply, Manhattan, KS, information technology
16. Samsonite, near Denver
17. Holland Group, Holland, MI

A series of fraudulent checks was also proffered to Performa for work conducted, or at least allegedly conducted during this time period by my partner, or a carefully disguised substitute as he allegedly relocated to Tucson with his wife and subsequently reappeared in the Seattle area, totaling about $160,000. Perhaps FBI, being so closely engaged with my company through TSL, was unaware of this, or perhaps they were fully engaged. I am unable to investigate this matter further until the discovery phase of my civil complaint, though perhaps it will offer further evidence of institutional misconduct as part of this overall package of destruction.

**2. Has FBI officially and categorically stated to your office they had no involvement with the Technology Sales Leads Boston boiler room sales leads development and the series of subsequent sales calls involving me and Performa in 2003/2004?**

FBI was also involved during my time in Boston as a homeless person in 2006 and 2007, and in the New York City metro area from 2007 to present. I was trafficked by a police powers network I am currently working to identify and subjected to investigation as a terrorist as confirmed by NYPD. This would strike most people as peculiar, given my previous consideration by the Governor of the State of Washington to Chair the Higher Education Coordinating Board for the State of Washington. This Board oversees an agency which has various regulatory authorities over all institutions of higher education in the state. Also, my tenure as the regional Chair of a high technology trade association and personal familiarity to and with members of the leadership of the state's House and Senate may strike some as a bit contradictory to the concept that I was inclined toward terrorism.

3. **Has FBI officially and categorically stated to your office that it was in no way involved in any investigation of me as a terror suspect in the state of Washington, the Boston metropolitan area, the New York City metropolitan region, or any other location within or without the United States, between 2001 and the present?**

That would stretch credulity well beyond the point of disbelief. I will note again that the landlord of my building informed me that an individual was removed from my seven unit apartment building in Cliffside Park, New Jersey by FBI and handed over to DHS for deportation due to anti-American statements or sympathies while I was a resident there.

Finally, I recommend you carefully review the full extent of my Complaint 22-cv-00592 to determine if you can truly disregard any and all institutional misconduct possibilities by any and all agencies, offices, bureaus of the Department of Justice.

I look forward to your reply to my three specific questions above and to other matters as you wish. I clearly understand your investigations are the confidential domain of the Department. Thank you very much for your attention to this matter.

Sincerely,


Dennis S. Brewer
1210 City Place
Edgewater, NJ 07020
201-887-6541


Cc:    Inspector General
       Department of Justice
       950 Pennsylvania Ave NW
       Washington, DC 20530

Enclosures:

       Complaint 22-cv-00592

       Letter to SDNY dated December 6, 2021 (later forwarded to DOJ OIG DC and acknowledged in January 28, 2002 reply)

       Letters to SDNY and OIG – Investigations

              February 16, 2022

              February 28, 2022

              March 2, 2022

              March 21, 2022

              March 25, 2022

Page 3 of 4



Enclosures continued:

Letters from DOJ OIG

January 28, 2022

March 22, 2022

Page 4 of 4

Lead Plaintiff has never received a reply to this March 25, 2022 letter to DOJ Assistant IG –
Investigations.

572. Based on this pattern evidence, it is profoundly obvious to any reasonable person that discovery will continue to demonstrate this continued pattern of acts, which are completely consistent with the other racketeering patterns in this complaint from prior decades, this time by using these defendants' own still available records. The accumulation of circumstantial evidence of means, motive, and opportunity for, and personal self-interest in, a continuing defendant DOJ and general government cover-up which cover-up is in the direct personal interest of certain senior governmental officials who have and do abuse their roles to sustain that cover-up of their own direct culpability, is profoundly obvious to any reasonable person, and clearly demonstrates both a sustained conspiracy and *mens rea.*

573. Paragraphs 573 through 579 are reserved.

**Willful Blindness - Forty Complaint Letters To US Attorney Ignored**

580. Willful blindness of defendant DOJ has and does continue including, without limitation, through a long series of direct contacts by the Lead Plaintiff with personnel who were then or later in both defendant FBI and DOJ Headquarters. Lead Plaintff's first in-person complaint to defendant DOJ was in the offices of the U.S. Attorney for the Western District of Washington in 2005 at a meeting - there was no follow-up. Letters and packages to defendant DOJ and to other federal departments and agencies with police powers mailed through the USPS and parcel carriers were blocked from delivery in Summer 2005, then hand delivered to DOJ, FBI, EOP, IRS, and others in Washington, DC in September 2005. No follow up or acknowledgement has ever been received.

581. Information about the acts, violations, and injuries primarily perpetrated by defendants ARMY, CIA, FBI, and USMS, including the malignant effects of the BRMT bioweapon and bioweapon delivery system, constitutional and civil rights violations, and the

associated-in-fact enterprise pattern of racketeering acts and overarching conspiracy, has been communicated to the US Attorney for the District of Columbia in September 2021 (paragraph 682A, LPEEV65-10), and the US Attorney for Southern District of New York beginning in December 2021, a few months after Lead Plaintiff began his forensic analysis in Summer 2021. This analysis continued to progress, and that progress was communicated in writing to SDNY throughout the process, including in over 40 detailed letters through October 2023, hand delivered to the US Attorney SDNY office security checkpoint, together with a curated evidentiary record delivered on two identical USB memory drives addressed to SDNY and to DOJ Headquarters in Summer 2023 (LPEE pages 368-793, LPEEV65-11-16).

582. Lead Plaintiff has never received any response to any of these communications.

583. Willful blindness by these and other co-conspirator police powers defendants, and by individual defendants in violations of constitutional rights under 28 U.S.C. § 2679(b)(2 ) and relevant state statutes, by their negligence in compliance and enforcement, violates 42 U.S.C. §§ 1981, 1983, 1985, 1986 neglect to prevent, among other statutes cited herein.

Willful acts, violations, and injuries by these same police powers defendants, including orchestration and facilitation of targeting and public vigilantism through technical hacking and other illegal means, their failures to act, and their direct and resultant impositions of duress on the victims are element of fraudulent concealment under common law and thereby invoke equitable tolling (paragraphs 314-321, citing *Rotella v. Wood,* 528 U.S. 549 (2000)).

584. Fraudulent concealment and willful blindness are the **fifth** of these defendants' five basic illegal patterns of practice.

585. Paragraphs 585 through 592 are reserved.

**FACTS – 110 ILLEGAL PATTERN ACTS, VIOLATIONS, AND INJURIES**

593. The 110 patterns of facts which follow (known as subcounts herein) are representative examples, not an exhaustive listing, of defendants' perpetuated conspiracy arranged by category of act, violation, and injury for ease of understanding. These illegal patterns of practice have been intertwined throughout this entire conspiracy from its beginning to the present ,but are disentangled for ease of understanding. Six principal categories of acts, violations, and injuries are defined and described in this section of the complaint. These six categories illuminate these defendants' primary illegal patterns of color of law abuses, criminal acts, and constitutional, civil, and human rights acts, violations, and injuries in an associated-in-fact enterprise pattern of racketeering act and other constitution, civil, and statutory rights violations which span more than fifty-six years of fraudulent concealment relying on defendants' abuse of the state secrets privilege and their deliberate, knowing, willful, fraudulent entanglement of these plaintiffs in national security matters to sustain involuntary servitude and other constitutional rights abuses.

594. The six primary categories of BRMT (Brain Remote Management Technology), constitutional rights, and racketeering pattern acts, violations, and injuries are:

*594.1 National Security Pretexting and Entanglements (subcounts NSEC-1 through 4)*
– deliberate and intentional fraudulent color of law abuses by police powers and intelligence departments and agencies and other defendants, which pretext and entangle targeted US persons and others in "state secret " privilege national security related events, operations, projects, and program for the corrupt purpose of fraudulently conceal continuing associated-in-fact enterprise patterns of racketeering acts, rights violations, and illegal biomedical experiments through abusive color of law operations, deliberate entanglements in a repetitive pattern of baseless

"investigations," to sustain illegal cover company, surveillance, domestic and international cover operations and espionage, and other corrupt acts abusing police powers, and national security regulations applied under color of law outside the legal limits imposed by 5 U.S.C. § 301. Similar to being "swatted" except that national security and complicity are incorporated directly into the corrupted police powers process.

*594.2 Illegal Human Experimentation - BRMT Brain Hijacking Abuses (subcounts HEXP-1 through 17)* – forcible human biomedical and psychological experiments on unwitting plaintiff human subjects without their consent, including a wide variety of attacks on and interferences with liberty; direct attacks on human autonomy, free will, and rights; and direct attacks on civil and Constitutional rights; including in and affecting interstate commerce. Primary subcategories of offenses are:

a) Biological and Medical Invasions – To And Including Torture: HEXP-1 through 4

b) Orchestrated Personal and Intimate Relationships – To And Including Deliberate Orchestration and Malicious Termination: HEXP-5 through 10

c) Biological and Medical Invasions – To And Including Personal Humiliation, Reckless Willful Endangerment, And Imposed Illnesses: HEXP-11 through 17

*594.3 Individual Rights Violations and Conspiracies (subcounts RGTS-1 through 17)* - direct interferences with liberty and freedom of choice in personal life and relationships, including pretexting, entrapment attempts, discrimination, incrimination, and related color of law malicious practices and patterns of practice. Primary subcategories of offenses are:

a) Entrapments, Illegal Searches, and Willful Blindness: RGTS-1 through 11

b) Direct Interferences in Personal and Intimate Relationships: RGTS-12 through 14

c) Hacking, Harassment, Disinformation, Abuse of Official Records: RGTS-15 through 17

*594.4 Racketeering Acts - Personally Targeted (subcounts RICO-1 through 10) -*

racketeering acts and patterns of racketeering acts including, without limitation, frauds and predicate act frauds which have and do result in the direct and indirect loss of constitutionally property rights including, without limitation, personal, real, and financial assets, and career, employment, and income opportunities, all as managed for the convenience of the defendant UNITED STATES as the primary subjugator of unwitting involuntary servants in forced labor and peonage, and as a key element of perpetual involuntary servitude and involuntary servitude, to control all aspects of the life of the Lead Plaintiff and others similarly situated, to promote development of the illegal and internationally prohibited BRMT bioweapon and bioweapon delivery system, and to perpetuate the fraudulent concealment of illegal BRMT, rights, and associated-in-fact enterprise racketeering acts and conspiracy, which have and do injure these plaintiffs. Primary subcategories of offenses are:

a) Thefts and Takings: RICO-1 through 7

b) Color of Law Entrapment Attempts: RICO-8 through 10

*594.5 Racketeering Acts - Business and Enterprise (subcounts RICO-11 through 55) –*

associated-in-fact enterprise patterns of racketeering acts including, without limitation, common law frauds, predicate act frauds, deprivation of government benefits to small businesses, which deprivations have and do result in direct loss of business sales and income opportunities including, without limitation, property rights to contracts, projects, financial assets, real property, equipment, and other assets, all as perpetrated for the convenience of defendant UNITED STATES as the primary subjugator of involuntary servants, and including, without limitation, the

key elements of involuntary servitude, of involuntary servitude, and of forced labor and peonage used to dominate and control all aspects of the life of the Lead Plaintiff and others similarly situated. Primary subcategories of offenses are:

    a) Thefts And Takings: RICO-11 through RICO-12

    b) Fraudulent Financings: RICO-13 through RICO-34

    c) Fraudulent Sales Leads: RICO-35 through RICO-42

    d) Dishonest Professional Services: RICO-43 through RICO-52

    e) Fraudulent Production Asset Sales: RICO-53 through RICO-55

    ***594.6 Lethality Attempts (subcounts LETHL-1 through 17)*** – personal injuries and potential injuries which are likely to result in severe injury or death.

    595. These acts, violations, and injuries, and racketeering patterns thereof, are managed by and for the convenience of defendant UNITED STATES' departments and agencies, and their co-conspirators, as they have and do engage in an associated-in-fact racketeering enterprise within their coordinated set of roles generally described at paragraphs 102-113. Certain of these abusive color of law operations have been and are conducted, by co-conspirators in this associated-in-fact enterprise which include, without limitation, state and local police powers departments and agencies NYPD, NJTPD, PAPD, NJSP, MARICOPA SHERIFF, BERGEN SHERIFF, and by other defendants who have and do conspire with defendant UNITED STATES' departments and agencies, and/or with other co-conspirators in the overall associated-in-fact enterprise of illegal BRMT bioweapon and bioweapon delivery system program, constitutional and civil rights violations, and associated-in-fact enterprise pattern of racketeering acts, violations, injuries, and conspiracy.

596. All these acts, violations, and injuries, and the patterns thereof, are key elements of defendant UNITED STATES' and co-conspirators' constitutional and statutory violations by, without limitation, involuntary servitude, forced labor, and peonage, which have been and are used to dominate, subjugate, and control all aspects of the life of the Lead Plaintiff and others similarly situated. Defendant UNITED STATES' overall intent has been and is to perpetuate the development of the illegal BRMT bioweapon and bioweapon delivery system through its past and continuing abuses of these plaintiff victims through its illegal human subject biomedical experiments and victimizations, to and including death. Imposed involuntary servitude among these plaintiffs ranges from short intervals of time to the lifetime abuses of some victims including, without limitation, Lead Plaintiff, whose injuries, short of actual loss of his life, are broadly representative of acts, violations, and injuries, and recurrent patterns of same in this conspiracy against this entire class of plaintiffs.

597. A compendium at LPEE pages 934-1075 lists key entities and individuals, selected emails, documents, and disbursements in both date order and alphabetic order using the RED colored page number found at bottom of each page which had been curated through the date of compendium. Additional materials are included in other exhibits not referenced therein as they were added after the date the compendium was prepared. Note there are spelling errors in the email subject lines referenced throughout these subcounts. These errors have not been corrected to maintain 100% traceability to the relevant LP Evidentiary Exhibit (LPEE). The directories of emails listed by date and party name in the compendium can be used to access these emails. Emails and documents discovered and curated later than the January 3, 2002 date of the compendium are listed in the later volumes of mixed documents beginning at LPEE page 10132. For most efficient retrieval, search the lower page numbered volumes first, then the higher

numbered pages of mixed documents which do contain some documents dating back to the
2000s.

598. The listing of 110 subcounts below (NSEC-1 through LETHL-17 paragraphs 600-
710 inclusive) are a comprehensive set of examples in the Lead Plaintiff's own personal and
direct experience over 56 years of abuses by these defendants. These 110 subcounts are the series
of specific acts, violations, and injuries which these plaintiffs have experienced in common to
varying degrees over varying periods of time. These 110 subcounts relate these acts, violations,
and injuries directly to the 54 statutory and common law claims for relief which follow this
section of the complaint. Each and every one of those 54 claims for relief are a specific and
discrete violation of a specific federal statute and/or common law, as well as the directly related
state laws cited therein. This layer cake organization structure is used to explain the full scope,
extent, and duration of the incredibly complex and intertwined (a) illegal BRMT bioweapon and
bioweapon delivery system program illegal human subject experiments, field tests, and other
offensive weapon deployments against US persons, (b) associated-in-fact enterprise pattern of
racketeering acts, (c) constitutional and civil rights violations and injuries, and (d) other statutory
violations of these plaintiffs over decades by these perpetrator defendants.

[Intentionally left blank.]



599. Each and every one of the 110 subcounts at paragraphs 600 through 710 includes

ALL of the following subparagraphs, which are incorporated therein by reference:

### 599A. Common Themes And Definitions In And Among Intertwined Subcount Acts, Violations, And Injuries

(i) The BRMT bioweapon and bioweapon delivery system, which is illegal and

subject to criminal penalties under 18 U.S.C. § 175, which provisions of law have

been and are systematically ignored by defendant DOJ and by defendant UNITED

STATES; and which is prohibited from development and operation by our

Constitution, and by international law under the ratified 1975 *Bioweapons Treaty*;

(ii) Each of the five subcount series' (NSEC national security entanglements, HEXP

illegal human experiments, RGTS rights violations, and RICO racketeering acts

and patterns, LETHL lethality attempts) includes a summary table at one or more

of the subcounts in that series. This summary table relates the common evidence

of all the subcounts in that specific series to every other subcount in that series

and, where specifically noted, to specific subcounts in other series. For example,

the table at subcount LETHL-1, paragraph 600N, relates each of the 17 LETHL

series subcounts to each other, and to the subcounts in other series' which are specifically described therein.

(iii) Each subcount consolidates multiple acts, violations, and injuries perpetrated by one or more defendants to the overall associated-in-fact enterprise. The exact number and date of certain violations remains to be determined through discovery against these defendants, as the identification of specific perpetrators and co-conspirators has been concealed by color of law abuses of state secret privilege and of police power exemptions.

(iv) Relevant emails and other documents which provide predicate act fraud and other evidence are incorporated by reference in each subcount, (a) as specified in the table contained in that subcount and (b) as specified in the summary table for that subcount series. These entries are summarized in a compendium which contains a directory of evidence of key entities and individuals; and of selected emails, documents, and disbursements, which are listed in both date order and alphabetic order. This compendium is at LPEE pages 934-1075 (use the RED colored page numbers found at the bottom of each page to look up materials in LPEE) for materials curated by the date of the compendium, see also the note at paragraph 597 related to other materials discovered and curated after the date of the compendium.

(v) Individual emails are listed in the compendium alphabetically by date. Most emails are found in date order (not filed in alphabetic order) from 2008 to 2022 at LPEE pages 1076-6094. Additional emails and documents are in the mixed volumes of documents and emails in other LPEE volumes filed herewith.

(vi) Relevant direct evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts by defendant UNITED STATES, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, all of which are inaccessible to Lead Plaintiff as this complaint is being written.

### 599B. Overall Purpose And Intent of Defendants' Associated-In-Fact Enterprise Conduct

(i) Defendants have and do fraudulently conceal their acts, violations, and injuries, and perpetuate their acts, violations, and injuries for the purpose of, among other things, (a) concealing their criminal and illegal deployment of the BRMT bioweapon and bioweapon delivery system against US persons and other innocents, and (b) concealing illegal acts of co-conspirator defendants, as these defendants have and do conspire to do since the illegal BRMT bioweapon and bioweapon delivery system program was initially conceived in the 1960s.

(ii) Defendants' programmed and abusive color of law operations and entrapments have been and are intended and used (i) to pretext and attempt entrapments and inculpation of innocent victims, (ii) to attempt to exculpate this class of defendants and their co-conspirators, and (iii) to sustain the intricate illegal human subject biological and neurological medical experiments on, and abuses of, these unwitting plaintiff victims, who have been and are used to further develop and to sustain deployment of defendant UNITED STATES' illegal and internationally prohibited BRMT brain hijacking bioweapon and bioweapon delivery system.

(iii) Defendant UNITED STATES has and does continue to fraudulently arrogate to itself the liberty to act freely and willfully in the corrupt interests of its own

institutions, departments, and agencies, and of these named and yet unnamed individual defendants, and of its co-conspirators, in patterns of unconstitutional acts, and statutory violations, and associated-in-fact enterprise patterns of racketeering acts and conspiracy which have and do directly contradict the liberty interests and "unalienable" constitutional, civil, and human rights of US persons, which these institutions and individuals are explicitly constitutionally sworn to protect, while systematically sustaining willful blindness and official silence in direct violation of the mission and purpose of defendant DOJ's initial establishment in 1870.

(iv) These acts have been and are conducted by defendant UNITED STATES and by its co-conspirators, some of whom are explicitly sponsored, funded, and contractually bound co-conspirator institutional and individual defendants, to sustain defendant UNITED STATES' perpetual control, involuntary servitude, forced labor and peonage, against Lead Plaintiff and other similarly situated US persons, in violation of our Constitution, of other statutes cited throughout this Complaint, in its continuing fraudulent abuse of the "state secrets" privilege which violates the mandates of 5 U.S.C. § 301 (paragraph 260, Interline Exhibit 2) and *United States v. Reynolds*, 345 U.S. 1, 12 (1953) (paragraphs 260, 319).

(v) All subcounts throughout this Complaint (NSEC-1 through LETHL-17 paragraphs 600-710 inclusive) are driven by defendants' conspiracy to commit, and together, as actually perpetrated in defendants' field operations, comprise an associated-in-fact enterprise pattern of racketeering acts, constitutional and civil rights violations, state statutory violations, and conspiracy.

**599C. Actual Defendants' Associated-In-Fact Enterprise Operational Conduct**

(i) Fraudulent illegal BRMT bioweapon and bioweapon delivery system biochemical brain hijackings, illegal human subject experiments, and deprivations of constitutional and civil rights, resulting from these defendants' careful timing of events, and from deliberate and malign brain hijackings during public exposure to facilitate vigilantism, have been and are elaborately contrived at vast taxpayer expense by defendants to appear as life circumstances and events, so as to conceal them from public understanding. These incidents, events, and cycles of misconduct have been and are used to control and human traffick Lead Plaintiff and other plaintiffs through a series of physical and emotional traumas and humiliations, as related throughout this complaint.

(ii) These deliberately perpetrated traumas and humiliations include, without limitation, (a) the selection, assignment, and destruction of teenage and adult personal friendships and intimate relationships; (b) destruction and recovery of physical and mental health; (c) enduring long-cycle and episodes of short-cycle torture; (d) extreme periods of biochemical brain hijacking to invoke suicide ideations; (e) homelessness and the related stress of losing relationships and virtually all possessions from a position of relative propriety and comfort; (f) enterprise failures, arbitrary terminations from employment, and extended deliberate unemployment; (g) de facto takings of real, financial, personal, and intangible assets; (h) various dire emergency situations with sometimes avoided lethal consequences (paragraph 10, Interline Exhibit 1 is indicative of lethal consequences most probably not avoided); (i) other traumas and frights directly

created by or arising from these defendants' acts, violations and injuries, and from their willful and negligent violations of the privacy and other constitutional rights of these plaintiffs. These which acts, violations, and injuries have and do expose these plaintiffs to abnormal public safety risks from (j) public vigilantism, and from (k) police powers departments and agencies which have and do engage in discriminatory patterns and are known to use excessive force. Illegal field tests of medical practices and of tools of violence have resulted in the deaths of victims, as cited herein.

(iii) Defendant inflicted and perpetrated acts affecting interstate commerce include, without limitation, fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof which have and arise as a result of, and have been and are continuously interfered with by defendants, through their offering of fraudulent pending sales opportunities they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of defendants affecting commerce and interstate commerce. The overriding intent of defendants in these violations, has been and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages, and of other plaintiffs similarly situated, to perpetuate their involuntary servitude in violation of the *Thirteenth* Amendment and other elements of violations of constitutional and civil rights and of statutes of the United States and the various states.

(iv) Defendant inflicted and perpetrated acts affecting interstate commerce include, without limitation, fraudulent impositions in interstate commerce conducted by Lead Plaintiff, and by others similarly situated, of corporate officers, employees, consultants, legal and professional service providers, who are actually defendants' own undercover defendant police powers personnel, intelligence personnel, and military personnel in civilian dress, or others they elect to infiltrate for their own corrupt purposes, who thereby have and do supplant legitimate qualified private individuals, and thereby deprive Lead Plaintiff and other plaintiffs similarly situated of their legal and constitutionally protected access in interstate commerce to qualified individuals, as elements of these defendants' conspiracy to, and pattern of practice of, acts, violations, and injuries which deprive Lead Plaintiff, his related entities, and others similarly situated, of their right to pursue and benefit from commerce and interstate commerce. These defendants have and do sustain their associated-in-fact enterprise and pattern of racketeering acts, injuries, and violations against Lead Plaintiff and other plaintiff victims, with the overriding intent to illegally consuming the financial resources and management time of these plaintiffs, including, without limitation, Lead Plaintiff and the entities he has and does legally own, control, and/or manage to, without limitation, maintain involuntary servitude, forced labor, and peonage.

**599D. Pattern Abuses Of The Revocable State Secrets Privilege And National Security Regulations Sustain Illegal BRMT, Rights, And Racketeering Acts, Violations, And Injuries**

(i) This deliberate pattern of human trafficking and cross-border entanglements in national security and related investigations repeats a pattern of practice which

defendant UNITED STATES has and does use to facilitate color of law abuses of US persons by and in their own service, and by foreign intelligence services who can conduct otherwise illegal operations against US persons and then "share" this otherwise illegally acquired intelligence with defendant UNITED STATES. These representative color of law abuse patterns of practice include, without limitation:

    a.  1978: Defendant UNITED STATES acting through, without limitation, defendants FBI, CIA, ARMY and associated individual defendants, used defendant WSU for human trafficking and involuntary servitude by directly placing Lead Plaintiff, while a Teaching Assistant and graduate student, in shared offices with foreign nationals under the care and surveillance of defendants UNITED STATES, CIA, and FBI, particularly including a foreign national from Iran during the Iranian Revolution against the Shah of Iran (Mohammed Bahari-Kashani) and a graduate student from Malawi, so as to abuse national security regulations as tools for otherwise illegal surveillance of Lead Plaintiff.

    b.  1983: Defendant UNITED STATES acting through, without limitation, defendants FBI, CIA, ARMY and associated individual defendants, used Deloitte Seattle for human trafficking and involuntary servitude in interstate commerce, and Queen Elizabeth II's visit to the Seattle Westin, a national security event which integrated MI-6 (Martin Astengo) into the Westin Hotel staff for a time, and to abuse foreign intelligence operations

and information sharing as tools for otherwise illegal surveillance of Lead
Plaintiff.

c.  1992-1994: Defendant UNITED STATES acting through, without
limitation, defendants FBI, CIA, ARMY and associated individual
defendants, used PAN for human trafficking and involuntary servitude
affecting interstate commerce, and for cross-border trafficking and
associated-in-fact enterprise fraudulent financings to involve RCMP,
CSIS, MI-5, MI-6 and London Metropolitan Police. and to abuse foreign
intelligence operations and information sharing as tools for otherwise
illegal surveillance of Lead Plaintiff.

d.  2003 - Defendant UNITED STATES acting through, without limitation,
defendants FBI, CIA, ARMY and associated individual defendants, used
Engelman Associates, Vancouver, WA, dba SoftSelect, and entertainment
industry actors in an illegal domestic spying operation of defendant
UNITED STATES (FBI) to provide fraudulent sales leads for services into
Iran which violated US government sanctions on the Islamic Republic of
Iran in an attempt to pretext and entrap Lead Plaintiff in violations of US
sanctions law, and to abuse national security law and regulations as tools
for otherwise illegal surveillance of Lead Plaintiff. This specific
entrapment attempt featured an entertainment industry actor, name not
recalled, who posed as Mark Engelmann, the proprietor of the company
doing business as SoftSelect, Vancouver, WA during the wrecking of
Allegent. LLC by defendants UNITED STATES, FBI, ROSENBERG,

FAUCI, PRAY, CALDWELL, and unknown others. The actor is a public figure who has starred as a male lead actor in one or more Martin Scorsese films, subject to identification during discovery.

e.  2007-2008: Defendant UNITED STATES acting through, without limitation, defendants FBI, CIA, ARMY and associated individual defendants, used defendant ESTABLISH (paragraphs 11, 465, 603 NSEC-4) for cross-border trafficking and associated-in-fact enterprise involuntary servitude and employment discrimination to involve MI-5, MI-6 and London Metropolitan Police. and to abuse foreign intelligence operations and information sharing as tools for otherwise illegal surveillance of Lead Plaintiff.

f.  1984-2022: Defendant UNITED STATES acting through, without limitation, FBI, CIA, ARMY and associated individual defendants, have and do use various cross-border meetings, seminars, and presentations, brokered international sales opportunities, and direct sales opportunities with international subsidiaries of US companies to abuse national security regulations and foreign intelligence services as tools for otherwise illegal surveillance of Lead Plaintiff.

g.  2015: Defendant UNITED STATES acting through, without limitation, defendants FBI, CIA and associated individual defendants, have and do use the forgery of a Qatari government form and fraudulently misrepresent its royal family as interested investors who sign a $52 million investment agreement with Lead Plaintiff to invest in his Winnett entities.

h. 2018-2023: Defendant UNITED STATES acting through, without
limitation, defendants FBI, CIA, ARMY and associated individual
defendants, have and do use the Senator Menendez foreign agent
investigations and indictment (Egypt, Qatar) and an Egyptian foreign
national proposed by defendant CFO SEARCH (MAGGARD, FBI) to
human traffick and abuse national security regulations as tools for
perpetuating otherwise illegal surveillance of Lead Plaintiff (paragraph
300-302, 563-569, 624 RGTS-4, 670, 672, 682, 689 RICO-32, 34, 44, 51).

(ii) This set of abusive practices are routinely and illegally deployed in color of law
abuses to deliberately ensnare, ensnarl, and attempt to entrap Lead Plaintiff,
perpetuate his involuntary servitude, forced labor, and peonage, and to sustain the
illegal continuing development of defendant UNITED STATES, CIA, and
ARMY's illegal BRMT bioweapon and bioweapon delivery system from at least
1968 to the present time, and to abuse state secret privilege, national security
regulations, foreign intelligence operations, and foreign intelligence information
sharing, as tools for otherwise illegal surveillance, subjugation, and involuntary
servitude of Lead Plaintiff in defendants' pattern of illegal BRMT, rights, and
racketeering acts, violations, and injuries against Lead Plaintiff and other
similarly situated.

(iii) This associated-in-fact enterprise pattern of predicate and illegal practices has
been applied against Lead Plaintiff, and others similarly situated, by defendant
UNITED STATES, named and unnamed co-conspirator defendants, since at least
1968.

**599E. Fraudulent Concealment Of Abuses Behind The Revocable State Secrets Privilege**

(i) Defendant UNITED STATES has and does engage in claiming "state secret" privilege as if this privilege were an irrevocable privilege, and "national security" regulations" which are not enforced as required, as playing cards by which it invalidly claims it can arbitrarily of its own accord and without review, deploy at will to trump the "unalienable" constitutional rights of individual US persons, in the fraudulent game these defendants play with the lives of these abused plaintiffs, with the lives of other US persons, and with plaintiffs' personal, mental, physical, and financial well-being, and property rights, while depriving these plaintiffs through its own whims, accords, conspiracies, and failures to act, of their "unalienable" constitutional rights.

(ii) Discovery of the primary defendants in this case was carefully, and at enormous taxpayer expense, fraudulently concealed for decades by these perpetrator defendants, despite their continuing undercover operations in plain sight. Forensic breakthroughs in this case beginning in Summer 2023 (LPEE pages 12251-12261) led to specific identities of individual perpetrator defendants who figure in the overall illegal BRMT bioweapon and bioweapon delivery system, constitutional and civil rights, and associated-in-fact enterprise pattern of racketeering acts and conspiracy. These identifications then explicitly connected the pattern of acts, violations, and injuries, and the underlying corrupt means, motives, and *mens rea*, directly to the responsible defendant departments, agencies, and institutions. This coordinated fraudulent concealment by these defendants was extensive, deliberate, and nearly foolproof, for almost six decades.

(iii) This pervasive fraudulent concealment by these defendants, as further described at paragraphs 307-321, 550-583, equitably tolled the statute of limitations for this entire complex intertwined pattern of acts, violations, and injuries in the decades-long associated-in-fact conspiracy including, without limitation, defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system, related patterns of constitutional and civil rights violations, and the associated-in-fact pattern of racketeering acts and conspiracy.

**599F. Inextricably Intertwined Pattern Of Acts, Violations, And Injuries**

All 110 subcounts herein are critical elements of the defendants' overarching and continual pattern of involuntary servitude, forced labor, and peonage at all times from inception, in at least 1968 if not earlier, to the present time which violate, without limitation, the *First, Third, Fourth Fifth Eighth Thirteenth* and *Fourteenth* Amendments to our United States Constitution, in furtherance of the defendants' conspiracy to, and systematic violations of, without limitation:

  i.   18 U.S.C. § 175 prohibiting the use and deployment of biological weapons and biological weapons delivery systems against US persons; in furtherance of conspiracy to and violations of

  ii.  18 U.S.C. §§ 241, 242, 246, 247, prohibiting conspiracy against and violation of rights; and in furtherance of conspiracy to and violations of

  iii. 18 U.S.C. § 1581 relating to peonage,

  iv.  18 U.S.C. § 1584 relating to involuntary servitude,

  v.   18 U.S.C. § 1589(a)(3) relating to forced labor, and

    vi.  18 U.S.C. § 1590 relating to human trafficking with respect to peonage, slavery, involuntary servitude, and forced labor,

    vii.  Dozens of additional sections of the United States Code listed at paragraphs 8 and 251, and

    viii.  Related state statutes, as listed at each of the 54 clams for relief at paragraphs 801-854.

## 599G. Inextricably Intertwined Bad Faith Acts, Violations, And Injuries By Individual Defendants

(i) All 110 subcounts incorporate, without limitation, constitutional rights claim(s) made against individual defendants herein under 28 U.S.C. 2679(b)(2), and, without limitation, 18 U.S.C. §§ 1961-1968, and/or 42 U.S.C. §§ 1983, 1985, 1986, which claims for relief are made under the *First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth,* and/or *Fourteenth* Amendments to the Constitution.

(ii) At each paragraph below, each set of emails and correlated documents in the tabular listing of cross-references and evidentiary exhibits (LPEE) is one set of the thousands of constitutional rights, fraudulent concealment, and/or pattern of racketeering acts sequences undertaken against Lead Plaintiff by the associated-in-fact enterprise of these defendants originated by defendant UNITED STATES in the late 1960s. If pled in detail in this initial filing, these individual sequences would extend the Complaint by many thousands of pages and be filled with redundant citations of the same curated evidence. The tabular listing at each paragraph is a far more efficient use of this pleading and provides particularity as required by F. R. Civ. P. Rule 9(b) without excessive redundancy.

(iii) Each of these thousands of sequences is pled in this fashion for efficiency and brevity in pleading in an already voluminous pleading. This is a necessity for judicial efficiency (a) in view of the fact that special access granted by defendant UNITED STATES was and is required to sustainably communicate with Lead Plaintiff in the unconstitutionally constrained environment of lies, disinformation, and hyper-intrusive surveillance created and perpetuated by defendant UNITED STATES and its co-conspirators, (b) defendants' systematic abuse of cover entities, fraudulent and spoofed websites, and information sources, used for their own purposes in this unconstitutionally constrained environment, (c) defendants' pervasive use of cover entities and identities for themselves and those to whom they have and do grant special access to a never convicted or incarcerated person (Lead Plaintiff) who nonetheless has been and is subjected to illegal human trafficking, undue restraints, on-going human experimentation and continual illegal brain biomedical hijackings by the illegal BRMT bioweapon and bioweapon delivery system, and (d) the reasonable expectation that the hundreds of contact entities listed and the number of specific individuals directly culpable will collapse to a limited number of actual defendants, including a limited number of police powers and intelligence agencies subject to the jurisdiction of the United States, and to media and politically connected persons and institutions granted special access to Lead Plaintiff's environment by defendant UNITED STATES, its departments and agencies, and through and by other sovereign governments' departments and agencies, as defendants have and do (*i*) systematically and illegally constrain constitutional rights of these plaintiffs including, without

limitation Lead Plaintiff, for (*ii*) their own illegal purposes, and (*iii*) the illegal

personal privilege and purposes of certain individual defendants, named and

unnamed, who have and-or do participate over the course of this illegal program

as field operatives and/or in executive leadership roles during these decades of

illegal constraints and restraints of constitutional rights, and who have and do

knowingly perpetuate these illegal constraints and restraints of constitutional

rights of US persons for their own direct personal benefit and convenience.

**599H. Discovery Will Support Additional Acts, Violations, And Injuries**

(i)  Discovery against these defendants will produce further evidence of the illegal

BRMT bioweapon and bioweapon delivery system induced bodily reactions and

involuntary responses included in each subcount. Discovery, as required by law

under, among others, the *Nietzke* and *Denton* mandates will, without limitation:

(ii) provide further evidence of extensive correspondence and documentation of

exchanges among, by, and/or with these defendants using email and other

electronic means,

(iii) provide crucial further identifications of known and unknown institutional and

individual perpetrators and of at least some portion of the victims who comprise

this class of injured plaintiffs,

(iv) recover Lead Plaintiff's own electronic records prior to 2007 which are currently

in the hands of defendant FBI, having been handed by Lead Plaintiff in Fall 2007

to defendant ROSENBERG while he posed as William Drumm at defendant

ESTABLISH in Fort Lee, NJ, after being transcribed from a hard disk, likely by

an FBI lab then using cover company third party identity,

(v) recover medical records related to Lead Plaintiff and to other plaintiffs, likely
including copies secretly maintained by defendant UNITED STATES, its medical
contractors and/or researchers, for the purposes of sustaining illegal BRMT
bioweapon and bioweapon delivery system research and development operations
including, without limitation, an extensive array of illegal human subject
experiments, which validate these claims, to the extent those records have not
been destroyed by obstructions of defendants; and/or copies of those records
secretly maintained by defendant UNITED STATES' to conceal from evidence
records secretly maintained and destroyed from normal discovery by abusive
human trafficking which has and does lead to lack of contact with initial providers
and their destruction of records due to the passage of time and lack of continuing
interactions between plaintiffs and those providers,

(vi) recover financial, business, and personal records related to Lead Plaintiff and to
other plaintiffs, likely including copies secretly maintained by defendant UNITED
STATES, its contractors and/or researchers, for the purpose of sustaining illegal
BRMT bioweapon and bioweapon delivery system research and development
operations, which validate these claims, to the extent those records have not been
destroyed by obstructions of defendants; and/or copies of those records secretly
maintained by defendant UNITED STATES' to conceal from evidence records
secretly maintained and destroyed from normal discovery by abusive human
trafficking which has and does lead to lack of contact with initial providers and
their destruction of records due to the passage of time and lack of continuing
interactions between plaintiffs and those providers,

(vii)    provide further evidence of federal funding and cross coordination of

military departments and agencies including, without limitation, defendants

ARMY, USAF, NAVY, JOINT STAFF, DARPA in violations of posse comitatus

by illegally leveraging interpersonal relationships, personnel, and facilities; and in

conspiracy to violate constitutional rights, federal and state statutes; together with

defendants DOJ, DHS and their police powers agencies including, without

limitation, defendants FBI, USMS, DEA, USSS, and CPB; together with

intelligence agencies including, without limitation, defendants CIA and ODNI.

These violations and conspiracies also have and do extend to domestic research

institutions funded by defendant UNITED STATES in developing knowingly

psychologically and medically coercive and intrusive operations and in knowingly

developing illegal medical technologies deployed with the illegal BRMT

bioweapon; to press, media, and entertainment who have and do play active roles

in violations of rights and statutes; to police powers departments and agencies

who engaged in and perpetuated illegal coercive operations against rights

exceeding statutory authority throughout the United States; and to collaborators in

foreign intelligence and police powers departments and agencies in Canada,

United Kingdom, France, and Israel, not incorporated as defendants herein,

(viii)    facilitate development of additional evidence through interrogatories,

depositions of direct witnesses, as well as through the routine internal reports of

these incidents authored and controlled by defendants, particularly relating to the

illegal BRMT bioweapon and bioweapon delivery system, prejudicial and

pretexted concealed police powers operations, and the associated-in-fact patterns

of racketeering acts.

[Intentionally left blank.]

## National Security Pretexting, Frauds, and Entanglements (NSEC series offenses)

### *600. NSEC-1 National Security Frauds:* Government Orchestrated Family Assignment and Deliberate Entanglements in National Security Matters, 1961 to Present

A. Lead Plaintiff is a descendant of Quakers, who serve in military service as religious conscientious objectors. His great-great grandfather, Willian John Brewer, is buried five miles north of West Point, where the US ARMY Military Academy has been located since after the Revolutionary War. At Appomattox Courthouse, Virgina on April 4, 1865, he earned the Medal of Honor for his service in the Union Army during the final major battle of the Civil War to end slavery. He then attended assassinated President Lincoln that same month as a member of the Honor Guard. Lead Plaintiff, and other members of this class, among them many direct descendants of this honorable servant to these United States, have been and continue to exist in involuntary servitude, in violation of the *Thirteenth* Amendment, which was ratified by the states effective December 6, 1865. This status, in involuntary servitude, has been perpetrated and perpetuated by defendant UNITED STATES, and particularly inculpates the original and continuing unconstitutional and illegal conduct of, without limitation, defendants ARMY, CIA, and DOJ, whose paramount duties are to provide for the common defense and to establish justice, in accordance with our Constitution. They do not.

B. As forensically reverse engineered, Lead Plaintiff's maternal grandfather, also a member of a Quaker related religious group, was employed beginning in the 1950s at a coopted farmer's cooperative (Farmer's Union Central Exchange, now known as Cenex) for much of his adult life after World War II. Both Lead Plaintiff's father and uncle served in the US ARMY Medical Corps as conscientious objectors. Lead Plaintiff's uncle's life and career path bears a

marked resemblance to the Lead Plaintiff's own subsequent path, to and including college era romantic interests and difficulties experienced throughout their careers and entrepreneurial activities. There are echoes directly across the generations between his now deceased father and the Lead Plaintiff as well. And among members of this extended family. And in common with the families of marital communities formed and destroyed by defendant UNITED STATES. And among private enterprises formed and/or acquired by these US persons and destroyed by defendant UNITED STATES. And among members of this close knit religious group, some of whom have been recruited and/or maneuvered into sustained series' of fraudulent church services operated by defendant UNITED STATES. Defendants ARMY, CIA, and DOJ paramount duties are to provide for the common defense and to establish justice, in accordance with our Constitution. They do not.

C. Lead Plaintiff's father was employed by an illegal FBI cover company, Pacific Paper Products, Tacoma, Washington, from approximately early 1961 to June 1963, first in northern and then southern California, for the stated purpose of selling examination table and surgical table disposable paper drapes to medical doctor practices and to medical facilities such as hospitals. The actual surreptitious purpose of this FBI cover company was to destroy physical medical evidence of crimes committed by agents, informants, police powers, and violent militia members engaged in the violent anti-civil rights campaign then underway, unmasked as Cointelpro in 1971 when it discovered by a citizen activist burglary of a Media, PA FBI satellite office. By his unwitting actions, Lead Plaintiff's father was being misdirected and duped into removing and recycling X-ray films from targeted medical practices to destroy this highly incriminating evidence, as defendant FBI and its collaborators continued their illegal Cointelpro program and other illegal and violent operations against civil rights activists and others. When

offered a third transfer, this time from southern California to Texas, Lead Plaintiff's father quit

and returned the young family to Washington state where he pursued work as a route delivery

employee, later delivery route owner under the watchful eye of another defendant FBI or USMS

undercover agent named Earl Keller (paragraphs 414, 415).

D. Defendant UNITED STATES has purposefully and repeatedly entangled Lead

Plaintiff in national security matters as a corrupt pattern of practice from the age of 12

(paragraph 417). Lead Plaintiff attended a government designated spin-out school in the Federal

Way, WA school district, Decatur High School, with 83 "students" in its initial graduating class,

which included youthful undercover agents posing as high school students. As a base for a secret

government program, this school included, among many others, KATYAL (FBI or ARMY),

posing as Shawn Morrissey a fellow student who fell from a horse while riding bareback lacking

experience and broke ribs while riding one of the family horses (paragraphs 221, 490).

E. Defendant UNITED STATES continued its pattern of pretexting Lead Plaintiff in

police powers investigations, and in intelligence and national security matters for the purpose of

perpetuating and covering up his involuntary enrollment as a human subject of BRMT in the

early 1970s while he is a high school teenager (at age 16). He and his cousin, Steve Smith,

encountered an apparent hitchhiker, actually a federal agent who left a classified briefcase

satellite phone in the bed of Lead Plaintiff's pickup truck in Summer 1972. The briefcase was

spotted by Lead Plaintiff in the pickup bed a few miles after the hitchhiker was dropped off, and

safely returned to that agent at the Greenwater Tavern in Greenwater, Washington. With his

fingerprints on the handle and locks of the briefcase, Lead Plaintiff had again been deliberately

pretexted into a national security matter, as satellite phones would have been classified

equipment, as satellite and cellular telephones unknown to the general public in 1972.

F. As a teenager, Lead Plaintiff worked for Larry's Market, an independent food market
in Federal Way, Washington, which was co-owned by Larry Brewer, a cousin of Lead Plaintiff's
father, and unbeknownst to the family, by FBI acting through an undercover agent who posed as
a business partner and produce manager for a time. WEISSMAN (FBI agent, later as General
Counsel under Director Robert Mueller) was then illegally embedded at West Coast Grocers, a
wholesale grocery cooperative which supplied Larry's Market, among others. Lead Plaintiff
worked for Larry Brewer for three years through high school and his first year of college at
Green River Community College in 1973-74.

G. Transferring to Washington State University in Fall 1974, Lead Plaintiff entered
Perham Hall, a WSU student dormitory. Close college era friends included numerous persons
who were in fact government employees of defendants FBI, DOJ, CIA, and the military,
(including, without limitation, defendants PAGE, William SACKVILLE-WEST, other
SACKVILLE-WEST family members in Spokane, WA, GARLAND, CUNHA, BREYER in
Spokane, WA; as well as Linda Pogreba, Karen Raines, Katherine Andrews, Susan Irish) some
of whom unwittingly assisted in managing and sustaining the involuntary servitude of the Lead
Plaintiff and others to support the secret, illegal development of the internationally prohibited
BRMT bioweapon and bioweapon delivery system by defendant CIA (Science and Technology
Directorate) and defendant ARMY (Bioweapons Lab). This program was and is sustained by
racketeering operations and rights violations perpetrated and perpetuated by defendant DOJ,
primarily through defendants FBI and USMS.

H. After graduate school, Lead Plaintiff was trafficked to Deloitte Seattle, where FBI and
CIA were involved in his initial professional assignment to an audit of Safeco Mutual Funds in
Seattle. He met his first wife Lynne in 1980 at Deloitte Seattle. Lynne was the former wife of a

then King County Sheriff's Department serial killer task force commander and later Maple Valley, WA precinct commander, with shared two early teen daughters. Lynne was later removed from Lead Plaintiff in late 1987-1988 by a divorce which resulted from sustained BRMT induced overdoses of oxytocin in the presence of serial adulterer, Robert SWAIN.

I. While at Deloitte Seattle (a cover operation described elsewhere herein), Lead Plaintiff spotted his first national security spy, Christopher Boyce, a convicted submarine espionage escapee from Lompoc, CA captured near Port Angeles, WA in or around late August 1981 in an orchestrated event, as Lead Plaintiff walked one morning from an ATM machine near his Seattle-First Bank building office at Deloitte Seattle, back toward his car to pay for parking that morning. An unmarked prisoner van and two unmarked Ford Crown Victoria federal police cruisers swept into the secured loading dock of the U.S. Federal Courthouse on Fifth Avenue in Seattle about 60 feet ahead of the Lead Plaintiff, carrying the convicted spy while Lead Plaintiff walk back up Spring Street to pay for parking at a lot on the east side of the I-5 freeway.

J. Defendant WEISSMAN (FBI) first appeared to Lead Plaintiff in 1981 or 1982 as the General Manager of Puget Consumers Cooperative, which Lead Plaintiff joined at the suggestion of an embedded department secretary at his first employer, Deloitte Seattle, and became a Board of Trustees member, then Chair.

K. After defendant BURNS (then program manager, now current CIA director) destroyed his first marriage to Lynne using an illegal BRMT oxytocin sequence against her in 1987-1998, BURNS orchestrated his next marriage through WATERS (paragraph 609 HEXP-6), to his second wife, Jeanette, which resulted from an coerced orchestrated introduction related to the deferred prosecution of this defendant ARMY enlisted member, and timely illegal BRMT oxytocin boosts after they met. The introduction itself was a field operation in 1988 undertaken

by defendant UNITED STATES. Stephen M. WATERS, an unknown federal agent, posing as a

software engineering contractor at LazerSoft, orchestrated the introduction with other field

agents of defendant UNITED STATES during the latter stages of Lead Plaintiff's divorce from

first wife , Lynne. During this period, Lead Plaintiff also sought out an offline dating service and

was orchestrated into a fruitless cover operation by defendant FBI instead. Defendant FBI then

presented again overtly as friends, Kerry (FBI, bank robbery squad) and Laurie Vanderberry

(embedded at Jeanette's employer) introduced through his second spouse, Jeanette.

　　　　L. Lead Plaintiff's second extended family included numerous persons portraying

themselves as friends or relatives who were in fact government employees of defendants FBI,

DOJ, CIA, ARMY, and other military services. These include specific individual defendants

who concealed their actual identities and official positions, which actual identities were

unknown to the Lead Plaintiff until September 2023 or later. In several cases, these individuals

have built new legends which morph then from their undercover identities, changed their ages to

significantly younger ages to cover their chronological age at that time, modified certain aspects

of their biographies, and in some cases modified their appearances in relatively minor ways, in

order to conceal their prior roles in this illegal program. These include, without limitation,

BREYER, a former Associate Justice of the Supreme Court; Alexander and Yvgeney

VINDMAN, two former members of the National Security Council; STONE, a consultant to

Republican candidates and presidents; and MELBER, WEISSMAN, ROSENBERG, RUBIN,

media personalities, who were defendant DOJ and/or FBI employees at the time of their

fraudulent interactions with Lead Plaintiff. These known individual defendants are individually

identified at LPEE pages 12251-12261. Others will be identified through the discovery process.

M. This color of law pattern of deliberate national security event pretexting and targeting has continued through forensic review which began in mid-2021 and through preparation of this complaint. The complaint has been drafted in late 2023 and 2024 in the most recently human trafficked location – Edgewater, NJ, the epicenter of the Senator Menendez domestic and national security corruption investigation by defendant DOJ's FBI and SDNY US Attorney's office, where Lead Plaintiff was human trafficked in November 2018, a few months after that investigation was started by defendant FBI.

N. This narrative comprises and has consumed Lead Plaintiff's entire adult life as related at paragraphs 350 through 584, and all subcounts herein at paragraphs 600-710. This narrative is representative of the scope of acts, violations, and injuries at the hands of the defendants to this entire class of plaintiffs. Defendant UNITED STATES has and does reprise the same illegal patterns of practice and conspiracy, together with its institutional and individual co-defendants, in illegal color of law abuses of state secrets privilege which it used to perpetrate, fraudulently conceal, and neglect to prevent in its acts, violations, and injuries under defendant CIA's MKUltra illegal LSD drugging program and defendant FBI's Cointelpro, its war on US persons "unalienable" constitutional rights under the *First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth* and *Fourteenth* Amendments to our Constitution.

O. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content in

searchable indexes and lists at LPEE Compendium at pages 934-1075. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 2, 3 |
|---|---|
| Complaint paragraphs: | 221, 414, 415, 417-418, 490, 350 through 584, 600-710, 609 HEXP-6 |
| Appendix 2 paragraphs: | Entirety |
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety |
| LPEE pages (see technical note on page numbering at paragraph 230): | LPEEV65-6, 7 |
| Emails and documents by topic and date, also located in LPEE: | Emails and documents are controlled by defendant UNITED STATES - as delivered to ROSENBERG (FBI) in 2007, and in USPS handled mail surveillance in 2008, 2010, possible recovery at Ramsey, NJ in 2018 |

P. Defendant DOJ's USMS managed Deloitte Seattle in 1979-1986, managed CNA Industrial Engineering in 1996-2002, and Establish in 2007-2008 as illegal cover companies used by DOJ and other federal departments and agencies for their illegal surveillance and spying operations. Harold Hopper and Michael Henderson at Deloitte Seattle, Joseph Holden at CNA Industrial Engineering who declined to spin-out to Allegent, as he explained he was close to Cook (FAUCI), and unknown member of the Establish employee team were the through line USMS undercover personnel in these roles. Hopper supervised the Deloitte Seattle office until he retired and was replaced by Hendersen. Holden worked on various CNA projects including, without limitation, with David Brown on Port of Seattle International Airport and Anchorage International Airport baggage systems for Alaska Airlines and others, worked on the Larry Harding Rapistan-initiated Nikken project which Lead Plaintiff redesigned for the Irvine, CA distribution center which included the mandated and unneeded package sorter required by the illegally embedded CFO which facilitated illegal spying on the multi-level marketing company's independent sales team, and on HomeGrocer warehouse design projects. Defendant

ESTABLISH hosted defendant ROSENBERG as its ostensible General Manager, replaced in
rotation by ROSS during Lead Plaintiff's ten month employment tenure during that human
trafficking sequence.

Q. This associated-in-fact enterprise pattern and conspiracy required and consumed the
time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation
of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED
STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including,
without limitation, illegal BRMT development and deployment; human medical experimentation
without consent, to and including torture and suicide ideations; systematic constitutional rights
violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are
incorporated herein by reference including, without limitation, paragraph 599, with particular
attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state
secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).
Discovery will provide critical confirming information directly from these institutional and
individual defendants and, among some who presented at the time as family members, their
children. See other selected relevant content in searchable indexes and lists at LPEE
Compendium at pages 934-1075. Directly cited relevant pre-discovery evidence and information
which relates this subcount to other relevant subcounts includes, without limitation:

| Interline Exhibits: | 2, 3 |
|---|---|
| Complaint paragraphs: | 221, 350 through 584, 414, 415, 417-418, 445-449, 454, 465, 471, 490, 494-501, 555-562, 600-710; 604D, 606N, 609 HEXP-1, 3, 6; 626, 635, 636, 637 RGTS-6, 15-17; 644, 645, 646, 647, 649, 650, 651, 653, 669, 670, 683 693, RICO-6-9, 11-13, 15, 31-32, 45, 55 |
| Appendix 2 paragraphs: | 1-006 through 1-017, 1-020 through 1-026, 1-031, 1-032 |
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety |

| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 416-426, 428, 569-571, 575-581, 598-606, 766-769, 778-780, 8294-8346, 10376-10393, LPEEV65-6,7,17 |
|---|---|
| Emails and documents by topic and date, also located in LPEE: | Emails and documents are controlled by defendant UNITED STATES - as delivered to ROSENBERG (FBI) in 2007, and in USPS handled mail surveillance in 2008, 2010, possible recovery at Ramsey, NJ in 2018 |

*601. NSEC-2 National Security Frauds:* **Human Trafficking, Forced Labor, Peonage, Inculpating Allied Intelligence Services - CSIS, RCMP, MI-6, MI-5, London Metropolitan Police, UK 1990-1994**

A. As forensically reverse engineered, during 1990 through 1994, defendant UNITED

STATES, its agents, officers, and confidential informants, co-opted and/or conspired with

Canadian and British intelligence and police powers organizations to develop further national

security entanglements of Lead Plaintiff beyond the already existing initial entanglements

related to Lead Plaintiff and his marital family's travels to Vancouver, British Columbia and

Queen Elizabeth II's visit to Seattle, WA in March 1983. This corrupt collaboration facilitated

the abuse of international spying operations across borders against citizens of various allied

countries by allied foreign intelligence services. Alliance was destroyed by FBI and caused the

personal bankruptcy of Lead Plaintiff and his spouse, Jeanette, in 1993 (paragraphs 445-449).

B. As forensically reverse engineered, as part of defendant UNITED STATES'

intentional financial wrecking of Lead Plaintiff's company Alliance, which incorporated (i)

fraudulent co-ownership and control through a nominee (David J. Carey as nominee, FBI,

paragraphs 445-449, 649 RICO-11), (ii) fraudulent legal representation (HIBBS and Susan

THORBROGGER, DOJ/FBI, both embedded at Short Cressman Burgess law firm, paragraphs

446; 626 RGTS-6, 649, 651, 653, 683 RICO-11, 13, 15, 45), (iii) fraudulent deprivation of

government benefits (SBA bonding, paragraph 446, 471; 649, 653 RICO-11, 15), (iv) theft and

compromise of receivables (Steve and Kerry Brewer, FBI, paragraphs 644, 650, 651 RICO-6, 12, 13), was then succeeded by (v) this Vancouver, B.C. fraudulent financing.

C. During this specific defendant FBI wrecking process – this time through Alliance (Steve's Maintenance) the business secretly co-owned by defendant FBI through Carey, through Lead Plaintiff's orchestrated personal bankruptcy, and through Lead Plaintiff's subsequent fraudulent employment at P.A.N. Environmental Services (PAN), defendant UNITED STATES directly and through confidential informant or agent CORNWELL (CIA commercial cover agent, who had operated in north Africa while posing as an irrigation equipment dealer) and his supposed spouse (a female FBI agent), abused the Lead Plaintiff affecting interstate commerce in his search for equity financings for Alliance, where he was CEO and principal owner. CORNWELL and FBI used an extended series of fraudulent equity financing search trips made to Vancouver, British Columbia, while seeking financing intended by Lead Plaintiff to offset the prior frauds, thefts, and denial of SBA bonding and loan guarantees by defendant UNITED STATES against Lead Plaintiff's environmental services company, Alliance in 1990-1993, tot sustain involuntary servitude, forced labor, peonage, and perpetuate the illegal BRMT bioweapon and bioweapon delivery program illegal human experiments and associated-in-fact enterprise pattern of racketeering acts, rights violations, and conspiracy.

D. CORNWELL had previously operated with his twin brother in CIA commercial cover operations by selling center pivot irrigation systems to farmers throughout the United States to cover this form of covert intelligence operations in northern Africa, primarily Libya, in the 1970s and 1980s, from a dealership in Pasco, Washington.

E. The Canadian intelligence and police powers operations, most likely RCMP and CSIS, posed in various roles and as domestic and international mining executives and financiers

in various office locations throughout Vancouver, British Columbia, Canada, include various associates of CORNWELL known as John Young, Ralph Shearing, and Rory Godhino, a barrister from the Vancouver, British Columbia region, all of whom figure in the fraudulent Alliance financing sequence.

F. After Alliance was destroyed by defendants in 1993 and unable to find other employment as result of defendant wire frauds and other interferences in employment, Lead Plaintiff joined PAN, where Cornwell was CEO and Lead Plaintiff became PAN COO. Cronwell arranged trips to Ontario, California where two of the three alleged PAN subsidiaries were located, and to London, UK for equity financing. In Londoon, Cornwell with and Lead Plaintiff met and worked with MI-6 and other British intelligence officers and police powers deep cover personnel and cover operations (likely London Metropolitan Police and MI-5), primarily operated through an individual known to Lead Plaintiff as Michael Kurtanjek, likely an MI-6 agent, posing as a Managing Director - Mining for Credit Lyonnaise Laing, an international investment bank headquartered in France, who operating from its stock trading operations in London. Lead Plaintiff traveled to London on three occasions, including one three week long business trip. On one of these trips between Summer 1993 and the end of 1994, Lead Plaintiff is greeted by a trotting Metropolitan Police counter-terror squad in a lengthy construction tunnel at Heathrow Airport. He was the only other person in the 500 plus foot long tunnel in mid-afternoon at a busy Heathrow Airport international terminal. This is the second of three similar instances related to national security spying and terror-related alerts and episodes, including one in Seattle in August 1981 and another in New York City around November 2007.

G. This series of defendant FBI and CIA international RICO frauds included persons posing and/or acting as financial brokers, barristers, company executives, and in other

professional roles to facilitate these frauds and swindles and permit foreign intelligence operations to "legally" engage in color of law spying upon the Lead Plaintiff in British Columbia, Canada, and London, England as well as within the United States using intelligence acquisition methods and assets which defendant UNITED STATES cannot legally deploy against its own citizens. Agents operating in international cover roles as financiers engaged in fraudulent financings on behalf of the Lead Plaintiff's own company, Alliance, and on behalf of PAN, all of which were fruitless and intended to perpetuate defendant UNITED STATES' involuntary servitude of the Lead Plaintiff both in the United States and in their own countries.

H. RCMP and/or other Canadian officers, agents, and cooperators, together with defendant UNITED STATES undercover agents and officers, have also been engaged by FBI and CIA to provide discrete security and surveillance of Lead Plaintiff and his families for various trips over many years to Vancouver and Whistler, British Columbia. Lead Plaintiff's solo trip to the Rocky Mountain area of western Alberta in 2005 in late Summer 2005 included an overnight disappearance and search of the Lead Plaintiff's briefcase travel bag including his personal computer and all related tracking data and documents to that point, somewhere between Lake Louise, Calgary, Canada, and its recovery at the front desk of his condo hotel in Canmore, Calgary, Canada, the following day.

I. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; human medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secret privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 445-449; 626 RGTS-6; 644, 649, 650, 651, 653, 683 RICO-6, 12, 11, 13, 15, 45; 446, 471 |
| Appendix 2 paragraphs: | 1-017 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0003 through 2-0012, 2-0024, 2-0059, 2-0060, 2-0095, 2-0097, 2-0109, 2-0153, 2-0155, 2-0202 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

**602. NSEC-3 National Security Frauds: Involuntary Servitude, Forced Labor, Deliberate Entanglements To Violate Rights - Nuclear and Space Deliberate Entanglements, 9/11 Attack, Domestic Sabotage Campaign 1996-2009**

A. As forensically reverse engineered, the Lead Plaintiff was human trafficked from PAN into Pacific Pipeline in 1995 (paragraph 454, 465), a Kent, WA based FBI embedded domestic book wholesaler spying operation, by FBI's Charles ROSENBERG (Chuck LeFevre as then known while CEO at NutraSource). After a disastrous ERP software system implementation in Fall 1995 to early Spring 1996, which extensively damaged a large number of independent retail booksellers in the Pacific Northwest, he was arbitrarily terminated from his

a disastrous ERP software system implementation in Fall 1995 to early Spring 1996, which extensively damaged finances and sales reputations both at the company and at a large number of independent retail booksellers in the Pacific Northwest who were out of stock from their key distributor due to the ERP problems with order fulfillment for what turned to be yet another Christmas season of many. These problems were blamed on computer problems (but were actually deliberate and intentional targeted sabotage aimed at these small independent businesses, which were often founded on overstretched credit card limits, personal loans, and second mortgages with personal guarantees. Defendant FBI could then pick and choose who got damaged by using the computer system to arbitrarily short-fill orders for certain retailers, could establish and then cut generous credit limits to damage sales, give slow credits for returned books and thereby reduce access to credit lines and store inventory stocking levels, demand customer financial information including personal financial information on owners to spy on them and to identify personal vulnerabilities, and engage in other *Fourth* Amendment violations against both small businesses and their owners by posing as their preferred supplier offering generous terms and free shipping on volume orders which were used to capture and retain customers, including those disfavored individuals targeted for financial wrecking, which Lead Plaintiff himself has now experienced multiple times from the 1980s into the 2020s.

B. Once the aforementioned ERP problems were resolved after eight to nine months of exhaustive efforts by the operations team and Lead Plaintiff to sustain company order fulfillment operations and in the late stages of his buyout attempt which would fail, PERILLO arbitrarily terminated Lead Plaintiff from his unwitting involuntary servitude at Pacific Pipeline by its "founder" Vito PERILLO (USMS) in Spring 1996. PERILLO wrecked Pacific Pipeline a few months after the Lead Plaintiff left in 1996, during a Barnes and Noble annual review in New

York City when he fired them as Pacific Pipeline's largest customer, about 55% of revenue which eventually led to the company's bankruptcy and demise when expenses were not controlled to match dramatically declining revenue, a pattern now recognized as a defendant DOJ trademark signature pattern. These cover company wrecking processes cover up evidence of years-long targeted defendant DOJ police powers agency spying and illegal spying and inquiries into company and personal finances and assets which violate the *Fourth* Amendment.

C. The company was also used by defendant FBI to orchestrate targeted self-publishers who wrote on disfavored topical areas or who wrote about unfavored perspectives into financial ruin by offering to distribute their books on consignment. Imagined and fictional inflated sales opportunities were used to encourage authors to self-publish. Large print runs were encouraged to get full case shipments into discount stores, chains, and buying clubs. Print run expenses on these consigned books were borne by the author and could consume substantial personal financial resources, requiring thousands or tens of thousands of dollars of personal loans or home mortgages based upon falsely and grossly inflated expectations of sales envisioned by the cynical undercover buyer embedded at Pacific Pipeline and the author who thought they had just written one of the greatest books ever. Consigned books that were stocked by Pacific Pipeline for sale at retail bookstores and at large retailers like COSTCO and Barnes and Noble would not be reimbursed for their sales for six months or more after those press run expenses were incurred because books which do not sell through to retail customers are returned to the distributor, Pacific Pipeline, and then to the publisher, spelling financial ruin for some when those over-inflated sales expectations did not materialize. Staff reported these types of incidents to the Lead Plaintiff while he worked there.

D. When defendant DOJ destroyed Pacific Pipeline, it was done in bankruptcy court. Consigned inventories do not belong to the consignor (original self-published author who paid the printing expenses and other costs). The consigned inventories belong to the bankruptcy estate and are liquidated to benefit secured creditors, then unsecured creditors, so the self-published author gets to see that inventory be sold for little or nothing to a liquidator and the funds used to satisfy secured creditors and others, typically receiving nothing in the bankruptcy liquidation. With careful planning, undercover embedded police powers personnel can maximize the financial losses to a self-publisher by pressing them for additional inventory in the months leading to the pre-planned bankruptcy date when the self-publisher will lose 100% of the funds they have advanced for print runs and other expenses.

E. Lead Plaintiff's arbitrary termination from Pacific Pipeline in Spring 1996 was followed by about six months of programmed unemployment facilitated by wire fraud hacking of employment sites and telephone intercepts and fraudulent employment interviews with FBI and/or USMS personnel posing in prospective employer roles. Lead Plaintiff had a base salary of about $125,000 in 1995-96 at Pacific Pipeline before this defendant UNITED STATES programmed six month period of unemployment.

F. He was next human trafficked to C.N.A. Industrial Engineering, (CNA) Bellevue, WA, by CNA employee Greg Lins in late Summer 1996, and a couple of months after a September 1996 consulting project contract sales proposal to Henry Schein, a medical supplies wholesaler in Port Washington, NY, did not succeed, Lead Plaintiff was offered an $80,000 salary by Charles Hadjinian (a former CIA covert asset from Nicaragua's Samoza regime who was spirited out of Nicaragua and into this DOJ/USMS cover company sometime before the Samoza regime collapse) which he negotiated up to $88,000. He had no bargaining power as all

other employment options were surreptitiously foreclosed by defendant FBI mail and wire fraud to sustain his involuntary servitude in defedants' illegal BRMT bioweapon and bioweapon delivery system program, constitutional and civil rights violations, and associated-in-fact enterprise pattern of racketeering acts. He joined CNA full time in November 1996 in Kirkland, WA, and met FAUCI within the first four weeks of his employment. About the same time, he began experiencing severe headaches which were traced to presbyopia (vision issues associated with middle age) and required bifocal eyeglasses. The prescription progression was normal for a time at each annual renewal but has gradually reversed since his first renewal in New Jersey in 2008. This medically implausible sequence of lesser strength eyeglass prescription requirement at each renewal since that time is the reverse of the normal aging process. This is but one element of a variety of bizarre health issues and outcomes health issues perpetrated by defendant UNITED STATES using its illegal BRMT bioweapon and bioweapon delivery system (paragraph 617 HEXP-14).

D. Soon after the Lad Plaintiff's full time employment in November 1996, CNA began work on a material handling systems engineering design and implementation supervision contract for the Boeing/USAF Delta IV rocket assembly plant in Decatur, AL, which was secured by H. Paul LOWBER (FBI undercover), who left soon after the contract was secured. Lead Plaintiff was once again deliberately inculpated in another national security project. USAF "could not locate" this multi-billion dollar heavy lift rocket project despite extensive dialog with the USAF FOIA representative during Lead Plaintiff's FOIA request in 2021, another clear lie in this long-running government cover-up. This CNA material handling design and implementation engineering subcontract was with The Austin Company, the general contractor which constructed the Boeing/US Air Force Delta IV rocket assembly plant in Decatur, AL. Lead

Plaintiff's further unwitting pretexting and entanglements in national security matters and his unwitting involuntary servitude was thus continued without any notice.

## DELTA IV ROCKET FACTORY
### THE BOEING COMPANY



E. As this project progressed, CNA sent Lead Plaintiff to Torrance, California to work on a programmed project failure, ostensibly for Davidson Entertainment (later CUC after a buyout of Davidson), a gaming and educational software company, which involved an Accu-Sort laser barcode sorter from this USPS mail sortation contractor. The sorter was ostensibly set up to fill custom orders for software retailers in a warehouse in Torrance, ran successfully on occasion, but sabotaged over its telephonic support line as FBI personnel tied up the Lead Plaintiff in this Los Angeles area project, and a co-employee at CNA worked with a team of contractors to construct a failed software system implementation project alongside the sorter sabotage project for about 18 months. Incomplete and failed software projects became a common theme which emerged over many years through 2022. Defendant FBI forced expenditures of about $1.2 million on this programmed project failure, as ordered by their Davidson embedded John Goodman who ran operations, to keep the Lead Plaintiff occupied for about 18 months. Soon after this project failure, Chuck Hadjinian was "terminated" from CNA (just as STONE had

been "terminated with sturm und drang from Lazersoft in early 1987, paragraphs 437-440), and

Lead Plaintiff was promoted to Managing Director for CNA, consistent with the still not

understood FBI pattern of practice in the unwitting Lead Plaintiff's involuntary servitude.

F. CNA also engaged in other sensitive technologies projects during Lead Plaintiff's

tenure, including software selection for non-destructive eddy current technology testing

equipment and services company (Zetec, Issaquah, WA) which supports the nuclear industry,

aerospace, rail and other key industries in the United States and elsewhere. Software selection

and engineering services require extensive detailed knowledge of processes and procedures, so

Lead Plaintiff and his team developed an extensive body of knowledge of the technology,

company services, and customer base to assist this client to make the optimal software system

selection.



## Sustaining the energy for the power generation industry

We have extensive experience in conducting feasibility studies and developing inspection solutions in the power generation industry. From developing and maintaining standardized processes to developing customized solutions for client specific needs, we are a leader in enabling utilities to reduce their inspection costs, improve their safety and reduce their downtime. Our clients can count on our eddy current and ultrasound technologies to be safe, sophisticated and successful in the procedure of flaw detection of their critical systems.

### Nuclear

With our world-class manufacturing and breadth of offerings in the eddy current instruments and ultrasound technologies, we can exceed the demands of the power generation industry. Our extensive experience in the nuclear segment, and our ability to leverage learnings from other segments, helps us deliver products that are well-engineered and field-tested. Discover our nuclear solutions.



G. Lead Plaintiff was also engaged by Media Arts Group in San Jose, California to design its new art production and distribution facility to be built in Morgan Hills, CA. This study and design process began under the project management of a defendant CIA commercial cover covert agent temporarily redeployed from Thailand to San Jose, CA, who was able to use Media Arts Group as his interim commercial cover while in the United States. This defendant CIA asset then reportedly redeployed to the Asian outsource manufacturing technology sector about six months later. CNA continued with the project through design, implementation, and completion. A similar study, design, and implementation process for Nikken, a Japanese consumer products multi-level marketing firm, was undertaken in Orange County, CA, allowing defendant FBI to spy on yet another "Japanese Miracle" company and its myriad levels of individual Americans

who purchased these products as small business independent distributors by installing a unneeded shipping sorter from Rapistan, the American subsidiary of Dematic. The sorter allowed the capture of destination name and address shipping information at the Nikken distribution center, and was ordered by the illegally embedded CFO. The former illegally embedded distribution center manager was recycled out of deep cover there, reportedly "dying" soon after the sorter was up and running in the distribution center, probably resurrected into her next assignment in a new identity.

H. These projects continued CNA's long history of unprofitable industrial design and engineering projects, which had already included various US NAVY nuclear submarine base construction and maintenance facility projects in the Pacific Northwest; domestic international airport projects at Sea-Tac and Anchorage on baggage systems; the Boeing 747 assembly plant; and the "Japanese Miracle" Sega, Sony, Nintendo, and Panasonic manufacturing and distribution plants in the United States. These prior projects, and the projects Lead Plaintiff was involved in were in fact, undertaken as commercial cover domestic intelligence and counterintelligence operations of the United States, some legal, some simply broad gauge illegal spying on, and wrecking where deemed appropriate by defendant DOJ and its police power agencies. The Lead Plaintiff was thereby continually being entangled unknowingly in various commercial cover domestic and international intelligence operations as he has been since arriving at his supposedly private employer, Larry's Market, in 1972. (As a historical note about patterns of culpability and patterns of illegal practice, defendant DOJ's Attorney General Robert Kennedy had approved some of the illegal surveillance of civil rights leader Dr. M. L. King, Jr. by defendant FBI, and it was "no holds barred, " according to senior FBI officials who testified to the Senate for the 1975 Cointelpro report at pages 6885-7288).

I. In May 2001, the Lead Plaintiff traveled to Washington, DC for the annual May AeA National Board Meeting and Capitol Hill visit. The Lead Plaintiff's taxi from Dulles Airport was halted on Constitution Avenue west of 15th Street, soon after passing the White House, for the Vice President's motorcade enroute west from Capitol Hill toward the White House or Naval Observatory in late afternoon as Lead Plaintiff traveled to his hotel a few blocks south of the Capitol in Washington, DC. During this visit, Lead Plaintiff was part of a group which toured the West Wing of the White House one evening and has his picture taken at the Press Room podium.

J. On this 2001 visit, the Lead Plaintiff spent an surprisingly long 90 minutes with Representative Jennifer Dunn (the Washington Eighth District Republican Congressperson who represented Lead Plaintiff's congressional district and was close to the President) in a House office building television studio - which was set up to look like a typical Congressional outer office but had television studio lighting and an interview style conference set-up in what is typically expected to be the representative's inner office. The normal ten-to fifteen minute sessions with Representatives and Senators for ordinary constituents can take months of waiting to hit a scheduled date and then are subject to cancellation, when committee and floor votes occur, whereupon a staff member typically takes the Representative's place, or the meeting must be rescehduled. As an aide sat nearby, Representative Dunn and the Lead Plaintiff discussed higher education policy and the Lead Plaintiff's policy related report and work with the Washington State Legislature, Governor, universities, colleges, and AeA's private sector members, including Intel, Microsoft, Motorola, Hewlett-Packard, and others during that 90 minute session, used by defendant FAUCI and team in establishing a psychological baseline for their next destructive sequence, through the illegal Allegent, LLC bad check and sales frauds

financial wrecking, separation and divorce of the fraudulently orchestrated marriage to Jeanette (*Third* Amendment violation), coercive psychological and illegal BRMT biochemical torture to suicide ideation, and eventual human trafficking sequence to Boston, MA in 2005, paragraphs 19(iv), 225, 457-462, 499-500.

K. In Summer 2001, CNA was requested by Berger ABAM Engineering, Inc., a Naval Facilities Command regional office (NAVFAC, NAVY) contractor to perform an indefinite quantity engineering study at Puget Sound Naval Shipyard (PSNS), Bremerton, WA, to repurpose and redeploy engineering and maintenance spaces in several dockside buildings at this nuclear submarine and aircraft carrier heavy maintenance and decommissioning facility. This project was placed on hold immediately after the 9/11/2001 attack on the World Trade Center, Pentagon, and in Shanksville, PA.

L. When the project resumed in Spring 2002, the Lead Plaintiff and one other CNA employee (Darrell PRAY, then not known to Lead Plaintiff as a federal undercover agent) were escorted through the approximately six to seven buildings to be studied in the 1.48 mile long shipyard docks area. On a typical weekday, the shipyard employs about 15,000 people. On this regular workday, not a federal holiday, there were about two dozen total employees in the entire dockside industrial shops complex. This is one example of a now well understood pattern of vacated facilities used by defendants FBI and CIA in this decades long sequence of national security deliberate entanglements across decades, intended to preserve defendants' deniability and their version of events due as the only plausible narrative (whether accurate or not), due to a complete lack of public witnesses to these entrapment attempts.



M. During this detailed hours-long tour, Lead Plaintiff was left standing beside a highly classified nuclear submarine pump (highly classified because it is an exotically engineered pump essential to the silent running of submarines) sitting on a wooden pallet covered by a green tarp. The pump was completely out of place, sitting on the floor in an engineering building which had absolutely no tooling or machine tools which would be used to repair or maintain such a pump (this building housed a giant lathe used to balance massive surface ship drivelines which transfer power to propellers from the ship's engines. The PSNS tour leader was most likely a key illegal BRMT program operative known to the Lead Plaintiff long before these events (plausibly fka as Mike CUNHA, the AFROTC medical psychiatrist candidate and WSU Resident Assistant at Perham Hall in 1974) and long after these events (plausibly known as David Keller, LIBERTY WEST, as Arizona EB-5 financier, still later as Mark GROSS at DOMINICK, then again still later at Westmark Capital, both New York City boutique international investment banks).

br

N. Lead Plaintiff and CNA co-employee PRAY were left standing unescorted in this maintenance and engineering building for about fifteen minutes as the entire escort team of about five to six people simply walked away. Upon the return of the escort team, the tour resumed without comment or explanation. This was a deliberate major breach of security protocol in a secure U.S. NAVY facility handling nuclear materials and classified technologies, and with sand-bagged gun emplacements protecting its submarine pens. The Marine Corps detachment which guards this facility was on heightened alert status after the 9/11/2001 attack and did and does have shoot-to-kill authorization to protect sensitive and classified technology, nuclear fuels, and other sensitive equipment and materials, as needed.

O. This PSNS tour was undertaken a few months after Lead Plaintiff had visited New York City at the same time (though in different locations) as President Bush. During that November 2001 visit, Lead Plaintiff visited the 9/11 World Trade Center family viewing platform one afternoon as recovery work was underway and as the workforce stopped periodically to honor the dead as they were removed.

P. Lead Plaintiff also had extensive interaction with an internationally deployed US commercial cover CIA intelligence asset while that individual was working in a domestic cover assignment at Media Arts Group, San Jose, California before redeploying back to Asia. Lead Plaintiff led a CNA engineering project for Media Arts Group to relocate their production and distribution operations from San Jose, CA to Morgan Hill, CA. This was similar to Lead Plaintiff's experiences with other defendant CIA commercial cover assets dating back to the 1980s, including, without limitation, STONE, Bannon, THORPE, Zoulas, Treadway, the UK's Astengo embedded at Westin Seattle in 1983, and others.

Q. CNA Industrial Engineering, Inc., operations were reportedly terminated by its "founder" Larry R. Cook (FAUCI) around 2003, after the Lead Plaintiff's departure, just as Pacific Pipeline had been in the years before. This enterprise destruction pattern is a now familiar theme to the Lead Plaintiff as a result of the forensic reverse engineering undertaken since mid-2021 and the individual identifications which began to clearly link the corrupt and illegal practices together most clearly beginning in September 2023. These particular patterns of corrupt practice abuse the federal bankruptcy courts to destroy business records periodically as the cover enterprise is financially wrecked. Alternatively, defendant DOJ and federal departments and agencies use the passage of time, asset sales, and common records destruction practices to eliminate historical financial and other records, which would otherwise be used to inculpate defendants DOJ, FBI, CIA, USMS, and other participating departments and agencies, in these illegal general searches, in these criminal acts, and in these associated-in-fact enterprise patterns of racketeering acts and conspiracies against targeted persons and their constitutional rights including, without limitation, religion, speech, property, and other rights. The overarching intent of all these techniques is to evade future discovery, such as through this type of civil litigation and through criminal appeals, of illegal search methods commonly used in general searches by defendants' cover companies, by embedding agents in positions in private enterprises, and by co-opting management of private enterprises and cooperatives such as PCC, CENEX, Associated Grocers, and other cooperatives, which illegal methods have long been common methods of illegal domestic spying. Evidence tampering, blocking, and outright technical deletion are also commonplace techniques illegally used by these agencies to fraudulently conceal inculpatory evidence - paragraphs 635, 636, 637 RGTS-15-17; 645, 646,

647, 669, 670, 693 RICO-7-9, 31-32, 55; and LPEE 11708-11925, comprise a non-exhaustive set of examples.

R. An affiliated company, CNA Architecture, was spun out of CNA as Collins Woerman through much manufactured drama (sturm und drang) during the Lead Plaintiff's tenure and continued to operate long after the demise of CNA Industrial Engineering. That firm engaged primarily in the architectural design of health care facilities in and around Seattle, Washington. Its current status is unknown.

S. Defendant Anthony FAUCI operated as the program executive for the illegal BRMT bioweapon and bioweapon delivery system as it evolved from its crude hormone hijacking form toward a more science and technology based illegal bioweapon which used a locally deployed device by exploiting medical, neuroscience, psychological, and technological advances, to modernize the illegal bioweapon used on unwitting human subjects and in secret offensive operations against other nations' leadership targets, and in its evolution from a local device toward remote platform deployment with precision ground correction, in the middle 1990s into the 2000s.

T. Defendant FAUCI was specifically identified by Lead Plaintiff in February 2024 as Larry R. Cook (Cook), the alleged founder of CNA Industrial Engineering and CNA Architecture in Bellevue, WA. He also allegedly controlled CNA Manufacturing, another local cover company used in illegal spying in aerospace manufacturing (primarily at Gulfstream, the private jet manufacturer) which was located some in Woodinville, WA, and explained as his primary work location during his prolonged absences from the Bellevue, WA CNA location. David Brown, and later Joseph Holden actually supervised day-to-day CNA Industrial

Engineering onsite operations during much of the Lead Plaintiff's tenure, both as supposed subordinates reporting to Lead Plaintiff.

U. Defendant FAUCI, as Larry Cook, appeared in person to the unwitting Lead Plaintiff between 1996-2002 for a few hours at a time every few weeks to few months, and through periodic phone calls and emails. He primarily played a "man behind the curtain" role and operated in meetings and events which ranged from direct one-on-one conversations to various confrontations about business matters, and at often lavish holiday events, funded by both private sector revenue from undercutting legitimate competitor pricing on projects and the subsideis disguised as loans from shadow banking system cover bank Banner Bank Bothell, where the unwitting Lead Plaintiff's unwitting uncle Bruce was employed during most of this same time period. Defendant FAUCI's direct and specific interactions with the Lead Plaintiff included, without limitation:

### In Personal Matters Related To Lead Plaintiff's Involuntary Servitude

(i) FAUCI staged various elaborately staged company Christmas parties most early years,

(ii) FAUCI staged company Christmas lunches in later years,

(iii) FAUCI staged a Christmas party conversation with Lead Plaintiff's BURNS fraudulently orchestrated (and disguised enlisted military under deferred prosecution) spouse Jeanette about a toy soldier collection in a staged Woodinville, WA mansion one Christmas which few recognizable people attended, none from CNA Industrial Engineering recollected,

(iv) FAUCI staged tear-jerker emotional talks about his wife Jody and her health while affecting deep emotion, during which Lead Plaintiff was also BRMT hijacked to tears,

(v) FAUCI staged drove a newly leased Jaguar at all times during his appearances,

(vi) FAUCI was allegedly a Mormon elder in the Bellevue/Woodinville, WA area stake who occasionally discussed his supposed work as a church elder (which recollects BREYER as fraudulent church elder Snow when Lead Plaintiff's sister Sandra was murdered, paragraph 99d).

### In CNA Industrial Engineering Company Related To Lead Plaintiff's Involuntary Servitude

(vii)     FAUCI met Lead Plaintiff briefly for first time in November or December 1996 when Lead Plaintiff was first trafficked to join CNA by Hadjinian while CNA was at the staged Carillon Point office site in Kirkland, WA, before moving to its location in Bellevue, WA,

(viii)     FAUCI continually drained about $150,000 per year from the company without doing any work at the company,

(ix) FAUCI frequently told Lead Plaintiff not to be concerned about cash stripping and losses as he had a special relationship with Banner Bank in Bothell (forensically reverse engineered as a fake cover bank used to deploy appropriated funds to cover illegal company operations which incurred losses on operations while undercutting private sector pricing as CNA competed with actual commercial enterprises for certain business opportunities used for illegal DOJ/FBI/USMS spying and surveillance operations), and as the employment location of Lead Plaintiff's uncle Bruce, also employed in involuntary servitude,

(x) FAUCI allegedly worked  primarily to rescue his CNA Manufacturing company in Woodinville, WA, which had an air-based tooling jig used in aerospace manufacturing at Gulfstream, the private jet manufacturer,

(xi) FAUCI supposedly worked in the background on the national security project
USAF/Boeing Delta IV rocket factory, as CNA had before Lead Plaintiff was employed
on other military, aerospace, and "Japanese Miracle" companies as they entered the US
including Sony, Sega, Nintendo, Pioneer,

(xii)        FAUCI facilitated company overstaffing by Hadjinian lead shortly before Lead
Plaintiff was tasked with unliked necessity of dozens of employee layoffs (actually
rotations to new illegal assignments as embeds in commercial enterprises where they
could illegally spy on and sabotage other people and enterprises),

(xiii)       FAUCI staged the fake failed rescue of a Titleist Golf distribution system
software project where embed Tim Auld went to work at Fortune Brands to strip about
$100,000 from the company to make the financial recovery Lead Plaintiff was tasked
with accomplishing more difficult,

(xiv)       FAUCI staged a faked control fight with Collins and Woerman during the
supposed spinoff of CNA Architecture, another illegal DOJ spying operation,

(xv)        FAUCI staged a theatrical crying performance with a long employed industrial
engineer then being laid off by Lead Plaintiff at CNA out of financial necessity, who later
infiltrated the Microsoft X-box platform program,

(xvi)       FAUCI stripped money from the company by making a promise to indefinitely
support that engineer during his extended job search,

(xvii)      FAUCI staged a completely clueless faked sales pitch to the supposed
HomeGrocer (HG) Board of Directors including the former COO of FedEx (to Smith) as
investor, gave feedback to Lead Plaintiff on discussions with HG CEO Terry Drayton at
the Irvine, CA distribution center project site which was less than positive, as Lead

Plaintiff was trying to be realistic with HG CEO about local public permitting and

inspection processes during HG's rapid geographic expansion,

(xviii)    FAUCI expressed strong disappointment in the HomeGrocer arbitration outcome

(a valid $500,000 arbitration claim netted $250,000 in previously withheld account

receivables, which was also used to financially distress CNA and thereby the Lead

Plaintiff who was forced to reduce his personal income to help save the company and

was a still continuing involuntary servant in the on-going illegal employment operations

of defendant DOJ and its police powers agencies),

(xix)    FAUCI strongly suggested the company move to focus on security immediately

after the 9/11 attack (obviously knowing the actual nature of the illegal cover company's

operations which the unwitting Lead Plaintiff did not understand),

(xx)    FAUCI and others at CNA worked with embedded undercover police powers

personnel and police powers personnel in other locations, such as southern California

(where the Rapistan sales team incorporated and was led by defendant FBI illegal

embeds) both to stall projects and to present only projects of captive interest (such as the

illegal FBI spying operation at Nikken in Irvine, CA with its Rapistan package tracking

sorter used to illegally capture shipping information for tracking to independent

individual multi-level marketing sales persons) as distribution systems engineering

project opportunities,

(xxi)    FAUCI stripped cash to force staff compensation cuts (which actually only

impacted the unwitting Lead Plaintiff as a captive of this illegal cover company, all other

personnel were actually federal undercover police powers personnel assigned from

defendants USMS, FBA, CIA, ARMY and other undercover government positions and

stall either temporarily or long term),

(xxii)    FAUCI allegedly killed embedded agent/engineer Art Thompson's alleged

independent Utah Alcohol Beverage Control post design engineering proposal,

supposedly made outside of CNA after this project was lost to another company due to

CNA missing the bid deadline, after an extreme cash flow problem caused by asset

stripping and project delays forced Lead Plaintiff to temporarily layoff core team member

Art Thompson, who was the lead engineer and project manager on the USAF/Boeing

Delta IV project,

(xxiii)    FAUCI stripped $100,000 of badly needed cash for company payrolls from CNA

in a telephone conversation with Lead Plaintiff shortly before the national security PSNS

facilities reengineering project was to be started in late Summer 2002, making it

financially impossible for CNA to conduct the project and to meet the company's

essential payroll and payroll tax obligations during the project.

**After CNA Employment In Legal Matters Related To Lead Plaintiff's Involuntary
Servitude**

U. Due to this PSNS time period imposed financial duress, Lead Plaintiff resigned in a

facsimile message to Cook (defendant FAUCI) sent to CNA Manufacturing on the Friday

afternoon before Labor Day 2002, after determining that conduct of the PSNS subcontract

engineering study was not financially possible due to FAUCI's (Cook) immediate prior cash

stripping (this specific operation has been determined during forensic reengineering to be a 941

federal employment tax entrapment on a national security project – an FBI ROSENBERG

operational signature form of entrapment, repeated by defendant FBI in slightly different form in 2018-2023 in Edgewater, NJ, paragraph 648 RICO-10), whereupon

(xxiv)   FAUCI (a) legally maneuvered to stall the King County Superior Court compensation theft case (paragraph 641 RICO-3) for many months by changing lawyers, adding about 8 months delay and additional financial distress, which (see the specific continuation of this a, b, c sequence below),

**In Post 9/11 High Intensity Illegal BRMT, Coercive Psychological Operations, Torture and Suicide Ideation Related To Lead Plaintiff's Involuntary Servitude**

(xxv)   legal maneuvering which delayed the six-figure CNA compensation case and added further personal financial stress during (b) the simultaneous DOJ/FBI/USMS financial wrecking of Allegent, LLC, the interstate consulting company which Lead Plaintiff had formed with illegal DOJ embed PRAY following CNA, (wherein defendant DOJ's CALDWELL appeared in an effort to discourage intellectual property litigation against ShipNow, another illegal FBI cover company which had conducted the check frauds and intellectual property theft, actually just part of an overall set of racketeering frauds by defendant FBI against the targeted Lead Plaintiff), and (c) the simultaneous repeated and final marital separation from fraudulently orchestrated and embedded military spouse Jeanette which led to the divorce, and the forced sale of the 149th Street Kirkland home, which Lead Plaintiff had remodeled and expanded by 60% over the prior ten or twelve years (Interline Exhibit 14).

(xxvi)   During a 14 hour arbitration, FAUCI had an apparently very friendly lunch with Allegent and Lead Plaintiff's personal counsel Michael Larson, an attorney who had

originally been referred by Conte (another FBI intelligence embedded agent long known to and trusted by unwitting Lead Plaintiff).

V. Defendant FAUCI, who Lead Plaintiff forensically identified February 2024 in the string of federal identifications which began in September 2023, thus played a key role in plain sight as the Lead Plaintiff was rolled out of CNA, into and through the financial wrecking of Allegent, LLC dba Performa, and was driven by defendant UNITED STATES through illegal BRMT bioweapon and bioweapon delivery system biochemical mental torture and simultaneous coercive psychological torture operations to a forced suicide ideation, and out of fear through a defendant FBI/ROSENBERG human trafficking sequence to Boston, MA (assisted by SUMMERS) in 2005.

W. From Boston, Lead Plaintiff was then human trafficked to northern NJ/NYC in 2007 through a defendant FBI (ROSENBERG) orchestrated Mossad interview to faked employment at defendant ESTABLISH in Fort Lee, NJ, on PPG Pittsburgh and Clipper Windpower to Carpinteria and Cedar Rapids, IA, the faked relationship with defendant MODDERMAN including the faked Pankowski wedding, all intended to retraumatize the Lead Plaintiff before the next follow-on asset stripping, financial wrecking, deprivation of benefits, theft of labor and materials, physical and metal biochemical torture to suicide ideation, psychiatric confinement to force federal civil rights litigation drop in October 2010, and the subsequent rehousing in Ramsey, NJ in March 2011. The precise timing of defendant FAUCI's exit from supervisory, management, and executive roles in this sustained illegal BRMT program operation is presently unknown.

X. Subsequent to his departure from CNA, Lead Plaintiff was skylined by this illegal secret defendant CIA and DOJ conspiracy to conceal illegal patterns of BRMT bioweapon and

bioweapon delivery system, rights violations, and associated-in-fact enterprise patterns of

racketeering acts and patterns of acts, and pretexted by association through police powers front-

running related to violent news reports and domestic sabotage events which were known to those

police powers defendant departments and agencies far ahead of general public knowledge, and

some most plausibly assigned to malign federal intelligence operations, subparagraphs 602Y and

602Z immediately below, as they were likely perpetrated from within defendant UNITED

STATES and/or by corrupted criminal and intelligence assets of the UNITED STATES, acting

against the broad public interest.

     Y. Domestic sabotage incidents include the fully involved arson fire in Conyers, Georgia

against the Bio-Lab chemical warehouse in May 2004, which generated a very large cloud of

extremely poisonous phosgene and chlorine gases over this suburban and mostly Black city.

This arson fire occurred within weeks after a fraudulent defendant FBI orchestrated sales call at

Bio-Lab's Lawrenceville, Georgia headquarters office location with Allegent, LLC dba

Performa co-owner Darrell PRAY (illegally embedded federal agent), for a meeting with the

Great Lakes Chemical parent company CIO Zoe SCHUMAKER and members of the Bio-Lab

information technology team (all now known to be unidentified federal officers operating

undercover). Lead Plaintiff's analysis of this event sequence is at LPEE pages 766-769. An EPA

report on this arson fire is producible from the public record on the EPA.gov website.

     Z. The other most notable domestic sabotage event was the bird strike double engine

flameout and crash of U.S. Airways Flight 1549 on January 15, 2009, which was preceded by

two flights of Canadian geese over Lead Plaintiff's involuntary USMS assigned "safe house" in

Cliffside Park, NJ which overlooks the Hudson River. Lead Plaintiff was human trafficked there

in August 2007 by defendants ROSENBERG, ESTABLISH, FBI, and USMS. The Lead

Plaintiff saw the aircraft pass his Hudson River view living room as it was on its final glide south over the Hudson River enroute to its forced landing crash site near midtown Manhattan. Defendant CHALOM (posing as landlord and former television producer of Contact 1-2-3) closely questioned Lead Plaintiff about this incident in an unusual visit to his residence soon after the crash. Sometime in this event sequence, Lead Plaintiff experienced an illegal BRMT bioweapon and bioweapon delivery system hijack of his visual nervous system which included the image of a noiseless commercial jet aircraft to the north of his apartment over the Palisades in a literally impossible flight configuration about 500 feet above the Palisades near Fort Lee, NJ. The date of this specific BRMT hijack is not recollected but is believed by Lead Plaintiff to be the initial event in the sequence which preceded the crash, see paragraph 606B HEXP-3).

### Other Relevant DOJ/FBI/USMS Trafficking and Spying 1996-2002 Known Through Lead Plaintiff's Involuntary Servitude

AA. Known defendant DOJ/FBI connections to other illegal enterprise embeds, spying, and sabotage:

(a) As Larry Cook, defendant FAUCI also supposedly tried but was reportedly cut out from investing in Point B, a software consulting firm also used as another illegal spying platform by FBI to infiltrate Starbucks and other commercial enterprises.

(b) CNA - Dennis last name not recollected was subcontracted from CNA to Point B in Point B's early formation years to work on a failed extended warehouse management software implementation being run by Point B.

(c) NutraSource - Starbucks employed and then fired a former NutraSource VP Operations Dana Smith (defendant DOJ ;police powers agency embed, who had formerly worked for ROSENBERG, FBI) while he ran its Seattle roasting plant.

(d) Rapistan - Larry Harding, Rapistan sales manager in the greater Los Angeles, CA area,
   was a primary source of CNA project opportunities in southern California through
   referrals to CUC/Davidson, Nikken, and to other site visits made in the greater Los
   Angeles region in the second half of the 1990s to support illegal enterprise infiltrations.

(e) Throughout this period, defendant ROSENBERG (FBI) operated in the background at
   NutraSource where he had been embedded by acts of defendant WEISSMAN while at
   PCC in the 1980s. After the sale of NutraSource, defendant ROSENBERG allegedly
   invested funds with partners in a golf driving range in Gig Harbor which failed, and into
   a Seattle wine shop which continued in operation.

AB. This scheme and conspiracy required and consumed the time and financial resources
of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running
schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude
over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT
development and deployment; illegal human subject medical experimentation without consent,
to and including torture and suicide ideations; systematic constitutional rights violations; and
racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated
herein by reference including, without limitation, paragraph 599, with particular attention
directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets
privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).
Discovery will provide critical confirming information directly from these institutional and
individual defendants and, among some who presented at the time as family members, their
children. See other selected relevant content at paragraph 600Q and in searchable indexes and
lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added

subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount

follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 454, 465; 604D, 606N HEXP-1, 3; 635, 636, 637 RGTS-15-17; 645, 646, 647, 669, 670, 693 RICO-7-9, 31-32, 55 |
| Appendix 2 paragraphs: | 1-020 through 1-026 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0003 through 2-0012, 2-0024, 2-0059, 2-0060, 2-0095, 2-0097, 2-0109, 2-0153, 2-0155, 2-0202 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 416-426, 766-769, 8294-8346, LPEEV65-17 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 603. NSEC-4 National Security Frauds: Human Trafficking, Forced Labor, Violations of Rights – Mossad, MI-6, MI-5, London Metropolitan Police, UK 2007

A. As forensically reverse engineered, during 2007 through 2008, defendant UNITED

STATES, its agents, officers, confidential informants, and other defendants, after the defendant

ROSENBERG led human trafficking Lead Plaintiff from Washington state to nearly two years

of homelessness in Massachusetts, then again human trafficked Lead Plaintiff to ten months of

fraudulent employment in Fort Lee, NJ at ESTABLISH Inc, a logistics consulting firm domestic

and international cover operation.

B. In Summer 2007, ROSENBERG orchestrated a "consulting firm" interview in

western suburb of Boston, MA for Lead Plaintiff, which was actually with Mossad, the Israeli

intelligence agency with expertise in terrorism and in terrorism screening, for the purpose of

creating a fictional terrorism legend to be associated with the Lead Plaintiff, placing him in

further physical danger from misguided police powers personnel and potentially members of the

public as he was further human trafficked to northern NJ and the greater NYC area. This absurd

premise, the interview with Mossad, was then spread by defendant ROSENBERG (who had

known Lead Plaintiff in his prior commercial cover in Seattle, WA for about two decades), defendants FBI, CIA, and possibly media personages including, without limitation, MELBER (formerly FBI with a direct former undercover relationship with Lead Plaintiff, paragraphs 494-501), to other defendant police powers operations and media (some previously also having had surreptitious relationships with Lead Plaintiff) in New York City and northern New Jersey, shortly before his August 2007 human trafficking to Fort Lee and Cliffside Park, NJ. This investigation was confirmed in 2021 by defendant NYPD, then immediately fraudulently concealed by NYPD and FBI, paragraph 555-562 and Interline Exhibits 17-18.

C. In September 2007, FBI's Charles ROSENBERG (while known as William Drumm, ESTABLISH General Manager of US operations) orchestrated and conspired with British intelligence and police powers organizations to human traffick Lead Plaintiff to London, United Kingdom for an ostensible week-long company international business conference, and thereby again develop pretexts (as in 1995 at PAN, see NSEC-2) for international spying on Lead Plaintiff. British intelligence and police powers operations (likely London Metropolitan Police, MI-5, and MI-6) posed at this September 2007 London meeting as international employees of defendant ESTABLISH posted at varied location in Europe, including its ostensible Swedish headquarters, and as employees in China.

D. This series of defendants' RICO frauds included police powers and media personnel posing as company executives and employee in professional police powers (and some media) roles, which facilitated color of law pretexting to permit foreign intelligence operations to "legally" engage in color of law spying upon the Lead Plaintiff in London and elsewhere in Great Britain, as well as within the United States using intelligence acquisition methods and assets which defendant UNITED STATES cannot legally deploy against its own citizens.

E. For the several months before and during this London trip, and into early 2008, defendant UNITED STATES operated primarily through William Drumm (ROSENBERG) and several other US based "employees" of ESTABLISH (including agents known as Ray KOVONUK. Piotr PREGNER, Steve MCDONALD, and Jason PANKOWSKI), and engaged other various federal, state, and local police powers and intelligence operations and assets in the greater New York City area in this corrupt color of law civil rights and racketeering pattern of acts, violations, and injuries, which continues into the present.

F. In September 2021, defendant NYPD verified and then disappeared evidence of a terror related investigation against the Lead Plaintiff (Interline Exhibits 17 and 18) surrounding the initial human trafficking, when Lead Plaintiff was met around November 2007 on his first recreational outing into New York City at the Port Authority Bus Terminal by about two dozen NYPD uniformed counter-terror squad members in bulletproof vests, helmets, and bearing submachine guns along the west side of Eighth Avenue. Together with defendant FBI's fraudulent concealment, these acts further delayed discovery of the primary responsible defendants (FBI and CIA) for the decades long overall pattern of BRMT human experimentation and bioweapon abuse, the racketeering associated-in-fact enterprise, and their fraudulent concealment, until the September 2023 forensic breakthrough in this case described at LPEE page 12251-12261.

G. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. Witness testimony, including direct examination of defendant UNITED STATES undercover personnel, including ROSENBERG, KOVONUK, PANKOWSKI, MCDONALD, ROSS, and others who worked at ESTABLISH, and discovery against these defendants will confirm this specific incident and the surrounding events. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 17, 18, 19 |
| --- | --- |
| Complaint paragraphs: | 494-501, 555-562, 604D, 606N HEXP-1, 3 |
| Appendix 2 paragraphs: | 1-031, 1-032 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0003 through 2-0012, 2-0024, 2-0059, 2-0060, 2-0095, 2-0097, 2-0109, 2-0153, 2-0155, 2-0202 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 8351-8355, 11639, LPEEV65-6, 7, 17 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

[Intentionally left blank.]

# ILLEGAL HUMAN EXPERIMENTATION (HEXP series offenses)

### *Biological and Medical Invasions- Torture*

### *604. HEXP-1 Illegal Human Experimentation:* **BRMT Induced Torture, Washington State 2002-2005**

A. As forensically reverse engineered, defendant UNITED STATES used BRMT and carefully orchestrated extremely adverse life event sequences in 1974-1977 at WSU, Pullman, WA; in 1988-1989 in Redmond, WA; and in 2002-2005 in Kirkland, WA; to disguise and enhance a series of extreme biomedical hijackings of Lead Plaintiff's brain chemistry. The most intense in this specific series occurred in 2002-2005. Stealthy, very high intensity, and long running illegal BRMT bioweapon and bioweapon delivery system hijackings of serotonin levels comparable to months and months of "Chinese Water Torture" were endured by the Lead Plaintiff, inducing periods of clinical depression, among other adverse health effects, as early as the 1970s into the 2020s. "Serotonin is a neurotransmitter and hormone that influences mood, sleep, digestion, and other body functions" (Source: Cleveland Clinic website).

B. These extreme illegal BRMT bioweapon and bioweapon delivery system brain chemistry hijackings were combined with (i) a years-long campaign of defendants' field-deployed coercive psychological operations, with (ii) the stress of a fraudulently derived relationship from 1988, subsequently manipulated and repeatedly damaged to total destruction by 2004 with Jeanette his second wife, with (iii) a total loss of income, and with (iv) multiple simultaneous litigations required in the early 2000s (*Brewer et al v. CNA*, *Allegent v. ShipNow* check fraud and *Allegent v. ShipNow* intellectual property theft litigation, paragraph 644 RICO-6) to attempt to recover various racketeering thefts, frauds, and the programmed destruction of Allegent, LLC, his small business which he unwittingly co-owned with defendant UNITED

STATES' PRAY during this period, all as described in other subcounts herein, for the benefit of defendant UNITED STATES, as perpetrated through the orchestrations and direct participation of, without limitation, defendants FAUCI, ROSENBERG, CALDWELL, MELBER, and other unknown individual defendants.

C. Defendant UNITED STATES also developed a program intended to invoke public vigilantism focused on Lead Plaintiff which its departments and agencies propagandistically used to shaped public perception by his deliberate online public exposure during this period unbeknownst to him at the time, and by an accompanying public narrative of lies and rumors pushed by these same defendants, principally defendant UNITED STATES. Together with defendants' direct manipulations, this public vigilantism created by propagandistic manipulations of the public narrative and the creation of sustained oppressive life circumstances across all dimensions of Lead Plaintiff's life, which foreclosed career and entrepreneurial choices, otherwise his to make in a free society in the absence of the false narrative created by defendant UNITED STATES (these choices were forcibly removed and were not his to make), to intimate personal relationship choices he believed were his to make (these choices were forcibly removed and were not his to make), and shaped public perceptions and direct public vigilantism, including threats of lethal violence, against the Lead Plaintiff.

D. This was an overwhelming campaign by defendant UNITED STATES and its co-conspirators directed against the Lead Plaintiff which is comparable to and worthy of any of the world's great demagogues and propagandists throughout history. Together with the serotonin hijacking using the illegal BRMT bioweapon and bioweapon delivery system, it was nearly fatal. See the full text on psychological torture at LPEEV65-17:

# Torture vs Other Cruel, Inhuman, and Degrading Treatment

## Is the Distinction Real or Apparent?

Metin Başoğlu, MD, PhD; Maria Livanou, PhD; Cvetana Crnobarić, MD

**Context:** After the reports of human rights abuses by the US military in Guantanamo Bay, Iraq, and Afghanistan, questions have been raised as to whether certain detention and interrogation procedures amount to torture.

**Objective:** To examine the distinction between various forms of ill treatment and torture during captivity in terms of their relative psychological impact.

**Design and Setting:** A cross-sectional survey was conducted with a population-based sample of survivors of torture from Sarajevo in Bosnia and Herzegovina, Banja Luka in Republica Srpska, Rijeka in Croatia, and Belgrade in Serbia.

**Participants:** A total of 279 survivors of torture accessed through linkage sampling in the community (Banja Luka, Sarajevo, and Rijeka) and among the members of 2 associations for war veterans and prisoners of war (Belgrade).

**Main Outcome Measures:** Scores on the Semistructured Interview for Survivors of War, Exposure to Torture Scale, Structured Clinical Interview for DSM-IV, and Clinician-Administered PTSD (posttraumatic stress disorder) Scale for DSM-IV.

**Results:** Psychological manipulations, humiliating treatment, exposure to aversive environmental conditions, and forced stress positions showed considerable overlap with physical torture stressors in terms of associated distress and uncontrollability. In regression analyses, physical torture did not significantly relate to posttraumatic stress disorder (odds ratio, 1.41, 95% confidence interval, 0.89-2.25) or depression (odds ratio, 1.41, 95% confidence interval, 0.71-2.78). The traumatic stress impact of torture (physical or nonphysical torture and ill treatment) seemed to be determined by perceived uncontrollability and distress associated with the stressors.

**Conclusions:** Ill treatment during captivity, such as psychological manipulations, humiliating treatment, and forced stress positions, does not seem to be substantially different from physical torture in terms of the severity of mental suffering they cause, the underlying mechanism of traumatic stress, and their long-term psychological outcome. Thus, these procedures do amount to torture, thereby lending support to their prohibition by international law.

*Arch Gen Psychiatry. 2007;64:277-285*

E. Lead Plaintiff sought out his physician Paul Mayeda one day after the suicide ideation, but was met by a so-called female physician's assistant in an otherwise empty Lakeshore Clinic medical office. This had never happened before. As Lead Plaintiff left the patient examination area, the figure representing his doctor Paul Mayeda had his back turned to the Lead Plaintiff on a stool and he did not turn to greet the Lead Plaintiff – very unusual. There were no other patients nor any other personnel than one receptionist, the physician's assistant, and the white coat male figure on the stool, observed in this entire normally moderately busy 2 story multi-doctor Lakeshore Medical Clinic facility near Evergreen Hospital, Kirkland, WA. A prescription

for paroxetine (Paxil, an SSRI, antidepressant) was entered and used to relieve the BRMT induced serotonin overdose.

F. Defendant UNITED STATES has since actively conspired to conceal its medical acts by destroying the Lead Plaintiff's personal medical records through the passage of time. After human trafficking the Lead Plaintiff through programmed destruction in Washington, through homelessness in Massachusetts, then to fraudulent employment in New Jersey, these essential medical records from about 1990 to 2005 were not sent to the Lead Plaintiff in 2007 despite his written request sent by US Mail to his Kirkland, Washington primary care physician.

G. This form of evidence suppression and destruction is a common pattern of practice of defendant UNITED STATES, as documented elsewhere throughout this Complaint. Lead Plaintiff's own father was a medical practice examination room paper salesperson between about 1960 and 1963. He routinely bought expired x-rays for recycling by his employer from medical practices in northern and southern California which sales targets were specifically assigned by his employer, Pacific Paper Products, Tacoma, Washington. This was a defendant FBI cover operation to cover its illegal tracks and suppress evidence of criminal violence during Cointelpro, a violent felony-filled campaign against civil rights activists and others, which was in full violent operation at the time. When Lead Plaintiff's father was asked to undertake the same pattern in Texas, he quit the company and returned to Washington state with his young family (paragraph 414-418).

H. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 414-418, 606N HEXP-3, 644 RICO-6 |
| Appendix 2 paragraphs: | 1-013, 1-014, 1-015, 1-023, 1-062 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0003 through 2-0006, 2-0015 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 140 et al, 371, 575-597, 9679-9696, 10372, LPEEV65-1, 17 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

I. These schemes and conspiracy in the illegal human experimentation (HEXP) series required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment;

illegal human subject medical experimentation without consent, to and including torture and

suicide ideations; systematic constitutional rights violations; and racketeering acts in an

associated-in-fact enterprise. All paragraphs above are incorporated herein by reference

including, without limitation, paragraph 599, with particular attention directed to paragraph

599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of

5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical

confirming information directly from these institutional and individual defendants and, among

some who presented at the time as family members, their children. See other selected relevant

content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages

934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.

Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 13, 14, 16-18 |
| Complaint paragraphs: | 10, 99, 61-67, 226 table, 308-311, 320e, 332-341, 357-399, 414-418, 419-584; 600H, 602, 603B, F, G, L NSEC-1, 3, 4; 604, 605, 606, 608, 609C, 613, 615-619 HEXP-1-3, 5, 6, 10, 12-16; 621 626, 629, 630 RGTS-1, 6, 9, 10; 634C RGTS-14, 641 642 644 648, 649, 650B(i), 651D, 653, 656 683 RICO-3, 4, 6, 10, 11, 12, 13, 15, 18, 45; 802B, 821, 839, 842B(ii); Appendix 1 – Prior Filings History |
| Appendix 2 paragraphs: | Entirety |
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 140 et al, 368-793, 7467-8179 (2014-2018), 2023 Financial Times photo confirmation of identity at 7470-7470A, 8233-8262, 8263-8287, 8347-8350; 9679-9696, 10256-10258, 10306-10310, 10335-10342, 10346-10351, 10365-10375, 10372, 10394-10422, 10428, 11653-11654, 11668, 12129 (third paragraph), 12121-12149, 12150-12159, LPEEV65-1, 3, 5, 6, 7, 17 |
| Emails and documents by topic and date, also located in LPEE: | Hurd Pine Street Inn update 110419.pdf<br>Bergen Regional Sinisi re resume and cover ltr 101230<br>D Brewer Marriage Cert May 5 1984 Lynne 840505.pdf<br>D Brewer Marriage Cert May 5 1984 Lynne 840505.pdf |

| | D Brewer Marriage App Jeanette 1990 900330.pdf |
| --- | --- |
| | D Brewer Marriage App Jeanette 1990 900330.pdf |
| | Jeanette Timeline 1 061001.pdf |
| | Jeanette Timeline 2 061001.pdf |
| | Jeanette Timeline 3 061001.pdf |
| | Jeanette timeline email 061001.pdf |
| | Match Group Second Notice re Preserve Evidence 220122, |
| | Match EPL Response 221110, |
| | Match Group Legal Dept Email 221110, |
| | MODDERMAN email re PANKOWSKI wedding Drumm attends 080625, |
| | MODDERMAN email re PANKOWSKI wedding Drumm attends 312pm 080625, |
| | MODDERMAN re wedding 080626, |
| | MODDERMAN email re PANKOWSKI wedding Drumm attends 817am 080627 |
| | AKOTO re AltaVista bad actor 161018, |
| | AKOTO re BLACKPOOL then DD 170315, |
| | AKOTO Laura re $2K to Mr Prince from Porter Patten $3K 171021, |
| | AKOTO Hints of money laundering entrap scam 171025, |
| | AKOTO Ramsey Fixup Expenses 171027 |
| | AKOTO Mailing Address 150101.pdf |
| | Gia first date 211207 (note actual date was in 2019) |
| | Match Group Second Notice re Preserve Evidence 220122, |
| | Match EPL Response 221110, |
| | Match Group Legal Dept Email 221110 |
| | New York Cares Library Bowling Outing 080815 |
| | Certain emails are blocked by a defendant UNITED STATES computer hack |

### *605. HEXP-2 Illegal Human Experimentation:* **BRMT Induced Torture And Psychological Operations, Massachusetts 2006-2007**

A. As forensically reverse engineered, during 2006-2007, defendant UNITED STATES

again used the illegal BRMT bioweapon and bioweapon delivery system and defendants'

carefully orchestrated life event sequences to disguise and sustain a series of biomedical

hijackings of Lead Plaintiff's brain chemistry. This combination of stealthy high frequency

hijackings (comparable to "Chinese Water Torture"); long duration extreme daily headaches and

severe vision impairment for protracted periods of extreme duress; and BRMT hijacked adrenaline levels induced hypersensitivity to certain sounds (such as the crinkling of plastic bags) which were employed each night in a public shelter by Lead Plaintiff's nearby minders while he was homeless. These acts, together with occasional "fights" among the "homeless residents" which included a rotating security detail at Dorchester Heights Catholic Church basement where most of this period was spent by the then unwitting Lead Plaintiff, and the drug and alcohol abuse induced collapses of consciousness which lead to concussions among the actual homeless residents at Pine Street Inn, and the destruction of his eyeglasses during which period he could not see clearly for about ten days as replacements had to be paid and manufactured, worked together with other illegal BRMT bioweapon and bioweapon delivery system imposed symptoms to amplify this emotional anxiety.

B. The October 31, 2017 symptoms identified at LETHL-9 were experienced daily with extreme pain and blurred vision for approximately 12 of the 17 months spent in the Pine Street Inn homeless shelter system in Boston, MA between about April 2006 and August 2007. This daily extreme head pain and blurred vision recurred each morning as Lead Plaintiff left the Dorchester Heights satellite shelter location, rode a 12 passenger van to the Pine Street Inn, then walked to the Boston Public Library where he spent most days reading. Despite the extreme pain, he was required to keep his eyes open and focused on reading material so the circulating security guard would not order him to leave the premises because he was not actively reading or had his eyes closed as the extreme headache and blurred continued for about 90 to 120 minutes each day. A further 60 minutes or so was required to fully recover from the pain and blurred vision. At one point, his eyeglasses were crushed and he was unable to see clearly for about ten

days, but necessarily had to focus on books to avoid being removed from the shelter of the library, described at subparagraph E below.

C. Identical extreme headache symptoms recurred in Cliffside Park, NJ, in 2008-2010 each morning soon after he returned to his apartment from the Edgewater, NJ Starbucks coffee shop he went to each day. These symptoms consistently recurred in connection with these same event sequences each morning, and abruptly appeared and months later abruptly disappeared with no clear medical explanation. These symptoms also directly correlate with extreme headaches and blurry vision experienced on occasion for a few days during 2021 and 2022 at his Edgewater, NJ apartment. A neurological examination in Boston, MA, in 2007, and MRI brain scans in New Jersey at Bergen Regional Medical Center hospital in 2010, and Palisades Medical Center hospital in 2021, provided no medical explanation for these symptoms or for the long-duration episodes of recurrence and abrupt disappearances. The illegal BRMT bioweapon and bioweapon delivery system imposed these torturous symptoms, effectively 90 to 120 minute daily periods of direct torture imposed remotely and triggered by operators with knowledge of Lead Plaintiff's schedule.

D. In late June 2006, one of Lead Plaintiff's minders left a single broadsheet page (four pages of newspaper content on a single sheet as printed) of the Boston Globe newspaper carefully folded to that story on the end table next to the Dorchester Heights shelter common room couch on which Lead Plaintiff normally watched the evening news. The folded section face up on adjacent coffee table contained an article about the suicide of Denise Denton, then Chancellor of the University of California at Santa Cruz. Lead Plaintiff quickly noticed this announcement about Chancellor Denton, who jumped to her death from her 33rd floor high rise apartment in San Francisco which she shared with her female partner. She had previously been

the Dean of the College of Engineering at the University of Washington in Seattle, WA, and had invited the Lead Plaintiff to join the College's Board of Advisors, which met periodically to advise Dean Denton.

E. These psychological operations, also included, without limitation, (i) the above reminder of his own previous suicide ideation in Kirkland, WA (paragraph 604 HEXP-1), (ii) the theft and destruction of Lead Plaintiff's eyeglasses from his locker at Pine Street Inn while he was showering each morning, which were then crushed beyond use and left on a sidewalk he used each day to reach the Boston Public Library on the day after the theft, and (iii) his left big toe which was abraded with a file so it split down the middle during deep sleep which can be easily secured by a BRMT brain hijack, and then had to be ripped out of the nail bed piece by piece with surgical pliers at the local hospital so it could regrow properly.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their

children. See other selected relevant content at paragraph 600Q and in searchable indexes and

lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added

subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount

follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 604 HEXP-1, 606N HEXP-3 |
| Appendix 2 paragraphs: | 1-030 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0125, 2-0150 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 10306-10310, LPEEV65-17 |
| Emails and documents by topic and date, also located in LPEE: | Hurd Pine Street Inn update 110419.pdf |

### 606. HEXP-3 Illegal Human Experimentation: BRMT Induced Torture And Psychological Operations, New Jersey 2008-2011

A. As forensically reverse engineered, during the second half of 2008 through early 2011,

defendant UNITED STATES used the illegal BRMT bioweapon and bioweapon delivery system

and defendants' carefully orchestrated life event sequences to disguise and sustain a series of

biomedical hijackings of Lead Plaintiff's brain chemistry. The methods used by defendant

UNITED STATES, and its defendant police powers co-conspirators and private sector co-

conspirators during this period were even more extreme than previously experienced. Illegal

BRMT imposed brain chemistry and physical hijackings of brain, central nervous system and

muscles was particularly extreme, severe, and of long duration, leading to Lead Plaintiff to

repeatedly cry out in pain and suffering (which he had not done in any previous months-long

sequence) imposed by defendant UNITED STATES use of BRMT. These illegal BRMT

bioweapon and bioweapon delivery system hijackings continued to be combined with the

coercive field-deployed psychological operations routinely used by defendants to influence a variety of Lead Plaintiff's personal decisions.

B. In late 2008 and the first few days of 2009, the Cliffside Park apartment events sequence included two flights of Canadian Geese which flew about ten feet above the building's parapet. The same birds would cause the January 15, 2009 dual engine flame-out of US Airways Flight 1549 as two formations of the birds were ingested into the intakes of both jet engines. Lead Plaintiff stood at the same top floor living room window to witness this event as he had in those preceding weeks when the two flights of geese had passed his living room window. He also experienced a BRMT imposed visual grayscale image on his visual cortex (the brain's vision processing center, see illustration below). The aircraft was in a very unusual slow flight condition and was completely silent when it necessarily would have been in full power slow flight mode. An actual aircraft of this type and size would not have legally been able to operate in this manner, nor in the almost impossible aircraft structural and aerodynamic configuration it supposedly operated a few hundred feet above the Palisades over Fort Lee, NJ, directly north of his Cliffside Park, NJ apartment. During forensic analysis of tradecraft patterns undertaken by the Lead Plaintiff in 2021-2022, it became apparent that these tradecraft signals (Canadian Geese sightings) and illegal BRMT hijackings (the out of position jet image over Fort Lee, NJ and the Palisades), clearly indicated foreknowledge and planning of the US Airways Flight 1549 Hudson River emergency landing which Lead Plaintiff witnessed on January 15, 2009 from the Cliffside Park apartment living room window.



C. The US Airways Flight 1549 emergency water ditching on the Hudson River occurred

five days before the Presidential inauguration on January 20, 2009. An earlier Conyers, GA Bio-

Lab arson fire in May 2004 had occurred about five and one-half months before the 2004

Presidential election, and a few weeks after a fraudulent "sales appointment" with defendant

UNITED STATES (Zoe SCHUMAKER who also possibly posed at other times as Phyllis

PRAY, Darrell PRAY, and others in a "Bio-Lab" conference room in Lawrenceville, GA for an

alleged IT project, which was an element of the surreptitious programmed destruction of

Allegent, LLC, (paragraph 602 NSEC-3), and in records handed to defendant ROSENBERG

(FBI, paragraph 462), an element of the pattern of precursor events by defendant FBI

(ROSENBERG) human trafficking to eliminate the 2005 FTCA claim from consideration, and

human traffick Lead Plaintiff from Kirkland, WA to Boston, MA and homelessness in

December 2005. Several years earlier, Lead Plaintiff had earlier visited the White House West

Wing during an AeA trade association (formerly American Electronics Association, representing

Microsoft, Hewlett-Packard, Intel, Motorola, and other technology companies) Board meeting in

May. While at the White House, a USSS agent pulled a hatch cover in an aisle and he was

shown an old swimming pool which was under the Press Room wherein his picture below was

taken at the podium by another USSS agent, and later mailed to Lead Plaintiff by AeA

Executive Director Bill Archey.



D. Based upon forensic analysis of tradecraft by Lead Plaintiff, both events' tradecraft

(Bio-Lab meetings and Canadian Geese (preceding Flight 1549), and the related BRMT visual

cortex jet aircraft imagery described paragraph B above, were and are indicative of national

security related willful domestic sabotage, which was almost certainly internally known in

advance and the US Airways Flight 1549 internal sabotage event was deliberately signaled to

him in advance by elements of defendant UNITED STATES, as they intended and did engage in

knowing and willful domestic sabotage.

E. This early 2009 aircraft ditching was followed by a brief out of place sighting, likely in the few months of 2009 soon after an Obama visit to NYC, wherein the "Beast" Presidential limousine was driven by the Lead Plaintiff's Cliffside Park NJ apartment as he stood at his kitchen window looking down onto Palisade Avenue, a kitchen window he rarely visited as he spent his daylight hours almost exclusively in his living room area.

F. A combination of stealthy high frequency illegal BRMT bioweapon and bioweapon delivery system brain hijackings including brain chemistry hacking, a long-running repeat of the series of the Boston extreme headache series (paragraph 605 HEXP-2) comparable to a severe recurring form of "Chinese Water Torture," with the addition of intense physical cramping symptoms and other body manipulations and malfunctions, comprised a protracted pattern of extreme duress and biochemical torture, with newly added physical torture, over many months of 2009 into 2010. These extremely coercive circumstances led directly to Lead Plaintiff's second suicide ideation at the southeast corner of Thompson Lane, Edgewater, NJ, during a return trip from his typical morning Starbucks coffee and newspaper reading visit at Edgewater Commons, where he was blocked from entering active on-coming street traffic by two pedestrians standing on that street corner blocking his path.

G. Somewhere during this period, Landlord CHALOM (USMS) visited the apartment and reported the removal of a "terror suspect" from the premises by FBI for deportation proceedings. Lead Plaintiff pursued a civil rights claim, preparing it over months in Spring 2010 still not recognizing he was in an USMS "safe" house run by CHALOM at that moment. The case was docketed on June 23, 2010, a federal district court complaint (Newark, case number 10-3204 (SDW)), never acted upon by the district court judge it was assigned to as legally required under 28 U.S.C. § 1915. Lead Plaintiff was notified of his ejection from the monthly

rental as of August 30, 2010 by landlord CHALOM (USMS) in July 2010, and was later forced

to leave his Cliffside Park, NJ apartment on October 1, 2010 after a thirty day overstay.

H. Shortly before his forced departure from this Cliffside Park, NJ apartment on October

1, 2010, he experienced three aural messages delivered from behind one afternoon which

appeared as aural hallucinations from the "United States Secret Service" (defendant USSS)

instructing him to descend to the building's basement and hide, a behavior which was witnessed

by two female undercover agents standing at the doorway of the apartment immediately below

his apartment. These agents were most probably defendant USSS personnel temporarily at this

location in this Cliffside Park USMS "safe" house.

I. On October 1, 2010, Lead Plaintiff traveled to Hackensack, NJ to a defendant

BERGEN COUNTY homeless shelter and was sent on to a non-existent BERGEN COUNTY

daily shelter at a non-existent address nearby, walked to and was referred by Hackensack Police

to a South Hackensack budget motel where he was aggressively BRMT hijacked overnight,

called 911 the following morning, and was then contacted by a South Hackensack, NJ Police

officer and ambulance, transported to, and kidnapped into Bergen Regional Medical Center on

October 2, 2010, about 100 days after that federal court filing was made (paragraph 808).

J. This involuntary commitment on October 2, 2010 occurred while Lead Plaintiff sat in

the emergency room of Bergen Regional Medical Center for about 12 hours, before being

wheeled to a locked psychiatric ward, and was told about five days later by his "counsel" he had

been ordered involuntarily committed for fourteen days. The lack of any actual NJ state law

compliant court procedure is discussed at paragraph 808.

K. The ejection from Cliffside Park, NJ housing mimicked the prior ejection in 2005,

about 100 days after hand delivering an FTCA claim to Washington, DC, in September 2005,

where he had traveled soon after that FTCA claim had not been delivered by either USPS or
FedEx while he resided in Kirkland, WA.

L. This event sequence was not understood by Lead Plaintiff until after the 2021 forensic
analysis was started, whereupon the Flight 1549 circumstances and other related events were
reported as they became more clearly understood to the US Attorney for SDNY in December
2021 (LPEE pages 368-793, LPEEV65-11-16). Explicit identifications which facilitated the
institutional defendant connections were not yet understood at that time but have become much
more apparent since other identifications were able to be made beginning in Summer 2023. All
letters, hand delivered, have been met with total silence from SDNY (DOJ), just like all prior
communications from Lead Plaintiff to federal police powers and intelligence personnel. The
kidnapping sequence was not apparent until the failure to comply with state law was made clear
during a forensic review of the hospital admittance process lack of legal compliance was
discovered in April 2024 and led to the addition of the kidnapping count to this series of
complaint drafts. Defendant UNITED STATES has and does engage in direct acts of fraudulent
concealment and a classic surreptitious whistleblower war against Lead Plaintiff (and others in
this class), at least since defendant ROSENBERG (FBI) began the process in the early 2000s
soon after the September 11, 2001 attacks using newly expanded powers to drag the Lead
Plaintiff from national security entanglements into the terrorism space as acknowledged by
defendant NYPD at Interline Exhibit 17. Apparently praying in a home church led by fraudulent
church infiltrator BREYER, working, babysitting, and socializing with these defendant UNITED
STATES personnel, and with other undercover USMS and CIA personnel, among others, from
high school age forward (BREYER's "Snow family" children and "Sackville-West family"
children, paragraphs 99b, 226 table, 421, 492-493, 501), babysitting FBI and ARMY personnel

children from the 1980s into the 1990s (including children of RUBIN, MELBER, and both VINDMANs), a complete lack of any adverse contacts with police powers while he was unwittingly in their presence almost constantly since high school (KATYAL and others, paragraph 99), and being assigned his fraudulent second spouse Jeanette by them in direct violation of the *Third* Amendment (BURNS, WATERS, paragraph 494), enduring enterprise destruction, property theft, illegal biomedical experiments and torture, among other associated-in-fact enterprise acts, violations, and injuries recounted herein, was insufficient to persuade these defendant UNITED STATES agencies of the Lead Plaintiff's character and conduct, so they have and do feel compelled to continue, without limitation, their sweeping violations of constitutional rights, illegal BRMT bioweapon human subject biomedical abuses, lethality attempts, and other patterns of racketeering acts, violations and injuries, as they perpetuate their associated-in-fact enterprise to sustain involuntary servitude in systematic violations of the *Thirteenth* Amendment, ratified in 1865, from the early 1960s to the present day.

M. Defendants have and do continue other coercive psychological operations, and public vigilantism inspired by defendants, and have and do create and sustain oppressive life circumstances across all dimensions of Lead Plaintiff's life, from career and entrepreneurial choices and outcomes, to intimate personal relationships, to illegal BRMT bioweapon brain hijacking, and continuing efforts to shape public perceptions and direct public vigilantism, including by multiple threats of violence and coercion to and including lethal violence attempts directed at Lead Plaintiff, as related herein.

N. The torture escalation sequence across the illegal BRMT torture psychological and illegal BRMT biomedical hijackings from 2002 coercive psychological operations have and do progress as follows:

| | Location | Defendant UNITED STATES Illegal BRMT Brain Hijackings And Racketeering Patterns |
|---|---|---|
| 2001-2002 | Kirkland, WA 149th Street home | Prelude sequence - 9/11 attack is proximate to 90 minute Capitol Hill interview with Rep. Dunn, close to Bush 43, meet with Adam Smith, all intended to secure a baseline for torture escalation sequence below – illegal medical research methodology used by FAUCI and other researchers |
| 2002-2003 | Kirkland, WA 149th Street home | Allegent, LLC financial wrecking, another in the series of prolonged marital separations from Jeanette, Jeanette suicidality phone call from the Lewis (MELBER, FBI) second home, CNA compensation theft litigation, and street level coercive psychological operations begin |
| 2004-2005 | Kirkland, WA 149th Street home and 124th St apartment | (a) Coercive psychological operations, *adding* (b) then unrecognized illegal BRMT biochemical brain hijacking *used* to induce biochemical depression and suicide ideation |
| 2006-2007 | Boston, MA hotel (4 months) then homeless shelter (17 months) | (a) Coercive psychological operations and (b) unrecognized illegal BRMT biochemical brain hijacking to depression, *adding* (c) Extreme daily morning headaches imposed by illegal BRMT hijacking while enroute to Boston Public Library - where eyes must be kept open at all times to avoid being removed from the Library for sleeping in the Library, required reading with vision extremely limited |
| 2008-2010 | Cliffside Park, NJ apartment, forced homelessness upon filing of civil rights litigation | (a) Coercive psychological operations, (b) illegal BRMT biochemical brain hijacking to depression, (c) extreme daily morning headaches, *adding* (d) Extreme physical body cramping of arm, leg, and chest muscles to induce verbalizations, biochemical depression, and suicide ideation |
| 2010-2011 | Paramus, NJ involuntary confinement in behavioral health ward after no-notice no appearance civil hearing, if any | Violent thoughts *added* through illegal BRMT brain hijacking, coercive drop of federal civil rights litigation leads to rehousing ten weeks after coercive drop, housing had always been available during confinement, clear coercion to force drop in using an embed "patient" to describe prolonged confinement |
| 2011-2018 | Ramsey, NJ | Initial violent thoughts and biochemical depression, transition away from covert biochemical torture, continued coercive psychological operations, followed by federal and local police powers illegal coercive operations and entrapments, e.g., sex traps, FBI and/or |
| 2018-present | Edgewater, NJ | |

| | | CIA Akoto and interstate commerce asset stripping and structured payment entrapments, sex traps, psychological isolations reprises, then 2018 human trafficking and coercive psychological operations again into national security entanglements from the 1970-1990s, *adding* accelerated lethality sequences in 2021-2024 |

O. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 99, 226 table, 421, 444, 462, 492-493, 501, 602 NSEC-3, 605 HEXP-2 |
| Appendix 2 paragraphs: | 1-032 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0153 |

| LPEE pages (see technical note on page numbering at paragraph 230): | LPEE pages 368-793, LPEEV65-11-17 |
| Emails and documents by topic and date, also located in LPEE: | Bergen Regional Sinisi re resume and cover ltr 101230 |

### 607. HEXP-4 Illegal Human Experimentation: BRMT Induced Emotional Swings And Short Cycle Torture Sequences Through 2023

A. As forensically reverse engineered, defendants have and do orchestrate a variety of

short cycle torture sessions in public places subsequent to the sequences above including,

without limitation:

> 1) Ongoing: frequent apparent emotional excursions from calm baseline behaviors
>
> (see paragraph 320e and LPEE pages 190-236, independent psychological
>
> validations of actual personal emotional stability), which would be indicative of
>
> bipolar emotional swings, have been and continue to be illegal BRMT hijackings
>
> in all variety of venues, ranging from Lead Plaintiffs' personal residence (which
>
> is systematically surveilled without consent) to public accommodations and
>
> venues he attends from bus transportation to sidewalks to parks, to theaters and
>
> museums. These BRMT hijackings have been and are used to create false public
>
> perceptions about Lead Plaintiff's emotional stability as he has been and is
>
> pervasively surveilled and hijacked at defendant UNITED STATES' convenience
>
> to create false perceptions as it manipulates and controls this false narrative about
>
> his emotional stability, which is directly contradicted by independent tests (LPEE
>
> pages 190-236). These emotional hijackings are particularly pervasive but still
>
> erratically applied, such as in moments when Lead Plaintiff cites his great-great
>
> grandfather and the act which resulted in his Medal of Honor award in 1865, so

are most probably indicative of the personal backgrounds of defendant UNITED
STATES' BRMT operators in their continued illegal acts.

2) Mets game August 2021: Defendant UNITED STATES (CIA), inflicted extended
extreme pain in a left knee lateral collateral ligament (for about 7 to 10 minutes as
a USMS/CIA security team member (white male early 30s) stretched his left leg
to a fully extended position over the empty seat in front of them), and the Lead
Plaintiff was put to sleep immediately prior to two base hits with loud home
crowd noise, and reawakened as the two men stood on first and second base.

3) August 1, 2023: when sleep deprivation over a three day period was used to
prime the Lead Plaintiff for one of thousands of attempts to orchestrate some sort
of public outburst of violence by Lead Plaintiff. None occurred, and never has
occurred, though he does at times speak openly in public places without a direct
audience, as he recognizes the pervasive pattern of surveillance that
accomppanies his unintended public notoriety as purposefully perpetrated by
technical hacks by defendant police powers and collaborating media.

4) September 23, 2023: during a Wynton Marsalis concert, as defendant UNITED
STATES, likely CIA, inflicted extended extreme pain left knee lateral collateral
ligament for ten minutes initially, then an additional five minutes after the
intermission.

5) October 10, 2023: during a bus trip after depositing written evidence of BRMT
and racketeering with members of Congress as defendant UNITED STATES,
likely CIA, inflicted extreme pain by an extended period of cramping of the right

palm and an extended period of extreme pain in a knee tendon behind both knees, see LPEE pages 12146-12149.

6) October 20, 2023: while awaiting NJ Transit bus route 158 from about 6:00 P.M., as defendant UNITED STATES, likely CIA, with a strong adrenaline (angry emotional sensation) surge which was physically associated with the simultaneous arrival of a bearded male agent at the bus stop immediately south of Thompson Lane, Edgewater, NJ, after some delay in the scheduled arrival of the bus; but which was actually the direct result of an illegal BRMT bioweapon and bioweapon delivery system hijacking to create a flash release of extreme adrenaline (fight or flight anger momentary response), intended by the BRMT operator to be directed by the Lead Plaintiff at that federal undercover officer who arrived at that moment. This sequence is quite familiar to the Lead Plaintiff from other similar events. The BRMT hijacked emotion is experienced by the victim as completely authentic, as it directly hijacks the specific brain biochemistry in which that emotion originates (by causing a short-term extreme biochemical surge which is similar in intensity to a muscle cramp). The hijacking is impossible to detect without prior specific experience to recognize it as fraudulently manipulated by the illegal BRMT bioweapon and bioweapon delivery system. This poses a clear and present danger to the member of the public who is the victim of this extreme biochemical hijacking, and to any nearby member of the public or undercover police officer who would be completely unaware that the entire sequence leading to the assaultive moment was being remotely hijacked by the illegal BRMT bioweapon and bioweapon delivery

system. See the contemporaneous write-up of this hijacking event by defendant UNITED STATES (CIA) at LPEE pages 12150-12159.

B. These occurrences have become commonplace in Lead Plaintiff's life experiences over the past twenty years since the first illegal BRMT cramping of the palm was experienced around 2004, though they were certainly not recognized for what they actually were and are – the direct hijacking of the human brain's biochemical and central nervous system to control a victim's mood and muscles through an illegal brain hijacking. Incidents of short cycle torturous abuses of the central nervous system by defendant UNITED STATES against the Lead Plaintiff number in the thousands, or perhaps tens of thousands over the years, so no attempt has been made to document each event as they were not recognized for a long time and there have simply been too many to count. Medical records, including neurological examinations and MRIs, show no neurological damage which would provide any alternate organic medical explanation for these central nervous system hiajckings by illegal BRMT abuse.

C. Defendant UNITED STATES most probably employed this method of extreme illegal BRMT biomedical abuse to orchestrate the murder of Audrey Brewer in September 2011 (paragraph 10) using an physically and emotionally abused female intermediary as the direct perpetrator while acting in apparent extreme rage under the direct influence of the illegal BRMT bioweapon system used to physically hijack her rate of pineal gland extreme adrenaline surge (adrenaline fight or flight hormone) to provoke the knife slashing attack which resulted in Audrey Brewer's death from the slashing of her carotid artery in her neck. The female perpetrator had absolutely no history of violence at any time but was also being psychologically provoked by the psychologically manipulative male who was involved in the relationships with both women at various times. The psychological abuse by the apparent perpetrator was used in

the moment to conceal the illegal BRMT bioweapon and bioweapon delivery system and its human operator from detection as the actual perpetrator of the extreme biomedical hijacking.

D. This momentary sense of extreme rage which was most probably experienced by the knife wielder is comparable to the momentary biochemical rage induced in Lead Plaintiff by the illegal BRMT bioweapon and bioweapon delivery system in the August 2023 Manhattan Subway Tunnel Flash Incident documented at paragraph 619 HEXP-16, LPEE pages 11668 and during an unrecorded incident adjacent to Lead Plaintiff's residence between August 2008 and October 2010 in Cliffside Park, NJ. The intent of defendant UNITED STATES (CIA) in orchestrating this process against US persons would have been and would be to facilitate its future deployment against others which it targets for assassination.

E. Since (i) the illegal BRMT bioweapon and bioweapon delivery system is highly classified through on-going abuse of the state secret privilege and defendant DOJ's active participation in its fraudulent concealment from public view, (ii) there is no previously known analogous weapon at any time in human history, and (iii) illegal BRMT hijackings leave no trace evidence behind as these hijackings are biochemically driven using a series of carefully focused energy pulses which penetrate the skull into the brain, and like any energy wave or pulse leave no trace evidence behind. The energy pulse is invisible, there is no abnormal sensation associated with it so it remains concealed. The actual perpetrators. a defendant UNITED STATES' BRMT operator and their chain of command, remain fully concealed from view and could only be detected by understanding enough about this energy weapon to develop a specific detection device for an energy pulse weapon which was not even known to exist. The simple act of destroying any residual classified evidence, such as computer software tracking logs and error trapping log files, encrypted communications transmission logs, and similar device logs, makes

this a perfect crime perpetrated by these defendants. In this homicide case, it was one of the two

victims in that moment of purely evil surreptitious biochemical extreme pulse hijacking of

adrenaline, who was charged with the crime because her hands and body were hijacked to

conduct this crime, actually most probably a live field test of an assassination method, under an

extremely well fabricated set of field conditions in a moment of organizational transition at

defendant CIA (paragraph 10). These types of obstructions of justice by various departments and

agencies of defendant UNITED STATES are common practices extensively documented by

Lead Plaintiff herein at (a) paragraphs 308, 556, 633A, 785, 793, 801, 804B, 806C, 807C, 839,

Interline Exhibits 17-19, (b) in public reports such as the 1975 Senate Select Committee report

referenced at paragraph 339 and LPEE pages 6885-7288, and (c) in the 2014 Senate Intelligence

Committee CIA Torture practices report referenced at paragraph 340.

F. This scheme and conspiracy required and consumed the time and financial resources

of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds,* 345 U.S. 1 (1953).

Discovery will provide critical confirming information directly from these institutional and

individual defendants and, among some who presented at the time as family members, their

...dren. See other selected relevant content at paragraph 600Q and in searchable indexes and

...s at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added

subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcou...

follow:

| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | 10. 320e. 604D. 606N. 619 HEXP-1. 3. 16 |
| Appendix 2 paragraphs: | 1-067 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0217 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 11653-11654, 11668, 12129 (third paragraph), 12150-12159, LPEEV65-1, 3, 17 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

**Orchestrated Personal and Intimate Relationships**

**608. HEXP-5 Illegal Human Experimentation: Personal and Intimate Relationships - Orchestrated Romantic Interests Using BRMT Hormone Hijacking, Generally**

A. As forensically reverse engineered, defendant UNITED STATES has and does use its

illegal BRMT bioweapon and bioweapon delivery system to deliver and suppress natural

occurrences of hormones including, without limitation, melatonin (sleep), oxytocin (love), and

adrenaline (fight or flight) to manipulate Lead Plaintiff to their desired goals, established by

executive program management including, without limitation defendants BREYER, BURNS,

HOPPER, and FAUCI. Those goals have included, without limitation, the melatonin (sleep)

induced double murder attempt by motor vehicle, see paragraph 694 LETHL-1, and oxytocin

hijacking used for thefts of real property, cash, and personal property, see paragraphs 609-613

HEXP-6-10.

B. Defendant UNITED STATES has used illegal BRMT bioweapon and bioweapon

delivery system hijacked oxytocin dosing to manage the romantic and intimate relationships of

Lead Plaintiff by suppressing or accelerating the oxytocin (love) hormone, began as early as
1968 (paragraph 417) to gain and sustain control of the Lead Plaintiff and his involuntary
servitude from that time to the present. These illegal BRMT induced brain biochemical
hijackings occurred in the presence of, and/or to, his long term college girlfriend Susan Irish, a
second strongly interested college friend who later became a regional television news anchor,
Katherine Andrews, and other interim dates and relationships, all of whom were carefully
maneuvered into place and/or removed from other people they could or did naturally develop an
interest in, by defendant CIA and its agents, officers, or confidential informants. Defendant haas
and does use the illegal BRMT bioweapon and bioweapon delivery system to extend involuntary
servitude and illegal control of human victims including, without limitation, Lead Plaintiff,
throughout the weapon's development, testing, and deployment across multiple generations of
technological and medical progressions. This aspect of defendant UNITED STATES' pattern of
involuntary servitude was forensically identified beginning in 2021, while examining Lead
Plaintiff's own evolving circumstances during key periods in his life.

C. Defendant UNITED STATES, primarily CIA, FBI, ARMY, USMS, BREYER,
GARLAND, CUNHA, DICKOVER, BRUNTON, William SACKVILLE-WEST, PAGE and
NG, were among the team which continued this manipulation of romantic and intimate interests
forward from high school through his undergraduate program at Green River Community
College, Auburn, WA in 1973-74 and Washington State University, Pullman, WA in 1974-1977.
See also the more recent examples at paragraphs 611-614 HEXP-8 through HEXP-11, including
various interim romantic interests and both spouses Lynne and Jeanette.

D. On knowledge and belief, defendant UNITED STATES also orchestrated and
conducted interferences in and of his romantic partners and their level of interest and/or

disinterest, who were most probably subjected to both psychological manipulations and to illegal

BRMT bioweapon and bioweapon delivery system hijacking to manage this aspect of their lives,

so they themselves are also most probably members of this class of injured US persons.

E. Various defendants (including, without limitation, UNITED STATES, ARMY, CIA

BREYER, William SACKVILLE-WEST, Craig PAGE, BURNS, WATERS, FAUCI, unknown

others) deliberately conspired to place romantic interests in Lead Plaintiff's life facilitated by

illegal BRMT bioweapon and bioweapon delivery system brain hijackings of oxytocin and other

hormones (see paragraphs 611-614 HEXP-8 through HEXP-11) from the 1970s through the

2020s. Defendants have and do continue this pattern of romantic and intimate interests

manipulation through the present, as partially related in other subcounts herein, by purposefully

screening-in and screening out potential romantic interests using various means, including

orchestrated meetings, relationships orchestrated using wire fraud on spoofed dating sites

(currently on-going since about 2004), incomplete relationships formed on dating sites from

2004, and Lead Plaintiff's known concern in recent years to retain traceability of these

manipulations, to sustain their psychological isolation of Lead Plaintiff.

F. Defendant UNITED STATES most probably employed this method of extreme

BRMT abuse to orchestrate the murder of Audrey Brewer in September 2011 (paragraph 10). A

physically and emotionally abused female intermediary was the knife wielder and apparent

direct perpetrator who acted in a confrontation and moment of apparent extreme jealous rage,

but actually directly manipulated into the emotional state under the direct influence of the illegal

BRMT bioweapon system which was used to physically hijack her pineal gland to biochemically

surge adrenaline (the fight or flight hormone). This specific BRMT manipulation of her pineal

gland provoked the knife slashing attack which resulted in Audrey Brewer's death as she bled

out from the unrepairable longitudinal slashing of her carotid artery. The female perpetrator had absolutely no history of violence at any time but was also being psychologically provoked by the manipulative male who was involved in relationships with both women at various times.

G. The psychological abuse of the apparent perpetrator by the misogynistic male former partner who was with Audrey that night at a Walla Walla, WA restaurant was used as the obvious public explanation of the extreme conduct in a fit of jealous rage - but was in fact a psychological device (similar to a sleight of hand trick performed by a magician) used to conceal the actual BRMT perpetrator, almost certainly a field operator concealed near the scene somewhere in the background, who commanded the extreme adrenaline biomedical hijacking of that specific victim in that specific moment of apparent rage. Since the illegal BRMT bioweapon and bioweapon delivery system is an illegal highly classified weapon, of a form not previously known in human history, which leaves no trace evidence (the series of carefully focused energy pulses absorbed through the skull into the brain leaves no trace evidence behind)., there would be no reason for anyone investigating the scene to look any further than the obvious facts - jealous women, murderous sequence, clear perpetrator, clear victim, case solved, another community tragedy.

H. HOWEVER, specifically during the months leading to this murder in Walla Walla, WA, Lead Plaintiff, 2,700 miles away in Ramsey, NJ, having just been relocated from Bergen Regional Medical Center on March 30, 2011 as described at paragraph 523, was being manipulated by that same illegal BRMT bioweapon to encourage him to choose a kitchen knife to assault his roommate Emil while they sometimes stood in the apartment kitchen they shared. Lead Plaintiff began experiencing the urge soon after his arrival, and he continued to experience it frequently for several succeeding months, finally reporting it to his psychiatric doctor, a

medical resident doctor at Bergen Regional Medical Center, who elected to increase his dose of Abilify as a result. Upon learning of Audrey's death in September 2011, who Lead Plaintiff had met at a Tacoma, WA family event at Johnny's dock when she was four years old, he reported his shock to an assigned minder, a male counselor assigned from Advance Housing, but made no connection at the time between the knife attack and his own impulses to pick up a knife in the preceding months in the presence of his roommate, which act he never undertook. But the connection to a family relative, and the date on which the attack occurred, September 6, 2011, the repeated drawing of his attention to the time 9:11 by BRMT remote operators which occurred hundreds of time disrupting his concentration during normal thought patterns and routine tasks over many years, led him to the eventual realization in April 2024 that the transition from acting CIA director (Assistant Director) Michael Morrell to Senate confirmed Director David Petraeus occurred on the exact date of Audrey's Walla Walla, WA murder, September 6, 2011, and that the knife impulse provocations sequence that had been run on him for about four months before it was almost certainly experienced by the physical perpetrator who was used to attack Audrey in September 2011. The specific transition date of the transition from Acting Director Morrell to Director Petraeus is sourced from Wikipedia.

I. FURTHER, the knife wielding physical perpetrator's momentary sense of extreme rage during the attack was most probably very similar to the momentary biochemical rage induced in Lead Plaintiff during an unrecorded incident adjacent to Lead Plaintiff's residence between August 2008 and October 2010 in Cliffside Park, NJ, and then again years later using the illegal BRMT bioweapon in the August 2023 Tunnel Flash Incident documented at paragraph 619 HEXP-16, LPEE pages 11668.

J. FINALLY, the intent of defendant CIA, and of other elements of defendant UNITED STATES, in orchestrating this process against US persons would have been and would be to facilitate its future deployment against others which it illegally targets for assassination using unwitting third parties. Though targeted assassinations are illegal under US law, this entire complaint relates to systematic evasions of US law by defendant UNITED STATES including, without limitation, agencies of defendant DOJ, which have and do perpetrate such violations including within the sphere of state secret privilege, to systematically abridge the unalienable rights of US persons, which defendant DOJ, acting in its own perceived interests, not in the People's interests, has and does choose to continue to perpetrate and to ignore as conducted by others claiming discretion as the reason for its own self-interested acts.

K. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and

lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added

subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount

follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 10, 417-418, 612-615, 619 HEXP-9-12, 16 |
| Appendix 2 paragraphs: | 1-001 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0038, 2-0128, 2-0171, 2-0179, 2-0185 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 140 et al, 11668, LPEEV65-1 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### *609. HEXP-6 Illegal Human Experimentation:* **Personal and Intimate Relationships - Orchestrated BRMT and Other Interference in Marital Community With First Spouse, Lynne 1980-1988**

A. As forensically reverse engineered, defendants including, without limitation, FBI,

CIA, and KCSD purposefully orchestrated the initial meeting of Lead Plaintiff and Lynne Boyle.

Lynne Boyle was the double ex-wife, as they twice married, of a King County Sheriff's

Department serial killer task force member, Gregory Boyle, who reported to defendant

REICHERT, then was leader of that Task Force when REICHERT was promoted, and still later

was Maple Valley, WA precinct commander, all while Gergory Boyle reported to REICHERT.

Lead Plaintiff and Lynne were professionally isolated together at a months-long financial audit

assignment at Safeco in early 1980. Deloitte Seattle was used by defendant UNITED STATES.

Primarily supervised by defendant USMS, Deloitte Seattle was a commercial cover operation for

various legal and illegal domestic and international spying operations, as well as for the

continued illegal development of the BRMT bioweapon and bioweapon delivery system

(paragraphs 359-399). Lead Plaintiff's introduction to Lynne was facilitated by the direct

assignment of an embedded FBI agent or romantic interest thereof, Maragaret Dufresne, to the

Safeco financial audit project as its overall manager. Margaret presented as the romantic partner

and later wife of Bruce Ciosacchi, who was known to Lead Plaintiff and to Lynne, to be an FBI

agent. Lead Plaintiff, romantic partner and later wife Lynne, Margaret Dufresne, and Bruce

Ciosacchi maintained a social relationship for several years after this initial four month project

assignment in 1980.

B. Among other illegal BRMT and coercive psychological manipulations in the 1980s,

while defendants WEISSMAN, ROSENBERG, and BURNS, were proximate, defendant

UNITED STATES later attempted to endanger spouse Lynne and to entrap Lead Plaintiff in,

among other malign events, the Stevens Pass Ski Area anger (BRMT hijacked adrenaline) flash

and subsequent dangerous walk-off by Lynne, related at paragraph 621 RGTS-1.

C. In 1987-88, defendant UNITED STATES, principally acting through BURNS,

SWAIN, ROSENBERG, WATERS, TARPLEY, destroyed this first marital community with

Lynne. Defendant UNITED STATES used the illegal BRMT bioweapon and bioweapon

delivery system to emotionally hijack Lynne with heavy doses of the hormone oxytocin while

she was engaged in a heavy professional work schedule at US West New Vector Group in the

presence of serial adulterer SWAIN (paragraph 440, 496, 600H NSEC-1, 609C HEXP-6) to

orchestrate a relationship with SWAIN. A combination of (i) Lead Plaintiff's work-related

absences for extended weekly travel at Deloitte Seattle, her two daughters having both recently

left the family home to attend college, and Lynne's excessive work assignments requiring

extensive overtime hours and creating exhaustion, were used to create fatigue and emotional

distance, and illegal BRMT hacks of her pineal gland to produce oxytocin, which operated

together to create her attraction to serial adulterer SWAIN, and to break Lynne's relationship

with Lead Plaintiff. Defendants eventually succeed in causing and creating the circumstances of the divorce by delivering these overdoses of oxytocin (love hormone) in 1987-88 to Lynne in the presence of her best work friend's husband, SWAIN, a serial adulterer. This pattern of racketeering acts resulted in the divorces of both couples; forced the liquidation of community real property, improvements, and other assets; and caused and created the loss of marital community, of mutual emotional and financial support, and a wide range of future financial benefits from that marital community which would have been sustained if it remained intact including, without limitation, accretion of financial assets and real property appreciation of the residence on NE 133rd Street, Redmond, WA, Interline Exhibit 13.

D. Defendant UNITED STATES used this sequence in the 1980s, as it would do again many times in the future with steadily increasing frequency as times passes as related herein, to inflict psychological stress on its unwitting human biomedical experiment subjects to support its development and deployment of the illegal BRMT bioweapon and bioweapon delivery system, as it directly interfered in the personal lives, careers, and brain biochemistry of both spouses. This cycle of destruction and its acceleration across time are indicative of obsessive, compulsive psychopathy (paragraph 820O-Q). It is also indicative of the sustained and increasing damage knowingly and willfully perpetuated and accelerated by the pattern of fraudulent concealment, willful blindness, and neglect to prevent of defendant DOJ, which enables these emboldened criminal perpetrators of defendant UNITED STATES to extend and accelerate their pattern of illegal acts, violations, and injuries. The pathology of this cycle is repeatedly demonstrated in the series of development cycles of the illegal BRMT bioweapon and bioweapon delivery system described throughout this complaint. This specific cycle was both a successor and a precursor to the murderous cycles cited at paragraphs 609 and 803.

E. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608 HEXP-5 subparagraphs C, D, E are incorporated herein by reference See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 13 |
|---|---|
| Complaint paragraphs: | 359-399, 440, 496, 600H NSEC-1, 609C HEXP-1, 621 RGTS-1 |
| Appendix 2 paragraphs: | 1-010, 1-011, 1-014, 1-015 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0023 through 2-0039 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 153-154 (para 42-45), 181-182 (para 107-111), 8233-8262 |
| Emails and documents by topic and date, also located in LPEE: | D Brewer Marriage Cert May 5 1984 Lynne 840505.pdf D Brewer Marriage Cert May 5 1984 Lynne 840505.pdf |

**610. HEXP-7 Illegal Human Experimentation: Personal and Intimate Relationships - Orchestrated BRMT and Other Interference in Fraudulent Marital Community With Second Spouse, Jeanette 1988-2005**

A. As forensically reverse engineered, when Lead Plaintiff's relationship with wife Lynne completely ended in 1988, he was reintroduced to Dorothy V. FULLER, a friend he had met on a United Way community fund budget allocation panel while at Deloitte Seattle through 1986. Defendant UNITED STATES used FULLER to hold Lead Plaintiff's interest for a time in early 1988 with the support of TARPLEY, an embedded federal agent employee of LazerSoft where Lead Plaintiff was CEO from 1990-1993. As Lead Plaintiff's divorce from Lynne was being processed by the Court in 1988, FULLER was then dropped out in Spring 1988 after about 2-3 months, so defendants CIA, ARMY, and BURNS could introduce a longer term romantic interest, Jeanette. Jeanette was most probably coerced into the relationship with Lead Plaintiff due to her deliberate inculpation in national security matters by defendant ARMY, which knew of her then illegal (in military service) sexual orientation, and worked to incriminate her specifically for this purpose by placing her in undercover intelligence assignments in the Middle East, where she may have known CORNWELL, as described at paragraphs 494-501.

B. Defendant WATERS, then reporting to Lead Plaintiff as a contract software engineer at LazerSoft, orchestrated the meeting of Lead Plaintiff and Jeanette (paragraph 494). He badgered Lead Plaintiff into agreeing to a week-night drinks session which "coincidentally" had the two males "drop in" on an obscure hotel basement cocktail lounge with a live band (most probably a police powers personnel live band) at the Greenwood Inn, Bellevue, WA. Several female co-conspirators were present at this "girls night out" which was used to introduce Jeanette Smith, who was then a temporary employee assigned to First American Title Insurance, Bellevue, WA.

C. Without limitation, defendants BURNS, WATERS, CIA, ARMY, FBI, USMS
maneuvered Jeanette into position (paragraph 494-501). As Lead Plaintiff would learn later in
1988 when he visited her residence, she "coincidentally" resided directly across the street from
the BURNS residence on 149th Street, Kirkland, WA. At the time, BURNS was a Board
member of LazerSoft originally introduced by STONE, who either posed as or was an OB/GYN
practicing at Evergreen Hospital in Kirkland, WA, and though unknown at the time, was the
primary executive in charge of the illegal BRMT bioweapon and bioweapon delivery program,
succeeding BREYER and HOPPER. This orchestrated introduction in Spring 1988 (as Lead
Plaintiff was going through divorce and more emotionally vulnerable than usual) eventually
resulted in Lead Plaintiff's March 1990 second marriage to Jeanette, just as Lead Plaintiff was
also purchasing the assets of Steve's Maintenance, an FBI or USMS cover operation (then
completely unbeknownst to the unwitting Lead Plaintiff), later renamed Alliance Environmental
Services (Alliance).

D. At least four lengthy informal separations (four to six months typical) were most
probably orchestrated under military orders to facilitate the further development of the illegal
BRMT bioweapon under the management of defendant BURNS, then defendant FAUCI, over a
very challenging 15 year marriage to Jeanette from 1990 to 2005, while she likely remained
under threat of deferred military prosecution throughout the period to continue manipulating her.
Lead Plaintiff's stepson Bryce (Jeanette's son) developed symptoms of schizophrenia during his
teen years and engaged in several violent outbursts against both Lead Plaintiff and his wife
Jeanette, forcing them to remove him from the family home to avoid a deadly outburst against
his mother Jeanette.

E. The disastrous acquisition of illegal cover company Steve's Maintenance, which had been and was then being surreptitiously used by defendant FBI in field investigations of the asbestos abatement industry, including its fraudulent deprivation of SBA government bid and performance bond guarantee benefits, and other criminal racketeering acts by defendant FBI, related at paragraphs 445-453, 471, 626 RGTS-6, 644B(i), 649, 650B(i), 651D, 653, 683 RICO-6, 11, 12, 13, 15, 45, led to Chapter 7 personal bankruptcy in late 1993. Multiple periods of financial instability included multiple orchestrated business failures, employment instability and unemployment, arbitrary termination. This sequence was a fifteen year rolling psychological, emotional, and financial disaster for Lead Plaintiff and for Jeanette, while residing directly across the street from defendant BURNS' alleged primary residence. Defendant BURNS was replaced sometime in the early middle 1990s as the cross-street neighbor.

F. For example, without limitation, the first residents who succeeded BURNS directly across from the 149th Street, Kirkland, WA residence where Lead Plaintiff and Jeanette resided, ostensibly owned a Vibra-Clean franchise, which can be used to secure illegal entry and general searches of private residences and businesses of interest to DOJ police powers agencies and prosecutors. The second family's male breadwinner posed as a realtor. Realtors commonly receive financial information from clients to qualify and assist in mortgage applications and can also be used to sustain programmatic human trafficking to support illegal BRMT and other malign programs by orchestrating residential choices into surreptitious cover housing using favorable rental rates and sales prices. Lead Plaintiff notes that both his Redmond and Kirkland residences, paragraphs 609, 610 HEXP-6, 7, sold extremely rapidly within two weeks after listing at prices favorable to the purchaser (whether an authentic private party, a favored private party, or a straw purchaser to restore to surreptitious ownership under cover is unknown), which

prices were recommended by the realtors involved to the Lead Plaintiff and the divorcing spouses. One realtor then proceeded, without authorization, a $5,000 discount on the agreed listing price without consent on the 149th Street, Kirkland, WA property.

G. Despite these orchestrated problems, Lead Plaintiff rebuilt the house he was living in near Kirkland, Washington (see Interline Exhibit 14) which is directly across 149th Street from the initial cover residence used by Dr, Heffron (BURNS) into the early 1990s. Lead Plaintiff also rebuilt his personal credit beginning in 1994, after the defendant FBI imposed business failure of Alliance, which also occurred while living across 149th Street from Heffron (BURNS), and through a series of further trafficking and related acts, violations, and injuries by, without limitation, BURNS, ROSENBERG, CORNWELL, PERILLO, COOK, RUBIN, VINDMAN, MELBER, CIA, ARMY, FBI, USMS while residing in Washington state and working in multiple states and briefly in the United Kingdom, as related at other subcounts herein.

H. After approximately two years of dating and fifteen years of marriage from 1988 to 2005, defendant UNITED STATES again orchestrated the final destruction of the Lead Plaintiff's marital community with Jeanette in 2004-2005. As before, defendant UNITED STATES (including ROSENBERG, BURNS, CIA, ARMY, FBI) acted to support its development and deployment of the BRMT bioweapon and bioweapon delivery system by interfering directly in the personal lives, careers, and brain biochemistry of both spouses, causing, among other acts, violations, and injuries, financial distress and extended separations for the purpose of harming and destroying the marital community, and engaged in other deliberate acts which stressed, harmed, endanger and attempted to entrap spouses.

I. Defendants eventually succeed in causing and creating the circumstances of the

divorce from Jeanette in 2005 including, without limitation, forced liquidation of real property

and improvements at 149th Street, Kirkland, WA, wherein a carefully pre-planned pre-payment

penalty on the final mortgage of $9,950 orchestrated with spouse Jeanette by defendant

UNITED STATES was piled onto other losses as the forced sale of the 149th Street, Kirkland,

WA property was closed and net proceeds were distributed, and loss of marital community and

mutual support, and a wide range of future financial benefits from an intact marital community,

including accretion of financial assets and real property appreciation. Similar property theft

abuses just under the $10,000 reporting limit, which also constitute racketeering acts in

deprivation of property rights by defendant UNITED STATES include, without limitation,

paragraphs 656, 661 RICO-18, 23, 830D, 831G, and of an international $5,000 reporting limit at

paragraph 665.

J. All these orchestrated acts, as documented in paragraphs 600-710 NSEC 1-4, HEXP 1-

17, RGTS-1-17 RICO-1 through 55, LETHL 1-17, were in the illegally imposed involuntary

servitude to defendant UNITED STATES and directly benefitted and promoted the development

of illegal BRMT brain hijacking by providing brain chemistry and neurological insights to

defendant UNITED STATES and its co-conspirators, while they engaged in a systematic

conspiracy against constitutional, statutory, and common law rights in an associated-in-fact

enterprise fraudulently concealed under the illegal assertion of state secrets privilege in violation

of, without limitation, 5 U.S.C. § 301 and *Reynolds*, which defendant DOJ, in its own interests

and those of GARLAND, BURNS, and others, who have and do conspire to and continue to

willfully neglect to prevent criminal violations of constitutional rights as their duties require by

42 U.S.C. § 1986 and under the United States Constitution, which imposes upon all Executive Branch appointees the duty to "take care that the laws be faithfully executed."

K. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608 HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 14 |
|---|---|
| Complaint paragraphs: | 445-453, 471, 494-501; 626 RGTS-6; 644B(i), 649, 650B(i), 651D, 653, 683 RICO-6, 11, 12, 13, 15, 45 |
| Appendix 2 paragraphs: | 1-017 through 1-027 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062 through 0092, 2-100 through 2-0121 |

| LPEE pages (see technical note on page numbering at paragraph 230): | 155-164 (paragraphs 45-69), 8263-8287, 8347-8350 |
|---|---|
| Emails and documents by topic and date, also located in LPEE: | D Brewer Marriage App Jeanette 1990 900330.pdf<br>D Brewer Marriage App Jeanette 1990 900330.pdf<br>Jeanette Timeline 1 061001.pdf<br>Jeanette Timeline 2 061001.pdf<br>Jeanette Timeline 3 061001.pdf<br>Jeanette timeline email 061001.pdf |

### *611. HEXP-8 Illegal Human Experimentation:* **Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fraudulent Relationship – Stephanie Clifford (MODDERMAN) 2008**

A. As forensically reverse engineered, defendants used the online dating platform Match.com, owned and controlled by defendant MATCH GROUP, or its spoofing by an unknown defendant police powers operation, likely defendant UNITED STATES, to screen-in and screen-out persons of interest to Lead Plaintiff, to sustain its involuntary servitude; and to orchestrate, to conspire to arrange the introduction of a co-conspirator whether involved by choice or coercion, and to arrange a brief fraudulent relationship (about six weeks, six week separation for a mother and children summer trip, then one date to break up) between Lead Plaintiff and Marinka MODDERMAN (Stephanie Clifford) in 2008. This relationship required at least one of the two parties to engage in interstate travel at all times during the relationship. Lead Plaintiff spent over $1,000 to travel and pay for meals and other entertainment during these 2008 fraudulent relationship dates.

B. Lead Plaintiff had dates with this New York City resident in New York City and Cliffside Park, NJ. Defendant UNITED STATES and MODDERMAN intended this act to continue the public discrediting process of Lead Plaintiff continued by FBI (ROSENBERG), USMS, CIA, ARMY in their 2002-2005 fraudulent family and business wrecking process in the Kirkland, WA area, through trafficking to Boston, MA and homelessness in 2006-2007, then to

ESTABLISH in Fort Lee, NJ for ten months of fraudulent employment in 2007-2008, including

a Pittsburgh, PA cameo appearance by former FBI Director MUELLER in an upper floor office

in PPG headquarters orchestrated by defendant ROSENBERG.

C. During one of the Cliffside Park dates in Spring 2008, as Lead Plaintiff experienced a

period of erectile dysfunction (ED), MODDERMAN suggested a relocation but did not explain

the actual purpose, saying "I thought it might help." It did result in placing the Lead Plaintiff in

front of his television, whereupon the illegal BRMT induced ED symptoms immediately

disappeared. On knowledge and belief, the forensically reverse engineered purpose of this illegal

BRMT (defendants CIA, FBI) sexual abuse in conspiracy with MODDERMAN was to relocate

Lead Plaintiff, placing him in a position to be captured on a video camera hidden in the flat

screen television, used for public replay as desired by defendant UNITED STATES after the live

session recorded in this Cliffside Park, NJ "safe house" (with defendant CHALOM as landlord,

USMS) where the unwitting Lead Plaintiff had been secretly relocated during his human

trafficking from Boston, MA, and then resided from August 2007 to October 1, 2010 due to the

human trafficking to defendant ESTABLISH by defendant ROSENBERG (FBI).

D. Lead Plaintiff and defendant MODDERMAN also took one weekend trip to rural NY

and CT in late June 2008 related to the "wedding" of former co-worker PANKOWSKI at

ESTABLISH (FBI, USMS) which included one night in a hotel where they were the only

occupants on a summer weekend night, and a second night at a cabin alleged to be the summer

home of the President of Yale University with two other "couples" and children. Introduced as

friends of defendant MODDERMAN, their actual agency, higher education, and/or media

affiliations are not specifically known and are subject to discovery.

E. Defendants ROSENBERG, ROSS, and UNITED STATES' orchestration of these

events was again intended, as in past events, to maximize emotional distress by closely timing

(i) the defendant ESTABLISH employment termination in June, (ii) the ostensible Pankowski

"wedding" in June where (iii) past peers and bosses defendants ROSENBERG, ROSS,

MCDONALD and other ESTABLISH employees were present, and (iv) the defendant

MODDERMAN six week long separation in July-August, and breakup immediately thereafter,

which was followed a few weeks later by (vi) a call from defendant MODDERMAN to Lead

Plaintiff to express interest in further dates, which Lead Plaintiff declined.

F. The sexual abuse herein and at paragraph 821 specifically includes defendant DOJ,

FBI, USMS, and CIA, other unknown police powers and press, media, and entertainment

defendants, and the individual officials and persons therein in their deliberate, knowing, and

willful election to engage in sexual abuse, and to slander, smear, libel, and interfere with

contract rights of Lead Plaintiff in orchestrating fraudulent relationships, using MATCH

GROUP websites either administered for their benefit or spoofed by them, between Lead

Plaintiff and MODDERMAN in 2008, which included episodes of illegal BRMT sexual abuse

by erectile dysfunction administered in accordance with a plan coordinated between CIA or

elements of DOJ and MODDERMAN, and GIA in 2019-2020, paragraph 613 HEXP-10, which

included episodes of illegal BRMT sexual abuse by erectile dysfunction administered in

accordance with a plan coordinated between CIA or elements of DOJ and GIA for the corrupt

purposes of introducing salacious sexual content which included Lead Plaintiff. These events

and their public availability were intended to publicly humiliate, smear, and defame Lead

Plaintiff as an element of defendants' criminal intent and conspiracy to construct a defamatory

narrative about Lead Plaintiff, and to prevent him from pursuing his own interests which have

and do contradict that corrupt narrative including, without limitation, by falsely communicating the site of the Pentagon 9/11/2005 memorial service in media reports so Lead Plaintiff could not attend in 2005, the abuse of volunteer and public events at paragraph 526, Interline Exhibit 16, and paragraph 842B(ii), and systematic misdirection (LPEEV65-5). Defendants also engaged in sexual abuse of the Lead Plaintiff through these two defendants, MODDERMAN and GIA. The entire associated-in-fact enterprise pattern of racketeering acts and rights violations were all intended, together with other entrapments described herein, to conceal defendants' long-running corrupt and criminal public conduct, using public funds to sustain the illegal BRMT bioweapon and bioweapon delivery system developed by imposing illegal human subject medical experiments without consent upon the Lead Plaintiff and others from this religious group, and on other unknown plaintiffs, abused as their illegal human medical experiment subjects over decades, and to conceal their associated-in-fact enterprise pattern of racketeering acts, and their rights violations against, among other plaintiffs, the Lead Plaintiff since he was first human trafficked by defendant UNITED STATES at age 12. Members of his family have, and some continue, to practice a Quaker-based religious pacifist faith which defendant UNITED STATES has and does discriminate against based upon those pacifist beliefs while in military service to defendant ARMY, and subsequent to military service, have and do target them and their posterity for religious discrimination, and through color of law, for crimes against them, which have been and are perpetrated by, without limitation, defendant UNITED STATES (DOJ, FBI, USMS, and CIA) and its co-conspirator defendants herein.

G. Defendants also created other false allegations against Lead Plaintiff including, without limitation, of pedophilia, which they acted out in various public venues, using the children of police powers personnel in volunteer outings with New York Cares and in

psychological operations conducted using the illegal BRMT bioweapon and bioweapon delivery system (paragraphs 526, and in full knowledge of his actual conduct as described at paragraph 839) to create false public impressions of the Lead Plaintiff; with sex traps and female officers who preceded him on his walks in New York City, and on buses, subways, and trains for the purpose of creating and sustaining false narratives intended to slander, libel and defame the Lead Plaintiff and have and do interfere with contract rights with dating sites and public venues for this purpose (paragraphs 505, 608 HEXP-5); and have constructed and did sustain for years a terror narrative (paragraphs 464, 519, 555, 560, Interline Exhibits 17-18, 603B, F, G, L, 634C, 802B, 839) for the purposes of endangerment, libel, and slander of Lead Plaintiff; caused an event of forced public urination by coordinated police powers operations (paragraph 618 HEXP-15); orchestrated and provoked an illegal BRMT bioweapon and bioweapon delivery system flash temper attack coordinated with undercover police powers personnel (paragraph 619 HEXP-16); and have systematically misdirected public narratives and public opinion, and deliberately misdirected the actions of co-conspirator defendants, all as misdirection for defendant UNITED STATES' own slander, libel, misrepresentation, deceit, interferences with contract rights, and other myriad acts, violations, and injuries of Lead Plaintiff's rights, as described in all sections of this complaint.

H. When the continuation of this public humiliation campaign against Lead Plaintiff failed to provoke a criminal response of any kind as a result of these interactions with MODDERMAN, and the stress of the ESTABLISH termination in close proximity, the pace of discrediting by defendants UNITED STATES, ROSENBERG, ROSS, and others was further escalated and accelerated by defendants DOJ, FBI, USMS and CIA, with the assistance of USSS and police powers operations including defendants NYPD, PAPD, NJTPD, and others. This

sequence from June 2008 through October 2010 while residing at the 282 Palisade Ave Apt. 5,

Cliffside Park, NJ "safe house" under landlord CHALOM (USMS) follows:

(i)     termination from ESTABLISH by ROSS in June 2008 (paragraph 466), and

(ii)    theft of thousands of dollars of ESTABLISH compensation in July 2008

        (paragraph 641 RICO-3),

(iii)   the fraudulent ESTABLISH co-worker PANKOWSKI (FBI) wedding, per emails

        here listed in LPEE pages by date:

            MODDERMAN email re PANKOWSKI wedding Drumm attends
            080625,
            MODDERMAN email re PANKOWSKI wedding Drumm attends 312pm
            080625,
            MODDERMAN re wedding 080626,

(iv)    a no-notice breakup initiated by MODDERMAN, after a six-week hiatus

        ostensibly for a summer family visit her mother in Canada; all within 90-100

        days, which was then followed by:

(v)     a request to reunite from MODDERMAN, declined by Lead Plaintiff in August

        2010, then

(vi)    renovation work to the Cliffside Park apartment requested by CHALOM (USMS)

        in 2010, which led to no income of any kind for about two months during the

        renovation (paragraph 642, RICO-4 which evidence was later destroyed by FBI

        using the method described at paragraph 656 RICO-18),

(vii)   which renovation work was never fully paid by CHALOM, who inspected the

        work, informed Lead Plaintiff he had no recourse as a written contract was

        required for improvements over $5,000 and provided $5,200, resulting in both an

out of pocket loss for materials, equipment, and equipment rental; and loss of

compensation for all labor hours expended over approximately 6-8 weeks, and

(viii) approximately $10,000 "Bank of America" credit card default when the payments

could not be made after cancellation of expensive credit insurance (premiums of

about 5% of outstanding balance over about two years), and due to the

renovations short pay, as well as the loss of two months of unemployment income

during the renovations, (paragraph 642, RICO-4 which evidence was later

destroyed by FBI using the method described at paragraph 656 RICO-18), then

(ix) a pattern of further public discrediting and harassing combined with illegal

BRMT physical assaults such as cramping and tensing of muscles, sleep

deprivation by BRMT adrenaline awakening;

(x) escalation to illegal BRMT torture (paragraph 606 HEXP-3) for a period of time

which was sufficient to

(xi) induce a second suicide ideation at the southeast corner of Thompson Lane and

River Road in Edgewater, NJ about 0.7 miles from his Cliffside Park, NJ

residence (consistent with the CIA pattern of practice documented by the 1975

and 2014 Senate Intelligence Committee reports at paragraphs 337-341, followed

by

(xii) preparation and filing of litigation in Newark federal court in June 2010,

(xiii) a notice to vacate from CHALOM (USMS) in July 2010,

(xiv) rejection and misdirection from Bergen County, NJ homeless shelter to a non-

existent homeless shelter on October 1, 2010, a mental distress call to 911, which

led to

(xv) involuntary commitment represented as being for fourteen days, which was actually kidnapping to confinement (paragraph 808), at Bergen Regional Medical Center, Paramus, NJ, after an alleged hearing with no knowledge of any hearing and no prior contact with the "legal counsel" who had allegedly represented the Lead Plaintiff at that supposed October 2, 2010 hearing, which contact occurred about five days after Lead Plaintiff's entry to the locked facility.

I. Defendants ROSENBERG, ROSS, CHALOM, PANKOWSKI, MODDERMAN, and UNITED STATES' orchestration of these events was again intended, as in past events, to maximize emotional distress. These acts, violations, and injuries were and are intended to operate psychologically together to maximize gratuitous cruelty. MODDERMAN's whereabouts are currently unknown to Lead Plaintiff but are very likely known to police powers defendants including defendant UNITED STATES, and are known to the Manhattan, New York City District Attorney's office.

J. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608

HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide

critical confirming information directly from these institutional and individual defendants and,

among some who presented at the time as family members, their children. See other selected

relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at

pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.

Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 16-18 |
|---|---|
| Complaint paragraphs: | 337-341, 466; 464, 505, 519, 526, 555, 560; 603B, F, G, L NSEC-4; 606, 608, 613, 618, 619 HEXP-3, 5, 10, 15, 16; 634C RGTS-14; 641, 642, 656 RICO-3, 4, 18; 802B, 821, 839, 842B(ii) |
| Appendix 2 paragraphs: | 1-031, 1-032 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0148, 2-0149 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 10335-10342, 10346-10351, 10394-10422, 10428, LPEEV65-5, 6, 7 |
| Emails and documents by topic and date, also located in LPEE: | Match Group Second Notice re Preserve Evidence 220122, Match EPL Response 221110, Match Group Legal Dept Email 221110, MODDERMAN email re PANKOWSKI wedding Drumm attends 080625, MODDERMAN email re PANKOWSKI wedding Drumm attends 312pm 080625, MODDERMAN re wedding 080626, MODDERMAN email re PANKOWSKI wedding Drumm attends 817am 080627 |

### 612. HEXP-9 Illegal Human Experimentation: Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fraudulent Relationship, Laura 2014-2018

A. As forensically reverse engineered, defendants used online dating platforms,

including Match Group websites and the Bumble.com website, or their spoofing by an unknown

defendant police powers operation to screen-in and screen-out women between 2011 and 2014, and to arrange a fraudulent online relationship with Laura AKOTO, ostensibly a resident of Ghana from 2014 into 2018. "Laura" was actually an online psychological operation and illegal BRMT bioweapon and bioweapon delivery system oxytocin hijacking, using personal and salacious photos sourced online from a website which featured a female who was actually from Broward County, Florida and sold photos and access online.

B. As forensically reverse engineered, Lead Plaintiff encountered an online dating match from the greater New York City area in 2014 while living in Ramsey, NJ. As that online discussion procced, it turned out that the white female "Laura" who lived in "Ghana." Over time and through a sequence of illegal BRMT oxytocin ("love" hormone) hijackings, defendant UNITED STATES combined email and wire frauds with illegal BRMT oxytocin (love hormone) hijacking to orchestrate and sustain theft of more than $14,000 via Western Union and by using other money transfer sites which permit anonymous pickup of cash; as well as two cell phones, LPEE pages 7845 mailed Sep. 9, 2015, 7824 mailed Nov. 15, 2015, a PlayStation 1, and game cartridges, all sent by unwitting Lead Plaintiff to Ghana, addressed to Prince B. Quaye, Agona Swedru, Ghana as directed by Laura AKOTO. This allowed defendant CIA agents or assets two clean cutout phones, game hardware and cartridges for use in Ghana. International postal services were used to deliver these hardgoods to Ghana. Around 2017, Laura asked Lead Plaintiff to relay payments among two international parties through his US bank account. He agreed to do this, and later expressed discomfort, and halted the practice after one or two transfers, specific emails below:

AKOTO Laura re $2K to Mr Prince from Porter Patten $3K 171021,
AKOTO Hints of money laundering entrap scam 171025,

C. In 2018, Lead Plaintiff discovered that the entire relationship was an online hoax which had been boosted by the yet to be identified illegal BRMT bioweapon and bioweapon delivery system using oxytocin hijacking, wherein defendant CIA used video feeds which it originated illegally so its BRMT operators could determine the timing of these oxytocin "love" hormone boosts. This had been combined with the 2017 defendant FBI structured payments entrapment attempt at subparagraph 612B above. Laura was actually nothing more than an online persona based upon ordinary and salacious pictures of a Broward County, Florida resident who sold the salacious pictures online, as Lead Plaintiff eventually discovered by using a Google photo-match search tool in 2018.

D. This ability to remotely manipulate human behavior completely online to and including monetary thefts by using illegal BRMT bioweapon and bioweapon delivery system remote hijacking of oxytocin represented illegal progress in the effectiveness of BRMT's neurological hijacking of its victims, which went well beyond the previous in-person illegal BRMT hijackings demonstrated in prior interpersonal relationship orchestrations and breakups in the 1980 into early 2000s, to total remote hijacking of the human victim by 2014. Prior progressions of the illegal BRMT program from (i) on-site hijackings at age 12 through 18 (in the late 1960s to early 1970s) to (ii) remote triggering of a local device by cell phone around age 30 (mid-1980s) was emblematic of the technological progression of the illegal BRMT system over that time. This clearly demonstrates the intentional, malicious, and psychopathic progression of the illegal BRMT bioweapon and bioweapon delivery program overall to leverage neuroscience and technical progress in way which Nazi Doctor Josef Mengele could only have wildly fantasized when he was trying to create the perfect Nazi soldier with experiments on involuntary human subjects in the Dachau Concentration Camp system in

western Europe. Recall that this set of principles undergirded CIA's Dr. Sidney Gottleib's quest for mind control through MKUltra from 1953-1973 (paragraphs 61-67, 308-311, 332-341, 357-364, Interline Exhibit 3), which defendant CIA has never renounced.

E. Defendant UNITED STATES most probably employed this method of extreme illegal BRMT biomedical abuse to orchestrate the murder of Audrey Brewer in September 2011 (paragraph 10) using an physically and emotionally abused female intermediary as the direct perpetrator while acting in apparent extreme rage under the direct influence of the illegal BRMT bioweapon system used to physically hijack her rate of pineal gland extreme adrenaline surge (adrenaline fight or flight hormone) to provoke the knife slashing attack which resulted in Audrey Brewer's death from the slashing of her carotid artery in her neck. The female perpetrator had absolutely no history of violence at any time but was also being psychologically provoked by the psychologically manipulative male who was involved in the relationships with both women at various times. The psychological abuse by the apparent perpetrator was used in the moment to conceal the illegal BRMT bioweapon and bioweapon delivery system and its human operator from detection as the actual perpetrator of the extreme biomedical hijacking.

E. This momentary sense of extreme rage which was most probably experienced by the knife wielder is comparable to the momentary biochemical rage induced in Lead Plaintiff by the illegal BRMT bioweapon and bioweapon delivery system in the August 2023 Manhattan Subway Tunnel Flash Incident documented at paragraph 619 HEXP-16, LPEE pages 11668 and during an unrecorded incident adjacent to Lead Plaintiff's residence between August 2008 and October 2010 in Cliffside Park, NJ. The intent of defendant UNITED STATES (CIA) in orchestrating this process against US persons would have been and would be to facilitate its future deployment against others which it targets for assassination.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608 HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 10, 61-67, 308-311, 332-341, 357-364, 619 HEXP-16 |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0171, 2-0179 through 2-0181, 2-0185 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 7467-8179 (2014-2018), and 2023 Financial Times photo confirmation of identity at 7470-7470A, 11668, LPEEV65-1 |
| Emails and documents by topic and date, also located in LPEE: | AKOTO re AltaVista bad actor 161018, AKOTO re BLACKPOOL then DD 170315, AKOTO Laura re $2K to Mr Prince from Porter Patten $3K 171021, |

| | AKOTO Hints of money laundering entrap scam 171025, |
| | AKOTO Ramsey Fixup Expenses 171027 |
| | AKOTO Mailing Address 150101.pdf |

**613. *HEXP-10 Illegal Human Experimentation:* Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fraudulent Relationship, GIA (Norelle Dean) 2019-2021**

A. As forensically reverse engineered, defendants used online dating platforms, including those of Match Group and Bumble, or their spoofing by an unknown defendant police powers operation to screen-in and screen-out persons of interest to Lead Plaintiff to arrange the introduction of their co-conspirator whether by choice or coercion. Except for the first female who was a white person, allegedly from the nation of Georgia, all fifteen or so participants were Black females of varying backgrounds and employment from entertainment clubs to medical school, belying their purposeful screening in by police powers defendants for this purpose, most likely to attempt to manipulate the Lead Plaintiff into some racially oriented speech or conduct, which pattern has been seen repeatedly since that time.

B. Defendants then arranged a fraudulent relationship between Lead Plaintiff and Norelle Dean (GIA), aka Gia Shakur, aka Tina Rhinehart, whereabouts currently unknown to Lead Plaintiff, but known to defendants DOJ, FBI, USMS, CIA and various other police powers defendants in the greater New York City area. Lead Plaintiff had dates with this New York City resident in New York City and in Edgewater, NJ, along with one trip to New Orleans, LA, all of which required at least one of the two parties to engage in interstate travel. Lead Plaintiff spent over $1,000 to travel and pay for meals and other entertainment during these fraudulent relationship dates, provided cash gifts including to assist in paying for a poetry workshop, purchased an Apple computer, and purchased an air ticket and hotel stay for a solo return trip to

New Orleans for GIA after their relationship was ended by GIA. The dates occurred between December 2019 and 2021 and are further described at LPEE Table 2 paragraph 2-0188.

C. Both this relationship with GIA in 2019-2020, and the relationship with MODDERMAN in 2008, paragraph 611 HEXP-8, included episodes of illegal BRMT sexual abuse by erectile dysfunction administered in accordance with a plan coordinated between CIA or elements of DOJ and these women. The sexual abuse herein and at paragraph 821 specifically includes defendants DOJ, FBI, USMS, and CIA, other unknown police powers and press, media, and entertainment defendants, and the individual officials and persons therein in their deliberate, knowing, and willful election to engage in sexual abuse,

D. These relationships were both also intended to slander, smear, libel, and interfere with contract rights of Lead Plaintiff in orchestrating fraudulent relationships, using MATCH GROUP websites either administered for their benefit or spoofed by them, for the corrupt purposes of developing salacious sexual content which included Lead Plaintiff, and through their public availability were intended to humiliate, smear, and defame Lead Plaintiff as an element of their criminal intent and conspiracy to construct a defamatory narrative about Lead Plaintiff, and to prevent him from pursuing his own interests which have and do contradict that corrupt narrative.

E. This coercive psychological game plan has also been run repeatedly by these defendants since at least 2004, featuring other ethnicities and races who are screened in and clustered for provocative purposes. This pattern is psychologically consistent with other patterns of practice resembling psychopathy described at paragraph 820O-Q.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

chemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608

HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide

critical confirming information directly from these institutional and individual defendants and,

among some who presented at the time as family members, their children. See other selected

relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at

pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.

Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 16-18 |
|---|---|
| Complaint paragraphs: | 10, 464, 505, 519, 526, 555, 560; 603B, F, G, L NSEC-4; 608, 613, 618, 619 HEXP-5, 10, 15, 16; 634C RGTS-14, 802B, 821, 839, 842B(ii) |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0188 through 2-0192 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 10256-10258, 11668, LPEEV65-1, LPEEV65-5 |
| Emails and documents by topic and date, also located in LPEE: | Gia first date 211207 (note actual date was in 2019) Match Group Second Notice re Preserve Evidence 220122, Match EPL Response 221110, Match Group Legal Dept Email 221110 |

*Biological and Medical Invasions – Personal Humiliation, Endangerment, Illness*

*614. HEXP-11 Illegal Human Experimentation:* **Personal and Intimate Relationships - Orchestrated Romantic Interests, BRMT Induced Erectile Dysfunction 2005, 2008, 2020-2021**

A. As forensically reverse engineered, defendant UNITED STATES used intimate relationships between Lead Plaintiff and a series of women in 2005, 2008, and 2020-2021 to field deploy increasingly sophisticated BRMT functionality against the Lead Plaintiff by inducing erectile dysfunction (ED). In 2005, two dates resulted in ED failures (BRMT induced). In 2008, BRMT was again induced but offset by the prescription medication tadalafil. In 2020 into 2021, defendant UNITED STATES again used its BRMT bioweapon and bioweapon delivery system to induce a progression of ED symptoms despite the tadalafil medication, indicating that BRMT bioweapon sophistication had evolved by that time to be much more granular in its effects on the brain, central nervous system, and muscular control required to attain and sustain an erection, as a variety of conditions could be induced and reversed in the moment as desired by the operator.

B. Periodically throughout and after each of these cycles, Lead Plaintiff's erectile dysfunction has completely disappeared, directly indicating that the ED symptoms were explicitly due to illegal BRMT bioweapon intervention. This BRMT direct control acts through the brain and the central nervous system to affect control of the muscles which control blood flow in the penis. Managed in the moment by a human operator, an employee of defendant UNITED STATES, most probably defendant CIA, this individual operator observing the intimate scene (using a locally embedded fiber optic camera, a PC camera, an infrared camera through non-metallic curtains, and other such options, or a coordinated verbal code with the accomplice in the scene) determines the specific timing of each BRMT ED intervention, electing

an outcome which in its most modern form can vary the degree and duration of the erection at the operator's command. Accomplishing this result required coordination among the personnel with direct operational control of the illegal BRMT bioweapon and bioweapon delivery system, field personnel - agents, confidential informants, or other consenting parties willing or coerced to engage sexually with the Lead Plaintiff.

C. Wire frauds were used to orchestrate all these sexual dates, some of which were the subject of other sub-counts in this Complaint. Lead Plaintiff expended personal funds on travel and entertainment during these fraudulent relationship dates.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608 HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at

pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.

Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Appendix 2 paragraphs: | 1-060 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0115, 2-0148, 2-0188 through 2-0190 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 140 et al |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 615. HEXP-12 Illegal Human Experimentation: BRMT Orchestrated Personal Movements and Orchestrated Activities

A. 2008: As forensically reverse engineered, illegal BRMT bioweapon inducement of strong anxiety in advance of a film festival in Telluride, CO which Lead Plaintiff had arranged, then cancelled as shown at LPEE pages 10365-10375 while employed at ESTABLISH, is emblematic of this pattern of illegal BRMT bioweapon and bioweapon delivery system biochemical emotional hijackings. This anxiety-induced vacation cancellation came in May 2008 after an earlier Winter 2008 ski vacation to Park City, UT. The Park City, UT solo ski trip was used by defendant UNITED STATES to arrange an "incidental" view of classified pulse jet technology in flight operations during this early 2008 trip on the day before Lead Plaintiff visited the Hill Air Force Base Museum near Ogden, UT. See other examples of this type of physical and logistical movement intervention and control herein using the illegal BRMT brain hijacking system. These illegal manipulations are a daily occurrence to Lead Plaintiff by defendant UNITED STATES' use of its illegal BRMT bioweapon and bioweapon delivery system to hijack and sustain involuntary servitude of Lead Plaintiff in his daily life as described herein.

B. 2018-2023: As forensically reverse engineered, defendant UNITED STATES used the
illegal BRMT bioweapon and online websites which it controls or spoofs including, without
limitation, EventBrite and Club Free Time. These defendant UNITED STATES and other
defendant police powers connected and manipulated activities and internally programmed events
(which have and do incorporate press, media, and entertainment defendants who are permitted
special access) most probably began in November 2018 or early 2019 (soon after Lead
Plaintiff's human trafficking from Ramsey, NJ to Edgewater, NJ (paragraph 648 RICO-10) and
continued until December 2023, as partially documented at LPEEV65-5, when the accessibility
was to events was terminated as the reservation system used to receive the discount ticket was
no longer accessible and complaints to Club FreeTime were met with no resolution. Other prior
evidence of this specific conduct was deleted by defendant UNITED STATES from Lead
Plaintiff's Outlook calendar in early September 2023.

C. These events and activities were intended to manage, direct, and control Lead
Plaintiff's movements, and to organize controlled in-house events and schedule non-existent
events for the purposes of developing specific narratives about personal interests, arranging
fruitless travel to non-existent events to frustrate Lead Plaintiff, to organize delivery of verbal
threats, and for other purposes (see LPEE pages 420, 456-459, 460-464, 543, 548-563, 564-571,
575-597, 598-606), all for the convenience of the defendants and to sustain management,
control, direction, and frustration of the Lead Plaintiff including, without limitation:

(i) managing venues and internally crafted and orchestrated events and performances
performances to sustain isolation and attempt to introduce its own personnel for the
purpose of controlling Lead Plaintiff's activities and associations with others,

(ii) to foster a sense and reality of physical and emotional isolation and magnify a sense of

aloneness,

(iii) to impose control of daily movements as basic as the timing of shopping trips so

orchestrated events, including, without limitation, contaminated foods (such as bagged

spinach, milk, and brats), and stockouts of common products such as cereals and

vegetables, could be orchestrated; and so field harassment sequences such as aisle

blocking, physical obstacles, and personal obstructions, including knowing

endangerment of fragile elderly persons by police powers defendants while the Lead

Plaintiff has been subjected to illegal BRMT hijacking using elevated adrenaline

(enhancing flight, fight, and anxiety as elderly people blocked his path in ACME market

in Edgewater, NJ and other locations) have been run by field personnel and volunteers at

all hours of day and night;

(iv) to purposefully misdirect non-randomized directed walks which have and do include

psychological operations by flipping Lead Plaintiff's sense of direction in New York

City and by orchestrating apparently random walk paths using illegal BRMT brain

hijacking at the moment of direction of travel decision;

(v) to manage the timing of his arrival at events or his missing of events;

(vi) to elect and cancel Lead Plaintiff's routine and vacation travel, and many other activities

and actions inside his personal residence and in public places.

D. October-November 2023: A 20 day event sequence captured in Lead Plaintiff's notes

from October 10, 2023 to November 8, 2023 incorporated herein as LPEEV65-3, is emblematic

of overall police powers conduct across multiple jurisdictions in federal, state, and local

governments since departure from CNA in September 2002. This specific event sequence

includes three local police powers operations (PAPD, DC, NYPD) in coordination with the defendant UNITED STATES BRMT team to create a street level narrative of an emotionally disturbed person (Lead Plaintiff) which were run during an October 10, 2023 trip to file letters and documents in Congressional offices in Washington, DC (LPEE pages 12121-12149), then a Complaint in the federal court in the Southern District of New York (23-cv-09605, Appendix 1 – Prior Filings History), then a series of local events in and around New York City (LPEEV65-3).

E. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608 HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 648 RICO-10, Appendix 1 – Prior Filings History |
| Appendix 2 paragraphs: | Entirety |
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety |
| LPEE pages (see technical note on page numbering at paragraph 230): | 420, 456-459,460-464, 543, 548-563, 564-571, 575-597, 598-606, 10365-10375, 12121-12149, LPEEV65-3, LPEEV65-5 |
| Emails and documents by topic and date, also located in LPEE: | New York Cares Library Bowling Outing 080815 |

*616. HEXP-13 Illegal Human Experimentation:* **Reckless Endangerment Through BRMT Induced Defamation**

A. As forensically reverse engineered, defendant UNITED STATES has and does engage in decades long protracted coercive psychological operations and illegal BRMT bioweapon and bioweapon delivery system biochemical hijackings of Lead Plaintiff's words and actions from approximately 2000, which have been and are intended to and do publicly defame and mischaracterize the Lead Plaintiff's own natural personal pattern of conduct when not being directly subjected to coercive psychological operations and/or illegal BRMT bioweapon and bioweapon delivery system hijacking. Combined with defendant UNITED STATES' (i) careful pre-texting of Lead Plaintiff in national security matters, which accelerated after the September 11, 2001 terrorist attack allowed them new powers and virtually free reign to trample "unalienable" rights, (ii) their purposeful public internet exposure of Lead Plaintiff, and (iii) general public and police powers paranoia surrounding defendant United States' explicit documented failure at defendant FBI to interdict the 9/11 attack by disrupting the aircraft hijackers during training, these illegal BRMT bioweapon and bioweapon delivery system hijackings have and do recklessly endanger the Lead Plaintiff's life and those who surround him, both members of the public and necessary undercover security now commonly required. Both deliberately malign police powers operations and public vigilantism have and do endanger and

have been and are used in numerous attempts to defame and discredit the Lead Plaintiff in the view of the general public and to attempt to exculpate these defendants.

B. Defendants UNITED STATES, primarily acting through defendants CIA, FBI, and USMS, and unknown co-conspirators who are almost certainly other police power departments and agencies, has and does engage in making and acting, directly and indirectly in threats and violence which is not directly attributable, and by engaging themselves and others through their agents, in public mayhem in an effort to attract a violent event directed specifically at Lead Plaintiff. Within one four month period in 2022, defendants (i) made an indirect verbal threat on the Lead Plaintiff in a New York City performance space on July 16, 2022 as described at Interline Exhibit 15A; (ii) a mass transit derailment attempt initiated just after sundown while traveling toward the setting sun in the train engineer's eyes at 50-60 mph against an express train operating on the Metropolitan Transportation Authority Hudson River Line on September 11, 2022 with the Lead Plaintiff as a passenger as described in paragraph 707 LETHL-14 (Interline Exhibit 15B), (iii) upon the Lead Plaintiff in defendant NYC (City of New York) Morningside Park on September 17, 2022 while using the illegal BRMT bioweapon and bioweapon delivery system, as described at paragraph 708 LETHL-15 (Interline Exhibit 15C), and (iv) on NYC (New York City) streets with their streetlights deliberately extinguished on November 18, 2022, and by a rapidly accelerating vehicle in a BERGEN (Bergen County) New Jersey shopping center parking lot on November 19, 2022 as described at LETHL-16 while traveling to and from theater performances (see also Interline Exhibit 15D, and these two specific theater performances listed at LPEEV65-5). The Bio-Lab arson fire and US Airways Flight 1549, paragraphs 602 NSEC-3, 606A-D HEXP-3, 673 RICO-35, both proximate to the Lead Plaintiff in relationship (Bio-Lab, paragraph 602 NSEC-3) or location (US Airways 1549, paragraph

606B, C, D HEXP-3), are elements of this overall pattern of domestic violence and sabotage
intended by defendant UNITED STATES to create the appearance of mayhem and violence
following the Lead Plaintiff, consistent with defendant's other unfounded rumors and
misdirection intended to skyline Lead Plaintiff as the root cause of this violence, which these
defendants themselves directly created to conceal their other illegal acts and misdirection.
Discovery will provide further specific evidence relevant to each noted incident and more
incidents of such acts, both survived and likely not survived, by members of this class of
plaintiffs. These acts and injuries are representative of those perpetrated by defendants on this
class of plaintiffs.

C. Defendants also created other false allegations against Lead Plaintiff including,
without limitation, (i) of pedophilia which they acted out using the children of police powers
personnel in volunteer outings with New York Cares, and in psychological operations conducted
using the illegal BRMT bioweapon and bioweapon delivery system (paragraphs 526, and in full
knowledge of his actual conduct as described at paragraph 839) to create false public
impressions of the Lead Plaintiff; (ii) with sex traps and female officers who preceded him on
his walks in New York City, and on buses, subways, and trains. Their intent and purpose has
been and is to create and sustain false narratives intended to slander, libel and defame the Lead
Plaintiff. Defendants (iii) have and do interfere with contract rights with dating sites and public
venues for this purpose (paragraphs 505, 608 HEXP-5); and (iv) have constructed and did
sustained for years a terror narrative (paragraphs 464, 519, 555, 560, Interline Exhibits 17-18,
603B, F, G, L, 634C, 802B, 839) for the purposes of endangerment, libel, and slander of Lead
Plaintiff; (v) caused an event of forced public urination by coordinated police powers operations
(paragraph 618 HEXP-15); (vi) orchestrated and provoked an illegal BRMT bioweapon and

bioweapon delivery system flash temper attack coordinated with undercover police powers personnel (paragraph 619 HEXP-16); and (vii) have systematically misdirected public narratives and public opinion, and deliberately misdirected the actions of co-conspirator defendants, all as misdirection for defendant UNITED STATES' own slander, libel, misrepresentation, deceit, interferences with contract rights, and other myriad acts, violations, and injuries of Lead Plaintiff's rights as described in all sections of this complaint.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608 HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 17-18 |
|---|---|
| Complaint paragraphs: | 419-584; 603B, F, G, L NSEC-4; 608, 618, 619 HEXP-5, 15, 16; 634C RGTS-14; 802B, 839 |
| Appendix 2 paragraphs: | 1-027 to end |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0083 to end |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 368-793 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 617. HEXP-14 Illegal Human Experimentation: BRMT Induced Adverse Medical Reactions, Symptoms, and Illnesses 1980 to present

A. As forensically reverse engineered, Lead Plaintiff has and does experience notably

atypical progressions of medical symptoms, quite unnatural to their normal progressions in

medical presentation, to wit, the nasal allergy and eye aging progressions documented here.

Other abnormal progressions related to the illegal BRMT bioweapon and bioweapon delivery

system include unusual excess hormone production spikes, extreme unexplained illness

symptoms upon return from London in 1994 or 1995 which led to life threatening deep vein

thrombosis (severe blood vein clotting), symptoms of non-Hodgkins lymphoma detected in

glandular swelling under both armpits in August 2007, and other symptoms noted in the

referenced evidence.

### Persistent Atypical Allergy Symptoms

B. Allergy symptoms, which in the early 1980s abruptly presented then later

mysteriously disappeared despite having lived in the exact same environment with evergreen

trees since birth, were diagnosed by a Redmond, Washington allergist as a primary allergy to

deciduous trees, despite the near complete absence of deciduous trees in Lead Plaintiff's normal

living environment. The problem steadily worsened from the 1980s through 2005 in Washington

state (nicknamed the Evergreen State for the obvious reason its trees are almost 100% evergreen trees). The condition required persistent nasal and oral steroid use and resulted in frequent nasal infections and antibiotic use.

C. During this worsening allergy progression, nasal surgery was performed in the early 1990s in the same Evergreen Surgical Center medical building where defendant BURNS allegedly had his OB/GYN medical practice adjacent to Evergreen Hospital in Kirkland, Washington. The nasal surgery may have been used to conceal a surreptitious implantation in the sinus cavity of a passive RF device used in the further development of illegal BRMT brain hijacking system to improve location accuracy for placement of remotely administered BRMT brain hijacks as the system was evolved from a local device to a remote device. Passive radio frequency devices (implanted and applied passive RF "chips") are now commonly used in animal identification systems, in entrance control systems, to identify and track physical assets like computers, forklift, and trucks, and to locate and control inventory.

D. The extremely persistent allergy symptoms described above changed dramatically, in a very unexpected and medically unnatural direction, after Lead Plaintiff was human trafficked by the FBI wrecking progression from Kirkland, Washington and its millions of fir, hemlock, and cedar evergreen trees to Boston, Massachusetts on December 24, 2005. Boston is a heavily treed city with millions of deciduous trees. Lead Plaintiff's medically diagnosed allergy, supposedly to deciduous trees, nearly vanished and has never again presented in any particularly notable manner though today, even when Spring and early Summer pollen loads are heaviest, despite deciduous trees being almost the only trees near any of his residences in the Boston and northern New Jersey area from 2006 to today.

**Unexplained Bleeding From Eardrum**

E. Lead Plaintiff also noted an overnight hemorrhage from his left ear after a full night's sleep sometime later while Jeanette was still present in the 149th Street, Kirkland, WA house. There was no reasonable medical explanation for a near sea level eardrum break resulting in bleeding in the middle of the night in a healthy 40-45 year old with no history of ear infections, no audiology issues, and no earache or pressure being experienced during that period, and despite nearly a million air miles over several prior decades. The Lead Plaintiff's persistent head tilt to the left for many years was likely used as a field identification method, as his disturbed equilibrium from a device implanted in the left ear caused a persistent head tilt to the left, which was used to make him easier for field observers to identify during a development phase to test a new illegal BRMT bioweapon and bioweapon delivery system set of pulsed commands. A possible hardware upgrade is another feasible explanation, though less likely, for this medically implausible event.

F. Since medical software can be hacked to conceal medical issues by surreptitious means, an independent MRI using medical technology and software securely furnished by the manufacturer, is required to establish whether this smoking gun evidence is present in Lead Plaintiff's sinuses and/or ear canal.

**Strong Headaches, Presbyopia, And Atypical Reversal Of Presbyopia**

G. Further to improbable organic medical explanations for synthetically driven BRMT related medical sequences, Lead Plaintiff began experiencing strong headaches a few days after joining CNA Industrial Engineering in November 1996. Defendant FAUCI first appeared soon thereafter to the unwitting Lead Plaintiff posing as CNA founder Larry Cook, identified in 2024 as the executive program manager of the illegal BRMT bioweapon and bioweapon delivery system from at least 1996 forward for an unknown number of years. Lead Plaintiff's visit to an

optometrist resulted in a moderate strength bifocal prescription, consistent at age 51 with normal aging. Subsequent visits continued this normal age related progression until 2008. However, since 2008, Lead Plaintiff has been informed on each successive visit that his prescription strength was being reduced, through and including at his most recent vision check-up in 2022. This vision progression since 2008, as verbally represented by his eye doctors and in their written prescriptions, directly contradicts the normal progression over time of virtually everyone who must use prescription eyewear.

H. These unexplained and reversing progression are atypical, and further circumstantial evidence of defendant UNITED STATES' manipulations of medical symptoms through illegal BRMT bioweapon and bioweapon delivery system biomedical abuses to sustain these adverse medical reactions, stresses, and deliberately contriving sinus symptoms and the resultant infections in Washington state in order to orchestrate sinus surgery as it continued its illegal involuntary servitude and illegal medical subjugation and victimization of Lead Plaintiff.

I. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608 HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | 419-584 |
| Appendix 2 paragraphs: | Entirety |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0002, 2-0013, 2-0014, 2-0022, 2-0026, 2-0028, 2-0065, 2-0067, 2-0076, 2-0099, 2-0115, 2-0131, 2-0150, 2-0153, 2-0189, 2-0193, 2-0196, 2-0197, 2-0198, 2-0200, 2-0202, 2-0213 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 10306-10310, LPEEV65-3 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 618. HEXP-15 Illegal Human Experimentation: BRMT Forced Public Urination Sequence, 2022

A. As forensically reverse engineered, defendant UNITED STATS, CIA, NYPD, with MTA, orchestrated a forced public urination sequence using BRMT after Lead Plaintiff attended a Saturday afternoon rally in Foley Square, NYC in 2022. The normal 10 minute subway return trip from Foley Square to Grand Central Terminal took an exceedingly long time, nearly 60 minutes, including the initial Foley Square subway station wait for a train which runs every 20 minutes on Saturdays. This permitted additional fluid to accumulate during the delay and required cross agency coordination between NYPD (perhaps incorporating embedded CIA personnel), the MTA train operator, and the CIA personnel who operate the illegal BRMT brain

hijacking device. See LPEE page 11667 for the detailed description of this specific forced public humiliation, which is consistent with defendant UNITED STATES' overall historical pattern of practice of discrediting, humiliating, and retaliating directly against whistleblowers and victims.

B. Further evidence of these BRMT bioweapon induced bodily reactions and responses is likely to be available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of defendants, through deposition of defendant UNITED STATES' BRMT operator (a local CIA employee in the vicinity of Lead Plaintiff or a remote operator acting through a locally deployed person acting as a scout), as well as the routine internal reports of these incidents authored and controlled by defendants, particularly the classified BRMT bioweapon and bioweapon delivery system defendant UNITED STATES uses without Constitutional authority and in violation of rights, law, and ratified international treaties, and which operations comprise crimes against US persons. To the extent they have not been destroyed, medical records, likely including copies maintained by defendant UNITED STATES, its medical contractors and/or researchers, can also be discovered to validate these claims.

C. This type of coordination has been experienced frequently in other situations including, without limitation, performance spaces and seating arrangements, bus trip delays and cancellations, fraudulent bomb scares at Port Authority Bus Terminal, protracted Lincoln Tunnel delays not experienced except in episodic cycles having little or nothing to do with seasonal, holiday, or normal peak hour traffic patterns, documented elsewhere including, without limitation, at paragraphs 629, 630 RGTS-9, 10.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608 HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 629, 630 RGTS-9, 10 |
| Appendix 2 paragraphs: | 1-067 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-001, 2-0217 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 575-597, 598-606, 10372 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### *619. HEXP-16 Illegal Human Experimentation:* **BRMT Public Flash Temper Hijacking, 2023**

A. Defendants orchestrated a dangerous Tunnel Flash Temper Hijacking using the illegal BRMT bioweapon and bioweapon delivery system to brain hijacking the Lead Plaintiff in a

pedestrian subway access tunnel under 42 Street near the Port Authority Bus Terminal in New

York City, which hijacking caused a very abrupt and totally out of character action during a

routine walk to catch a subway train, something the Lead Plaintiff does multiple times each

week in the often crowded subway tunnels of New York City. Crowded conditions while

walking are nothing new to someone who has spent over 16 years in the greater New York City

area, so this was an extremely unusual reaction to an entirely normal situation by a highly

emotionally stable person (paragraph 320e) is a cause for concern and alarm. A sudden flash of

intense anger was caused and created by a BRMT hijacked extreme adrenaline flash, exposing

the Lead Plaintiff and nearby pedestrians to risk of assault or injury from this deliberately

hijacked action. This can pose the risk of a violent reaction, including by nearby undercover

police powers personnel with weapons who do not recognize the true source of the disturbance

or assault, and thereby result in severe injury or death. See the descriptive narrative at LPEE

pages 11668-11670.

B. Further evidence of these BRMT bioweapon induced bodily reactions and responses

is likely to available through the discovery process, including the recovery of the Lead Plaintiff's

own records currently in the hands of defendants, through deposition of direct witnesses, as well

as routine internal reports of these incidents authored and controlled by defendants, particularly

the classified BRMT bioweapon and bioweapon delivery system defendant UNITED STATES

uses without Constitutional authority and in violation of rights, law, and ratified international

treaties, which comprise crimes against US persons. To the extent they have not been destroyed,

medical and other records, likely including copies maintained by defendant UNITED STATES,

its medical contractors and/or researchers, can also be discovered to validate these claims.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608 HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 320e |
| Appendix 2 paragraphs: | 1-067 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0217 |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

**620. HEXP-17 Illegal Human Experimentation: Biological and Medical Invasions – Food Borne Illnesses 2008-2010, 2018-2023**

A. As forensically reverse engineered, defendants orchestrated multiple episodes of food borne illnesses to Lead Plaintiff by arranging for spoiled food products to replace fresh refrigerated products on store shelves at ACME Market in Edgewater, NJ in 2008-2010 and again in 2020-2022. Bagged salads were contaminated with rotted and blackened spoiled spinach from 2008 through 2010, which risked potentially deadly salmonella and listeria infections. This pattern of illegal practice recurred in 2020-2022 in fresh milk and packaged Johnsonville sausage bratwurst which were allowed to spoil, then placed on the refrigerated dairy shelf for sale to the Lead Plaintiff shortly before he arrived. This contaminated food, which carried similar infectious disease risks was then removed before other customers could select them. This element, likely carried out by embedded personnel of USMS. (Edgewater, NJ is the location where Lead Plaintiff was again human trafficked by DOJ, FBI, and USMS in 2018 into the midst of the Senator Menedez corruption investigation described in this Complaint.)

B. All refrigerated foods which are spoiled originated at the ACME grocery store in Edgewater Commons shopping center in Edgewater, NJ. Some packaged foods originate there, and others are home delivered from WALMART in North Bergen, NJ. Emails evidencing Lead Plaintiff's correspondence with the parent company of the Acme Edgewater, NJ grocery store, Albertsons, customer service organization in 2020-2022 are no longer on the Lead Plaintiff's personal Hotmail.com email account as of the date this Complaint is being prepared, and were not deleted by the Lead Plaintiff, providing further indications of evidence tampering by defendant UNITED STATES.

C. Lead Plaintiff has also endured several episodes of vomiting from instant rice purchased and fulfilled through WALMART, North Bergen, NJ which was home delivered, so the chain of custody is not clear, as an uncontaminated purchased package could have been replaced before delivery by an embedded undercover agent or officer posing as the delivery agent. This was most probably deliberately mishandled after pre-cooking in a small batch so it would spoil before being dried and specially packaged in normal factory packaging but outside the normal production process.

D. Further evidence of these food borne illness induced bodily reactions and responses is likely to available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of defendants, through depositions, as well as routine internal reports authored and controlled by defendants, particularly the classified BRMT bioweapon and bioweapon delivery system defendant UNITED STATES uses. To the extent they have not been destroyed medical and other records maintained by defendant UNITED STATES, its medical contractors and/or researchers, can also be discovered to validate these claims.

E. This same malign harassing pattern of practice has been experienced frequently with other types of products, including, without limitation, mismarked and improperly sized clothing ordered and fulfilled online, remotely electronically hacked and defective printers which have been rendered unusable by these technical hacks, extreme tear resistance plastic packaging being used for ketchup and mustard condiment packaging at Rumsey Playfield, Central Park, New York City. These acts, violations, and injuries are used by police powers personnel to harass targeted persons and have been experienced with especially high frequency over the past three to four years, consistent with other patterns of misconduct described elsewhere throughout this

Complaint. This experience is typical of police powers abuses of government resources to harass targeted persons, particularly targeting whistleblowers exposing corrupt police powers practices.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 604 HEXP-1 subparagraph I is incorporated herein by reference. Paragraph 608 HEXP-5 subparagraphs C, D, E are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0006, 2-0151, 2-152, 2-0191 |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |

| Emails and documents by topic and date, also located in LPEE: | ACME emails are blocked by defendant UNITED STATES computer hack or deletion from electronic records |
|---|---|

**INDIVIDUAL RIGHTS VIOLATIONS AND CONSPIRACIES (RGTS** series offenses which incorporate paragraph 504 at all subcounts herein by reference.)

*Entrapments, Illegal Searches, and Willful Blindness*

*621. RGTS-1 Rights Violations:* **Entrapment/Incrimination Attempts, Inculpations - Stevens Pass 1980s, Longacres Murder 1980s, Pierce County Corruption Follow-on 1980s, Alistar Capital Probe 1996**

A. Stevens Pass 1980s: As forensically reverse engineered, defendant UNITED STATES and its defendant co-conspirators engaged in an illegal BRMT brain hijacking operation which posed extremely dangerous personal risk to Lead Plaintiff's first spouse Lynne during a ski outing to Steven's Pass, Washington in the 1980s. This operation also posed a grave risk of false incrimination to the Lead Plaintiff.

B. Defendant UNITED STATES created this scenario by initiating a public argument initiated by Lead Plaintiff's first wife Lynne expressing a surprising verbal outburst toward the Lead Plaintiff. During his reply, Lead Plaintiff swept his left hand to his left from a centered position and knocked over a glass of red wine. His spouse Lynne rose explosively and angrily from the table (carefully timed illegal BRMT gives this result from an extreme adrenaline surge, as shown in the 2023 Tunnel Flash incident documented herein at paragraph 619 HEXP-16). She walked angrily from the basement café in the oldest Stevens Pass day lodge (now replaced by the much larger Granite Peaks Lodge) and began to walk west down Steven Pass Highway toward Kirkland, WA, where they lived about 68 miles away.

C. After loading the ski equipment on the car, Lead Plaintiff located Lynne walking down the north side of the highway about 1 mile west of the summit and stopped to persuade her to return to the vehicle for the ride home, about 75 minutes by car. Lynne reluctantly and angrily

got into the car after a brief conversation. Had the Lead Plaintiff angrily left his spouse walking

on that highway that night, Lead Plaintiff believes it is likely his spouse would not have returned

home alive. Though it did not occur to him then, this would have been the perfect setup of police

powers witnesses in the basement café, and an angry events sequence for her mysterious

disappearance and his probable incarceration as the prime suspect. See paragraphs 494-498,

600G through I, 609 HEXP-6, LPEE page 182.

D. During the 1980s, Lead Plaintiff functioned as a member of the unwitting clean-up

crew who assisted with accounting and finance related projects which followed defendants FBI

and USMS in, without limitation, the Longacres Racetrack, Renton, WA chemist murder, a

Pierce County, WA public corruption probe, and dozens of other domestic surveillance projects

and cover operations dressed as consulting projects. Lead Plaintiff was deliberately positioned to

see a Christopher Boyce (the recaptured convicted Navy nuclear submarine spy) cameo as

Boyce's USMS prisoner transfer caravan entered the secured underground transfer location in

the Federal District Courthouse in Seattle, WA in August 1981. As Lead Plaintiff searched for

funding to acquire Pacific Pipeline in 1996, John C.T. Conte (defendant FBI Seattle, WA deep

cover financial intelligence) directed him to Alistar Capital, whose founder, Bud Greer, and his

spouse were later jailed for contempt after transferring funds in violation of their fiduciary duty

to Britannia Corporation, a Seattle-based apparel company. Lead Plaintiff was later subjected to

an attempt to use this style of court sanction entrapment by defendants FBI and ROSENBERG

as a King County Superior Court Order, setting aside a default judgement entered by attorney

Michael Larson who had formed Allegent, LLC binding Lead Plaintiff and embedded defendant

PRAY as co-managers, was used as a pressure tactic in the forced wrecking of Allegent, LLC

during the course of the ShipNow litigation, paragraphs 275(i), 471(ii), 650 RICO-12. These

pretexting sequences are indicative of defendant UNITED STATES' perpetual on-going effort to sustain its pattern of bad faith acts and the subjugation and involuntary servitude of the Lead Plaintiff. These acts are representative of acts, violations, and injuries of the constitutional and statutory rights of this entire class of plaintiffs.

E. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 445, 494-498, 600G through I, 609 HEXP-6, 619 HEXP-16, 675 RICO-35 |
| Appendix 2 paragraphs: | Entirety |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0030 |

| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al |
|---|---|
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

F. These schemes and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4-12,16-19 |
|---|---|
| Complaint paragraphs: | 10, 104, 171, 275, 276, 301, 303, 320, 337, 374-375, 417-418, 424-436, 441, 445-449, 450-451, 457-462, 462-463, 464-466, 471, 481, 494-498, 490-584, 514-515, 516, 518, 522-524, 525, 526, 565, 600-603 NSEC-1-4, 604, 606, 609, 611, 612-620 HEXP-1-3, 6, 8-17; 622, 624-626, 628-632, 635, 636 RGTS-2, 4, 5, 6, 8-12, 15, 16; 638-693 RICO-1-55, 694-710 LETHL-1-17 |

| Appendix 2 paragraphs: | Entirety |
|---|---|
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 140 et al, 368-794, 797-865, 934-1075, 6044-6084, 8453, 10187-10250, 10251-10255, 10259-10301, 10376-10393, 10423-10433, 10434-10444, 10614, 10620, 11630-11936, 11668, 12160-12232, LPEEV65-1, LPEEV65-3 through 16, 18 |
| Emails and documents by topic and date, also located in LPEE: | See emails and documents listed at all relevant individual subcounts in HEXP series and all other subcounts in other series listed at Complaint paragraphs above. Certain emails are blocked by a defendant UNITED STATES computer hack. |

**622. RGTS-2 Rights Violations: Entrapment And Incrimination Attempts, Money Laundering - Alliance Nominee Cash Bank Deposit 1990, Akoto Structured Payments 2016-2017**

A. 1990-1993: As forensically reverse engineered, as part of defendant UNITED

STATES' intentional financial wrecking of Lead Plaintiff's company Alliance, which

incorporated (i) fraudulent co-ownership and control through a nominee investor (David J. Carey

as nominee, FBI, paragraphs 445-449, 649 RICO-11), (ii) fraudulent legal representation

(HIBBS and Susan THORBROGGER, DOJ/FBI, both embedded at Short Cressman Burgess

law firm, paragraphs 446; 626 RGTS-6, 649, 651, 653, 683 RICO-11, 13, 15, 45), (iii)

fraudulent deprivation of government benefits (SBA bonding, paragraph 446, 471; 649, 653

RICO-11, 15), (iv) theft and compromise of receivables (Steve and Kerry Brewer, FBI,

paragraphs 644, 650, 651 RICO-6, 12, 13), was then succeeded by (v) a Vancouver, B.C.

fraudulent financing which failed (paragraph 653 RICO-15).

B. Defendant UNITED STATES made an approximately $80,000 cash bank deposit at a

U.S. Bank, N.A. branch on 14th Street NW, Auburn, WA in the middle of 1990, a few months

after Lead Plaintiff purchased the assets of Steve's Maintenance. The physical deposit was made

by Kerry Brewer (defendant FBI, no relation to Lead Plaintiff) in the presence of Lead Plaintiff

to an account intended to provide a cash deposit intended for the purpose of securing bid and performance bonding from a third path bonding company. Lead Plaintiff signed the IRS disclosure form for the cash deposit since it exceeded the $10,000 non-disclosure limit which requires disclosure to IRS. The funds were deposited in an account under the signatory control of Kerry Brewer (not a corporate officer), not Lead Plaintiff (sole corporate officer). The funds were removed the following day by Kerry Brewer. An in-person IRS inquiry followed some days later at the company's office and was answered by Lead Plaintiff. No further follow-up occurred. This was an attempt by defendant FBI to attract the attention and interest of IRS. This was supposedly intended to replace the loss of SBA bonding (FBI fraud, paragraph 649 RICO-11). It was also intended to replace defendant FBI theft and forced compromised of receivables undertaken by Steve and Kerry Brewer (paragraph 650 RICO-12). But as it was an overnight event, it was piling on to the pattern of frauds then being perpetrated by defendant FBI, another aggravating circumstance of their overall associate-in-fact enterprise pattern of racketeering acts, in conspiracy with defendants CIA and BURNS, the cross street resident at the 149th Street Kirkland, WA residence which Lead Plaintiff shared with the fraudulently orchestrated surreptitious active duty deferred prosecution bisexual ARMY soldier (Jeanette) in violation of the *Third* Amendment, all with conspiracy and complicity of defendants KCSD and WASH.

C. Around mid-1991, as defendant FBI orchestrated the acceleration of asbestos abatement work on the Sea-Tac Airport Concourse B, C, D expansion project, which exacerbated cash flow problems (as a result of a quadrupling of the weekly payroll with 45 day cash flow receipts on billings) on the Sea-Tac Airport project, the Lead Plaintiff contacted the UT bonding company to request financial assistance, only to learn the Utah based insurance company had been seized by the Utah Insurance Commissioner. The insurance company was

actually most probably seized prior to use of it's otherwise empty of personnel company building and offices by defendant FBI during the Lead Plaintiff's good faith visit to secure initial bonding coverage, which was followed by defendant FBI fraudulent issuance of the performance bond on the seized insurance company's bond form. No financing support was forthcoming from the bonding company. The Lead Plaintiff then conducted a telephone search for factoring services, was rejected by numerous factors or by intercepted phone inquiries, and eventually located Pacific Financial Services, Bellevue, WA (with defendant FBI's "Henry Wozow" posing as President).

D. Pacific Financial Services took over the Sea-Tac Airport employee payroll function, but failed to pay employment taxes and state worker compensation insurance premiums and attempted to lay this responsibility back on Lead Plaintiff. An IRS agent visited Lead Plaintiff at home in Kirkland, WA during his recovery from deep vein thrombosis (DVT is a life-threatening condition), which DVT arose after a financing trip to London for PAN in 1994. Lead Plaintiff described the turnover to Pacific Financial Services of all payroll responsibilities which had occurred early in the course of the accelerated project. With the benefit of forensic reverse engineering and based upon pattern of practice, defendant FBI's clear intent was the financial wrecking of the company after it was sold into Lead Plaintiff's private hands (David Carey, "co-owner and investor," was a former Rainier National Bank SVP used by FBI as the intermediary for its investment of agency funds). Defendant FBI's clear intent, based upon the now identifiable pattern of practice was (i) to destroy the evidence of their illegal surveillance of the environmental services businesses in western Washington (violating the *Fourth* Amendment in criminal investigations), (ii) to entangle Lead Plaintiff in liability for unpaid federal 941 payroll taxes, and (iii) to perpetuate federal involuntary servitude of Lead Plaintiff in defendant

UNITED STATES' and its co-conspirators' associated-in-fact enterprise pattern of continued

illegal BRMT human subject biomedical experimentation without consent, rights, and

racketeering acts, violations, and injuries.

E. 2014-2018: As forensically reverse engineered, Lead Plaintiff encountered an online

dating match from the greater New York City area in 2014 while living in Ramsey, NJ. As that

online discussion procced, it turned out that the white female "Laura AKOTO" who lived in

"Ghana." Over time and through a sequence of illegal BRMT oxytocin ("love" hormone)

hijackings, defendant UNITED STATES combined email and wire frauds with illegal BRMT

oxytocin (love hormone) hijackings to orchestrate and sustain theft of more than $14,000 via

Western Union and by using other money transfer sites which permit anonymous pickup of cash;

as well as two cell phones, LPEE pages 7845 mailed Sep. 9, 2015, 7824 mailed Nov. 15, 2015, a

PlayStation 1, and game cartridges, all sent by unwitting Lead Plaintiff to Ghana – (a defendant

CIA agent or asset), addressed to Prince B. Quaye, Agona Swedru, Ghana as directed by online

pseudonym Laura AKOTO, actually to defendant CIA agent or asset clean cutout phones for use

in Ghana, also tightly correlated to illegal use of Lead Plaintiff's U.S. passport per CPB travel

record (LPEE page 540) where Lead Plaintiff supposedly departed to Dubai as planned on May

2, 2015. This trip was planned, and the sir ticket purchased by Lead Plaintiff, but cancelled at the

last moment due to defendant UNITED STATES orchestrating and directing a fraudulent

financing in that region to Lead Plaintiff, and then demanding a known to be unaffordable

advance fee a few days prior to the Lead Plaintiff's already paid and scheduled departure. The

air ticket was used by a defendant CIA agent or asset traveling on Lead Plaintiff's passport.

International postal services were used to deliver the hardgoods to Ghana later in 2015. Around

October 2017, Laura asked Lead Plaintiff to relay payments among two international parties

through his US bank account. He agreed to do this, and later expressed discomfort, and halted the practice after one or two transfers, specific emails below:

AKOTO Laura re $2K to Mr Prince from Porter Patten $3K 171021,
AKOTO Hints of money laundering entrap scam 171025,

F. Lead Plaintiff discovered in 2018 that the entire relationship was an online fraud boosted by illegal BRMT bioweapon and bioweapon delivery system oxytocin hijacking (defendant CIA used video feeds which it originated illegally so its BRMT operators could determine the timing of oxytocin "love" hormone boosts to serve its illegal purposes in delivering funds and hardgoods from Lead Plaintiff to its Ghana asset in 2014-2017) which was followed with a defendant FBI structured payments entrapment attempt in 2017. Laura was actually nothing more than an online persona based upon ordinary and salacious pictures of a Broward County, Florida resident who sold the salacious pictures online, as Lead Plaintiff eventually discovered by using a Google photo-match search tool in 2018 (LPEE pages 7467-8179).

G. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will

provide critical confirming information directly from these institutional and individual

defendants and, among some who presented at the time as family members, their children. See

other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE

Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at

paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 445-449, 471; 626 RGTS-6; 644, 649, 650, 651, 653, 683 RICO-6, 11, 12, 13, 15, 45 |
| Appendix 2 paragraphs: | Entirety |
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety |
| LPEE pages (see technical note on page numbering at paragraph 230): | 7467-8179 |
| Emails and documents by topic and date, also located in LPEE: | Certain emails are blocked by a defendant UNITED STATES computer hack |

### 623. *RGTS-3 Rights Violations:* Entrapment and Incrimination Attempts – FBI/CIA/CSIS/RCMP VSE Pink Sheet Probe 1992-1993

A. P.A.N. Environmental Services Corporation (PAN) was an SEC pink sheet company

which Lead Plaintiff joined as Chief Operating Officer in 1993-94 as it sought financing for

three existing operations in California and Minnesota. Defendant UNITED STATES,

unbeknownst to Lead Plaintiff, was using PAN as a platform for a cross border investigation of

financial frauds involving US persons and the Vancouver Stock Exchange, its brokers, agents,

and others, and deliberately entangled the unwitting Lead Plaintiff into this international

investigation which included defendants FBI and CIA, as well as RCMP, CSIS, and MI-6. Lead

Plaintiff also made three trips to London to meet with Credit Lyonnaise Laing Managing

Director Michael Kurtanjek (MI-6) regarding supposed PAN financing, returning from London Heathrow to Seattle, WA on Feb 8, 1994, and on March 11, 1994 according to CPB port of entry encounter records at LPEE page 540. A third return to La Guardia, New York is not recorded in CPB records during that 1994 time period.

B. This deliberate pattern of cross-border entanglements in national security and related investigations in 1993-94 repeats a pattern of practice defendant UNITED STATES had already used at Deloitte Seattle. Queen Elizabeth II's visit to the Seattle Westin in 1983 was a national security event which integrated MI-6 (Martin Astengo) into the Westin Hotel staff for a time. Defendant UNITED STATES has and does use this pattern of practice repeatedly since 1983. Defendants FBI and CIA in PAN in 1994 (paragraph 450-451), ESTABLISH 2007 (paragraph 464-466), and Senator Menendez foreign agent investigation and indictment between 2018-2023 (paragraph 525) which is the most recent example in this long-running sequence) to deliberately ensnare, ensnarl, and attempt to entrap Lead Plaintiff, perpetuate involuntary servitude, and sustain development of the defendant CIA and ARMY illegal BRMT bioweapon and bioweapon delivery system from 1968 to the present time.

C. CORNWELL, a former US Navy carrier pilot turned deep cover CIA agent who had worked espionage operations under commercial cover in north Africa before returning to the US, and who had deliberately and fraudulently failed to secure Alliance equity financing in 1992 through early 1993, now posed as having formed this new venture, PAN. PAN was allegedly using a publicly traded shell corporation (as recommended by Greg Harry, who was presented by CORNWELL as a public shell/PIPE expert during an office visit in Laguna Beach, CA) to work toward securing a form of financing known as a PIPE (private investment in public equity). PIPE financing allowed private funds to be invested in unregistered company shares

which after 90 days became publicly tradeable stock. These company shares would in turn be listed on NASDAQ to provide investor liquidity without the need to go through the SEC securities registration process.

D. CORNWELL also promised Lead Plaintiff PAN compensation and stock options as soon as a financing with Credit Lyonnaise Laing (CLL), a major French investment bank and stock broking firm with offices in London, was completed, so the Lead Plaintiff agreed to defer compensation for a time until the financing was completed. He had no knowledge that he remained the effective captive and involuntary servant of defendant UNITED STATES (CIA, ARMY, FBI, USMS), and its continuing BRMT, rights, and racketeering conspiracy.

E. The promised CLL financing, was actually simply another effort by defendants CIA and FBI to engage Lead Plaintiff in deliberate pattern of national security entanglements by cross-border projects involving CSIS (John Young, CSIS Vancouver mining financier/engineer commercial cover), and MI-6 (Michael Kurtanjek, CLL, international Managing Director for mining commercial cover used in MI-6 operations in Africa and elsewhere), MI-5 (UK's FBI equivalent), and the London Metropolitan Police. The London Metropolitan Police visible to Lead Plaintiff during his three PAN-related trips to London and CLL included a five man Counterterror squad trot-by while he was alone in a 500 foot long construction tunnel at Heathrow Airport, and a Copthorne Tara, Kensington, hotel bill on his hotel room number, which remained unpaid by CORNWELL for a sufficient time to attract the attention of their Serious Fraud squad. Lead Plaintiff made three trips to London to meet with Credit Lyonnaise Laing Managing Director Michael Kurtanjek (MI-6) regarding financing, returning from London Heathrow to Seattle, WA on Feb 8, 1994, and on March 11, 1994 according to CPB port of entry

encounter records at LPEE page 540. A third return to La Guardia, New York is not recorded in
CPB records during that 1994 time period.

F. This deliberate pattern of cross-border entanglement in national security and related
investigations again repeats, without limitation, the prior 1983 and 1994 patterns when it recurs
in 2007. Lead Plaintiff was again trafficked by defendants FBI and ROSENBERG while
employed after human trafficking from Seattle to Boston to Fort Lee, NJ and ESTABLISH, yet
another FBI false flag employment cover company. While defendant ROSENBERG did not
directly participate in the 1983 Queen Elizabeth II and 1994 PAN scenario he was present as an
illegal FBI embed at NutraSource and connected with Lead Plaintiff, as BURNS (CIA)
throughout that period of time. Through these careful and deliberate cross-border forms of
national security entanglements by defendants CIA and FBI, Lead Plaintiff was rendered eligible
for technical surveillance by CSIS, MI-5, and MI-6 during those periods of time, permitting
those countries' intelligence surveillance personnel and tools to be used against the Lead
Plaintiff and others in his direct contact network, even though such practices are not legal under
US law for US police powers operations to use against their own citizens. This form of off the
books trading of intelligence support facilitates illegal spying on US persons through fraudulent
color of law abuse of international intelligence cooperation, which thereby functionally abuses
and abridges the rights of US persons.

G. CORNWELL and defendant FBI also ran a $165,000 fraudulent factoring theft on a
Pacific Environmental Services (the P. in PAN) sub-soil remediation or paving project during
this sequence in 1994, echoing the prior $20,000 factoring loan which had been used for the
fraudulent Canadian financing,$65,000 loan default, and forced bankruptcy closed out just four
or five months before. The California factoring company used in this specific fraud on Lead

Plaintiff was represented in a meeting in the greater vicinity of Orange County, CA, by an individual with a strong overall physical resemblance to Dave Brown (CNA), Henry Wozow (Pacific Financial Services), and Ron McCormick (Walmart- Bentonville), who appeared at various other times during this decades long associated-in-fact enterprise pattern of racketeering acts and rights violations. The practical effect of this specific factoring fraud was the continued deprivation of promised compensation by defendant UNITED STATES while at PAN.

H. Lead Plaintiff made numerous trips to supposed PAN operations in Ontario, California, met the London CLL contact, Michael Kurtanjek, in Los Angeles with CORNWELL, and took three trips to London and CLL over the next approximately six months, all in expectation of the completion of the promised financing of PAN by CLL, a major financial services firm with global reach and connections. Lead Plaintiff made three trips to London to meet with Credit Lyonnaise Laing Managing Director Michael Kurtanjek (MI-6) regarding financing, returning from London Heathrow to Seattle, WA on Feb 8, 1994, and on March 11, 1994 according to CPB port of entry encounter records at LPEE page 540. A third return to La Guardia, New York is not recorded in CPB records during that 1994 time period. Lead Plaintiff never received the compensation due for his work at PAN and was referred by ROSENBERG (FBI) during the latter stages of this FBI operation to Pacific Pipeline where he joined the Board of Directors in 1994 alongside ROSENBERG and PERILLO, among others.

I. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 450-451, 464-466, 525 |
| Appendix 2 paragraphs: | 1-017 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0045 through 2-0061 |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |
| Emails and documents by topic and date, also located in LPEE: | Emails and documents are controlled by defendant UNITED STATES - as delivered to ROSENBERG (FBI) in 2007, and in USPS handled mail surveillance in 2008, 2010, possible recovery at Ramsey, NJ in 2018 |

### 624. *RGTS-4 Rights Violations:* **Entrapment and Incrimination Attempts – FBI Sole Source, CFO Search, Tax Filings, Ironwood 2018-2023**

A. As forensically reverse engineered, at the same time FBI opened a 2018-2023 national security investigation centered in Edgewater, NJ, FBI reached out to Lead Plaintiff as this investigation in January 2018 using a fraudulent financing from SOLE SOURCE as its bait to connect FBI SDNY directly to Lead Plaintiff. The investigation led to the September 22, 2023

indictment of NJ Senator Menendez for domestic corruption with a local real estate developer, bribery and influence peddling related to an Egyptian halal certification scheme, and actions as an unregistered foreign agent for Qatar.

B. Defendant UNITED STATES has and does sustain Lead Plaintiff's involuntary servitude and continue it entrapment attempts during 2018 to the present. Lead Plaintiff had sent a series of interstate email financing solicitations in late 2017 sourced from a list in a Los Angeles Times business news article, now known as a fraudulent planted story by defendant FBI on a spoofed Los Angeles Times website, seeking business financing. SOLE SOURCE Capital, Santa Monica, CA responded and introduced Dewey TURNER, a principal, from this fraudulent defendant FBI cover operation actually run from Manhattan, New York.

C. A few weeks later, TURNER and three other agents, one known as Bradford ROSSI, ostensibly visiting from Los Angeles, requested a meeting the afternoon of January 9, 2018 on very short notice at the St. Regis Hotel bar in New York City. ROSSI, as the senior most executive at SOLE SOURCE, verbally promised a multi-million dollar financing at that meeting. SOLE SOURCE, acting through emails and a January 23, 2018 phone call from Dewey TURNER, then reneged to the Lead Plaintiff's company Winnett Cattle Company (see paragraph 337). As dialog continued on other possible future investments occasionally into 2021, TURNER mentioned a visit to an operation in west Texas in one of his calls to Lead Plaintiff.

D. Searching for a CFO to support the company after a replacement financing, Lead Plaintiff came across CFO SEARCH in 2020, a specialized senior financial officer executive search firm with a "partner" who did or does work from a residential address in west Texas - Lubbock, Texas. The partner, known as Michael MAGGARD (FBI), located a CFO, Ibrahim

ABDELSAYED, an Egyptian national working in the United States, who was looking for a new position and had appropriate food industry experience.

E. The search for other financing was still underway in 2020. With alternate financing sources stalled (by defendant FBI technical hacks and intercepts of outward communications from Lead Plaintiff to viable and authentic private financing sources as it continued interference in interstate commerce), Lead Plaintiff advised MAGGARD of the delay in placing his identified CFO candidate Ibrahim ABDELSAYED as company CFO pending financing.

F. After some additional discussions, MAGGARD loaned $6,000 (actually FBI funds) to Lead Plaintiff's company Gannett Peak Ranch (GPR) for web development, and another $6,000 to Lead Plaintiff personally which was used to try to improve his credit score by lowering credit utilization and payment defaults, so Lead Plaintiff would be able to co-sign for a six figure loan for Gannett Peak Ranch. As previously experienced, this good faith interstate commerce Gannett Peak Ranch project also went wrong - the web site was never completed by ENVOTEC (almost completed, saying they just needed a little more time and money, yet again as with other prior software projects). Nonetheless, the $6,000 personal loan was still due from Lead Plaintiff to MAGGARD, the $6,000 business loan was still due, and there was no offsetting revenue or income.

G. Defendant UNITED STATES (FBI) then cooked up a new entrapment scheme to get this $6,000 loan off defendant FBI records. A release form for a Whistler, British Columbia, Canada condo (Ironwood, LPEEV65-9) already released by Lead Plaintiff to second spouse Jeanette (and not shown on either the condo association records nor the British Columbia, Canada property roll) in their 2005 divorce, mysteriously showed up beginning in February 2023

in the approximate amount of $6,000 a nearly perfect offset for the $6,000 MAGGARD personal
loan (if defaulted) for tax purposes.

H. The disclosure requesting the release stated there were no underlying records which
support this timeshare on either the condo association or the British Columbia timeshare interest
register as required by law (paragraph 648 RICO-10, LPEEV65-9). While a British Columbia
notary firm was used to complete the release of interest process, this was a transparent attempt to
either (i) secure a loan default against FBI agency funds by FBI, to entrap the Lead Plaintiff,
and/or (ii) to create a condition for loss of government benefits by alternate means (federal
Section 8 housing choice voucher, paragraph 301, 481, 514-515, 646B, C, 647B, C RICO-8, 9)
and (iii) to transfer responsibility for this transparently illegal act against a US person off
defendant FBI's records, using classic "blame the victim" tactics seen often in criminal assaults,
as recounted throughout this Complaint.

I. Forensic reverse engineering provides the following common pattern racketeering acts
by defendant UNITED STATES (FBI) and its co-conspirators in this sequence as previously
experienced by Lead Plaintiff which have no valid original legal basis for their initiation by
defendant UNITED STATES:

- (i) Fraudulent pretexting lacking legal basis repeated

- (ii) National security entanglements repeated

- (iii) Human trafficking repeated

- (iv) Interstate commerce interference entrapment repeated – fraudulent financings,
  fraudulent employees, incomplete and defective technology projects

- (v) Interstate commerce interference incorporating a personal liability entrapment
  repeated

(vi) Successor fraudulent concealment acts repeated

J. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 301, 337, 481, 514-515; RICO-10, 646B, C, 647B, C 648 RICO-8, 9, 10 |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | LPEEV65-8, 9 |
| Emails and documents by topic and date, also located in LPEE: | Certain emails are blocked by a defendant UNITED STATES computer hack |

### 625. *RGTS-5 Rights Violations:* **Bad Faith Acts – Illegal Searches, BRMT Hijacking, and Harassing, Oregon Trip 2021**

A. Lead Plaintiff's flight from Kennedy Airport in New York City to Seattle, WA, enroute to Redmond OR, for the Lake County Ranch tour listed at paragraph 693 RICO-55, in July 2021 was delayed for about two hours due to a local thunderstorm over Kennedy Airport. The flight arrived in Seattle about 1:00 AM local time, about 20 hours after the Lead Plaintiff awakened the previous morning in New Jersey, and hours after the last evening flight connection to Redmond, OR. Lead Plaintiff remained overnight in Seattle, where he got about four hours of sleep. Defendants attempted to take advantage of this much shortened night of sleep to cause the Lead Plaintiff to act out against an undercover officer the next morning.

B. About an hour before his early morning flight, he stopped at a concourse restaurant for breakfast. After a few minutes, an undercover police powers officer abruptly replaced the food service worker shortly after he ordered breakfast, then delayed providing the check for the meal for about 15 minutes while he conversed with a 6 to 8 person undercover police backup team which had arrived and was seated a couple of tables away. Needing to catch the departing flight, Lead Plaintiff called to this server several times for the food service check, the server repeatedly acknowledged and delayed, so the Lead Plaintiff who rarely carries cash, dropped a $20 bill on the table and began to leave. Seeing that his bluff has been called and with the establishment allegedly not accepting cash (it is illegal not to accept cash as payment in Washington state), the server rushed to the table and an illegal BRMT bioweapon and bioweapon hijacked moment of anger (BRMT adrenaline boost) on short sleep ensued as the server insisted a credit card must be used. No violence occurred as Lead Plaintiff had by now learned substantially more about the biochemically driven emotional body sensations exhibited

in illegal BRMT brain hijacking, and carefully kept his arms rigid at his sides so his movements could not be misinterpreted by the police snatch team seated nearby as any assaultive move, and simply raised his voice, so the nearby police snatch team would be aware of their operational failure.

C. This was a typical illegal BRMT-enhanced entrapment sequence run by defendant UNITED STATES hundreds of times against Lead Plaintiff (including many dangerous scenarios which were not reverse engineered until 2021 and thereafter), using the natural circumstances of events as they unfold to involve local police powers, who would have no reason to be aware of this classified illegal BRMT bioweapon and bioweapon delivery system's existence and these malign methods of surreptitious operation.

D. Since the illegal BRMT bioweapon and bioweapon delivery system has been a very highly classified federal program of defendant UNITED STATES, it can be used very successfully in corrupt federal police powers and intelligence agency entrapment attempts. If an unpaid food service check walk-off or an assault on the undercover officer (food server) had occurred, local police would have arrested, processed, and prosecuted this incident as an unprovoked assault on a police officer or as a walk-off theft, though it was actually perpetrated as an entrapment crime targeting the Lead Plaintiff perpetrated by defendant UNITED STATES (defendant CIA domestic field personnel) using the illegal BRMT bioweapon and bioweapon delivery system, its brain hijacking system, to effect the imprisonment of the Lead Plaintiff through this third party local or other federal police powers operation.

E. This conduct is completely consistent with prior and subsequent behaviors of defendant UNITED STATES and its co-conspirator defendant police powers entities, officers, and agents, as expressed through their conduct, including conspiratorial conduct cited in

paragraphs 600-603 NSEC-1-4; 615-618, 620 HEXP-12, 13, 14, 17; 624-626, 628-632, 635, 636

RGTS-4, 5, 6, 8-12, 15, 16; 638-693 RICO-1-55, 694-710 LETHL-1-17. See also these types of

harassment, entrapment, and incrimination attempts at LPEE page 181H paragraph 138. These

incidents are a very small set of select of examples of these incidents which have been and are

run against Lead Plaintiff. Hundreds of other such incidents will unquestionably be unveiled

through the discovery process, including in Lead Plaintiff's own hand-written notes, and in

computer files most probably still in the hands of FBI, as computerized files dating back into the

early 2000s were handed to ROSENBERG in late 2007.

F. Since members of the general public also engage in these harassing and annoying

behaviors in the vicinity of the Lead Plaintiff at times due to his extreme public visibility, it can

be difficult at times to distinguish the purposeful harassment by defendant police powers

personnel acting illegally under color of law from lawful exercises of civil rights and nonviolent

free expression by members of the public. This particular scenario on a Sea-Tac Airport

concourse before flying to Redmond, Oregon was, to the now well-experienced Lead Plaintiff, a

clearly obvious police powers operation. The risk of BRMT induced escalation in his hijacked

brain at these kind of moments leads Lead Plaintiff to exercise extreme caution around others in

these scenarios to avoid any undue provocations and encounters which could lead to escalation

and use of force by police powers personnel or others. But the same cannot be said for other

unwitting persons targeted and victimized by these corrupt police powers operations against

them, who are doubtless among the other members of this class of victimized plaintiffs.

G. This scheme and conspiracy required and consumed the time and financial resources

of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will

provide critical confirming information directly from these institutional and individual

defendants and, among some who presented at the time as family members, their children. See

other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE

Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at

paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 600-603 NSEC-1-4; 615-618, 620 HEXP-12, 13, 14, 17; 624-626, 628-632, 635, 636 RGTS-4, 5, 6, 8-12, 15, 16; 638-693 RICO-1-55, 694-710 LETHL-1-17 |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | 181H paragraph 138 |
| Emails and documents by topic and date, also located in LPEE: | Bryant Park Jazz and 911 call bemused response 220701, COSTCO GC reply to verficiation request 211102, Match Group Second Notice re Preserve Evidence 220122, Match EPL Response 221110, Match Group Legal Dept Email 221110, NYPD FOIL righttoknow Summary 210901, NYPD FOIL Appeal Denial Letter 210915, NYC Mayor Ofc Assist Re NYPD FOIL Appeal Denial 211001, |

| | NYC Mayor Ofc Assit Request NYPD FOIL Appeal Denial 211001, NYPD FOIL Request 210901, NYPD Response to FOIL Request 210903, NYPD Notice of Duty to Preserve Evidence 211116, NYPD Reply to Evidence Retention Letter 211123, NYPD Reply to Corbett Evdence Preservation 211127, NYPD Event Sequence 220422, Certain emails are blocked by a defendant UNITED STATES computer hack |
|---|---|

*626. RGTS-6 Rights Violations:* **Bad Faith Acts – Federal Police Powers Abuses of Legal Processes 1990 to present**

A. As forensically reverse engineered, defendant UNITED STATES and its defendant co-conspirators have and do engage in bad faith acts in their systemic abuses of the legal system and legal process. Defendant UNITED STATES has and does use a variety of legally abusive practices to (i) engage in broad ranging general searches, to (ii) harm and wreck the political and commercial interests of US persons, and to (iii) conceal those illegal acts behind normal practices of records destruction, which are used with human trafficking and other direct methods to conceal and destroy evidence of their crimes and criminal intent, and of those committed by co-conspirators. Illegally embedded and misrepresented or ethically and legal compromised corporate lawyers have and do act against client interests while apparently engaged for their benefit in direct violation of (a) legal standards of conduct, and their (b) fiduciary duty to clients as specialists in the field of law in both common law frauds against interests through the color of law abuse of the legal process (violations of 18 USC 1589(a)(3) related to forced labor) and (c) constructive frauds against client interests and in violations of their ethical duty to clients under state and federal bar codes of ethics for conduct as officers of the court. Federal police powers defendants both act to enable these practices and fail to act to suppress and disable these illegal patterns of practice. These abusive practices, as experienced directly by the Lead Plaintiff

against his own interests and against the interests of others of this class of injured plaintiffs, include:

i.    Imposed litigation expenses required to remedy illegal acts undertaken in cover operations by or on behalf of federal defendants against US persons, including, without limitation, thefts of compensation, check fraud, wire fraud, receivables fraud persons. (Direct examples of this pattern of practice include, without limitation, frauds against Alliance, and Allegent, LLC dba Performa cited herein, paragraphs 275, 276, 303, 462.)

ii.    Imposed compromises of financial and other assets required to remedy illegal acts undertaken in cover operations by or on behalf of federal defendants against US persons, including, without limitation, thefts of compensation, check fraud, wire fraud, receivables fraud. (Direct examples of this pattern of practice include direct frauds against Alliance (paragraph 650 RICO-12, and against Lead Plaintiff by CNA cited herein (paragraphs 457-461, 600 NSEC-1, 602 NSEC-3, 639-641 RICO-1-3).

iii.    Non-working attorneys embedded in law firms who make vague claims to represent client interests but who do no direct work for those clients (government targets) to evade attorney-client privilege ethical and legal constraints, and thereby conduct de facto general searches. (Direct examples of this pattern of practice include embedded attorneys HIBBS and GARRISON cited herein, paragraphs 446, 441.)

iv.    Corporate lawyers who misrepresent client interests to benefit the government, while operating in illegally embedded undercover roles in law firms. Lead Plaintiff was not consulted prior to the removal of a cost-plus provision at paragraph 12 of the Alliance purchase and sale agreement for the asset purchase of Steve's Maintenance, including the assumption of project contracts for projects then currently underway but incomplete. The

Short Cressman Burgess attorney did not mention the removal of the cost-plus reimbursement paragraph 12 to Lead Plaintiff. Only his direct review and insistence on its return to the agreement resulted in the final agreement which included this paragraph 12. If the purposeful deletion by Susan THORBROGGER (Short Cressman Burgess, Seattle, WA, most probably DOJ, together with HIBBS) had not been noticed and returned on Lead Plaintiff's insistence, this deletion would have potentially cost Alliance up to $165,000 of lost revenue and approximately $100,000 of unreimbursed costs for labor, materials, asbestos waste dump fees, and direct project overhead costs, on the Bates Vocational-Technical parking garage asbestos abatement project which required hand jack-hammering and removal of an asbestos paper interposed between the concrete finish floor an the underlying structural floor in the multi-story parking structure at Bates in Summer 1990. A $265,000 loss would have wiped out company equity (initially $250,000) and left the Lead Plaintiff in personal default on a $150,000 bank line of credit related to his personal guarantee with excellent personal credit. Nonetheless, defendant FBI would go on to complete the wrecking of the illegal search cover company, Steve's Maintenance, which destroyed its business records and thereby fraudulently concealed criminal wrongdoing in criminal investigations. This process destroyed Lead Plaintiff's company Alliance in 1993 through the use of, without limitation, as forensically reverse engineered, as part of defendant UNITED STATES' intentional financial wrecking of Lead Plaintiff's company Alliance, which incorporated (i) fraudulent co-ownership and control through a nominee (David J. Carey as nominee, FBI, paragraphs 445-449, 649 RICO-11), (ii) fraudulent legal representation (HIBBS and Susan THORBROGGER, DOJ/FBI, both embedded at Short Cressman Burgess law firm, paragraphs 446; 626

RGTS-6, 649, 651, 653, 683 RICO-11, 13, 15, 45), (iii) fraudulent deprivation of government benefits (SBA bonding, paragraph 446, 471; 649, 653 RICO-11, 15), (iv) theft and compromise of receivables (Steve and Kerry Brewer, FBI, paragraphs 644, 650, 651 RICO-6, 12, 13), was then succeeded by (v) a Vancouver, B.C. fraudulent financing which failed (paragraph 653 RICO-15).

v.  Corporate lawyer abuses using embedded and solo practice attorneys who represent corporate entities but not individuals and use this distinction to conduct intelligence operations, general searches, and conceal illegal operations of defendant DOJ and its police powers agencies, as conducted against individuals, their rights, and interests. (Direct examples of this pattern of practice include HIBBS, GARRISON, LARSON, CALDWELL, SULLIVAN cited herein, paragraphs 446, 441, 602U(xxvi), 621D, 99e, 171.)

vi.  Subpoena process abuses used to extract otherwise inaccessible information by engaging in litigation directly against the target and/or indirectly by faux litigation between two cover entities. (Direct examples of this pattern of practice include *CORNHUSKER Capital v. Auctus* cited herein, paragraph 671 RICO-33.)

vii.  Entity embeds of undercover officers and/or agents as employees of an entity who target that entity and/or customer operations and/or finances for disruption, to empower internal dissension, and/or to sabotage direction and operations. (Direct examples of this pattern of practice include PCC – Whiteman (WEISSMAN); Pacific Pipeline - PERILLO et al; Nutra Source – LeFevre (ROSENBERG) et al; Alliance – Hintz, Kealoha, Steele (BIVENS) et al; ESTABLISH – Drumm (ROSENBERG) et al cited herein.)

viii.   Corporate and other legal form cover entities used to sustain captive employees in involuntary servitude in entities which have employed Lead Plaintiff and were and/or are cover entities, and together with various mail and electronic frauds, sustain this involuntary servitude and forced labor, and enable captive human biomedical experimentation without informed consent. (Direct examples of this pattern of practice include Deloitte Seattle (Consulting) – Hopper et al; LazerSoft – Moller (STONE) et al; PCC-Whiteman (WEISSMAN); NutraSource – LeFevre (ROSENBERG); P. A. N. – CORNWELL et al; Pacific Pipeline-PERILLO; CNA Industrial Engineering – COOK et al; ESTABLISH – Drumm (ROSENBERG) et al cited herein.

ix.    Corporate and other legal form cover entities used to sustain captive "owners" including, without limitation, entities which have employed Lead Plaintiff as an "owner" which were and/or are cover entities used, together with various mail and electronic frauds, to sustain involuntary servitude and forced labor, and human biomedical experimentation without consent. (Direct examples of this pattern of practice include, without limitation, Alliance, Allegent, LLC dba Performa, Winnett, Winnett Cattle, Gannett Peak Ranch – all with co-investment by federal defendants, generally FBI and/or CIA cited herein, paragraphs 445, 516,565, Interline Exhibit 6.)

x.     General searches, which are broad ranging inquiries against specific groups or individuals rather than against suspicion of specific acts and patterns of conduct are specifically unconstitutional, and directly violate the Founder's intent, wherein legalistic maneuvers are used to claim them as intelligence operations, and which may embed undercover personnel and informants, and bleed appropriated funds into ostensibly private cover entities and into favored collaborating private entities to sustain financial

losses while competing with private sector firms for certain types of contracts and sales. Used to conduct commercial and other general searches (under the sweeping title of "intelligence operations") of all forms of persons, private entities, including civic, political, cultural, artistic, and religious groups, cooperatives, and other officially disfavored institutions and individuals. (Direct examples of this pattern of practice include all elements of Lead Plaintiff's human existence both domestic and international; Deloitte Seattle (Consulting) as to various domestic undercover investigations and international commercial cover spying projects; NutraSource as to food buying clubs and cooperatives; Pacific Pipeline as to authors, publishers, and retail booksellers; CNA as to the "Japanese Miracle" and national security matters cited herein, paragraph 600 NSEC-1.)

xi. Foreign intelligence and national security entanglements claimed as intelligence operations which abuse relationships with foreign intelligence and formulate and /or promote officially propagated lies for the purpose of abusing US persons by orchestrating both in-country and international spying on those persons by foreign intelligence operations, who then share this information legally acquired under their own laws with US police powers and intelligence operations. Used to conduct otherwise illegal general searches (under the sweeping titles of "intelligence operations" and "national security") of all forms of persons, private entities, including civic, political, cultural, artistic, and religious groups, cooperatives, and other officially disfavored institutions and individuals.

xii. Attorney-client privilege inadvertently waived by having individuals unrelated by marriage, and individuals not represented with corporate and other legal form interests

engage legal counsel on an issue in which both the individual(s) and/or the entity and the individual do not share a common and direct legal interest.

B. All subcounts throughout this Complaint relate directly and explicitly to these patterns of practice which are driven by defendants' conspiracy to commit and comprise an integrated pattern of illegal acts including racketeering acts, which both individually and as a pattern of practice, would reasonably be expected to engage the interest of elements of defendant DOJ, rather than no element of defendant DOJ in its sworn constitutional duty to protect the public interest, including the liberty and constitutional rights interests of all US persons.

C. One example of this durable pattern of corrupt practice inculpates defendant Leslie CALDWELL, who conspired to and supported the illegal BRMT bioweapon and bioweapon delivery system and the accompanying rights and associated-in-fact enterprise pattern of racketeering acts from the 1970s throughout her public employment at defendant DOJ. Defendant CALDWELL has been plausibly identified as the roommate of Susan B. Irish at WSU, who was Lead Plaintiff's assigned romantic partner for nearly two years. Defendant CALDWELL expressed anger one morning after his overnight stay in the bedroom she shared with Irish, for observation by Irish for possible sunstroke (more plausibly an illegal BRMT human subject biomedical experiment without consent which caused and created this specific set of symptoms under the program management of defendant BREYER and with the participation at WSU of GARLAND, now Attorney General). CALDWELL apologized a few days later to Lead Plaintiff, explaining that Irish had informed of the reason for the overnight in the bedroom shared by Irish and Caldwell.

D. Defendant CALDWELL worked with defendant WEISSMAN as an Assistant US Attorney in the Eastern District of New York from 1987-1998, after defendant WEISSMAN left

his illegal embedded position at PCC where Lead Plaintiff had served on the Boards of both PCC run by defendant WEISSMAN, and NutraSource formed by WEISSMAN using PCC financial resources and run by illegally embedded defendant ROSENBERG as CEO. Defendant CALDWELL transferred to the Northern District of California where she worked for US Attorney Robert MUELLER (who was later FBI Director from 2001-2013) and for his successor from 1999 to 2002. Defendant CALDWELL rejoined defendant WEISSMAN on the Enron Task Force between 2002 and 2005. During this period, defendant CALDWELL fraudulently misrepresented herself as a Seed & Berry intellectual property attorney in Allegent LLC's 2004 ShipNow check fraud intellectual property claim brought by the Lead Plaintiff, wherein she acted outside the plausible role and any plausible expectation of the role of a prosecutor (as defined at 28 U.S.C. § 547) in a conspiracy to fraudulently conceal defendant FBI's illegal associated-in-fact enterprise pattern of racketeering acts, which included this ShipNow bad check fraud on Allegent, LLC and co-owner Lead Plaintiff, which racketeering acts were then being run by defendants ROSENBERG and PRAY (who was posing as Allegent, LLC's co-owner) during the 2002-2005 financial, marital, and emotional wrecking of Lead Plaintiff through a period of divorce, business destruction, income destruction, torture, suicide ideation, loss of property, homelessness, and destruction of evidence conspiracy of defendants ROSENBERG and PRAY in conspiracy with defendant FAUCI (including Lead Plaintiff's compensation litigation against CNA for compensation theft, paragraph 641 RICO-3).

E. Between 2014 and 2017 CALDWELL was promoted to Assistant Attorney General Criminal Division under Attorney General HOLDER, as about $14,000 was stolen from Lead Plaintiff by defendant CIA using the pseudonym Laura Akoto in his on-going involuntary servitude and illegal BRMT bioweapon and bioweapon delivery system hijacking and oxytocin

manipulations (paragraph 637 RGTS-17) while he resided in Ramsey, NJ, before he was human trafficked to Edgewater, NJ including, without limitation, an accelerated cycle of lethality attempts (paragraphs 703-710 LETHL-10-17, Interline Exhibit 15), another salacious video session and fraudulent relationship (paragraph 613 HEXP-10) in the middle of the Senator Menendez public corruption investigation which was indicted on September 22, 2023.

F. Comparable conflicts between the interests of justice and the personal interests of defendant WEISSMAN arose in the 1960s or 1970s when he was embedded by defendant FBI in Associated Grocers, where he supervised the infiltration team at Larry's Market, co-owned by Lead Plaintiff's father cousin, Larry Brewer and secretly co-owned and financially destroyed by defendant FBI, WEISSMAN, paragraph 99j, 99k, 418, 449.

G. Defendant WEISSMAN then moved from Associated Grocers, the Seattle, WA based regional independent supermarket cooperative wholesaler, to a new illegal embedded position as PCC General Manager in the early 1980s. Defendant BREYER rotated out of the illegal BRMT bioweapon and bioweapon delivery system program management role. BREYER was replaced at some point during the early 1980s by defendant BURNS (CIA), whose first known direct personal interaction with Lead Plaintiff was in Summer 1986, paragraphs 36 table, 48(b), 120, 437-444.

H. Defendant WEISSMAN arranged defendant ROSENBERG's transfer to the defendant FBI Seattle field office in the early 1980s to operate as the illegally embedded CEO of newly formed NutraSource, where the unwitting Lead Plaintiff served as a member of the Board of Directors representing PCC, and where defendant WEISSMAN was himself illegally embedded with other defendant FBI personnel from the Oakland, CA food cooperative in secret control of the NutraSource Board of Directors, so the illegal regional defendant FBI spying mission could

be expanded to all organic and natural food retailers and food buying clubs in the Pacific Northwest and Alaska using NutraSource as the platform for this illegal spying and targeted financial wrecking operations.

I. Defendant WEISSMAN later transferred out of defendant FBI to become an Assistant U.S. Attorney for the Eastern District of New York in 1991-2002, ran the Enron Task Force prosecutions from 2002-2005 with CALDWELL and others, then was FBI General Counsel to FBI Director MUELLER from 2011-2013 before moving back to defendant DOJ to be Chief of the Criminal Fraud Section at defendant DOJ headquarters from 2015-2017, working there for CALDWELL, then Assistant Attorney General for the Criminal Division, also at defendant DOJ's headquarters.

J. Comparable conflicts between the interests of justice and the personal interests of defendant ROSENBERG, the former illegal embedded CEO of NutraSource, the PCC investment with Lead Plaintiff on its Board, after NutraSource was merged with an Auburn, CA wholesaler. In 2005-2006, Attorney General GONZALES appointed defendant ROSENBERG Acting US Attorney for South Texas in June 2005-2006 to move him away from the on-going conspiracy with defendant FAUCI divorce/business wrecking/torture sequence described at paragraph 510-520, 610 HEXP-7, immediately after the May 2005 forced sale of Lead Plaintiff's 149th Street, Kirkland, WA home (Interline Exhibit 14) was completed and that particular FAUCI, ROSENBERG, FBI, CIA, ARMY, DOJ, RUBIN, MELBER, VINDMAN, PRAY, and unknown other defendants, total wrecking sequence was nearing completion.

K. Attorney General GONZALES then arranged Rosenberg's confirmation as US Attorney for Eastern Virginia from 2006 to 2008, wherein Lead Plaintiff was again being human trafficked directly under defendant ROSENBERG's supervision from homelessness in Boston,

MA (paragraphs 213, 223, 225A, 276A, 416, 464-466, 603 NSEC-4) to Fort Lee, NJ. In fact, defendant ROSENBERG had been human trafficking the unwitting Lead Plaintiff since the early 1980s, paragraphs 600-604 NSEC-1-4, previously with CORNWELL, PERILLO, and others, this time in conspiracy with defendant FAUCI. Through a bogus Mossad interview in Boston which was intended to develop a completely fictional terror legend for Lead Plaintiff (confirmed by defendant NYPD before a local and federal coordinated police powers cover-up, Interline Exhibit 17-19), then during his direct employment at ESTABLISH in Fort Lee, NJ, where defendant ROSENBERG was General Manager in 2007 through early 2008.

L. Defendant ROSENBERG then burnished the fraudulent and defamatory legend he had spun about the Lead Plaintiff into further depravity with defendants MODDERMAN, NYPD, PAPD, NJTPD, BERGEN SHERIFF, NJSP, CIA and other unknown defendants (paragraphs 464-466, 603 NSEC-4, 606, 611-616, 618 HEXP-3, 8-13, 15). Defendant ROSENBERG later served again in defendant FBI under Director Comey as Chief of Staff from 2013-2015, and then was designated as Acting Administrator of DEA from 2014 to 2017. The conflicts of interest with the alleged justice mission of defendant DOJ dated from the early 1980s and there was no personal interest for defendant ROSENBERG or for defendant FBI in anything other than an adverse outcome to Lead Plaintiff.

K. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 4-12,16-19 |
| Complaint paragraphs: | 99e, 99j, 99k, 36 table, 48(b), 120, 171, 213, 223, 225A, 275, 276, 303, 416, 418, 437-449, 457-462, 464-466, 471, 516, 565, 510-520, 600-604 NSEC-1-4; 606, 610-616, 618 HEXP-3, 7-13, 15; 621D, 626, 637 RGTS-1, 6, 17; 639-641 644, 649-651, 653, 671, 683 RICO-1-3, 6, 11-13, 15, 33, 45; 703-710 LETHL-10-17 |
| Appendix 2 paragraphs: | Entirety |
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 368-794, 797-865, 934-1075, 11630-11936 |
| Emails and documents by topic and date, also located in LPEE: | LIBERTY EB-5 Contract Annotated 141112.pdf<br>LIBERTY EB-5 LOI .pdf<br>LIBERTY EB-5 LOI 141112.pdf<br>LIBERTY EB-5 LOI WinnettOrganics LOI 11-5-14.pdf<br>WO (CO) Articles of Incorporation 150702.pdf<br>WP (CO) Articles of Incorporation 121022.pdf<br>WP IRS Employer ID Number FEIN 120824.pdf<br>Stock Cert 003 D Merck 121202.pdf<br>WP WO Los Angeles Management Meeting Agenda 150924.pdf<br>150805 WP Stock Cert 002 Preferred Series A Dean Smith 150805.pdf<br>150917 WP Stock Cert 003 D Brewer 150917.pdf |

150921 WP Stock Cert 016 Common BELLI Architectural Group 190521.pdf
150921 WP Stock Cert 017 Common SULLIVAN 190521.pdf
150927 WP Stock Cert 004 Preferred Series A Doug PETERSEN 150927.pdf
150927 WP Stock Cert 005 Preferred Series A Dean Smith 150927.pdf
150929 WP Winnett Perico Shares Auth Attach150929.pdf
160320 WP Stock Cert 006 Preferred Series A Dean Smith 160320.pdf
160404 WP Stock Cert 007 Preferred Series A Doug PETERSEN 160404.pdf
161024 WP Stock Cert 008 Preferred Series A Dean Smith 161024.pdf
161028 WO Cattle Co Annual Report 161028.pdf
170103 WP Stock Cert 009 Preferred Series A Doug PETERSEN 170103.pdf
170420 WP Stock Cert 010 Preferred Series A Doug PETERSEN 170420.pdf
170519 WP Stock Cert 011 Preferred Series A Doug PETERSEN 170519.pdf
170708 WP Stock Cert 012 Preferred Series A Doug PETERSEN 170708.pdf
170911 WP Stock Cert 013 Common D Brewer 170911.pdf
170914 WP Stock Cert 014 Preferred Series A Doug PETERSEN 170914.pdf
170923 WP CO SOS Annual Report 170923.pdf
180305 WP Stock Cert 015 Preferred Series A Doug PETERSEN 180305.pdf
190628 WP Shares Distribution 190628.pdf
SBI AP Aging Detail Report 2020 12-31 draft v1 201231.pdf
SBI Articles of Incorporation NJ 200123.pdf
SBI Balance Sheet 2020 12-31 draft v1 201231.pdf
SBI Case Ready Plant 17 Plant Operations Workflow Design Rev 1.7 200707.pdf
SBI Completed App NJ-REG 200123.pdf
SBI Debt Schedule Digitally Signed Document Not Converted 210703.pdf
SBI EIN CP 575 A Notice 200123.pdf
SBI Income Statement 2020 12-31 draft v1 SBI.pdf
SBI Shares Distn 200124.pdf
SBI Shares Distn 200225.pdf
SBI Sheldon Beef Tax Return 2020 12-31 Draft v1 201231.pdf



200123 SBI Completed NJ-REG 200123.pdf
200123 SBI EIN 84-4406368 CP 575 A Notice 200123.pdf
200123SBI Articles of Incorp NJ 200123.pdf
200225 SBI 001 Brewer Stock Cert Common 200225.pdf
200225 SBI 002 WASEMAN Stock Cert Common
200225.pdf
200225 SBI 003 NICKLESS Stock Cert Common
200225.pdf
200225 SBI 004 SULLIVAN Stock Cert Common
200225.pdf
200225 SBI 005 Canchola Stock Cert Common 200225.pdf
200225 SBI 006 PETERSEN Stock Cert Common
200225.pdf
200225 SBI 007 BELLI Stock Cert Common 200225.pdf
200225 SBI 2020 Stock Opt Plan approved by BD on
200225.pdf
200225 SBI Canchola SB Grant - Signed 200225.pdf
200225 SBI Canchola SBI Notice of Stock Option Grant
200225.pdf
200225 SBI NICKLESS SBI Notice of Stock Option Grant
200225.pdf
200225 SBI NICKLESS Stokcoption Grant 200225.pdf
200225 SBI WASEMAN SBI Notice of Stock Option Grant
200225.pdf
200324 SBI Shares Distribution 200324.pdf
Certain emails are blocked by a defendant UNITED
STATES computer hack

**627. *RGTS-7 Rights Violations:* Bad Faith Acts – Federal Police Powers Abuses of Legal Processes Forced Personal Bankruptcy 1993**

A. CORNWELL (former commercial cover CIA agent in north Africa selling center

pivot irrigation systems as cover) and defendant FBI worked, unknown to Lead Plaintiff, with

RCMP, Ralph Shearing (who ostensibly ran a Canadian mining geophysical sampling company

based in Vancouver, BC, Canada), and Rory Godinho (barrister in the Vancouver, BC area), and

CSIS, John Young (international mining financier and mining engineer), to develop a fraudulent

Vancouver, BC financing package through Shearing, which required a financial audit. A

$20,000 factoring loan from Pacific Financial Services, Bellevue, WA (a fraudulent factoring

company run by Henry Wozow, most probably FBI) was used to cover the financing fees, audit fees, and expenses (paragraphs 447-448).

B. When this fraudulent financing eventually failed in Vancouver, BC, Canada, the $20,000 factoring loan turned in a few months into a loan default totaling $65,000 which Lead Plaintiff had personally guaranteed, and then into personal federal bankruptcy in December 1993 for Lead Plaintiff and his second wife Jeanette. Lead Plaintiff was working on a financing at PAN when his wife Jeanette, who worked in the same First American Title Company office in Bellevue, WA as Laurie Vanderberry (wife of Kerry Vanderberry, FBI Seattle bank robbery squad agent, whose infant son Lead Plaintiff and Jeanette babysat at their home in Kirkland, WA, paragraph 104) informed him that the Pacific Financial Services default court order against community property was being used to garnish her wages for this $65,000 defaulted loan.

C. During a conversation with the Bellevue, WA bankruptcy attorney in Fall 1993, Jeanette proposed that the 149th Street, Kirkland, WA house be forfeited in the bankruptcy. (Federal Bankruptcy Court case filed November 1993). This made no financial sense as the equity in the residence did not exceed and was protected by the bankruptcy exemption for minimal assets. She persisted for some time as Lead Plaintiff demurred and Jeanette eventually relented. Lead Plaintiff proceeded later to complete the improvements to the 149th Street residence at Interline Exhibit 14.

D. With the benefit of forensic reverse engineering, it is plausible Jeanette understood the circumstances but was fearful of revealing the true nature of the contrived marital relationship and the hostile local environment, including defendant BURNS. The defendant BURNS (CIA) residence was across the street. Jeanette's supposed extended family members included sister-in-law Michelle (RUBIN, FBI), stepbrother Paul (Alexander VINDMAN, ARMY), and stepbrother

by marriage Wes (Ari MELBER, FBI). Based upon some oblique comments Jeanette made, which were misunderstood then by Lead Plaintiff, it is highly probable ARMY was then deferring criminal prosecution for national security matters based upon her sexual orientation and deliberate inculpation in national security matters to force the relationship with Lead Plaintiff.

E. Non-heterosexual military service in the 1980s and 1990s was a prosecutable military criminal justice system offense, which would have been compounded by the deliberate inculpation of Jeanette into national security matters. Wife Jeanette may then have been attempting to remove herself from the BURNS/ARMY problem, or at least the physical proximity to BURNS (across 149th Street, Kirkland, WA) through a physical relocation.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See

other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE

Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at

paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 104, 447-448 |
| Appendix 2 paragraphs: | 1-017 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-054 through 2-056 |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |
| Emails and documents by topic and date, also located in LPEE: | Federal Bankruptcy Court case filed November 1989 |

## 628. RGTS-8 Rights Violations: Bad Faith Acts – Willful Blindness, US Attorney Offices, DOJ Headquarters 2005 to present

A. Lead Plaintiff shared information about all the then known acts, violations, and

injuries from about 2002 to 2005 with the U.S. Attorney's Office for the Western Washington in

Summer 2005. This description was far short of an accurate portrayal of the facts and

circumstances even to that date, as Lead Plaintiff was completely ignorant of all, but the most

obvious elements, of the coercive psychological operations undertaken during that specific

period. He was met with the events of duress and homelessness described at paragraphs 320,

462-463, 518. The U.S. Attorney's Office for the District of Columbia received a courtesy filing

in September 2021 of DC 1:21-cv-2424 by personal hand delivery (and a laughable DC Fire

Department Hazmat Team sluggish emergency response was witnessed immediately as the

Hazmat Team enroute toward the DC US Attorney Civil section office immediately thereafter

rolled by the National Building Museum and the Lead Plaintiff). The only reply was an email

from the office indicating that the filing was not served (full text at LPEEV65-10):



A series of letters and evidence was delivered to the Southern District of New York in person between December 2021 and September 2023, to DOJ Headquarters through SDNY during 2022 and 2023, and to the DOJ Assistant Inspector General for Investigations (Interline Exhibit 19, LPEE pages 368-793, LPEEV65-11-16).

B. The Lead Plaintiff's communications attempts are evidenced in extensive exhibits throughout this complaint, both inline and in hundreds of pages and dozens of letters included the LPEE herein. No other contact from any U.S. executive branch police powers operation has ever been forthcoming, with the notable exception of the FBI's September 30, 2021 "liar letter" coordinated in September 2021 with a prior admission, then quick retraction twelve days later by defendant NYPD shown in series in Interline Exhibits 17 through 18 herein. A 2022 no interest letter series with the DOJ Assistant Inspector General for Investigations is at Interline Exhibit 19.

C. All subcounts throughout this Complaint are driven by defendants' conspiracy to commit and comprise an integrated pattern of illegal acts including racketeering acts, which both

individually and as a pattern of practice, would reasonably be expected to engage the interest of elements of the Department of Justice, rather than no element of that Department.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 17 though 19 |
|---|---|
| Complaint paragraphs: | 320, 462-463, 518 |
| Appendix 2 paragraphs: | 1-038, 1-040 through 1-059, 1-067 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0116 through 2-0119, 2-0154, 2-205 through 2-0207, 2-0210 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 368-794, 797-865, 934-1075, 11630-11936, LPEEV65-10-16 |

| Emails and documents by topic and date, also located in LPEE: | Not applicable |
|---|---|

### 629. RGTS-9 Rights Violations: Bad Faith Acts – Illegal General Searches, Continual Monitoring in Involuntary Servitude 1968 to present

A. As forensically reverse engineered, defendant UNITED STATES first directly abused Lead Plaintiff in 1968 with interstate human trafficking to California, paragraph 417. Defendant UNITED STATES has and does fraudulently and repeatedly engage in prejudicial acts, violations, and injuries against Lead Plaintiff and his constitutional rights from the age of 12 as a minor child, through his high school years, through college and graduate school, and through captive employment thereafter, to and through his last permitted employment in 2008 and through all prior and current period attempts by Lead Plaintiff to engage in interstate commerce. Defendant UNITED STATES has and does engage in the hacking of Lead Plaintiff's personal computer and printers, used for both personal and business matters, beginning around 1984 and into the present time.

B. At all times, defendant UNITED STATES and its co-conspirators have and do invade his privacy, and monitor his communications whether by email, telephone, or cellular phone, including arranging through his spouse, then a newly hired employee of US West Cellular, cellular car telephone service in the 1980s from AT&T's cellular telephone service, later used in a double murder attempt on Lead Plaintiff and spouse Lynne in British Columbia (paragraph 694 LETHL-1). This US West subsidiary, also a previous client of Lead Plaintiff while serving as a consultant at Deloitte Seattle, was used to track movements, to listen to in-car conversations and communications, and to sustain their pattern of involuntary servitude, manipulation, and control of Lead Plaintiff.

C. One specific example of fraudulent color of law falsely pretexted searches conducted by police powers: While in Boston's Pine Street Inn, unknown police powers defendants engaged in warrantless illegal searches using a housing pretext with no intention of providing housing as the basis for an illegal search. This search was comprised of two urine tests undertaken soon after Lead Plaintiff's arrival around April 2006 ostensibly as a condition of securing housing. Soon after the second test, the staff member administering the tests announced that the program had been cancelled.

D. Defendant UNITED STATES has and does arrange for the continual public monitoring of all Lead Plaintiff's private activities in his personal residences to and including the preparation of this complaint, normal hygiene activities, food preparation, doctor visits, drug prescription fulfillment, control of persons who are permitted to interact with and meet him using electronic means, entertainment venues, performances and nearby patrons, and the myriad other acts comprising normal daily life in the United States and other nations where he has travelled at various times and nearly all times since the early 2000s.

E. Some of this monitoring is essential to personal security due to the public corruption which has and does cause this security concern given his global visibility and the political desire to project political stability in the United States to the domestic population and to the world at large, as well as to secure him from persons seeking to make violent and hateful political statements or to conceal prior criminal acts undertaken in public corruption of United States' domestic police powers operations and corruption in its international intelligence and espionage operations. But the root cause of the entirety of this claimed necessity is public corruption, to and including, without limitation, defendant DOJ's series of Attorneys General and its subordinate agencies, which dates back decades to the 1950s and the initial stages of these

illegal programs perpetrated by defendant ARMY, CIA, DOJ, FBI, and other police powers defendants which have no legal basis in law nor in our Constitution.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 417-418, 694 LETHL-1 |
| Appendix 2 paragraphs: | Entirety |
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 770-772, 783-784, 10251-10255, 10376-10393, 10434-10444 |
| Emails and documents by topic and date, also located in LPEE: | D Brewer reply to DOJ OIG decline ltr 220325, DOJ OIG Institutional Contacts 211109, |

| | DOJ OIG From Investigations 220128 Div Ack Letter 220128,<br>DOJ OIG Decline Ltr 220322,<br>NJ EDC Inquiry 200805,<br>NJ Unemployment Hangup and shelter info request 081217,<br>Wire Fraud Examples Raising Consciousness of Guilt 221004 |

### 630. RGTS-10 Rights Violations: Bad Faith Acts – Privacy and Quiet Enjoyment 1968 to present

A. As forensically reverse engineered, since approximately 1968, Lead Plaintiff's life, relationships, family life, physical health, emotional well-being, career, businesses, life circumstances, and public reputation, as well as all human, Constitutional, civil, and legal rights have been usurped and subsumed by the illegal acts, violations, and injuries of defendant UNITED STATES and its co-conspirators.

B. Lead Plaintiff was, without consent, designated as an involuntary servant of defendant UNITED STATES as a minor child. Lead Plaintiff's formal petitions in 2005 under FTCA for limited injuries, as then understood, were never answered by any defendant UNITED STATES department, agency, nor the Executive Office of the President. By their acts, violations, and injuries, he was rendered homeless, and human trafficked to further homelessness in Boston, MA. A litigation attempt in U.S. District Court at Newark, NJ, was indirectly answered by defendants through their illegal racketeering acts. By their acts, violations, and injuries, he was rendered homeless, then involuntarily committed to a psychiatric hospital (Bergen Regional Medical Center) for two weeks, followed by a bureaucratically obstructed further 5.5 months, for a total of six months. In 2022, as this entire pattern of facts was first reasonably well understood and communicated to a US Attorney's Office, defendants again answered indirectly with BRMT assisted attempts on the Lead Plaintiff's life, and through their still on-going and

persistent pattern of threats and violence (paragraphs 707-710 LETHL-14-17, Interline Exhibit 15).

C. Defendant UNITED STATES and its co-conspirators desperately seek to avoid legal liability for their associated-in-fact enterprise, their patterns of racketeering and civil rights conspiracy and acts of violence, and their patterns of terror. Terror acts include, without limitation, at least three mass casualty attempts, the most recent against an express train traveling 50 to 60 miles per hour enroute to New York City on the evening of September 11, 2022 which directly threatened the lives of about 300 people in addition to the Lead Plaintiff (paragraph 707 LETHL-14).

D. The broad sweep of about fifty-five years and nearly uncountable acts, violations, and injuries by defendant UNITED STATES and its co-conspirators, including thousands of examples presented in this Complaint and the accompanying exhibits which, together with the violations of five international treaties (paragraph 251), are systematic violations of RICO, civil rights, and the powers of limited government envisioned by the founders.

E. The Constitution, from its ratification in June 1788, was and is intended to restrain the federal government from replacing the tyranny and oppression of a King with new forms of the same patterns of practice, not replace one form of government with another which functionally continues those same patterns. Our institutions continue to fail us rather dramatically in these matters, including in their neglect to prevent (per 42 U.S.C. Chapter 21) acts, violations, and injuries against both enumerated and unenumerated rights of Lead Plaintiff and others of this class, each and every one of whom is, together with all others, entitled to the quiet enjoyment of life, liberty, family, and property; to the pursuit of happiness rather than the imposition of coercive psychological operations and BRMT driven suicide ideations; and to the protections of

the rule of law, rather than to involuntary servitude with their lives being dictated – past, present, and future – to the whims of government executives, managers, remote BRMT operators, and undercover police powers acting with impunity under color of law and subjecting these plaintiffs to the dangers of public vigilantes.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
| --- | --- |
| Complaint paragraphs: | 251, 707-710 LETHL-14-17 |
| Appendix 2 paragraphs: | Entirety |
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety |

| LPEE pages (see technical note on page numbering at paragraph 230): | Entirety. LPEEV65-3, 5 |
| Emails and documents by topic and date, also located in LPEE: | Entirety |

### 631. RGTS-11 Rights Violations: Bad Faith Acts – Biological and Medical Invasions, Access to Basic Health Care Lifetime

A. As forensically reverse engineered, defendant UNITED STATES and its defendant co-conspirators deprive Lead Plaintiff of access to basic health care services using a variety of means including, without limitation, through involuntary servitude, peonage, and penury inflicted by denial of employment, and by theft of compensation, by theft of personal services, by deprivation of access to unemployment benefits payments, and by using email fraud and wire fraud (paragraphs 490-584). Defendant UNITED STATES and its defendant co-conspirators denied access to initial Covid-19 vaccinations series 149 times when eligible (paragraph 704 LETHL-11 and LPEE pages 9875, 10187-10250); to medical doctors; to prescription medications essential to treat the illegal BRMT induced mental depression ranging to suicide ideation (paragraphs 604-606 HEXP-1-3), while defendant UNITED STATES was fully aware of the broad spectrum of biochemical and physical abuses it has been and does inflict with its illegal BRMT bioweapon and bioweapon delivery system during periods of unemployment, peonage, penury, and forced unemployment.

B. This awareness is most clearly demonstrated by the physical presence of two undercover officers on the southeast corner of Thompson Lane and River Road, Edgewater, NJ, who stood in front of and blocked the Lead Plaintiff's path to cross this very busy street at this particular moment on this particular day of suicide ideation between 2008 and 2010 (paragraph 606, HEXP-3). Defendants also blocked access to basic preventative dental services, exams,

checkups, and other routine but essential preventative services, resulting in the loss of teeth and the onset of infections in teeth, which have and do risk infections spreading to the brain and other parts of the body. Defendant UNITED STATES bears complete and total responsibility for these acts, violations, and injuries, as Lead Plaintiff has been and is conscientious about seeking affordable medical care when needed at all times.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 490-584, 604-606, 617 HEXP-1-3, 14 704 LETHL-11 |
| Appendix 2 paragraphs: | 1-039, 1-067 |

| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001 through 2-0006, 2-0059, 2-0067, 2-0076, 2-0117, 2-0118, 2-0159, 2-0167, 2-0196, 2-0205 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al; pages 9875, 10187-10250, 11656-11664, 12160-12232, LPEEV65-2, 3, 13, 15 |
| Emails and documents by topic and date, also located in LPEE: | Bergen Covid Exec emails 210324, Bergen Covid Exec emails 210326. |

### *Direct Interferences in Personal and Intimate Relationships*

### *632. RGTS-12 Rights Violations:* **Personal and Intimate Relationships - Managed Romantic Interests, Arranged In-Person Meetings 2004-2005**

A. As forensically reverse engineered, defendants, in late 2004 and continuing in 2005 use an ostensibly drunken female bar patron in hot pants, an in-person bar pickup, and other females of interest as they screen-in and screen-out women placed in the presence of Lead Plaintiff. Lead Plaintiff expended personal funds during these screened and manipulated in-person events in the Kirkland, WA area. Additional computer files and electronic calendar evidence noted by Lead Plaintiff during this period and related to this sequence is currently in the hands of defendant UNITED STATES, as it was personally handed to ROSENBERG (FBI) by Lead Plaintiff at ESTABLISH around October 2007 and had likely been recovered by an FBI lab working through a cover company website. Paper based documentation of these events may have been scanned or photographed by defendant UNITED STATES, specifically FBI or USPIS, during mailing to and from New Jersey to Washington in 2010 and 2011 by Lead Plaintiff as he was trafficked from Cliffside Park, NJ through Bergen Regional, coercion and duress, to Ramsey, NJ (paragraph 522-524, 606 HEXP-3G-K, 611H(xii)-(xv) HEXP-8, 630 RGTS-10B, 643 RICO-5C-H).

B. Defendants have and do continue this romantic and intimate interests manipulations through 2024 by purposefully screening-in and screening out potential romantic interests using

wire fraud on dating sites, and his known concern to retain traceability of these manipulations, primarily to sustain isolation of Lead Plaintiff. Defendants also placed BRMT manipulated romantic interests in his life (see paragraphs 611-614 HEXP-8 through HEXP-11, LPEEV65-4).

C. On knowledge and belief, defendant UNITED STATES has and does also orchestrate and conduct such interferences of certain of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also BRMT injured and trafficked members of this class. These victims include at least both former spouses (Lynne and Jeanette), one college girlfriend (Susan Irish), and one close college female friend (Katherine Andrews). Given the ease of remote surreptitious illegal BRMT bioweapon and bioweapon delivery system hijackings and the obvious misogynistic character of certain individual defendants hereto personally known to the Lead Plaintiff, there are undoubtedly many more people who comprise this class of unwitting victims who are as yet unidentified plaintiffs.

D. Defendant UNITED STATES most probably employed this method of extreme BRMT abuse to orchestrate the murder of Audrey Brewer in September 2011 (paragraph 10) using an physically and emotionally abused female intermediary as the direct perpetrator while acting in apparent extreme jealous rage under the direct influence of the illegal BRMT bioweapon and bioweapon delivery system used to physically hijack her pineal gland for explosive adrenaline surge to provoke the knife slashing attack, which resulted in Audrey Brewer's death from the fatal slashing of her carotid artery in her neck. The female perpetrator had absolutely no history of violence at any time but was also being psychologically provoked by the manipulative male who was involved in relationships with both women at various times. The psychological abuse of the apparent perpetrator was the plausible explanation for the attack, which concealed the actual BRMT perpetrator of the extreme BRMT biomedical manipulation

from being exposed as the root perpetrator. BRMT is a highly classified weapon system, not previously known in human history, certainly not known to local police departments, which leaves absolutely no trace evidence of the series of carefully focused energy pulses absorbed by the brain to cause the extreme adrenaline surge.

E. The momentary sense of extreme rage (adrenaline), which was most probably experienced by the knife wielder in that fatal moment, is comparable to the momentary biochemical rage induced in Lead Plaintiff by the illegal BRMT bioweapon and bioweapon delivery system in the 2023 Subway Tunnel Flash Incident documented at paragraph 619 HEXP-16, LPEE pages 11668, and as he experienced during an unrecorded incident while walking one morning past the gas station adjacent to his Cliffside Park, NJ residence between August 2008 and October 2010. The intent of defendant UNITED STATES in orchestrating this illegal BRMT bioweapon and bioweapon delivery system operation against US persons (Lead Plaintiff, Audrey Brewer, Lead Plaintiff) was most probably to test and field deploy it in a specific deadly manner to demonstrate its field effectiveness for its future deployment against others which defendant UNITED STATES (CIA) targets for assassination in its field operations.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Discovery will provide critical confirming information directly from these institutional and

individual defendants and, among some who presented at the time as family members, their

children. See other selected relevant content at paragraph 600Q and in searchable indexes and

lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added

subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount

follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 10, 522-524, 606 HEXP-3G-K, 611H(xii)-(xv) HEXP-8, 611-614, 619 HEXP-8 through HEXP-11, 16, 630 RGTS-10B, 643 RICO-5C-H |
| Appendix 2 paragraphs: | |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0115, 2-0148, 2-0188, 2-0192 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 140 et al, 441-459, 11668, LPEEV65-1, LPEEV65-4 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 633. *RGTS-13 Rights Violations:* Personal and Intimate Relationships – Blocked and Spoofed Access to Dating Sites 2004-2005, 2007-2008, 2011-2014, 2018 to present

A. As forensically reverse engineered, defendants have and do use online dating

platforms, including those of MATCH GROUP and BUMBLE, or their spoofing by an unknown

defendant police powers operation, to completely block Lead Plaintiff from all access to dating

site participants among the general public to orchestrate the relationships elected by defendant

UNITED STATES (paragraphs 612-615 HEXP-9-12). When Lead Plaintiff has and does

recently (late 2023 to present) provide direct feedback about these specific forms of *First*

Amendment civil rights violations to the other party on dating sited of interferences, criminal

deprivation of rights, and conspiracy against rights, to these imaginary dates, the texts related to this conversation are most frequently subsequently deleted by unmatching which removes this evidence from the Lead Plaintiff's phone app. For example, police powers use of the Hinge app, where this destruction of evidence is accomplished by the website administrator claiming that the match was a fraud, withdrawing the match, and thereby automatically deleting it from the Lead Plaintiff's phone application, which destroys the evidence of the defendants' knowing, clear, and continuing violations of the Lead Plaintiff's *First* Amendment civil rights as communicated directly to the perpetrators of these acts (LPEEV65-4). This can also be accomplished by unmatching by the imaginary prospective date, actually defendant police powers personnel violating the *First* Amendment, to wit, in an egregious and durable pattern of violations of 18 U.S.C. §§ 241, 242, and Title 42 Chapter 21 Civil Rights.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual

defendants and, among some who presented at the time as family members, their children. See

other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE

Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at

paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 611-614 HEXP-8 through HEXP-11 |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0115, 2-0148, 2-0169, 2-0184, 2-0188 |
| LPEE pages (see technical note on page numbering at paragraph 230): | LPEE pages as shown at 611-614 HEXP-8 through HEXP-11 incorporated here by reference, LPEEV65-4, 6, 7 |
| Emails and documents by topic and date, also located in LPEE: | LPEE emails and documents as shown at 611-614 HEXP-8 through HEXP-11 incorporated here by reference |

### 634. RGTS-14 Rights Violations: Personal and Intimate Relationships - Managed Romantic Interests, Fraudulent Dates 2004-2005, 2008, 2019-2020

A. As forensically reverse engineered, 2004-2005: Defendants used the online dating

platform Match.com, a Match Group website, or its spoofing by an unknown defendant police

powers operation, to arrange approximately 15 to 20 fraudulent dates with defendant police

powers agents, officers, and confidential informants in the greater Seattle, WA and Tacoma, WA

area and the greater Portland, OR area. Lead Plaintiff spent over $1,000 for in-state and

interstate travel and to pay for meals and other entertainment during these fraudulent dates in

late 2004 and the first half of 2005, arranged using email and other electronic means.

Documentation is available through the discovery process, including the recovery of the Lead

Plaintiff's own records currently in the hands of defendants, as well as the routine police reports

of these incidents controlled by defendants. Additional computer files and electronic calendar

evidence noted by Lead Plaintiff during this period and related to this sequence is currently in

the hands of defendant UNITED STATES, as it was personally handed to defendant

ROSENBERG (FBI) by Lead Plaintiff at defendant ESTABLISH in Fall 2007 around October and had likely been recovered by an FBI lab working through a cover company website. Paper based documentation of these events may have been scanned or photographed by defendant UNITED STATES, specifically FBI or USPIS, during mailing to and from New Jersey to Washington in 2010 and 2011 by Lead Plaintiff.

B. 2007-2008: Defendants, used various online dating platforms including Match, or spoofing by an unknown defendant police powers operation as they screened-in and screened-out women of interest to Lead Plaintiff in 2008, resulting only in the brief relationship with defendant MODDERMAN, paragraph 611 HEXP-8.

C. All other members of the public were (and are) systematically excluded by the acts of defendants UNITED STATES, FBI, and ROSENBERG, to orchestrate the maximum detrimental psychological impact on Lead Plaintiff during the ESTABLISH termination, PANKOWSKI wedding, MODDERMAN start, stop, then attempt resume sequence in Summer 2008 (paragraph 611 HEXP-8), as the imagined terror investigation pretexted by FBI and ROSENBERG and underway by regional Joint Terrorism Task Forces continued in the background in NYC and NJ.

D. Documentation is available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of defendants, as well as the routine police reports of these incidents controlled by defendants. Additional computer files and electronic calendar evidence noted by Lead Plaintiff during this period and related to this sequence is currently in the hands of defendant UNITED STATES, as it was personally handed to defendant ROSENBERG (FBI) by Lead Plaintiff at defendant ESTABLISH in Fall 2007 around October and had likely been recovered by an FBI lab working through a cover company

website. Paper based documentation of these events may have been scanned or photographed by defendant UNITED STATES, specifically FBI or USPIS, during mailing to and from New Jersey to Washington in 2010 and 2011 by Lead Plaintiff.

E. 2018 to present: Defendants use online dating platforms, Hinge, Plenty of Fish, Elite Singles, Black People Meet, Tinder, Bumble, Adult Friend Finder, eHarmony, Zoosk, Ashley Madison, OKCupid, or spoofing of these sites by an unknown defendant police powers operation from 2018 and orchestrate a series of approximately 15 to 20 fraudulent dates with defendant police powers agents, officers, and confidential informants in the greater New York City area in 2019-2020. All these dates require interstate travel from Lead Plaintiff's residence in Edgewater, NJ to various parts of New York City, NY. Lead Plaintiff spends over $1,000 to travel to and pay for meals and other entertainment during these fraudulent dates arranged using email and other electronic means. Documentation is available through the discovery process, including the recovery of the Lead Plaintiff's own records currently controlled by defendants, as well as the routine police reports of these incidents controlled by defendants, also LPEEV65-4.

F. Defendants have and do continue this romantic and intimate interests manipulation which is a 100% freeze out from any direct personal contact through these sites from 2020 through the present time and have and do terminate all online discussions without any direct in-person contact to sustain isolation of Lead Plaintiff, and to destroy evidence of the police powers corruption narrative which Lead Plaintiff uses to identify these continuing interferences in defendant UNITED STATES' and other defendants in their knowing decades-long and continuing violations of human, Constitutional, and civil rights.

G. On knowledge and belief, defendant UNITED STATES also has and does orchestrate and conduct such interferences of his romantic partners and their interests to manage this aspect

of the lives of other unidentified plaintiffs, who are themselves also members of this class. These victims have included both spouses, one college girlfriend, and one close college female friend.

H. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 611 HEXP-8 |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0115, 2-0148, 2-0169, 2-0184, 2-0188 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 140 et al, 441-459, from 611-614 HEXP-8 through HEXP-11 incorporated here by reference, LPEEV65-4, 6, 7 |
| Emails and documents by topic and date, also located in LPEE: | Match Group Second Notice re Preserve Evidence 220122, |

| | Match EPL Response 221110,<br>Match Group Legal Dept Email 221110<br>Also see LPEE pages listed at 611-614 HEXP-8 through<br>HEXP-11 incorporated here by reference |
|---|---|

### *Hacking, Harassment, Disinformation, Abuse of Official Records*

### *635. RGTS-15 Rights Violations:* Illegal Searches, Hacking, and Harassing, Computer Technology

A. Defendants have and do fraudulently and repeatedly engage in the hacking of Lead Plaintiff's personal computer and printers, used for both personal and business matters beginning around 1984 and into the present time including, without limitation, for the purposes of suppressing and destroying evidence of their criminal acts such food contamination (paragraph 620 HEXP-17), suppressing printing of predicate act evidence for submission to federal court (DC 23-cv-0415, related at Appendix 1, and docketed at DC 23-mc-014), managing his unemployment compensation access (paragraph 642 RICO-4), and his work with public charities (paragraph 526). They have and do create technical hacks to, without limitation, (i) pretext phone support troubleshooting opportunities, (ii) physical disable personal computers and force their physical repair, (iii) perform fraudulent online system updates of Windows 10 and various applications, as well as (iv) Android updates of cell phone software, all of which then have been and are used by defendant UNITED STATES to, without limitation, (a) strip data, (b) to install and remove malware and keyboard loggers, (c) to permit personal computer video camera operation without consent, (d) to create remote printer and other computer hacks which require (e) harassing forms of customer support use by Lead Plaintiff while (f) failing to solve the problem they created and (g) shifting responsibility among various in-house assets to perpetuate these frustrations of Lead Plaintiff.

B. Defendants also cause and create circumstances requiring the Lead Plaintiff to replace or return non-functional equipment at considerable expense on his very limited financial resources (also subject to control and to asset stripping by defendant UNITED STATES and co-conspirators, see for example LPEEV65-18 third printer disabled during complaint preparations). Defendants have and do systematically violate the *First, Fourth*, and *Fifth* Amendment rights, among many other rights, of Lead Plaintiff, and have and do continuously fail to respect, much less protect, those rights, as evidenced by the comprehensive official silence of defendant UNITED STATES and co-conspirators including, without limitation, defendant NYPD, paragraphs 550-584, Interline exhibits 17-19.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE

Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at

paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 526, 620 HEXP-17, 642 RICO-4 |
| Appendix 2 paragraphs: | 1-067 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0207, 2-0215 through 2-0217 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al; pages 371, 473, 544, 549, 566-573, 575-576, 599, 603, 609-612, 770-771, 783, 6044-6084, 10251-10255, 10259-10301, 10423-10433, 10434-10444, 11673-11925, LPEEV65-6, 7, 18 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 636. RGTS-16 Rights Violations: Blocking Information Access and Supplying Deliberate Disinformation

A. Defendants have and do block, continuously surveil, and/or spoof Lead Plaintiff's

access to various online services both in-state and interstate, including, without limitation, dating

sites; news sites including, without limitation, New York Times, Washington Post, Wall Street

Journal, Al Jazeera, and others; corporate sites for shopping, technical support, customer service,

and other commercial purposes; performance and performance ticketing sites, and many others,

including all online activities.

B. Brain-computer interface company sites were also actively suppressed by defendant

UNITED STATES from Lead Plaintiff's view from at least as early as 2012 (Synchron's

founding date, paragraphs 374-375) into 2021, as they were and are a vital element of

corroborating evidence of the scientific and technical feasibility of the illegal BRMT bioweapon

and bioweapon delivery system to place before non-technical US District Court, to assist in their

evaluation of the threshold veracity of Lead Plaintiff's novel technological claims made in

accordance with the *Denton* mandate.

C. Defendant UNITED STATES has and does fraudulently fail, despite their direct control of access, to prevent certain hacks, performs others of their own making, and abuses paid services to sustain defendants' involuntary servitude, control, and manipulation of Lead Plaintiff, including to arrange various captive events, to control who are the audience members who surround him at captive and public events attended by Lead Plaintiff, including his public charity volunteer work, which Lead Plaintiff attends alongside defendant police powers agents, officers, confidential informants and/or performance actors, in their scheme to manage and control the actions of Lead Plaintiff, including, without limitation, in the sequence of programmed events which used the Club FreeTime website to orchestrate attendance at these functions, see Interline Exhibit 15A (July 16, 2022 direct verbal threat), LPEEV65-5.

D. This spoofing and/or blocking of various websites, has and does include the blocking of accurate information access, and its absence or replacement by other false and misleading information, which is intended to mislead and/or publicly discredit the Lead Plaintiff when he cites this incorrect information, currently continues under defendants' direction and control, LPEEV65-4.

E. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will

provide critical confirming information directly from these institutional and individual

defendants and, among some who presented at the time as family members, their children. See

other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE

Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at

paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 16 |
|---|---|
| Complaint paragraphs: | 374-375 |
| Appendix 2 paragraphs: | 1-067 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0129, 2-0141, 2-0148, 2-0169, 2-0171, 2-0179, 2-0179, 2-0180, 2-0185, 2-0199, 2-0200, 2-0202, 2-0205 through 2-0207 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al; pages 548-549, 576, 582-597, 771-772, 782, 10251-10255, 10259-10301, 10423-10433, 10614, 10620. See also beginning page 148 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 83-95, 11738-11739, 11743-11748, 11760-11870, 11871-11886, 11908-11925, LPEEV65-4, 5 |
| Emails and documents by topic and date, also located in LPEE: | Certain time periods continue to be blocked by defendant UNITED STATES computer hacks |

## *637. RGTS-17 Rights Violations:* Misuse of Official Records, Mispersonation, Dubai 2015

A.      As forensically reverse engineered, Lead Plaintiff encountered an online dating

match from the greater New York City area in 2014 while living in Ramsey, NJ. As that online

discussion procced, it turned out that the white female "Laura" who lived in "Ghana"

(paragraphs 612 HEXP-9, 622 RGTS-2). Between 2014 and 2018, defendant UNITED STATES

combined email and wire frauds with illegal BRMT bioweapon and bioweapon delivery system

oxytocin (love hormone) hijacking to orchestrate and perpetuate a series of thefts totaling more

than $14,000 from Lead Plaintiff via Western Union and other money transfer sites which permit anonymous pickup of cash; as well as two cell phones, mailed Sep. 9, 2015 (LPEE page 7845), mailed Nov. 15, 2015 (LPEE page 7824), a PlayStation 1, game cartridges, and several dvd movies which the unwitting Lead Plaintiff to Ghana – (CIA field asset), addressed to Prince B. Quaye, Agona Swedru, Ghana as directed by Laura AKOTO. This provided a CIA asset with two clean cutout phones for use in Africa.

   B.    This sequence is tightly correlated to the illegal use of Lead Plaintiff's U.S. passport (per CPB travel record, LPEE page 540) where Lead Plaintiff supposedly departed to Dubai on May 2, 2015. Lead Plaintiff had planned this trip and purchased the air ticket but cancelled a few days prior to departure (non-refundable ticket) due to the late addition of an advanced fee (known to be unaffordable) a few days prior to the Lead Plaintiff's already paid and scheduled departure. The air ticket was used by a CIA exfiltrator traveling on Lead Plaintiff's passport to Dubai. The unwitting Lead Plaintiff then used International postal services were then used to deliver the phones, Playstation I, game cartridges, and movies to Ghana in September and November 2015.

   C.    Around 2017 Laura asked Lead Plaintiff to relay payments among two international parties through his US bank account. He agreed to do this, and later expressed discomfort, and halted the practice after one or two transfers, specific emails below:

   AKOTO Laura re $2K to Mr Prince from Porter Patten $3K 171021,
   AKOTO Hints of money laundering entrap scam 171025

   D. This was an FBI structured payments entrapment attempt with no legal basis or foundation as Lead Plaintiff has never engaged in such practices nor expressed any interest in doing so. "Laura" was FBI's bait and a carefully pretexted trap demonstrating FBI culpability

and FBI/CIA *mens rea*, since it incorporated the pattern of theft of funds and phones sent to Ghana using Lead Plaintiff as a cutout for sending phones not traceable to defendant UNITED STATES through Lead Plaintiff.

E. Simple replacement of the Lead Plaintiff's picture and physical description on a blank duplicate passport accessible to CIA by defendant UNITED STATES was all that was needed to complete this specific exfiltration of a CIA asset to Dubai. According to these records, Lead Plaintiff left the United States on May 2, 2015 and has never returned, CPB at LPEE pages 537-541. Lead Plaintiff was also used in September and November 2015 to supply two cell phones to a CIA operative in Ghana who had traveled to Dubai using the Lead Plaintiff's passport number in May 2015 as defendant CIA abused the Lead Plaintiff with the illegal BRMT bioweapon and bioweapon delivery system to hijack and manipulate his oxytocin level, creating and gradually escalating his biochemically-driven online romantic interest in the imaginary Laura Akoto, in whose name an anonymous party (defendant CIA personnel) also received about $14,000 of untraceable funds sent via Western Union and other money transmission services from the Lead Plaintiff.

| From: | Dennis Brewer |
| To: | laura akoto |
| Subject: | Hi Love |
| Date: | Wednesday, September 9, 2015 8:22:44 AM |

Sorry we could not chat. Things are going well. Had our last meeting with vendors yesterday and met my consultant on the packing plant. Have a contract for the $22 million raise, may sign today or tomorrow.
Hope all is well with you. Your phone was mailed yesterday. Love you very much.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

er Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 621 RGTS-1 subparagraph F is incorporated herein by reference. Discovery will

provide critical confirming information directly from these institutional and individual

defendants and, among some who presented at the time as family members, their children. See

other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE

Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at

paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 612 HEXP-9, 622 RGTS-2 |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | 8453 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

## *Racketeering* – (RICO series offenses)

638. All RICO acts, violations, and injuries (RICO-1 through RICO-55) have been

forensically reverse engineered and have and do comprise a durable, integrated pattern of

associated-in-fact enterprise pattern racketeering acts, violations, and injuries, by these

defendants, as defined in accordance with 18 U.S.C. §§ 1961-1968; and in accordance with

Congressional intent in PL 91-452 (RICO) October 1970 that 18 U.S.C. §§ 1961-1968 be

liberally construed to effect its intended purpose:

> "(a) The provisions of this title [enacting this chapter and amending sections 1505, 2516, and 2517 of this title] shall be liberally construed to effectuate its remedial purposes."

## *Thefts and Takings Targeted at Personal Assets*

### *639. RICO-1 Racketeering Violations:* **Involuntary Servitude, Forced Labor, Human Trafficking, Entrapment Attempts and Entanglements – Obstructing Market Rate Private Employment and Interstate Commerce From Deloitte (1979) through Establish (2008)**

A. As forensically reverse engineered, fraudulent takings resulting from the defendants'

careful timing of events contrived by defendants to appear as life circumstances and events have

been and are used to control and human traffick Lead Plaintiff through a series of physical and

emotional traumas including the selection, assignment, and destruction of teenage and adult

relationships; destruction and recovery of physical and mental health; tortures and suicide

ideations; homelessness; enterprise and employment failures; de facto takings of real and

financial assets; various emergency situations with barely avoided lethal consequences; among

other traumas, many of which are directly created by or arise from the defendants direct acts and

their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from

adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's

interests, life, and liberty, are elements of and arise from defendants' associated-in-fact

enterprise pattern of racketeering acts, including, without limitation, their commercial and police

powers frauds and conspiracies in commerce and interstate commerce, and violations of

individual rights and liberties protected by the Constitution, laws, and treaties of the United

States of America (paragraphs 414-534).

B. Each and every act against the Lead Plaintiff included in the inline evidence herein at all paragraphs, and each and all the LPEE evidentiary exhibits incorporated herein by reference, are representative of the array of injuries to other similarly situated plaintiffs by these defendants, though certain plaintiffs likely did not survive these acts by these defendants and must therefore be represented through their heirs and estates.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). RGTS-6 subparagraphs A through C are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4 through 14 |
| --- | --- |
| Complaint paragraphs: | 414-534; 639-648 RICO-1-10 generally |
| Appendix 2 paragraphs: | 1-010, 1-015, 1-017 through 1-023, 1-025, 1-031, 1-032 |

| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety of column entitled: Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate |
| LPEE pages (see technical note on page numbering at paragraph 230): | 10311-10364, 10376-10393, LPEEV65-6, 7 |
| Emails and documents by topic and date, also located in LPEE: | Mail and email blocks and website spoofs and hacks as described at NSEC, RGTS, and RICO subcounts incorporate predicate acts which preclude valid First Amendment protected rights and communications, which are consistently violated by defendants. See also Complaint paragraph 70 for a separation of powers example of defendants' contempt for First Amendment rights, and paragraph 74 for relevant demonstrations of contempt for Fourth Amendment rights, all of which proceed with minimal, if any at all, adverse consequences ever against these defendant perpetrators (paragraph 40). |

D. These schemes and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). RGTS-6 subparagraphs A through C are incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable

indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 4 through 14 |
| Complaint paragraphs: | 99l., 170, 219, 222, 226, 275(i), 276, 320f(iv), 337, 414-534, 543, 563; 601 602 NSEC-2, 3; 612, 613 HEXP-9, 10; 623, 624, 626, 627A, 629 RGTS-3, 4, 6, 7, 9; 640-653, 655, 656C, 658-661, 667, 668, 670, 672-693 RICO-2-15, 17, 18, 20-23, 29, 30, 32, 34-54 |
| Appendix 2 paragraphs: | 1-007 through 1-010, 1-015, 1-017 through 1-023, 1-025, 1-031, 1-032, 1-067 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0036, 2-0039, 2-0045, 2-0047, 2-0050, 2-0053 through 2-0058, 2-0059, 2-0061, 2-0068, 2-0072, 2-0081, 2-0106, 2-0107, 2-0110, 2-0111, 2-0113, 2-0114, 2-0115, 2-0117, 2-0122, 2-0134, 2-0135, 2-0140, 2-0141, 2-0150, 2-0157 through 2-0164, 2-0165 through 2-0179, 2-0185, 2-0186, 2-0195, 2-0202, 2-0207; entirety of column entitled: Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 11-139, 140 et al, 371, 380, 382, 383-384, 386, 398, 420, 427, 430-438, 440, 463, 473, 474, 486, 518, 549, 542-547, 566-573, 575-576, 599, 602, 603, 609-612, 616-765, 767-768, 770-771, 783, 1740, 6085, 8290, 8291-8293, 8350-8355, 8351-8352, 8370-8373, 8378, 8379, 8411, 8454-8467, 8472-8473, 8474, 8479, 8489-8506, 8507-8514, 8563-8714, 8715-8718, 8770-8787, 8788-8804, 8805-8812, 8813-8854, 8937-8938, 8939-8955, 8956, 9053-9059, 9068-9078, 9093, 9094, 9181, 9193, 9194-9206, 9207-9214, 9219-9222, 9240, 9241-9248, 9256-9259, 9260, 9270-9272, 9275-9276, 9277, 9278-9279, 9280, 9281-9283, 9285, 9300-9306, 9307-9310, 9311, 9312-9313, 9314-9318, 9328-9337, 9340-9391, 9392-9393, 9394-9401, 9406-9534, 9538, 9539-9545, 9547, 9548-9561, 9568-9572, 9573-9591, 9601-9604, 9610-9611, 9636-9637, 9639, 9642, 9645, 9646-9647, 9649, 9651, 9653, 9722, 9727-9728, 9788-9790, 9820, 9840, 9890-9896, 9897-9901, 9902, 9905, 9907, 9917, 9920, 9923, 9925, 9926, 9984, 9985, 9987, 9989, 9991-9993, 9997, 10000, 10002, 10004, 10005, 10007, 10011, 10013, 10014, 10015, 10017, 10021, 10023, 10027 second line, 10028 second line, 10093, 10094; 10095, 10132-10137, noting entries for Arizona destinations and locations, 10750-10771, 10179-10186, noting |

| | |
|---|---|
| | disbursements on (yymmdd) 210706 Delta $534.40, 210707 JFK $22.90, 210707 Motel 6 $2121.54, 210708 Africa Lounge $23.81, SEPTA $9.25; 10108-10118, 10138-10613, 11641, 11704-11707, 11708-11726, LPEEV65-6, 7, 8, 9,12<br><br>AXIAL Investor Interest 150904.pdf<br>AXIAL to ALTAHAWI connect 150910.pdf<br>AXIAL NYC re Investor Referrals 171108.pdf<br>AXIAL re Paine Schwartz 171113.pdf<br>AXIAL NYC FRACTAL Intro 171116.pdf<br>AXIAL NYC FRACTAL stall 171129.pdf<br>AXIAL NYC FRACTAL stall 171204.pdf<br>AXIAL NYC FRACTAL drag out 171206.pdf<br>AXIAL fake investor leads 180302.pdf<br>See Compendium at LPEE pages 934-1075 for other selected relevant emails and documents related to each entity and individuals named in this subcount. Full documentation to be provided in discovery. |
| Emails and documents by topic and date, also located in LPEE: | See emails and documents listed at all relevant individual subcounts in RICO series and all other subcounts in other series listed at Complaint paragraphs above. |
| Disbursements in Interstate Commerce (partial listing only, bank statements to be produced during discovery process): | 130101 Winnett Perico 2013 Expenses P&L 130101.pdf<br>130926 JACKSON fee from BA personal acct130926.pdf<br>150730 Smith 100K Check 150730.pdf<br>150822 Inv Blue Sky Search150822.pdf<br>150824 Vista Bus Cards Pd 150824.pdf<br>150825 Pd Inv Org Trade Assn150825.pdf<br>150825 Pd Inv Tucson Intel Ofc 150825.pdf<br>150828 D Brewer Expense report 150824.pdf<br>150831 PETERSEN 25K Inv Check 150831.pdf<br>150901 Pd Inv Tucson Intel Ofc 150901.pdf<br>150916 D Brewer Expense report 150916.pdf<br>151116 D Brewer Expense Report 151116.pdf<br>151231 D Brewer Expense Report 151231.pdf<br>151231 WP Financial Statements 151231.pdf<br>170126 Smith 5K Wire 170126.pdf<br>170315 Smith Active 1K Wire170315.pdf<br>170930 WCC Balance Sheet Only 9-30-2017 170930.pdf<br>180131 NBH 7469-BUSINESS CHECKING-20180131.pdf<br>180228 NBH 7469-BUSINESS CHECKING-20180228.pdf<br>180308 Lance Surety Livestock Dlr Bond 180308.pdf<br>180320 ADP Quote Reprint 180320.pdf |

180329 NBH Pex Deposit 180329.pdf
180331 NBH 7469-BUSINESS CHECKING-
20180331.pdf 180414
SALLYPORT Wire ACH Information 180414.pdf
180430 NBH 7469-BUSINESS CHECKING-
20180430.pdf
180430 TRADEKEY Orbit ACH 180430.pdf
180501 WEBLINK Pymt180501.pdf
180511 Reprint of ADP Payroll Setup Fees 180511.pdf
180515 TRADEKEY Orbit ACH 180515.pdf
180521 Lux Offices Pd 180521.pdf
180531 NBH 7469-BUSINESS CHECKING-
20180531.pdf
180620 Lux Offices Pd 180620.pdf
180720 Lux Offices Pd 180720.pdf
180726 Smith 30K Note 180726.pdf
180803 Autoklose Paid Invoice180803.pdf
180803 EGM List Pd INV 4479 180803.pdf
180806 EGM Deploy INV 4481 180806.pdf
180905 EGM Email List Rent Pd Inv 4485 180905.pdf
180906 EGM INV 4485 $300 Completed ACH
180906.pdf
180807 Smith $18K Wire 180807.pdf
180814 SALLYPORT Fee 2K Wire180814.pdf
180814 TRADEKEY Orbit 3K ACH 180814.pdf
180814 TRADEKEY Orbit ACH 180814.pdf
180816 True Comm Pd 180816.pdf
180823 NAL HUGHES $2K Wire Details 180823.pdf
180831 ALVAREZ Lori Acctnt Svcs Invoice Pd
180831.pdf
180906 EXACT DATA Fee ACH 180906.pdf
180906 EXACT DATA Rent Agrmt180906.pdf
180925 Right Networks $25 pd Setup INV180925.pdf
181012 NAL HUGHES $5000 Compl Wire 181012.pdf
181203 WEBLINK $500 Wire 181203.pdf
181204 WEBLINK Invoice 181204.pdf
181231 WCC PandL 181231.pdf
181231 WP IRS 1120 18Exp Sched 181231.pdf
181231 WP IRS 1120 for 2015 181231.pdf
181231 WP IRS 1120 for 2016 181231.pdf
181231 WP IRS 1120 for 2017 181231.pdf
181231 WP IRS 1120 for 2018 181231.pdf
190228 NBH 7469-BUSINESS CHECKING-
20190228.pdf 190331 NBH 7469-BUSINESS
CHECKING-20190331 (1).pdf
190430 Financials WCC 190430.pdf

| | |
|---|---|
| | 190430 NBH 7469-BUSINESS CHECKING-20190430.pdf |
| | 190513 NBH 7469-BUSINESS CHECKING-20190513.pdf |
| | 190531 NBH 7469-BUSINESS CHECKING-20190531.pdf |
| | 190630 NBH 7469-BUSINESS CHECKING-20190630.pdf |
| | 190731 NBH 7469-BUSINESS CHECKING-20190731.pdf |
| | 191231 WP Financials 2018-2019 191231.pdf |
| | 201231 SBI General Ledger Detail 201231.pdf |
| | 201231 SBI Income Statement Detail 201231.pdf |
| | 210901 DB Reimb for Advance to SBI 210901.pdf |
| | 210903 GPR 210731 FS Change Notes 210903.pdf |
| | 210904 GPR INC 073121 GAAP FS 210904.pdf |
| | 220614 Sheldon Beef Chase Check To 220614.pdf |
| | C1 220628 Notes to C1 Ltrs Series 220628.pdf |
| | C1 220629 CapitalOne Autopay June 29 220629.pdf |
| | C1 220719 CapitalOne WMT late fee dispute 220719.pdf |
| | C1 220801 C1 CEO 220629Ltr re Autopay 220801.pdf |
| | C1 220805 C1 Letter from 220805.pdf |
| | C1 220808 C1 Pymt Corresp 220808.pdf |
| | C1 220812 C1 Letter from 220812 .pdf |
| | C1 220813 C1 Collections Process 220813.pdf |
| | Certain emails are blocked by a defendant UNITED STATES computer hack |
| Calendared meetings and phone calls in date sequence: Dennis Brewer, WinnettOrganics.com Calendar (partial listing only, bank statements to be produced during discovery process): | **Date    Party** <br> **2016** <br> 1/22 Colby Arkin, NetSuite update <br> 2/18 Chris Nichols, Ryder <br> 3/17 Ramsey Café Ryder Mtg (Chris Nichols + Mktg VP or Sandra, Controller <br> 3/30 Richard MILLER, RAM Consulting <br> 4/25 Richard MILLER, RAM Consulting <br> 5/2 BA BESTWICK CARDONE Group Group Natural Food symposium Andrew CARDONE <br> 6/22 Matt Paul <br> 8/11 Libby Leggett re solar greenhouses <br> 8/25 NYC Food Investing Conference - intial introduction, Revolution VC <br> 9/12 Quentin Cote, LeaseQ <br> 9/19 GVC intro call <br> 9/26 Michael Callahan (KEENE), Domincik and Dickerman (DD) <br> 9/30 Peter Hsuing, DelMorgan introduction |

10/4 CARDONE intro of John Kiely - trust attny
10/11 Micheal Callahan (KEENE), DD
10/18 Ron MCCORMICK, WALMART Senior Director,
Fresh, WebEx call
10/26 John Cecilian, Clutch
10/27 Jim Case, Champion (re housing at Hyder farm,
AZ)
11/3 Jim Case
11/4 Lance Troutman
11/9 Jacob KREMPEL & Jose MERCED, KROGER re
organic produce in KPPC Conference room,
Blue Vine, OH
11/10 Dan Davidson re soils and gypsum addition
11/14 Michael Callaahn (KEENE), DD, meeting at NYC
office on Lexington Ave
11/21 Chris Nichols, Ryder, re update
11/23 Ken Ferguson re Hyder ag housing
11/29 Britney Smith re Hyder ag housing
**2017**
1/6 Sarah Freese re IBM marketing cloud
1/27 Dan KREWSON, MULTIFUNDING re loans
2/6 SHEFFORD Wire Transfer
2/8 Kingman, AZ farm visit w/ Christine J VOLK, realtor,
and Jonathan CROSS
(BLACKPOOL/SHEFFORD), Bruce Blitch
2/17 C Arkin
2/21 WALMART Bentonville, AR - Meeting with Ron
MCCORMICK, Shawn Baldwin, others in
WALMART second floor GPS conference room
2/22 Jim Case, Chamion re Gerlach, NV , Hyder, AZ,
Kingman, AZ agricultural worker
housing
2/23 C Arkin, NetSuite, review of NetSuite Professional
Services statement of work
2/24 SHEFFORD closing sked
2/27 J. Buddy Persons re Constsvcs ag housing
2/27 C Nichols, Ryder reupdated fleet needs
2/28 Dave Wanders, Utica Leaseco
4/6 Wendy Berger, re refrigerated facilities development
4/26 Steve Monroe, re factor financing NJ
5/18 M Callahan (KEENE), DD and staff meeting at DD
Lexington Avenue offices, NYC
7/11 G Troutman, telcon re SPAC meeting at Chardan
offices, Battery Park, NYC
7/11 EarlyBird telcon re SPAC meeting at their offices

| |
|---|
| 7/11 LOEB & LOEB telcon re SPAC meeting at their offices |
| 7/14 J Ju, DD, conference call w/Advantage Capital Partners |
| 7/18 Conference call w/HIG |
| 8/7 Gordon, MAUGHAN breakfast meeting in Salt Lake City re accounting services |
| 8/7 Sam SANDERS, Swan Raelty, travel from Salt Lake City to Idaho Falls, ID for two days at Skaar, then afternoon visits to Wells Fargo Bank, Idaho Falls, Jefferson County offices, then to Teton River Farm and rural residential property near Driggs, ID |
| 8/8 Sam SANDERS - Skaar tour complete and return to Salt Lake City, UT for travel home to NJ |
| 8/24 Jasper VAN BRAKEL, Armonia, and 2 female team members in NYC shared offices conference room re grassfed beef |
| 8/25 Jasper VAN BRAKEL follow-up telcon |
| 9/7 JD Kritser, Ranch Partners, Seattle, WA telcon |
| 9/8 Stephen O'Hara Riverside Capital, NYC re investment review |
| 9/25 Gavin Haladay - Equilibrium Capital, Portland, OR permanent crop investment firm telcon |
| 10/30 JD Kritser, Ranchland Partners, Seattle, WA and Fiona Industries ex-CEO John Herring TX feedlot expert call, per email |
| 10/31 Visit to Manning Beef, Pico Rivera, CA with Anthony DiMaria |
| 11/1 Phoenix, AZ investor meeting scheduled with GREG SMITH, Zach SEASE, both of BANCO Advisors. Both are no shows at their office in Scottsdale with WP employees including Blitch and others. Receptionist connects us to BANCO and some of the supposed investors on a conference call while we are at their offices. Afternoon meeting thereafter with Joel GOTTESMAN, Liquid Capital AZ re financing. |
| 11/1 Joel GOTTESMAN Liquid Capital early pm restaurant mtg |
| 11/13 Gavin Haladay - Equilibrium Capital, Portland, OR permanent crop investment firm telcon |
| 11/13 Monday date to confirm Andy Wiegand Peninsula Funds telcon per email on 11/10/17 |
| 12/22 Lucas Gibson NBH re nat org beef telcon |
| 12/27 Lucas Gibson NBH re nat org beef telcon |

| | **2018** |
| | 1/9 SOLE SOURCE Capital in NYC for meetings with |
| | their funders, so Brewer has meeting with |
| | TURNER, ROSSI, two others at St Regis King Cole Bar |
| | in NYC. Managing Partner ROSSI verbally |
| | commits to funding Winnett Perico during that meeting |
| | 1/10 Eric Edwards NBH Ag Banking telcon |
| | 1/17 Chris Nichols, Ryder update |
| | 1/18 Mike ROZNOWSKI FRACTAL Advisors intro |
| | Black Lake Capital intro |
| | 1/23 Dewey TURNER telcon |
| | 2/26 Brandon Sowder Indoor cattle pen facility telcon |
| | Hart TX |
| | 2/28 Bryan Sprinkman project review telcon |
| | 4/26 Colby Arkin, NetSuite update |
| | Certain emails are blocked by a defendant UNITED |
| | STATES computer hack, calendar entries have been |
| | deleted by a defendant UNITED STATES computer hack |

**640. RICO-2 Racketeering Violations: Theft and Takings - Financial Resources, Obstructing Market Rate Private Employment 1986 to Present**

A. As forensically reverse engineered, defendants with police powers have and do hack and manipulate Lead Plaintiff's personal computer and the websites and/or spoofs of legitimate websites presented to Lead Plaintiff to engage in repeated blocking of access to legitimate personal employment opportunities, perpetuating involuntary servitude and forced labor from college graduation in 1977 forward through the present. Defendant UNITED STATES has and does repeatedly substitute its own fraudulent executive recruiters and insider network of defendant police powers, domestic and international intelligence agents, officers, and confidential informants, for both legitimate existing and to place imaginary non-existent positions, and do not permit the Lead Plaintiff to seek or engage in legitimate private employment. This fraudulent scheme, running from the Lead Plaintiff's first instance of a mailed application and resume, through his ownership of a personal computer beginning in the 1980s to the present, has and does use mail fraud, and since the 1980s, primarily uses wire frauds and

email frauds, in both in-state and interstate commerce, to sustain and perpetuate plaintiff involuntary servitude, forced labor, and to perpetuate systematic violations of the *First, Third, Fourth, Eighth, Ninth, Thirteenth,* and *Fourteenth* Amendments, and other civil, Constitutional, and human rights guaranteed under ratified international treaties including, without limitation, the 1972 *Bioweapons Treaty* and the 1992 *Torture Treaty.*

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 414-534, 629 RGTS-9; 639-648 RICO-1-10 generally |

| Appendix 2 paragraphs: | 1-007 through 1-010, 1-015, 1-017 through 1-023, 1-025, 1-031, 1-032 |
|---|---|
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety of column entitled: Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 8350-8355, 10259-10301, 10352-10363, 10376-10393, LPEEV65-6, 7 |
| Emails and documents by topic and date, also located in LPEE: | CaseStack cutout Edwards Tracy 080625, |
| | IBM Circo DB Headhunter 1080717, |
| | LLoyd Staffing K Shipper DB Headhunter 110621, |
| | Paul Rainer IMS 080701, |
| | Personal Recruiter Connections Carnegieww Stricklin DB Headhunter 080625, |
| | Personal Recruiter Connections Circo 080716, |
| | Personal Recruiter Connections Kvederis 080716, |
| | Personal Recruiter Connections Circo 080725, |
| | Personal Recruiter Connections Rivera 080725, |
| | Personal Recruiter Connections Rowa 080801, |
| | Personal Recruiter Connections Sklenar 081021, |
| | Personal Recruiter Connections Gonzalez 110324, |
| | Personal Recruiter Connections Knox 110413, |
| | Personal Recruiter Connections Santorelli 110420, |
| | Personal Recruiter Connections McQuilkin 111015, |
| | Personal Recruiter Connections Lang 120726, |
| | Personal Recruiter Connections Melino 130213, |
| | Personal Recruiter Connections Andersen 140128, |
| | Personal Recruiter Connections DeNapoles 150210, |
| | Personal Recruiter Connections Weis 171019, |
| | Personal Recruiter Connections Pages 171205, |
| | Personal Recruiter Connections Nithin 180206, |
| | Personal Recruiter Connections Alcanzirin 181105, |
| | Personal Recruiter Connections Harte 190910, |
| | Personal Recruiter Connections Foster Peters 210518, |
| | Personal Recruiter Connections Olympia 210518, |
| | Personal Recruiter Connections Walsh 210518, |
| | Personal Recruiter Connections Foster Peters 210604, |
| | Personal Recruiter Connections Vasamshetti 220127 |

*641. RICO-3 Racketeering Violations:* **Theft and Takings - Financial Resources, Thefts of Compensation PAN 1993-1994, CNA 2002, Establish 2008**

A. 1993: PAN, CORNWELL, Ron WILLIAMS, as an employer promised and then denied compensation by using the fraudulent subterfuge of an accounts receivable factoring fraud, a loss of approximately $65,000 to $125,000 of compensation and theft of services (paragraphs 450-451, 519, 599D(i)c, 600, 601, 623, 627B, 639, 640, 644B(iv), 649F, 650B(ii), 652, 653, 683B(iv)).

B. 2002: CNA, defendant UNITED STATES' USMS cover company, which was ostensibly founded, managed, and owned by defendant FAUCI, (i) attempted to defraud Lead Plaintiff of a six-figure sum, paragraphs 471(i), 644 RICO-6), and did succeed in depriving him of the double damages and attorney's fees which would have awarded through a timely process before a King County Superior Court jury, through its protracted pattern of delays and attorney substitutions on this matter. These delaying tactics, abusing the King Couty Superior Court litigation process under state law through lies, evasions, misrepresentations, and legal maneuvers, such as the last minute withdrawal and replacement of counsel, and the series of other concurrent frauds, (ii) defendant FBI ShipNow check fraud (paragraphs 275(i), 471(ii), 650 RICO-12), and (iii) litigation expenses (ShipNow and CNA, paragraphs 471(ii), 644(v) RICO-6, CALDWELL, paragraphs 99c, 275(i), 320(f)(vi)), 683 RICO-45), combined with other fraudulent police powers color of law actions including, without limitation, (iv) defendants FBI and TSL commercial sales frauds (paragraph 673 RICO-35); which ran concurrently with (v) other hacking and the (vi) torture to suicide ideation process, paragraph 604 HEXP-1, all of which comprised simultaneous elements of defendant UNITED STATES' associated-in-fact enterprise racketeering acts, rights violations, and property rights wrecking process between 2002 and 2005, while defendant REICHERT was Sheriff of defendant KCSD, and which led to

the further human trafficking by defendant ROSENBERG in December 2005, to Boston, MA, with the assistance of SUMMERS, described at paragraph 463.

C. 2008: Defendant ESTABLISH sales commissions were not paid as due while Lead Plaintiff was employed in 2007 and 2008, despite the explicit and specific wording of the Lead Plaintiff's offer letter from ESTABLISH (paragraph 465 offer letter excerpt, LPEE pages 797-798). As forensically reverse engineered, this purposeful and deliberate fraud by defendant ESTABLISH and its key executive in the United States, defendant ROSENBERG (FBI). ROSENBERG (posing as Drumm) chose not to pay Lead Plaintiff these commissions timely, citing company cash flow issues, despite this sole US office being alleged wholly owned by a well-capitalized Swedish parent company, Establish, a four PL with global operations, with international consulting ostensibly run internationally by Haaken Andersen.

D. Defendants purposefully delayed the ESTABLISH commission payments until they had placed the Lead Plaintiff in a more financially vulnerable position after he was terminated in June 2008, and he lacked the financial resources to adequately defend his personal financial interests. ROSENBERG fraudulently leading ESTABLISH (FBI) company cash flow problems, then ROSS simply reusing to pay the full amount knowing the Lead Plaintiff's deliberately impoverished position which made litigation impossible. The actual sales commissions due by the time of Lead Plaintiff's June 2008 termination are approximately $6,600. ESTABLISH also refused to pay the one month of termination pay agreed with the executive recruiter (nearly $11,666) despite a verbal agreement at the time the offer was reviewed in a telephone call with Joe McKeon ("MRI" Executive Recruiter, Pittsburgh, PA, actually embedded FBI). According to the terminating manager, Conrad ROSS, the agreement to pay one month of severance was

not included in the company offer letter signed by ROSENBERG (William Drumm), and therefore was not due.

E. ESTABLISH provided $700 to Lead Plaintiff and claimed this as full payment of all these claims, the proximate theft by a sequence of racketeering acts of approximately $17,500 by defendant UNITED STATES (FBI, USMS) in this instance. The Lead Plaintiff lacked the funds to pay for legal services to litigate this matter and so was unable to legally pursue and collect the full amount of compensation due, legally permitted damages, and attorney's fees, which he would otherwise have received in a Court action and order.

F. These acts both reprise and repeat the compensation theft pattern also used by FBI at CNA in 2001-2002 in paragraph 644 RICO-6, and reprises, in alternate form, the SHIPNOW check fraud theft, paragraph 650 RICO-12. Further, this pattern of practice echoes the thefts by alternate means by defendant UNITED STATES which have been part of Lead Plaintiff's loss of quiet enjoyment and future value appreciation in the two residential improvements, which occurred by defendant UNITED STATES' design, in the two marital community destruction sequences in Redmond, WA and Kirkland, WA (paragraphs 425-470, Interline Exhibits 13, 14). Two subsequent residential improvements, followed closely by human trafficking events, in Cliffside Park, NJ, at paragraph 642 RICO-4, and Ramsey, NJ at paragraph 523, and have also deprived the Lead Plaintiff of quiet enjoyment of improvements made at personal expense, and not fully compensated by defendant UNITED STATES as actual landlord in its cover entity owned "safe" houses.

G. These schemes and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES'

involuntary servitude over Lead Plaintiff, and all the elements thereof including, without

limitation, illegal BRMT development and deployment; human medical experimentation without

consent, to and including torture and suicide ideations; systematic constitutional rights

violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are

incorporated herein by reference including, without limitation, paragraph 599, with particular

attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state

secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content in

searchable indexes and lists at LPEE Compendium at pages 934-1075. Evidentiary materials

related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 425-470, 523, 642, 650 RICO-4, 12; 639-648 RICO-1-10 generally |
| Appendix 2 paragraphs: | 1-031, 1-032 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0094, 2-0129 through 2-0150 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al; pages 8351-8355, 10311-10364, LPEEV65-6, 7 |
| Emails and documents by topic and date, also located in LPEE: | ESTABLISH Drumm post wedding 253pm 080630, ESTABLISH Meeks re closeout issues 080630, ESTABLISH ROSS re CWP stiff and closeout 080702, ESTABLISH ROSS re CWP stiff and closeout 080709, ESTABLISH ROSS Demand Ltr 080714, ESTABLISH Meeks New Ramsey Address Move in date 110331 |

*642. RICO-4 Racketeering Violations:* **Theft and Takings - Financial Resources, Thefts of Labor And Materials, Cliffside Park Apartment Renovations 2008**

A. After Lead Plaintiff was terminated from defendant ESTABLISH in June 2008, his Cliffside Park landlord (CHALOM, USMS) requested he renovate and improve his top floor apartment in Cliffside Park, NJ several months after he began collecting unemployment benefits (paragraph 472-474). To avoid losing his eligibility for unemployment payments (and being entrapped for collecting unemployment benefits while employed, which tradecraft pattern echoed the alleged AUSTIN double dipping allegations from his alleged lay-off at Boeing which arose while he worked at CNA), Lead Plaintiff agreed to accept the work as required by state law and stopped his unemployment compensation benefits while he worked on this project. When the project was completed, he presented defendant CHALOM the bill for equipment rental, tools, materials, supplies, and for his labor at $17.00 per hour, a total of approximately $16,000. Defendant CHALOM (USMS) then informed Lead Plaintiff that New Jersey law requires written contracts for all such agreements when the cost totals more than $5,000. Lead Plaintiff was forced to settle for $5,200, less than the amount of out of pocket costs he had incurred. He had continued his professional job search for alternate employment throughout this period and reapplied for resumption of unemployment compensation on completion of the project which cost all his labor and significant out-of-pocket, which exhausted his $10,000 limit Bank of America credit card.

B. As forensically reverse engineered, as in similar prior sequences driven and orchestrated by defendant UNITED STATES and its co-conspirators, Lead Plaintiff was again placed in a very precarious financial position while unemployed, with no financial reserves after only ten months of employment in this fraudulent VP job at defendant ESTABLISH and prior homelessness, exactly where defendant UNITED STATES and it co-conspirators seek to keep

him as they have for years already – and will tomorrow and the next day – through the
preparation of this Complaint.

C. This scheme and conspiracy required and consumed the time and financial resources
of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running
schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude
over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT
development and deployment; illegal human subject medical experimentation without consent,
to and including torture and suicide ideations; systematic constitutional rights violations; and
racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated
herein by reference including, without limitation, paragraph 599, with particular attention
directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets
privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).
Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical
confirming information directly from these institutional and individual defendants and, among
some who presented at the time as family members, their children. See other selected relevant
content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages
934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.
Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 472-474; 639-648 RICO-1-10 generally |
| Appendix 2 paragraphs: | 1-032 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0141, 2-0157 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 10305-10307, LPEEV65-6, 7 |
| Emails and documents by topic and date, also located in LPEE: | CHALOM re improvements billing 081229, CHALOM Final rent pymt 100913 |

**643. *RICO-5 Racketeering Violations:* Theft and Takings - Financial Resources, Deprivation of Benefits, Kidnapping, and Involuntary Commitment 2008-2011**

A. As a result of incurring renovation and improvement out-of-pocket expenses at Cliffside Park, NJ apartment, as related in paragraph 642 RICO-4, while his unemployment compensation had been suspended, by using his available credit to pay for the project costs and for daily food and other necessities, Lead Plaintiff's access to the credit he had reestablished in 2007 and 2008 was eliminated yet again, and his credit rating was again destroyed in this process. His $10,000 Bank of America credit card was completely exhausted by advances to pay for the renovation project.

B. When he missed a payment on the credit card (likely actually issued by a defendant USMS or other federal defendant captive bank, not the actual Bank of America commonly used by the general public, LPEEV65-6, 7), while awaiting resumption of unemployment benefits, the credit card insurer (likely also a captive of federal defendants and which had removed funds by its premium charges) immediately cancelled his credit insurance before any claim could be made. The credit card then went into default as he was forced to choose eating and paying rent over making his credit card payment, all while waiting the further two weeks for unemployment compensation to be resumed.

C. In May and June 2010, Lead Plaintiff composed and filed a US District Court Complaint in Newark, NJ on June 23, 2010, naming USSS and FBI as lead defendants. Lead Plaintiff did not then remotely understand the full scope of the associated-in-fact enterprise and conspiracy, and presumed those parties may have been the primary perpetrators, and lacked the specific positive identifications which he has developed since beginning forensic analysis in mid-2021 and has been able to develop since September 2023, which served to highlight the full

scope of events, the related institutional defendants' operational tradecraft signatures, and facilitated specific positive identifications of individual defendants who clearly linked specific institutional defendants to specific acts, violations, and injuries.

D. The June 2010 federal court filing, docketed June 23 was swiftly followed in July 2010 by a certified letter from his landlord, defendant CHALOM (USMS), terminating his month to month apartment rental (paragraph 472-474). The Cliffside Park US Post Office did not allow him to collect this certified letter due to an alleged signature mismatch between the addressee name and his electronic signature at the point of collection, a clerk's workstation in the Post Office in July 2010, and no first class copy was sent, so the notice to vacate was never received.

E. Defendant CHALOM knocked at his apartment door on September 1, 2010 demanding he leave the premises. He overstayed his rental period to remain in his renovated Cliffside Park, NJ until October 1, 2010 when, with no financial resources or credit, he became homeless again. Duress, as a preferred method of fraudulent concealment was being reintroduced yet again by defendant UNITED STATES, with co-conspirators NJSP, BERGEN COUNTY, and BERGEN SHERIFF, as related below.

F. Lead Plaintiff took one rolling suitcase, donating his suits and most other clothing, leaving all other possessions – apartment furnishing, household equipment, and construction tools, behind. He boarded a New Jersey Transit bus to the Bergen County homeless shelter in Hackensack, NJ. Upon arrival, he was informed by BERGEN COUNTY shelter personnel that the shelter was full and was redirected by that person to the street address of an alleged nightly shelter a few blocks away. There was no shelter at that address, only older family residences on that street, and no such street address number between those residences.

G. Lead Plaintiff then walked to the Hackensack, NJ Police station and waited for about

20-30 minutes for a not particularly busy desk sergeant to respond. He was directed and walked

to a South Hackensack, NJ motel about 2 miles away. One night in this low budget motel

exhausted his remaining funds, and he called 911 in distress the morning of October 2, 2010. A

South Hackensack Police officer and an ambulance responded. Lead Plaintiff was interviewed,

loaded into the ambulance and, without explanation, transported to an unfamiliar hospital

location (Bergen Regional Medical Center in Paramus, NJ), was briefly examined, and waited

about 12 hours in the emergency room.

H. Unbeknownst to Lead Plaintiff, an emergency involuntary commitment hearing was

allegedly held with no contact with either his appointed legal counsel before the hearing or with

the Court at the time of the hearing. This alleged process actually constituted a kidnapping

offense, as civil due process rights related to the involuntary commitment hearing, if one

actually transpired, were systematically violated. These rights, which are unconditionally

guaranteed to any subject of such a hearing under New Jersey statutes and case law *In Re R.S.,*

*263 N.J. Super.* 428, 432 (App. Div. 1993), are summarized below:

New Jersey courts have held that because of the important liberty interests in being free from unnecessary commitment, all procedural and substantive safeguards must be followed closely. (See In re R.S., 263 N.J. Super. 428, 432 (App. Div. 1993)).

- You have the right to be present at your commitment hearing. (See NJSA § 30:4-27.14(b) and NJ R. 4:74-7(e)).
- You have the right to an attorney. (See NJSA § 30:4-27.12(d) and NJ R. 4:74-7(e)).
- You have the right to an in camera hearing, which means that there is not an audience. (See NJSA § 30:4-27.14(e)). However, you may request that your family attend and testify on your behalf at your hearing. (See NJSA § 30:4-27.13(c)).
- The decision of the judge must be supported by the testimony of a psychiatrist on your treatment team. (See NJ R. 4:74-7(e).
- Other members of the treatment team may also testify at the hearing. (See NJSA § 30:4-27.13(b) and NJ R. 4:74-7(e)).
- You and your attorney have the right to present evidence and cross-examine witnesses. (See NJSA § 30:4-27.14 and NJ R. 4:74-7(e)).
- You have the right to testify at your hearing. (See NJ R. 4:74-7(e)).
- At the conclusion of the hearing, the judge will sign an order. (See NJSA § 30:4-27.15 and NJ R. 4:74-7(h)). This decision may order your discharge, order your continued involuntary, or convert your status to Conditional Extension Pending Placement (CEPP). The special legal status of CEPP is discussed here.

Source: Website_Involuntary_Patients_Legal-Rights_2.23.2021.pdf located at disabilityrightsnj.org

The involuntary commitment in Bergen Regional Medical Center from October 2, 2010 to

March 31, 2011 by these defendants violated the Lead Plaintiff's civil rights as follows:

(i) It is presently unknown if there even was an actual court hearing on October

2, 2010, the day of the involuntary commitment, as Lead Plaintiff remained in

the hospital emergency room for about 12 hours while a uniformed police

officer was present outside his examining room whereupon, with no

explanation, he was taken in a wheelchair with his meager belongings to a

locked ward, where his belongings were searched and inventoried,

(ii) Lead Plaintiff had no awareness of any court proceeding at any time, and was

not present at the alleged hearing,

(iii) The alleged legal representative was never in the presence of the Lead

Plaintiff on the day of the alleged hearing,

(iv) no evidence was allowed to be presented,

(v) there was no cross-examination of anyone,

(vi) there was no right to testify at the alleged hearing which Lead Plaintiff did not attend.

Lead Plaintiff was informed in a personal meeting with his alleged legal counsel about 5 days (around October 7, 2010) after the allegedly held hearing that he had been ordered involuntarily committed for 14 days.

I. A few days into this involuntary commitment, after refusing medication because the nurse would not tell him the names or the effects of the medications being administered orally, he was placed in a padded cell overnight and forcibly medicated by three large male orderlies with an injection in the buttocks. During this six month confinement period, he was transferred among various wards three or four times, experienced a violent indirect threat, experienced indirect physical violence, and a suicide trauma trigger attempt was perpetrated, had limited access to indoor exercise facilities intermittently and had virtually no outdoor access, which outdoor access consisted of a maximum of two minutes less than once each week as he walked from the main entrance to the behavioral facility entrance at the hospital. If in criminal confinement, this would constitute a clear violation of the *Eighth* Amendment prohibition on cruel and unusual punishment.

J. Since NJ state law states that a hospital may only release admitted patients to safe housing, and he had no access to housing or funds that he was then aware of, had been informed there were no shelter beds available upon this specific inquiry of the floor social worker Sinisi,

he "elected" to remain, and was unable to leave the locked psychiatric wards of his confinement until March 31, 2011, about six months later. In actual fact, rehousing was already immediately available through Advance Housing (Ramsey, NJ where he was eventually relocated on March 31, 2011) on the day he was admitted, had those confining him permitted him to access this housing.

K. As forensically reverse engineered, the "voluntary decision," by the Lead Plaintiff to dismiss the federal civil rights litigation was made under extreme duress on December 15, 2010 while confined in the locked ward, and after a specific indirect threat of an indefinite civil confinement period in the hospital ward was described by an undercover officer who was posing as a patient on the ward, which furthered the stress of the direct and specific duress which had already and was continuing to be imposed throughout the entire sequence of defendants' illegal police powers actions in their extreme violations of civil rights including, without limitation, multiple periods of extreme psychological and physical torture, which had began in Washington state in 2002 (paragraphs 604-606 HEXP-1-3).

L. The District of New Jersey federal court took absolutely no action of any kind on the June 2010 *in forma pauperis* complaint, and the complaint was never served by USMS as required by law on any of the defendants. Once the federal court received the December 15, 2010 duress letter from the Lead Plaintiff, it then ordered the "voluntary" dismissal of the complaint on January 7, 2001. The rehousing process began very soon thereafter with an interview in late January or early February, then two overnight visits in February/March, and rehousing was completed on March 31, 2011, with a series of five interposed USMS minders posing as Advance Housing counselors thereafter.

M. These acts were perpetrated as further elements of the ongoing conspiracy which was
and is an associated-in-fact enterprise pattern of racketeering acts including, without limitation,
defendants' (i) intentional starve outs at various times and locations described herein, (ii) thefts
of resources, (iii) psychological and physical torture, and (iv) deprivation of benefits under law
including, without limitation, (a) the denial of shelter, (b) misdirection to a non-existent
homeless shelter on October 1, 2010, and (c) the subsequent systematic denial of civil rights and
civil due process rights in ordering, or allegedly ordering, without proper civil adjudication, this
six month period of confinement of the Lead Plaintiff in Bergen Regional Medical Center, when
rehousing resources (through Advance Housing in Ramsey, NJ where he was eventually
relocated on March 30, 2011) had been vacant and available from at least the first day he was
involuntarily committed to Bergen Regional Medical Center, so he could have been promptly
rehoused within days, rather than months later, under the alleged court findings which led to his
involuntary commitment (kidnapping and coerced confinement). Defendants, led by defendant
UNITED STATES, in this on-going conspiracy against rights and long-running associated-in-
fact enterprise pattern of racketeering acts, once again acted as, and are clearly shown to be,
kidnappers and human traffickers of the Lead Plaintiff as their involuntary servant under duress,
while they sustained their illegal abuse of the state's secrets privilege, among their other
violations of rights and law.

N. This scheme and conspiracy required and consumed the time and financial resources
of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running
schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude
over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT
development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 472-474, 642 RICO-4; 639-648 RICO-1-10 generally |
| Appendix 2 paragraphs: | 1-032 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0141, 2-0157 through 2-0164 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 10259-10301, 10305-10310, 10311-10364, 10434-10444, LPEEV65-6, 7 |
| Emails and documents by topic and date, also located in LPEE: | Bergen Regional Sinisi re resume and cover ltr 101230 |

### 644. *RICO-6 Racketeering Violations:* Theft and Takings - Financial Resources, Forced Labor Imposed Litigation Expenses 1993-2022

A. As forensically reverse engineered, defendant UNITED STATES has used a variety of disguised methods to perpetuate involuntary servitude in forced labor including, without limitation, the imposition of litigation expenses, in violation of 18 U.S.C. § 1589(3),

B. Litigation, including compromises of funds legally due and legal expenses and fees, as imposed by defendant UNITED STATES in violation of 18 U.S.C. § 1589(3), was also required to attempt recovery of stolen and/or promised funds and compensation in both personal matters and in closely held commercial enterprises, all while engaged in interstate commerce and, in some case, on federally funded projects:

(i) 1990: Alliance for a stolen project account receivable payment of approximately $165,000, ostensibly to Steve's Maintenance from the Bates Vocational-Technical Institute project in Tacoma, WA, with eventual recovery of about $82,000, a loss of $83,000, plus legal fees paid;

(ii) 1993: Forced personal bankruptcy litigation expenses resulting from the deliberate fraudulent financing by CORNWELL, Shearing, Wozow (acting through Pacific Financial Services, Bellevue, WA, paragraph 448);

(iii) 1993: LaserAccess (formerly LazerSoft when run by Lead Plaintiff) for recovery of $40,000 of post-merger sales bonuses awarded in 1989 with an eventual recovery of $22,000 coming from defendant Stephen M. WATERS rather than the entity itself, a loss of $18,000 plus legal fees paid;

(iv) 1993: PAN, CORNWELL, Ron WILLIAMS, as an employer promised and then denied compensation by using the fraudulent subterfuge of accounts receivable factoring fraud, a loss of approximately $65,000 to $125,000;

(v) 1994: Forced to pay $2,200 of legal fees after leaving P.A.N. Environmental Services (PAN) by a supposed freelancer seeking payment for an unpaid PAN bill for services which had to be defended to avoid a default judgment;

(vi) 2003-2004: CNA Industrial Engineering, another six-figure compensation theft where there was no valid legal basis for the arguments being presented and legal maneuvering including a change of attorneys and failures to comply with court deadlines used to delay the matter while starving the Lead Plaintiff's financial resources (as he was working unwittingly with PRAY as fraudulently embedded defendant UNITED STATES co-owner of Allegent, LLC, and in 2004 had engaged defendant CALDWELL fraudulently misrepresenting herself as a Seed & Berry intellectual property attorney to pursue the ShipNow intellectual property matter for Allegent), so as to avoid the double damages (approximately $250,000 of compensation if fully recovered) and attorney's fees recovery allowed under Washington state law for this kind of compensation theft (see LPEE pages 10467-10527), while costing $37,000 in legal fees out of pocket,

(vii)    2004: Allegent, LLC dba Performa, for $82,000 of bad checks passed to Performa by a customer, actually a defendant FBI entity ShipNow (see LPEE pages 10445-10471),

(viii)    2019: defendant DEAN T. SMITH (UNITED STATES, FBI) filed litigation in the Eastern District of California (19-cv-01918, which see on Pacer.gov) which further extended Lead Plaintiff's involuntary servitude and functionally destroyed the interstate commerce startup Winnett Perico, Inc. (Winnett), and its subsidiaries. The federal court case filed lacked a sound legal basis for the claims made and was based on false representations with virtually no due diligence prior to filing by attorney Evers, all in furtherance of defendant UNITED STATES and co-conspirators associated-in-fact enterprise pattern of racketeering acts and its on-going violations of, without limitation, 18 U.S.C. § 1589(3), forced labor, abuse of legal process (paragraph 626 RGTS-6). The

*Smith v. Winnett/Brewer* et al case in 19-cv-01918 was voluntarily dismissed without prejudice in April 2021, so it effectively continues to hang over the Lead Plaintiff despite the false original premise for the claims being made in the Complaint and is clear abuse of the legal process by defendant UNITED STATES, FBI, DEAN T. SMITH. See Interline Exhibits 6, 11, LPEE pages 140 et al, 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9925, 9926, 9997, 10004.

C. This forced litigation abuse pattern of racketeering acts by defendants is part of a very broad scope and long running pattern of defendants prior and continuing bad faith acts toward Lead Plaintiff and enterprises he has and does own or control in interstate commerce, which include thefts by various means, including, without limitation, uncollectible and disputed accounts receivable, bad checks, compensation theft, and related litigation recounted at paragraphs 629 RGTS-9, 640-645, 650, 655, 680-693 RICO-2 through RICO-7, RICO-12, RICO-17, RICO-42 through RICO-54. This series of "legal" techniques, used by defendant UNITED STATES and its officers, agents, and confidential informants, abuses the legal system to induce delay, expense, and mental and financial stress, while "dirtying up" the Lead Plaintiff as it does for other similarly situated plaintiffs.

D. Defendant FBI also deprived Lead Plaintiff's private enterprise of both (i) access to private investors through its co-ownership of Alliance, and (ii) of SBA government benefits to small businesses, for which Alliance qualified under SBA's contractor bonding program as FBI defrauded Alliance and Lead Plaintiff in 1990-1993 as (a) it destroyed the company, and (b) placed Lead Plaintiff in personal bankruptcy, using (c) a fraudulent cross-border financing through CORNWELL (CIA, paragraph 652 RICO-14). All these acts, violations, and injuries occurred while the Lead Plaintiff was under the unwitting coercive control and duress imposed

by his human traffickers, defendant UNITED STATES including, without limitation, FBI, CIA, ARMY, BURNS, ROSENBERG, in circumstances not reflecting the full market value of the Lead Plaintiff's professional services, as he was then and still an involuntary servant from 1968. These amounts are not adjusted for inflation or interest due, nor for consequential damages including, without limitation, the loss of other professional and entrepreneurial opportunities, the repeated loss of real property and financial assets, and appreciation of those assets over time due to interest compounding and real property appreciation.

E. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 6, 11 |
|---|---|
| Complaint paragraphs: | 626 RGTS-6, 629 RGTS-9, 640-645, 650, 655, 680-693 RICO-2 through RICO-7, RICO-12, RICO-17, RICO-42 through RICO-54, 652 RICO-14; 639-648 RICO-1-10 generally |
| Appendix 2 paragraphs: | |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0047, 2-0056, 2-0057, 2-0110, 2-0111, 2-0113, 2-0114, 2-0134, 2-0185, 2-0186 |
| LPEE pages (see technical note on page numbering at paragraph 230): | A. 140 et al, 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9925, 9926, 9997, 10004<br><br>B(v)  10445-10471<br><br>B(vi) 10467-10527 |
| Emails and documents by topic and date, also located in LPEE: | COSTCO GC reply to verficiation request 211102, D Brewer reply to DOJ OIG decline ltr 220325 Performa (Allegent dba) v ShipNow 220818 040210.pdf 040713 Allegent ShipNow Confirmation of Joinder 040713.pdf 040713 Allegent ShipNow Dismissal With Prejudice 040713.pdf 040713 Brewer Allegent ShipNow Docket Sheet 040713.pdf 040713 Brewer ShipNow Amended Complaint 040713.pdf 040713 Brewer ShipNow Disclosure 040713.pdf 040713 Brewer ShipNow Notice of Appearance 040713.pdf 10445-10467 030122 Brewer CNA Brewer Counsel LARSON 030122.pdf 030122 Brewer CNA CNA Motion for Summary Judgment 030122.pdf 030122 Brewer CNA Decl Amount Due etc 030122.pdf 10468-10527 030122 Brewer CNA Docket Sheet 030122.pdf 030122 Brewer CNA Plaintiff Brewer Ans 030122.pdf 030122 Brewer CNA Summons and Complaint 030122.pdf Smith 100K Check 1of2 150730.pdf Smith 100K Check 2oof2 150730.pdf Smith 100K Subscription Agreement SKMBT_C36415072911310 DB Signed 150729.pdf Smith Litigation Halt Proposal to resume company operations 200106.pdf Smith Litigation SULLIVAN Winnett - WCC Letter Respond to Evers-DSmith 190621.pdf |

| | Smith Litigation SULLIVAN Winnett - WCC Letter to Evers - Dean Smith III 190723.pdf |
| | Smith Litigation Winnett - WCC Letter Responding to Evers - Dean Smith II 190710.pdf |
| | Smith Note 5K 190201.pdf |
| | Smith Loan pays CORNHUSKER Retainer 10125 |
| | Smith $30K Loan 10157 |
| | Smith $5K loan 10164 |
| | Smith Paid COSTCO Trip Hotel Reservation 10165-10171 |
| | Evers Ltr to R. SULLIVAN 160925.pdf |

*645. RICO-7 Racketeering Violations:* **Theft and Takings - Financial Resources, Shadow Banking System Thefts And Manipulations**

A. As forensically reverse engineered, during the late 1980s into the 1990s, as debit cards came into widespread use, defendant UNITED STATES spoofed Washington Mutual Bank and orchestrated a cascade of thousands of dollars of insufficient funds charges against Lead Plaintiff's DDA checking account by imposing a minimum $25 transaction amount to his DDA account each time he used his debit card, even when the actual transaction was much less. This cost the Lead Plaintiff in the vicinity of $5,000 for insufficient funds charges over several years at a time when his non-market compensation as an involuntary servant to the UNITED STATES at LazerSoft was in the range of $40,000 per year and zero at Alliance after 4-6 months at about $65,000 per year. This is part of a pattern of similar acts, violations, and injuries by defendant UNITED STATES directed at Lead Plaintiff and others similarly situated.

B. Defendant UNITED STATES' control of Lead Plaintiff's finances was demonstrated yet again by their hacking of the ACH system, or their complete control of Lead Plaintiff's financial life through use of a completely controlled financial system in their hack or their contrivance to appear as a hack. An $8 ACH payment to CapitalOne from Lead Plaintiff's personal checking account failed as a result of their hack or some other fraudulent contrivance of

defendants and resulted in a $20 late fee. A recent BRMT hijacking of Lead Plaintiff resulted in a cascade of late fees on a Taz Visa credit card sequence.

C. Defendant UNITED STATES has and does routinely impound Lead Plaintiff's funds and credit availability using double-billing and overbilling for goods and services, as well as order fulfillment shortages, delivery of wrongly sized items, and hacked electronic devices requiring returns to the vendor, to frustrate rights, to constrain available financial resources, and to limit financial flexibility and the ability of Lead Plaintiff to travel, entertain, and purchase goods and services at certain times (paragraph 646 RICO-8, and in evidence blocked by defendant UNITED STATES related to a 2020 trip to New Orleans, LA with defendant GIA, paragraph 613 HEXP-10). This complements defendants' outright illegal conversions to the benefit of themselves or to others by alternate means including, without limitation, contrived employment and unemployment, business losses, destroyed marital communities, alternate form thefts and seizures of real and personal property, thefts of financial assets, and imposed expenses documented throughout the RICO series of offenses and injuries herein.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 613 HEXP-10, 646 RICO-8; 639-648 RICO-1-10 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0047, 2-0054, 2-0115, 2-0202, 2-0207 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 609-612, LPEEV65-6, 7 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

***Racketeering – Personal Color of Law Entrapments***

*646. RICO-8 Racketeering Violations:* **Theft and Takings - Credit and Credit Access Hacks**

A. As forensically reverse engineered, defendant UNITED STATES' control of Lead Plaintiff's finances has been demonstrated repeatedly in its continuing control of his credit and credit access. Defendants have and do routinely impound Lead Plaintiff's funds and credit availability using:

(i) posting delays when crediting available funds,

(ii) double billing to reduce available credit,

(ii) hacking to prevent credit availability online.

These illegal manipulations have and do constrain available financial resources and limit

financial flexibility and the ability of Lead Plaintiff to travel, entertain, and purchase goods and

services at certain times.

B. These particular credit and collections accounts frauds and swindles are an element of

defendants' broader scheme to use uncollected credit card account balances as part of a scheme

to generate some sort of tax liability which could be coordinated with other entrapment attempts

including, without limitation, paragraphs 647-648 RICO-9, 10. Non-payment of these collection

accounts by Lead Plaintiff would lead to taxable income from unpaid debts. This specific

entrapment combination of unpaid collection accounts, with the $6,000 cash loans from

MAGGARD (FBI), and any forced or voluntary default such as would occur if Lead Plaintiff did

not make an annual interest payment on the $6,000 loan from MAGGARD (FBI), which

combination could then be used in an effort to render the Lead Plaintiff guilty of tax fraud for

failure to declare income resulting from these debt extinguishments.

C. Lead Plaintiff could then be deprived of certain federal government benefits

including, without limitation, the Section 8 housing voucher he must use to maintain stable

housing. This would again limit his ability to pursue litigation against these defendants, just as

they were able to accomplish by imposing extreme duress on Lead Plaintiff soon after his June

23, 2010 filing in Newark federal district court when they rendered him homeless and

orchestrated the involuntary commitment related at paragraphs 512-522. This entire complex

scheme in 2023 arose in the months after the Lead Plaintiff mentioned such a scheme to the US

Attorney for the Southern District of New York in a hand delivered letter on July 18, 2022

(LPEE pages 542-544).

D. This sequence of events, pattern of practice, and its application in this timeframe, all demonstrate defendants including, without limitation, defendant FBI's clear awareness of their own past pattern of corrupted practice in their operation of their associated-in-fact enterprise pattern of racketeering acts, continued surveillance of all Lead Plaintiff's activities and systematic rights violations, and confirm defendants' long-running patterns of fraudulent concealment, racketeering acts, *mens rea,* and consciousness of guilt.

E. This was another step in an evolving complex financial entrapment scheme primarily perpetrated by defendant UNITED STATES (FBI, USMS, CIA) which extends to other subsequently dated RICO counts herein at paragraphs 647-648 RICO-9, 10.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
| --- | --- |
| Complaint paragraphs: | 512-522, 647-648 RICO-9, 10; 639-648 RICO-1-10 generally |
| Appendix 2 paragraphs: | 1-067 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0047, 2-0054, 2-0055, 2-0056, 2-0068, 2-0122, 2-0195 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 542-547, 10256-10258, 11708-11726 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 647. RICO-9 Racketeering Violations: Illegal Searches, Hacking, and Harassing– Tax Software Hack EITC Entrapment Attempt 2021, 2022

A. As forensically reverse engineered, defendant UNITED STATES' control of Lead

Plaintiff's finances was demonstrated yet again by their hacking of TurboTax tax filing software

so that it requires earned income to complete the filing (LPEEV65-12). Normally, a Social

Security recipient with no taxable income could file without the need to add any taxable income

to their filing. Lead Plaintiff worked around this hack by reporting $1 of earned income for 2021

and 2022 so the tax returns could be filed timely. There was no resultant problem from this

method of filing in 2021. In 2022, this same filing technique generated an EITC check from the

State of New Jersey, which defendant FBI (UNITED STATES) clearly intended would not be

returned to the State of New Jersey as required by law (since there was no actual earned

income). Lead Plaintiff returned the EITC check with a note to the NJ state tax investigators, see

LPEE pages 11704-11707.

B. This was another step in an evolving complex financial entrapment scheme primarily perpetrated by defendant UNITED STATES (FBI, USMS, CIA) which subsequently extended to RICO-10. This is the next step in a series of recent transparent attempts in 2021-2023 by defendant FBI (UNITED STATES) to entrap for improper receipt of EITC refund, which would then cause the loss of Lead Plaintiff's federally funded, state administered Section 8 housing voucher rent subsidy and force displacement of the Lead Plaintiff from his current Edgewater, NJ apartment. This pattern of practice is completely consistent with these police powers defendants' long running pattern of practice which has included prior losses of residence and related personal property to and including homelessness (involuntary servitude and forced labor).

C. This Section 8 voucher loss would have the practical effect of making civil rights litigation over this fraudulently concealed illegal program of BRMT, rights, and racketeering acts, violations, and injuries practically impossible, as these defendants have done in imposing duress to complement other methods of fraudulent concealment in the past including, without limitation, in December 2005 (within 120 days following a FTCA complaint letter) and October 2010 (within 100 days following a federal district court at Newark complaint).

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 13, 14 |
|---|---|
| Complaint paragraphs: | 639-648 RICO-1-10 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | 11704-11707, LPEEV65-9, 12 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 648. *RICO-10 Racketeering Violations:* SOLE SOURCE Fraudulent Financing with Ironwood Tax Loss Self-Exculpatory Offset Attempt 2018-2023

A. As forensically reverse engineered, Lead Plaintiff sent a series of email solicitations in

2018 sourced from a list in a Los Angeles Times business news article, now known as likely a

fraudulent planted story on a spoofed LA Times website, seeking business financing. SOLE

SOURCE Capital responded and introduced Dewey TURNER, a principal, from this defendant

FBI cover operation actually run from Manhattan, New York. A few weeks later, TURNER and

three other agents, one known as Bradford ROSSI, ostensibly visiting from Los Angeles,

requested a meeting the afternoon of January 9, 2018 on very short notice at the St. Regis Hotel
bar in New York City. ROSSI, as the senior most executive at SOLE SOURCE, verbally
promised a multi-million dollar financing at that meeting. SOLE SOURCE, acting through
emails and a January 23, 2018 phone call from Dewey TURNER, then reneged to the Lead
Plaintiff's company in 2018 (see paragraph 337). This was part of the pattern of fraudulent
financing commitments which have become evident to Lead Plaintiff over time with the benefit
of forensic reverse engineering from mid-2021. It is an element of defendant UNITED
STATES' pattern of involuntary servitude racketeering acts which has and does continue from
the 1970s forward to this day.

B. TURNER mentioned a visit to an operation in west Texas in one of his calls to Lead
Plaintiff sometime in the following months (paragraph 624 RGTS-4). In searching for a CFO to
support the originally promised financing or a replacement financing, Lead Plaintiff had also
come across CFO SEARCH, a specialized senior financial officer executive search firm with a
"partner" who did or does work from a residential address in Lubbock, Texas. The partner,
known as Michael MAGGARD, located a CFO, an Egyptian national working in the United
States, for Sheldon Beef, but company financing, originally promised by SOLE SOURCE had
been withdrawn as above. and a search for other financing was still underway (never to be
completed due to on-going interferences with interstate commerce by police powers defendants
and their on-going pattern of involuntary servitude, illegal BRMT abuses, rights violations, and
racketeering acts, violations, and injuries). See paragraph 624 RGTS-4.

C. At the time, Lead Plaintiff had not connected these defendant FBI dots between SOLE
SOURCE and the search firm CFO SEARCH, despite TURNER's prior phone hint as related by
his casual mention of a trip to a potential company investment prospect in West Texas. (This is

now known from forensic analysis and evaluation of direct prior experiences reviewed in that

analysis as an common tradecraft practice used by defendant FBI for in-process operational

security checks and is therefore also useful as a breadcrumb for forensic backtracking of their

operations by Lead Plaintiff.) The CFO SEARCH partner, defendant Michael MAGGARD, an

FBI agent assigned to the Amarillo field office, had coordinated this overall operation with New

York field office agent known as principal Dewey TURNER, SOLE SOURCE. This is a step in

an evolving complex financial entrapment scheme primarily perpetrated by defendant UNITED

STATES (FBI, USMS, CIA) which extends to other subsequently dated RICO counts herein.

D. MAGGARD then loaned $6,000 to Lead Plaintiff's company Gannett Peak Ranch

(GPR, Inc., incorporated in Oregon) for web development, and another $6,000 to Lead Plaintiff

personally which was used to try to improve his credit score by lowering credit utilization and

payment defaults, so Lead Plaintiff would be able to co-sign for a six figure loan for Gannett

Peak Ranch. As previously experienced, this good faith interstate commerce Gannett Peak

Ranch project also went wrong - the web site was never completed by ENVOTEC (almost

completed, saying they just needed a little more time and money, yet again as with other prior

software projects). Nonetheless, the $6,000 personal loan was still due from Lead Plaintiff to

MAGGARD, the $6,000 business loan was still due, and there was no offsetting revenue or

income. This is a virtually identical repeat of the pattern of racketeering act frauds experienced

repeatedly in other interstate commerce private business projects since Sheldon-Lee Associates

in 1984 with THORPE through this 2022 project with MAGGARD as perpetrated by defendant

UNITED STATES and its co-conspirators. See paragraph 650 RICO-12.

E. Defendant UNITED STATES then cooked up a new entrapment scheme to get this

$6,000 loan off defendant FBI records. A release form for a Whistler, British Columbia, Canada

condo relinquished to Lead Plaintiff's second spouse in their 2005 divorce mysteriously showed up beginning in February 2023 in the approximate amount of $6,000 a nearly perfect offset for the $6,000 MAGGARD personal loan (if defaulted) for tax purposes.

F. The email sent by the alleged condo association representative requesting the release stated there were no underlying records which support this timeshare on either the condo association or the British Columbia timeshare interest register (Ironwood, LPEEV65-9). While a British Columbia notary firm was used the release, this was a transparent attempt to secure a loan default against defendant FBI agency funds by FBI. Defendant FBI would then hold this matter open looking for another offense to add, or until the statute of limitations and/or internal record keeping requirements had run their course, so this fraudulent loan record is lost to the evidence destruction cycle related to closed "investigations," thus disappearing the direct evidence of defendant FBI's own direct repeated direct interference in the Lead Plaintiff's financial affairs and business in interstate commerce, effectively another attempt to transfer its culpability for its own participation in this associated-in-fact enterprise pattern of racketeering acts to the Lead Plaintiff. See LPEE page 11641 where Lead Plaintiff explicitly was finally able to connect this illicit defendant FBI train of events.

G. This was another step in an evolving complex financial entrapment scheme primarily perpetrated by defendant UNITED STATES (FBI, USMS, CIA) which extended through other previously dated RICO counts herein. Defendant UNITED STATES has a long history of these patterns of practices, including scofflaw conduct and repeated evidence destruction cycles using human trafficking, technical hacks, check fraud, among other illegal techniques in bad faith acts against Lead Plaintiff and his business efforts in interstate commerce (at all paragraphs in this Complaint).

H. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 337, 624 RGTS-4, 650 RICO-12; 639-648 RICO-1-10 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | 11641, LPEEV65-8 |
| Emails and documents by topic and date, also located in LPEE: | MAGGARD TX re ABDELSAYED 200722, MAGGARD TX re ABDELSAYED start date 200817, MAGGARD TX status 201015, |

MAGGARD re Korea Angus pgm etc 210118,
MAGGARD re 26 Ranch and ABDELSAYED 210221,
MAGGARD on ABDELSAYED positive connect 210222,
MAGGARD re ABDELSAYED 210302,
MAGGARD re ABDELSAYED to Egypt 210304,
MAGGARD on loan docs PFS need 210306,
MAGGARD re gty and PFS 210307,
MAGGARD re Big Sandy BAFO 210322,
MAGGARD re Big Sandy reprise 210505,
MAGGARD re investors and Big Sandy 210519,
MAGGARD re Lake County LOI 210701,
MAGGARD re Lake County 210702,
MAGGARD re 500k loan 210703,
MAGGARD enroute Lake County 210707,
MAGGARD re Lake County enroute 210707,
MAGGARD re Lake Copunty tour and plus minus issues 210709,
MAGGARD re Lake County and pers FICo improvement 210715,
MAGGARD re Lake County 210719,
MAGGARD Loan to DB improving FICO 210721,
MAGGARD re Lake County 3559 LOI 210721,
MAGGARD on Lake County Fin snags 210725,
MAGGARD on WMT Wagyu comp price and other status 210804,
MAGGARD re startup sequencing plan 210816,
MAGGARD re status web dev sales 210816,
MAGGARD re add subs WEFUNDER 210817,
MAGGARD re GAAP fin need 210818,
MAGGARD re mkt gap 210818,
MAGGARD 5k GPR loan 210826,
MAGGARD re 4500 loan recvd 210826,
MAGGARD Revised GPR Startup Plan 210830,
MAGGARD re DB overadvance 210901,
MAGGARD re loan not pursued 210903,
MAGGARD re 26k loan 210909,
MAGGARD re ICPO LOI-FM-LZ-210913,
MAGGARD re Terminating Trader efforts 210916,
MAGGARD re status 211104,
MAGGARD re 700 211221,
SOLE SOURCE cold email hit 171219,
SOLE SOURCE feedback 171222,
SOLE SOURCE call 171226,
SOLE SOURCE NDA Double D feedyard 171227,
SOLE SOURCE TURNER phenom news HEC etc 180105,
SOLE SOURCE TX feedyard options 180105,

| | SOLE SOURCE TURNER mtg invite StRegis NYC 180108, |
| | SOLE SOURCE TURNER re NYC mtg 180108, |
| | SOLE SOURCE mtg fup NYC 180109, |
| | SOLE SOURCE mtg in NYC 180109, (see also LPEE page 1074V entry 1/9/2018) |
| | SOLE SOURCE TURNER at mtg StRegis 180109, |
| | SOLE SOURCE mtg results to NICKLESS 180110, |
| | SOLE SOURCE 180111, |
| | SOLE SOURCE update TX 180119, |
| | SOLE SOURCE 180121, |
| | SOLE SOURCE Check by outsider 180122, |
| | SOLE SOURCE re WMT China added opptntys 180123, |
| | SOLE SOURCE on string out 180125, |
| | SOLE SOURCE hold cmu to Gearn 180126, |
| | SOLE SOURCE repeat decline 180228, |
| | SOLE SOURCE TURNER on Big Sandy 210507, |
| | SOLE SOURCE TURNER on feed price sensitivity 210601, |
| | TURNER on Feedyards and Deloitte Earnings review 180111, |
| | TURNER re TX feedyards status 180121, |

*Racketeering – Targeting Small Business And Enterprise*

*649. RICO-11 Racketeering Violations:* **Deprivation Of SBA Government Bonding Benefits, UT Bonding Fraud 1990-1993**

A. As forensically reverse engineered, as part of defendant UNITED STATES'

intentional financial wrecking of Lead Plaintiff's company Alliance, which incorporated (i)

fraudulent co-ownership and control through a nominee (David J. Carey as nominee, FBI,

paragraphs 445-449, 649 RICO-11), (ii) fraudulent legal representation (HIBBS and Susan

THORBROGGER, DOJ/FBI, both embedded at Short Cressman Burgess law firm, paragraphs

446; 626 RGTS-6, 649, 651, 653, 683 RICO-11, 13, 15, 45), (iii) fraudulent deprivation of

government benefits (SBA bonding, paragraph 446, 471; 649, 653 RICO-11, 15), (iv) theft and

compromise of receivables (Steve and Kerry Brewer, FBI, paragraphs 644, 650, 651 RICO-6,

12, 13), was then succeeded by (v) a Vancouver, B.C. fraudulent financing which failed
(paragraph 653 RICO-15).

B. 1990-1993: As forensically reverse engineered, defendant UNITED STATES deprived
Alliance, Lead Plaintiff's environmental services company, of legally guaranteed access to
Small Business Administration (SBA) bid and performance bonding and loan guarantees
ordinarily available to small businesses through SBA by interposing a defendant FBI agent as
the supposed SBA representative during and after Alliance's acquisition of the assets of Steve's
Maintenance in March 1990. Steve's Maintenance was in fact an FBI cover company which FBI
was intent on financially wrecking on Lead Plaintiff, both (i) to conceal evidence of its own
illegal acts during general searches of businesses in the asbestos abatement and other
environmental services in western Washington, and (ii) to further CIA/ARMY continued
development of the illegal BRMT bioweapon through continued illegal human medical
experimentation on the unwitting Lead Plaintiff, and his new spouse Jeanette (married March
1990).

C. 1992: Alliance was awarded the asbestos abatement subcontract for the Sea-Tac
Airport B, C, D Concourse expansion project by the general contractor on this federally funded
project. Defendant FBI then orchestrated a two to three month delay of contract start, deferred
submittal of structural steel building plans and orders so other work would not start, and then
abrupt acceleration of asbestos abatement work. The malicious project delay then resulted in a
greatly increased weekly payroll requirement for 80 people instead of 20 people with 45 day
cash flow cycle from billing to project payment from the general contractor on the Sea-Tac
Airport project. The Lead Plaintiff contacted the Utah based insurance company which had
furnished the performance bond to request a temporary working capital loan, only to learn the

Utah based insurance company had been seized by the Utah Insurance Commissioner. In fact, the company had actually been seized prior to FBI's fraudulent use of the company's building and offices by two FBI agents in the otherwise empty two or three story building about two blocks west of the abruptly rising Wasatch Mountains in or around Provo, UT, during the Lead Plaintiff's visit there to secure initial bonding coverage. FBI then fraudulently issued the performance bond on the seized insurance company's bonding form.

D. 1993: Denial of SBA bonding and its continuous withholding thereafter, as well as disruption of all other efforts to secure authentic bonding services cost Alliance millions in lost revenue over the three years it was able to operate, including at least $1.2 million in 1993 as the winning subcontractor on the FAA Air Route Traffic Control Center renovation project in Auburn, WA to a Kirkland, WA general contractor it had already worked for very successfully on the renovation and expansion of Snoqualmie High School, Snoqualmie, WA in late 1990-1991.

E. 1990-1993: The entire sequence was the plan and conspiracy of defendant FBI with defendants BURNS, CIA, and ARMY (Jeanette, secretly active duty coerced ARMY soldier, was the fraudulently orchestrated spouse as arranged by BURNS, CIA during this period) used to intentionally exacerbate Alliance company cash flow problems, which cash flow problems had resulted from defendants' earlier illegal deprivation of SBA benefits in its fraudulent earlier denial of bonding, deliberate overstaffing just before acquisition close, attempted detrimental modification of purchase and sale contract terms, and deliberate overstaffing just prior to transaction close, then theft of $80,00 in forced compromise in the first 90 days of operation, all of which had dramatically reduced company revenue and profit from other projects to that point to financially weaken the company. G. The SBA bonding denial fraud by FBI in 1990 was the

critical proximate cause of the financial failure of Alliance in mid-1993 and, together with defendants FBI and CIA cross-border financing frauds (paragraph 623 RGTS-3), was also the proximate cause of the Lead Plaintiff's subsequent federal bankruptcy related filed in November 1993.

F. Alliance's individual projects were generally profitable with 30% to 35% gross margins, the persistent lack of revenue created by lack of bonding capacity meant that overhead salaries and expenses were not able to funded adequately. Lead Plaintiff worked without compensation from late Summer 1990 until the company was closed in 1993, then continued without compensation at PAN due to on-going FBI and CIA illegal racketeering acts, as described at paragraphs 450-453, 601 NSEC-2, 623 RGTS-3, 653 RICO-15.

G. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 445-449, 450-453, 471, 601 NSEC-2; 623, 626 RGTS-3, 6; 644, 649, 650, 651, 653, 683 RICO-6, 11, 12, 13, 15, 45 |
| Appendix 2 paragraphs: | 1-017 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0052 |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 650. RICO-12 Racketeering Violations: Theft of Receivables, Check Frauds 1990 to present

A. As forensically reverse engineered, defendant UNITED STATES has and does

conspire with other defendants, both named and not yet identified, without limitation, as it (i)

plans and conducts thefts of property by various alternate means (paragraphs 490-516, Interline

Exhibits 13, 14), (ii) evades and/or totally avoids payments of legally due accounts receivable in

its cover company operations, and (iii) purveys fraudulent unfunded bank checks to Lead

Plaintiff and to his in-state and interstate commercial businesses. Defendants have and do

systematically conspire and act to (iv) deprive Lead Plaintiff of personal and business financial

resources, (v) force litigation for recovery or partial recovery of assets and sums due, (vi) force

arbitration to compromise amounts due, and (vii) engage in outright theft, including passing bad

checks, as they perpetrate these frauds.

B. These check, mail, and wire frauds have been and are used by defendant UNITED

STATES (principally defendants FBI, CIA, ARMY, USMS) to control Lead Plaintiff in

perpetual involuntary servitude and forced labor from majority age in what are supposedly the Lead Plaintiff's private enterprises owned and controlled by him, and while he has and does act and operate in "manager investor," "member" and/or "partner," roles. Co-investor, member, and partner roles have been persistently and surreptitiously filled by preselected undercover agents, officers, informants, and periodically by members of the media, as part of defendants' conspiracy, typically driven by defendant UNITED STATES, which has and does place its own and other police powers officers, agents, and confidential informants in these positions by systematically screening out all other options including in, without limitation, each and every one of Lead Plaintiff's numerous attempts from 1983 (Sheldon-Lee Associates, with THORPE, CIA, paragraphs 428, 563) to engage in untrammeled interstate commerce and commerce on federally funded projects in various entrepreneurial businesses, to wit:

(i) 1990, Alliance for a stolen project account receivable payment of approximately $165,000, ostensibly to Steve's Maintenance from the Bates Vocational-Technical Institute project in Tacoma, WA, with eventual recovery of about $82,000, a loss of $83,000, plus legal fees paid (paragraphs 445, 446),

(ii) 1993, PAN, CORNWELL, Ron WILLIAMS, (UNITED STATES, FBI, CIA) as an employer PAN promised and then denied compensation by using the fraudulent subterfuge of accounts receivable factoring fraud, a loss of approximately $65,000 to $125,000 (paragraph 448, US Bankruptcy Court filing November 1993, Western Washington, Dennis and Jeanette Brewer),

(iii) 2004, Allegent, LLC dba Performa for $82,000 of bad checks passed to Performa by a customer, actually a defendant insider entity ShipNow (paragraphs 461, 462, 471(ii), 516, LPEE pages 10445-10471),

(iv) 2004, Allegent, LLC, engaged CALDWELL (DOJ), while she fraudulently posed as an
intellectual property attorney at Seed & Berry to pursue the ShipNow intellectual
property matter for Allegent, while starving the Lead Plaintiff's LLC of financial
resources, as Lead Plaintiff was working unwittingly with PRAY (UNITED STATES,
USMS or FBI) as co-owner while accruing legal fees paid by Allegent to Seed & Berry
(paragraphs 219, 275(i), 276, 320f(iv), 461, 462, 471(ii), 516), and,

(v) 2019, defendant DEAN T. SMITH (UNITED STATES, FBI) filed litigation in the
Eastern District of California (19-cv-01918, which see on Pacer.gov). The *Smith v.
Winnett/Brewer* et al case in 19-cv-01918 was eventually voluntarily dismissed without
prejudice in April 2021, is a clear abuse of the legal process by defendant UNITED
STATES, FBI, DEAN T. SMITH (paragraphs 477, 626 RGTS-6, 658 RICO-20,
Interline Exhibits 6, 11, LPEE pages 140 et al, 8472-8473, 9601-9604, 9610-9611, 9788-
9790, 9925, 9926, 9997, 10004).

D. Defendant UNITED STATES and its co-conspirators have never allowed any
enterprise Lead Plaintiff has attempted to run to actually operate without disruption since co-
opting Sheldon-Lee Associates with partner and co-investor THORPE (defendant CIA) in 1983.
Nor have defendants UNITED STATES and its co-conspirators allowed any further employment
by the Lead Plaintiff since September 2002 except the human trafficked from imposed
homelessness in Boston, MA 10 months of fraudulent employment in 2007-2008 at
ESTABLISH by ROSENBERG and ROSS.

E. Lead Plaintiff has been illegally human trafficked in involuntary servitude since 1968,
and has been and is subject at all times from 1979 to the present, to involuntary servitude and
forced labor while being human trafficked to various assigned employment "options" and to

immediate arbitrary termination on whim as determined by defendant UNITED STATES and co-conspirator defendants for their convenience. He was forced to accept the compensation the defendants indirectly specified using mail fraud, wire fraud, and their internal illegal intelligence operations and enterprises, as he was unable to access any authentic private employment opportunities, and his businesses have been and are repeatedly defrauded to failure using various means, including deprivation of SBA loans, guarantees, and bonding, and access to private investor financing and/or public investor markets.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 6, 11 |
|---|---|
| Complaint paragraphs: | 219, 275(i), 276, 320f(iv), 428, 445, 446, 448, 461, 462, 471(ii), 477, 490-516, 563, 626 RGTS-6, 650, 658 RICO-11, 20 |
| Appendix 2 paragraphs: | 1-017 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0047, 2-0054, 2-0056, 2-0057, 2-0061, 2-0081, 2-0106, 2-0110, 2-0111, 2-0113, 2-0114, 2-0115, 2-0150 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 566, 8291-8293, 8351-8352, 10445-10506 |
| Emails and documents by topic and date, also located in LPEE: | Currently blocked by defendant UNITED STATES |

**Racketeering - Fraudulent Financings**

### *651. RICO-13 Racketeering Violations:* **Money Laundering - Alliance Nominee Cash Bank Deposit 1990**

A. As forensically reverse engineered, as part of defendant UNITED STATES'

intentional financial wrecking of Lead Plaintiff's company Alliance, which incorporated (i)

fraudulent co-ownership and control through a nominee (David J. Carey as nominee, FBI,

paragraphs 445-449, 649 RICO-11), (ii) fraudulent legal representation (HIBBS and Susan

THORBROGGER, DOJ/FBI, both embedded at Short Cressman Burgess law firm, paragraphs

446; 626 RGTS-6, 649, 651, 653, 683 RICO-11, 13, 15, 45), (iii) fraudulent deprivation of

government benefits (SBA bonding, paragraph 446, 471; 649, 653 RICO-11, 15), (iv) theft and

compromise of receivables (Steve and Kerry Brewer, FBI, paragraphs 644, 650, 651 RICO-6,

12, 13), was then succeeded by (v) a Vancouver, B.C. fraudulent financing which failed

(paragraph 653 RICO-15).

B. 1990: As forensically reverse engineered, defendant UNITED STATES made an

approximately $80,000 cash bank deposit at a U.S. Bank, N.A. branch on 14th Street NW,

Auburn, WA in the middle of 1990, a few months after Lead Plaintiff purchased the assets of Steve's Maintenance. The physical cash deposit was made by Kerry Brewer (defendant FBI, no relation to Lead Plaintiff) using a paper barrel bag typically used for groceries, in the presence of Lead Plaintiff to an account supposedly intended to provide a cash deposit for the purpose of securing bid and performance bonding from a third party bonding company. Since the deposit exceeded the $10,000 limit which then required a written disclosure to IRS, Lead Plaintiff signed the required IRS form for the cash deposit.

C. The funds were deposited in an account under the signatory control of Kerry Brewer, not Lead Plaintiff. The funds were removed the following day by Kerry Brewer. An in-person IRS inquiry which followed weeks later at the company's office was answered by Lead Plaintiff. No further IRS follow-up occurred. This was most probably an attempt by defendant FBI to attract the attention and interest of IRS.

D. This cash deposit was intended by Lead Plaintiff to partially replace Alliance's lack of SBA bonding (defendant FBI fraud in deprivation of government benefits, paragraph 649 RICO-11) through use of a private bonding company, so the company could regain required bonding capacity essential to bidding larger projects and thereby growing sales revenue and profits on its 30% to 35% gross margin business. Lead Plaintiff also intended the cash deposit would, by increasing future revenues, partially replace defendant FBI's theft of receivables from the Bates Vocational-Technical School project, which Steve and Kerry Brewer had undertaken to remove $165,000 of Alliance company cash flow (defendant did cut the cash receipts by around $80,000 in a "compromise" of the actual amount legally due to Alliance from that Bates Vocational-Technical School project, in another of defendant FBI's series of attempts to (a) accelerate the

demise of Alliance (paragraph 650 RICO-12) and (b) to destroy the Steve's Maintenance records which evidenced prior illegal general searches conducted by FBI through this cover company.

E. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 445-449, 471, 626 RGTS-6, 644, 649, 650, 651, 653, 683 RICO-6, 11, 12, 13, 15, 45; 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | 1-017 |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |

| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |
|---|---|
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 652. RICO-14 Racketeering Violations: Factoring Frauds – Pacific Financial Services 1992-1993, PAN Environmental Services 1993-1994

A. As forensically reverse engineered, Alliance won the subcontract to M.A. Mortenson for asbestos abatement on the federally funded Sea-Tac Airport Concourse BCD expansion project. Typically the first contractor on site, Alliance's start date was deliberately delayed by defendant FBI as part of it program of involuntary servitude and control of Lead Plaintiff and its planned destruction of the records of its illegal search and surveillance operations in the environmental services industry in western Washington, during which it had used cover company Steve's Maintenance, whose assets and records had been purchased by Lead Plaintiff's company, Alliance, which had FBI as a secret investor using a former Rainier National Bank SVP as the straw investment conduit (David J. Carey, former SVP Commercial Lending - Rainier National Bank).

B. The Sea-Tac Airport project late start led to a dramatic acceleration of the asbestos abatement schedule to meet the overall project schedule. The company's 12-20 person crew had to be expanded to about 80 people practically overnight, severely straining cash flow due to the need to meet a much greater weekly payroll expense without sufficient cash reserves prior to the 45 day payment of project progress invoices by the general contractor. As FBI orchestrated this delay and acceleration of asbestos abatement work on the Sea-Tac Airport Concourse expansion project, the Lead Plaintiff contacted the performance bonding company to request financial

assistance, only to learn the Utah based insurance company had been seized by the Utah Insurance Commissioner.

C. In fact, the company had actually been seized prior to FBI's fraudulent use of the company's building and offices by two FBI agents in the otherwise empty two or three story building about two blocks west of the abruptly rising Wasatch Mountains in or around Provo, UT during the Lead Plaintiff's visit there to secure initial bonding coverage, which FBI then fraudulently issued on the seized company's bonding form.

D. The Lead Plaintiff then sought an expensive form of contract financing known as factoring, with typical effective interest payment in the 70% to 90% per annum range. Pacific Financial Services took over the payroll function but failed to pay employment taxes, attempting to lay this back on Lead Plaintiff (paragraph 448). An IRS agent visited Lead Plaintiff at home during his recovery from DVT which arose after a financing trip to London for PAN, who described the turnover to Pacific Financial Services of all payroll responsibilities early in the course of the accelerated project.

E. With the benefit of forensic reverse engineering and based upon pattern of practice, defendant FBI's clear intent was the financial wrecking of the company after it was sold into private hands (David Carey, "co-owner and investor," was then former Rainier National Bank SVP used by FBI as the intermediary for its investment of agency funds), for the purpose of destroying the evidence of their illegal surveillance of the environmental services businesses in western Washington, and to entangle Lead Plaintiff in liability for unpaid federal 941 payroll taxes.

F. When this fraudulent financing eventually failed in Vancouver, BC, Canada, the $20,000 factoring loan turned in a few months into a loan default totaling $65,000 which Lead

Plaintiff had personally guaranteed, and then into personal federal bankruptcy in November 1993 filing for Lead Plaintiff and his second wife Jeanette. Lead Plaintiff was working on a financing at PAN when his wife Jeanette informed him that Pacific Financial Services had secured a court order against community property which was being used to garnish her wages for this $65,000 defaulted loan.

G. Soon after the fraudulent Vancouver VSE related financing (CORNWELL, BURNS, CIA, and FBI) failed and the PFS factoring loan then caused Lead Plaintiff's personal bankruptcy, FBI and CIA (CORNWELL, Ron Williams) ran a similar pattern of racketeering acts in southern California against Lead Plaintiff by allegedly factoring a large Pacific Remediation Services (PAN subsidiary) account receivable to a southern California factoring company, which factoring proceeds were then to be used to make catch salary payments to Lead Plaintiff who was working without compensation, The factoring loan never transpired, the contract payment funds were allegedly placed in First Interstate Bank to cover a loan to the factoring company by First Interstate Bank and no effort was made by CORNWELL or PAN to legally claim the funds as required under California law.

H. As forensically reverse engineered, this was actually merely a gratuitously cruel fraud on Lead Plaintiff, mocking the prior fraudulent and forced bankruptcy, as the factor operation and the receivable were a completely fabricated operation with no actual proceeds to factor and no authentic factoring company involved. Lead Plaintiff never received any compensation for his work PAN during 1993-1994 – a compensation fraud on the Lead Plaintiff is the forensically reverse engineered clear and transparent purpose of this associated-in-fact enterprise pattern of racketeering acts. Defendant ROSENBERG (FBI) then trafficked Lead Plaintiff to Pacific

Pipeline's Board of Directors as the PAN racketeering acts and conspiracy was being wound down.

I. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 448; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | 1-017 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0055 |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |

| Emails and documents by topic | Not applicable |
| and date, also located in LPEE: | |

### 653. RICO-15 Racketeering *Violations:* Fraudulent Financial Services – Ex-CIA Northern Africa Case Officer 1992-1995 Alliance

A. 1992-1993: As forensically reverse engineered, as part of defendant UNITED STATES' intentional financial wrecking of Lead Plaintiff's company Alliance, which incorporated (i) fraudulent co-ownership and control through a nominee (David J. Carey as nominee, FBI, paragraphs 445-449, 649 RICO-11), (ii) fraudulent legal representation (HIBBS and Susan THORBROGGER, DOJ/FBI, both embedded at Short Cressman Burgess law firm, paragraphs 446; 626 RGTS-6, 649, 651, 653, 683 RICO-11, 13, 15, 45), (iii) fraudulent deprivation of government benefits (SBA bonding, paragraph 446, 471; 649, 653 RICO-11, 15), (iv) theft and compromise of receivables (Steve and Kerry Brewer, FBI, paragraphs 644, 650, 651 RICO-6, 12, 13), was then succeeded by (v) a Vancouver, B.C. fraudulent financing which failed (paragraph 653 RICO-15).

B. This sequence of fraudulent financing acts by defendant UNITED STATES which led to zero dollars of company financing but did require considerable time and expense by Lead Plaintiff and his company, Alliance, was initiated in 1992 by an alleged financial services broker, Gerald CORNWELL (formerly a commercial cover CIA officer who operated from Pasco, WA in northern Africa as proprietor of a center pivot irrigation installation company), claiming much needed investment funding was available from a "known reliable source" in Vancouver, B.C., Canada.

C. CORNWELL (former commercial cover CIA agent in north Africa) and FBI worked, unknown to Lead Plaintiff, with RCMP, Ralph Shearing (who ostensibly ran a Canadian mining geophysical sampling company based in Vancouver, BC, Canada), and Rory Godinho (barrister

in the Vancouver, BC area), and CSIS, John Young (international mining financier and mining engineer), to develop this fraudulent Vancouver, BC financing package through Shearing, which required a financial audit.

D. CPA reviewed financial statements for Alliance were required to obtain this alleged multi-million dollar financing. To accomplish this task, financial statement compilation was contracted to the "sister" of a former Deloitte Seattle co-worker of Lead Plaintiff, Phil Walter. This "sister" (UNITED STATES, most probably FBI), then walked away after several weeks of work, leaving the financial statement compilation incomplete after being paid for work to date. This led to protracted delays in financial statement preparation as the Lead Plaintiff was forced to spend days straightening out her mess instead of bidding projects to sustain Alliance's critically important sales and cash flow. The financial statement review process was then further dragged out by the local "accountants," a local firm which was actually another illegal cover spying operation (defendant FBI). This sequence caused weeks of delay and cost the company thousands of dollars out of pocket for accounting services.

E. When this fraudulent financing eventually failed in Vancouver, BC, Canada, the $20,000 factoring loan from Pacific Financial Services, Bellevue, WA (a fraudulent factoring company run by Henry Wozow, probably FBI) was used to cover the financing fees, audit fees, and expenses. turned in a few months into a loan default totaling $65,000 which Lead Plaintiff had personally guaranteed, and then into personal federal bankruptcy in December 1993 for Lead Plaintiff and his fraudulently orchestrated second wife Jeanette (defendant ARMY, active duty, coerced using deferred prosecution threat for sexual orientation within national security sphere of military regulations).

F. Alliance, which already lacked the SBA bid and performance bonding it was legally

entitled to access as a small business (paragraph 649 RICO-11), was starved out of existence due

to the lack of bonding, lack of financing, and the abrupt acceleration of the federally funded Sea-

Tac International Airport B, C, D Concourse expansion project, (paragraph 652 RICO-14) which

further exacerbated its cash flow problems and resultant cash flow from projects. This

accomplished the dual purposes of (i) Lead Plaintiff's perpetuated involuntary servitude in the

illegal BRMT bioweapon and bioweapon delivery system, rights violations, and associated-in-

fact racketeering enterprise of the UNITED STATES, and (ii) resulted in the destruction of

Steve's Maintenance and records of that illegal cover company, which had previously been

illegally used in criminal investigations in the asbestos abatement marketplace in Washington

state, in continued knowing violation of the *Fourth* Amendment by defendant UNITED

STATES.

G. 1993-1994: CORNWELL (former CIA) later became CEO of P.A.N. Environmental

Services (PAN), a SEC pink sheet company, which in 1994 also deprived Lead Plaintiff of

compensation due through yet another fraudulent factoring fraud. This particular episode of the

pattern of racketeering acts occurred while defendant UNITED STATES, unbeknownst to Lead

Plaintiff, was using PAN as a platform for a cross border investigation of financial frauds

involving US persons and the Vancouver Stock Exchange, its brokers, agents, and others, while

entangling the unwitting Lead Plaintiff further into this international investigation, a theme

defendant UNITED STATES (FBI, USMS, CIA) has and does use repeatedly (among other still

worse patterns of acts at other subcounts) to deliberately ensnare, entangle, and attempt to entrap

Lead Plaintiff in national security matters due to the lack of recourse for these color of law abuse

criminal conspiracies against rights (18 U.S.C. § 241) by defendant UNITED STATES.

H. Lead Plaintiff searched for new employment in mid-1993 as Alliance operations were terminated as the company was forced to close. During this period, CORNWELL (a former Navy carrier pilot turned deep cover CIA agent who had worked espionage operations in north Africa before retiring), now posed as having formed a new venture, as CEO of an environmental services company, PAN, by using a publicly traded shell corporation to work toward securing a form of financing known as a PIPE (private investment in public equity), which allowed private funds to be invested in public stock, which in turn was to be listed on NASDAQ to provide investor liquidity without the need to go through the SEC registration process. CORNWELL promised Lead Plaintiff compensation as soon as a financing with Credit Lyonnaise Laing (CLL), a major French investment bank and stock broking firm with offices in London, was completed, so Lead Plaintiff agreed. He had no knowledge that he remained the effective captive and involuntary servant of defendant UNITED STATES (CIA, ARMY, FBI, USMS), and its continuing BRMT, rights, and racketeering conspiracy.

I. The promised CLL financing, actually simply an effort to engage MI-6 (Kurtanjek, CLL as his international Managing Director commercial cover for mining projects in Africa and elsewhere), MI-5 (UK's FBI equivalent), and the London Metropolitan Police (which included a five man Counterterror squad trot-by while he was alone in a 500 foot long construction tunnel at Heathrow Airport, and a hotel bill on his Copthorne Tara, Kensington, hotel room number which remained unpaid by CORNWELL for a time being sufficient to attract the attention of their Serious Fraud squad) with the Lead Plaintiff for technical surveillance (yet again, see the national security event Queen Elizabeth II's 1983 visit to Seattle, Queen Elizabeth II's 1983 visit to Seattle at paragraphs 211, 600 NSEC-1, 623B RGTS-3, 679B RICO-41 for a prior example) failed in Spring 1994. CORNWELL and FBI also ran a $165,000 fraudulent factoring theft on a

Pacific Environmental Services (the P. in P.A.N.) sub-soil remediation or paving project during

this sequence in 1994, echoing the prior $20,000 factoring loan which had been used for the

fraudulent Canadian financing, $65,000 loan default, and forced bankruptcy closed out just four

or five months before. Lead Plaintiff never received the compensation due for his work at PAN

(paragraphs 450-453, 601 NSEC-2, 623 RGTS-3).

 J. This scheme and conspiracy required and consumed the time and financial resources of

Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|

| Complaint paragraphs: | 211, 445-449, 450-453, 471; 600, 601 NSEC-1, 2; 623, 626 RGTS-3, 6; 644, 649, 651, 652, 653, 679B. 683 RICO-6, 11, 13, 14, 15, 41, 45; 474, 474, 651-672 RICO-13-34 generally |
|---|---|
| Appendix 2 paragraphs: | 1-017 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0053 through 2-0055 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 11-139, 140 et al, 383, 398, 420, 463, 566, 767-768 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### *654. RICO-16 Racketeering Violations:* Fraudulent Financial Services – Ex-CIA Latin America Case Officer 2013-2015

A. Charles JACKSON, (who has been represented by defendant Ray SULLIVAN as deceased since around December 2014) was a former Merrill Lynch Mexico City investment banker (CIA commercial cover, Latin America), was paid $750 from Lead Plaintiff's personal funds and contracted by Winnett, owned by Lead Plaintiff, for investment banking services. These services were fraudulently provided in bad faith with numerous discussions and emails including fraudulent progress reports of investor interest over several used to create the appearance of progress, fraudulently freeze the Lead Plaintiff form engaging services, and perpetuate the involuntary servitude of Lead Plaintiff beginning in March 2013 (paragraphs 543, 661D, 684A RICO-23, 46). In September 2014, Lead Plaintiff expended an additional $700 of personal funds (loaned by JACKSON and repaid to his supposed widow after his alleged death) for travel to a Phoenix, AZ area investor development meeting with JACKSON, his supposed spouse Gail (identified as former Attorney General Janet Reno in April 2024 photo identification by Lead Plaintiff and the sister of Charles), and John Tyler, Cherry Creek Partners, a supposed major investor, as well as to tour potential organic farming sites with Jack Doughty, Three Rivers Ag, a real estate broker.

B. JACKSON's alleged investor and lender interactions and interests described and

discussed with Lead Plaintiff during this period during this period included Prudential

Agricultural Lenders; Prince Zayid Mohammed, a Middle Eastern investor; Skye Root, WGIM

agriculture investment advisory firm for TIAA-CREF; an elderly Mississippi investor, Jack

Burstein, a Florida investor; Lawrence Financial; John Tyler, Cherry Creek Partners; RABO

VanDeGraaf (actually the then recently returned CIA Moscow station chief); Sherbrooke

Capital; Byron Lekulvich, Resource Land Holdings, Colorado Springs, CO, among others. All

elements of this fraud and swindle were completely fraudulent representations made by

JACKSON and others herein both in person and using emails and phone calls. No investment

funds were raised nor intended to be raised in this fraudulent deprivation of honest services.

Defendants DOJ and CIA intended this solely as internal security backcheck and to defraud the

Lead Plaintiff in interstate commerce by depriving him of those rights to sustain involuntary

servitude as human subject of illegal biomedical experiments without consent service of the

illegal BRMT bioweapon and bioweapon delivery system and to determine their own security of

senior government officials who had operated in and as executives of those defendants in this

associated-in-fact racketeering enterprise and conspiracy against rights.

C. This scheme and conspiracy required and consumed the time and financial resources

of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 4 through 14 |
| Complaint paragraphs: | 543, 661D, 684A RICO-23, 46; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0171 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 383-384, 431, 440, 8370-8373, 8378, 8411, 9902, 9905, 9923, LPEEV65-6, 7 |
| Emails and documents by topic and date, also located in LPEE: | Charles JACKSON Resume 130311.pdf<br>JACKSON Contract 140207.pdf<br>JACKSON Initial Contact 130311,<br>JACKSON ibanker deal agreed 130809,<br>JACKSON retainer pymt 130903,<br>JACKSON fee from BA personal acct130926.pdf<br>JACKSON re BLACKPOOL Term Sheet and BP fail 131015,<br>JACKSON intro to SULLIVAN 131125,<br>JACKSON re Alberts Organics as customer 140114,<br>JACKSON investor status inquiry 140115,<br>JACKSON re new cust 2 3 140115,<br>JACKSON reply on investor questions 140128,<br>JACKSON Hurwitz on 25MM loan 140206,<br>JACKSON Hurwitz verbal Relay 140206,<br>JACKSON Pru Ag REED Mitchell referral 140207,<br>JACKSON REED Mitch Pru Ag Loans self intro 140207, |

| | JACKSON on Alberts contract update 140218,<br>JACKSON re 140226 SULLIVAN mtg Ramsey 140219,<br>JACKSON re SULLIVAN face mtg 140219,<br>JACKSON Domeier Prudential Ag referral 140224,<br>JACKSON re Zayid alleged investment 140303,<br>JACKSON re Attorney retainer wire on Zayid deal 140304,<br>JACKSON re Zayid Attny Retainer Xfr 140304,<br>JACKSON re Burstein call FL 140307,<br>JACKSON re Sherbrooke Capital 140404,<br>JACKSON connects Skye Root 140407,<br>JACKSON re circular referral to Resource Land Byron Lekulvich 140627,<br>JACKSON re Tyler 140629,<br>JACKSON re Tyler Eager to Raise 200MM 140701,<br>JACKSON Contract 140707,<br>JACKSON re 55% MS investor 140827,<br>JACKSON on 3 London closings 140902,<br>JACKSON re 3 London Closings 140902,<br>JACKSON re Tyler Doughty Maricopa County mtg 140909,<br>JACKSON Maricopa County Visit Details 140917,<br>JACKSON re PHX trip 141101 Tyler mtg 140917,<br>JACKSON re personal BofA acct number 141015,<br>JACKSON VanDeGraaf likely Maricopa Rabo poser 141024,<br>JACKSON 700 for Maricopa trip 141027,<br>JACKSON VanDeGraaf likely Maricopa Rabo poser 141027,<br>JACKSON re Burstein Miami update 141204,<br>JACKSON re Burstein mtg and Hain 141210,<br>JACKSON re Hain Celestial interest 141210,<br>JACKSON Gail on Charles Death 150209,<br>JACKSON Tyler re PPM review by SULLIVAN 150806,<br>Westchester Mgmt Skye Root re farm acq parameters 140407<br>Zayid 20MM Cancelled Signed Subscription Agreement Cancelled 121002.pdf<br>Zayid Signed JV Agreement121022.pdf |
|---|---|

**655. RICO-17 Racketeering Violations: Fraudulent Financings and Loans - NYC Broker/Investor 2011-2017**

A. Defendant Jonathan CROSS (UNITED STATES, FBI), represented himself as an

officer or principal of various entities using the various defendant entities sharing the names

BLACKPOOL and SHEFFORD, while acting as a defendant agent, officer, and as a part of this on-going conspiracy (paragraph 692B RICO-54). CROSS represented his firms, these various BLACKPOOL and SHEFFORD entities legally named in the caption of this Complaint, as capable of and sincerely interested in securing financing on behalf of Lead Plaintiff's entities, thereby conspiring with and playing an on-going role from approximately 2011 to 2017 in a complex evolving sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of investment and authentic opportunities to engage in interstate commerce.

B. CROSS proposed various fraudulent financings, bridge loans, held imaginary Investment Committee meetings, traveled to Las Vegas on February 8, 2017, and caused the Lead Plaintiff to do so as well, while misrepresenting himself as having TIAA-CREF as a co-investor interested in investments in the tens of millions of dollars in Winnett entities owned and controlled by Lead Plaintiff as the parties toured Stockton Hill Farm north of Kingman, AZ with VOLK (FBI). Lead Plaintiff also negotiated with Robert Saul, representing Barings, the institutional investor manager/owner, for the 16,000 acre irrigated Stockton Hill Farm acquisition, as he was being assisted in preparation of purchase proposals by Bill REED (FBI Tucson). He was introduced to James Rhodes, a Las Vegas real estate developer being investigated for bank fraud by defendant FBI (introduction by Steve POINDEXTER, FBI) who owned Kingman Farms (first together with and then as a farm which was split from Barings' Stockton Hill Farm) during the course of this sequence of defendant FBI fraudulent interferences in interstate commerce. Robert Saul later appeared again in this defendant FBI scheme as a Massachusetts-based member of the Fiera Comox team, a Montreal, Quebec, Canada

institutional investor, where Lead Plaintiff held investment discussions by email and phone with another team member in the series of fraudulent financings led by defendant FBI.

C. This overall pattern is yet another in the decades-long sequences of FBI institutional racketeering acts interferences in interstate commerce across multiple field offices (most probably Phoenix, Tucson, Las Vegas, Manhattan, and/or Miami), to sustain illegal BRMT development, rights, and racketeering acts, violations, and injuries against Lead Plaintiff. This pattern of practice is representative of the type and manner of acts, injuries, and violations against this class of plaintiffs by defendant UNITED STATES in its broad institutional pattern of violations of constitutional rights, primarily by DOJ, its police powers operations, ARMY, other military services operating contrary to posse comitatus legal constraints on operations against US persons, and CIA/ARMY illegal development and deployment of the illegal and internationally BRMT bioweapon and bioweapon delivery system.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4 through 14 |
|---|---|
| Complaint paragraphs: | 692B RICO-54; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 8454-8467, 8939-8955, 9053-9059, 10138-10156, 10528-10565, 10566-10613, LPEEV65-6, 7 |
| Emails and documents by topic and date, also located in LPEE: | BLACKPOOL First Hit 110815, BLACKPOOL IC Approval 120919, BLACKPOOL decl Podzemny to Dalhart Realty130201, BLACKPOOL CROSS early hook 140120, BLACKPOOL Persists Example 150707, BLACKPOOL IC Approval 150821, BLACKPOOL on PHX trip 150825, BLACKPOOL Persists Example 151103, BLACKPOOL merge anncmnt 161101, BLACKPOOL PPM process 161122, BLACKPOOL 1MM Bridge Loan Contract 161129, BLACKPOOL WF wire advice 161130, BLACKPOOL Term Sheet proposal email Smith PETERSEN 170126, BLACKPOOL re TIAA-CREF (Skye Root JACKSON tieback poss) 170131, BLACKPOOL email Term Sheet Signed 170201, BLACKPOOL re other investors rejected 170201, BLACKPOOL tour Stckton Hill Farm LV realtor contact 170202, BLACKPOOL re Stckton Hill Broadway VOLK connection 170203, BLACKPOOL Stockton Hill tpour fup 170210, BLACKPOOL Stockton Hill dataroom access 170213, BLACKPOOL Stockton Hill offer status 170214, BLACKPOOL SAUL Barings Stockton Hill LOI 170215, |

| | BLACKPOOL Stockton Hills Farm Tour Final Logistics 170217, BLACKPOOL re Stockton Hill SAUL Barings LOI response 170221, BLACKPOOL re delay 170225, BLACKPOOL xmit detail financial info 170227, BLACKPOOL re investment to date 170228, BLACKPOOL to fund fup 170301, BLACKPOOL re SAUL Barings Deadline Stockton Hill 170303, BLACKPOOL stringout 60MM financing 170303, BLACKPOOL Cmte Mtg 170307, BLACKPOOL re possible loss Stockton Hill Farm 170307, BLACKPOOL more questions string out 170308, BLACKPOOL stringout 60MM financing 170308, BLACKPOOL recvs CFO Smith resume during IC mtg 170308, BLACKPOOL re DB personal bkgrnd 170310, BLACKPOOL re former counsel Seattle 170310, BLACKPOOL to request firm commit on 60MM 170310, DD Callahan (KEENE) on BLACKPOOL funding 170202, DD Callahan (KEENE) re BLACKPOOL Term Sheet 170202, DD Callahan (KEENE) update BLACKPOOL 170227 |
|---|---|

*656. RICO-18 Racketeering Violations:* **BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution 2014-2015**

A. In June 2015, defendant FBI executed a complex interstate and international funding fraud across five weeks which FBI had first set up in May 2014 (first contact). A $10 million financing commitment was made by email. This fraud and swindle used the illegal BRMT bioweapon and bioweapon delivery system and check fraud to cause fraudulent checks to be deposited in the Winnett corporate account by mailing a check to the Lead Plaintiff ($9,826 as deposited) and by an agent of defendant UNITED STATES (unknown FBI, Manhattan) who used the Lead Plaintiff's identity and live automated teller assistance at an ATM in New York City ($26,430 as deposited). Lead Plaintiff transferred $9,125 to a third party. Both deposits

from two different parties are dishonored, and the business account was overdrafted by $9,118, as a result of the $9,125 wire transfer to the third party above. The Ramsey, NJ Bank of America branch where these accounts were serviced was closed for the day as Lead Plaintiff received this emailed notice of dishonor, so he called Bank of America's customer service line. He was unable to reach live customer assistance despite several long periods on hold. This inability to reach a responsive customer service agent was a new experience which later became quite familiar to the Lead Plaintiff over the next 15 years into 2022. Similar property theft abuses just under the $10,000 reporting limit which also constitute racketeering acts in deprivation of property rights by defendant UNITED STATES include paragraphs 610I HEXP-7, 661 RICO-23, 830D, 831G, and an international $5,000 reporting limit at paragraph 665.

B. Lead Plaintiff received a check drawn on a Canadian company and addressed to him personally around this same time, deposited this check and received an overdraft notice mailed on July 7, 2015 for $180,000 against his personal account several days later.

C. These Bank of America accounts were closed by the "bank" (most probably controlled by an FBI embed, or less likely SECRET SERVICE, LPEEV65-6, 7) soon thereafter. The Ramsey, NJ branch refused to accept a cashier's check made out to Bank of America from Wells Fargo, forcing the Lead Plaintiff to transport about $9,200 in cash between the two bank's branches in Ramsey, NJ.to pay off the overdraft and fees on the closed account (the requirement to use cash sustained untraceability/concealment of evidence of this FBI perpetrated crime sequence which was just under the $10,000 disclosure limit).

D. Bank of America (actually a shadow version controlled by defendant UNITED STATES, LPEEV65-6, 7) then closed both accounts. Since these accounts were opened immediately after Lead Plaintiff was human trafficked by ROSENBERG to ESTABLISH, Fort

Lee, NJ, *the first practical effect* was to conceal and later destroy evidence of (i) the fraudulent employment at ESTABLISH and related compensation theft (ROSENBERG, ROSS, FBI, USMS); (ii) the fraudulent relationship with MODDERMAN; and (iii) related costs and expenses, and theft of labor, materials, and project overhead for Cliffside Park, NJ apartment renovations by CHALOM (USMS); (iv) the human trafficking sequence incorporating the Newark federal District Court filing, loss of residence less than 120 days later (initiated by CHALOM); (v) involuntary commitment in Paramus, NJ hospital, (vi) subsequent trafficking, after Lead Plaintiff's "voluntary" dismissal of the Newark federal case under duress and coercion, to Ramsey, NJ; and (vii) the privations related thereto between August 2007 and August 2015. The "bank" telephone legal department representative later informed Lead Plaintiff, the bank would not preserve banking records as required by his evidence preservation letter (LPEEV65-7) sent to the bank address as it was not a named defendant in the litigation, and Lead Plaintiff had no online access to retrieve these records.

E. *The second practical effect* was defendant UNITED STATES' use of an illegal BRMT bioweapon and bioweapon delivery system brain hijacking to manipulate Lead Plaintiff's mental process to high trust (which is totally consistent with his life experience throughout his childhood within the highly ethical Quaker sect religious group he was raised in) for this sequence of judgement errors he rarely made otherwise, as a test of illegal BRMT brain hijacking progress, which was then repeated with Laura Akoto using this same method and adding illegal BRMT bioweapon and bioweapon delivery system hijacking of oxytocin, at paragraph 612 HEXP-9.

F. This sequence of defendant UNITED STATES racketeering acts was another in the sequence of patterns of multi-layered entrapment attempts. This sequence was set up by first

contact in May 2014, implemented in June-July 2015, and acted to destroy evidence (by passage of time) of the financial crimes undertaken at ESTABLISH (paragraph 643 RICO-5) and by CHALOM (paragraph 642 RICO-4). This Bank of America sequence was a modified and more predatory reprise of Lead Plaintiff's experience with "Washington Mutual Savings Bank," and his complete inability to understand their method of balance calculation during the 1980s and 1990s, despite being a Certified Public Accountant licensed in Washington state during the 1980s. This difference between his checking account balance as calculated (paper checks were still quite common at this time) by him and by the "Bank" leads to literally thousands of dollars of $25/$35 overdraft fees being illegally drains from his account for NSF fees over several years. This repetitive pattern of strong circumstantial evidence leads Lead Plaintiff to believe his finances were then the subject of direct government control by defendant UNITED STATES and have been for decades, comprising additional thousands of color of law RICO and Fourth Amendment violations by defendant UNITED STATES and its co-conspirators.

G. This is yet more evidence, which Lead Plaintiff has reverse engineered years later in preparation of this complaint, indicative of defendant UNITED STATES' massive, sustained and targeted efforts to cause and create circumstances of non-payment of this overdraft to the "Bank," thereby exposing the Lead Plaintiff to potential criminal liability - another instance of an on-going series of nearly perpetual entrapment attempts across his personal and professional life while effecting the destruction of records of its specific culpability for these acts, violations, and injuries. Systematic interferences in Lead Plaintiff's telephonic and electronic communication have and do continue at all times, completely disrupting legal and constitutional rights and legal protections in interstate commerce, and are incorporated in defendant UNITED STATES' complete, total, and direct control of Lead Plaintiff's life circumstances in systematic

violation of constitutional rights, and are representative of comparable acts, violations, and injuries to other members of this class of plaintiffs.

H. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | 612 HEXP-9; 642, 643 RICO-4, 5; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |

| LPEE pages (see technical note on page numbering at paragraph 230): | 1686, 1699-1700, LPEEV65-6, 7 |
|---|---|
| Emails and documents by topic and date, also located in LPEE: | Tissiman first hit 140519,<br>Wells Oliver Tissiman 419pm acct info150612,<br>Wells Oliver Tissiman 654pm 150612,<br>Wells Oliver Tissiman 150613,<br>Wells Oliver Tissiman 2015 150615,<br>Wells Oliver Tissiman 1 655am 150616,<br>Wells Oliver Tissiman 2 713am 150616,<br>Wells Oliver Tissiman 3 141110 to 1120am 150616,<br>Wells Oliver Tissiman 3 BA Deposit Slip 1120am 150616,<br>Wells Oliver Tissiman 4 439pm 150616,<br>Wells Oliver Tissiman 5 619am 150617,<br>Wells Oliver Tissiman 6 818am 150617,<br>Wells Oliver Tissiman 7 1207pm act fast on 150617,<br>Wells Oliver Tissiman 8 105pm 150617,<br>Wells Oliver Tissiman 9 343pm 150617,<br>Wells Oliver Tissiman 9190 150622,<br>Wells Oliver Tissiman 150616R BA 180K NSF 150707,<br>Wells Oliver Tissiman P BA 180K NSF 150707,<br>Wells Oliver Tissiman Q re bank fraud 150715 |

### 657. *RICO-19 Racketeering Violations:* **False Personation – NYC Forbes 200 Captive Corporate Investment Firm 2013-2017**

A. Defendant Daniel WEINER, a practicing attorney in New York City, engaged in false personation, fraudulently misrepresenting himself as a defendant ARLON GROUP employee to further the defendants' overall scheme of fraudulent interferences in interstate commerce, thereby coordinating with and playing an on-going role from 2013 in a complex scheme of racketeering acts integrating sales, production, operations, and financing frauds and misrepresentations to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce. This scheme requires and consumes the time and financial resources of Lead Plaintiff and his business entities in the bad faith perpetuation of defendants' long-running schemes, frauds, swindles, and pattern of racketeering acts. See LPEE pages 386, 3938.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
| --- | --- |
| Complaint paragraphs: | 170; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 386, 3938 |
| Emails and documents by topic and date, also located in LPEE: | Arlon WEINER intial hit 130202, Arlon update to WO team 130203, Arlon Declines 130207, Arlon WEINER reprise 170510, |

| | Arlon Webel DD Callahan (KEENE) phone call set 170530,<br>Arlon Webel from WEINER 170530,<br>Arlon Danl WEINER 170826,<br>WEINER Arlon 130202 |

*658. RICO-20 Racketeering Violations:* **Fraudulent Investor Personation - Investments and Loans 2015-2019**

A. Defendant DEAN T. SMITH (defendant FBI, most probably Sacramento field office) responded to an online EquityNet.com (website whose electronic communications are captive to defendant UNITED STATES intercepts and interventions) solicitation of accredited investors and made an initial investment of $100,000 in August 2015 (FBI funds), then made a series of additional investments and loans from allegedly personal funds, trusts, and entities. These funds were used to perpetuate this four year episode of involuntary servitude from August 2015 to September 2019, adding still more years to defendants' perpetual string out and involuntary servitude by defendant UNITED STATES and its co-conspirators as they blocked Winnett, its subsidiaries, and Lead Plaintiff from actual, legitimate interstate commerce activities, primarily using (i) electronic frauds including, without limitation, wire fraud, email fraud, computer access device fraud; and (ii) other color of law abuses of police powers operations in, without limitation, Pima, Maricopa, and Mohave Counties and other locations in Arizona, in New York state including in New York City, and in New Jersey, Nebraska, Arkansas, Missouri, and Washington state, as well as (iii) international co-conspirators such as externally based CIA personnel and friendly foreign intelligence services, and (iv) explicitly screened-in domestic and international bad actors.

B. In total, FBI expended approximately $200,000 of agency funds which were secretly invested in Winnett in their 2015-2109 entrapment attempt series against Lead Plaintiff led by

"investors" DEAN T. SMITH, Auburn, CA and DOUG PETERSEN, Brookline, NH. These FBI

funds were then effectively recycled through other undercover entities including, without

limitation, ADAMSON BROTHERS, I-BANK ATTORNEYS, SULLIVAN, INSIGHT

NETWORK, PPM EXPERTS, CORNHUSKER CAPITAL as well as individual defendants

including, without limitation, FBI's NICKLESS, CASTRO, PAUL SMITH, BLITCH,

WASEMAN, LEBLOND, (all Winnett embedded FBI fraudulent officers and employees),

DOJ/FBI Daniel KREWSON (MULTIFUNDING) as they engaged in bad faith acts interfering

with interstate commerce.

C. Fraudulently placed employees and legal counsel also personally took stock options in

various Lead Plaintiff owned and controlled private businesses for future benefit:

| Grantee | Date | Shares | Price | | Grant Number |
|---------|------|--------|-------|---|--------------|
| *Winnett Perico:* | | | | | |
| P Smith | Sep 30 2015 | 200,000 | $ | 5.50 | G150930-1 |
| M Castro | Sep 30 2015 | 200,000 | $ | 5.50 | G150930-2 |
| P LeBlond | Sep 30 2015 | 200,000 | $ | 5.50 | G159015-3 |
| J Waseman | Dec 1 2015 | 40,000 | $ | 5.50 | G151201-1 |
| R Gomez | Dec 1 2015 | 40,000 | $ | 5.50 | G151201-2 |
| D Mota | Dec 1 2015 | 40,000 | $ | 5.50 | G151201-3 |
| R Sullivan | Dec 1 2015 | 40,000 | $ | 5.50 | G151201-4 |
| G Crossgrove | Dec 1 2015 | 40,000 | $ | 5.50 | G151201-5 |
| R Foland | Jan 14 2016 | 40,000 | $ | 5.50 | G160114-1 |
| M Vindiola | Jan 14 2016 | 40,000 | $ | 5.50 | G160114-2 |
| B Blitch | Jan 14 2016 | 40,000 | $ | 5.50 | G160114-3 |
| B Reed | Jan 15 2017 | 40,000 | $ | 5.50 | G170115-1 |
| R Wood | Jan 17 2017 | 40,000 | $ | 5.50 | G170117-1 |
| *Sheldon Beef:* | | | | | |
| C Canchola | Feb 25 2020 | 7,750 | $ | 0.01 | 200225-1 |
| J Nickless | Feb 25 2020 | 7,750 | $ | 0.01 | 200225-2 |
| J Waseman | Feb 25 2020 | 7,750 | $ | 0.01 | 200225-3 |

D. PAUL SMITH (FBI undercover name of unknown agent) also persisted in attempting

to secure back-dated stock options to be signed off by Lead Plaintiff during his fraudulent tenure

as incoming CFO of Winnett, as he engaged in protracted delays and harassment throughout his preparations of financial projections, consistent with FBI tradecraft and interferences with interstate commerce as forensically reverse engineered.

E. These funds were being expended in good faith by Lead Plaintiff intending to raise additional funds and accomplish interstate commerce including, without limitation, to fulfill sales orders and prospective sales contracts from corporate entities including, without limitation, Albert's Organics, Albertsons, WALMART, KROGER and, COSTCO through Bridge's Produce, Portland, OR. This sequence also inculpated defendant ARPAIO (Interline Exhibit 5) in various acts, violations, and injuries in interstate commerce as he posed as Greg Crossgrove, a produce industry and organic production consultant.

F. These FBI agency funds were expended in interstate commerce to perpetuate involuntary servitude to sustain constitutional rights violations against Lead Plaintiff in defendant UNITED STATES' illegal BRMT bioweapon and bioweapon system development and deployment, civil and constitutional rights violations, and pattern racketeering acts sustained by the co-conspirator associated-in-fact enterprise from inception.

G. In 2019, defendant DEAN T. SMITH (UNITED STATES, FBI Sacramento) filed litigation in the Eastern District of California (19-cv-01918, which see on Pacer.gov) which further extended Lead Plaintiff's involuntary servitude and functionally destroyed the interstate commerce startup Winnett and its subsidiaries, as described herein at Interline Exhibits 6, 11, paragraph 626 RGTS-6.

H. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 6 specifically, 4 through 14 |
|---|---|
| Complaint paragraphs: | 626 RGTS-6; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Entirety of column entitled Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate from 2-0165 through 2-0187 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 380, 382, 430, 8472-8473, 9642, 9645, 9646-9647, 9907, 9925, 9926, 9997, 10004, 10157, 10164, 10165-10171 |
| Emails and documents by topic and date, also located in LPEE: | Shareholder Info D Smith Address Preferred Trust 150821.pdf<br>Smith adds investment 160326,<br>Smith 5K View Wire Transfer Detail - U.S 170126,<br>Smith Active Air Freight LLC USbank wire 1000 170315,<br>Smith adds 1000 170315,<br>Smith avail escrow funds 170531,<br>Smith VP Fin intvw and connect DSmithPDX 150826,<br>Smith on expenses Vindiola 160114, |

Smith on BA pers acct scam wire xfrs 160125,
Smith on Jabor wire fee scam 160125,
Smith on potential financing network intro 160217,
Smith on development costs per acre 160406,
Smith sales intro call in AZ 160704,
Smith re Oliver Term Sheet 160707,
Smith re fine tuning on Oliver financial proposal 160720,
Smith re IT traceability budget add Oliver Hyder 160731,
Smith re Status Report Detail on Hyder Oliver et al 160818,
Smith Triple Fresh Contact on Sales Prospects 160907,
Smith status 160908,
Smith Triple Fresh passes setback on sales 160915,
Smith re WMT prior sales agents failures 161011,
Smith re continuation 161012,
Smith re 2500 add 161022,
Smith re avocdos sales hook and PACA 161102,
Smith re Blockpool Funding 170202,
Smith re backup plan 170322,
Smith re SHEFFORD Active Air Frt LLC 170322,
Smith re collateral support for loan 170323,
Smith re prior lost orders and funding level 170427,
Smith re investor lead development 170504,
Smith re trip 170506,
Smith worried 170510,
Smith escrow lender fail 170603,
Smith complains 170712,
Smith referred investor 170719,
Smith re WMT 170811,
Smith on 7500 loan and cattle rotation 170914,
Smith re 7500 loan and cattle rotation 170914,
Smith update WMT ND investor 171106
Smith 100K Check 1of2 150730.pdf Smith 100K Check
2oof2 150730.pdf
Smith 100K Subscription Agreement
SKMBT_C36415072911310 DB Signed 150729.pdf
Smith Litigation Halt Proposal to resume company
operations 200106.pdf
Smith Litigation SULLIVAN Winnett - WCC Letter
Respond to Evers-DSmith 190621.pdf
Smith Litigation SULLIVAN Winnett - WCC Letter to
Evers - Dean Smith III 190723.pdf
Smith Litigation Winnett - WCC Letter Responding to
Evers - Dean Smith II 190710.pdf
Smith Note 5K 190201.pdf
Smith Loan pays CORNHUSKER Retainer 10125
Smith $30K Loan 10157

| | Smith $5K loan 10164 |
| | Smith Paid COSTCO Trip Hotel Reservation 10165-10171 |

### *659. RICO-21 Racketeering Violations:* Fraudulent Investor Personation and Investments 2015-2020

A. Defendant Doug PETERSEN (FBI embedded as CEO of Worker's Credit Union, resident of New Hampshire) responded to an online EquityNet (website, whether spoofed or actual, whose electronic communications were and/or captive to defendant UNITED STATES intercepts and interventions as to Lead Plaintiff) solicitation of accredited investors and invested $25,000 in 2015, plus additional funds over following years, from personal funds and retirement trusts. These funds were used to perpetuate this four year episode of involuntary servitude from August 2015 to September 2019, adding still more years to defendants' perpetual string out and involuntary servitude by defendant UNITED STATES and its co-conspirators as they blocked Winnett, its subsidiaries, and Lead Plaintiff from actual, legitimate interstate commerce activities, primarily using (i) electronic frauds including, without limitation, wire fraud, email fraud, computer access device fraud; and (ii) other color of law abuses of police powers operations in, without limitation, Pima, Maricopa, and Mohave Counties and other locations in Arizona, in New York state including in New York City, and in New Jersey, Nebraska, Arkansas, Missouri, and Washington state, as well as (iii) international co-conspirators such as externally based CIA personnel and friendly foreign intelligence services, and (iv) explicitly screened-in domestic and international bad actors.

B. In total, defendant FBI expended approximately $200,000 of agency funds which were secretly invested in Winnett in their 2015-2019 entrapment attempt series against Lead Plaintiff led by "investors" DEAN T. SMITH, Auburn, CA and DOUG PETERSEN, Brookline, NH. These FBI funds were then effectively recycled through other undercover entities including,

without limitation, ADAMSON BROTHERS, I-BANK ATTORNEYS, SULLIVAN, INSIGHT NETWORK, PPM EXPERTS, CORNHUSKER CAPITAL, as well as individual defendants including, without limitation, FBI's NICKLESS, CASTRO, PAUL SMITH, BLITCH, WASEMAN, LEBLOND, (all Winnett embedded FBI fraudulent officers and employees), DOJ/FBI Daniel KREWSON (MULTIFUNDING), as they engaged in bad faith acts interfering with interstate commerce (paragraphs 471-489, Interline Exhibits 4-12).

C. These funds were being expended in good faith by Lead Plaintiff intending to raise additional funds and accomplish interstate commerce including, without limitation, to fulfill sales orders and prospective sales contracts from corporate entities including, without limitation, Albert's Organics, Albertsons, WALMART, KROGER, and COSTCO through Bridge's Produce, Portland, OR. This sequence also inculpated defendant ARPAIO (Interline Exhibit 5) in various acts, violations, and injuries in interstate commerce as he posed as Greg Crossgrove, a produce industry and organic production consultant (paragraph 645 RICO-47).

D. These defendant FBI agency funds were expended in interstate commerce to perpetuate involuntary servitude to sustain constitutional rights violations against Lead Plaintiff in defendant UNITED STATES' illegal BRMT bioweapon and bioweapon system development and deployment, civil and constitutional rights violations, and pattern racketeering acts sustained by the co-conspirator associated-in-fact enterprise from inception.

E. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 4 through 14 |
| Complaint paragraphs: | 471-489, 645 RICO-47; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179, column entitled Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate from 2-0165 through 2-0187 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 9653, 9917, 9923 |
| Emails and documents by topic and date, also located in LPEE: | PETERSEN Stock Cert Issued 150927, PETERSEN Status comments 160107, PETERSEN adds 2500 170102, PETERSEN re backup financing plans 170315, PETERSEN stock for cash infusion 170420, PETERSEN adds 2500 170516, PETERSEN re investor options 170516, PETERSEN stock cert 170519, PETERSEN FL agent on funds xfr 170913, PETERSEN FL agent stock cert 170914, PETERSEN re WMT China 171016, PETERSEN extends 171024, |

| |
|---|
| PETERSEN re funding next steps WMT 180301, PETERSEN re WMT China 180301 PETERSEN Midland Completed New Asset Information Document.5.10.17 170510.pdf 150831 PETERSEN 25K Inv Check 150831.pdf 150927 WP Stock Cert 004 Preferred Series A Doug PETERSEN 150927.pdf 160404 WP Stock Cert 007 Preferred Series A Doug PETERSEN 160404.pdf 170103 WP Stock Cert 009 Preferred Series A Doug PETERSEN 170103.pdf 170420 WP Stock Cert 010 Preferred Series A Doug PETERSEN 170420.pdf 170519 WP Stock Cert 011 Preferred Series A Doug PETERSEN 170519.pdf 170708 WP Stock Cert 012 Preferred Series A Doug PETERSEN 170708.pdf 170914 WP Stock Cert 014 Preferred Series A Doug PETERSEN 170914.pdf 180305 WP Stock Cert 015 Preferred Series A Doug PETERSEN 200225 SBI 006 PETERSEN Stock Cert Common 200225.pdf |

*660. RICO-22 Racketeering Violations:* **Fraudulent Financings – Private Placement and Public IPO 2015-2017**

A. Defendant ADAMSON Brothers (with defendant Andrew ALTAHAWI as CEO, FBI Newark, NJ) primarily operating from Paramus, NJ, offered investment banking services to Winnett, including a $22 million private placement shown at Interline Exhibit 7, to be followed by a public offering using an SEC S-1 registration statement to provide those investors with future liquidity, the classic financing SEC public process legitimately used by private companies when investment market conditions are favorable.

B. Winnett expended $40,000 with ADAMSON of invested funds from DEAN T. SMITH (FBI, Sacramento) for this fraudulent private placement (Interline Exhibit 7, LPEE pages 8507-8514, 8524-8654, 8565-8626, zero dollars raised from the investors) and for legal

fees to defendant I-BANK ATTORNEYS of Illinois to prepare the SEC Form S-1 public stock offering registration statement for the promised public offering which was to follow for Lead Plaintiff's company, Winnett. The alleged interstate private placement raised zero dollars after an extended delay, consistent with both prior and subsequent experience in other defendant UNITED STATES racketeering interferences in interstate commerce from 1983, and which would be experienced by Lead Plaintiff again through a small but highly prestigious old line Wall Street brokerage and investment banking firm in 2017, DOMINICK (KEENE, GROSS) including, without limitation, in conspiracy with other members of this associated-in-fact enterprise with police powers operations at WALMART (Bentonville, AR. MCCORMICK, among others) and KROGER (Blue Vine, OH, KREMPEL, MERCED), (paragraphs 471-489, Interline Exhibits 4-12).

C. During the preparation of the SEC S-1 statement, defendant ADAMSON's CEO ALTAHAWI delayed the required financial statement audit by delaying his auditor recommendation, so Lead Plaintiff's company was unable to file audited financial statements with the S-1 public offering statement for timely SEC review. In the meantime, other actions were taken by defendants in Lead Plaintiff's captive environment to orchestrate delays and exhaustion of company and personal funds, so Lead Plaintiff and Winnett were unable to pay the auditors to provide the signed audit opinion within the required SEC filing period, which then expired for the S-1, effectively trashing the entire set of expenditures made by Winnett and further extending involuntary servitude and acts, violations, and injuries by defendant UNITED STATES and its co-conspirators.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 7 specifically, 4-12 |
|---|---|
| Complaint paragraphs: | 471-489; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0053, 2-0054, 2-0059, 2-0173 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 8507-8514, 8565-8626, 9923 |
| Emails and documents by topic and date, also located in LPEE: | AJSH Jain re xmit audited fin stmts 151205, ALTAHAWI re S1 PPM fees 150909, ALTAHAWI 40K and info for S1 PPM 150910, ALTAHAWI re PPM corrections150919, ALTAHAWI re any progress S1 PPM 150928, ALTAHAWI re auditor ref 150929, ALTAHAWI PPM progress 151001, ALTAHAWI re auditor engagement ltr 151001, |

| | ALTAHAWI S1 PPM progress 151005, |
| --- | --- |
| | ALTAHAWI PPM connection 151007, |
| | ALTAHAWI re Jabor MEC fee 151028, |
| | ALTAHAWI Tracy re 100mm debt PPM 151203, |
| | ALTAHAWI Jain re auditor consent 160108, |
| | ALTAHAWI re auditors 160111, |
| | ALTAHAWI on status 160115, |
| | ALTAHAWI on status 160126, |
| | ALTAHAWI on status 160324, |
| | ALTAHAWI on status 160401, |
| | ALTAHAWI on investor search fail 161122, |
| | ALTAHAWI re status 161122, |
| | ALTAHAWI re Dropbox Access to BLACKPOOL 170202, |
| | ALTAHAWI Auditors popup 171114, |
| | ALTAHAWI ADAMSON 150908 Capital Markets Agreement Signed 150908.pdf |
| | ALTAHAWI ADAMSON 150908 Consultency Agreemnt, Winnett Perico Signed 150908.pdf |
| | ALTAHAWI ADAMSON 22MM WP PPM FINAL 150920.pdf |
| | ALTAHAWI ADAMSON Consultancy Agreement ANNEX A.pdf |
| | Ibankattny S-1 update email 161022, |
| | KUNSAK re ALTAHAWI ADAMSON Contract 160108, |
| | WO Status Report ADAMSON PPM 150917, |
| | WO Team re PPM S-1 processes 150921 |

**661. RICO-23 Racketeering Violations: Fraudulent Financings, International CFIUS Pretexting 2015**

A. At Lead Plaintiff's request, Defendant SULLIVAN (paragraph 171, 626A(v) RGTS-6, then representing himself as a former CPB investigator and attorney as a result of an introduction by JACKSON) consulted a third party attorney to assist in determining the veracity of the Qatar Ministry of Economy and Commerce document (LPEE pages 750-752) required to secure a license to process a USD $52,000,000 investment by Jabor International Investment QSC, ostensibly controlled by members of Qatar's al-Thani royal family. Lead Plaintiff's company, Winnett, paid $9975 by wire transfer to an account in the United Kingdom (not Qatar). See LPEE pages 754-765, 10108-10118.

B. On knowledge and belief, this alleged investment was in fact a defendant CIA international fraud and forgery in the name of the Qatari royal family using official government forms. The $9975 wire transfer to the United Kingdom (not to Qatar) was just under the $10,000 government disclosure limit, as intended by defendant UNITED STATES to conceal this transfer from official US government records during perpetration of this fraud by defendant UNITED STATES (most probably CIA), in the same pattern demonstrated at paragraph 656C RICO-18, Bank of America, Ramsey, NJ when $9200 cash had to be physically transferred from Wells Fargo, Ramsey, NJ to Bank of America, Ramsey, NJ. Similar property theft abuses just under the $10,000 reporting limit which also constitute racketeering acts in deprivation of property rights by defendant UNITED STATES include paragraphs 610I HEXP-7, 656 RICO-18, 830D, 831G, and an international $5,000 reporting limit at paragraph 665.

C. Lead Plaintiff took a copy of this signed $52 million Jabor International Investment QSC agreement with him to an October 2015 organic vegetable packing plant construction design meeting in the otherwise empty Willmeng Construction headquarters building in Maricopa County, AZ. He showed the signed $52,000,000 financing contract document to ARPAIO (known as Greg Crossgrove, defendant MARICOPA SHERIFF, ARPAIO) who sat to the Lead Plaintiff's immediate left, as they faced a large video conference viewing screen for a project design progress discussion with Lino BELLI and his Belli Architectural Group team members, Salinas, CA, for the WinnettOrganics (a Winnett trade name) Central Arizona Distribution Center organic vegetable production plant planned for Eloy, AZ . See LPEE pages 1740, 8489-8506.

D. Since the ostensible $52 million investment involved members of a foreign government in a material investment in a US business, it would have required review by CFIUS,

yet another fraudulent entrapment pretext in the long-running series of defendant FBI and CIA

entanglement and entrapment attempts to sustain their associated-in-fact enterprise acts,

violations, and injuries directed at Lead Plaintiff for the purpose of perpetuating illegal BRMT

development and deployment operations in their on-going pattern of illegal BRMT, rights, and

racketeering acts, violations, and injuries which are representative of these associated-in-fact

enterprise patterns perpetrated against this class of plaintiffs. Lead Plaintiff discussed this

CFIUS review requirement with SULLIVAN, a well-experienced ostensibly former defendant

DHS CPB attorney and investigator who had worked with CIA and JACKSON, but the

fraudulent defendant UNITED STATES (FBI/CIA) $52 million investment never transpired, as

was defendant UNITED STATES pattern of practice to and since that time.

E. Lead Plaintiff also spent an extra week in Tucson, AZ during this time waiting for a

site visit by Dr. Moise Anglade, a Miami, FL area cardiologist, allegedly interested in making a

six figure investment. Anglade cancelled the meeting late in that week of waiting by Lead

Plaintiff, another now familiar delaying tactic of defendant FBI to expend the limited resources

of others to pursue its pattern of racketeering acts while interfering in interstate commerce.

F. This scheme and conspiracy required and consumed the time and financial resources

of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 4 through 14 |
| --- | --- |
| Complaint paragraphs: | 171, 626A(v) RGTS-6, 656C RICO-18; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 754-765, 10108-10118; 1740, 8489-8506 |
| Emails and documents by topic and date, also located in LPEE: | BELLI 14077 BELLI-WO PSA Signed 150917.pdf<br>BELLI 14077 WO Mtg Agenda Salinas 150925.pdf<br>BELLI 14077_Meeting Minutes 150918.pdf<br>BELLI 14077_Project Contacts 150925.pdf<br>BELLI 14077_Winnett Organics Kick-Off Meeting Minutes 1 150925.pdf<br>D Brewer Air Itenerary EWR PHX Hold for Anglade EWR 150830.pdf<br>D Brewer Car Rental Itenerary EWR PHX Hold for Anglade EWR 150830.pdf<br>D Brewer FS for SBI Surety Bond 413-NEW-as-of-7-30-2018 180730 .pdf<br>D Brewer Hotel EWR PHX Hold for Anglade EWR 150830.pdf<br>D Brewer Hotel Tucson EWR PHX Hold for Anglade EWR 150830.pdf<br>D Brewer US Airways EWR PHX EWR 150830.pdf<br>Swisslog Winnette Organics-Budget Proposal 12-28-2016 v1_1 161228.pdf |

| | Jabor Funding Due Diligence151012, |
| --- | --- |
| | Jabor dilution and free trading share plan 151014, |
| | Jabor investor team info to SULLIVAN 151020, |
| | Jabor Due Diligence Info SULLIVAN 151021, |
| | Jabor Funding Agreement 151021, |
| | Jabor investor wire xfr date 151021, |
| | Jabor Funding Stock Adj PETERSEN 151022, |
| | Jabor Funding wire tomorrow 151026, |
| | Jabor Funding MEC fee and agreement sig page 151027, |
| | Jabor MEC fee wire xfr record TD Ameritrade 151028, |
| | Jabor Funding MEC fee wire MIA 151030, |
| | Jabor Funding Cinfirm to BELLI Salinas 151105, |
| | Jabor Funding MEC License Rcvd 151105, |
| | Jabor Funding Bust 151119 |
| | DoubleK Invoice Ricky King 10132- 10133 |

## *662. RICO-24 Racketeering Violations:* **Fraudulent Financing Fees Supporting Fraudulent Sales Opportunities 2018**

A. Defendant SALLYPORT, a commercial financing company domiciled in Texas, was paid an application fee of $2,000 for Accounts Receivable and Purchase Order financing services which arose as a result of, and/or were interfered with, by defendant UNITED STATES and its co-conspirators, through their offering of fraudulent pending sales orders and contracts in 2018 which they had no intention to complete, and which were elements of a pattern of commercial entity and police powers frauds and conspiracies of defendant UNITED STATES and its co-conspirators in commerce and interstate commerce, which have and do consume financial resources and management time of Lead Plaintiff and the entities he has and/or does legally own, control, and/or manage. See LPEE pages 9271-9272, 9281-9283, 9312-9313, 10005.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4 through 14 |
|---|---|
| Complaint paragraphs: | 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | 9312-9313, 9271-9272, 9281-9283, 10005 |
| Emails and documents by topic and date, also located in LPEE: | 180814 SALLYPORT 1750K SCF Proposal Letter Winnett Cattle Company Inc_ (003) 180814.pdf |
| | 180414 SALLYPORT Signed SCF Proposal Letter Winnett Cattle Company Inc_ (003) |
| | 180616 SALLYPORT Signed SCF Application 180616.pdf |

### 663. RICO-25 Racketeering Violations: Fraudulent Financing Fees 2018

A. Lead Plaintiff business entities paid fees to alleged financial services providers in April, August, and October of 2018 totaling $14,950. Access to the accounting detail which identifies these potential defendants is currently blocked from access by defendant UNITED STATES, so the payees' identities and the exact amounts of these payments are currently not discernible. See LPEE pages 10026, 10027 second line, 10028 second line (also excepted below), for the currently accessible recordation of these expenditures.

LPEE page 10026 excerpt:



Winnett Cattle Company, Inc.
PROFIT AND LOSS
January 1 – December 31, 2018

| | TOTAL |
|---|---|

LPEE page 10027 excerpt (2018 summary from accounting records):

| | JAN | FEB | MAR | APR | MAY | JUN | JUL |
|---|---|---|---|---|---|---|---|
| Bank fees | | | 189 | | | | |
| Financial provider fees | | | | 5450 | | | |
| - | | | ---- | ---- | --- | | ---- |

LPEE page 10028 excerpt (continuing the 2018 record above to succeeding months):

| AUG | SEP | OCT | NOV | DEC | Total |
|---|---|---|---|---|---|
| | | | | | 189 ** |
| 4500 | | 5000 | | | 14950 ** |

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 10027 second line, 10028 second line |
| Emails and documents by topic and date, also located in LPEE: | Blocked by defendant computer email access hack |

### *664. RICO-26 Racketeering Violations:* Fraudulent Financial Services – Domestic Debt Broker 2018

A. Defendant NEW AMERICA LENDING, a Illinois domiciled LLC owned and

managed by David Choate HUGHES, which has and/or does engage in commercial financing

and broker/finder of private investors for commercial enterprises company was paid fees totaling

$7,500 to arrange or complete financing for the Lead Plaintiff's company, to be supplied by

defendant NEW AMERICA LENDING, as represented by HUGHES in these transactions as

using its own internally controlled loan and equity investment funds, and those of third parties to
be raised by defendant NEW AMERICA LENDING, to finance general working capital,
specific assets, and/or sales opportunities of the Lead Plaintiff's Winnett commercial entities.
Lead Plaintiff entities were defrauded by these bad faith acts of NEW AMERICA LENDING
and HUGHES. See LPEE pages 9314-9318, 9328-9337, 9394-9401, 9653, 10011, 10021.
Relevant emails form this period are currently blocked by defendant UNITED STATES as this
Complaint is being prepared. HUGHES was either a defendant FBI agent, asset or investigatory
subject permitted to enter the carefully controlled electronic environment used violate
constitutional rights and to sustain the involuntary servitude and control of Lead Plaintiff as an
involuntary human subject of the illegal BRMT bioweapon and bioweapon delivery system
program and the associated-in-fact enterprise of defendant UNITED STATES, DOJ, FBI, CIA,
ARMY, NIAID, and the individual defendants associated therewith, together with all their
contemporaneous co-conspirators.

     B. This scheme and conspiracy required and consumed the time and financial resources
of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running
schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude
over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT
development and deployment; illegal human subject medical experimentation without consent,
to and including torture and suicide ideations; systematic constitutional rights violations; and
racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated
herein by reference including, without limitation, paragraph 599, with particular attention
directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets
privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
| --- | --- |
| Complaint paragraphs: | 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 9314-9318, 9328-9337, 9394-9401, 9653, 10011, 10021 |
| Emails and documents by topic and date, also located in LPEE: | 150130 MULTIFUNDING SULLIVAN re referral to David HUGHES 150130 Bates.pdf |
| | 180823 NAL HUGHES $2point5MM Initial Term Sheet debenture 180823.pdf |
| | 180823 NAL HUGHES $2K Wire Details 180823.pdf |
| | 180905 NAL HUGHES Consulting Agreement Winnerr 180905.pdf |
| | 181012 NAL HUGHES 350K min Winnett Conditional Term Sheet (002) 181012.pdf |
| | 181012 NAL HUGHES $5000 Compl Wire 181012.pdf |

### 665. RICO-27 Racketeering Violations: Fraudulent Financial Services -International Debt Broker 2015-2016

A. Winnett expended $4,950 with PPM Experts in Europe for the preparation of a Private

Placement Memorandum required for fraudulent private placement services by defendant

INSIGHT NETWORK and Don KEISER, which thereupon engaged in pretending to work to

place $100 million of debt with European and other investors and submitted false and

misleading progress reports to Lead Plaintiff by email and phone. Exactly zero dollars were raised in this fraudulent scheme, another in the long-running series of investor and investment finder/banker agreements frauds failing to provide honest services in interstate commerce. During this same period, other actions were taken by defendants in their captive environment of Lead Plaintiff to continue to exhaust personal and business entity funds, see paragraphs 612 HEXP-9, 622 637 RGTS-2, 17; paragraphs 640, 655-661, 668-670 RICO-2, 17-23, 30-32, as elements of this conspiracy across all defendants.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
|---|---|
| Complaint paragraphs: | 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 8563-8564, 8627-8714, 9923 |
| Emails and documents by topic and date, also located in LPEE: | INSIGHT KEISER Intl Debt placement 100mm 151028, INSIGHT Ovcar Intl Debt placement 100mm 151029, INSIGHT KEISER Terms for Intl Debt placement 100mm 151104, INSIGHT Verbal Commit by WO 151104, INSIGHT PPM Winnett Perico 151201, INSIGHT status inquiry 160112, INSIGHT status report 160113, INSIGHT status report 160122, INSIGHT re lack of progress 160418, PPM Expert Invoice 145.11-2015 Winnett Perico, Inc 151117 PPM Expert 100MM Debt Offer Document Winnett Perico 160105.pdf PPM Expert Questionnaire 151123.pdf |

### 666. RICO-28 Racketeering Violations: Fraudulent Financial Services – Mid-Market Investment Bank 2016-2017

A. Defendant MADISON STREET Capital's various officers and employees, while

defendant police powers agents, officers, and/or confidential informants, and as a part of this on-

going conspiracy and pattern of racketeering acts, represented themselves and their firm as

capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's business

entities, and thereby conspired, during 2015 through 2018 in a complex sales, production,

operations, and financing scheme and conspiracy to deprive Lead Plaintiff and his related

entities of authentic opportunities to engage interstate commerce. This scheme required and

consumed the time and financial resources ($1,950 per a signed agreement on April 5, 2018) of

Lead Plaintiff and his business entities in the bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles.

     B. This scheme and conspiracy required and consumed the time and financial resources

of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 4 through 14 |
|---|---|
| Complaint paragraphs: | 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; |

| LPEE pages (see technical note on page numbering at paragraph 230): | 9270, 9722 |
|---|---|
| Emails and documents by topic and date, also located in LPEE: | MADISON ST Capital 160328, MADISON ST outreach 170726, MADISON ST Ibanker Madison St Capital initial hit 170727 |

### *667. RICO-29 Racketeering Violations:* **Fraudulent Financial Services - International Financial Services Institution 2016-2017**

A. Defendant Bank of America BESTWICK CARDONE Group Senior Vice President Robert BESTWICK and Vice President Andrew CARDONE (defendant FBI Manhattan, New York) with offices embedded in Bank of America, N.A., at One Bryant Park, New York, NY, held a Natural Foods Symposium in New York City in May 2016, and invited Lead Plaintiff to this fraudulent conference for the purpose of sustaining involuntary servitude, defrauding, and acquiring intelligence, and to introduce Lead Plaintiff to DOMINICK investment banker Michael Callahan (KEENE), thereby aiding and abetting the fraudulent scheme, swindle, and conspiracy of defendant UNITED STATES and its co-conspirators. See also paragraph 668 RICO-30.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
|---|---|
| Complaint paragraphs: | 668 RICO-30; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0178, 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 8805-8812, 9094 |
| Emails and documents by topic and date, also located in LPEE: | BA BESTWICK CARDONE AXIAL Nat Food Symposium 160415,<br>BA BESTWICK CARDONE on my BA history160502,<br>BA BESTWICK CARDONE Fake Food Symposium 160531,<br>BA BESTWICK CARDONE on RAM CS sales contract 160608,<br>BA BESTWICK CARDONE referes Callahan (KEENE) DD 160707,<br>BA BESTWICK CARDONE re intro at DD 160712,<br>BA BESTWICK CARDONE progress report DD 160808,<br>BA BESTWICK CARDONE lunch pre DD mtg 160927,<br>BA BESTWICK CARDONE sked Kiely call 161024,<br>BA BESTWICK CARDONE NYC Keily trust ref call161102,<br>BA BESTWICK CARDONE on KROGER uptake agreed 161110,<br>BA BESTWICK CARDONE update 170227,<br>BA BESTWICK CARDONE on Balckpool fail new search DD170323, |

| | BA BESTWICK CARDONE on BLACKPOOL SHEFFORD 170324, BA BESTWICK CARDONE Fake Food Symposium 170516, BA BESTWICK CARDONE Fake Food Symposium 170609, BA BESTWICK CARDONE alt ibanker intro 171130, BA BESTWICK CARDONE re Skaar alt ibankers intro offer 171130 |
|---|---|

**668. *RICO-30 Racketeering Violations:* Fraudulent Financial Services – Wall Street and Los Angeles Investment Banks 2015-2021**

A. Defendants Michael Callahan (KEENE) and Mark GROSS, while acting as defendant agents, officers, or confidential informants, (defendant UNITED STATES' CIA, FBI, as well as media industry allowed to operate inside the conspiracy to obstruct interstate commerce) as part of this on-going conspiracy and pattern of racketeering acts, represented themselves and their firm, defendant DOMINICK, as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's business entities, thereby conspiring, coordinating with, and playing an on-going role during 2016-2017, and thereafter into 2021 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce (paragraphs 99l., 222, 602 NSEC-3, 660, 667 RICO-22B, 29).

B. Robert FINKELSTEIN sustained a fraudulent relationship with Lead Plaintiff and his entities, misrepresenting his firm Del Morgan, domiciled in southern CA, as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's business entities, thereby conspiring, coordinating with, and playing an on-going role during 2016-2017 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

C. Other defendant bad faith actors and co-conspirators in this fraudulent scheme and

swindle include, without limitation, defendants Joseph ARPAIO, both as MARICOPA

SHERIFF and individually; Double K Farming and Ricky King, as an associate of ARPAIO;

WALMART; KROGER; Willmeng Construction as to use of their facility by FBI, ARPAIO,

MARICOPA SHERIFF; RAM Consulting; Richard MILLER, Steve SAYRE, Sean LYLE, and

David HINSON (FBI); and fraudulent Winnett employees known to Lead Plaintiff as Bruce

BLITCH, Michael CASTRO, Rafael GOMEZ, Peter LEBLOND, Jon NICKLESS, PAUL

SMITH, Mark VINDIOLA, and Jason WASEMAN, while acting in bad faith, jointly and

severally (paragraph 687 RICO-49).

D. This scheme and conspiracy required and consumed the time and financial resources

of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 4-14 |
| Complaint paragraphs: | 99l., 222, 602 NSEC-3, 660, 667 687 RICO-22B, 29, 49; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0178, 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 622-623, 632-635, 639, 642-643, 651-652, 656-658, 659-661, 8770-8787, 8788-8804, 8805-8812, 9193, 9207-9214, 9277, 9280 |
| Emails and documents by topic and date, also located in LPEE: | AltaVista Investment Commitment- Winnett Perico, Inc.161010, |
| | AltaVists faked fin 161017, |
| | AltaVista fup 161018, |
| | AltaVista key personnel intro 161018, |
| | AltaVista SULLIVAN re bad actor 161018, |
| | AltaVista WP due diligence on AV 161018, |
| | AltaVista fake followon funding anncmnt 161025, |
| | AltaVista update 161026, |
| | BELLI 14077 BELLI-WO PSA Signed 150917.pdf |
| | BELLI 14077 WO Mtg Agenda Salinas 150925.pdf |
| | BELLI 14077_Meeting Minutes 150918.pdf |
| | BELLI 14077_Project Contacts 150925.pdf |
| | BELLI 14077_Winnett Organics Kick-Off Meeting Minutes 1 150925.pdf |
| | Centerboard Grp as Investor 170517, |
| | Centerboard Grp as Finder DD 170526, |
| | Centerboard PE intro 170526, |
| | D Brewer Air Itenerary EWR PHX Hold for Anglade EWR 150830.pdf |
| | D Brewer Car Rental Itenerary EWR PHX Hold for Anglade EWR 150830.pdf |
| | D Brewer FS for SBI Surety Bond 413-NEW-as-of-7-30-2018 180730 .pdf |
| | D Brewer Hotel EWR PHX Hold for Anglade EWR 150830.pdf |
| | D Brewer Hotel Tucson EWR PHX Hold for Anglade EWR 150830.pdf |
| | D Brewer US Airways EWR PHX EWR 150830.pdf |
| | DD Engagement Letter Signed 160713.pdf |

| | DD Signed Terminated Engagement Agreement Winnett-Dominick_5_31_17 171116.pdf |
| | DD Skaar JBS Letter 170522.pdf |
| | DD Skaar Teaser 170905.pdf |
| | DD Swisslog Winnette Organics- JAN Mtg 1-24-2017 v1 170124.pdf |
| | DD Callahan (KEENE) on Holistic Impact Partners 140417, |
| | DD on Oliver Term Sheet 160711, |
| | DD Callahan (KEENE) re engement ltr 160714, |
| | DD Callahan (KEENE) re cancelled Oliver mtg 160812, |
| | DD on Oliver Hyder resurrection 160824, |
| | DD re Revolution intro 160825, |
| | DD for Revolution WinnettOrganics Presentation 160910, |
| | DD Callahan (KEENE) 160914, |
| | DD on Revolution VC presentation 160919, |
| | DD on Nielson organic foods outlook 160920, |
| | DD on DelMorgan intro 160925, |
| | DD mtg fup 160929, |
| | DD Sep Discussion Document 160929, |
| | DD re work Wakefern connection 160930, |
| | DD Commitment Cmte pkg to Callahan (KEENE) 161006, |
| | DD re Kingman acquisition 161007, |
| | DD GROSS on other fin options 161014, |
| | DD re Alta Vista involvement 161014, |
| | DD Callahan (KEENE) re AltaVista 401pm 161017, |
| | DD notes on AltaVista offer 161017, |
| | DD Callahan (KEENE) 2 re AltaVista 161018, |
| | DD Callahan (KEENE) re AltaVista 1107am 161018, |
| | DD Callahan (KEENE) re AltaVista739pm 161018, |
| | DD GROSS on Alta Vista2 161018, |
| | DD GROSS re AltaVista 161018, |
| | DD on Alta Vista play out 161018, |
| | DD on Smith CFO Hyder Stall 161105, |
| | DD Hinson on production volumes 161106, |
| | DD Callahan (KEENE) on proposed WMT revision 161114, |
| | DD Callahan (KEENE) re investor interest 161115, |
| | DD on WMT Swisslog 161230, |
| | DD re 5 yr plan to WMT 161231, |
| | DD Callahan (KEENE) re 170124 Swisslog mtg 170109, |
| | DD Callahan (KEENE) re Swisslog mtg 170109, |
| | DD Callahan (KEENE) re lending DD name to WMT presentation 170126, |
| | DD Callahan (KEENE) re Swisslog mtg fup 170126, |

DD Callahan (KEENE) on BLACKPOOL funding 170202,
DD Callahan (KEENE) re BLACKPOOL Term Sheet 170202,
DD Callahan (KEENE) update BLACKPOOL 170227,
DD Callahan (KEENE) continue working 170328,
DD update to outside bridge potential investor 170410,
DD revised Bus Plan adds cattle 170417,
DD re Rabo ID Skaar 170503,
DD Skaar Site Plan Barns Winnet   Site Opt 8 170509,
DD Transom re Skaar 170512,
DD on Skaar fert option 170513,
DD Skaar Barns Detail Site Opt 8 170523,
DD Fleming on DD Finl Model 170526,
DD Callahan (KEENE) re PE dilutive 170531,
DD on Skaar Organic Fertilizer Mkt Size 170531,
DD on Skaar Organic Fertilizer Plant Ops 170531,
DD on Skaar Organic Fertilizer Plant Concept Plan 170601,
DD Skaar Royal Chem CAS numbers Contract Fert Pkg 170604,
DD Skaar Site Plan 170605,
DD Skaar Site Plan Ammonia Recovery Manure 170605,
DD Skaar Organic Fertilizer Effectiveness 170607,
DD Skaar Organic Fertilizer Pricing 170607,
DD Skaar PE Investor Bid email 170607,
DD Skaar PE Investor Bid form 170607,
DD re Centerboard Housing Solution WO 170608,
DD WCC teaser draft 170608,
DD Skaar Organic Fertilizer Production Cost 170609,
DD Callahan (KEENE) re funding sked 170612,
DD Skaar Organic Fertilizer Advantages 170614,
DD WCC Pitch Deck Skaar etal 170614,
DD Callahan (KEENE) on DeSai 170616,
DD Skaar Biiding Process to SANDERS 170616,
DD Callahan (KEENE) on AXIAL lead Chatham 170619,
DD Skaar Site Plan Mods 170619,
DD NGEN fake NYC investor 170622,
DD NYC VAN BRAKEL 170622,
DD Callahan (KEENE) re AGIS NDA cmu not credible 170628,
DD Skaaar AgIS Boston 170628,
DD Skaar Advantage NDA 170628,
DD Skaar AgIS Boston 170628,
DD Callahan (KEENE) re Skaaar visit sked 170726,
DD on HIG Capital Miami 170728,

DD Skaar site visit Sander 170728,
DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,
DD Skaar BDO Auditor SLC Gordon 170804,
DD Skaar BDO Auditor SLC Gordon 170807,
DD NYC Callahan (KEENE) connects to BDO SLC 170808,
DD Skaar Callahan (KEENE) Update 170809,
DD LABELLE Teton County 240 Tour Pass 170810,
DD Skaar Cost per pound gain 170811,
DD Skaar LOI xmit 170811,
DD Skaar LOI signing 170821,
DD Skaar past contacts 170821,
DD Skaar Teton River Farm Feeney email 170822,
DD Skaar rcv Alt Offer 170828,
DD Skaar Teaser 170905,
DD Callahan (KEENE) re no progress 170906,
DD Skaar Kritser 170907,
DD Skaar Kritser to WO team 170907,
DD Skaar SANDERS tours Frank MAUGHAN BDO 170913,
DD Skaar SANDERS on Kritser alt structure 170915,
DD Skaar Kritser re adjusted LOI 170919,
DD Callahan (KEENE) on failure to date and breach 170920,
DD Skaar Kritser 170921,
DD Skaar Sander re Kritser 170921,
DD Skaar SANDERS on revised structure 170929,
DD Skaar Kritser 171002,
DD Skaar Kritser string out 171004,
DD Skaar SANDERS Update 171013,
DD Skaar SANDERS re Kritser Friona Ind ExCEO call 171022,
DD Skaar WMT China ND Rep Sr Legislator BANCO Advisors 171024,
DD Skaar Kritser dragout decline to WO team 171110,
DD Skaar Revised Buyout 171112,
DD Termination Notice 171114,
DD Callahan (KEENE) Disappears 171115,
DD Callahan (KEENE) acks Termiantion 171117,
DD Skaar SANDERS revised LOI 171128,
DD Skaar WMT China procurement 180817,
DelMorgan re intro 160925,
DelMorgan email WP proposal 160928,
DelMorgan fup DD declines to share 160929,
DelMorgan update WMT 170106,
DelMorgan 170110,

DelMorgan re DD engagement 170308,
DelMorgan re alt retainer arrangement 170324,
DelMorgan revised docs170324,
DelMorgan re alt firm retainer avail 170327,
DelMorgan nogo on alt fee provider 170404,
DelMorgan on DD Callahan (KEENE) telcon 170822,
DelMorgan 160928 Engagement Summary -
WinnettOrganics.pdf
DoubleK Invoice Ricky King 10132- 10133
GROSS re Korea beef pgm finance 210115,
GROSS re Big Sandy finance 210506,
GROSS re grainfed organic taste difference 210513,
GROSS 210514,
GROSS re Big Sandy rewrite Bus plan 210517,
GROSS re mkt research to demo our case 210519,
GROSS on organic mkt update 210522,
GROSS re organic beef proof of concept 210603,
GROSS re WMT Redfield US Grocery SVP 210618,
GROSS re Lake County tax advantages opptny zone
210630,
Hartman re GROSS organic mkt research inquiry 210520,
Hartman re refs and experience 210525,
Hartman Group re Organic Mktg Study for GROSS Mark
210603,
M GROSS re Korea contract finanaicn g et al 210119,
Swisslog automation Jennings NYC in house 161101,
Swisslog automation Jennings NYC in house 161107,
Swisslog automation Jennings NYC in house 161205,
Swisslog to WASEMAN re automation 161228,
Swisslog Jennings re DD mtg and progress 170113,
Swisslog re NYC meeting notes and fup 170126,
Swisslog Deck DD mtg to WO team members 170128,
Swisslog Winnette Organics-Budget Proposal 12-28-2016
v1_1 161228.pdf
WMT initial hit on cold email 161002,
WMT fup Baldwin 161010,
WMT MCCORMICK ref from Balwin 161011,
WMT sales news to WO team 161011,
WMT MCCORMICK Webex 161014,
WMT MCCORMICK call tomorrow email 161017,
WMT MCCORMICK call fup 161018,
WMT MCCORMICK call fup production volumes
161020,
WMT MCCORMICK call 161109,
WMT MCCORMICK re DD discussion 161114,
WMT MCCORMICK resked and participant list 161114,

WMT MCCORMICK call fup 161116,
WMT MCCORMICK call fup 161118,
WMT MCCORMICK re investors ibankers 161121,
WMT MCCORMICK on contract outline 170108,
WMT MCCORMICK Bentonville Mtg Attendees 170111,
WMT MCCORMICK 170224 Bentonville mtg Present Draft 170123,
WMT MCCORMICK email Bentonville Mtg Presentation 170123,
WMT MCCORMICK Bentonville Mtg Attendees 170216,
WMT MCCORMICK Bentonville Mtg Invite 170216,
WMT MCCORMICK Bentonville Mtg Location 170216,
WMT MCCORMICK Bentonville mtg fup 170222,
WMT MCCORMICK re post Bentonville Mtg Rev 170222,
WMT MCCORMICK nonreply fup 170328,
WMT Baldwin re decision next week 170403,
WMT MCCORMICK re mktg plans 170403,
WMT MCCORMICK on price drop 170412,
WMT MCCORMICK buyer contacts 170425,
WMT China Beef ref from MCCORMICK 170703,
WMT connects China on beef 170703,
WMT China Zheng initial contact 170704,
WMT China Zheng merch support 170707,
WMT China Zheng ROM pricing 170708,
WMT China beef HIGAKI intro 170718,
WMT China beef HIGAKI pricing 170811,
WMT China HIGAKI price quote 170811,
WMT China Hgiaki Quotes Specs 170821,
WMT China HIGAKI adding WO factory id 170821,
WMT China HIGAKI request factory number add 170821,
WMT China HIGAKI quote fup 170822,
WMT China WO Status Report WMT China Beef 680 ton order 170921,
WMT Chna HIGAKI re WMT contract 170924,
WMT China HIGAKI re process steps 170926,
WMT China Preferred Freezer initial hit 170926,
WMT China Americold initial hit 170929,
WMT China Cargill contact punt 171002,
WMT China HIGAKI Executed WMT Contract 171010,
WMT China Update WO Team 171012,
WMT China HIGAKI China visit and update 171023,
WMT China HIGAKI re contract signature rqmt 171023,
WMT China HIGAKI re JBS Specs 171026,
WMT China HIGAKI on revised order pricing 171208,

WMT MCCORMICK on China status 171220,
WMT China re labeling 180110,
WMT China xmit manually signed contract copies 180112,
WMT China order processing timeline 180115,
WMT China HIGAKI re sked 180116,
WMT China order timing Apr 180116,
WMT China HIGAKI re factory flow charts trial shipment 180122,
WMT China HIGAKI orig signed contracts sent 180123,
WMT China CA OWB Packers delay 180131,
WMT China HIGAKI intro of SCS process 180201,
WMT China HIGAKI re OWB approval 180201,
WMT China HIGAKI SCS 180201,
WMT China Hgiaki re Cargill Tyson on China 180202,
WMT China Higki re OWB SCS audit 180202,
WMT China OWB stringout 180206,
WMT China OWB stringout 180207,
WMT China OWB stringout 180214,
WMT China OWB stall 180223,
WMT China OWB stall continues 180223,
WMT China SamsClub China dragin 180227,
WMT China HIGAKI email sig page xmit 180228,
WMT China LiqCap AZ update 180228,
WMT China PETERSEN re signed contract evidence 180301,
WMT China re post OWB to JFO 180301,
WMT China JFO inquiry 180302,
WMT China re retail link 180302,
WMT China status on China 180302,
WMT China re local China ofcs 210130,
WMT China re China ofc and contact history 210202,
WMT China Liao re China ofc details 210204,
WMT China on packaged cuts 210222,
WMT China docs needed 210312,
WMT China Liao re new ofcs in China 210407,
WMT China re beef purchase embargo in China 210415,
WMT China SAmerica Quote 210422,
WMT China rejects BR Tradimpex case ready pricing 210426,
WMT China intro to RMC China rep Jason 210428,
WMT re US organic beef pgm 210605,
WMT Redfield on domestic organic beef 210607,
WMT Lehr Organic Beef Intro 210610,
WMT re organic beef partner pgm 210615,
WMT Lehr video mtg 210616,

| | |
|---|---|
| | WMT Lehr re comp organic price premiums on ther products 210617,<br>WMT Redfield cc Lehr video mtg 210617,<br>WMT Lehr alt sales ramp 210618,<br>WMT Lehr Baskin video mtg to come 210702,<br>WMT Hutchins mtg set 210713,<br>WMT Baskin Lehr call fup on pricing 210729,<br>WMT Baskin Lehr video call 210729,<br>WMT Partnering Zoom Call 210729,<br>WMT Baskin on pricing 210810,<br>WMT Baskin status inquiry 210816,<br>WMT Baskin pass 210818,<br>WMT Organic Beef pass 210818,<br>WMT Organic Beef pgm not established 210823,<br>WMT Baskin re pass pricing other issues 210824,<br>WO Plant Kickoff Salinas Mtg 150916,<br>WO Plant Willmeng ref from Sayre 150917,<br>WO Status Report ADAMSON PPM 150917,<br>WO Team re PPM S-1 processes 150921,<br>WO Plant Kickoff Salinas Mtg 150922,<br>WO Plant Willmeng contract draft 151012,<br>WO Plant Willmeng kickoff meet Oct 27 151019,<br>WO Plant Willmeng cost workup status 151021,<br>WO Status Report Jabor and Sales 151022,<br>WO Hyder Farm CASTRO on Oliver 151028,<br>WO Weekly Status Report reaction PETERSEN 151029,<br>WO Hyder Farm Terminal Estimate to Oliver 151030,<br>WO Sales Fresh Express Smith contact 151104,<br>WO Grt Western Bk local takeover visit 151117,<br>WO Team on Jabor Funded on Time 151117,<br>WO Team re Jabor snag 151118,<br>WO Team on financings 151120,<br>WP Paypal Acct Detail Sep-Dec 151231,<br>WO Team on 179mm Financings 160101,<br>WO Status Financings 160121,<br>WO Financings deal status to team 160208,<br>WO Status Kingman Startup Financings 160209,<br>WO Status Report financings 160421,<br>WO Status re Oliver Term Sheet Verbal 160719,<br>WO Status Final Oliver Hyder present sked 160804,<br>WO Status Hyder Oliver rework 160818,<br>WO Status DD Fin Sales 160929,<br>WO Status Report on Hyder Oliver new pitch status 161006,<br>WO on WMT progress 161018,<br>WO Status financings 161103, |

| | WO Status Financings WMT KROGER 161115, |
| --- | --- |
| | WO Status KROGER projection incl 161226, |
| | WP Great Western 2016 DDA Account 161231, |
| | WO Org Chart 170111, |
| | WO Blitch re ofc space tour 170118, |
| | WO Status Report REED Wood join 170119, |
| | WO Team re Gerlach soi tests 170201, |
| | WO Blitch re Stockton Hill Famr tour w BLACKPOOL 170203, |
| | WO Smith CFO re Revolution VC pass 170203, |
| | WO Status Rpt Stockton Hill Update 170209, |
| | WO Status Rpt incl WMT status 170223, |
| | WO Team re Blackppol to fund 170301, |
| | WO Team re BLACKPOOL no reply stringout 170309, |
| | WO Team re BLACKPOOL deadline miss 170310, |
| | WO Status Report DD retainer need 170320, |
| | WO also CARDONE on Status WMT others 170403, |
| | WO Team WMT dead Alb on track others 170404, |
| | WO Status Skaar 170504, |
| | WP Executive Summary Bus Plan 170507, |
| | WO Status Report Skaar Investor Interest 170515, |
| | WO Team Smith CFO Termination Notice 170612, |
| | WO Team Smith CFO Termination 170613, |
| | WO Team on DD Funding Skaar Acq Date 170615, |
| | WO Status Report Skaar nothing from Alberts 170706, |
| | WO Status Report re DD potential investors 170713, |
| | WO Status Report Skaar deal progress LOI 170727 |

*669. RICO-31 Racketeering Violations:* **Fraudulent Financings and Representation, Online Referral Services 2015-2018**

A. Defendant AXIAL.com held an annual investor conference in New York City in Fall 2015 and invited Lead Plaintiff as an interested party. Defendants used this conference, open to the public, to arrange meetings with MADISON STREET Capital, Perella Wasserstein Partners, and Young America Capital, among others. Most of these meetings were carefully arranged for the purpose of screening, acquiring intelligence, and introducing Lead Plaintiff to other defendant police powers officers, agents, and confidential informants to further defendants' fraudulent scheme and swindle by portraying themselves as capable of and sincerely interested

in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role during 2015 through 2018 in the continuation of their decades long complex sales, production, operations, financing and litigation scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

B. Defendant AXIAL personnel also later reintroduced themselves using AXIAL email addresses and phone calls to refer Lead Plaintiff to other similar fraudulent contacts and to cut out any contact between Lead Plaintiff and any serious investor interest from the real business and investor community as he made good faith attempts to pursue financing in interstate commerce.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
|---|---|
| Complaint paragraphs: | 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | AXIAL Investor Interest 150904.pdf<br>AXIAL to ALTAHAWI connect 150910.pdf<br>AXIAL NYC re Investor Referrals 171108.pdf<br>AXIAL re Paine Schwartz 171113.pdf<br>AXIAL NYC FRACTAL Intro 171116.pdf<br>AXIAL NYC FRACTAL stall 171129.pdf<br>AXIAL NYC FRACTAL stall 171204.pdf<br>AXIAL NYC FRACTAL drag out 171206.pdf<br>AXIAL fake investor leads 180302.pdf |
| Emails and documents by topic and date, also located in LPEE: | AGI 1 NYC Investor hit AXIAL 170515,<br>AGI 1 Lee Mtg Set 170517,<br>AXIAL Investor Interest 150904,<br>AXIAL to ALTAHAWI connect 150910,<br>AXIAL NYC re Investor Referrals 171108,<br>AXIAL re Paine Schwartz 171113,<br>AXIAL NYC FRACTAL Intro 171116,<br>AXIAL NYC FRACTAL stall 171129,<br>AXIAL NYC FRACTAL stall 171204,<br>AXIAL NYC FRACTAL drag out 171206,<br>AXIAL fake investor leads 180302,<br>FRACTAL re initial contact 171117,<br>FRACTAL progress 171206,<br>FRACTAL on status and nterest 171221,<br>FRACTAL intro Black Lake Chad Scripps 180117,<br>NYC Investor AXIAL Conf Intro PWP Growth Schectman 151028,<br>NYC Investor from AXIAL Formanek 151027 |

*670. RICO-32 Racketeering Violations:* **Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses 1986 to 2022**

A. Fraudulent commercial financing opportunities required the Lead Plaintiff and his related business entities to expend time and financial resources to locate and attempt to secure these alleged but fraudulent financings, and occurred in conjunction with both fraudulent sales opportunities and fraudulent property acquisitions arranged by defendants in conspiracy with other defendants, including, among others, individual persons and marital communities as owners; various forms of commercial enterprises, some as direct co-conspirators and others who were being spoofed by defendants.

B. Defendants have and do make common use of interstate wire fraud, mail fraud, in-person visits, entertainment, travel, and other means requiring expense or efforts by the Lead Plaintiff on his own behalf and for his business entities. These individuals and entities include, without limitation, all named defendants in various schemes as experienced by Lead Plaintiff and these various business entities, dating from 1986 to 2022 as listed in the Compendium at LPEE pages 934-1075, the table at paragraph 226 (defendants section), as well as those listed below. These defendants include domestic and international entities and individuals legally named above in this Complaint when known, and named as commonly known herein, and/or spoofed as the authentic entity by defendant UNITED STATES and other governments with police powers, their officers, agents and confidential informants, and with bad actors carefully screened-in by these defendants, including many entities for which there is no available pre-discovery evidence that disbursements have been made but that nonetheless required time and resources of the Lead Plaintiff and his business entities to pursue based upon their fraudulent misrepresentations. Many of these are most probably the fictional creations of defendant

UNITED STATES, but those entities are not discernible from authentic entities which also engaged in fraudulent acts. They must necessarily be deduced using discovery from these defendants. These individuals and entities include, without limitation, the following 220 plus domestic and international entities and individuals: Bank of America BA BESTWICK CARDONE; DOMINICK; Alta Vista; EarlyBird Capital; Chardan; NGEN; US Bank; Rabo Bank; JP Morgan Chase; NEW AMERICA LENDING; Intrepid Capital; Jabor; NHIG; JCXL; Alfardan; RJ Lumba; William Hoyle; Worldwide Financial; Stratos Commercial, Tesiina PAINTER; Warren John, Borgenson; Kabah family; LIBERTY WEST Regional Center; Vision Partners; Trinity; Blumberg; Whitestone, Lex Gubsky; Ken Shepherd; MULTIFUNDING; Utica Leaseco; Reich Bros; Viking Equipment Finance, Jim Buckingham; RAM Consulting, Richard A MILLER; DelMorgan, Robert FINKELSTEIN; Moise Anglade; Fiera Comox; Barings; FRACTAL Advisors; Black Lake Capital; Summit Partners; Summit Investment; NBH Banks; Great Western Bank; Currency Capital; Dynamic Capital; Al Mal; Kennedy Financial; Commercial Finance Partners; Capital Source Group; Ag America; World Business Lenders; Axos Bank; Patriot Funding/David Antonelli; Capital Markets Expert; Johnston-Todd; Business Capital; SouthStar; AgAmerica; Capstone Trading; AAY Panama; Credit Lyonnaise Laing/Michael Kurtanjek; Coco Capital; SOLE SOURCE Capital; Mayfield VC; Legendary VC; VII Capital; Vendome Bond; Songbird UK; Liquid Capital; Lantern Capital Advisors; Key and Company, David Key; JCXL; Jack Burstein; Zayid Mohammed; Isaac Capital; Interstate Capital; INSIGHT Network; Holistic Impact Partners; Harvest Returns; Fisher Enterprises; Equilibrium Capital; Centerboard Group; Farm Enterprises, Margie Costamanga; Brereton Hamilton; Elkehereiji; HIG Capital; Riverside; Armonia, Jasper VAN BRAKEL; Manna Tree; Crystal Lands Resources; Crestnorth Capital; Conterra; Correlation VC; Ethan Blum; Charles

Blair; Big Path Capital; BANCO Advisors; Auctus Capital; Armgold Harmony; Arlon; Alam Junaid; Hurwitz Financial; Silverwood Partners; Firelake Capital; Fountain Partners; Ridgestone; Chess Capital Partners; Endeavor; Republic Business Credit; Loan Whisperer; LeaseQ; Falcon Investments; CFA Omaha; Hawthorne Equity Partners; LNK Partners; MSTCPT; KLC Financial; Land O Lakes; BBVA; Ranch Creek; Hillstar Capital; AGR Partners; High Street Capital; C6 Capital; MetLife; Ag Lending Group; BMO; Arizona Bank and Trust; Bank of Tucson; Wells Fargo; Liquid Capital Express; FSW; Paramount Payment; Grand Canyon RC (EB-5); Prudential; United Financial Investment Group; Broadmark Capital; Zions Bank; Green Card Fund; TTM Capital; London Manhattan; Crucible Capital; Roth Capital Partners; Trianz; Citi Financial Group; Clarke Advisors; Noble Business Lending; Funding Merchant Source; Crowd Fooding; AgFunder; Prosperity Funding; Business Backer; YA Capital; Altima Partners; JACKSON Consulting Group; IPO Capital UK; Premier Financial Services; Commerce Bank Arizona; Merchant Finance; GUD Capital; Lynwood Capital; Headwaters Merchant Bank; Pinnacle Ventures; LGV Partners; New Star Financial; SJF Ventures; Farwest Capital; Resource Land Holdings; VN Partners; Cobank; Huron Capital; BLC Lending; Brickell Financial; Siena Lending; FCP Capital; DB Capital Solutions; First Capital Business Finance; Midland American Capital; Black Coral Capital; Olin Capital; US Capital Partners; SuperG Funding; Modern Capital Solutions; Brightway Financial Group; Sherbrooke Capital; WGIM Global; FS Equity; Point Financial; Clarion Partners; Biltmore Bank; Wall Street Strategic Capital; Nations Equipment Finance; MARV Capital; Fire Lake Capital; Perella Wasserstein Partners; Lycom Financial Group; Farwest Capital; Comerica; Mainstreet Capital; TDP Fund; Farmland LP; Blue Leopard LLC; SCS Dynamics; Don L Wood; Open Prairie; Chase Winters; New Seed Advisors; Bahraini Investment Group; Biz2Credit; American United

Capital; Vertex Financial; Phoenix Global Finance; Brahma Lending; West Monroe Partners; Lucid Solutions; Popular Commercial; ITBMS Global; BIBBY Financial; Bradley Gibson; CROSSROADS FINANCIAL; MB Financial; BLACKPOOL (various entities); SHEFFORD (various entities); Priority Funding; and various unknown Canadian broker and investment banker entities, typically doing business related directly or tangentially to the Vancouver Stock Exchange and with offices in the Vancouver, British Columbia area.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
| --- | --- |
| Complaint paragraphs: | 226, 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179, column entitled Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate 2-0165 through 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | See Compendium at LPEE pages 934-1075 for selected relevant emails and documents related to each entity and individuals named in this subcount. Full documentation to be provided in discovery. |
| Emails and documents by topic and date, also located in LPEE: | AAY Investments Panama Info Form PO Fin $3MM SBI AAY CIS – 2020 Completed 200306.pdf AgAmerica Reiten Big Sandy loan re pers gty issues 210304, AgAmerica attempt Miles Reiten Big Sandy pers gty 210322, AgAmerica Miles Reiten 210415, AgAmerica Reiten sked call 210707, AgAmerica Carson re WMT organic sales progress 210716, WCC AgAmerica Land Loan Application FL 3MM 190730.pdf Alam Junaid ibanker too busy AZ 160419, Alfardan Carr ref investor Prince Omar Alfardan160404, Alfardan loan proposal accepted 160512, Alfardan decline due to advance fee rqmt 160627, Al Mal Capital KYC 181025.pdf Al Mal Capital signature page on This PC drive 181120.pdf AltaVista Investment Commitment- Winnett Perico, Inc.161010, AltaVists faked fin 161017, AltaVista fup 161018, AltaVista key personnel intro 161018, AltaVista SULLIVAN re bad actor 161018, AltaVista WP due diligence on AV 161018, AltaVista fake followon funding anncmnt 161025, AltaVista update 161026, Anglade FL investor 150811, Anglade FL investor update PHX trip date 150817, Anglade FL investor cancel PHX trip date 150910, Armgold Harmony Vusimile on seed funds investor 141211, Armgold Harmony Vusimile funds notice email 141215, Armgold Harmony Vusimile funds notice recvd 141215, |

Armgold Harmony Vusimile funds notice 141216,
Armgold Harmony Vusimile delay discussion 141218,
Armgold investor interest 160412,
Armgold affirms investor interest 160418,
Armonia VAN BRAKEL re poss SLC mtg 170807,
Armonia VAN BRAKEL 170810,
Armonia NYC VAN BRAKEL on grass fed other options 170822,
Armonia NYC vanBrakel MacGill mtg 170926,
Armonia Mtg Delay 171016,
Armonia NYC mtg 171107 invite 171021,
Armonia VAN BRAKEL on Rabo referral 171204,
Armonia VAN BRAKEL Rabo referral 171204,
Antonelli refers World Bus Lenders 2point5MM WCC WBL Application 190508.pdf
Auctus on Skaar DD 170822,
Auctus Confidentiality Agreement 10119
Auctus Subpoena re CORNHUSKER Poaching Illegal Search Pretext 10126-10131
AZ Foreign Corp Signed 150825 WINNETT PERICO, INC. AZ QUALIFICATION 150825.pdf
BA BESTWICK CARDONE BAML-Natural Food Symposium (2017) 170524.pdf
BANCO Advisors ref from GOTTESMAN 171011,
BANCO Advisors Nov 1 mtg w Nicholas 171021,
BANCO Advisors 171101 mtg Blitch re pitch 171024,
BANCO Advisors 171101 busted mtg fup NICKLESS 171102,
BANCO Advisors Blitch Vindiola WASEMAN invite 171114, (see also LPEE page 1074V, entries 11/1/2017)
BANCO Advisors re other intl investors 171130,
BANCO Advisors China drag out 171206,
Bankers Capital ref to Riverside Marcks 210624,
Barings WinnettOrganics Barings Presentation 170107.pdf
BIBBY 1MM AR Line WCC Signed Proposal for Winnett Cattle Company, Inc. 180320.pdf
BIBBY WCC Signed Proposal for Winnett Cattle Company, Inc. 180320.pdf
Big Path ping MA D Patrick Bain 170823,
Big Sandy Ranch sub debt RFQ 210314,
Bk Tucson Lender re S-1 and banker due diligence 151025,
Bk Tucson Lender re Brewer bio red flag issues for lenders 151030,
Bk Tucson Lender re Brewer bio red flag issues for lenders 151102,

Bk Tucson Lender re S-1 and banker due diligence 151103,
Black Lake Capital ref FRACTAL perhaps 180216,
Black Lake Capital re capital rqmts 180227,
BLACKPOOL 20MM WinnettOrganics Term Sheet Executed 170202.pdf
BLACKPOOL Private Placement Offering Doc Winnett 150618.pdf
BLACKPOOL SHEFFORD Consulting Agreement $1MM WinnettOrganics Fully Executed 161129.pdf
BLACKPOOL Bridge Loans Brochure 10138-10156
Blair bogus lender 170418,
Blair 17mm fin proposal 170419,
Blair bogus lender 170419,
Blair bogus lender 170420,
Blum re mtg to discuss finders fee arrangement 130327,
Blum Signed Agreement Blum 130620,
Brickell Fin FL referred to ADAMSON 150910,
Broadmark WA 150717,
Broadmark re Lake County fin 210704,
Broussard re Lake County fin 210710,
Caasmailaffairs Morocco Investment for WILLIAMS R 140918,
Capital Markets Expert WCC Submission Policy w. agent CME 190729.pdf
Capital Source Group App 190325.pdf
Capital Source S Gordon 210316,
Capital Source S Gordon 211015,
Capstone Trading re fin 210831,
Capstone Trading re fin 210901,
Capstone App 200110.pdf
Capstone Term Sheet 11MM Trade Finance Line 200401.pdf
Case Champoin rep re funding options 170328,
Case intro Dickens PVG Global re financing 170328,
Centerboard Grp as Investor 170517,
Centerboard Grp as Finder DD 170526,
Centerboard PE intro 170526,
Cerebro Capital on Big Sandy Ranch 210317,
Chardan SPAC overview (June 2017) - $50 MM (Sponsors) 160601.pdf
Chardan SPAC overview (June 2017) - $50 MM 170601.pdf
Blum Signed Agreement Blum 130620.pdf
Chase phone intro appt 210402,

Chinese money laundering scam email 161219,
Chinese AR money laundering scam attempt 220218,
Coco Capital 2 LA NYC re sub debt 151002,
Coco Capital LA NYC re sub debt 151002,
Coco Capital on loan availability 161015,
Coco Capital on status 161130,
Coco Capital on status incl WMT 170103,
Coco Capital connects others 170104,
Coco Capital STRASSER re connect results pass 170104,
Collins ref by SULLIVAN on Bridge Loan 150629,
Commercial Finance Partners App 190319.pdf
Commercial Finance Partners App Acct Rec Suppl
190319.pdf
Conterra IA brdige loan term sheet Skaar 170509,
Correlation VC are followon investors 170328,
Crestnorth Capital disbursement instruction 140327,
CROSSroads PO Fin 750K Winnett Cattle Company -
Signed Proposal 180331.pdf
Crystal Lands Resources 150924,
Crystal Reosurces Xfr 150928,
Crystal Resources Xfr Fail 150928,
Crystal Resources XFR Fail to Smith 150928,
Crystal Resources Fee Scam 150929,
WCC 420K App Currency Signed Verification Form -
Currency 2016 180323.pdf
Dynamic Capital App Signed Winnett Dynamic App
180620.pdf
DD re Rabo ID Skaar 170503,
DD Skaar Site Plan Barns Winnet   Site Opt 8 170509,
DD Transom re Skaar 170512,
DD Fleming on DD Finl Model 170526,
DD Callahan (KEENE) re PE dilutive 170531,
DD Skaar Site Plan 170605,
DD Skaar PE Investor Bid email 170607,
DD Skaar PE Investor Bid form 170607,
DD re Centerboard Housing Solution WO 170608,
DD WCC teaser draft 170608,
DD Skaar Organic Fertilizer Production Cost 170609,
DD Callahan (KEENE) re funding sked 170612,
DD Skaar Organic Fertilizer Advantages 170614,
DD WCC Pitch Deck Skaar etal 170614,
DD Callahan (KEENE) on DeSai 170616,
DD Skaar Biiding Process to SANDERS 170616,
DD Callahan (KEENE) on AXIAL lead Chatham 170619,
DD Skaar Site Plan Mods 170619,
DD NGEN fake NYC investor 170622,

DD NYC VAN BRAKEL 170622,
DD Callahan (KEENE) re AGIS NDA cmu not credible 170628,
DD Skaaar AgIS Boston 170628,
DD Skaar Advantage NDA 170628,
DD Skaar AgIS Boston 170628,
DD Callahan (KEENE) re Skaaar visit sked 170726,
DD on HIG Capital Miami 170728,
DD Skaar site visit Sander 170728,
DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,
DD Skaar BDO Auditor SLC Gordon 170804,
DD Skaar BDO Auditor SLC Gordon 170807,
DD NYC Callahan (KEENE) connects to BDO SLC 170808,
DD LABELLE Teton County 240 Tour Pass 170810,
DD Skaar LOI xmit 170811,
DD Skaar LOI signing 170821,
DD Skaar past contacts 170821,
DD Skaar Teton River Farm Feeney email 170822,
DD Skaar rcv Alt Offer 170828,
DD Skaar Teaser 170905,
DD Callahan (KEENE) re no progress 170906,
DD Skaar Kritser 170907,
DD Skaar Kritser to WO team 170907,
DD Skaar SANDERS on Kritser alt structure 170915,
DD Skaar Kritser re adjusted LOI 170919,
DD Callahan (KEENE) on failure to date and breach 170920,
DD Skaar Kritser 170921,
DD Skaar Sander re Kritser 170921,
DD Skaar Kritser 171002,
DD Skaar Kritser string out 171004,
DD Skaar SANDERS re Kritser Friona Ind ExCEO call 171022,
DD Skaar WMT China ND Rep Sr Legislator BANCO Advisors 171024, (see also LPEE page 1074V, entries 11/1/2017)
DD Skaar Kritser dragout decline to WO team 171110,
DD Skaar Revised Buyout 171112,
Deeken re financing 200710,
DelMorgan re intro 160925,
DelMorgan email WP proposal 160928,
DelMorgan fup DD declines to share 160929,
DelMorgan update WMT 170106,
DelMorgan 170110,
DelMorgan re DD engagement 170308,

DelMorgan re alt retainer arrangement 170324,
DelMorgan revised docs170324,
DelMorgan re alt firm retainer avail 170327,
DelMorgan nogo on alt fee provider 170404,
DelMorgan on DD Callahan (KEENE) telcon 170822,
DelMorgan 160928 Engagement Summary -
WinnettOrganics.pdf
Dooley Hook to EB-5 110922,
EarlyBirdCapital SPAC Overview - June 2017 v3
170601.pdf
Edgar Wood on Dubai Trip Sched 150626,
Elkhereiji Assistant referral 150410,
Elkhereiji Loan 150412,
Elkhereiji Reponse 150412,
Elkehereiji Increased Loan Amount 150421,
Elkhereiji Agreement Meeting150430,
Elkhereiji Wood Edgar on trip cancelled 150626,
Energy Bank Ghana Kabah xfr bank info 170425,
Equilibrium Capital cold email on online article 170628,
Equilibrium Capital referral to Haladay 170706,
Equities dot com Financing Proposal 160623,
Equities dot com Financing contract 160630,
Equities dot com implementation sked 160708,
EquityNet Profile Interest 150520,
EquityNet Profile up 150520,
Factoring Rec Financing Fees 160217,
Fargotrust Investor ND interest in PPM 151010,
Fiera Comox Corbett initial hit 210511,
Fiera Comox Corbett Big Sandy structure revision
210519,
Fiera Comox Corbett Big Sandy returns issues 210520,
Fiera Comox Corbett decline 210520,
Figdor Drew Paris investment banker 160712,
Fisher Ent NYC re 60MM funding 160701,
Flores on funds raise 160705,
Flynn re additional capital 200730,
Flynn re Lake County fin and DB prior WMT China issue
210714,
Signed Focus Acquisition-Winnett Cattle NDA
170710.PDF
FRACTAL re initial contact 171117,
FRACTAL progress 171206,
FRACTAL on status and nterest 171221,
FRACTAL intro Black Lake Chad Scripps 180117,
FRACTAL ROZNOWSKI Executed Agreement1-17-18
180117.pdf

Fundable re fin after zero leads dev for WO 171211,
Funding options Patriot Antonelli 200720,
Gaines Ira AZ first contact ref by Sayre Tappen 150311,
Gibson 8plusMM BGibson WCC LOAN Contract
180901.pdf
GOMEZ Dir Food Safety Intvw 150829,
GOMEZ refers Brereton Hamilton 160407,
GOMEZ re investor call request 160408,
GOMEZ re investor interest 160427,
GOMEZ on Costamanga mtg plan 160429,
GOMEZ update on CA investor progress 160506,
GOMEZ Costamanga mtg request 160508,
GOMEZ re new investor leads 160512,
GOMEZ investor update 160525,
GOMEZ re Japanese Inv Lead sales progress 160616,
GOMEZ update Kevin investor 160704,
GOMEZ re Costamanga mtg 170203,
GOMEZ re Brereton has organic cattle in TX 171228,
GROSS re Korea beef pgm finance 210115,
GROSS re Big Sandy finance 210506,
GROSS re grainfed organic taste difference 210513,
GROSS 210514,
GROSS re Big Sandy rewrite Bus plan 210517,
GROSS re mkt research to demo our case 210519,
GROSS on organic mkt update 210522,
GROSS re organic beef proof of concept 210603,
GROSS re WMT Redfield US Grocery SVP 210618,
GROSS re Lake County tax advantages opptny zone
210630,
Grt Western Bk local takeover visit 151117,
GWB Pagel re Financing 160216,
GWB Pagel re 7500000 LOC 160222,
GWB line announcement to team 160223,
Harvest Returns Debt Opptny Zone 210623,
Harvest Returns 210701,
Harvest Returns Cattle Notes Decline 210709,
Harvest Returns Lake County Due Diligence 1of2 210709,
Harvest Returns Lake County Due Diligence 2of2 210709,
Harvest Returns 1 cattle notes 210720,
Harvest Returns 2 Cattle Notes 210720,
Harvest Returns Cattle Notes SBI team email 210721,
Harvest Returns checkin 210909,
Hillcrest PE IL interest 180112,
Hillcrest pass IL 180115,
Hitoshi Investment $3MM Fully Executed NOGUCHI
HITOSHI 190714.pdf

Holistic Impact intro 170404,
Holistic Impact fup 170415,
Holistic Impact fup on prospectus distn 170503,
Hoyle Finl Intro 140216,
Hoyle Fee Agreement Signed 140221,
I banker BreretonHamilton 160407,
I banker BreretonHamilton 160412,
I banker BreretonHamilton 160718,
Interstate Commerce WMT KR emails 170403,
Intrepid Capital DC reprise 221011,
Intrepid Capital Fees 12K Invoice 1 200225.pdf
Intrepid Capital Sheldon Beef Intrepid NC-NDA
Completed 200220.pdf
Intrepid Capital Sheldon Beef Intrepid NC-NDA
Completed Screenshots 200220.pdf
Investor Commitment Crystal Resources 150924,
Investor Commiment Fail to Smith re Ukraine Xfr Fail
150928,
Investor Commitment Crystal Resources Xfr 150928,
Investor Commitment Crystal Resources Xfr Fail 150928,
Investor Commitment Crystal Resources Fee Scam
150929,
Investor Contact List Sent to WYLY 130712,
Investor Lead GOMEZ re CA 160322,
Investor Lead fup GOMEZ 160331,
Investor Prince Omar Alfardan 160404,
Isaac Capital Grp NYC investor interest 170515,
151021 Jabor Qatar MEC Application for JV License -
Jabor 100108-10110
151027 Jabor Wire Transfer $9975 for MEC License
10111-10113
151027 Jabor TD Ameritrade Wire Transfer 10114-10118
JACKSONCG Frambes TX 161205,
JCXL Advance Fee Scam Barrister140602,
JCXL Term Sheet 10MM 140609,
JCXL Term Sheet 10MM JACKSON SULLIVAN 140609,
JCXL Advance Fee Scam 140611,
Johnson Todd Approval letter to Loaning 2.8MM
190729.pdf
JPM Aberbach ref to another unit 210604,
JPM Kolleng re China LC monetization 210131,
Kabah scam resurrection 140424,
Kabah first hit 140526,
Kabah funds xfr 140605,
Kabah Energy Bank Ghana 180K 170425,
Kabah Energy Bank Ghana 180K 170426,

Kabah Energy Bank Ghana Govt Doc Forged 180K 170426,

Kabah Energy Bank Ghana 180K 170427,

Kabah re Energy Bank xfr 170428,

Kabah Energy Bank Ghana 180K 170502,

KEISER 100MM Debt Raise Terms Summary 151104,

Kennedy Orrego intial hit 141110,

Kennedy Funding LOI Turpin 2pt5MM 190708.pdf

Kennedy Funding WCC Completed

KFF_Executive_Summary_Fillable_Levitt NEW 190529.pdf

Key NYC ibanker reconnect 170821,

King Trade Capital re WMT order thru JBS 170824,

Kofi on Ghana AKOTO contact via Yahoo Messenger 170314,

Kolleng JPMorgan prob cutout 210115,

Krapf Bank Tucson Land Financing Inquiry 160213,

Kritser re Lake County OR Organic Finishing Op 220621,

Lantern Capital Advisors Risey re raise financing 111007,

Lease Co Van Tassell 161102,

LIBERTY EB-5 initial hit 141027,

LIBERTY KELLER CARTER mtg thanks 141103,

LIBERTY EB-5 WinnettOrganics LOI 11-12-14 141112,

LIBERTY CARTER ref request services matrix request 141114,

LIBERTY re CADC TEA eligibility 150106,

LIBERTY backout excuse sent to UFIG 150505,

LIBERTY EB-5 LOI to WP 221105,

LIBERTY EB-5 Contract Annotated 141112.pdf

LIBERTY EB-5 LOI .pdf

LIBERTY EB-5 LOI 141112.pdf

LIBERTY EB-5 LOI WinnettOrganics LOI 11-5-14.pdf

Liquid Capital AZ GOTTESMAN initial hit 170928,

Liquid Capital AZ GOTTESMAN signed app 171012,

Liquid Capital AZ GOTTESMAN on underwriting info request 171012,

Liquid Capital AZ GOTTESMAN underwriting info complete 171013,

Liquid Capital AZ GOTTESMAN email DLC sample 171017,

Liquid Capital AZ GOTTESMAN 171101 mtg request 171024,

M GROSS re Korea contract finanaicn g et al 210119,

MADISON STREET Capital MSC Agreement-Winnett Cattle Co, Inc. 180405.pdf

MAGGARD TX re ABDELSAYED 200722,

MAGGARD TX re ABDELSAYED start date 200817,
MAGGARD TX status 201015,
MAGGARD re Korea Angus pgm etc 210118,
MAGGARD re 26 Ranch and ABDELSAYED 210221,
MAGGARD on ABDELSAYED positive connect 210222,
MAGGARD re ABDELSAYED 210302,
MAGGARD re ABDELSAYED to Egypt 210304,
MAGGARD on loan docs PFS need 210306,
MAGGARD re gty and PFS 210307,
MAGGARD re Big Sandy BAFO 210322,
MAGGARD re Big Sandy reprise 210505,
MAGGARD re investors and Big Sandy 210519,
MAGGARD re Lake County LOI 210701,
MAGGARD re Lake County 210702,
MAGGARD re 500k loan 210703,
MAGGARD enroute Lake County 210707,
MAGGARD re Lake County enroute 210707,
MAGGARD re Lake Copunty tour and plus minus issues
210709,
MAGGARD re Lake County and pers FICo improvement
210715,
MAGGARD re Lake County 210719,
MAGGARD Loan to DB improving FICO 210721,
MAGGARD re Lake County 3559 LOI 210721,
MAGGARD on Lake County Fin snags 210725,
MAGGARD on WMT Wagyu comp price and other status
210804,
MAGGARD re startup sequencing plan 210816,
MAGGARD re status web dev sales 210816,
MAGGARD re add subs WEFUNDER 210817,
MAGGARD re GAAP fin need 210818,
MAGGARD re mkt gap 210818,
MAGGARD 5k GPR loan 210826,
MAGGARD re 4500 loan recvd 210826,
MAGGARD Revised GPR Startup Plan 210830,
MAGGARD re DB overadvance 210901,
MAGGARD re loan not pursued 210903,
MAGGARD re 26k loan 210909,
MAGGARD re ICPO LOI-FM-LZ-210913,
MAGGARD re Terminating Trader efforts 210916,
MAGGARD re status 211104,
MAGGARD re 700 211221,
Manna Tree update WMT organic beef pgm sales progress
210702,
Mbazock Kelvin French Investment firm 140219,
Mbazock Kelvin 140220,

Montminy Les Allan re investors 200724,
Mubadala Capital UAE Investment 140624,
Mubadala SULLIVAN on FCPA violation 140715,
MULTIFUNDING initial hit 141215,
MULTIFUNDING Paul Avery initial contact 141215,
MULTIFUNDING SULLIVAN re referral to David HUGHES 150130,
MULTIFUNDING Dan KREWSON initial contact 150915,
MULTIFUNDING referral Shepherd 161018,
MULTIFUNDING referral Shepherd has target 161208,
MULTIFUNDING referral Shepherd refs Lex 170120,
MULTIFUNDING re Whitestone Lex Gubsky Phil 170123,
MULTIFUNDING Shepherd Whitestone Gubsky email 170125,
MULTIFUNDING re eqpt loan 170126,
MULTIFUNDING Shepherd Intro Whitestone Lex Gubsky 170127,
MULTIFUNDING Whitestone Lex Gubsky term sheet deadline 170130,
MULTIFUNDING Conf call fup 170131,
MULTIFUNDING Whitestone Lex Gubsky confirms interest 170131,
MULTIFUNDING Whitestone Lex Gubsky casting doubt on other deals 170201,
MULTIFUNDING Shepherd Whitestone Gubsky update email 170206,
MULTIFUNDING re Utica eqpt leasing 170210,
MULTIFUNDING re broker fee on Utica eqpt leasing 170222,
MULTIFUNDING re Utica eqpt lease LOI 170222,
MULTIFUNDING Shepherd BLACKPOOL progress delay 170309,
MULTIFUNDING re Moore defame Whitestone Lex Gubsky 170310,
MULTIFUNDING Moore defame Whitestone Lex Gubsky 170311,
MULTIFUNDING re BLACKPOOL fail DD retainer needed 170323,
National Livestock cattle financing 170820,
Natnl Livestock re fin MO organic cattle 200817,
New World FL 170410,
New World FL 170428,
NEWMAN 2014 Master DRF Completed 140424,
NEWMAN AA NDA GNA Signed 140424,

NEWMAN Gerald agreement via Inder Singh 140424,
NEWMAN Gerald Inder Singh re Bridges not confirm orders 140425,
NEWMAN re 2MM proof of concept 140425,
NGEN GRUBSTEIN re Organic beef pigs 210521,
NGEN and Correlation VCs 210522,
NGEN update 210604,
NGEN next round 210607,
NHIG Firm Insurance re payment bond 140821,
NHIG Songbird Niles re bond invoice nonpayment 140917,
NHIG Hong Kong Financing Signed 140801.pdf
NorthwestFCS Rayl re Lake County fin 210712,
NY Business Capital App 190730.pdf
NY Business Capital App is digitally signed at the original 190730.pdf
NYC Investor AXIAL Conf Intro PWP Growth Schectman 151028,
NYC Investor from AXIAL Formanek 151027,
NYC Investor Seth investors 150818,
NYC Investor Seth re eqpt 150901,
NYC Investor Seth re eqpt detail 150911,
NYC Investor Seth re eqpt losn progress151001,
NYC Investor Seth proposal 151016,
NYC Investor Seth re Jabor and 300mm loan terms 151019,
NYC Investor Seth re fee waiver 151021,
NYC Investor Seth signed MARV capital agreement 151023,
NYC Investor Seth on status 160203,
NYC Investor Seth on equity investor interest 160208,
NYC Investor Seth on closing 7MM investment 160219,
NY PE Firm Ref by DD OGrady Signed Project Feedlot NDA 170710.PDF
Oppy Vancouver BC broker re financing rqmts 170331,
Paine Schwartz contact 171116,
PAINTER TX earlier ref from WorldWide Fin 200730,
PAINTER TX on WCC collapse 200730,
PAINTER TX wants exclusivity also WWF cc on this email 200803,
PAINTER re ABDELSAYED gty 200811,
PAINTER re Ibdelsayed gty 200811,
PAINTER TX re loan fail income 200825,
PAINTER re Galkin telcon 200831,
PAINTER re Korea finance 210115,

PAINTER re Lake County 550K need and WMT progress 210703,
PAINTER re Lake County 500k loan purpose 210705,
Paris I Bank interest 160712,
PDX Investor cold email on online article 170628,
PDX ref to Haladay 170706,
PE reaction1 to Big Sandy offer 210525,
PE reaction2 to Big Sandy offer 210525,
PE reaction3 to Big Sandy offer 210525,
PE reaction4 to Big Sandy offer 210525,
Perer Super G Funding 151020,
Pitch Deck to RAM WinnettOrganics Notes 160328,
PLM coop fin for beef 200821,
Priority Funding 5point6 MM WCC PFS-Application 180919.pdf
Pruska investor 161128,
Pruska investor 161129,
PWP update 160928,
RaboAg Kemp re Arlon Podzemny Perico 130203,
Rabo on Oliver Direct funding 160721,
Raboag Pitcher re Skaar review 170429,
Raboag Wilson TX 170531,
Rabo on organic fruits and veg mkt outllok 170822,
RAM initial meeting set 160325,
RAM private placement interest 160326,
RAM mtg sked 160330,
RAM Call Summary re financing strategy 160425,
RAM investor progress 160426,
RAM on Olin engagemeent ltr 160427,
RAM Olin update 160430,
RAM re sales POs 160430,
RAM re Maines 160503,
RAM call to update RAM progress 160505,
RAM contract redline draft 160509,
RAM update 160526,
RAM re progress and concerns 160527,
RAM re progress and sales lead 160604,
RAM re sales leads progress 160609,
RAM re accredited investors 160612,
RAM on financing progress 160629,
RAM inital referrer reconnect 160708,
RAM on CS sales mtg 160711,
RAM Olin Termination Notice 160718,
RAM inital referrer reconnect 160720,
RAM Olin Capital Accepts Termination 160722,
RAM re DD Clark Mckenzie 160809,

RAM temriantion no results 160907,
RAM continues work 160911,
RAM Investment Priorities 160911,
RAM connects ARPAIO ACTS freedom farms 160913,
RAM on Hinson ACTS Freedom Farms 160914,
RAM re ground lease and beef investor iinterest 160914,
RAM re CS apptmt attempt 161027,
RAM CS reqmts 161028,
RAM CS 161103,
RAM CS stall 161108,
RAM stall family emergency 161109,
RAM conv produce fail 161121,
RAM on conv produce contractual issues 161205,
RAM re conv produce agents sales progress 161215,
RAM failure on conv produce and lack of notice 161221,
RAM litigation threat 170228,
RAM demand notice 170401,
RAM final demand 170401,
RAM on final demand from SULLIVAN 170406,
Reich Bros $3pt5MM Lease ref Buckingham 190612.pdf
Resorce Land Holdings CO reconnect 180213,
Revolution VC Interest HUGHES 160825,
Revolution VC Feedback HUGHES 161019,
Revolution VC Feedback HUGHES2 161019,
Richards Sarah DB Headhunter 080630,
Riverside re investment opptny 210607,
Riverside founder Kohl re investment opptny 210611,
Riverside Kohl CoCEO re financing turndown 210611,
RJ Capital Flynn re additional capital 200730,
RJ Capital Flynn re Lake County fin and DB prior WMT
China 210714,
RJ Lumba CV 12.2012 121201,
RJ Lumba Starbucks Ramsey following day 121211,
RJ Lumba Ramsy Xmas Deutsche Bank Ibanker fup
121216,
RJ Lumba no response 130208,
Rostra 300K Notes Term Sheet no signature reqd.pdf
Roth on S-1 160124,
Salm Ben Promissory Note 131204,
SeedInvest Winnett Perico, Inc. Engagement Agreement
170509.pdf
Seth MARV Capital xmit of PPM S1 151124,
Sherbrooke re LA organic mkt 140409,
Sherbrooke re sales backlog 140411,
SOLE SOURCE cold email hit 171219,
SOLE SOURCE feedback 171222,

SOLE SOURCE call 171226,
SOLE SOURCE NDA Double D feedyard 171227,
SOLE SOURCE TURNER phenom news HEC etc
180105,
SOLE SOURCE TX feedyard options 180105,
SOLE SOURCE TURNER mtg invite StRegis NYC
180108,
SOLE SOURCE TURNER re NYC mtg 180108,
SOLE SOURCE mtg fup NYC 180109,
SOLE SOURCE mtg in NYC 180109, (see also LPEE
page 1074V entry 1/9/2018)
SOLE SOURCE TURNER at mtg StRegis 180109,
SOLE SOURCE mtg results to NICKLESS 180110,
SOLE SOURCE 180111,
SOLE SOURCE update TX 180119,
SOLE SOURCE 180121,
SOLE SOURCE Check by outsider 180122,
SOLE SOURCE re WMT China added opptntys 180123,
SOLE SOURCE on string out 180125,
SOLE SOURCE hold cmu to Gearn 180126,
SOLE SOURCE repeat decline 180228,
SOLE SOURCE TURNER on Big Sandy 210507,
SOLE SOURCE TURNER on feed price sensitivity
210601,
SPAC Early Bird 170626,
SPAC EB Dennis Brewer - $100mm SPAC Illustrations
170626.pdf,
SPAC Chardan 170627,
SPAC Chardan ref LOEB NUSSBAUM 170629,
SPAC NUSSBAUM LOEB atty 170629,
SPAC NUSSBAUM LOEB appt reset to 170711,
SPAC Chardan mtg fup 170712,
SPAC EB mtg fup 170712,
Summit Partners on Skaar 170511,
Summit on CO feedyard 171223,
Summit connects NBH Ag bank 180111,
Summit re distressed deal E-6 feedyard 180215,
Summit on E6 distress sale 180223,
Summit own capital must have 180228,
Signed Tawfeek Chiang standard agreement form filling
140227.pdf
Trinity AZ expression of interest 160930,
Trinity re AltaVista 161014,
Trust Capital re bridge loan 210719,
TURNER on Feedyards and Deloitte Earnings review
180111,

| | TURNER re TX feedyards status 180121, |
| | UFIG Loan conf call 141107, |
| | UFIG LOI Adding Eqpt to Loan Amt 150107, |
| | UFIG Fin Inquiry Land for Stock Kingman RHODES 160216, |
| | US Capital Partners Ritter 150409, |
| | Utica Signed Winnet Proposal 2-21-17 170222.pdf |
| | VC Legendary 210115, |
| | VC in-house fake pitch Blumberg 210817, |
| | VC in-house fake pitch Mayfield 210817, |
| | VC Mayfield 210817, |
| | VC Blumberg 210818, |
| | VC Mayfield feedback 210818, |
| | Vendome Bond re financing interest 130513, |
| | VII Capital reply 210506, |
| | Vision AZ re Lake County fin 210709, |
| | Vision AZ re Lake County fin 210728, |
| | Vision AZ re Lake County fin 210813, |
| | Warren John intial hit 140827, |
| | Warren John London 150403, |
| | Warren John INVESTMENT AGREEMENT New-2 Signed 140829.pdf |
| | WHoyle Fee Agreement Signed 140221, |
| | WHoyle Fee Agreement Signed 20140221150230580 140221.pdf, |
| | Winters Referral from WYLY 111101, |
| | Winters on Earnout 111123, |
| | Winters on Fund Closing 120225, |
| | Winters extends 120601, |
| | Winters re set bridge loan appt time 130104, |
| | WO Status Report ADAMSON PPM 150917, |
| | WO Team re PPM S-1 processes 150921, |
| | WO Grt Western Bk local takeover visit 151117, |
| | WO Team on Jabor Funded on Time 151117, |
| | WO Team re Jabor snag 151118, |
| | WO Team on financings 151120, |
| | WO Team on 179mm Financings 160101, |
| | WO Status Financings 160121, |
| | WO Financings deal status to team 160208, |
| | WO Status Kingman Startup Financings 160209, |
| | WO Status Report financings 160421, |
| | WO Status re Oliver Term Sheet Verbal 160719, |
| | WO Status Final Oliver Hyder present sked 160804, |
| | WO Status Hyder Oliver rework 160818, |
| | WO Status DD Fin Sales 160929, |

WO Status Report on Hyder Oliver new pitch status 161006,
WO on WMT progress 161018,
WO Status financings 161103,
WO Status Financings WMT KROGER 161115,
WO Org Chart 170111,
WO Blitch re Stockton Hill Famr tour w BLACKPOOL 170203,
WO Smith CFO re Revolution VC pass 170203,
WO Team re Blackppol to fund 170301,
WO Team re BLACKPOOL no reply stringout 170309,
WO Team re BLACKPOOL deadline miss 170310,
WO Status Report DD retainer need 170320,
WO also CARDONE on Status WMT others 170403,
WO Status Report Skaar Investor Interest 170515,
WO Team on DD Funding Skaar Acq Date 170615,
WO Status Report Skaar nothing from Alberts 170706,
WO Status Report re DD potential investors 170713,
WO Status Report BANCO Advisors busted mtg 171101,
WO Status Report re BANCO ND Investors Skaar WMT 171116,
WO Status Report new investors BANCO ND pass 171118,
WO Status Report re WMT China SOLE SOURCE 180104,
WYLY re Winters Delay Response 111114,
WYLY re bridge need BLACKPOOL 120921,
WYLY early contact 130716,
YieldStreet re Lake County fin 210711,
Zayid email cc Hewitt London 121008,
Zayid Hewitt re Investor Zayid 121008,
Zayid email re funds transfer 121014,
Zayid Corp JV Agreement 121018,
Zayid Signed Subscription Agreement Cancelled 121018,
Zayid Inv BANCO Santander App 121115,
Zayid FIRST AMENDMENT TO JV 140220,
Zayid on attny funding request 140227,
Zayid re BofA checking account number 140228,
Zayid Attorney Tawfeek Chaing re fee 140301,
Zayid re Malaysian Attny Not Confirmed 140305
Zayid 20MM Cancelled Signed Subscription Agreement Cancelled 121002.pdf
Zayid Signed JV Agreement121022.pdf

### 671. *RICO-33 Racketeering Violations*: **Commercial Frauds: Fraudulent Financings and Litigation -** *AUCTUS v. CORNHUSKER*, **2019**

A. Defendant Reginald MCGAUGH, acting as a defendant agent, officer, or confidential informant, and part of this on-going conspiracy, represents himself and his firm, defendant CORNHUSKER Capital, as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role during 2019 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

B. This color of law swindle required and consumed the time and financial resources of Lead Plaintiff and his business entities in the bad faith perpetuation of defendants' long-running schemes, frauds, swindles and associated-in-fact enterprise pattern of racketeering acts affecting interstate commerce. The $2,500 retainer required by CORNHUSKER was delivered directly from investor DEAN T. SMITH to CORNHUSKER and is counted as a portion of a $5,000 loan in January 2019 from DEAN T. SMITH to Winnett. As frequently occurred in his interactions with defendants, the Lead Plaintiff signed the agreement first and never received a fully executed copy of the agreement, though the retainer was represented as received from DEAN T. SMITH and the acts required of defendant under the agreement were represented as being conducted in good faith through communications between the Lead Plaintiff and the defendant(s) as counterparty. But there were absolutely no tangible results as usual as defendants MCGAUGH and CORNHUSKER interfered in and affected interstate commerce. See LPEE pages 10119-10124, 10125, 10158-10164. Relevant emails from March 4, 2018 through July 9, 2020 are currently blocked without warrant by defendant UNITED STATES as this Complaint is being prepared, paragraph 47.

C. Further, defendants ostensibly conducted litigation in Cook County, IL between defendant AUCTUS (founder MCGAUGH) and defendant CORNHUSKER (founder MCGAUGH after leaving AUCTUS) for client poaching by CORNHUSKER of Lead Plaintiff's company, Winnett, from AUCTUS. This requires extensive efforts to comply with a Cook County, IL court subpoena served on the Lead Plaintiff and his company, to spy upon and consume time and resources in this color of law fraud. See LPEE pages 10126-10131, 10158-10163.

D. This is a variation on the usual direct litigation theme defendants have used frequently when attempting to run up expenses and reduce cash flow to plaintiffs of this class. Defendants also attempted this specific approach in the Tower Books bankruptcy case around 2003, in an effort to arrange the Lead Plaintiff's potential avoidance of a lawful subpoena, which can lead to criminal charges for failure to appear and cooperate. And, of course, color of law discovery in "litigation" is an alternate method of spying without warrant. See also other such abuses of the litigation process by defendant UNITED STATES at paragraph 643 RICO-45.

E. This is an element of the now quite the familiar pattern of "sources and methods" used by defendant police powers who violate the Fourth Amendment by alternate means, using pretexted email fraud and wire fraud under color of law to engage in illegal searches, later sanitized as legitimate searches developed through informants and then misrepresented to federal courts to secure legally required warrants to support criminal prosecutions, which themselves are not necessarily based in reasonable suspicion, but rather on the specific targeting and headhunting of particular individuals and entities, which practice defendants UNITED STATES and other police powers defendants have and do repeatedly engaged in bad faith against the rights and interests of Lead Plaintiff and others similarly situated.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
|---|---|
| Complaint paragraphs: | 643 RICO-45; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 10119-10124, 10125, 10126-10131, 10158-10164 |
| Emails and documents by topic and date, also located in LPEE: | Certain emails are blocked by a defendant UNITED STATES computer hack |

## 672. *RICO-34 Racketeering Violations:* **Fraudulent Financings, Online Platform 2021**

A. Defendants WEFUNDER and its officer and employees, through the various entities legally named in the caption, whether acting on their own behalf or as spoofed by other defendants with police powers representing themselves as defendant WEFUNDER personnel and as the actual website while acting as a defendant agent, officer, and as part of this on-going conspiracy, represented themselves, their firm, and their web platform as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role in 2021 and later years in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

B. This series of frauds and conspiracy required and consumed the time and financial resources of Lead Plaintiff and his business entities. Among defendants' bad faith acts were the refusal to permit the level of return to individual investors proposed for the offering by the Lead Plaintiff; and their role in knowingly recommending an auditor, Alice CHENG, who, after gathering key financial information on their behalf from Lead Plaintiff's company, refused to issue any form of the professional auditor Opinion letter required to complete the financial statements (LPEE pages noted in CHENG emails at subparagraph 672C below), so the fund raising process could be undertaken as planned in conformance with SEC Regulation A+. This scenario played out almost identically to defendants' previous frauds and swindles in paragraph 659 RICO-21 undertaken by defendant ADAMSON Brothers, most probably entirely a fraudulent construction in interference with interstate commerce by defendant UNITED STATES (FBI). This pattern of practice repeated prior fraudulent acts of defendants and effectively killed any possibility of this public financing, thereby, once again, sustaining

involuntary servitude and forced labor control of Lead Plaintiff while interfering in interstate commerce.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
|---|---|
| Complaint paragraphs: | 659 RICO-21; 474, 474, 651-672 RICO-13-34 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |

| Emails and documents by topic and date, also located in LPEE: | WEFUNDER MAGGARD as sponsor 210719, WEFUNDER Solicitation fup example 1of55 sent 210719, WEFUNDER MAGGARD re 2k 210720, WEFUNDER LABELLE re mandatory signup to vouch 210803, WEFUNDER GAAP Acctnt CHENG 210902, WEFUNDER start sequence 210903, WEFUNDER GAAP Acctnt CHENG Delays 210907, WEFUNDER re CHENG auditor delay 210908, WEFUNDER GAAP Acctnt CHENG 210909, WEFUNDER GAAP Acctnt refuses Opinion 210909 |
|---|---|

## 673. RICO-35 Racketeering Violations: Fraudulent Sales Leads 2002-2004

A. Lead Plaintiff's co-owned consulting company, Allegent, LLC dba Performa, in which he invested $25,000 cash, provided a personal guarantee for a bank line of credit, and provided professional time and other resources, funded travel and other expenses in 2002-2004 to make sales calls on and submit consulting services proposals to Chelan Fruit, Chelan, WA, a former CNA client, to Bio-Lab, Lawrenceville, GA, both with defendant PRAY in attendance at sales meetings; and to approximately 15-20 defendant Technology Sales Leads (TSL) fraudulent (FBI staffed) sales opportunities across the United States from California to New York to Florida and many states in between (LPEE page 8290 and in evidence handed by Lead Plaintiff to defendant ROSENBERG (FBI) in Fall 2007, also likely in FBI lab archives from its cover mail-in service used in the hard drive recovery, as defendant ROSENBERG FBI was principal human trafficker of Lead Plaintiff from around 1983 to at least 2008). These fraudulent sales calls typically occurred in otherwise empty offices, plants, and warehouses, and required travel, printing, and mailing expenses to respond to fraudulent and non-existent consulting project opportunities presented by defendants, most probably entirely defendant UNITED STATES, to wit defendant FBI. Allegent, LLC dba Performa spent well over $10,000 for travel, proposal preparation, office overhead expenses, and provided below market compensation to Lead

Plaintiff and his co-managing member PRAY which relationship was legally formalized by Michael LARSON, introduced by John C.T. CONTE, a defendant UNITED STATES (FBI) embed in various roles who professionally befriended Lead Plaintiff during his time at LazerSoft immediately after the departure of defendant STONE from LazerSoft in 1986, and during his efforts to secure additional financing for LazerSoft. Unknown to Lead Plaintiff at the time, his "partner" defendant PRAY was actually directly associated with defendants, specifically defendant ROSENBERG (while both were at NutraSource, among other times) in this "managing member" role and his prior roles while employed with defendant to various predecessor firms (including cover operations). See LPEE pages 140 et al, 844, 6085, 8290.

B. Other evidence is currently inaccessible to Lead Plaintiff but is available on discovery on a computer hard drive image shared with defendant ROSENBERG, known as William Drumm while General Manager of ESTABLISH for North America, unless subsequently destroyed by defendant FBI to obstruct this litigation and justice.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
|---|---|
| Complaint paragraphs: | 673-680 RICO-35-42 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0107, 2-0117, 2-0135, 2-0140 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al; pages 844, 6085, 8290 |
| Emails and documents by topic and date, also located in LPEE: | Tech Sales Leads Revised TSL List 221007.pdf |

## 674. RICO-36 Racketeering Violations: Fraudulent Sales Lead Solicitation Services 2021

A. Defendants fraudulently failed to distribute or prevented the distribution of email correspondence to US persons on a mailing list purchased from EXACT DATA, a marketing list and email deployment service, by a Lead Plaintiff owned and managed entity, Sheldon Beef. This sales lead list and related services were purchased to solicit grocery industry executives and/or retail customers, and, as usual, accomplished no legitimate sales solicitations or results due to defendants' frauds in interstate commerce. Other such services were also purchased from various online services by this and other Lead Plaintiff owned and controlled entities, and also accomplished no authentic results in interstate commerce. This specific $1065 expenditure in

interstate commerce is shown at LPEE page 10017. Related emails are currently blocked by

defendant UNITED STATES.

B. This scheme and conspiracy required and consumed the time and financial resources

of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 673-680 RICO-35-42 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0114 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 10017 |

| Emails and documents by topic and date, also located in LPEE: | SBI Team Startup Sequencing Plan 210808, SBI Team on further web slowness ABT sales 210910 Emails are currently blocked by defendant UNITED STATES |

## 675. RICO-37 *Racketeering Violations:* Fraudulent Sales Lead Solicitation Services 2021

A. Defendants fraudulently fail to or prevent the distribution of email correspondence services purchased from EGM, a marketing list and email deployment service, by a Lead Plaintiff owned and managed entity, Sheldon Beef, which purchased these services to solicit grocery industry executives or retail customers, and, as usual, accomplished no legitimate sales solicitations or results due to defendants' frauds. Other such services were also purchased from various online services and also accomplished no authentic results. This specific $4342 set of expenditures in interstate commerce is shown at LPEE pages 140 et al, 10000, 10002, 10014, 10015.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
|---|---|
| Complaint paragraphs: | 673-680 RICO-35-42 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0114 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 10000, 10002, 10014, 10015 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

## 676. RICO-38 Racketeering Violations: Fraudulent Sales Lead Development Services 2017

A. Defendant TRADEKEY, a Pakistan domiciled company, conspired with other defendants to provide fraudulent contracted sales leads, and submit false sales lead progress reports using wire fraud and contract fraud. This fraud and swindle was an element of the pattern of racketeering act against Lead Plaintiff and his business entities to strip financial resources and authentic international sales opportunities of the company, perpetuating defendants' control and human trafficking of Lead Plaintiff in involuntary servitude, forced labor, and other violations of rights under law and ratified international treaties having force of law at all levels of government in the United States. These fraudulent services cost Lead Plainitff's company $6,000 and nearly two years lost for legitimate sales opportunities. See LPEE pages 140 et al, 8290, 9219-9222,

9241-9248, 9275-9276, 9300-9306, 9307-9310, 9340-9391, 9406-9534, 9926, 9984, 9989, 9997, 10004, 10007.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | 673-680 RICO-35-42 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0114 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 8290, 9219-9222, 9241-9248, 9275-9276, 9300-9306, 9307-9310, 9340-9391, 9406-9534, 9926, 9984, 9989, 9997, 10004, 10007 |

| Emails and documents by topic and date, also located in LPEE: | TRADEKEY KYC Form Complete 180313.pdf<br>TRADEKEY Orbit Winnett Cattle Company VIP Contract #89779 - C.PDF<br>TRADEKEY Orbit Winnett Cattle Company VIP Contract #89779 180306.pdf<br>TRADEKEY Orbit Winnett Cattle Company VIP Invioce 180425.pdf<br>TRADEKEY VIP Contract #89779 180102.pdf<br>TRADEKEY Winnett Cattle Company VIP Invoice #89779-B 180514.pdf<br>TRADEKEY Winnett Cattle Company VIP Invoice #89779-C 180726.pdf<br>TRADEKEY Winnett Cattle Company Working Report 181010.pdf<br>TRADEKEY Winnett Cattle Company Working Report 181228.pdf<br>Winnett Cattle Company Working Report181106.pdf<br>Winnett Perico Bill for July 2018 180801.pdf |
| --- | --- |

**677. RICO-39 *Racketeering Violations:* Fraudulent Sales Lead Development Services 2018**

A. Defendant WEBLINK.in, domiciled in India, initiated useless web services development in lieu of the actual sales lead development services requested by Winnett, and $639 was expended before the improperly provided services are cancelled. See LPEE page 140 et al, 9985, 10023.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
|---|---|
| Complaint paragraphs: | 673-680 RICO-35-42 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0114 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 9985, 10023 |
| Emails and documents by topic and date, also located in LPEE: | 180501 WEBLINK Pymt180501.pdf 181203 WEBLINK $500 Wire 181203.pdf 181204 WEBLINK Invoice 181204.pdf |

## 678. *RICO-40 Racketeering Violations:* Fraudulent Sales Opportunities, International 2020-2021

A. Fraudulent international sales and sourcing opportunities in the Middle East, China,

southeast Asia, Australia, South America, Russia, United Kingdom, and various countries

throughout Europe, involve several defendants posing as international traders between 2018 and

2022 including, without limitation, defendants Assure Group International (ASSURE GROUP,

AGI), ABT Trading, DC INTERNATIONAL, Todd CRAFT, LEVERSTONE (Andrew CHO),

TRADEIMPEX, and TRADIMPEX. Defendants provide fraudulent international sales leads and

fraudulent sourcing opportunities, using wire fraud and contract fraud. These fraudulent services have cost Lead Plaintiff owned and managed business entities extensive time, financial and other resources, and resulted in lost time and business development options for legitimate sales opportunities in interstate and international commerce. See LPEE pages 140 et al, 9260, 9547, 9548-9561, 9568-9572, 9840, 9890-9896, 9897-9901.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
|---|---|
| Complaint paragraphs: | 673-680 RICO-35-42 generally |

| Appendix 2 paragraphs: | Not applicable |
|---|---|
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0114 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 9260, 9547, 9548-9561, 9568-9572, 9840, 9890-9896, 9897-9901 |
| Emails and documents by topic and date, also located in LPEE: | ABT ICPO Lan Zhou Utility Beef Qtrs 210913.pdf ABT inquiry 200731, ABT Pork 6 way China 201008, ABT Pork 6 way China Referral Contract 201008, ABT Pork 6 Way Referral 201008, ABT FL Quote 210105, ABT re Korea Angus pgm 210118, ABT FL Quote 210123, ABT re Euro price quote request 210428, ABT China Utility Grade 210610, ABT re deboning labor costs and pricing 210613, ABT quote request for Houston TX delivery 210616, ABT re WhatsApp and Houston 210626, ABT Partner re China quotes 210902, ABT Partner re Freelancer label delay 210907, ABT re Lan Zhou ICPO LOI-FM-210913, ABT re pending contract 210914, ABT sends Lan Zhou ICPO-FB4-LZ-210914, ABT re further deadline extension request 210915, ABT re termination 210915, ABT Trader Liu Intl Termination 210916, ABT quote request 211223, AGI pork heads 200916, AGI Uruguay beef sale 210414, AGI RFQ non-GMO soybeans 210421, AGI non-GMO Soybeans 210527, AGI non-GMO soybean supplier quote reply to SBI 210528, AGI non GMO soybeans 210531, AGI beef utility wrapped qtrs 210714, AGI re Q421 pricing 211017, AGI Trader quote request 211227, AGI coal handling inquiry 220622, AGI Quote Request 220701, AGI SBI unable to reply AGI disappears 220701, |

ASSURE GROUP AGI signature page 201002.pdf
Bawtry ProForma Invioce from WCC bdproforma 180530.pdf
Bawtry UK Winnett PO 180529.pdf
BR Packer Quote Request FOB Indonesia 210203,
BRF China re contact info for RMC China rep 210125,
BRF Brazil re pymt terms for new customers 210127,
BRF Quote Authentication Request 210127,
BRF_Specification & Price Offer 2020 210127.pdf
Caviness CS Cattle re finishing contrct potential 200901,
Caviness on plant availability for slaughter pending order 210617,
Caviness re salughter availability 210915,
Cho Trader 200911,
Cho Trader re pricing 210104,
Craft sourcing agent and network on pork products 201014,
Craft re bogus chicken part ref photos and doc set 210123,
Craft re bogus chicken part ref photos and doc set2 210123,
Craft re bogus supply network 210127,
Craft re bogus suppliers prev provided 210128,
Craft re quote request 210227,
DC INTERNATIONAL DALEUSKI Passport DC Intl 180318.pdf
Est Date of DC INTERNATIONAL Sales Agreement 190310.pdf
Est Date of DC INTERNATIONAL Sales Agreement Signed 190310.pdf
DC INTERNATIONAL DALEUSKI re KUMIN intro 200902,
DC Intl Intro KUMIN Galkin 200902,
DC Intl re export mkt dev 201214,
DC Intl re export pgm 201214,
DC INTERNATIONAL DALEUSKI re pricing 201221,
DC Intl re Korea Angus pricing 210118,
DC Intl Beef Pricing Quote 210203,
DC Intl beef quote request 210712,
DC INTERNATIONAL DALEUSKI re pricing 211020,
DC Intl pricing avail ability 211020,
G3 Vancouver BC Terminal Transit for AGI Quote Request 211130,

| | Interbio ICPO Nº IBI-20190321-01 Beef Cuts_ Signed 190411.pdf |
| --- | --- |
| | Leverstone LOI Beef 190303.pdf |
| | Manning Beef CA quote request 210226, |
| | Manning Beef CA quote request reply 210302, |
| | Manning re contracts in process 210330, |
| | Manning China case ready 210405, |
| | Manning Beef re slaughter avialability 210914, |
| | Mercaimpex ES initial hit180301, |
| | Sadia BR re quote request 210124, |
| | Tradeimpex fup prior INSIGHT Network domicile 180301, |
| | Tradeimpex re Madrid air frieght 180301, |
| | Tradeimpex re Madrid air frieght differential 180302, |
| | TRADEKEY intro 170825, |
| | Tradimpex BR re retail prepack 210319, |
| | Tradimpex BR re quote 210325, |
| | Tradimpex BR re case ready retail prepack 210406, |
| | Tradimpex BR re China beef quotes 210423, |
| | Tradimpex BR soybean availability 210423, |
| | Tradimpex re prices quotes and competitiveness 210521 |

*679. RICO-41 Racketeering Violations:* **Fraudulent Sales Opportunities, Domestic 1985-2022**

A. Lead Plaintiff expended company and personal funds to prepare sales materials, develop sales leads, and secure sales for various entities he owned, controlled, and managed as a result of defendants' fraudulent sales opportunities from 1985-1993, and from 2002-2005, and from 2015 to 2022. While the records documenting this travel, and other direct and overhead expenses, and the related loss of sales revenue and personal income are not currently accessible to Lead Plaintiff, and are controlled or maintained by defendants, all these instances of interstate travel require expenditures of personal and company funds and are the subject of future discovery in this case.

B. Initial entrepreneurial efforts began in late 1983 with the personal expenditure of hundreds of hours and about $4,000 of Lead Plaintiff's personal funds invested in software development for a hotel industry scheduling system, which was purposefully rejected by an agent of defendant UNITED STATES posing as the CFO of Westin Hotels in the Westin Corporate Headquarters in Seattle, WA, alongside ZOULAS and THORPE. This meeting and rejection occurred some months after the Seattle Westin cost reduction project, developed and managed by Lead Plaintiff, was completed. This innovative first of its kind services industry software system, similar to those now broadly used in services industries including, without limitation, hotels, banks, and retail stores to control labor costs and manage customer service levels, was declined, unknown to Lead Plaintiff at the time, for the purpose of sustaining the illegal human trafficking, human subject medical experimentation without consent, involuntary servitude, and forced labor of the Lead Plaintiff by defendant UNITED STATES.

C. Defendants collectively engage in contributing to this conspiracy through the use of their facilities, websites, personnel, email addresses, and other means to conspire in and facilitate these extended series' of constructive frauds which are intended to perpetuate, deprive, and entrap Lead Plaintiff while starving his various enterprises of legitimate commercial opportunities to engage in interstate commerce. These defendant commercial business entities include, without limitation, the named defendant entities commonly known as WALMART and WALMART China, Bentonville, AR; KROGER, Cincinnati and Blue Vine, OH; Alberts Organics, Los Angeles ,CA; COSTCO, Issaquah, WA; VENDORCO, San Diego, CA; various defendant Skaar Livestock and related entities, Lewistown, ID; BDO, Salt Lake City, UT; Bay State Milling, Boston, MA; Briggs & Stratton, Wauwatosa, WI; Badger Meter, Milwaukee, WI; Raynor Garage Door, Dixon, IL; First Alert, Aurora, IL; Borg Warner, Muncie, IN; Adtran,

Huntsville, AL; Western Digital, San Jose, CA; currently unidentifiable grocery wholesaler in the midwestern states; Orange City Beef, Orange City, IA; Bio-Lab, Lawrenceville, GA; Brightstar, Miami, FL; Rockwell Collins, Cedar Rapids, IA; Rocketdyne, Folsom, CA; Steel and Pipe Supply, Manhattan, KS; Samsonite, Denver, CO; Holland Group, Holland, MI; PPG, Pittsburgh, PA; Clipper Windpower, Cedar Rapids, IA and Carpinteria, CA; various Canadian firms with offices in Vancouver, British Columbia, Canada. Other co-conspirators will be identified through recovery of Lead Plaintiff's own records from defendants as well as through defendants' discovery disclosures. These defendants conspire with and sustain, together with other known and as yet unknown defendants, the abuses and violations of law and rights in this long-running conspiracy and pattern of racketeering acts and rights violations. See LPEE pages 140 et al, 427, 430, 463, 518, 616-618, 693, 711-740, 8379, 9068-9078, 9093, 9193, 9194-9206, 9240, 9277, 9278-9279, 9280, 9392-9393, 9538, 9539-9545, 9547, 9573-9591.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 4-14 |
| Complaint paragraphs: | 673-680 RICO-35-42 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0114 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 427, 430, 463, 518, 616-618, 693, 711-740, 8379, 9068-9078, 9093, 9193, 9194-9206, 9240, 9277, 9278-9279, 9280, 9392-9393, 9538, 9539-9545, 9547, 9573-9591 |
| Emails and documents by topic and date, also located in LPEE: | Alberts Organics first hit 140115,<br>Alberts buyer re free freight 140218,<br>Alberts Organics Argiros and Pres phone mtg 170516,<br>Alberts Organics as Customer 170516,<br>Alberts Organics as Customer 170517,<br>Alberts Organics as Customer 170619,<br>Alberts Reorg replace Pres 170707,<br>Alberts Organics 20131230955 New Vendor Form Signed 140217.pdf<br>Annies General Mills CROSS Marketing Discussion 210818,<br>Bay State Milling RFQ 220328,<br>Bridges re organic produce PNW and COSTCO sales 140410,<br>Bridges re production update 160922,<br>CalOrganic Price List 201401301259 131021.pdf<br>COSTCO Padilla on Craves 161110,<br>COSTCO initial review 170630,<br>COSTCO HUSKEY re China ofcs 210130,<br>COSTCO HUSKEY re China ofcs 210207,<br>COSTCO HUSKEY Update 210604,<br>COSTCO HUSKEY on organic beef 210616,<br>COSTCO HUSKEY re pricing organics 210617,<br>COSTCO GC reply to verficiation request 211102, |

VENDORCO Walker SBI Teaser for COSTCO 190213.pdf
VENDORCO Wlaker Signed Agreement COSTCO 190213.pdf
CrowdCow organic beef intro 210426,
DD re 5 yr plan to WMT 161231,
DD Callahan (KEENE) re lending DD name to WMT presentation 170126,
Earthbound Kodet re cust commitiment and timing 140327,
EMN Europe Sales Network 180228,
EMN Euro unapproved 180301,
England Logistics WCC Signed CCLTL Customer Packet (Master) 180723.pdf
General Mills outreach re Annies 210806,
Hive re non-std product line 210914,
KROGER cold email initial hit 161005,
KROGER re mtg plan 161010,
KROGER re coming mtg 161107,
KROGER mtg contact info 161109,
KROGER mtg fup 161109,
KROGER Frys Avg Utilization Jose MERCED 161221,
KROGER Demand Projection MERCED 161223,
KROGER cust ltr request 170426,
KROGER re organic pork availability 210426,
Liu Markk re ICPO-FB4-LZ-210914,
Natural Grocers New Item Submission 210811,
NYC Ace Produce Hit 150724,
1856_001 SMETA Audit Invoice181011.pdf
Preferred Freezer CA Winnett Cattle 2018 Agreement Preferred signed 180604.pdf
Pruska investor 161128,
Pruska investor 161129,
PWP update 160928,
RaboAg Kemp re Arlon Podzemny Perico 130203,
Rabo on Oliver Direct funding 160721,
Raboag Pitcher re Skaar review 170429,
Raboag Wilson TX 170531,
Rabo on organic fruits and veg mkt outllok 170822,
RAM initial meeting set 160325,
RAM re sales POs 160430,
RAM re Maines 160503,
RAM call to update RAM progress 160505,
RAM contract redline draft 160509,

RAM update 160526,

RAM re progress and concerns 160527,

RAM re progress and sales lead 160604,

RAM re sales leads progress 160609,

RAM inital referrer reconnect 160708,

RAM on CS sales mtg 160711,

RAM inital referrer reconnect 160720,

RAM Olin Capital Accepts Termination 160722,

RAM re DD Clark Mckenzie 160809,

RAM temriantion no results 160907,

RAM continues work 160911,

RAM re CS apptmt attempt 161027,

RAM CS reqmts 161028,

RAM CS 161103,

RAM CS stall 161108,

RAM conv produce fail 161121,

RAM on conv produce contractual issues 161205,

RAM re conv produce agents sales progress 161215,

RAM failure on conv produce and lack of notice 161221,

RAM C&S WinnettOrganics C&S Presentation 160604.pdf

RAM Reinhart WinnettOrganics Reinhart Food Services 160609.pdf

Safeway Rayburn decline 210614,

SBI Team on WMT mtg plan 210702,

Sirk re selling product 210115,

Smith sales intro call in AZ 160704,

Smith Triple Fresh Contact on Sales Prospects 160907,

Smith Triple Fresh passes setback on sales 160915,

Smith re WMT prior sales agents failures 161011,

Smith re avocdos sales hook and PACA 161102,

Whole Foods Weening organic beef decline 210610,

WMT initial hit on cold email 161002,

WMT fup Baldwin 161010,

WMT MCCORMICK ref from Balwin 161011,

WMT sales news to WO team 161011,

WMT MCCORMICK Webex 161014,

WMT MCCORMICK call tomorrow email 161017,

WMT MCCORMICK call fup 161018,

WMT MCCORMICK call fup production volumes 161020,

WMT MCCORMICK call 161109,

WMT MCCORMICK re DD discussion 161114,

WMT MCCORMICK resked and participant list 161114,
WMT MCCORMICK call fup 161116,
WMT MCCORMICK call fup 161118,
WMT MCCORMICK re investors ibankers 161121,
WMT MCCORMICK on contract outline 170108,
WMT MCCORMICK Bentonville Mtg Attendees 170111,
WMT MCCORMICK 170224 Bentonville mtg Present Draft 170123,
WMT MCCORMICK email Bentonville Mtg Presentation 170123,
WMT MCCORMICK Bentonville Mtg Attendees 170216,
WMT MCCORMICK Bentonville Mtg Invite 170216,
WMT MCCORMICK Bentonville Mtg Location 170216, (see also LPEE page 1074U, entry 2/21/2017)
WMT MCCORMICK Bentonville mtg fup 170222,
WMT MCCORMICK re post Bentonville Mtg Rev 170222,
WMT MCCORMICK nonreply fup 170328,
WMT Baldwin re decision next week 170403,
WMT MCCORMICK re mktg plans 170403,
WMT MCCORMICK on price drop 170412,
WMT MCCORMICK buyer contacts 170425,
WMT China Beef ref from MCCORMICK 170703,
WMT connects China on beef 170703,
WMT China Zheng initial contact 170704,
WMT China Zheng merch support 170707,
WMT China Zheng ROM pricing 170708,
WMT China beef HIGAKI intro 170718,
WMT China beef HIGAKI pricing 170811,
WMT China HIGAKI price quote 170811,
WMT China Hgiaki Quotes Specs 170821,
WMT China HIGAKI adding WO factory id 170821,
WMT China HIGAKI request factory number add 170821,
WMT China HIGAKI quote fup 170822,
WMT China WO Status Report WMT China Beef 680 ton order 170921,
WMT Chna HIGAKI re WMT contract 170924,
WMT China HIGAKI re process steps 170926,
WMT China Preferred Freezer initial hit 170926,
WMT China Americold initial hit 170929,
WMT China Cargill contact punt 171002,
WMT China HIGAKI Executed WMT Contract 171010,

WMT China Update WO Team 171012,
WMT China HIGAKI China visit and update 171023,
WMT China HIGAKI re contract signature rqmt 171023,
WMT China HIGAKI re JBS Specs 171026,
WMT China HIGAKI on revised order pricing 171208,
WMT MCCORMICK on China status 171220,
WMT China re labeling 180110,
WMT China xmit manually signed contract copies 180112,
WMT China order processing timeline 180115,
WMT China HIGAKI re sked 180116,
WMT China order timing Apr 180116,
WMT China HIGAKI re factory flow charts trial shipment 180122,
WMT China HIGAKI orig signed contracts sent 180123,
WMT China CA OWB Packers delay 180131,
WMT China HIGAKI intro of SCS process 180201,
WMT China HIGAKI re OWB approval 180201,
WMT China HIGAKI SCS 180201,
WMT China Hgiaki re Cargill Tyson on China 180202,
WMT China Higki re OWB SCS audit 180202,
WMT China OWB stringout 180206,
WMT China OWB stringout 180207,
WMT China OWB stringout 180214,
WMT China OWB stall 180223,
WMT China OWB stall continues 180223,
WMT China SamsClub China dragin 180227,
WMT China HIGAKI email sig page xmit 180228,
WMT China LiqCap AZ update 180228,
WMT China PETERSEN re signed contract evidence 180301,
WMT China re post OWB to JFO 180301,
WMT China JFO inquiry 180302,
WMT China re retail link 180302,
WMT China status on China 180302,
WMT China re local China ofcs 210130,
WMT China re China ofc and contact history 210202,
WMT China Liao re China ofc details 210204,
WMT China on packaged cuts 210222,
WMT China docs needed 210312,
WMT China Liao re new ofcs in China 210407,
WMT China re beef purchase embargo in China 210415,

| | WMT China SAmerica Quote 210422, |
| | WMT China rejects BR Tradimpex case ready pricing 210426, |
| | WMT China intro to RMC China rep Jason 210428, |
| | WMT re US organic beef pgm 210605, |
| | WMT Redfield on domestic organic beef 210607, |
| | WMT Lehr Organic Beef Intro 210610, |
| | WMT re organic beef partner pgm 210615, |
| | WMT Lehr video mtg 210616, |
| | WMT Lehr re comp organic price premiums on ther products 210617, |
| | WMT Redfield cc Lehr video mtg 210617, |
| | WMT Lehr alt sales ramp 210618, |
| | WMT Lehr Baskin video mtg to come 210702, |
| | WMT Hutchins mtg set 210713, |
| | WMT Baskin Lehr call fup on pricing 210729, |
| | WMT Baskin Lehr video call 210729, |
| | WMT Partnering Zoom Call 210729, |
| | WMT Baskin on pricing 210810, |
| | WMT Baskin status inquiry 210816, |
| | WMT Baskin pass 210818, |
| | WMT Organic Beef pass 210818, |
| | WMT Organic Beef pgm not established 210823, |
| | WMT Baskin re pass pricing other issues 210824, |
| | WALMART China Retail Link Vendor application 10172-10173 |
| | WMT MCCORMICK 170221 Bentonville mtg Revised Presentation Fup 170222.pdf |
| | WMT SCS Audit Preferred Frzr 20180517_1005110267Deposit_Invoice 180517.pdf |
| | WMT Std Supplier Contract Signature Page image2018-02-09-142033 180207.pdf |

*680. RICO-42 Racketeering Violations:* **Fraudulent Sales and Marketing Representation 2019-2021**

A. This pattern of sales lead development frauds and fraudulent lead reports repeats yet again in 2019-2021, conducted by defendants VENDORCO (FBI), and FOSHAN SHUNDE XinJianHan Trading Co, Ltd (RMC, CIA), with Raymond POON as principal, LONERGAN

(FBI) as intermediary both as the referral source to POON and as an alternate contact to POON after the introduction. VENDORCO through its principal, Susan WALKER (FBI), domiciled in or around San Diego, California represented one of Lead Plaintiff's companies, Winnett Cattle Company, to COSTCO. Perimeter Sales and Marketing was a sales representation firm to retail grocery fresh departments (produce and other fresh products) domiciled in California. RMC (POON, LONERGAN) is alleged to be a commercial trading operation domiciled in New York City, with a dedicated agent allegedly operating from Shanghai, China to solicit customers in China for Sheldon Beef, with progress as reported by that China-based sales agent. Lead Plaintiff also assigned sustainment of Lead Plaintiff's business entity Sheldon Beef's (Interline Exhibit 12) relationship with WALMART China so POON's entities could earn commissions through that relationship. Defendant POON and other related defendant personnel provided fraudulent sales leads and reports, facilitated by wire fraud and contract fraud, for the fraudulent purpose of stripping authentic international sales opportunities from Sheldon Beef (Interline Exhibit 12). These fraudulent services cost the company nearly two years lost for legitimate international sales opportunities. Defendant UNITED STATES also introduced an influencer MANNER who consumed time and resources in Lead Plaintiff's attempt to launch the consumer retail website for Sheldon Beef with influencer marketing.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
| --- | --- |
| Complaint paragraphs: | 673-680 RICO-35-42 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0114 |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |
| Emails and documents by topic and date, also located in LPEE: | Manner Influencer Contract 210901, |
| | Manner Influencer Status 210909, |
| | Manner Influencer re web progress status 210910, |
| | Manner Influencer Hold 211101, |
| | Perimeter Sales Mktg re brokered LA regional mkt coverage 140408 |
| | Perimeter Sales Merchandising Pitch Deck 140408.pdfRMC LONERGAN re agent quals 200811, |
| | RMC LONERGAN POON mtg 200812, |
| | RMC LONERGAN re contract 200812, |
| | RMC POON Raymond Signed Contract RMC Signature page 200813.pdf |
| | RMC LONERGAN contract agreement 200813, |
| | RMC LONERGAN POON collaboration agreed 200814, |
| | RMC LONERGAN re sales activity 200830, |

RMC LONERGAN re co-venture details 200831.

RMC POON coventure orgzn options 200902,

RMC LONERGAN 200902,

RMC LONERGAN re pricing 200908,

RMC LONERGAN re China Mktg 201207,

RMC LONERGAN re POON mktg direct support 201207,

RMC China direct mktg pgm 201230,

RMC POON re BRF contact inside China 210126,

RMC re BRF info request 210128,

RMC LONERGAN re COSTCO WMT on China ofc 210130,

RMC POON on BRF China mtg results 210203,

RMC re China contract mod 210225,

RMC LONERGAN on RMC sales strategy doc China 210226,

RMC LONERGAN re Berkshire pork 210307,

RMC LONERGAN re Berkshire cuts cherry picking 210311,

RMC LONERGAN re China sales progress 210311,

RMC LONERGAN Berkshire Trial Order Pricing 210312,

RMC LONERGAN re Berkshire volumes 210312,

RMC LONERGAN 210316,

RMC LONERGAN sales prospect report 210316,

RMC LONERGAN Yao Quote 210316,

RMC LONERGAN China sales quotes 210326,

RMC re signed modified contract 210331,

RMC LONERGAN beef sales quote 210413,

RMC China sales report 210430,

RMC POON on Big Sandy investment potential 210507,

RMC Jason on WMT China Intro mtg 210511,

RMC POON on status 210518,

RMC China pricing 210520,

RMC Jason on scam beef request 210525,

RMC China sales pgm conversion attempts reqd 210622,

RMC Jason re sales efforts 210628,

RMC Jason Sales Advice 210628,

RMC Jason Omasum No Quote 210703,

RMC POON re status and future pymt opptnys 210731,

RMC Jason re status 210816,

RMC POON re status 210816,

RMC re 60 day notice terminating 210902,

| | RMC LONERGAN re repay advances 210903, <br> RMC payment plan request 210903, <br> RMC POON re pricing guidleines 211015, <br> RMC Raymond re status 211220 <br> COSTCO Walker VENDORCO HUSKEY COSTCO Final <br> Presentation 190501 (1) (2).pdf |
|---|---|

**Racketeering – Dishonest Professional Services**

*681. RICO-43 Racketeering Violations:* **Dishonest Professional Services – Accounting Compilation And Review 1993, 2021**

A. 1993: As forensically reverse engineered, CPA reviewed financial statements for Alliance were required to obtain financing allegedly available from a Vancouver, BC source as represented by CORNWELL (defendant CIA). So, Lead Plaintiff engaged the professional accountant "sister" recommended by a former Deloitte Seattle employee, Phil Walter. This individual then stopped working and abandoned this assignment during preparation (FBI, UNITED STATES), leaving the financial statement compilation incomplete after being paid for work to date. This led to protracted delays in preparation as the Lead Plaintiff was forced to spend days straightening out her mess instead of bidding projects to sustain Alliance's critically important sales and cash flow. The financial statement review process was then further dragged out by the "accountants," a local accounting firm which was actually just another defendant FBI illegal cover spying operation posing as an accounting firm. This entire defendants FBI and CIA mandated financial statement compilation and review to complete the proposed financing cost the company a substantial portion of the $20,000 loan fraudulently advanced by Pacific Financial Services (FBI, Henry Wozow) for professional fees and expenses, which was the specific cause of Lead Plaintiff's personal bankruptcy filed in November 1993 (paragraph 653 RICO-15).

B. 2021: Defendant WEFUNDER and its officer and employees, through the various entities legally named above, whether acting on its own behalf or as spoofed by other defendants with police powers representing themselves as WEFUNDER personnel and as the actual website while acting as a defendant agent, officer, and as part of this on-going conspiracy, represented themselves, their firm, and their web platform as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's Winnett and/or Sheldon Beef entities, thereby coordinating with and playing an on-going role in 2021 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

C. Among their bad faith acts was defendant WEFUNDER's role in knowingly recommending an auditor, Alice CHENG, who after gathering key financial information on their behalf from Lead Plaintiff's company, refused to issue any form of the professional auditor Opinion letter required to complete the financial statements (paragraph 672B RICO-34), so the fund raising process could be undertaken as planned in conformance with SEC Regulation A+. This scenario played out almost identically to defendants' previous frauds and swindles in paragraph 659 RICO-21 undertaken by defendant ADAMSON Brothers (FBI) and in paragraph A above (CIA, FBI, CSIS, RCMP).

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | 653, 672B RICO-15, 34; 681-690 RICO-43-52 generally |
| Appendix 2 paragraphs: | 1-017 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0053 through 2-0059 |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |
| Emails and documents by topic and date, also located in LPEE: | WEFUNDER MAGGARD as sponsor 210719, WEFUNDER Solicitation fup example 1of55 sent 210719, WEFUNDER MAGGARD re 2k 210720, WEFUNDER LABELLE re mandatory signup to vouch 210803, WEFUNDER GAAP Acctnt CHENG 210902, WEFUNDER start sequence 210903, WEFUNDER GAAP Acctnt CHENG Delays 210907, WEFUNDER re CHENG auditor delay 210908, WEFUNDER GAAP Acctnt CHENG 210909, WEFUNDER GAAP Acctnt refuses Opinion 210909 |

## 682. *RICO-44 Racketeering Violations:* **Dishonest Professional Services, Web 2021-2022**

A. Defendant ENVOTEC, a website developer, located by Lead Plaintiff in Pakistan through a defendant spoofed or otherwise controlled version of website Freelancer.com, and while acting or posing as its employees and contractors, was paid for web development services. Defendants, including the funding source for this fraudulent project using cover name Michael MAGGARD, FBI Amarillo (paragraph 648 RICO-10), as an element of their on-going pattern of racketeering acts, never intend to allow these web development services to be completed and for the online Sheldon Beef store to operate and be permitted to offer products for retail sale. This was another in the series of these fraudulent interferences in interstate commerce against an online store by defendant UNITED STATES, FBI. The Lead Plaintiff had previously developed an online store on Shopify.com intended to be used to launch product sales to beef wholesalers, and which was the subject of a launch meeting with fraudulent employees Jason WASEMAN, Chris CANCHOLA, and Lori ALVAREZ in Avondale, AZ, as documented in paragraphs 686-690 RICO-48 through 52 herein, as well as in email evidence stripped and/or currently blocked by defendant UNITED STATES. Funds for web subscriptions, travel expenses and reimbursements, and other resources were expended in interstate commerce to attempt to launch this interstate commercial enterprise, as part of the attempted startup and commercialization of Gannett Peak Ranch, a now defunct Oregon corporation funded by Lead Plaintiff out of pocket.

B. This fraud and swindle is an element of defendants' on-going conspiracy to sustain, among other acts, violations, and injuries, involuntary servitude, forced labor, and human trafficking using repeated cycles of delay and financial starvation of Lead Plaintiff's business entities, and used to further their intent to exhaust the personal financial resources of Lead

Plaintiff, who regularly has and does invest personal funds and extensive amounts of personal time and professional talent in each of these entities in good faith. These expenditures in international commerce are shown at LPEE pages 10093, 10094.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | 648 RICO-10, 686-690 RICO-48 through 52; 681-690 RICO-43-52 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |

| LPEE pages (see technical note on page numbering at paragraph 230): | 10093, 10094 |
|---|---|
| Emails and documents by topic and date, also located in LPEE: | GPR website developer re feeedback 210814, GPR Website stall 210819, GPR Website product load begins 210820, GPR website further delays 210824, GPR Startup Plan Rev 210829, GPR website closer but not functional 210903, GPR website slides again 210907, GPR website added dev fees 210909, GPR web dev re project hold 211026, GPR Web contacts zero response rate note 221117 |

# 683. RICO-45 Racketeering Violations: Dishonest Professional Services, Legal 1986-2005

A. Lead Plaintiff businesses and intertwined personal interests have been repeatedly deprived of honest legal services at various law firms. This trail of attorneys who did minimal or no legal work for the corporate clients Lead Plaintiff owned or worked for between 1986 and 2005 include, but sustained professional relationships include, without limitation: (i) Lazersoft - Glen GARRISON at Keller Rohrback; (ii) Alliance Environmental Services - Robert HIBBS and Susan THORBROGGER at Short Cressman & Burgess; (iii) CNA Industrial Engineering - Mike BABCOCK (also spouse of Lead Plaintiff co-worker Gwen HEATHCOTE at Deloitte Seattle); (iv) Allegent, LLC dba Performa - Michael LARSON - LARSON Hart & Shepherd, later Pivotal Law Group. LARSON was introduced by John C. T. "Jay" Conte, a federal commercial cover agent specializing in financial frauds (defendant FBI). (v) Leslie CALDWELL (defendant DOJ, cover name not recalled) at Seed & Berry, Seattle, Washington relating to intellectual property claims by Allegent LLC (which Lead Plaintiff unwittingly co-owned with PRAY as he operated undercover for defendant UNITED STATES and using its funds) against ShipNow (another UNITED STATES FBI fraudulent cover company run by Kurgan), where TARPLEY was also

noted to appear in a bank branch on an intervening retail shop floor to Lead Plaintiff's left during his multi-floor transiting escalator ride from the Fourth Avenue building lobby to the Fifth Avenue elevator lobby enroute to Lead Plaintiff's meeting regarding ShipNow intellectual property litigation with CALDWELL and PRAY at Seed & Berry.

B. Examples of this pattern of practice of illegal general searches includes:

1) Corporate lawyers who act against client interests while apparently engaged for their benefit. Lead Plaintiff was not consulted prior to the removal of a cost-plus provision at paragraph 12 of the Alliance purchase and sale agreement for the asset purchase of Steve's Maintenance, including the assumption of project contracts for projects then currently underway but incomplete. THORBROGGER, the Short Cressman & Burgess attorney did not mention the removal of the cost-plus reimbursement paragraph 12 to Lead Plaintiff. Only his direct review and insistence on its return to the agreement resulted in the final agreement which included this paragraph 12. If the purposeful deletion by Susan THORBROGGER (Short Cressman Burgess, Seattle, WA, most probably DOJ, together with HIBBS) had not been noticed and returned to the document on Lead Plaintiff's insistence, this deletion would have potentially cost Alliance up to $165,000 of lost cash flow plus approximately $100,000 of unreimbursed costs for labor, materials, asbestos waste dump fees, and direct project overhead costs, on the Bates Vocational-Technical parking garage asbestos abatement project. This labor-intensive project required hand jack-hammering and removal of an asbestos paper interposed between the concrete finish floor and the underlying structural floor in the multi-story parking structure at Bates in Summer 1990. A $265,000 loss would have wiped out company equity (initially $250,000) within four months of the purchase and left the Lead Plaintiff in personal default on a $150,000 U.S. Bank, N.A., line of credit due

to his personal guarantee with excellent personal credit. Nonetheless, defendant FBI would go on to complete the wrecking of the illegal search cover company, Steve's Maintenance. As forensically reverse engineered, this process destroyed Lead Plaintiff's company Alliance in 1993 through the use of, without limitation, as part of defendant UNITED STATES' intentional financial wrecking of Lead Plaintiff's company Alliance, which incorporated (i) fraudulent co-ownership and control through a nominee (David J. Carey as nominee, FBI, paragraphs 445-449, 649 RICO-11), (ii) fraudulent legal representation (HIBBS and Susan THORBROGGER, DOJ/FBI, both embedded at Short Cressman & Burgess law firm, paragraphs 446; 626 RGTS-6, 649, 651, 653, 683 RICO-11, 13, 15, 45), (iii) fraudulent deprivation of government benefits (SBA bonding, paragraph 446, 471; 649, 653 RICO-11, 15), (iv) theft and compromise of receivables (Steve and Kerry Brewer, FBI, paragraphs 644, 650, 651 RICO-6, 12, 13), was then succeeded by (v) a Vancouver, B.C. fraudulent financing which failed (paragraph 653 RICO-15). This was completed at the Lead Plaintiff's personal expense, including about three years of uncompensated professional labor and personal bankruptcy, for the specific purpose of destroying the Steve's Maintenance business records, thereby fraudulently concealing defendant FBI's criminal wrongdoing in its criminal investigations using this cover company.

2) The original bankruptcy case intended to be filed against LazerSoft by Lead Plaintiff and two other individuals (WATERS, TARPLEY), mysteriously resulted in absolutely no federal bankruptcy court actions or notices. With the benefit of forensic reverse engineering of defendant DOY and FBI methods, this was most probably due to HIBBS' (DOJ or FBI, Short Cressman & Burgess, Seattle, WA) actual fraudulent failure to

file this litigation when directed to do so, while acting against Lead Plaintiff's personal interest in this matter.

3)  Extensive and expensive subsequent litigation included a federal court hearing in the US District Court for Western Washington (Judge Carolyn Dimmick) on the standing of Network Imaging Corporation, then in the process of acquiring LazerSoft assets from parent Wembley plc in this matter in 1994 or 1995, in which the Court denied standing to Network Imaging. The case was never resolved but did lead to yet another matter allegedly filed related to WATERS' ownership of the intellectual property (software work product he produced), adding still more litigation expense. WATERS reported a $30,000 overbilling by Short Cressman & Burgess lead attorney Robert HIBBS. Most probably this too was an internal conspiracy with Lead Plaintiff's two remaining co-workers, TARPLEY AND WATERS, actually operating as members of Lead Plaintiff's defendant FBI, USMS, DOJ, CIA, ARMY minder team throughout the entire sequence in perpetuation of the illegal involuntary servitude.

4)  A $150,000 account receivable of a PAN subsidiary was allegedly discounted with a commercial factor in southern California. These funds mysteriously disappeared into the factor's bank, First Interstate Bank, after PAN's CEO promised to pay Lead Plaintiff compensation from that receivable (paragraphs 450-451, 601C NSEC-2; 623D, G, 627A RGTS-3, 7; 644B(iii), 650B (ii), 652G, 653H RICO-6, 12, 14, 15). The funds were allegedly seized by the bank to repay an outstanding debt of the factor to the bank. PAN CEO CORNWELL declined to take immediate action within seven days as required by California law to legally notify the bank of the actual provenance of the payment to retain the PAN subsidiaries ownership interest in the payment, so the Lead Plaintiff was once again strung

out financially as the promise of legally due compensation being paid after another delay was broken yet again by the purposeful, deliberate, and conspiratorial associated-in-fact enterprise pattern of racketeering acts by defendant UNITED STATES, FBI, CIA, and other unknown individual defendants.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4-14 |
|---|---|
| Complaint paragraphs: | 445-449, 450-451, 471, 601C NSEC-2; 623D, G, 626, 627A RGTS-3, 6, 7; 644, 649, 650, 651, 652G, 653, 683 RICO-6, 11, 12, 13, 14, 15, 45; 681-690 RICO-43-52 generally |

| Appendix 2 paragraphs: | Not applicable |
|---|---|
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0056 through 2-0058, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### *684. RICO-46 Racketeering Violations:* **Dishonest Professional Services, Legal 2014-2021**

A. Defendant Raymond SULLIVAN was introduced to Lead Plaintiff by Charles

JACKSON, a former CIA commercial cover "Merrill Lynch investment banker" who worked in

Mexico City (likely in the same timeframe as Sheriff ARPAIO while ARPAIO was at DEA).

Defendant SULLIVAN is an international trade attorney and former federal Customs and Border

Protection investigator and attorney. Defendant SULLIVAN billed entities owned and controlled

by Lead Plaintiff approximately $400,000 for legal services between November 2013 and April

2021. He received $10,000 paid for legal services from the funds invested by "DEAN T.

SMITH" in August 2015 and continued his services billing at $600 per hour despite Winnett's

inability to pay as Winnett and Lead Plaintiff were continually strapped for cash flow and being

stripped of resources by the actions of defendant UNITED STATES.

B. Upon knowledge and belief, Defendant SULLIVAN was fundamentally detailed, as

were prior attorneys referred by trusted sources to Lead Plaintiff and used by his business

entities, for the actual purpose of spying upon and sustaining functional control of Lead Plaintiff

and his related business enterprises, and to interfere with and surveil all contracts and business

opportunities. These associated-in-fact enterprise racketeering acts under color of law were and

are another element of defendant UNITED STATES and its co-conspirators' overall scheme and

pattern of frauds and racketeering acts used to perpetuate their human trafficking, involuntary

servitude, forced labor, and invasions of human autonomy and rights in support of illegal human subject experiments and the illegal BRMT bioweapon and bioweapon delivery system.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 4-14 |
| Complaint paragraphs: | 681-690 RICO-43-52 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 383-384, 430-438, 440, 8370, 8371-8373, 8474, 8378, 8411, 9249-9255, 9285, 9311, 9820, LPEEV65-6, 7 |

| | |
|---|---|
| Emails and documents by topic and date, also located in LPEE: | Ray SULLIVAN ID incl Bar Numbers 140620.pdf<br>Burges Salmon 1 re London Closing 140917,<br>Burges Salmon 1 re London Closing 140918,<br>Collins ref by SULLIVAN on Bridge Loan 150629,<br>SULLIVAN re Benibo fake 131202,<br>SULLIVAN Intro from JACKSON 140219,<br>SULLIVAN on 140225 mtg 140226,<br>SULLIVAN re Zayid investment 140304,<br>SULLIVAN re Zayid as former Customs Investigator 140305,<br>SULLIVAN re Mubadala Commission reqmt and FCPA violation 140715,<br>SULLIVAN WO sends $10K 150828,<br>SULLIVAN appointed Corp Counsel 151110,<br>SULLIVAN on financings 160111,<br>SULLIVAN on financing lead from CASTRO 160206,<br>SULLIVAN on MARV Capital drop 160401,<br>SULLIVAN re INSIGHT scam Argold, Brereton status 160419,<br>SULLIVAN re RAM Olin contract 160426,<br>SULLIVAN on Oliver Term Sheet to Contract 160707,<br>SULLIVAN on AKOTO Brewer Fund creation 160710,<br>SULLIVAN on AKOTO Brewer Fund creation 160727,<br>SULLIVAN Draft for Oliver Funding 160728,<br>SULLIVAN re BLACKPOOL CAP 161128,<br>SULLIVAN re ARPAIO Palmeri Gerlach Black Rock Farms 161220,<br>SULLIVAN ARPAIO Palmeri Black Rock Farms Jack Palmeri 161222,<br>SULLIVAN re WMT Bentonville visit Feb 161229,<br>SULLIVAN re Smith 5K loan 170126,<br>SULLIVAN re Whitestone Lex Gubsky Moneywise 170126,<br>SULLIVAN Marvel re Black Rock Gerlach 170301,<br>SULLIVAN re Black Rock Marvel 26 Ranch reappears 170301,<br>SULLIVAN re Marvel Black Rock retainer review 170303,<br>SULLIVAN re pea harvester lease 170303,<br>SULLIVAN re RAM demand notice 170401,<br>SULLIVAN re prospective escrow lenders 170602,<br>SULLIVAN re CFO Smith termination 170608, |

| | Sullian re FATCO re title for Skaar 170613, |
| | SULLIVAN TX HEC feedyard contract 180118, |
| | SULLIVAN review of E6 docs okay 180223, |
| | SULLIVAN re sales contract review 200804, |
| | SULLIVAN re ABDELSAYED 2mm loan gty shares grant 200822, |
| | SULLIVAN re RMC contract mod 26 Ranch sked 210225 |
| | SULLIVAN Billing for Feb 2019 190228.pdf |
| | SULLIVAN Billing for Jan 2019 190201.pdf |
| | SULLIVAN December 2018 Billing 190102.pdf |
| | SULLIVAN Winnett Perico Bill for April 2019 190501.pdf |
| | SULLIVAN Winnett Perico Bill for August 2018 180901.pdf |
| | SULLIVAN Winnett Perico Bill for June 2018 180701.pdf |
| | SULLIVAN Winnett Perico Bill for March 2019 190401.pdf |
| | SULLIVAN Winnett Perico Bill for November 2018 181201.pdf |
| | SULLIVAN Winnett Perico Bill for October 2018 181101.pdf |
| | SULLIVAN Winnett Perico Bill for September 2108 181001.pdf |

**685. *RICO-47 Racketeering Violations:* Dishonest Professional Services, MARICOPA SHERIFF, ARPAIO as Consultant 2014-2017**

A. Defendant Joseph ARPAIO, as MARICOPA SHERIFF, and as a private individual acting in bad faith outside the scope of his legal authority, was instrumental in orchestrating his own introduction to Lead Plaintiff as Greg Crossgrove (ARPAIO, Interline Exhibit 5, paragraph 661C RICO-23), an organic produce farming and packing expert with prior organic farming experience in 2014 through a fraudulent resourced online search result. Defendant ARPAIO (as Greg CROSSGROVE) also then MARICOPA SHERIFF allegedly worked with Captiva Verde, an organic grower domiciled in California with a farm in Arizona funded by investors associated with the Vancouver Stock Exchange, in Vancouver, British Columbia, Canada. Crossgrove (ARPAIO) also claimed an association with the Nunes family agriculture operations in California through his brother as President of a Nunes family fresh produce enterprise. Notably,

Representative Devin Nunes, closely aligned with then President Trump and House Minority Leader Kevin McCarthy, chaired the House Intelligence Committee around this time.

B. Consultant CROSSGROVE (ARPAIO) assisted Lead Plaintiff with production methods, staffing, and locating investors, none of which came to fruition. He introduced a fellow consultant, Ricky King, Double K Enterprises, (MARICOPA SHERIFF officer) who assisted the Lead Plaintiff in touring an abandoned farming property in Hyder, Maricopa County. AZ, then currently leased from the State of Arizona by Barry Oliver, allegedly a wealthy investor (both then current or former police powers officers or agent). Defendant ARPAIO also allegedly argued about production methods and costs with another defendant police powers agent or officer, Mike CASTRO, after CASTRO (defendant FBI) was selected to become the VP Operations for WinnettOrganics, a Lead Plaintiff business entity, and conspired with PAUL SMITH (defendant FBI) then posing as embedded Winnett CFO.

C. Lead Plaintiff took a copy of a signed $52 million investment agreement with a Qatari company, Jabor, with him to an October 2015 organic vegetable packing plant construction meeting at Willmeng Construction's otherwise empty headquarters building in Maricopa County and showed the signed document to CROSSGROVE (defendant Sheriff Joseph ARPAIO) sitting to his immediate left as they faced the video conference screen at the other end of the conference room. See LPEE pages 8489-8506.

D. Eventually, this fraud and swindle come crashing down, by defendants' deliberate and continuing interferences in interstate commerce, with the Lead Plaintiff having been run through another years-long sequence of associated-in-fact enterprise pattern of racketeering acts, false starts, false promises, frauds, and failures which began in 2013, continued with ARPAIO's direct involvement from late 2014 until a final email exchange on August 17, 2017, around the

time of his conviction on criminal contempt charges, and about a week before he was pardoned by President Trump.

E. This years-long sequence included air, hotel, and car rental expenses along with uncompensated professional labor for, among other purposes business meetings and property and facility siting and selection tours; for processing plant design meetings in Salinas, CA and Maricopa County, AZ; to meet and present information to investors; to gather with employees for tours, company project kick-off and staff meetings; as well as sales trips to WALMART (Interline Exhibits 9-10) in Bentonville, AR, and to KROGER (Interline Exhibit 8) in Cincinnati, OH; attendance at conferences and referrals by agents or officers posing as investment firms and their officers or employees in New York City; all fraudulently perpetrated over years by these defendants as they have and do interfere with and affect interstate commerce and constitutional rights. This elaborate and wildly expensive multi-jurisdiction, multi-level of government fraud and swindle, incorporating media and other private entities and individuals as co-conspirators by defendants, has been and is completely fabricated, systematically fraudulent, and has and does involve thousands of emails, phone calls, and expenditures for travel, entertainment, proposals, samples, and mailings. It is a comparable sequence to those previously undertaken by defendants to control and human traffick the Lead Plaintiff since he began directly engaging as an "independent entrepreneur" in 1983, and it is a markedly similar process to his prior business and career experiences prior to 2005 and to the subsequent ten month stint at defendant ESTABLISH for defendant ROSENBERG (first defendant FBI in Seattle, WA until June 2005, then defendant DOJ from 2005 as US Attorney in two sequential federal districts - South Texas, Eastern District of Virginia) in 2007 to 2008, which is still the final employment and earned income permitted to Lead Plaintiff by defendant UNITED STATES and its co-conspirators. See

documentary and disbursements evidence which dates from December 2014 to August 2017 referenced below.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5 specifically, 4-14 |
|---|---|
| Complaint paragraphs: | 661C RICO-23; 681-690 RICO-43-52 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0172, 2-0174, 2-0176, 2-0177 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 383, 386, 427, 431, 602, 616, 632-635, 8351-8352, 8489-8506, 8813-8854, 8937-8938, 8956, 10132-10137, noting |

| | |
|---|---|
| | entries for Arizona destinations and locations, LPEEV65-6, 7 |
| Emails and documents by topic and date, also located in LPEE: | ARPAIO Truitt inital hit connects to B Oliver 141108, |
| | ARPAIO CROSSGROVE (ARPAIO) first hit 141212, |
| | ARPAIO CROSSGROVE (ARPAIO) Persist Example 150707, |
| | ARPAIO from Brewer on startup plan 150810, |
| | ARPAIO intro Oliver 150902, |
| | ARPAIO on Project Progress Oliver 150906, |
| | ARPAIO on Plant Design Rqmts 150916, |
| | ARPAIO CASTRO Leases to do forgoteen during telcon 151007, |
| | ARPAIO availability 151014, |
| | ARPAIO tours Gerra Plug Power 151018, |
| | ARPAIO announces Captiva Salome Farm Availability 160210, |
| | ARPAIO on Oliver Hyder 160321, |
| | ARPAIO on involvement 160427, |
| | ARPAIO on greenhouses and financing arranged 160430, |
| | ARPAIO on lack of investor contact other updates 160505, |
| | ARPAIO King update 160511, |
| | ARPAIO on Oliver as poss investor 160513, |
| | ARPAIO on Oliver and Hyder layout 160520, |
| | ARPAIO on status and prior Captiva Verde involvement 160624, |
| | ARPAIO on Brother as Nunes exec 160627, |
| | ARPAIO on Oliver proposal 160703, |
| | ARPAIO on Oliver Term Sheet Clarification 160707, |
| | ARPAIO on Oliver Direct Funding 160721, |
| | ARPAIO on Proposed budget Oliver Hyder project 160729, |
| | ARPAIO on temp cooler Cowley Kodiak Produce PHX 160730, |
| | ARPAIO on Hyder Oliver per acre costs CASTRO 160801, |
| | ARPAIO info request 160805, |
| | ARPAIO on grow plan fin projections 160809, |
| | ARPAIO on Oliver deal collapse 160809, |
| | ARPAIO King re Hyder Oliver 160812, |
| | ARPAIO re Hyder Oliver resurrection 160813, |
| | ARPAIO on Oliver Hyder structure 160816, |
| | ARPAIO on Oliver Hyder 160819, |
| | ARPAIO on spring lettuce season 160819, |

ARPAIO on Oliver Hyder prep and Buckeye 160902,
ARPAIO on acre reallocation 160906,
ARPAIO on Oliver proposal and conv cropping 160911,
ARPAIO connects RAM ACTS Freedom Famrs 160913,
ARPAIO intro ACTS Freedom Farms 160913,
ARPAIO on Oliver Hyder son objection 160913,
ARPAIO ACTS Freedom Farms and Hinson 161005,
ARPAIO on brother at Nunes and Sprouts open AZ 161008,
ARPAIO CFO Smith re plan for Hyder Oliver presnetation 161026,
ARPAIO on Oliver pitch date 161026,
ARPAIO on Western Growers Assn Pricing 161027,
ARPAIO CFO Smith re plan for Hyder Oliver presnetation 161102,
ARPAIO re WMT KROGER 161215,
ARPAIO on Gerlach NV 161216,
ARPAIO refers Gerlach Black Rock 161216,
ARPAIO re Sprouts 161230,
ARPAIO re Sprouts KROGER COSTCO WMT 161230,
ARPAIO Sheriff Term Ends 170101,
ARPAIO ref grower shipper interest 170115,
ARPAIO ref RWood Offer Letter 170115,
ARPAIO on new VP Growing referred 170117,
ARPAIO on Buckeye Greenhouses 170211,
ARPAIO on Freedom Farms reconnect 170211,
ARPAIO re phone appt avail 170216,
ARPAIO on investor closing and startup 170303,
ARPAIO re land avail and deadlines 170303,
ARPAIO 170309,
ARPAIO VP Grow comments 170309,
ARPAIO as land rep announcement 170316,
ARPAIO Prader Integrted Ag re Hyder Farms 170526,
ARPAIO on status inquiry 170707,
ARPAIO 170724,
ARPAIO on land and mkt conditions 170724,
ARPAIO 170817,
ARPAIO Prader IntegratedAG AZ hangs in 180207,
CASTRO CA VP-Ops Intvw 150825,
CASTRO CA re Mota Dir Ops add 150901,
CASTRO introduces Gerlach to DB ARPAIO 151106,
CASTRO re financings 151120,

CASTRO re Hyder Water Quality 151126,

CASTRO on Dole Gerlach 160125,

CASTRO on lettuce production detail 160214,

CASTRO on Kingman Farms status 160304,

CASTRO progress report 160427,

CASTRO re Hinson Lyle proposal via ARPAIO 160513,

CASTRO on Aqua 4D saline water trmt 160608,

CASTRO re personnel rqmts 160705,

CASTRO re Aqua 4D Giora bkfst miss and Oliver mtg 160719,

CASTRO on Aqua4D in Oliver Hyder budget 160731,

CASTRO on budget format Oliver Hyder 160801,

CASTRO on resignation 160810,

CASTRO Separation Agreement 160811,

CASTRO Separation Agreement to SULLIVAN 160811,

CASTRO connection Aqua 4D Giliad email samples 161101

DD on Oliver Term Sheet 160711,

DD Callahan (KEENE) re engement ltr 160714,

DD Callahan (KEENE) re cancelled Oliver mtg 160812,

DD on Oliver Hyder resurrection 160824,

DD Hinson on production volumes 161106,

Indeed re Galkin start 200716,

Indeed Company recruiter Indeed 200828,

Indeed re KUMIN Galkin starts 200828,

Indeed recruiter re status 201022,

King AZ ARPAIO Ops Connection 150818,

LIBERTY EB-5 initial hit 141027,

LIBERTY KELLER CARTER mtg thanks 141103,

LIBERTY EB-5 WinnettOrganics LOI 11-12-14 141112,

LIBERTY CARTER ref request services matrix request 141114,

LIBERTY re CADC TEA eligibility 150106,

LIBERTY backout excuse sent to UFIG 150505,

LIBERTY EB-5 LOI to WP 221105,

Liquid Capital AZ GOTTESMAN initial hit 170928,

Liquid Capital AZ GOTTESMAN signed app 171012,

Liquid Capital AZ GOTTESMAN on underwriting info request 171012,

Liquid Capital AZ GOTTESMAN underwriting info complete 171013,

Liquid Capital AZ GOTTESMAN email DLC sample 171017,

Liquid Capital AZ GOTTESMAN 171101 mtg request 171024,

Lyle Hinson re Buckeye Grnhses DC 161218,

Lyle re 350K Buckeye whse cooler 160818,

Oliver AZ mtg contact 150902,

Oliver re Hyder Lease 150928,

Oliver PHX Hyder Lease Sign 151004,

Oliver Hyder Eqpt Lease Dep Status 151215,

Oliver Hyder Funding update 151222,

Oliver on financings outstanding 160111,

Oliver Dole sales update 160123,

Oliver on financings status 160129,

Oliver on financings status 160208,

Oliver on financings status 160217,

Oliver on financings status 160223,

Oliver has poss investor interest 160226,

Oliver on financings status 160226,

Oliver on status 160322,

Oliver re Costamanga invest decsion postponed 160420,

Oliver update 160629,

Oliver Term Sheet Proposal 160705,

Oliver on Term Sheet Clarification 160707,

Oliver PHX mtg proposal 160713,

Oliver re mtg location ARPAIO King CASTRO Smith 160714,

Oliver 160719 mtg preview email 160718,

Oliver Term Sht mtg update to TARAZEWICH 160719,

Oliver on Hyder Budget Cost Detail 160810,

Oliver on Hyder Deal Fail 160810,

Oliver resurrects Hyder 160812,

Oliver re Hyder Dev collateral 161103,

Oliver re Hyder Dev proposal 161103,

Oliver re Hyder Farm Dev Plan 161103,

Oliver Hyder WO Presentation to Oliver 160719.pdf
Oliver mtg WO ProForma Presentation V1 160719.pdf
RAM connects ARPAIO ACTS freedom farms 160913,

RAM on Hinson ACTS Freedom Farms 160914,

Rose Jordan Recruiter Fee Agreement 150824,

Smith re Oliver Term Sheet 160707,

| | Smith re fine tuning on Oliver financial proposal 160720, |
| | Smith re IT traceability budget add Oliver Hyder 160731, |
| | Smith re Status Report Detail on Hyder Oliver et al 160818, |
| | WMT initial hit on cold email 161002, |
| | WMT fup Baldwin 161010, |
| | WMT MCCORMICK ref from Balwin 161011, |
| | WMT sales news to WO team 161011, |
| | WMT MCCORMICK Webex 161014, |
| | WMT MCCORMICK call tomorrow email 161017, |
| | WMT MCCORMICK call fup 161018, |
| | WMT MCCORMICK call fup production volumes 161020, |
| | WMT MCCORMICK call 161109, |
| | WMT MCCORMICK re DD discussion 161114, |
| | WMT MCCORMICK resked and participant list 161114, |
| | WMT MCCORMICK call fup 161116, |
| | WMT MCCORMICK call fup 161118, |
| | WMT MCCORMICK re investors ibankers 161121, |
| | WMT MCCORMICK on contract outline 170108, |
| | WMT MCCORMICK Bentonville Mtg Attendees 170111, |
| | WMT MCCORMICK 170224 Bentonville mtg Present Draft 170123, |
| | WMT MCCORMICK email Bentonville Mtg Presentation 170123, |
| | WMT MCCORMICK Bentonville Mtg Attendees 170216, |
| | WMT MCCORMICK Bentonville Mtg Invite 170216, |
| | WMT MCCORMICK Bentonville Mtg Location 170216, |
| | WMT MCCORMICK Bentonville mtg fup 170222, |
| | WMT MCCORMICK re post Bentonville Mtg Rev 170222, |
| | WMT MCCORMICK nonreply fup 170328, |
| | WMT Baldwin re decision next week 170403, |
| | WMT MCCORMICK re mktg plans 170403, |
| | WMT MCCORMICK on price drop 170412, |
| | WMT MCCORMICK buyer contacts 170425, |
| | WMT China Beef ref from MCCORMICK 170703, |
| | WMT connects China on beef 170703, |
| | WMT China Zheng initial contact 170704, |
| | WMT China Zheng merch support 170707, |
| | WMT China Zheng ROM pricing 170708, |
| | Willmeng Jarvis Tom Contact Info 150808, |
| | WO Intent to Proceed Brewer corp apt rental inquiry 150809, |

WO Team Initial Mtg LAX 150914,
WO Plant Kickoff Salinas Mtg 150916,
WO Plant Willmeng ref from Sayre 150917,
WO Status Report ADAMSON PPM 150917,
WO Team re PPM S-1 processes 150921,
WO Plant Kickoff Salinas Mtg 150922,
WO Plant Willmeng contract draft 151012,
WO Plant Willmeng kickoff meet Oct 27 151019,
WO Plant Willmeng cost workup status 151021,
WO Status Report Jabor and Sales 151022,
WO Hyder Farm CASTRO on Oliver 151028,
WO Weekly Status Report reaction PETERSEN 151029,
WO Hyder Farm Terminal Estimate to Oliver 151030,
WO Sales Fresh Express Smith contact 151104,
WO Grt Western Bk local takeover visit 151117,
WO Team on Jabor Funded on Time 151117,
WO Team re Jabor snag 151118,
WO Team on financings 151120,
WP Paypal Acct Detail Sep-Dec 151231,
WO Team on 179mm Financings 160101,
WO Status Financings 160121,
WO Financings deal status to team 160208,
WO Status Kingman Startup Financings 160209,
WO Status Report financings 160421,
WO Status re Oliver Term Sheet Verbal 160719,
WO Status Final Oliver Hyder present sked 160804,
WO Status Hyder Oliver rework 160818,
WO Status DD Fin Sales 160929,
WO Status Report on Hyder Oliver new pitch status 161006,
WO on WMT progress 161018,
WO Status financings 161103,
WO Status Financings WMT KROGER 161115,
WO Status KROGER projection incl 161226,
WP Great Western 2016 DDA Account 161231,
WO Org Chart 170111,
WO Blitch re ofc space tour 170118,
WO Status Report REED Wood join 170119,
WO Team re Gerlach soi tests 170201,
WO Blitch re Stockton Hill Famr tour w BLACKPOOL 170203,

| | WO Smith CFO re Revolution VC pass 170203, |
| | WO Status Rpt Stockton Hill Update 170209, |
| | WO Status Rpt incl WMT status 170223, |
| | WO Team re Blackppol to fund 170301, |
| | WO Team re BLACKPOOL no reply stringout 170309, |
| | WO Team re BLACKPOOL deadline miss 170310, |
| | WO Status Report DD retainer need 170320, |
| | WO also CARDONE on Status WMT others 170403, |
| | WO Team WMT dead Alb on track others 170404, |
| | WO Status Skaar 170504, |
| | WP Executive Summary Bus Plan 170507, |
| | WO Status Report Skaar Investor Interest 170515, |
| | WO Team Smith CFO Termination Notice 170612, |
| | WO Team Smith CFO Termination 170613, |
| | Zaharis re Cowley Kodiak Produce temp cooler space 170206 |

**686. RICO-48 Racketeering Violations: Dishonest Professional Services, Employees, Recruiters, Various Positions 2011-2022**

A. Defendants with police powers have and do electronically hack Lead Plaintiff's personal computer and the websites presented to Lead Plaintiff thereon. Defendants have and do engage in repeated blocking of access to legitimate business recruiters, repeatedly substitute their own fraudulent executive recruiters and place fraudulent employees in Lead Plaintiff owned and managed companies to arrange the hiring of defendants' own screened-in personnel and confidential informants. Defendants have and do also refer other professionals and firms as service providers for design and architectural services, and as suppliers, to supplant legitimate suppliers of plant and equipment which are essential to meeting customer needs of the various businesses which Lead Plaintiff owns, controls, and/or manages.

B. These *First* Amendment violations and associated-in-fact enterprise patterns of racketeering act mail and electronic frauds repeat many hundreds of thousands of times, including, for example, defendant police powers agents, officers, or confidential informants

Rafael GOMEZ, domiciled in California slated to be Director – Food Safety and Eric Galkin, domiciled in New York state, slated to be Director- Procurement, once permanent financing can be arranged for various entities owned and controlled by Lead Plaintiff. These and other fraudulently entered police powers personnel are recruited through online job postings on spoofed websites, and by an Indeed.com online contract recruiter. These contractors and personnel have and do continue these defendants' pattern of racketeering acts while interfering in and affecting interstate commerce and engaging in on-going entrapment attempts and entanglements of the Lead Plaintiff in other investigations in local, state, and federal interstate jurisdictions.

C. These online frauds and swindles have run from the first instance of Lead Plaintiff's use of a personal computer in the 1980s to the present for personal job hunts and for business recruiting as Lead Plaintiff has and does primarily use these online tools for this purpose while defendants, in particular defendant UNITED STATES has and does use wire fraud and email fraud, in both in-state and interstate commerce to manage the Lead Plaintiff by controlling his employment and destroying his private enterprises to perpetuate Lead Plaintiff's human trafficking, involuntary servitude, and forced labor; and their violations of the *First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth*, and *Fourteenth* Amendments, and other civil, Constitutional, and human rights under international law and ratified treaties.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 681-690 RICO-43-52 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0036, 2-0045, 2-0050, 2-0053, 2-0072, 2-0081 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 371, 473, 474, 486, 544, 549, 566-573, 575-576, 599, 603, 609-612, 616-765, 770-771, 783, 8479, 9181, 9820, 10179-10186 |
| Emails and documents by topic and date, also located in LPEE: | Blitch re contract fertilizer packaging 170526 |
| | BREED email Offer Letter 170115, |
| | BREED Offer Letter 170115, |
| | BREED on Stockton Hill Farm Kingman 170129, |
| | BREED on Stockton Hill Farm offer progress 170131, |
| | BREED re Gila Bend lead 170131, |
| | BREED re Stockton Hills tour 170209, |
| | BREED refs VP Grow candidate 170210, |
| | REED Bill REED Disclosure Letter Winnett Organics 17.01.2017.pdf |
| | Canchola phone number change 200727, |
| | CASTRO CA VP-Ops Intvw 150825, |
| | CASTRO CA re Mota Dir Ops add 150901, |

CASTRO introduces Gerlach to DB ARPAIO 151106,

CASTRO re financings 151120,

CASTRO re Hyder Water Quality 151126,

CASTRO on Dole Gerlach 160125,

CASTRO on lettuce production detail 160214,

CASTRO on Kingman Farms status 160304,

CASTRO progress report 160427,

CASTRO re Hinson Lyle proposal via ARPAIO 160513,

CASTRO on Aqua 4D saline water trmt 160608,

CASTRO re personnel rqmts 160705,

CASTRO re Aqua 4D Giora bkfst miss and Oliver mtg 160719,

CASTRO on Aqua4D in Oliver Hyder budget 160731,

CASTRO on budget format Oliver Hyder 160801,

CASTRO on resignation 160810,

CASTRO Separation Agreement 160811,

CASTRO Separation Agreement to SULLIVAN 160811,

CASTRO connection Aqua 4D Giliad email samples 161101

CFO Smith entrap attempt backdating 161016,

Galkin NYCDir Procuremnt 200824,

Galkin is vehicle for procurement contacts dump 200826,

Galkin fishing expedition and leave 200831,

Galkin KUMIN on quote requests 200831,

Galkin re termination after source strip via Indeed 200924,

GOMEZ Dir Food Safety Intvw 150829,

GOMEZ refers Brereton Hamilton 160407,

GOMEZ re investor call request 160408,

GOMEZ re investor interest 160427,

GOMEZ on Costamanga mtg plan 160429,

GOMEZ update on CA investor progress 160506,

GOMEZ Costamanga mtg request 160508,

GOMEZ re new investor leads 160512,

GOMEZ investor update 160525,

GOMEZ re Japanese Inv Lead sales progress 160616,

GOMEZ update Kevin investor 160704,

GOMEZ re Costamanga mtg 170203,

GOMEZ re Brereton has organic cattle in TX 171228,

Hansen AgriPlacment Glandt refers NICKLESS 170710,

NICKLESS initial hits re 170803,

NICKLESS initial hits re Skaar 170803,

NICKLESS on status 170818,

NICKLESS sources a TX feedyard 171229,

NICKLESS re HEC Friona eqpt 180116,

NICKLESS re HEC price drop 180116,

NICKLESS re HEC LOI 180117,

NICKLESS on Rio Bravo fake finls 180213,

NICKLESS Ops re Galkin Procurement 200811,

NICKLESS Ops re Galkin Procurement contract 200811,

NICKLESS re Korea sales pgm 210116,

NICKLESS re Big Sandy 210217,

NICKLESS re Big Sandy Housing 210307,

NICKLESS on Lake County tour 210709,

NICKLESS re Intl Trader Termination 210917,

PAUL SMITH Resume 170308,

Smith CFO Stock Option Agreement Signed After
Backdating Request 10176-10178

POINDEXTER VP Sales intvw Kingman later 150826,

POINDEXTER Kingman veg crops 151001,

POINDEXTER Kingman tour Jim RHODES intro 151007,

POINDEXTER direct RHODES re Kingman 151017,

Recruiter Connections Plus DeLeon Recruiter 150903,

Recruiter Connection Plus DeLeon ref WASEMAN 150911,

Recruiter Connections Plus DeLeon submits WASEMAN
150915,

Recruiter Connections LEBLOND subord searches 150928,

Recruiter Connections Smith CFO subord 151117,

Recruiter Connections DeLeon on WASEMAN fee160229,

Recruiter Connections JBN  Contingency Fee Agrmt
160414,

Recruiter Connections JBN 160414,

Recruiter Connections DeLeon update WASEMAN 160513,

Recruiter Connections JBN 160513,

Recruiter Connections Plus DeLeon 160513,

Recruiter Connections DeLeon re WASEMAN start160627,

Recruiter Connections Plus DeLeon on WASEMAN fees
170307,

Recruiter Connections Agricareers 170615,

Recruiter Connections Glandt 170630,

REED VP Ops intvw Lunch Tucson 150831,

REED re Gerlach 170127,

REED on Stockton Hill Farm Kingman 221028 170129,

REED re Stockton Hill Status 170130,
REED xmits Stockton Hill Rd LOI draft 170209,
REED re Black Rock visit 170304,
REED to GOMEZ on Bacak Rock Farm Maps Gerlach 170305,
REED on Jiim RHODES ppty 170311,
REED on RHODES Peacock Highlands 170313,
REED Gerlach assessment 170315,
REED Gerlach Plan B Memo UTAH 170320,
REED re Gerlach Assessment 170320,
SBI first accesible email Canchola 200709
Task Worksheet – Brewer CEO 10179-10180
Task Worksheet – Blitch CIO 10181-10182
Task Worksheet – Smith CFO 10183-10184
Task Worksheet – Vindiola Dir HR 10185-10186
WO Blitch re ofc space tour 170118,
WO Status Report REED Wood join 170119,
WO Blitch re Stockton Hill Famr tour w BLACKPOOL 170203,
WO Smith CFO re Revolution VC pass 170203

**687. *RICO-49 Racketeering Violations:* Dishonest Professional Services, Employees, Recruiters, Logistics 2015-2021**

A. Numerous defendants' police powers agents, officers, confidential informants, members of the media and other persons with privileged access have and do pose and present themselves as prospective employees of one of the Lead Plaintiff's commerce and interstate commerce business entities. While myriad persons have played such fraudulent roles, Jason WASEMAN was the only individual who requested and accepted payroll direct deposits. Two payments are made through the ADP payroll service for payroll amounts and ADP fees deposits directly to WASEMAN's personal accounts by Winnett headquartered in New Jersey, to WASEMAN then a resident of Arizona. Other fraudulent employees and potential employees had stock and stock option grants including, without limitation, CASTRO, NICKLESS, PAUL SMITH, BLITCH, CANCHOLA, REED, MOTA, CASTRO, VINDIOLA, LEBLOND,

GOMEZ, WOOD, FOLAND, REED, SULLIVAN, ARPAIO (Crossgrove), (paragraph 668 RICO-30). Note that several of these individuals also had military (DOD, ARMY, NAVY, AIR FORCE) and/or international employment (CIA commercial cover in certain instances) experience, including in military and CIA paramilitary special operations, a recurrent theme among the individuals who were assigned to employment stints with the Lead Plaintiff by defendant UNITED STATES and other defendants. These personnel were substituted by defendants including, without limitation, UNITED STATES for and consumed resources intended for use in legitimate interstate commerce in Lead Plaintiff's various private enterprises.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 5 |
|---|---|
| Complaint paragraphs: | 681-690 RICO-43-52 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 616-765, 9256-9259, 9636-9637, 9639, 9727-9728, 9820, 9987, 9991-9993 |
| Emails and documents by topic and date, also located in LPEE: | Recruiter Connections Plus DeLeon Recruiter 150903, |
| | Recruiter Connection Plus DeLeon ref WASEMAN 150911, |
| | Recruiter Connections Plus DeLeon submits WASEMAN 150915, |
| | Recruiter Connections DeLeon on WASEMAN fee160229, |
| | Recruiter Connections DeLeon update WASEMAN 160513, |
| | Recruiter Connections Plus DeLeon 160513, |
| | Recruiter Connections DeLeon re WASEMAN start160627, |
| | Recruiter Connections Plus DeLeon on WASEMAN fees 170307, |
| | Rose Jordan Contingency Agreement-Winnett Organics Signed 150824.pdf |
| | WASEMAN re Tucson ofc tour 160604, |
| | WASEMAN re intvw new VP Ops Bill REED 170104, |
| | WASEMAN re Stockton Hill Farm 170310, |
| | WASEMAN re WMT China logistics and fulfillment process 170926, |
| | WASEMAN history disappeared new email acct needed 210104, |
| | WASEMAN NICKLESS re Korea sales pgm 210115, |
| | WASEMAN ref request 210525, |
| | WASEMAN ref request fup 210526, |
| | WASEMAN checkin re WMT organic beef 210616, |
| | WASEMAN re cold chain fulfillment 210830, |
| | WASEMAN re cold chain launch timing 210830 |
| | WASEMAN I-9 scan0010 180315.pdf |

## *688. RICO-50 Racketeering Violations:* Dishonest Professional Services, Employees, Sales

A. Peter LEBLOND was recruited as Vice President of Sales and Marketing at
WinnettOrganics in 2015, the organic fresh produce business entity managed by the Lead
Plaintiff with planned operations in Maricopa County, AZ. He aggressively requested,
complained, then accepted two payroll advances totaling $7500 and claimed close relationships
with senior executives at several large grocery retailers, then left Winnett before turning these
commitments into sales contracts, depriving Winnett (trade name then WinnettOrganics) of his
honest services while fraudulently securing financial resources through his misrepresentations.
Discovery will show LEBLOND was another in the long series of carefully screened-in police
power agents, officers, and confidential informants used to strip company financial resources,
interfere with legitimate interstate commerce activities; and to contribute to the company's
financial destruction using mail fraud, wire fraud, and other frauds and swindles in conspiracy
with other fraudulent WinnettOrganics team members herein, including defendant Joseph
ARPAIO in 2014-2017. while MARICOPA SHERIFF and individually.

B. Two other fraudulent cover candidates for sales and sales leadership positions
introduced by defendants included William TARAZEWICH, domiciled in the Dallas, TX area
slated to be Vice President of Sales and Marketing in 2016; and Brad KUMIN, domiciled in
Houston, TX as a Sales and Marketing contractor also slated to be Vice President, Sales and
Marketing who operated in bad faith as a sales contractor in 2020-2021 while FBI continued its
long-running pattern of interferences in interstate commerce including, without limitation,
fraudulent financings (paragraphs 668, 670, 672 RICO-30, 32, 34) and fraudulent domestic and
international sales leads (paragraphs 673-680 RICO-35-42).

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 681-690 RICO-43-52 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 616-765, 8489-8506, 8715-8718, 8813-8854, 9920, 10179-10186 |
| Emails and documents by topic and date, also located in LPEE: | KUMIN Ind Contr TX 200710, <br> KUMIN re China Supplier Search 200710, <br> KUMIN re China chicken price diff 200721, <br> KUMIN sales and fulfillment options 200723, |

| |
|---|
| KUMIN TX re third party supplier 200724, |
| KUMIN re ABT FL sales contract 200728, |
| KUMIN re ABT pork 200728, |
| KUMIN Craft re rferaal agrmt 200731, |
| KUMIN Craft referral agrmt 200629 sent 200731, |
| KUMIN re ABT 200801, |
| KUMIN ABT 200802, |
| KUMIN ABT pork inquiry 200803, |
| KUMIN re Thomas Referral Contract and NCNDA 200930, |
| KUMIN LOA announcement 201015, |
| KUMIN re China mkt dev 201207, |
| KUMIN takes LOA 210120, |
| KUMIN re his status 210813, |
| LEBLOND CA VP Sales Intvw 150825, |
| LEBLOND re KROGER connection 150910, |
| LEBLOND sales update 150917, |
| LEBLOND sales update 150928, |
| LEBLOND 5K advance 150930, |
| LEBLOND re 2500 advance 151117, |
| LEBLOND re status 160525 |
| LEBLOND Hire Release Signed 160107.pdf |
| TARAZEWICH TX re VP Sales position 160420, |
| TARAZEWICH TX re RAM on Maines other progress 160503, |
| TARAZEWICH TX re Maines fail others in flux 160506, |
| TARAZEWICH TX refers ibanker 160527, |
| TARAZEWICH TX re financing progress 160616, |
| TARAZEWICH accepts alt employ 160706, |
| TARAZEWICH TX loan 2500 160725, |
| TARAZEWICH TX loan 2500 demand 170419, |

*689. RICO-51 Racketeering Violations:* **Dishonest Professional Services, Employees, CFO**

A. Defendant FBI police powers agent, officer, or confidential informant as DEAN

SMITH, President of Mountain Pacific Machinery in Portland, Oregon" introduced his brother,

"PAUL SMITH, Boulder, Colorado" in 2017 as a candidate for CFO of Winnett. Paul was

selected by Lead Plaintiff based upon his resume, a phone interview, and emails. Among the

defendants' police powers agents, officers, and confidential informants posing as current or prospective employees of one of the Lead Plaintiff's private interstate commerce business entities, PAUL SMITH (FBI) was the only individual who requested back-dated stock options and then delayed signing the properly dated stock options offered for months. Back-dating is an illegal act and is an example of one more of the vast series of entrapment attempts and frauds by defendants acting under the color of law without reasonable suspicion or any sound legal basis for their actions.

B. Defendant UNITED STATES also introduced Michael Dooley from Colorado in 2011; Dennis Merck from Oregon in 2012; and through a fraudulent cover operation CFO SEARCH, Inc. and executive recruiter Michael MAGGARD introduced Ibrahim ABDELSAYED in 2021 as another CFO candidate (paragraph 478, 624D, E RGTS-4), all under false pretenses to sustain their involuntary servitude of Lead Plaintiff and thwart and conspire to thwart his numerous attempts to engage in interstate commerce.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 478, 624D, E RGTS-4, 681-690 RICO-43-52 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 616-765, 10176-10178, 10179-10186 |
| Emails and documents by topic and date, also located in LPEE: | ABDELSAYED on market 200710, |
| | ABDELSAYED re status 200724, |
| | ABDELSAYED PAINTER re loan gty 200730, |
| | ABDELSAYED on est start dates team 200821, |
| | ABDELSAYED re loan gty 200821, |
| | ABDELSAYED signs loan form 200822, |
| | ABDELSAYED 201123, |
| | ABDELSAYED and WASEMAN Covid DB no vax appt Bergen 210120, |
| | ABDELSAYED re 26 Ranch 210219, |
| | ABDELSAYED re status 210302, |
| | ABDELSAYED pg decline 210716, |
| | ABDELSAYED inquiry on status 211202, |
| | ABDELSAYED re cancel email address 220114, |
| | D Merck Stock Cert 3 121202, |
| | Dooley Hook to EB-5 110922, |
| | MAGGARD TX re ABDELSAYED 200722, |
| | MAGGARD TX re ABDELSAYED start date 200817, |
| | MAGGARD TX re ABDELSAYED 200722, |
| | MAGGARD TX re ABDELSAYED start date 200817, |
| | MAGGARD TX status 201015, |

| |
|---|
| MAGGARD re Korea Angus pgm etc 210118, |
| MAGGARD re 26 Ranch and ABDELSAYED 210221, |
| MAGGARD on ABDELSAYED positive connect 210222, |
| MAGGARD re ABDELSAYED 210302, |
| MAGGARD re ABDELSAYED to Egypt 210304, |
| MAGGARD on loan docs PFS need 210306, |
| MAGGARD re gty and PFS 210307, |
| MAGGARD re Big Sandy BAFO 210322, |
| MAGGARD re Big Sandy reprise 210505, |
| MAGGARD re investors and Big Sandy 210519, |
| MAGGARD re Lake County LOI 210701, |
| MAGGARD re Lake County 210702, |
| MAGGARD re 500k loan 210703, |
| MAGGARD enroute Lake County 210707, |
| MAGGARD re Lake County enroute 210707, |
| MAGGARD re Lake Copunty tour and plus minus issues 210709, |
| MAGGARD re Lake County and pers FICo improvement 210715, |
| MAGGARD re Lake County 210719, |
| MAGGARD Loan to DB improving FICO 210721, |
| MAGGARD re Lake County 3559 LOI 210721, |
| MAGGARD on Lake County Fin snags 210725, |
| MAGGARD on WMT Wagyu comp price and other status 210804, |
| MAGGARD re startup sequencing plan 210816, |
| MAGGARD re status web dev sales 210816, |
| MAGGARD re add subs WEFUNDER 210817, |
| MAGGARD re GAAP fin need 210818, |
| MAGGARD re mkt gap 210818, |
| MAGGARD 5k GPR loan 210826, |
| MAGGARD re 4500 loan recvd 210826, |
| MAGGARD Revised GPR Startup Plan 210830, |
| MAGGARD re DB overadvance 210901, |
| MAGGARD re loan not pursued 210903, |
| MAGGARD re 26k loan 210909, |
| MAGGARD re ICPO LOI-FM-LZ-210913, |
| MAGGARD re Terminating Trader efforts 210916, |
| MAGGARD re status 211104, |
| MAGGARD re 700 211221, |
| CFO Smith entrap attempt backdating 161016, |

| | Smith CFO Stock Option Agreement Signed After Backdating Request 10176-10178 |
| | Smith CFO re BELLI invoices 151105, |
| | Smith CFO re Jabor confirms xfr BkTucson rejects 151113, |
| | Smith CFO on avoiding expenditures 151119, |
| | Smith CFO reports CASTRO determines Jabor is scam 151119, |
| | Smith CFO KEISER re PPM wire xfr 151123, |
| | Smith CFO re PPM Expert Fees Paid160103, |
| | WO Smith CFO re Revolution VC pass 170203, |
| | WO Team Smith CFO Termination Notice 170612, |
| | WO Team Smith CFO Termination 170613 |

**690. RICO-52 Racketeering Violations: Dishonest Professional Services, Employees, Controller 2018**

A. Lori ALVAREZ, an agent, officer, or confidential informant of defendants posing as an accountant contractor and prospective employee of a Lead Plaintiff business entity is paid to attend an online store kickoff meeting in 2018 in Avondale, Maricopa County, Arizona, for a web-based wholesale beef supply store, along with Chris CANCHOLA and Jason WASEMAN, also scheduled to become business entity team members. Defendant UNITED STATES blocks access to the online store and blocks or fails to deliver email business solicitations for this store around this same time (paragraph 676, 677 RICO-38, 39). See this $854 interstate payment to ALVAREZ, an Arizona resident by Winnett, the Colorado organized and New Jersey domiciled business entity below.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5 |
| Complaint paragraphs: | 676, 677 RICO-38, 39; 681-690 RICO-43-52 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 616-765, 9649, 9651, 10013 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### *691. RICO-53 Racketeering Violations:* **Fraudulent Production Asset Purchase Options, Professional Services 2015-2021**

A. Defendant UNITED STATES and co-conspirator defendants' frauds against the Lead Plaintiff have repeatedly caused extensive time, effort, and expenses to be incurred for interstate travel, office products, overhead, and staff expenses for professional services. These services

were used to develop concepts, process designs, and conduct plant location analysis, equipment selection and design analyses, and architectural design requiring services, travel, and other expenses by Lead Plaintiff's companies and, at times, by legitimate prospective suppliers engaged in in-state and interstate commerce. Defendant UNITED STATES holds an additional thousands of pages of documents, emails, business plans, proposals, studies, and other relevant materials dating from earlier periods to 2006 as this electronic evidence was delivered into the hands of defendant ROSENBERG at ESTABLISH in October or November, 2007. It is also probable that further paper evidence was photographed or scanned during mailing between New Jersey and Washington by Lead Plaintiff and also resides in the hands of defendant UNITED STATES.

B. Fraudulent agricultural production and processing related assets were and are listed online by defendants, who simultaneously deprived Lead Plaintiff access to actual agricultural and ranchland listings, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages. This pattern of continual interferences with constitutional rights and with interstate commerce by this associated-in-fact enterprise has recurred across time from 1968 to the present.

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 691-693 RICO-53-55 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | See disbursements and travel at LETHL-1 and compendium 2015-2021 |
| Emails and documents by topic and date, also located in LPEE: | 26 Ranch Clark re PPM stock swap 151016, |
| | 26 Ranch Terms Marvel 160107, |
| | ARTUSO re plant design 200722, |
| | ARTUSO on plant progression 200901, |
| | ARTUSO update 210409, |
| | BDO SLC initial contact 170727, |
| | BDO SLC to DD NYC connection 170807, |
| | BELLI intital hit 141217, |
| | BELLI on payment 160304, |
| | BELLI on investor sales progress 160608, |
| | BELLI on status 160811, |

BELLI on organic mkt conditions 170802,

BELLI on progress lack of 180117,

Big Sandy Ranch sub debt RFQ 210314,

Bretz Hutchins on HEC E6 Double D feedyards 180120,

Bretz re E6 proof of funds conflict w investor 180208,

Burges Salmon 1 re London Closing 140917,

Burges Salmon 1 re London Closing 140918,

Caviness CS Cattle re finishing contrct potential 200901,

Caviness on plant availability for slaughter pending order 210617,

Caviness re salughter availability 210915,

CCW ARTUSO on plant design 200722,

CCW ARTUSO Case Ready Plant email to 3rd party 200807,

CCW Atruso re engrng recommendation 200811,

CCW ARTUSO on plant progression 200901,

CCW ARTUSO on plant Dematic study 210114,

CCW Artruso update 210409,

CCW ARTUSO on Dematic study 211014,

Colliers re Dev prtnr IN plant 200819,

Colliers Powers check in 220118,

Cresa Realty Advisors AZ Office Search 180904,

Dallam Cty LOI Farm HULL LOI 0001 120809,

DD on WMT Swisslog 161230,

DD re 5 yr plan to WMT 161231,

DD Callahan (KEENE) re 170124 Swisslog mtg 170109,

DD Callahan (KEENE) re Swisslog mtg 170109,

DD Callahan (KEENE) re lending DD name to WMT presentation 170126,

DD Callahan (KEENE) re Swisslog mtg fup 170126,

DD re Rabo ID Skaar 170503,

DD Skaar Site Plan Barns Winnet   Site Opt 8 170509,

DD Transom re Skaar 170512,

DD on Skaar fert option 170513,

DD Skaar Barns Detail Site Opt 8 170523,

DD Fleming on DD Finl Model 170526,

DD Callahan (KEENE) re PE dilutive 170531,

DD on Skaar Organic Fertilizer Mkt Size 170531,

DD on Skaar Organic Fertilizer Plant Ops 170531,

DD on Skaar Organic Fertilizer Plant Concept Plan 170601,

| | DD Skaar Royal Chem CAS numbers Contract Fert Pkg 170604, |
| --- | --- |
| | DD Skaar Site Plan 170605, |
| | DD Skaar Site Plan Ammonia Recovery Manure 170605, |
| | DD Skaar Organic Fertilizer Effectiveness 170607, |
| | DD Skaar Organic Fertilizer Pricing 170607, |
| | DD Skaar PE Investor Bid email 170607, |
| | DD Skaar PE Investor Bid form 170607, |
| | DD re Centerboard Housing Solution WO 170608, |
| | DD WCC teaser draft 170608, |
| | DD Skaar Organic Fertilizer Production Cost 170609, |
| | DD Callahan (KEENE) re funding sked 170612, |
| | DD Skaar Organic Fertilizer Advantages 170614, |
| | DD WCC Pitch Deck Skaar etal 170614, |
| | DD Callahan (KEENE) on DeSai 170616, |
| | DD Skaar Biiding Process to SANDERS 170616, |
| | DD Callahan (KEENE) on AXIAL lead Chatham 170619, |
| | DD Skaar Site Plan Mods 170619, |
| | DD NGEN fake NYC investor 170622, |
| | DD NYC VAN BRAKEL 170622, |
| | DD Callahan (KEENE) re AGIS NDA cmu not credible 170628, |
| | DD Skaaar AgIS Boston 170628, |
| | DD Skaar Advantage NDA 170628, |
| | DD Skaar AgIS Boston 170628, |
| | DD Callahan (KEENE) re Skaaar visit sked 170726, |
| | DD on HIG Capital Miami 170728, |
| | DD Skaar site visit Sander 170728, |
| | DD JJU - Winnett Cattle Target Tracker_8_4_17 170804, |
| | DD Skaar BDO Auditor SLC Gordon 170804, |
| | DD Skaar BDO Auditor SLC Gordon 170807, |
| | DD NYC Callahan (KEENE) connects to BDO SLC 170808, |
| | DD Skaar Callahan (KEENE) Update 170809, |
| | DD LABELLE Teton County 240 Tour Pass 170810, |
| | DD Skaar Cost per pound gain 170811, |
| | DD Skaar LOI xmit 170811, |
| | DD Skaar LOI signing 170821, |
| | DD Skaar past contacts 170821, |
| | DD Skaar Teton River Farm Feeney email 170822, |
| | DD Skaar rcv Alt Offer 170828, |

DD Skaar Teaser 170905,

DD Callahan (KEENE) re no progress 170906,

DD Skaar Site Plan Barns Winnet  Site Opt 8 170509,

DD Transom re Skaar 170512,

DD on Skaar fert option 170513,

DD Skaar Barns Detail Site Opt 8 170523,

DD Fleming on DD Finl Model 170526,

DD Callahan (KEENE) re PE dilutive 170531,

DD on Skaar Organic Fertilizer Mkt Size 170531,

DD on Skaar Organic Fertilizer Plant Ops 170531,

DD on Skaar Organic Fertilizer Plant Concept Plan 170601,

DD Skaar Royal Chem CAS numbers Contract Fert Pkg 170604,

DD Skaar Site Plan 170605,

DD Skaar Site Plan Ammonia Recovery Manure 170605,

DD Skaar Organic Fertilizer Effectiveness 170607,

DD Skaar Organic Fertilizer Pricing 170607,

DD Skaar PE Investor Bid email 170607,

DD Skaar PE Investor Bid form 170607,

DD re Centerboard Housing Solution WO 170608,

DD WCC teaser draft 170608,

DD Skaar Organic Fertilizer Production Cost 170609,

DD Callahan (KEENE) re funding sked 170612,

DD Skaar Organic Fertilizer Advantages 170614,

DD WCC Pitch Deck Skaar etal 170614,

DD Callahan (KEENE) on DeSai 170616,

DD Skaar Biiding Process to SANDERS 170616,

DD Callahan (KEENE) on AXIAL lead Chatham 170619,

DD Skaar Site Plan Mods 170619,

DD NGEN fake NYC investor 170622,

DD NYC VAN BRAKEL 170622,

DD Callahan (KEENE) re AGIS NDA cmu not credible 170628,

DD Skaaar AgIS Boston 170628,

DD Skaar Advantage NDA 170628,

DD Skaar AgIS Boston 170628,

DD Callahan (KEENE) re Skaaar visit sked 170726,

DD on HIG Capital Miami 170728,

DD Skaar site visit Sander 170728,

DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,

DD Skaar BDO Auditor SLC Gordon 170804,

| | DD Skaar BDO Auditor SLC Gordon 170807, |
| | DD NYC Callahan (KEENE) connects to BDO SLC 170808, |
| | DD Skaar Callahan (KEENE) Update 170809, |
| | DD LABELLE Teton County 240 Tour Pass 170810, |
| | DD Skaar Cost per pound gain 170811, |
| | DD Skaar LOI xmit 170811, |
| | DD Skaar LOI signing 170821, |
| | DD Skaar past contacts 170821, |
| | DD Skaar Teton River Farm Feeney email 170822, |
| | DD Skaar rcv Alt Offer 170828, |
| | DD Skaar Teaser 170905, |
| | DD Callahan (KEENE) re no progress 170906, |
| | DD Skaar SANDERS tours Frank MAUGHAN BDO 170913, |
| | DD Skaar Sander re Kritser 170921, |
| | DD Skaar SANDERS on revised structure 170929, |
| | DD Skaar SANDERS Update 171013, |
| | DD Skaar SANDERS re Kritser Friona Ind ExCEO call 171022, |
| | DD Skaar WMT China ND Rep Sr Legislator BANCO Advisors 171024, |
| | DD Skaar Revised Buyout 171112, |
| | Dematic Proposal to WASEMAN 161228, |
| | Dematic 200720, |
| | Dematic 200806, |
| | Dematic2 200806, |
| | Digested Organics WO Proposal 1 page DD 170531, |
| | Digested Organic 1 pager 170601, |
| | Digested Organic on processing cost per gallon 170609, |
| | Digested Organic liq fert offering 171107, |
| | Digested Organic liq fert offering referrals 171116, |
| | Euro pig trailers 210427, |
| | Feedex UAE Export Quotes ref from Phillips 201209, |
| | Feedex Phillips update 210224, |
| | Feeedex re their catalog our volumes 210312, |
| | Feedex update 210420, |
| | Feedex re organic dairy in Earth TX 210604, |
| | Freelancer disappearance on Chinese beef label 210907, |
| | Full Circle Compost Cody Witt Invoice 170331, |

| | G3 Vancouver BC Terminal Transit for AGI Quote Request 211130, |
| | Gearn Ibach on HEC feedyard 171231, |
| | Gearn Ibach on state of HEC feedyard 180104, |
| | Gearn Ibach NICKLESS re HEC design reconfig 180118, |
| | Gearn Ibach HEC design discusssion 180119, |
| | Gearn Ibach re halt work as HEC gone 180126, |
| | Google Ads circular response to initial ban info request 210805, |
| | Hartman re GROSS organic mkt research inquiry 210520, |
| | Hartman re refs and experience 210525, |
| | Hartman Group re Organic Mktg Study for GROSS Mark 210603, |
| | Heuer MO on timing 200720, |
| | JBS WILLIAMS Organic Beef 170523, |
| | JBS on Natural Cattle Production Projection 170530, |
| | JBS re natural program for customer 170818, |
| | JBS WMT is customer for JBS program inquiry 170818, |
| | JBS Stevens re WMT China natural cattle processing Hyrum 171002, |
| | JBS Hyrum Rawlings 171108, |
| | JBS Rust re plant slaughter capacity 210116, |
| | JBS Bradbury re slaughter pgm 210119, |
| | JBS chicken pork quote requests 210126, |
| | JLL Sayre AZ check in 170926, |
| | LONERGAN re BRF China 210125, |
| | Luckhart pig trlr quote request 210428, |
| | Luckhart pig trlrs and transport 210428, |
| | Lux re virtual ofc svcs 161021, |
| | Lux ofc switch WASEMAN 161022, |
| | Lux 1 of many credit card decline 170301, |
| | Lux DB advances rent Indian School Rd 180206, |
| | Lux AZ re rent Indian School Rd 180301, |
| | Marchal Semple CPA AZ 160125, |
| | Mijajlovic acctnt re billing 200804, |
| | Mijajlovic re deferral of billing 210325, |
| | Mijajlovic re no response email acct delete and status 210831, |
| | Mijajlovic checkin 220222, |
| | MO Contract Farmer Heuer 200921, |
| | OWB Brandt intro to Summers 180123, |

| | OWB Summers Korea Angus pgm 201214, |
| --- | --- |
| | OWB Korea suspension reply 201223, |
| | OWB Korea beef pgm 201226, |
| | OWB Summers slaughter availability 210116, |
| | OWB Summers Quote Request 210321, |
| | OWB re Utility Cattle for China 210609, |
| | OWB Summers Req 6 for deboning cost 210620, |
| | OWB Summers apology re telcon 210621, |
| | Oxbo Eqpt PO 1004_from_Winnett_Perico_Inc 170303, |
| | Oxbo Eqpt WP PO 170303, |
| | Oxbo Smith PO for 170306, |
| | Portable Vac Coolers Inquiry 160216, |
| | Royal Chem re organic liq fert 170530, |
| | Royal Chemical email price quote 170721, |
| | Royal Chemical drop on True misinformation 170723, |
| | Ryder re financing plan 160317, |
| | Ryder Nichols VP Sales Ramsey mtg 161201, |
| | Ryder Aquilino re startup sequence fin 161208, |
| | Sayre BELLI re Jabor scam 151119, |
| | Sayre AZ check in 170926, |
| | Southern Vacuum Coolers Inquiry 160216, |
| | Stampede Meats delay sales reply 4MM pound opptny 210317, |
| | Stampede Meats retail prepack RFQ 210317, |
| | Stampede Meats retail prepack RFQ questions 210319, |
| | Stampede re WMT China pricing reaction 210426, |
| | Sterling re further process beef 201226, |
| | Sure Fresh re bean processing 170309, |
| | Swisslog automation Jennings NYC in house 161101, |
| | Swisslog automation Jennings NYC in house 161107, |
| | Swisslog automation Jennings NYC in house 161205, |
| | Swisslog to WASEMAN re automation 161228, |
| | Swisslog Jennings re DD mtg and progress 170113, |
| | Swisslog re NYC meeting notes and fup 170126, |
| | Swisslog Deck DD mtg to WO team members 170128, |
| | Swisslog developer search 170316, |
| | Swisslog referral developer 170331, |
| | Swisslog ref Developer on PPDC costs 170402, |
| | Swisslog Dev Chain Berger 170405, |
| | Swisslog re ASRS investment 170515, |
| | Symbrosia Etzioni re methane reduction cattle trial 210731, |

| | Symbrosia re LITIGATION transition 210928, |
| | True Fert re org fert samples 170719, |
| | Tucson Intel Ofc re temrination 161020, |
| | Tyson chicken re China no availability, alt pork contact 210201, |
| | Tyson re China mkt 180205, |
| | Uddermatic Martin re Uddermatic 180202, |
| | Uddermatic cutout 180206, |
| | Uddermatic feeding rates 180217, |
| | WestCoastPrime reatil prepack quote request 210313, |
| | Willmeng Jarvis Tom Contact Info 150808, |
| | Winnett Initial Property Search Email to Espy 110627 |

**692. *RICO-54 Racketeering Violations:* Fraudulent Production Asset Purchase Options, AZ 2015-2017**

A. Defendants initiated their Kingman Farms and Stockton Farms fraudulent sales and financing frauds in 2015 as Lead Plaintiff discovered the agricultural production asset acquisition opportunities they had planted online to acquire around 8,000 acres of irrigated farmland near Kingman, Arizona. This land would have supported Lead Plaintiff's planned organic produce production operation, WinnettOrganics (Winnett), a project then in sales and supply negotiation with defendants WALMART (Interline Exhibit 9) and MCCORMICK, among others. This elaborate fraud engaged several defendant FBI agents, across Las Vegas, NV, Kingman, AZ, and Phoenix, AZ who served as fraudulent Winnett employees, as realtors; and as Las Vegas real estate developer, James Rhodes, likely then suspected of bank fraud, financial fraud; as well as a tangentially related drug trafficking investigation involving employees of the Stockton Hill, Kingman, AZ farm's lessee operator indirectly disclosed by REED (FBI).

B. Defendants' fraudulent misrepresentation of an authentic asset sales and the alleged availability of owner financing for both Stockton Hill and Kingman Farms, and their entrapment

scheme failed in 2017 after many months of fraudulent scenarios and variations to be recounted at trial and on the emails and documents cited in this paragraph below. A financing allegedly available through defendant Jonathan CROSS related entities commonly known as BLACKPOOL and SHEFFORD, and allegedly with the participation of TIAA/CREF, a large scale pension and retirement funds manager failed. The Kingman Stockton Hill Farm deal collapsed after a series of delays, twists, turns, and more lies were piled upon the defendants' vast pile of lies, misrepresentations, and frauds. This complex sequence involved New York based defendant entities BLACKPOOL/SHEFFORD and DOMINICK, an Arizona and Nevada based realtor team (BROADWAY, VOLK), the Las Vegas Nevada based real estate developer (RHODES), and a Boston, Massachusetts based investor and former investment partner and land co-owner (represented by its officer SAUL), a one time a co-owner of a still larger farm with the Las Vegas developer (RHODES). Wire fraud, fraudulent offers of financing, and travel expenses paid by Winnett were used to perpetuate this sequence of human trafficking, involuntary servitude, and forced labor, while asset stripping and entrapment efforts continued.

D. Fraudulent agricultural production and processing related assets were and are furnished, by defendants, while simultaneously depriving Lead Plaintiff access to alternative sources, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of defendants, with regard to these acts, violations, and injuries was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 691-693 RICO-53-55 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | Not applicable |
| Emails and documents by topic and date, also located in LPEE: | Broadway AZ 16K acres Hyder 161005, |
| | Broadway AZ likely cutout msg 161006, |
| | Broadway Kingman Red Lake info 161020, |
| | Broadway KJV re BLACKPOOL CROSS sked arrival 170203, |
| | Broadway KJV re SAUL and Barings availability 170209, |
| | Broadway KJV re Stockton Hill Loans 170212, |

Broadway KJV re well drill sub Stockton Hill Loans 170213,

Broadway KJV xmit NDA dataroom access 170214,

Broadway  KJV escrow and psa to be drafted  170301,

D Brewer Air Itenerary EWR PHX Hold for Anglade EWR 150830.pdf

D Brewer Car Rental Itenerary EWR PHX Hold for Anglade EWR 150830.pdf

D Brewer FS for SBI Surety Bond 413-NEW-as-of-7-30-2018 180730 .pdf

D Brewer Hotel EWR PHX Hold for Anglade EWR 150830.pdf

D Brewer Hotel Tucson EWR PHX Hold for Anglade EWR 150830.pdf

D Brewer US Airways EWR PHX EWR 150830.pdf

Kingman Land Swap status inquiry 160219,

Kingman land legal des request 160223,

Kingman Farm land swap 160224,

Kingman Land Swap status 160224,

Kingman Farms deal structure revision 160229,

Kingman Farms RHODES discussion confirm 160229,

Kingman status to team 160303,

Kingman Farms deal structure revision 160304,

POINDEXTER VP Sales intvw Kingman later 150826,

POINDEXTER Kingman veg crops 151001,

POINDEXTER Kingman tour Jim RHODES intro 151007,

POINDEXTER direct RHODES re Kingman 151017,

Oxbo Dump Carts WP PO 1008 170306.pdf
Oxbo Eqpt email
Purchase_Order_1004_from_Winnett_Perico_Inc 170303.pdf
Oxbo Quote Winnett Organics 2475 x3 rev. 03.02.17 (2) 170306.pdf

SAUL Barings Stockton Hill WO LOI RLV 170215,

SAUL Stockton Hill WinnettOrganics LOI RLV 170215,

SAUL re Stockton Hill Farms Structure 170217,

SAUL Barings revise Stockton Hill WO LOI RLV 170218,

SAUL Barings re LOI rev plans 170220,

SAUL Barings status on BLACKPOOL financing 170224,

SAUL Barings moving ahead BLACKPOOL financing 170301,

SAUL Barings re sked pressure on fin 170303,

SAUL to Fiera Comox 170804,

| | SAUL JV Structure incl Teton Valley Farm 170929, |
| | SAUL re Skaar Purchase Leaseback 170929, |
| | SAUL Barings WO Revised LOI Stockton Hill Farm 170218.pdf |
| | Zaharis re Cowley Kodiak Produce temp cooler space 170206 |

### *693. RICO-55 Racketeering Violations:* **Fraudulent Production Asset Purchase Options, OR, ID, TX 2015-2021**

A. Defendants have repeatedly misrepresented farms and ranches as available properties for purchase by Lead Plaintiff business entities as part of their scheme to keep Lead Plaintiff engaged in expending time and financial resources to develop the productive capacity of his planned organic agriculture businesses. Among other elements, this includes presenting actually unavailable properties as available for purchase. One of these fraudulent sales was a 3559 acre ranch in Lake County, Oregon, presented by defendants (HUTCHINSON, AMSBAUGH, FBI). Lead Plaintiff spent more than $700 to travel to and inspect this property. The specific emails and travel records related to this trip are currently blocked by defendant UNITED STATES, but a signed Letter of Intent is included in the evidence presented at the table below.

B. The outbound trip to Lake County, Oregon via Kennedy Airport, NYC to Seattle-Tacoma Airport near Seattle, WA, then to Redmond Airport, Redmond, OR for ground transportation to Lake County, OR by defendants' agent or officer (operating undercover, unknown to Lead Plaintiff at that time) included a thunderstorm delay and missed connection, forcing a late arrival and very brief overnight stay near Sea-Tac. See LPEE page 10095, noting disbursements on (yymmdd) 210706 Delta $534.40, 210707 JFK $22.90, 210707 Motel 6 $2121.54, 210708 Africa Lounge $23.81, SEPTA $9.25.

C. Other email and wire predicate frauds of agriculture real estate and production facilities and related financing options include, for example, Julian Bros Sheep Ranch, Boulder,

WY fraudulent ranch sale listing as Big Sandy Ranch, in 2021 sale brochure and 2023 New

York Times article at LPEE pages 10750-10771, and "LABELLE" emails listed below.

    D. Fraudulent agricultural production and processing related assets were and are

furnished, by defendants, while simultaneously depriving Lead Plaintiff access to alternative

sources, as elements of their conspiracy to and pattern and practice of acts depriving Lead

Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate

commerce. The overriding intent of defendants, with regard to these violations, was and

continues to be, to consume the financial resources and management time of Lead Plaintiff and

the entities he legally owns, controls, and/or manages.

    E. This scheme and conspiracy required and consumed the time and financial resources

of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626

RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming

information directly from these institutional and individual defendants and, among some who

presented at the time as family members, their children. See other selected relevant content at

paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as

well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 691-693 RICO-53-55 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | 10750-10771, 10095, noting disbursements on (yymmdd) 210706 Delta $534.40, 210707 JFK $22.90, 210707 Motel 6 $2121.54, 210708 Africa Lounge $23.81, SEPTA $9.25. |
| Emails and documents by topic and date, also located in LPEE: | 26 Ranch Clark re PPM stock swap 151016, 26 Ranch Terms Marvel 160107, Broussard re Lake County fin 210710, Colliers re Dev prtnr IN plant 200819, Colliers Powers check in 220118, Cresa Realty Advisors AZ Office Search 180904, Dallam Cty LOI Farm HULL LOI 0001 120809, Eslabon Bretz Executed Winnett Cattle CA 12-22-17 171221.pdf Grasse Long Realty 160601, Grasse re properties search 160630, Guitierrez Ranch LOI Signed140130, HEC feedyard email contract 180118, HEC feedyard NBH cattle loan 180119, HEC Feedyard NBH re loans 180119, HEC water lease contact 180119, HEC Bretz re Double D issues 180120, HEC Rio Bravo agrres to share fin data 3yr 180123, HEC contract redraft fm SULLIVAN 180124, HEC returns to mkt per NICKLESS 180212, HEC and E6 Blitch re workflow 180218, HEC E6 calf barns quote 180219, HEC E6 calf barn eqpt 180221, HEC E6 calf milk pasteurizing plant 180222, HEC E6 note sale to Summit 180222, HEC E6 Calf hutch housing option 180223, HEC E6 Calf barn floors 180228, HEC feedyard contract SKMBT_C654e18011814500 180118.pdf IntegratedAg initial web hit Prader 170516, LABELLE MJ hold add Big Sandy 210216, LABELLE re Big Sandy cmsn split w Theo list agt 210218, |

| |
|---|
| LABELLE on Big Sandy Rejects First Offer 210222, |

LABELLE on Big Sandy Rejects First Offer 210222,
LABELLE re contract for deed 210224,
LABELLE on Big Sandy deal structure 210226,
LABELLE re Big Sandy botton line from Theo 210301,
LABELLE Big Sandy basic title info 210304,
LABELLE on Big Sandy Ranch MAGGARD gty 210305,
LABELLE re Big Sandy 210310,
LABELLE re New Mexico comp AU pricing 210310,
LABELLE Big Sandy BAFO 210317,
LABELLE on Big Sandy BAFO DB reaction to rejection
210324,
LABELLE re Big Sandy BAFO response to Theo comments
210324,
LABELLE on Theo ping Big Sandy 210415,
LABELLE re Theo and Big Sandy new interest 210506,
LABELLE on Big Sandy structure and deal quantitties
210508,
LABELLE re Theo Pearson Big Sandy behavior 210510,
LABELLE on broker comments and Big Sandy 210514,
LABELLE Big Sandy delay and deficient reply pattern
210517,
LABELLE Pearson re Big Sandy deficient communications
210517,
LABELLE Big Sandy drop 210617,
Lake County 3559 Appraisal 210322,
Lake County Appraisal 210322,
Lake County OR Brandon 210627,
Lake County Gannett Peak Ranch Mid-Case Business Plan
210628,
Lake County OR Offer Mod 210629,
Lake County Opptny Zone Investments cold email 210630,
Lake County LOI 210702,
Lake County Due Diligence folder link 210703,
Lake County tour fup 210708,
Lake County Creek Fishway project 210709,
Lake County plant siting opptny zone 210710,
Lake County 3559 Mike MAGGARD PFS 210712,
Lake County Opptny Zone seller options 210712,
Lake County seller re stock v loan 210713,
Lake County Binding PurchSale Agrmt 210714,
Lake County Prelim title report request 210719,
Lake County Loan Options Disappear Ex 1of11 210725
Lake County 3559 AC MOL Signed LOI 210701.pdf
Lake County 3559.45 Brochure.pdf
LOI Farm Dickson Final 121211.pdf
Marvel 26 Ranch rejects structure 160122,

Marvel re Black Rock Famrs deal 170303,
Nelson on dropping Yreka CA ranch no water 210614,
Oppliger via Abacherli 180130,
Oppliger Abacherli drops out 180209,
Oppliger Abacherli ref to McDowel 180228,
Renfrew CA Ashurst Ranch into escrow 210312,
Royal Chemical Price Qte Org Fert Pkg 170721.pdf
SBI team on Big Sandy BAFO deal fail 210324,
SBI Team on Lake County 210701,
SBI team on Lake County fin WMT mtg 210715,
Skaar SANDERS Swan 170419,
Skaar Winnett Cattle Company LOI Skaar 170429,
Skaar Pitch Deck 170512,
Skaar Sales Brochure 170512,
Skaar JBS WILLIAMS on Organic Beef 170523,
Skaar Teton River Ranch Broker ref Rumsfeld ref 170523,
Skaar Barns 170530,
Skaar Steam Flake Plant Cost Est Gearn170530,
Skaar Jeffereon Cty ID on Skaar Expansion 170731,
Skaar Poulsen CPA appt 170731,
Skaar WF Id Falls Kay Burke and SANDERS 170809,
Skaar ID Dept of Ag rqmts 170810,
Skaar outreach - US Bank reply delay arrange cutout
170817,
Skaar Sander re US Bank established relationship 170817,
Skaar Teton River Ranch Broker Feeney 170822,
Skaar AGR interest initial hit 170828,
Skaar Kritser Ranch Creek WA initial hit 170829,
Skaar ClearLight initial hit 170905,
Skaar Harris WILLIAMS re AGR 170906,
Skaar SANDERS on strong interest Kritser Ranch Creek
170907,
Skaar WF Id Falls Luke on sub debt 170915,
Skaar Teton River Ranch Broker sale fail price drop Feeney
170925,
Skaar Teton River Ranch Broker Feeney connects RL
Holdings 170929,
Skaar Teton River Ranch Broker Halgerson 171002,
Skaar Kritser WA advisor John Herring Friona Ind 171030,
(see also LPEE page 1074V, entries 9/7/2017 and
10/30/2017)
Skaar deal dead Gerra 171208,
Skaar SANDERS on alt buyer LOI 180124,
Turpin Feedyard Purch Agrmt144454 190703.pdf
WILLIAMS LOI Dallam Cnty 800ac Farm HULL LOI
0001.pdf

| | Zeman Ranch 2 NE on famr sales process and investors 210605, |
| | Zeman Ranch broker discussion re investors 210605. |

## LETHALITY ATTEMPTS (LETHL series offenses)

### *694. LETHL-1 Lethality Attempts:* British Columbia Sea to Sky Highway BRMT Melatonin Overdose, Mid 1980s

A. Lead Plaintiff was deliberately overdosed with melatonin to induce intense sleepiness while driving on the BC Highway 99 Sea-To-Sky highway south of Squamish, British Columbia, Canada near Porteau Cove by defendant UNITED STATES (CIA and/or ARMY) in approximately 1983. The Lead Plaintiff and his first spouse Lynne were together in the vehicle traveling south at about 50 to 60 miles per hour approximately eight feet from the unguarded edge of an 80 to 110 foot cliff adjacent to Howe Sound. Both would have been severely injured or killed if the Lead Plaintiff had failed to stop before being overtaken by the BRMT melatonin overdose in early afternoon after a full night of sleep. The evidence as to the specific date, time, and remote illegal BRMT instructions provided across the cell phone network to the cellular telephone equipment box in the vehicle's trunk which concealed the local BRMT bioweapon and bioweapon delivery system inside, which provide specific evidence of this event are likely to be available upon further investigation and discovery against defendants. Known iilegal BRMT program, rights, and associated-in-fact enterprise racketeering principals in the region at this time were defendants WEISSMAN, ROSENBERG, HOPPER, and most probably BURNS who was not known to have been met under any cover by Lead Plaintiff until 1986, when he was introduced by STONE at LazerSoft as one of its Board members along with GARRISON, DeBon, and HOPPER, as Lead Plaintiff was trafficked from Deloitte Seattle to become

LazerSoft CFO. Bannon and THORPE were also employees at Deloitte Seattle and Zoulas at

Westin during this period. REICHERT and BOYLE were senior officers at defendant KCSD

during this period.

B. Defendant UNITED STATES most probably employed this method of extreme

BRMT abuse to orchestrate the murder of Audrey Brewer in September 2011 (paragraph 10)

using a physically and emotionally abused female intermediary as the direct perpetrator who

acted in apparent extreme rage under the direct influence of the illegal BRMT bioweapon and

bioweapon delivery system, which biochemically hijacked her pineal gland to provoke an

extreme adrenaline level (fight or flight hormones), and the knife slashing attack which resulted

in Audrey Brewer's death from the slashing of her carotid artery in her neck. The female

perpetrator had absolutely no history of violence at any time but was also being psychologically

provoked by the manipulative male who was involved in relationships with both females at

various times. The psychological abuse of the apparent perpetrator was used in the moment as

the concealment which hid the actual BRMT perpetrator of the extreme biomedical manipulation

from view and exposure, since the illegal BRMT bioweapon's mere existence is highly

classified, no comparable was previously known in human history, and BRMT operation leaves

no trace evidence as it is a series of carefully focused energy pulses absorbed into the brain.

This momentary sense of extreme rage which was most probably experienced by the knife

wielder is comparable to the momentary biochemical rage induced in Lead Plaintiff during an

unrecorded incident adjacent to Lead Plaintiff's residence between August 2008 and October

2010 in Cliffside Park, NJ and by the illegal BRMT bioweapon in the Tunnel Flash Incident

documented at paragraph 619 HEXP-16, LPEE pages 11668. The intent of defendant UNITED

STATES in orchestrating this process against US persons would have been and would be to

facilitate its future deployment against others which it targets for assassination (paragraphs 803, 805).

C. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 10, 608, 609, 619 HEXP-5, 6,16; 626, 629, 630 RGTS-6, 9, 10; 639 RICO-1; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-001A |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0026 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 11-139, 140 et al, 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304, 11656-11664, 11668, LPEEV65-1 |

| Emails and documents by topic and date, also located in LPEE: | Not applicable |
|---|---|

D. These schemes and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to these Lethality Attempts series subcounts at paragraphs 697 through 710 follow:

| Interline Exhibits: | 15, 15C, 15D |
|---|---|
| Complaint paragraphs: | 10, 462-469, 471-473, 499-500, 502-503, 511-512, 516-521, 527B; 600, 602, 603 NSEC-1, 3, 4; 604-609, 611, 614, 615, 616, 617-620 HEXP-1-6, 8, 11, 12, 13, 14-17; 626, 629-636 RGTS-6, 9-16; 639, 641, 642 RICO-1, 3, 4; 695, 699-701, 703, 705, 706-710 LETHL-2, 6-8, 10, 12, 13-17 |
| Appendix 2 paragraphs: | 1-001A, 1-001C, 1-001D, 1-001E, 1-032, 1-056, 1-058, 1-059, 1-064, 1-065, 1-066, 1-067 |

| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0026, 2-0076, 2-0099, 2-0115, 2-0117, 2-0150, 2-0158, 2-0188, 2-0193, 2-0194. 2-0196, 2-0202, 2-0203 through 2-0215, 2-0217 |
|---|---|
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 140 et al, 413-415, 416-418, 419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793; 794, 1074V (10/31/2017 entry), 9679-9696, 9875, 10187-10250, 10302-10304, 10306-10310, 10614-10619, 10620, 10631, 10637, 10639, 10653, 11656-11664, 10672, 10694-10736, 10737-10738, 10739-10744, 10745-10747, 10748-10749, 11668, 12160-12244, LPEEV65-1, 2, 13-16 |
| Emails and documents by topic and date, also located in LPEE: | Certain emails are currently blocked by a defendant UNITED STATES computer hack |

### 695. LETHL-2 Lethality Attempts: Washington State BRMT Induced Falls, 1990-2005

A. While a resident of the state of Washington, Lead Plaintiff was subject, between approximately 1990 and 2005, to a series of unexplained falls which were caused and created by defendant UNITED STATES or its agents, including at his 149th Street, Kirkland, WA residence across the street from the BURNS residence, during and after BURNS residency there. These losses of balance and equilibrium falls caused the Lead Plaintiff to tip backwards while remaining in a completely erect posture, tipping him as if a statue, and created serious risks of severe injury or death. These falls were initiated while the Lead Plaintiff was hiking alone near Stevens Pass, climbing a ladder to the roof of his home in Kirkland, standing on living room scaffolding during construction, and under other circumstances not currently recalled. The evidence as to the specific date, time, and remote BRMT instructions which are given to initiate each event are likely to be available upon discovery against defendant UNITED STATES.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 615, 617 HEXP-12, 14; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-001C |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0076 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 419-426, 774-785 |
| Emails and documents by topic and date, also located in LPEE: | Certain emails are currently blocked by a defendant UNITED STATES computer hack |

### 696. *LETHL-3 Lethality Attempts:* Washington State BRMT Induced Suicide Ideation, 2003-2005

A. In the aftermath of the precursor and successor events related to the 9/11/2001 terrorist attack, and as defendant REICHERT moved from Sheriff at defendant KCSD to Congress, defendants DOJ, FBI, CIA, ARMY, ROSENBERG, FAUCI, and unknown others maneuvered systematically and decisively to destroy Lead Plaintiff's fraudulently orchestrated

and managed marriage to Jeanette and all potential sources of personal income. While a resident of King County, Washington, Lead Plaintiff was subject between approximately 2002 and 2005 to intense, torturous BRMT manipulation of brain biochemistry, and to on-going coercive psychological abuse by visual and electronic means, which defendant UNITED STATES, DOJ, FBI, CIA, ARMY, FAUCI, NIAID, ROSENBERG, CALDWELL, PRAY, MUELLER, and unknown others, used to drive Lead Plaintiff through biochemical torture and clinical depression to suicide ideation (paragraphs 462-469, 499-500, 511-512, 516-517, 520, 602 NSEC-3). This sequence of high stress events and manipulations induced severe brain biochemical imbalances, caused and created by defendant UNITED STATES and/or may directly involve other defendants and their respective agents. This created a very high risk of severe injury or death. The evidence as to the specific date range and sequence of the remotely commanded BRMT instructions which drive this sequence are available during discovery against these defendants.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical

confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 462-469, 499-500, 511-512, 516-517, 520, 602 NSEC-3; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-032 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0115, 2-0117 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 419-426, 598-606, 774-785, 9679-9696 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 697. LETHL-4 Lethality Attempts: Inciting Public Vigilantism, 2004-2024

A. Defendants with police powers hacked and manipulated Lead Plaintiff's personal computer to make his actions, plans, and movements a matter of public viewing sometime after he joined CNA Industrial Engineering in 1996. This led to and inspired violent acts against third parties, ranging from commercial enterprises to individuals (paragraph 602 NSEC-3). Defendants used the illegal BRMT bioweapon and bioweapon delivery system, tradecraft signaling, and direct action against third parties to create and sustain a public mythology about Lead Plaintiff, which directly endangered his life, well-being, personal prospects, employment, and entrepreneurial activities to further their illegal scheme as they employed public vigilantism, along with their direct acts against Lead Plaintiff, and harmed third parties to create and sustain the propagandistic mythology about the Lead Plaintiff while engaged in this corrupt process.

B. These direct acts ranged from mass casualty attempts to individual acts against innocent third parties with lethal and potentially lethal outcomes (paragraphs 706-710 LETHL-13-17). This fraudulent scheme, running into recent years, primarily has and does (i) use the illegal BRMT bioweapon and bioweapon delivery system to control certain of Lead Plaintiff's movements, public and private activities, words, expressions, and brain biochemistry (paragraphs 616 HEXP-13); induces on-going brain biochemical depression and induces suicidal ideations at times (paragraphs 604-607 HEXP-1-4); (ii) use wire frauds and email frauds to control Lead Plaintiff's digital and online environment (paragraphs 629, 630, 631, 635, 636 RGTS-9-11, 15, 16) (iii) to make his actions and reactions to the defendants' on-gong harassments public; (paragraphs 617-619 HEXP-14-16; 629, 630, 632 RGTS- 9, 10, 12) and (iv) systematically disrupts Lead Plaintiff's private and commercial actions including, without limitation, in its affects on interstate commerce (paragraphs 600-710, all subcounts in all series generally).

C. Defendants' overriding purposes has been and is, without limitation, to sustain and perpetuate the defendant UNITED STATES' ability to sustain its illegal and unconstitutional control Lead Plaintiff, and his moment-to-moment environment, actions, reactions across many years, perpetuate Lead Plaintiff's involuntary servitude, forced labor, all in violation of the *First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth,* and *Fourteenth* Amendments, and other civil, Constitutional, and human rights; to subject him to public sensationalism, greatly enhance the risk of direct violence and vigilantism against Lead Plaintiff; and create the circumstances for public harassment of Lead Plaintiff creating risks and circumstances which they could not legally conduct directly, and which could not otherwise occur in or to the Lead Plaintiff. These acts have been and are intended to discredit, damage, or harm the health and well-being of the

Lead Plaintiff through all feasible means, be it entrapment, intimidation, an act of lethal public

vigilantism, or a natural appearing lethal sequence or event.

D. Defendant UNITED STATES most probably employed this method of extreme illegal

BRMT bioweapon and bioweapon delivery system biochemical, physical, and sexual abuses to

orchestrate the murder of Audrey Brewer in September 2011 (paragraph 10) using an physically

and emotionally abused female intermediary as the direct perpetrator while acting in apparent

extreme rage under the direct influence of the illegal BRMT bioweapon system used to

biochemically hijack her pineal gland to surge adrenaline and thereby provoke the knife slashing

attack which resulted in Audrey Brewer's death from the slashing of her carotid artery in her

neck. The female perpetrator had absolutely no history of violence at any time but was also

being psychologically provoked by the manipulative male who was involved in relationships

with both females at various times. The psychological abuse of the apparent perpetrator is used

in the moment as the concealment which hides the actual BRMT perpetrator of the extreme

biomedical hijacking from view and exposure, since BRMT is highly classified, not previously

known in human history, and leaves no trace evidence as it is a series of carefully focused

energy pulses absorbed into the brain which leaves no trace evidence behind. This momentary

sense of extreme rage which was most probably experienced by the knife wielder is comparable

to the momentary biochemical rage induced in Lead Plaintiff by the illegal BRMT bioweapon in

during an unrecorded incident adjacent to Lead Plaintiff's residence between August 2008 and

October 2010 in Cliffside Park, NJ and the Tunnel Flash Incident documented at paragraph 619

HEXP-16, LPEE pages 11668. The intent of defendant UNITED STATES in orchestrating this

process against US persons would have been and would be to facilitate its future deployment

against others which it targets for assassination.

1. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 10, 602 NSEC-3: 619 HEXP-16: 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 140 et al, 419-426, 774-785, 9679-9696, 11668, LPEEV65-1 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 698. *LETHL-5 Lethality Attempts:* New Jersey BRMT Induced Suicide Ideation, 2008-2010

A. While a resident of the state of New Jersey, Lead Plaintiff was subject between
approximately August 2008 and June 2010 to extreme BRMT hijacking of brain biochemistry
and psychological abuse which defendants used to drive Lead Plaintiff to a suicide ideation
(paragraph 631B RGTS-11). This sequence of high stress events and hijacking to create an
extreme brain biochemical imbalance was caused and created by defendant UNITED STATES
and/or may have directly involved other defendants and their respective agents (paragraphs 462-
466, 471-473, 502-503, 512, 516-521, 527B; 600, 602, 603 NSEC-1, 3, 4; 606, 611, 614, 615,
617, 620 HEXP-3, 8, 11,12, 14, 17; 629-634 RGTS-9-14; 641, 642 RICO-3, 4). This created a
very high risk of severe injury or death. The evidence as to the specific date range and sequence
of these remote BRMT instructions given to sustain the event are available upon discovery
against defendant UNITED STATES and other police powers defendants including, without
limitation, defendants NJTPD, PAPD, NYPD, NJSP, BERGEN SHERIFF, BERGEN, as well as
corporate, press, and individual defendants herein.

B. This scheme and conspiracy required and consumed the time and financial resources
of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running
schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude
over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT
development and deployment; illegal human subject medical experimentation without consent,
to and including torture and suicide ideations; systematic constitutional rights violations; and
racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated
herein by reference including, without limitation, paragraph 599, with particular attention
directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical

confirming information directly from these institutional and individual defendants and, among

some who presented at the time as family members, their children. See other selected relevant

content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages

934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.

Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 462-466, 471-473, 502-503, 512, 516-521, 527B; 600, 602, 603 NSEC-1, 3, 4; 606, 611, 614, 615, 617, 620 HEXP-3, 8, 11,12, 14, 17; 629-634 RGTS-9-14; 641, 642 RICO-3, 4; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-032 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0150 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 419-426, 598-606, 774-785, 9679-9696 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 699. LETHL-6 *Lethality Attempts:* **New Jersey Cliffside Park BRMT Falls, 2008-2010**

A. While a resident of the state of New Jersey, Lead Plaintiff was subject between

approximately 2008 and 2010 to a series of unexplained falls which were caused and created by

defendant UNITED STATES, CIA, ARMY in its illegal and potentially lethal deployment of the

illegal BRMT bioweapon and bioweapon delivery system. These falls caused the Lead Plaintiff

to tip backwards while remaining in a completely erect posture, tipping him as if a statue, and

created a risk of severe injury or death. One of these falls was triggered while the Lead Plaintiff

was walking alone at the northwest corner of Thompson Lane and River Road. The back of the

Lead Plaintiff's head struck the sidewalk, missing the base of a streetlight and a broken neck by

approximately 24 inches. The evidence as to the specific dates, times, and remote BRMT

instructions which were given to initiate each event are likely to be available upon further

investigation and discovery against defendants. Related comparable illegal BRMT induced

hazardous events are shown at paragraph 615 617-619 HEXP-12, 14-16; 695, 700, 701, 703,

705, 706, 708 LETHL-2, 7, 8, 10, 12, 13, 15.

  B. This scheme and conspiracy required and consumed the time and financial resources

of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical

confirming information directly from these institutional and individual defendants and, among

some who presented at the time as family members, their children. See other selected relevant

content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages

934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.

Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 615 617-619 HEXP-12, 14-16; 695, 700, 701, 703, 705, 706, 708 LETHL-2, 7, 8, 10, 12, 13, 15; 694-710 LETHL-1-17 generally |

| Appendix 2 paragraphs: | 1-001C |
|---|---|
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0076, 2-0158 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 419-426, 774-785 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### *700. LETHL-7 Lethality Attempts:* **BRMT Staircase Falls and Attempts in New Jersey and New York 2008-2022**

A. While a resident of the state of New Jersey, Lead Plaintiff was subject from approximately 2008 to the present to a series of near falls in New Jersey and New York on staircases inside, for example, the Metropolitan Museum of Art ground floor entrance near the southeastern corner of the main building; at various times on stairs n his Edgewater, NJ residential building; in the building housing the third floor New School theater space, Museum of the City of New York, Port Authority Bus Terminal South Building, and numerous other locations. Defendant UNITED STATES, CIA, ARMY deliberately has and does use the illegal BRMT bioweapon and bioweapon delivery system to mislocate the placement of the foot on the stair, either by hitting the heel, or by misplacing the foot on the stair tread behind the toes, causing a fall. These loss of balance disturbances have been and are easily created with the illegal BRMT bioweapon and bioweapon delivery system. At other times, the illegal BRMT bioweapon and bioweapon delivery system is used to keep the head upright and eyes looking forward, instead of down toward the stair tread as needed for safe descent; by momentary interruption of central nervous system muscle control which drops the descending foot too early causing a trip; and/or by momentary loss of consciousness which causes a complete loss of positional awareness. Each and every such loss of balance event creates a risk of severe injury or death. The evidence as to the specific date, time, and remote BRMT instructions given to initiate

each event are available upon discovery against defendant UNITED STATES , CIA, ARMY and the co-conspirators participating in the set-up and conduct of each specific event. Related comparable illegal BRMT induced hazardous events are shown at paragraph 615 617-619 HEXP-12, 14-16; 695, 699, 701, 703, 705, 706, 708 LETHL-2, 6, 8, 10, 12, 13, 15.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 615 617-619 HEXP-12, 14-16; 695, 699, 701, 703, 705, 706, 708 LETHL-2, 6, 8, 10, 12, 13, 15; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-001D |

| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0076, 2-0158, 2-0194 |
|---|---|
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 11-139, 140 et al, 419-426, 564-574, and 786-793 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 701. LETHL-8 Lethality Attempts: New Jersey Hackensack BRMT Fall, 2017

A. While a resident of the state of New Jersey, Lead Plaintiff was subject in approximately 2017 to an illegal BRMT bioweapon and bioweapon delivery system induced fall in a County of Bergen, NJ (BERGEN COUNTY) office building while leaving a housing interview appointment. This fall was caused and created by defendant UNITED STATES purposefully locking the Lead Plaintiff's eyes to the horizon rather than focusing on the stair he was descending at that moment, causing Lead Plaintiff to trip and fall forward. Lead Plaintiff's heel struck the edge of the stair tread, and he stumbled to one knee, abrading and injuring that knee. This event created a risk of severe injury or death. The evidence as to the specific date, time, and remote BRMT instructions given to trigger the event are available upon discovery against defendants. Related comparable illegal BRMT induced hazardous events are shown at paragraph 615 617-619 HEXP-12, 14-16; 695, 699, 700, 703, 705, 706, 708 LETHL-2, 6, 7, 10, 12, 13, 15.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical

confirming information directly from these institutional and individual defendants and, among

some who presented at the time as family members, their children. See other selected relevant

content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages

934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.

Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 615 617-619 HEXP-12, 14-16; 695, 699, 700, 703, 705, 706, 708 LETHL-2, 6, 7, 10, 12, 13, 15; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-001C |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0076, 2-0158 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 419-426, 774-785 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### *702. LETHL-9 Lethality Attempts:* **California BRMT Induced Extreme Eye Watering, 2017**

A. While traveling for business between Pico Rivera, CA and Los Angeles

International Airport on October 31, 2017, defendant UNITED STATES, CIA , ARMY,

produced extreme eye irritation and watering of Lead Plaintiff eyes while he was driving west on

the I-105 freeway near Lynnwood, CA, traveling approximately 65 to 70 miles per hour. This

created a substantial risk of loss of vehicle control and collision with another vehicle or obstacle,

and the resultant severe risk of injury or death to himself and to members of the public. This was not an allergic reaction to any airborne substance. Lead Plaintiff previously spent years in this part of California under the same conditions and had driven this same freeway through this same area eastbound without incident about 3-4 hours earlier while traveling toward his meeting in Pico Rivera, CA.

B. Lead Plaintiff has subsequently experienced these symptoms periodically while using over-the-counter eye drops at home, likely due to a deliberate illegal BRMT bioweapon and bioweapon delivery system induced manipulation of the pH level of the eyes. These symptoms also correlate with extreme headaches and blurry vision induced on occasion during 2021 and 2022. Those extreme headache and blurry vision symptoms had also been experienced for months on end in Boston, MA in 2006-2007 and in Cliffside Park, NJ, in 2008-2010, where they occurred in both locations at the same morning hour each day. These symptoms abruptly appeared for a long sequence of daily headaches and vision issues, then abruptly disappeared with no medical reason for any of these repetitive abrupt changes in pattern. A neurological examination in Boston, MA, and two brain scans in New Jersey have provided no plausible medical explanation for these symptoms or for their long-duration irregular recurrences. Illegal triggering through BRMT bioweapon and bioweapon delivery system abuse is the sole remaining plausible explanation for this pattern, which correlates with the medically bizarre reversal of presbyopia with aging described at paragraphs 602F, 617G, H.

C. The evidence as to the specific date, time, and remote BRMT instructions given to initiate the event are available upon discovery against defendant UNITED STATES, CIA, ARMY. Similar illegal BRMT induced events include, without limitation, those related at

paragraphs 615 617-619 HEXP-12, 14-16; 695, 699-701, 705, 706, 708 LETHL-2, 6-8, 12, 13, 15.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 615 617-619 HEXP-12, 14-16; 695, 699-701, 705, 706, 708 LETHL-2, 6-8, 12, 13, 15; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | Not applicable |
| LPEE pages (see technical note on page numbering at paragraph 230): | 1 et al, 140 et al, 419-426, 774-785, 1074V (10/31/2017 entry), 10306-10310 |

| Emails and documents by topic and date, also located in LPEE: | Not applicable |
| --- | --- |

### *703. LETHL-10 Lethality Attempts:* **New Jersey Edgewater Bedroom BRMT Falls, 2019**

A. On two instances in 2019, Lead Plaintiff was rolled out of bed like a log and struck the floor. These falls were initiated while the Lead Plaintiff was sleeping alone in his residence in Edgewater, NJ. These falls were caused and created by defendant UNITED STATES or its agents using the illegal BRMT bioweapon and bioweapon delivery system. One of these falls caused a visible head injury to the right side of his forehead as the head struck a nightstand as the rest of the body continued falling to the floor, which torqued the neck and spinal cord. This injury left an obvious scar on his forehead which was noted several months later, and again over a year later, by medical professionals during routine head examinations at dental hygiene appointments at the Bergen Community College Dental Hygiene Clinic. Medical records which recorded these notations have been requested under HIPPAA. These falls created risks of severe injury or even death as a result of the head strike while the body continued to fall to the floor, potentially fatally torquing the neck and spinal cord. The evidence as to the specific dates, times, and remote BRMT instructions given to initiate these falls are available upon discovery against defendants. Similar illegal BRMT induced events include, without limitation, those related at paragraphs 615 617-619 HEXP-12, 14-16; 695, 699-701, 705, 706, 708 LETHL-2, 6-8, 12, 13, 15.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 615 617-619 HEXP-12, 14-16; 695, 699-701, 703, 705, 706, 708 LETHL-2, 6-8, 10, 12, 13, 15; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-001C |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0076 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 419-426, 774-785 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### *704. LETHL-11 Lethality Attempts:* **Website Hacks to Eliminate or Delay Covid Vaccination, 2020**

A. On 149 occasions from late January to March 24, 2021, defendant UNITED

STATES, CIA, ARMY hacked or spoofed Lead Plaintiff's access to

www.bergencountycovidvaccine.com so an appointment could not be made to receive the

Covid-19 vaccine he was eligible for as a 65 year old, creating additional risks of hospitalization, severe injury, or death. On occasion, he navigated through the identification and qualifications phases to the appointment setting step before being denied an appointment during that step while he was attempting to set the specific time for the specific appointment, at other times he was informed at that screen that there were no appointments available. He emailed with the BERGEN COUNTY Executive's office about these issues over an extended conversation, and also emailed Bergen County Council members about the matter but received no response from any of the Council member (likely due to email blocking by defendants, who likely also spoofed both this only available Covid-19 vaccination site at that time and any relevant email responses intended to be received by Lead Plaintiff). See paragraph 631 RGTS-11.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant

content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages

934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.

Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 631 RGTS-11; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | Not applicable |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0188 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 419-426, 794, 9875, 10187-10250 |
| Emails and documents by topic and date, also located in LPEE: | Currently blocked by defendant UNITED STATES computer hack |

### 705. *LETHL-12 Lethality Attempts:* **New Jersey Edgewater BRMT Falls, 2021 to present**

A. While a resident of the state of New Jersey, Lead Plaintiff was subject between

approximately December 2021 and August 2022 to unexplained tripping and falling events.

These events were caused and created by defendant UNITED STATES, CIA, ARMY using the

illegal BRMT bioweapon and bioweapon delivery system to cause momentary blackouts, and/or

contract or relax muscles of Lead Plaintiff, leading to a loss of control and balance. These events

caused the Lead Plaintiff to trip and very nearly fall near the southwest corner of the Edgewater

Commons south access road at River Road, and at another time, while crossing River Road near

Penny Lane, both in Edgewater, NJ. Failure to quickly regain his balance by stumbling forward

to an upright posture could have ended with the Lead Plaintiff falling onto this heavily traveled

street. Such an outcome could have caused severe injury or death in traffic. Evidence as to the

specific date, time, and remote BRMT instructions given to initiate each event are available

upon discovery against defendants. Similar illegal BRMT induced events include, without

limitation, those related at paragraphs 615 617-619 HEXP-12, 14-16; 695, 699-701, 706, 708 LETHL-2, 6-8, 13, 15.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 615 617-619 HEXP-12, 14-16; 695, 699-701, 703, 706, 708 LETHL-2, 6-8, 10, 13, 15; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-001D |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0196, 2-0202 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 419-426, 774-785, 11665-11666 |

| Emails and documents by topic and date, also located in LPEE: | |

### 706. *LETHL-13 Lethality Attempts:* **North Bergen Hospital Fall, 2021**

A. While a resident of the state of New Jersey, Lead Plaintiff was subject in April 2021 to an illegal BRMT bioweapon and bioweapon delivery system induced fall in Palisades Medical Center, North Bergen, NJ. This fall caused the Lead Plaintiff to tip to the right while remaining completely rigid, tipping him as if a statue. His head narrowly missed striking the vulnerable skull opening of the right temple on a 4 inch tall metal base of a rolling bed table at floor level. This fall was caused and created by defendant UNITED STATES, CIA, ARMY use of the illegal BRMT bioweapon and bioweapon delivery system to create a risk of severe injury or death. The evidence as to the specific date, time, and remote BRMT instructions which were given to initiate the event are available upon discovery against defendants. Medical evidence which documents this event and the follow-on medical tests required before a doctor would release the Lead Plaintiff from the hospital have been requested from SCIARRA, the attending physician, and Palisades Medical Center, North Bergen, NJ, as has the identity of the medical doctor who attended the Lead Plaintiff and ordered an MRI immediately after the fall, and who also noted an alleged irregular heartbeat and made a referral to ASTUDILLO for cardiology follow-up (see 710 LETHL-17). SCIARRA has stated in an email to Lead Plaintiff that there are no such records as his medical practice entity in New Jersey is defunct. This incident is subject to further discovery, noting that SCIARRA abruptly abandoned his decades-long northern New Jersey medical practice soon after this incident. Similar illegal BRMT induced events include, without limitation, those related at paragraphs 615 617-619 HEXP-12, 14-16; 695, 699-701, 705, 708 LETHL-2, 6-8, 12, 15.

B. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | 615 617-619 HEXP-12, 14-16; 695, 699-701, 703, 705, 708 LETHL-2, 6-8, 10, 12, 15; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-001E, 1-039 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0193, 2-0194 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 419-426, 774-785 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 707. *LETHL-14 Lethality Attempts:* New York Metro North Mass Casualty Attempt, 2022

A. While a resident of the state of New Jersey, Lead Plaintiff boarded a Metro North Hudson Line express train from Beacon, New York to Grand Central Terminal in New York City on Sunday evening, September 11, 2022. The express train was traveling south at approximately 50 to 60 miles per hour when the engineer urgently braked the train to an emergency stop as the train collided with a tree which had fallen or been fallen to block at least three of the four railroad tracks at that point, including the southbound express track the train was traveling on at the time.

B. This incident occurred within 2 to 3 minutes after sundown, just after the sun had set to the south, directly impacting engineer's adjustment from bright daylight with sun setting on the horizon almost directly ahead to night vision. The location of the tree strike was carefully selected by those who planned the strike for this moment right after sunset as the train engineer's eyes would take several minutes to adjust to night vision from the bright sunlight of the setting sun directly in his eyes to the moonless darkness of that night. The location was a relatively remote track section with no nearby structures or inhabitants, so there were no ambient light sources in the area. If the tree had been larger, the train would have contacted a more substantial portion of the trunk of the tree, and with the tree's full weight and its root ball still wedged in the ground, it could have exerted enough lateral force to derail the train at its relatively high speed. This created a very significant risk of injury or death to the Lead Plaintiff and several hundred other passengers while the train operated about 20 feet from edge of the embankment on the Hudson River. Similar illegal mass casualty events include, without limitation, those related at paragraphs 602 NSEC-3.

C. There was a specific sequence of further follow-on events, reportedly including a stalled train, which then resulted in the Lead Plaintiff's exit from that MTA Hudson Line express train at Yankee Stadium, one stop short of his destination, where he walked to the MTA 4 line subway train to complete his travel to Grand Central Terminal in New York City. This sequence included noted signature tradecraft events, details available from defendants upon discovery, indicating the detail's knowledge and pre-planning of this sequence by defendants under command authority of defendants with police powers which would have occurred well in advance of his arrival at the Yankee Stadium station where he walked to the 4 line subway train, all of which is indicative of pre-planning far in advance of the Yankee Station transfer. Evidence of the specific defendants who conspired and/or caused this event sequence is available upon discovery.

D. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among

some who presented at the time as family members, their children. See other selected relevant

content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages

934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.

Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 15, Appendix paragraph 1-056 |
|---|---|
| Complaint paragraphs: | 602 NSEC-3; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-056 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0099, 2-0202 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 413-415, 416-418, 542-547, 564-574, 598-606, 766-769, 772-773, LPEEV65-11 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

### 708. LETHL-15 Lethality Attempts: New York Morningside Park BRMT Fall, 2022

A. While a resident of the state of New Jersey, Lead Plaintiff was subject on

September 17, 2022 at 7:29PM to a fall from the top step of a deliberately darkened staircase in

a series of park pathway stairs spread over 250 feet in the southwest corner of Morningside Park,

a New York City Park (defendant NYC) which was caused and created by defendant UNITED

STATES, CIA, ARMY acting in coordination with individuals employed by defendants NYC

and/or NYPD. This illegal BRMT bioweapon and bioweapon delivery system induced fall

caused the Lead Plaintiff to misplace his left foot on the top stair, lose his balance, and do a

complete forward somersault on the stairs, landing on his back on the set of stairs, injuring his

head, knees, and hands (Interline Exhibit 15C). This fall created a specific risk of severe injury

or death. Further evidence corroborating the specific date, time, and remote BRMT instructions

given to initiate this event are available upon discovery against defendants. Similar illegal

BRMT induced events include, without limitation, those related at paragraphs 615, 617-619
HEXP-12, 14-16; 695, 699-701, 705, 706 LETHL-2, 6-8, 12, 13.

    B. This scheme and conspiracy required and consumed the time and financial resources
of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running
schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude
over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT
development and deployment; illegal human subject medical experimentation without consent,
to and including torture and suicide ideations; systematic constitutional rights violations; and
racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated
herein by reference including, without limitation, paragraph 599, with particular attention
directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets
privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).
Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical
confirming information directly from these institutional and individual defendants and, among
some who presented at the time as family members, their children. See other selected relevant
content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages
934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.
Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 15C |
|---|---|
| Complaint paragraphs: | 615 617-619 HEXP-12, 14-16; 695, 699-701, 705, 706, LETHL-2, 6-8, 12, 13; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-058, 1-059 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0076, 2-0099, 2-0202, 2-0203 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 140 et al, 419-426, 542-547, 564-574, 786-793, 10302-10304, LPEEV65-11 |

| Emails and documents by topic and date, also located in LPEE: | Not applicable |
|---|---|

### 709. *LETHL-16 Lethality Attempts:* **New Jersey North Bergen Vehicle Rundown. 2022**

A. A vehicle rundown sequence, intended to harm and/or intimidate the Lead Plaintiff was conducted in New York City and North Bergen, NY on November 18 and 19, 2022. Two streets being crossed by Lead Plaintiff in New York City had their streetlights extinguished in both directions from Eighth Avenue (Interline Exhibit 15D) and electric scooters ran in the opposite travel direction from normal traffic on these one-way streets after dark. No other vehicle traffic was on either street at this time. About 90-110 minutes later, normal vehicle traffic in the proper direction was allowed on these streets as the Lead Plaintiff returned to the same subway station from a performance event. The following night the illegal BRMT bioweapon and bioweapon delivery system was used as his attention was distracted toward a bright light and his left peripheral vision was limited by his rightward diagonal angle of travel across a parking lot travel aisle. While his walking pace was fixed by the illegal BRMT bioweapon and bioweapon delivery, a white compact car in the left distance traveling slowly south in the traffic aisle was rapidly accelerated and raced toward him in the parking lot of the North Bergen, NJ WALMART, whereupon it was panic slowed very abruptly within 15 feet of the Lead Plaintiff, and coming to a final stop about 5 feet away just after it had entered his peripheral vision. As he visited a restroom in the Wendy's restaurant after a meal there, a male appeared to vomit into the restroom sink. There was no injury from this event sequence, but this pattern of practice was and is completely consistent with other coordinated illegal BRMT bioweapon and bioweapon delivery system, and related physical violence and intimidation attempts directed at the Lead Plaintiff, as further described in these subcounts and narrative.

These close pass and near miss incidents, with high speed electric scooter, electric bike, pop-out

cars, cross-town buses, and single axle commercial trucks (police powers cover vehicles) have

been particularly pervasive in NYC.

B. This scheme and conspiracy required and consumed the time and financial resources

of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running

schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude

over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent,

to and including torture and suicide ideations; systematic constitutional rights violations; and

racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated

herein by reference including, without limitation, paragraph 599, with particular attention

directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets

privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953).

Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical

confirming information directly from these institutional and individual defendants and, among

some who presented at the time as family members, their children. See other selected relevant

content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages

934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597.

Evidentiary materials related to this specific subcount follows:

| Interline Exhibits: | 15D |
|---|---|
| Complaint paragraphs: | 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-064, 1-065, 1-066 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0099, 2-0203 through 2-0215 |
| LPEE pages (see technical note on page numbering at paragraph 230): | LPEEV65-11 |

| Emails and documents by topic and date, also located in LPEE: | Not applicable |
|---|---|

### 710. LETHL-17 Lethality Attempts: **Programmed Health Collapse, 2023**

A. During 2023 into early 2024, Lead Plaintiff observed defendants' direct attempts to construct a programmed health collapse narrative using health professionals assigned to Lead Plaintiff through the health care plan, Braven, which was used by defendants as part of their on-going illegal involuntary servitude and other acts, violations, and injuries to Lead Plaintiff. Two primary sequences have been used to construct this narrative:

(i) on-going obstructions of the colon which have presented in a medically very unlikely sequence, paragraph 710 LETHL-17

(ii) a cardio/heart health sequence which appeared without any prior history at the time of the fall related in paragraph 706 LETHL-13.

B. Lead Plaintiff began experiencing constipation in irregular cycles around 1984. Periodically throughout and after these progressions, Lead Plaintiff's constipation completely disappeared, then recurred in bouts. This illegal BRMT bioweapon and bioweapon delivery system abuse form of pattern, their abrupt appearances, disappearances, and recurrence of patterns, matches other such anomalous health patterns of reversing presbyopia and extreme headaches cycles, as noted at paragraph 702B. While others also naturally experience this issue, it is notable as illegal BRMT bioweapon and bioweapon delivery system hijackings of brain biochemistry, per paragraph A(i) above, and is potentially lethal, given the bizarre and aggressive form this illegal BRMT hijacking has taken on in 2023-24.

C. This specific 2023-24 colon blocking sequence is evidenced by a series of Lead Plaintiff diary entries which identify a specific sequence of highly medically improbable

occurrences including the progressive cyclic failures of a series of normal medical interventions including fiber supplements, polypropylene glycol, and lactulose. Further, the lag period between each of those medical interventions and the normal period in which they act upon the body, compared to the direct experience of the Lead Plaintiff, does not consistently match their normal efficacy and lag time patterns. This can only plausibly be explained as an external intervention using the illegal BRMT bioweapon and bioweapon delivery system, a biomedical abuse tool available only to defendant UNITED STATES, CIA, ARMY. When explained to Lead Plaintiff's primary physician PATEL, actually an employee of defendant UNITED STATES, the physician recommended contacting a gastroenterologist, suggested one might be joining his local practice at some point in the near future, then simply walked away, suggesting a return visit in three months. Upon attempting to contact the gastroenterologist SCIARRA, whose office had completed the colon examination described at paragraph 706 LETHL-13, the phone company message indicated the office phone line had been temporarily disconnected and the gastroenterologist's direct personal cell phone was not accepting calls. As a result of this follow-up, Lead Plaintiff discovered that SCIARRA, who had a longtime northern New Jersey gastroenterological medical practice, had abruptly relocated to Beaufort, North Carolina in the months after Lead Plaintiff's hospital fall at paragraph 706 LETHL-13. See LPEE pages 11656-11664, 12234-12244, LPEEV65-2, 13-16.

     D. The heart health narrative sequence is evidenced by ASTUDILLO, a cardiologist who was introduced to Lead Plaintiff immediately after the North Bergen hospital fall at Palisades Medical Center in 2021, paragraph 706 LETHL-13, reviewed a routine EKG in 2022 and said there was no imminent danger and that routine follow-up was adequate, then reviewed another routine EKG in 2023 which looked identical to the 2022 EKG to Lead Plaintiff, and

surprisingly recommended an extensive series of tests, including a wearable round the clock heart monitor and a hospital based heart test. See LPEE pages 12160-12233.

E. During a prior visit to this cardiologist's office, a pulse monitor had indicated the Lead Plaintiff heart rate was 38 beats per minute, at a time when the actual reading was well within normal range of about 65 to 74 beats per minute based upon the Lead Plaintiff's own physical body reactions at that time. Depending upon the actual software code in the EEPROM (electrically erasable programmable read only memory) of the wearable heart monitoring device, the monitoring device itself could be manipulated to suit a specific cardio health narrative intended by defendant UNITED STATES, CIA, ARMY simply by hacking the software to record a different pattern to the device's memory than is actually being experienced by the wearer of the monitor. This allows the third party intervenor (perhaps a nefarious defendant UNITED STATES, CIA, ARMY) to construct an alternative health narrative about the patient, so that the patient can be orchestrated into an apparently natural adverse life outcome using the illegal BRMT bioweapon and bioweapon delivery system to manufacture a specific intervention, such as a fatal heart attack. The illegal BRMT bioweapon and bioweapon delivery system can and does control any bodily function selected by the perpetrator operator for modification or termination, as demonstrated by, among other things, the unnatural nature of the colon interventions described in subparagraph B above. Medical records and related medical tests will be produced from the attending physicians through the discovery process.

F. This scheme and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT

development and deployment; illegal human subject medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 694D LETHL-1 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content at paragraph 600Q and in searchable indexes and lists at LPEE Compendium at pages 934-1075, as well as other LPEE volumes added subsequently as noted at paragraph 597. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 706 LETHL-13; 694-710 LETHL-1-17 generally |
| Appendix 2 paragraphs: | 1-067 |
| LPEE Table 2 pages 12023-12120 paragraphs: | 2-0217 |
| LPEE pages (see technical note on page numbering at paragraph 230): | 11656-11664, 12160-12233, 12234-12244, LPEEV65-2, 11, 13-16 |
| Emails and documents by topic and date, also located in LPEE: | Not applicable |

711. Paragraph 711 is reserved.

**Key Illegal BRMT Program State And Local Government Co-Conspirators' Relationships To Federal Defendants**

712. Defendant UNITED STATES, DOJ, DOD, CIA, ARMY, NIAID current and former senior executives both directly perpetrated and supervised illegal BRMT bioweapon and bioweapon delivery system field development test and deployment, constitutional, civil and

constitutional, civil and human rights violations, and racketeering acts, violations, and injuries, in conspiracy with state and local governments in various states where Lead Plaintiff and other plaintiffs have and do reside, work, worship and conduct other activities of normal life. There is a clear long-running pattern of an associated-in-fact racketeering enterprise in which these individual defendants have and do engage in this misconduct and pattern of racketeering acts and rights violations systematically not prosecuted by defendant DOJ since at least 1961 (paragraphs 1-37, 550-584).

713. From the 1960s into at least 1979, while Lead Plaintiff attended schools and colleges funded by defendant WASH, the illegal BRMT program manager BREYER, then operating from an assistant professor position at Harvard University, posed in Washington state as Snow, fraudulent church elder and apartment developer in Kent, WA at least between 1970-72, then as Jack Sackville-West, parent of Perham Hall Lead Plaintiff co-resident Bill Sackville-West, and as a Spokane architect, from at least 1974 until his supposed demise and memorial service in the 1990s shortly before his ascent to the US Supreme Court. This fraudulent memorial service at Spokane Presbyterian Church to bury the Jack Sackville-West legend in Spokane, WA, which fraudulent memorial service was attended by the unwitting Lead Plaintiff, who sat as part of the Sackville-West family, and by Admiral Stansfield Turner, former CIA Director under President Carter who had walked by the Lead Plaintiff as he visited the National Gallery of Art East Building rotunda in a cameo in Spring 1979, paragraph 424. On his return flight to Seattle, the unwitting Lead Plaintiff sat next to Admiral Turner using a first class upgrade offered and purchased by the former CIA Director.

714. While employed by defendants ARMY and CIA on the illegal BRMT bioweapon and bioweapon delivery program, defendant BREYER was in defendant ARMY Reserves from

1957-65, including six months active duty in Intelligence. BREYER then operated under cover

as a Harvard Law School Assistant Professor from 1967-1980. This time period specifically

coincides with the entirety of Lead Plaintiff's human trafficking during his education between

1967 and 1979, which incorporates, without limitation, (i) the initial known illegal human

trafficking in 1968 to the California campground by Gary Jack for the illegal BRMT oxytocin

hijacking of Lead Plaintiff's pineal gland, (ii) the 1970 Reye Syndrome aspirin/codeine murder

of sister Sandra by embedded doctor KOHLER (paragraphs 99d, 417, 418, 714, 740, 803C-D,

805B(i), H, S, BS, 806B, 814B) whose improper prescription of aspirin and codeine was the

cause of her death, (iii) the immediate subsequent 1970 fraudulent home church transfers to the

homes of Elder Snow (BREYER) and to the Northeast Tacoma home churches of Lead

Plaintiff's family of origin, (iv) the equilibrium disruptions and fall from a family Shetland pony

to a head temple blow strike injury of Sandra's surviving twin Susan and, (v) in that same time

period, KATYAL's comparable fall from a family horse breaking ribs during a riding lesson

being given to KATYAL and to Grady by Lead Plaintiff, (vi) through multiple fraudulent and

BRMT manipulated friendships and relationships in high school, and (vii) through other national

security entanglements including, without limitation, at Green River Community College and

defendant WSU. All these operations were directly supported and contributed to by various state

and local governments and their employees, officers, and agents in Washington state, defendants

FWSD, WASH, WSU, KCSD, as described below at paragraphs 716-781.

715. Defendant BREYER (ARMY Intelligence, CIA) also conspired with defendant

WEISSMAN (FBI) during this period. Defendant WEISSMAN, while embedded at Associated

Grocers, a Seattle, WA based grocery wholesaler to independent supermarkets, supervised the

team which was fraudulently deployed into Larry's Markets (paragraph 418), Federal Way, WA,

which was co-owned by Larry Brewer, a cousin of Lead Plaintiff's father, during that

surreptitious undercover FBI grocery store co-ownership and enterprise wrecking process which

continued as Lead Plaintiff was employed there from 1972-1974. Defendant BREYER also

conspired with FBI's Earl Keller, who was illegally embedded at Smith Brothers Dairy as Lead

Plaintiff's father Don's minder from 1963, in the sequence of minders from at least 1961 and

Pacific Paper Products, Tacoma, WA while he had worked in California from 1961-63, as the

illegal BRMT bioweapon and bioweapon delivery system secret program managed the religious

discrimination and other constitutional rights violations by defendant UNITED STATES, DOJ,

FBI, CIA, ARMY against Lead Plaintiff's extended family enslaved in involuntary servitude to

defendant UNITED STATES. Defendant BREYER also conspired with other unknown

defendants against the Lead Plaintiff's uncle in Walla Walla, WA during this time period, upon

his uncle's return from Fort Hood, Texas after service in defendant ARMY, all in furtherance of

the illegal BRMT bioweapon and bioweapon delivery system program.

### A. Defendant Federal Way School District

716. In 1969 or 1970, defendant Federal Way School District (FWSD) conspired with

defendant UNITED STATES to organize a new high school, which according to defendant

KATYAL (DOJ, fellow student Shawn Morrissey) was named Decatur based upon defendant

KATYAL's lobbying of the FWSD Board Chair, with whom he represented he lived at the time.

Decatur was formed prematurely as the school district grew, specifically to accommodate the

illegal BRMT bioweapon program's further development cycle under defendant BREYER by its

illegal human subject medical experiments on extended family members, including Lead

Plaintiff, from about 1968 forward (paragraphs 2-7, 357-402, 604-619 HEXP-1-16), and on

others in the small 80-90 student initial high school class. Defendant KATYAL attended with

Thomas Grady, his DOJ/FBI working partner. In 1970-71, Decatur High School had a few

teachers and was housed in a small former district administration building adjacent to the
existing Federal Way High School where all but a few classes were taught by Federal Way High
School faculty. In Fall 1971, Decatur was moved to a new junior high school campus for the
subsequent two years, at what later became Illahee Junior High School. A normal size high
school class of around 200-300 was admitted at the Illahee site. The Decatur High School
campus was completed and opened in Fall 1973, after the Lead Plaintiff's graduation in June
1973, held at Illahee.

717. The new sophomore class which entered in 1971 at the Illahee campus included
Stuart Bettesworth (plausibly identified as GARLAND, paragraphs 5, 99m, 417-418, 845E(vii)),
Frank Backman, also a junior, and his sister Mariam Backman, a sophomore, who allegedly had
a romantic relationship with Bettesworth (GARLAND). Mariam Backman, presumably a false
identity, may previously have been Karen Milholland in 1966-67 while posing as a sixth grade
classmate at Lakeland Elementary School alongside classmate Martha (who was later Janet
RENO, Attorney General from 1993-2001, as photo identified by Lead Plaintiff in April 2024).
Miriam Backman (also plausibly Karen Milholland) also plausibly later reappeared as Karen
Sackville-West (daughter of defendant BREYER as Jack Sackville-West) in Spokane in 1974-76,
and as a Tacoma, WA area teacher working on her Masters Degree in Education in Summer
1978, (paragraphs 211, 417B, 467, 717, 762 table, 805AB, AC, AK) as introduced at WSU by
Allene Sampson, while Lead Plaintiff attended graduate school for his MBA at defendant WSU.
Sampson has been plausibly identified in April 2024 as Lisa Desjardins, now an employee of
PBS News, the public media organization. Other members of defendant DOJ, FBI, ARMY, CIA,
and other unknown federal agencies, who posed as students to perpetuate the illegal BRMT
program and the involuntary servitude of the Lead Plaintiff and others, also attended through this

special accommodation granted to defendant UNITED STATES by defendant FWSD, as orchestrated by defendants KATYAL and BREYER, and unknown others. Decatur High School was overseen by school principal Dietrich, and by a vice principal name not recollected who directly fits the forensically identified defendant DOJ/FBI model agent profile of the time, and was taught by still other unknown defendant UNITED STATES and FWSD personnel who operated as educators during the years Lead Plaintiff attended until his June 1973 graduation.

### B. WSU – Defendant Washington State University

718. Upon leaving Decatur and defendant FWSD, Lead Plaintiff attended Green River Community College (GRCC), which included defendant KCSD personnel and defendant UNITED STATES personnel, embedded as both students (Donna Dickover, David Brunton, others) and as faculty. Terry Buckles, employed by defendant WASH, who presented as a Washington Library Network employee in 1973-74 (and later as Wolfgang Opitz, on WA Governor Locke's staff when next met by the unwitting Lead Plaintiff in 1999, see paragraph 729 below), befriended and socialized with Lead Plaintiff. Lead Plaintiff continued to work at Larry's Market, where other defendant UNITED STATES personnel were embedded and which was secretly co-owned by defendant FBI (paragraph 418), all as part the comprehensive surrounding and surreptitious involuntary servitude and control of the Lead Plaintiff and his extended family by defendants' government, intelligence, and police powers personnel in the illegal BRMT bioweapon and bioweapon delivery system program managed by defendant BREYER.

719. Defendant WSU supported federal police powers operations and an initial surreptitious undergraduate introduction of the unwitting Lead Plaintiff to the Whitman County Sheriff office using a faked volunteer search and rescue squad, orchestrated classroom assignments of embedded federal agents as fellow undergraduate students and permitted

embedded defendant UNITED STATES personnel as teaching assistants to provide false feedback on inorganic chemistry lab results. Undergraduate years at Washington State University, Pullman, WA, included nearly continuous contacts with federal officers, agents, informants, university and state employees, who posed as roommates, friends, fellow employees, romantic interests, insurance agents, recreational program staff, and in other roles intended to provide defendant UNITED STATES' BRMT program management with continuous awareness and extremely powerful adverse influence over nearly all life choices. While a WSU undergraduate student, the Lead Plaintiff was still being handled in the field under a team headed by BRMT program executive Jack Sackville-West (BREYER), acting on behalf of defendants ARMY and CIA, who was later known as Stephen BREYER a federal appellate judge and Supreme Court Associate Justice.

720. Upon transferring from Green River Community College to Washington State University in Fall 1974, Lead Plaintiff was assigned to Perham Hall, a WSU student dormitory. Lead Plaintiff was unwittingly and unknowingly handled throughout college and graduate school by federal agents posing as fellow students and roommates beginning at Green River Community College, Auburn, Washington by Dickover and Brunton who transferred with Lead Plaintiff to Washington State University, Pullman, Washington in Fall 1974. During his first semester, his first assigned roommate Jay Costa was replaced by Andrew Ng, a British national from Hong Kong. Soon thereafter, the Resident Assistant who supervised the Perham residence hall floor for WSU was replaced by Michael CUNHA, introduced as an AFROTC member working toward medical school admission in psychiatry in the Air Force. In Perham Hall, he met and developed friendships and/or close personal relationships with defendants Craig PAGE, William (Bill) SACKVILLE-WEST, Bill's "father" Jack (defendant BREYER) and other Jack and Dorothy

SACKVILLE-WEST family members in Spokane, WA, Robert Mandich (GARLAND),

CUNHA; as well as Linda Pogreba, Karen Raines, Susan Irish, Lynn Sorenson, Vic Jones, James

Carberry, Tracy Berry, Katherine "Kit" Andrews, Bob Ross, among many others, as an

undergraduate. This team included BREYER's undercover "Jack and Dorothy family of wife and

seven children," with three remaining children – Bob, Bill, and Jim (the latter known today as

Jack Smith – DOJ Special Counsel) who principally resided in the Spokane, WA area "family

home" at 1424 South Maple Street, where Lead Plaintiff was a frequent weekend guest, having

been befriended by William (Bill) Sackville-West who resided in WSU student dormitory

Perham Hall on the same floor as Lead Plaintiff in 1974-75 and in Nez Perce Village thereafter, a

few buildings east of Lead Plainitff's apartment, which he shared with NG and PAGE in 1975-76

and with PAGE in 1976-77.

721. Current Attorney General GARLAND has been forensically identified by Lead

Plaintiff in late 2023 as the person known to him as Robert Mandich while GARLAND operated

undercover at Washington State University (WSU), Pullman, WA in 1974-1976, posing as a

student co-resident on the same residential floor of the WSU Perham Hall student dormitory in

1974-75 and as a student neighbor in WSU Nez Perce Village student apartment housing in

1975-76 while driving a well-used green Mercury Capri, in support of this illegal program under

the supervision of BREYER, its apparent field executive then housed first in Kent, WA, then in

Spokane, WA (paragraphs 99d, 111, 211, 417-419).

722. While a Washington State University, Pullman, Washington (WSU) undergraduate,

Lead Plaintiff had a nearly two year relationship with Susan B. Irish, which included an

overnight canoe trip to Dworshak Reservoir east of Lewiston, Idaho accompanied by a WSU

Recreation Department group which had two males camping in an adjacent tent. This event

sequence bore a strong resemblance to the camping trip he had taken at the age of 12 with Gary

Jack where he was oxytocin (love hormone) hijacked in a California State Park for illegal

biomedical experiment without consent with no direct sexual abuse, by the use of a local BRMT

hormone manipulation device triggered by two males in an adjacent tent camping spot. Lead

Plaintiff also noted, during forensic review in 2021, the likelihood of certain oxytocin

enhancements of Katherine "Kit" Andrews and the simultaneous flattening of Lead Plaintiff

oxytocin levels while an undergraduate, which likely were illegally BRMT bioweapon and

bioweapon delivery system hijacked. This was noted in particular, as the potential for such a

relationship was specifically verbally minimized by then close friend and co-resident of Perham

Hall, William SACKVILLE-WEST, the ostensible son of Jack Sackville-West (BREYER), after

Lead Plaintiff was called out during a Cougars basketball game by Katherine's roommate, a

WSU cheerleader, to join the skylined Katherine in the vacant school band section diagonally

across the Performing Arts Coliseum from Section 51 where Lead Plaintiff was sitting at the time

with Bill SACKVILLE-WEST and Craig PAGE. Lead Plaintiff graduated in June 1977 with a

BA degree in Business Administration.

723. In February 1978, Lead Plaintiff returned to defendant WSU as an MBA program

graduate student. Defendant WSU provided the Lead Plaintiff with the MBA student

employment which allowed him to attend, an office assignment with a defendant CIA Iranian

asset officemate and assigned professor/student employment and academic advisor of the Lead

Plaintiff to the embedded federal agent professor SHAFFER. SHAFFER was Lead Plaintiff's

primary graduate school contact in the WSU faculty. SHAFFER, to whom Lead Plaintiff acted as

a Teaching Assistant, was allegedly formerly employed by a petroleum company (a CIA

tradecraft rhyme which alluded to the Iranian CIA asset with whom Lead Plaintiff then officed).

SHAFFER was joined by Don Yale, likely the ARMY embed posing as a retired Navy Supply officer and Assistant Professor.

724. Other national security entanglements also occurred in this time period including, without limitation, being assigned to co-office with Hamid Bahari-Kashani, an Iranian national economics PhD candidate and supporter of the Shah of Iran, whose family doubtless had CIA or other US connections. Bahari-Kashani, an Iranian national whose family was connected to and loyal to the Shah of Iran (installed as penultimate head of state with help from CIA). The Shah abdicated and left Iran in January 1979 as described at paragraphs 421-424 above. Lead Plaintiff was then reassigned away from his shared office with Bahari-Kashani to a shared office in the basement of Todd Hall (now Carson Hall) with defendant CIA and FBI personnel then attending the WSU MBA program.

725. During WSU Spring Break sometime in March or April 1979, CIA Director Stansfield Turner walked past the completely ignorant Lead Plaintiff with an intent knowing stare in the rotunda of the East Building of the National Gallery of Art (during his return to WSU from a job interview trip to GTE in Stamford, CT he spent much of the Spring Break week in Washington, DC), as Stansfield Turner examined Lead Plaintiff (Appendix 2 paragraph 1-008, 1-009), one of defendant CIA and ARMY's unwitting illegally subjugated human medical experiment victims used for illegal BRMT bioweapon and bioweapon delivery system development. Years later, Turner would upgrade him to first class on flight from the Sackville-West memorial service burial of that legend, in a tradecraft joke he played on the unwitting Lead Plaintiff many years later in the 1990s, shortly before BREYER was being upgraded from First Circuit appellate Judge to Associate Justice on the Supreme Court.

726. While enrolled in the defendant WSU MBA program, Lead Plaintiff met Michael

WORTHY, who was then not recognized as having been a key FBI illegally embedded agent

working at Larry's Market during the wrecking of Larry's Market, which had been underway as

the Lead Plaintiff worked at Larry's Market in 1972-1974 (paragraphs 99k, 418, 422, 493, 726,

762 table, 770, 805AG, AK). WORTHY (defendant FBI) was identified through his appearance

in a still photograph with defendant WEISSMAN, which was displayed behind WEISSMAN in

2023, during an MSNBC television interview with defendant MELBER). Other defendant FBI

and CIA agents also attended WSU MBA graduate school, included EPSKAMP, WORTHY,

ZOULAS, and THORPE, who reappeared in various roles during Lead Plaintiff's professional

employment over the following twenty-five years.

727. Lead Plaintiff was referred by his WSU MBA professor Dr. Paul Shaffer (CIA

faculty embed), to Deloitte Denver, who then further referred him to Deloitte Seattle which he

joined in August 1979, working as an auditor for about six months, then as a consultant, and later

as a consulting Manager. This Deloitte Seattle commercial cover operation, actually hosted by

defendant USMS, provided commercial covers for CIA commercial cover international

espionage projects, and for FBI domestic spying and investigations (Appendix 2 paragraph 1-010

through 1-012).

### C. Defendant WASH State of Washington

728. Defendant State of Washington (WASH), including various unknown state agencies

and local government units to be identified in discovery, which were funded and enlisted by

WASH, deployed and detailed current and former government employees in various positions in

cover entities used to employ or which permitted volunteer service by Lead Plaintiff to maintain

the appearance of normal personal, educational, and professional life, while actually sustaining

Lead Plaintiff's involuntary servitude at all times. Nearly all the defendant WASH state and local

government employees later returned to publicly visible positions in state and/or local government employment, most probably never having actually left such employment for the cover positions to which they were deployed to provide logistical support to the illegal BRMT bioweapon and bioweapon delivery system program and associated-in-fact enterprise pattern of racketeering acts and conspiracy, including conspiracy against rights. This pattern continued from the time of the Lead Plaintiff and his family of origin's return to Washington state in 1963, from surreptitious FBI employment at Pacific Paper Products while in CA, to defendant FWSD for third grade elementary school until he left WSU MBA graduate school in June 1979, and was then employed in August 1979 by Deloitte Seattle.

729. These defendant WASH state funded departments agencies and governments were most probably supported by DOJ and other federal grants to provide this logistical support to the illegal BRMT program in support of defendant BREYER's program management in Washington state. Participating defendant WASH departments and agencies included, without limitation, defendant WASH Governor's Office (WASH state employee Terry Buckles in 1973-74, also later known as Wolfgang Opitz), Washington State Human Rights Commission (Terry Byington, who acted as AeA Executive Director during Lead Plaintiff's fraudulent employment at LazerSoft and CNA, paragraphs 729, 735, 762 table), Green River Community College (among others, Terry Buckles, Washington Library Network, later known as Wolfgang Opitz, staff of WASH Governor Locke and Office of Financial Management), and David BRUNTON and Donna DICKOVER during Lead Plaintiff's GRCC 1973-74 freshman year.

730. BRUNTON and Donna DICKOVER then transferred with Lead Plaintiff to defendant WSU Washington State University during undergraduate studies in 1974-77. Lead Plaintiff's Perham Hall dormitory resident, resident assistant, neighboring Perham Hall floor

resident assignments, and his class assignments, were constructed to accommodate the illegal

BRMT bioweapon and bioweapon delivery system program. Defendant WASH also provided

further personnel resources in the Spokane area, including several individual employees who

posed as BREYER family members when BREYER appeared there as Jack SACKVILLE-

WEST while ostensibly working as a Spokane area public facilities architect who lived at 1424 S

Maple Street, Spokane, WA, while Lead Plaintiff attended defendant WSU, an independent

agency of defendant WASH.

731. Terry Buckles, paragraph 729 above, reappeared as Wolfgang Opitz, Governor

Locke's supposed advisor on Higher Education, who then moved to the Office of Financial

Management, all while the Lead Plaintiff conducted the Higher Education Task Force for the

American Electronics Association (AeA), then directed by detailed WASH employee Terry

Byington, during the Governor Locke administration (paragraphs 729, 735, 762 table).

732. Laurie DOLAN was fraudulently presented with others as a daughter-in-law married

to son David (supposed son of Jack) SACKVILLE-WEST in Spokane, WA beginning in Fall

1974-77 (paragraphs 111, 211, 805AT). DOLAN later joined her fellow defendant WASH state

employee college classmate Governor Chirstine Gregoire in 2005 as the governor's Chief of

Staff and may have served on Gregoire's staff while Gregoire was defendant WASH Attorney

General.

733. The Governor Spellman administration detailed Joseph L. McGavick as a Director

in the Deloitte Seattle cover company office run by defendant USMS personnel and HOPPER in

support of defendants UNITED STATES, DOJ, FBI, CIA, and ARMY in the early 1980s.

Defendant WASH conspired and participated in the illegal human trafficking process and BRMT

bioweapon and bioweapon delivery system program involuntary servitude imposing forced labor

on Lead Plaintiff through these acts, violations, and injuries in support of defendant BREYER, the illegal BRMT bioweapon and bioweapon delivery program, and defendant UNITED STATES' illegal human subject medical experiments on Lead Plaintiff and others in this class of plaintiffs.

734. A then former political aide to defendant WASH Governor John Spellman, McGavick was deployed to Deloitte Seattle from 1979 to approximately 1983, and while there worked with Lead Plaintiff and assisted in the deployment of illegal defendant FBI general surveillance operations into the City of Tacoma, Tacoma Public Utilities, City of Bellevue, Pierce County, Clallam County, Thurston County, Seattle School District, all in Washington state, and Buffalo New York School District, Spring Texas School District, San Francisco School District, the latter with Bannon (defendant CIA, then known as Timothy C. Easton, Deloitte Seattle Manager, then Director). McGavick returned around 1983 to state employment at the Washington State Liquor Control Board as a Commissioner. McGavick also orchestrated deployment to Deloitte Seattle, for a time, of retired Seattle School District Superintendent David Moberley who worked as a contractor, and of the Seattle School District's former chief finance officer Pat Moyer, who worked as a project manager. A former Spellman administration era Washington State Treasurer was also detailed to Deloitte Seattle for about 18 months.

735. AeA Executive Director Terry Byington, another assigned defendant WASH employee, was deployed from the defendant WASH Human Rights Commission. Byington returned to state employment at Lake Washington Technical College after acting as a security picket and contact of the Lead Plaintiff while he was at LazerSoft in Bothell from 1987-89, where the company had been relocated from north Seattle, WA by then CEO Stone (CIA,

working with BURNS) in 1987, and again while the Lead Plaintiff was at CNA in Bellevue, WA,
employed by defendant FAUCI.

736. These and other illegal involuntary servitude federal cover company fraudulent
employment operations including, without limitation, Deloitte Seattle, LazerSoft, PAN, Pacific
Pipeline, CNA, and ESTABLISH, were typically run day-to-day by defendant USMS for use as
cover operations by various defendant UNITED STATES departments and agencies including,
without limitation, DOJ, DHS, DOD, CIA and other police powers operations of defendant
UNITED STATES. Based upon tradecraft security backcheck comments made by Dave Brown,
an employee at CNA, Rod Proctor was most probably the actual defendant DOJ/USMS manager
overseeing the AeA technology industry trade association cover operation and Byington in
Washington state, which included Ian McGregor, a defendant FBI agent posing as a contract
lobbyist, who ran intelligence probes against defendant WASH government legislators,
departments, and agencies, and at one point instructed the unwitting Lead Plaintiff to time a
specific campaign donation at a particular time, apparently as part of one of those probes.
Proctor's cover was Redmond, WA based analog to digital telecommunications technology cover
company Tone Commander, most probably formed, funded, and sustained by defendant USMS
in the aftermath of the 1982 AT&T telecommunications breakup, to facilitate intelligence
operations and illegal general surveillance and *Fourth* Amendment violations.

737. Paragraphs 737 through 739 are reserved.

### D. Defendant KCSD – King County Sheriff's Department

740. Defendant King County Sheriff's Department (KCSD) acted and conspired against
plaintiff's rights in support of the criminal and illegal operations of defendant UNITED STATES
(DOJ, FBI, CIA, ARMY, USMS, DHHS, NIH, NIAID, BREYER, WEISSMAN, ROSENBERG,
HOOPER, BURNS, FAUCI, and other defendants named herein) throughout these plaintiffs'

tenure in King County, Washington beginning in the 1950s (paragraph 1, 805L, 833E), under

Directors Hoover (FBI, #1) and Helms CIA, #8), and continuing under Director Wray (FBI, #8)

and Burns (a direct perpetrator individually named herein, now Director, CIA, #16), with

evidence to be provided subject to discovery. Among the myriad acts, violations, and injuries in

this complaint, Sandra Darlene Brewer, age 11, was administered a lethal dose of codeine and

aspirin in Federal Way, WA, deliberately inducing Reye Syndrome (paragraphs 417, 803, 805),

and died within 48 hours in a Pierce County, WA hospital in April 1970, at the hand of an

embedded medical doctor KOHLER (paragraphs 99d, 417, 418, 714, 740, 803C-D, 805B(i), H,

S, BS, 806B, 814B) working within or on behalf of defendant UNITED STATES illegal BRMT

bioweapon and bioweapon delivery system program (which then coexisted with defendants

ARMY Bioweapons Lab and CIA's illegal LSD drugging program MKUltra run by Dr. Sidney

Gottleib) while it was managed by defendant BREYER.

741. This corrupt police powers conspiracy continued at least throughout the tenure of

Lead Plaintiff and his extended family in King County, WA between 1955 and 2005 under the

series of defendant KCSD Sheriffs, much as the Pierce County WA Sheriff's Department

conspired with the Carbone crime family for decades in adjacent Pierce County, WA until the late

1970s, when Sheriff Janovich was indicted and convicted only after ATF uncovered the

Carbone/Pierce County Sheriff's department relationship and turned over its investigation to

defendant FBI, which had previously ignored Pierce County for years despite dozens of

numbers-racket, prostitution, and related tavern arson fires in and around the federal Fort

Lewis/McChord military bases.

742. Unlike Pierce County, where the US Attorney for Western Washington eventually

brought criminal charges and secured the conviction of Sheriff Janovich for that decades long

criminal racketeering conspiracy,  this corrupt conspiracy in King County, WA was never

prosecuted, even after the Lead Plaintiff visited and personally served an FTCA complaint letter

on the US Attorney for Western Washington office in 2005, never answered (paragraph 320),

because it involved illegal operations conducted by defendant UNITED STATES, DOJ, and other

federal departments and agencies as the principal conspirators in this criminal conspiracy against

the Lead Plaintiff and his extended family. This defendant DOJ fraudulent concealment pattern

has been repeated in the Eastern District of Massachusetts from 2005-2007, District of New

Jersey since at least 2007 (paragraph 320) and the Southern District of New York at least since

2018 (paragraph 320, 550-584), as well as in federal district courts in those two districts, and in

the District of Columbia (Appendix 1).

743. Defendant KCSD Deputy David REICHERT joined defendant KCSD as a deputy in

1972, around the same time his subordinate Gregory R. Boyle joined defendant KCSD.

REICHERT progressed through the ranks and was elected Sheriff from 1997 until 2005. Reichert

worked with Boyle as a trusted subordinate for many years as a patrol deputy, detective, task

force leader, and other assignments in the department. Boyle served under REICHERT as a

Green River Task Force detective which tracked the King County serial killer, then as the task

force leader, and later as Maple Valley Precinct Commander. Boyle was the first and second

husband of Lead Plaintiff's romantic partner and first wife Lynne. Boyle and Lynne shared two

daughters who were pre-teens when Lead Plaintiff first met them.

744. REICHERT's 1972-2005 KCSD tenure encompasses the period from Lead

Plaintiff's first employment as a teen in 1972 at the defendant FBI infiltrated and secretly co-

owned Larry's Market (paragraph 418), through his graduation from the BREYER/BRMT

corrupted defendant FWSD Decatur High School in 1973 (paragraph 716) to the end of

BREYER's tenure as Lead Plaintiff left graduate school in 1979, through Lead Plaintiff's introduction to Boyle's former wife Lynne Boyle, orchestrated by BREYER, HOPPER, and unknown others at the illegal cover company Deloitte Seattle (paragraph 609 HEXP-6), through Lead Plaintiff's marriage to Lynne and his support of Boyle's two daughters from pre-teen to college and departure from the family home, through the subsequent destruction of the Lead Plaintiff's marriage to (paragraph 609 HEXP-6) in 1987-88, soon after Boyle's two daughters had left home for college, and through his subsequent orchestrated fraudulent marriage to Jeanette (ARMY) orchestrated by CIA's BURNS, WATERS, and other defendants, and through the following years of depredations to and including the torture to suicide ideation sequence by FAUCI and others in the early 2000s, before REICHERT departed for Congress.

745. This 1972-2005 King County, WA time period also includes Lead Plaintiff's orchestration in 1988 (by defendants WATERS and BURNS, and unknown others) and subsequent fifteen years of the fraudulent marriage to Jeanette from 1990-2005 (paragraph 610 HEXP-7), when defendants ROSENBERG, FAUCI, PRAY, CALDWELL, and other defendants orchestrated his final divorce, psychological and financial destruction, and human trafficking to Boston, MA in December 2005.

746. Between 1979 and 2005, this time period in King County, WA, also included numerous severe injury to lethality attempts while he lived at NE 113rd Street in Redmond, WA with Lynne, at 149th Street, Kirkland, WA with Jeanette adjacent to the defendant BURNS' residence (paragraph 695 LETHL-2), which period included, without limitation, an entrapment operation at Stevens Pass (paragraph 621 RGTS-1) multiple fraudulent employments in defendant UNITED STATES illegal cover operations in King County (paragraphs 600-603 NSEC-1-3) as well as the financial, sales, litigation, and bank frauds used to destroy multiple

private enterprises of Lead Plaintiff in King County (paragraphs 639-641, 645, 649-653 RICO-1-3, 7, 11-15), and nearly the entire coercive psychological operations/torture/suicide ideation sequence by defendant FAUCI and co-conspirators in 2002-2005 (paragraphs 403-464, 490-520).

747. REICHERT was born in Detroit Lakes, MN, and knew and was known to Orland Howard, an associate of CORNWELL (defendant CIA) at PAN. Howard reported to Lead Plaintiff in 1993-94 while Lead Plaintiff was PAN Chief Operating Officer during those defendant UNITED STATES employment and compensation frauds against Lead Plaintiff, as conspired and perpetrated by defendants UNITED STATES, CIA, FBI and unknown individual defendants to be identified, paragraphs 450-451, 601 NSEC-2. Howard allegedly operated a railroad right-of-way recycling operations known as Northwest in Detroit Lakes, MN, which disposed of old telegraph lines from mainline railroad rights-of-way and was one of three businesses placed under the PAN umbrella for an alleged financing, (and CEO Cornwell, CIA) which was actually a defendant CIA/FBI fraudulent cover company operation used to sustain involuntary servitude and to pretext and entangle Lead Plaintiff in another of these defendants' series of fraudulent enterprises, financing, and cross-border activities with RCMP, CSIS, MI-5, MI-6, and London Metropolitan Police, as described at paragraph 601 NSEC-2.

748. REICHERT replaced Dunn in the US House of Representatives in 2005 and remained there until 2019. REICHERT's departure from defendant KCSD to Congress came less than 12 months before the Lead Plaintiff was human trafficked in December 2005 from King County, WA where he had lived from 1955-1961 and 1963-2005 to Boston, MA. Representative Dunn had conspired in her role in Congress, including by conducting the behavioral baseline interview in Washington, DC in support of the subsequent episodes of torture by FAUCI

described in paragraphs 604-607 HEXP-1-4, to support the involuntary servitude process on behalf of the Bush administration and defendant DOJ under Attorney General Alberto Gonzales.

749. As REICHERT began serving in Congress in 2005, DOJ AG Gonzales placed defendant ROSENBERG as US Attorney for South Texas briefly in 2005-2006 during the 2005 human trafficking before moving him to the US Attorney for Eastern Virginia so he could then act in the role of ESTABLISH General Manager as Lead Plaintiff was trafficked to Fort Lee, NJ from Boston in August 2007 for further illegal BRMT bioweapon and bioweapon delivery system abuse to and including torture and suicide ideations and coercive kidnapping for the explicit purpose of coercing dismissal of federal civil rights litigation in 2010-11.

750. The King County, WA based portion of the on-going FAUCI (UNITED STATES, NIAID) led illegal BRMT bioweapon and bioweapon delivery program and defendant FBI-led rights and racketeering operation against Lead Plaintiff was shut down in 2005. Principal elements of this late 2004-2005 shut-down year operations were (i) forced fraudulent spouse Jeanette moved out and divorce from Jeanette was completed, (ii) the forced sale of the NE 149th Street, Kirkland, WA residence occurred as the wrecking of Allegent, LLC was completed, (iii) remote BRMT inflicted torture sessions were undertaken at 149th Street, and (iv) then again at the 124th Avenue NE, Kirkland, WA apartment to which Lead Plaintiff was surreptitiously forced to relocate after the local illegal BRMT bioweapon and bioweapon delivery system psychological operations and security detail vacated that 84 unit apartment complex and a nearby office building on Slater Avenue NE, abandoning their government-owned undercover vehicles in the apartment building's parking lot. A brief stay at his sister's house in Edgewood, WA resulted in direction from a carefully placed faked family member there that he was not

welcome, also the moment of a cameo as Aunt Joanne by PBS media personality Judy Woodruff, which led to a decision to leave the area out of fear for his extended family's welfare.

751. As REICHERT served in Congress in 2005, Lead Plaintiff was human trafficked, by coercion and bait, to carefully pretexted Boston, MA (paragraph 276A, 320e, 46, 462-464). Defendants UNITED STATES, DOJ, FBI, USMS, CIA, ARMY, ROSENBERG, FAUCI, and unknown others, having lost local police powers support in King County, WA, had conspired and organized Lead Plaintiff's human trafficking in December 2005 to Boston, MA and 21 months of homelessness, and to a new round of torture (paragraph 605 HEXP-2), with the assistance of SUMMERS, formerly known as Roger Penner when he was briefly at Deloitte Seattle in the early 1980s, paragraph 463.

752. Defendant KCSD, including Boyle and REICHERT, acted illegally in conspiracy with defendant UNITED STATES, and with ARPAIO as MARICOPA SHERIFF from 1993-2017, to support this entire operation during Lead Plaintiff's tenure in King County, Washington, which continued until December 23, 2005, and during his frequent visits to Maricopa County, AZ to visit Boyle's daughter Debora (Lead Plaintiff's stepdaughter while married to Lynne) after the marriage to Lynne had been ended in 1988. Boyle is alleged to have died in Sun City, AZ in the later 1990s within the jurisdiction of defendant ARPAIO while MARICOPA SHERIFF, but that event of death from lung cancer has not been confirmed. Evidence of widespread fraudulent concealment of illegal acts by police powers operations has been and remains clear and apparent throughout the pre-discovery forensic review conducted to prepare this complaint.

753. Sue Rahr, who was first employed by defendant KCSD in 1979, succeeded Reichert as Sheriff in January 2005. Based upon her other record of service in police powers operations and subject to discovery, Rahr was plausibly unwilling to perpetuate the local police powers

conspiracy which had been continued under Reichert. According to the Seattle Times, Rahr

"*served 33 years with the King County Sheriff's Office and nine years as the executive director of*

*the Washington State Criminal Justice Training Commission. She co-authored "From Warriors*

*to Guardians — Recommitting American Police Culture to Democratic Ideals."* "

754. Rahr's election as Sheriff ended defendant KCSD protection of this conspiracy.

Defendant KCSD including, without limitation, REICHERT while sworn deputy, then Sheriff,

and Boyle while sworn deputy, had acted in conspiracy with defendant UNITED STATES (DOJ,

FBI, CIA, ARMY, FAUCI, ROSENBERG, and unknown others) to sustain operations of the

illegal BRMT bioweapon and bioweapon delivery program in its associated-in-fact enterprise

pattern of racketeering acts, rights violations, and other acts, violations, and injuries, from the

1950s through the 2005 human trafficking of Lead Plaintiff from King County, WA, and

thereafter with ARPAIO and MARICOPA SHERIFF.

755. Paragraphs 755 through 759 are reserved.

## E. Summary – Lead Plaintiff's Relationships With Federal, State And Local Governmental Defendants

760. Defendant UNITED STATES, DOJ, DOD, CIA, ARMY, NIAID personnel and

senior executives both directly perpetrated and supervised illegal BRMT bioweapon and

bioweapon delivery system field development test and deployment; constitutional, civil and

human rights violations; and racketeering acts, violations, and injuries; all in conspiracy with

state and local governments and their employees, in various states where Lead Plaintiff and other

plaintiffs have and do reside, work, worship, and conduct other activities of normal life. There is

a clear long-running pattern of an associated-in-fact enterprise pattern of racketeering acts and

violations of constitutional rights conspiracy, which these individual defendants have and do

manage and operate, and which criminal acts and civil injuries are systematically fraudulently

concealed and persistently not prosecuted by defendant DOJ since at least 1961 (paragraphs 550-584).

761. This pattern and the progression of promotions of these personnel from field operations to executive branch senior civil service positions, cabinet officer positions, to judicial, and to congressional roles demonstrates broad senior management awareness among these institutional defendants in various federal, state, and local roles identified herein, reaching back at least to human trafficking for defendant FBI Cointelpro evidence destruction in 1961 (paragraphs 414-416) through Lead Plaintiff's direct human trafficking by ARMY religious discrimination (defendant BREYER, Gary JACK) in 1968 at age 12 paragraph to the present time (Appendix 2 timeline and entirety of complaint narrative at paragraphs 1-37, 403-571).

762. A summary table of the various individual defendant roles, their varying institutional defendant employment and affiliations, and their relationships to the Lead Plaintiff, which are representative of these relationships with other plaintiffs of this class, in defendants' systematic pattern of constitutional rights violations and associated -in-fact enterprise pattern of racketeering acts, for which Congress and state statutes have assigned individual defendant liability at, without limitation, 28 U.S.C. § 2679(b)(2) and 42 U.S.C. §§ 1961-1968, as further described in paragraphs 267-306, follows:

| Individual Official | Executive Management Role, Governmental Employer (Known or Presumed) | Field Cover Identity And Role – paragraph reference (LP is Lead Plaintiff) | Notes: Security Backcheck – Operational and Personal |
|---|---|---|---|
| Janet Reno | **US Attorney General, DOJ** | Lakeland Elementary School LP sixth grade fellow student named Martha under teacher Simpson, 1966-67, FBI | Janet Reno back check conducted in 2014, including brother Charles Jackson (CIA), who was probably Bruce Zuelsdorf at Lakeland Elementary or Lakota |

| | | | |
|---|---|---|---|
| | | | Junior High School, Federal Way, WA in 1960s |
| Gary Jack | Unknown, ARMY | 1968 CA campground BRMT oxytocin incident with LP (paragraph 417) | Army buddy of LP father Don, same church (whether infiltrator or otherwise is unknown) |
| Unknown – Lani Fish, Dorothy Fuller | Unknown, DOJ | Lani Fish, Lakota Junior High School, also played french horn alongside LP 1968-70 and oxytocin incident paragraph 415. Later Dorothy Fuller 1988 – paragraph 610A HEXP-7 | Fuller was interim romantic interest who held LP between Lynne and Jeanette during this Burns (CIA/ARMY) marital wrecking and fraudulent forced marital community |
| Unknown – Brad red hair and mustache FBI at Larry's Market, later Mike Worthy | FBI | Clerk, Larry's Market, later Michael Worthy WSU MBA, appeared in FBI group photo with Weissman paragraph 99k | |
| Wolfgang Opitz | **WASH Staff Advisor to WA Gov. Locke, then WA Office Financial Management senior manager** | Terry Buckles WASH Washington Library Network employee while LP at GRCC paragraph 718. Later Wolfgang Opitz, WA Gov. Locke higher education advisor, OFM senior manager, paragraph 729 | |
| Stephen Breyer | ARMY Intelligence, illegal BRMT program manager, appellate Judge, then **Associate Justice US Supreme Court** | Fraudulent church Elder Snow, 1970-72, and supervisor of NE Tacoma fraudulent church, then Jack Sackville-West, Spokane, WA from 1974, paragraphs 21(i), 36 table | Stanfield Turner 1979 walk-by at NGA East Building Rotunda, then Jack Sackville-West post memorial service flight upgrade from Spokane to Seattle, shortly before BREYER was upgraded from First Circuit appellate court |

| | | | to SCOTUS, paragraph 725 |
|---|---|---|---|
| Neal K. Katyal | DOJ, **Acting Solicitor-General** | Shawn Morrissey, LP fellow student Decatur High School in 1970-71, part of BREYER BRMT team. | Injured in bareback fall from horse at Caudle farm during horse riding informal training with Grady by LP, injured in the same time period as the death of LP's sister Sandra and injury to her surviving twin sister Susan |
| Andrew Weissman | FBI, DOJ EDNY Asst US Attorney, **FBI General Counsel under Mueller** | Embedded in cooperative management at Associated Grocers during Larry's Market employment and wrecking, then PCC as GM during LP Board service | Part of BREYER BRMT team |
| Merrick Garland | FBI/USMS/DOJ, Judge DC Appeals Court, **US Attorney General** | Fellow undergraduate student Robert Mandich WSU 1974-76, plausibly fellow student Stuart Bettesworth, Decatur High School 1971-72, part of BREYER BRMT team | Bettesworth had an alleged relationship with Mariam Backman, a likely BRMT victim, see paragraph 717 for her other plausible identities across time |
| Laurie Dolan Chief of Staff to WA Gov. Gregoire, who was also WA AG prior to her service as Governor | WASH, **Chief of Staff to WA Gov. Gregoire,** also possibly on staff while **Gregoire was WA Attorney General** | Sackville-West family member by marriage to David, infant daughter Anne | |
| Hamid Bahari-Kashani | CIA asset, family closely associated with Shah of Iran and SAVAK secret police | Economics PhD graduate student, LP WSU office mate as CIA asset, served as pretext for LP's continuing national security entanglements | Richard Helms was CIA Director 1966-1973 while BRMT BREYER operated on LP at age 12 in 1968-73 and family. Helms was Ambassador to |

| | | by CIA, FBI at WSU. LP's family entangled since by ARMY and CIA in early 1950s, FBI cover company Pacific Paper Products 1961-63 | Iran 1973-76. LP assigned to co-office at WSU MBA with this CIA Iranian asset in 1978-79 |
|---|---|---|---|
| Gerald L. Thorpe | CIA field operations with Bannon, Blair | WSU MBA, later Deloitte Seattle, then to Deloitte Riyadh Saudia Airlines info tech project (CIA) | |
| John L. Zoulas | CIA field operations Caribbean, WSU MBA, then Westin Corporate Seattle - CIA | WSU MBA, then Westin Seattle | Pretexted LP into Queen Elizabeth II Seattle visit national security event 1983 |
| Lisa Desjardins | Media, now PBS Congressional Correspondent | Allene Sampson, while LP was WSU MBA student | Possibly reintroduced an emotionally frustrated Mariam Backman (from Decatur H.S. one year behind LP and former girlfriend of Stuart Bettesworth) as a Tacoma-area teacher seeking her M.Ed. at WSU during Summer 1978, whose other plausible identities are at paragraph 717. Sampson reappeared near Hisyasu's Kirkland, WA condo during Lead Plaintiff's several months stay there in the early 1980s |
| David Reichert/ Gregory R. Boyle 1979-2005 | **KCSD Reichert and** Boyle rose together from patrol to detective to Task Force to Precinct to **KCSD Sheriff Reichert, later Congressman Reichert** | **KCSD Boyle was** former husband of first wife Lynne, Reichert was immediate superior of Boyle throughout the King County based BRMT program operations, from 1979 to 2005 | Field operations from 1979-2005 in WA were terminated shortly after Reichert left for Congress. LP was trafficked to Boston within 12 months after Rahr assumed the KCSD |

|  |  |  | Sheriff role (paragraphs 743-752) |
|---|---|---|---|
| Joseph L. McGavick | WASH Staff to WA Gov. Spellman, then returned to WASH as Commissioner, WSLCB | Director, Deloitte Seattle |  |
| Steve Bannon | CIA field operations, EOP under Tump, media | Timothy C. Easton Manager, then Director, Deloitte Seattle | Served as Thorpe's field supervisor at Deloitte Seattle on Central America and Micronesia commercial cover projects, CIA |
| John R. Blair | CIA field operations | Director Deloitte Seattle, then to Honolulu to support Micronesia projects, then to | Served as Thorpe's field supervisor at Deloitte Riyadh Saudia Airlines info tech project, CIA |
| Roger Stone | CIA field operations, Republican Party consultant, political operative | David P. Moller Manager, Deloitte Seattle; then CEO, LazerSoft, employed LP as CFO | South Africa ATM project around 1983-85, then to LazerSoft around 1985, where LP was pushed and employed 1986-89 |
| Warren Wilkins | ARMY, WA ANG Colonel | Sales Representative, LazerSoft | Pre-positioned by Stone at LazerSoft before LP became its CEO when Stone removed |
| R. Kent Tarpley | Plausibly local government at City of Bellevue public utilities, DOJ/FBI/USMS embedded at LazerSoft | Plausibly City of Bellevue cover while LP at Deloitte Seattle, LazerSoft VP Operations under Stone and LP | Pre-positioned by Stone at LazerSoft before LP became its CEO when Stone removed |
| Stephen Waters | DOJ/FBI/USMS | Embedded as software contractor at LazerSoft 1987-89 | Conducted introduction of Jeanette, who became LP's second spouse |
| William Burns | BRMT program manager, CIA Director | J. Patrick Heffron, Director, Investor, LazerSoft |  |
| Chuck Rosenberg | FBI, US Attorney, Southern District TX then US Attorney Eastern VA, | Chick LeFevre, CEO, NutraSource. Placed in role by Weissman FBI. Later General Manager | Part of BREYER, BURNS, FAUCI BRMT teams |

|  |  |  |  |
|---|---|---|---|
|  | then DEA Acting Administrator, all at DOJ | Establish, Fort Lee, NJ where LP was trafficked from Boston, then terminated |  |
| Terry Byington | WASH Human Rights Commission staff, AeA, then WASH Lake Washington Technical College staff | AeA Executive Director | Provided physical picket duty adjacent to LazerSoft – Bothell 1987-89, and provided around 1999-2003 Higher Education Task Force support to LP to access WASH political establishment during LP tenure in King County, WA |
| Anthony Fauci | **NIAID Director, DHHS** | Alleged CNA Founder, present throughout LP's CNA employment | Persistently described Banner Bank Bothell as a financing source. LP's uncle worked in that same shadow bank unwittingly during the same time period |
| Lloyd Austin | ARMY General Officer, **Secretary of Defense** | CNA Project Manager on HomeGrocer.com Renton, WA distribution center around 1999 |  |
| Alexander Vindman | ARMY, Lt. Colonel, **National Security Council staff** | Jeanette blended family brother-in-law, 1992-2004 |  |
| Ari Melber | FBI, SDNY Asst. US Attorney, DOJ, MSNBC media anchor | Wes Lewis, husband of Theresa, Jeanette blended family brother-in-law 1992-2004, FBI |  |
| Lisa Rubin 92-04 | FBI, SDNY Assistant US Attorney, DOJ, MSNBC media commentator | Michelle Yarbrough, Jeanette blended family sister-in-law 1990-2004, FBI |  |
| Orland Howard | Unknown police powers affiliation, possibly KCSD | CEO, Advantage, a PAN subsidiary, reported to LP and Cornwell (CIA), 1993-94 | Same hometown, similar age to Reichert, then a senior KCSD commander. Likely an associate from small town |

| | | | Detroit Lakes, MN, or a KCSD deputy using this as cover legend |
|---|---|---|---|
| Gil Kerlikowski | Reported to Attorney General Reno while at DOJ, later EOP Drugs Czar, then Commissioner Customs and Border Protection (CBP) at DHS, then Seattle, WA Chief of Police | Seattle Chief of Police, crosswalk LP sightseeing once in Seattle while LP under continuing perpetual surveillance, around 2004-05. | Administered community policing grants used to sustain cooperation and support illegal BRMT and racketeering field operations in King County, WA under AG Reno |
| Raymond Sullivan | US Customs and Border Protection investigator and attorney, possible descendant of 1977-79 Ambassador to Iran Sullivan, who assumed that role and was recalled to DC prior to the hostage crisis. LP shared office space with CIA Iranian asset at WSU MBA 1978-79 | Private Attorney, International Trade | Operated as LP's Winnett counsel 2013-2020, introduced by Charles Jackson (RENO's brother) in December 2013, four months before Kerlikowski (then EOP Drug Czar) was confirmed to Commissioner, CBP in March 2014 |
| Robert Mueller | FBI, Assistant Attorney General Criminal Division 1990-93, US Attorney Northern District of CA, where he **supervised Caldwell between 1998-01**, then **FBI Director** 9/4/2001 – 9/4/2013 | PPG Industries headquarters building Pittsburgh security backcheck on LP conducted with Rosenberg in 2007 while LP fraudulently trafficked and employed at captive cover company Establish, Fort Lee, NJ<br><br>Rosenberg was previously embedded as CEO NutraSource by Weissman while at PCC. Rosenberg was chief geographic and employment trafficker, and repeat enterprise wrecker for FBI in WA and NJ | Supervised 13 years of FBI racketeering, including LP enterprise wrecking, and human trafficking, with WEISSMAN and ROSENBERG in field and later executive roles, both FBI. Mueller conspired with FAUCI, NIAID, CIA, ARMY who engaged in marital wrecking, torture, and other violations |

| | | Weissman served as General Counsel and other key functions under Mueller | |
|---|---|---|---|
| Darrell C. Pray | DOJ/FBI/USMS field agent | Embedded DOJ/FBI/USMS agent at CSC, FSA, NutraSource, Pacific Pipeline, Allegent | Long term associate of Rosenberg, FBI. Pray was supposed Allegent LLC co-owner in FBI ShipNow and TSL racketeering of LP's Allegent |
| Leslie Caldwell | DOJ EDNY Asst US Attorney with Weissman, SF Asst. US Attorney under Mueller, **Assistant Attorney General Criminal Division 2014-2017** | Intellectual Property Attorney, Seed & Berry | Falsely presented as Seed & Berry legal counsel to secretly co-owned Allegent LLC, concealing FBI direct action ShipNow multiple check frauds and Caldwell litigation fraud against LP interests in interstate commerce |
| Joseph Arpaio | DEA – Latin America, Arizona, then **Sheriff Maricopa County** | Greg Crossgrove, Produce Industry Consultant. Arpaio as MCSO Sheriff also plausibly provided venue for KCSD Gregory R. Boyle alleged relocation and death sequence | Frauds in interstate commerce with federal defendants and MCSO officers |
| FBI SACs, CIA, ARMY, NIAID, and state and local police powers in 44 states, Canada, UK, France, Switzerland from 1979 forward | Various SAC in numerous field offices coordinated local fraudulent sales call operations in TSL Boston office 2003-04 wrecking/trafficking sequence | Various FBI Field Offices in 44 states, 1979 to 2023 | Persistent racketeering frauds in career and enterprise wrecking and illegal surveillance. BRMT lethality and torture events, among others |

| Judy Woodruff | PBS former anchor. | Aunt Joanne December 2005 at sister's Edgewood, WA home | Cameo during faked sister push operation by Rosenberg, FBI in December 2005 trafficking to Boston |
| Tom Keene | Bloomberg Media former anchor | Michael Callahan, Dominick and Dickerman Managing Director | Fraudulent Dominick investment banker in interstate commerce frauds involving fake investors and fake Walmart organic produce sales proposals |

763. Paragraphs 763 through 765 are reserved.

**State and Local Government Co-Conspirator Employee Crossover Employment - Adverse Impacts On Lead Plaintiff and Other Class Members**

766. Defendant UNITED STATES, its cover entities, and corporate entities with embedded defendant UNITED STATES personnel, and state and local governmental departments and agencies, operating within and across state lines in Washington and Oregon, and subject to further discovery as to specific dates, times, and roles, employed other members of Lead Plaintiff's extended family in defendants' associated-in-fact enterprise pattern of racketeering acts and constitutional rights violations including, without limitation, in their abuses using the illegal BRMT bioweapon and bioweapon delivery system for illegal human subject medical experiments without consent, biochemical hijacking, human trafficking, murder, and other racketeering and rights acts, violations and injuries against these plaintiffs and in both legal operations and in their illegal spying, surveillance, and rights and financial wrecking operations against other parties, without limitation, as follows:

(i) multiple Lead Plaintiff romantic interests and partners, and both spouses, paragraphs 608-614 HEXP-5-11, who were subjected to illegal BRMT bioweapon and bioweapon

delivery system direct manipulations and illegal human experimentation by defendant UNITED STATES.

(ii) maternal grandparents Don and Madeleine Thompson - who both worked at the cooperative Farmer's Union Central Exchange (FUCE, then Cenex) in Auburn, WA, and Don for interstate trucking as an owner-operator and as a driver for a hazardous materials tanker trucking operation, Mitchell Brothers near Portland, OR, as well as two years in northern Montana managing CENEX cooperatives in Shelby, Cutbank, and Valier, MT, the latter most probably related to defendant FBI national security operations related to ICBM and missile defense sites in that region

(iii) aunt Delores Thompson - who worked at the cooperative FUCE (Cenex) in Auburn, WA, and for defendant WASH at the Buckley, WA campus of Rainier School

(iv) aunt Joanne Brewer - who worked for Social Security Administration in Lakewood, WA

(v) uncle Bruce Brewer – who worked as an appraiser in the national security zone Hanford Nuclear Reservation after defendant ARMY service, and at the shadow bank Banner Bank Bothell

(vi) father's cousin Larry Brewer– whose grocery store was secretly owned in part by defendant FBI and financially destroyed during WEISSMAN's tenure embedded at Associated Grocers, the regional grocery for independent supermarkets based in Seattle, WA

(vii)      sister's husband Jerry Hansen – Boeing, in its model shop which handled classified shapes and parts for wind tunnel testing and similar purposes

(viii)      brother Jeff Brewer – who worked for a US military demolition contractor at various facilities in and around Puget Sound, WA

(ix) father Don Brewer - in Boyd's Coffee and in Miller-Cascade (a Stevedoring Services of
America affiliate or subsidiary owned by the Smith family and operated at the time by
Ricky Smith) which acquired Pacific Gamble Robinson in May 1986 (and thereby the
embedded defendant UNITED STATES accounting staff member Christensen, who also
worked with defendant ROSENBERG), which was consolidated as Food Services of
America (FSA).

**Entities With Known Embedded Agent Which Employed Class Members**

767. Lead Plaintiff's father Don was employed by Miller-Cascade as a coffee route sales
representative, which consolidated with Pacific Gamble Robinson (where embedded federal
officer Christensen had already been working prior to father Don's employment there, and where
Lead Plaintiff, Don's son, had been recruited for a position after his undergraduate program at
defendant WSU in 1977) into FSA. At some point, defendant UNITED STATES acted
surreptitiously through an embedded human resources manager to orchestrate FSA hiring of
embedded federal officer PRAY from CSC, where he had been embedded on the CSC Alaska
Retirement Systems information services contract in Juneau, AK. Pray installed IBM System 36
minicomputers and software systems at FSA headquarters and its branch locations. As FSA
employed PRAY, Christensen, and a CEO whose name is not recollected, the company began
experiencing financial difficulties. That CEO was fired, along with Pray and other senior
managers, by principal owner Ricky Smith in a manner characterized by Pray as a "hostile
takeover." That former FSA CEO then went on to the Portland unit of grocery wholesaler
McLane as Smith replaced the FSA management team. Embedded federal officers PRAY and
CHRISTENSEN then joined defendant ROSENBERG at NutraSource to continue the illegal
spying and wrecking operations against organic and natural foods buying clubs, small
businesses, and PCC, which continued well beyond defendant WEISSMAN's initial organization

of NutraSource and his subsequent departure from PCC as its illegally embedded General
Manager (paragraphs 11, 425-436).

768. Lead Plaintiff had himself previously been recruited to Pacific Gamble Robinson as
a regional food service sales representative for southwest Oregon in 1977 while a defendant
WSU undergraduate, but declined to accept the position. Lead Plaintiff served on the Boards of
NutraSource and PCC while employed at illegal cover company Deloitte Seattle. Lead Plaintiff
served on the Board of illegal cover company Pacific Pipeline with defendant ROSENBERG
then as Pacific Pipeline COO and employed CHRISTENSEN and PRAY at Pacific Pipeline.
Lead Plaintiff also worked at CNA as defendant FAUCI used shadow cover bank Banner Bank
Bothell, which was then employing Lead Plaintiff's uncle during the same time period.

769. Lead Plaintiff and defendant PRAY formed Allegent, LLC, and defendant PRAY
used another shadow bank in Bellevue name not recollected to fund the illegal co-ownership of
Allegent by PRAY, the embedded federal officer in this repeat of the associated-in-fact enterprise
pattern of racketeering acts. Allegent was financially wrecked in the course of sequence of
defendant FBI financial and litigation entrapments and involuntary servitude and forced labor
with co-conspirators CALDWELL and FAUCI. Allegent, LLC had been legally organized by
attorney Michael Larson, who also managed the ShipNow and CNA litigation against those
entities, which were actually cover entities and illegal operations of defendant UNITED STATES
used by defendants DOJ, FBI, USMS, CIA, ARMY, and who (Larson) had been referred to Lead
Plaintiff by another embedded federal agent, John C.T. Conte, who had befriended the Lead
Plaintiff in 1987 when Lead Plaintiff was seeking investment financing for LazerSoft.

770. This repeat of the associated-in-fact enterprise pattern of racketeering acts at
Allegent, LLC, directly links this pattern of racketeering acts back to Lead Plaintiff's original

employment at Larry's Market, Federal Way, WA, co-owned by Lead Plaintiff's father's cousin Larry Brewer in the 1970s, and financially wrecked while secretly co-owned by defendant FBI through an FBI agent who posed as the supermarket's produce manager and business partner. Larry's Market employed a red-haired and mustached clerk, who was later known to Lead Plaintiff as Mike WORTHY at defendant WSU MBA graduate school and thereafter. WORTHY (paragraphs 99k, 418, 422, 493, 726, 762 table, 770, 805AG, AK) appeared in a defendant FBI group photo with WEISSMAN in the home office background behind defendant WEISSMAN during an MSNBC Ari MELBER interview in late Summer or Fall 2023.

**Other Lead Plaintiff Related Class Members' Involuntary Servitude Employment Patterns**

### A. First Spouse Lynne's Employment Pattern

771. Lead Plaintiff met his first spouse, Lynne Boyle, on the Deloitte Seattle financial audit of Safeco, where he was assigned as an auditor before joining the management consulting practice. Lynne had completed her accounting degree at the University of Washington in June 1979 and joined the audit staff as a staff auditor. She was employed and promoted normally for three to four years on a series of financial audits. She joined US West New Vector Group, the cellular telephone spin-off from AT&T a few months after the Lead Plaintiff had trained the accounting manager during the initial start-up of the spin-off in Bellevue, WA. Her employment there soon after Lead Plaintiff's training sessions is now understood to be an element of the conspiracy, not a coincidence. It was another step in the illegal BRMT bioweapon and bioweapon delivery system development process, as local BRMT bioweapon devices were illegally concealed in cellular telephone equipment boxes (full duplex transceivers) installed in both family vehicles by SWAIN, the installation shop then used and later purchased by US WEST New Vector Group. These and other locally installed systems were used to trigger various illegal human medical experiments including, without limitation, the Stevens Pass entrapment

attempt (paragraph 621 RGTS-1), the Porteau Cove double murder attempt (paragraph 694
LETHL-1), and the SWAIN marital breakup (paragraph 609 HEXP-6).

### B. Second Spouse Jeanette's Employment Pattern

772. Lead Plaintiff met Jeanette, his fraudulently orchestrated and coerced second spouse
(coerced bisexual ARMY active duty deferred military criminal prosecution status), while she
was temporarily employed as a receptionist at First American Title Insurance Company (FATCO
Bellevue), Bellevue, WA in 1988, during a defendant UNITED STATES operation orchestrated
by defendants FBI, CIA, ARMY, WATERS, BURNS and unknown others. Soon thereafter,
Jeanette transitioned from temporary contract employees status and became permanently
employed at FATCO Bellevue, working alongside embedded co-worker Laurie Vanderberry, the
wife of Kerry Vanderberry, then known to be a defendant FBI agent on the bank robbery squad in
the Seattle field office. Jeanette frequently mentioned her difficulty in engaging in role playing
sessions in office training. This became an apparent psychological inhibitor, most probably
actually a form of illegal BRMT bioweapon and bioweapon delivery system mental torture by
defendant BURNS (the cross-street resident on 149th Street), to her continued employment with
First American in 1994, sometime after a November 1993 family bankruptcy caused by
defendant UNITED STATES destroying Alliance, paragraph 610 HEXP-7, 649-651 RICO-11-13.

773. Jeanette left First American and operated as an independent ACT software
consultant from around 1994, during which she experienced long hours and frequent bouts of
mental confusion by illegal BRMT bioweapon and bioweapon delivery system hijacking in these
defendant CIA, ARMY, NIAID, BURNS, and FAUCI illegal human subject biomedical
experiments. During this period, she worked with a variety of clients including her former
FATCO Bellevue client real estate sales agents and brokers, which included illegally embedded
federal police powers personnel, as well as Key Technologies in Walla Walla, WA, where Lead

Plaintiff's cousin Burt and family were under the surreptitious surveillance, and most probably

illegal BRMT bioweapon and bioweapon delivery system brain biomanipulations, which were

also most probably being used in abuse of the Lead Plaintiff's uncle Bruce's family in the Tri-

Cities, WA region (Hanford Nuclear Reservation national security zone). Jeanette also worked at

Alaska Brewing in Juneau, AK, and with the Kemper Freeman real estate development company.

In each of her clients, she dealt with sales contact databases which could easily be illegally

accessed by defendant FBI, USMS and other federal police powers and intelligence operations to

engage in illegal remote spying on those companies and those companies' own customers

through accessing Jeanette's database downloads for her customization projects undertaken for

those clients.

### C. Father Don's Employment Pattern

774. Lead Plaintiff's father, Don, worked at Nelson Lumber and Hardware as a part-time

job, then full time after high school in Enumclaw, WA until drafted during the Korean War by

defendant Army where he served as a medical corpsman, returned to Nelson Lumber and

Hardware, then went to Fibreboard, Sumner, WA, followed by employment in defendant FBI's

captive cover company Pacific Paper Products, Tacoma, WA, (1961-63) unwittingly assisting

FBI to destroy evidence of its Cointelpro program violence in northern and then southern

California; followed by defendant FBI handling which continued at Smith Brothers Dairy, Kent,

WA as a route deliveryman, where he later purchased a Des Moines, WA area delivery route from

Alan Fisher, as Earl Keller, his defendant FBI handler posed as a fuel oil salesman. BREYER,

defendant CIA/ARMY's handler was pre-positioned as Snow in the late 1960s and was the

fraudulent Sunday home church elder where the Lead Plaintiff's family was abruptly reassigned,

together with the reassignment to northeast Tacoma for Wednesday night services immediately

after Sandra's 1970 death. The family was then reassigned again around 1972 to another set of
home churches.

775. Following defendants BREYER, CIA, ARMY, FBI, DOJ, and UNITED STATES
(and unknown others), Summer 1974 oxytocin family destruction excursion (paragraph 415),
Don sold his dairy products route, and was then illegally handled through Boyd's Coffee, which
was followed by employment at Miller Cascade, the subsidiary or affiliate of SSA consolidated
with PGR to form FSA, where federal agent Christensen was illegally embedded as a result of
the PGR consolidation into FSA. Don then purchased and rehabilitated an abandoned poultry
farm, which he later sold, then moved to a South Hill, WA home, where he semi-retired,
returning to part-time working at Smith Brothers Dairy, Kent, WA, as a delivery route relief
driver, before moving again in South Hill, WA, to the current home he shared with Lead
Plaintiff's mother until his death.

776. At his death, Don was suffering from severe hearing loss and sight loss from
macular degeneration, plausibly related to illegal human medical experiments on eyesight, which
Lead Plaintiff has experienced through (i) lengthy periods of repeated torturous headache
sessions in Boston, MA and Cliffside Park, NJ (paragraphs 602C NSEC-3, 605A-C HEXP-2)
which effect different parts of the visual system and (ii) through flattened (non-stereoscopic)
images directly placed by illegal BRMT bioweapon and bioweapon delivery system hacks upon
either (a) his lateral geniculate nucleus (most plausibly only one of the two as the image was
non-stereoscopic) the two visual processors between the eyes, or (b) on his visual cortex in the
brain when the precursor 1549 image was placed in the weeks leading to the January 15, 2009
US Airways 1549 Hudson River emergency landing, as related at paragraphs 602Z, 606B. As he

was going blind and deaf, Don elected not to treat a pre-leukemia condition, which led to his death within about six weeks on October 4, 2015.

### D. Uncle Bruce's Employment Pattern

777. After his defendant ARMY service, Lead Plaintiff's uncle Bruce was employed by Walla Walla Federal Savings and Loan, which failed during the 1980s S&L crisis. Soon thereafter, unable to find other work, Lead Plaintiff's uncle Bruce became an independent real estate appraiser, then moved from Walla Walla, WA to Tri-Cities (Richland, Kennewick, Pasco, WA) in the mid-1980s. Tri-Cities was built around federal government operations at Hanford Nuclear Reservation, where weapons-grade uranium was produced during World War II. Weapons grade plutonium production began in the 1950s. Hanford Nuclear Reservation operated until 1965-1987 as the nuclear reactors used in production of weapons-grade plutonium were successively shut down. The region hosted defendant FBI national security counterintelligence operations and agents.

778. Bruce was then hired by Banner Bank, Bothell, WA in the 1990s. This shadow bank, hidden under the name of the regional Banner Bank, was used by defendant UNITED STATES to launder the funds which subsidized loss leading cover operations of CNA Industrial Engineering, where Lead Plaintiff worked from 1996-2002. Defendant FAUCI frequently referenced Banner Bank Bothell in his discussions with Lead Plaintiff regarding the funding of CNA operations, most probably to backcheck operational security to determine if the unwitting Lead Plaintiff had made any connection with the parallel manipulation of the uncle Bruce who worked at Banner Bank Bothell. Bruce retired from Banner Bank Bothell back to Walla Walla, WA, his old college town and his wife's hometown, where his son Burt and his wife were raising Audrey, their oldest child, and other grandchildren, murdered at age 18 in an illegal BRMT

bioweapon and bioweapon delivery system assassination field test of tools of violence in
September 2011, described at paragraphs 803, 805.

### E. Maternal Grandparents' Employment Pattern

779. Lead Plaintiff's grandfather Don Thompson was an Enumclaw dairy farmer in the
1950 who sought outside employment at Farmer's Union Central Exchange Cooperative (FUCE,
now CENEX), Auburn, WA where he was promoted to Manager until ousted by the local coop
Board, which plausibly was coopted by defendant FBI embedded agents, then became an
independent trucker, then was plausibly trafficked by defendant FBI to manage CENEX coop
location in Shelby, Cutbank, and Valier, MT, for about two years, most probably during national
security investigations, then returned to Auburn, WA and employment at Mitchell Brothers, a
hazardous material line haul trucking company, then retired.

780. The coopting of coops by defendant UNITED STATES with no plausible basis for
their legal presence in these private sector operations, which defendant FBI has sometimes used
to destroy other private enterprises and the cooperatives themselves, is a clear pattern of
racketeering enterprise conduct, based upon Lead Plaintiff's own direct experience at PCC,
Seattle, WA and its affiliate, NutraSource. Further, Lead Plaintiff's grandmother complained of
the same form of episodically recurring plausibly BRMT induced intense headaches after
retirement and return to Auburn, WA, as the Lead Plaintiff has experienced during documented
torture episodes described at paragraphs 602C, 605A-C, indicative of the scope and duration of
the extended family's experience with the illegal BRMT bioweapon and bioweapon delivery
system, illegal human subject experimentation, extent and duration of human trafficking, the
overall patterns of associated-in-fact enterprise racketeering acts and conspiracy, and the
conspiracy against rights by these defendants.

**F. Other Class Member Employment Patterns Subject to Discovery**

781. Other extended family members and romantic partners have similar distinctive employment patterns, but the scope and duration of those patterns is not well-known at the time of the preparation of this complaint and are subject to discovery. These employment patterns are representative of the associated-in-fact enterprise pattern of defendant UNITED STATES departments and agencies, and their co-conspirator state and local government conspiracy and complicity to support and sustain systematic violations of constitutional and the associated-in-fact enterprise pattern of racketeering acts from at least 1961 to the present time, all in violations of, without limitation, our Constitution, of constitutional, civil, and human rights, of 42 U.S.C. Chapter 21 Civil Rights and 21B Religious Freedom Restoration Act, of 18 U.S.C. §§ 1961-1968 and the directly related associated-in-fact enterprise pattern of racketeering acts, violations, and injuries against this class of plaintiffs.

782. Paragraphs 782 through 784 are reserved.

**END OF FACTS.**

[Intentionally left blank.]

## CLAIMS FOR RELIEF

785. Acts, violations, and injuries to these plaintiffs are identified in accordance with the form and method of constitutional and statutory violations in this section. The legal authority for the specific remedies for these constitutional and statutory claims, and the legal forms that remedies can take are identified in paragraphs 899 through 916. Defendants have and do act, in their series of conspiracies and attempts to defraud, entrap, incriminate, discredit, disable, and/or destroy the Lead Plaintiff, as particularly cited and described in each subcount in the table at each paragraph 801 through 854, both within and without the territory of these states and of the United States. This long-running, comprehensive, and systematic pattern of associated-in-fact enterprise racketeering acts has and does sustain the fraudulent concealment of (i) the illegal BRMT bioweapon and bioweapon delivery system, of (iii) the associated-in-fact illegal enterprise itself, of (iii) continuing obstructions of justice both by acts and by willful blindness, and (iv) perpetuate the destruction of evidence of prior criminal acts, and of acts, injuries, and violations of constitutional, common law, and statutory Privileges and Immunities, by these defendants, all directed without legal cause under color of law at this specifically targeted  class of plaintiffs.

786. In accordance with 18 U.S.C. § 1962(d), 28 U.S.C. 2679(b)(2), and, without limitation, 18 U.S.C. §§ 1961-1968, 42 U.S.C. §§ 1983, 1985, 1986, and the *First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth,* and *Fourteenth* Amendments to the Constitution. and relevant case law cited in paragraphs 250 through 345, all defendants share direct, vicarious, and joint and several liability for each and every claim for the acts, violations, and injuries cited in this complaint, which taken together characterize this durable associated-in-fact enterprise and conspiracy. Liability attaches to each and all of these defendants, whether named herein or not

yet known, as to all the acts, violations, and injuries herein, as they have and do engage and

conspire to engage in one or more of the following:

(i)  Direct commission of a substantive act, violation or injury of rights, whether or not under

a specific statute;

(ii) Conspiracy to commit a substantive act, violation or injury – in accordance with

*Pinkerton v. United States*, 328 U.S. 640 (1946), co-defendants in a conspiracy are liable

for acts, violations, and injuries committed by their co-conspirators, when those co-

conspirator violations are reasonably foreseeable and committed to further the

conspiracy;

(iii) Aiding and abetting a substantive act, violation or injury - any form of concerted

action(s) knowingly rendered to the principal perpetrator(s) as substantial assistance in

the absence of an agreement, given when the aider and abettor has knowledge of the act,

violation, or injury, whether rendered before, during, or after the act, violation, or injury,

to these plaintiffs.

787. The acts and circumstances alleged in this complaint establish that defendants have

and do both act and conspire with each other and with others to accomplish the objectives

detailed in this complaint, including through the following agreements including, without

limitation, through tacit and implicit agreements:

(i)  To sustain acts and a pattern of acts, violations, and injuries which have and do

continue to damage and injure the lives, business, business prospects, and the

business and personal financial, real, and intangible property of the Lead Plaintiff and

other plaintiffs, regardless of their attributed motive;

(ii) To sustain acts and a pattern of acts, violations, and injuries which have and do

damage the business, business prospects, and the personal financial, real, and

intangible property of the Lead Plaintiff and other plaintiffs, so as to suppress or

eliminate Lead Plaintiff's ability, and other plaintiffs' ability, to act to expose the

defendants' prior and planned criminal actions and rights violations and those by

other of the defendants;

(iii) To fraudulently conceal and explicitly prevent the Lead Plaintiff and other plaintiffs

from learning the identities of the defendants who act under color of law in violation

of their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

788. The acts, facts, and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

defendant's intentional participation in the furtherance of the agreement. The acts, facts, and

circumstances alleged in this Complaint establish that defendants conspired with each other and

others to accomplish the objectives and injuries detailed in this Complaint including, without

limitation, through their agreements as detailed in the subcounts at paragraphs 600-710 herein.

789. As a result of each act committed, and in furtherance of the conspiracies identified,

each plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above,

including, without limitation, in both in-state and interstate commerce.

790. Defendants, both known and unknown, acting under color of law are directly liable

for the violations of federal and state statutes as specifically cited at each paragraph 801 through

854 while acting outside the scope of their agency, as will be established by facts, some of

which can only be established through discovery, and proven at trial.

791. Discovery will provide further specific evidence relevant to each noted incident and more incidents of such acts, both of acts,   violations, and injuries survived by the targeted plaintiffs and those likely not survived by members of this class of plaintiffs. These acts, violations, and injuries are representative of those perpetrated by these defendants on this class of plaintiffs.

792. All defendants are vicariously liable for the violations of violations of federal and state statutes as specifically cited at each paragraph 801 through 854, caused and created by their agents who acted within the scope of their agency in accordance or agreements with other defendants, to cause and create injury to the Lead Plaintiff and/or other members of this class of plaintiffs.

793. *All defendants:* Defendants' specific responsibilities for each of the 54 specific claims for relief herein are difficult for plaintiffs to establish except at trial due to the institutional and legal strictures which relate to undercover police powers operations and the clear and readily apparent willingness of various police powers agencies to violate even those extremely advantageous legal strictures. Assignment of specific liability and responsibility to entity and individual person defendants acting outside the law, and acting outside the scope of their agency in the case of those who are police powers officers and agents, is extremely difficult for these plaintiffs at this time given (i) the long-running pattern abuses of civil rights by these agencies (which are also well documented in the public record), (ii) by the systematic abuses by electronic means using both (a) ordinary electronic devices and (b) the illegal development and deployment of the BRMT bioweapon and bioweapon system under the deep cover of color of law abuse of the state secrets privilege against US persons, just as defendant CIA did for over twenty years in MKUltra. This pattern of racketeering acts is further complicated by the police powers and intelligence agency abuses of cover legends and identities across time among deep

cover police powers and intelligence officials who have acted within and without their scope of agency, and by their willful obstructions of justice including, without limitation, destruction of evidence before and as this complaint was prepared, witness tampering, retaliation, intimidation, and lethality threats and attempts during the forensic analysis period beginning in 2021 to unmask this unprosecuted criminal conspiracy under color of law.

794. *All governmental defendants:* The acts, facts, and circumstances alleged in this Complaint demonstrate the following:

(i) In the exercise or failure to exercise their duties under law, defendants know, knew, should know, or should have known, that (a) their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or (b) is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or (c) would or will play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

(ii) Defendants at all governmental levels, both with and without intelligence, military, and police powers departments and agencies have and do act under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the rights of the Lead Plaintiff and/or other plaintiffs while acting within and outside the scope of (a) their individual duties; and/or (b) their supervisory duties to properly direct their subordinate(s); and/or (c) pursuant to (ca) an expressly adopted official policy or (cb) a widespread or longstanding practice or custom of the defendant organization; and/or (d) while engaged in acting as a final policymaker, (da) had and/or have final policymaking authority, and (db) knew of and specifically made a deliberate choice to approve the

act or policy; and/or (e) the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or (f) the defendant organization was deliberately indifferent to (fa) the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and (fb) the known or obvious consequences of its failure to train its employees adequately.

795. *Defendant UNITED STATES:* Defendant UNITED STATES, its departments, and its agencies, are the originating perpetrators of all injuries incurred by these plaintiffs and bear primary original responsibility for the associated-in-fact enterprise these defendants initiated and have perpetuated for over fifty-six years in usurpations of power not granted and authority never permitted to be authorized in these violations of our Constitution. All defendants are culpable and liable for the entire associated-in-fact enterprise under law, and no defendant is released from any liability for any claim as parties to this associated-in-fact enterprise.

796. *Individual defendants who are or were governmental employees:* Claims for relief incorporate, without limitation, constitutional rights claim(s) made against individual defendants who are or were federal government officials and/or employees during their commission or negligent supervision during commission of the illegal acts herein, and /or abused their possession of information resulting from that employment, and their relationships with co-conspirators, to commit and/or conspire to commit these acts, violations, and injuries. A government provided defense under 28 U.S.C. § 2679(c), is consistent with Congressional intent ONLY for actions brought under the Westfall Act 28 U.S.C. Chapter 171 – Tort Procedure §§ 2671-2680. NONE of these claims are brought under the Westfall Act 28 U.S.C. Chapter 171 – Tort Procedure §§ 2671-2680. These former government officials are NOT entitled to a government provided defense, as they are individual defendants who bear the direct and total

personal responsibility and liability for constitutional claims against them in accordance with Congressional intent under 28 U.S.C. § 2679(b)(2).

797. The acts, violations, and injuries which comprise this action (a) exceed the authority available to any government official or employee under our Constitution to sustain any defensible claim of "immunity" (paragraphs 255-306) and, (b) are clearly justiciable directly against this class of individual defendants as demonstrated by (i) Congressional intent at 28 U.S.C. 2679(b)(2) which authorizes:

"civil action against an employee of the Government (A) which is brought for a violation of the Constitution of the United States, or (B) which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized"

and by (ii) Congressional intent in PL 91-452 (RICO) October 1970 that 18 U.S.C. §§ 1961-1968 be liberally construed to effect its intended purpose:

"(a) The provisions of this title [enacting this chapter and amending sections 1505, 2516, and 2517 of this title] shall be liberally construed to effectuate its remedial purposes"

and by (iii) our Constitution which expresses the constitutional intent of our founders to protect our "unalienable rights" at the:

First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, and Fourteenth Amendments,

which constitutional claims all arise herein throughout all the claims at paragraphs 801 through 854, so these current and/or former federal government officials and/or employees may not rely on defendant DOJ for their individual defense and must provide for their own defense in this civil action.

798. Constitutional rights claims are made against these defendants for their violations of the:

(i)     *First Amendment right* to freedom of religion, as the originating cause of these

acts, violations, and injuries was and is defendant UNITED STATES, DOD, ARMY, CIA,

DOJ, and departments and agencies' discrimination against this class of plaintiffs in their

free choice and exercise of religion, whether by their personal choice or that of a

forebear,

(ii)     *First Amendment right* to peaceably assemble with persons of their choice in the

time, place, and manner of their choosing,

(iii)     *Third Amendment right* to be free of intrusions into their homes, families, and

lives by soldiers, except in the time and manner of their own choosing,

(iv)     *Fourth Amendment rights* to be secure in their persons, papers, houses, and effects

from government intrusions, searches, and seizures absent reasonable suspicion, probable

cause, and the securing of a warrant for such intrusions, searches, and/or seizures,

(v)     *Fifth Amendment rights* to quiet enjoyment of life, liberty, and property without

undue intrusions or abuses under color of law by government acting for its own purposes

when it has no constitutional and legally compelling governmental purpose,

(vi)     *Eighth Amendment right* to be free of all cruel and unusual punishments at all

times,

(vii)     *Ninth Amendment rights* to privacy and quiet enjoyment of life, family, friends,

property, and shared national resources,

(viii)     *Thirteenth Amendment right* to be free at all times from involuntary servitude,

unless duly convicted,

(ix)     *Fourteenth Amendment right* to equal protection of the laws without regard to

religion, personal and political beliefs, or practices.

Each and every claim for relief herein arises from a violation of the constitutional rights of plaintiffs by current or former government officials and employees, who further have vicarious liability for all claims through the conspiracy they have and do promulgate and perpetuate against these plaintiffs both severally and jointly with others. Each and all these claims at paragraphs 801 through 854 include acts, violations, and injuries perpetrated directly by and/or in conspiracy with other defendants, and are brought under federal statutes including, without limitation, the RICO Act, the KKK Act, and civil rights statutes, as well as state statutes, as cited in each claim. These constitutional rights claims are specifically applied to each and every one of the 54 claims for relief herein, and are specifically asserted and incorporated by reference in each paragraph 801-854, and throughout this complaint, by reference as follows:

| Constitutional Rights Claims By Amendment | 1 | 3 | 4 | 5 | 8 | 9 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | X | X | X | X | X | X | X | X |
| 802 Terrorism - Violent Crimes in Aid of Racketeering Enterprises | X | | X | | X | X | X | X |
| 803 Murder | X | | X | | X | X | X | X |
| 804 Attempted Murder | | | X | X | X | X | | X |
| 805 Conspiracy To Murder | X | | X | | X | X | X | X |
| 806 Manslaughter | | | X | X | X | X | | X |
| 807 Attempted Manslaughter | X | | X | | X | X | X | X |
| 808 Kidnapping | X | | X | X | X | X | X | X |
| 809 Human Trafficking | X | | X | X | X | X | X | X |
| 810 Torture – Mental and Physical Abuse | X | | X | X | X | X | X | X |
| 811 Conspiracy to Torture | X | | X | X | X | X | X | X |
| 812 Assault | X | | X | | X | X | X | X |
| 813 Aggravated Battery | X | | X | | X | X | X | X |
| 814 Soliciting Crime Of Violence | X | | X | | X | X | X | X |
| 815 Interference With Interstate Commerce By Threats Or Violence | X | | X | X | X | X | X | X |
| 816 Tampering With Witness | X | X | X | | X | X | X | X |
| 817 Tampering With Witness - Evidence | X | | X | | | X | | X |
| 818 Retaliating Against Witness | X | X | X | | X | X | X | X |
| 819 Tampering With Consumer Products | X | | X | | X | X | X | X |
| 820 Involuntary Servitude | X | X | X | X | X | X | X | X |
| 821 Peonage | X | | X | X | X | X | X | X |
| 822 Forced Labor | X | | X | X | X | X | X | X |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 823 Sexual Abuse | X | X | X | X | X | X | X | X |
| 824 Frauds - Mail | X | | X | | X | X | X | X |
| 825 Frauds – Wire | X | | X | | X | X | X | X |
| 826 Frauds - Computer Access Devices | X | | | | | X | X | X |
| 827 Fraud And Related Activity - Computers | X | | X | X | | X | X | X |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | | X | X | | X | X | X |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | X | | X | X | | X | X | X |
| 830 Property Rights and Illegal Takings | X | X | X | X | X | X | X | X |
| 831 Racketeering - Monetary Benefit From Unlawful Activity | X | | X | X | | X | X | X |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | X | | X | X | | X | X | X |
| 833. Civil Rights - Free Exercise Of Religion | X | | | X | X | X | X | X |
| 834 Posse Comitatus - Use Of Military To Violate Constitutional Rights | X | X | X | X | | X | X | X |
| 835 Involuntary Servitude | X | | X | X | X | X | X | X |
| 836 Intentional Discrimination in Employment | X | X | X | X | X | X | X | X |
| 837 Peonage | X | | X | X | X | X | X | X |
| 838 Conspiracy Against Rights | X | X | X | X | | X | X | X |
| 839 Deprivation of Rights | X | X | X | X | | X | X | X |
| 840 Deprivation of Rights Under Color of Law | X | X | X | X | | X | X | X |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | X | X | X | X | | X | X | X |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | X | X | X | X | | X | X | X |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant. | X | | X | X | | X | X | X |
| 844 False Information and Hoaxes | X | | X | | | X | X | X |
| 845 Neglect To Protect - Failure To Protect | X | X | X | X | X | X | X | X |
| 846 Neglect To Protect - Failure To Supervise | X | X | X | X | X | X | X | X |
| 847 Neglect To Protect - Failure To Train | X | X | X | X | X | X | X | X |
| 848 Neglect To Protect - Misprison of Felony | X | X | X | X | X | X | X | X |
| 849 Neglect To Protect - Acting as Accomplice | X | X | X | X | X | X | X | X |
| 850 Neglect To Protect - Acting as Accessory | X | X | X | X | X | X | X | X |
| 851 Neglect To Protect - Aiding and Abetting | X | X | X | X | X | X | X | X |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | X | X | X | X | X | X |
| 853 Defamation | X | | X | X | X | X | X | X |
| 854 Freedom Of Information | X | | | | | X | X | |

799. Defendant UNITED STATES is directly and specifically liable as to all claims

herein and has co-opted and/or conspired with private companies and organizations to perpetrate

illegal and unconstitutional acts against "unalienable" constitutional rights, economic rights, and

political rights in its sabotage and damaging of those entities and organizations, and against the

Lead Plaintiff and other plaintiffs, as evidenced by both the direct experience of the Lead

Plaintiff throughout this Complaint, and by the Congressional record at LPEE pages 237-367,

6885-7466. All defendants are culpable and liable as direct perpetrators and/or co-conspirators

for all claims herein including those made under, without limitation, 28 U.S.C. 2679(b)(2), 18

U.S.C. §§ 1961-1968, 42 U.S.C. §§ 1983, 1985, 1986, and the *First, Third, Fourth, Fifth, Eighth,*

*Ninth, Thirteenth*, and *Fourteenth* Amendments to the Constitution. For efficiency in

presentation, each defendant is identified in the table below by the paragraph number in

paragraphs 120 through 227 where they are identified as a party to this litigation, and are hereby

named as defendants to each related count at paragraphs 801 through 854 as follows:

[Intentionally left blank.]

| Defendant Named at Paragraph Number | 119 | 120 | 121 | 122 | 123 | 124 | 125 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | US | CIA | FBI | DOJ | USMS | DNI | DOD |
| **Claims – Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | X | X | X | X | X | X | X |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | X | X | X | X | X | | X |
| 803 Murder | X | X | X | X | X | | X |
| 804 Attempted Murder | X | X | X | X | X | | X |
| 805 Conspiracy To Murder | X | X | X | X | X | | X |
| 806 Manslaughter | X | X | X | X | X | | X |
| 807 Attempted Manslaughter | X | X | X | X | X | | X |
| 808 Kidnapping | X | X | X | X | X | | |
| 809 Human Trafficking | X | X | X | X | X | | X |
| 810 Torture – Mental and Physical Abuse | X | X | X | X | X | | X |
| 811 Conspiracy to Torture | X | X | X | X | X | | X |
| 812 Assault | X | X | X | X | X | | X |
| 813 Aggravated Battery | X | X | X | X | X | | X |
| 814 Soliciting Crime Of Violence | X | X | X | X | X | | X |
| 815 Interference With Interstate Commerce By Threats Or Violence | X | X | X | X | X | | X |
| 816 Tampering With Witness | X | X | X | X | X | | X |
| 817 Tampering With Witness - Evidence | X | X | X | X | X | | X |
| 818 Retaliating Against Witness | X | X | X | X | X | | X |
| 819 Tampering With Consumer Products | X | X | X | X | X | | X |
| 820 Involuntary Servitude | X | X | X | X | X | | X |
| 821 Peonage | X | X | X | X | X | | X |
| 822 Forced Labor | X | X | X | X | X | | X |
| 823 Sexual Abuse | X | X | X | X | X | | X |
| 824 Frauds - Mail | X | X | X | X | X | | X |
| 825 Frauds – Wire | X | X | X | X | X | | X |
| 826 Frauds - Computer Access Devices | X | X | X | X | X | | X |
| 827 Fraud And Related Activity - Computers | X | X | X | X | X | | X |

| Defendant Named at Paragraph Number | 119 | 120 | 121 | 122 | 123 | 124 | 125 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | US | CIA | FBI | DOJ | USMS | DNI | DOD |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | X | X | X | | X |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | X | X | X | X | X | | X |
| 830 Property Rights and Illegal Takings | X | X | X | X | X | | X |
| 831 Racketeering - Monetary Benefit | X | X | X | X | X | | X |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | X | X | X | X | X | | X |
| 833 Civil Rights - Free Exercise Of Religion | X | X | X | X | X | X | X |
| 834 Posse Comitatus - Use Of Military | X | X | X | X | X | X | X |
| 835 Involuntary Servitude | X | X | X | X | X | X | X |
| 836 Intentional Discrimination in Employment | X | X | X | X | X | | X |
| 837 Peonage | X | X | X | X | X | | X |
| 838 Conspiracy Against Rights | X | X | X | X | X | X | X |
| 839 Deprivation of Rights | X | X | X | X | X | X | X |
| 840 Deprivation of Rights Under Color of Law | X | X | X | X | X | X | X |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | X | X | X | X | X | X | X |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | X | X | X | X | X | X | X |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | X | X | X | X | X | | X |
| 844 False Information and Hoaxes | X | X | X | X | X | | X |
| 845 Neglect To Protect - Failure To Protect | X | X | X | X | X | X | X |
| 846 Neglect To Protect - Failure To Supervise | X | X | X | X | X | X | X |
| 847 Neglect To Protect - Failure To Train | X | X | X | X | X | X | X |
| 848 Neglect To Protect - Misprison of Felony | X | X | X | X | X | X | X |
| 849 Neglect To Protect - Acting as Accomplice | X | X | X | X | X | X | X |
| 850 Neglect To Protect - Acting as Accessory | X | X | X | X | X | X | X |
| 851 Neglect To Protect - Aiding and Abetting | X | X | X | X | X | X | X |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | X | X | X | X | X |
| 853 Defamation | X | X | X | X | X | | |
| 854 Freedom Of Information | X | X | X | X | X | X | X |

| Defendant Named at Paragraph Number | 126 | 127 | 128 | 129 | 130 | 131 | 132 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | ARM Y | DAR PA | DHS | USSS | DHH S | NIAI D | NAT ARC HIV |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | X | X | X | X | X | X | |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | X | X | X | X | X | X | |
| 803 Murder | X | | | | X | X | |
| 804 Attempted Murder | X | | X | X | X | X | |
| 805 Conspiracy To Murder | X | | X | X | X | X | |
| 806 Manslaughter | X | | X | X | X | X | |
| 807 Attempted Manslaughter | X | | X | X | X | X | |
| 808 Kidnapping | | | X | X | X | X | |
| 809 Human Trafficking | X | X | X | X | X | X | |
| 810 Torture – Mental and Physical Abuse | X | X | X | X | X | X | |
| 811 Conspiracy to Torture | X | X | X | X | X | X | |
| 812 Assault | X | X | X | X | X | X | |
| 813 Aggravated Battery | X | X | X | X | X | X | |
| 814 Soliciting Crime Of Violence | X | | X | X | X | X | |
| 815 Interference With Interstate Commerce By Threats Or Violence | X | | X | X | X | X | |
| 816 Tampering With Witness | X | | X | X | X | X | |
| 817 Tampering With Witness - Evidence | X | | X | X | X | X | |
| 818 Retaliating Against Witness | X | | X | X | X | X | |
| 819 Tampering With Consumer Products | X | | | | X | X | |
| 820 Involuntary Servitude | X | X | X | X | X | X | |
| 821 Peonage | X | X | X | X | X | X | |
| 822 Forced Labor | X | X | X | X | X | X | |
| 823 Sexual Abuse | X | X | X | X | X | X | |
| 824 Frauds - Mail | X | | X | X | X | X | |
| 825 Frauds – Wire | X | | X | X | X | X | |
| 826 Frauds - Computer Access Devices | X | | X | X | X | X | |
| 827 Fraud And Related Activity - Computers | X | X | X | X | X | X | |

| Defendant Named at Paragraph Number | 126 | 127 | 128 | 129 | 130 | 131 | 132 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | ARM Y | DAR PA | DHS | USSS | DHH S | NIAI D | NAT ARC HIV |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | X | X | X | X | |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | X | | X | X | X | X | |
| 830 Property Rights and Illegal Takings | X | X | | | X | X | |
| 831 Racketeering - Monetary Benefit | X | X | | | X | X | |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | X | | X | X | X | X | |
| 833 Civil Rights - Free Exercise Of Religion | X | X | X | | X | X | |
| 834 Posse Comitatus - Use Of Military | X | X | X | | | | |
| 835 Involuntary Servitude | X | X | X | X | X | X | |
| 836 Intentional Discrimination in Employment | X | X | X | X | X | X | |
| 837 Peonage | X | X | X | X | X | X | |
| 838 Conspiracy Against Rights | X | X | X | X | X | X | |
| 839 Deprivation of Rights | X | X | X | X | X | X | |
| 840 Deprivation of Rights Under Color of Law | X | X | X | X | X | X | |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | X | X | X | X | X | X | |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | X | | X | X | X | X | |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | X | | X | X | X | X | |
| 844 False Information and Hoaxes | X | X | X | X | | X | |
| 845 Neglect To Protect - Failure To Protect | X | X | X | X | X | X | |
| 846 Neglect To Protect - Failure To Supervise | X | X | X | X | X | X | |
| 847 Neglect To Protect - Failure To Train | X | X | X | X | X | X | |
| 848 Neglect To Protect - Misprison of Felony | X | X | X | X | X | X | |
| 849 Neglect To Protect - Acting as Accomplice | X | X | X | X | X | X | |
| 850 Neglect To Protect - Acting as Accessory | X | X | X | X | X | X | |
| 851 Neglect To Protect - Aiding and Abetting | X | X | X | X | X | X | |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | X | X | X | X | |
| 853 Defamation | | | X | X | X | X | |
| 854 Freedom Of Information | X | X | X | X | X | X | X |

| Defendant Named at Paragraph Number | 133 | 136 | 137 | 138 | 139 | 140 | 141 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | UNK FED | FWS D | KCS D | WAS H | WSU | NYC | NYP D |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | X | X | X | X | X | | |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | X | | | | | | |
| 803 Murder | X | | X | | | | |
| 804 Attempted Murder | X | | X | | | | |
| 805 Conspiracy To Murder | X | | X | | | | |
| 806 Manslaughter | X | | X | | | | |
| 807 Attempted Manslaughter | X | | X | | | | |
| 808 Kidnapping | X | | X | | | | |
| 809 Human Trafficking | X | X | X | X | X | | |
| 810 Torture – Mental and Physical Abuse | X | | X | | | | |
| 811 Conspiracy to Torture | X | | X | | | | |
| 812 Assault | X | X | X | X | X | X | X |
| 813 Aggravated Battery | X | X | X | X | X | X | X |
| 814 Soliciting Crime Of Violence | X | | X | | | | X |
| 815 Interference With Interstate Commerce By Threats Or Violence | X | | X | | | | X |
| 816 Tampering With Witness | X | | | | | | X |
| 817 Tampering With Witness - Evidence | X | | | | | | X |
| 818 Retaliating Against Witness | X | | | | | | X |
| 819 Tampering With Consumer Products | X | | | | | | |
| 820 Involuntary Servitude | X | | X | X | X | | X |
| 821 Peonage | X | X | X | X | X | | X |
| 822 Forced Labor | X | X | X | X | X | | X |
| 823 Sexual Abuse | X | | X | X | X | X | X |
| 824 Frauds - Mail | X | X | X | X | X | X | X |
| 825 Frauds – Wire | X | X | X | X | X | X | X |
| 826 Frauds - Computer Access Devices | X | | X | X | X | X | X |
| 827 Fraud And Related Activity - Computers | X | | X | X | X | X | X |

| Defendant Named at Paragraph Number | 133 | 136 | 137 | 138 | 139 | 140 | 141 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | UNK FED | FWSD | KCSD | WASH | WSU | NYC | NYPD |
| **Claims – Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | X | X | X | X | X |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | X | | X | X | X | X | X |
| 830 Property Rights and Illegal Takings | X | | X | X | | | X |
| 831 Racketeering - Monetary Benefit | X | | | | | | |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | X | | | | X | | X |
| 833 Civil Rights - Free Exercise Of Religion | X | X | X | X | X | | |
| 834 Posse Comitatus - Use Of Military | X | X | X | X | X | | |
| 835 Involuntary Servitude | X | | X | X | X | | X |
| 836 Intentional Discrimination in Employment | X | | X | | X | | X |
| 837 Peonage | X | X | X | X | X | | X |
| 838 Conspiracy Against Rights | X | X | X | X | X | X | X |
| 839 Deprivation of Rights | X | X | X | X | X | X | X |
| 840 Deprivation of Rights Under Color of Law | X | X | X | X | X | X | X |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | X | | X | X | X | X | X |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | X | X | X | X | X | | X |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | X | X | X | X | X | | X |
| 844 False Information and Hoaxes | X | | | | | | X |
| 845 Neglect To Protect - Failure To Protect | X | X | X | X | X | X | X |
| 846 Neglect To Protect - Failure To Supervise | X | X | X | X | X | X | X |
| 847 Neglect To Protect - Failure To Train | X | X | X | X | X | X | X |
| 848 Neglect To Protect - Misprison of Felony | X | X | X | X | X | X | X |
| 849 Neglect To Protect - Acting as Accomplice | X | X | X | X | X | X | X |
| 850 Neglect To Protect - Acting as Accessory | X | X | X | X | X | X | X |
| 851 Neglect To Protect - Aiding and Abetting | X | X | X | X | X | X | X |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | X | X | X | X | X |
| 853 Defamation | X | | | | | X | X |
| 854 Freedom Of Information | X | | | | | X | X |

| Defendant Named at Paragraph Number | 142 | 143 | 144 | 145 | 146 | 147 | 148 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | NJSP | PAP D | NJTP D | BER GEN SHE RIFF | BER GEN COU NTY | MAR ICOP A COU NTY | MAR ICOP A SHE RIFF |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | | | | | | | |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | | | | | | | |
| 803 Murder | | | | | | | |
| 804 Attempted Murder | | | | | | | |
| 805 Conspiracy To Murder | | | | | | | |
| 806 Manslaughter | | | | | | | |
| 807 Attempted Manslaughter | | | | | | | |
| 808 Kidnapping | X | X | X | X | X | | |
| 809 Human Trafficking | | | | | | X | X |
| 810 Torture – Mental and Physical Abuse | | | | | | | |
| 811 Conspiracy to Torture | | | | | | | |
| 812 Assault | | | | | | | |
| 813 Aggravated Battery | | | | | | | |
| 814 Soliciting Crime Of Violence | | | | | | | |
| 815 Interference With Interstate Commerce By Threats Or Violence | X | X | X | | | | |
| 816 Tampering With Witness | X | X | X | X | X | | |
| 817 Tampering With Witness - Evidence | | | | | | | |
| 818 Retaliating Against Witness | X | X | X | X | X | | |
| 819 Tampering With Consumer Products | | | | | | | |
| 820 Involuntary Servitude | X | X | X | X | X | X | X |
| 821 Peonage | X | X | X | X | X | X | X |
| 822 Forced Labor | X | X | X | X | X | X | X |
| 823 Sexual Abuse | X | X | X | | | | |
| 824 Frauds - Mail | | | | | | | |
| 825 Frauds – Wire | X | X | X | X | X | X | X |
| 826 Frauds - Computer Access Devices | | | | | | | |
| 827 Fraud And Related Activity - Computers | X | X | X | X | X | X | X |

| Defendant Named at Paragraph Number | 142 | 143 | 144 | 145 | 146 | 147 | 148 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | NJSP | PAP D | NJTP D | BER GEN SHE RIFF | BER GEN COU NTY | MAR ICOP A COU NTY | MAR ICOP A SHE RIFF |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | X | X | X | X | X |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | | | | | | | X |
| 830 Property Rights and Illegal Takings | X | X | X | X | X | X | X |
| 831 Racketeering - Monetary Benefit | | | | | | | |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | | X | X | | | | X |
| 833 Civil Rights - Free Exercise Of Religion | | | | | | | |
| 834 Posse Comitatus - Use Of Military | | | | | | | |
| 835 Involuntary Servitude | X | X | X | X | X | X | X |
| 836 Intentional Discrimination in Employment | X | X | X | X | X | X | X |
| 837 Peonage | X | X | X | X | X | X | X |
| 838 Conspiracy Against Rights | X | X | X | X | X | X | X |
| 839 Deprivation of Rights | X | X | X | X | X | X | X |
| 840 Deprivation of Rights Under Color of Law | X | X | X | X | X | X | X |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | X | X | X | X | X | X | X |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | X | X | X | X | X | X | X |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | X | X | X | X | X | X | X |
| 844 False Information and Hoaxes | X | X | X | X | X | X | X |
| 845 Neglect To Protect - Failure To Protect | X | X | X | X | X | X | X |
| 846 Neglect To Protect - Failure To Supervise | X | X | X | X | X | X | X |
| 847 Neglect To Protect - Failure To Train | X | X | X | X | X | X | X |
| 848 Neglect To Protect - Misprison of Felony | X | X | X | X | X | X | X |
| 849 Neglect To Protect - Acting as Accomplice | X | X | X | X | X | X | X |
| 850 Neglect To Protect - Acting as Accessory | X | X | X | X | X | X | X |
| 851 Neglect To Protect - Aiding and Abetting | X | X | X | X | X | X | X |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | X | X | X | X | X |
| 853 Defamation | X | X | X | X | X | X | X |
| 854 Freedom Of Information | | | | | | | |

| Defendant Named at Paragraph Number | 149 | 150 | 160 | 161 | 162 | 163 | 164 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | COVER COMPANIES | JDOE POLICE POW... | ACME MARKETS | WALMART CHINA | WALMART | COSTCO | KROGER |
| **Claims – Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | | | | | | | |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | | | | | | | |
| 803 Murder | | | | | | | |
| 804 Attempted Murder | | | | | | | |
| 805 Conspiracy To Murder | | | | | | | |
| 806 Manslaughter | | | | | | | |
| 807 Attempted Manslaughter | | | | | | | |
| 808 Kidnapping | | | | | | | |
| 809 Human Trafficking | X | X | | | | | |
| 810 Torture – Mental and Physical Abuse | | | | | | | |
| 811 Conspiracy to Torture | | | | | | | |
| 812 Assault | | | | | | | |
| 813 Aggravated Battery | | | | | | | |
| 814 Soliciting Crime Of Violence | | | | | | | |
| 815 Interference With Interstate Commerce By Threats Or Violence | | | | | | | |
| 816 Tampering With Witness | X | X | | | | | |
| 817 Tampering With Witness - Evidence | X | X | | | | | |
| 818 Retaliating Against Witness | X | X | | | | | |
| 819 Tampering With Consumer Products | | | X | | | | |
| 820 Involuntary Servitude | X | X | | X | X | X | X |
| 821 Peonage | X | X | | X | X | X | X |
| 822 Forced Labor | X | X | | X | X | X | X |
| 823 Sexual Abuse | | | | | | | |
| 824 Frauds - Mail | | | | | | | |
| 825 Frauds – Wire | X | X | | X | X | X | X |
| 826 Frauds - Computer Access Devices | | | X | X | X | X | X |
| 827 Fraud And Related Activity - Computers | X | X | | | | | |

| Defendant Named at Paragraph Number | 149 | 150 | 160 | 161 | 162 | 163 | 164 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | COV ER PANI ES | JDO E COM POLI CE POW ER S | ACM E E MAR KET S | WAL MAR T CHI NA | WAL MAR T | COS TCO | KRO GER |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | | X | X | X | X |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | X | X | | | | | |
| 830 Property Rights and Illegal Takings | X | X | | X | X | X | X |
| 831 Racketeering - Monetary Benefit | X | X | | | | | |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | | | | | | | |
| 833 Civil Rights - Free Exercise Of Religion | | | | | | | |
| 834 Posse Comitatus - Use Of Military | | | | | | | |
| 835 Involuntary Servitude | X | X | | X | X | X | X |
| 836 Intentional Discrimination in Employment | X | X | | | | | |
| 837 Peonage | X | X | | X | X | X | X |
| 838 Conspiracy Against Rights | X | X | | X | X | X | X |
| 839 Deprivation of Rights | X | X | | X | X | X | X |
| 840 Deprivation of Rights Under Color of Law | X | X | | | | | |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | X | X | | | | | |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | X | X | | | | | |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | X | X | | | | | |
| 844 False Information and Hoaxes | X | X | | X | X | X | X |
| 845 Neglect To Protect - Failure To Protect | X | X | | | | | |
| 846 Neglect To Protect - Failure To Supervise | X | X | | | | | |
| 847 Neglect To Protect - Failure To Train | X | X | | | | | |
| 848 Neglect To Protect - Misprison of Felony | X | X | | | | | |
| 849 Neglect To Protect - Acting as Accomplice | X | X | | | | | |
| 850 Neglect To Protect - Acting as Accessory | X | X | | | | | |
| 851 Neglect To Protect - Aiding and Abetting | X | X | | | | | |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | | X | X | X | X |
| 853 Defamation | X | X | | | | | |
| 854 Freedom Of Information | | | | | | | |

| Defendant Named at Paragraph Number | 165 | 166 | 167 | 168 | 169 | 170 | 171 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | PPG | EST ABLI SH | INSI GHT NET WOR K | TEC H SAL ES LEA DO | LOE B & LOE ~ | WEI NER | SUL LIVA N |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | | X | | | | | |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | | | | | | | |
| 803 Murder | | | | | | | |
| 804 Attempted Murder | | | | | | | |
| 805 Conspiracy To Murder | | | | | | | |
| 806 Manslaughter | | | | | | | |
| 807 Attempted Manslaughter | | | | | | | |
| 808 Kidnapping | | | | | | | |
| 809 Human Trafficking | | X | | X | | | |
| 810 Torture – Mental and Physical Abuse | | | | | | | |
| 811 Conspiracy to Torture | | X | | | | | |
| 812 Assault | | | | | | | |
| 813 Aggravated Battery | | | | | | | |
| 814 Soliciting Crime Of Violence | | | | | | | |
| 815 Interference With Interstate Commerce By Threats Or Violence | | | | | | | |
| 816 Tampering With Witness | | | | | | | |
| 817 Tampering With Witness - Evidence | | | | | | | |
| 818 Retaliating Against Witness | | | | | | | |
| 819 Tampering With Consumer Products | | | | | | | |
| 820 Involuntary Servitude | X | X | | X | X | X | X |
| 821 Peonage | X | X | | X | X | X | X |
| 822 Forced Labor | X | X | | X | X | X | X |
| 823 Sexual Abuse | | X | | | | | |
| 824 Frauds - Mail | | | | | | | |
| 825 Frauds – Wire | X | X | X | X | X | X | X |
| 826 Frauds - Computer Access Devices | X | | | | | | |
| 827 Fraud And Related Activity - Computers | | X | X | X | X | X | X |

| Defendant Named at Paragraph Number | 165 | 166 | 167 | 168 | 169 | 170 | 171 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | PPG | EST ABLI SH | INSI GHT NET WOR K | TEC H SAL ES LEA ... | LOE B & LOE ... | WEI NER | SUL LIVA N |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | X | X | X | X | X |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | | | X | X | X | X | X |
| 830 Property Rights and Illegal Takings | X | X | X | X | X | X | X |
| 831 Racketeering - Monetary Benefit | | X | X | X | X | X | X |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | | X | | X | X | X | X |
| 833 Civil Rights - Free Exercise Of Religion | | | | | | | |
| 834 Posse Comitatus - Use Of Military | | X | | | | | |
| 835 Involuntary Servitude | X | X | X | X | X | X | X |
| 836 Intentional Discrimination in Employment | | X | | | | | |
| 837 Peonage | X | X | X | X | X | X | X |
| 838 Conspiracy Against Rights | X | X | X | X | X | X | X |
| 839 Deprivation of Rights | X | X | X | X | X | X | X |
| 840 Deprivation of Rights Under Color of Law | | X | | | | | X |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | | X | | | | | X |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | | | | | | | X |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | | | | | | | X |
| 844 False Information and Hoaxes | X | X | | | | | |
| 845 Neglect To Protect - Failure To Protect | | X | X | X | | | X |
| 846 Neglect To Protect - Failure To Supervise | | X | X | X | | | X |
| 847 Neglect To Protect - Failure To Train | | X | X | X | | | X |
| 848 Neglect To Protect - Misprison of Felony | | X | X | X | | | X |
| 849 Neglect To Protect - Acting as Accomplice | | X | X | X | | | X |
| 850 Neglect To Protect - Acting as Accessory | | X | X | X | | | X |
| 851 Neglect To Protect - Aiding and Abetting | | X | X | X | | | X |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | X | X | | | X |
| 853 Defamation | | X | | | | | |
| 854 Freedom Of Information | | | | | | | |

| Defendant Named at Paragraph Number | 172 | 173 | 174 | 175 | 176 | 177 | 178 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | TRA DEK EY.C ⌢ ᵇ | WEB LINK .IN | PAT EL | SCIA RRA | AST UDIL LO | MAT CH GRO ᵁᴾ | BUM BLE |
| **Claims – Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | | | X | X | X | | |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | | | | X | | | |
| 803 Murder | | | | | | | |
| 804 Attempted Murder | | | | X | | | |
| 805 Conspiracy To Murder | | | | | | | |
| 806 Manslaughter | | | | | | | |
| 807 Attempted Manslaughter | | | | X | | | |
| 808 Kidnapping | | | | | | | |
| 809 Human Trafficking | | | X | X | X | | |
| 810 Torture – Mental and Physical Abuse | | | X | X | | | |
| 811 Conspiracy to Torture | | | X | X | X | | |
| 812 Assault | | | | | | | |
| 813 Aggravated Battery | | | | | | | |
| 814 Soliciting Crime Of Violence | | | | | | | |
| 815 Interference With Interstate Commerce By Threats Or Violence | | | | | | | |
| 816 Tampering With Witness | | | X | X | X | | |
| 817 Tampering With Witness - Evidence | | | | | | | |
| 818 Retaliating Against Witness | | | X | X | X | | |
| 819 Tampering With Consumer Products | | | | | | | |
| 820 Involuntary Servitude | | | X | X | X | | |
| 821 Peonage | | | X | X | X | | |
| 822 Forced Labor | | | X | X | X | | |
| 823 Sexual Abuse | | | | | | | |
| 824 Frauds - Mail | | | | | | | |
| 825 Frauds – Wire | X | X | X | X | X | X | X |
| 826 Frauds - Computer Access Devices | | | | | | | |
| 827 Fraud And Related Activity - Computers | X | X | | | | X | X |

| Defendant Named at Paragraph Number | 172 | 173 | 174 | 175 | 176 | 177 | 178 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | TRA DEK EY.C ○ ▪ | WEB LINK .IN | PAT EL | SCIA RRA | AST UDIL LO | MAT CH GRO ▪▪▫ | BUM BLE |
| **Claims – Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | X | X | X | X | X |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | X | X | X | X | X | X | X |
| 830 Property Rights and Illegal Takings | X | X | | | | X | X |
| 831 Racketeering - Monetary Benefit | X | X | X | X | X | | |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | X | X | | | | X | X |
| 833 Civil Rights - Free Exercise Of Religion | | | | | | | |
| 834 Posse Comitatus - Use Of Military | | | | | | | |
| 835 Involuntary Servitude | X | X | X | X | X | X | X |
| 836 Intentional Discrimination in Employment | | | | | | | |
| 837 Peonage | X | X | X | X | X | X | X |
| 838 Conspiracy Against Rights | X | X | X | X | X | X | X |
| 839 Deprivation of Rights | X | X | X | X | X | X | X |
| 840 Deprivation of Rights Under Color of Law | | | X | X | X | X | X |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | | | | | | X | X |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | | | X | X | X | X | X |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | | | X | X | X | X | X |
| 844 False Information and Hoaxes | | | | | | X | X |
| 845 Neglect To Protect - Failure To Protect | X | X | X | X | X | X | X |
| 846 Neglect To Protect - Failure To Supervise | X | X | X | X | X | X | X |
| 847 Neglect To Protect - Failure To Train | X | X | X | X | X | X | X |
| 848 Neglect To Protect - Misprison of Felony | X | X | X | X | X | X | X |
| 849 Neglect To Protect - Acting as Accomplice | X | X | X | X | X | X | X |
| 850 Neglect To Protect - Acting as Accessory | X | X | X | X | X | X | X |
| 851 Neglect To Protect - Aiding and Abetting | X | X | X | X | X | X | X |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | X | X | X | X | X |
| 853 Defamation | | | | | | X | |
| 854 Freedom Of Information | | | | | | | |

| Defendant Named at Paragraph Number | 179 | 211 | 212 | 213 | 213A | 214 | 215 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | JDO E COM PANI ES | BRE YER | WEIS SMA N | ROS ENB ERG | REIC HER T | BUR NS | STO NE |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | X | X | X | X | X | X | X |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | X | X | X | X | | X | |
| 803 Murder | | X | X | X | X | X | |
| 804 Attempted Murder | X | X | X | X | X | X | |
| 805 Conspiracy To Murder | | X | X | X | X | X | |
| 806 Manslaughter | | X | X | X | X | X | |
| 807 Attempted Manslaughter | X | X | X | X | X | X | |
| 808 Kidnapping | | X | X | X | X | X | |
| 809 Human Trafficking | X | X | X | X | X | X | X |
| 810 Torture – Mental and Physical Abuse | X | X | X | X | X | X | |
| 811 Conspiracy to Torture | X | X | X | X | X | X | |
| 812 Assault | | X | X | X | X | X | |
| 813 Aggravated Battery | | X | X | X | X | X | |
| 814 Soliciting Crime Of Violence | | | | | X | | |
| 815 Interference With Interstate Commerce By Threats Or Violence | | X | X | X | X | X | |
| 816 Tampering With Witness | X | | | | | | |
| 817 Tampering With Witness - Evidence | | | | | | | |
| 818 Retaliating Against Witness | X | | | | | | |
| 819 Tampering With Consumer Products | | | | | | | |
| 820 Involuntary Servitude | X | X | X | X | X | X | X |
| 821 Peonage | X | X | X | X | X | X | X |
| 822 Forced Labor | X | X | X | X | X | X | X |
| 823 Sexual Abuse | | X | X | X | X | X | X |
| 824 Frauds - Mail | | X | X | X | X | X | X |
| 825 Frauds – Wire | X | X | X | X | X | X | X |
| 826 Frauds - Computer Access Devices | | X | X | X | X | X | X |
| 827 Fraud And Related Activity - Computers | X | X | X | X | X | X | X |

| Defendant Named at Paragraph Number | 179 | 211 | 212 | 213 | 213A | 214 | 215 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | JDO E COM PANI ES | BRE YER | WEIS SMA N | ROS ENB ERG | REIC HER T | BUR NS | STO NE |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | X | X | X | X | X |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | X | X | X | X | X | X | X |
| 830 Property Rights and Illegal Takings | X | X | X | X | X | X | X |
| 831 Racketeering - Monetary Benefit | X | | X | X | | | |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | X | X | X | X | | X | |
| 833 Civil Rights - Free Exercise Of Religion | | X | X | X | X | X | |
| 834 Posse Comitatus - Use Of Military | | X | X | X | X | X | X |
| 835 Involuntary Servitude | X | X | X | X | X | X | X |
| 836 Intentional Discrimination in Employment | X | X | X | X | X | X | X |
| 837 Peonage | X | X | X | X | X | X | X |
| 838 Conspiracy Against Rights | X | X | X | X | X | X | X |
| 839 Deprivation of Rights | X | X | X | X | X | X | X |
| 840 Deprivation of Rights Under Color of Law | X | X | X | X | X | X | X |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | X | X | X | X | X | X | X |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | X | X | X | X | X | X | X |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | X | X | X | X | X | X | X |
| 844 False Information and Hoaxes | X | X | X | X | | X | X |
| 845 Neglect To Protect - Failure To Protect | X | X | X | X | X | X | X |
| 846 Neglect To Protect - Failure To Supervise | X | X | X | X | X | X | X |
| 847 Neglect To Protect - Failure To Train | X | X | X | X | X | X | X |
| 848 Neglect To Protect - Misprison of Felony | X | X | X | X | X | X | X |
| 849 Neglect To Protect - Acting as Accomplice | X | X | X | X | X | X | X |
| 850 Neglect To Protect - Acting as Accessory | X | X | X | X | X | X | X |
| 851 Neglect To Protect - Aiding and Abetting | X | X | X | X | X | X | X |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | X | X | X | X | X |
| 853 Defamation | X | | | X | | X | |
| 854 Freedom Of Information | | | | | | | |

| Defendant Named at Paragraph Number | 216 | 217 | 218 | 218A | 219 | 220 | 221 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | RUBI N | VIN DMA N, A | MEL BER | MUE LLE R | CAL DWE LL | ARP AIO | KAT YAL |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | X | X | X | X | X | X | X |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | | | | X | | | |
| 803 Murder | | | | X | | | |
| 804 Attempted Murder | | | | X | | | |
| 805 Conspiracy To Murder | | | | X | | | |
| 806 Manslaughter | | | | X | | | |
| 807 Attempted Manslaughter | | | | X | | | |
| 808 Kidnapping | | | | X | | | |
| 809 Human Trafficking | X | X | X | X | | X | X |
| 810 Torture – Mental and Physical Abuse | | | | X | | | |
| 811 Conspiracy to Torture | | | | X | | | |
| 812 Assault | | | | X | | | |
| 813 Aggravated Battery | | | | X | | | |
| 814 Soliciting Crime Of Violence | | | | X | | | |
| 815 Interference With Interstate Commerce By Threats Or Violence | | | | X | | | |
| 816 Tampering With Witness | | | | X | | | |
| 817 Tampering With Witness - Evidence | | | | X | | | |
| 818 Retaliating Against Witness | | | | X | | | |
| 819 Tampering With Consumer Products | | | | X | | | |
| 820 Involuntary Servitude | X | X | X | X | X | X | X |
| 821 Peonage | X | X | X | X | X | X | X |
| 822 Forced Labor | X | X | X | X | X | X | X |
| 823 Sexual Abuse | X | X | X | X | X | X | |
| 824 Frauds - Mail | X | X | X | X | X | X | |
| 825 Frauds – Wire | X | X | X | X | X | X | |
| 826 Frauds - Computer Access Devices | X | X | X | X | X | X | |
| 827 Fraud And Related Activity - Computers | X | X | X | X | X | X | |

| Defendant Named at Paragraph Number | 216 | 217 | 218 | 218A | 219 | 220 | 221 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | RUBI N | VIN DMA N, A | MEL BER | MUE LLE R | CAL DWE LL | ARP AIO | KAT YAL |
| **Claims – Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | X | X | X | X | |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | | | | X | X | X | |
| 830 Property Rights and Illegal Takings | X | X | X | X | X | X | |
| 831 Racketeering - Monetary Benefit | | | | X | | | |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | | | | X | | | |
| 833 Civil Rights - Free Exercise Of Religion | | | | X | | | X |
| 834 Posse Comitatus - Use Of Military | X | X | X | X | | | X |
| 835 Involuntary Servitude | X | X | X | X | X | X | X |
| 836 Intentional Discrimination in Employment | | | | X | X | | |
| 837 Peonage | X | X | X | X | X | X | X |
| 838 Conspiracy Against Rights | X | X | X | X | X | X | X |
| 839 Deprivation of Rights | X | X | X | X | X | X | X |
| 840 Deprivation of Rights Under Color of Law | X | X | X | X | X | X | X |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | X | X | X | X | X | X | X |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | X | X | X | X | X | X | |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | X | X | X | X | X | X | |
| 844 False Information and Hoaxes | X | X | X | X | X | X | |
| 845 Neglect To Protect - Failure To Protect | X | X | X | X | X | X | X |
| 846 Neglect To Protect - Failure To Supervise | X | X | X | X | X | X | X |
| 847 Neglect To Protect - Failure To Train | X | X | X | X | X | X | X |
| 848 Neglect To Protect - Misprison of Felony | X | X | X | X | X | X | X |
| 849 Neglect To Protect - Acting as Accomplice | X | X | X | X | X | X | X |
| 850 Neglect To Protect - Acting as Accessory | X | X | X | X | X | X | X |
| 851 Neglect To Protect - Aiding and Abetting | X | X | X | X | X | X | X |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | X | X | X | X | X |
| 853 Defamation | | | | X | | | |
| 854 Freedom Of Information | | | | | | | |

| Defendant Named at Paragraph Number | 222 | 223 | 224 | 225 | 225A | 226 | 227 |
|---|---|---|---|---|---|---|---|
| Defendant Common Name<br><br>Claims - Constitutional Rights, Statutory, and Common Law | KEE NE | MOD DER MAN | GIA | FAU CI | CHA LOM | UNK GOV T ENTI TY | JDO E INDI VID UAL |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | X | | | X | X | X | X |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | | | | X | X | X | X |
| 803 Murder | | | | X | | X | X |
| 804 Attempted Murder | | | | X | | X | X |
| 805 Conspiracy To Murder | | | | X | | X | X |
| 806 Manslaughter | | | | X | | X | X |
| 807 Attempted Manslaughter | | | | X | | X | X |
| 808 Kidnapping | | | | X | X | X | X |
| 809 Human Trafficking | X | X | X | X | X | X | X |
| 810 Torture – Mental and Physical Abuse | | | | X | X | X | X |
| 811 Conspiracy to Torture | | | | X | X | X | X |
| 812 Assault | | | | X | | X | X |
| 813 Aggravated Battery | | | | X | | X | X |
| 814 Soliciting Crime Of Violence | | | | | | | |
| 815 Interference With Interstate Commerce By Threats Or Violence | | | | X | X | X | X |
| 816 Tampering With Witness | | | | | X | | |
| 817 Tampering With Witness - Evidence | | | | | | | |
| 818 Retaliating Against Witness | | | | | X | | |
| 819 Tampering With Consumer Products | | | | | | | |
| 820 Involuntary Servitude | X | X | X | X | X | X | X |
| 821 Peonage | X | X | X | X | X | X | X |
| 822 Forced Labor | X | X | X | X | X | X | X |
| 823 Sexual Abuse | | | | X | X | X | X |
| 824 Frauds - Mail | | | | X | X | X | X |
| 825 Frauds – Wire | X | X | X | X | X | X | X |
| 826 Frauds - Computer Access Devices | | | | X | X | X | X |
| 827 Fraud And Related Activity - Computers | X | X | X | X | X | X | X |

| Defendant Named at Paragraph Number | 222 | 223 | 224 | 225 | 225A | 226 | 227 |
|---|---|---|---|---|---|---|---|
| **Defendant Common Name** | KEE NE | MOD DER MAN | GIA | FAU CI | CHA LOM | UNK GOV T ENTI TY | JDO E INDI VID UAL |
| **Claims - Constitutional Rights, Statutory, and Common Law** | | | | | | | |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | X | X | X | X | X |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | X | | | X | | X | X |
| 830 Property Rights and Illegal Takings | X | | | X | X | X | X |
| 831 Racketeering - Monetary Benefit | X | | | | X | | |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | X | | | X | X | X | X |
| 833 Civil Rights - Free Exercise Of Religion | | | | X | | X | X |
| 834 Posse Comitatus - Use Of Military | X | | | X | | X | X |
| 835 Involuntary Servitude | X | | | X | X | X | X |
| 836 Intentional Discrimination in Employment | X | | | X | | X | X |
| 837 Peonage | X | | | X | X | X | X |
| 838 Conspiracy Against Rights | X | X | X | X | X | X | X |
| 839 Deprivation of Rights | X | X | X | X | X | X | X |
| 840 Deprivation of Rights Under Color of Law | | | | X | X | X | X |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | X | X | X | X | X | X | X |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | | | | X | X | X | X |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | | | | X | X | X | X |
| 844 False Information and Hoaxes | | X | X | X | X | X | X |
| 845 Neglect To Protect - Failure To Protect | | | | X | X | X | X |
| 846 Neglect To Protect - Failure To Supervise | | | | X | X | X | X |
| 847 Neglect To Protect - Failure To Train | | | | X | X | X | X |
| 848 Neglect To Protect - Misprison of Felony | | | | X | X | X | X |
| 849 Neglect To Protect - Acting as Accomplice | | | | X | X | X | X |
| 850 Neglect To Protect - Acting as Accessory | | | | X | X | X | X |
| 851 Neglect To Protect - Aiding and Abetting | | | | X | X | X | X |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | | X | X | X | X | X | X |
| 853 Defamation | | X | X | X | X | X | X |
| 854 Freedom Of Information | | | | | | | |

### Legally Responsive Answers Requirements

800. Legally responsive answers must include (a) proper identifications of all known and currently unknown defendants, (b) full, complete disclosure of the identities of co-conspirator defendants, and (c) the specific acts, violations, and injuries attributable to and by each defendant, to these plaintiffs. Each and every governmental defendant, each and every individual defendant currently or formerly in the employ of governmental defendants including, without limitation, police powers and intelligence defendant agencies and current and former employees thereof, and each and every other defendant with any relationship with these governmental defendants must provide:

(i) direct answers at all counts at paragraphs 801-854 during any period in which that specific police powers agency or department had any, direct or indirect participations, and/or knowledge, through its own agents, officers, employees, confidential informants, contractors, nominees, and through its relationships with or knowledge of the identities of any and all co-conspirators,

(ii) direct answers to each and every subparagraph cited in each count (claim for relief) at paragraphs 801 through 854,

(iii) direct answers to each and every element of the contents of the tables incorporated in each paragraph 801-854.

This legal responsive answer requirement applies to all named defendants for the purposes of, without limitation, (i) properly establishing direct and indirect joint and several liability for all these acts and conspiracies, (ii) to identify other acts, violations, and injuries not yet known to these named plaintiffs, (iii) to identify further members of this class of plaintiffs, and (iv) to establish liability for the failures to act and other negligence described herein.

## 801. CLAIMS FOR RELIEF - COUNT 1

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

#### Bioweapons and Bioweapons Delivery Systems Prohibited

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 175, 1961-1968, 2339, 2339A |
| Washington: | RCW § 9A.36.011(1)a, c |
| New Jersey: | NJ Stat §§ 2C:38-3, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 120.10, 490.25, 490.55 |
| California: | Cal. Penal Code §§ 203, 206 |
| Massachusetts: | Mass Genl L ch 269 § 14(b)(1) |
| Arizona: | AZ Rev Stat §§ 13-2301.C.4, 13-2301.C.12, 13-2301.C.14, 13-2301.C.16, 13-2308.03 |
| Texas: | TX Penal Code § 22.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process, have and do act in violation of federal and state statutes listed above in this paragraph. The initiation and perpetuation of the development of defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system has been and is the principal initial *rasion d'etre* for these rights and racketeering crimes, and provides the primary *mens rea* for the entire pattern of illegal conduct of defendant UNITED STATES, and that of the co-conspirators in other police powers, intelligence, press, media, entertainment, political, corporate, and other interests which it has entangled in these associated-in-fact enterprise pattern of racketeering acts over the intervening decades in (a) illegal human medical experiments on human subjects, (b) the religious discrimination used to select the initial victim plaintiffs for this illegal experimentation and to pretext and entangle their children, including the Lead Plaintiff, (c) the pattern of deliberate national security entanglements, (d) human experiments ranging from human relationship management to inducing medical

emergencies to human trafficking, (e) racketeering acts of all forms including career, interstate commerce, financial and other property crimes, (f) multiple lethality attempts and murders, (g) entanglements and inculpations of press, media, and entertainment industry persons.

B. Defendant UNITED STATES has and does (i) spend billions of dollars through various government departments including, without limitation, defendants DOD and its departments and agencies, through defendant DOJ and its departments and agencies, and other federal departments and agencies, and has and does (ii) pretext and entangle these co-conspirators, using a variety of illegal means and methods, to accomplish this illegal and criminal violation of law, 18 U.S.C. § 175:

"(c) For purposes of this section, the term "for use as a weapon" includes the development, production, transfer, acquisition, retention, or possession of any biological agent, toxin, or delivery system for other than prophylactic, protective, bona fide research, or other peaceful purposes."

and violation of the ratified 1972 Bioweapons Treaty, paragraphs 803M-O, and (iii) has and does perpetuate these criminal offenses through its continuing its criminal violations of our Constitution and laws and those of its co-conspirators including, without limitation, RICO 18 U.S.C. §§ 1961-1968,, for (a) the illegal purposes of politically and economically sustaining this illegal program and for (b) the illegal cover-up of this conspiracy.

C. Defendants' decades long program of sustained physical, psychological, and biomedical abuse of this class of plaintiffs to and including death including, without limitation, of Lead Plaintiff, provide defendant UNITED STATES with consistent and well-known and studied human subjects, which are the same in form and function as its former practice in the federal National Institutes of Health, of painful medical experimentation on apes and other advanced animal subjects, which were discontinued against those animals in 2015. This illegal human experimentation, in Lead Plaintiff's own case from age 12 to his present age of 68, on

meticulously well-known human platforms has been and is abuse which extends and perpetuates
the development of the illegal BRMT bioweapon and bioweapon delivery system.

D. Defendant UNITED STATES has and does economically benefit both directly and
indirectly from each and every act, violation, and injury against rights and property by this
specific means. Defendant UNITED STATES is, for this specific illegal purpose, the principal
criminal actor in this associated-in-fact enterprise, even when it does not directly and
immediately benefit from a specific act, violation, or injury by receiving the direct proceeds of
that specific act, violation or injury, whether or not it explicitly conspired to conduct that specific
act with its co-conspirators. Effectively, defendant UNITED STATES gets its cut of each and
every rights and racketeering robbery undertaken by this gang of associated-in-fact enterprise
racketeers, through its further development of its illegal BRMT bioweapon and bioweapon
deliver system on these involuntary human subjects, even though its co-conspirators in this
associated-in-fact enterprise do not deliver a specific cut of the direct proceeds of a particular
specific act, violation, or injury directly to defendant UNITED STATES.

E. Nazi doctors and their research assistants worked for Dr. Josef Mengele in this same
fashion, sharing the results of their heinous experiments on human subjects to benefit the state
(Germany) at various Dachau Concentration Camps. Those human subjects were objects of
religious, political, ethnic, and sexual orientation discrimination, confined both with and without
"due process" in Germany and other territories controlled by Nazi Germany, principally between
1942 and 1945, a 3 year period. Seven of those criminal medical experiment perpetrators
received death sentences, nine received ten years to life sentences, and seven were acquitted for
those illegal experiments on human subjects, to and including permanent physical and
psychological disabilities and deaths of those human subjects.

F. Defendants CIA's MKULtra and FBI's Cointelpro programs, both illegal, ran for 20 years and 15 years respectively, and included well-documented illegal human medical experiments with 100 million doses of LSD, myriad rights violations, and documented direct violence against US persons. No criminal consequences ever resulted to any defendant UNITED STATES government employee or contractor for these crimes, nor for the destruction of evidence which obstructed justice for defendant UNITED STATES' innocent and unwitting victims, which hit was constitutionally created and obligated to protect.

G. Defendant UNITED STATES, specifically defendant DOJ including, without, limitation, its leader GARLAND, known to and by Lead Plaintiff as Robert Mandich in 1974-1976 (paragraphs 5, 99m, 211, 417-419), continues this associated-in-fact enterprise pattern of acts, rights violations, and conspiracy today, specifically ignoring criminal offenses in federal departments and agencies (paragraphs 550-584), and those of its co-conspirators who would thereby inculpate defendant DOJ directly into this criminal conspiracy for their own defense and cross-claims.

H. This illegal BRMT bioweapon and bioweapon delivery system program has been run by defendant UNITED STATES on these involuntary servants, chosen by discriminating against their religious beliefs and practices in national service from at least 1968 to 2024, more than 56 years so far. The Lead Plaintiff's own great-great grandfather served as a Quaker conscientious objector in President Lincoln's day to free slaves through four years of the Civil War, winning the Medal of Honor at Appomattox in 1865 while faithfully serving defendant ARMY as a company bugler. Seventy-nine medical corpsmen, and one bugler, serving as conscientious objectors, have each won one of the 3,535 Medals of Honor awarded in its history from 1861. His issue have now been enslaved as the involuntary servants of defendant UNITED STATES for four generations, in violation of the 1865 *Fourteenth* Amendment.

I. Lead Plaintiff, as part of the third generation of involuntary servants, has been functionally enslaved and human trafficked by defendant UNITED STATES for more than 56 years (as of 2024) based upon that same set of his Quaker-based family's religious beliefs and practices, which religious discrimination was first prejudicially used by defendant ARMY during military service, and by defendants CIA and ARMY thereafter to select him by age 12, as a direct result of his father's faithful and honorable service to defendant ARMY when called to service during the Korean War.

J. By this pattern of practice, defendant UNITED STATES also selected the Lead Plaintiff's uncle for this same discrimination, most probably initiated at Whitman College, Walla Walla, WA prior to military service in defendant ARMY during the Vietnam War. Defendant UNITED STATES has since perpetuated this malign pattern of religious discrimination and criminal conduct to others in this religious family including, most probably from childhood, toward Audrey (a granddaughter), who was murdered in September 2011 at age 18, and her alleged and convicted intermediary assailant, both of whom were also most probably being biochemically hijacked by defendant CIA using the illegal BRMT bioweapon and bioweapon delivery system in the preceding months during their relationships with the male partner they both knew, in the preceding events leading directly to the confrontation, and in the violent moment of that criminal act (paragraphs 10, 412, 413, 600B, 803I, Interline Exhibit1). Defendant CIA's malignant purpose and intent was to conduct a field development test of the ability to create and sustain a lethal violent sequence by an illegal BRMT bioweapon hijacked human subject, using the illegal BRMT bioweapon and bioweapon delivery system to control emotions and muscle movements in the violent moment (paragraphs 803, 805) to secure the lethal effect it did achieve, the longitudinal severing of the carotid artery, creating the medically unrepairable injury which resulted in Audrey's death. Lead Plaintiff has also experienced similar forms of

specific patterned muscular control by the illegal BRMT bioweapon and bioweapon delivery system as described in this complaint (paragraphs 58(1), 537(b), (c), (e), (m)), though these numerous attempts have only resulted in injuries to date.

K. This murderous act against Audrey, performed by a non-violent intermediary as the very unlikely perpetrator (a woman with no prior violent history of any kind who had been abused by the misogynist third party male who had attracted both women to this specific moment of violence through his prior pattern of acts and abuse) was, in fact, a surreptitious development field test of the illegal BRMT bioweapon and bioweapon delivery system.

L. This violent development test (Audrey's murder) directly emulates one of defendant CIA's MKUltra goals for its supposed MKUltra LSD superweapon, a human agent or intermediary who could be programmed through hypnosis and drugs to commit an assassination and entirely forget the matter thereafter. Lead Plaintiff's own short-term memory function has been repeatedly effected then restored in this way on an incident by incident basis, but the illegal BRMT bioweapon and bioweapon delivery system has never successfully been used to erase or delete long term memory sequences of events nor been able to sustain any long duration impairment of longer-term visual memories.

M. A farfetched and delusional concept? No, a stated mind control objective of defendant CIA which it never disavowed (Interline Exhibit 3), and entirely consistent with defendant CIA's on-going scofflaw behavior (paragraphs 51, 102(i), 320, 332, 340, LPEE pages 237-271, 6885-7466) and that of federal police powers agencies, none ever criminally pursued by defendant DOJ for any systemic institutional crimes. Whistleblowers are punished regardless of laws prohibiting such reprisals. Federal institutional crimes go unnoted and unindicted - MKUltra criminal drug distribution and illegal human experimentation to death; Cointelpro rights violations and violence to death; FISA rights violations; Section 702 rights violations; the illegal

personal, family, business and financial wreckings of Americans in which Lead Plaintiff was

unwittingly victimized, pretexted, and entangled by federal police powers defendants, are all

well documented throughout this complaint and in Congressional and federal Court findings

described herein. Reinforcing the "unalienable" constitutional, civil, and human rights of these

plaintiffs and other US persons is the specific remedial purpose of this litigation. It is undertaken

specifically in light of defendant DOJ's known and documented history of (i) negligence and

neglect to prevent practiced across decades, as specifically participated in by its current leader

GARLAND, (ii) of fraudulent concealment and knowing willful blindness (paragraphs 550-584),

and (iii) its documented history of absolutely no broad-based criminal prosecutions for publicly

known broad-based institutionally tolerated misconduct in police powers and intelligence

operations (paragraphs 307-313).

 N. These associated-in-fact enterprise patterns of practice have or do persist for decades

while these institutional perpetrators and their executive management teams go unpunished for

serial criminal violations - moving on to other federal positions and to eventual government

pensions when crimes have been committed against US persons include, without limitation,

Gottleib – MKUltra principal; BREYER, past BRMT principal; BURNS, past BRMT principal;

GARLAND, past BRMT field operations; WEISSMAN, ROSENBERG, MELBER, past

racketeering acts; and to have police powers buildings named after them (Hoover, FBI's

Cointelpro principal). This provides the individuals in this gang of unindicted felons with direct

and immediate economic benefits (illegal programs and practices sustained, current positions and

career paths continued), and indirect economic benefits (paths to future pensions and other forms

of prosperity). This pattern of corrupt practices of fraudulent concealment and neglect to prevent

illegal acts, violations, and injuries provides defendant UNITED STATES with the direct and

indirect economic benefits of a group of meticulously well-researched and reliable human

subjects for its illegal experimentation. Defendant UNITED STATES has and does systematically abuse these specific human subjects as it continues its decades long illegal human biochemical brain hijacking of these plaintiffs using the illegal BRMT bioweapon and bioweapon delivery system. These illegal biomedical experiments on human subjects for illegal bioweapons development testing, and deployment are comparable in scope to the criminal offenses tried in the 1946-1947 Nuremberg Doctors Trial, though they are at least five decades longer in duration than the three years of illegal experiments by those Nazi doctors, some of whom received the death penalty for their illegal medical experiments.

O. By this means of religious discrimination, defendant UNITED STATES has and does sustain a functional bill of attainder across generations against these plaintiff victims in its secret police state of involuntary servitude and subjugation. The democratic republic which defendant UNITED STATES was created in the founder's vision to affirmatively "secure unalienable rights" of the People has been systematically perverted. Defendant UNITED STATES sustains administrative prerogatives, rather than unalienable rights, against people it selected generations ago as its human guinea pigs based upon their religion and upon their honorable service as conscientious objectors, and has and does abuse these US persons to subvert the very purpose defined during the founding of our nation in the Declaration. Defendant UNITED STATES mission to "establish justice," one of the five principal purposes for which the federal Constitution was ratified by the states of the United States of America, has been subverted to its own willful blindness, fraudulent concealment, and racketeering crimes, perpetrated by defendant DOJ and its police powers agencies, particularly defendants FBI and USMS. Defendant UNITED STATES has and does knowingly choose to subvert and pervert these objectives and to defy the constitutional limits placed upon government power and to subvert

purposes which are prescribed in our Constitution, trading its own imagined security (and

conduct of impunity) for these plaintiffs' actual liberty and for their lives.

    P. Defendant UNITED STATES has and does act in violation of federal and state statutes

listed above in this paragraph and Article 1 of that certain Senate ratified international treaty

*"Convention on the Prohibition of the Development, Production and Stockpiling of*

*Bacteriological (Biological) and Toxin Weapons and on Their Destruction"* in its long history of

violations against Lead Plaintiff and other plaintiffs of this class and its prior and on-going

operation, management, and collaboration with other defendants in their pattern of racketeering

acts, conspiracies, violations of rights, interference with interstate commerce, and other crimes

and rights violations to cause and create injuries to the Lead Plaintiff and other plaintiffs of this

class, including, without limitation, those specifically cited and described in the 110 subcounts at

paragraphs 600-710 in this Complaint, both within and without the territory of the United States.

    Q. PL 91-452, Racketeering Influenced and Corrupt Organizations Act of 1970, as

amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged

in patterns of racketeering acts, including a specific list of crimes and injuries defined in 18

U.S.C. § 1961(1), which includes the crime(s) and injuries listed in this Claim For Relief. As

stated in 18 U.S.C. § 1962(c) it is

> "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

As stated in 18 U.S.C. § 1962(d) it is unlawful for:

> "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

    R. These acts, violations, and injuries are representative of those perpetrated by

defendants on this class of plaintiffs, which also include other acts of violence, fraud, and

continued willful blindness and fraudulent concealment directed at several generations of Lead

Plaintiff's extended family and this religious group, and to other yet unknown plaintiffs, by

defendant UNITED STATES and its co-conspirators.

S. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies:

> " If two or more persons in any State or Territory conspire or go in disguise on the
> highway or on the premises of another, for the purpose of depriving, either directly or
> indirectly, any person or class of persons of the equal protection of the laws, or of
> equal privileges and immunities under the laws; or for the purpose of preventing or
> hindering the constituted authorities of any State or Territory from giving or securing
> to all persons within such State or Territory the equal protection of the laws; or .......;
> in any case of conspiracy set forth in this section, if one or more persons engaged
> therein do, or cause to be done, any act in furtherance of the object of such
> conspiracy, whereby another is injured in his person or property, or deprived of
> having and exercising any right or privilege of a citizen of the United States, the party
> so injured or deprived may have an action for the recovery of damages occasioned by
> such injury or deprivation, against any one or more of the conspirators."

T. Under our Constitution, all US persons are entitled to equal protection of the laws.

Neither equal nor unequal predations of rights were intended as the primary purpose of any

government, whether defendant UNITED STATES or any state or locality. Despite the explicit

constitutional prohibitions on governmental predations of individual rights, Privileges, and

Immunities, which prohibitions adopted in the Bill of Rights were specifically required for

ratification of the Constitution in 1788 by those concerned about liberty and overreach by a

powerful federal government, and which led to the 1791 ratification of the Bill of Rights,

defendant UNITED STATES and co-conspirator defendants have and do act in a long-running

pattern of direct and systematic violations of the constitutional rights to equal protection and

other rights from at least 1968, by perpetrating and sustaining defendant UNITED STATES'

discriminatory pattern of unequal protection against these plaintiffs in their practices of religion,

commerce, assembly and other *unalienable individual constitutional rights* while fraudulently

concealing its own and co-conspirators' criminal conduct behind its color of law abuse of the
*conditioned privilege of state secrets* and behind the *willful blindness* of defendant DOJ.

U. Defendant DOJ has and does sustain complete silence and willfully refuse all
prosecutions of these institutional criminal offenses in the illegal human experimentation upon
these plaintiffs, while acting as a key conspirator in defendant UNITED STATES' conspiracy
among its own departments and agencies in the overall associated-in-fact enterprise with co-
conspirators having direct knowledge of this illegal weapon, (i) to sustain and fraudulently
conceal this unlawful development (prohibited under 18 U.S.C. § 175 and 1972 Bioweapons
Treaty) of the illegal and prohibited BRMT bioweapon and bioweapon delivery system, (ii) to
pretext and entangle these plaintiffs in other illegal acts and patterns of acts by defendant
UNITED STATES departments and agencies, and by other police powers departments and
agencies acting against the rights of other US persons while (iii) defendant UNITED STATES
fraudulently conceals its associated-in-fact enterprise pattern of racketeering acts and
constitutional rights violations of religion, property, free assembly and other crimes (18 U.S.C.
§§ 241, 242, among others) behind its color of law abuse of the conditioned privilege of state
secrets and (iv) has and does act directly against these plaintiffs despite the repeated specific and
direct pleas of these plaintiffs delivered in writing and by hand, complete with the *prima facie*
evidence of these criminal offenses against rights.

V. These acts and injuries are representative of those perpetrated by defendants on this
class of plaintiffs, which also include other acts of violence, fraud, and continued willful
blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended
family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant
UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further
violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-16 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 3, 4 |
| 639-693 | RICO Racketeering | 1 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

## 802. CLAIMS FOR RELIEF - COUNT 2

### Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments

### Terrorism - Violent Crimes in Aid of Racketeering Enterprises

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1961(1)(G), 1961-1968, 1992(b)(3), 2339, 2339A |
| Washington: | RCW § 9A.36.011(1)a, c |
| New Jersey: | NJ Stat §§ 2C:38-2, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 110.00, 120.10, 125.27(a)(v), 460.00 through 460.80, 490.25, 490.55 |
| California: | Cal. Penal Code §§ 203, 206 |
| Massachusetts: | Mass Genl L ch 269 § 14(b)(1) |
| Arizona: | AZ Rev Stat §§ 13-2301.C.4, 13-2301.C.12, 13-2301.C.14, 13-2301.C.16, 13-2308.03 |
| Texas: | TX Penal Code § 22.02, 71.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in, among other violent and threatening acts, injuries, and violations at the final subparagraph in this paragraph, an act of violence on a rail mass transit express train operating on the Metropolitan Transportation Authority Hudson River Line north of New York City on September 11, 2022 as described in paragraph 707 LETHL-14. This event occurred in a sequence of violent threats and acts occurring in the four months between mid-July 2022 and November 2022, which are further described at Complaint Interline Exhibit 15: Indirect Verbal Threat and Subsequent Lethality Events. Other domestic terror incidents intentionally associated indirectly by defendants with Lead Plaintiff to serve their corrupt purpose to discredit through indirect association with Lead Plaintiff include, without limitation, the 2004 Bio-Lab arson fire and 2009 US Airways Flight 1549, paragraphs 602 NSEC-3, 606A-D HEXP-3, 673 RICO-35, which are elements of these defendants' overall pattern of domestic violence and sabotage for the reasons cited therein,

which are supported by the historical patterns of facts found by Congressional investigations of the violent defendant CIA MKUltra LSD drugging and defendant FBI Cointelpro programs which targeted individual US persons and groups for their political and religious beliefs and practices (LPEE pages 237-271, 6885-7466) during the same time periods as the illegal BRMT bioweapon and bioweapon delivery system and illegal human subject medical experiments were being conducted and used against US persons.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 602 | NSEC National Security Pretexting and Entanglements | 3 |
| 606 | HEXP Illegal Human Experimentation | 3 |
| | RGTS Individual Rights Violations and Conspiracies | |
| | RICO Racketeering | |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 803. CLAIMS FOR RELIEF - COUNT 3

### Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments

### Murder

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 175, 1111, 1961-1968; 42 U.S.C. 1985(3) |
| Washington: | RCW §§ 9A.32.030(1)a, b |
| New Jersey: | NA |
| New York: | NA |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in causing and creating injury and death to members of the Lead Plaintiff's family of origin and extended family.

C. Sandra Darlene Brewer (age 11) died of Reye Syndrome at Mary Bridge Children's Hospital, Tacoma, WA, from a medically prescribed aspirin/codeine dosed death during an episode of influenza in April 1970, at the hand of that certain federally embedded medical doctor KOHLER (paragraphs 99d, 417, 418, 714, 740, 803C-D, 805B(i), H, S, BS, 806B, 814B), now deceased, then practicing medicine in Federal Way, WA, where Lead Plaintiff lived with his

family of origin (age 14). See paragraphs 99d, 211, 417-418. Sandra was a minor child and

member of the Lead Plaintiff's family of origin, which family had been secretly subjugated in

involuntary servitude to defendant UNITED STATES based upon religious discrimination as

described at paragraphs 1-5, 403-418 for the illegal purposes described therein and throughout

this complaint.

D. Reye syndrome, first medically described in 1963, paragraph 805H, is a rapidly

worsening brain disease. The brain swells in the skull with fluid buildup and toxicity, as liver

function fails, from internal compression against the irregular jagged interior surfaces of the skull

and through fluid pressure bursting cell walls as fluid pressure builds, leading to convulsions, to

loss of consciousness, and to eventual brain death. About 90% of cases in children are

associated with aspirin (salicylate) use. Sandra was in bed suffering from influenza and a

headache in the morning as Lead Plaintiff left for school. When Lead Plaintiff returned from

school around 2:30PM, he tried to comfort her as she was holding her head and wincing and

crying in pain as she rocked upright from her prone position in her bed, back and forth in very

clear pain. In late afternoon, around 4-5PM, she was transported by ambulance to Mary Bridge

Children's Hospital in Tacoma, WA. Sandra died about 2AM from the overdose of aspirin

(which caused the brain swelling) and codeine (which suppressed the sensations of pain as the

swelling and cellular destruction continued to the point of death) prescribed by Dr. KOHLER

(paragraphs 99d, 417, 418, 714, 740, 803C-D, 805B(i), H, S, BS, 806B, 814B), then presenting

as a family physician who was embedded in a medical clinic in Federal Way, WA, where the

parents had managed to buy a house they could afford about 150 feet west of the Interstate 5

freeway about 1200 feet from a King County garbage dump.

E. The current (2024) on-going defendant CIA psychological and physical gratuitous

tradecraft cruelty "rhyme" with Sandra's death at age 11 is Lead Plaintiff's colon block medical

issue which requires on-going medication which would otherwise lead to liver failure if chronically sustained. Lead Plaintiff began experiencing these colon blocking symptoms in August 2023 (LPEE pages 11656-11664, LPEEV65-2) and used a series of medication which worked for about ten days, then stopped working one after another, indicative of an illegal BRMT bioweapon block rather than a natural medical condition. Symptoms are currently on-going as Lead Plaintiff also continues to use low dose aspirin daily (the critical medical cause of Sandra's death as noted above) to treat chronic symptoms of deep vein thrombosis (DVT) experienced in 1994 soon after a fraudulent financing trip to London with CORNWELL (CIA) described at paragraph 601 NSEC-2. Cardio symptoms of no note to cardiologist ASTUDILLO in 2022 as age related also were suddenly of great interest to the cardiologist about the same time the colon issue emerged, as documented in the programmed health collapse subcount at paragraph 710 LETHL-17. This classic defendant CIA gratuitous cruelty is comparable to other similar patterns of practice by defendants FBI, USMS, and CIA experienced by Lead Plaintiff over many years wherein defendants echo prior traumas in an attempt to trigger psychological stress to push their subject toward acting out in some form, as part of their overall pattern of racketeering acts during their sustained human trafficking, targeting, and entrapment operations.

F. Defendants CIA and ARMY intent was to use Sandra's death in 1970 to inflict one in a series of emotional traumas on family members including Lead Plaintiff, and just three months prior to the deaths of both paternal great grandparents in this very close knit family, all between January and August 1970, during defendant CIA research to develop its early versions of the illegal BRMT bioweapon. This sense of psychological trauma was further magnified as these deaths occurred within seven months after the birth of the youngest child in the family,

G. Defendant CIA then had a documented history of such accidental appearing deaths in its assassinations record and described such methods in its official Assassination Manual (an

official internal publication later discontinued). The CIA MKUltra program had previously murdered Frank Olson, a former ARMY Biomedical Researcher contracted to CIA, in 1953 soon after he objected to certain illegal and unethical practices which were subsequently employed as elements of CIA's illegal MKUltra biomedical experiments which used 100 million LSD doses in secret on American and Canadian citizens and soldiers (paragraph 359-363). The Olson family received an official apology for that murder from President Ford in 1975.

H. Defendant CIA's MKUltra program first came to public notice in 1973, three years after Sandra's death. By 1970, defendant FBI had already human trafficked Lead Plaintiff's unwitting family to California beginning in Summer 1961 to destroy evidence of its Cointelpro violence using his unwitting father to destroy evidence of crimes traceable to FBI against civil rights activists by recycling medical x-rays from the sales targets list (clinics and hospitals where it had tracked the victims of violence). Its cover company, Pacific Paper Products, provided sales leads to Lead Plaintiff's father which targeted those specific clinics, along with the added commission incentives for this x-ray film (silver) recycling (evidence destruction) program (paragraphs 414-416). Defendant FBI's Cointelpro was publicly revealed in 1971 after a citizen-activist burglary, one year after Sandra died (paragraphs 51, 61, 332, 406, 600C NSEC-1). Lead Plaintiff's family was reassigned soon after Sandra's 1970 death from its long-time home church congregation to one led by an impostor elder, defendant BREYER (ARMY, CIA) while he was known as elder "Snow" in Kent, WA, in late Spring or Summer 1970 (paragraph 99d, 211, 417, 606L HEXP-3).

I. Audrey Brewer (age 18), the daughter of Lead Plaintiff's cousin, was murdered in Walla Walla, WA by a knife slashing of her carotid artery on September 6, 2011, at the hand of an emotionally and physically traumatized and otherwise completely non-violent female. Both Audrey and the perpetrator were most probably abused both preceding (by hijacking oxytocin –

the "love" hormone) and during that violent homicide (by hijacking adrenaline – the "fight or

flight" hormone) in an extreme event which resulted in Audrey's death, through hormone

hijacking by defendant CIA using the illegal BRMT bioweapon and bioweapon delivery system,

While this entire sequence was closely observed and manipulated by a misogynistic male who

had abused both women psychologically and/or physically, and was the apparent psychological

catalyst for this violent event (paragraphs 10, 412, 413, 600B, Interline Exhibit 1), defendant

CIA lurked in the background waiting for the optimum moment to conduct its lethal field test.

J. Audrey was murdered using the illegal BRMT bioweapon and bioweapon delivery

system. During the lead-up to the violent sequence, BRMT illegally dosed oxytocin to both

women at varying times both by a remote operator operating in proximity in public spaces and

by secret video monitoring typically embedded in electronic devices which are permanently

connected to electricity sources (televisions, computers, cell phones, fire detection devices,

carbon monoxide alarms and similar devices) to observe both women over time, so as to time the

oxytocin dosing abuses of both Audrey and her assailant for the purpose of orchestrating the

relationships, then adrenaline to orchestrate and magnify the biochemical sense of conflict,

confrontation, and the specific violent incident which led to Audrey's death, for the purpose of

testing and evaluating the modern illegal BRMT bioweapon's effectiveness in creating and

sustaining violent events. Such field tests validate the BRMT bioweapon and bioweapon delivery

system for use in defendant CIA assassinations by remote means in otherwise apparently natural

scenes and circumstances of violence. This is consistent with CIA's documented past pattern of

practice (paragraphs 359-402), including in Frank Olson's death by LSD overdose and

subsequent toss from an upper floor hotel window in NYC after he raised ethical and legal

concerns about the illegal MKUltra program (see at paragraph 802H above). The ability to

manipulate extreme emotion and control physical violence are not in doubt and are also directly

echoed in lethality attempts against the Lead Plaintiff including, without limitation, at paragraphs 58(1), 537e, 614 HEXP-11, 700, 701, 708 Lethl-7, 8, 15. Interline Exhibit 15C.

K. An additional tragic consequence of this murder and subsequent trauma was the divorce of Audrey's parents, Lead Plaintiff's cousin and his spouse. That trauma was similar to the marital trauma Lead Plaintiff's family nearly suffered in the 4-5 years after Sandra's death. Divorce was and remains extremely rare among members of this very close-knit Quaker-based religious group which has extraordinarily strong conservative family values.

L. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family and this religious group, and to other yet unknown plaintiffs, by defendant UNITED STATES as related at paragraphs 403-584.

M. The illegal BRMT bioweapon and bioweapon delivery system, and its fraudulent concealment are among the principal underlying causes and motivations (*mens rea*) of the extraordinary variety of knowing criminal offenses and civil acts, violations, and injuries in this complaint against constitutional rights, all of which are constitutionally and statutorily prohibited to defendant UNITED STATES and its co-conspirators, both within and without the territory of the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this 1972 international treaty (referred to as the "*Bioweapons Treaty*" herein) on December 16, 1974. The treaty was signed by the President on January 22, 1975, and thereby attained the force of law in the United States of America on that date and entered into force internationally on March 26, 1975. Under treaty Article I (emphasis added):

"Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain: (1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

N.     As defined at 18 U.S.C. § 178(2):

"toxin means the toxic material or product of .... animals....a recombinant or synthesized molecule, whatever their origin and method of production, and includes – any....biological product that may be engineered as a result of biotechnology produced by a living organism; or... any...biological product..."

O. The 1972 *Bioweapons Treaty* prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly hijacks (forcibly takes over) the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought to physical injury and death. As research, development, and deployment of the illegal BRMT bioweapon, bioweapon delivery technology, and neurological science have all progressed since the 1970s, the capability of this illegal BRMT bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as adrenaline – "fight or flight," melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) using a local bioweapon device; to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions including, without limitation, breathing, heart rhythms,

emotions, and reactive muscle movements, among other things; all of which can now be remotely and very precisely controlled, both as individual illegal acts against a person, and as lengthy sequences of illegal acts against a person by defendant UNITED STATES. Defendant UNITED STATES can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault using an illegal and internationally prohibited bioweapon and bioweapon delivery system in violation of the 1972 Bioweapons Treaty by defendant UNITED STATES. In so doing, defendant UNITED STATES also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in this complaint.

P. The clear criminal offenses (18 U.S.C. § 175) and civil acts, violations, and injuries underlying this entire conspiracy, as alleged herein and as will be further developed and affirmed through discovery are, are in part related to, and are in part motivated by, defendant UNITED STATES' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by defendant UNITED STATES acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified 1972 *Bioweapons Treaty*. Further, defendant UNITED STATES has and does engage in an on-going conspiracy to fraudulently conceal, cover up, and sustain this illegal pattern for over five decades of its willful and knowing violations of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. In doing so, defendant UNITED STATES has and does directly and knowingly violate 18 U.S.C. § 175:

"Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

Q. This illegal and internationally prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the late 1960s or early 1970s, leveraging the illegal biomedical human hormone hijacking experiments conducted on Lead Plaintiff in 1968, and most probably on other unknown victims in the 1960s. Throughout the entire illegal progression, from 1940s origins in Hitler's Dachau Concentration Camps, through defendant UNITED STATES' secret import of that program's doctors, scientists, and technicians at the end of World War II, to eventually become defendant CIA's program director Dr. Sidney Gottleib's MKUltra LSD drugging program, and through its continuation as the illegal and prohibited BRMT bioweapon and bioweapon delivery system, defendant UNITED STATES has and does violate our Constitution and US law through (i) its own myriad departments and agencies coordinated to engage in patterns of racketeering acts (as they are known under PL 91-452, RICO, and the amendments thereto since 1970) and (ii) by engaging co-conspirator defendants including other police powers and intelligence agencies, press, and other interested persons and groups in its conspiracy. Defendant UNITED STATES, through its own and its co-conspirator defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to employ originating and sustaining principals and other knowing co-conspirators (including, without limitation, defendant BURNS, and GARLAND), using a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as against the Lead Plaintiff and other plaintiff victims of this class.

R. As such, defendant UNITED STATES has been, is, and continues to be, directly

liable, as well as indirectly and vicariously liable, for the conduct of all acts, violations, and

injuries against Lead Plaintiff and this class of injured plaintiffs. This class of plaintiff victims

includes those who are, without limitation, direct victims, heirs of deceased persons, permanently

disabled persons, and others who have had their properties, businesses, and families destroyed,

been incarcerated as a result of defendants' predicate acts, and have and are otherwise directly or

indirectly injured by these willful and knowing acts, and by the on-going violations of this

associated-in-fact enterprise, which has over time grown to encompass a wide variety of

domestic and international police powers and intelligence operations, as well as press, other

entities, and individuals. Discovery will provide critical confirming information directly from

these institutional and individual defendants and, among some who presented at the time as

family members, their children.

## 804. CLAIMS FOR RELIEF - COUNT 4

### Violations of Constitutional Rights Under the Fourth, Fifth, Eighth, Fourteenth Amendments

#### Attempted Murder

| Defendants identified at paragraph 799 have and/or do violate the following statutes: ||
|---|---|
| United States Code: | 18 U.S.C. §§ 175, 956, 1113, 1119, 1961-1968, 2332b; 42 U.S.C. 1985(3) |
| Washington: | RCW § 9A.28.020 |
| New Jersey: | NJ Rev Stat §§ 2C:5-1, 2C:11-3, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 110; 125.27(a)(v), 460.00 through 460.80, 490.25 |
| California: | Cal Penal Code §§ 187(a)/664 |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Paragraph 803 subparagraphs E through Y are specifically incorporated by reference

to avoid their repetition in this paragraph. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in attempts to cause and create injury and death to the Lead Plaintiff as specifically cited and described at final subparagraph of this paragraph 804 below, both within and without the territory of these states and of the UNITED STATES. Defendants have and do act, in their series of conspiracies and attempts to defraud, entrap, incriminate, discredit, disable, and/or destroy the Lead Plaintiff, as particularly cited and described in each subcount in the table at the next subparagraph below, both within and without the territory of these states and of the United States. This long-running, comprehensive, and systematic pattern of associated-in-fact enterprise racketeering acts has and does sustain the fraudulent concealment of (i) the illegal BRMT bioweapon and bioweapon delivery system, of (iii) the associated-in-fact illegal enterprise itself, of (iii) continuing obstructions of justice both by acts and by willful blindness, and (iv) perpetuate the destruction of evidence of prior criminal acts, and of acts, injuries, and violations of constitutional, common law, and statutory Privileges and Immunities, by these defendants, all directed without legal cause under color of law at these specifically targeted plaintiffs. Discovery will provide further specific evidence relevant to each noted incident and more incidents of such acts, both survived by the targeted persons and likely not survived, against members of this class of plaintiffs. These acts, violations, and injuries are representative of those perpetrated by these defendants on this class of plaintiffs.

C. Lead Plaintiff is an active person who regularly engages in exercise, has an excellent sense of balance, and a demonstrated history of sports and other activities which have not, on their own, led to any loss of balance. Lead Plaintiff is an extremely emotionally stable person not

prone to panic, phobias, or irrational thoughts or thought processes, with strong and deep

analytical professional education, training, and experience. See paragraphs 320e, LPEE pages

190-236. Lead Plaintiff has and does have regular medical examinations and tests (except

between June 2008 and October 2010 during the period when defendant CIA added remotely

applied physical torture, paragraph 606 HEXP-3, while there was no practical affordable medical

access, to the biochemical and coercive psychological operations from Kirkland, WA, paragraph

604 HEXP-2, leading to another suicide ideation), including neurological examinations, which

disclose no known injury or disability which would lead to loss of balance or mental reasoning

ability, except by the purposeful biochemical hijackings of brain chemistry by the illegal and

internationally prohibited BRMT bioweapon and bioweapon delivery system.

    D. These acts and injuries are representative of those perpetrated by defendants on this

class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
|  | NSEC National Security Pretexting and Entanglements |  |
| 604-606, 620 | HEXP Illegal Human Experimentation | 1-3, 17 |
|  | RGTS Individual Rights Violations and Conspiracies |  |
|  | RICO Racketeering |  |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 805. CLAIMS FOR RELIEF – COUNT 5

### Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments

#### Conspiracy to Murder

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 175, 1117, 1961-1968, 1981 |
| Washington: | RCW § 9A.28.040(1) |
| New Jersey: | NJ Rev Stat §§ 2C:5-2, 2C:11-3, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 105.15; 125.27(a)(v), 460.00 through 460.80, 490.25 |
| California: | Cal. Penal Code §§ 182(a)(1), 187(a) |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to

be identified through the discovery process have and do act in violation of federal and state

statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of

conspiracies to cause and create injury and death to these plaintiffs as specifically cited and

described at all subparagraphs in this paragraph, both within and without the territory of these

states, and of the United States. These conspiracies include, without limitation and subject to

discovery, the extreme traumas and deaths during illegal human experimentation on Lead

Plaintiff and other immediate and extended family members in the development of the illegal

BRMT bioweapon and bioweapon delivery system in:

(i)    the medically prescribed aspirin/codeine overdose death of Sandra Darlene

Brewer (age 11) of Reye Syndrome in April 1970, at the hand of a certain embedded federal

medical doctor KOHLER (paragraphs 99d, 417, 418, 714, 740, 803C-D, 805B(i), H, S, BS,

806B, 814B), then practicing medicine in Federal Way, WA;

(ii)    the death of Audrey Brewer (age 18) in September 2011 at the hand of an armed

perpetrator manipulated by psychological coercion and by the illegal BRMT bioweapon and

bioweapon delivery system brain hijacking described herein, and

(iii)    the attempts on the Lead Plaintiff's life and other innocent lives described at

paragraphs 694-710 LETHL-1 through LETHL-17 and Interline Exhibit 15.

C. These conspiracies to commit violent acts in pursuit of deadly outcomes against these

three members of an extended family of the descendants of Earl Brewer, Cashmere, WA, and his

father William John Brewer, a Civil War recipient of the Medal of Honor as a conscientious

objector, were and are integral elements of religious discrimination used by defendant UNITED

STATES which illegally selected these US persons for direct persecution in its illegal pursuit of

the prohibited BRMT bioweapon and bioweapon delivery system to pursue its goal of mind

control of human subjects, which was a parallel program to the illegal defendant CIA MKUltra

program, and which ultimately supplanted and replaced that failed illegal MKUltra program of

LSD drugging for mind control.

**Lead Plaintiff's Family Of Origin Was Trafficked Into 1970 Family Trauma -
Sandra's Death At Age 11**

D. Defendant FBI's illegal Cointelpro program and defendant CIA's illegal MKUltra LSD program (which was run in cooperation with defendant ARMY Bioweapons Lab and abused members of its Medical Corps medics) were both well underway in the 1950s during the time when Lead Plaintiff's father Don was drafted into defendant ARMY. He was a religious conscientious objector and served as a medical corpsman at Fort Lewis, WA during the Korean War era. A few years after leaving defendant ARMY, Lead Plaintiff's unwitting father Don was employed and surreptitiously human trafficked in 1961 by an illicit defendant FBI cover company, Pacific Paper Products, Tacoma, Washington to northern California in 1961 and southern California in 1962. Ostensibly employed there as a medical products sales representative targeting health care practices and facilities, he sold disposable paper examination room table covers and surgical paper drapes for operating tables.

E. Lead Plaintiff's father Don was first employed in northern California for a year, then moved to southern California for a second year, to follow a built list of specific sales leads at medical treatment facilities – clinics and hospitals - which the cover company provided. By using federal funds to subsidize the medical paper products company operations, this defendant FBI cover company undercut private competitors' prices to gain market access to specific medical facilities targeted by defendant FBI. Lead Plaintiff's father Don was offered a commission bonus for securing and recycling x-ray films from these same health care practices and facilities. With a young family of five from low cost Washington living in far more expensive California, he pursued this added commission income for medical x-ray films recycling.

F. Defendant FBI's true intent in secretly employing Lead Plaintiff's father Don at the defendant FBI cover company, Pacific Paper Products, was to collect and destroy the x-ray medical evidence of illegal Cointelpro physical violence to victims of FBI's war on civil rights in

the United States. Defendant FBI's Cointelpro operations included violent acts by FBI agents,

other police powers, informants, and by violent criminal militias funded by FBI between 1956

and 1971. Offered a third year of employment if he moved to Texas to continue sales work and

secret evidence destruction program he was unwittingly performing for defendant FBI, he

declined to move his family again year after year and returned to Washington state in 1963.

G. On his return to Washington state, Lead Plaintiff's father Don was befriended,

surveilled, and manipulated by defendant undercover FBI embedded agent Earl Keller, posing as

a fuel oil salesman at Smith Brothers Dairy in Kent, WA where Don worked as a route delivery

driver and then as owner of a Des Moines, WA area dairy products delivery route purchased

from Alan Fisher, between 1963 into the 1970s.

### Reye Syndrome Death Of Sandra, Age 11 Was Directly Caused Or Dramatically Accelerated By Defendant United States' Embedded Physician Kohler

H. Lead Plaintiff was age 14 on January 1, 1970. His family of origin experienced a

series of extreme emotional experiences during 1970 as his brother was born in January (echoing

the 15 year difference in ages between his father Don and uncle Bruce), his sister Sandra died

from Reye Syndrome. Reye Syndrome is triggers extremely rapid brain and liver swelling first

described in The Lancet, British medical journal in a 1963 article describing Reye Syndrome at

https://www.sciencedirect.com/getaccess/pii/S0140673663905543/purchase. Sandra's death was

caused family doctor KOHLER (paragraphs 99d, 417, 418, 714, 740, 803C-D, 805B(i), H, S, BS,

806B, 814B), who prescribed an extreme dose of aspirin (the cause of Reye Syndrome) which

was masked by opiate pain-killer codeine in the same prescription while she was experiencing

influenza in April 1970. This prescription and its strength magnified the adverse medical effects

of Reye Syndrome's extreme rapidity of salicyclate (aspirin) damage to the brain and liver by

masking the pain (with codeine, an opiate) from Sandra for a time, which depressed the

symptoms and functionally greatly increased the chances she would die from Reye Syndrome.

She died within 24 hours of receiving this fatal prescribed overdose of salicylates (aspirin) with

the pain of Reye Syndrome brain swelling partially masked by codeine (an opiate), as described:

**Salicylates Toxicity (emphasis added):**

"In an acute salicylate overdose, the onset of symptoms will occur within 3 to
8 hours. The severity of symptoms is dependent on the amount ingested. For mild
ingestions (salicylate levels 40 to 80 mg/dL) nausea, vomiting, and generalized
abdominal pain are common. Tachypnea (rapid, shallow breathing) is usually
present. Headaches and dizziness may also occur. The classic finding of tinnitus may
also be present. However, this can occur at lower, non-toxic levels.

Patients with moderate salicylate toxicity (80 to 100 mg/dL) will experience
more severe neurological symptoms. These can include confusion, slurred speech,
and hallucinations. Tachypnea is more pronounced and is accompanied by
tachycardia and orthostatic hypotension (lightheadedness). Expect these symptoms
6 to 18 hours after ingestion.

Salicylate levels greater than 100 mg/dL are considered severe toxicity and
occur 12 to 24 hours after ingestion. Damage to the basement membranes will
cause cerebral and pulmonary edema (brain swelling and fluid accumulation).
Patients may become obtunded and develop seizures. Hypoventilation may replace
hyperventilation, which is concerning for impending respiratory failure.
Endotracheal intubation, while not ideal for the metabolic disorders, may be
necessary for airway protection. Hypotension due to acidosis and hypovolemia is
possible. Cardiac dysrhythmias may occur. Sinus tachycardia is the most common.
Cardiac arrest may also occur with asystole being the most common rhythm."

*Source:* https://www.ncbi.nlm.nih.gov/books/NBK499879/



**The Lancet**

Volume 282, Issue 7311, 12 October 1963, Pages 749-752



ORIGINAL ARTICLES

# ENCEPHALOPATHY AND FATTY DEGENERATION OF THE VISCERA A DISEASE ENTITY IN CHILDHOOD

R.D.K. Reye M.D. Sydney, M.R.A.C.P. (DIRECTOR OF PATHOLOGY),

Graeme Morgan M.R.A.C.P. (CHIEF RESIDENT MEDICAL OFFICER) [2],

J. Baral M.B. Sydney (RESIDENT PATHOLOGIST) [1]

I. Sandra's condition around 3PM the afternoon before her death indicated extreme head pain from swelling and fluid accumulation within the skull to the then 14 year old Lead Plaintiff. While Lead Plaintiff was present in her bedroom for about ten minutes trying to comfort her, she sat up and rocked back to the fully reclining position in her bed repeatedly as she cried out in pain, holding both hands to her head. She was transported to Mary Bridge Children's hospital in Tacoma, WA by ambulance around 4:30PM and died early the following morning.

### Family Is Abrupt Trafficking To Fraudulent Home Churches And Congregants In Kent, WA And Northeast Tacoma, WA

J. Around June 1970, within 4-8 weeks after Sandra's death, the family was told to move from the home church they had attended in Convington, WA, since their Summer 1963 return from California. This transfer to a different home-based church congregation of total strangers in this tight knit community was communicated to the Lead Plaintiff's father Don by church ministers who traveled among these home meeting places in their assigned territories (called workers in this church). There was no particular reason given by the workers for moving them

away from the comfort of the familiar fellowship within weeks after Sandra's death into another
home-based church congregation (typically 16-20 people in 3-5 families).

K. The family was transferred to the home church congregation of elder "Snow."
(Stephen BREYER) on about 40 acres in Kent, WA, who then hosted these Sunday home
religious services from mid-1970, a few weeks after the death of Lead Plaintiff's sister Sandra
from Reye Syndrome at age 11 until around 1972. This transfer required defendant UNITED
STATES to infiltrate this church in this particular area of King County, WA, either while posing
as workers (whose territories are assigned by more senior worker leaders) or for the illicit
purpose of directly influencing those senior workers who directed the church workers to make
this reassignment to a group of strangers hosted by Snow (BREYER).

L. This new group met in a home in Kent, WA, within five to seven miles of the original
Covington, WA area home church. This directed transfer brought the family into contact with
complete strangers they did not know. This was very unusual in this small, tight-knit community
where the family had lived among fellow worshippers, relatives, and friends in this church
community of friends in the Enumclaw-Kent-Federal Way area of southern King County, WA
since both parents had been children, except for the two years spent in California between
Summer 1961 and Summer 1963. Church members were well acquainted with friends from other
church gatherings in the region. The church held weekly gospel meetings in rented community
halls attended by dozens of friends from different home churches every Sunday night most of the
year, held annual special meetings of hundreds of friends, and gathered thousands of friends
gathered in a series of annual conventions held in various regions of different states, which
featured four days of three per day meetings with workers and friends who traveled from other
areas of the state and country to preach and to attend, so there was little reason they would not
have known these congregants as friends.

M. Soon after this reassignment to the Snow (defendant BREYER) home church, the family was hosted for an after-meeting Sunday afternoon dinner, where they were fed a meat product as the main course. After the dinner, the male head of that family told Lead Plaintiff's father Don they had just had horsemeat for that Sunday dinner, likely believing it would provoke an angry reaction from his father Don . It was well known that Lead Plaintiff's father Don loved horses from his first ownership of them as a teenager, and then had a number of horses at the family's Federal Way home, beginning about 1966. This demonstrates the clear malice and complete lack of understanding of the ethic and culture of people in this religion by these federal agents, most probably defendant FBI in this particular scenario. The Lead Plaintiff father Don's emotional reaction was thoughtful, as he verbally compared the taste and texture of the meat to other meats, not even slightly angry, and based in the naïve belief that these people were actually friends in this tight-knit high trust community of fellow worshippers. This family and the small handful of other families in the faked Snow (BREYER) home church congregation were undercover personnel of defendant UNITED STATES (ARMY, CIA, FBI, USMS) deliberately assigned in support of the illegal BRMT bioweapon and bioweapon delivery system development program while masquerading as fellow worshippers.

N. The Lead Plaintiff's family attended this Snow (defendant BREYER) congregation for about two years before being moved again to another congregation near Des Moines, WA, where Lead Plaintiff would attend his last Sunday services as a teen, before he reluctantly parted from this Quaker-based church he had grown up in since birth.

O. After Sandra's death, the Lead Plaintiff's family was also removed about the same time in 1970 from the Wednesday night bible study at the Hansen residence in Edgewood, WA, a few miles south of their Federal Way, WA to a home Bible study meeting in northeast Tacoma. (Sandra's surviving twin sister married a member of that same Hansen family years later.) While

attending this unfamiliar northeast Tacoma home church one Wednesday night around June

1970, Lead Plaintiff's 4-6 month old brother was teething and fussing during one of those

Wednesday night bible study meetings. He was offered a small thin glass two sphere bubble-

shaped hourglass filled with an orange fluid, which used hand temperature on one sphere to

bubble the orange liquid into the other sphere. This object was accepted, and he bit down on one

sphere, which broke in his mouth. The broken glass was quickly cleared from his mouth, and he

was rushed by Lead Plaintiff's parents to Mary Bridge Children's Hospital, where he was placed

in the same room where Sandra had died about 2-3 months earlier. He survived this trauma.

P. Both Lead Plaintiff's paternal great-grandparents then died in their 90s within 6-8

weeks of one another in Summer 1970.

Q. The Lead Plaintiff's family was systematically and programmatically traumatized by

this series of extreme psychological impact events within the first seven months of 1970, and by

their removal from their natural religious support groups in the two church congregations to

fraudulent meetings comprised of complete strangers who appeared to share their faith (actually

defendant UNITED STATES personnel carefully positioned in advance of these traumas and

posing as church members) who displayed micro-aggressive psychological behaviors including,

without limitation, the horsemeat incident related at paragraph 805M above. These behaviors

supported illegal medical research on the Lead Plaintiff's family which began in the 1950s as

Lead Plaintiff's father Don served honorably in defendant ARMY Medical Corps, and continues

into the present across four generation of this extended family and religion, all by systematically

abusing religious and other freedoms using the illegal BRMT bioweapon and bioweapon

delivery system, rights violations, and racketeering acts by defendant UNITED STATES and its

co-conspirators, descendants of Quaker defendant ARMY Medal of Honor winner who helped

free slaves and reunite the United States of America between 1861-1865.

R. To accomplish this 1970 church transfer required elaborate pre-planning to (i) penetrate the church sufficiently to create the reassignment after Sandra's death, to (ii) acquire a location in the immediate area of the existing home-based church locations where the Lead Plaintiff's family participated for the fraudulent church meetings which was sufficiently separate from others nearby residences to avoid notice, and (iii) study the religion sufficiently to understand its organization structure, customary forms and manners of worship practices, and customary modes of speaking, (iv) and to select and train the assigned fraudulent congregants ("friends" as known in various Quaker religious groups). These activities would require several years of research to establish the totality of the church pattern of customary practices, including attendance at services over an extended period of time, at least one year is required to directly experience the entire annual cycle of worship.

S. Defendant UNITED STATES, and individual government personnel including, without limitation, defendant BREYER and unknown others, acted in violation of the constitutional rights found in the Establishment Clause and case law which prevailed at the time and has been renewed by Congress in 42 U.S.C. §§ 2000bb-2000bb-4, and conspired to engage in this deliberate human traumatization of an extended American family, for the criminal purpose of developing an illegal weapons system using illegal human medical experimentation on US persons, to and including conspiring to orchestrate the death of Sandra Darlene Brewer at age 11 from a medical cause. This cause was described in British medical journal The Lancet in 1963 and known to cause and create deadly outcomes (murder). This murder was surreptitiously concealed as a medical cure administered by community-embedded physician KOHLER (paragraphs 99d, 417, 418, 714, 740, 803C-D, 805B(i), H, S, BS, 806B, 814B), and further concealed by color of law abuse of state secret privilege in violation of 5 U.S.C. § 22 (now amended as 5 U.S.C. § 301, paragraph 260) and *United States v. Reynolds*, 345 U.S. 1 (1953).

T. In 1970, the year Sandra died, Congress adopted and President Nixon signed the

Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 to combat

organized crime. Defendant FBI's Cointelpro was discovered by a citizen burglary in 1971,

CIA's secret LSD drug program MKUltra was first publicly disclosed in 1973. No criminal

prosecutions resulted from either of those decades of criminal racketeering acts by defendants

FBI and CIA. The pattern of racketeering acts conducted by an associated-in-fact enterprise in

defendants' actual field operations as directly experienced by Lead Plaintiff (the majority of the

content of this complaint) then did, and still does, match the statutory definitions at 18 U.S.C. §

1961.

U. In 2018, Lead Plaintiff was trafficked to a location 550 feet from two co-indicted

conspirators in the New Jersey Senator Menendez national security investigation. In July through

November, he was subjected to an indirect verbal threat and three direct instances of violence

(Interline Exhibit 15) which could have caused death and did result in direct injury using the

illegal BRMT bioweapon and bioweapon delivery system in a situation requiring a conspiracy to

orchestrate (Interline Exhibit 15C). While the technology has been updated, the pattern of

racketeering acts has not significantly changed. The shoe fit in 1970, it still fits.

### Lead Plaintiff's Own 1968 Involuntary Servitude And Trafficking At Age 12 Had Preceded 1970 Family Traumas

V. Lead Plaintiff was first directly human trafficked in 1968 at age 12 by a former

defendant ARMY Medical Corps "buddy" of his father, Gary JACK, for an illegal biomedical

experiment on him during a camping trip by an ARMY or CIA bioweapons team abusing Lead

Plaintiff's oxytocin hormones by using a battery powered close proximity remote device to

activate oxytocin (love) hormones in a California State Park tent camping site near Redwood

National Park (paragraph 3).

W. As 14 year old Lead Plaintiff attended the second semester of ninth grade at Lakota

Junior High School in 1970, majority age undercover intelligence agent Lani FISH (paragraphs

415, 417B, 803AW, FBI) posed as a fellow student, played french horn in the Lakota Junior

High School band alongside Lead Plaintiff, and attended some of the same classes, including a

class taught by Suss, recollected as a math teacher. Suss indirectly called out Lead Plaintiff in

front of the class for a junior high school romantic crush 3 or 4 page love letter written at home

which Lead Plaintiff had handed to FISH (who later reappeared Dorothy FULLER in the early

1980s, paragraph 415, 417B, 803AW). This was perpetrated by placing a local BRMT hormone

manipulation device in the Lead Plaintiff's home to get the required oxytocin (love) hormone

boost as he wrote the junior high crush letter. A bedroom nightstand tube AM radio is the most

probable source of the specific radio frequency emissions used by defendant CIA or ARMY to

abnormally stimulate the posterior pituitary gland to secrete additional oxytocin (love hormone).

According to the Cleveland Clinic: "Your hypothalamus makes oxytocin, but your posterior

pituitary gland stores and releases it into your bloodstream."

X. Lani FISH, as she presented in 1970 during the defendant BREYER management of

the BRMT program, was also very probably later known as Dorothy V. FULLER, paragraph

610A HEXP-7, while Lead Plaintiff was at Deloitte Seattle in 1979-1986 and during the 1988

transition from spouse Lynne to spouse Jeanette (paragraphs 609, 610) orchestrated by illegal

BRMT bioweapon and bioweapon delivery system program manager BURNS and by WATERS.

Y. Doug DANIELSON (paragraphs 417B, 418), a saxophone player in the Lakota Junior

High School band, also much older in fact, later appeared to the Lead Plaintiff reporting himself

as a medically discharged defendant ARMY Ranger, due to a microwave radar eye injury. This

was most probably an early security backcheck in the 1970s used to test the security of these

illegal surreptitious operations. Lead Plaintiff has subsequently used his memory of this

infrequently repeated tradecraft security backcheck technique to work backwards through his forensic review in reconstructing the sequence of events and the cover identities of various co-conspirators who worked for defendant UNITED STATES or other police powers and intelligence operations defendants.

Z. Lead Plaintiff moved to tenth grade at Decatur High School in Fall 1970. This public high school was a unique school district spin-out high school formed three years before the building was completed. It met in 1970-71 in the former administration annex adjacent to Federal Way High School, had few teachers and only about 80-90 students, with most classes were conducted by Federal Way High School in the high school building. The other two high schools then graduated about 300-350 students in each graduating class.

AA. Class members beginning in 1970-71 included Shawn Morrissey (Neal K. KATYAL, who posed as a Naval Academy aspirant, either actually defendant DOJ or DOD department or agency, who much later served in defendant DOJ's Solicitor General's office at the same time defendant WEISSMAN was FBI General Counsel to defendant MUELLER) and Thomas Grady (unknown identity, who posed as a West Point aspirant). KATYAL fell from a horse and broke a rib or two while riding bareback as the Lead Plaintiff looked on while giving Morrissey and Grady horse riding lessons around 1970-71 at the Caudle farm which the family rented for horse pasture, around the same time Lead Plaintiff's sister fell from a Shetland pony and struck her temple on a water faucet in the front yard. Both incidents were most probably caused using a sniperscope aimed version of the illegal BRMT bioweapon to aim and disrupt balance and equilibrium which was fired by a camouflaged and concealed individual from a nearby location, causing these falls from horseback.

**Illegal BRMT Involuntary Servitude And Human Trafficking Pattern Against Lead Plaintiff And Other Family Members Continued After 1970 Family Traumas**

AB. Decatur High School was moved in Fall 1971 to a newly constructed campus at Illahee Junior High School where normal sized classes of students followed the Lead Plaintiff's abnormally small class of 80-90 students. Among the new students who arrived in this larger facility were the Backman "children," Frank and Mariam. Frank, with a receding chin, was in the same graduating class as Lead Plaintiff, and Mariam, a very attractive blond female, presented as a year younger (and in identities at paragraphs 211, 417B, 467, 717, 762 table, 805AC, AK). Mariam's ostensible boyfriend in 1971 was Stuart Bettesworth, who was most plausibly identified in March 2024 as Merrick GARLAND, based upon the morphological comparability of face shape and structure, relative age, and body frame size and shape, as well the distinctive wavy hair. GARLAND definitively reappeared in 1974-76 as Robert Mandich, paragraph 5, 99m, 211, 320, 419, 600G, 803Q, 833F, while still working with defendant BREYER, illegal BRMT bioweapon and bioweapon delivery system program manager. In 1971, Lead Plaintiff was attending the fraudulent cutout home church religious services with his family at the Kent, WA residence used by defendant BREYER while he posed as church elder Snow (paragraphs 21(i), 99M, 211, 417-418), and at the Northeast Tacoma location of Wednesday night bible study, during the two years following his 11 year old sister Sandra's death in April 1970, as related in paragraph 803C-H.

AD. The Backman family's father (or poser) reportedly served as FAA General Counsel in the Pacific Northwest Region office. This Boeing Field, Seattle, WA FAA office, among other duties, supervised Boeing, which manufactured and finished the Boeing 747SP sold to the Kingdom of Saudi Arabia for use by the King in the late 1970s. All Boeing 747s were built in the Everett, WA plant. CNA Industrial Engineering, a captive cover company of defendant UNITED STATES, which later employed the Lead Plaintiff from 1996-2002 while defendant FAUCI posed as its founder, was the principal material handling engineering consultant for the Boeing

Everett 747 manufacturing plant's production equipment design, specification, and installation (paragraph 457, 602H NSEC-3, 841E), as that 98.3 acres under one roof Boeing 747 assembly plant was being built through the 1960's, completed in 1967. The later employment of the Lead Plaintiff at CNA is further evidence of the overall pattern of human trafficking, employment discrimination, and involuntary servitude, and of this durable conspiracy by defendant UNITED STATES departments, agencies, officers, agents, and personnel in systematic violations of constitutional rights and statutes.

AE. In Summer 1972, near Greenwater, WA, defendant UNITED STATES continued its pattern of pretexting Lead Plaintiff in police powers operations, and in intelligence and national security matters, for the purpose of perpetuating and covering up his involuntary servitude as a human subject of its illegal BRMT biomedical human subject experiments, and bioweapon and bioweapon weapon delivery system development, testing, and deployment in the early 1970s. While a high school teenager (at age 16 between his junior and senior years), he and his cousin, Steve Smith, encountered a very well dressed apparent hitchhiker with a briefcase and no vehicle breakdown anywhere in the area to explain his appearance and presence near a forest service logging access road about 5-7 miles south of Greenwater, WA. This male, almost certainly an FBI agent, joined them for a ride to the Greenwater Tavern in Greenwater, WA, then left a classified briefcase satellite phone in the bed of Lead Plaintiff's 1955 Ford pickup truck. The leather briefcase was spotted by Lead Plaintiff in the pickup bed a few miles after the hitchhiker was dropped off, he opened the briefcase out of curiosity, and then safely returned it to that agent at the Greenwater Tavern. With his fingerprints on the handle and locks of the briefcase, Lead Plaintiff had again been deliberately pretexted into a national security matter, as satellite phones would have been classified equipment unknown to the general public in 1972, as nearly everyone had rotary dial landline phones and there were no cell phones.

AF. Lead Plaintiff graduated Decatur High School in 1973 with the small spin-out class of 83-84 graduates where defendant KATYAL and Bettesworth (plausibly identified as GARLAND in March 2024) were present for periods of time, then he elected to attend Green River Community College despite his parent's concern about further education, which was not the family tradition.

AG. From Spring 1972 to Fall 1974, Lead Plaintiff's first job in high school was at an independent grocery store, Larry's Market, serviced by Associated Grocers (WEISSMAN FBI was then illegally embedded at this Seattle wholesale grocery cooperative in the 1970s prior to his illegal embed in the 1980s as General Manager of Puget Consumers Cooperative, where Lead Plaintiff was a Board member and Chair in the 1980s, described at paragraph 425-436). Larry Brewer, cousin of Lead Plaintiff's father Don, was the manager and co-owned the market, supposedly with the produce department manager, but the surreptitious co-owner was defendant FBI, which had embedded its agent posing as a co-owner partner (using defendant FBI funds for the investment) as the produce manager in the grocery store. This defendant FBI agent left several months after the Lead Plaintiff was first employed in 1972, ostensibly due to financial hardship and a medical condition which required kidney dialysis. Fellow employee, Brad, with distinctive red hair and mustache worked as a clerk in Larry's Market, and would reappear in later years in new identities, in the WSU MBA program and for years afterwards in the Pacific Northwest as Mike WORTHY (paragraphs 99k, 418, 422, 493, 726, 762 table, 770, 805AG, AK). His positive identification as an FBI agent came in 2023 through a photograph behind defendant WEISSMAN during a defendant WEISSMAN interview on MSNBC with defendant MELBER wherein red hair Mike WORTHY appears with WEISSMAN, apparently while posing in a Eastern District of New York (Brooklyn) U.S. Attorney group photo.

**Family Traumas Continued As Defendant BREYER Perpetuated Pattern Of
Involuntary Servitude And Trafficking After 1970**

AH. During this same early 1970s period, Lead Plaintiff's father Don was also subjected
to illegal BRMT bioweapon oxytocin hormone hijacking. A local BRMT bioweapon device was
installed in his route delivery truck, concealed inside the ice cream freezer unit, installed after
King County, WA health regulations were changed to require mechanical cooling of dairy
products, replacing ice cooling. The illegal BRMT bioweapon unit, hidden in this forward
mounted ice cream freezer unit, was activated by an operator stationed in proximity of the
delivery truck using a radio frequency remote control.

AI. Defendant UNITED STATES (CIA) housed a single divorced female at the end of
his delivery route. Defendant CIA used domestic U.S. brothels elsewhere during this same time
period, so this type of operation was not atypical of their operations. The illegal BRMT unit was
activated to give an oxytocin (love hormone) boost using a radio frequency remote control to
develop and sustain these specific event-driven oxytocin boosts for an uncertain time period, at
least four to six months in 1974.

AJ. These cumulative traumas contributed to family marital difficulties over the next few
years. These were the same hormone boosts experienced but not understood by Lead Plaintiff at
age 12 in 1968, and which he has experienced periodically since that time, paragraphs 608-614.
These hormone hijackings support the programmed destruction and fraudulently orchestrations
to construct American families, as targeted by defendant UNITED STATES (paragraphs 609-
610) and are also used in the programmed destructions of careers and enterprises as it chooses
(paragraphs 600-603, 639-693), all of which are practices consistent with those documented by
Congress in 1975 related to defendant FBI's illegal Cointelpro and defendant CIA's illegal
MKUltra programs and the criminal violations of rights and law documented during those illegal

programs. These are the direct consequences of defendant DOJ's failure to prosecute those felonies and the culture of impunity which continues to prevail as a result of the lack of any meaningful deterrent to federal criminal acts which are institutionally tacitly authorized by defendant UNITED STATES, regardless of Constitution, treaty, and law, all as fraudulently concealed by color of law abuse of state secrets privilege and police powers exemptions, and met with official silence when these criminal acts are reported to defendant DOJ.

AK. The links in this chain of conspiracy have been carefully analyzed and are built on explicit known identifications of individual defendants beginning in September 2023, and on their known patterns of common undercover employment in various defendant UNITED STATES departments and agencies within DOJ, DOD, CIA, and on those individuals' connections with defendant KCSD (defendant REICHERT and close subordinate Boyle, first and second husband of Lynne, who was thereafter married to Lead Plaintiff for a time), Maricopa County Sheriff (ARPAIO), NYPD, state police powers agencies in Washington, Massachusetts, New York and New Jersey, and across the parallel presences of defendants BREYER (Snow), KATYAL (Morrissey, Naval Academy aspirant who resided with School District BD chair explained as ex-Navy veteran), WEISSMAN (at Associated Grocers as self-reported), GARLAND (plausibly as Bettesworth, boyfriend of Mariam Backman in 1971), Brad red mustache at Larry's Market (paragraphs 99k, 418, 422, 493, 726, 762 table, 770, 805AG, AK, later Mike WORTHY at WSU MBA and thereafter, together with defendant FBI produce manager/business partner also at Larry's Market, co-owned by Lead Plaintiff's fathers cousin Larry Brewer, and embedded FBI minder Earl KELLER at Smith Brothers Dairy, which was Lead Plaintiff's father Don's employer and later wholesaler when he owned the route sold to him by Alan Fisher, all beginning in the late 1960s and continuing in the 1970s.

AL. This 1960s-1970s portion of the long-running conspiracy is built upon the definitive

links across the extended family of descendants of Earl Brewer (who was the son of William

John Brewer, Medal of Honor winner in freeing the slaves in the Civil War) in the family's

pursuit of the American dream through higher education, employment, and their

entrepreneurship in small businesses, all destroyed by corrupt police powers operations, to and

including surreptitious murders.

AM. This pattern of conduct is indicative of the complete surrounding, domination, and

subjugation of the family by defendant UNITED STATES in its illegal pursuit of the BRMT

bioweapon, which at this stage was a local device controlled by radio frequency remote control,

in an associated-in-fact enterprise and conspiracy which could only be accomplished by a

conspiracy across multiple defendant UNITED STATES departments, agencies, and personnel

with local co-conspirators in this pattern of systematic violations of constitutional rights, federal

and state statutes.

### Defendant BREYER Perpetuated Pattern Of Involuntary Servitude And Trafficking As Lead Plaintiff Attended College

AN. In Fall 1973, as a freshman at Green River Community College, Lead Plaintiff met

and was befriended by Donna Dickover and David Brunton, and by Terry Buckles, ostensibly an

employee of the Washington Library Network. From Green River Community College, Lead

Plaintiff then transferred to Washington State University in Pullman, WA in Fall 1974.

Defendant BREYER had repositioned to Spokane, WA by Fall 1974 while Lead Plaintiff

attended Washington State University, Pullman, WA, about 80 miles south of Spokane, WA with

Bill Sackville-West, GARLAND (Robert Mandich), and others identified herein at paragraph

419.

AO. Defendant UNITED STATES, primarily CIA, FBI, ARMY, USMS, BREYER,

GARLAND, CUNHA, DICKOVER, BRUNTON, William SACKVILLE-WEST, PAGE and

NG, continued this manipulation of romantic and intimate interests forward from high school

through his undergraduate program at Green River Community College, Auburn, WA in 1973-74

and Washington State University, Pullman, WA in 1974-1977.

AP. Transferring to Washington State University in Fall 1974, Lead Plaintiff entered

Perham Hall, a WSU student dormitory. Lead Plaintiff was unwittingly and unknowingly

handled throughout college and graduate school by federal agents posing as fellow students and

roommates beginning at Green River Community College, Auburn, Washington in 1973 by

Dickover and Brunton, who also accompanied Lead Plaintiff to Washington State University,

Pullman, Washington in 1974, where he met and developed friendships and/or close personal

relationships with defendants Craig PAGE, William SACKVILLE-WEST, other SACKVILLE-

WEST family members in Spokane, WA, Robert Mandich (GARLAND), CUNHA, BREYER in

Spokane, WA; as well as Linda Pogreba, Karen Raines, Susan Irish, Lynn Sorenson, Vic Jones,

James Carberry, Tracy Berry, Katherine "Kit" Andrews, Bob Ross, among many others, as an

undergraduate.

AQ. During his first semester, his first assigned roommate Jay Costa was replaced after a

few weeks by Andrew Ng, a British national from Hong Kong. Soon thereafter, the Resident

Assistant who supervised the Perham residence hall floor for WSU was replaced by Michael

CUNHA (ARMY), introduced as an AFROTC member working toward medical school

admission in psychiatry in the Air Force.

AR. These close college era friends included numerous persons who were in fact

government employees of defendants FBI, DOJ, CIA, ARMY including, without limitation,

some who may have unwittingly assisted in managing and sustaining the involuntary servitude of

the Lead Plaintiff and others who wittingly to support the secret, illegal development of the internationally prohibited BRMT bioweapon and bioweapon delivery system by defendant CIA (Science and Technology Directorate) and defendant ARMY (Bioweapons Lab).

AS. Lead Plaintiff met Mandich (GARLAND, who had plausibly posed as Stuart Bettesworth at Decatur High School) in defendant WSU Perham Hall residential dormitory in Fall 1974 to Spring 1975 when they resided on the same floor, then both also resided in WSU Nez Perce Village student apartments during the 1975-76 school year. Mandich (GARLAND) drove an older green Mercury Capri compact sedan with extensive door dings which he jokingly accused Lead Plaintiff of causing. Lead Plaintiff opened the door on his 1969 Ford Mustang, which door edge landed on one of the few places where the green paint was still intact and laughed at Mandich (GARLAND). GARLAND was then a subordinate and protégé of defendant BREYER in the illegal BRMT bioweapon and bioweapon delivery system program. GARLAND was dropped from that cover identity at some point, and later "resurrected" out of that cover identity and placed on the DC Appellate Court in 1997 and is now Attorney General since 2021. This federal court appointment occurred after BREYER was elevated in 1994 to the Supreme Court soon after his own "memorial service" at Spokane's downtown Presbyterian Church attended by the Lead Plaintiff alongside the "Sackville-West" family. The unwitting Lead Plaintiff flew back to Seattle from that 1990s memorial service on a first class upgrade, provided by and sitting alongside former CIA director Stansfield Turner, whom he had previously seen at the National Gallery of Art, East Building rotunda in Spring 1979. This connection was made during the identifications sequence subsequent to September 2023.

AT. While he was an undergraduate at defendant WSU, Lead Plaintiff had a close relationship with Bill and with other members of the Sackville-West family, and was a frequent weekend guest in their Spokane home between 1974 and 1977. One Christmas vacation, likely in

1975, Lead Plaintiff stayed at the Sackville-West home for the first several days of Christmas

break and arrived at his home in Federal Way, WA in the Sackville-West family's white

Chevrolet station wagon to his parent's great relief. He had neglected to tell them he would be

coming home a few days late and had been reported missing to the police in Pullman, WA when

he did not return at the expected time a few days earlier. In Spring 1976, defendant BREYER

asked, and Lead Plaintiff agreed, to haul the foundation pier blocks for the Sackville-West family

cabin from Spokane to a site adjacent to the USAF Survival School Range near Cusick and Usk,

WA in his blue Ford four wheel drive pickup, and later helped frame the cabin. Lead Plaintiff

also rocked infant Anne Sackville-West to sleep as a newborn in David (ostensibly BREYER's

son) and Laurie Sackville-West's home in the Spokane area. Laurie (DOLAN) was later Chief of

Staff to Washington Governor Gregoire. Lead Plaintiff was a frequent visitor to the Bill

Sackville-West home near Manitou Park in Spokane for years afterward into the 1990s, where

PAGE, his former college roommate, also lived for a number of years.

AU. Washington Governor Gregoire was supported by DOLAN as chief of staff.

DOLAN had posed as daughter-in-law Laurie, married to David, the son of Jack Sackville-West

(BREYER), who relocated to Spokane, WA sometime between 1972 and 1974. Gregoire's

predecessor was Washington Governor Locke whose administration included Wolfgang OPITZ,

a senior level budget agency executive (OFM), who had served as higher education advisor

immediately prior to Lead Plaintiff's volunteer work beginning about 1999 at AeA, American

Electronics Association, on higher education STEM programs expansion (paragraphs 526, 602H-

J NSEC-3, 606C HEXP-3) at colleges and universities in Washington state. OPITZ was

plausibly known as Terry BUCKLES, a Washington Library Network employee who Lead

Plaintiff knew while at Green River Community College in 1973-74. These relationships

coordinated across federal, state, and local governments under color of law will be further developed through discovery.

AV. Defendants BREYER, GARLAND, CUNHA, BURNS, and unknown other US government employees with the identified cover names in paragraphs 105 table, 226 table, 541 table, LPEE pages 934-1075 as officers, employees, agents, informants, and contractors of defendant UNITED STATES (DOJ, FBI, CIA, ARMY) acted in coordination with defendant WSU (Washington State University), a state chartered and funded land grant university with its own police powers operation, and with defendant WASH state, defendant KCSD and Whitman County Sheriff's Department, city and university police powers agencies to coordinate student housing and teaching assistant office assignments and specified assignment of federal personnel surrounding Lead Plaintiff during Lead Plaintiff's undergraduate and graduate programs, all as described at paragraphs 4(i), 5, 21(i), 48, 99d, 99m, 111, 211, 415, 419, 491-492, 541, 599(i)(a), 600G, 608C, 833F, 840C. All these defendants acted and conspired together, as described at (i) above, in the illegal BRMT bioweapon and bioweapon development program, and in conspiracy with state and local officials identified above.

AW. Lead Plaintiff has experienced these types of illegal operations, conspiracies, and rights violations, as he has been biomedically abused and subjugated by the illegal BRMT bioweapon and bioweapon delivery system which has and does hijack and suppress, without limitation, oxytocin (love), adrenaline (fight or flight), and other mood hormones for decades, beginning in 1968 (age 12, California campground, paragraphs 3, 417, 92), 1970 (Lani FISH love letter, paragraph 415, 417B, 803W), and 1974-1977 (various inaccessible female embedded agents) while he attended defendant WSU (Washington State University), paragraph 415.

AX. This pattern of defendants FBI, ARMY, and CIA abuses of constitutional rights is indicative of the complete surrounding, domination, and subjugation of the family by defendant

UNITED STATES in its illegal pursuit of the BRMT bioweapon which in the 1970s was a local device controlled by an operator or by radio frequency remote control. This pattern of acts, violations, and injuries could only be accomplished by a conspiracy across multiple defendant UNITED STATES departments, agencies, and personnel in systematic violations of constitutional rights and statutes.

### Lead Plaintiff's Uncle And His Family Abused Through Involuntary Servitude And Trafficking From 1960s Forward Was Managed By BREYER, BURNS, FAUCI

AY. Defendant BREYER, while employed by the UNITED STATES, most probably continuing his defendant ARMY service or at defendant CIA or DOJ in the late 1960s, directed the illegal BRMT bioweapon and bioweapon delivery system program focused on Lead Plaintiff and on his family of origin, and against other extended family members then residing in the region. Defendant BREYER almost certainly supervised the illegal subjugation and manipulation of Lead Plaintiff's uncle Bruce and family in Walla, Walla and Tri-Cities, WA during the 1970s into the 1980s as uncle Bruce returned to Walla Walla, WA from defendant ARMY Medical Corps service at Fort Hood, TX during the Vietnam War era.

AZ. After his defendant ARMY service, Lead Plaintiff's uncle Bruce was employed by Walla Walla Federal Savings and Loan, which failed during the 1980s S&L crisis. Soon thereafter, unable to find other work, Lead Plaintiff's uncle Bruce became an independent real estate appraiser, then moved from Walla Walla, WA to Tri-Cities (Richland, Kennewick, Pasco, WA) sometime in the mid-1980s. Tri-Cities was built around federal government operations at Hanford Nuclear Reservation, where weapons-grade uranium was produced during World War II and weapons grade plutonium production began in the 1950s. Hanford Nuclear Reservation operated until 1965-1987 when the nuclear reactors used in production of weapons-grade

plutonium were successively shut down. The region hosted defendant FBI national security
counterintelligence operations and agents.

BA. Lead Plaintiff's uncle Bruce was hired by Banner Bank, Bothell, WA in the 1990s
where he worked for several years before retiring to Walla Walla, WA. This shadow bank,
known herein as Banner Bank Bothell, was hidden under the name of the regional Banner Bank,
and used by defendant UNITED STATES to launder the funds which subsidized loss leading
cover company operations of CNA Industrial Engineering, where Lead Plaintiff worked from
1996-2002. Defendant FAUCI, posing as founder of CNA, frequently referenced Banner Bank
Bothell in his discussions with Lead Plaintiff regarding the funding of CNA operations which
employed Lead Plaintiff. These repeated mentions were most probably being used to backcheck
operational security, to determine if the unwitting Lead Plaintiff had made any connection with
the parallel manipulation of the uncle Bruce who worked at Banner Bank Bothell. This
embedded shadow bank was most probably run by an embedded defendant USMS or USSS
personnel who were also known to defendant ROSENBERG (FBI), subject to confirmation
through discovery. This overall pattern of fraudulent concealment was uncovered in 2023-24
during the latter stages of the Lead Plaintiff's forensic analysis of tradecraft methods and
practices.

BB. Defendant FBI's ROSENBERG, a deep cover illegal embedded agent at
NutraSource, Seattle, WA, routinely talked about Walla Walla wine tours in the 1980s and 1990s
during his on-going contacts with Lead Plaintiff. Walla Walla is a mid-size city with a slowly
growing population averaging 25,000 to 35,000 over the past four decades, and a regional
agricultural hub with a private college, Whitman College, and hometown media. The
surrounding region began developing a substantial reputation for wine making in the late 1980s
and 1990s. Defendant FBI's ROSENBERG was maneuvered into that NutraSource CEO position

out of an illegal FBI Anchorage filed office deep cover position by the illegally embedded FBI agent WEISSMAN as General Manager at PCC. Defendant WEISSMAN had originally formed NutraSource soon after Lead Plaintiff joined the PCC Board, subparagraph 805AG above. and defendant ESTABLISH, Fort Lee, NJ. Defendant ROSENBERG was a principal human trafficker of Lead Plaintiff with defendant CIA's BURNS and defendant NIAID's FAUCI in employment and residential locations from the mid-1980s into the 2000s, while his uncle, Bruce, was employed at Banner Bank Bothell. Bruce retired from Banner Bank Bothell back to his old college town and his wife's hometown Walla Walla, WA, where his son Burt and his wife were raising Audrey, their oldest child, and other grandchildren. Defendant FBI's ROSENBERG, a one hour airline flight away in Seattle, WA, was well positioned to oversee defendant FBI's human trafficking of these extended family members as he did with Lead Plaintiff until he trafficked Lead Plaintiff to the East Coast in late 2005.

BC. This pattern of defendants UNITED STATES, including DOJ, FBI, USMS, ARMY, and CIA, systematic abuses of constitutional rights is indicative of the complete surrounding, domination, and subjugation of the extended family by defendant UNITED STATES in its illegal pursuit of the BRMT bioweapon, which in the 1970s was a local device controlled by an operator or by radio frequency remote control. This pattern of acts, violations, and injuries could only be accomplished by a conspiracy across multiple defendant UNITED STATES departments, agencies, and personnel in systematic violations of constitutional rights and statutes.

### Lead Plaintiff's Uncle's Granddaughter Audrey Is Murdered At Age 18 In Defendant CIA's Illegal BRMT Tools of Violence Field Test

BD. Audrey (age 18) was murdered in Walla Walla, WA by a knife slashing of her carotid artery on September 6, 2011, at the hand of an emotionally traumatized and otherwise

completely non-violent female Angela. Audrey, the 18 year old homicide victim of this conspiracy, the daughter of Lead Plaintiff's cousin Burt, and the granddaughter of Lead Plaintiff's uncle Bruce, was born around 1993 and raised in Walla Walla, WA by Lead Plaintiff's cousin Burt and his spouse.

BE. Both Audrey and Angela, the perpetrator, were most probably serially abused with the untraceable illegal BRMT bioweapon and bioweapon delivery system in a defendant CIA field test of tools of violence by defendant CIA to validate the development sequence which they had worked through, during their series of biomedical and coercive psychological abuses of the Lead Plaintiff in 2008-2011 while he was used as an initial test subject for these Tools of Violence, as shown in Tools Of Violence tables A and B below at paragraph 805BH.

BF. Both Audrey and Angela were BRMT brain hijacked both during the series of events preceding the violent incident (by oxytocin – the "love" hormone and adrenaline – "fight or flight" hormone), and then most aggressively during that specific violent homicidal sequence (by adrenaline – the "fight or flight" hormone) in the extreme event which resulted in Audrey's death. This entire sequence was orchestrated by connecting these two victims to the common male "romantic" interest, then by closely observing and manipulating both Audrey and Angela through the misogynistic male who abused both women psychologically and/or physically. The male was the obvious and apparent psychological catalyst for this violent event (paragraph 10, 412, 413, 600B, Interline Exhibit 1) as defendant CIA lurked in the background (operating remotely by video in private and remotely by field operators waiting in public places for the optimum moment to conduct this ultimately lethal field test. This sequence echoes, in a relatively short period of time, the comparable repeated patterns of racketeering conduct which the Lead Plaintiff has experienced over a number of cycles, repeated across decades as related in this

complaint, particularly at paragraphs 604-614, 619 HEXP-1-11, 16; 632-634 RGTS 12-14; 695, 696, 698 LETHL-2,3, 5.

BG. Audrey was murdered using the illegal BRMT bioweapon and bioweapon delivery system. BRMT was used by remote operators operating in proximity of the two women in public spaces, and in supposedly private spaces by secret video monitoring, typically ultra-high resolution fiber optic cameras embedded in electronic devices such as televisions, computers, cell phones, fire detection devices, carbon monoxide alarms, and similar devices which are permanently connected to electricity sources or cable set-top box devices usable as secure virtual private networks. Defendant CIA observed both women over time to illegally use BRMT to biomanipulate hormones (such as oxytocin "love hormone" in the presence of the male) and other aspects of human behavior (pushing particular thoughts and moods on them) to biochemically hijack and abuse both Audrey and her assailant Angela for purpose of orchestrating the relationships, the interpersonal conflict, confrontation, and the violent incident.

BH. This sequence and the violent ultimately homicidal confrontation was used to test and evaluate the modern BRMT bioweapon's effectiveness to perpetrate and sustain violent behaviors. The gross motor muscular control used to manage muscle movement during the fatal longitudinal severing of the carotid artery echoes the pattern of lethality attempts against the Lead Plaintiff including, without limitation, at paragraphs 58(1), 537e, 614 HEXP-11, 700, 701, 708 Lethl-7, 8, 15, and Interline Exhibit 15C. Defendant CIA assassinations are a historical pattern of fact, as is the durable widespread scofflaw behavior of federal police powers and intelligence as related throughout this complaint and in Congressional reports, Presidential Commission reports, and FISA Court reports referenced herein, and in the 1975 Presidential apology for the defendant CIA murder of Frank Olsen in 1953 as defendant CIA's MKUltra was commencing its illegal secret distribution of 100 million doses of LSD into the general US

population. The use of remote, indirect, and non-attributable means in apparently natural creation

of violent incidents, are consistent with defendant CIA's historical pattern of practice

(paragraphs 359-402). This illegal field test of tools of violence, which tools were constructed

over a period of years by defendants CIA and ARMY using illegal human subject medical tests

on the Lead Plaintiff below in Table A, was then conducted on his extended family kin, Audrey,

as shown in Table B.

| Table A - Tools Of Violence: Defendant CIA's Torturous Acts Against Lead Plaintiff (LP) Specifically Incorporated Tools Of Violence Building Blocks Between 2008 And 2011 | |
|---|---|
| A: 1968 | Northern California campground 1968: First known oxytocin hormone manipulation at age 12 using a locally operated device |
| B: 1970s-1990s | King County, Washington 1970s-1990s: BRMT oxytocin and serotonin hormone manipulations from local devices, using locally triggered then remotely triggered by cell phone network by the mid-1980s |
| C: Late 1990s | Kirkland, WA late 1990s: BRMT balance and consciousness hijacking begin with full body muscle locking rigid statue falls (there is no body crumpling to the ground as normally occurs during fainting) |
| D: 2003-2005 | Kirkland, WA 2003-2005: Coercive psychological operations mask simultaneous brain biochemical torture, which gradually escalates to extreme mental duress and suicide ideation (biochemical imbalance requiring SSRI paroxetine to remedy), a self-inflicted form of violence |
| E: 2008 | Cliffside Park, NJ 2008: On/off BRMT sexual abuse by erectile dysfunction uses central nervous system to block normal specific muscle control |
| F: 2009-2010 | Cliffside Park, NJ 2009-2010: BRMT hijacking for torturous physical cramping and abrupt muscle involuntary movements, long cycle and pulsed short cycle biochemical verbalization and extreme rage events, lead to a full set of emotionally disturbed person symptoms in 2009-2010 |
| G: 2011 | Intrusive thoughts and very low intensity adrenaline hijacking to encourage development of a knife use urge while standing near LP's Ramsey, NJ roommate begins in April 2011, and resulted in an Abilify dosage boost later in an attempt to counteract these thoughts. Extensive sexualization of thoughts and behaviors run parallel with sex sting entrapments beginning in 2011 |

| Table B - Tools of Violence: Defendant CIA's 2011 Illegal BRMT Field Test Leads To Audrey's Death | | | |
|---|---|---|---|
| **Comparable LP Illegal BRMT Development Activity Occurrence Shown In Table A Above** | **Audrey, age 18** | **Angela, approximately age 30** | **Comparable LP Illegal BRMT Development Activity Occurrence Shown In Table A Above** |
| | | Male contacts Angela first, enters relationship, and psychologically and physically abuses her | A, B: Oxytocin, then adrenaline escalation hijacking, using local monitoring through planted video in private spaces; and using field operators with cell phone type devices in public spaces; both types of operators can activate the remotely located illegal BRMT device from encrypted control devices at their fingertips |
| A, B: Oxytocin long cycle escalation hijacking | Male contacts second | Angela identifies with male and directs anger at Audrey | A, B: Oxytocin and adrenaline escalation hijacking |
| B: Oxytocin and adrenaline short-cycle hijackings | Contested contact(s) | Contested contact(s) | B, D: Oxytocin and adrenaline escalation with pulsed short-cycle high intensity hijackings |
| | | Decision to violently confront/jealous rage, impulsively grabs knife for confrontation | D, G: Oxytocin and adrenaline pulsed short-cycle high intensity hijackings, with intrusive thoughts adding knife as the tool of violence |
| A, D: Oxytocin and adrenaline short cycle extreme hijackings | Male and Audrey together, male encourages confrontation | Enraged confrontation | B, D: Oxytocin and adrenaline escalation with pulsed short-cycle high intensity hijackings |
| B, D: Local operator triggered short cycle extreme adrenaline hijacking | Knife slashing of carotid artery leads to September 6, 2011 death | Violent contact initiated by a 30 year old female with no history of violent acts at any time (paragraph 803) | B, D, F, G: Oxytocin and adrenaline escalation, muscle control and extreme rage pulsed short-cycle high intensity hijackings, intrusive thoughts to knife use as tool of violence |

BI. An additional tragic consequence of this murder and subsequent trauma was the divorce of Audrey's parents, Lead Plaintiff's cousin Burt and his spouse. That trauma was similar to the marital trauma Lead Plaintiff's family nearly suffered about 4 years after Sandra's death. Divorce was and remains extremely rare among members of this very close-knit Quaker-based religious group which has extraordinarily strong traditional family and religious community ties and values.

BJ. Attempts to contact Walla Walla Union-Bulletin to follow up on the specific circumstances of this homicide were obstructed by defendant UNITED STATES on March 20, 2024, so further public records and media reports beyond those at paragraphs 10 and 803 could not be added to the evidentiary record to further develop the context and content of this conspiracy to murder. Discovery is required to further develop this allegation as the illegal BRMT bioweapon and bioweapon delivery system are operated remotely, directly usable to hijack and directly manage human behavior, leave no trace, are illegally concealed behind state secret privilege, and the family connections established herein are extremely strong durable circumstantial evidence of durable adverse contact by defendant UNITED STATES targeting this extended family and their specific Quaker-based religious group across four generations from the early 1950s.

### This Specific Progression As A Shared Patterns Echoes Other Documented Patterns Of Practice Of These Defendants

BK. This entire pattern of direct interference by defendant UNITED STATES throughout the course of their lives in the families' movements, employment, businesses, and religion, to and including the abrupt transfers of Lead Plaintiff's family of origin to the fraudulent Snow (defendant BREYER) and northeast Tacoma home church congregations weeks after Sandra's 1970 death are compelling circumstantial evidence of a durable over-arching conspiracy which

led to the deaths of both Sandra in April 1990 and of Audrey in September 2011 (a notably

symbolic date). These plaintiffs currently lack the technical and financial resources to develop

this portion of the overall conspiracy and the circumstantial connections, but the pattern is quite

clear and obvious to the well-practiced eye of the Lead Plaintiff based upon his literal lifetime of

unwitting (until around 2021) lived experience in this corrupted undercover and intelligence

tradecraft world of associated-in-fact pattern of racketeering acts and rights violations by

defendant UNITED STATES and its co-conspirators. Discovery will further substantiate this

corrupt pattern of racketeering acts and rights violations by this cross-department, agency, and

level of government driven associated-in-fact enterprise.

## Other BRMT And Racketeering Pattern Evidence Of Extended Family Illegal Trafficking And Programmed Destruction

BL. The Lead Plaintiff's father Don's cousins, Larry and Linda, located in this same

general area of south King County and Pierce County, WA, were also subjected to comparable

treatment during this 1960s-1970s period while defendant BREYER was directly present in Lead

Plaintiff's family life. Cousin Larry Brewer, who ran and lost Larry's Market to bankruptcy,

employed Lead Plaintiff, employed defendant FBI's red hair and mustached Brad last name not

recalled but discoverable, and had an alleged financial partner produce department manager

whose name is not recalled but discoverable, who were both illegally embedded defendant FBI

as defendant WEISSMAN was embedded at its cooperative wholesale grocery supplier,

Associated Grocers, and later would report to Lead Plaintiff for three years as Lead Plaintiff

joined and then chaired the Puget Consumers Cooperative (PCC) Board of Trustees after Hilde

Birnbaum, who chaired the board which Lead Plaintiff joined in the early 1980s, and who was a

Nazi tattooed Holocaust survivor of child human medical experiments overseen by Nazi Dachau

Concentration Camps Dr. Josef Mengele, similar to those already then being perpetrated since

the 1960s by defendants CIA and ARMY on Lead Plaintiff and his family, who were being
secretly manipulated from the 1960s forward by defendant FBI human trafficking and overall
control in involuntary servitude to serve the illegal BRMT human medical experiments under
field conditions by defendant UNITED STATES (violating our Constitution, 18 USC §§ 175,
241, 242, 1961-1968, and other federal and state statutes as described herein).

BM. Cousin Linda Brewer was diagnosed with schizophrenia and institutionalized in the
late 1960s or early 1970s, as was the common practice at the time. Linda later committed suicide
in the 1970s or early 1980s after dropping her medication. Lead Plaintiff's own experience has
incorporated illegal BRMT biochemical brain hijacking and torture to suicide ideation. There is
no other known extended family history or pattern of this form of mental disability or death
among this group of family members, descendants of Earl Brewer, Cashmere, WA, son of
defendant ARMY's Quaker conscientious objector Medal Of Honor winner, William John
Brewer. Private William John Brewer won this Medal Of Honor on April 4, 1865 at the Battle of
Appomattox Courthouse, when he rode his horse into the ranks of the confederate Army of
Northern Virginia Engineering Company, and stole their Engineer battle flag, as he was
concluding his service through the four years of the Civil War as the unarmed company bugler of
New York's Second Cavalry Company C, in the last major battle of the Civil War, months
before Congress passed and state legislatures ratified the *Thirteenth* Amendment banning slavery
and  involuntary servitude in December 1865, the very practice used against four subsequent
generations of Private Brewer's family from the 1950s through this day.

BN. Lead Plaintiff's stepson Bryce, son of his second wife Jeanette, developed similar
metal illness symptoms while in high school, and while being handled by a fellow "student"
known to Lead Plaintiff as Donny. Stepson Bryce had to be removed from the 149th Street home
after repeatedly refusing medication, multiple assaults on his mother and one on Lead Plaintiff,

medication, and lived on the streets and in a series of shelters and at times in jail, beginning in the late 1990s as his mental illness was not consistently untreated for more than a decade.

### BREYER's Deliberate Tradecraft Echoes Directly Inculpate Him By His Own Words And Actions In This Illegal BRMT Conspiracy

BO. Defendant BREYER authored the book Active Liberty in 2005. The book's title echoes the name which Lead Plaintiff gave to a labor scheduling software application in 1983. The ActivLabor software application was developed in 1983 from experience gained at the Westin Hotel Seattle, soon after the Lead Plaintiff was inculpated in that particular national security event, the April 1983 visit of Queen Elizabeth II to Seattle where she remained overnight at the Westin Hotel Seattle.

BP. Sheldon-Lee Associates, a personal partnership, developed this PC-based software application, ActivLabor, using personal funds from the Lead Plaintiff, and as funded through co-worker THORPE at Deloitte Seattle, who most probably used defendant CIA funds authorized by defendant BURNS, not personal funds. THORPE was in the same WSU MBA class as Lead Plaintiff. Lead Plaintiff was inculpated in this particular 1983 Queen Elizaeth II visit national security event by ZOULAS, who was then employed by Westin Corporation at its world headquarters across the street from the hotel. ZOULAS, who was also in the same WSU MBA program graduating class, extended an invitation to Lead Plaintiff to propose consulting services for a profit improvement consulting project at the Seattle Westin hotel. The project was conducted in the immediate aftermath of the Queen's visit. Lead Plaintiff and romantic partner Lynne married and held their reception at this same Westin Hotel May 5, 1984 (paragraph 609 HEXP-6).

BQ. The unwitting Lead Plaintiff had shared an office with a defendant CIA Iranian mercantile class PhD graduate student asset in Fall semester 1978 which ended in January 1979

just as the Shah of Iran left the Peacock Throne in Iran and Ayatollah Khomeini returned to Iran in triumph, replacing the widely-hated Shah and his Savak secret police. Lead Plaintiff was them moved to shared offices in Todd Hall (now Carson Hall) with THORPE and shared classes with both THORPE and ZOULAS at WSU, as defendant BREYER continued oversight of illegal BRMT operations from Spokane, Washington, about 80 miles north of WSU, Pullman, WA, where Lead Plaintiff was a frequent weekend visitor with Jack's (BREYER) son Bill (William Sackville-West) who was also at WSU at the time and in Spokane for many years thereafter.

BR. This PC-based software application, ActivLabor, was then presented to the Westin CFO through ZOULAS, another former WSU MBA classmate who worked in Westin corporate headquarters across the street from the Seattle Westin Hotel CFO. The Westin CFO rejected the ActivLabor software application in late 1983 or early 1984, soon after a software demonstration in a meeting with ZOULAS and THORPE. THORPE transitioned to other projects with Steve Bannon (then known as Tim Easton at Deloitte Seattle) in Micronesia and Central America, then relocated to work on the Saudia Airlines information technology projects in Saudi Arabia with John Blair another Deloitte Seattle defendant CIA asset.

BS. Other defendants conspired with embedded medical doctor KOHLER (paragraphs 99d, 417, 418, 714, 740, 803C-D, 805B(i), H, S, BS, 806B, 814B), BREYER, and with other unknown perpetrators, in the deaths of Sandra and Audrey, for the corrupt and criminal purposes related to the continuous associated-in-fact enterprise pattern of racketeering acts and of rights acts, violations, and injuries, in illegal human subject medical experiments without consent which are prohibited under our Constitution and laws, and in the development, testing, and deployment of the illegal BRMT bioweapon and bioweapon delivery system prohibited at all times since the entry into force of the 1972 Bioweapons Treaty on March 26, 1975. These conspiracies, acts, violations, and injuries, from at least 1968 forward, led to and through the

deaths of Sandra in 1970 and Audrey in 2011, and are integral elements of, and are directly

related to those conspiracies to inflict death. The identities of those other institutional and

individual defendants are subject to discovery against these defendants, in particular defendants

UNITED STATES, FBI, ARMY, CIA, NIAID, and other unknown departments and agencies

therein.

### Congress Extended Individual Liability To Federal Officials For Constitutional and Color Of Law Acts, Violations, And Injuries

BT. As more fully discussed at paragraphs 250-346, Congress extended liability for these

acts, including conspiracies to act, beyond the institutional defendants herein under 42 U.S.C. §§

1983, 1986 and 18 U.S.C. §§ 1961-1968 to all current and former government individual

defendants herein while acting outside the scope of their official capacity, whether or not they

were acting under color of law:

> ".....when Congress amended FTCA in 1974 to create a cause of action against the
> United States for intentional torts committed by federal law enforcement officers,
> 28 U.S.C. § 2680(h), the congressional comments accompanying that amendment
> made it crystal clear that Congress views FTCA and Bivens as parallel,
> complementary causes of action:" *Carlson v. Green*, 446 U. S. 14, 18-20 (1980)

28 U.S.C. § 2679(b)(2) removes the exclusiveness of the federal tort claims remedy as follows:

> "(2) Paragraph (1) does not extend or apply to a civil action against an employee of
> the Government—
>      (A) which is brought for a violation of the Constitution of the United States, or
>      (B) which is brought for a violation of a statute of the United States under
> which such action against an individual is otherwise authorized."

BU. Such a cause of action had also existed for injuries which were the result of

intentional discrimination against religion in violation of the Establishment Clause prior to 1970,

as Congress made clear when enacting the Religious Freedom Restoration Act in 1993:

> "2000-bb (b) PURPOSES The purposes of this chapter are—

(1) to restore the compelling interest test as set forth in Sherbert v. Verner,
374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its
application in all cases where free exercise of religion is substantially burdened; and
          (2) to provide a claim or defense to persons whose religious exercise is
substantially burdened by government."

"2000bb-1(c) JUDICIAL RELIEF
          A person whose religious exercise has been burdened in violation of this
section may assert that violation as a claim or defense in a judicial proceeding and
obtain appropriate relief against a government."

In *Butz v. Economou*, 438 U. S. 478 (1978):

"Federal officials should enjoy no greater zone of protection when they violate
federal constitutional rules than do state officers."

BV. The targeting of plaintiffs in this class for criminal violations of rights and law

including, without limitation 18 U.S.C. § 175 prohibiting the illegal BRMT bioweapon and

bioweapon delivery system development, testing, and deployment, is the direct result of religious

discrimination by defendant UNITED STATES against them and their forebears, as set forth

above in this paragraph and at paragraphs 1, 403-418. *Bivens* constitutional rights claims

(paragraphs 91, 277-285, 288-296) are also valid for these constitutional claims of conspiracy

against these individual defendants since (i) no special relationship existed with any plaintiff at

the times and places of these defendants' conspiracies to violate plaintiffs' Constitutional and

statutory rights, (ii) no other remedy has been enacted beyond those set forth within the four

corners of this complaint, and (iii) all pleas and petitions to the federal executive have been met

by official silence (paragraphs 25, 29, 37, 580-592, Interline Exhibit 15E) which has and does

accompany defendants' coordinated fraudulent concealment (paragraphs 550-592, Interline

Exhibits 17-19, LPEE pages 368-793, 795-796, 11630-11936, particularly 508-541). Color of

law claims at paragraph 845 against both named and as yet unknown defendants, who are the

subjects or discovery against named defendants, are also incorporated herein by reference in these conspiracies to murder and/or manslaughter of Sandra in 1970 and Audrey in 2011.

BW. These acts and injuries are representative of those perpetrated by defendants on the class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| 604-607 | HEXP Illegal Human Experimentation | 1-4, 17 |
| | RGTS Individual Rights Violations and Conspiracies | |
| | RICO Racketeering | |
| 694-710 | LTHL Lethality Attempts | 1-17 |

## 806. CLAIMS FOR RELIEF - COUNT 6

### Violations of Constitutional Rights Under the Fourth, Fifth, Eighth, Fourteenth Amendments

#### Manslaughter

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
| --- | --- |
| United States Code: | 18 U.S.C. §§ 175, 1112, 1119, 1961-1968, 1981 |
| Washington: | RCW § 9A.32.060 |
| New Jersey: | NA |
| New York: | NA |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in, as the proximate cause, among other acts, injuries, and violations at the final subparagraph in this paragraph, which occurred both within and without the territory of the United States, for the purpose of inflicting extreme trauma during the illegal human experimentation on Lead Plaintiff and other family members in the development of BRMT, of the prescribed aspirin/codeine dosed death of Sandra Darlene Brewer (age 11) during an episode of influenza in April 1975, at the hand of a certain medical doctor KOHLER (paragraphs 99d, 417, 418, 714, 740, 803C-D, 805B(i), H, S, BS, 806B, 814B), then practicing medicine in Federal Way, WA, where Lead Plaintiff lived with his family of origin (age 14). See paragraphs 99d, 211, 417-418, 803. This further incorporates the death of Audrey Brewer in September 2011, at the hand of an emotionally traumatized and otherwise completely non-violent person through the direct abuse of apparent perpetrator and

victim abused by the illegal BRMT bioweapon and bioweapon delivery system preceding and during that violent homicide in Walla Walla, WA (paragraph 10, 412, 413, 600B, 803, Interline Exhibit 1). These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs.

C. Defendants have and do act, in their series of conspiracies and attempts to defraud, entrap, incriminate, discredit, disable, and/or destroy the Lead Plaintiff, as particularly cited and described in each subcount in the table at the next subparagraph below, both within and without the territory of these states and of the United States. This long-running, comprehensive, and systematic pattern of associated-in-fact enterprise racketeering acts has and does sustain the fraudulent concealment of (i) the illegal BRMT bioweapon and bioweapon delivery system, of (iii) the associated-in-fact illegal enterprise itself, of (iii) continuing obstructions of justice both by acts and by willful blindness, and (iv) perpetuate the destruction of evidence of prior criminal acts, and of acts, injuries, and violations of constitutional rights, Privileges and Immunities, statutes, and common law by these defendants, all directed without legal cause under color of law at these specifically targeted persons.

D. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| 604-607, 620 | HEXP Illegal Human Experimentation | 1-4, 17 |
| | RGTS Individual Rights Violations and Conspiracies | |
| | RICO Racketeering | |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 807. CLAIMS FOR RELIEF - COUNT 7

### Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments

### Attempted Manslaughter

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 175, 1113, 1119, 1961-1968, 1981, 2332b |
| Washington: | RCW § 9A.28.020 |
| New Jersey: | NJ Rev Stat §§ 2C:5-1, 2C:11-4, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 110, 125.20, 460.00 through 460.80, 490.25 |
| California: | Cal. Penal Code §§ 192(a)/664 |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Paragraph 803 subparagraphs E through Y are specifically incorporated by reference

to avoid their repetition in this paragraph. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of attempts to cause and create injury and death to the Lead Plaintiff as specifically cited and described at subparagraph E below, both within and without the territory of these states and of the United States.

C. Defendants have and do act, in their series of conspiracies and attempts to defraud, entrap, incriminate, discredit, disable, and/or destroy the Lead Plaintiff, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of these states and of the United States. This long-running, comprehensive, and systematic pattern of associated-in-fact enterprise racketeering acts has and does sustain the fraudulent concealment of (i) the illegal BRMT bioweapon and bioweapon delivery system, of (iii) the associated-in-fact illegal enterprise itself, of (iii) continuing obstructions of justice both by acts and by willful blindness, and (iv) perpetuate the destruction of evidence of prior criminal acts, and of acts, injuries, and violations of constitutional, common law, and statutory Privileges and Immunities, by these defendants, all directed without legal cause under color of law at these specifically targeted persons. Discovery will provide further specific evidence relevant to each noted incident and more incidents of such acts, both survived by the targeted persons and likely not survived, to members of this class of plaintiffs. These acts, violations, and injuries are representative of those perpetrated by these defendants on this class of plaintiffs.

D. Lead Plaintiff is an active person who regularly engages in exercise, has an excellent sense of balance, and a demonstrated history of sports and other activities which have not, on their own, led to any loss of balance. Lead Plaintiff is an extremely emotionally stable person not

prone to panic, phobias, or irrational thoughts or thought processes, with strong and deep analytical professional education, training, and experience. See paragraphs 320e, LPEE pages 190-236. Lead Plaintiff has and does have regular medical examinations and tests, including neurological examinations, which disclose no known injury or disability which would lead to loss of balance or mental reasoning ability absent the purposeful external hijackings of the illegal and internationally prohibited BRMT bioweapon and bioweapon delivery system.

E. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| 604-606, 620 | HEXP Illegal Human Experimentation | 1-3, 17 |
| | RGTS Individual Rights Violations and Conspiracies | |
| | RICO Racketeering | |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 808. CLAIMS FOR RELIEF – COUNT 8

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth Amendments

#### Kidnapping

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1590, 1961-1968 |
| Washington: | NA |
| New Jersey: | NJ Rev Stat §§ 2C:13-1, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | NA |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in obstructions of justice through the illegal color of law use of the laws of the State of New Jersey to kidnap and suppress the rights of the Lead Plaintiff and to obstruct justice. In May and June 2010, Lead Plaintiff composed and filed a US District Court Complaint in Newark, NJ on June 23, 2010, naming USSS and FBI as lead defendants. Lead Plaintiff did not then remotely understand the full scope of the associated-in-fact enterprise and conspiracy, and presumed those parties may have been the primary perpetrators, and lacked the specific positive identifications which he has

developed since beginning forensic analysis in mid-2021 on the acts, violations, and injuries, and has been able to develop since the September 2023 personal identifications of individual federal officials which definitively linked these individual federal defendants to their federal departments and agencies for definitive identifications of the perpetrators and which thereby served to highlight the full scope of events, the related institutional defendants' operational tradecraft signatures, and to facilitate specific positive identifications of additional individual defendants who clearly linked specific institutional defendants to specific acts, violations, and injuries.

C. The June 2010 federal court filing was swiftly followed in July 2010 by a certified letter from Lead Plaintiff's landlord, defendant CHALOM (USMS), terminating his month to month apartment rental (paragraph 472-474). The Cliffside Park US Post Office did not allow him to collect this certified letter due to an alleged signature mismatch between the addressee name and his electronic signature at the point of collection, a clerk's workstation in the Post Office in July 2010, and no first class copy was sent, so the notice to vacate was never received.

D. CHALOM knocked at his apartment door on September 1, 2010 demanding he leave the premises. He overstayed his rental period to remain in renovated Cliffside Park, NJ (renovated by his hand and his funds never fully compensated by CHALOM, paragraph 642 RICO-4) until October 1, 2010 when, with no financial resources or credit, he became homeless again. Duress as a preferred method of fraudulent concealment was hereby being reintroduced yet again by defendant UNITED STATES, with co-conspirators NJSP, BERGEN COUNTY, and BERGEN SHERIFF, as related below.

E. Lead Plaintiff took one rolling suitcase, donating his suits and most other clothing, leaving all other possessions – apartment furnishing, household equipment, and construction tools, behind. He boarded a New Jersey Transit bus to the Bergen County homeless shelter in

Hackensack, NJ. Upon arrival, he was informed by BERGEN COUNTY shelter personnel that

the shelter was full and was redirected by that person to the street address of an alleged nightly

shelter a few blocks away. There was no shelter at that address, only older family residences on

that street, and no such street address number between those residences.

F. Lead Plaintiff then walked to the Hackensack, NJ Police station and waited for about

20-30 minutes for a not particularly busy desk sergeant to respond. He was directed and walked

to a South Hackensack, NJ motel about 2 miles away. One night in this low budget motel

exhausted his remaining funds, and he called 911 in distress the morning of October 2, 2010. A

South Hackensack Police officer and an ambulance responded. Lead Plaintiff was interviewed,

loaded into the ambulance and, without explanation, transported to an unfamiliar hospital

location (Bergen Regional Medical Center in Paramus, NJ), was briefly examined, and waited

about 12 hours in the emergency room.

G. Unbeknownst to Lead Plaintiff, an emergency involuntary commitment hearing was

allegedly held with no contact with either his appointed legal counsel before the hearing or with

the Court at the time of the hearing. This alleged process actually constituted a kidnapping

offense, as civil due process rights related to the involuntary commitment hearing, if one actually

transpired, were systematically violated. These rights, which are unconditionally guaranteed to

any subject of such a hearing under New Jersey Revised Statute 30:4-27 and case law *In Re R.S.,*

*263 N.J. Super.* 428, 432 (App. Div. 1993), are summarized below:

[Intentionally left blank.]

New Jersey courts have held that because of the important liberty interests in being free from unnecessary commitment, all procedural and substantive safeguards must be followed closely. (See In re R.S., 263 N.J. Super. 428, 432 (App. Div. 1993)).

- You have the right to be present at your commitment hearing. (See NJSA § 30:4-27.14(b) and NJ R. 4:74-7(e)).
- You have the right to an attorney. (See NJSA § 30:4-27.12(d) and NJ R. 4:74-7(e)).
- You have the right to an in camera hearing, which means that there is not an audience. (See NJSA § 30:4-27.14(e)). However, you may request that your family attend and testify on your behalf at your hearing. (See NJSA § 30:4-27.13(c)).
- The decision of the judge must be supported by the testimony of a psychiatrist on your treatment team. (See NJ R. 4:74-7(e).
- Other members of the treatment team may also testify at the hearing. (See NJSA § 30:4-27.13(b) and NJ R. 4:74-7(e)).
- You and your attorney have the right to present evidence and cross-examine witnesses. (See NJSA § 30:4-27.14 and NJ R. 4:74-7(e)).
- You have the right to testify at your hearing. (See NJ R. 4:74-7(e)).
- At the conclusion of the hearing, the judge will sign an order. (See NJSA § 30:4-27.15 and NJ R. 4:74-7(h)). This decision may order your discharge, order your continued involuntary, or convert your status to Conditional Extension Pending Placement (CEPP). The special legal status of CEPP is discussed here.

Source: Website_Involuntary_Patients_Legal-Rights_2.23.2021.pdf located at disabilityrightsnj.org

The involuntary commitment in Bergen Regional Medical Center from October 2, 2010 to March

31, 2011 by these defendants violated the Lead Plaintiff's civil rights as follows:

(i) It is presently unknown if there even was any actual court hearing on October 2,

2010, the day of the involuntary commitment, as Lead Plaintiff remained in the

hospital emergency room for about 12 hours while a uniformed police officer was

present outside his examining room whereupon, with no explanation, he was taken in

a wheelchair with his meager belongings to a locked ward, where his belongings were

searched and inventoried,

(ii) Lead Plaintiff had no awareness of any court proceeding at any time, and was not

present at any alleged hearing,

(iii) The alleged legal representative was never in the presence of the Lead Plaintiff on

the day of the alleged hearing,

(iv) no evidence was allowed to be presented,

(v) there was no cross-examination of anyone,

(vi) there was no right to testify at the alleged hearing which Lead Plaintiff did not

attend.

H. Lead Plaintiff was informed in a personal meeting with his alleged legal counsel about 5 days later (sometime around October 7, 2010) after the allegedly held hearing, that he had been ordered involuntarily committed for 14 days.

I. A few days into this involuntary commitment, after refusing medication because the nurse would not tell him the names or the effects of the medications being administered orally, he was placed in a padded cell overnight and forcibly medicated by three large male orderlies with an injection in the buttocks.

J. During this six month confinement period from October 2, 2010 to March 30, 2011, he was (i) transferred among various wards, (ii) experienced a violent indirect threat, (iii) experienced indirect physical violence, (iv) a suicide trauma trigger attempt was perpetrated, (v) had limited access to indoor exercise facilities intermittently and virtually no outdoor access, which outdoor access consisted of a maximum of two minutes less than once each week as he walked from the main entrance to the behavioral facility entrance at the hospital.

K. If Lead Plaintiff had been held in criminal confinement upon a conviction by a jury trial, this lack of access to the outdoors would constitute a clear violation of the *Eighth* Amendment prohibition on cruel and unusual punishment. But there was no legal proceeding of any kind, a violation of the *Fifth* Amendment which preceded this sequence of kidnapping and

false imprisonment, all apparently paid for NJ Charity Care, so the *Eighth* Amendment violation must simply be additive to the *Fifth* Amendment violation.

L. Since New Jersey state law states that a hospital may only release admitted patients to safe housing, and he had no access to housing or funds that he was then aware of, he volunteered to enter a homeless shelter, then when told that was unavailable, "elected" to remain, and was unable to leave the locked psychiatric wards of his confinement until March 31, 2011, about six months later. In actual fact, rehousing was already immediately available through Advance Housing (Ramsey, NJ where he was eventually relocated on March 31, 2011) on the day he was admitted, had those confining him permitted him to access this housing.

M. As forensically reverse engineered, the "voluntary decision," by the Lead Plaintiff to dismiss the federal civil rights litigation was made under extreme duress on December 15, 2010 while confined in the locked ward, and after a specific indirect threat of an indefinite civil confinement period in the hospital ward was described by an undercover officer who was posing as a patient on the ward, which furthered the stress of the direct and specific duress which had already and was continuing to be imposed throughout the entire sequence of defendants' illegal police powers actions in their extreme violations of civil rights including, without limitation, multiple periods of extreme psychological and physical torture, which had began in Washington state in 2002 (paragraphs 604-606 HEXP-1-3).

N. The District of New Jersey federal court took absolutely no action of any kind on the June 2010 *in forma pauperis* complaint, and the complaint was never served by USMS as required by law on any of the defendants. Once the federal court received the December 15, 2010 duress letter from the Lead Plaintiff, it then ordered the January 7, 2001 "voluntary" dismissal of the complaint. The rehousing process began soon thereafter with an "Advance Housing" interview, then two overnight visits to the Ramsey, NJ apartment he would share with a male

roommate, and rehousing was completed on March 31, 2011, with a series of five USMS minders posing as Advance Housing counselors thereafter. This housing had been vacant for several months before he was committed involuntarily to the hospital behavioral health ward on October 3, 2010, according to both his counselor and his new apartment mate in Ramsey, NJ.

O. These acts were perpetrated as further elements of the ongoing conspiracy which was and is an associated-in-fact enterprise pattern of racketeering acts including, without limitation, defendants' (i) intentional starve outs at various times and locations described herein, (ii) thefts of resources, (iii) psychological and physical torture, and (iv) deprivation of benefits under law including, without limitation, (a) the denial of shelter, (b) misdirection to a non-existent homeless shelter on October 1, 2010, and (c) the subsequent systematic denial of civil rights and civil due process rights in ordering, or allegedly ordering, without proper civil adjudication, this six month period of confinement of the Lead Plaintiff in Bergen Regional Medical Center, when rehousing resources (through Advance Housing to the Ramsey, NJ apartment where he was eventually relocated on March 30, 2011) had been vacant and available from at least the first day he was involuntarily committed to Bergen Regional Medical Center, so he could have been promptly rehoused within days, rather than six months after the kidnapping including the imaginary and never held court hearing and order which led to his supposed involuntary commitment, which was actually kidnapping and false imprisonment.

P. Defendants, led by defendant UNITED STATES, in this on-going conspiracy against rights and long-running RICO frauds sequence, once again acted as, and are clearly shown to be, kidnappers and human traffickers of the Lead Plaintiff as their involuntary servant under duress, abusing color of law, and sustaining their illegal abuse of the state secret privilege, among their other violations of rights and law.

Q. These schemes and conspiracy required and consumed the time and financial resources of Lead Plaintiff, and his business entities, in bad faith perpetuation of defendants' long-running schemes, frauds, and swindles to sustain defendant UNITED STATES' involuntary servitude over Lead Plaintiff, and all the elements thereof including, without limitation, illegal BRMT development and deployment; human medical experimentation without consent, to and including torture and suicide ideations; systematic constitutional rights violations; and racketeering acts in an associated-in-fact enterprise. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 599, with particular attention directed to paragraph 599D pattern abuses by defendant UNITED STATES of the state secrets privilege in violation of 5 U.S.C. § 301 and *United States v. Reynolds*, 345 U.S. 1 (1953). Paragraph 638 subparagraph D RICO-1 is incorporated herein by reference. Paragraph 626 RGTS-6 is incorporated herein by reference. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. See other selected relevant content in searchable indexes and lists at LPEE Compendium at pages 934-1075. Evidentiary materials related to this specific subcount follow:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| | HEXP Illegal Human Experimentation | |
| | RGTS Individual Rights Violations and Conspiracies | |
| 643 | RICO Racketeering | 5 |
| | LTHL Lethality Attempts | |

### 809. CLAIMS FOR RELIEF - COUNT 9

**Violations of Constitutional Rights Under the First, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth Amendments**

#### Human Trafficking

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1590, 1961-1968 |
| Washington: | RCW § 9A.40.100 |
| New Jersey: | NJ Rev Stat §§ 2C:13-8, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 135.05, 135.35, 135.60, 460.00 through 460.80 |
| California: | Cal Penal Code §§ 236, 236.1(a) Cal Labor Code §§ 2801, 2802 Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 265 § 51 |
| Arizona: | AZ Rev Stat § 13-1308 |
| Texas: | TX Penal Code § 20A.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraphs 820C through AA, paragraphs 821C through I, and paragraphs 822C and D are particularly incorporated herein for specific relevance to this paragraph 809. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in, at all times since 1968 (age 12, paragraph 417) in knowing and willful violations while they have and do engage in physical human trafficking to sustain peonage, involuntary servitude, and forced labor in acts, violations, and injuries to Lead Plaintiff and to others similarly situated in at least 44 states and several foreign countries, Canada, United Kingdom, France, and Switzerland, as to Lead Plaintiff alone, as related throughout this complaint.

C. The physical form of human trafficking from 1968 to the present has been conducted together with virtual means of human trafficking, for the specific purposes of (i) deliberately pretexting and entangling Lead Plaintiff without cause in national security matters behind color of law abuse of the state secrets privilege, to (ii) sustain his involuntary servitude and to (iii)

sustain fraudulent concealment for defendants' direct, corrupt, and perpetual benefit. Defendants

FBI and CIA have both engaged in virtual human trafficking for this corrupt purpose into other

international national security matters under color of law through these and other defendants'

fraudulent pretexting, misdirection, and electronic communications interferences in interstate and

international commerce as a long-running form of trafficking in many more places around the

world. The recently observed forms of these virtual human trafficking acts, violations and

injuries include, without limitation:

(i) FBI – using alleged international traders undercover, paragraphs 678 RICO-10; the

international operations of Walmart through its subsidiary Walmart (China) paragraphs

475, 478, Interline Exhibit 10; and the international operations of Costco in China and

Korea through its Issaquah, WA headquarters, paragraph 478, 679, 680 RICO-41, 42, and

as currently blocked from discovery on Lead Plaintiff's own email accounts, paragraphs

515, 565.

(ii) CIA – Ghana, paragraph 637 RGTS-17; China as to Uighur labor exploitation and

sourcing, paragraph 680 RICO-42; Russia, paragraph 654B RICO-16 as conducted by the

former CIA Moscow station chief who met Lead Plaintiff in Tucson, AZ while posing as

an executive of Rabobank in Arizona. Defendant CIA personnel from China and Russia

conducted domestic interactions with Lead Plaintiff which were used for their internal

security checks and counterintelligence purposes of attempting to identify any adversary

intelligence service tracking of those former defendant CIA personnel inside the United

States.

Lead Plaintiff's most recent physical human trafficking sequence for these corrupt purposes

began in 2018 and continues, by defendant FBI, the US Attorney for the Southern District of

New York, and other unknown defendants to be identified, placing him directly into the Senator

Menendez national security investigation which indicted two co-defendants with offices 550 feet from the Lead Plaintiff's trafficked residence which itself is systematically tricked out with electronic devices and surreptitious access used by defendant UNITED STATES in continued illegal surveillance, harassment, and in obstructions of justice through the erasure, deletion, and concealment of evidence, and other systematic violations of rights by these and other as yet unknown defendants, and from which location Lead Plaintiff has been trafficked by these defendants into lethal threats and attempts as related at paragraphs 700, 703-710 LETHL-7, 10-17.

D. The statutory definition of human trafficking, 18 U.S. C. § 1590, has and does identify acts, violation, and injuries to explicitly include "harboring....by any means," which statutory definition is inclusive of both physical and virtual means *(emphasis added)*:

> "(a) Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse, or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.
> (b) Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be subject to the penalties under subsection (a)."

E. In the criminal matter *United States v. Costello,* No. 11-2917 (7th Cir. 2012), the Seventh Circuit criticized the government's use of an overly broad definition of harboring which conflated sheltering as harboring, and referred in its opinion to Black's Law Dictionary, which defines harboring as:

> "To receive clandestinely and without lawful authority a person for the purpose of so concealing him that another having a right to the lawful custody of such person shall be deprived of the same. *Jones v. Van Zandt,* 5 How. 215, 227, 12 L. Ed.122. A distinction has been taken, in some decisions, between "harbor" and "conceal." A

person may be convicted of harboring a slave, although he may not have concealed her. *McElhaney v. State*, 24 Ala. 71."

F. Modern Congressional intent regarding the crime of human trafficking, incorporating

all these aforementioned statutory elements – recruit, harbor, transport, provide, or obtain by any

means, as included at 18 U.S. C. § 1590 - in its findings when that statute was adopted in 2000.

This modern Congressional intent is at 22 U.S.C. Chapter 78 - Trafficking Victims Protection.

Key elements of relevant Congressional intent and statutory definitions related to human

trafficking are excerpted below (emphasis added):

"22 U.S. Code Chapter 78 - TRAFFICKING VICTIMS PROTECTION
22 U.S. Code § 7101 - Purposes and findings
(a) Purposes
The purposes of this chapter are to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims.
(b) Findings
Congress finds that:
(1) As the 21st century begins, the degrading institution of slavery continues throughout the world. Trafficking in persons is a modern form of slavery, and it is the largest manifestation of slavery today......
(3) Trafficking in persons is not limited to the sex industry. This growing transnational crime also includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide......
(4) Traffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities in countries of origin. Traffickers lure ..... children from poor families and sell them into prostitution or into various types of forced or bonded labor.
(5) Traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable.
(6) Victims are often forced through physical violence to engage in sex acts or perform slavery-like labor. Such force includes rape and other forms of sexual abuse, torture, starvation, imprisonment, threats, psychological abuse, and coercion.
(7) Traffickers often make representations to their victims that physical harm may occur to them or others should the victim escape or attempt to escape. Such

representations can have the same coercive effects on victims as direct threats to inflict such harm.

(8) <u>Trafficking in persons is increasingly perpetrated by organized, sophisticated criminal enterprises</u>...... Trafficking in persons is often aided by official corruption in countries of origin, transit, and destination, thereby threatening the rule of law.

(9) Trafficking includes all the elements of the crime of forcible rape when it involves the involuntary participation of another person in sex acts by means of fraud, force, or coercion.

(10) <u>Trafficking also involves violations of other laws, including labor</u> and immigration codes and <u>laws</u> against kidnapping, slavery, false imprisonment, assault, battery, pandering, fraud, and extortion.

(11) <u>Trafficking exposes victims to serious health risks</u>...... Trafficking victims are sometimes worked or physically brutalized to death.

(12) <u>Trafficking in persons substantially affects interstate and foreign commerce. Trafficking for such purposes as involuntary servitude, peonage, and other forms of forced labor</u> has an impact on the nationwide employment network and labor market. Within the context of slavery, servitude, and labor or services which are obtained or maintained through coercive conduct that amounts to a condition of servitude, victims are subjected to a range of violations.

(13) Involuntary servitude statutes are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion. In *United States v. Kozminski*, 487 U.S. 931 (1988), the Supreme Court found that section 1584 of title 18, should be narrowly interpreted, absent a definition of involuntary servitude by Congress. As a result, that section was interpreted to criminalize only servitude that is brought about through use or threatened use of physical or legal coercion, and to exclude other conduct that can have the same purpose and effect.

(14) <u>Existing legislation and law enforcement in the United States and other countries are inadequate to deter trafficking and bring traffickers to justice, failing to reflect the gravity of the offenses involved</u>. No comprehensive law exists in the United States that penalizes the range of offenses involved in the trafficking scheme. Instead, even the most brutal instances of trafficking in the sex industry are often punished under laws that also apply to lesser offenses, so that traffickers typically escape deserved punishment.

(15) In the United States, the seriousness of this crime and its components is not reflected in current sentencing guidelines, resulting in weak penalties for convicted traffickers.

(16) In some countries, enforcement against traffickers is also hindered by official indifference, by corruption, and sometimes even by official participation in trafficking.

(17) <u>Existing laws often fail to protect victims of trafficking</u>.....

(18) Additionally, adequate services and facilities do not exist to meet victims' needs regarding health care, housing, education, and legal assistance, which safely reintegrate trafficking victims into their home countries.

(19) Victims of severe forms of trafficking should not be inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts committed as a direct result of being trafficked, such as using false documents, entering the country without documentation, or working without documentation.

(20) Because victims of trafficking are ..... often subjected to coercion and intimidation including physical detention and debt bondage, and because they often fear retribution and forcible removal....., these victims often find it difficult or impossible to report the crimes committed against them or to assist in the investigation and prosecution of such crimes.

(21) Trafficking of persons is an evil requiring concerted and vigorous action by countries of origin, transit or destination, and by international organizations.

(22) One of the founding documents of the United States, the Declaration of Independence, recognizes the inherent dignity and worth of all people. It states that all men are created equal and that they are endowed by their Creator with certain unalienable rights. The right to be free from slavery and involuntary servitude is among those unalienable rights. Acknowledging this fact, the United States outlawed slavery and involuntary servitude in 1865, recognizing them as evil institutions that must be abolished. Current practices of sexual slavery and trafficking of women and children are similarly abhorrent to the principles upon which the United States was founded.

(23) The United States and the international community agree that trafficking in persons involves grave violations of human rights and is a matter of pressing international concern. The international community has repeatedly condemned slavery and involuntary servitude, violence against women, and other elements of trafficking, through declarations, treaties, and United Nations resolutions and reports, including the Universal Declaration of Human Rights; the 1956 Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery; the 1948 American Declaration on the Rights and Duties of Man; the 1957 Abolition of Forced Labor Convention; the International Covenant on Civil and Political Rights; the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; United Nations General Assembly Resolutions 50/167, 51/66, and 52/98; the Final Report of the World Congress against Sexual Exploitation of Children (Stockholm, 1996); the Fourth World Conference on Women (Beijing, 1995); and the 1991 Moscow Document of the Organization for Security and Cooperation in Europe.

(24) Trafficking in persons is a transnational crime with national implications. To deter international trafficking and bring its perpetrators to justice, nations including the United States must recognize that trafficking is a serious offense. This is done by prescribing appropriate punishment, giving priority to the prosecution of trafficking offenses, and protecting rather than punishing the victims of such offenses. The United States must work ....... to engage recalcitrant countries in serious and sustained efforts to eliminate trafficking and protect trafficking victims.

(Pub. L. 106–386, div. A, § 102, Oct. 28, 2000, 114 Stat. 1466.)

22 U.S. Code § 7102 – Definitions........

(8) Involuntary servitude The term "involuntary servitude" includes a condition of servitude induced by means of— (A) any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or (B) the abuse or threatened abuse of the legal process........

(11) Severe forms of trafficking in persons. The term "severe forms of trafficking in persons" means.......(B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

G. Defendant UNITED STATES through its various departments and agencies, at times with co-conspirator defendants, and itself at all times has, primarily through defendants DOJ, FBI, CIA, USMS, ARMY, acted in knowing and willful violation of 18 U.S.C. §§ 1590, 1961-1968, by engaging in human trafficking of Lead Plaintiff, including as collateral in his family of origin from age 5 in 1961 (paragraph 414), and directly as the specific subject from age 12 (1968, paragraph 417), to injure Lead Plaintiff in furtherance of these defendants' series of illegal BRMT bioweapon and bioweapon delivery system human subject experimentation, development, and deployment; associated-in-fact pattern of racketeering acts; and illegal schemes, conspiracies, frauds, thefts, and deprivations against him and against these plaintiffs, their rights, families, personal relations and relationships, careers, reputations, property, and business interests, including closely held business entities, and against other US persons in these defendants' illegal spying, surveillance, violence, and property destruction operations against US persons and their property rights and interests, as specifically cited and described in the 110 subcounts and 54 counts (claims) in this complaint, both within and without the territory of these states and of the United States.

H. The sequence of key human trafficking events from 1968 is presented in the entirety of Appendix 1 and at Table 2, found at LPEE pages 12023-12120. Key events in this sequence as

to Lead Plaintiff are recounted at paragraphs 403-584 herein from 1961 to the present time, including initial collateral human trafficking at age 5, direct human trafficking at age 12, career related human trafficking from 1979 through 2005, and subsequent human trafficking in penury in 2005-2007, further fraudulent employment in 2007-2008, and from mid-2008 to the present, including most recently into the geographic locus of the Senator Menendez public corruption investigation.

I. This illegal conduct meets and exceeds the legal definition of severe human trafficking for the purposes of violations of other statutes, involuntary servitude at 18 U.S.C. § 1584, peonage at 18 U.S.C. § 1581, forced labor at 18 U.S.C. § 1589, is classified as serious harm under 18 U.S.C. § 1589(c)(2), as human trafficking at 18 U.S.C. § 1590, and is a severe form of human trafficking under 22 U.S.C. § 7102 (11) in the duration, scope, and extent of its illegal conduct against the Lead Plaintiff in 44 states and multiple foreign nations from 1968 to the present. Since defendant DOJ and its agencies have been and are directly involved in perpetrating and perpetuating this egregious illegal conduct, defendant DOJ has and does willfully refuse to investigate and charge these crimes and turns its blind eye to this conduct by its own agencies and by its co-conspirator defendants.

J. In furtherance of this conspiracy, defendants have and do act in violation of federal statutes and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties, all as perpetrated by defendant UNITED STATES and its defendant co-conspirators:

(i) pretexting and acts, violations, and injuries directed at Lead Plaintiff and other members of this class of plaintiffs; by defendant UNITED STATES' election in its illegal discretionary acts in (ii) permitting, enlisting, empowering, and/or enabling domestic and foreign fraudulent actors electronically screened in by defendants, (iii) permitting,

enlisting, empowering, and/or enabling foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or (iv) pretexted regarding Lead Plaintiff to cause other discriminatory illegal acts targeting Lead Plaintiff, and/or other members of this class of plaintiffs, in violation of US law and of their own laws, and of any reasonable standard of practice, in

(a) their series of schemes, conspiracies, injuries, and deprivations of rights, and of (b) deprivations of Privileges and Immunities, including, without limitation, (b-i) Lead Plaintiff's rights to free, equal, and non-discriminatory access to acquire, possess, retain, and enjoy all forms of property, including those rights to same as guaranteed under ratified international treaties, and (b-ii) including such rights as they relate to employment, interstate commerce, and to closely held business entities. Defendants have and do injure the Lead Plaintiff and other members of the class by such deprivations of rights. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint subject to discovery.

K. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-608, 610, 611, 613-615 | HEXP Illegal Human Experimentation | 1-5, 7, 8, 10-12 |
| 623-625, 632-634 | RGTS Individual Rights Violations and Conspiracies | 3-5, 12-14 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 810. CLAIMS FOR RELIEF - COUNT 10

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

### Torture – Mental and Physical Abuse

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 175, 1961-1968, 1981, 2340A |
| Washington: | RCW §§ 9A.36.011(1)c, 9A.36.021(1)d, f, 9A.36.060 |
| New Jersey: | NJ Stat §§ 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 120.10, 120.25, 120.30, 120.35, 460.00 through 460.80 |
| California: | Cal Penal Code § 206 |
| Massachusetts: | Mass. Gen. L ch 265 § 13a |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to

be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in physical biochemical and psychological (mental) torture undertaken by defendant CIA on various persons as found by the Senate Intelligence Community in 2014 (paragraph 340), which focused on foreign nationals in the aftermath of the 9/11/2001 attacks. The Lead Plaintiff has experienced (i) coercive psychological operations which present as torture, (ii) biochemically enhanced coercive torture operations combined with coercive psychological operations, and (iii) combined coercive biochemical, psychological, and direct and indirect physical torture, in a progression of sequences Kirkland, WA, to Boston, MA to Cliffside Park, NJ. This seven year stairstep torture progression began with defendants UNITED STATES, DOJ, FBI, CIA, NIAID, particularly defendants FAUCI and ROSENBERG soon after the wrecking of Allegent, LLC was accomplished in:

(i)   Washington (coercive psychological and BRMT biochemical torture forms),

(ii)  Massachusetts while homeless (coercive psychological, BRMT biochemical, and medical short cycle direct physical torture forms),

(iii) New Jersey/New York (coercive psychological, BRMT biochemical, BRMT short and long cycle physical torture forms)

soon after Lead Plaintiff's abrupt termination from defendant ESTABLISH and the imposed manipulated relationship distress by defendant MODDERMAN which accompanied that employment termination. The surrounding life events during this torture progression which added further psychological weight to this NJ/NY conspiracy, the fraudulent Pankowski wedding where two principal perpetrators defendant ROSENBERG and ROSS appeared, and the close

proximity in time MODDERMAN relationship termination, at paragraphs 465, 466, 602W
NSEC-3.

C. This methodological stairstep torture progression is detailed at paragraphs 604-607
HEXP-1-4. This stairstep torture progression began with a measured baseline - the Jennifer Dunn
90 minute Capitol Hill interview (paragraphs 602J, 602N NSEC-3) and continuing frequent
direct exposure to defendant FAUCI which occurred after the 9/11/2001 attack until Lead
Plaintiff's August 30, 2002 orchestrated resignation (paragraph 602 NSEC-3), and then
progressed over approximately 7 years through continually more depraved and aggressive
stairstep sequence of combined forms of torture described in subparagraph 810B above. This
depraved sequence continued until the October 2010 kidnapping for fraudulent concealment
litigation duress after defendant CHALOM rendered Lead Plaintiff homeless again (paragraph
808). These short-cycle torture forms then recurred again beginning in 2021 and have continued
episodically since that time, including while returning from attempts to deliver information
regarding these and other events to Congress, DOJ, and the Supreme Court on October 10, 2023,
paragraphs 607, 617-619 HEXP-4, 14-16.

D. The *Journal of the American Medical Association* has republished scientific medical
research on these forms of torture, noting the lack of distinction relating to the damage to human
sufferers of torture regardless of form:

[Intentionally left blank.]

**ORIGINAL ARTICLE**

# Torture vs Other Cruel, Inhuman, and Degrading Treatment

## Is the Distinction Real or Apparent?

Metin Başoğlu, MD, PhD; Maria Livanou, PhD; Cvetana Crnobarić, MD

**Context:** After the reports of human rights abuses by the US military in Guantanamo Bay, Iraq, and Afghanistan, questions have been raised as to whether certain detention and interrogation procedures amount to torture.

**Objective:** To examine the distinction between various forms of ill treatment and torture during captivity in terms of their relative psychological impact.

**Design and Setting:** A cross-sectional survey was conducted with a population-based sample of survivors of torture from Sarajevo in Bosnia and Herzegovina, Banja Luka in Republica Srpska, Rijeka in Croatia, and Belgrade in Serbia.

**Participants:** A total of 279 survivors of torture accessed through linkage sampling in the community (Banja Luka, Sarajevo, and Rijeka) and among the members of 2 associations for war veterans and prisoners of war (Belgrade).

**Main Outcome Measures:** Scores on the Semistructured Interview for Survivors of War, Exposure to Torture Scale, Structured Clinical Interview for DSM-IV, and Clinician-Administered PTSD (posttraumatic stress disorder) Scale for DSM-IV.

**Results:** Psychological manipulations, humiliating treatment, exposure to aversive environmental conditions, and forced stress positions showed considerable overlap with physical torture stressors in terms of associated distress and uncontrollability. In regression analyses, physical torture did not significantly relate to posttraumatic stress disorder (odds ratio, 1.41; 95% confidence interval, 0.89-2.23) or depression (odds ratio, 1.41, 95% confidence interval, 0.71-2.78). The traumatic stress impact of torture (physical or nonphysical torture and ill treatment) seemed to be determined by perceived uncontrollability and distress associated with the stressors.

**Conclusions:** Ill treatment during captivity, such as psychological manipulations, humiliating treatment, and forced stress positions, does not seem to be substantially different from physical torture in terms of the severity of mental suffering they cause, the underlying mechanism of traumatic stress, and their long-term psychological outcome. Thus, these procedures do amount to torture, thereby lending support to their prohibition by international law.

*Arch Gen Psychiatry. 2007;64:277-285*

Source: *Arch Gen Psychiatry.* 2007;64:277-285 republished in *JAMA* 2007. See LPEEV65-1 for the full article.

E. Torture is legally defined at 18 U.S.C. §§ 2340 as:

(1) "torture" means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control;

(2) "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality; and

**(3)** "United States" means the several States of the United States, the District of Columbia, and the commonwealths, territories, and possessions of the United States.

F. As discussed at paragraphs 47-70, defendant UNITED STATES and all other defendants both known and currently unknown, and their officers, agents, confidential informants, contractors, assigns, or others, associated with any or all of these torturous acts, are constitutionally prohibited from asserting any waiver of liability or immunity for their conspiracies and for their injuries to Lead Plaintiff and other members of this class of plaintiffs under 18 U.S.C. § 2340B, as prohibited by the *Eighth* Amendment prohibition on cruel and unusual punishment, which is not waived by these defendants' failure to comply with the *Fifth* Amendment due process prerequisite to any form of punishment whatsoever, nor by prevailing case law in *Harlow* and other prevailing case law, nor by *The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,* as ratified by the Senate, which mandates recovery of civil damages and other civil remedies for torture and other inhumane and degrading treatment as follows:

"Article 14
1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependents shall be entitled to compensation."

G. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| 604-619 | HEXP Illegal Human Experimentation | 1-16 |
| | RGTS Individual Rights Violations and Conspiracies | |
| | RICO Racketeering | |
| 696, 698, 710 | LTHL Lethality Attempts | 3, 5, 17 |

[Intentionally left blank.]

## 811. CLAIMS FOR RELIEF - COUNT 11

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

#### Conspiracy to Torture

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 175, 1961-1968, 1981, 2340A |
| Washington: | RCW §§ 9A.28.030, 9A.28.040 |
| New Jersey: | NJ Stat §§ 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 105.15, 120.10, 120.25, 120.30, 120.35, 460.00 through 460.80 |
| California: | Cal Penal Code §§ 182, 206 |
| Massachusetts: | Mass Gen L ch 265 § 13a, ch 274 § 7 |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraphs 810B and 810C are specifically referenced for description of this durable illegal science and medical research driven conspiracy. Paragraphs 810D, 810E, and 810F are specifically referenced for description of the specific scope of harms to victims, for definition of torture, and for legal right of action required under the ratified international 1992 *Torture Treaty* having force of law in the United States, in accordance with our Constitution, Article VI, clause 2, federal supremacy clause. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of conspiracies and their willful engagement in torturous acts (both violent and aggressive series' of acts, and perpetually harassing series' of acts) to the Lead Plaintiff, among other acts, injuries, and violations at the final subparagraph in this paragraph.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 629-632, 635 | RGTS Individual Rights Violations and Conspiracies | 9-12, 15 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

## 812. CLAIMS FOR RELIEF – COUNT 12

### Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments

#### Assault

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 175, 1961-1968, 1981 |
| Washington: | RCW §§ 9A.36.011(1)c, 9A.36.021(1)d, f, 9A.36.060 |
| New Jersey: | NJ Stat §§ 2C:12-1, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 105.15, 120.00, 120.05, 120.10, 460.00 through 460.80 |
| California: | Cal Penal Code §§ 241, 245(a)(1) |
| Massachusetts: | Mass Gen L ch 265 § 13a |
| Arizona: | AZ Rev Stat § 13-1203 |
| Texas: | TX Penal Code § 22.01 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. Paragraph 810 in its entirety and all refences therein are specifically incorporated by reference.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of conspiracies and their willful engagement in assaultive acts (both physically and psychologically violent and aggressive series' of acts, and perpetually harassing series' of acts) to the Lead Plaintiff, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of these states and of the United States.

C. Defendant UNITED STATES through its officers, agents, confidential informants, both separately and together with other known and unknown defendants, all operating either remotely or undercover in plainclothes and undistinguishable from the general public, intentionally and unlawfully attacked, both physically through indirect means using the illegal

BRMT bioweapon and bioweapon delivery system and by their coercive psychological operations, Lead Plaintiff and other plaintiffs from time to time from the 1970s to the present, as described by a very small set of example incidents described herein, and in so doing attempted or threatened by their words and/or acts to do physical harm to Plaintiffs. Plaintiffs each reasonably suffered apprehension of imminent harmful or offensive contact on a daily or near daily basis throughout much of this 56 year period both within and without the territory of the United States as a result.

    D. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 632 | RGTS Individual Rights Violations and Conspiracies | 12 |
| 639 | RICO Racketeering | 1 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 813. CLAIMS FOR RELIEF - COUNT 13

**Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments**

#### Aggravated Battery

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 175, 1961-1968, 1981 |
| Washington: | RCW §§ 9A.36.011(1)c, 9A.36.021(1)d, f, 9A.36.060 |
| New Jersey: | NJ Stat §§ 2C:12-1(b), 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 105.15, 120.00, 120.05, 120.10, 460.00 through 460.80 |
| California: | Cal Penal Code § 242 |
| Massachusetts: | Mass Gen L ch 265 § 13a |
| Arizona: | AZ Rev Stat § 13-1204 |
| Texas: | TX Penal Code § 22.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. Paragraph 810 in its entirety and all refences therein are specifically incorporated by reference.

B. Defendants have and do plan, conspire, perpetrate and engage in this paragraph in their series of conspiracies and their willful engagement in assaultive acts (both physically and psychologically violent and aggressive series' of acts, and perpetually harassing series' of acts) to the Lead Plaintiff, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of these states and of the United States.

C. Defendant UNITED STATES using BRMT and its officers, agents, confidential informants, both separately and together with other known and unknown defendants, all operating either remotely or undercover in plainclothes and undistinguishable from the general public, intentionally and unlawfully attacked Lead Plaintiff and other plaintiffs from time to time from the 1960s to the present, using the illegal BRMT bioweapon and bioweapon delivery system, as illustrated by the very small subset of 110 examples described herein, and in so doing acted to do physical and psychological harm to plaintiffs. Defendant UNITED STATES using BRMT and, at times other defendants intentionally and unlawfully attacked Plaintiffs as described in subcounts below, have and do cause assaultive, harmful, and offensive bodily contact to Lead Plaintiff and other members of this class of plaintiffs since at least 1968, both within and without the territory of the United States as a result.

D. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| | RGTS Individual Rights Violations and Conspiracies | |
| | RICO Racketeering | |
| 694-710 | LTHL Lethality Attempts | 1-17 |

## 814. CLAIMS FOR RELIEF - COUNT 14

### Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments

### Soliciting Crime of Violence

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 373, 1961-1968 |
| Washington: | RCW § 9A.28.030 |
| New Jersey: | NJ Stat §§ 2C:5-2, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 100.00, 100.10, 460.00 through 460.80 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to

be identified through the discovery process have and do act in violation of federal and state

statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of

solicitations to commit a crime of violence and related conspiracies to cause and create injury,

death, assault, aggravated assault, and other crimes of violence to the Lead Plaintiff, among other

acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of these states and of the United States. This includes as the proximate cause, for the purpose of inflicting extreme trauma during the illegal human experimentation on Lead Plaintiff and other family members in the development of the illegal BRMT bioweapon and bioweapon delivery system, of the prescribed aspirin/codeine overdosed death of Sandra Darlene Brewer (age 11) during an episode of influenza in April 1975, at the hands of a certain medical doctor KOHLER (paragraphs 99d, 211, 417, 418, 714, 740, 803C-D, 805B(i), H, S, BS, 806B, 814B), then practicing medicine in Federal Way, WA, where Lead Plaintiff lived with his family of origin (age 14), in conspiracy with the illegal BRMT bioweapon operations managed by defendant BREYER (ARMY, CIA, DOJ, FBI, USMS, and unknown other defendants). This further incorporates the death of Audrey Brewer in September 2011, at the hand of an emotionally traumatized and otherwise completely non-violent person through the direct abuse of apparent perpetrator and victim by the illegal BRMT bioweapon and bioweapon delivery system preceding and during that violent homicide in Walla Walla, WA, where Lead Plaintiff's uncle and descendants have and do reside (paragraph 10, 412, 413, 600B, Interline Exhibit 1). The sequences of lethality attempts, torture, assaults, and batteries described at subparagraph 814C table below are also directly attributable to the acts and conspiracies of defendant UNITED STATES, its department and agencies, its other police powers co-conspirators, and other known and unknown defendants. These acts, violations, and injuries comprise an integral pattern of explicit and implicit solicitations of crimes of violence by these defendants.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| 616 | HEXP Illegal Human Experimentation | 13 |
| | RGTS Individual Rights Violations and Conspiracies | |
| | RICO Racketeering | |
| 694-710 | LTHL Lethality Attempts | 1-17 |

[Intentionally left blank.]

## 815. CLAIMS FOR RELIEF 15

**Violations of Constitutional Rights Under the First, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments**

**Interference With Interstate Commerce By Threats or Violence**

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 175, 1951, 1961(1)(A), 1961(1)(G), 1961-1968, 1992(b)(3), 2332, 2340A |
| Washington: | RCW §§ 9A.28.030, 9A.36.011(1)c, 9A.36.021(1)d, f, 9A.36.060 |
| New Jersey: | NJ Stat §§ 2C:5-2, 2C:12-1, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 100.00, 100.10, 105.15, 110.00, 120.00, 120.05, 120.10, 120.25, 120.30, 120.35, 125.20, 125.27(a)(v), 135.05, 135.35, 135.60, 460.00 through 460.80, 490.25 |
| California: | Cal Penal Code §§ 186 through 186.8 |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage to interfere in and affect interstate commerce by making, and by acting upon, threats with violence. Among other acts, injuries, and violations at the final subparagraph in this paragraph, defendants within one four month period in 2022, (i) made an indirect verbal threat on the Lead Plaintiff in a New York City performance space on July 16, 2022 as described at Interline Exhibit 15A; (ii) a mass transit derailment attempt initiated just after sundown while traveling toward the setting sun in the train engineer's eyes at 50-60 mph against an express train operating on the Metropolitan Transportation Authority Hudson River Line on September 11, 2022 with the Lead Plaintiff as a passenger as described in paragraph 707 LETHL-14 (Interline Exhibit 15B), (iii) upon the Lead

Plaintiff in defendant NYC (City of New York) Morningside Park on September 17, 2022 while using the illegal BRMT bioweapon and bioweapon delivery system, as described at paragraph 708 LETHL-15 (Interline Exhibit 15C), and (iv) on NYC (New York City) streets with their streetlights deliberately extinguished on November 18, 2022, and by a rapidly accelerating vehicle in a BERGEN (Bergen County) New Jersey shopping center parking lot on November 19, 2022 as described at LETHL-16 while traveling to and from theater performances (see also Interline Exhibit 15D, and these two specific theater performances listed at LPEEV65-5). The Bio-Lab arson fire and US Airways Flight 1549, paragraphs 602 NSEC-3, 606A-D HEXP-3, 673 RICO-35, both proximate to the Lead Plaintiff in relationship (Bio-Lab, paragraph 602 NSEC-3) or location (US Airways 1549, paragraph 606B, C, D HEXP-3), are elements of this overall pattern of domestic violence and sabotage intended by defendant UNITED STATES to create the appearance of mayhem and violence following the Lead Plaintiff consistent with its other unfounded rumors and misdirection intended to skyline Lead Plaintiff as the root cause of this violence which these defendants themselves directly created to conceal their other illegal acts and misdirection.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| 604-607 | HEXP Illegal Human Experimentation | 1-4 |
| | RGTS Individual Rights Violations and Conspiracies | |
| | RICO Racketeering | |
| 694, 700, 707-710 | LTHL Lethality Attempts | 1, 7, 14-17 |

### 816. CLAIMS FOR RELIEF - COUNT 16

### Violations of Constitutional Rights Under the First, Third, Fourth, Eighth, Thirteenth, Fourteenth Amendments

### Tampering With Witness

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1512, 1961-1968 |
| Washington: | RCW §§ 9A.72.110, 9A.72.120 |
| New Jersey: | NJ Stat §§ 2C:28-5, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal Law §§ 105.15, 120.25, 215.10, 215.15, 460.00 through 460.80 |
| California: | Cal Penal Code § 140 |
| Massachusetts: | Mass Gen L ch 268 § 13b |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to

be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of schemes, conspiracies, acts, injuries, and deprivations to tamper with, interfere with, and attempt to intimidate the Lead Plaintiff from, among other acts, injuries, and violations at the final subparagraph in this paragraph, contacting the US District Court for the District of Eastern California, the US District Court for the District of Columbia, the office of the US Attorney for the Southern District of New York, the Department of Justice, and the Public Integrity section of the Attorney General of New Jersey, as specifically cited and described in the subcounts in this complaint. Perpetual prejudicial acts which constitute tampering have and do continue from at least 2002 when the Lead Plaintiff was subjected to porn spam on his work computer by defendant PRAY at CNA, through his multiple attempts to contact the federal executive in 2005 in Washington, DC which are documented in digital documentary evidence handed directly to defendant ROSENBERG (FBI) around October 2007 at defendant ESTABLISH, Fort Lee, NJ and in defendant FBI's possession absent its destruction of evidence, and since that time in all acts, violations, and injuries undertaken by these plaintiffs for the purposes of, without limitation, facilitating the continued development of the illegal BRMT bioweapon and bioweapon delivery system, depriving the Lead Plaintiff of rights and property, acting in a long series of accelerated lethality events, and in defendants' other acts, injuries, and violations documented in this complaint.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-608, 611-620 | HEXP Illegal Human Experimentation | 1-5, 8-17 |
| 622, 624-637 | RGTS Individual Rights Violations and Conspiracies | 2, 4-17 |
| 639-648, 654-680, 682-693 | RICO Racketeering | 1-10, 16-42, 44-55 |
| 695-710 | LTHL Lethality Attempts | 2-17 |

[Intentionally left blank.]

## 817. CLAIMS FOR RELIEF - COUNT 17

### Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments

### Tampering With Witness – Evidence

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1513, 1961-1968 |
| Washington: | RCW §§ 9A.72.150 |
| New Jersey: | NJ Stat §§ 2C:28-6, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal Law §§ 105.15, 215.40, 460.00 through 460.80 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of schemes, conspiracies, acts, injuries, and deprivations to tamper with, interfere with, and/or attempt to intimidate the Lead Plaintiff from contacting the US District Court for the District of Eastern California, the US District Court for the District of Columbia, the office of the US Attorney for the Southern District of New York, the Department of Justice, and the Public Integrity section of the Attorney General of New Jersey, among other acts, injuries, and violations at the final subparagraph in this paragraph. Perpetual prejudicial acts which constitute tampering have and do continue from at least 2002 when the Lead Plaintiff was subjected to porn spam on his work computer by defendant PRAY at CNA, through his multiple attempts to contact the federal executive in 2005 in Washington, DC which are documented in digital documentary evidence handed directly to defendant ROSENBERG (FBI) around October 2007

at Establish, Fort Lee, NJ and in defendant FBI's possession absent its destruction of evidence,

and since that time in all acts, violations, and injuries undertaken by these plaintiffs for the

purposes of, without limitation, facilitating the continued development of the illegal BRMT

bioweapon, depriving the Lead Plaintiff of rights and property, acting in a long series of

accelerated lethality events, and in defendants' other acts, injuries, and violations documented in

this complaint. One recent example of these myriad obstructions of justice by defendant

UNITED STATES, which mirrors the long-running patterns of obstructive conduct described in

(i) the Senate Select Committee Report in 1975 (LPEE pages 237-271. 6885-7466) (ii) the

Senate Intelligence Committee in 2014 (paragraphs 336-340), (iii) 45 years of scofflaw conduct

related FISA Act (iv) 15 years of PATRIOT Act Section 702 rights abuses, all by defendant

UNITED STATES (paragraphs 308, 320), and (v) as a pattern of practice directly Lead Plaintiff

in the table below follows:

> INCIDENT REPORT – DATA STRIP FROM OLDER CELL PHONE NO LONGER IN
> USE 240204
> Available phone data old phone, all other date contacts wiped from phone from 2019 to
> early 2020, they were on phone yesterday when booted for first time since last use in
> appx 2022. Deleted from old phone by defendant UNITED STATES remote electronic
> hack during charging from cold dead state (most likely penetrated and deleted through
> the electrical service to 1210 City Place residential unit while recharging overnight for
> retrieval)
> Also see photos taken on current cell phone on 240204 which document the calendar
> entries below from the old Samsung Galaxy cell phone:
>> 191215  Starbucks Park and 29th, GIA, both late to location, then to American
>> Academy of Dramatic Artists for play entitled "Clybourne Park"
>> 191225 Café du Soleil, 4 White female pickets there on my arrival, no other
>> customers appeared during this brunch, GIA approximately 1 hour late for
>> brunch, 396 W Broadway
>> 191229 Reservation Laduree SOHO, unknown party
>> 210214 Bocado, 1293 Lexington Ave, pink teddy bear, GIA

C. These acts and injuries are representative of those perpetrated by defendants on this

class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-608, 611-620 | HEXP Illegal Human Experimentation | 1-5, 8-17 |
| 622, 624-637 | RGTS Individual Rights Violations and Conspiracies | 2, 4-17 |
| 639-648, 654-680, 682-693 | RICO Racketeering | 1-10, 16-42, 44-55 |
| 695-710 | LTHL Lethality Attempts | 2-17 |

[Intentionally left blank.]

## 818. CLAIMS FOR RELIEF - COUNT 18

### Violations of Constitutional Rights Under the First, Third, Fourth, Eighth, Thirteenth, Fourteenth Amendments

#### Retaliating Against Witness

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1513, 1961-1968 |
| Washington: | RCW §§ 9A.72.110, 9A.72.120 |
| New Jersey: | NJ Stat §§ 2C:28-5, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal Law §§ 105.15, 120.25, 215.10, 215.15 |
| California: | Cal Penal Code § 140 |
| Massachusetts: | Mass Gen L ch 268 § 13b |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of schemes, conspiracies, acts, injuries, and deprivations to tamper with, interfere with, attempts to intimidate, and retaliate against the Lead Plaintiff from contacting the US District Court for the District of Eastern California, the US District Court for the District of Columbia, the office of the US Attorney for the Southern District of New York, the Department of Justice, and the Public Integrity section of the Attorney General of New Jersey, among other acts, injuries, and violations at the final subparagraph in this paragraph. Perpetual prejudicial acts which constitute retaliating have and do continue from at least 2002 when the Lead Plaintiff was subjected to porn spam on his work computer by defendant PRAY at CNA, through his multiple attempts to contact the federal executive in 2005 in Washington, DC, and since that time in all acts, violations, and injuries undertaken by these plaintiffs for the purposes of, without limitation,

facilitating the continued development of the illegal BRMT bioweapon, depriving the Lead

plaintiff of rights and property, acting in a long series of accelerated lethality events, and in

defendants' other acts, injuries, and violations documented in this complaint.

C. These acts and injuries are representative of those perpetrated by defendants on this

class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-608, 611-620 | HEXP Illegal Human Experimentation | 1-5, 8-17 |
| 622, 624-637 | RGTS Individual Rights Violations and Conspiracies | 2, 4-17 |
| 639-648, 654-680, 682-693 | RICO Racketeering | 1-10, 16-42, 44-55 |

| 695-710 | LTHL Lethality Attempts | 2-17 |

## 819. CLAIMS FOR RELIEF - COUNT 19

### Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments

### Tampering With Consumer Products

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. § 1365(a) |
| Washington: | NA |
| New Jersey: | NJ Stat §§ 2C:12-1(b), 2C:40-17.2.a, 10:6-2 |
| New York: | NA |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in, among other acts, injuries, and violations at the final subparagraph in this paragraph, contaminated and spoiled refrigerated foods were placed upon grocery store shelves at ACME MARKETS, Edgewater, NJ in 2021 and 2022 for sale on more than one dozen occasions to the Lead Plaintiff as specifically cited and described in paragraph 620 HEXP-17. Defendants have and do create injuries and construct thereby a risk of death or severe injury by listeria, salmonella, and other harmful biological agents specifically directed at Lead Plaintiff through their purposeful stocking to shelves immediately prior to his arrival at the grocery store at 481 River Road, Edgewater, NJ of contaminated and/or spoiled foods and by permitting access to same by the Lead Plaintiff and the general public in 2008-2010 and from 2018 to the present, most probably by defendant USMS

personnel embedded as store employees, just as defendant FBI had personnel posing as store investors, partners, and employees in Larry's Market, Federal Way, WA when Lead Plaintiff was employed there by his father's cousin, Larry Brewer, in 1972-1974 (paragraphs 99K, 417-418, 449, 600F, 602). This is further evidenced by (i) the deletion of records of email correspondence with Albertsons Companies Headquarters Customer Service unit and with the Bergen County Health Department from his personal computer email accounts when he searched for these records during litigation preparation in 2023, and (ii) the notable absence of certain specific products normally carried by this store and on his shopping list for that specific trip which shelf locations completely disappeared or were emptied, and later reappeared in the identical shelf slot. Detailed examples of this element of the long-running, comprehensive, and systematic pattern of racketeering acts and defendants' series' of violations, acts, deprivations, and injuries are currently blocked and inaccessible in email accounts as noted elsewhere in this Complaint, and are representative of these types of violations, acts, injuries, and deprivations also experienced by Lead Plaintiff from 2008 to 2010 at this same location, and by other plaintiff members of this class.

   C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws. will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| 620 | HEXP Illegal Human Experimentation | 17 |
| | RGTS Individual Rights Violations and Conspiracies | |
| | RICO Racketeering | |
| | LTHL Lethality Attempts | |

### 820. CLAIMS FOR RELIEF - COUNT 20

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

### Involuntary Servitude – Title 18 RICO

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1584, 1961-1968 |
| Washington: | RCW §§ 9A.40.100 |
| New Jersey: | NJ Stat. §§ 2C:13-8, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | NA |
| California: | Cal Penal Code §§ 236, 236.1(a) |
| | Cal Labor Code §§ 2801, 2802 |
| | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 265 § 51 |
| Arizona: | AZ Rev Stat § 13-1308 |
| Texas: | TX Penal Code § 20A.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Paragraph 821C through I, and paragraph 822C and D are particularly incorporated

herein for specific relevance to this paragraph 820. Defendants identified at paragraph 799,

together with other unknown defendants to be identified through the discovery process have and

do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in illegal conduct which

meets and exceeds the legal definition of involuntary servitude at 18 U.S.C. § 1584, peonage at

18 U.S.C. § 1581, forced labor at 18 U.S.C. § 1589, is classified as serious harm under 18 U.S.C.

§ 1589(c)(2), as human trafficking at 18 U.S.C. § 1590, and is a severe form of human

trafficking under 22 U.S.C. § 7102 (11) in the duration, scope, and extent of its illegal conduct

against the Lead Plaintiff in 44 states and multiple foreign nations from 1968 to the present.

Since defendant DOJ and its agencies have been and are directly involved in perpetrating this

conduct, it has and does willfully refuse to investigate and charge these crimes and turns its blind

eye to this conduct by its own agencies and by other co-conspirator defendants.

C. The *Thirteenth* Amendment prohibits involuntary servitude directed at any person by

any person, with the only exception being upon a conviction by due process respecting rights. In

considering and legally defining conditions which constitute involuntary servitude, the Supreme

Court found in *United States v. Kozminski*, 487 U.S. 931 (1988), as excerpted here at 932, 933

(emphasis added):

> "(b) The language and legislative history of § 1584 and its statutory
> progenitors indicate that its reach should be limited to cases involving the
> compulsion of services by the use or threatened use of physical or legal coercion.
> That is the understanding of the Thirteenth Amendment's "involuntary servitude"
> phrase that prevailed at the time of § 1584's enactment and, since Congress clearly
> borrowed that phrase in enacting § 1584, the phrase should have the same meaning
> in both places <u>absent any contrary indications. Section 1584's history undercuts the
> contention that Congress had a broader concept of involuntary servitude in mind</u>
> when it enacted the statute.....
> (c) The Government's broad construction of "involuntary servitude" -- which
> would prohibit the compulsion of services by any type of speech or intentional
> conduct that, from the victim's point of view, either leaves the victim with no

tolerable alternative but to serve the defendant or deprives the victim of the power
of choice -- could not have been intended by Congress. That interpretation would
appear to criminalize a broad range of day-to-day activity; would delegate to
prosecutors and juries the inherently legislative task of determining what type of
coercive activities are so morally reprehensible that they should be punished as
crimes; would subject individuals to the risk of arbitrary or discriminatory
prosecution and conviction; and would make the type of coercion prohibited
depend entirely on the victim's state of mind, thereby depriving ordinary people of
fair notice of what is required of them........The purposes underlying the rule of lenity
for interpreting ambiguous statutory provisions are served by construing § 241 and
§ 1584 to prohibit only compulsion of services through physical or legal coercion.
Pp. 487 U. S. 949-952.

      (d) The latter construction does not imply that evidence of other means of
coercion, or of extremely poor working conditions, or of the victim's special
vulnerabilities, is irrelevant. The victim's vulnerabilities are relevant in determining
whether the physical or legal coercion or threats thereof could plausibly have
compelled the victim to serve......"

D. Repeating *United States v. Kozminski*, 487 U.S. 931 (1988), at 933 (emphasis added):

      "The purposes underlying the rule of lenity for interpreting ambiguous
statutory provisions are served by construing § 241 and § 1584 to prohibit only
compulsion of services through physical or legal coercion."

      Involuntary servitude is a pattern of pervasive coercion by force by another. A US person

not permitted by government or by any person or conspiracy of persons and/or groups to be free

to exercise their constitutional rights as they choose, in the absence of a proper judicial finding

which validly subjects the person to some form of punishment or servitude, is the subject of

coercion which is "the practice of persuading someone to do something by using force or

threats" (as defined by the Cambridge Dictionary online). Such coerced persons are the

involuntary servants of that force by those other party(ies), particularly when that coercion

through force or threats is broadly and durably applied, as is the case for these plaintiffs in the

Lead Plaintiff's own direct experience described herein.

      E. Coercion specifically includes not only (i) explicit act(s) or threat(s) of force but also

(ii) the surreptitious application of force, as when such methods incorporate the application of

physical and/or psychological pressure including, without limitation, by (a) the provision of specific profoundly objectionable and/or preferable options, and/or (b) the foreclosing of alternatives readily available to others by wrongful acts or persistent failures to act, when (c) the coercer uses these options and foreclosures for the purpose of forcibly threatening or acting to persuade or pressure a person to (d) act in a particular way or toward a specific outcome or behavior or set of outcomes or behaviors intended by (e) the coercing party(ies), including by government with its overwhelming police powers and relatively unlimited resources to (f) pursue the particular coercive directions it elects, whether or not it does so in good faith compliance with law and rights or for its own corrupt and illegal purposes under color of law.

F. Coercive force does not require any direct knowledge or understanding by the coerced person of any specific intention by the coercer to apply any force, including the forcing of an act by the coercer's election to foreclose preferable options when those coercive methods are applied by any surreptitious means available to the coercer (effectively acting in secret as the master of the involuntary servant). Repeating *United States v. Kozminski,* 487 U.S. 931 (1988), at 933 again (emphasis added):

> "The purposes underlying the rule of lenity for interpreting ambiguous statutory provisions are served by construing § 241 and § 1584 to prohibit only compulsion of services through physical or legal coercion."

G. Government possesses myriad means of surreptitious coercion for compulsion of services by both (a) its valid exercise of its legal authority in the use of surreptitious police powers tools, and (b) by any illegal exercise of those same police powers tools under color of law including, without limitation, by the illegal use of the BRMT bioweapon and bioweapon delivery system in violation of 18 U.S.C. § 175 to hijack the free will and actions of the plaintiff victim. These defendants, particularly defendant UNITED STATES, have engaged in a profoundly egregious broad and durable surreptitious pattern of acts, violations, and injuries of

constitutional rights for decades, all fraudulently concealed by profound abuses of the state secrets privilege, for the entire set of purposes and intentions (*mens rea*) identified at paragraphs 801-854.

H. These means of government coercion available to defendant UNITED STATES include, without limitation, (a) direct hijacking of human brain hormones which can and does directly and surreptitiously alter free will in ways which the human subject cannot directly detect by use of the illegal BRMT bioweapon and bioweapon delivery system. These means of government coercion available to defendant UNITED STATES and to other police powers include, without limitation, (b) electronic surveillance, (c) continual monitoring, (d) directed manipulations and acts knowingly undertaken by others, whether voluntarily, or themselves under threat and/or under obligation not to disclose their coercion and their plan of coercion; (e) undertaken by frauds, such as mail, wire, and electronic frauds; (f) undertaken by means of shadow investments, services, financial devices such as shadow banks, and (g) by other technological devices and human methods available to government with their comparatively unlimited resources, but not generally known to the public. The evidence of targeting, and perverse coercion of these plaintiffs by defendant UNITED STATES and its co-conspirators in plaintiffs' destroyed careers, families, and businesses is profound and overwhelming.

I. Defendant UNITED STATES and co-conspirator defendants have and do act in systematic fraudulently concealed violations of this *Thirteenth* Amendment constitutional right and against other rights of Lead Plaintiffs and of other plaintiffs of this class by, in Lead Plainitff's specific case, initially subjecting and then sustaining involuntary servitude by, without limitation, (i) embedding him into their surreptitious illegal cover company employment; by (ii) assigning direct embedded minders into his personal life; by (iii) contriving and orchestrating female companions; by (iv) contriving and destroying marital communityin 1987-88; by (v)

orchestrating, creating, and destroying a fraudulently coerced marital community in 1988-2005
in direct violation of, among others, the *Third* Amendment by using a coerced and threatened
with criminal prosecution active duty ARMY soldier as the orchestrated spouse from first
introduction in 1988, fraudulent marriage in 1990, periodic orchestrated absences, and an
associated-in-fact enterprise pattern of racketeering acts through the first half of 2005; by (vi)
controlling all professional employment from 1977; by (vii) controlling all periods of
unemployment from 1977 to the present day; (viii) by controlling and destroying all Lead
Plaintiff's numerous attempts and efforts to affect and to engage in independent in-state,
interstate, and international commerce from 1983; (ix) by subjecting him without consent to
perpetual video and other intrusive surveillance from an unknown date; by (x) creating and
sustaining false public narratives; by (xi) literally putting words in his mouth and thoughts in his
mind using the illegal BRMT bioweapon and bioweapon delivery system, among other acts,
injuries, and violations also described at the final subparagraph in this paragraph, both within and
without the territory of the United States.

J. These decades long pattens of coercive exercise of police powers, by these police
powers defendants' own acts, violations, and injuries to these plaintiffs, and by the acts,
violations, and injuries it permits others to undertake jointly and/or severally through privileged
access such as members of the press, media, and entertainment industries, and other persons who
are defendants herein and still others as yet unknown, and in the knowing failures of police
powers to protect these plaintiffs, are all knowing and willful abuses of the constitutional rights
of these plaintiffs in defendants' associated-in-fact enterprise pattern of acts, violations,
racketeering acts, and injuries to constitutional rights.

K. In response to the erosions of constitutional rights in *United States v. Kozminski,* 487
U.S. 931 (1988) finding that "absent any contrary indications….Section 1584's history undercuts

the contention that Congress had a broader concept of involuntary servitude in mind," Congress

in 2000 adopted new statutory findings and new protections for victims of involuntary servitude

and human trafficking, including for the purpose of further defining involuntary servitude

(including through the forms known as peonage and forced labor) in 18 U.S.C. § 1589 and 22

U.S. Code Chapter 78. Congressional intent expressed in 18 U.S.C. § 1589 holds that:

> "(13) Involuntary servitude statutes are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion. In *United States v. Kozminski*, 487 U.S. 931 (1988), the Supreme Court found that section 1584 of title 18, should be narrowly interpreted, absent a definition of involuntary servitude by Congress. As a result, that section was interpreted to criminalize only servitude that is brought about through use or threatened use of physical or legal coercion, and to exclude other conduct that can have the same purpose and effect."

L. Congress also further defined involuntary servitude and the severe form of human

trafficking at 22 U.S. Code § 7102 (emphasis added):

> "(8) Involuntary servitude - The term "involuntary servitude" includes a condition of servitude induced by means of— (A) any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or (B) the abuse or threatened abuse of the legal process.
> (11) Severe forms of trafficking in persons. The term "severe forms of trafficking in persons" means.......(B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

M. Defendant UNITED STATES, through its departments and agencies, has and does

engage in violations of the constitutional prohibition on involuntary servitude including, without

limitation, severe forms of trafficking under color of law, through its abuse of police powers in

the patterns of racketeering acts conducted by the associated-in-fact enterprise, which it has and

does perpetrate, and has and does perpetuate both severally and jointly with other co-conspirator

defendants. This illegal conduct meets and exceeds the legal definition of involuntary servitude

and is also *prima facie*, a severe form of human trafficking in the duration, scope, and extent of its illegal conduct against the Lead Plaintiff from 1968 to the present.

N. This defendants' pattern of practice of involuntary servitude explicitly incorporates, without limitation (i) indirect threats delivered visually and verbally on multiple occasions in public venues, and (ii) acts of physical violence to and including indirect, non-attributable injuries and lethality attempts (see, for example, Interline Exhibit 15 and paragraphs 604-607, 617-620 HEXP-1-4, 14-17, 694-710 LETHL-1-17), (iii) psychological coercion to terrorization and suicide ideation (see also listing below in this subparagraph) as intermixed with those lethality threats and attempts, all as perpetrated on Lead Plaintiff primarily by repeated psychopathic acts of coercion by defendant UNITED STATES, in conspiracy at various times and places with institutional, entity, and individual co-defendants including, without limitation, ROSENBERG, SUMMERS, CHALOM, WEISSMAN, MELBER, MODDERMAN, AKOTO, GIA, and currently unknown others. These sequences of illegal extreme psychological coercion (medically considered to be torture, paragraph 604D HEXP-1), and illegal BRMT bioweapon and bioweapon delivery system forcibly imposed biochemical hijackings - the repeated traumas of programmed divorces, human trafficking, and homelessness - were used in varying combinations and in close proximity in time for the maximum traumatic effects, which effects have been and are magnified in their extreme impacts using the illegal BRMT bioweapon and bioweapon delivery system. These illegal human subject brain hijacking biomedical experiments on unwitting human subjects without their consent, have and do propel illegal BRMT bioweapon and bioweapon delivery system development, testing, and deployment from 1988 to the present including, without limitation, during the following sequences of psychopathic coercion and violence by defendant UNITED STATES, particularly CIA and ARMY:

(i) Repeated lethality attempts from the mid-1980s to the present at paragraphs 694-710 LETHL-1-17 orchestrated by BURNS, WEISSMAN, ROSENBERG, others,

(ii) Divorce from Lynne 1987-1988 and marriage to SWAIN the installer of the double homicide attempt device used by defendant CIA at Porteau Cove, BC, Canada (paragraph 694 LETHL-1),

(iii) Lynne divorce trauma was orchestrated with the emotionally premature orchestrated introduction of fraudulent deferred military criminal prosecution coerced active duty bisexual soldier as spouse Jeanette and use of the illegal BRMT bioweapon and bioweapon delivery system oxytocin boosted in that orchestrated relationship with Jeanette beginning in middle 1988 after WATERS and others orchestrated that introduction,

(iv) Alliance business wrecking in 1990-1993, including 2.5 years with no compensation,

(v) Repeatedly broken compensation promises for approximately 12 months at PAN in 1993-1994,

(vi) Pacific Pipeline forced labor employment and abrupt termination without notice in 1995-1996,

(vii)     CNA forced labor and peonage employment through compensation reduction theft attempt, litigation maneuvering abuses of state law in legal process between 1996 to 2002, after six months of programmed unemployment of 1996,

(viii)     Multiple military orders programmed forced separations by Jeanette between 1990 and 2005 divorce,

(ix) Performa business wrecking with defendants KURGAN, PRAY, CALDWELL, others to financial ruin and complete loss of all income (state unemployment compensation is unavailable to self-employed persons) in 2002-2005,

(x) Kirkland suicide ideation orchestrated by coercive psychological operations and illegal BRMT bioweapon and bioweapon delivery system by FAUCI in 2003 or 2004,

(xi) Kirkland complete loss of income by 2004, loss of personal residence and final elements of financial starve-out to homelessness in 2005 by ROSENBERG,

(xii)     Boston human trafficking into homelessness in 2005 for 21 months, by ROSENBERG, supported by SUMMERS,

(xiii)     Retraumatization by repetition in Cliffside Park, NJ sequence ESTABLISH programmed and timed employment and abrupt unemployment, fake Pankowski wedding, and MODDERMAN relationship termination - all within about 100 days in 2008 by ROSENBERG, ROSS, MODDERMAN, and continuing use of illegal BRMT bioweapon and bioweapon delivery system for, among other things, the specific purposes of (a) inflicting symptoms of erectile dysfunction and (b) securing salacious and publicly humiliating videos of Lead Plaintiff to perpetuate malign defamatory public narrative.

(xiv)     Retraumatization by repetition in the Cliffside Park, NJ force out to homelessness by CHALOM in 2010 within 110 days after filing a non-exhaustive federal civil rights lawsuit in 2010,

(xv)      Bergen Regional psychiatric confinement through kidnapping without due process for six months from October 2010 through March 2011,

(xvi)     Bergen Regional psychiatric confinement indirect duress to force dismissal of Newark federal civil rights complaint with indefinite confinement presented as an outcome "never be able to leave" inferred by the self-report of indefinite confinement of a "peer patient" actually an agent embedded for the purpose of delivering that specific message to Lead Plaintiff in 2010, while Ramsey, NJ rehousing was already open and available for immediate rehousing from a date prior to initial admittance,

(xvii)    Ramsey, NJ rehousing from March 30, 2011 incorporated intense malodors in roommate hygiene for more than 18 months, other hostile environment living conditions, and no access to employment despite intense searches, including casual employment at local supermarket, while

(xviii)   Illegal BRMT bioweapon and bioweapon delivery system was used for oxytocin boost in online fake romance and funds theft in 2014-2018,

(xix)     Deprivation of Covid-19 vaccine access by technical computer hacks of computer and web site occurred in 149 failed attempts to secure vaccination appointment in 2020,

(xx)      Dating website used to screen in specific individuals, including surreptitious media an police powers females, and form fraudulently manipulated interpersonal relationship with GIA, use of illegal BRMT bioweapon and bioweapon delivery system continued for, among other things, the specific purposes of (a) inflicting intermittent symptoms of erectile dysfunction and (b) to secure salacious and publicly humiliating videos of Lead Plaintiff with GIA,

(xxi)     Retraumatization attempted through psychological duress and coercion as recycled in current Edgewater, NJ residence with uncertainty imposed by defendant USMS offsets of lease renewal date from Section 8 renewal dates in 2022-2024, after human trafficked yet again unwittingly to Edgewater, NJ, and into the middle of another national security investigation, this one of Senator Menendez, and two co-defendants who have offices 550 feet from Lead Plaintiff's residence.

O. The destruction of Lead Plaintiff's property rights summarized at paragraph 828D further evidences this involuntary servitude as a key element in the rights violations and associated-in-fact enterprise pattern of racketeering acts which are part of defendants' overall pattern of practice and elements of the entire complex sweep of adverse outcomes through

criminal acts of these defendants which have and do injure the Lead Plaintiff, all as perpetrated

by defendant UNITED STATES and its co-conspirators during the Lead Plaintiff's professional

career and marriages. Prior adverse outcomes are also evidenced at all other paragraphs of this

complaint including, without limitation, paragraph 250-710. This form of involuntary servitude

is pervasive and systematic, comprising at various times each and every aspect of human life and

liberty which are the cornerstone unalienable rights alleged to be secured by government in our

constitutional republic. In point of fact and actual practice clearly demonstrated by the abundant

evidence, this government (defendant UNITED STATES) and its co-conspirators have and do

engage in practices against human subjects which are directly comparable to the treatment of

Dachau medical prisoners between 1942 and 1945, to and including torture (a direct comparison

will be presented at trial), comparable to National Institutes of Health biomedical abuses of

captive great apes prior to 2015 (a direct comparison will be presented at trial), and incorporate

cruel and unusual treatment which federal courts have found to be Eighth Amendment violations

against persons incarcerated after due process in US prisons (a direct comparison will be

presented at trial).

P. Psychopathy has been specifically defined through 40 years of clinical research and is

included in the definitive field manual DSM-5 of the American Psychiatric Association, to be

presented in expert testimony at trial. A Psychology Today article reproduced below summarizes

this condition and conduct which is evidenced in the institutional and individual misconduct and

color of law crimes and abuses by, without limitation, defendant UNITED STATES, in particular

CIA, FBI, USMS, described in this paragraph and throughout this complaint in paragraphs 250-

710 (emphasis added below.)

[Intentionally left blank.]

### "Psychopathy: A Clinical Diagnosis
The most dangerous antisocial personality disorder.

Psychopathy is an antisocial personality disorder that is highly correlated with crime and violence. The concept of psychopathy has been known for centuries but only in recent years has there been considerable research attention paid. In particular, Robert Hare, a prominent researcher in the field of criminal psychology, has led research efforts to develop a series of assessment tools to evaluate the personality traits and behaviors attributable to psychopaths.

Dr. Hare and his associates developed the Psychopathy Check List Revised (PCL-R) and its derivatives which provide a clinical assessment of the degree of psychopathy that an individual possesses.

Based on 40 years of intensive empirical research, the PCL-R has been established as a powerful tool for the assessment of this serious and dangerous personality disorder. Specific scoring criteria rate twenty separate items on a three-point scale (0, 1, 2) to determine the extent to which they apply to a given individual.

The instruments developed by Dr. Hare and his colleagues attempt to measure a distinct cluster of personality traits and socially deviant behaviors which fall into four factors: interpersonal, affective, lifestyle and antisocial.

The interpersonal traits include glibness, superficial charm, grandiosity, pathological lying and manipulation of others. The affective traits include a lack of remorse and/or guilt, shallow affect, lack of empathy and failure to accept responsibility. The lifestyle behaviors include stimulation-seeking behavior, impulsivity, irresponsibility, parasitic orientation and a lack of realistic life goals. Antisocial behaviors include poor behavioral controls, early childhood behavior problems, juvenile delinquency, revocation of conditional release and committing a variety of crimes........"

*Excerpt Source:*
https://www.psychologytoday.com/us/blog/wicked-deeds/201610/psychopathy-clinical-diagnosis

Q. The acts described herein and in the 1975 Senate Select Committee report on FBI and

CIA are consistent with the findings of the 40 years of research above into criminal and other

anti-social behaviors which comprise psychopathy. The findings from both those sources

corroborate and are completely consistent with the direct experience of the Lead Plaintiff, and

with the observed patterns of life experiences noted by Lead Plaintiff in the life paths of other

extended family members of this religious family and their other relatives and described herein
(paragraphs 1-710, particularly 336-340, LPEE pages 237-271, 312, 6885-7466), with 45 years
of scofflaw conduct related FISA Act, and (iv) with 15 years of PATRIOT Act Section 702
rights abuses, all at the hands of primary perpetrator defendant UNITED STATES, and its co-
conspirator defendants (paragraphs 308, 320). Further evidence of this pattern of institutional and
individual criminal and illegal scofflaw behavior under color of law will be identified through
the discovery process

R. These plaintiffs have and do act in good faith in their exercise of their constitutional
rights of free exercise of religion, and of all other rights; have and do faithfully serve their nation
when called to duty; have and do engage in ordinary jobs, careers, commerce, and interstate
commerce in a fair and reasonable manner; have and do conduct their lives in the manner
expected of good citizens.

S. The proper constitutional role of government includes, without limitation, defendant
UNITED STATES' direct and explicit duty to specifically and affirmatively to secure these
plaintiffs' rights to free exercise of their religious beliefs including, without limitation, military
service as conscientious objectors who serve without bearing arms when called into military
service, and to establish justice which includes securing all their rights of free expression and
action. These plaintiffs and their posterity, including the Lead Plaintiff, have instead been used
as the involuntary servants of government (human guinea pigs and lab rats) in its pursuit of acts
which are illegal under our Constitution, laws, and ratified treaties, by using these plaintiffs (i) as
the subjects of illegal human medical experiments, which acts are specifically chargeable and
indicatable as crimes, (ii) to sustain the cover-up of other of its own criminal acts against still
other citizens exercising their rights, and (iii) as government's prey for entrapments and

incriminations, by setting upon them and engaging in coercion while those citizens conduct

themselves in accordance with their religious beliefs and without harm or malice toward others.

T. These defendants, particularly defendant UNITED STATES as the original and

perpetual perpetrator, fail the most basic test of the very purpose of government, "to secure these

rights" (Declaration, 1776), by their continual coercion of these plaintiffs. They are unfit to

exercise the police powers of our government.

U. In the case of the Lead Plaintiff's own family of origin, which is representative of the

experiences of this class of plaintiffs, these surreptitious coercive and forcible methods date to at

least 1961, and almost certainly even earlier while in defendant ARMY miliary service during

the Korean War. After Lead Plaintiff's father Don's early 1950s faithful service in defendant

ARMY Medical Corps, Don was then human trafficked and coerced into moving his family by

his employment in a defendant FBI cover company, Pacific Paper Products, Tacoma, WA, in

service of defendant FBI as it (i) undercut the prices of legitimate businesses using funds

appropriated by Congress to (ii) subsidize its losses on medical paper products sales at less than

cost, to (iii) destroy medical x-ray evidence of its violent racist and anti-rights Cointelpro

program operations in northern California in 1961-62 and in southern California in 1962-63

(paragraphs 403-416) using a "recycling" program to destroy this evidence for the stated purpose

of recovering the silver in these x-ray films. Defendant FBI, through Pacific Paper Products, (iv)

provided Lead Plaintiff's unwitting father (a) a specific targeted list of medical facilities,

presented to him as sales leads for specific follow-up, where Cointelpro victims had sought

medical treatment for these underpriced medical paper products and (b) provided substantial

commissions for the "recycling" of these x-ray films from these medical providers to (c) obstruct

justice for those victims by destroying evidence of its own inculpation in violent criminal

assaults on US persons. That tradition of the obstruction of justice to fraudulently conceal its

own illegal and violent methods against rights and against US persons by defendant UNITED

STATES (including, without limitation, DOJ, FBI, USMS, CIA, ARMY, DOD) has and does

continue into the present time, as well and expensively documented throughout this complaint.

V. Lead Plaintiff himself was first human trafficked to California from Washington state

in Summer 1968 as an involuntary and unwitting human subject of illegal biomedical

experiments at age 12 by defendant UNITED STATES (paragraph 417-418). This illegal human

trafficking was conducted by Gary JACK acting for defendants ARMY and CIA which could

have occurred as early as Summer 1967 at age 11, after various individuals described herein at

paragraph 717 first appeared in Lead Plaintiff's sixth grade elementary school class at defendant

FWSD's Lakeland Elementary School during the 1966-67 school year. These acts, violations,

and injuries echo and repeat defendant UNITED STATES' departments and agencies' other

criminal violations of constitutional rights in (a) defendant FBI's Cointelpro, in (b) defendant

CIA's MKUltra, and by (c) Nazi doctors prosecuted in the Nuremberg Trials in 1946 -47 for

illegal medical experimentation on human subjects without consent (LPEE pages 237-367, 6885-

7466) and those secretly emigrated to the United States by defendant ARMY, other elements of

defendant DOD, and the State Department in Operation Paperclip between 1945-1959, paragraph

358.

W. Lead Plaintiff worked for Larry Brewer, his father's cousin, at a grocery store in

Federal Way, WA, from 1972-1974, wherein defendant FBI had a secret investment interest

made through a "partner" who was actually an FBI agent posing for a time as its produce

manager, while another FBI agent worked as a clerk in that store, while the grocery store was

supplied by Associated Grocers, a Seattle, WA wholesale grocery cooperative which employed

defendant WEISSMAN, then known as Lyle Whiteman. Defendant WEISSMAN also later ran

Puget Consumers Cooperative where the Lead Plaintiff served for three years on the Board of

Trustees in the early 1980s while he was employed at still another illegal defendant USMS cover company Deloitte Seattle from 1979-1986, allegedly an office of an international accounting and consulting firm, as Deloitte Seattle supported illegal domestic and international espionage and intelligence operations of defendants FBI and CIA, (paragraphs 99K, 417-418, 449, 600F, 602).

X. Lead Plaintiff's uncle (paragraphs 10, 412, 413, 600B, Interline Exhibit 1) unwittingly worked in a shadow version of Banner Bank with an office in Bothell, WA, during a period when the Lead Plaintiff was employed by CNA, a cover company which, according to his CNA employer Larry Cook (defendant FAUCI), used that same shadow bank, Banner Bank Bothell, as its surreptitious funding source which laundered appropriated funds into CNA as subsidies for its on-going losses during its illegal spying and surveillance operations (to engage in widespread violations of *Fourth* Amendment rights) both before and during unwitting Lead Plaintiff's employment at CNA (paragraphs 457-461).

Y. Both Lead Plaintiff's own 11 year old sister, Sandra, and his cousin's 18 year old daughter, Audrey, were most probably murdered in 1970 and 2011 respectively, using extreme murderous medical malpractice in 1970 with a lethal salicylate (aspirin) drug overdose to Reye Syndrome masked by an opiod (codeine), and then in 2011 using coercive psychological and biochemical manipulations, during different stages of the field test of the illegal BRMT bioweapon and bioweapon delivery system tools of violence (paragraphs 803, 805). These specific murderous acts are consistent with other deadly experiences, including whistleblower Frank Olson in 1953 (paragraphs 359-363) as CIA's MKUltra LSD drugging, and FBI's Cointelpro illegal and violent wars on civil rights, targeted US persons in those times and places who were asserting their rights, their faiths, and their beliefs. These patterns of persistent criminal and illegal practices were very well investigated and documented by Congress in 1975 and during Vice President Rockefeller's 1977 Presidential Commission of MKUltra program

evidence which accidentally was not destroyed during defendant CIA's obstruction of justice by its destruction of program records in 1973 (LPEE pages 237-271, 6885-7466). Those same well-documented associated-in-fact enterprise patterns of racketeering acts, rights violations, and conspiracy repeat herein.

Z. This involuntary servitude has and does continue throughout the Lead Plaintiff's personal and work life and professional career from his collateral trafficking to California in 1961, through his first direct human trafficking in 1968, his first employment in 1972, to his last permitted employment in 2008, and since that time, as he has been unable to secure employment and all entrepreneurial efforts have been repeatedly stymied, coopted, and destroyed by defendant UNITED STATES, its departments and agencies, and its co-conspirators. By acts of human trafficking and frauds from 2008 to the present, defendant UNITED STATES has and does prohibit all employment and entrepreneurial activity from being freely undertaken and pursued by Lead Plaintiff, violating rights and costing the Lead Plaintiff further millions of dollars in lost direct personal compensation, in addition to defendants' prior periods of active control of direct compensation, of periods of unemployment and other deprivations, and thefts and frauds on his business enterprises, and personal, financial, real, and intangible property in their perpetual pattern of involuntary servitude including, without limitation, surreptitious employment, deprivation of alternative employment opportunities, secret co-investments, share ownership, and assigned embedded partners in his businesses, workplaces, and personal life (paragraphs 403-584) from 1968 as a minor child through first professional employments in 1977 and 1979, to the present time.

AA. In furtherance of this conspiracy, defendants have and do act in violation of federal statutes and the state laws of at least 44 states physically visited by Lead Plaintiff, and in

violation of international laws and treaties, all as perpetrated by defendant UNITED STATES
and its defendant co-conspirators:

(i) pretexting and acts, violations, and injuries directed at Lead Plaintiff and other
members of this class of plaintiffs; by defendant UNITED STATES' election in its illegal
discretionary acts in (ii) permitting, enlisting, empowering, and/or enabling domestic and
foreign fraudulent actors electronically screened in by defendants, (iii) permitting,
enlisting, empowering, and/or enabling foreign intelligence services of countries
pretexted and/or physically visited by Lead Plaintiff, and/or (iv) pretexting of false and
misleading narratives regarding Lead Plaintiff to cause other discriminatory illegal acts
targeting Lead Plaintiff, and/or other members of this class of plaintiffs, in violation of
US law and of their own laws, and of any reasonable standard of practice, in

(a) their series of schemes, conspiracies, injuries, and deprivations of rights, and
of (b) deprivations of Privileges and Immunities, including, without limitation, (b-i) Lead
Plaintiff's rights to free, equal, and non-discriminatory access to acquire, possess, retain,
and enjoy all forms of property, including those rights to same as guaranteed under
ratified international treaties, and (b-ii) including such rights as they relate to
employment, interstate commerce, and to closely held business entities. Defendants have
and do injure the Lead Plaintiff and other members of the class by such deprivations of
rights.  Locations and particular details of many of these acts, violations, and injuries are
unknown at the time of this complaint and subject to discovery.

AB. These acts and injuries are representative of those perpetrated by defendants on this
class of plaintiffs, which also include other acts of violence, fraud, and continued willful
blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended
family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES, its departments and agencies, and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

[Intentionally left blank.]

## 821. CLAIMS FOR RELIEF - COUNT 21

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

#### Peonage– Title 18 RICO

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1581, 1961-1698, |
| Washington: | RCW §§ 9A.40.100 |
| New Jersey: | NJ Stat §§ 2C:13-2, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | NA |
| California: | Cal Penal Code §§ 236, 236.1(a) |
| | Cal Labor Code §§ 2801, 2802 |
| | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 265 § 51 |
| Arizona: | AZ Rev Stat § 13-1308 |
| Texas: | TX Penal Code § 20A.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraph 820C through AA and paragraph 822C and D are specifically incorporated by reference for their particular relevance to this paragraph 821. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in violations of the Thirteenth Amendment which prohibits involuntary servitude, which includes peonage defined as holding of any person to service or labor. Enacted by the 39th Congress, the Peonage Act prohibits this form of involuntary servitude, as follows:

[Intentionally left blank.]

546    THIRTY–NINTH CONGRESS.  Sess. II.  Ch. 187, 188.  1867.

March 2, 1867.  CHAP. CLXXXVII. — *An Act to abolish and forever prohibit the System of Peonage in the Territory of New Mexico and other Parts of the United States.*

*Peonage declared unlawful, and abolished.*

*Acts establishing it, &c. void.*

*Penalty for holding, &c. a person in peonage.*

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the holding of any person to service or labor under the system known as peonage is hereby declared to be unlawful, and the same is hereby abolished and forever prohibited in the Territory of New Mexico, or in any other Territory or State of the United States ; and all acts, laws, resolutions, orders, regulations, or usages of the Territory of New Mexico, or of any other Territory or State of the United States, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, be, and the same are hereby, declared null and void ; and any person or persons who shall hold, arrest, or return, or cause to be held, arrested, or returned, or in any manner aid in the arrest or return of any person or persons to a condition of peonage, shall, upon conviction, be punished by fine not less than one thousand nor more than five thousand dollars, or by imprisonment not less than one nor more than five years, or both, at the discretion of the court.

*Foregoing section to be enforced.*

*Penalty for obstructing its enforcement.*

Sec. 2. *And be it further enacted,* That it shall be the duty of all persons in the military or civil service in the Territory of New Mexico to aid in the enforcement of the foregoing section of this act ; and any person or persons who shall obstruct or attempt to obstruct, or in any way interfere with, or prevent the enforcement of this act, shall be liable to the pains and penalties hereby provided ; and any officer or other person in the military service of the United States who shall so offend, directly or indirectly, shall, on conviction before a court-martial, be dishonorably dismissed the service of the United States, and shall thereafter be ineligible to reappointment to any office of trust, honor, or profit under the government.

Approved, March 2, 1867.

C. Defendants have and do act in violation of the above referenced statutes throughout the Lead Plaintiff's personal and work life, and his education and professional career, from at least 1972 to the present. Peonage is "any form of wage labor, financial exploitation, coercive economic practice, or policy in which the victim or a laborer (peon) has little control over employment or economic conditions" (Source: Wikipedia). Defendant UNITED STATES, it departments and agencies and individual defendants therein, have and do engage in violations of the statutory prohibition on peonage 18 U.S.C. § 1581 by means of the abuse of law and legal process under color of law, through its abuse of police powers in the patterns of racketeering acts conducted by the associated-in-fact enterprise, and by discrimination in employment, which it

has and does perpetrate, both severally and jointly with other co-conspirator defendants. This illegal conduct meets and exceeds the legal definitions of involuntary servitude at 18 U.S.C. § 1584, of peonage at 18 U.S.C. § 1581, in both defendants' continuing conduct and their continuing obstructions of all efforts to terminate this unconstitutional condition imposed on these plaintiffs, of forced labor at 18 U.S.C. § 1589, is classified as serious harm under 18 U.S.C. § 1589(c)(2), as human trafficking at 18 U.S.C. § 1590, and is a severe form of human trafficking under 22 U.S.C. § 7102 (11) in the duration, scope, and extent of its illegal conduct against the Lead Plaintiff in 44 states and multiple foreign nations from 1968 to the present. Since defendant DOJ and its agencies have been and are directly involved in perpetrating this conduct, it has and does willfully refuse to investigate and charge these crimes and turns its blind eye to this conduct by its own agencies and by other co-conspirator defendants.

D. Defendant UNITED STATES and its co-conspirators have and do act, violate, and injure Lead Plaintiff and other members of this class of plaintiffs through, without limitation, surreptitious employment, assigned and dictated employment and compensation, direct and indirect control of the duration, location, and extent of employment periods, unemployment periods, deprivation of alternative employment opportunities, through systematic enterprise wreckings to total destruction, bankruptcy, and liquidation, thefts and frauds on business enterprises, flawed and fraudulent software implementations, surreptitious financial control, secret co-investments and share ownership, fraudulent banking and credit relationships, assignment of illegally embedded partners and employees in businesses, workplaces, interposition of fraudulent business opportunities, exclusion from actual business opportunities, delays and accelerations of contracts to exacerbate cash flow problems, fraudulent bid and performance bonding, deprivation of governmental small business benefits, and of other ordinary commercial benefits to which these enterprises were and are legally entitled.

E. Lead Plaintiff's career and all ability to earn independent income were ended by defendant UNITED STATES and its co-conspirator defendants in their own corrupt interests in June 2008, and which defendants have and do by their direct and indirect acts of frauds and other actions under color of law since that time, effectively prohibit all employment and entrepreneurial activities from being freely undertaken and pursued by Lead Plaintiff, thereby perpetuating defendants' associated-in-fact enterprise pattern of racketeering acts, violating rights, and costing the Lead Plaintiff further millions of dollars in lost direct personal compensation.

F. Defendant UNITED STATES and its co-conspirators have and do act, violate, and injure Lead Plaintiff and other members of this class of plaintiffs and their personal, psychological, emotional, and property interests through, without limitation, destruction of marital communities and families, entrapment attempts, physical and emotional injuries approaching death by illness, deep vein thrombosis, and direct illegal BRMT bioweapon and bioweapon delivery system hijacking, drive defendant UNITED STATES and its co-conspirators myriad attempts to inflict lethality remotely and through indirect means, through their acts, violations, and injuries directed at personal, financial, real, and intangible property from 1972 to present, as described at paragraph 828D, psychological and emotional through defendants' sequences of psychopathic coercion and violence described at paragraph 820E through F, through harassment while attempting to secure and through deprivations of personal benefits legally entitled such as unemployment compensation, government housing support, and health care.

H. Defendant UNITED STATES and co-conspirator defendants have and do act in systematic fraudulently concealed violations of constitutional rights by initially subjecting and then sustaining illegal searches by, without limitation, (i) embedding Lead Plaintiff into their

surreptitious cover employment; by (ii) assigning direct embedded minders into his personal life; by (iii) contriving and orchestrating female companions; by (iv) contriving and destroying a marital community; by (v) orchestrating, creating, and destroying a marital community; by (vi) controlling all professional employment from 1977; by (vii) controlling all periods of unemployment from 1978 to the present day; (viii) by controlling and destroying all efforts to engage in independent in-state, interstate, and international commerce; (ix) by subjecting him without consent to perpetual video and other intrusive surveillance; by (x) creating and sustaining false public narratives; by (xi) literally putting words in his mouth and thoughts in his mind using the illegal BRMT bioweapon and bioweapon delivery system. These acts, violations, and injuries are representative of those to this class of plaintiffs.

I. This pattern of peonage is part of these defendants' pattern of racketeering acts directed at the Lead Plaintiff in all matters of life through a system of fraud-based virtual restraints and assigned and designated circumstances to the Lead Plaintiff as specifically cited and described at paragraphs 419 through 534, together with and among other acts, injuries, and violations at the final subparagraph in this paragraph. In furtherance of this conspiracy, defendants have and do act in violation of federal statutes and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties, all as perpetrated by defendant UNITED STATES and its defendant co-conspirators:

(i) pretexting and acts, violations, and injuries directed at Lead Plaintiff and other members of this class of plaintiffs; by defendant UNITED STATES' election in its illegal discretionary acts in (ii) permitting, enlisting, empowering, and/or enabling domestic and foreign fraudulent actors electronically screened in by defendants, (iii) permitting, enlisting, empowering, and/or enabling foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or (iv) pretexting of false and

misleading narratives regarding Lead Plaintiff to cause other discriminatory illegal acts targeting Lead Plaintiff, and/or other members of this class of plaintiffs, in violation of US law and of their own laws, and of any reasonable standard of practice, in

(a) their series of schemes, conspiracies, injuries, and deprivations of rights, and of (b) deprivations of Privileges and Immunities, including, without limitation, (b-i) Lead Plaintiff's rights to free, equal, and non-discriminatory access to acquire, possess, retain, and enjoy all forms of property, including those rights to same as guaranteed under ratified international treaties, and (b-ii) including such rights as they relate to employment, interstate commerce, and to closely held business entities. Defendants have and do injure the Lead Plaintiff and other members of the class by such deprivations of rights. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this complaint and subject to discovery.

J. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES, its departments and agencies, and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries

while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-613 | HEXP Illegal Human Experimentation | 1-17 |
| 623-629 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| | LTHL Lethality Attempts | 1-17 |

### 822. CLAIMS FOR RELIEF - COUNT 22

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

### Forced Labor– Title 18 RICO

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1589, 1961-1968 |
| Washington: | RCW §§ 9A.40.100 |
| New Jersey: | NJ Stat §§ 2C:13-2, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | NA |
| California: | Cal Penal Code §§ 236, 236.1(a) |
| | Cal Labor Code §§ 2801, 2802 |
| | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 265 § 51 |
| Arizona: | AZ Rev Stat § 13-1308 |
| Texas: | TX Penal Code § 20A.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraphs 820C through AA and paragraphs 821D through 821I are particularly incorporated herein for specific relevance to this paragraph 822. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in the management and operation of an enterprise-in-fact system of forced labor by using virtual restraints and assigned and designated circumstances to the Lead Plaintiff in all matters of life through a system of fraud-based virtual restraints and assigned and designated circumstances to the Lead Plaintiff as specifically cited and described at paragraphs 419 through 534 together with and among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States.

C. Defendant UNITED STATES, its departments and agencies, and individual co-conspirators, has and does engage in violations of the statutory prohibition on forced labor 18 U.S.C. § 1589(a)(3) by means of the abuse of law and legal process under color of law, through its abuse of police powers in the patterns of racketeering acts conducted by the associated-in-fact enterprise, which it has and does perpetrate, and has and does perpetuate both severally and jointly with other co-conspirator defendants. This illegal conduct meets and exceeds the legal definition of involuntary servitude at 18 U.S.C. § 1584, of peonage at 18 U.S.C. § 1581, of forced labor at 18 U.S.C. § 1589, is classified as serious harm under 18 U.S.C. § 1589(c)(2), as human trafficking at 18 U.S.C. § 1590, and is a severe form of human trafficking under 22 U.S.C. § 7102 (11) in the duration, scope, and extent of its illegal conduct against the Lead Plaintiff in 44 states and multiple foreign nations from 1968 to the present. Since defendant DOJ and its agencies have been and are directly involved in perpetrating this conduct, it has and does willfully refuse to investigate and charge these crimes and turns its blind eye to this conduct by its own agencies and by other co-conspirator defendants.

D. This forced labor conduct explicitly incorporates, without limitation, the duress and psychological coercion to terrorization and suicide ideation, intermixed with lethality attempts as imposed on Lead Plaintiff primarily by defendant UNITED STATES, in conspiracy at various

times and places with co-defendants including, without limitation, defendants ROSENBERG, SUMMERS, CHALOM, WEISSMAN, MELBER, and currently unknown others, through their repeated psychopathic acts, as that term is medically defined through forty years of clinical research at paragraphs 820N through 820Q, of coercion and duress by in the sequences of psychological and illegal BRMT bioweapon and bioweapon delivery system brain chemistry hijacking and torture, and psychological coercion imposed during repeated traumas including, without limitation, programmed divorces, human trafficking, and homelessness, mixed with illegal BRMT bioweapon and bioweapon delivery system illegal human subject medical experiments without consent and bioweapon deployment from 1988 to the present during the sequences of psychopathic coercion and violence described at paragraphs 820E through 820F.

E. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-613 | HEXP Illegal Human Experimentation | 1-10 |
| 623-629 | RGTS Individual Rights Violations and Conspiracies | 3-9 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 823. CLAIMS FOR RELIEF - COUNT 23

**Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments**

#### Sexual Abuse – Title 42 Civil Rights

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 250, 42 U.S.C. §§ 1981, 1985 |
| Washington: | RCW §§ 9A.36.011(1)c, 9A.36.021(1)d, f, 9A.40.115 |
| New Jersey: | NJ Stat §§ 2C:14-9, 10:6-2 |
| New York: | New York Penal L. § 190.25 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of acts to screen-in and screen-out potential sexual partners to the Lead Plaintiff, among other acts, injuries, and violations at the final subparagraph in this paragraph.

C. This sexual abuse at paragraph 823 specifically includes defendants DOJ, FBI, USMS, and CIA in their election to orchestrate fraudulent relationships and to develop false public and, at times salacious, narratives about the Lead Plaintiff, using defendant MATCH GROUP websites either administered for their benefit or spoofed by them, between Lead Plaintiff and MODDERMAN in 2008, paragraph 611 HEXP-8, which included episodes of illegal BRMT sexual abuse by erectile dysfunction administered in accordance with a plan coordinated between defendant CIA or elements of defendant DOJ, and defendants MODDERMAN in 2008 at paragraph 611 HEXP-8, and GIA in 2019-2020 at paragraph 613 HEXP-10, which events and their public availability were intended to publicly humiliate, smear, and defame Lead Plaintiff as an element of defendants' criminal intent and conspiracy to construct a defamatory narrative about Lead Plaintiff, and to prevent him from pursuing his own interests which have and do contradict that corrupt defamatory and salacious narrative.

D. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| 610, 611, 613, 614 | HEXP Illegal Human Experimentation | 7, 8, 10, 11 |
| | RGTS Individual Rights Violations and Conspiracies | |
| | RICO Racketeering | |
| | LTHL Lethality Attempts | |

### 824. CLAIMS FOR RELIEF - COUNT 24

### Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments

### Frauds - Mail

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1341, 1961-1968 |
| Washington: | RCW § 9A.60.040 |
| New Jersey: | NJ Stat §§ 2C:20-4, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | NA |
| California: | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 151b § 4, ch 265 § 51 |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to

be identified through the discovery process have and do act in violation of federal and state

statutes listed above in this paragraph. as well as state statutes in all originating locations, many

of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage in frauds and patterns of frauds through intentional and negligent misrepresentations which harm these plaintiffs which are claimed as legal acts under color of law by police powers, and claimed as legal acts of press freedom. These frauds in fact have been and are perpetrated for the purposes of perpetuating plaintiffs' involuntary servitude, sustaining fraudulent concealment, evading all accountability for criminal and illegal acts in violations of human, constitutional, civil rights, and statutory and common law, and to turn a blind eye to obvious wrongs and neglect to prevent for purposes of evasion, by deliberately inculpating members of the press in this long-running sequence of associated-in-fact enterprise pattern of racketeering acts for the purpose of inculpating members of the media as principals, actors, and accomplices to the conspiracy, in which some have and do engage as so identified as co-conspirator defendants in an associated-in-fact pattern of racketeering acts, rights violations, and conspiracy herein. These frauds, schemes, attempts, and conspiracies incorporate predicate acts and frauds in simple and complex patterns of racketeering acts by this associated-in-fact enterprise, wherein these governmental defendants have and do exercise control and constraints on the parties who are allowed to participate, by their color of law abuses of rights in their exercise of police powers, which comprises a systematic and durable scheme of abuses of rights under color of law. This associated-in-fact enterprise pattern of racketeering acts, rights violations, and conspiracy is primarily but not exclusively controlled by defendant UNITED STATES, its departments and agencies, for its own corrupt and durable purposes including, without limitation, fraudulently concealing violations of constitutional rights, of criminal law in its associated-in-fact enterprise pattern of racketeering acts with co-conspirator defendants, and the overall conspiracy through which it has and does act against the constitutional rights and interests of these plaintiffs.

C. These frauds are pled with particularly herein using a layer cake approach to cross reference the specific statutory violations to the particular acts, violations, injuries which comprise the fraud, conspiracy, or attempt to defraud. This layered approach cross references and relates (i) the statutory method used (including, without limitation, mail, wire, email, computer, access device) to (ii) the general form of these frauds (five categories, some with subcategories), thereby relating each relevant subcount among the 110 subcounts herein at paragraphs 600-710, and which direct each defendant to (iii) the specific evidence of the set of acts in the fraudulent scheme, conspiracy, or attempt to defraud so each defendant named can provide a legally responsive answer. These 110 subcounts are a representative listing, they are not an exhaustive recitation of each and every act, violation, and injury to the Lead Plaintiff. These 110 subcounts are necessarily representative of the forms of frauds against other plaintiffs of this class, given the current lack of specific evidence and of the particularity required in pleading under F. R. Civ. P. Rule 9(b), as that Rule relates to other members of the class of plaintiffs as of this filing, which are subject to discovery.

D. The 110 subcounts at paragraphs 600-710 are generally organized into (ii) five categories, some with subcategories, presented in these categories for convenience of organization not to make specific legal arguments, as follows:

(i) *National Security Pretexting, Frauds, And Entanglements* (NSEC series) – principally used to pretext, entangle, and attempt to entrap plaintiffs and to sustain their involuntary servitude through color of law abuse of the state secret privilege.

(ii) *Illegal Human Experimentation, BRMT Brain Hijacking Abuses* (HEXP series)– principally used to illegally experiment on these plaintiff victims as human subjects without their consent, and to research, develop, test, and deploy the illegal bioweapon and bioweapon delivery system through its development cycles and technological

advances from crude local use by hijacking basic human hormones in 1968, to the more modern extreme forms of hijackings of bodily functions, thought, and action and thence through fully remote illegal bioweapon deployment and abuses. These illegal experiments on unwitting human subjects without consent, used to develop, test, and deploy this internationally prohibited device, illegal under federal law, have and do continue in a manner similar to (a) the systematic abuses of Dachau prisoners; to (b) the abuse of great apes in cruel medical experiments discontinued on primates since 2015 by the federal government, but continued against these unwitting and unwilling plaintiffs as involuntary human subjects; and to (c) military weapons acceptance tests done on military ranges to accurately replicate the field conditions in which those physical weapons are used. The illegal BRMT bioweapon and bioweapon delivery system is a bioweapon system illegally developed and deployed against individual human targets, in violation of 18 U.S.C. § 175 and the ratified 1972 *Bioweapons Treaty.*

(iii) *Individual Rights Violations* (RGTS series) – principally used to sustain surreptitious involuntary servitude as the means of control of life circumstances for illegal biological and coercive psychological hijackings of these human subject plaintiffs to support illegal BRMT bioweapon and bioweapon delivery system research, development, test, and deployment in field conditions to fraudulently conceal the illegal program and to field test its deployment as a weapon in normal field conditions, similar to methods used in the field testing and acceptance of other weapons on ranges specifically intended for those tests, including through actual patterns of injury to plaintiff victims. Incidents of testing to death and attempted deaths are described at the lethality series below and in paragraphs 803 and 805. The three subcategories are:

    a. Entrapments, Illegal Searches, and Willful Blindness

    b.  Direct Interferences in Personal and Intimate Relationships

    c.  Hacking, Harassments, Disinformation, Abuse of Official Records

(iv) *Racketeering* (RICO subcount) – principally used to sustain vocational control of income, employment, conditions of employment, and of the ability to form and control private enterprises affecting and engaged in direct and indirectly federally funded in-state commerce, in interstate commerce, and in international commerce; and to sustain control of the accumulation and use of property; all planned and perpetrated to control the life circumstances and psychological well-being of these plaintiff victims for their involuntary servitude to perpetrate and sustain illegal manipulations of rights and their life circumstances as human test subjects to illegally abuse these plaintiff victims and to research, develop, test, and deploy the illegal BRMT bioweapon and bioweapon delivery system through its development cycles and technological advance; to support and sustain other illegal domestic spying and surveillance operations of denfednat UNITED STATES, its departments and agencies, under commercial covers; to support international commercial cover espionage operations; and to perpetuate the color of law abuse of the state secret privilege and color of law abuse of police powers. The two principal subcategories are acts targeted directly at personal property and at small businesses and the further subcategories are as follows:

    a.  Racketeering – Personal

        i.  Thefts and Takings Targeted at Personal Assets

        ii.  Personal Color of Law Entrapment Attempts

    b.  Racketeering – Targeting Small Business and Enterprise

        i.  Thefts and Takings

        ii.  Fraudulent Financings

       iii.  Fraudulent Sales Leads

       iv.  Dishonest Professional Services

       v.  Fraudulent Production Asset Sales

(v) *Lethality Attempts* (LETHL series) - principally used to research and field test the effectiveness of methods of violence, severe injury and lethality (death), using actual field tests, events and circumstances specifically contrived for those purposes as described in each of the 17 subcounts (paragraphs), including various separate incidents described at the subcounts, including some subcounts which contain multiple incidents of the same pattern. These incidents are also used, as are other illegal BRMT bioweapon and bioweapon delivery system hijackings, to psychologically and biochemically shape plaintiff victim behaviors and to sustain psychological and behavioral control through threats of violence and injuries to the test subject which can occur at any time in any circumstance which the defendants deem useful in the psychological terrorization of the specific plaintiff victim, either as an isolated event or in conjunction with their coercive psychological operations in the environment.

E. Each of these 110 subcounts at paragraphs 600-710 particularly incorporates the specific set of acts known to be used in the fraudulent scheme, conspiracy, or attempt to defraud. The exact nature, scope, and extent of defendants' acts, violations, and injuries using the specific communications and documentation required to prove the fraud are set out; known defendants are specifically identified; unknown defendants using cover and fraudulent identities are also identified as they are known to the Lead Plaintiff until their true underlying identity can be determined through discovery. Many of these 110 subcounts incorporate extensive, multi-layered, and durable patterns of frauds by multiple defendants acting both undercover and in entangled ways which require discovery to set forth with clarity and therefore must be initially

presented with curated underlying evidence, so these defendant can provide legally responsive

initial answers to this complaint and its complex pattern of durable frauds and rights violations

against these plaintiffs fraudulently concealed over many decades of color of law abuse of the

state secrets privilege and other corrupt abuses of police powers.

F. It is generally impossible for these plaintiffs to directly discern the specific underlying

identity of the particular defendants perpetrating and permitting the perpetrations of the specific

frauds given (a) the pervasive presence of entangled undercover police powers departments and

agencies, and (b) of the particular press, media, and entertainment entities and individuals who

have permitted access to this specifically discriminatory and gated access environment through

the pervasive surreptitious constraints placed upon the Lead Plaintiff, primarily by defendant

UNITED STATES in its own corrupt interests and in the interests of certain current and former

government officials, whether or not known and named herein. Defendant UNITED STATES

routinely has and does use human trafficking, electronic control of access, hijackings (forcible

takeovers) by its operation of the illegal BRMT bioweapon and bioweapon delivery system,

imposed penury, peonage, and other surreptitious means, as described throughout this complaint,

to exercise pervasive control and to direct the acts, places, circumstances, and times of access of

the Lead Plaintiff to all variety of ordinary acts of human beings and persons who are supposedly

free citizens of the United States with freedoms and due process rights, but are in fact

involuntary servants, free in name only not in form or substance, due to its pervasive control.

G. Defendants have and do deploy a variety of surreptitious methods and artifices as they

conduct, act as accomplices, perform acts as accessories, and aid and abet these frauds. Specific

identifications as to roles and relationships among these defendants regarding particular frauds

and patterns of frauds, conspiracies, and attempts to defraud require discovery against these

defendants. The statutory forms of these frauds, attempts, and conspiracies, whether personally

conducted using direct interaction, or by another means such as mail, wire, email, computers,

access devices, or using some blend of these forms, is related in the underlying evidence which

forms the base layer of evidence in each of the 110 subcounts described above, which evidence

is specifically referenced in the narrative and/or table included at each claim for relief herein.

H. Defendants have and do act in violation of federal statutes 18 U.S.C. §§ 1341, 1961-

1968, as well as state statutes in all originating locations, many of which are unknown at the time

of this Complaint and will be available upon discovery, in their series of fraudulent checks and

other documents mailed to the Lead Plaintiff, and in their interceptions of mail to others, among

other acts, injuries, and violations at the final subparagraph in this paragraph, both within and

without the territory of these states and of the United States.

I. Under 18 USC § 1962(c) (emphasis added):

"It shall be unlawful for any person employed by or associated with any enterprise
engaged in, or the activities of which affect, interstate or foreign commerce, to
conduct or participate, directly or indirectly, in the conduct of such enterprise's
affairs through a pattern of racketeering activity or collection of unlawful debt."

Under 18 USC § 1961(5) (emphasis added):

"pattern of racketeering activity" requires at least two acts of racketeering activity,
one of which occurred after the effective date of this chapter and the last of which
occurred within ten years (excluding any period of imprisonment) after the
commission of a prior act of racketeering activity;"

J. Defendant UNITED STATES has and does engage with its co-conspirator defendants

to affect interstate commerce through this associated-in-fact enterprise and the pattern of

racketeering acts conducted by these various defendants in their shared corrupt enterprise and

conspiracy through their collective and shared responsibilities for various elements of this pattern

of racketeering activity including, without limitation, the frauds described in this specific claim

and all other claims against these defendants.

K. The mail fraud statute 18 USC § 1341 states (emphasis added):

Whoever, having devised or intending to devise any scheme or artifice to defraud, or
for obtaining money or property ..... places in places in any post office or authorized
depository for mail matter, any matter or thing whatever to be sent or delivered
by..... shall be fined under this title or imprisoned....."

Having "devised or intending to devise any scheme or artifice to defraud" which "affects

interstate commerce" is alone sufficient to meet the statutory test at 18 USC 1962(c), no further

benefit from the defendants' pattern of racketeering activity is required. A scheme or artifice to

defraud is defined as:

"Defraud: To make a Misrepresentation of an existing material fact, knowing it to be
false or making it recklessly without regard to whether it is true or false, intending
for someone to rely on the misrepresentation and under circumstances in which
such person does rely on it to his or her damage. To practice Fraud; to cheat or trick.
To deprive a person of property or any interest, estate, or right by fraud, deceit, or
artifice."

*Source:* https://legal-dictionary.thefreedictionary.com/defraud

And at 18 U.S.C. § 1346 includes, without limitation (emphasis added):

"For the purposes of this chapter, the term "scheme or artifice to defraud" includes a
scheme or artifice to deprive another of the intangible right of honest services."

L. This long-running scheme to defraud, which has and does incorporate dishonest

professional services from defendant UNITED STATES and other defendants including, without

limitation, other police powers defendants, directly affects interstate commerce, thus meeting the

specific statutory tests of racketeering activity using schemes and artifices to defraud and

patterns of frauds required under 18 U.S.C. § 1962(c) and 18 USC §§ 1341-1351. In addition to

meeting this explicit statutory test, which is alone sufficient to meet the burden of proof as to the

purpose of this conspiracy, this pattern of racketeering activity further benefits defendant

UNITED STATES and co-conspirator defendants by driving direct and indirect economic

benefits for these co-conspirators in their associated-in-fact enterprise, as they have and do share

common purposes and these various direct and indirect economic benefits, from its perpetuation and fraudulent concealment including, without limitation, the specific benefits described at paragraphs 801 and 803.

M. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600 | NSEC National Security Pretexting and Entanglements | 1 |
| | HEXP Illegal Human Experimentation | |
| 622, 623, 624, 627, 631, 637 | RGTS Individual Rights Violations and Conspiracies | 2, 3, 4, 7, 11, 17 |

| 639, 640, 641, 645, 649, 650, 653 | RICO Racketeering | 1, 2, 3, 7, 11, 12, 15 |
|---|---|---|
| | LTHL Lethality Attempts | |

N. These frauds are pled with particularity in compliance with F. R. Civ. P. Rule 9(b), using the layer cake method described at paragraphs 593-599, since it is not possible for these plaintiffs to accurately determine the specific underlying identities of many of the defendant parties who were directly involved in the acts, violations, and injuries, due to defendant UNITED STATES' pervasive control of plaintiffs' places and manner of residence, employment, enterprise, income and benefits, and relationships. Many of these acts, violations, and injuries were perpetrated in person and using electronic and other communications by undercover police powers personnel and entities concealing their personnel and operations, and by their agents and others they permitted special access including, without limitation press, media, entertainment, and privileged persons, wherein the actual identities of these defendants cannot reasonably be expected to be known by these plaintiffs absent legally responsive answers and discovery from these defendants, as discussed at paragraphs 90-114. Other frauds were perpetrated by defendants who were permitted to enter this pervasively controlled environment without their own direct knowledge that they were entering, as part of police powers defendants' color of law conspiracy to attempt to inculpate these plaintiffs and those defendants simultaneously for purposes of entrapping both parties, and, as result, the frauds are the responsibility of both these defendants' own acts, the related fraudulent concealments, and the neglect to protect from known bad actors in the bad faith practices of police powers defendants.

| Elements of Fraud | Associated-In-Fact Pattern of Racketeering Acts Used By Defendants To Construct And Conduct Fraud |
|---|---|
| Defendant(s) fraudulent act(s) | Defendants named at paragraph 799 |
| (1) material representation - what; | Obstructed delivery of mail, and sent false and fraudulent mail to induce acts and services provided in good faith by plaintiffs, |

| | as described in the aforementioned paragraphs 600, 622, 623, 624, 627, 631, 637, 639, 640, 641, 645, 649, 650, 653 |
|---|---|
| (2) the representation was false - how; | Defendants repetitively deprived plaintiffs of constitutionally guaranteed rights to free and fair access to employment opportunities, products, services and/or honest services in interstate commerce under federal law and in-state commerce under state law |
| (3) the representation was known to be false or was recklessly made – why known; | Mail was physically obstructed, diverted, modified, or delayed from delivery by its interception in violation of federal law depriving plaintiffs of constitutionally guaranteed honest services from government and/or private mail carriers |
| (4) the representation was intended to induce the plaintiff to act - toward what act; | Plaintiffs were given to believe that services would be rendered securely and honestly so they took no other actions to protect their rights to free and fair access to other methods of securing these employment opportunities, products, services, and/or honest professional services |
| (5) the plaintiff relied on the misrepresentation - form of reliance; | Plaintiffs acted in good faith in the sincere belief that services would be rendered the same as for all other persons |
| (6) the plaintiff was damaged as a result - how | Plaintiffs were deprived of rights to free market employment or honest services from persons and entities they would otherwise be able to access, and damaged by the loss of opportunity, income, added costs, and deprivations of timely access to desired products and services resulting from defendant illegal obstruction of their legal rights in all forms and amounts of damages to be proven at trial |

[Intentionally left blank.]

## 825. CLAIMS FOR RELIEF - COUNT 25

### Violations of Constitutional Rights Under the First, Fourth, Eighth, Thirteenth, Fourteenth Amendments

#### Frauds – Wire

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1341, 1343, 1961-1968 |
| Washington: | RCW §§ 9A.60.040 |
| New Jersey: | NJ Stat §§ 2C:20-4, 2C:20-8, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 190.05, 190.25, 190.60, 460.00 through 460.80 |
| California: | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 151b § 4, ch 265 § 51 |
| Arizona: | AZ Rev Stat § 13-2310 through 2312 |
| Texas: | TX Penal Code §§ 32.01 through 32.03, 32.42, 71.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs, specifically including paragraph 824 wherein both the satisfaction of the statutory test, and the further benefits to these defendant of their patterns of frauds, racketeering activity affecting interstate commerce, is described. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this complaint and will be available upon discovery.

B. Defendants have and do plan, conspire, perpetrate and engage in wire frauds in their series of emails which contain false and misleading content and/or personation both to the Lead Plaintiff, and falsely labeled as from the Lead Plaintiff, and as blocked, delayed, or otherwise obstructed to the Lead Plaintiff and/or authentic recipients, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 607, 608, 610-616, 618-620 | HEXP Illegal Human Experimentation | 4, 5, 7-13, 15-17 |
| 622-625, 627, 629, 631-637 | RGTS Individual Rights Violations and Conspiracies | 2-5, 7, 9, 11-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 700-702, 704, 706, 710 | LTHL Lethality Attempts | 7-9, 11, 13-17 |

D. These frauds are pleaded with particularity in compliance with F. R. Civ. P. Rule 9(b) using the layer cake method described at paragraphs 593-599 since it is not possible for these plaintiffs to accurately determine the specific underlying identities of many of the defendant parties who were directly involved in the acts, violations, and injuries, due to defendant UNITED STATES' pervasive control of plaintiffs' places and manner of residence, employment, enterprise, income and benefits, and relationships. Many of these acts, violations, and injuries were perpetrated in person and using electronic and other communications by undercover police powers personnel and entities concealing their personnel and operations, and by their agents and others they permitted special access including, without limitation press, media, entertainment, and privileged persons, wherein the actual identities of these defendants cannot reasonably be expected to be known by these plaintiffs absent legally responsive answers and discovery from these defendants, as discussed at paragraphs 90-114. Other frauds were perpetrated by defendants who were permitted to enter this pervasively controlled environment without their own direct knowledge that they were entering, as part of police powers defendants' color of law conspiracy to attempt to inculpate these plaintiffs and those defendants simultaneously for purposes of entrapping both parties, and, as result, the frauds are the responsibility of both these defendants' own acts, the related fraudulent concealments, and the neglect to protect from known bad actors in the bad faith practices of police powers defendants.

| Elements of Fraud | Associated-In-Fact Pattern of Racketeering Acts Used By Defendants To Construct And Conduct Fraud |
|---|---|
| Defendant(s) fraudulent act(s) | Defendants named at paragraph 799 |
| (1) material representation - what; | Obstructed delivery of correct and accurate electronic mail and provided false and deceptive emails, sent false and fraudulent emails to induce acts and services provided in good faith by plaintiffs, and engaged in electronic banking and financial services in false and fraudulent promises and acts related to goods, services, and honest services as described in the aforementioned paragraphs 600-603, 607, 608, 610-616, 618- |

| | 620, 622-625, 627, 629, 631-637, 639-693, 700-702, 704, 706, 710 |
|---|---|
| (2) the representation was false - how; | Defendants repetitively deprived plaintiffs of constitutionally guaranteed rights to free and fair access to employment opportunities, products, services, and/or honest services in interstate commerce under federal law and in-state commerce under state law |
| (3) the representation was known to be false or was recklessly made – why known; | Wireline communications (including wireless communications which use wirelines for long-haul transmission) and/or transactions were physically obstructed, diverted, and/or delayed from delivery by interception and/or modification in violation of federal law depriving plaintiffs of constitutionally guaranteed secure and honest services when using wireline services |
| (4) the representation was intended to induce the plaintiff to act - toward what act; | Plaintiffs were given to believe that services would be rendered securely and honestly so they took no other actions to protect their rights to free and fair access to other methods of securing these employment opportunities, products, services, and/or honest services |
| (5) the plaintiff relied on the misrepresentation - form of reliance; | Plaintiffs acted in good faith in the sincere belief that services would be rendered the same as for all other persons |
| (6) the plaintiff was damaged as a result - how | Plaintiffs were deprived of rights to free market employment, products, services, and/or honest services from persons and entities they would otherwise be able to access, and damaged by the loss of opportunity, income, added costs, and deprivations of timely access to desired products and services resulting from defendant illegal obstruction of their legal rights in all forms and amounts of damages to be proven at trial |

## 826. CLAIMS FOR RELIEF - COUNT 26

## Violations of Constitutional Rights Under the First, Thirteenth, Fourteenth Amendments

### Frauds – Computer Access Devices

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1341, 1343, 1961-1968 |
| Washington: | RCW § 9A.60.040 |
| New Jersey: | NJ Stat §§ 2C:20-4, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 190.75, 460.00 through 460.80 |
| California: | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs, specifically including paragraph 824 wherein both the satisfaction of the statutory test, and the further benefits to these defendant of their patterns of frauds, racketeering activity affecting interstate commerce, is described. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage in their series of fraudulent bank and other payment system wires by and between those defendants and the Lead Plaintiff, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 608-616 | HEXP Illegal Human Experimentation | 5-13 |
| 622, 635, 636 | RGTS Individual Rights Violations and Conspiracies | 2, 15, 16 |
| 639-693 | RICO Racketeering | 1-55 |
| 704 | LTHL Lethality Attempts | 11 |

D. These frauds are pleaded with particularity in compliance with F. R. Civ. P. Rule 9(b)

using the layer cake method described at paragraphs 593-599 since it is not possible for these

plaintiffs to accurately determine the specific underlying identities of many of the defendant

parties who were directly involved in the acts, violations, and injuries, due to defendant UNITED

STATES' pervasive control of plaintiffs' places and manner of residence, employment,

enterprise, income and benefits, and relationships. Many of these acts, violations, and injuries

were perpetrated in person and using electronic and other communications by undercover police

powers personnel and entities concealing their personnel and operations, and by their agents and

others they permitted special access including, without limitation press, media, entertainment,

and privileged persons, wherein the actual identities of these defendants cannot reasonably be

expected to be known by these plaintiffs absent legally responsive answers and discovery from

these defendants, as discussed at paragraphs 90-114. Other frauds were perpetrated by

defendants who were permitted to enter this pervasively controlled environment without their

own direct knowledge that they were entering, as part of police powers defendants' color of law

conspiracy to attempt to inculpate these plaintiffs and those defendants simultaneously for

purposes of entrapping both parties, and, as result, the frauds are the responsibility of both these

defendants' own acts, the related fraudulent concealments, and the neglect to protect from known

bad actors in the bad faith practices of police powers defendants.

| Elements of Fraud | Associated-In-Fact Pattern of Racketeering Acts Used By Defendants To Construct And Conduct Fraud |
|---|---|
| Defendant(s) fraudulent act(s) | Defendants named at paragraph 799 |
| (1) material representation - what; | Misused, abused, modified, and interfered with plaintiff uses of computer access devices through technical hacks during transactions to obstruct those transactions and the delivery of correct and accurate products and services, and engaged in electronic banking and financial services in false and fraudulent acts related to goods, services, and honest services as described in the aforementioned paragraphs 600-603, 608-616, 622, 635, 636, 639-693, 704, when using payment cards, and/or during plaintiff use of UPC-A barcodes in retail stores for the purpose of fraudulently inducing shoplifting entrapment |
| (2) the representation was false - how; | Defendants repetitively deprived plaintiffs of constitutionally guaranteed rights to free and fair access to employment opportunities, products, services, and/or honest services in interstate commerce under federal law and in-state commerce under state law |
| (3) the representation was known to be false or was recklessly made – why known; | Wireless and wireline computer access device communications and/or transactions were technically obstructed, diverted, and/or delayed from delivery by interception and/or modification in violation of federal law depriving plaintiffs of constitutionally guaranteed secure and honest services when using wireless proximity and wireline computer access devices |
| (4) the representation was intended to induce the plaintiff to act - toward what act; | Plaintiffs were given to believe that services would be rendered securely and honestly so they took no other actions to protect their rights to free and fair access to other methods of securing these employment opportunities, products, services, and/or honest services |
| (5) the plaintiff relied on the misrepresentation - form of reliance; | Plaintiffs acted in good faith in the sincere belief that services would be rendered the same as for all other persons |
| (6) the plaintiff was damaged as a result - how | Plaintiffs were deprived of rights to free market employment, products, services, and/or honest services from persons and entities they would otherwise be able to access, and damaged by the loss of opportunity, income, added costs, and deprivations of timely access to desired products and services resulting from defendant illegal obstruction of their legal rights in all forms and amounts of damages to be proven at trial |

## 827. CLAIMS FOR RELIEF - COUNT 27

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Thirteenth, Fourteenth Amendments

#### Frauds - Computers

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1030, 1961-1968 |
| Washington: | RCW § 9A.60.040 |
| New Jersey: | NJ Stat §§ 2C:20-4, 2C:20-8, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | NA |
| California: | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 151b § 4, ch 265 § 51 |
| Arizona: | AZ Rev Stat § 13-2310 through 2312 |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs, specifically including paragraph 824 wherein both the satisfaction of the statutory test, and the further benefits to these defendant of their patterns of frauds, racketeering activity affecting interstate commerce, is described. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage in their series of fraudulent transactions, website hacking and spoofing for financial frauds, transactions, communications, and other purposes to the Lead Plaintiff, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-619 | HEXP Illegal Human Experimentation | 1-16 |
| 622-637 | RGTS Individual Rights Violations and Conspiracies | 2-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

D. These frauds are pleaded with particularity in compliance with F. R. Civ. P. Rule 9(b)

using the layer cake method described at paragraphs 593-599 since it is not possible for these

plaintiffs to accurately determine the specific underlying identities of many of the defendant

parties who were directly involved in the acts, violations, and injuries, due to defendant UNITED

STATES' pervasive control of plaintiffs' places and manner of residence, employment,

enterprise, income and benefits, and relationships. Many of these acts, violations, and injuries were perpetrated in person and using electronic and other communications by undercover police powers personnel and entities concealing their personnel and operations, and by their agents and others they permitted special access including, without limitation press, media, entertainment, and privileged persons, wherein the actual identities of these defendants cannot reasonably be expected to be known by these plaintiffs absent legally responsive answers and discovery from these defendants, as discussed at paragraphs 90-114. Other frauds were perpetrated by defendants who were permitted to enter this pervasively controlled environment without their own direct knowledge that they were entering, as part of police powers defendants' color of law conspiracy to attempt to inculpate these plaintiffs and those defendants simultaneously for purposes of entrapping both parties, and, as result, the frauds are the responsibility of both these defendants' own acts, the related fraudulent concealments, and the neglect to protect from known bad actors in the bad faith practices of police powers defendants.

| Elements of Fraud | Associated-In-Fact Pattern of Racketeering Acts Used By Defendants To Construct And Conduct Fraud |
|---|---|
| Defendant(s) fraudulent act(s) | Defendants named at paragraph 799 |
| (1) material representation - what; | Misused, abused, modified, and interfered with plaintiff uses of personal and cellular telephone computers through technical hacks during transactions to obstruct those transactions and the delivery of correct and accurate products and services; hacked and modified passwords to misuse computers; illegally install fraudulent software, applications, and spyware; illegally access, modify, and delete data, evidence, and documents; to deny plaintiff access to true and authentic websites, employment opportunities, products, services, and honest services; spoofed and fraudulently provided access to fraudulent websites which provided fraudulent services or no services; used computers to engage in fraudulent electronic banking and financial services and in false and fraudulent acts related to goods, services, and honest services, all as described in the aforementioned paragraphs 600-710, excepting paragraphs 620 and 621 |
| (2) the representation was false - how; | Defendants repetitively deprived plaintiffs of constitutionally guaranteed rights to free and fair access to employment |

| | opportunities, products, services, and/or honest services in interstate commerce under federal law and in-state commerce under state law |
|---|---|
| (3) the representation was known to be false or was recklessly made – why known; | Personal and cellular telephone computers and their installed and/or accessed software applications were technically obstructed, hacked, diverted, and/or delayed from delivery by interception and/or modification in violation of federal law depriving plaintiffs of constitutionally guaranteed secure and honest services when accessing and using computers |
| (4) the representation was intended to induce the plaintiff to act - toward what act; | Plaintiffs were given to believe that computers would be legally secured from deliberate and targeted hacking and interference by malign government police powers actors operating without legal authority, so they took no other actions to protect their rights to free and fair access to other methods of securing computers and their applications software |
| (5) the plaintiff relied on the misrepresentation - form of reliance; | Plaintiffs acted in good faith in the sincere belief that services and legally entitled constitutional protections of rights would be rendered the same as for all other persons |
| (6) the plaintiff was damaged as a result - how | Plaintiffs were deprived of rights to secure use of computers and application software, to continuity of their own accurate and accessible data, documents, and evidence of claims, and to free market employment, products, services, and/or honest services from persons and entities they would otherwise be able to access, and damaged by the loss of opportunity, income, added costs, and deprivations of timely access to desired products and services resulting from defendant illegal obstruction of their legal rights in all forms and amounts of damages to be proven at trial |

[Intentionally left blank.]

## 828. CLAIMS FOR RELIEF - COUNT 28

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Thirteenth, Fourteenth Amendments

### Attempts and Conspiracy - Frauds By Mail, Wire, Computer

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1349, 1961-1968) |
| Washington: | RCW § 9A.28.020, 9A.28.040, 9A.60.040 |
| New Jersey: | NJ Stat §§ 2C:20-4, 2C:20-8, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | NA |
| California: | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 151b § 4, ch 265 § 51, ch 274 § 7 |
| Arizona: | AZ Rev Stat § 13-2310 through 2312 |
| Texas: | TX Penal Code §§ 15.02, 32.01 through 32.03, 32.42, 71.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs, specifically including paragraph 824 wherein both the satisfaction of the statutory test, and the further benefits to these defendant of their patterns of frauds, racketeering activity affecting interstate commerce, is described. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph, as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery.

B. Defendants have and do plan, conspire, perpetrate and engage in attempts and conspiracy to defraud by mail, wire, and/or computer.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 622-637 | RGTS Individual Rights Violations and Conspiracies | 2-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

D. These frauds are pleaded with particularity in compliance with F. R. Civ. P. Rule 9(b) using the layer cake method described at paragraphs 593-599 since it is not possible for these plaintiffs to accurately determine the specific underlying identities of many of the defendant parties who were directly involved in the acts, violations, and injuries, due to defendant UNITED STATES' pervasive control of plaintiffs' places and manner of residence, employment, enterprise, income and benefits, and relationships. Many of these acts, violations, and injuries were perpetrated in person and using electronic and other communications by undercover police powers personnel and entities concealing their personnel and operations, and by their agents and

others they permitted special access including, without limitation press, media, entertainment, and privileged persons, wherein the actual identities of these defendants cannot reasonably be expected to be known by these plaintiffs absent legally responsive answers and discovery from these defendants, as discussed at paragraphs 90-114. Other frauds were perpetrated by defendants who were permitted to enter this pervasively controlled environment without their own direct knowledge that they were entering, as part of police powers defendants' color of law conspiracy to attempt to inculpate these plaintiffs and those defendants simultaneously for purposes of entrapping both parties, and, as result, the frauds are the responsibility of both these defendants' own acts, the related fraudulent concealments, and the neglect to protect from known bad actors in the bad faith practices of police powers defendants.

| Elements of Fraud | Associated-In-Fact Pattern of Racketeering Acts Used By Defendants To Construct And Conduct Fraud |
|---|---|
| Defendant(s) fraudulent act(s) | Defendants named at paragraph 799 engaged in a sustained pattern of attempts and conspiracy across various police powers operations and by allowing illegal and fraudulent access through their technical electronic screen to specific malign actors to whom they elected to permit entry |
| (1) material representation - what; | (a) Obstructed delivery of mail, and sent false and fraudulent mail to induce acts and services provided in good faith by plaintiffs, as described in the aforementioned paragraphs 600, 622, 623, 624, 627, 631, 637, 639, 640, 641, 645, 649, 650, 653 (b) Obstructed delivery of correct and accurate electronic mail and provided false and deceptive emails, sent false and fraudulent emails to induce acts and services provided in good faith by plaintiffs, and engaged in electronic banking and financial services in false and fraudulent promises and acts related to goods, services, and honest services as described in the aforementioned paragraphs 600-603, 607, 608, 610-616, 618-620, 622-625, 627, 629, 631-637, 639-693, 700-702, 704, 706, 710 (c) Misused, abused, modified, and interfered with plaintiff uses of computer access devices through technical hacks during transactions to obstruct those transactions and the delivery of correct and accurate products and services, and engaged in electronic banking and financial services in false and fraudulent acts related to goods, services, and honest services as described in the aforementioned paragraphs 600-603, 608-616, 622, 635, |

| | 636, 639-693, 704, when using payment cards, and/or during plaintiff use of UPC-A barcodes in retail stores for the purpose of fraudulently inducing shoplifting entrapment |
| | (d) Misused, abused, modified, and interfered with plaintiff uses of personal and cellular telephone computers through technical hacks during transactions to obstruct those transactions and the delivery of correct and accurate products and services; hacked and modified passwords to misuse computers; illegally install fraudulent software, applications, and spyware; illegally access, modify, and delete data, evidence, and documents; to deny plaintiff access to true and authentic websites, employment opportunities, products, services, and honest services; spoofed and fraudulently provided access to fraudulent websites which provided fraudulent services or no services; used computers to engage in fraudulent electronic banking and financial services and in false and fraudulent acts related to goods, services, and honest services, all as described in the aforementioned paragraphs 600-710, excepting paragraphs 620 and 621 |
| (2) the representation was false - how; | Defendants repetitively deprived plaintiffs of constitutionally guaranteed rights to free and fair access to employment opportunities, products, services, and/or honest services in interstate commerce under federal law and in-state commerce under state law |
| (3) the representation was known to be false or was recklessly made – why known; | (a) Mail was physically obstructed, diverted, modified, or delayed from delivery by its interception in violation of federal law depriving plaintiffs of constitutionally guaranteed honest services from government and/or private mail carriers |
| | (b) Wireline communications and/or transactions were physically obstructed, diverted, and/or delayed from delivery by interception and/or modification in violation of federal law depriving plaintiffs of constitutionally guaranteed secure and honest services when using wireline services |
| | (c) Wireline communications and/or transactions were physically obstructed, diverted, and/or delayed from delivery by interception and/or modification in violation of federal law depriving plaintiffs of constitutionally guaranteed secure and honest services when using wireline services |
| | (d) Personal and cellular telephone computers and their installed and/or accessed software applications were technically obstructed, hacked, diverted, and/or delayed from delivery by interception and/or modification in violation of federal law depriving plaintiffs of constitutionally guaranteed secure and honest services when accessing and using computers |
| (4) the representation was intended to induce the plaintiff to act - toward what act; | (a) Plaintiffs were given to believe that services would be rendered securely and honestly so they took no other actions to protect their rights to free and fair access to other methods of |

| | securing these employment opportunities, products, services, and/or honest professional services<br>(b) Plaintiffs were given to believe that computers would be legally secured from deliberate and targeted hacking and interference by malign government police powers actors operating without legal authority, so they took no other actions to protect their rights to free and fair access to other methods of securing computers and their applications software |
|---|---|
| (5) the plaintiff relied on the misrepresentation - form of reliance; | Plaintiffs acted in good faith in the sincere belief that services would be rendered the same as for all other persons<br>Plaintiffs acted in good faith in the sincere belief that services and legally entitled constitutional protections of rights would be rendered the same as for all other persons |
| (6) the plaintiff was damaged as a result - how | (a) The plaintiffs were deprived of rights to free market employment or honest services from persons and entities they would otherwise be able to access, and damaged by the loss of opportunity, income, added costs, and deprivations of timely access to desired products and services resulting from defendant illegal obstruction of their legal rights in all forms and amounts of damages to be proven at trial<br>(b) The plaintiffs were deprived of rights to free market employment, products, services, and/or honest services from persons and entities they would otherwise be able to access, and damaged by the loss of opportunity, income, added costs, and deprivations of timely access to desired products and services resulting from defendant illegal obstruction of their legal rights in all forms and amounts of damages to be proven at trial<br>(c) The plaintiffs were deprived of rights to free market employment, products, services, and/or honest services from persons and entities they would otherwise be able to access, and damaged by the loss of opportunity, income, added costs, and deprivations of timely access to desired products and services resulting from defendant illegal obstruction of their legal rights in all forms and amounts of damages to be proven at trial<br>(d) The plaintiffs were deprived of rights to secure use of computers and application software, to continuity of their own accurate and accessible data, documents, and evidence of claims, and to free market employment, products, services, and/or honest services from persons and entities they would otherwise be able to access, and damaged by the loss of opportunity, income, added costs, and deprivations of timely access to desired products and services resulting from defendant illegal obstruction of their legal rights in all forms and amounts of damages to be proven at trial |

## 829. CLAIMS FOR RELIEF - COUNT 29

**Violations of Constitutional Rights Under the First, Fourth, Fifth, Thirteenth, Fourteenth Amendments**

### Scheme to Defraud of Honest Services - Mail, Wire, Email

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1346, 1961-1968 |
| Washington: | RCW §§ 9A.28.020, 9A.28.040, 9A.60.040 |
| New Jersey: | NJ Stat §§ 2C:20-8, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. §§ 105.15, 165.15, 460.00 through 460.80 |
| California: | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 151b § 4, ch 265 § 51, ch 274 § 7 |
| Arizona: | AZ Rev Stat § 13-2310 through 2312 |
| Texas: | TX Penal Code § 32.01 through 32.03, 32.42 |
| Maryland: | WA NJ NY CA MA MD TX AZ |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs, specifically including paragraph 824 wherein both the satisfaction of the statutory test, and the further benefits to these defendant of their patterns of frauds, racketeering activity affecting interstate commerce, is described. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of schemes, conspiracies, and deprivations of honest services to the Lead Plaintiff and closely held business entities as specifically cited and described in the final subparagraph below, both within and without the territory of these states and of the United States. Defendants have and do actively create these acts, violations, and injuries which have and do deprive the Lead Plaintiff of honest services and of access to honest services in, among other places, Washington, California, Arizona, New York, New Jersey, Illinois, Iowa, Texas, Maryland, Massachusetts,.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts – Subcount Series | Subcount(s) |
|---|---|---|
| 600-602 | NSEC National Security Pretexting and Entanglements | 1-3 |
| 608, 610-613, 615, 620 | HEXP Illegal Human Experimentation | 5, 7-10, 12, 17 |
| 622-627, 631-637 | RGTS Individual Rights Violations and Conspiracies | 2-7, 11-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 704, 706, 710 | LTHL Lethality Attempts | 11, 13, 17 |

D. These frauds are pleaded with particularity in compliance with F. R. Civ. P. Rule 9(b) using the layer cake method described at paragraphs 593-599 since it is not possible for these

plaintiffs to accurately determine the specific underlying identities of many of the defendant parties who were directly involved in the acts, violations, and injuries, due to defendant UNITED STATES' pervasive control of plaintiffs' places and manner of residence, employment, enterprise, income and benefits, and relationships. Many of these acts, violations, and injuries were perpetrated in person and using electronic and other communications by undercover police powers personnel and entities concealing their personnel and operations, and by their agents and others they permitted special access including, without limitation press, media, entertainment, and privileged persons, wherein the actual identities of these defendants cannot reasonably be expected to be known by these plaintiffs absent legally responsive answers and discovery from these defendants, as discussed at paragraphs 90-114. Other frauds were perpetrated by defendants who were permitted to enter this pervasively controlled environment without their own direct knowledge that they were entering, as part of police powers defendants' color of law conspiracy to attempt to inculpate these plaintiffs and those defendants simultaneously for purposes of entrapping both parties, and, as result, the frauds are the responsibility of both these defendants' own acts, the related fraudulent concealments, and the neglect to protect from known bad actors in the bad faith practices of police powers defendants.

E. In *Percoco v. United States,* 598 U.S. ___ (2023), the Supreme Court defined the boundaries of honest services fraud related to public employees, and to agents acting on behalf of and in coordination or conspiracy with governments, all of whom have a duty to provide honest services. Fiduciaries also have legal obligations to provide honest services including, without limitation, financial institutions, attorneys, accountants, tax software providers, and others in trust relationships with regard to the services they render, whether rendered honestly in constructive fraud or dishonestly in common law frauds. These defendants knowing provided dishonest services individually, jointly, and in conspiracy to (a) support and sustain acts,

violations, and injuries of constitutional rights; (b) to sustain involuntary servitude in service of the illegal human subject biomedical and coercive psychological experiments; (c) to sustain development, testing, and deployment of the illegal BRMT bioweapon and bioweapon delivery system; (d) to sustain the associated-in-fact enterprise pattern of racketeering acts; (e) to sustain fraudulent concealment of the entire associated-in-fact enterprise and systematic violations of constitutional rights.

| Elements of Fraud | Associated-In-Fact Pattern of Racketeering Acts Used By Defendants To Construct And Conduct Fraud |
|---|---|
| Defendant(s) fraudulent act(s) | Defendants named at paragraph 799 |
| (1) material representation - what; | Obstructed delivery of mail, and sent false and fraudulent mail to induce acts and services provided in good faith by plaintiffs, as described in the aforementioned paragraphs 600-602, 608, 610-613, 615, 620, 622-627, 631-637, 639-693, 704, 706, 710 |
| (2) the representation was false - how; | Defendants repetitively deprived plaintiffs of constitutionally guaranteed rights to free and fair access to honest services in interstate commerce under federal law and in-state commerce under state law |
| (3) the representation was known to be false or was recklessly made – why known; | Depriving plaintiffs of constitutionally guaranteed honest services from these defendants in their roles as employees of enterprises controlled by these plaintiffs, wherein the plaintiffs derived direct income and benefits or intended to do so in the future by their own efforts and those of others presenting as employees or future employees; by fiduciaries, by government officials and employees, and/or by agents of government |
| (4) the representation was intended to induce the plaintiff to act - toward what act; | Plaintiffs were given to believe that honest services would be rendered securely and honestly so they took no other actions to protect their rights to free and fair access to other methods of securing these honest professional services |
| (5) the plaintiff relied on the misrepresentation - form of reliance; | Plaintiffs acted in good faith in the sincere belief that honest services would be rendered the same as for all other persons |
| (6) the plaintiff was damaged as a result - how | Plaintiffs were deprived of rights to free market honest services from persons and entities they would otherwise be able to access, and damaged by the loss of opportunity, income, added costs, and deprivations of timely access to desired honest services outcomes to themselves and to the enterprises they owned, managed, and derived income and benefits from, as the direct result defendant illegal obstruction of their legal rights to honest services, and were injured as a result in all forms and amounts of damages to be proven at trial |

## 830. CLAIMS FOR RELIEF - COUNT 30

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

### Property Rights Of Citizens - Illegal Takings And Fraudulent Forced Forfeitures

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1584, 1961-1968; 42 U.S.C. § 1982) |
| Washington: | RCW 49.060.030(1)c, f |
| New Jersey: | NJ Stat 2C:20-4, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | New York Penal L. 190.05, 190.25, 190.60, 190.75, 460.00 through 460.80 |
| California: | Cal Penal Code §§ 236, 236.1(a) Cal Labor Code §§ 2801, 2802 Cal Civil Code §§ 1708-1725 |
| Massachusetts: | NA |
| Arizona: | AZ Rev Stat § 13-2310 through 2312 |
| Texas: | TX Penal Code §§ 32.01 through 32.03, 32.42 |
| Maryland: | WA NJ NY CA MA MD TX AZ |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage to deprive and remove property by illegal surreptitious means including, without limitation, through direct control and frauds, repeated and systematic destruction of career and employment opportunities, marriages, and businesses, and human trafficking to destroy the evidence thereof, while acting against the interests and property of Lead Plaintiff and similarly situated members of this class of plaintiffs in all the myriad forms of property which US persons are entitled to possess, own, and enjoy, in associated-in-fact enterprise patterns of racketeering acts. These acts, violations and injuries have

been and are for the corrupt and criminal purposes of perpetuating and sustaining involuntary servitude and continuing illegal abuses of these US persons with the illegal BRMT bioweapon and bioweapon delivery system, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States.

C. In furtherance of this conspiracy, defendants have and do act in violation of federal statutes and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties, all as perpetrated by defendant UNITED STATES and its defendant co-conspirators:

(i) pretexting and acts, violations, and injuries directed at Lead Plaintiff and other members of this class of plaintiffs; by defendant UNITED STATES' election in its illegal discretionary acts in (ii) permitting, enlisting, empowering, and/or enabling domestic and foreign fraudulent actors electronically screened in by defendants, (iii) permitting, enlisting, empowering, and/or enabling foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or (iv) pretexted regarding Lead Plaintiff to cause other discriminatory illegal acts targeting Lead Plaintiff, and/or other members of this class of plaintiffs, in violation of US law and of their own laws, and of any reasonable standard of practice, in

(a) their series of schemes, conspiracies, injuries, and deprivations of rights, and of (b) deprivations of Privileges and Immunities, including, without limitation, (b-i) Lead Plaintiff's rights to free, equal, and non-discriminatory access to acquire, possess, retain, and enjoy all forms of property, including those rights to same as guaranteed under ratified international treaties, and (b-ii) including such rights as they relate to employment, interstate commerce, and to closely held business entities. Defendants have and do injure the Lead Plaintiff and other members of the class by such deprivations of

rights. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint subject to discovery.

D. Defendant UNITED STATES, acting with its co-conspirators, has and does orchestrate alternative forms of thefts and deprivations of personal, financial, real, and intangible property as an alternative form of property seizure without due process. Defendants use apparent life events, carefully contrived, including, without limitation, divorce, personal guarantees tied to orchestrated business failures, deprivations of benefits, personal bankruptcies, thefts of services, programmed employment and unemployment, dishonest professional services, to deprive these plaintiffs of their constitutional property rights. This complaint is an encyclopedic and repetitive recitation of the methods of these defendants' property seizures by alternate means, which use direct frauds, delays, and deprivations of legally available benefits to these plaintiffs to fraudulently consume their limited financial resources by illegally concealed means of color of law abuses which result in losses and takings of personal, financial, real, and intangible property, to wit:

| Primary Methods Of Alternate Form Property Rights Deprivations And Seizures | Short Title - Paragraph Reference |
|---|---|
| Orchestrations of relationships by programmed isolation during constrained employment and by illegal constraints on electronic access | WSU, Susan Irish – 4(vii), 492, 600G, 608, 632<br>Lynne – 4(viii), 104, 311, 494-498, 600H, 608, 609, 621, Interline Exhibit 13<br>Jeanette – 104, 216-218, 302, 440-448, 453, 481, 498-502, 567, 600I, 610, 624G, 627B-E, 632, 649B, 650B(ii), Interline Exhibit 14<br>Fraudulent orchestrated dates Seattle, Portland – 632, 634A<br>Marinka Modderman – 608, 611, 632, 634<br>Laura – 608, 612<br>Fraudulent orchestrated dates, NYC – 632, 634<br>Gia – 608, 613, 632 |
| Programmed marital strife and divorce | Lynne – 4(viii), 104, 311, 494-498, 600H, 608, 609, 621, Interline Exhibit 13 |

| Programmed marital strife and divorce | Lynne – 4(viii), 104, 311, 494-498, 600H, 608, 609, 621, Interline Exhibit 13 |
|---|---|
| | Jeanette – – 104, 216-218, 302, 440-448, 453, 481, 498-502, 567, 600K, 610, 624G, 627B-E, 632, 649B, 650B(ii), Interline Exhibit 14 |
| Programmed employment and unemployment | Deloitte Seattle – 211, 424-438, 494, 541 table, 599D(i)b, 600H-J, 609A, 610A, 623B, 626A(viii), (x), 639, 640 |
| | LazerSoft – 120, 215, 427, 428, 437-442, 471A(iv), 499, 600, 639, 640 |
| | Alliance – 445-449, 453, 471(ii) through (v), 601A through H, 610, 622, 626, 644, 645A, 649, 650B(i), 651-653, 681A, 683 |
| | PAN – 450-451, 519, 599D(i)c, 600, 601, 623, 627B, 639, 640, 644B(iv), 649E, 650B(ii), 652, 653, 683B(iv) |
| | Pacific Pipeline – 427, 454-456, 465, 600, 602, 621D, 626A(vii), 639, 640 |
| | CNA – 427, 457-460, 471, 516, 600, 602, 604B, 615D, 617F, 626A(ii), (viii), (x), 639, 640, 641, 642A, 644B(v), 673A, 683A |
| | Allegent dba Performa – 99e, 219, 275(i), 276, 320f(vi), 461-462, 471, 516, 562, 604B, 606C, 626A(ix), 644(v), (vi), 650B(iii), (iv), 673A, 683A |
| | Establish – 11, 99e, g, 165, 166, 213, 320c, 320f(v), 416, 427, 462-471(i), 471(v), 472, 474, 482, 503, 518-519, 521, 536, 557, 599D(i)(e), 600, 602, 603, 611, 634A, C, 639, 640, 641, 650D, 656D) |
| | Banner Bank (shadow bank) – employer of Bruce Brewer (Lead Plaintiff's uncle) while in Bothell, WA, and referenced by COOK as his funding source for CNA, dependent on discovery |
| Penury in employment and unemployment | Extended uncompensated employment and unemployment before Pacific Pipeline – 454 |
| | Extended unemployment after Pacific Pipeline - 457 |
| | Compensation reduction on entry CNA - 457 |

| | |
|---|---|
| | Jeanette – – 104, 216-218, 302, 440-448, 453, 481, 498-502, 567, 600K, 610, 624G, 627B-E, 632, 649B, 650B(ii), Interline Exhibit 14 |
| Programmed employment and unemployment | Deloitte Seattle – 211, 424-438, 494, 541 table, 599D(i)b, 600H-J, 609A, 610A, 623B, 626A(viii), (x), 639, 640 |
| | LazerSoft – 120, 215, 427, 428, 437-442, 471A(iv), 499, 600, 639, 640 |
| | Alliance – 445-449, 453, 471(ii) through (v), 601A through H, 610, 622, 626, 644, 645A, 649, 650B(i), 651-653, 681A, 683 |
| | PAN – 450-451, 519, 599D(i)c, 600, 601, 623, 627B, 639, 640, 644B(iv), 649E, 650B(ii), 652, 653, 683B(iv) |
| | Pacific Pipeline – 427, 454-456, 465, 600, 602, 621D, 626A(vii), 639, 640 |
| | CNA – 427, 457-460, 471, 516, 600, 602, 604B, 615D, 617F, 626A(ii), (viii), (x), 639, 640, 641, 642A, 644B(v), 673A, 683A |
| | Allegent dba Performa – 99e, 219, 275(i), 276, 320f(vi), 461-462, 471, 516, 562, 604B, 606C, 626A(ix), 644(v), (vi), 650B(iii), (iv), 673A, 683A |
| | Establish – 11, 99e, g, 165, 166, 213, 320c, 320f(v), 416, 427, ??, 462-471(i), 471(v), 472, 474, 482, 503, 518-519, 521, 536, 557, 599D(i)(e), 600, 602, 603, 611, 634A, C, 639, 640, 641, 650D, 656D) |
| | Banner Bank (shadow bank) – employer of Bruce Brewer (Lead Plaintiff's uncle) while in Bothell, WA, and referenced by COOK as his funding source for CNA, dependent on discovery |
| Penury in employment and unemployment | Extended uncompensated employment and unemployment before Pacific Pipeline – 454 |
| | Extended unemployment after Pacific Pipeline - 457 |
| | Compensation reduction on entry CNA - 457 |
| | CNA contrived financial distress forces compensation reduction – 644B(v) |
| | CNA "founder" Cook removes $100,000 from CNA as PSNS project looms - 461 |

| | |
|---|---|
| | Starve out to homelessness for trafficking to Boston - 463 |
| | Homelessness and unemployment in Boston – 463-465 |
| | Post Establish Cliffside Park unemployment to homeless detention – 643 |
| | Perpetuated unemployment 2008 to present - 639, 640 |
| Thefts of market rate compensation and bonuses by frauds and misrepresentations, including of captive employees within cover companies operated by defendants for illegal searches, for domestic economic espionage, and for international espionage activities | Deloitte Seattle, LazerSoft, Alliance PAN – 450-451, 623 Pacific Pipeline CNA – 457-460, 644 Allegent, LLC dba Performa Establish – 462-474, 641 |
| Thefts of labor, materials, and services from vulnerable individuals | Chalom at Cliffside Park apartment – 642 |
| Deprivations of government benefits, such as SBA and unemployment benefits | Alliance SBA bonding - 649 Chalom through unemployment compensation deprivation - 643 |
| Dishonest professional services - financial instruments | Mortgage $9950 pre-payment penalty at 149th St Kirkland – 610I Shadow banking fees and credit insurance – 645, 646 |
| Dishonest professional services - tax | TurboTax NJ earned income hack - 647 |
| Forced legal services imposed by creation of legal controversies by government agents and/or informants on targeted persons and enterprises | Alliance, Steve's Maintenance check theft – 644 Laseraccess (successor to LazerSoft) compensation litigation - 644 PAN graphic art services – 644 CNA compensation theft - 644 Allegent, ShipNow bad check litigation – 644 Winnett, Smith litigation – 644 |
| Personal guarantees used in orchestrated business failures used to impose personal asset forfeitures to third parties or cover companies | Alliance to US Bank Kent Alliance to Pacific Financial Services – 644B(ii) Winnett to Smith –644B(viii), 659 |
| Personal bankruptcy imposed by programmed business failures using racketeering enterprise frauds | Alliance programmed business failure to conceal evidence of prior illegal searches – 627 |
| Entrapments – tax, financial, structured payments, medical/drugs | Alliance – 622, 651 ED, opioids offer from induced back pain – 614, 617 |

|  | Laura structured payments orchestration – 622 |
|---|---|
|  | Ironwood property release - 624 |
| Fraudulent sales leads and sales solicitation services not rendered or intercepted by government agents during emailing to prevent authentic interactions with legitimate sales prospects | Sheldon-Lee - 679<br>Performa – 673, 679<br>Winnett/Sheldon Beef/GPR – 674-680 |
| Fraudulent financings and fees – services not professionally provided, to and including media and entertainment industry personnel embedded with undercover government agents engaging in racketeering enterprise frauds | LazerSoft - 441<br>Alliance – 652, 653<br>PAN – 652, 653<br>Winnett/Sheldon/GPR – 648, 654, 655, 657-672 |
| Compromises of assets - check frauds, receivables frauds | Alliance, Bates Voc-Tech - 650<br>CNA, HomeGrocer - 650<br>Performa, ShipNow – 650<br>Winnett/Sheldon Beef/GPR - 656 |
| Transaction frauds – mergers and acquisitions of cover companies prevented and perverted | Alliance, Steve's Maintenance – 446, 626, 644, 683<br>Pacific Pipeline - 456 |
| Dishonest professional services - legal counsel who do no legal work embedded in law firms as spies, contractual provisions arbitrarily modified to benefit another party rather than the represented party | Hibbs – 626, 644, 683<br>Thorbrogger – 626, 644, 683<br>Caldwell – 626, 644, 683<br>PAN graphic artist litigation – 683<br>Winnett/Sheldon Beef/GPR - 684 |
| Dishonest professional services - accounting walk-away during professional project | Alliance, Phil Walter's sister, accounting firm - 681 |
| Dishonest professional services - deliberate overstaffing before ownership transitions, undercover embeds operating as illegal spies and employee saboteurs | Larry's Market, employee (Brad) and partner (produce manager) – 99k<br>LazerSoft - 686<br>Alliance - 686<br>Allegent, Pray as partner - 686<br>CNA - 686<br>Establish - 686<br>Winnett/Sheldon Beef/GPR – 687-690 |
| Dishonest professional services - consultants, sales representations | Winnett/Sheldon Beef/GPR – 680, 685 |
| Dishonest professional services – software development incomplete and inoperative | LazerSoft (WATERS) – 600K<br>CNA at CUC (PRAY) – 458<br>Winnett/Sheldon Beef/GPR - 682 |

| Dishonest professional services – real property forced forfeitures soon after extensive improvements | 133rd St, Redmond - 609 |
| | 149th St, Kirkland - 610 |
| | Farm And Ranch – 625, 691-693 |
| Predatory dismissals of founders and inventors | Friday Harbor light diffraction device (defendant is morphologically comparable to CHALOM, dependent on discovery) |
| | Drip irrigation system inventor, as represented to Lead Plaintiff by CORNWELL, dependent on discovery |
| | CNA Manufacturing- as represented to Lead Plaintiff by COOK and HOLDEN, dependent on discovery |
| Federal projects contract delay and acceleration orchestration to maximize cash flow difficulties and minimize profitability | Alliance, Sea-Tac project delay acceleration – 649 |

E. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-617 | HEXP Illegal Human Experimentation | 5-14 |
| 622-627, 631-634 | RGTS Individual Rights Violations and Conspiracies | 2-7, 11-14 |
| 639-693 | RICO Racketeering | 1-55 |
| 702, 706 | LTHL Lethality Attempts | 9, 13 |

F. These frauds are pleaded with particularity in compliance with F. R. Civ. P. Rule 9(b)

using the layer cake method described at paragraphs 593-599 since it is not possible for these

plaintiffs to accurately determine the specific underlying identities of many of the defendant

parties who were directly involved in the acts, violations, and injuries, due to defendant UNITED

STATES' pervasive control of plaintiffs' places and manner of residence, employment,

enterprise, income and benefits, and relationships. Many of these acts, violations, and injuries

were perpetrated in person and using electronic and other communications by undercover police

powers personnel and entities concealing their personnel and operations, and by their agents and

others they permitted special access including, without limitation press, media, entertainment,

and privileged persons, wherein the actual identities of these defendants cannot reasonably be

expected to be known by these plaintiffs absent legally responsive answers and discovery from

these defendants, as discussed at paragraphs 90-114. Other frauds were perpetrated by

defendants who were permitted to enter this pervasively controlled environment without their

own direct knowledge that they were entering, as part of police powers defendants' color of law

conspiracy to attempt to inculpate these plaintiffs and those defendants simultaneously for

purposes of entrapping both parties, and, as result, the frauds are the responsibility of both these

defendants' own acts, the related fraudulent concealments, and the neglect to protect from known

bad actors in the bad faith practices of police powers defendants.

G. Defendants deprived these plaintiffs of their property rights of these plaintiffs, acting individually, jointly, and in conspiracy to (a) support and sustain acts, violations, and injuries of constitutional rights; (b)  sustain involuntary servitude in service of the illegal human subject biomedical and coercive psychological experiments; (c) sustain development, testing, and deployment of the illegal BRMT bioweapon and bioweapon delivery system; (d) sustain the associated-in-fact enterprise pattern of racketeering acts; (e) sustain fraudulent concealment of the entire associated-in-fact enterprise and systematic violations of constitutional rights.

| Elements of Fraud | Associated-In-Fact Pattern of Racketeering Acts Used By Defendants To Construct And Conduct Fraud |
|---|---|
| Defendant(s) fraudulent act(s) | Defendants named at paragraph 799 |
| (1) material representation - what; | Conspired and orchestrated interstate travel in support of it associated-in fact enterprise pattern of racketeering acts intended to induce acts and services provided in good faith by plaintiffs, as described in the aforementioned paragraphs 600-603, 604-617, 622-627, 631-634, 639-693, 702, 706 and at the table 830D in this paragraph and at 830E in this paragraph |
| (2) the representation was false - how; | Defendants repetitively deprived plaintiffs of constitutionally guaranteed property rights to real, personal, tangible, and/or intangible property |
| (3) the representation was known to be false or was recklessly made – why known; | Depriving plaintiffs of constitutionally guaranteed property rights through fraudulent concealment of illegal acts, violations, and injuries targeted and intended to separate these plaintiffs' property from these plaintiffs |
| (4) the representation was intended to induce the plaintiff to act - toward what act; | Plaintiffs were given to believe that honest services of police powers and of agents of those police powers, and that members of the public would not knowingly thereby misrepresent themselves and their own pecuniary interests, such that services, interactions, and transactions would be rendered in ordinary, secure and honest ways generally accepted, so they took no other actions to protect their rights of free and fair access to other methods of securing themselves, their families, their constitutional rights, and their property |
| (5) the plaintiff relied on the misrepresentation - form of reliance; | Plaintiffs acted in good faith in the sincere belief that honest services, interactions, and transactions would be rendered the same as for all other persons |
| (6) the plaintiff was damaged as a result - how | Plaintiffs were deprived of property rights including, without limitation, through deprivations of free market honest services, interactions, and transactions from persons and entities they would otherwise be able to access, and were damaged by the |

| | loss of opportunity, income, added costs, and deprivations of timely access to their property, and through deprivations and depredations of the enterprises they owned, managed, and derived income and benefits from, all as the direct result defendant illegal direct and indirect targeted discriminations and obstructions of their legal rights to property, and were injured as a result in all forms and amounts of damages to be proven at trial |
|---|---|

## 831. CLAIMS FOR RELIEF - COUNT 31

**Violations of Constitutional Rights Under the First, Fourth, Fifth, Thirteenth, Fourteenth Amendments**

### Racketeering - Monetary Benefit From Unlawful Activity

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1961-1968; 42 U.S.C. § 1982 |
| Washington: | RCW § 9A.82.010(12) |
| New Jersey: | NJ Stat §§ 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | NA |
| California: | Cal Penal Code §§ 236, 236.1(a) |
| | Cal Labor Code §§ 2801, 2802 |
| | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | NA |
| Arizona: | AZ Rev Stat § 13-2308, 13-2310 through 2312 |
| Texas: | NA |
| Maryland: | MD Criminal Law Code § 9-801 through 9-805 |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage in their series of schemes, conspiracies, and deprivations of real, financial, and personal property to the Lead Plaintiff and closely held business entities, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States.

Discovery will provide evidence of this widespread pattern of practice by illegally embedded police powers personnel posing as executive employees. While there is no civil remedy which directly attaches to 18 U.S.C. § 654, the conversion of property by a government employee is also a specific criminal offense, in addition to its status as an associated-in-fact enterprise racketeering offense and as a rights violation, when brought as it is in this paragraph for constitutional property rights violations and injuries.

C. These associated-in-fact enterprise racketeering acts, which have and do provide direct monetary benefit from unlawful activity have and do include, without limitation, defendant ROSENBERG (FBI), while illegally embedded at NutraSource, who exploited his relationship with Lead Plaintiff and with other captive Board members of NutraSource (WEISSMAN, FBI as PCC General Manager Whiteman, two FBI illegal embeds at Oakland Food Cooperative, Oakland, CA, and Carr's/Gottstein's Gallant – Anchorage, AK) for the purpose of securing and continuing a Sahale Golf and Country Club, Redmond, WA, initiation fees, membership, fees, and dues, all paid directly and indirectly with equity finds contributed by and through orchestrated sales to Puget Consumer Cooperative, NutraSource's 50% founding investor ($200,000) which was then illegally managed by WEISSMAN (FBI), whose Board of Trustees included Lead Plaintiff, for the purpose of securing a personal benefit and compensation, not otherwise available to federal employees by use of federal funds, during his illegally embedded tenure as CEO of NutraSource during the 1980s and 1990s, until NutraSource was sold to another natural food wholesale company in Auburn, CA, which may also have been an illegal cover company, also used as a device to destroy the business records of NutraSource for the corrupt of fraudulent concealment of evidence of illegal surveillance and surreptitious targeted property destruction through commerce, which Auburn, CA cover company itself, was later sold to UNFI, a publicly traded company.

D. Individual defendants employed by government as police powers personnel accepted Lead Plaintiff's corporate entities' company stock and company stock options (Winnett and Sheldon Beef, paragraphs 685-690 RICO-47-52) in their own or their cover names either for the purpose of directly benefitting from their fraudulent employment or with the advance knowledge that crimes in interstate commerce related to the financial destruction of these enterprises were intended by them and by their police powers employers to occur to avoid this illegal conversion through to monetary benefit in conjunction with their associated-in-fact enterprise pattern of racketeering acts, violations, and injuries.

E. Defendant UNITED STATES also has and does benefit from this illegal takeover and/or embedding of its personnel in private enterprises, whose commercial purpose is to benefit their members and/or shareholders, by misdirecting and reallocating private funds toward purposes other than purposes intended to directly benefit those members and/or owners, and which has and does use those private resources for its own benefit, by, for example using employees to illegally spy and report on others it may be targeting for its illegal purposes, by misdirecting these activities while embedded as supervisors, managers, and/or executives, as was the case with defendants WEISSMAN and ROSENBERG including, without limitation, before, during, and after Lead Plaintiff was a Board member of organizations (PCC, NutraSource, Pacific Pipeline) illegally managed by those illegally embedded defendant UNITED STATES (including, without limitation, DOJ, FBI, USMS, CIA, ARMY) agents. Misallocation of these private sector revenues and profits to governmental purposes, rather than the private purposes intended in private enterprises, operates as illegal appropriations of private moneys, a form of theft used to facilitate illegal acts by defendant UNITED STATES outside constitutional prohibitions and in direct contradiction and contravention of Congressional intent, and illegal

conversion criminally indicted by defendant DOJ against labor unions and other organizations under 18 U.S.C. 1961-1968.

F. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments. Defendant UNITED STATES and/or a predesignated purchaser acting with direct knowledge secured a monetary benefit from a bargain purchase in the forced rapid sale of Lead Plaintiff's first purchased and improved residence at 133rd Street in Redmond, WA, when defendant UNITED STATES (and defendant BURNS and other unknown defendants) used the illegal BRMT bioweapon and bioweapon delivery system (oxytocin – "love" hormone) against Lead Plaintiff's first spouse, Lynne, in her US West New Vector Group workplace affair with SWAIN (after the double homicide attempt at paragraph 694 failed), who then owned the cellular telephone equipment installation shop which installed the cellular telephone equipment box in Lead Plaintiff's vehicle used in the double homicide attempt at Porteau Cove (paragraph 694 LETHL-1), and was a known serial adulterer, to cause and create the divorce of Lead Plaintiff and spouse Lynne in 1988. These illegal acts by defendant UNITED STATES (defendant BURNS and unknown others) forced the rapid bargain sale in 1988 within ten days of listing of their jointly owned residence (Interline Exhibit 13), by the hand of an embedded and self-interested defendant FBI or USMS "realtor," who had originally and abruptly jacked up the purchase price by $5,000 during the initial purchase in 1984. This forced 1988 bargain sale was undertaken a few months after the Lead Plaintiff completed extensive and expensive landscaping improvements to the rear of the property (approximately 14,000 square feet including tress, plants, hedge, purchased sod and in-ground sprinklers) at considerable time and expense. (Paragraph 510, Interline Exhibit 13)

G. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments. Defendant UNITED STATES and/or a predesignated purchaser acting with direct knowledge and secured a monetary benefit from a bargain purchase in the forced rapid sale of Lead Plaintiff's residence at 149th Street in Kirkland, WA, in 2005,when defendant UNITED STATES caused and created the divorce of second wife Jeanette after Lead Plaintiff completed extensive improvements to the 149th Street residence. During the refinancing of the two Chase Bank HELOCs and credit card debt used as construction loans for these improvements, defendant UNITED STATES orchestrated, and Jeanette arranged, a pre-payment penalty of $9,950 on the mortgage loan (similar property theft abuses just under the $10,000 reporting limit which also constitute racketeering acts in deprivation of property rights by defendant UNITED STATES include paragraphs 610I HEXP-7, 656, 661 RICO-18, 23). Later, the embedded agent realtor, who was a "friend" or federal agent handler of fraudulently orchestrated spouse Jeanette (coerced into the relationship with Lead Plaintiff as a deferred military criminal prosecution active duty ARMY bisexual soldier in civilian dress in 1988, a *Third* Amendment violation), offered a unilateral $5,000 price reduction without authorization, all part of its on-going associated-in-fact enterprise pattern of racketeering acts which deprived Lead Plaintiff and spouse Jeanette of the full appreciation of this forced real estate sale, which occurred within ten to thirty days of listing, (paragraph 511, Interline Exhibit 14).

H. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments when it deprived Lead Plaintiff's business Alliance Environmental Services of

Small Business Administration bid and performance bonding services from 1990 to 1993 by the false personation of an SBA employee by defendant FBI, who then also provided a fraudulent performance bond for a federally funded project using a previously seized Utah insurance company as cover for this fraudulent issuance, then cancelled that performance bond they had fraudulently issued in the seized insurance company's name during the course of the project it was intended to secure, and arranged the acceleration of the project's performance schedule to exacerbate cash flow problems, all to create financial distress for Alliance and for the Lead Plaintiff, then again deprived the company of performance bonding to deprive Alliance of a federally funded air route traffic control center project for about $1.2 million, and also engaged with defendant CIA, in a cross-border financing fraud buried in another cross-border investigation with CSIS and RCMP, and a factoring fraud, all used to force a personal bankruptcy which deprived Lead Plaintiff of nearly all financial assets and severely damaged his access to credit, while they used other mail and wire frauds to perpetuate compensation frauds and deprivation of free and fair access to other employment opportunities (paragraphs 450-451, 601F NSEC-2, 639, 652, 653 RICO-1, 14, 15).

I. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments. Defendant UNITED STATES derived monetary benefits from its racketeering acts by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments on him when it repeated this scheme and accelerated his programmed financial and psychological destruction to suicide ideation and homelessness in 2002 to 2005 using a combination of check fraud and false sales opportunities requiring extensive travel throughout the United States to starve another Lead Plaintiff company, Allegent,

LLC dba Performa, of legitimate sales opportunities, and to again force the rapid bargain sale, this time to avoid foreclosure, of Lead Plaintiff's 149th Street, Kirkland, WA residence, improved using over $100,000 of out of pocket and borrowed funds (paragraphs 99e, 219, 275(i), 276, 320f(vi), 461-462, 471, 516, 562, 604B, 606C, 626A(ix), 644(v), (vi), 650B(iii), (iv), 673A, 683A) between about 1994 and 2004 (Interline Exhibit 14).

J. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments. Defendant UNITED STATES derived monetary benefits from its racketeering acts by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments on him when it repeated this scheme and accelerated his programmed financial and psychological destruction to suicide ideation and homelessness again at his residence in Cliffside Park, NJ in 2010 (paragraph 474, 642 RICO-4).

K. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments. Defendant UNITED STATES derived monetary benefits from its racketeering acts by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments on him when it repeated this same process, except for an explicit suicide ideation in this specific instance, at Ramsey, NJ, (paragraph 513, also LPEE email to AKOTO on 171027).

L. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical

experiments. Defendant UNITED STATES derived monetary benefits from its racketeering acts by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments on him when it repeated this same process, except for an explicit suicide ideation in this specific instance, yet again in his trafficking to Edgewater, NJ in 2018 (paragraph 648 RICO-10 and other paragraphs cited therein).

M. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments. Each and every time, defendant UNITED STATES, acting through its departments and agencies including, without limitation, defendants CIA, ARMY, FBI, USMS, DHA, USSS, CPB, conspired and acted to deprive him of (i) the benefit of his financial investments, (ii) adequate compensation for his labor, materials, and other expenses, and (iii) of any enjoyment of those improvements, and (iv) each time this occurred very soon after (never during) the time these investments, expenses, and labor were completed.

N. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments. In each of these four sequences, the two forced removals from his owned real properties, and the two removals from his rented residences, the removal occurred soon after the improvements were completed and before financial reserves could be reaccumulated. This is the very same pattern of acts these defendants also used to orchestrate periods of employment, unemployment, and setbacks in his pay rate while he had little or no bargaining power and his paths to alternative employment were blocked by mail frauds and wire frauds during his employment searches, as well documented int the subparagraphs cited above.

O. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments. Thereafter, defendant UNITED STATES and its co-conspirators completely eliminated all the Lead Plaintiff's employment options, including all professional employment, and even including hourly part-time employment at a local supermarket in Ramsey, NJ while he lived there between 2011 and 2018.

P. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments. All these acts were and are part of their conspiracy and scheme to deprive Lead Plaintiff of the benefits of real property appreciation and the accumulation of financial resources so as to sustain his involuntary servitude to defendant UNITED STATES' BRMT brain hijacking program and its attempted fraudulent concealment and cover-up in plain sight. These defendants used their official knowledge and their color of law "investigations" to individually and personally to directly benefit themselves or others by exploiting this insider conspiracy and knowledge of each of these frauds and schemes in sequence from 1968 to the present.

Q. Particular details of those directly benefiting or steering to certain persons the benefits of these property improvements and subsequent appreciation of real properties which Lead Plaintiff improved (including, without limitation, from $189,340 in 1984 to $1,829,013 in 2023 per Redfin.com for his first residence in Redmond, WA; and from zero equity on marriage to Jeanette in 1990 to $1,091,991 in 2024 per Redfin.com) are unknown at the time of this complaint and will be available to be introduced upon proper discovery.

R. Defendant UNITED STATES has and does derive continuing monetary benefits from its associated-in-fact enterprise pattern of racketeering acts, specifically by continuing its involuntary servitude of Lead Plaintiff in his continued subjugation for illegal human medical experiments. A known group of human subjects provides the virtually immeasurable economic benefit of a specific group of extremely well-known and long studied human subject victims intis illegal pursuit of the internationally prohibited BRMT bioweapon and bioweapon delivery system, illegal under 18 U.S.C. § 175. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

S. These frauds are pleaded with particularity in compliance with F. R. Civ. P. Rule 9(b) using the layer cake method described at paragraphs 593-599 since it is not possible for these plaintiffs to accurately determine the specific underlying identities of many of the defendant parties who were directly involved in the acts, violations, and injuries, due to defendant UNITED STATES' pervasive control of plaintiffs' places and manner of residence, employment, enterprise, income and benefits, and relationships. Many of these acts, violations, and injuries were perpetrated in person and using electronic and other communications by undercover police powers personnel and entities concealing their personnel and operations, and by their agents and others they permitted special access including, without limitation press, media, entertainment, and privileged persons, wherein the actual identities of these defendants cannot reasonably be expected to be known by these plaintiffs absent legally responsive answers and discovery from these defendants, as discussed at paragraphs 90-114. Other frauds were perpetrated by defendants who were permitted to enter this pervasively controlled environment without their own direct knowledge that they were entering, as part of police powers defendants' color of law conspiracy to attempt to inculpate these plaintiffs and those defendants simultaneously for purposes of entrapping both parties, and, as result, the frauds are the responsibility of both these defendants' own acts, the related fraudulent concealments, and the neglect to protect from known bad actors in the bad faith practices of police powers defendants.

T. Defendants converted property of these plaintiffs, described at paragraphs 830D, 830E, and as described in the entirety of this paragraph 831, for their own benefit and/or for the

benefit of other related parties and/or co-conspirator defendants, while (i) operating undercover
to fraudulently conceal their identities and their relationships with parties directly benefitting
from these conversions through illegally forced forfeitures under color of law, and/or their
relationships with other defendants who possessed operational knowledge of these illegally
forced property forfeitures, to (ii) convert and to benefit monetarily from these forced forfeitures
caused by the associated-in-fact enterprise pattern of racketeering act and violations of
constitutional rights which (iii) defendants caused and created to individually, jointly, and in
conspiracy, which illegal conversions for monetary benefit have and do (a) support and sustain
acts, violations, and injuries of constitutional rights; (b) sustain involuntary servitude in service
of the illegal human subject biomedical and coercive psychological experiments; (c) sustain
development, testing, and deployment of the illegal BRMT bioweapon and bioweapon delivery
system; (d) sustain the associated-in-fact enterprise pattern of racketeering acts; (e) sustain
fraudulent concealment of the entire associated-in-fact enterprise and systematic violations of
constitutional rights.

[Intentionally left blank.]

## 832. CLAIMS FOR RELIEF - COUNT 32

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Thirteenth, Fourteenth Amendments

#### Interstate and Foreign Travel or Transportation For Racketeering Purposes

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1952, 1961-1968 |
| Washington: | RCW § 9A.82.010(12) |
| New Jersey: | NJ Stat §§ 2C:20-8, 2C:41-1 through 2C:41-6, 10:6-2 |
| New York: | NA |
| California: | Cal Penal Code §§ 236, 236.1(a) |
| | Cal Labor Code §§ 2801, 2802 |
| | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 271a §§ 1-3 |
| Arizona: | AZ Rev Stat § 13-2308, 13-2310 through 2312 |
| Texas: | TX Penal Code §§ 32.01 through 32.03, 32.42, 71.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of frauds, schemes, conspiracies, injuries, and deprivations of rights using interstate and international travel, federally funded public transportation modes and facilities in interstate and international commerce, to deprive the Lead Plaintiff and closely held business entities, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States.

C. Defendant UNITED STATES, through its various departments and agencies and in collaboration with other co-conspirator defendants, conducted interstate and international travel and transportation for racketeering purposes in the never completed fraudulent financings of

Alliance Environmental Services Corporation (paragraph 623 RGTS-3, 653 RICO-15, Vancover, Canada), PAN (paragraphs 601 NSEC-2, 652 RICO-14, London, UK), and in the fraudulent trafficking and employment at ESTABLISH (paragraph 603 NSEC-4, 641 RICO-3, London, UK).

D. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 607, 608, 610-611, 613, 615, 618, 619 | HEXP Illegal Human Experimentation | 4-5, 7-8, 10, 12, 15, 16 |

| 623-628, 632, 634 | RGTS Individual Rights Violations and Conspiracies | 3-8, 12, 14 |
|---|---|---|
| 639-642, 644, 648-650, 652-655, 658, 661, 666-669, 671, 672, 673, 684-687, 689, 690, 692, 693 | RICO Racketeering | 1-4, 6, 10-12, 14-17, 20, 23, 28-31, 33, 34, 35, 46-49, 51, 52, 54, 55 |
| 694, 700, 702, 707-709 | LTHL Lethality Attempts | 1, 7, 9, 14-16 |

E. These frauds are pleaded with particularity in compliance with F. R. Civ. P. Rule 9(b) using the layer cake method described at paragraphs 593-599 since it is not possible for these plaintiffs to accurately determine the specific underlying identities of many of the defendant parties who were directly involved in the acts, violations, and injuries, due to defendant UNITED STATES' pervasive control of plaintiffs' places and manner of residence, employment, enterprise, income and benefits, and relationships. Many of these acts, violations, and injuries were perpetrated in person and using electronic and other communications by undercover police powers personnel and entities concealing their personnel and operations, and by their agents and others they permitted special access including, without limitation press, media, entertainment, and privileged persons, wherein the actual identities of these defendants cannot reasonably be expected to be known by these plaintiffs absent legally responsive answers and discovery from these defendants, as discussed at paragraphs 90-114. Other frauds were perpetrated by defendants who were permitted to enter this pervasively controlled environment without their own direct knowledge that they were entering, as part of police powers defendants' color of law conspiracy to attempt to inculpate these plaintiffs and those defendants simultaneously for purposes of entrapping both parties, and, as result, the frauds are the responsibility of both these

defendants' own acts, the related fraudulent concealments, and the neglect to protect from known bad actors in the bad faith practices of police powers defendants.

F. In *Percoco v. United States*, 598 U.S. ___ (2023), the Supreme Court defined the boundaries of honest services fraud related to public employees, and to agents acting on behalf of and in coordination or conspiracy with governments, all of whom have a duty to provide honest services. Fiduciaries also have legal obligations to provide honest services including, without limitation, financial institutions, attorneys, accountants, tax software providers, and others in trust relationships with regard to the services they render, whether rendered honestly in constructive fraud or dishonestly in common law frauds. These defendants knowing provided dishonest services individually, jointly, and in conspiracy to (a) support and sustain acts, violations, and injuries of constitutional rights; (b) to sustain involuntary servitude in service of the illegal human subject biomedical and coercive psychological experiments; (c) to sustain development, testing, and deployment of the illegal BRMT bioweapon and bioweapon delivery system; (d) to sustain the associated-in-fact enterprise pattern of racketeering acts; (e) to sustain fraudulent concealment of the entire associated-in-fact enterprise and systematic violations of constitutional rights.

| Elements of Fraud | Associated-In-Fact Pattern of Racketeering Acts Used By Defendants To Construct And Conduct Fraud |
|---|---|
| Defendant(s) fraudulent act(s) | Defendants named at paragraph 799 |
| (1) material representation - what; | Obstructed delivery of mail, and sent false and fraudulent mail to induce acts and services provided in good faith by plaintiffs, as described in the aforementioned paragraphs 600-602, 608, 610-613, 615, 620, 622-627, 631-637, 639-693, 704, 706, 710 |
| (2) the representation was false - how; | Defendants repetitively deprived plaintiffs of constitutionally guaranteed rights to free and fair access to honest services in interstate commerce under federal law and in-state commerce under state law |
| (3) the representation was known to be false or was | Depriving plaintiffs of constitutionally guaranteed honest services from these defendants in their roles as employees of enterprises controlled by these plaintiffs, wherein the plaintiffs |

| recklessly made – why known; | derived direct income and benefits or intended to do so in the future by their own efforts and those of others presenting as employees or future employees; by fiduciaries, by government officials and employees, and/or by agents of government |
|---|---|
| (4) the representation was intended to induce the plaintiff to act - toward what act; | Plaintiffs were given to believe that honest services would be rendered securely and honestly so they took no other actions to protect their rights to free and fair access to other methods of securing these honest professional services |
| (5) the plaintiff relied on the misrepresentation - form of reliance; | Plaintiffs acted in good faith in the sincere belief that honest services would be rendered the same as for all other persons |
| (6) the plaintiff was damaged as a result - how | Plaintiffs were deprived of rights to free market honest services from persons and entities they would otherwise be able to access, and damaged by the loss of opportunity, income, added costs, and deprivations of timely access to desired honest services outcomes to themselves and to the enterprises they owned, managed, and derived income and benefits from, as the direct result defendant illegal obstruction of their legal rights to honest services, and were injured as a result in all forms and amounts of damages to be proven at trial |

## 833. CLAIMS FOR RELIEF - COUNT 33

### Violations of Constitutional Rights Under the First, Fifth, Eighth, Thirteenth, Fourteenth Amendments

### Free Exercise Of Religion

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 42 U.S.C. §§ 1985, 2000bb-1 |
| Washington: | RCW § 49.060.030(1) |
| New Jersey: | NA |
| New York: | NA |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to

be identified through the discovery process have and do act in violation of federal and state

statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery.

B. Congress adopted the Religious Freedom Restoration Act in 1993 to restore the prior historical pattern of religious freedom in religious expression which had prevailed from the founding until it was disrupted by the Supreme Court in 1990. Except for this brief period from April 17, 1990 to November 16, 1993, the prevailing law in the United States conformed to the legal principles expressed in the Religious Freedom Restoration Act.

C. Defendants have and do plan, conspire, perpetrate and engage in systematic plans, conspiracies, and violations of religious freedom to discriminate against these plaintiffs and their children from minor age to death, selected by defendant UNITED STATES (including, without limitation, CIA, ARMY, DOD, DOJ, FBI, USMS) for involuntary servitude and for illegal human medical experimentation without consent, to develop an illegal and internationally prohibited bioweapon and bioweapon delivery system, which has and does continue regardless whether or not these plaintiffs have or do sustain the specific religious practices of their forebears, based solely upon defendant UNITED STATES' initial involuntary selection of those plaintiffs and of other members of their family of origin, which authority it does not constitutionally possess. This associated-in-fact enterprise conspiracy of racketeering acts against rights, religious freedom, and the other acts, violations, and injuries of these defendants, have and do illegally impose a functional administratively placed bill of attainder in violation of our Constitution, criminal laws, and of 5 U.S.C. § 301, among others, upon these adult and minor child plaintiffs including, without limitation, for their illegal human trafficking and illegal medical experimentation from age 12 or earlier, as in Lead Plaintiff's own direct experience. Defendant UNITED STATES has and does place continuing involuntary constraints and deprivations on these plaintiffs of religious practice and other

constitutional rights directed at and against those targeted persons based upon the religion into which they were born, and for other discriminatory purposes in violation of 5 U.S.C. § 301 Administrative Procedures and of 42 U.S.C. § 2000bb-1:

> "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest."

C. There is no compelling governmental interest in illegal human medical experimentation on selected members of religious groups discriminatorily chosen for that specific reason, nor on their children and succeeding generations of their families. There is no compelling governmental interest in facilitating the development of an illegal bioweapon and bioweapon delivery systems upon specific religious groups. There is no compelling governmental interest in abusing the state secret privilege to undertake, sustain, and conceal racketeering acts by any conspiracy which includes, or even which would exclude, defendant UNITED STATES, its departments and agencies, as a leader and/or member of such an associated-in-fact enterprise and conspriacy against members of a specific religious group. None of these acts is constitutionally permitted to defendant UNITED STATES. There can be no compelling governmental interests in acts which are not constitutionally permitted to government, nor when those supposed interests have and do exceed the clear intent expressed by Congress to protect these religious rights and the constitutional rights of each and all these US persons, their minor children, and succeeding generations, such as these defendants have and do continue to perpetrate using color of law abuse of state secret privilege and alleged national security regulations for the specific purposes of systematic violations of 5 U.S.C. § 301 (paragraph 260, Interline Exhibit 2).

D. The origins of this fraudulently concealed religious discrimination against four
generations of American families is based upon their religious belief in pacifism, and their
religious choice not to bear arms in military service, which has been and, as to certain plaintiffs
continues to be, practiced by Lead Plaintiff's family at least since his great-great grandfather
who served during four years of the Civil War, and who was awarded the Medal of Honor after
Appomattox on the defeat of slavery and perpetuated involuntary servitude (so the family
believed and America constitutionally ratfied in the *Thirteenth* Amendment). Defendant
UNITED STATES (including, without limitation, CIA, ARMY. DOJ, FBI, USMS, NIAID)
and its co-conspirators has and does constitutionally and criminally abuse these plaintiffs in its
religious discrimination and selection of these families for its illegal human experimentation
upon them without informed consent, and in fact, without consent of any kind, and upon their
minor children, without consent of any kind (paragraphs 1-27, 350-584), to and including
lifetime involuntary servitude (paragraphs 403-424).

E. After faithfully serving as conscientious objectors in defendant ARMY Medical
Corps and other military service, these veterans, including Lead Plaintiff's father (the parent of
now deceased Sandra at age 11, paragraph 803C-H), and uncle (grandfather of now deceased
Audrey at age 18, paragraph 803I-K), and their families of this Quaker-based religious group,
have been and are subjected to continuing religious discrimination throughout their lives, and
succeeding generations of their minor children born into this religion, which have also been
similarly subjected to these acts, violations, and injuries by defendant UNITED STATES. The
acts, violations, and injuries, both by active measures, and by its neglect to prevent these
constitutional and civil rights violations and crimes including, without limitation, as perpetrated
and as fraudulently concealed specifically by defendant DOJ and its police powers agencies, in
coordination and conspiracy with other police powers, intelligence, and foreign police powers

and intelligence departments and agencies, and with other known and unknown defendants
which acts. violations, injuries, and conspiracies, together with other departments and agencies
of defendant UNITED STATES, have persisted secretly for at least 70 years since the first
known visit of defendant FBI to the family's home church on a Sunday morning in rural
Enumclaw, WA when Lead Plaintiff's mother was a teenager in the early 1950s (paragraph
410-411).

E. This pattern of continual religious discrimination has been and is also fraudulently
concealed by subjecting these same families and their individual members to ruinous and lethal
racketeering acts perpetrated and perpetuated by defendant UNITED STATES and its co-
conspirators. This associated-in-fact enterprise and conspiracy operates in the same continuing
patterns of illegal associated-in-fact enterprise racketeering acts and conspiracies which
Congress investigated and legislated to outlaw in accordance with the 1975 Senate Intelligence
Committee Final Report on CIA's illegal MKUltra program and FBI's illegal Cointelpro
program. Those programs perpetrated, sustained, and fraudulently concealed long-running
patterns of constitutional rights violations, violence, lethality, discrediting, financial ruin, and
other discrimination, undertaken by defendant DOJ and its police powers agencies against the
constitutional and statutory rights of US persons (LPEE pages 237-271, 6885-7466) from the
1950s into the 1970s, which have and do continue in the present time in lawless disregard of
Congressional intent, as well documented herein.

F. The massive scope and duration of these acts, injuries and violations comprises the
entirety of this complaint, from at least 1961 (paragraph 414) to the present day without
interruption, all fraudulently concealed behind systematic illegal color of law pretexting, state
secret entanglements intended to conceal, and myriad attempts to inculpate these plaintiffs in
further state secret privilege matters by defendant UNITED STATES for the purposes of

extending their involuntary servitude, the government's corrupt cover-up abusing the state

secret privilege under color of law, and perpetuating the illegal and reckless development of the

BRMT bioweapon and bioweapon delivery system. This overall conspiracy specifically

includes, without limitation, both illegal acts and neglect to prevent by defendant DOJ, and

specifically includes the present Attorney General GARLAND, who has a direct conflict of

personal interest with the interests of justice in this matter as he is personally known to the

Lead Plaintiff as a direct participant (then known as Robert Mandich, and plausibly previously

as Stuart Bettesworth, paragraphs 5, 99m, 211) in this illegal program from 1974-1976, as a

result of his identification in January 2024 as a co-resident at Washington State University,

Pullman, WA, while defendant BREYER ran the illegal BRMT program posing as resident of

Spokane, WA, and which program most probably already included the involuntary servitude of

Lead Plaintiff's uncle Bruce's family in nearby Walla Walla, WA, during this time period

(paragraph 10, 412, 413, 600B, Interline Exhibit 1).

G. Defendant UNITED STATES and co-conspirator defendants have and do act in

systematic fraudulently concealed violations of constitutional rights of free exercise of religion,

and the constitutionally guaranteed right that no bill of attainder shall attach by inheritance,

whether formally drafted or informally assigned by familial association, to any person, by

initially subjecting and then sustaining, without limitation, these defendants' acts, violations,

and injuries which have and do include, without limitation, (i) trafficking the Lead Plaintiff to

California from Washington state without the knowing consent of the minor child or his parents

for illegal human medical experimentation upon him beginning at age 12 (paragraphs 3, 19(i),

417, 492) and continuing without consent into the present day, in violation of Supreme Court

mandate *Sherbert v. Verner,* 374 U.S. 398 (1963) and the explicit cause of action therein and,

(ii) embedding Lead Plaintiff into their surreptitious cover employment; by (iii) assigning

direct embedded minders into his personal life; by (iv) contriving and orchestrating female companions; by (v) contriving and destroying a marital community; by (vi) orchestrating, creating, and destroying a fraudulent marital community; by (vii) controlling all professional employment from 1979; by (viii) controlling all periods of unemployment from 1989 to the present day; (ix) by controlling and destroying all efforts to independently engage and affect in-state, interstate, and international commerce; (x) by subjecting him without consent to perpetual video and other intrusive surveillance; by (xi) creating and sustaining false public narratives; by (xii) literally putting words in his mouth and thoughts in his mind using the illegal BRMT bioweapon and bioweapon delivery system, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States.

H. A specific purpose of this long-running pattern of fraudulent concealment is the intentional evasion of all accountability for, and fraudulent concealment of, these heinous acts, violations, and injuries to US persons and the religious discrimination against them, as defendant UNITED STATES has and does remain perpetually and willfully blind to all these crimes and rights violations, perpetrated by these defendants' own hands and by the hands of their co-conspirators.

I. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

## 834. CLAIMS FOR RELIEF - COUNT 34

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Thirteenth, Fourteenth Amendments

### Posse Comitatus - Use of Military To Violate Constitutional Rights

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. § 1385 |
| Washington: | RCW § 49.060.030(1) |
| New Jersey: | NA |
| New York: | NA |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this complaint and will be available upon discovery.

B. Defendants have and do plan, conspire, perpetrate and engage in illegal color of law acts against rights and law in pursuit of the continued illegal development of its illegal BRMT bioweapon and bioweapon delivery system using illegal human subject medical experiments on these involuntary plaintiffs, defendant UNITED STATES has and does violate the human, Constitutional, and civil rights of Lead Plaintiff, and similarly situated plaintiffs, by its use of active duty military personnel in civilian dress to effectuate and perpetuate its continued illegal BRMT bioweapon and bioweapon delivery system program, constitutional, civil, and human rights violations, and associated-in-fact enterprise pattern of racketeering acts, violations, and injuries of these plaintiffs. Defendant UNITED STATES has and does use personnel, infrastructure, and facilities of the Department of Defense (DOD, DARPA, and others unknown), including, without limitation, active and reserve duty soldiers of the ARMY, NAVY, AIR FORCE, SPACE FORCE both in military dress and concealed in civilian dress, and specific infrastructure of the Air Force, Space Force, National Reconnaissance Office, National Security Agency, Navy, and other unknown departments and agencies, in its violation of 18 U.S.C. § 1385:

> "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws....,"

to engage with co-conspirators in color of law entrapments, criminal pretexting, to aid and abet its operation of the illegal BRMT bioweapon and bioweapon delivery system for decades, and to conspire with other defendants, known and unknown, for these corrupt purposes, and to violate human, constitutional, and civil rights of this class of plaintiffs, both within and without the territory of the United States. Defendant UNITED STATES has and does violate the *Third* Amendment, illegally conspiring to and forcing the quartering of soldiers in the private residences of the Lead Plaintiff by its illegal orchestrations for involuntary servitude perpetrated by defendants including, without limitation, CIA, ARMY, DOD, DOJ, USMS, FBI, BURNS, WATERS, FAUCI. Defendant UNITED STATES has and does violate the *Ninth* Amendment unenumerated right to "blessings of liberty to ourselves and our posterity" (Constitution) – by its general searches, and through its oppressive and tyrannical direct daily interference in the private affairs, personal business, and property of the Lead Plaintiff and others of this class of plaintiffs.

C. Defendant UNITED STATES has and does engage in a persistent pattern of color of law abuses in the field operations of the illegal BRMT bioweapon and bioweapon delivery system, and has and did deliberately conspire to maneuver military personnel into the civilian life of Lead Plaintiff through a specific conspiracy of color of law fraudulent acts by defendant UNITED STATES for that specific purpose in (i) his trafficking from employment at Deloitte Seattle to LazerSoft reporting to STONE (CIA) as a peer to WILKINS (ARMY, WA ANG) in 1986, followed by the programmed destruction of Lead Plaintiff's marriage to Lynne (paragraph 609 HEXP-6) using the illegal BRMT bioweapon and bioweapon system to boost Lynne's oxytocin in the presence of adulterer SWAIN) in 1987-1988, causing their divorce and destruction of that marital community, orchestrated by defendant BURNS (CIA), then the fraudulent orchestration of Jeanette, an active duty ARMY soldier in civilian dress only into Lead Plaintiff's life to engage in a fraudulent relationship while she was under duress and

fraudulent concealment, paragraph 610 HEXP-7, and he was under the illegal control of and servitude to defendant UNITED STATES and the malign and concealed biochemical manipulations of the illegal BRMT bioweapon and bioweapon delivery system and the abuse of hijacked oxytocin hormones.

D. These illegal acts were perpetrated by defendants ARMY and CIA for the specific corrupt purpose of orchestrating the introduction of an enlisted military member who had been thereby deliberately inculpated in sensitive national security matters in the Middle East, then exposed as a bisexual in military service and threatened with criminal prosecution, then orchestrated as the prospective partner to Lead Plaintiff in 1988 by WATERS (paragraph 610 HEXP-7) for the specific corrupt and illegal purpose of evading posse comitatus law 18 U.S.C. § 1385 by this color of law abuse, as perpetrated and conspired by departments and agencies of defendant UNITED STATES, specifically including, without limitation, DOD, DARPA, ARMY, CIA, FBI, USMS, BURNS, WATERS, ROSENBERG, and unknown others. Specifically, and without limitation, defendant UNITED STATES, through this orchestration of the destruction of the marital community with Lynne (paragraph 609 HEXP-6) for the corrupt purpose of assigning an active duty member of the military as the Lead Plaintiff's second spouse, Jeanette, for its continued illegal abuse of the BRMT bioweapon and bioweapon delivery system against Lead Plaintiff, and during which it specifically assigned, as members of the conspiracy other active duty members of the military (including, without limitation Alexander and Yvgeney VINDMAN, with family members in tow) posing as extended family of spouse Jeanette, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States, and as referenced throughout this complaint (paragraphs 440, 498-499, 600K NSEC-1, 610 HEXP-7 ).

E. Through these surreptitious military deployments in civilian dress, defendant UNITED STATES incorporated active military personnel illegally into civilian life, in proximity to the Lead Plaintiff while he was being subjected to various illegal BRMT bioweapon and bioweapon delivery system hijackings together with fraudulently orchestrates spouse Jeanette and stepson Bryce, in undercover roles with no legal basis for violations of the *Third* Amendment and 18 U.S.C. § 1385, nor its subsequently perpetrated violations through the temporary employment of AUSTIN and unknown other military personnel at CNA between 1996-2002.

F. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-602 | NSEC National Security Pretexting and Entanglements | 1-3 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 626, 630-632 | RGTS Individual Rights Violations and Conspiracies | 6, 10-12 |
| 639 | RICO Racketeering | 1 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

## 835. CLAIMS FOR RELIEF - COUNT 35

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

#### Involuntary Servitude- Title 42 Civil Rights

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 42 U.S.C. §§ 1981, 1985 |
| Washington: | RCW § 49.60.030(1)a |
| New Jersey: | NJ Stat §§ 2C:13-8, 2C:41-1 through 2C:41-6, 10:5-4, 10:5-12, 10:6-2 |
| New York: | NA |
| California: | Cal Penal Code §§ 236, 236.1(a) |
| | Cal Labor Code §§ 2801, 2802 |
| | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 265 § 51 |
| Arizona: | AZ Rev Stat § 13-1308 |
| Texas: | TX Penal Code § 20A.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraph 820C through AA, paragraph 821C through I, and paragraph 822C and D are specifically incorporated herein for their particular relevance to this paragraph 835. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery.

B. Defendants have and do plan, conspire, perpetrate and engage in violations of the Thirteenth Amendment which prohibits involuntary servitude directed at any person by any

person, with the only exception being upon a conviction by due process respecting rights. Involuntary servitude is a pattern of pervasive coercion by force by another. **Coercion** is "the practice of persuading someone to do something by using force or threats" (as defined by the Cambridge Dictionary online). Such coerced persons are the involuntary servants of that or those other party(ies) when coercion and force are broadly applied, whether or not the targeted person being forcibly coerced is even aware of the specific methods of coercion being used by the coercer(s).

C. Coercive force does not require any knowledge or understanding by the coerced person of any specific intention by the coercer to apply any force, including the forcing of an act by the coercer's election to foreclose preferable options when those coercive methods are applied by any surreptitious means available to the coercer. Government possesses myriad means of surreptitious forced coercion by both (a) its valid exercise of its legal authority in the use of surreptitious police powers tools, and (b) by any illegal exercise of those same police powers tools under color of law. These defendants, particularly, without limitation, defendant UNITED STATES, it departments and agencies, and the individual officials, officers, agents, and employees thereof, have engaged in a profoundly broad and durable surreptitious pattern of illegal acts, violations, and injuries of constitutional rights for decades, all fraudulently concealed by profound abuses of the state secret privilege (paragraph 260-271), for the entire set of purposes and intentions (*mens rea*) identified in all claims at paragraphs 801-854.

D. These decades long pattens of coercive exercise of police powers, as regard both these police powers defendants' own acts, violations, and injuries to these plaintiffs, and as regards the acts, violations, and injuries it permits others to undertake jointly and/or severally through privileged access such as members of the press, media, and entertainment industry who are defendants herein, and in the knowing failures of police powers to protect these

plaintiffs, are all knowing and willful abuses of the constitutional rights of these plaintiffs in their associated-in-fact enterprise pattern of acts, violations, racketeering acts, and injuries to constitutional rights.

E. These plaintiffs have and do act in good faith in their exercise of their constitutional rights of free exercise of religion, and of all other rights; have and do faithfully serve their nation when called to duty; have and do engage in ordinary jobs, careers, commerce, and interstate commerce in a fair and reasonable manner; have and do conduct their lives in the manner expected of good citizens.

F. The proper constitutional role of government includes, without limitation, defendant UNITED STATES' direct and explicit duties to (i) specifically and affirmatively secure these plaintiffs' rights to free exercise of their religious beliefs as conscientious objectors not to bear arms when called into military service, and to (ii) establish justice, which includes securing all their rights of free expression, free will, and action, as declared in establishing our nation: "that to secure these rights, governments are instituted among men…," *Declaration of Independence*, 1776. These plaintiffs and their posterity, including the Lead Plaintiff, have instead been used as the involuntary servants of government (human guinea pigs, lab rats, and human sacrifices in illegal medical experiments and development of the illegal BRMT bioweapon and bioweapon delivery system) in its pursuit of acts which are illegal under our Constitution, laws, and ratified treaties, by using these plaintiffs (i) as the subjects of illegal human medical experiments, which acts are specifically chargeable and indictable as crimes, (ii) to sustain the illegal cover-up of other of its own criminal acts against still other citizens exercising their rights, and (iii) as the government's human prey, by setting upon these plaintiffs and subjecting them to coercion, while these citizens of this class of plaintiffs have

and do conduct themselves in accordance with their religious beliefs and without harm or
malice toward others.

G. These acts and injuries are representative of those perpetrated by defendants on this
class of plaintiffs, which also include other acts of violence, fraud, and continued willful
blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended
family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant
UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further
violations not described herein and will (ii) provide further evidence from these defendants; and
(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the
Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family
religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of
whom were directly and individually involved in these violations of constitutional rights and
laws, will provide further evidence from their then minor children who had no stake in creating
or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and
friends children which those individual defendants entrusted to the temporary care of Lead
Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate
frauds and other specific currently known acts, violations, and injuries to this claim for relief are
the following, which together comprise a representative sampling of the full scope of such
violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

## 836. CLAIMS FOR RELIEF - COUNT 36

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

### Intentional Discrimination in Employment

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 42 U.S.C. §§ 1981 |
| Washington: | RCW § 49.60.030(1)a |
| New Jersey: | NJ Stat §§ 2C:13-8, 2C:41-1 through 2C:41-6, 10:1-1, 10:5-4, 10:5-12, 10:6-2 |
| New York: | NA |
| California: | Cal Penal Code §§ 236, 236.1(a) <br> Cal Labor Code §§ 2801, 2802 <br> Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 265 § 51 |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraph 820C through AA, paragraph 821C through I, and paragraph 822C and D are particularly incorporated herein for specific relevance to this paragraph 836. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery.

B. Defendants have and do plan, conspire, perpetrate and engage in intentional discrimination in employment. The only work Lead Plaintiff has been allowed to undertake since his college undergraduate degree was awarded in June 1977, has been employment specifically permitted to the unwitting Lead Plaintiff by defendant UNITED STATES in its intentional discrimination in employment rights using various surreptitious means to perpetuate its involuntary servitude, originating in religious discriminations against Lead Plaintiff, his family

of origin, and extended family. Among other acts, injuries, and violations at the final

subparagraph in this paragraph, both within and without the territory of the United States,

defendants have and do act in violation of federal and state criminal and civil rights statutes

throughout the Lead Plaintiff's work life and professional career from 1977 when he was first

professionally employed by the Spokane General Agency of John Hancock Insurance (defendant

FBI), then by Washington State University (defendant CIA embed Dr. Paul Shaffer), then

Deloitte Seattle (defendants USMS, FBI, CIA), and so forth (paragraphs 419-489, 600-603

NSEC-1-4, LPEE pages 140-236) as recounted herein to June 2008, when his career and his

ability to earn any income whatsoever in any form was terminated by defendant UNITED

STATES after its fraudulent employment of Lead Plaintiff by cover company defendant

ESTABLISH (ROSENBERG, FBI), acting in its own corrupt interests before orchestrating his

kidnapping (paragraph 808) and further human trafficking through Bergen Regional psychiatric

wards for six months, while housing was continuously available, to effect duress-driven

relinquishment of legal claims (paragraphs 522, 523), and in 2108 his further human trafficking

into yet another national security entanglement, the national security and public corruption

investigation in Edgewater, NJ involving Senator Menendez and co-defendants by defendant FBI

(paragraphs 524, 624 RGTS-4). Defendants DOJ and FBI, and persons who have left defendant

DOJ for the media industry and for other professions, such as defendants MELBER,

ROSENBERG, WEISSMAN, RUBIN, and unknown others have and do, by direct and indirect

frauds and other actions under color of law, prohibit all employment and entrepreneurial

activities from being freely undertaken and pursued by Lead Plaintiff since that time, thereby

perpetuating their associated-in-fact enterprise pattern of racketeering acts, systematically

violating rights, and costing the Lead Plaintiff millions of dollars in lost direct personal

compensation. These acts, violations, and injuries in the intentional discrimination of permanent

unemployment since June 2008, are in addition to their prior active control of direct

compensation, of periods of unemployment and other deprivations, and thefts and frauds on Lead

Plaintiff's business enterprises, and his personal, financial, real, and intangible property from

1972 through June 2008. These persistent patterns of rights violations, intentional discrimination

in employment, and associated-in-fact enterprise patterns of racketeering acts, have and do

continue defendant UNITED STATES and co-conspirator defendants' perpetual pattern of

involuntary servitude including, without limitation, surreptitious employment, deprivation of

alternative employment opportunities, secret co-investments and share ownership, and assigned

illegally embedded partners in his businesses, workplaces, and personal life. This illegal conduct

meets and exceeds the criminal legal definitions of involuntary servitude at 18 U.S.C. § 1584, of

peonage at 18 U.S.C. § 1581, of forced labor at 18 U.S.C. § 1589, is classified as serious harm

under 18 U.S.C. § 1589(c)(2), as human trafficking at 18 U.S.C. § 1590, and is a severe form of

human trafficking under 22 U.S.C. § 7102 (11) in the duration, scope, and extent of its illegal

conduct against the Lead Plaintiff in 44 states and multiple foreign nations from 1968 to the

present. Since defendant DOJ and its agencies are directly involved in this intentional

discrimination, as they have been since inception, they decline to prosecute these serial crimes

and perpetuate their willful blindness (paragraphs 307-317, 550-584) and the direct conflict of

their institutional interest with the interests of justice for these plaintiffs and for the People.

C. Defendant UNITED STATES and co-conspirator defendants have and do act in

systematic violations of constitutional rights by subjecting and sustaining illegal methods of

intentional discrimination in employment by, without limitation, (i) embedding Lead Plaintiff

into their surreptitious cover employment; by (ii) assigning direct embedded minders into his

personal life; by (iii) controlling all professional employment from 1977; by (iv) controlling all

periods of unemployment from 1978 to the present day; (v) by controlling and destroying all

efforts to engage in independent in-state, interstate, and international commerce; (vi) by

subjecting him without consent to perpetual video and other intrusive surveillance; (vii) by

creating and sustaining false public narratives; (viii) by literally putting words in his mouth and

thoughts in his mind using the illegal BRMT bioweapon and bioweapon delivery system.

These acts, violations, and injuries are representative of those to this class of plaintiffs.

D. In furtherance of this conspiracy, defendants have and do act in violation of federal

statutes and the state laws of at least 44 states physically visited by Lead Plaintiff, and in

violation of international laws and treaties, all as perpetrated by defendant UNITED STATES

and its defendant co-conspirators:

(i) pretexting and acts, violations, and injuries directed at Lead Plaintiff and other

members of this class of plaintiffs; by defendant UNITED STATES' election in its illegal

discretionary acts in (ii) permitting, enlisting, empowering, and/or enabling domestic and

foreign fraudulent actors electronically screened in by defendants, (iii) permitting,

enlisting, empowering, and/or enabling foreign intelligence services of countries

pretexted and/or physically visited by Lead Plaintiff, and/or (iv) pretexted regarding Lead

Plaintiff to cause other discriminatory illegal acts targeting Lead Plaintiff, and/or other

members of this class of plaintiffs, in violation of US law and of their own laws, and of

any reasonable standard of practice, in

(a) their series of schemes, conspiracies, injuries, and deprivations of rights, and

of (b) deprivations of Privileges and Immunities, including, without limitation, (b-i) Lead

Plaintiff's rights to free, equal, and non-discriminatory access to acquire, possess, retain,

and enjoy all forms of property, including those rights to same as guaranteed under

ratified international treaties, and (b-ii) including such rights as they relate to

employment, interstate commerce, and to closely held business entities. Defendants have

and do injure the Lead Plaintiff and other members of the class by such deprivations of

rights. Locations and particular details of many of these acts, violations, and injuries are

unknown at the time of this Complaint subject to discovery.

E. These acts and injuries are representative of those perpetrated by defendants on this

class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 616 | HEXP Illegal Human Experimentation | 13 |
| 622-625, 627, 629-631 | RGTS Individual Rights Violations and Conspiracies | 2-5, 7, 9-11 |
| 639-693 | RICO Racketeering | 1-55 |
| | LTHL Lethality Attempts | |

## 837. CLAIMS FOR RELIEF - COUNT 37

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

#### Peonage Abolished - Title 42 Civil Rights

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 42 U.S.C. §§ 1981, 1994 |
| Washington: | RCW § 49.60.030(1)a |
| New Jersey: | NJ Stat §§ 2C:13-8, 2C:41-1 through 2C:41-6, 10:1-1, 10:5-4, 10:5-12, 10:6-2 |
| New York: | NA |
| California: | Cal Penal Code §§ 236, 236.1(a) <br> Cal Labor Code §§ 2801, 2802 <br> Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 265 § 51 |
| Arizona: | AZ Rev Stat § 13-1308 |
| Texas: | TX Penal Code § 20A.02 |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraph 820C through AA, paragraph 821C through I, and paragraph 822C and D are particularly incorporated herein for specific relevance to this paragraph 837. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this complaint and will be available upon discovery. The Peonage Act abolished and prohibited this practice in 1867:

546   THIRTY–NINTH CONGRESS. Sess. II, Ch. 187, 188. 1867.

March 2, 1867. CHAP. CLXXXVII. — *An Act to abolish and forever prohibit the System of Peonage in the Territory of New Mexico and other Parts of the United States.*

Peonage declared unlawful, and abolished.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the holding of any person to service or labor under the system known as peonage is hereby declared to be unlawful, and the same is hereby abolished and forever prohibited

See full text of Peonage Act at paragraph 821.

B. Defendants have and do plan, conspire, perpetrate and engage in violations of the Thirteenth Amendment prohibits involuntary servitude, which includes peonage defined as holding of any person to service or labor. Peonage is "any form of wage labor, financial exploitation, coercive economic practice, or policy in which the victim or a laborer (peon) has little control over employment or economic conditions" (Wikipedia). Defendant UNITED STATES has and does engage in violations of the statutory prohibition on peonage 42 U.S.C. §§ 1981, 1994 by means of the abuse of law and legal process under color of law, through its abuse of police powers in the patterns of racketeering acts conducted by the associated-in-fact enterprise, which it has and does perpetrate, and has and does perpetuate both severally and jointly with other co-conspirator defendants. This illegal conduct meets and exceeds the criminal legal definition of involuntary servitude at 18 U.S.C. § 1584, of peonage at 18 U.S.C. § 1581, of forced labor at 18 U.S.C. § 1589, is classified as serious harm under 18 U.S.C. § 1589(c)(2), as human trafficking at 18 U.S.C. § 1590, and is a severe form of human trafficking under 22 U.S.C. § 7102 (11) in the duration, scope, and extent of its illegal conduct against the Lead Plaintiff in 44 states and multiple foreign nations from 1968 to the present. Since defendant DOJ and its agencies have been and are directly involved in perpetrating this conduct, it has and does willfully refuse to investigate and charge these crimes and turns its blind eye to this conduct by its own agencies and by other co-conspirator defendants.

C. Defendants have and do act in violation of the above referenced statutes throughout the Lead Plaintiff's personal and work life, and his education and professional career, from at least 1968 to the present.

D. Defendant UNITED STATES and its co-conspirators have and do act, violate, and injure Lead Plaintiff and other members of this class of plaintiffs through, without limitation, surreptitious employment, assigned and dictated employment and compensation, direct and indirect control of the duration, location, and extent of employment periods, unemployment periods, deprivation of alternative employment opportunities, through systematic enterprise wreckings to total destruction, bankruptcy, and liquidation, thefts and frauds on business enterprises, flawed and fraudulent software implementations, surreptitious financial control, secret co-investments and share ownership, fraudulent banking and credit relationships, assignment of illegally embedded partners and employees in businesses, workplaces, interposition of fraudulent business opportunities, exclusion from actual business opportunities, delays and accelerations of contracts to exacerbate cash flow problems, fraudulent bid and performance bonding, deprivation of governmental small business benefits, and of other ordinary commercial benefits to which these enterprises were and are legally entitled.

E. Lead Plaintiff's career and all ability to earn independent income were ended in June 2008 by defendant UNITED STATES and its co-conspirator defendants in their own corrupt interests, and which defendants have and do by their direct and indirect acts of frauds and other actions under color of law since that time, effectively prohibited all employment and entrepreneurial activities from being freely undertaken and pursued by Lead Plaintiff, thereby perpetuating its associated-in-fact enterprise pattern of racketeering acts, violating rights, and costing the Lead Plaintiff millions of dollars in lost direct personal compensation.

F. Defendant UNITED STATES and its co-conspirators have and do act, violate, and injure Lead Plaintiff and other members of this class of plaintiffs and their personal, psychological, emotional, and property interests through, without limitation, destruction of marital communities and families, entrapment attempts, physical and emotional injuries approaching death by illness, deep vein thrombosis, and direct illegal BRMT bioweapon and bioweapon delivery system hijacking, to drive defendant UNITED STATES and its co-conspirators myriad attempts to inflict lethality remotely and through indirect means, through their acts, violations, and injuries directed at personal, financial, real, and intangible property from 1972 to present, as described at paragraph 830D, and psychologically and emotionally through defendants' sequences of psychopathic coercion and violence described at paragraph 820, through harassment while attempting to secure, and through specific deprivations, of personal benefits legally entitled such as unemployment compensation, government housing support, and health care, all as particularly described in the paragraphs referenced in the table at the last subparagraph in this paragraph.

H. Defendant UNITED STATES and co-conspirator defendants have and do act in systematic fraudulently concealed violations of constitutional rights by initially subjecting and then sustaining illegal searches by, without limitation, (i) embedding Lead Plaintiff into their surreptitious cover employment; by (ii) assigning direct embedded minders into his personal life; by (iii) contriving and orchestrating female companions; by (iv) contriving and destroying a marital community; by (v) orchestrating, creating, and destroying a fraudulent marital community; by (vi) controlling all professional employment from 1977; by (vii) controlling all periods of unemployment from 1978 to the present day; (viii) by controlling and destroying all efforts to engage in independent in-state, interstate, and international commerce; (ix) by subjecting him without consent to perpetual video and other intrusive surveillance; by (x)

creating and sustaining false public narratives; by (xi) literally putting words in his mouth and thoughts in his mind using the illegal BRMT bioweapon and bioweapon delivery system. These acts, violations, and injuries are representative of those to this class of plaintiffs.

I. This pattern of peonage is part of these defendants' pattern of racketeering acts directed at the Lead Plaintiff in all matters of life through a system of fraud-based virtual restraints and assigned and designated circumstances to the Lead Plaintiff as specifically cited and described at paragraphs 419 through 534, among other acts, injuries, and violations at the final subparagraph in this paragraph. In furtherance of this conspiracy, defendants have and do act in violation of federal statutes and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties, all as perpetrated by defendant UNITED STATES and its defendant co-conspirators:

(i) pretexting and acts, violations, and injuries directed at Lead Plaintiff and other members of this class of plaintiffs; by defendant UNITED STATES' election in its illegal discretionary acts in (ii) permitting, enlisting, empowering, and/or enabling domestic and foreign fraudulent actors electronically screened in by defendants, (iii) permitting, enlisting, empowering, and/or enabling foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or (iv) pretexted regarding Lead Plaintiff to cause other discriminatory illegal acts targeting Lead Plaintiff, and/or other members of this class of plaintiffs, in violation of US law and of their own laws, and of any reasonable standard of practice, in

(a) their series of schemes, conspiracies, injuries, and deprivations of rights, and of (b) deprivations of Privileges and Immunities, including, without limitation, (b-i) Lead Plaintiff's rights to free, equal, and non-discriminatory access to acquire, possess, retain, and enjoy all forms of property, including those rights to same as guaranteed under

ratified international treaties, and (b-ii) including such rights as they relate to

employment, interstate commerce, and to closely held business entities. Defendants have

and do injure the Lead Plaintiff and other members of the class by such deprivations of

rights. Locations and particular details of many of these acts, violations, and injuries are

unknown at the time of this Complaint subject to discovery.

J. These acts and injuries are representative of those perpetrated by defendants on this

class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |

| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 838. CLAIMS FOR RELIEF - COUNT 38

**Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Thirteenth, Fourteenth Amendments**

**Conspiracy Against Rights**

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
| --- | --- |
| United States Code: | 5 U.S.C. § 552; 42 U.S.C. §§ 1981, 1985 |
| Washington: | RCW § 49.060.030(1) |
| New Jersey: | NJ Stat §§ 10:1-1, 10:5-4, 10:5-12, 10:6-2 |
| New York: | New York Penal L. §§ 105.15, 460.00 through 460.80; New York Pub Off L § 95 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of constitutional rights, federal and state statutes listed above in this paragraph, as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery.

B. Defendants have and do plan, conspire, perpetrate and engage in (i) pretexting and acts, violations, and injuries directed at Lead Plaintiff and other members of this class of plaintiffs; by defendant UNITED STATES' election in its illegal discretionary acts in (ii) permitting, enlisting, empowering, and/or enabling domestic and foreign fraudulent actors electronically screened in by defendants, (iii) permitting, enlisting, empowering, and/or enabling foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff,

and/or (iv) pretexted regarding Lead Plaintiff to cause other discriminatory illegal acts targeting

Lead Plaintiff, and/or other members of this class of plaintiffs, in violation of US law and of their

own laws, and of any reasonable standard of practice, in (a) their series of schemes, conspiracies,

injuries, and deprivations of rights, and of (b) deprivations of Privileges and Immunities,

including, without limitation:

   (b-i) Lead Plaintiff's rights to free, equal, and non-discriminatory access to acquire,

   possess, retain, and enjoy all forms of property, including those rights to same as

   guaranteed under ratified international treaties, and

   (b-ii) such rights as they relate to employment, interstate commerce, and to closely held

   business entities.

Defendants have and do injure the Lead Plaintiff and other members of the class by such

deprivations of rights. Locations and particular details of many of these acts, violations, and

injuries are unknown at the time of this complaint subject to discovery.

   C. Defendant UNITED STATES and co-conspirator defendants have and do act in

systematic violations of constitutional rights in a conspiracy against rights by, without limitation,

(i) embedding Lead Plaintiff into their surreptitious cover employment; by (ii) assigning direct

embedded minders into his personal life as co-residents and assigned family members; by (iii)

contriving and orchestrating female companions; by (iv) contriving and destroying a marital

community in 1987-1988; by (v) orchestrating a relationship in 1988, then creating, and

destroying a fraudulent marital community in 1990-2005; by (vi) controlling all professional

employment from 1977; by (vii) controlling all periods of unemployment from 1978 to the

present day; (viii) by controlling and destroying all his efforts to engage in independent in-state,

interstate, and international commerce; (ix) by subjecting him without consent to perpetual video

and other intrusive surveillance; by (x) creating and sustaining false public narratives including

of terrorism and other imaginary offensive behaviors create personal endangerment of injury or death from among the general public, after entrusting their minor children to his custody and care over many years; by (xi) precluding, preventing, stymying and misdirecting his volunteer efforts and attendance at public events and peaceable assemblies to create, further, and sustain false public narratives, and by (xii) literally putting words in his mouth and thoughts in his mind using the illegal BRMT bioweapon and bioweapon delivery system. These acts, violations, and injuries are representative of those to this class of plaintiffs.

D. The primary purposes of this conspiracy against rights are to sustain the conspiracy itself against these plaintiffs for the continued purposes of (i) the development and deployment of the illegal BRMT bioweapon and bioweapon using illegal human subject experimentation on these plaintiffs and to sustain the cover-up of the involvement of defendant UNITED STATES, to (ii) continue the associated-in-fact enterprise and pattern of racketeering acts, and (iii) sustain the political cover-up which initially authorized and has and does sustain the continued illegal conduct so as to avoid and evade political accountability for its authorization, funding, and systematic violations of religious and other constitutional rights by the executive and by senior members of Congress who have had knowledge of this illegal program for decades and persist in political leadership positions.

E. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 839. CLAIMS FOR RELIEF - COUNT 39

**Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Thirteenth, Fourteenth Amendments**

#### Deprivation of Rights – Equal Protection

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 5 U.S.C. § 301; 18 U.S.C. §§ 1961-1968; 42 U.S.C. § 1981 |
| Washington: | RCW § 49.60.030(1) |
| New Jersey: | NJ Stat §§ 10:1-1, 10:5-4, 10:5-12, 10:6-2 |
| New York: | New York Penal L. §§ 105.15, 460.00 through 460.80; New York Pub Off L § 95 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage in color law abuses of equal protection afforded under our Constitution. All US persons are entitled to equal protection of the laws. Neither equal nor unequal predations of rights were intended as the primary purpose of any government, whether by defendant UNITED STATES or any state or locality. Despite the explicit constitutional prohibitions on governmental predations of individual rights, Privileges and Immunities, which were specifically required in 1788 by those concerned about liberty and overreach by a powerful federal government for ratification of the Constitution, and which directly led to the 1791 ratification of the Bill of Rights, defendant UNITED STATES and co-conspirator defendants have and do act in a long-running pattern of direct and systematic violations of constitutional rights to equal protection and in violations of other rights from at least 1968, by perpetrating and sustaining defendant UNITED STATES' discriminatory pattern of unequal protection against these plaintiffs in their practices of religion, commerce, assembly and other *unalienable individual Constitutional rights, Privileges and Immunities* while fraudulently concealing its own and co-conspirators' criminal conduct behind its color of law abuse of the **Congressionally** *conditioned privilege of state secret* and behind the *willful blindness* of defendant DOJ, which has and does sustain complete official silence and refuse all prosecutions of these institutional criminal offenses against these plaintiffs despite the repeated specific and direct pleas of these plaintiffs delivered in writing and by hand complete with the

*prima facie* evidence of criminal offenses against rights in durable and systematic violations of 18 U.S.C. §§ 241, 242, among others, at paragraphs 800-854 and as referenced therein.

C. Defendant UNITED STATES and co-conspirator defendants have and do act in systematic violations of constitutional rights in a conspiracy against rights by, without limitation, (i) embedding Lead Plaintiff into their surreptitious cover employment (paragraphs 600 NSEC-1, 639 RICO-1); by (ii) assigning direct embedded minders into his personal life as co-residents and assigned family members (paragraphs 490-532); by (iii) contriving and orchestrating female companions (paragraphs 608-614 HEXP-5-11); by (iv) destroying a marital community in 1987-1988 (paragraphs 609 HEXP-6); by (v) contriving and orchestrating a fraudulent relationship in 1988, then creating, and destroying a fraudulent marital community in 1990-2005 (paragraph 610 HEXP-7); by (vi) controlling all professional employment from 1977 (paragraphs 600-603 NSEC-1-4, 639, 640 RICO-1-2); by (vii) controlling all periods of unemployment from 1989 to the present day (paragraphs 600-603 NSEC-1-4, 639, 640 RICO-1-2); (viii) by controlling and destroying all his efforts to engage in independent in-state, interstate, and international commerce (paragraphs 649-693 RICO-11-55); (ix) by subjecting him without consent to perpetual video and other intrusive surveillance (paragraphs 629, 630 RGTS-9-10); by (x) creating and sustaining false public narratives including of terrorism and other imaginary offensive behaviors create personal endangerment of injury or death from among the general public, after entrusting their minor children to his custody and care over many years (paragraph 853); by (xi) precluding, preventing, stymying and misdirecting his volunteer efforts and attendance at public events and peaceable assemblies to create, further, and sustain false public narratives (paragraphs 526); and by (xii) literally putting words in his mouth and thoughts in his mind using the illegal BRMT bioweapon and bioweapon delivery system (paragraphs 607, 608,

612, 613, 615, 619 HEXP-4, 5, 9, 10, 16). These acts, violations, and injuries to rights, Privileges and Immunities of Lead Plaintiff, are representative of those to this class of plaintiffs.

D. These acts, violations, and injuries have been and are perpetrated by defendant UNITED STATES, and by its co-conspirators, whether witting or unwitting in any particular moment, in direct and explicit unequal treatment and unequal protection. In furtherance of this conspiracy, defendants have and do act in violation of federal statutes and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties, all as perpetrated by defendant UNITED STATES and its defendant co-conspirators:

(i) pretexting and acts, violations, and injuries directed at Lead Plaintiff and other members of this class of plaintiffs; by defendant UNITED STATES' election in its illegal discretionary acts in (ii) permitting, enlisting, empowering, and/or enabling domestic and foreign fraudulent actors electronically screened in by defendants, (iii) permitting, enlisting, empowering, and/or enabling foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or (iv) pretexted regarding Lead Plaintiff to cause other discriminatory illegal acts targeting Lead Plaintiff, and/or other members of this class of plaintiffs, in violation of US law and of their own laws, and of any reasonable standard of practice, in

(a) their series of schemes, conspiracies, injuries, and deprivations of rights, and of (b) deprivations of Privileges and Immunities, including, without limitation, (b-i) Lead Plaintiff's rights to free, equal, and non-discriminatory access to acquire, possess, retain, and enjoy all forms of property, including those rights to same as guaranteed under ratified international treaties, and (b-ii) including such rights as they relate to employment, interstate commerce, and to closely held business entities. Defendants have and do injure the Lead Plaintiff and other members of the class by such deprivations of

rights. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint subject to discovery.

Defendants UNITED STATES, ZOULAS, CORNWELL, ROSENBERG; cover companies ESTABLISH (ROSENBERG, ROSS), ABT (HABERER), DC INTERNATIONAL (DALEUSKI), ASSURE GROUP (VANGCHHIA) and those undercover agents (including, without limitation, as parenthetically noted in this subparagraph) acting as principals of those cover companies; WALMART (BALDWIN, MCCORMICK), COSTCO (PADILLA, HUSKEY), and unknown others to be identified during discovery, engaged these co-conspirators in its series of schemes, conspiracies, injuries, and deprivations of rights, Privileges and Immunities, including, without limitation, against:

(a) rights to free, equal, and non-discriminatory access to acquire, possess, retain, and enjoy all forms of property, including those rights to same as guaranteed under ratified international treaties, and

(b) rights as they relate to employment, interstate commerce, and to closely held business entities.

Defendants have and do injure the Lead Plaintiff and other members of the class by such unequal protection in their systematic pattern of deprivations of rights. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this complaint and are subject to disclosure through the discovery process.

E. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts – Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

[Intentionally left blank.]

## 840. CLAIMS FOR RELIEF - COUNT 40

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Thirteenth, Fourteenth Amendments

#### Deprivation of Rights Under Color of Law

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
| --- | --- |
| United States Code: | 18 U.S.C. §§ 1961-1968; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1994 |
| Washington: | RCW § 49.060.030(1) |
| New Jersey: | NJ Stat §§ 10:1-1, 10:5-4, 10:5-12, 10:6-2 |
| New York: | New York Penal L. §§ 105.15, 460.00 through 460.80 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraphs 839C and 839D are specifically incorporated by reference for their particular relevance to this paragraph. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery.

B. Defendants have and do plan, conspire, perpetrate and engage in the color of law abuse of the rights of US persons while falsely claiming to be protecting the public and enforcing the law, when they do so for the corrupt purposes of protecting themselves from the proper criminal consequences for their own illegal acts and those of their officers, agents, employees, contractors, or other privileged or favored institutions and individuals. This is color of law abuse, when a fraudulent claim of respect for and equal enforcement of law, of regulation, and of the conditioned privilege of state secrets, known in modern times by the term "national security," or

other regulation, which must comply with the Constitution, with law and ratified international

treaties, and with 5 U.S.C. § 301 Departmental Regulation, is made with which defendants,

*prima facie* on the evidence herein, do not comply. This color of law abuse has been and is

pervasive in the conduct of defendant UNITED STATES in this matter as it illegally (i)

continues its development of the prohibited BRMT bioweapon and bioweapon delivery system

since at least 1968, (ii) has and does conspire and violate the rights of US persons, (iii) conducts

and permit the conduct of racketeering acts against these plaintiffs, (iv) fraudulently conceals

these illegal acts and those of its co-conspirators, and (v) willfully sustains official silence and

official blindness to even profound *prima facie* evidence of decades long sustained violations of

law and regulation, and of obstructions of justice by its own police powers departments and

agencies.

C. The primary purposes of this deprivation of rights under color of law have been and

are to sustain the conspiracy itself against these plaintiffs for the continued purposes of (i) the

development and deployment of the illegal BRMT bioweapon and bioweapon using illegal

human subject experimentation on these plaintiffs and to sustain the cover-up of the involvement

of defendant UNITED STATES, to (ii) continue the associated-in-fact enterprise and pattern of

racketeering acts, and (iii) sustain the political cover-up which initially authorized and has and

does sustain the continued illegal conduct so as to avoid and evade political accountability for its

authorization, funding, and systematic violations of religious and other constitutional rights by

the executive and by senior members of Congress who have had knowledge of this illegal

program for decades and persist in political leadership positions. The current Attorney General,

GARLAND (DOJ) was a member of the team (then known as Robert Mandich to Lead Plaintiff)

who was directly involved in Lead Plaintiff's continued involuntary servitude between at least

from 1974-1976 while he attended his undergraduate degree program at Washington State

University, and plausibly as Stuart Bettesworth in 1971-72 at Decatur High School, as related at paragraphs 5, 99m, 211, 320, 419, 600G, 803Q, 833F), which illegal BRMT bioweapon and bioweapon delivery system program was directed by defendant BREYER during that period while posing as fraudulent church elder "Snow" in Kent, WA, then as Jack Sackville-West in Spokane, WA between 1967 and 1980.

D. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |

| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 841. CLAIMS FOR RELIEF - COUNT 41

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Thirteenth, Fourteenth Amendments

### Deprivation of Rights Under Color of Law - Anti-Terrorist Forfeiture Protection

| Defendants identified at paragraph 799 have and/or do violate the following statutes: ||
|---|---|
| United States Code: | 18 U.S.C. § 987, 42 U.S.C. § 1985(1) |
| Washington: | RCW § 49.060.030(1) |
| New Jersey: | NJ Stat §§ 2C:20-4, 2C:20-8, 2C:41-1 through 2C:41-6, 10:1-1, 10:5-4, 10:5-12, 10:6-2 |
| New York: | NA |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to

be identified through the discovery process have and do act in violation of federal and state

statutes listed above in this paragraph. as well as state statutes in all originating locations, many

of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage, in particular, defendant

UNITED STATES (FBI, ROSENBERG who knew Lead Plaintiff professionally from the early

1980s) created a false terror narrative about Lead Plaintiff in the aftermath of 9/11/2001. This

false narrative is now known to have been deliberate public misdirection of accountability which

abused the additional powers granted by Congress under the PATRIOT Act and related national

security regulations under color of law in creating this false terror narrative.

C. During the Lead Plaintiff's initial forensic reverse engineering in his pre-litigation

discovery using FOIA and other public information law requests, this false terror narrative from

2002 turned bogus defendant FBI investigation by ROSENBERG, including the bogus Mossad

counter-terror interview ROSENBERG orchestrated in Boston in 2007, was officially

acknowledged by defendant NYPD on September 3, 2021, (see Interline Exhibit 17), whereupon

it was almost immediately covered up by defendants NYPD and FBI by September 30, 2021

(Interline Exhibit 17-19) as all records were disappeared and substituted by defendant DOJ

confirmed disinterest.

D. This false terror narrative was abused in a now failed attempt to fraudulently conceal

now clear and convincing evidence that Lead Plaintiff was unwittingly employed as an

involuntary servant at Deloitte Seattle from 1979-1986 and other illegal cover companies

thereafter for their multiple illegal undercover operational support purposes by defendant

UNITED STATES. Some of the coercive commercial cover espionage operations in the lead-up

to the 9/11/2001 attack originated among the defendant CIA personnel who used Deloitte Seattle

as their commercial cover for those espionage operations in the Middle East (BLAIR, THORPE)

while defendant CIA was run by Director William Casey between 1981-1987. Casey was later

publicly nicknamed "Wild Bill" for his extremely aggressive use of commercial cover espionage

and paramilitary operations, including during the Iran-Contra affair when Deloitte Seattle

personnel known to Lead Plaintiff at the time only as fellow consulting team employees

(BANNON, BLAIR, THORPE, and separately CORNWELL) most probably played roles in the

Middle East and/or in Nicaragua.

E. Deloitte Seattle also employed commercial cover CIA personnel (hosting them to

develop their commercial cover legends) who were dispatched into information technology

projects at Saudia Airlines (used for defendant CIA espionage during and after that IT project),

soon after the CIA bugging of the headboard in the Saudi King's bedroom on his personal

Boeing 747 (later publicly reported in the Seattle-Times newspaper sometime after its discovery

by Saudi intelligence). These and other long-running acts against Saudi sovereignty by defendant

CIA led in turn to the indirect reprisal attacks in 1993 and 2001 on the World Trade Center and

other US targets by third parties known to the Saudis and to defendant CIA.

F. These defendant CIA commercial cover espionage operations, which were run in part

out of Deloitte Seattle, are consistent with the pattern of other defendant CIA operations in the

Middle East from the 1940s into the early 2000s. Lead Plaintiff gained some personal awareness

of these operations when he had unwittingly shared an office in 1978-79 with another CIA asset,

a PhD candidate in economics from Iran at defendant WSU during MBA graduate school just as

the Shah of Iran, installed during a MI-5/CIA assisted military coup in 1953, abdicated in

January 1979.

G. Defendant FBI's WEISSMAN and ROSENBERG were present in Seattle during the

1980s, then illegally embedded at PCC and NutraSource, respectively. Queen Elizabeth II visited

Seattle in March 1983 as Lead Plaintiff sold and then worked on a Seattle Westin Hotel

consulting project at Deloitte Seattle with commercial cover CIA personnel, FBI, USMS, and

UK MI-5 and/or MI-6 at the Seattle Westin during this national security event, where the Queen

remained overnight. Defendant WEISSMAN later left the Seattle area for other duties in FBI and

DOJ, while defendant ROSENBERG remained illegally embedded at NutraSource to continue

those illegal spying and enterprise wrecking programs, and as he directed and participated in

defendant FBI's human trafficking of Lead Plaintiff through the illegal defendant CIA and

ARMY BRMT bioweapon and bioweapon delivery system program, rights vioaliotns, and

associated-in-fact enterprise pattern of racketeering acts into the 2000s, primarily as the CEO of

NutraSource before it sale to another wholesaler in Auburn, CA, then while appointed by

defendant DOJ AG Alberto Gonzales as acting US Attorney for the Southern District of Texas and then as Senate confirmed US Attorney for the Eastern District of Virginia.

H. In the aftermath of the 9/11/2001 attack, defendants FBI (ROSENBERG, WEISSMAN, others), ARMY, CIA, and unknown others, recognized a color of law opportunity to (a) conceal the source of the personnel and coercive operations in the Middle East which led to that reprisal attack on 9/11/2001, and (b) to conceal its pattern of illegal conduct using BRMT and racketeering acts, and (c) to evade public accountability and claims against it, which will arise through this complaint and its litigation, for other plaintiffs subjected to comparable patterns of associated-in-fact racketeering acts and rights violations during illegal BRMT development, and from defendants' other corrupt and illegal acts, violations, and injuries to other classes of plaintiffs from illegal spying, surveillance, and *Fourth* Amendment violations described herein.

I. A primary underlying purposes of this entire corrupt sequence from 2002 forward was the fraudulent concealment of defendant CIA's commercial cover espionage activity originating in part from Deloitte Seattle, and of other secret espionage activity, against the Saudi government as a root cause of the indirect 9/11 retaliatory attack, which risk persisted as the 9/11 Commission, which included Slade Gorton, a former senator from Washington state as one of its members, conducted its investigation. Lead Plaintiff had resided in Washington state, with extensive travels elsewhere, except for two years as a young child when he was collaterally trafficked to California with his unwitting family. This Middle Eastern espionage had most probably also included the Lead Plaintiff's own illegal BRMT program orchestrated second spouse, Jeanette (his relationship to Lynne already destroyed by illegal BRMT operations, then orchestrated by defendants BURNS, WATERS, and others). Jeanette most probably had a prior surreptitious history as a trafficked person into the Middle East as an attractive skilled belly

dancer in her 20s and 30s, while she was an enlisted military bisexual who had been deliberately

inculpated in national security matters, who was then threatened with criminal military

prosecution for her bisexuality while participating in national security matters by defendant

ARMY, paragraph 610 and others as referenced therein. Lead Plaintiff was therefore unwittingly

a key witness to the entire series of acts which led to the 9/11 indirect retaliatory attack for

defendant CIA's meddling.

J. As forensically reverse engineered, before the 9/11 attack occurred, defendant FBI

(ROSENBERG) had initiated its plan for the illegal human trafficking of Lead Plaintiff to

destroy certain personal medical and financial records. These records provided criminal evidence

which inculpated the defendants listed in the subparagraphs below in their long-running pattern

of illegal BRMT bioweapon and racketeering crimes. By using the CNA facilities utilization and

engineering space planning subcontract with Berger-Abam at the Puget Sound Naval Shipyard

industrial area project at paragraph 602 NSEC-3, defendant FBI planned this criminal

entrapment attempt with defendant FAUCI, with elements of defendant DOD, and with unknown

others, incorporating both national security nuclear secrets and IRS 941 payroll tax trap

elements.

K. In the aftermath of 9/11/2001, defendant UNITED STATES then recognized and

exploited the additional PATRIOT Act national security powers, and the huge increase in

funding it received as a direct result of its interdiction failures, to more aggressively abuse the

Lead Plaintiff by applying extreme coercion through extreme forms of illegal BRMT bioweapon

and bioweapon delivery system enhanced brain hijackings (forcible takeover) to torture and by

simultaneously applying BRMT brain hijacking enhancements to create terrifying psychological

operations, all of which combined to drive the Lead Plaintiff to suicide ideation for the purposes

of (i) eliminating both a critical witness (Lead Plaintiff, see paragraphs 697-710) and then when

that failed, (ii) by defendants' human trafficking which (a) facilitated the closing of accounts and
(b) termination of years-long relationships for medical care and secretly corrupted surgeries, and
financial services, and by (c) its knowing refusal to transfer medical records on written request
and (d) the passage of time which allowed (e) ordinary course of business destruction of records,
which were the direct evidence of the patterns of criminal acts by these defendants against the
Lead Plaintiff then available in his personal medical, financial, employment, and other records to
be destroyed (the same and comparable obstruction of justice patterns as at Pacific Paper
Products in his father's unwitting employment there in 1961-1963 to destroy Cointelpro related
medical records evidencing defendant FBI violence against other citizens, and at paragraphs 414,
555, 635, 636, 637).

L. After the security alert delay which strictly restricted access to military facilities
imposed after the 9/11 attack, defendants invited Lead Plaintiff to tour the NAVY's PSNS
industrial area for the planned engineering study; removed the needed funds to finance the
payrolls needed to complete the study from CNA, making that work basically financially
impossible to complete; leading to his orchestrated resignation to form Allegent LLC with
defendant PRAY, while it invested as co-owner through PRAY in the programmed failure of
Allegent, LLC; conspired with CALDWELL (DOJ) to cover up their use of check fraud to
destroy Allegent; refused to pay past due compensation to Lead Planitff due from CNA; acted to
finally and completely destroy the Lead Plaintiff's orchestrated and coerced marriage to Jeanette
in 2004-2005, destroyed career other options from 2003 forward; and attempted the complete
theft of past due CNA compensation. Taken together, these acts deprived Lead Plaintiff of all
cash flow, all further employment, and then of all liquid assets, which forced the liquidation of
all other personal and real property in 2005 to homelessness, which defendants accomplished by
December 2005. With the assistance of SUMMERS, defendant FBI then human trafficked Lead

Plaintiff to Boston and homelessness in late December 2005 for 21 months, before his further trafficking to fake employment in ESTABLISH in August 2007, another cover company run once again by defendant ROSENBERG, whose prior male pattern baldness had been concealed while he ran NutraSource in Seattle and, in any case, was not expected by the Lead Plaintiff to appear on the east coast under a different name as Lead Plaintiff's new direct supervisor and employer at defendant ESTABLISH.

M. These national security pretexting and related color of law abuses, acts, violations, and injuries to Lead Plaintiff are explained in detail at paragraphs 600-603 NSEC-1 through NSEC-4 and are representative of such acts, violations, and injuries to this class of plaintiffs.

N. This illegal human trafficking of Lead Plaintiff further benefitted these defendants and their corrupt associated-in-fact enterprise by concealing and arranging the destruction of medical records (requested but never delivered to Lead Plaintiff from his Kirkland, WA primary care physician of many years in 2007) from the sequence of illegal BRMT programmed illnesses, allergies, hospitalizations, and surgeries, and of financial and other records evidence of racketeering acts, which could then have been used to positively establish criminal liability for both (a) the illegal human experiments by these defendants during illegal BRMT development and deployments, and (b) the racketeering acts used to sustain involuntary servitude and other illegal acts. All this now destroyed evidence would have inculpated the below listed defendants and others unknown, and operated in their corrupt interests. The destruction of Lead Plaintiff's records from his residence in Washington state directly benefitted defendants including, without limitation, UNITED STATES, ARMY, CIA, DOJ, FBI, USMS, WEISSMAN, ROSENBERG, MELBER, RUBIN, Alexander VINDMAN, BREYER, GARLAND, and other defendants, who operated in this associated-in-fact enterprise pattern of racketeering acts in the illegal and criminal acts from inception to 2005, which incorporated these defendants' systematic criminal

abuses of the constitutional rights of Lead Plaintiff and of certain other plaintiffs of this class through their associated-in-fact enterprise pattern of racketeering acts.

O. Defendants UNITED STATES, most particularly including defendants DOJ, FBI, USMS, CIA, and individual defendants who are current or former government officials, among others unknown have since 1979 through the present, abused the Lead Plaintiff through human trafficking, other racketeering crimes, and illegal BRMT operation to the point of torture and multiple suicide ideations, which have been and are combined with street level harassment by police powers personnel and misguided members of the public. This pattern has and does continue from 1968 over decades, in the 2018 human trafficking of Lead Plaintiff to his current residence in a mixed use complex 550 feet from a key locus in the Senator Menedez public corruption investigation, paragraph 599D(i)(h), and continues at present through the programmed health collapse at paragraph 710, and by other now recognized means.

P. Defendant UNITED STATES, its departments and agencies, and certain of its co-conspirator defendants, have and do routinely and repeatedly elect to directly entangle Lead Plaintiff in its national security probes and investigations, and has and does purposefully engage in these acts, violations, and injuries under color of law to perpetuate its cover-up of its cross-department, cross-agency, and cross jurisdictional organization of and perpetuated participation in, the associated-in-fact enterprise pattern of racketeering acts, rights violations, and the illegal BRMT bioweapon and bioweapon system development, test, and deployment cycle over the past more than 56 years.

Q. The false terror narrative and pretext which began in 2002, and which was swiftly covered up after its confirmation in September 2021 by defendant NYPD (Interline Exhibits 17-19), was defendant UNITED STATES' (including ROSENBERG, FBI, and other defendants) purposeful, deliberate, and malicious color of law abuse of the state secret privilege, and its

knowing and willful construction of the fraudulent terror pretext, resulted in (a) the complete loss

of property and (b) the knowing and willful destruction of evidence of crimes and valid legal

claims which had been and were fraudulently concealed.

R. The Lead Plaintiff, and other plaintiffs similarly situated, have and do suffer such

losses of property rights without forfeiture procedure at the hands of defendant UNITED

STATES beginning in 1983 with thousands of dollars forfeited to a fraudulent programmed to

fail enterprise in the now known as fraudulent Sheldon-Lee partnership with defendant CIA's

THORPE (paragraphs 428, 650D RICO-12), even before the 1986 initial adoption of 18 U.S.C.

§§ 981-986 absent the March 2006 § 987 anti-terrorist forfeiture protection. All these forfeitures

were surreptitious in origin and without any administrative process whatsoever, but did

incorporate in some direct or indirect form which was unknown to Lead Plaintiff until

understood through the forensic reverse engineering process he began in mid-2021, the

continued illegal operation of the prohibited BRMT bioweapon and bioweapon delivery system

and the associated-in-fact enterprise pattern of racketeering acts, and of rights violations, by

defendant UNITED STATES, it departments and agencies, and its co-conspirator defendants,

which are well documented throughout this complaint. Losses sustained both before and since

adoption of 18 U.S.C. § 987 from wrongful narratives constructed by defendants have and do

include the loss of property and appreciation, including all rights which affect interstate

commerce, forcibly forfeited by the actions and failures to act of defendant UNITED STATES

and its co-conspirators including, without limitation, press, media, entertainment, and other

private defendants in this conspiracy.

S. The complete and total forced forfeiture of rights and property which resulted from

this series of comprehensive frauds has included, without limitation, the forced complete

forfeiture of all property by Lead Plaintiff through loss of income to suicide ideation to

homelessness, all meticulously planned and systematically perpetrated by defendant UNITED

STATES and the related institutional and individual defendants, whether currently known or

unknown, for defendants' own corrupt purposes and benefit, without absolutely no due process

of any kind, much less a properly contestable civil forfeiture process under 18 U.S.C. §§ 981-

986, destroying all notions of unalienable rights in the face of the force of corrupt government

officials and the operations they illegally ordered and conducted for their own institutional and

individual purposes and benefit with no regard for rights or law.

      T. Congress added 18 U.S.C. § 987 on March 9, 2006 to protect the personal, financial,

real, intangible and other property and property rights of persons wrongfully accused of terrorism

from the forced forfeiture of their property. This law was coincidentally adopted soon after Lead

Plaintiff had already been forcibly coerced into homelessness in December 2005 from Kirkland,

WA and, fearing at the time for other family members, was again illegally human trafficked, this

time while homeless to Boston, MA, by defendant UNITED STATES (FBI, CIA, USMS,

ROSENBERG (FBI), with the support of SUMMERS, then Harvard University President, in

December 2005, to further homelessness in Boston, MA, where Lead Plainitff ran out of money

in Spring 2006. Lead Plaintiff moved from a hotel to Pine Steet Inn in about April 2006, then

later to the Dorchester Heights facility used by Pine Street Inn, Boston, MA, which housed Lead

Plaintiff and his federally assigned BRMT illegal bioweapon and bioweapon delivery system

related security team, where he remained in limbo during fruitless job hunting (electronically

hacked for continued control by defendant UNITED STATES) until his next human trafficking

in August 2007 to ESTABLISH, Fort Lee, NJ, under the direction of defendant ROSENBERG,

after a Boston-area Mossad counter-terrorism behavioral "job" interview orchestrated as a

pretext by defendant FBI (ROSENBERG), as defendants FBI and CIA perpetuated their false

terror narrative used to misdirect other police powers toward Lead Plaintiff and way from the

reality that 9/11/2001 was in part retaliation by groups in the Middle East for activities against

sovereignty by defendant CIA in that region, and as they perpetuated and expanded their

associated-in-fact racketeering enterprise directed specifically at Lead Plaintiff from his age 12

in 1968, to include various police powers operations in the greater New York City area, among

others.

U. After the adoption of 18 U.S.C. § 987 in March 2006, the Lead Plaintiff has also

repeatedly suffered further surreptitious property forfeitures including, without limitation, losses

of valuable physical and electronic evidence (much or all most probably still remaining in the

hands of defendants FBI, ROSENBERG) supporting this complaint, losses of computers,

printers, personal property, furnishings, furniture, tools, equipment, intangible work product, and

other items, in Boston, MA, Cliffside Park, NJ, Ramsey, NJ, and Edgewater, NJ, between March

2006 and the present. These forced orchestrated surreptitiously organized and executed

forfeitures without notice and without process have recurred to Lead Plaintiff (i) while residing

in the Boston, MA homeless shelter in mid-2006 losing valuable eyeglasses with no funds

available to replace them, 650,000 air miles lost to forfeiture, computer files which support his

claims against these defendants lost to rough handling by defendants, and lost to suppression of

evidence (personal intangible property) not yet returned by defendant FBI, (ii) while residing in

Cliffside Park, NJ from August 2008 to October 2010, (iii) by his forcible removal to a

behavioral health unit for coercion into dismissing under duress a federal court complaint from

October 2010 through March 2011, and (iv) by his human trafficking by defendant FBI and other

co-conspirators from his assigned apartment in Ramsey, NJ, where he lived from 2011-2018,

soon after he made substantial improvements to its physical infrastructure, furnishings, and

fixtures. These involuntary forfeitures have and do include valuable documentary evidence

supporting constitutional claims which have been lost to obstructions of justice by defendant

UNITED STATES, as well as forfeited, tampered, and destroyed personal property lost to defendant UNITED STATES by operation of illegal tampering, human trafficking, and electronic vandalism, all as orchestrated by defendant UNITED STATES without due process and without administrative process. amounts and losses to be proven at trial.

V. The BRMT bioweapon brain hijacking program is not defensible either as a "state secret" nor in the interests of "national security," as it systematically (i) violates the Article II limits on federal executive powers established in the Constitution, (ii) vastly exceeds the Article I authorities of Congress to constitutionally approve or appropriate to support or sustain such an illegal program in violation of a ratified treaty and of individual rights under our Constitution, (iii) can and does directly injure US persons and their rights and (iv) even their physical well-being to and including torturous injury and death without due process, and (v) systematically violates their human, Constitutional, legal, and civil rights, including (vi) those guaranteed to all humans under ratified international treaties having force of law in the United States of America, while (vii) posing a direct, immediate, and continuing threat to any and all US persons. Yet this illegal BRMT bioweapon and bioweapon delivery system (effectively an actual weapon of mass destruction which can be individually targeted, rather than the imaginary WMD they were tagging Saddam Hussein with prior to the invasion of Iraq) which is internationally prohibited by ratified treaty, was and still is used to internally justify the persistence of a functionally illegal and unconstitutional secret police state within a state, wherein the seizure and forfeiture of private property was and is justified. Our Constitution says otherwise:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

W. Defendant UNITED STATES (FBI, CIA, USMS, ARMY) simply chose not to recognize the Constitution in their forcible surreptitious seizures and forcible forfeitures of these unalienable rights, including to all form of property. They have and do deem that by using surreptitious means they can excise these plaintiffs of their property rights without due process, and not be subject to our Constitution or to federal law. This conduct, never legal, occurred most aggressively in 2005 at the very moment when Congress enacted, and specifically intended to protect, all property rights of those wrongfully accused and subjected to forfeiture by any and all means, and wherein Congress specified the broadest possible application of these protections as it adopted 18 U.S.C. § 987(b):

"In considering a claim filed under this section, a court may admit evidence that is otherwise inadmissible under the Federal Rules of Evidence, if the court determines that the evidence is reliable, and that compliance with the Federal Rules of Evidence may jeopardize the national security interests of the United States."

X. Protecting property rights was the paramount intent of Congress in this specific legislation. Yet somehow, separation of powers meant to the executive branch, that Congressional intent could be ignored by the executive branch, that the Constitution itself could be ignored by the executive branch, and that it could seize by surreptitious means whatever property it chose from any US person it selected for its property rights seizures. Defendant UNITED STATES itself created the false terror narrative it then used to serve its own corrupt purposes and to fraudulently conceal the entire pattern of prior conduct against rights and property from inception.

Y. By 2005, the unwitting Lead Plaintiff had already lived with defendant USMS, FBI, DOJ personnel in college (PAGE, GARLAND, and others), stayed with and shared "family" life with illegal BRMT bioweapon and bioweapon delivery system program manager (future Supreme Court Justice) defendant BREYER in Spokane, WA, officed with CIA international

assets while in MBA graduate school (Hamid Bahari-Kashani, now deceased), married the

former wife of a police powers official (Lynne, former wife of Task Force and Precinct

Commander Boyle, King County Sheriff's Department), raised that police powers official's

children as his teen stepchildren, was an uncle to children of personnel directly engaged in

national security matters (RUBIN, VINDMAN), and held family gatherings, and other social

events with, and worked directly with, the members of various national security teams on

military, defense, and intelligence matters, police powers investigations (Deloitte Seattle, PCC,

LazerSoft, Alliance, PAN, Pacific Pipeline, CNA, later ESTABLISH), and with deep cover

commercial espionage assets of CIA, and FBI, ARMY, USMS and other federal police powers

personnel while they engaged in these activities in both domestic US and international

operations, and had lived through a fraudulently orchestrated marriage formed in violation of US

law and of the third Amendment by defendants CIA, ARMY, BURNS, WATERS, and other

defendants, and through fraudulent employment and other depravities described herein.

 Z. Lead Plaintiff lived with defendant UNITED STATES personnel, sharing the same

dormitory and apartment bedrooms and showers, babysat and played with their kids from at least

college age onward, bought gifts, threw and attendee adult and childrens' parties, spent holidays,

mooched meals in college, and cooked and cleaned for them as family, roommate, and friend.

There neither was, nor is, any possibility that defendant UNITED STATES did not clearly

understand every single aspect of Lead Plaintiff's life and character from at least age 12,

arguably even from his initial collateral trafficking at age 5 to California for the covert defendant

FBI Cointelpro evidence destruction program which trafficked his unwitting father and family to

California for two years.

 AA. Any argument by defendant UNITED STATES, or any other party including press,

that the Lead Plaintiff has ever presented any national security or terror threat was always utterly

absurd on its face, and was based solely upon and directly intended to serve, defendant UNITED STATES' (CIA, FBI, ROSENBERG, FAUCI, and unknown others) specific corrupt purpose of erecting and sustaining a false and specifically misdirected propaganda narrative intended to endanger the Lead Plaintiff. This defendant UNITED STATES and its co-conspirators' fraudulently constructed narrative actually best fits these defendants' own pattern of conduct in their prior covert actions when they meddled directly in other nations' leadership ands sovereignty, and engaged in covert acts of war against national sovereignty which generated the 9/11/2011 indirect reprisal attack on the United States, and in these defendants' own conspiracies, acts, violations, and injuries, which they have and do perpetrate against the Lead Plaintiff and his interests including, without limitation, his property interests, both tangible and intangible.

AB. All available evidence, including defendant UNITED STATES' continuing abuses of the illegal BRMT bioweapon and bioweapon delivery system to literally manipulate the words coming from the Lead Plaintiff's mouth, point directly and immediately at defendant UNITED STATES and its co-conspirators as the specific source of this threat. So, there never was nor is any legal basis for any argument by defendants that there is any foundation in law for any forced forfeiture of property by Lead Plaintiff, nor have they ever indicated, much less undertaken, any proceeding to even assert any such forfeiture claim, which is required under 18 U.S.C. § 983. They knew there was no legal basis for their planned actions, so they undertook these acts surreptitiously instead. The result was the same, forfeitures but in the complete absence of due process and their utter contempt of the legal process specified by Congress and under our Constitution. Defendants illegally conspired, schemed, and acted to effect this scheme and conspiracy extra-legally and with absolutely no authority of any kind whatsoever, upon which this Court can and must act and order to reverse, and to which and for which restoration of rights,

Congress has granted this Court the broadest conceivable legal authority, both to restore to

equity the Lead Plaintiff and to order defendants to immediately disgorge any and all property, to

account for each and every property item and interest it forced into forfeiture, and to immediately

undertake to identify, reconstruct, and restore all property, to each and every member of this

class of injured plaintiffs, from the first day of the illegal BRMT program initiation in the 1970s,

so these plaintiffs may finally receive justice under our Constitution and laws.

AC. Neither the federal executive, acting through defendant DOJ Department of Justice,

nor Congress has previously taken up or pursued, much less implemented, any such action to

restore equity, as demonstrated by their complete neglect of the innocent victims of FBI's

felonious Cointelpro program and of CIA's criminal MKUltra program, for either those deceased

or for those who survived, in the aftermath of those programs. The remedies for these extreme

excursions from Constitutional limits by these wild federal excesses in exercise of discretion

against property rights, are thereby placed in the hands of our Article III Courts as their clear

constitutional responsibility through this clearly expressed Congressional intent to act against

such egregious injuries and to restore equity. Congress acted aggressively to protect persons and

their property and to restore equity and property for wrongfully inculpated persons in 18 U.S.C.

§ 987. This court has the most expansive possible means to restore property and equity to these

victims of the illegal actions by defendant UNITED STATES against the property, rights, and

religion of these plaintiffs.

AD. These acts and injuries are representative of those perpetrated by defendants on this

class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 602, 603 | NSEC National Security Pretexting and Entanglements | 3, 4 |
| 612 | HEXP Illegal Human Experimentation | 9 |
| 625 | RGTS Individual Rights Violations and Conspiracies | 5 |
| 639, 641-646, 654-680, 682, 684-693 | RICO Racketeering | 1, 3-8, 16-42, 44, 46-55 |
| | LTHL Lethality Attempts | |

[Intentionally left blank.]

## CLAIMS FOR RELIEF - COUNT 42

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Thirteenth, Fourteenth Amendments

#### Deprivation of Rights Under Color of Law - Searches and Warrants

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 42 U.S.C. §§ 1981, 1985 |
| Washington: | RCW § 49.60.030(1) |
| New Jersey: | NJ Stat §§ 10:1-1, 10:5-4, 10:5-12, 10:6-2 |
| New York: | NA |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraphs 839C and 839D are specifically incorporated by reference for their particular relevance to this paragraph. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage in violations of the *Fourth* Amendment which guarantees the right to be free of searches and seizures absent a lawfully obtained warrant. Among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States, defendant UNITED STATES and co-conspirator defendants have and do act in systematic fraudulently concealed violations of constitutional rights by the means described, without limitation, in paragraphs 839C and 839D.

C. These acts and injuries are representative of those perpetrated by defendants on this

class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

### 843. CLAIMS FOR RELIEF - COUNT 43

**Violations of Constitutional Rights Under the First, Fourth, Fifth, Thirteenth, Fourteenth
Amendments**

**Deprivation of Rights Under Color of Law - Searches Without Warrant**

May 3, 2024    BREWER et al v. BURNS et al    COMPLAINT    Page 1225 of 1321

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 42 U.S.C. §§ 1981, 1985 |
| Washington: | RCW § 49.060.030(1) |
| New Jersey: | NJ Stat § 10:6-2 |
| New York: | NA |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding
paragraphs. Paragraphs 839C and 839D are specifically incorporated by reference for their
particular relevance to this paragraph. Defendants identified at paragraph 799, together with
other unknown defendants to be identified through the discovery process have and do act in
violation of federal and state statutes listed above in this paragraph. as well as state statutes in all
originating locations, many of which are unknown at the time of this Complaint and will be
available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage in violations of the
Fourth Amendment guarantees the right to be free of searches and seizures absent a lawfully
obtained warrant. Among other acts, injuries, and violations at the final subparagraph in this
paragraph, both within and without the territory of the United States, defendant UNITED
STATES and co-conspirator defendants have and do act in systematic fraudulently concealed
violations of constitutional rights, initially subjecting and then sustaining illegal searches by the
means described, without limitation, in paragraphs 839C and 839D.

C. These acts and injuries are representative of those perpetrated by defendants on this
class of plaintiffs, which also include other acts of violence, fraud, and continued willful
blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended
family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

[Intentionally left blank.]

## 844. CLAIMS FOR RELIEF - COUNT 44

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Thirteenth, Fourteenth Amendments

#### Fraud - False Information and Hoaxes

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
| --- | --- |
| United States Code: | 18 U.S.C. §§ 1038; 42 USC 1981, 1985 |
| Washington: | RCW § 49.60.030(1) |
| New Jersey: | NJ Stat §§ 2C:14-9, 10:6-2 |
| New York: | New York Penal L. § 190.25 |
| California: | NA |
| Massachusetts: | Mass Gen L ch 269 § 14a |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage in furtherance of illegal BRMT bioweapon and bioweapon delivery system development, testing, and deployment, illegal human subject biomedical and psychological experimentation and terrorization, torture, and theft, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States, defendant UNITED STATES has at all times since 1968 acted in knowing and willful violation of 18 U.S.C. §§ 1038, 1542, 1543, 1544, to injure Lead Plaintiff and all members of this class of plaintiffs by, promulgating and disseminating false information and hoaxes regarding the alleged conduct of Lead Plaintiff and others similarly situated to directly endanger these plaintiffs and to persuade others not to employ or associate with them when such employment or association would not suit the corrupt

and criminal purposes of defendant UNITED STATES in perpetuating their peonage,

involuntary servitude, forced labor, and other deliberate discriminations against unalienable

rights in furtherance of defendant UNITED STATES and its co-conspirators' series of schemes,

conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations

and relationships, their careers, reputations, fortunes, and business interests, including closely

held business entities, among other acts, injuries, and violations at the final subparagraph in this

paragraph, both within and without the territory of the United States. Statutory civil recovery for

42 U.S.C. §§ 1981, 1985 equal protection and conspiracy violations under 42 U.S.C. § 1983

action for conspiracy against rights under color of law is permitted against defendants UNITED

STATES, and including, without limitation, individual defendants ROSENBERG, BURNS,

MELBER, RUBIN, VINDMAN, and others not presently known for their 18 U.S.C. § 1038

attempts to create hoaxes, fictional legends, and entrapments as follows:

(i) Chapter 2—Aircraft And Motor Vehicles (18 U.S.C. §§ 31 – 40a)

§ 32. Destruction of aircraft or aircraft facilities  - several illegal BRMT
bioweapon brain hijacking prompts toward attempting in-flight door operations as
Lead Plaintiff was pursuing fraudulent sales leads during the 2002-2005 cash flow
and income starve out (paragraph 673), wherein no action was taken by Lead
Plaintiff to complete these door opening mental prompts by the illegal BRMT
bioweapon and bioweapon delivery system,

§ 37. Violence at international airports – an FBI entrapment attempt at paragraph
693A-C, wherein defendant FBI and/or its co-conspirators attempted to create a
violent outburst after a storm-truncated flight delay at Kennedy Airport in New
York City sleep period remain overnight resulting from a missed connection
during his transit of Seattle-Tacoma International Airport, by their substitution of

an undercover officer who refused to deliver a breakfast check to Lead Plaintiff as
he needed to depart the concourse restaurant for his early morning flight to visit a
ranch property listed for sale in Lake County, Oregon during one of his many
attempts at private business affecting interstate commerce.

(ii) Chapter 10—Biological Weapons (18 U.S.C. §§ 175 – 178) -  as actually used by
UNITED STATES against Lead Plaintiff through its illegal deployment of the BRMT
bioweapon and bioweapon delivery system against Lead Plaintiff, but created,
promulgated, and perpetuated as a legend and false public narrative against him by its
surreptitious creation and publication of live video, and in its exploitations in public
venues of Lead Plaintiff which specifically includes, without limitation, on August 26,
2023 while Lead Plaintiff was enroute to and from Washington, DC for a MLK memorial
civil rights rally. Defendant co-conspirators PAPD, DC Metro, and NYPD (LPEE page
11931), each conducted EDP training session drills while he transited locations in their
jurisdictions, which drills had been developed, promulgated, and perpetuated and were
intended and used by defendant UNITED STATES and its co-conspirators as persistent
misdirection, to create and perpetuate their hoax and wrongfully convey a false public
image of Lead Plaintiff as an emotionally disturbed person, paragraphs 320b, e, 615D,
463-465.

(iii) Chapter 113b—Terrorism (18 U.S.C. §§ 2331 – 2339d) as actually perpetrated by
UNITED STATES and/or its co-conspirators against Lead Plaintiff and other innocent
persons but promulgated against as misdirection to promote and perpetuate a fictional
legend regarding Lead Plaintiff, paragraphs 11, 451, 516-519, 521, 603T-U, 604F.

(iv) 42 U.S.C. Division A - Atomic Energy Subchapter XVII - Enforcement § 2284(b)

a. "Unauthorized use or tampering with facilities, etc. Any person who knowingly causes an interruption of normal operation of any such facility through the unauthorized use of or tampering with the machinery, components, or controls of any such facility, or attempts or conspires to do such an act…"

b. as actually perpetrated by UNITED STATES and its co-conspirators against Lead Plaintiff, and promulgated and promoted by specific misdirection to create, promote, and perpetuate a fictional legend regarding Lead Plaintiff, paragraph 602 NSEC-3.

C. Among other falsely created legends in service of defendant UNITED STATES and its co-conspirators have been unfounded allegations spread by and in service of myths about sexual deviancy, pedophilia, terrorism, murder, misogyny, and other heinous acts and allegations regarding Lead Plaintiff who had prior to the decision to raise these allegations in support of potential lethal threats from others through this program of misdirection, spent hundreds of thousands of hours unwittingly living with and working with these same defendants for more than three decades. Defendants (UNITED STATES, ROSENBERG, NYPD, NJTPD, PAPD, BERGEN SHERIFF, NJSP, unknown others) conspired and arranged (a) a bogusly pretexted Mossad interview in greater Boston (paragraphs 464, 603B), (b) the female officer honey traps run in the NYC region by various police powers (paragraph 504, 505), (c) the NYPD/FBI fraudulent terror investigation (paragraphs 464, 519, 555, 560, Interline Exhibits 17-18, 603B, F, G, L, 634C, 802B, 841) cover-up in September 2021 are illustrative of the effort and energy which defendant UNITED STATES (FBI, USMS, CIA) put into this effort from 2002 forward, (d) the use of police powers personnel children during volunteer work with a falsified police powers variant of New York Cares (paragraph 526) and (e) the now known to be publicly and permanently internet available sex scenes from 2008 with MODDERMAN (paragraph 611

orchestrated to Lead Plaintiff as a doting mother of three children by defendant FBI's

ROSENBERG using MATCH GROUP website Match.com, actually adult film actor and later

Trump hush money recipient Stephanie Clifford related to their 2006 relationship, all then

unknown to Lead Plaintiff but well known to defendants FBI, CIA, ROSENBERG, and

unknown others), and with defendant GIA (paragraph 613 HEXP-10) were all examples of the

wide variety of the false information and hoaxes used in this myth creation and public

propaganda by defendants DOJ, FBI (ROSENBERG, WEISSMAN) and CIA (BURNS).

D. These acts and injuries are representative of those perpetrated by defendants on this

class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 607, 608,611-615, 619 | HEXP Illegal Human Experimentation | 4, 5, 8-12, 16 |
| 625 | RGTS Individual Rights Violations and Conspiracies | 5 |
| | RICO Racketeering | |
| | LTHL Lethality Attempts | |

## 845. CLAIMS FOR RELIEF - COUNT 45

## Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth Amendments

### Neglect To Protect - Failure to Protect

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1961-1968; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1994 |
| Washington: | RCW §§ 9A.80.010, 42.20.100 |
| New Jersey: | NJ Stat §§ 10:6-2, 59:2-2, 59:3-14 |
| New York: | New York Penal L. §§ 100.00, 100.10, 105.15, 115.00, 115.05, 460.00 through 460.80 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | AZ Rev Stat § 11-441 |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery. Arguments and allegations in paragraph 805 are specifically incorporated herein by reference.

B. Defendants have and do plan, conspire, perpetrate and engage, at all times since approximately 1968, in direct and explicit acts, violations, and injuries against the unwitting Lead Plaintiff and even prior to the time acted against others in this class of plaintiffs including,

without limitation, his now deceased father and other extended family members, who did or do

practice the Quaker-based religion of Lead Plaintiff's family from at least the time of the Civil

War (paragraph 409). Defendants have and do violate 18 U.S.C. §§ 1961-1968 inclusive of all

criminal and civil violations recited herein and defined at 18 U.S.C. § 1961, 42 U.S.C. §§ 1981,

1982, 1983, 1985, 1986, 1994, and state statutes in an unknown number of states, in a knowing

and willfully negligent manner to fail to protect and prevent acts, violations, and injuries to

constitutional and statutory rights of this class of plaintiffs, and in fact, acted jointly and

severally to align their various teams, details, and organizations to injure Lead Plaintiff and other

members of this class of plaintiffs by systematically failing to comply with their sworn oath to

preserve, protect, and defend the Constitution, their fellow citizens themselves, the rights and

properties of those fellow citizens, and the personal relationships, homes, and families of those

fellow citizens, of this entire class of similarly situated plaintiffs.

C. Under 42 U.S.C. § 1986, inculpated defendants are defined as follows (emphasis

added):

"Every person who, having knowledge that any of the wrongs conspired to be done,
and mentioned in section 1985 of this title, are about to be committed, and having
power to prevent or aid in preventing the commission of the same, neglects or
refuses so to do, if such wrongful act be committed, shall be liable to the party
injured, or his legal representatives, for all damages caused by such wrongful act,
which such person by reasonable diligence could have prevented; and such
damages may be recovered in an action on the case; and any number of persons
guilty of such wrongful neglect or refusal may be joined as defendants in the
action;"

Under Congressional intent, inclusive of fraudulently concealed 42 U.S.C. § 1985 conspiracies
against rights at 28 U.S.C. § 2679(b)(2):

"(2)Paragraph (1) does not extend or apply to a civil action against an employee of
the Government—
(A) which is brought for a violation of the Constitution of the United States, or
(B) which is brought for a violation of a statute of the United States under which
such action against an individual is otherwise authorized."

D. This pattern of neglect to prevent has been and is widespread and deeply rooted,
durable as to time and place for more than 56 years in Lead Plaintiff's direct personal experience
and most probably longer as experienced by other members of this class including members of
his extended family, and is documented herein at paragraphs 99e-h, 99j-m, 219, 298, 571, 580-
584, 628 RGTS-8, 816, 817, Interline Exhibits 17-19. This purposeful and willful negligence
actively furthered these defendants' series of schemes, conspiracies, frauds, thefts, and
deprivations to these plaintiffs, their families, personal relations and relationships, their careers,
reputations, fortunes, and business interests, including closely held business entities among other
acts, injuries, and violations at the final subparagraph in this paragraph, both within and without
the territory of the United States.

E. Constitutional rights violations which these defendants neglected to prevent in their
acts, violations, and injuries of the Lead Plaintiff include the specific known violations
referenced in this paragraph and those referenced at other paragraphs in this complaint. Among
other acts in conspiracy with state and local governments and their police powers, the following
individual defendants, and all the persons whose cover identities are included at paragraph 105
table, 226 table, 541 table, and in the compendium at LPEE pages 934-1075, engaged in
conspiracies, attempts and acts to conduct:

(i) BREYER, KATYAL, GARLAND, WEISSMAN, ROSENBERG, BURNS, STONE,
RUBIN, MELBER, FAUCI, CALDWELL, Alexander VINDMAN, Yvgeney
VINDMAN, directly, knowingly, willfully, and sustainably participated in an on-going
program of involuntary servitude (*Thirteenth* Amendment rights violations) together with
state and local officials who cooperated in and accommodated their specific requests for
discriminatory conduct directed at Lead Plaintiff using their state and local police and

administrative powers, including without limitation, (i) Federal Way School District,
FWSD, which created Decatur High School three years before constructing the high
school campus, (ii) Green River Community College which assigned instructors and
arranged for specific encounters with federal and defendant WASH and its department
and agency employees posing as students for specific federal purposes, (iii) defendant
WSU (Washington State University) which made specific residential housing
arrangements and reassignments for the purposes of arranging the use of federal and
defendant WASH state employees to accompany and befriend the Lead Plaintiff, and
assisted to directly associate and entangle him with defendant CIA assets and personnel
and with defendant DOJ, FBI, USMS personnel while in undergraduate and graduate
school, and (iv) with the Whitman County Sheriff's Department and (v) defendant KCSD
(King County Sheriff's Department) for embedded resources, which were used to manage
and surround him from 1970 until 2005, when the Lead Plaintiff was human trafficked
from the Seattle area by defendants FBI, CIA, FAUCI, and ROSENBERG, all acting for
(a) the illegal purposes of perpetrating and perpetuating illegal human experimentation on
an unwitting human medical subject to support the development of the illegal bioweapon
and bioweapon delivery system in violation of 18 U.S.C. § 175, and (b) while engaging
in other associated-in-fact enterprise patterns of racketeering acts, violations, and injuries,
by (c) knowingly and fraudulently posing as friends, relatives, employers, subordinates,
attorneys, medical doctors, and (d) in other fraudulent and fraudulently concealed
relationships with the Lead Plaintiff, all to manage his affairs, relationships, and
employment in their systematic violations of constitutional rights and associated-in-fact
pattern of racketeering acts.

(ii) BREYER, GARLAND, CUNHA, BURNS, and unknown other US government employees with the identified cover names of defendant UNITED STATES (DOJ, FBI, CIA, ARMY) acted in conspiracy with defendant WSU (Washington State University), Pullman WA, a state chartered and funded land grant university with its own police powers operation, and with state, county, and city police powers to orchestrate student housing and teaching assistant office assignments and specified assignment of federal personnel surrounding Lead Plaintiff during Lead Plaintiff's undergraduate and graduate programs, with all as described at paragraphs 4(i), 5, 21(i), 48, 99d, 99m, 111, 211, 415, 419, 491-492, 541, 599(i)(a), 600G, 608C, 833F, 840C, all of whom participated as described at (i) above in the illegal BRMT bioweapon and bioweapon development program, and in conspiracy with state and local officials identified at (i) above.

(iii) WEISSMAN, an agent of defendant FBI, and through other unknown U.S. government employees with the identified cover names included at paragraphs 105 table, 541 table, LPEE pages 934-1075 acted in conspiracy with state and local police powers in Washington state (State Patrol, King County Sheriff) as described at paragraphs 51, 99j, 105 table, 112, 212, 303, 320A, 417-418, 422, 425-436, 436, 449, 497-498, 541, table, 557-562, 600, 602, 609, 626, 694, 820, 822, 831, 836, 841.

(iv) ROSENBERG, an agent of defendant FBI, having human trafficked Lead Plaintiff from Washington state through Boston, MA with the assistance of SUMMERS, and Governors Mitt Romney and Deval Patrick as Massachusetts governors during that period, who allocated state and local resources to this purpose and acted in conspiracy with defendants CIA, DOJ and its agencies, then conspired through the regional Joint Terror Task Forces in New Jersey and New York City with defendants NYPD, PAPD, NJTPD, NJSP to conduct joint and several targeted operations against the Lead Plaintiff

operations, beginning with the human trafficking to fraudulent employment of Lead Plaintiff at Establish, Fort Lee, NJ in August 2007. These defendants, acting through defendant ROSENBERG and unknown others, conspired with MI-5, MI-6, and London Metropolitan Police to conduct a week-long visit in September 2007 for operational pretexting and entanglement into illegal searches and fraudulent employment at ESTABLISH, Fort Lee, NJ, having previously acted in other conspiracies with state and local police powers in Washington state (WASH, KCSD, unknown others), all as described at paragraphs 21(iv), 38, 51, 99g, 105 table, 107, 112, 121, 165, 166, 213, 223, 320c, 320f, 320end, 416, 431-436, 440, 452, 454, 459, 462-472, 497-498, 516-519, 536, 541 table, 555-562, 599H, 600P, 602, 603, 606, 609, 611, 623, 625, 626, 632, 634, 641, 650, 656, 673, 691, 694, 801, 820, 831, 836, 841, 844.

(v) MELBER, RUBIN, as agents of defendant FBI, acted as fraudulent extended family members of Jeanette, Lead Plaintiff's fraudulently orchestrated second spouse, in conspiracies which also incorporated ROSENBERG, BURNS, and FAUCI in undercover embedded enterprise roles as program managers and executives of defendant UNITED STATES (DOJ, CIA), with defendants' state and local police powers in Washington state (WASH, KCSD, unknown others), British Columbia, and the United Kingdom, all as described at paragraphs 99f, 99h, 216, 218, 303, 320f, 422, 443, 500, 501, 562, 600P, 603B, 604B, 606L-O, 610G, 627D, 801N, 820N, 822D, 836B, 841N, 844B.

(vi) In conspiracy with the individual defendants as (v) above and in the same time periods, VINDMAN, Alexander, VINDMAN, Yvgeney, and AUSTIN as officers of defendant ARMY, acted in further conspiracies with state executive branch and military leaders including, without limitation, Colonel Warren WILKINS, Washington Army National Guard, during and after WILKINS served as a direct report of Lead Plaintiff at LazerSoft

in 1986-1989, and with police powers at (v) above and as described at paragraphs 112, 320f, 394, 436, 438, 439, 834.

(vii)    GARLAND, directly inculpated and personally acquainted with Lead Plaintiff in 1974-1976 at Washington State University as Robert Mandich (paragraphs 5, 99m, 105 table, 211, 226, 419, 801G, 833F, 840C), and plausibly as Stuart Bettesworth at Decatur High School in 1970-1973 (paragraphs 5, 99m, 417-418), all while defendant BREYER ran the illegal human medical experimentation and BRMT bioweapon program, further conspired in illegal program continuity into the present time with state and local police powers operations NYPD, NJSP, PAPD, NJTPD, and other police powers department and agencies during two specific visits he made to the Southern District of New York and the District of New Jersey on November 27, 2023, and at other unknown times subject to discovery.

(viii)    Defendant UNITED STATES, through JACKSON, SULLIVAN, NICKLESS, WASEMAN, CASTRO, Paul SMITH, Peter LEBLOND, and others acted in conspiracy with MARICOPA SHERIFF, ARPAIO, and with other as yet unknown police powers and departments and agencies in the U.S. and with intelligence and police powers of foreign nations using undercover brokers and associated entities DALEUSKI (DC Intl), VANGCHHIA (AGI), CHO (LEVERSTONE), CRAFT and HABERER (ABT), (paragraphs 149 table, 226 table, 478, 678B emails), to directly interfere in the legitimate interstate commerce of Lead Plaintiff's company's Winnett Perico and its subsidiaries, and Sheldon Beef, Inc., through which Lead Plaintiff acted and intended to derive business and personal income and benefits in and through affecting interstate commerce. These acts, violations, and injuries affecting interstate commerce, rights including property and employment included, without limitation, acts which were fraudulent and in

the complete absence of any legal cause under color of law, interfering with and affecting

relationships with investors, bank and private debt financing, marketing, sales leads, sales

opportunities, website development, employment of consultants, hiring of executive

recruiters, recruitment and employment of qualified personnel, through their illegal

solicitation of backdated stock options, in interstate travel, fraudulent suppliers of goods

and services, fraudulent offerings of agricultural properties, fraudulent contractual

arrangements for domestic and international sales, as related herein at paragraphs 639

through 694.

(ix) Defendant UNITED STATES (most particularly and without limitation defendants DOJ,

FBI, CIA, USMS) conspired with state and local governments and their police powers as

identified herein, in operations and in allocation of illegal and abusive color of law police

powers operations, together with bad faith private actors, among these defendants as

described at paragraphs 102, 462-489, 502-507, 516, 526-592, 603, 611, 613, 628, 633,

634 in the allocation of responsibility for color of law acts against the Lead Plaintiff by

those defendants related to constitutional rights, employment discrimination, sex traps,

illegal conspiracy to cover-up of an illegal color of law terror investigation, and myriad

other conspiracies and acts alleged in this complaint.

F. Each and every individual and institutional defendant identified at 845E had the legal

duty and authority to report and/or to terminate the illegal conduct described throughout this

complaint, and to terminate their own direct role in these criminal acts. They did not do so

whether then acting as line, supervisory, management, or executive personnel, despite their

sworn legal duty and the extensive protections afforded under 5 U.S.C. § 2302(b)(8) to

whistleblowers related to reporting, investigating, and prosecuting illegal and criminal acts of

government. These acts and injuries are representative of those perpetrated by defendants on this

class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate

frauds and other specific currently known acts, violations, and injuries to this claim for relief are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

[Intentionally left blank.]

## 846. CLAIMS FOR RELIEF - COUNT 46

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth Amendments

#### <u>Neglect To Protect – Failure to Properly Supervise</u>

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1961-1968; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1994 |
| Washington: | RCW §§ 9A.80.010, 42.20.100 |
| New Jersey: | NJ Stat §§ 10:6-2, 59:2-2, 59:3-14 |
| New York: | New York Penal L. §§ 100.00, 100.10, 105.15, 115.00, 115.05, 460.00 through 460.80 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | AZ Rev Stat § 11-441 |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraph 845 is particularly incorporated herein for its specific relevance to this paragraph 846. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage, at all times since approximately 1968, in direct and explicit acts, violations, and injuries against the unwitting Lead Plaintiff and even prior to the time acted against others in this class of plaintiffs including, without limitation, his now deceased father and other extended family members, who did or do practice the Quaker-based religion of Lead Plaintiff's family from at least the time of the Civil War (paragraph 409). Defendants have and do violate 18 U.S.C. §§ 1961-1968 inclusive of all sections defined at § 1961; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1994, and state statutes in an

unknown number of states, in a knowing and willfully negligent manner as they have and do fail

to properly supervise personnel and allocate resources to and protect and prevent acts, violations,

and injuries to constitutional and statutory rights of this class of plaintiffs, and in fact, acted

jointly and severally to align their various teams, details, and organizations to injure Lead

Plaintiff and other members of this class of plaintiffs by systematically failing to comply with

their sworn oath to preserve, protect, and defend the Constitution, their fellow citizens

themselves, the rights and properties of those fellow citizens, and the personal relationships,

homes, and families of those fellow citizens, of this entire class of similarly situated plaintiffs.

This purposeful and willful negligence actively furthered their series of schemes, conspiracies,

frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and

relationships, their careers, reputations, fortunes, and business interests, including closely held

business entities as specifically cited and described in the subcounts at paragraphs 600-710 in

this complaint, both within and without the territory of these states and of the United States.

C. Among other acts in conspiracy with state and local governments and their police

powers, defendant UNITED STATES acted with MARICOPA SHERIFF, ARPAIO, and other as

yet unknown police powers departments and agencies in the U.S. and foreign nations, to directly

interfere in and to adversely affect the legitimate interstate commerce of Lead Plaintiff's

company's Winnett Perico and its subsidiaries, and Sheldon Beef, Inc., from which Lead

Plaintiff acted for the purpose of, and intended to derive income and benefits through affecting

interstate commerce from, including, without limitation, by fraudulently and in the complete

absence of any legal cause, interfering with and affecting relationships with investors, bank and

private debt financing, marketing, sales leads, sales opportunities, website development,

employment of consultants, hiring of executive recruiters, recruitment and employment of

qualified personnel, through their illegal solicitation of backdated stock options, in interstate

travel, fraudulent suppliers of goods and services, fraudulent offerings of agricultural properties, fraudulent contractual arrangements for domestic and international sales, as related herein at paragraphs 639 through 694. Defendant UNITED STATES (most particularly and without limitation defendants DOJ, FBI, CIA, USMS) conspired with state and local governments and their police powers as identified herein, in operations and in allocation of illegal and abusive color of law police powers operations, together with bad faith private actors, among these defendants as described at paragraphs 102, 462-489, 502-507, 516, 526-592, 603, 611, 613, 628, 633, 634 in the allocation of responsibility for color of law acts against the Lead Plaintiff by those defendants related to constitutional rights, employment discrimination, sex traps, illegal conspiracy and cover-up of an illegal color of law terror investigation, and myriad other acts alleged in this complaint.

D. Each and every individual and institutional defendant identified at 845E and in this paragraph 846 had the legal duty and authority to report and/or to terminate the illegal conduct described throughout this complaint, and to terminate their own direct role in these criminal acts. They did not do so whether then acting as line, supervisory, management, or executive personnel, despite their sworn legal duty and the extensive protections afforded under 5 U.S.C. § 2302(b)(8) to whistleblowers related to reporting, investigating, and prosecuting illegal and criminal acts of government. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families,

(b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

[Intentionally left blank.]

## 847. CLAIMS FOR RELIEF - COUNT 47

**Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth Amendments**

**Neglect To Protect – Failure to Properly Train**

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1961-1968; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1994 |
| Washington: | RCW §§ 9A.80.010, 42.20.100 |
| New Jersey: | NJ Stat §§ 10:6-2, 59:2-2, 59:3-14 |
| New York: | New York Penal L. §§ 100.00, 100.10, 105.15, 115.00, 115.05, 460.00 through 460.80 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | AZ Rev Stat § 11-441 |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraph 845 is particularly incorporated herein for its specific relevance to this paragraph 847. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage, at all times since approximately 1968, in direct and explicit acts, violations, and injuries against the unwitting Lead Plaintiff and even prior to the time acted against others in this class of plaintiffs including, without limitation, his now deceased father and other extended family members, who did or do practice the Quaker-based religion of Lead Plaintiff's family from at least the time of the Civil War (paragraph 409). Defendants have and do violate 18 U.S.C. §§ 1961-1968 inclusive of all sections defined at § 1961; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1994, and state statutes

in an unknown number of states, in a knowing and willfully negligent manner as they have and

do fail to properly train personnel and allocate resources to and protect and prevent acts,

violations, and injuries to constitutional and statutory rights of this class of plaintiffs, and in fact,

acted jointly and severally to improperly initially train, retrain, instruct, and align their various

teams, details, and organizations to injure Lead Plaintiff and other members of this class of

plaintiffs by systematically failing to comply with their sworn oath to preserve, protect, and

defend the Constitution, their fellow citizens themselves, the rights and properties of those fellow

citizens, and the personal relationships, homes, and families of those fellow citizens, of this

entire class of similarly situated plaintiffs. This purposeful and willful negligence actively

furthered their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs,

their families, personal relations and relationships, their careers, reputations, fortunes, and

business interests, including closely held business entities as specifically cited and described in

the subcounts at paragraphs 600-710 in this complaint, both within and without the territory of

these states and of the United States.

     C. Among other acts in conspiracy with state and local governments and their police

powers, defendant UNITED STATES acted in conspiracy with MARICOPA SHERIFF,

ARPAIO, and other as yet unknown police powers departments and agencies in the U.S. and

foreign nations, to directly interfere in the legitimate interstate commerce of Lead Plaintiff's

company's Winnett Perico and its subsidiaries, and Sheldon Beef, Inc., from which Lead

Plaintiff acted for the purpose of, and intended to derive income and benefits through interstate

commerce from, including, without limitation by fraudulently and in the complete absence of

any legal cause, interfering with and affecting relationships with investors, bank and private debt

financing, marketing, sales leads, sales opportunities, website development, employment of

consultants, hiring of executive recruiters, recruitment and employment of qualified personnel,

through their illegal solicitation of backdated stock options, in interstate travel, fraudulent

suppliers of goods and services, fraudulent offerings of agricultural properties, fraudulent

contractual arrangements for domestic and international sales, as related herein at paragraphs 639

through 694. Defendant UNITED STATES (most particularly and without limitation defendants

DOJ, FBI, CIA, USMS) conspired with state and local governments and their police powers as

identified herein, in operations and in allocation of illegal and abusive color of law police powers

operations, together with bad faith private actors, among these defendants as described at

paragraphs 102, 462-489, 502-507, 516, 526-592, 603, 611, 613, 628, 633, 634 in the allocation

of responsibility for color of law acts against the Lead Plaintiff by those defendants related to

constitutional rights, employment discrimination, sex traps, illegal conspiracy to cover-up of an

illegal color of law terror investigation, and myriad other acts alleged in this complaint.

      D. Each and every individual and institutional defendant identified at 845E and in this

paragraph 847 had the legal duty and authority to report and/or to terminate the illegal conduct

described throughout this complaint, and to terminate their own direct role in these criminal acts.

They did not do so whether then acting as line, supervisory, management, or executive

personnel, despite their sworn legal duty and the extensive protections afforded under 5 U.S.C. §

2302(b)(8) to whistleblowers related to reporting, investigating, and prosecuting illegal and

criminal acts of government. These acts and injuries are representative of those perpetrated by

defendants on this class of plaintiffs, which also include other acts of violence, fraud, and

continued willful blindness and fraudulent concealment directed at several generations of Lead

Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs

perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide

evidence of further violations not described herein and will (ii) provide further evidence from

these defendants; and (iii) among defendants who presented, without limitation, (a) as families,

(b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

[Intentionally left blank.]

## 848. CLAIMS FOR RELIEF - COUNT 48

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth Amendments

#### Neglect To Protect - Misprison of Felony

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1961-1968; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1994 |
| Washington: | RCW §§ 9A.80.010, 42.20.100 |
| New Jersey: | NJ Stat §§ 10:6-2, 59:2-2, 59:3-14 |
| New York: | New York Penal L. §§ 100.00, 100.10, 105.15, 115.00, 115.05, 460.00 through 460.80 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | AZ Rev Stat § 11-441 |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraph 845 is particularly incorporated herein for its specific relevance to this paragraph 848. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph, as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage as follows: Without excusing any defendant in this action for their knowing and willful violations of rights and conspiracies against rights, all police powers defendants at all levels of government in this action are particularly and specifically inculpated, given their particular education, training, experience and sworn oaths, for each and every knowing and willful act, violation, and injury to rights and the conspiracies related thereto both as institutional defendants and as individual defendants for

all constitutional rights violations in accord with 28 USC § 2679(b)(2), under 18 U.S.C. 4

misprison of felony, as follows (emphasis added):

> "**Whoever,** having knowledge of the actual commission of a felony cognizable by a
> court of the United States, conceals and does not as soon as possible make known
> the same to some judge or other person in civil or military authority under the
> United States, shall be fined under this title or imprisoned not more than three
> years, or both."

C. Whereas, the formerly unwitting Lead Plaintiff has made these acts known in writing

by hand delivery to U.S. Attorney's offices in three federal districts on approximately 4 dozen

occasions, to the Executive Office of the President by mail and/or by hand delivery on at least

two occasions, to the FBI headquarters and to the Justice Department headquarters by hand

delivery on at least one occasion and during at least one additional thwarted attempt where he

was intercepted by unformed police personnel who first misdirected then blocked access to the

building, to a member of Congress directly in person on at least one occasion, to the Supreme

Court where it was rejected by action of the Clerk's office on at least two occasions, attempted to

be delivered through the USPS to GARLAND and to defendant DOJ prosecutors Jack Smith and

Robert Hur wherein it was blocked from delivery by USPS, and whereas former Supreme Court

Associate Justice BREYER, and former Appellate Court Judge and Attorney General

GARLAND are directly inculpated by acts in the 1970s and by their eventual specific

identifications in 2023 and 2024 in this pattern of knowing and willful acts, violations, and

injuries to Lead Plaintiff and most probably to other members of this class of plaintiffs, this

pervasive and durable pattern of misprison of felony by these police powers defendants in

conspiracies against rights is clear, transparent, and obvious. A reasonable person must simply be

prepared to look at facts, and to avoid the willful blindness in these fraudulent concealments, so

as to see this pervasive pattern for these defendants in their failure to act in accordance with their

sworn duty to act.

D. Defendants UNITED STATES and all other defendants with police powers, among

other acts, injuries, and violations at the final subparagraph in this paragraph, both within and

without the territory of the United States, have at all times since approximately 1968 acted in

direct and explicit acts, violations, and injuries against the unwitting Lead Plaintiff and even

prior to the time, acted against others in this class of plaintiffs including, without limitation, his

now deceased father and other extended family members, who did or do practice the Quaker-

based religion of Lead Plaintiff's family from at least the time of the Civil War (paragraph 409).

Defendants have and do violate 18 U.S.C. §§ 1961-1968 inclusive of all sections defined at §

1961 cited herein; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1994, and state statutes in an unknown

number of states, in a knowing and willfully negligent manner as they have and do fail to

properly execute their sworn duties, and to supervise, train, and educate personnel, and to

allocate resources to protect rights and to prevent acts, violations, and injuries to constitutional

and statutory rights of this class of plaintiffs, and in fact, have and do act jointly and severally to

align their various teams, details, and organizations to injure Lead Plaintiff and other members of

this class of plaintiffs by systematically failing to comply with their sworn oath to preserve,

protect, and defend the Constitution, their fellow citizens themselves, the rights and properties of

those fellow citizens, and the personal relationships, homes, and families of those fellow citizens,

of this entire class of similarly situated plaintiffs. This purposeful and willful negligence has and

does actively further their series of schemes, conspiracies, frauds, thefts, and deprivations to

these plaintiffs, their families, personal relations and relationships, their careers, reputations,

fortunes, and business interests, including closely held business entities as specifically cited and

described in the subcounts at paragraphs 600-710 in this complaint, both within and without the
territory of these states and of the United States.

E. Defendants with police powers have so engaged jointly and severally to improperly
task, command, and control their forces, officers, agents, confidential informants, contractors,
and others in these acts, injuries, and violations, and acted to train those persons and align their
various teams, details, and organizations to act in continuous attempts and conspiracies to injure
the persons, rights, and property interests of Lead Plaintiff and other members of this class of
plaintiffs by systematically failing to comply with their sworn oath to preserve, protect, and
defend the Constitution, their fellow citizens themselves, the rights and properties of those fellow
citizens, and the personal relationships, homes, and families of those fellow citizens, of this
entire class of similarly situated plaintiffs. This purposeful and willful negligence actively
furthered their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs,
their families, personal relations and relationships, their careers, reputations, fortunes, and
business interests, including closely held business entities as specifically cited and described in
the subcounts at paragraphs 600-710 in this complaint, both within and without the territory of
these states and of the United States.

F. Among other acts in conspiracy with state and local governments and their police
powers, defendant UNITED STATES acted in conspiracy with MARICOPA SHERIFF,
ARPAIO, and other as yet unknown police powers departments and agencies in the U.S. and
foreign nations, to directly interfere in the legitimate interstate commerce of Lead Plaintiff's
company's Winnett Perico and its subsidiaries, and Sheldon Beef, Inc., from which Lead
Plaintiff acted for the purpose of, and intended to derive income and benefits through activities
affecting interstate commerce from, including, without limitation by fraudulently and in the
complete absence of any legal cause, interfering with and affecting relationships with investors,

bank and private debt financing, marketing, sales leads, sales opportunities, website development, employment of consultants, hiring of executive recruiters, recruitment and employment of qualified personnel, through their illegal solicitation of backdated stock options, in interstate travel, fraudulent suppliers of goods and services, fraudulent offerings of agricultural properties, fraudulent contractual arrangements for domestic and international sales, as related herein at paragraphs 639 through 694. Defendant UNITED STATES (most particularly and without limitation defendants DOJ, FBI, CIA, USMS) conspired with state and local governments and their police powers as identified herein, in operations and in allocation of illegal and abusive color of law police powers operations, together with bad faith private actors, among these defendants as described at paragraphs 102, 462-489, 502-507, 516, 526-592, 603, 611, 613, 628, 633, 634 in the allocation of responsibility for color of law acts against the Lead Plaintiff by those defendants related to constitutional rights, employment discrimination, sex traps, illegal conspiracy to cover-up of an illegal color of law terror investigation, and myriad other acts alleged in this complaint.

G. Each and every individual and institutional defendant identified at 845E and in this paragraph 848 had the legal duty and authority to report and/or to terminate the illegal conduct described throughout this complaint, and to terminate their own direct role in these criminal acts. They did not do so whether then acting as line, supervisory, management, or executive personnel, despite their sworn legal duty and the extensive protections afforded under 5 U.S.C. § 2302(b)(8) to whistleblowers related to reporting, investigating, and prosecuting illegal and criminal acts of government. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs

perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide

evidence of further violations not described herein and will (ii) provide further evidence from

these defendants; and (iii) among defendants who presented, without limitation, (a) as families,

(b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent

members of the family religion and its beliefs and practices, and/or (d) as "personal friend"

individual defendants; all of whom were directly and individually involved in these violations of

constitutional rights and laws, will provide further evidence from their then minor children who

had no stake in creating or sustaining these illegal acts, violations, and injuries while considered

as nephews, nieces, and friends children which those individual defendants entrusted to the

temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs

which particularly relate frauds and other specific currently known acts, violations, and injuries

to this claim for relief are the following, which together comprise a representative sampling of

the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

[Intentionally left blank.]

## 849. CLAIMS FOR RELIEF - COUNT 49

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth Amendments

#### Neglect To Protect - Acting as Accomplice

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1961-1968; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1994 |
| Washington: | RCW §§ 9A.80.010, 42.20.100 |
| New Jersey: | NJ Stat §§ 10:6-2, 59:2-2, 59:3-14 |
| New York: | New York Penal L. §§ 100.00, 100.10, 105.15, 115.00, 115.05, 460.00 through 460.80 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | AZ Rev Stat § 11-441 |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraph 845 is particularly incorporated herein for its specific relevance to this paragraph 849. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage, at all times since approximately 1968, in direct and explicit acts, violations, and injuries against the unwitting Lead Plaintiff and even prior to the time acted against others in this class of plaintiffs including, without limitation, his now deceased father and other extended family members, who did or do practice the Quaker-based religion of Lead Plaintiff's family from at least the time of the Civil War (paragraph 409). Defendants have and do act in a knowingly and willfully negligent manner to fail in their duties as departments, agencies, organizations, groups, individual sworn officers and agents, and as individual citizens, and have in fact, acted negligently and willfully as

principals (18 U.S.C. § 2) as described throughout the claims for relief counts herein, and as accomplices (18 U.S.C. § 3) during the conduct, aiding, and abetting of the acts, violations, and injuries described in this complaint, and those which will come to light through the discovery process, in their (i) failure to report illegal acts; (ii) failure to report violations of rules and regulations essential to good order and discipline within departments and agencies; (iii) have acted as accessories to criminal acts and civil violations; (iv) have acted as accomplices to criminal acts and civil violations; (v) have aided and abetted others and each other in acts, violations, and injuries; which have and do directly injure Lead Plaintiff and other plaintiffs of this class including, without limitation, in all forms of liberty, rights, property, and commerce.

C. Defendants with police powers have so engaged jointly and severally to improperly train, supervise, command, task, and control their forces, officers, agents, confidential informants, contractors, and others in these acts, injuries, and violations, and acted to train those persons and align their various teams, details, and organizations to act in continuous attempts and conspiracies to injure the persons, rights, and property interests of Lead Plaintiff and other members of this class of plaintiffs, by systematically failing to comply with their sworn oath to preserve, protect, and defend the Constitution, their fellow citizens themselves, the rights and properties of those fellow citizens, and the personal relationships, homes, and families of those fellow citizens, of this entire class of similarly situated plaintiffs. This purposeful and willful negligence actively furthered their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities as specifically cited and described in the subcounts at paragraphs 600-710 in this complaint, both within and without the territory of these states and of the United States.

D. Among other acts in conspiracy with state and local governments and their police powers, defendant UNITED STATES acted in conspiracy with MARICOPA SHERIFF, ARPAIO, and other as yet unknown police powers departments and agencies in the U.S. and foreign nations, to directly interfere in the legitimate interstate commerce of Lead Plaintiff's company's Winnett  Perico and its subsidiaries, and Sheldon Beef, Inc., from which Lead Plaintiff acted for the purpose of, and intended to derive income and benefits through interstate commerce from, including, without limitation by fraudulently and in the complete absence of any legal cause, interfering with and affecting relationships with investors, bank and private debt financing, marketing, sales leads, sales opportunities, website development, employment of consultants, hiring of executive recruiters, recruitment and employment of qualified personnel, through their illegal solicitation of backdated stock options, in interstate travel, fraudulent suppliers of goods and services, fraudulent offerings of agricultural properties, fraudulent contractual arrangements for domestic and international sales, as related herein at paragraphs 639 through 694. Defendant UNITED STATES (most particularly and without limitation defendants DOJ, FBI, CIA, USMS) conspired with state and local governments and their police powers as identified herein, in operations and in allocation of illegal and abusive color of law police powers operations, together with bad faith private actors, among these defendants as described at paragraphs 102, 462-489, 502-507, 516, 526-592, 603, 611, 613, 628, 633, 634 in the allocation of responsibility for color of law acts against the Lead Plaintiff by those defendants related to constitutional rights, employment discrimination, sex traps, illegal conspiracy to cover-up of an illegal color of law terror investigation, and myriad other acts alleged in this complaint.

E. Each and every individual and institutional defendant identified at 845E and in this paragraph 849 had the legal duty and authority to report and/or to terminate the illegal conduct described throughout this complaint, and to terminate their own direct role in these criminal acts.

They did not do so whether then acting as line, supervisory, management, or executive personnel, despite their sworn legal duty and the extensive protections afforded under 5 U.S.C. § 2302(b)(8) to whistleblowers related to reporting, investigating, and prosecuting illegal and criminal acts of government. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

## 850. CLAIMS FOR RELIEF - COUNT 50

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth Amendments

#### Neglect To Protect - Acting as Accessory

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1961-1968; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1994 |
| Washington: | RCW §§ 9A.80.010, 42.20.100 |
| New Jersey: | NJ Stat §§ 10:6-2, 59:2-2, 59:3-14 |
| New York: | New York Penal L. §§ 100.00, 100.10, 105.15, 115.00, 115.05, 460.00 through 460.80 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | AZ Rev Stat § 11-441 |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraph 845 is particularly incorporated herein for its specific relevance to this paragraph 850. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph, as well as state statutes in all originating locations, many of which are unknown at the time of this complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage, at all times since approximately 1968, in direct and explicit acts, violations, and injuries against the unwitting Lead Plaintiff and even prior to the time acted against others in this class of plaintiffs including, without limitation, his now deceased father and other extended family members, who did or do practice the Quaker-based religion of Lead Plaintiff's family from at least the time of the Civil War (paragraph 409). Defendants have and do act in a knowingly and willfully negligent manner to fail in their duties as departments, agencies, organizations, groups, individual sworn officers and agents, and as individual citizens, and have in fact, acted negligently and willfully as

principals (18 U.S.C. § 2), and as accessories (18 U.S.C. § 3) to aid and abet perpetration, and in some cases to direct, command, and/or task the perpetration by forces under their command and control, of the acts, violations, and injuries described in this complaint, and those which will come to light through the discovery process, in their (i) failure to report illegal acts; (ii) failure to report violations of rules and regulations essential to good order and discipline within departments and agencies; (iii) have acted as accessories to criminal acts and civil violations; (iv) have acted as accomplices to criminal acts and civil violations; (v) have aided and abetted others and each other in acts, violations, and injuries; which have and do directly injure Lead Plaintiff and other plaintiffs of this class including, without limitation, in all forms of liberty, rights, property, and affecting in-state, interstate, and international commerce.

C. Defendants with police powers have so engaged jointly and severally to improperly train, supervise, command, task, and control their forces, officers, agents, confidential informants, contractors, and others in these acts, injuries, and violations, and acted to train those persons and align their various teams, details, and organizations to act in continuous attempts and conspiracies to injure the persons, rights, and property interests of Lead Plaintiff and other members of this class of plaintiffs, by systematically failing to comply with their sworn oath to preserve, protect, and defend the Constitution, their fellow citizens themselves, the rights and properties of those fellow citizens, and the personal relationships, homes, and families of those fellow citizens, of this entire class of similarly situated plaintiffs. This purposeful and willful negligence actively furthered their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities as specifically cited and described in the subcounts at paragraphs 600-710 in this complaint, both within and without the territory of these states and of the United States.

D. Among other acts in conspiracy with state and local governments and their police powers, defendant UNITED STATES acted in conspiracy with MARICOPA SHERIFF, ARPAIO, and other as yet unknown police powers departments and agencies in the U.S. and foreign nations, to directly interfere in the legitimate interstate commerce of Lead Plaintiff's company's Winnett  Perico and its subsidiaries, and Sheldon Beef, Inc., from which Lead Plaintiff acted for the purpose of, and intended to derive income and benefits through interstate commerce from, including, without limitation by fraudulently and in the complete absence of any legal cause, interfering with and affecting relationships with investors, bank and private debt financing, marketing, sales leads, sales opportunities, website development, employment of consultants, hiring of executive recruiters, recruitment and employment of qualified personnel, through their illegal solicitation of backdated stock options, in interstate travel, fraudulent suppliers of goods and services, fraudulent offerings of agricultural properties, fraudulent contractual arrangements for domestic and international sales, as related herein at paragraphs 639 through 694. Defendant UNITED STATES (most particularly and without limitation defendants DOJ, FBI, CIA, USMS) conspired with state and local governments and their police powers as identified herein, in operations and in allocation of illegal and abusive color of law police powers operations, together with bad faith private actors, among these defendants as described at paragraphs 102, 462-489, 502-507, 516, 526-592, 603, 611, 613, 628, 633, 634 in the allocation of responsibility for color of law acts against the Lead Plaintiff by those defendants related to constitutional rights, employment discrimination, sex traps, illegal conspiracy to cover-up an illegal color of law terror investigation, and myriad other acts alleged in this complaint.

E. Each and every individual and institutional defendant identified at 845E and in this paragraph 850 had the legal duty and authority to report and/or to terminate the illegal conduct described throughout this complaint, and to terminate their own direct role in these criminal acts.

They did not do so whether then acting as line, supervisory, management, or executive personnel, despite their sworn legal duty and the extensive protections afforded under 5 U.S.C. § 2302(b)(8) to whistleblowers related to reporting, investigating, and prosecuting illegal and criminal acts of government. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs which particularly relate frauds and other specific currently known acts, violations, and injuries to this claim for relief are the following, which together comprise a representative sampling of the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |

| 694-710 | LTHL Lethality Attempts | 1-17 |

## 851. CLAIMS FOR RELIEF - COUNT 51

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth Amendments

### <u>Neglect To Protect - Aiding and Abetting</u>

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 18 U.S.C. §§ 1961-1968; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1994 |
| Washington: | RCW § 9A.80.010, 42.20.100 |
| New Jersey: | NJ Stat §§ 10:6-2, 59:2-2, 59:3-14 |
| New York: | New York Penal L. §§ 100.00, 100.10, 105.15, 115.00, 115.05, 460.00 through 460.80 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | AZ Rev Stat § 11-441 |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Paragraph 845 is particularly incorporated herein for its specific relevance to this paragraph 851. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage, at all times since approximately 1968, in direct and explicit acts, violations, and injuries against the unwitting Lead Plaintiff and even prior to the time acted against others in this class of plaintiffs including, without limitation, his now deceased father and other extended family members, who did or do practice the Quaker-based religion of Lead Plaintiff's family from at least the time of the Civil War (paragraph 409). Defendants have and do act in a knowingly and willfully negligent manner to fail in their duties as departments, agencies, organizations, groups, individual sworn

officers and agents, and as individual citizens, and have in fact, acted negligently and willfully as
principals (18 U.S.C. § 2), to aid and abet (18 U.S.C. § 3) the planning, conduct, and fraudulent
concealment, thereby aiding and abetting the acts, violations, and injuries described in this
complaint, and those which will come to light through the discovery process, in their (i) failure to
report illegal acts; (ii) failure to report violations of rules and regulations essential to good order
and discipline within departments and agencies; (iii) have acted as accessories to criminal acts
and civil violations; (iv) have acted as accomplices to criminal acts and civil violations; (v) have
aided and abetted others and each other in acts, violations, and injuries; which have and do
directly injure Lead Plaintiff and other plaintiffs of this class including, without limitation, in all
forms of liberty, rights, property, and commerce.

C. Defendants with police powers have so engaged jointly and severally to improperly
train, supervise, command, task, and control their forces, officers, agents, confidential
informants, contractors, and others in these acts, injuries, and violations, and acted to train those
persons and align their various teams, details, and organizations to act in continuous attempts and
conspiracies to injure the persons, rights, and property interests of Lead Plaintiff and other
members of this class of plaintiffs, by systematically failing to comply with their sworn oath to
preserve, protect, and defend the Constitution, their fellow citizens themselves, the rights and
properties of those fellow citizens, and the personal relationships, homes, and families of those
fellow citizens, of this entire class of similarly situated plaintiffs. This purposeful and willful
negligence actively furthered their series of schemes, conspiracies, frauds, thefts, and
deprivations to these plaintiffs, their families, personal relations and relationships, their careers,
reputations, fortunes, and business interests, including closely held business entities as
specifically cited and described in the subcounts at paragraphs 600-710 in this complaint, both
within and without the territory of these states and of the United States.

D. Among other acts in conspiracy with state and local governments and their police

powers, defendant UNITED STATES acted in conspiracy with MARICOPA SHERIFF,

ARPAIO, and other as yet unknown police powers departments and agencies in the U.S. and

foreign nations, to directly interfere in the legitimate interstate commerce of Lead Plaintiff's

company's Winnett Perico and its subsidiaries, and Sheldon Beef, Inc., from which Lead

Plaintiff acted for the purpose of, and intended to derive income and benefits through interstate

commerce from, including, without limitation by fraudulently and in the complete absence of

any legal cause, interfering with and affecting relationships with investors, bank and private debt

financing, marketing, sales leads, sales opportunities, website development, employment of

consultants, hiring of executive recruiters, recruitment and employment of qualified personnel,

through their illegal solicitation of backdated stock options, in interstate travel, fraudulent

suppliers of goods and services, fraudulent offerings of agricultural properties, fraudulent

contractual arrangements for domestic and international sales, as related herein at paragraphs 639

through 694. Defendant UNITED STATES (most particularly and without limitation defendants

DOJ, FBI, CIA, USMS) conspired with state and local governments and their police powers as

identified herein, in operations and in allocation of illegal and abusive color of law police powers

operations, together with bad faith private actors, among these defendants as described at

paragraphs 102, 462-489, 502-507, 516, 526-592, 603, 611, 613, 628, 633, 634 in the allocation

of responsibility for color of law acts against the Lead Plaintiff by those defendants related to

constitutional rights, employment discrimination, sex traps, illegal conspiracy in the cover-up of

an illegal color of law terror investigation, and myriad other conspiracies and acts alleged in this

complaint.

E. Each and every individual and institutional defendant identified at 845E and in this

paragraph 851 had the legal duty and authority to report and/or to terminate the illegal conduct

described throughout this complaint, and to terminate their own direct role in these criminal acts.

They did not do so whether then acting as line, supervisory, management, or executive

personnel, despite their sworn legal duty and the extensive protections afforded under 5 U.S.C. §

2302(b)(8) to whistleblowers related to reporting, investigating, and prosecuting illegal and

criminal acts of government. These acts and injuries are representative of those perpetrated by

defendants on this class of plaintiffs, which also include other acts of violence, fraud, and

continued willful blindness and fraudulent concealment directed at several generations of Lead

Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs

perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide

evidence of further violations not described herein and will (ii) provide further evidence from

these defendants; and (iii) among defendants who presented, without limitation, (a) as families,

(b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent

members of the family religion and its beliefs and practices, and/or (d) as "personal friend"

individual defendants; all of whom were directly and individually involved in these violations of

constitutional rights and laws, will provide further evidence from their then minor children who

had no stake in creating or sustaining these illegal acts, violations, and injuries while considered

as nephews, nieces, and friends children which those individual defendants entrusted to the

temporary care of Lead Plaintiff for varying periods of time. Applicable subcount paragraphs

which particularly relate frauds and other specific currently known acts, violations, and injuries

to this claim for relief are the following, which together comprise a representative sampling of

the full scope of such violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-637 | RGTS Individual Rights Violations and Conspiracies | 1-17 |
| 639-693 | RICO Racketeering | 1-55 |

| 694-710 | LTHL Lethality Attempts | 1-17 |

## 852. CLAIMS FOR RELIEF - COUNT 52

### Violations of Constitutional Rights Under the First, Third, Fourth, Fifth, Eighth, Thirteenth, Fourteenth Amendments

#### Prohibited Activities - Pattern of Racketeering Acts

| United States Code: | 18 U.S.C. §§ 1961-1968 |
|---|---|
| Washington: | RCW § 9A.82.010(12) |
| New Jersey: | NJ Stat §§ 2C:41-1 through 2C:41-6, 10:6-2, 59:2-2, 59:3-14 |
| New York: | New York Penal L. §§ 100.00, 100.10, 105.15, 115.00, 115.05, 190.25, 460.00 through 460.80 |
| California: | Cal Penal Code §§ 236, 236.1(a) |
| | Cal Labor Code §§ 2801, 2802 |
| | Cal Civil Code §§ 1708-1725 |
| Massachusetts: | Mass Gen L ch 271a §§ 1-3 |
| Arizona: | AZ Rev Stat §§ 11-441, 13-2308, 13-2310 through 2312 |
| Texas: | TX Penal Code §§ 20A.02, 22.01, 22.02, 32.01 through 32.03, 32.42, 71.02 |
| Maryland: | MD Criminal Law Code §§ 9-801 through 9-805 |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage in at all times since approximately 1968 acted in their series of schemes, conspiracies, deprivations, blocking, screening and other related acts, violations, and injuries targeting, directed to, and directed at the Lead Plaintiff and his closely held business entities. Among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States, this systematic associated-in-fact enterprise pattern of racketeering acts has been planned,

directed, managed, and operated by persons who have been at times directly embedded within these private businesses while the businesses seek business opportunities, engage in, and affect interstate commerce, bid and worked on federally funded projects for various governmental departments, agencies, districts, and institutions partially or wholly funded through interstate commerce, even as these defendants have and do directly surreptitiously manage and direct Lead Plaintiff's personal affairs and finances while engaged in and affecting interstate commerce, all in systematic violations of constitutional rights, and through defendants' associated-in-fact enterprise pattern of racketeering acts used to sustain and perpetuate the illegal BRMT bioweapon and bioweapon delivery system program, and its fraudulent concealment through color of law abuse of state secret privilege..

C. Defendants have and do violate human, Constitutional, civil rights and laws by engaging in a continuous pattern of racketeering activity against the Lead Plaintiff and other members of this class of plaintiffs at least since the Lead Plaintiff was a minor child. Additional particular details are both unknown and unrecollected at the time of this complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts at paragraphs 600-710, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

D. Under 18 U.S.C. § 1962 (c):

(i) "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

A careful parsing of each phrase of subsection 1962(c) clearly conveys the culpability of these defendants in the violations related herein by defendant UNITED STATES and by all other institutional and individual defendants, both named and as yet unnamed and unknown. Subsection 1962(c) is parsed phrased by phrase below, specifically analyzing each element, with emphasis added where appropriate:

### (i) 1962(c): It shall be unlawful for any person...

18 USC § 1961 definitions subsection (3")"person" includes any individual or entity capable of holding a legal or beneficial interest in property;"

Discussion: All named defendants are individuals and entities which can, have, and do hold property as defined under law to include both tangible and intangible assets and rights or claims to assets.

### (ii) 1962(c): ...employed by or associated with...

Discussion: In *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) the Supreme Court held that:

"One must participate in the operation or management of the enterprise itself in order to be subject to § 1962(c) liability."

Persons (individuals and entities) who are employed by (including through relationships such as personal employment, contracts, and such) or associated with (loosely affiliated in some form or fashion through acquaintance, mutual aid, or other relationship) includes myriad forms of relationships ranging from formal employment as for officers and agents, informal associations by acquaintance as in other police powers, press, media, entertainment, and informants, police unions, political and community organizations of all kinds and types provided they engage in operation or management of the enterprise through such activities as promoting, directing,

planning, supervising, conducting, aiding, abetting, and concealing. These defendants

have and do meet these tests in *Reves*, as they participated in and managed operations.

**(iii) 1962(c): …any <u>enterprise</u> engaged in, …… interstate or foreign commerce,…**

18 USC § 1961 definitions subsection "(4)"enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;"

*Boyle v. United States,* 556 U.S. 938 (2009):

"As we succinctly put it in *Turkette,* an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct. 452 U. S., at 583."

Discussion: These persons are known to one another through various formal and

informal associations, and it is not necessary that a person who is a defendant have

full knowledge of the racketeering acts of others in the enterprise to be considered

part of the enterprise and to be liable for the acts of the enterprise. Fifty-six years is

sufficient duration for a number persons to have entered into this common associated-

in-fact enterprise, as are the many much shorter associations including, for example, a

mere twenty-one months while Lead Plaintiff was domiciled as homeless at the

election of defendant UNITED STATES in Boston, MA, a mere seventeen years in

the case of defendants only ever operating in the greater New York City area, a mere

six months for those defendants who participated only while the Lead Plaintiff was

kidnapped into illegal imprisonment in a Bergen County, NJ hospital to effect duress

while homeless against a federal court civil action brought by the Lead Plaintiff, as

well as for somewhat longer periods, as in the decades of racketeering acts and rights

violations by those identified as having been reassigned to and/or relocated from

Washington state to the greater New York City area, some to pursue alternate

government positions, and others to pursue completely different professions, while

still retaining privileged access directly and through their associations with defendant

UNITED STATES and other police powers defendants, to access the Lead Plaintiff in

his perpetuated status of involuntary servitude to defendant UNITED STATES and to

the coercive and illegal operations of all these defendants.

**(iv) 1962(c): …or the activities of which affect, <u>interstate or foreign commerce</u>,,,,**

18 USC 10 definitions. "The term "interstate commerce", as used in this title, includes commerce between one State, Territory, Possession, or the District of Columbia and another State, Territory, Possession, or the District of Columbia. The term "foreign commerce", as used in this title, includes commerce with a foreign country."

Discussion: The activities described throughout this complaint have been and are

conducted in or affect interstate commerce, to and including all activities of Lead

Plaintiff which were related to and required funds used or received directly through

and/or required the use of funds derived in interstate commerce, which funds were

and are directly expended by defendants or through subsidies of ostensibly private

enterprises which were subsidized directly or indirectly through surreptitious cover

companies, investors,  and financial institutions which laundered appropriated federal

funds to those persons, whether entities or individuals, AT ALL TIMES from Lead

Plaintiff's first employment by Larry's Market, which was secretly owned n part by

defendant UNITED STATES. Interstate commerce has been an ever present element

of this associated-in-fact enterprise as to the Lead Plaintiff since at least Spring 1972,

as fderal funds have been used in every operation involving the Lead Plaintiff, his

employment, and his relationships with others, the vast majority of whom were

federal and other governmental employees operating undercover in civilian dress and

in cover companies secretly  owned and controlled by defendant UNITED STATES,

its departments, agencies, and personnel..

**(v) 1962(c): …to <u>conduct or participate</u>, directly or indirectly,…**

Under *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) the Supreme Court held that:

"One must participate in the operation or management of the enterprise itself in order to be subject to § 1962(c) liability."

Discussion: These defendants have and do meet these tests in *Reves.* "Conduct or participate" - conduct and meaningful participation extend to the explicit planning and execution of any act in the overall pattern of racketeering acts, including without limitation, such activities as promoting, directing, planning, supervision, conduct, aid, abet, or concealing. "Directly or indirectly" – direct and indirect participation includes acting through direct acts and through others hired or merely inspired by common interest and explicit plan or direction to the planning and execution of any act in the overall pattern of racketeering acts

**(vi) 1962(c): …in the conduct of such enterprise's affairs through a <u>pattern of racketeering activity</u>…**

18 USC § 1961 defines all acts which are racketeering activity at subsection 18 USC § 1961(1).

18 USC § 1961 definitions subsection (5)"'pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;"

F.  Under 18 U.S.C. § 1962(d):

"It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section"

The direct involvement of two or more persons (whether individuals or entities), one of whom

undertakes an explicit act toward a violation of a constitutional right or toward a violation of

statute, constitutes conduct sufficient to be a conspiracy under law.

    G. As found in *Boyle v. United States*, 556 U.S. 938 (2009) (emphasis added):

> "From the terms of RICO, it is apparent that an association-in-fact enterprise
> must have at least three structural features: a purpose, relationships among
> those associated with the enterprise, and longevity sufficient to permit these
> associates to pursue the enterprise's purpose. As we succinctly put it in Turkette,
> an association-in-fact enterprise is "a group of persons associated together for a
> common purpose of engaging in a course of conduct. 452 U. S., at 583."

    H. Defendant UNITED STATES and its co-conspirator defendants have and do meet

these three tests in *Turkette* (as described at subparagraph G above), as they have and do initiate,

construct, and sustain an associated-in-fact enterprise in a pattern of racketeering acts

fraudulently concealed from the Lead Plaintiff and other plaintiffs of this class as follows:

    (i) Purpose – the perpetuation of the development of the illegal BRMT bioweapon and

      bioweapon delivery system (18 U.S.C. § 175) over the past at least fifty-six years, the

      perpetuation of involuntary servitude (18 U.S.C. § 1584) to illegally benefit defendant

      UNITED STATES domestic and international spying operations, to benefit other police

      powers illegal operations (42 U.S.C. §§ 1981-1986, 1994) against the Lead Plaintiff and

      others, and to sustain a long-running cover-up (18 U.S.C. §§ 1512, 1513) and to evade

      political, financial, and other consequences from its exposure related to any financial

      damages and/or budget cuts which would result from its full and complete public

      disclosure.

    (ii) Relationships – exist and persist among those associated with the enterprise, including

      police powers operations with both formal and informal relationships, with and among

      press, entertainment, political, and moneyed interests and groups which have consistent

and persistent formal and informal relationships across time, which have and do pursue

prejudicial and discriminatory acts, violations, and injuries against the Lead Plaintiff and

other plaintiffs similarly situated.

(iii) <u>Longevity</u> – more than 56 years of corrupt systematic violations of constitutional rights

and patterns of racketeering acts in interstate commerce, and to perpetuate illegal

development of the BRMT bioweapon and bioweapon system in violation of both US and

international treaties ratified by Congress.

    I. These acts and injuries are representative of those perpetrated by defendants on this

class of plaintiffs, which also include other acts of violence, fraud, and continued willful

blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended

family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant

UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further

violations not described herein and will (ii) provide further evidence from these defendants; and

(iii) among defendants who presented, without limitation, (a) as families, (b) as members of the

Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family

religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of

whom were directly and individually involved in these violations of constitutional rights and

laws, will provide further evidence from their then minor children who had no stake in creating

or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and

friends children which those individual defendants entrusted to the temporary care of Lead

Plaintiff for varying periods of time. While all claims herein are directly related to the same set

of illegal programs prohibited under 18 U.S.C. §§ 1961-1968, in particular the underlying

original focus and purpose of the entire associated-in-fact enterprise 18 U.S.C. § 175, directly

applicable subcount paragraphs among paragraphs 600-794, which particularly relate to

associated-in-fact patterns of racketeering acts, violations, and injuries to this claim for relief, are

the following, which together comprise a representative sampling of the full scope of such

violations to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 600-603 | NSEC National Security Pretexting and Entanglements | 1-4 |
| 604-620 | HEXP Illegal Human Experimentation | 1-17 |
| 621-627, 629, 631-637 | RGTS Individual Rights Violations and Conspiracies | 1-7, 9, 11-17 |
| 639-693 | RICO Racketeering | 1-55 |
| 694-710 | LTHL Lethality Attempts | 1-17 |

## 853. CLAIMS FOR RELIEF - COUNT 53

### Violations of Constitutional Rights Under the First, Fourth, Fifth, Eighth, Ninth, Thirteenth, Fourteenth Amendments

### Defamation

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 28 U.S.C. § 2679(b)(2) |
| Washington: | RCW §§ 4.04.010, Common law defamation per se |
| New Jersey: | NJ Stat §§ 2C:14-9, 10:6-2, Common law defamation per se |
| New York: | Common law defamation per se |
| California: | NA |
| Massachusetts: | Common law defamation per se |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to

be identified through the discovery process have and do act in violation of federal and state

statutes listed above in this paragraph. as well as state statutes in all originating locations, many

of which are unknown at the time of this Complaint and will be available upon discovery. Lead

Plaintiff was unable to locate any state statutory references for defamation during legal research

so this claim is presented under common law, though technical hacking by defendant UNITED

STATES can and has been broadly used to conceal information from the Lead Plaintiff as

described in paragraph 635, 636 RGTS-15, 16. Any such state statutory rights are reserved
hereby.

B. Defendants have and do plan, conspire, perpetrate and engage in their series of acts to
defame, libel, slander, and misrepresent the Lead Plaintiff by, among other acts, injuries, and
violations at the final subparagraph in this paragraph, both within and without the territory of the
United States. Absent knowledge of the identities of the perpetrators of these acts it was
impossible for the Lead Plaintiff to bring these matters to this court due to the extensive and
durable pattern of fraudulent concealments by these defendants. The actual institutional and
individual identifications of these defendants (paragraph 99 and LPEE 12251-12261) were not
possible until June 2022 as to ARPAIO (paragraph 99a), as to various defendant FBI and ARMY
personnel until Summer 2023, of GARLAND (as Mandich) until January 2024 and possibly in
another role in March 2024 (as plausibly Bettesworth), and of MODDERMAN and GIA until
February 2024.

C. As defined at 28 U.S. C. § 4101:

"The term "defamation" means any action or other proceeding for defamation, libel,
slander, or similar claim alleging that forms of speech are false, have caused
damage to reputation or emotional distress, have presented any person in a false
light, or have resulted in criticism, dishonor, or condemnation of any person."

D.      Under the Westfall Act Federal Tort Claims Procedure 28 USC § 2680

Exemptions (emphasis added):

"The provisions of this chapter and section 1346(b) of this title shall not apply to (the
following tort claims) —
(h) Any claim arising out of assault, battery, false imprisonment, false arrest,
malicious prosecution, abuse of process, *libel, slander, misrepresentation, deceit, or
interference with contract rights*:

Provided, That, with regard to acts or omissions of investigative or law enforcement
officers of the United States Government, the provisions of this chapter and section
1346(b) of this title shall apply to any claim arising, on or after the date of the

enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."

E. This action is brought under state laws for defamation, not under the Westfall Act, as the pattern of acts which comprise the false light and slanderous public narratives ascribed to the Lead Plaintiff related to terrorism, pedophilia, and the highly visible and publicized public acts of sabotage conducted by others who are most probably related to these defendants, as has been well documented by Congress in defendants' past pattern of practices perpetrated in defendant FBI's Cointelpro and defendant CIA's MKUltra. False narratives comprise the principal defamations by defendants UNITED STATES, ROSENBERG, FAUCI, and other as yet unknown individual and institutional defendants, who were not identified until the aforementioned dates but which began and spread from 2002 forward across Washington state, Massachusetts, and New Jersey during defendants' most coercive psychological operations and most aggressive illegal BRMT bioweapon and bioweapon delivery system hijackings through torture to suicide ideations, through their aggressive financial wrecking process, and human trafficking process, and other acts, violations, and injuries. These false and slanderous narratives, and their publications of acts intended to be private acts as public acts, were used to deflect attention from their criminal acts and injuries for the specific purpose of shielding themselves from blame and to blame their victim for their own associated-in-fact enterprise pattern of racketeering and other corrupt and illegal acts comprising:

(i) illegal human medical experiments without consent using the predecessor devices to the illegal BRMT bioweapon and bioweapon delivery system beginning in 1968 on the Lead Plaintiff as a 12 year old minor child and subsequent illegal medical experiments, entrapment and homicide attempts related herein, through and including the 1987-1988

destruction of his first marriage to Lynne, who was twice the ex-wife of a King County

Sheriff's Department employee who reported directly to defendant REICHERT, followed

by the orchestrated assignment of a fraudulently inculpated and orchestrated spouse

Jeanette by defendants ARMY, CIA, DOJ, FBI, USMS, US Attorney for Western

Washington, ROSENBERG, BURNS, WATERS, all under the close supervision of

defendants of defendants FBI, USMS, and CIA personnel who supervised and directed

this orchestration of Jeanette into Lead Plaintiff's personal and professional life,

MUELLER (as FBI Director from 2001-2013), and unknown others.

(ii) a broad sweep of rights violations in employment and personal affairs and an associated-
in-fact pattern of racketeering acts against Lead Plaintiff's businesses,

(iii) illegal human medical experiments without consent using the illegal BRMT bioweapon
and bioweapon delivery system in 2002-2005 to torture to the point of suicide ideation in
Kirkland, WA, to

(iv) a fraudulent terror narrative constructed there and perpetuated through trafficking to
Boston for a Mossad interview, thence to northern New Jersey for

(v) police powers and illegal BRMT biomedical abuses orchestrated by defendant
ROSENBERG using Joint Terror Task Forces in New Jersey and New York City, thence
again

(vi) after terminated from ESTABLISH supervised by ROSENBERG for another round of
torture,

(vii)        followed by kidnapping into a Bergen County, NJ hospital from false
imprisonment allegedly as a mental patient but actually for duress to secure the dismissal
of a federal civil rights complaint while the federal court took no action to serve or

dismiss the complaint for over 150 days, which service it is required to timely effect
under 28 U.S.C. § 1915, thence

(viii)    trafficked into a Ramsy, NJ residence where no employment was permitted as
police powers entrapment attempts proliferated and where illegal BRMT bioweapon and
bioweapon delivery system oxytocin manipulations were used to orchestrate a fraudulent
onlinf relationship and steal funds, phone equipment and a game console to steal money
from the Lead Plaintiff, thence

(ix)trafficked into another national security public corruption matter in Edgewater, NJ, all for
the inculpatory convenience of defendants DOJ, FBI, CIA, ARMY, NJSP, BERGEN
SHERIFF,

all of which is hopelessly intertwined with defendant UNITED STATES and its co-conspirator
and cooperating police powers decades long durable pattern of violations of constitutional rights
by these same defendants, and which cannot be separated from their overall pattern of acts,
violations, and injuries concealed by this false light and slander. All of which were orchestrated
in full public view, then unknown to Lead Plaintiff, for the purposes of slandering and damaging
his reputation. Claims and actions against governmental officials as individual defendants for
*libel, slander, misrepresentation, deceit, or interference with contract rights* are explicitly
permitted to proceed under other federal and state statutes, as at 28 USC §2679(b)(2), which also
provides for claims against current and former governmental officials as individual defendants
for these defendnats' violations of constitutional rights:

"2679(b)(2) Government Officials' Individual Liability For Constitutional Rights
Violations, All Statutes

(b)(1) The remedy against the United States provided by sections 1346(b) and 2672
of this title for injury or loss of property, or personal injury or death arising or
resulting from the negligent or wrongful act or omission of any employee of the
Government while acting within the scope of his office or employment is exclusive

of any other civil action or proceeding for money damages by reason of the same subject matter .......

(b)(2) Paragraph (1) does not extend or apply to a civil action against an employee of the Government—
(A) which is brought for a violation of the Constitution of the United States, or
(B) which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized."

### Defendants' Defamatory Purpose And Intent

F. These defamatory acts were and are all intended, together with other entrapments described herein, to (i) conceal defendants' long-running corrupt and criminal public conduct which has and does use taxpayer funds and public debt to sustain the illegal BRMT bioweapon and bioweapon delivery system developed using Lead Plaintiff and others from this religious group and other unknown plaintiffs, as defendants' illegal human subject biomedical experiment victims over decades, and to (ii) conceal their associated-in-fact enterprise pattern of racketeering acts, and their rights violations against, among other plaintiffs, the Lead Plaintiff since he was first human trafficked by defendant UNITED STATES at age 12 from his family of origin, who have, and among whom some still do, practice a Quaker-based pacifist religious faith.

G. Even despite the awarding of the Medal of Honor to an unarmed Quaker ARMY cavalry bugler during the Civil War (William John Brewer, who is Lead Plaintiff's great-great, grandfather), defendant UNITED STATES has and does discriminate against this same religious family and religion, into which the Lead Plaintiff was born and is a fourth generation descendant of that unarmed freer of slaves (his great-great grandfather Wiiliam John Brewer), based upon specific religious discrimination against those pacifist beliefs of his family including, without limitation, his father and uncle while in military service to defendant ARMY. This targeting by defendant UNITED STATES did and continued subsequent to military service as defendant

UNITED STATES, its departments and agencies have and do continue to target them and their posterity for religious discrimination and color of law associated-in-fact racketeering acts and abuses of rights perpetrated by, without limitation, defendant UNITED STATES (DOJ, FBI, USMS, ARMY, and CIA) and its co-conspirator defendants, including individual defendants known and unknown. As defendant UNITED STATES has continued this discrimination, it has attempted numerous and repeated entrapments against these same plaintiffs including for the explicit purpose of defaming them to "blame the victim" and to deliberately misdirect the public away from these defendants' criminal acts against these plaintiffs.

### Defamation - Criminal Entrapment Attempts Used To Construct Defamatory Legends

H. In furtherance of illegal BRMT bioweapon and bioweapon delivery system development, testing, and deployment, illegal human subject biomedical and psychological experimentation and terrorization, torture, and theft, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States, defendant UNITED STATES has at all times since 1968 acted to injure the Lead Plaintiff and members of this class of plaintiffs by promulgating and disseminating defamatory and false information and hoaxes regarding the alleged conduct of Lead Plaintiff and others similarly situated, which has and does damage their public reputations as intended by defendant UNITED STATES to assist in its campaign and program to control them at all times through its pattern of racketeering acts to (i) reduce them to penury through peonage and forced labor, (ii) sustain involuntary servitude, (iii) eliminate other employment options, (iv) destroy their enterprises, and (iv) to directly endanger these plaintiffs, and (v) to persuade others not to associate with them when such associations would not suit the corrupt and criminal purposes of defendant UNITED STATES in perpetuating these plaintiffs' peonage, involuntary servitude, forced labor, and other

deliberate discriminations against unalienable rights, all in furtherance of defendant UNITED STATES and its co-conspirators' series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities, among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States.

I. Certain of these false narratives which defame these plaintiffs have been and are constructed together with operation of the illegal BRMT bioweapon and bioweapon delivery system for entrapment attempts, wherein the illegal BRMT bioweapon and bioweapon delivery system is used to create biochemical emotional impulses by, without limitation, hijacking the Lead Plaintiff's free will and behaviors in corrupt attempts to shape entrapments and perpetrations of criminal acts by the Lead Plaintiff including, without limitation, the following examples of entrapments and false and defamatory narratives worthy of an corrupt secret police operation, all taken from recent years:

(i) Chapter 2—Aircraft And Motor Vehicles (18 U.S.C. §§ 31 – 40a) § 32. Destruction of aircraft or aircraft facilities  - several illegal BRMT bioweapon brain hijacking prompts toward attempting in-flight door operations in as Lead Plaintiff was pursuing fraudulent sales leads during the 2002-2005 cash flow and income starve out (paragraph 673), wherein no action was taken by Lead Plaintiff to complete these door opening mental prompts by the illegal BRMT bioweapon and bioweapon delivery system,

(ii) Chapter 2—Aircraft And Motor Vehicles (18 U.S.C. §§ 31 – 40a) § 37. Violence at international airports – an FBI entrapment attempt at paragraph 693A-C, wherein defendant FBI and/or its co-conspirators attempted to create a violent outburst after a storm-truncated sleep period resulting from a flight delay at Kennedy Airport in New

York City forced him to remain overnight due to a missed connection during his transit of Seattle-Tacoma International Airport, which they attempted by their substitution of an undercover officer who refused to deliver a breakfast check to Lead Plaintiff as he needed to depart the concourse restaurant for his early morning flight to visit a ranch property listed for sale in Lake County, Oregon during one of his many attempts to engage in and which affected interstate commerce.

(iii) Chapter 10—Biological Weapons (18 U.S.C. §§ 175 – 178) As actually used by defendant UNITED STATES against Lead Plaintiff through its illegal deployment of the BRMT bioweapon and bioweapon delivery system against Lead Plaintiff, but created, promulgated, and perpetuated as a legend and false public narrative against him by its surreptitious creation and publication of live video, and in its exploitations in public venues of Lead Plaintiff which specifically includes, without limitation, on August 26, 2023, while Lead Plaintiff was enroute to and from Washington, DC for a MLK memorial civil rights rally. Defendant co-conspirators PAPD, DC Metro, and NYPD (paragraph 615D, LPEE page 11931) each conducted emotionally disturbed persons (EDP) training session drills while he transited from the Port Authority (PAPD); then into DC Metro where he was unable to access the subway system, so he walked to and from the Lincoln Memorial (DC Metro) which held such a training session as he walked back to Union Station; then while walking from Penn Station back up Eighth Avenue in NYC (NYPD) to the Port Bus Terminal to return home through their jurisdictions. This narrative was originally constructed by FBI and CIA (ROSENBERG, BURNS) in Kirkland, WA, then reprised in Cliffside Park, NJ and had been developed and used by defendant UNITED STATES and its co-conspirators as part of its pattern of defamation and persistent misdirection, to create and wrongfully convey a false public image of the

Lead Plaintiff as an emotionally disturbed person, paragraphs 320b, e, 615D, 463-465, despite their years of direct interactions with the Lead Plaintiff, all for their own corrupt purposes.

(iv) Chapter 113b—Terrorism (18 U.S.C. §§ 2331 – 2339d) As actually perpetrated by UNITED STATES (FBI, CIA, ROSENBERG, unknown others) and/or its co-conspirators against Lead Plaintiff and other innocent persons as misdirection to promote and perpetuate a fictional legend regarding Lead Plaintiff, paragraphs 11, 451, 516-519, 521, 603T-U, 604F.

(v) 42 U.S.C. Division A - Atomic Energy Subchapter XVII - Enforcement § 2284(b):

"Unauthorized use or tampering with facilities, etc. Any person who knowingly causes an interruption of normal operation of any such facility through the unauthorized use of or tampering with the machinery, components, or controls of any such facility, or attempts or conspires to do such an act..."

As actually perpetrated by UNITED STATES and its co-conspirators against Lead Plaintiff, and promoted as specific misdirection to create, promote, and perpetuate this fictional legend regarding Lead Plaintiff, paragraph 602 NSEC-3.

**Defamation – Using Surreptitious Public Sexualization And Sexual Humiliation**

J. Among other falsely created legends in service of defendant UNITED STATES and its co-conspirators have been unfounded allegations spread by and in service of myths about sexual deviancy, pedophilia, terrorism, murder, misogyny, and other heinous acts and false allegations regarding Lead Plaintiff. Prior to defendant UNITED STATES' decision (primarily defendants FBI, CIA, ROSENBERG, BURNS, unknown others in their own self-interest) to raise these false allegations about Lead plaintiff which they knew would attract potential lethal threats from the public and from other defendants herein, through their program of malicious misdirection, Lead Plaintiff had by then unwittingly spent hundreds of thousands of hours over decades (i)

religiously communing under false pretenses with fraudulent church elder BREYER, paragraphs 99D, 211, 803C-H), (ii) living with PAGE, paragraphs 419, 492, (iii) then living with Jeanette, paragraphs 440-444, 610 HEXP-7, and others and (iv) working with these same institutional and individual defendants for more than three decades, (paragraphs 601-604 NSEC-1-4), all from at least 1970 to 2002, and (v) then again through 2008 in MA (the Dorchester homeless shelter federal security detail) and (vi) New Jersey at defendant ESTABLISH with defendant ROSENBERG (who had personally known, the Lead Plaintiff for mor than 25 years, while operating under two false cover identities not known to Lead Plaintiff), and others named at paragraphs 465-467.

K. While perpetrating this defamatory pattern against the Lead Plaintiff, defendant UNITED STATES (ROSENBERG) and other police powers, press, media, and entertainment defendants, and other defendants, acted to defame Lead Plaintiff by (a) a bogusly pretexted Mossad interview in greater Boston (paragraphs 464, 603B) intended to cement the terror legend shortly before his trafficking to NYC, (b) years of female officer honey entrapment attempts run in the NYC region both online and in field operations by various police powers operations (paragraph 504, 505), (c) the NYPD/FBI fraudulent terror investigation, probably from 2002 (FBI, ROSENBERG) which was carried forward into NYC in 2007 (paragraphs 464, 519, 555, 560, Interline Exhibits 17-18, 603B, F, G, L, 634C, 802B, 841), followed by defendants' attempted cover-up in September 2021, which is illustrative of the effort, energy, and taxpayer resources which defendant UNITED STATES (FBI, USMS, CIA) has put into this massive defamation campaign and these public hoax narratives from 2002 forward, (d) the use of police powers personnel children during volunteer work with a falsified police powers variant of New York Cares (paragraph 526), among myriad other defamatory acts, hoaxes, and threats which carried on for years.

**Defamation - Sensationalized Direct Sexual Abuse In Fraudulent Relationships**

L. Defendant DOJ, FBI, USMS, and CIA, other unknown police powers and press, media, and entertainment defendants, and the individual officials and persons therein, in their deliberate, knowing, and willful election to engage in slander, smear, libel, and interfere with the rights of Lead Plaintiff in orchestrating fraudulent relationships have and do use both public venues such as the Beach Café in Kirkland, WA, and MATCH GROUP and HINGE websites either administered for their benefit or spoofed by them, to arrange these fraudulent relationships between Lead Plaintiff and (a) two not currently identifiable women due to Lead Plaintiff's current lack of access to his own records currently under defendant UNITED STATES' control, (b) MODDERMAN in 2008 paragraph 611 HEXP-8, and (c) GIA in 2019-2020, paragraph 613 HEXP-10.

M. Defendant UNITED STATES orchestrated, publicized, and sensationalized sexual acts intended by Lead Plaintiff to be private acts, without his knowledge or consent for their own prurient, corrupt, slanderous, and defamatory interests in concealing the facts of their illegal operations by "blaming the victim" as any criminal organization would do, by damaging his reputation even as it engaged in continued human trafficking in (i) the Kirkland, WA in 2005, where these acts were videographed in the 149th Street residence (directly across 149th Street from the residence previously occupied by BURNS, CIA) from the unoccupied adjacent rear property line residence (which had been fire damaged previously and was extremely slow to be rehabilitated), and the government tricked out residences (USMS) in (ii) Cliffside Park, NJ where the MODDERMAN related acts occurred, including the now known to be publicly and permanently internet available sex scenes from 2008 with MODDERMAN (paragraph 611), who was presented on Match.com to Lead Plaintiff as the doting mother of three children by defendant FBI (ROSENBERG using that MATCH GROUP website, but actually adult film actor

and later Trump hush money recipient defendant Stephanie Clifford, related to their fraudulent 2006 relationship, and (iii) the current Edgewater, NJ apartment using a federal Section 8 voucher administered by the State of New Jersey, where the related acts intended to be private with GIA occurred.

N. In addition to the defamation and sensationalization of publicly available videography, defendants added elements of public sexual humiliation. All three videographed episodes of sensationalized sexual acts (Kirkland, Cliffside Park, Edgewater) also included specific efforts to sexually humiliate the Lead Plaintiff using the illegal BRMT bioweapon and bioweapon delivery system through sexual abuse using the illegal BRMT bioweapon and bioweapon delivery system for brain hijacking of the central nervous system to induce erectile dysfunction (ED). Each of these ED episodes (paragraph 611 HEXP-5) was part of an orchestrated conspiracy between defendant UNITED STATES and these female participants so these events would occur in locations in the residences where surreptitious videography was possible. The specific ED symptoms experienced progressed over time from on/off ED in 2005-2008 to completely variable fine tuning of ED to various degrees during these incidents in 2020-2021, as the illegal BRMT bioweapon and bioweapon delivery system's capability to manage fine muscle control progressed from binary (similar to an on/off light switch) to totally variable and rapidly reversible (similar to operation of a dimmer light switch).

O. This sexual abuse, also at paragraph 823, and its publicly available videography were intended to publicly humiliate, smear, slander, and defame Lead Plaintiff as an element of these defendants' criminal intent and conspiracy to construct a defamatory narrative about Lead Plaintiff, to misdirect the public, and to prevent him from pursuing his own interests which have and do contradict defendants' corrupt narrative.

P. Among about two dozen fraudulent dates between 2019 and 2021 used in constructing

the overall defamatory narrative was a May 5, 2021 at Junior's Restaurant, NYC, where

surreptitious videography of the Lead Plaintiff and an orchestrated date was recorded using a

35mm camera and telescopic lens from the exterior sidewalk the night before Junior's official

post-pandemic reopening was announced by NY Senator Schumer. Documentary evidence of

this orchestrated supposedly private date was deleted from the Lead Plaintiff's old out of service

phone by defendant UNITED STATES in February 2024 to attempt to conceal the event, as

described at paragraph 228.

### Other Defamations In Greater New York City Region

Q. Defendants also created other false allegations against Lead Plaintiff including,

without limitation, of pedophilia which they attempted to act out by (i) using the children of

police powers personnel posing as homeless children who went on faked volunteer outings with

New York Cares; (ii) psychological operations conducted using the illegal BRMT bioweapon

and bioweapon delivery system (paragraphs 526), all while having full knowledge of his actual

conduct as described at paragraph 841, which was intended to create false public impressions of

the Lead Plaintiff; (iii) with sex traps and female officers who preceded him on his walks in New

York City, and on buses, subways, and trains for the purpose of creating and sustaining false

narratives intended to slander, libel and defame the Lead Plaintiff as a sexual predator. (iv) while

they have and do interfere with contract rights with dating sites and public venues for this

purpose (paragraphs 505, 608 HEXP-5); (v) a terror narrative sustained for years (paragraphs

464, 519, 555, 560, Interline Exhibits 17-18, 603B, F, G, L, 634C, 802B, 841), for the purposes

of endangerment, libel, and slander of Lead Plaintiff; (vi) have systematically misdirected public

narratives and public opinion, and deliberately misdirected the actions of co-conspirator

defendants for example, (vii) by falsely communicating to him the site of the Pentagon

9/11/2005 memorial service in media reports so Lead Plaintiff could not attend in 2005, and (viii) myriad other repeated and patterned abuses of rights in his attempts to participate in public assemblies, memorials; (ix) and in other public events; as described at paragraph 526, at Interline Exhibit 16, at paragraph 844B(ii), and systematic misdirection documented at LPEEV65-5.

R. These defamatory acts were and are all misdirection specifically intended to benefit defendant UNITED STATES' through its own slander, libel, misrepresentation, deceit, interferences with contract rights, and other myriad acts, violations, and injuries of Lead Plaintiff's rights, as described in all sections of this complaint.

### Fraudulent Concealment And Willful Blindness Support Construction Of A Long-Running Slanderous And Defamatory Narrative From 2002

S. These slanderous and defamatory acts against rights and reputation are both grave and dangerous to personal well-being and health, which is the reason that defamation is subject to sanctions under law. Congress prescribed the same criminal penalties to punish and deter rights violations as for non-violent bank robbery (10 year maximum sentences), and for human trafficking as for violent bank robberies (20 year maximum sentences). But these crimes by federal police powers officials are never prosecuted by U.S. Attorneys, because they serve the corrupt and criminal interests of defendant UNITED STATES' departments, agencies, and of individual political appointees, officers, agents, and employees, who are or would be liable as individual defendants for these acts, violations, and injuries, even as they are perpetrated by those same defendants including, without limitation, defendant UNITED STATES, its departments and agencies, its own officials, officers, and agents (paragraphs 308, 320) against US persons. Civil litigants, such as these plaintiffs, are reduced by this endemically corrupt failure to enforce the laws, to using state defamation laws to combat criminal acts undertaken by the federal executive branch against them.

T. These defamatory acts, together with other pattern rights violations and crimes, are deliberately directed toward members of this pious Quaker-based religious group and their posterity, and are entirely consistent with prior patterns of practice, illegal conduct which is well documented in the findings of the Senate Select Committee in 1975 and the Rockefeller Commission in 1977 (LPEE pages 237-271, 6885-7466), the findings of the Senate Intelligence Committee in 2014 (paragraphs 336-340), the repeated findings of the FISA Court in 45 years of scofflaw conduct related to FISA Act violations, and in 15 years of Section 702 rights violations documented by Congress.

U. Defendant UNITED STATES, in particular defendants FBI, USMS, and CIA, and their co-conspirator defendants, intended to create a false narrative and to sensationalize that narrative about the Lead Plaintiff in their direct interferences with the rights and reputation of Lead Plaintiff. Among other acts, injuries, and violations at the final subparagraph in this paragraph, both within and without the territory of the United States, these acts, violations, and injuries are the "worthy work" of any depraved secret police operation intent on destroying the reputation of its involuntary servant in an attempt to preserve its own corrupt interests in fraudulently concealing more than fifty-six years of police powers depravity and corruption.

**Defendants' Durable Pattern Of Fraudulently Concealed Systematized Defamation**

V. The systematic and durable program of fraudulently concealed defamation described herein, all then unknown to Lead Plaintiff, but well known to defendant UNITED STATES (FBI, ROSENBERG, CIA, BURNS, other unknown) and to myriad other defendants in press, media, and entertainment, and to still other as yet known defendants, whose culpability will be exposed through the discovery process, is a necessarily limited set of examples of the wide variety of the public reaction and endangerment which has and does result from the false, defamatory, and

slanderous fraudulently disinformation, misinformation, and hoaxes used in this mythical narrative creation and public propaganda campaign by these defendants.

W. Statutory civil recovery for defamation under color of law is permitted against defendant UNITED STATES, individual former and current officers and employees including, without limitation, ROSENBERG, BURNS, MELBER, RUBIN, VINDMAN, and others not presently known, for their acts, violations, and injuries in creating false, slanderous, and defamatory narratives, hoaxes, fictional legends, entrapments and public endangerment through their abuse of process, for the defamatory purposes of "libel, slander, misrepresentation, deceit, or interference with contract rights" (28 USC §§ 2679(b)(2), 2680, 4101) of the Lead Plaintiff and of other similarly situated, as it is under state statutes against other defendants herein.

X. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein and will (ii) provide further evidence from these defendants; and (iii) among defendants who presented, without limitation, (a) as families, (b) as members of the Lead Plaintiff's own extended family by marriage, (c) as fraudulent members of the family religion and its beliefs and practices, and/or (d) as "personal friend" individual defendants; all of whom were directly and individually involved in these violations of constitutional rights and laws, will provide further evidence from their then minor children who had no stake in creating or sustaining these illegal acts, violations, and injuries while considered as nephews, nieces, and friends children which those individual defendants entrusted to the temporary care of Lead Plaintiff for varying periods of time.

## 854. CLAIMS FOR RELIEF - COUNT 54

**Violations of Constitutional Rights Under the First, Ninth, Fourteenth Amendments**

**Freedom of Information**

| Defendants identified at paragraph 799 have and/or do violate the following statutes: | |
|---|---|
| United States Code: | 5 U.S.C. § 552 |
| Washington: | NA |
| New Jersey: | NA |
| New York: | New York Pub Off L. §§ 84-90 |
| California: | NA |
| Massachusetts: | NA |
| Arizona: | NA |
| Texas: | NA |
| Maryland: | NA |

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. Defendants identified at paragraph 799, together with other unknown defendants to be identified through the discovery process have and do act in violation of federal and state statutes listed above in this paragraph. as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery,

B. Defendants have and do plan, conspire, perpetrate and engage in their series of acts to violate public information laws in the above named jurisdictions, as described at paragraphs 25, 298, 318, 320i, 571, 602D NSEC-3, 636 RGTS-16, Interline Exhibits 17-18, LPEE pages 508-541.

C. These acts and injuries are representative of those perpetrated by defendants on this class of plaintiffs, which also include other acts of violence, fraud, and continued willful blindness and fraudulent concealment directed at several generations of Lead Plaintiff's extended family, to this religious group, and to other as yet unknown plaintiffs perpetrated by defendant UNITED STATES and its co-conspirators. Discovery will (i) provide evidence of further violations not described herein. Applicable subcount paragraphs which particularly relate frauds

and other specific currently known acts, violations, and injuries to this claim for relief are the

following, which together comprise a representative sampling of the full scope of such violations

to this class of plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | NSEC National Security Pretexting and Entanglements | |
| | HEXP Illegal Human Experimentation | |
| 636 | RGTS Individual Rights Violations and Conspiracies | 16 |
| | RICO Racketeering | |
| | LTHL Lethality Attempts | |

855. Paragraphs 855 through 898 are reserved.

**END OF CLAIMS FOR RELIEF**

\*                    \*                    \*

[Intentionally left blank.]

## CONSTITUTIONAL AND STATUTORY REMEDIES FOR CLAIMS

893. Defendant UNITED STATES, its departments and agencies, most particularly defendant DOJ and its agencies, including, without limitation, its current Attorney General GARLAND, (who has a direct personal conflict of interest in this specific matter as a prior employee of defendant DOJ and/or its agencies which began in the 1970s when he interacted directly with at least the Lead Plaintiff and most probably others of this class, paragraphs 5, 21, 99d, 99m, 417-421, 490-493, 600G, 600L, 608C, 801N, 833F, 840C, 841N, 845E, 848C, have and do repeatedly, and in willful blindness, (paragraphs 25-30, 550-584) abuse their positions to evade both the institutional accountability of defendant UNITED STATES, its departments, and agencies, and their own direct individual culpability and liability for corrupt, extra-legal, and unconstitutional acts, violations, and injuries against these plaintiffs, and against these US persons' "unalienable rights," and have and do abuse color of law assertions of "state secret" privilege to place defendants' institutional and personal self-interest above "unalienable rights."

894. Since illegal highly classified programs, including this specific illegal BRMT bioweapon and bioweapon delivery system program (felony violation of 18 U.S.C. § 175, which is also classed as a RICO crime under 18 U.S.C. 1961(1)(B)), are briefed to senior members of Congress as the political leaders of the only two political parties of practical import in establishing federal policies through legislation, just as legal highly classified programs are briefed to those same political leaders, senior members of Congress have and do at times place partisan and personal political interests above their sworn constitutional interests.

895. This leaves no place other than the Article III Courts, which constitutionally were and are intended as the place of last resort for US persons to pursue justice, even in the face of invalid assertions of state secret privilege over "unalienable" individual rights. Since eighty-eight percent of jurists also originate as former employees and officials of the executive branch,

particularly within defendant DOJ, some may have concealed conflicts of interest in sustaining the secrecy of a long-running illegal program which has been illegally operated as a "state secret" program. This Court must consider those realities.

896. When Courts refuse, as the final refuge of justice for unalienable rights, to hear in civil complaints what defendant DOJ defends as "state secret" privilege and refuses to criminally pursue, what Congress in the self-interest of certain political leaders of both pollical parties will not hear, and courts themselves then systematically decline to hear, consider, and remedy these offenses against unalienable rights, there is no practical Constitution, nor is there any "unalienable right" in practice for plaintiffs so aggrieved. Their "unalienable" rights have simply vanished into the thin classified air of state secret privilege abused for the political convenience of a corrupt executive, which classification scheme and specific program classification are themselves defined and asserted under color of law by self-interested institutions and individuals who have direct inherent conflicts of interest.

897. When state secret privilege triumphs over unalienable rights, this triumph of privilege over rights is the unconstitutional perversion of a government created for the explicitly declared purpose "......that to secure these rights, governments are instituted among men," and of the Constitution itself, whose six paramount purposes expressed in its Preamble include "to form a more perfect Union, establish justice,....., and secure the blessings of liberty......"

898. This leaves US persons and our "unalienable" rights in a constitutionally untenable position. This cannot constitutionally stand, else we have no Constitution at all, merely pretty parchment wrought in meaningless gesture by the blood of many who have fought and died to obtain and sustain liberty for individuals over tyrannical institutions. The Courts cannot countenance this abused and contorted argument the privilege triumphs over individual liberty, else they themselves are no final refuge of justice, the very purpose for which they are

constitutionally established. Rather they become the last refuge of self-interested institutions, and

corrupt institutional interests and individual officials who are placed in those positions for the

explicit purpose of faithfully executing our Constitution and securing our rights.

899. For each count asserted in this Complaint, each plaintiff is entitled to injunctive

relief, compensatory and statutory damages, and punitive damages, in addition to reasonable

attorneys' fees and costs, from each of these institutional and individual defendants for physical

and emotional injuries, loss of income, assets, and property, and other injuries incurred as the

direct and indirect causal effect of the actions and failures to act of defendants. The table below

summarizes the forms of remedies available for each claim by each type of defendant to indicate

the scope of remedies available by federal statute and case law. Additional state statutory

remedies are available to this Court as well.

**Table 899A - Scope Of Remedies Available Under Constitution, Federal Statutes, Common
Law**

| Title 5 Government Organization And Employees U.S.C. §§ Short Title |
| --- |
| § 301 Administrative Procedure Compliance With Statutes: "The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public." |

| Title 28 Judiciary And Judicial Procedure U.S.C. §§ Short Title |
| --- |
| § 2679(b)(2) Government Officials' Individual Liability For Constitutional Rights Violations, All Statutes<br><br>"(b)(1) The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter …….<br><br>(b)(2) Paragraph (1) does not extend or apply to a civil action against an employee of the Government—<br>　　(A) which is brought for a violation of the Constitution of the United States, or |

(B) which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized."

[Intentionally left blank.]
**Title 18 Crimes And Criminal Procedure U.S.C. §§ Short Title**

**Chapter 77 Peonage, Slavery, And Trafficking In Persons**
§§ 1581-1590 violations, including peonage, involuntary servitude, slavery, forced labor, and human trafficking  - § 1593 requires mandatory restitution, § 1595 permits civil actions, and § 1595A permits injunctive relief.

**§1593(a)** "Notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any offense under this chapter.
**(b)**

    **(1)** The order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses, as determined by the court under paragraph (3) of this subsection.
    **(2)** An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A.
    **(3)** As used in this subsection, the term "full amount of the victim's losses" has the same meaning as provided in section 2259(c)(2) and shall in addition include the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. 201 et seq.).
    **(4)** The forfeiture of property under this subsection shall be governed by the provisions of section 413 (other than subsection (d) of such section) of the Controlled Substances Act (21 U.S.C. 853)."

**Chapter 96 Racketeering Influenced And Corrupt Organizations (RICO Act) - Congressional Intent** PL 91-452 October 1970:

    "(a) The provisions of this title [enacting this chapter and amending sections 1505, 2516, and 2517 of this title] shall be liberally construed to effectuate its remedial purposes."

**Chapter 96 Racketeering Influenced And Corrupt Organizations - Racketeering Acts Civil Remedies**

1964(a): "(a)The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons."

"1964(c): (c)Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee……" inclusive of all violations defined at § 1961, including of acts of terrorism defined at 2332b(g)(5)(B)

§ 1962 Racketeering Acts Under § 1030 Computer Fraud "1030(g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief……."

**These § 1964 remedies apply to the following sections of U.S.C. Title 18:**

| 1961-1968 Racketeering Influenced Corrupt Organizations | 1343 Wire  Fraud | 1590 Trafficking – Forced Labor, Peonage, Involuntary Servitude |
|---|---|---|
| 175 Biological Weapons | 1512  Obstruction - Tampering | 1951 Racketeering Threats Violence |
| 1111 Murder | 1513 Obstruction - Retaliating | 1952 Racketeering Travel |
| 1112 Manslaughter | 1581 Peonage | 1957 Racketeering Thefts |
| 1113 Attempted Murder Or Manslaughter | 1584 Involuntary Servitude | |
| 1341 Mail Fraud | 1589 Forced Labor | |

**Racketeering Acts under 18 U.S.C. § 1961, are inclusive of 2332b(g)(5)(B) Terrorism, under**

| 844(i) Arson In Interstate Commerce | 1992 Terrorist Attacks on Rail, Air, Mass Transit | 2332b Transcending national boundaries, within and without United States |
|---|---|---|
| 956(a)(1) relating to conspiracy to murder, kidnap, or maim persons abroad | 2332 Homicides and other violence against United States nationals occurring outside of the United States | 2339 Terrorism, Harboring Concealing, Material Support, Financing |
| 1030(a)(1), 1030(a)(5)(A) Protection of computers | 2332a Weapons of mass destruction | 2340A Torture |

**Chapter 113B § 2333 Terrorism, Civil Remedies (emphasis added)**

"2333 (a) Action and Jurisdiction.— Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

"2337 Terrorism, Official Capacity Exempted – "No action shall be maintained under section 2333 of this title against— (1) the United States, an agency of the United States, or an officer or employee of the United States or any agency thereof acting **within** his or her official capacity or under color of legal authority……." noting that 5 U.S.C. § 301 mandates regulations must comply with law (paragraph 260).

| These § 2333 remedies apply to the following sections of U.S.C. Title 18: | | |
|---|---|---|
| 844(i) Arson In Interstate Commerce | 1992 Terrorist Attacks on Rail, Air, Mass Transit | 2332b Transcending national boundaries, within and without United States |
| 956(a)(1) relating to conspiracy to murder, kidnap, or maim persons abroad | 2332 Homicides and other violence against United States nationals occurring outside of the United States | 2339 Terrorism, Harboring Concealing, Material Support, Financing |
| 1030(a)(1), 1030(a)(5)(A) Protection of computers | 2332a Weapons of mass destruction | 2340A Torture |

**Civil Remedies For Constitutional Claims – All Persons, Including, Without Limitation, Federal Officials When Acting In Conspiracy With Others Under Color Of Law**

42 U.S.C. § 1983 Civil Action For Deprivation Of Rights - "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress….."

42 U.S.C. § 1986 Civil Action For Neglect to Prevent – "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action;…."

Title 18 Chapter 46 Forfeiture § 987 Anti-terror forfeitures of property rights claims are permitted under any and all of 18 U.S.C. §§ 983, 987, Constitution, 5 U.S.C. Chapter 5 Administrative Procedure, all allowing at minimum compensatory damages and costs, and/or restoration of property, damages, and costs

**These various remedies apply to all constitutional claims including, without limitation, the following sections of U.S.C. Title 18:**

| 981-987 Forfeiture | 1119 Foreign Murder Of US Nationals | 1385 Posse Comitatus |
|---|---|---|
| 1037 Email Fraud – track down stat ref | 1349 Wire Fraud – Attempt And Conspiracy | 1905 Disclosing Confidential Information |
| 1038 False Information And Hoaxes | 1365 Tampering With Consumer Products | |

**Title 42 Chapter 21 Civil Rights U.S.C. §§ Short Title**

**Chapter 21 Civil Rights Remedies**
1983 "Every person who ….. subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

1986 "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured......"

**These remedies apply to the following sections of U.S.C. Title 42:**

| 1981 Equal Protection | 1985 Conspiracy Against Rights | 2000a Equal Access to Public Accommodations |
|---|---|---|
| 1982 Property Rights Of Citizens | 1994 Peonage Abolished | |

**Title 42 Chapter 21A Privacy Protection U.S.C. §§ Short Title**

**Chapter 21A Privacy Protection Remedies**
2000aa-6 (a) Right of action
A person aggrieved by a search for or seizure of materials in violation of this chapter shall have a civil cause of action for damages for such search or seizure

**These remedies apply to the following section of U.S.C. Title 42:**
2000aa - Searches and seizures

**Title 42 Chapter 21B Religious Freedom Restoration U.S.C. §§ Short Title**

Chapter 21B Religious Freedom Restoration Remedies
2000bb-1(c) Judicial relief "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution."

**These remedies apply to the following section of U.S.C. Title 42:**

| 2000bb Findings | 2000bb-1 Free Exercise Of Religion Protected | |
|---|---|---|

[Intentionally left blank.]

**Table 899B – Scope of Remedies By Claim**

| Claims - Constitutional Rights, Statutory, and Common Law | Available Remedies By Claim | | | |
|---|---|---|---|---|
| | Injunctive Relief | Monetary Damages – Compensatory, Statutory | Monetary Damages – Punitive | Fees and Costs |
| 801 Bioweapons and Bioweapons Delivery Systems Prohibited | X | X | X | X |
| 802 Terrorism - Violent Crimes In Aid Of Racketeering Enterprises | X | X | X | X |
| 803 Murder | X | X | X | X |
| 804 Attempted Murder | X | X | X | X |
| 805 Conspiracy To Murder | X | X | X | X |
| 806 Manslaughter | X | X | X | X |
| 807 Attempted Manslaughter | X | X | X | X |
| 808 Kidnapping | X | X | X | X |
| 809 Human Trafficking | X | X | X | X |
| 810 Torture – Mental and Physical Abuse | X | X | X | X |
| 811 Conspiracy to Torture | X | X | X | X |
| 812 Assault | X | X | X | X |
| 813 Aggravated Battery | X | X | X | X |
| 814 Soliciting Crime Of Violence | X | X | X | X |
| 815 Interference With Interstate Commerce By Threats Or Violence | X | X | X | X |
| 816 Tampering With Witness | X | X | X | X |
| 817 Tampering With Witness - Evidence | X | X | X | X |
| 818 Retaliating Against Witness | X | X | X | X |
| 819 Tampering With Consumer Products | X | X | X | X |
| 820 Involuntary Servitude | X | X | X | X |
| 821 Peonage | X | X | X | X |
| 822 Forced Labor | X | X | X | X |
| 823 Sexual Abuse | X | X | X | X |
| 824 Frauds - Mail | X | X | X | X |
| 825 Frauds – Wire | X | X | X | X |
| 826 Frauds - Computer Access Devices | X | X | X | X |
| 827 Fraud And Related Activity - Computers | X | X | X | X |
| 828 Attempts And Conspiracy - Frauds By Mail, Wire, Computer | X | X | X | X |
| 829 Scheme To Defraud of Honest Services - Mail, Wire, Computer | X | X | X | X |
| 830 Property Rights and Illegal Takings | X | X | X | X |
| 831 Racketeering - Monetary Benefit | X | X | X | X |
| 832 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | X | X | X | X |

| Claims - Constitutional Rights, Statutory, and Common Law | Available Remedies By Claim | | | |
|---|---|---|---|---|
| | Injunctive Relief | Monetary Damages – Compensatory, Statutory | Monetary Damages – Punitive | Fees and Costs |
| 833 Civil Rights - Free Exercise Of Religion | X | X | | X |
| 834 Posse Comitatus - Use Of Military | X | X | | X |
| 835 Involuntary Servitude | X | X | | X |
| 836 Intentional Discrimination in Employment | X | X | | X |
| 837 Peonage | X | X | | X |
| 838 Conspiracy Against Rights | X | X | | X |
| 839 Deprivation of Rights | X | X | | X |
| 840 Deprivation of Rights Under Color of Law | X | X | X | X |
| 841 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | X | X | X | X |
| 842 Deprivation of Rights Under Color of Law - Searches and Warrants | X | X | X | X |
| 843 Searches Exceed Authority, Malicious Procurement, Without Warrant | X | X | X | X |
| 844 False Information and Hoaxes | X | X | | X |
| 845 Neglect To Protect - Failure To Protect | X | X | | X |
| 846 Neglect To Protect - Failure To Supervise | X | X | | X |
| 847 Neglect To Protect - Failure To Train | X | X | | X |
| 848 Neglect To Protect - Misprison of Felony | X | X | | X |
| 849 Neglect To Protect - Acting as Accomplice | X | X | | X |
| 850 Neglect To Protect - Acting as Accessory | X | X | | X |
| 851 Neglect To Protect - Aiding and Abetting | X | X | | X |
| 852 Prohibited Activities - Pattern Of Racketeering Acts | X | X | X | X |
| 853 Defamation | X | X | | X |
| 854 Freedom Of Information | X | | | |

900. Lead Plaintiff, as representative of and behalf of the class of injured Plaintiffs,

respectfully requests an award of the following relief described at paragraphs 901-916:

901. **Declaratory Judgment** that the actions described herein constitute violations of all

federal and state statutes cited in this complaint.

902. **Order reversing conflict of law** that (i) the language in 18 U.S.C. 2340B:

"...nor shall anything in this chapter be construed as creating any substantive or procedural right enforceable by law by any party in any civil proceeding"

which statutory provision violates our Constitution and the supremacy of the the ratified and

adopted *Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or*

*Punishment,* Article 14.1:

> "Each State Party shall ensure in its legal system that the victim of an act of torture
> obtains redress and has an enforceable right to fair and adequate compensation,
> including the means for as full rehabilitation as possible. In the event of the death of
> the victim as a result of an act of torture, his dependents shall be entitled to
> compensation,"

and that (ii) 18 U.S.C. § 2340B is null and void as to that specific section from October 27, 1990,

and may not be enforced from that date under the Constitution and laws of the United States, and

that (iii) the Constitution and laws of the United States and the common law interests of equity

require all such deprived plaintiffs in whatever action be so notified by defendant UNITED

STATES within 90 days, and that (iv) the entire class of plaintiffs who are parties to this

litigation be restored as near as possible for all injuries suffered throughout the development,

deployment, and operation of defendant UNITED STATES' illegal BRMT bioweapon and

bioweapon system.

903. **Emergency Order** providing immediate injunctive relief under (i) 42 U.S.C. § 1983

deprivation of rights, and under (ii) 18 U.S.C. § 1964, prohibiting defendant UNITED STATES'

use of the 18 U.S.C. § 175 prohibited and illegal BRMT bioweapon and bioweapon delivery

system per 18 U.S.C. 1961(1)(B), and (iii) for any and all other injuries as further defined,

without limitation, at 18 U.S.C. §§ 1961-1968, and 42 U.S.C. Chapter 21, which Emergency

Order thereby prohibits defendant UNITED STATES and any and all other known and unknown

defendants who may possess or be able to access the illegal BRMT bioweapon and bioweapon

delivery system, and any variant thereof, and including, without limitation, all their officers,

agents, employees, contractors, and assigns, from engaging in all and every use of the illegal

BRMT bioweapon and bioweapon delivery system technology, and which Emergency Order

declares the illegal BRMT (Brain Remote Management Technology) bioweapon, bioweapon delivery system, and any variant(s) thereof, as an immediate and continuing threat to life, health, and wellbeing, and to the human, civil, and Constitutional rights, of each and every plaintiff as a member of this class, to their families and communities, and to the general public, including any and all U.S. persons wherever they may be.

904. The Court is reminded that absent such an Emergency Order, the harms and injuries to this entire class of plaintiffs, to others as indirect victims, and to the public at large will continue, may very well escalate, and will lead to further injuries, including reasonably foreseeable deaths, disabilities, injuries, incarceration, and other readily foreseeable injuries, damage, and adverse consequences. Such consequences have already been experienced by Lead Plaintiff and other members of the class of plaintiffs for at least fifty-six years as defendant UNITED STATES' continuing and unaltered pattern of practice from prior illegal operations of predecessor programs including, without limitation, defendant CIA's MKUltra and defendant FBI's Cointelpro.

905. **Permanent Injunctive Order** prohibiting defendant UNITED STATES and any and all other known and unknown defendants who may possess or be able to access the illegal BRMT bioweapon, bioweapon delivery system, and any variant thereof, and including, without limitation, all their officers, agents, contractors, and assigns, and all other persons, from owning, possessing, controlling, operating, developing, using, licensing, or permitting any use of the illegal BRMT bioweapon and bioweapon delivery system, in any form or variant, for any purpose, against any US person or other innocent at any time and place. Further, that such Order:

(a) declare the illegal BRMT (Brain Remote Management Technology) bioweapon, bioweapon delivery system, and any variant(s) thereof has, does, and will pose an immediate and continuing threat to the life and health; and to the human, civil, and Constitutional rights;

(b) that the illegal BRMT bioweapon and bioweapon delivery system has and does violate that certain ratified international treaty having force of law in the United States of America, *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction,*

(c) that the illegal BRMT bioweapon and bioweapon delivery system and is an instrument of domestic terrorism in violation of US law as defined at 18 U.S.C. § 2331(5), and is therefore subject to penalties under 18 U.S.C. § 2332(a) relating to illegal use under 18 U.S.C. § 175,

(d) require defendant UNITED STATES to use all feasible, ordinary, and extraordinary means and resources to protect and defend all US persons and other innocents from any such device, equipment, system, or operation, at any time and for all time,

(e) declare that the illegal BRMT bioweapon and bioweapon delivery system has been and is used as an instrument of torture by defendant UNITED STATES in violation of that certain treaty *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,*

(f) declare that defendant UNITED STATES has and does create and sustain an associated-in-fact enterprise which has and does engage in racketeering acts to fraudulently conceal (i) this pattern of racketeering acts by its own hands and those of known and unknown co-conspirators, and (ii) the illegal development and use of the illegal BRMT bioweapon and bioweapon delivery system on human subjects, and must immediately and for all time halt any such illegal medical experimentation, deployment, and abuse as to all persons without their knowledge and knowing consent, and that

(g) all future appropriations, funding, contracting, research, development, deployment and uses by defendant UNITED STATES and/or any other party, including any sovereign, for

the purposes of engaging in the development of the BRMT bioweapon and bioweapon delivery system, and in any racketeering acts for any purpose, are prohibited for all time.

906. The Court is reminded that absent such a permanent Order, defendant UNITED STATES will continue its historical pattern of serial violations in which it has continuously engaged since at least 1968, which abuse of US persons as subjects of illegal human subject medical experiments and as targets of an illegal bioweapon and bioweapon delivery system, has and does harm and injure the entire class of plaintiffs, still others as its indirect victims, the public at large, and has and does endanger national security in its internationally prohibited deployment and direct or indirect use against any person; and that defendant UNITED STATES, together with its co-conspirator defendants, may very well escalate these violations, injuries, and abuses, and cause and create further injuries, including, without limitation, death, disability, incarceration, racketeering acts, and other readily foreseeable adverse consequences, as such consequences have been experienced by Lead Plaintiff and other members of the class of plaintiffs for more than fifty-six years as relates to the illegal BRMT bioweapon and bioweapon delivery system, and as was experienced by direct and indirect victims in the immediate predecessor illegal programs of defendant UNITED STATES, CIA's MKUltra and FBI's Cointelpro, and their predecessor programs from at least the 1940s for which there were absolutely no criminal consequences of any kind at any time to any person, department, or agency for those massive and durable violations of criminal law by defendant UNITED STATES and its co-conspirators, which systemic failures of justice must be redressed in this matter by this court else it be repeated, functionally defeating ALL the unalienable rights of these plaintiffs while the Court would be facilitating the continuation of an extra-legal state of police powers impunity and color of law abuse of our Constitution by these defendants toward any US person(s) they may elect to target, pursue, and persecute without cause or due process under law.

907. **Order of Forfeiture** commanding defendant UNITED STATES to promptly and swiftly identify to the Court all direct and indirect victims of the illegal BRMT bioweapon and bioweapon delivery system, and to immediately restore any real, personal, or intangible property of any plaintiff, or if unavailable for restoration through intervening operation of law, to restore in equity and/or fairly compensate, including through all available statutory remedies, all which was proximately caused to be lost to these plaintiffs and/or to their businesses, estates, or kin as a result of the use of the illegal BRMT bioweapon and bioweapon system and its collateral, consequential, and indirect effects, and the pattern of racketeering acts of these defendants, whether or not directly or indirectly caused and created by defendant UNITED STATES, from the date of the commencement of the initial research on human subjects without consent (which dates at least from Summer 1968) to investigate, conceive, research, develop, and deploy the illegal BRMT bioweapon and bioweapon delivery system brain hijacking program from its most primitive early form to the present time, in accordance with the procedure described at 18 U.S.C. §§ 981 through 987, consistent with 18 U.S.C. § 1964, and with 18 U.S.C. §2333 as the prohibitions on such litigation at 18 U.S.C. § 2337 have and do violate those certain ratified international treaties having force of law in the United States of America, *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, and *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction,* and 42 U.S.C. §§ 1983, 1986 as these acts, violations, and injuries are elements of a conspiracy with state and local officials, and under other applicable federal, state, and common law.

908. **Monetary Damages** award in an amount to be determined by the jury, which amount cannot be properly identified at this time, which will fully compensate these plaintiff victims for injuries resulting directly and indirectly from the systematic abridgements and

violations of their constitutional, statutory and common law rights under federal and state law for

the any and all uses of any generation of the illegal BRMT bioweapon and bioweapon delivery

system, illegal human experimentation without consent, and the related associated-in-fact

enterprise pattern of racketeering acts, throughout the defendants' approximately fifty-six year

long pattern of color of law constitutional and statutory acts, violations, and injuries, and other

criminal acts, violations, and injuries, misconduct, prejudicial operations, and neglect to prevent

against the Lead Plaintiff and other plaintiffs of the class from at least Summer 1968 to the

present. Lead Plaintiff is currently unable to identify and describe each and every specific

violation and injury sustained over the past approximately fifty-six years, and has provided a

representative sampling in the 110 subcounts at paragraphs 600-710, and in the claims at

paragraphs 801-854, of the forms of criminal, civil, and treaty guaranteed compensable injuries

which are representative, but not fully encompassing, of the extent and types of acts, violations,

and injuries to plaintiff victims. Members of this class of plaintiffs have been victimized by (i)

defendants' discrimination against their religious beliefs and practices, and (ii) through other

forms of discrimination against them and their kin for multiple generations, by (iii) patterns' of

racketeering acts, criminal acts, civil rights violations, treaty violations, coercive psychological

manipulations, BRMT hijackings, and other injuries, and have and/or do experience from (a) as

little as a few hours of illegal BRMT bioweapon and bioweapon system operations with

unknown outcomes and injuries ranging to death, to (b) more than fifty-six years of continuously

torturous injuries, including numerous attempted lethality events, such as (c) the past and

continuing acts, violations, and injuries experienced directly by the Lead Plaintiff to date. Some

plaintiffs of this class are doubtless heirs to deceased victims, and/or themselves permanently

disabled, and/or themselves incarcerated, all as a result of these undiscovered remotely

manipulated criminal act(s) perpetrated in fact by defendant UNITED STATES' use of the

illegal BRMT bioweapon and bioweapon delivery system against that particular plaintiff or to provoke that particular plaintiff to involuntarily and without so knowing, undertake a harmful act against a third party they would not otherwise have undertaken. All members of this class and their kin are entitled to full discovery of these crimes and injuries, and to justice including, without limitation, monetary damages. The monetary damages to be awarded will include some or all of the following:

909. **Compensatory damages for defendants' individual injuries to plaintiffs** - human, constitutional, civil, statutory, common law, and ratified treaty rights having force of law injuries in amounts to be determined by the jury at trial for injuries, whether by joint or several acts:

    i.    Torture, for each and every day of (a) torture and torture enhancement imposed by defendant UNITED STATES' operation of the illegal BRMT bioweapon and bioweapon system, and (b) torture and torture enhancement by the psychological operations of all defendants, however perpetrated;

    ii.    Daily suffering from torturous injury including, without limitation, the approximately 20,000 days experienced by Lead Plaintiff, and unknown numbers of days and injuries to other plaintiffs of this class, from (a) physical, mental, and psychological coercions and hijackings; from (b) public humiliations and threats; from (c) extreme fear, anxiety, and panic inducing damaging hyper-vigilance and other phobias and stress, and including post-traumatic stress disorder;

    iii.    Repeatedly induced biomedical abuses which have and do result in mental symptoms and illnesses, imposed by defendant UNITED STATES and its co-conspirator defendants, including, without limitation, (a) chronic anxiety, depression, phobias, fears, and suicide ideations from short cycle and long cycle

psychological coercion, provocations, and brain biochemical hacking, and (b)

inducing both temporary and permanent biochemical damage to the brain, gut,

and immune systems;

iv.    Repeated physical illnesses, and symptoms of illnesses imposed through

simulation of swelling and other physical manifestation, by defendant UNITED

STATES including, without limitation, (a) repeated and extreme headaches of

long duration in two cycles of approximately 100 to 300 days in Boston, MA and

Cliffside Park, NJ; (b) heart irregularities and chest pains, (c) breathing

irregularities, (d) vision irregularities, all with physical symptoms including,

without limitation, pain to extreme levels, and inducing fears and phobias; (e)

extreme physical pain in the torso, arms, legs, and head; (f) loss of control of

bodily functions including, without limitation, life threatening acts against the

Lead Plaintiff's own proper colon function in 2023-2024; and (g) induced allergic

symptoms, requiring cost, expense of treatment, (h) stomach and digestive

irregularities, (i) inducing needless emotional distress, to and including post-

traumatic stress disorder;

v.    Repeated daily coercion of psychological operations by defendants including,

without limitation, those conducted using (a) hacked and spoofed websites,

hacked home appliances, computers, printers, cell phones, and other electronic

devices to induce and amplify stress, anxiety, anger, fear, and panic; (b) to engage

and to amplify repeated cycles of hope, despair, fear, anger and reversal of those

cycles, thereby magnifying psychological, physical, and biochemical changes, and

(c) causing permanent irreparable damage to brain, gut, and immune system

biochemistry, and (d) causing the necessity, inconvenience, and expense of

contacting fraudulently delivered and stressful fraudulently interposed services, intended to be provided by corporations which have been and are interposed by police powers personnel posing as customer service and support personnel by defendants in their corrupt intent to frustrate and provoke plaintiffs; and (e) the necessity, cost, inconvenience and expense of repairs, returns, loss of use, and replacements of property;

vi.   Permanent health damage and disability imposed by defendants including, without limitation, those resulting from (a) medical misdiagnosis or malpractice by wrongfully modified biomedical test results and malfunctions through hacking of medical test and diagnostic equipment; (b) hormone suppression and magnification of appetite to induce rapid weight gain and adverse physical health changes; (c) organ malfunctions and simulated symptoms of organ malfunctions; and (d) short term memory blocking and loss; among others;

vii.  Repeated physical and mental injury and lethality attempts and incidents, directed, orchestrated, and executed by defendants including, without limitation, (a) all forms of visual and verbal violent threats, (b) a wide variety of natural and accidental appearing induced injury and lethality attempts and cycles, including, without limitation, choking, tripping, falling, loss of balance, loss of consciousness; (c) purposeful distraction by visual illusions, color choices, and other psychological tricks, and by illegal BRMT bioweapon operations by defendants, leading to loss of concentration at points of risk and injury; (d) illegal BRMT directed and induced dangerous movements of plaintiff victims which can and do endanger them and bystanders, (e) plaintiff victim operation of vehicles and equipment under dangerous induced conditions, including, without limitation,

illegal BRMT bioweapon brain hijacking for momentary and longer periods of extreme sleepiness, extreme eye watering, rapidly induced vision distortions and headaches, and other injuries and temporary disabilities manifesting as allergic reactions;

viii.    All these torturous injuries above have been and are created and/or aggravated by defendant UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system brain hijacking to (a) magnify the adverse physical and psychological experience and injury to the plaintiff victim, and (b) to engage the plaintiff victim in high risk activities and conditions, and (c) to orchestrate these malign events and circumstances in environments where the action may result in injury, incarceration, or death to themselves or others from their involuntary acts perpetrated by the illegal BRMT bioweapon and bioweapon delivery system, and/or (d) from the acts of others who wrongly interpret the plaintiff victim's acts as voluntary and threatening, including, without limitation, by an armed agent or officer perceiving a lethal threat to themselves from a body movement or words which are in fact induced through illegal BRMT bioweapon brain hijacking;

ix.    Involuntary servitude imposed by defendants including, without limitation, (a) partially compensated and uncompensated, unwitting, and involuntary employment and injury imposed upon plaintiff and/or aggravated or perpetuated by defendant UNITED STATES' through its conspiracy with other defendant(s), (b) forced labor and peonage, (c) various frauds, and/or (d) use of the illegal BRMT bioweapon and bioweapon delivery system to cause an act or failure to act which is apparently entirely a voluntary act or failure but is actually an illegal BRMT bioweapon and bioweapon delivery system hijacked and contrived

deviation from the plaintiff victim's own free will in a manner which is
undiscernible to the plaintiff victim. Plaintiff injuries which have been, are, and
will be experienced include, without limitation, partial and total loss of income,
and unreimbursed costs from contractual thefts and malfeasance by defendants,
due to (e) purposeful below-market compensation, (f) periods of planned
unemployment facilitated by frauds and color of law abuses; (g) failure to fully
compensate for materials, equipment, and services rendered; (h) deprivation of
access to equal employment and career opportunities available to all other
persons; (i) limits on and/or total elimination of business and entrepreneurship
options, including (j) deprivation of rights to start, acquire, operate, and innovate
freely and fairly in in-state, interstate, and international commerce. Involuntary
servitude, forced labor, and peonage are distinct conditions which have been and
are imposed by defendants, which status and conditions are not dependent
upon the existence or lack of compensation or its specific amounts, as each exists
if any conditions are imposed, including, without limitation, any and every threat,
act, open or surreptitious coercion, or deliberate destitution of the plaintiff and/or
other family or household members;

x.    Forced labor and peonage injuries imposed by defendants including, without
limitation, lack of fair market determined and fully paid compensation from
defendants' deprivation of fair and equal access to employment opportunities,
contractual rights, and to market established compensation, including by
defendant entrapment, and retention for (a) plaintiff victim labor, services, and
planned subsequent adverse termination and/or failure to fully compensate thefts;
for (b) enhanced entrapment, incarceration and lethality risks; for (c) loss of

income, dividends, property and financial assets appreciation, and compound

interest due to forced and contrived forfeitures; leading to (d) adverse income and

employment outcomes, and to (e) programmed imposition of loss of

creditworthiness and of access to non-usurious credit facilities; for (f) adverse

imposition of and upon family, relationship, and financial choices and distress; for

(g) frauds, and entrapment for adverse imposition of peonage; for (h) imposition

of tax liabilities and penalties; for (i) color of law pretexting to falsely create

suspicion, and by invoking imagined risks to state secrets and national security,

including, without limitation, those which are deliberately created by the

defendants to perpetuate their malign acts and conspiracy; for (j) the false

imposition of international subject and terror classification designations, for (k)

for human trafficking, kidnapping, and false imprisonment; (l) human trafficking

for purposeful exposure to high risk and lethal domestic and international police

powers environments; for (m) threat of destitution, for (n) realized destitution, for

(o) homelessness, for (p) imposition of extreme risks and hardships on plaintiff

victim and/or for (q) members of their families, including, without limitation, fear

of and loss of liberty, health, and life, all at the direction, coercive manipulations,

and/or hands and color of law lawless acts of these defendants;

xi.     Loss of individual income and property, for each and every instance of injury,

including, without limitation, predicate acts and frauds by defendants to force (a)

disposal of personal, real, intangible property including, without limitation, real

estate and financial assets and to force the forfeiture of normal appreciation of

those assets, including, without limitation, by (b) the use of illegal BRMT

bioweapon and bioweapon delivery system hijacking for biomanipulation of

oxytocin and other hormones and thoughts to create the circumstances of marital

dissolution; (c) forced litigation expense and compromise of financial assets by

acting in bad faith, by screening-in bad faith actors and screening out reliable

customers, service providers, vendors, and relationships; (d) providing or

screening-in dishonest services and service providers; using coerced service

providers who act in their own self-interest to avoid personal consequences and

penalties by functionally transferring those consequences to the plaintiff through

their actions and failures to act, including, without limitation, illegally embedded

legal counsel, legal counsel in criminal and/or civil difficulties manipulated into

adverse actions or advice toward a targeted victim which police powers

defendants are headhunting through this illegal color of law pattern of practice;

(e) defendant injuries to plaintiff victims under color of law to evade

accountability for prior acts or by perpetration of planned self-exculpatory acts to

transfer culpability from the defendant to the innocent plaintiff victim, and/or (f)

to evade accountability for defendants' self-inculpatory acts and injuries directed

at plaintiff victim by using color of law abuses of other third parties; (g) defendant

hacking of computers, cell phones, appliances, and electronic hacks and

harassment, (h) thereby forcing losses of property and opportunity, and driving

victim plaintiffs into extenuating circumstances used for incrimination and

pretexting by creating financial, economic, relationship, and other personal

difficulties, and (i) integrating illegal BRMT bioweapon hijackings and coercive

psychological manipulations to add stress and to create conditions where the

plaintiff victim is more likely to act out so that the acting out discredits or

incriminates the plaintiff, and thereby the actual perpetrator defendant evades

responsibility, liability, and loss of reputation if their own patterns of malign, malicious, and physically or psychologically injurious acts, actions, injuries, and racketeering were to be publicly exposed; (j) destruction to complete loss of marital community and benefits therefrom including, without limitation, emotional, real, personal, and intangible property injuries; (k) purposeful exhaustion of benefits through frauds and deprivations to orchestrate forfeitures, destitution, and homelessness; (l) deprivations of benefits, programs, loans, and loan guarantees from federal, state, local, and private sector organizations; (m) forced litigation and compromise of bad debts and dishonest services of and by defendants exploiting police powers under color of law both through direct injury, and through the screening-in and screening-out of persons and entities to contrive particular outcomes; (n) negotiation of contractual penalties to reduce profits on future forced sales when a defendant has and does plan and contrive a forced forfeiture to occur at a future point;

xii. Virtual and physical incarceration of plaintiffs by defendants including, without limitation, each and every day of (o) involuntary servitude and entrapment by defendants for their own corrupt and self-interested purposes; (p) continuous subjugation to the illegal BRMT bioweapon and bioweapon delivery system for illegal human subject medical experiments, bioweapon targeting and brain hijacking by defendant UNITED STATES; (q) subjugation to other deliberate, pre-meditated, and coercive virtual restraints on liberty and rights in choices of activities and movements at all times of day and night; (r) all as aggravated by ongoing BRMT bioweapon and bioweapon delivery system induced torture, and by on-going psychological operations; (s) kidnapping into six months of false

imprisonment without due process of law of Lead Plaintiff conducted for duress in forcing the ostensibly voluntary dismissal of federal civil rights and racketeering litigation under duress to sustain defendants' continued fraudulent concealment;

xiii.    Life and health injuries by defendants including, without limitation, those to (a) personal relationships, (b) mental and physical health, (c) freedom from fear of injury to health and well-being from defendants' police powers operations and interferences, (d) public defamation, notoriety, discrediting, humiliation, harm to reputation, and risks from public vigilantism, (e) manifested symptoms of physical disease and sicknesses, including, without limitation, mental illness, depression, anxiety, physical illness, extreme headaches, heart irregularities, breathing irregularities, vision irregularities, extreme pain in the torso, arms, legs, head; lethal threats, loss of control of bodily functions;

xiv.    Liberty and free exercise of human, constitutional, civil, common law, contractual and other rights injured by defendants including, without limitation, (a) free pursuit of personal interests, activities, and avocations; (b) freedom of movement and travel; (c) unimpeded access to professional and career choices; (d) freedom from induced anxiety, stress, fear, and panic related to defendants' entrapment attempts and threats and attempts on life, business, career, and property; (e) freedom from fear, pain, anxiety, panic, and suffering from defendants' repeated forced forfeitures leading to homelessness, destitution, loss of personal relationships, (f) imposed threats on life from public vigilantism, loss of privacy and of personal space, (g) loss of liberty to form relationships freely and without fear of disruption and injury caused and created by defendants' ulterior motives

related to prejudicial police powers operations, political, and/or criminal intents and agendas;

xv. Pursuit of happiness injuries by defendants, including, without limitation, (a) feelings and reality of imposed isolation, (b) loss of companionship, community, and (c) trusted close emotional relationships and friendships imposed by defendants including, without limitation, the freedom to (d) enjoy family, leisure, hobbies, and interests; to (e) emotionally benefit from stable relationships and family, free of defendants' coercive manipulations of these plaintiff victim and/or other family members by illegal BRMT bioweapon and bioweapon delivery system hijackings, and deliberate brain, gut, and immune system disruptions, and ill health; (f) to travel and experience events, activities, culture, and the natural environment free from fear, concern, and vigilance for contrived accidents, adverse encounters, and entrapment attempts;

xvi. Civic participation rights and benefits lost to injuries by defendants including, without limitation, (a) free and private expression absent harassment and entrapment for personal religious and political beliefs, political speech, participation in civic life and organizations, as well as (b) trade and business organizations for personal and social enrichment and benefit;

xvii. All the torturous injuries above have been and are aggravated by illegal BRMT bioweapon and bioweapon delivery system brain hijacking used by defendant United States and its co-conspirators to (a) magnify these listed and other injuries and adverse emotional experiences of the plaintiff victim described herein, and to (b) further emotionally adversely engage the plaintiff victim while in high risk conditions and environments where their actions are (c) more likely to result in

injury, incarceration, or death from their own emotional state, (d) from illegal
BRMT bioweapon and bioweapon delivery system hijacked involuntary acts, or
(e) the acts of others who wrongly interpret the plaintiff victims' acts as
voluntarily hostile and use force to injure or kill the plaintiff victim, including,
without limitation, (f) an agent or officer perceiving a lethal threat to themselves
from an involuntary body movement or from words induced by defendant
UNITED STATES' illegal BRMT bioweapon and bioweapon delivery system
brain hijacking to manipulate and control the plaintiff victim in that moment.

910. **Compensatory damages for defendants' injuries to business, commercial, and entrepreneurial property and rights** including, without limitation, a wide variety of (a) malign and illegal acts, some under color of law, (b) failures to act despite a sworn duty to do so, and (c) other adverse acts which have and do injure in-state, interstate, and international commerce, and (d) injure business income and prospects including, without limitation, loss of business and commercial reputation; (e) attempts on plaintiff victims' life(s) which damages the ability to freely travel and develop business and commercial interests; (f) illegally embedding personnel, sabotaging, hacking, and harassing plaintiffs and their commercial interests to develop and enhance plaintiffs' personal feelings of vulnerability, mistrust, and loss of freedom of movement and choice, thereby constraining plaintiff business, commercial, and entrepreneurial activities and (g) fraudulently replacing, limiting, or eliminating plaintiff business and commercial attractiveness to investors and to other equity and debt resources; (h) forcing litigation expenses and loss or compromise of legally due amounts and assets; (h) providing dishonest services directly or through screened-in bad actors and/or compromised companies, persons, and services; (i) sabotaging company operations and equipment using undercover police powers agents and operators; (j) posing as interested third parties to prejudice potential customers to the plaintiff by

engaging the customer in their entrapment efforts; (k) engaging, screening-in and promoting

known third party bad actors; (l) loss of financial assets and appreciation of same; (m) forcing

litigation and providing dishonest services by exploiting police powers under color of law both

directly and through the screening-in and screening-out of persons and entities to manipulatively

determine specific intended outcomes; (n) hacking and harassing to damage the business' ability

to provide prompt services and products to customers; (o) anonymously disparaging business

reputation; (p) engaging directly and through others in thefts of services; (q) creating and

engaging directly and through others in business frauds including, without limitation, receivables

thefts, bad check losses, forced asset compromises, defalcations, and thefts to reduce revenue,

profits, and cash flow; (r) failing to provide, intervening to prevent, and/or providing fraudulent

bid and performance bonds, and loan guarantees; (s) failing to provide, intervening to prevent,

and/or providing fraudulent insurance and other financial products and services; (t) using

fraudulent services and/or their intervention preventing or discouraging legitimate service

providers to sustain their control of plaintiff and business cash flow, profits, sales opportunities

and prospects and (u) to cause and create adverse financial outcomes to the plaintiff victim's

business and personal income and future prospects; (v) reduce and/or eliminate through

screening, hacking, spoofing, and other frauds the ability of the plaintiff victim and their

business to form relationships freely and (w) without fear of ulterior motives related to

prejudicial police powers operations, sabotage and entrapments; (x) deliberate overstaffing and

costs created by departments, agencies, and persons acting in bad faith under color of law; (y)

project delays, stoppages, and accelerations to increase labor and materials costs under color of

law and/or coercion; (z) negotiation of contractual penalties which are normally rarely

experienced as part of defendants' conspiracy to reduce profits on future forced sales when a

defendant planned and contrived forfeiture is forced on the plaintiff victim and/or their business occurs during a defendant planned and contrive future event.

911. **Compensatory damages for defendants' business, commercial, and entrepreneurial civic participation rights and benefits injuries** by defendants' predatory acts against rights and freedom including, without limitation, harassment and entrapment of plaintiff victim while participating in and benefiting from civic life and organizations, including, without limitation, trade and business organizations, to develop (i) business growth and expansion options through sales and revenue, (ii) projects, (iii) partnerships, (iv) acquisitions, (v) credit relationships, and (vi) other civic business and reputational benefits; civic participation in organizations including, without limitation, (a) religious, (b) political, (c) speech, (d) civic organizations, (d) trade and business organizations benefitting trade, business and commercial opportunities in in-state, interstate, and/or international commerce; all these injuries have been and are aggravated by the illegal BRMT bioweapon and bioweapon delivery system brain hijacking used by defendant UNITED STATES and its defendant co-conspirators to distort and to damage the emotional experience of the plaintiff victim, and to further emotionally engage the plaintiff victim while in high risk conditions and environments where their actions are more likely to result in (a) injury, (b) incarceration, or (c) death from their own involuntary acts or (d) the acts of others who wrongly interpret their acts as voluntary, including, without limitation, (e) another individual including, without limitation, a police powers officer or agent, or an individual in a weapons open-carry environment, perceiving a lethal threat to themselves from a body movement or words induced through illegal BRMT bioweapon and bioweapon delivery system brain hijacking.

912. **Additional statutory damages and remedies** as available to affected members of the class of plaintiffs, including, without limitation, those to be awarded in accordance with 18

U.S.C. §§ 981 through 987, 1514, 1514A, 1961-1968, 1595, 2333, 2441, 2520; 42 U.S.C.

Chapters 21 and 21B generally, including §§ 1981 through 2000h-6, and particularly 42 U.S.C.

§§ 1983, 1986, 2000a, 2000b-2, 2000d, 2000d-1 through 2000d-7, 2000-e2(a)(2); 42 USC §§

2000bb-2000bb-4, and all other federal, state, and local statutory program protections, relief, and

civil and criminal recoveries afforded to any or all plaintiff victims of the class so injured.

913. **Costs and damages** from loss of use, value, and appreciation of value due to all loss

and/or forced sale of any and all property and property rights in tangible and intangible property;

any and all transaction costs, fees, and expenses; accumulated appreciation; accumulated

interest; all from the date of the injury, for all injuries.

914. **Punitive damages** against defendant UNITED STATES, against all governmental

defendants including, without limitation, their agents, officers, employees, confidential

informants, in their official capacity, and as individual defendants where so identified herein

and/or through the discovery process, and any and all others acting with their knowledge or

consent, or acting with privileged access not available to the general public including, without

limitation, press, media and entertainment industry persons, for (i) color of law abuses of the

"state secret" privilege under *United States v. Reynolds,* 345 U. S. 1, 12 (1953), which privilege

defendants forfeited from the very first day of these violations and injuries; for (ii) bad faith

abuses of "qualified immunity" under *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) and related

case law cited herein, whereby defendants forfeited any legally valid claim to such defense; (iii)

under 18 U.S.C. §§ 1961-1968 and other relevant statues and treaties, for all compensable acts,

violations, and injuries including, without limitation, for the constitutional violations by

defendant UNITED STATES, its departments and agencies, and individual defendants who have

and do act outside their scope of authority in acts, violations, and injuries in grave Common

Article 3 injuries as defined at 18 U.S.C. §§ 2441(d), including 2441(d)(1)(a) Torture,

2441(d)(1)(b) Cruel or inhuman treatment, 2441(d)(1)(c) Performing biological experiments, 2441(d)(1)(d) Murder and attempted murder, 2441(d)(1)(f) Intentionally causing serious bodily injury, 2441(d)(1)(f) Sexual assault or abuse; all as committed in violation of ratified international treaties as cited at paragraph 251 herein and compensable under 18 U.S.C. §§ 1961-1968, and for (iv) other such damages and punitive damages as the Court may instruct, all in amounts to be determined by the jury at trial.

915. **Reasonable costs, expenses, and fees** including an award of reasonable attorneys' and experts' fees, and for expenses.

916. **Such other relief** as the Court deems necessary and just.

**JURY DEMAND**

917. Plaintiffs demand a jury trial on all issues so triable.

**REQUEST FOR APPOINTMENT OF COUNSEL**

918. Lead Plaintiff respectfully requests the appointment of counsel on behalf of the entire class of plaintiffs.

\*　　　　\*　　　　\*

Dated: May 1, 2024

Respectfully submitted,

Dennis Sheldon Brewer, Lead Plaintiff and Pro Se Attorney

1210 City Place

Edgewater, NJ 07020

dbrewer@dennisbrewer.us